**Filed**
**File Date: 10/8/2025 9:17 AM**
**Hillsborough Superior Court Northern District**
**E-Filed Document**

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

# EXHIBITS

## FOR

# PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM

## Filed for Plaintffs

## Dated: October 6, 2025

## [PART 2 OF 2]¹

---

¹ The Exhibits had to be broken into parts because of file size limitations that prevented the upload of one combined document via the e-filing system.

# EXHIBIT LIST/TABLE OF CONTENTS
# FOR MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY
# [PART 2]

1. Exhibit 30 – Excerpt of Transcript of Hearing with Judge Christopher Barry-Smith citing credibility of "Jussie Smollett" analogy supporting harm from alleging racial hoax defamation.
2. Exhibit 31 – Letter from Connecticut Bar Counsel via Connecticut Superior Court Judge Regarding Donais' Misconduct | Excerpt of Finding by Connecticut Judge Regarding Donais' Misconduct.
3. Exhibit 32 – Donais' Withdrawal of Connecticut Law License.
4. Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest.
5. Exhibit 34 – Full Official Transcript of the District Court Hearing with Judge Paul Moore on 1-18-17.
6. Exhibit 35 – Relevant excerpt of transcript of Karl Terrell's Testimony in 4-27-17 in preliminary injunction hearing in superior court.

# <u>Exhibit 30</u>

1

Volume:    I
Pages:     1-24
Exhibits: 0

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX COUNTY                                    SUPERIOR COURT

* * * * * * * * * * * * * * * * * * *
                                    *
ANDRE BISSASOR                      *
                                    *
v.                                  *   Docket No. 2081CV00087
                                    *
CRAIG DONAIS                        *
                                    *
* * * * * * * * * * * * * * * * * *

          HEARING

          BEFORE THE HONORABLE CHRISTOPHER K. BARRY-SMITH


APPEARANCES:

For the Plaintiff:
Pro Se

BY:  PRO SE

For the Defendants:
Pro Se

BY:  PRO SE

                         Woburn, Massachusetts
                         Courtroom via Zoom
                         November 13, 2020




                Sherri L. Breach
                Approved Court Transcriber

12

undermined the case.  It undermined the ability to settle the matter with the underlying defendants in that case.

And I should also point out that that case ended up resulting later on, after much back and forth and after much litigation, ended up in a situation where the value of the case was determined to be in the six figures.  And I can't go into detail right now about that because it does involve a settlement negotiation situation, which has been stalled and whatnot.  But the bottom line is that the case has not been resolved, and the impact and the interference by the defendant in that matter has, you know, interfered with that proceeding, that litigation, and those claims who the defendant represented at one point and then no longer represented them.

And I should be clear that when he no longer represented them, that is when the majority of the wrongful acts or the torts took place.

So the bottom line, Your Honor, is that the -- you know, I want to point out, too, Your Honor, that surrounding the issue of racial -- race-based perjury, which is what I've articulated in the pleadings, Your Honor, it's almost as if he would compare it to the well-known example of the Jussie Smollett false claim of racism and the false attack that occurred in Chicago.  That subjected Mr. Smollett to tremendous despise and contempt in the community because

13

there was the perception of a frivolous false claim of an accusation of racism.

And I use that as an example in my pleadings, Your Honor, that Mr. Donais has falsely accused me of accusing him of racial discrimination in a frivolous manner; that there would be no conceivable way in which my accusation against him that he was racially discriminating against me at the relevant time in question, there would be no way for it to be valid.  There would be no way for it to make sense. It suggests that I'm a crazed --

THE COURT:  All right.  Let me interrupt.  Let me interrupt for a second.  Let me interrupt because you're getting into the merits now, which I'm not really going to do.

MR. BISSASOR:  Oh, I'm sorry.

THE COURT:  -- And I just -- I think your example --

MR. BISSASOR:  Oh, okay.

THE COURT:  -- is a good one about false racism claims being covered widely in a particular city or, state or country that thereby hurts someone's reputation.

One of the questions on my mind here is that we don't seem to be dealing with a broad circulation of allegedly false acts.  It's an affidavit in a court proceeding and I don't have any information that it was publicized broadly. So since we're talking about reputation and emotional harm,

# Exhibit 31


**Exhibit 3**

## STATE OF CONNECTICUT
## JUDICIAL BRANCH

## COURT OPERATIONS DIVISION

**OFFICE OF CHIEF DISCIPLINARY COUNSEL**

Desi Imetovski, *Assistant Chief Disciplinary Counsel*

*100 Washington Street*
*Hartford, Connecticut 06106*
*(860) 706-5055 Fax (860) 706-5063*
*E-mail: Desi.Imetovski@jud.ct.gov*

January 15, 2016

New Hampshire Supreme Court
Attorney Discipline Office
ATTN: Janet DeVito, Esquire
4 Chenelle Drive, Suite 102
Concord, New Hampshire 03301

RE:    Referral of Attorney Craig Donais

Dear Attorney DeVito:

As per our conversation in connection with the New Hampshire attorney referenced above, please find a copy of the Memorandum of Decision as well as a transcript of the proceedings dated October 5, 2015 regarding Attorney Craig Donais. These documents are being provided for further investigation by your office of probable attorney misconduct which occurred in Connecticut. Do not hesitate to contact my office with any questions or if additional information is needed.

Thank you in advance for your attention to this matter.

Very truly yours,

Desi Imetovski

Enclosures:/as listed

cc: Hon. Sheila A. Ozalis (without enc.)

49

**Excerpt from Connecticut Superior Court Judge's ruling**

**(in *Golf Ridge Micro Cap LLC v Aftokinoto Properties Inc.*, Superior Court Judicial District Danbury, December 18, 2015 Memorandum of Decision, Case# DBD-CV-13-6011692S)**

George, advised the court, that shortly before Mr. West's affidavit was filed in this action, he and defendant's New Hampshire counsel, Attorney Craig Donais, had communicated. Attorney George represented that he told Attorney Donais that Mr. West was contemplating filing an affidavit in this action and Attorney Donais had told him "your client will be sorry if he goes to testify today." (10/5/15 Tr. pp. 9-10). Attorney George then represented that Mr. West did supply an affidavit and a few months later Mr. West was sued by the defendant Aftokinito in New Hampshire in August 2015. (10/5/15 Tr. p.10.) Attorney George also advised the court that Attorney Donais had explicitly offered to Mr. West's New Hampshire attorney at the very first hearing in the New Hampshire case in September 2015, that if "Mr. West does not go down to testify in Connecticut, we'll drop the lawsuit in Rockingham County." (10/5/15 Tr p. 11.) Attorney George was deeply concerned by the statements made by New Hampshire counsel.

The court made an inquiry as to whether New Hampshire counsel, Attorney Donais, was sitting in the courtroom observing this proceeding, and defendant's Connecticut counsel, Attorney McCabe, advised the court that he was. This court ordered Attorney Donais up to the front of the courtroom to address the court and swore him in. Attorney Donais was explicitly asked if he told counsel for Mr. West "that if he did not come to testify in this proceeding, you'd drop the lawsuit against him." The following colloquy on the record followed the court's inquiry, which the court finds important to include in this decision:

> The Court: "Yes. Did you tell the attorney for Mr. West that if he did not come to testify in this proceeding, the lawsuit in New Hampshire would be dropped against him?
>
> Mr. Donais: We were exploring options, Your Honor, with his counsel in New Hampshire about the case and under New Hampshire rule of evidence 408, it was a settlement discussion with his counsel, Your Honor.

The Court:    Well, I'm concerned here about intimidation of witnesses, so my question to you is; did you tell his counsel that if he did not come to this proceeding that you would drop the lawsuit?

Mr Donais:    I don't believe we said that specifically, Your Honor.

The Court:    What did you say generally, sir?

Mr. Donais:    We – We generally said that we really didn't have an interest in pursuing Mr. West, *but if Mr. West was going to make trouble, by being involved in this proceeding, by injecting himself in a way that he did not need to* that we were going to proceed with the case in New Hampshire.

The Court:    Okay.  And, did you say that if he did not come into this proceeding and testify that you would drop the case?

Mr. Donais:    We didn't, specifically, say we were going to drop the case." (Emphasis added. 10/5/15 Tr.  pp. 13-14.)

It is clear from Attorney Donais' statements that the lawsuit in New Hampshire was brought in an effort to prevent Mr. West from providing testimony and evidence in this litigation. Attorney Donais' comments that "we really didn't have an interest in pursuing Mr. West" defies logic if defendant Aftokinito's story is to believed that it paid Mr. West $150,400 for ten classic cars that it never received. Attorney Donais' further comment that *"if Mr. West was going to make trouble, by being involved in this proceeding, by injecting himself in a way that he did not need to, then they were going to proceed with the case in New Hampshire"* against him is troubling to this court. (10/5/15 Tr. pp. 13-14.)

On October 5 and 15, 2015, this court held hearings with evidence and testimony from defendant's principal Mr. Condodemetraky, another employee of defendant and Mr. West. Mr. West testified credibly that he never prepared nor signed the Motor Vehicle Purchase Agreements for the sale of the ten classic cars, never received any payment from the defendant for any vehicles, that he had closed down the location of his business in September 2013, and all of the

Page -8-

# <u>Exhibit 32</u>

## Connecticut Law License Retirement of Donais



### Back to Attorney Firm Look-up

Registered Juris Information For:     **CRAIG STEPHEN DONAIS**

| | | | |
|---|---|---|---|
| Juris Number: | 414541 | Office Address: | WADLEIGH, STARR & PETERS, PLLC |
| Current Status: | Retirement | | 95 MARKET ST |
| Juris Type: | A | | |
| Admission Date: | 11/7/1997 | | MANCHESTER, NH 03101 |
| | | | (603) 669-4140 |

### Court History

| Action | Start Date | Reinstated Date | Action Comments |
|---|---|---|---|
| Retirement | 1/5/2017 | | |

# Exhibit 33

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 06-CV-5189 (JFB) (WDW)
_____

MICHAEL FIERRO AND CHRISTINE FIERRO,

Plaintiffs,

VERSUS

THOMAS GALLUCCI AND FLORENCE GALLUCCI,

AND

VILLA POINTE LLC, JAMES NICOTRA AND ANN MARIE NICOTRA
Defendants.

_____

MEMORANDUM AND ORDER
December 4, 2007
_____

JOSEPH F. BIANCO, District Judge:

Plaintiffs Michael and Christine Fierro brought this action against Thomas and Florence Gallucci, Villa Pointe LLC, and James and Ann Marie Nicotra, claiming that defendants committed fraud by making false and misleading statements to the plaintiffs in order to induce plaintiffs to enter into a contract of sale for their home. Plaintiffs contend that the subsequent demolition of the home and development of the property constitute, among other things, fraud, fraudulent inducement, and breach of contract. Plaintiffs now move to disqualify defendants' counsel – namely, the law firm of Dollinger, Gonski, and Grossman (hereinafter, "the Dollinger Firm" or the "Firm") – because, according to Michael Fierro, he consulted with a member of the Dollinger Firm almost two years prior to bringing this lawsuit about the subject matter of this lawsuit. As set forth below, the motion to disqualify is granted.

I. BACKGROUND

A. The Amended Complaint

This case involves the plaintiffs sale of their residence at 327 Lakeview Avenue in Rockville Centre, New York (hereinafter, the "Residence"), to Thomas and Florence Gallucci (hereinafter, the "Gallucci Defendants").

According to the amended complaint, plaintiffs were introduced to the Gallucci Defendants by James and Ann-Marie Nicotra (hereinafter, the "Nicotra Defendants"), who reside immediately adjacent to the Residence. (Amended Compl. ¶ 8.) The amended complaint alleges that the Gallucci Defendants, the Nicotra Defendants, and an LLC created by the Galucci Defendants – namely, Villa Pointe LLC – "were partners in a scheme to con the Plaintiffs into selling the Galucci Defendants their Home, and to then tear it down and develop the property with new homes." (*Id.* ¶ 9.) Specifically, it is alleged that the Gallucci Defendants fraudulently concealed their intention to tear down the home and develop the property. (*Id.* ¶ 11.) Less than one week prior to the consummation of the contract of sale in August 2004, the Gallucci Defendants allegedly informed plaintiffs that they wished to have the right to purchase the home under the contract of sale transferred to the Villa Pointe LLC. (*Id.* ¶ 19.) According to the complaint, prior to the agreement to this assignment of rights to the LLC, plaintiffs asked the Gallucci Defendants whether they intended to tear down the Residence and the Gallucci Defendants denied any current intention to tear down the home. (*Id.* ¶¶ 23-24.) The complaint further alleges that, within one month after the closing on the Residence, the Gallucci Defendants had arranged for the property to be re-zoned for two homes and, shortly thereafter, had the Residence destroyed. (*Id.* ¶¶ 28-29.) Plaintiffs allege that, pursuant to a partnership with the Nicotra Defendants, the Gallucci Defendants (through the Villa Pointe LLC) built two new residences in place of the Residence which sold for approximately $1,300,000 each. (*Id.* ¶¶ 30-31.)

Plaintiffs allege, among other things, that the Gallucci Defendants and Nicotra Defendants made false and misleading statements prior to the signing of the contract of sale in order to fraudulently induce them to enter into the contract of sale for the purchase of the Residence. (*Id.* ¶¶ 35,45.) Plaintiffs contend that "had the [Plaintiffs] known about Defendants' plan to tear down their Home, and had it not been for Defendants' false and misleading statements to Plaintiffs, Plaintiffs would have never sold the Home to Gallucci Defendants, nor would they have agreed to the assignment for the contract of sale to the LLC or the waiver of the rights under the contract of sale." (*Id.* ¶ 32.)

B. Facts Regarding Disqualification Motion

According to plaintiffs, in late November/ early December of 2004, plaintiffs became aware of defendants' intentions and actions to demolish plaintiffs' former residence and develop the property. According to Michael Fierro, he then consulted with Matthew Dollinger, Esq., of the Dollinger Firm on at least two, and possibly three, occasions. (Michael Fierro Affidavit ¶ 3.) Mr. Fierro stated in his affidavit that these conversations related to potential claims pertaining to the subject matter of this action:

The subject of my conversation with Mr. Dollinger related to potential claims for fraud against the defendants in the above-referenced lawsuit, relating to the sale of our former home. During the conversations, Mr. Dollinger and I discussed the underlying facts of the case, potential claims against the defendants, potential defenses available to the defendants, dollar amounts at risk, and

2

relevant case law and other legal theories applicable to the facts in issue.

(*Id.* ¶¶ 4-5.) Mr. Fierro further contends that a fax was sent to him relating to the relevant case law pertaining to plaintiffs' claim. (*Id.* ¶ 6.) Finally, Mr. Fierro states the following: (1) "I have not consented to the Dollinger firm's representation of the defendants in this action" (*Id.* ¶ 7); and (2) "I have not consented to the disclosure of any of the contents of my conversations with any employee of the Dollinger firm nor of any confidential information concerning this case in the Dollinger firm's possession, nor have I waived the attorney-client privilege covering my conversations with the Dollinger firm and its employees" (*Id.* ¶ 8). Plaintiffs decided not to retain Mr. Dollinger and his Firm to represent them in this matter and filed this lawsuit *pro se* on September 25, 2006.

Mr. Dollinger stated in an affirmation to the Court that he has "absolutely no recollection of ever having been contacted by Michael Fierro, or anyone on behalf of the plaintiffs." (Dollinger Affirmation ¶ 5.) Mr. Dollinger further stated that he does "not recall ever speaking with Bernadette Arnold, Esq., who apparently was Mr. Fierro's real-estate attorney in connection with the transaction underlying the plaintiff's lawsuit." (*Id.*) However, at the Court's request, Mr. Dollinger searched the Firm's records to determine whether there is any documentation reflecting contact with Mr. Fierro.[1]

___

[1] The Court notes that both Mr. Dollinger and the Dollinger Firm have acted in good faith at all times in this litigation in attempting to provide to the Court any information or documentation in their possession that may be relevant to plaintiffs'

A search of the Firm's records revealed a record of a phone message from Mr. Fierro taken by Mr. Dollinger's Office Administrator on December 10, 2004, which suggests that Mr. Dollinger spoke with Bernadette Arnold on December 9, 2004, and that the Dollinger Firm had sent a fax to Mr. Fierro. (*Id.* ¶ 10; *see also* Attachment to Aug. 14, 2007 Letter to the Court.) A further search of telephone company records by the Firm reflects that two telephone calls were placed from the Firm to plaintiffs' telephone number in Atlanta, Georgia, one lasting 36 seconds, and another lasting ten minutes, twelve seconds. (Dollinger Affirmation ¶ 13.) Based upon these records, Mr. Dollinger concluded the following in his Affirmation: "I assume from these records that I called Michael Fierro and spoke with him for about ten minutes. But again, I have no recollection of ever having spoken to him. I kept no record of any conversation between myself, and Michael Fierro." (*Id.*) Mr. Dollinger emphasized, "I have not worked on, nor have I had any connection with this case except my appearance before Judge Bianco on August 7, 2007 to address the conflict-of-interest issue."

___

motion for disqualification. Although Mr. Fierro claims that Mr. Dollinger has unnecessarily disclosed confidential communications to the Court, the Court finds the allegation to be without merit. Instead, Mr. Dollinger has been diligently acting as an officer of the Court in conducting a thorough search of the Firm's records and providing documentation to the Court that, in fact, helps Mr. Fierro's position by corroborating his contact with the Firm, which Mr. Dollinger does not independently recall. Although the phone record provides a very brief summary of the substance of Mr. Fierro's phone message, such disclosure to the Court in connection with the disqualification motion has not in any way prejudiced Mr. Fierro.

(*Id.* ¶ 17.)    Instead, his partners, with the assistance of some associates, have performed all the legal work in this matter.  (*Id.* ¶ 16.) Finally, Mr. Dollinger stated that the Firm did not make any record indicating either plaintiff as a potential client, did not open up a file as a result of the telephone contact, and never issued a bill in connection with any communications between Mr. Fierro and the Firm.  (*Id.* ¶ 18.)

C. Procedural History

Plaintiffs acting *pro se* brought this action by a Summons and Complaint on September 25, 2006.  Dollinger, Gonski, & Grossman was retained, through partner Floyd G. Grossman, Esq., to represent the defendants in this action. (Dollinger Affirmation ¶ 14.)  On January 31, 2007, plaintiffs filed an amended complaint.  On April 17, 2007, defendants moved to dismiss the complaint. In a letter filed July 17, 2007, Mr. Fierro notified the Court that he recently remembered that he had contacted Mr. Dollinger two years prior to bringing this lawsuit about the subject matter of this lawsuit.  On September 17, 2007, plaintiffs moved to disqualify defense counsel.

II. DISCUSSION

A. Standard for Disqualification of Counsel

Disqualification is viewed "with disfavor in this circuit," *In re Bohack Corp.*, 607 F.2d 258, 263 (2d Cir. 1979), because it "impinges on parties' rights to employ the attorney of their choice." *U.S. Football League v. Nat'l Football League*, 605 F.Supp. 1448, 1452 (S.D.N.Y. 1985) (citation omitted).    In particular, the Second Circuit has noted the "high standard of proof" required for disqualification motions because, among other

things, they are "often interposed for tactical reasons, and that even when made in the best of faith, such motions inevitably cause delay." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); *accord Gov't India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

Nevertheless, the disqualification of counsel "is a matter committed to the sound discretion of the district court." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990).  A federal court's power to disqualify an attorney derives from its "inherent power to 'preserve the integrity of the adversary process,'" *Hempstead Video, Inc. v. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)), and "is only appropriate where allowing the representation to continue would pose a significant risk of trial taint." *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) (internal quotation marks omitted).  In exercising this power, courts look for "general guidance" to the American Bar Association ("ABA") and state disciplinary rules, although the Second Circuit has emphasized that "not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc.*, 409 F.3d at 132.[2]  However, "any doubt is to be resolved in favor of disqualification."

---

[2]  The Court also notes that Civil Rule 1.5(b)(5) of the Local Rules of the U.S. District Courts for the Southern and Eastern Districts of New York binds attorneys appearing before those courts to the New York State Lawyer's Code of Professional Responsibility.  Local Civ. R. 1.5(b)(5); *see, e.g., United States v. Hammad*, 846 F.2d 854, 857-58 (2d Cir.1988); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y.1990) ("[I]n this Court federal law incorporates by reference the Code of Professional Responsibility.").

4

*See Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975); *see also Nichols v. Vill. Voice,* 99 Misc.2d 822, 826, 417 N.Y.S.2d 415 (N.Y. 1979).

B. Grounds for Disqualification

Plaintiffs argue that the Dollinger Firm should be disqualified because, almost two years before bringing this action, plaintiff Michael Fierro had preliminary discussions with the Firm regarding his claims and potential representation in this matter. Specifically, plaintiffs contend that the Firm's continued representation of the defendants would violate New York Code of Professional Responsibility, Disciplinary Rule 4-101(B) and Disciplinary Rule 5-108.

Defendants argue that the motion to disqualify the Dollinger Firm should be denied because of the following: (1) there was never an attorney-client relationship established between the Mr. Dollinger or the Firm and Mr. Fierro; (2) there was no indication that there were any "secrets" or "confidences" discussed during the conversations between Mr. Dollinger and Mr. Fierro; and (3) even if such secrets or confidences were discussed, Mr. Dollinger has no recollection of any such conversations. Thus, defendants contend that there is no conflict of interest in continuing to represent the defendants in this lawsuit.

As set forth below, the Court concludes that plaintiffs have made a sufficient showing to warrant disqualification of the Dollinger Firm. Fierro's statement in his affidavit – that he consulted with Mr. Dollinger in late 2004 regarding the subject matter of this case, including potential claims, potential defenses, and relevant case law – is corroborated by a phone message and phone records maintained by the Firm. Thus, this preliminary discussion regarding the subject matter of this litigation fell within the umbrella of an attorney-client relationship and was privileged. This prior consultation with Mr. Fierro regarding the exact subject matter of this litigation is sufficient to warrant disqualification. Although Mr. Dollinger does not recall any client confidences revealed to him during the conversation, his failure to recall such conversations does not vitiate the otherwise clear basis for disqualification.

a. Code of Professional Responsibility Disciplinary Rules 4-101(B) and 5-108(A)

The two key provisions of the New York Code of Professional Responsibility implicated by this motion are DR 4-101(B) and DR 5-108(A). Disciplinary Rule 4-101(B) provides, in relevant part, that "a lawyer shall not knowingly: (1) Reveal a confidence or secret of a client; [or] (2) Use a confidence or secret of a client to the disadvantage of that client." (McKinney Supp. 1991).

The Disciplinary Rules define a "confidence" as "information protected by the attorney-client privilege under applicable law" and a "secret" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." DR 4-101(A) (McKinney Supp. 1991). Although DR 4-101(A) generally only applies where an attorney-client relationship is present, courts have held that an "analagous fiduciary obligation may be implied in the absence of a attorney-client relationship." *Liu v. Real Estate Inv. Group, Inc.*, 771 F. Supp. 83

5

(S.D.N.Y. 1991) (internal citations omitted). As the court in *Liu* noted:

> It is clear that where an attorney receives confidential information from a person, who under the circumstances has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidences irrespective of the absence of a formal attorney client relationship.

*Id.* at 86 (quoting *Nichols,* 99 Misc.2d 822, 417 N.Y.S.2d at 418); *see also Rosman v. Shapiro,* 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987); *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.,* 578 F. Supp. 1280, 1283 (D. Conn. 1984).

Disciplinary Rule 5-108 analyzes the duties owed by an attorney to a former client. Specifically, Disciplinary Rule 5-108 provides that "[a] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . .[t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client . . . ." DR 5-108 (McKinney Supp. 1991). Further, an individual lawyer's conflicts are ordinarily imputed to his firm based on the presumption that "associated attorneys share client confidences." *Hempstead Video, Inc.,* 409 F.3d at 133 (internal citations omitted); *see also* 22 N.Y.C.R.R. § 1200.27(b); *Kasis v. Teacher's Ins. and Annuity Ass'n,* 93 N.Y.2d 611, 616, 695 N.Y.S.2d 515, 717 N.E.2d 674 (N.Y.1999) ("[W]here an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are likewise precluded from such representation."). The Second Circuit has held that an attorney may be disqualified under Disciplinary Rule 5-108 if:

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video*, 409 F.3d at 133. As set forth below, under this standard, the Court finds in its discretion that disqualification is warranted because (1) plaintiffs have established that an attorney-client relationship existed as to Mr. Fierro's preliminary discussions, (2) the matters are not just "substantially related" to this litigation, but are indeed identical, and (3) it is likely that confidential and privileged information relevant to this lawsuit was shared with Mr. Dollinger during these conversations.

The first prong of this test requires an attorney-client relationship between the movant and the law firm sought to be disqualified. Although defendants point to the several factors in arguing there was no attorney client relationship – including the fact that the preliminary conversations were brief, the Dollinger Firm never opened a file related to Mr. Fierro, and the Dollinger Firm never charged any legal fees for the initial consultation – none of those factors, individually or collectively, is necessarily

6

dispositive in analyzing whether there was an attorney-client relationship. *See, e.g., United States v. Devery,* No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship."); *Green v. Montgomery County,* 784 F. Supp. 841, 844 (M.D. Ala. 1992) ("The mere existence of an express contract of employment, or the payment of legal fees, or the length of consultation is not determinative of whether a preliminary consultation has matured into an attorney-client relationship.").

"[C]ourts have not employed a single, well-defined test for determining whether an attorney client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship are necessary.   Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *First Hawaiian Bank v. Russell & Volkening, Inc.,* 861 F. Supp. 233, 238 (S.D.N.Y. 1994); *accord Bennet Silvershein Assocs. v. Furman,* 776 F. Supp. 800, 803 (S.D.N.Y. 1981) (quoting *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.,* 578 F. Supp. at 1283); *Keoseian v. Von Kaulbach,* 707 F. Supp. 150, 152 (S.D.N.Y. 1989) (same).  As the Second Circuit has stated, "[t]he key, of course, to whether an attorney/ client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." *United States v. Dennis,* 843 F.2d 652, 657 (2d Cir. 1998).

Further, whether or not employment

occurs, preliminary discussions between an attorney and a prospective client are subject to the attorney client privilege.  *See Dennis,* 843 F.2d at 657 ("To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."); *see also Green,* 784 F. Supp. at 845 ("[T]he fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result.") (quotations and citations omitted); *Liu,* 771 F.Supp. at 86 ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."); McCormick on Evidence 6th Ed. § 88 (West Publishing Co., 2006) ( "[C]ommunications in the course of [a] preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted.").

In this instance, it is clear from Mr. Fierro's affidavit – and the corroboration contained in the phone message – that Mr. Fierro engaged Mr. Dollinger in preliminary discussions related to a legal analysis of the potential  claims that could be brought in connection with the alleged fraudulent conduct by defendants during the purchase of plaintiff's Residence.  Although Mr. Fierro decided not to retain Mr. Dollinger, any communication made during this preliminary consultation is protected by the duty of confidentiality and protected by the attorney-client privilege.   Thus, this preliminary conversation is sufficient to establish the existence of an attorney-client relationship, even though the Dollinger Firm was not ultimately retained.

7

The next prong of the test requires that there be a "substantial relationship" between the issue in the pending case and those in the prior representation. "The substantial relationship test does not depend on the amount of work performed or the duration of the representation, but on the similarity of the issues in the former and current represetantions." *Arifi v. De Transport Du Cocher, Inc.,* 290 F. Supp. 2d 344, 349 (E.D.N.Y. 2003). In this case, the issues are identical. Therefore, the substantial relationship element is met.

The final requirement under the test articulated in *Hempstead Video* is that "the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client." *Hempstead Video*, 409 F.3d at 133. In finding that there was a substantial relationship between Mr. Fierro's preliminary consultation and the current litigation, a rebuttable presumption is created that Mr. Fierro imparted to Mr. Dollinger confidential information relevant to the present litigation. *See Arifi*, 290 F. Supp. 2d at 350. A party moving to disqualify opposing counsel "is not required to prove that [opposing counsel] had access to confidential information while representing the [moving party] but only that he was *likely* to have had such access." *Id.*

As noted *supra*, Mr. Ferro's statement in his affidavit that "confidences" and "secrets" were shared with Mr. Dollinger is corroborated by the Firm's records. Specifically, there are telephone records indicating that there were at least two telephone calls on December 14, 2004 between Mr. Dollinger and Mr. Fierro, one of which lasted over ten minutes. Additionally,

a message left with Mr. Dollinger's assistant on that date establishes that Mr. Fierro called Mr. Dollinger, Mr. Dollinger spoke with Ms. Arnold (Mr. Fierro's real estate attorney), that a fax from Mr. Dollinger was transmitted and reviewed by Mr. Fierro, and that Mr. Fierro wanted to proceed with his claim. The message provides suffcent circumstantial evidence to conclude that it is likely that some "confidences" or "secrets" were revealed to Mr. Dollinger in order for him to evaluate the case.

Although Mr. Dollinger states that he has no recollection of any conversation with Mr. Fierro or Ms. Arnold, his failure to recall the conversation does not change the analysis. For example, in *Arifi,* the court held that the former attorney's assertion, that he could not remember any confidential information conveyed to him during the short representation of one of the defendants, did not cure the professional responsibility conflicts which were present. *Arifi,* 290 F. Supp. 2d at 350 ("While there is no reason to doubt Green's claim that he does not remember any confidential information, the Court nevertheless finds that he was likely to have had *access* to such information during the short representation."); *see also Schwed v. Gen. Elec. Co.,* 990 F. Supp. 113, 117 n.2 (N.D.N.Y. 1998) (holding in a case where attorney claimed he did not possess confidential information and did not recall any discussions regarding the case, that the third prong of the Second Circuit test was nevertheless met because there was a likelihood that attorney had access to confidential information.) This Court agress with the analysis in those cases and finds that Mr. Dollinger's lack of recollection does not negate the fact that Mr. Dollinger likely had access to "confidences" or "secrets" during

8

Mr. Fierro's preliminary discussions and, thus, the third prong has been met.

In sum, the Court finds that all of the requirements of the *Hempstead Video* test have been met and that disqualification is warranted.[3]  In reaching this decision, the Court recognizes that the defendants have already moved to dismiss the lawsuit because they argue that it must fail as a matter of law.

---

[3]    Plaintiffs further contend that the Firm's representation of defendants in this matter would violate Canon 9 of the Code of Professional Responsibility.  Canon 9 of the Code states that "[a] lawyer should avoid even the appearance of professional impropriety."  This requirement "reflects the bar's concern that some conduct which is in fact ethical may appear to the layman as unethical and thereby erode public confidence in the judicial system and the legal profession." *Liu*, 771 F. Supp. at 87 (S.D.N.Y. 1991).  A motion to disqualify under Canon 9 should only be granted under circumstances in which the facts present a real risk that the trial will be tainted. *See Nyquist*, 590 F.2d at 1246; *accord United States Football League,* 605 F. Supp. at 1452.  Although the Court has already concluded that disqualification is warranted under the *Hempstead Video* test, the Court also finds that disqualification is warranted under Canon 9.  In the present case, defendants' counsel was consulted by the plaintiffs, but then  was retained by the defendants. Such facts raise the specter that this litigation could be tainted. *See Liu,* 771 F. Supp. at 87 ("Although this is not strictly a successive representation problem because R & D simultaneously consulted with plaintiffs and [defendant] simultaneously, the second situation is not implicated here. R & D's initial involvement with parties having adverse postures in this litigation raises significant risks that the trial will be tainted or will appear to be tainted to the laymen.").  For the reasons stated above, the risk of the litigation being tainted, or appearing to be tainted, is real.

Defendants argue that the motion to disqualify should be held in abeyance until after the defendants' motion to dismiss is decided.[4]  However, the Court believes such an approach under the circumstances presented here is ill-advised. Although that motion to dismiss is fully briefed, the Court is going to hear oral argument on that motion and believes that this disqualification issue should be resolved prior to having oral argument and addressing the motion to dismiss.[5]  As the court stated in *Mitchell v. Metropolitan Life Insurance Co., Inc.,*

> Client confidences are not so inert as to limit their usefulness to defined legal disciplines or practice areas. They are fungible, and once disclosed can be applied by an experienced lawyer in ways too numerous to anticipate at this stage of the proceeding. As the Second Circuit observed, "[t]he dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical

---

[4]    As a threshold matter, the Court notes that this argument is inconsistent with the position taken by counsel for the defendants at the August 7, 2007 pre-motion conference at which both sides agreed that the Court should decide the disqualification issue before addressing the motion to dismiss. In any event, as set forth *infra*, the Court declines to follow the approach suggested by the defendants

[5]    The Court also notes that, even assuming *arguendo* defendants are successful in their motion, the Court would generally provide plaintiffs with an opportunity to replead to attempt to cure any pleading defects, which could then lead to another round of motion practice.

propriety of a lawyer's representation in a given case."

No. 01 CIV. 2112 (WHP)*,* 2002 WL 441194, at *8 (S.D.N.Y. Mar. 21, 2002) (quoting *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973). Given the circumstances, and the fact that Mr. Dollinger's conflict is imputed to the Firm, the Court will not allow the Dollinger Firm to continue the representation even for purposes of a motion to dismiss.

C. Undue Delay

Defendants also contend that plaintiffs' delay in bringing this motion is evidence that they are using disqualification as litigation tactic and, therefore, disqualification should be barred. Defense counsel cites to *Abel v. Morabito,* No. 04 Civ. 7284 (SCR)(MDF), 2005 WL 2452906, at *1 (S.D.N.Y. Oct. 3, 2005) for the proposition that a negative inference should be drawn from delay. In *Abel*, the court had set a discovery schedule five months prior to when the motion for disqualification was filed. *Id.* At the time of the motion for disqualification, various discovery disputes were ruled on and a deposition schedule was about to be set. *Id.* However, the court in *Abel* specifically stated "[d]elay in bringing an application to disqualify counsel, whether tactical or inadvertent, cannot defeat the motion because the basis for disqualification, if it exists, would be a breach of the Code of Professional Responsibility, a matter which implicates the public interest." *Id.* at *1 (internal citations omitted). Thus, undue delay was not a factor in the court's analysis and decision to deny the motion.

In the instant case, the Court does not believe there is any basis to conclude that

plaintiffs intentionally delayed bringing this motion. First, the Court has no reason to doubt Mr. Fierro's representation that he did not immediately realize that the Dollinger Firm is the same firm that he had engaged in these preliminary discussions several years ago. Moreover, Mr. Fierro has gained no tactical advantage by not raising this issue as soon as the Dollinger Firm appeared in the action. The case was filed in September 2006, discovery has not begun, and defendants have suffered no material prejudice from any alleged delay. *See, e.g., Talvy v. Am. Red Cross in Greater N.Y.,* 205 A.D.2d 143, 618 N.Y.S.2d 25 (1st Dept. 1994) (disqualification motion made three years had elapsed), *aff'd, 87* N.Y.2d 826, 661 N.E.2d 159, 637 N.Y.S.2d 687; *Potters v. 71st Street Lexington Corp.*, 8 A.D.3d 198, 779 N.Y.S.2d 473 (1st Dept. 2004) (disqualification motion made on eve of trial). Thus, the Court does not conclude there was undue delay or prejudice to the defendants from the timing of the motion. Moreover, although defendents will need to retain new counsel, that counsel will not necessarily need to duplicate the work product of the Dollinger Firm. Specifically, new counsel could adopt the motion papers already filed by the Dollinger Firm or, if necessary, the Court will allow supplemental briefing before oral argument.

10

III. CONCLUSION

For the foregoing reasons, plaintiffs' motion to disqualify Dollinger, Gonski and Grossman is GRANTED. Defendants will have 30 days to obtain new counsel and have that counsel file a notice of appearance in this action. Following the filing of a notice of appearance, the Court will schedule a telephone conference to discuss how it intends to proceed with respect to the motion to dismiss.

SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 4, 2007
Central Islip, New York



* * *

The attorneys for plaintiffs pro-se are Michael & Christine Fierro, 5148 Vinings Estates Way, Mableton, GA 30126. The attorneys for defendants are Floyd G. Grossman and Michael J. Spithogiannis of Dollinger, Gonski & Grossman, One Old Country Road, Suite 102, Carle Place, NY 11514.

# Exhibit 34

1

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - DISTRICT DIVISION - NASHUA

| | | |
|---|---|---|
| NATALIE ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | District Division Case No. |
| | ) | 459-2017-LT-00010 |
| vs. | ) | |
| | ) | Nashua, New Hampshire |
| ADAM ROBITAILLE, | ) | January 18, 2017 |
| | ) | 1:19 p.m. |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

FINAL HEARING
BEFORE THE HONORABLE PAUL MOORE
JUDGE OF THE CIRCUIT COURT - DISTRICT DIVISION

**AMENDED AMENDED**

APPEARANCES:

For the Plaintiff:        Elliott Berry, Esq.
                          NEW HAMPSHIRE LEGAL ASSISTANCE
                          1850 Elm Street, Suite 7
                          Manchester, NH 03104

For the Defendant:        Craig Donais, Esq.
                          DONAIS LAW OFFICES, PLLC
                          444 Willow Street
                          Manchester, NH 03103

Also Present:             Karl Terrell, Esq.

Audio Operator:           Electronically Recorded
                          **Not Monitored**

TRANSCRIPTION COMPANY:    AVTranz, an eScribers Company
                          7227 N. 16th Street, Suite 207
                          Phoenix, AZ 85020
                          (800) 257-0885
                          www.avtranz.com

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.



(Proceedings commence at 1:19 p.m.)

(Indiscernibles due to majority of hearing spent at sidebar and lots of shuffling of papers)

THE CLERK:  Natalie Anderson versus Adam Robitaille.

THE COURT:  Good morning.  I have docket number 2017-LT-10.

MR. TERRELL:  Here for Robitaille and Nashua the Homewood Suites.  Mr. Berry, is he in the hall?

MR. DONAIS:  He's coming in.  I just went and grabbed him.

THE COURT:  Okay, counsel, if I could have counsel for the record just identify yourself please.

MR. DONAIS:  Sure, I'm Craig Donais, Your Honor, here as local counsel for Attorney Terrell who filed a motion that's granted by the Court pro hac vice.

THE COURT:  All right.  Thank you.

MR. TERRELL:  Karl Terrell, admitted pro hac vice, Your Honor.

THE COURT:  Thank you, counsel.

MR. BERRY:  Elliott Berry, New Hampshire Legal Assistance for the Plaintiff.

THE COURT:  Thank you, counsel.  Ma'am, you are?

MS. ANDERSON:  Natalie Anderson, Plaintiff.

THE COURT:  Thank you, ma'am.

MR. BISASOR:  Andre Bisasor.  I'm --



MR. BERRY:  Plaintiff's husband.

THE COURT:  Oh, okay, that's fine.  Thank you, sir.

MR. ROBITAILLE:  Adam Robitaille, Defendant.

THE COURT:  Thank you, sir.

MR. AKRIDGE:  David Akridge.

THE COURT:  Great.  Thank you, sir.  Okay.  Now, I had an opportunity to review the parties' case file and we're here for a final hearing.  Now, have the parties had an opportunity to discuss this matter?

MR. TERRELL:  We have, Your Honor.

THE COURT:  Any movement?

MR. TERRELL:  We proposed two forms of settlement but Mr. Berry informed me a few minutes ago that there's no go.

THE COURT:  Well, that's fine.  I just wanted to know whether or not you've had an opportunity because if you didn't have an opportunity and you needed some time, I'd give you that time today, that's all.

MR. TERRELL:  Thanks, Judge.

THE COURT:  All right.

MR. BERRY:  Your Honor, as a preliminary matter --

THE COURT:  Yes.

MR. BERRY:  -- if you looked at the file, then you know there was a pleading yesterday, a motion to dismiss on exhibits of over 60 pages dated yesterday which my client got yesterday, which I only got yesterday.



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

THE COURT:  I have that today.

MR. BERRY:  And that's one reason we would move that the case be continued at least for a reasonably short time to respond to a pleading like that.

THE COURT:  Right.

MR. BERRY:  There is a second reason but I would prefer that we at least be able to attest that we'd be able to approach the bench to talk about a more sensitive matter.

THE COURT:  Certainly.  Why don't you approach, counsel.

(Sidebar begins at 1:22 p.m.)

THE COURT:  There are two issues here.  Counsel, there are two issues here.  The first of which is going to be if you look at the circuit court rules, he had filed -- if you look in that introducing responsive pleadings.  Normally, you would do it at least ten days prior.

MR. DONAIS:  Didn't even have ten days notice prior to this hearing today.

THE COURT:  How many days notice did you get?

MR. DONAIS:  The suit I think was the 9th probably.

MR. TERRELL:  Tuesday.  The 9th, it was filed on the 9th and I think we received it on the 9th.

THE COURT:  Okay.  The point being is that in a perfect world, you've got -- you would have received notice greater than ten days and given the opportunity to submit it



and at least ten days prior give the other party an opportunity to review and make an informative decision as to how they ought to address that.

Chances are -- this is a 540 so the reason that you received notice so quickly, you know, the 540-A, we're required to schedule these within a set period of time.  That's why.

MR. DONAIS:  Sure.

THE COURT:  So that's a separate issue.  We'll deal with your request in a second, counsel.

MR. BERRY:  Sure.

THE COURT:  Now, I don't think you drafted these initial pleadings.

MR. BERRY:  I did not.

THE COURT:  In going through the initial pleadings, the majority of what's in here has nothing to do with the 540 or 540-A.  It's a contract issue.  I mean --

MR. BERRY:  No, I get that.  And look at the end of the day, it's really about the nature of this facility, right, if it's a more like a tenancy than a guest arrangement, then they have to give and to go through the eviction process.  If it's not, they don't.

But what seems like a simple question doesn't have a simple answer.  And I know that's why in part Defendants would like to have a big chunk of time to make their case, which they're more than entitled to.  But I think we need a little



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

more time to rebut that.

MR. TERRELL:  The issue though is very narrow.  It's rather well, do they have the rights of tenancy or are they a hotel guest which we have addressed in our pleading.

THE COURT:  Right.  And these matters normally, unless you file a specific request for additional time, you're allotted 30 minutes.

MR. TERRELL:  Thirty minutes.

THE COURT:  Right.  And that's both parties.

MR. TERRELL:  Uh-huh.

THE COURT:  So that's something -- I don't know if it's something I'll be able to do.  Now, when I finish our landlord-tenant list today, we're backed up in court and I -- so I'll be setting more probable cause hearings, we can do this afternoon and then I also have a daily supposed to be coming in.  The reason I mention that is I don't -- normally I just had landlord-tenant today.  We had nothing else coming over. I'd say it's not a big deal, I'll put you on last and I can give you the rest of the afternoon so I can give you an hour, hour and a half.  I don't have that today.  All right.

So the problem is if you're looking at anything more than 30 minutes, I don't have that time.

MR. TERRELL:  How about tomorrow, Your Honor?

THE COURT:  You know what the schedule is?

MR. TERRELL:  I flew up here from Atlanta.  I'm happy



to stay over tomorrow.

THE COURT:  Certainly.

MR. TERRELL:  Would prefer not to go beyond that if possible.

THE COURT:  No, I understand.  So counsel, while the clerk's looking at it, so why is this a tenancy matter?

MR. BERRY:  Your Honor, first and foremost, but not exclusively, because they have been there for as now almost 14 months.  They have a discrete room that looks and feels like an apartment.  They made they feel the commitment to be there that long and believe that, you know, there was a reciprocal commitment.

So I think our case law, there's a very important case called Evans versus J Four Realty and Evans clearly recognizes that even within the 540-A -- the 540 exceptions to tenancy which includes hotels, motels, and tourist homes and others for recreational and vacation uses, that even within a facility like that, you can't have a tenancy based on the particular circumstances of that case.  So --

THE COURT:  Okay.  The reason I was asking is I was going through -- granted, we took this granted -- this came in, I haven't had a chance to go through as yet.

MR. TERRELL:  I'm not surprised.

MR. DONAIS:  I know it's a --

THE COURT:  So but going through what was filed



originally, I can see what the tenants are trying to do in the sense that they were utilizing the statute and basically like you said, you know, walks like a duck and quacks like a duck and talks like one, it's a duck.  And that's not very eloquent, but --

MR. TERRELL:  I've used it myself.

THE COURT:  And that's why it's really a tenancy, but I'm not convinced.  Now granted, I haven't taken a look at the rest of the paperwork and but when I say that, please don't misunderstand.  I'm not predisposed.

MR. BERRY:  I understand.

THE COURT:  What I'm saying is based upon the pleadings filed.  Now, I am assuming that if you filed these pleadings, I wouldn't be having that issue, right, because the promises are what -- you have to see the forest through the trees.  There's a ton of issues here that really --

MR. BERRY:  And I've made very clear to my client that the other issues will not be dependent on this Court.

THE COURT:  Right.

MR. BERRY:  I wonder if we could do it this way.

THE COURT:  Okay.

MR. BERRY:  As you say, normally you get ten days to respond.  I don't want to have to make opposing counsel come back here.  What if he gave me ten days to just file a response and then you decide it on the pleadings and the memos?



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

THE COURT:  I can certainly do that.  There wouldn't be anything in a 20 to 30 minute presentation that's not covered by the pleadings.

MR. BERRY:  You know and to the extent they're factual disputes if -- we could certainly do that by affidavit which I imagine you'd be willing to --

MR. TERRELL:  I'd like to consult with my local counsel on that suggestion.

THE COURT:  Yeah, certainly.  Go ahead and take a minute.  All right.  I'm happy to give you as much time as I can today.  My problem being is that if I give you 30 minutes, I still have to review these documents and in fairness to counsel, I'd rather give him time to, you know, to really go through this and --

MR. TERRELL:  Is tomorrow a possibility?

THE COURT:  Madam Clerk?

THE CLERK:  Tomorrow you have a block.  And on Friday, it's an administrative day.

THE COURT:  Yes.

THE CLERK:  We have nothing in the afternoon on Friday.

MR. BERRY:  Can I raise just one other issue?

THE COURT:  Sure.

MR. BERRY:  I mean I don't want to, but I feel like I have to.  And I mentioned this to Attorney Donais yesterday.



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

And I wanted to make clear before I say anything and I'm not making any accusations, but I think what I'm about to tell you and what I can show you raises concern and question.  Okay.  And that is my client had a conference with a third attorney who and do you mind, I have the email that exchanged a lot.  The third attorney called Attorney Donais and obviously discussed the case with him.  After which Attorney Donais, all I can tell you right now is that there was a ten-minute, almost 11-minute conversation between Attorney Donais --

MR. DONAIS:  Yeah, the --

MR. BERRY:  And well, I have a record.

MR. DONAIS:  I have mine, too.

MR. BERRY:  And so obviously there was a discussion.  And I -- again, I really want to be clear.  I'm not making any accusation, but I do feel like that ethical responsibilities are such that I do need a chance to look into a little bit more about that issue because obviously there is a potential here and Rule 1.18 of the Code of Professional Ethics is really clear about prospective -- communications between prospective clients and attorneys.  And so, you know, basically the duties are pretty similar.

THE COURT:  So who had a conversation with --

MR. DONAIS:  So here's what happened, Your Honor, is on Thursday, January 5th, at 5:37, Rob O'Brien called me and said hey, I've got a potential client, here's what the issues



are, is it something that you'd be interested in?  He didn't tell me who the plaintiff was, didn't tell me who the defendant was, just generically laid out what some of the issues were.

I said I'm not interested.  Rob said can I give your name to the other party so that you can explain that to him.  I said I'd rather you not since I'm not interested in taking the case.  I don't want to take it.  I don't have the ability to do it on the timeline.  Notwithstanding that, Rob gave contact information.  I got a phone call -- I can give you all the records if Your Honor would like.  So this is Rob O'Brien's statement of what transpired.

THE COURT:  Thank you.

MR. DONAIS:  So Rob told me about the case.  These come from my phone records and my system, Your Honor.  And I redacted out the other entries for the names of -- because they are clients --

THE COURT:  Sure.

MR. DONAIS:  -- and the whole bit.  But there were two records.  One was on January 5th.

THE COURT:  Yes.

MR. DONAIS:  The other was on January 6th.  So on the 5th at 6:17 p.m., I had a seven second phone call and that was probably spent navigating the phone tree and it disappeared. There was another phone call on Friday the 6th at 5:16 p.m. for a minute 37.  Again, navigating the phone tree.  There was a



AVTRANZ    eScribers

AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

message.

Got the message, generically about hey, got a landlord-tenant case, can I talk with you about it. And I said sure. This is my call back the following day on Monday, spoke for six minutes 37 seconds to get a sense of what this case was about, Your Honor. Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien and the answer is yes. And I said I already told him I don't want to do it.

So at that point, there was pressure to what can I do with the case. I really don't want to do it. I'm not interested in doing that. I don't have the time to do it. I can't do it on the timeline that you want. May even be a potential conflict. Don't want to take the case. That was the end of the phone call.

THE COURT: See, counsel, here's the issue.

MR. DONAIS: Yeah. Well, and my conversation, Your Honor, wasn't with the plaintiff. It's -- not even a party to this case.

THE COURT: Oh, no, it's -- I understand.

MR. BERRY: If I could --

THE COURT: Just --

MR. BERRY: -- if you don't mind just as long as there's exhibits there to an exhibit showing a ten -- the (indiscernible) showing the next of the (indiscernible) a 10



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

minute and 40 something second phone call.  And here's the emails on the (indiscernible) Friday to my client.

THE COURT:  It's ten minutes -- why do I have six minutes here?

MR. BERRY:  There --

MR. DONAIS:  My system says it was a six minute phone call.

MR. TERRELL:  Is it the same phone number?  The same 781 number?

THE COURT:  624-7100.  You can look at the two and tell me if it's the same number. See the issue is --

MR. DONAIS:  10:43 a.m., Your Honor.  That's not how long it was.  It was the time.

MR. BERRY:  Oh, that could be.

MR. DONAIS:  That's the time of the call.  Not 11 minutes.

MR. BERRY:  My eyesight is shot.

MR. DONAIS:  10:43 a.m.

THE COURT:  Oh, it is, yeah.

MR. DONAIS:  Which matches with my call.

THE COURT:  Right.

MR. DONAIS:  Right.

THE COURT:  So it was six minutes and 37 seconds.

MR. DONAIS:  Yeah.

THE COURT:  Okay.  But here's the issue.  It doesn't


AVTRANZ, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

make a difference if you talked to the plaintiffs or not, the petitioners, (indiscernible) is the specific facts of the case, if this other attorney called you and said hey, Craig, I've got a matter involving discrimination, billing fraud and wrongful eviction --

MR. DONAIS:  Uh-huh.

THE COURT:  -- you know, how are these handled and he said, okay, this is what you have to do.

MR. DONAIS:  Uh-huh.

THE COURT:  Without getting into any of the facts.

MR. DONAIS:  Uh-huh.

THE COURT:  You're giving that person a really brief (indiscernible) on how to handle it, that's one issue.  If you're sitting there and discussing the facts particular to the case, then that's something else.

MR. DONAIS:  And I don't think we did, Your Honor. It was a generic discrimination over charge and I said I don't want to do it, Your Honor.

MR. BERRY:  But take a look at the email to my client.

MR. DONAIS:  But that's not my email, Your Honor.

THE COURT:  Before I do that, let me share something with you, counsel.  I spent about ten years on the PCC.

MR. DONAIS:  Uh-huh.

THE COURT:  The last four I was the vice chair of the


AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

hearing committee.

MR. DONAIS:  Uh-huh.

THE COURT:  Okay.  The reason I mention that is I always feel very uncomfortable when it's a JCC or a PCC complaint because once you (indiscernible) any allegation (indiscernible) you may come across, you may want to address that issue, you know, before the door is open, before the bell is -- the bell is rung.

MR. DONAIS:  Uh-huh.

THE COURT:  You know what I'm saying?

MR. DONAIS:  Yeah.

THE COURT:  And because you understand something, I think Attorney Berry is going to afford you every professional courtesy that he can --

MR. DONAIS:  Uh-huh.

THE COURT:  -- but he answers to his client.

MR. DONAIS:  Understood, Your Honor.

THE COURT:  All right.  Because he has no control over that.

MR. DONAIS:  Right.

THE COURT:  All right.

MR. BERRY:  Right.

MR. DONAIS:  When the call came in from my client to do this case, found out who the plaintiff was, I did my conflict check and it was clear so.



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

THE COURT: Sure. No, I don't think anybody's for a second thinking that you were (indiscernible).

MR. DONAIS: And that's actually not what I said to Rob but that's okay. And I think Rob gave his own statement of what transpired in that conversation.

THE COURT: Not when you're getting statements that are (indiscernible).

MR. DONAIS: Right. I guess, Your Honor, this is kind of a contrived conflict to exclude me when this is my client and has been my client. I've worked with Dave Akridge who is the principal of the defendant for ten years on other matters and the like. So it's easy to call opposing counsel --

MR. BERRY: He can't make it a contrived conflict. In some ways it makes it worse.

THE COURT: Okay. Two things. Before this gets any further. I think the word contrived is inappropriate.

MR. DONAIS: Okay.

THE COURT: Okay. I don't think that -- and I'm not -- and I want to make sure we understand something. I'm trying to help you guys. And I don't want (indiscernible) current situation (indiscernible). That's the last thing (indiscernible).

MR. DONAIS: Sure.

THE COURT: Okay. So we've got three issues. The first of which is we have possibly a conflict issue. Okay.



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

And that is something that counsel needs to talk to his clients and decide --

MR. DONAIS:  Uh-huh.

THE COURT:  -- if there are.  Because if they don't believe there's a conflict, they can waive it and we can put that issue to bed real quick.  Okay, that's the first thing.  If they do believe it's a conflict, then you need to have a conversation to decide how you want to handle it.  That's issue number one.

The second issue, we have and I agree with counsel, I think it's a very narrow focus as to what is this.

MR. DONAIS:  Uh-huh.

THE COURT:  Because that's going to make a difference on once the Court determines how they're -- if it's a tenancy and, you know, whether or not their (indiscernible) rules apply as an example.  Once the Court decides that and just (indiscernible), I think that's going to drive the bus and I think things may come to a resolution fairly quickly.

And the last thing is (indiscernible) want to sit down and have a conversation with your client, okay, I'm sorry, your co-counsel and decide, you know, how you want to handle it.  At the same time, counsel have a conversation with your clients.  Take care of the first issue, you know.  And whatever happens there, that's just so you know what you're up against.

MR. DONAIS:  Uh-huh.



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

THE COURT:  Okay.  Because I want you to make an informed decision before you go forward.  I don't want you to get caught halfway through this.  Okay.

MR. DONAIS:  Okay, Your Honor.

MR. TERRELL:  Your Honor, may I ask two questions?

THE COURT:  Certainly, sir.

MR. TERRELL:  As for the hearing option, are we down to not this afternoon, not tomorrow, but is Friday a possibility?

THE COURT:  Friday is open.  Friday is an admin day.

THE CLERK:  Friday is an admin day.  We don't have anything scheduled Friday afternoon.  You're here all day.

THE COURT:  Right.

THE CLERK:  It's up to you.  Do you want to --

THE COURT:  I mean I've got a couple hearings but I can make time for you Friday afternoon if that's what you need.  However --

MR. TERRELL:  And alternatively that submission on pleadings --

MR. BERRY:  Right.

THE COURT:  Yes.

MR. TERRELL:  -- as Mr. Berry suggested.

MR. BERRY:  That's kind of what -- I think the problem is it squeezes me as you probably can guess, my schedule isn't all that flexible.  So I'd prefer to do it on



the pleadings, but --

THE COURT:  Certainly.  Well, have that conversation. Come back and tell me how you want to handle it.  If you can't decide between the two of you, that's fine.  I'll make the decision.  Fair enough?

MR. DONAIS:  So I guess, Your Honor, if I'm going to withdraw from this, then what would the implications be for Attorney Terrell's pro hac admission on this case?

MR. TERRELL:  I noted that in the pro hac statute that the Court has discretion to allow the pro hac admitted counsel to proceed without local counsel in the courtroom.

THE COURT:  I mean and you can also just call any attorney in town.  I'm sure there's a number of attorneys that would be happy to step in.

MR. DONAIS:  Sure, I can certainly locate someone --

THE COURT:  Right.

MR. DONAIS:  -- to be able to do this.

THE COURT:  Right.

MR. BERRY:  Then one other issue --

THE COURT:  Yes.

MR. BERRY:  -- that in regard to that and again I would certainly give a lot of respect to the affidavit; it's just about the communications about this specific case.

MR. TERRELL:  I'm sorry -- I'm sorry.  I see your point.



AVTRANZ ◇ eScribers
THE COURT RECORD ONLINE
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

MR. BERRY:  (Indiscernible) the communications between the two of you about the case, like you know, so I can at least do some due diligence about whether if there were a conflict, whether it's infected corporate counsel.

THE COURT:  Oh, I see.

MR. TERRELL:  Well, I can state as an officer of the court --

THE COURT:  Yeah.

MR. TERRELL:  -- that Mr. Donais did not convey to me anything about the substance of any conversation he had with the plaintiff.

THE COURT:  All right. Counsel?

MR. BERRY:  I mean I would say I have to consult with my client but I hear that and respect it.

THE COURT:  I mean as an officer of the court unless I have any information to the contrary, I would accept that. But again, I want to give Attorney Berry an opportunity to do some due diligence just to make sure.  So have that conversation, let me get back to my list and I'll call you back in a few minutes.

MR. BERRY:  Thank you very much.

MR. DONAIS:  Thanks.

(Sidebar ends at 1:41 p.m.)

(Recess at 1:41 p.m., recommencing at 3:03 p.m.)

THE COURT:  All right, counsel, if you would be kind



enough to approach?  I didn't want to keep you waiting if you had --

(Sidebar begins at 3:03 p.m.)

MR. TERRELL:  Appreciate that.  We're inclined from my client's side to proceed on pleadings.  Mr. Berry wants to submit something as well.  Our concern with doing it that way is it's just going to stretch this out.  It's our belief, it's your decision, that they're hotel guests and we want to end that relationship as soon as we can.

But we're prepared to do it on the pleadings.  We would request a short timeline for Mr. Berry to submit his --

THE COURT:  And the issue is hotel guest v. --

MR. TERRELL:  Versus hotel --

MR. BERRY:  Tenancy -- tenant.

MR. TERRELL:  -- versus tenant.  I mean that's the issue.

THE COURT:  Okay.

MR. TERRELL:  There were some statements in my pleading setting forth the reasons why we want them removed from the hotel.

THE COURT:  Certainly.

MR. TERRELL:  I'll acknowledge that those issues are not germane to the issue of whether they're a tenant versus a hotel guest.

THE COURT:  All right.  How much time do you need?



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

MR. TERRELL:  I would like Mr. Berry to submit his by this Friday.

MR. BERRY:  I'm sure you would, but I need more time than that.

THE COURT:  How much time do you need, sir?

MR. BERRY:  I'd like ten days from yesterday which is when I got the pleading.

THE COURT:  All right.  So let me take a look.  And I know that and I'm sensitive to your concerns, too, so don't misunderstand where I'm coming from.  Okay.  So yesterday was the 17th.  Well, whether it's eight or ten days, we're still dealing with -- with my schedule, it's academic whether it's ten days.  So I wouldn't be able to get over and deal with it until the weekend anyways.  So --

MR. TERRELL:  The weekend after the seven --

THE COURT:  So it'd be the, you know, without getting into my calendar and everything, whether I gave Attorney Berry ten days or I cut it to seven or eight days, I'm not going to be able to get to it until the 28th, 29th anyways.  So I'll take it home that weekend to get to it.

MR. TERRELL:  Okay.

THE COURT:  Based upon my schedule next week.  So what I'll do is the pleadings, what I want to do is the deadline -- I need to have them here at the court no later than, let me see, on the 27th.  Counsel?



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

MR. BERRY:  Sure.

THE COURT:  All right.  That way, by 3 and that way I can take them --

MR. TERRELL:  Your Honor, but it's a little more complicated than that.  Based on my discussion --

THE COURT:  What --

MR. TERRELL:  -- we had, if Mr. Berry submits new evidence or new arguments, we would want the right to respond and the right to waive that in order to speed things up.  Now, it looks like we might not be reaching a decision until on into February.  And I need to discuss with my client whether they want to go that option or whether they want to have the hearing this Friday.  That'll only take me a minute to have that discussion.

THE COURT:  Okay.  I mean what I'd do is obviously Attorney Berry is going to email it to you.

MR. TERRELL:  Yeah.

THE COURT:  You can email it to him, correct?

MR. BERRY:  Oh, yeah.  Sure.

THE COURT:  Yeah, right.  That way you have it when I have it or even beforehand.  So if there's an issue, you can notify the Court.

MR. TERRELL:  Uh-huh.

THE COURT:  And we could deal with that.

MR. TERRELL:  And I should be in a position where if



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

I need to respond, I can do so quickly, hopefully before the weekend.  What day of the week is the 27th?

THE COURT:  It's a Friday.

MR. TERRELL:  Oh, well, maybe not.

MR. BERRY:  It would be helpful if you could identify specific information that you're willing to strike because if you're willing to strike it, my client's not going to feel the need to rebut it.  So if you have a chance to do that, that would be (indiscernible).

MR. TERRELL:  I can -- actually I just represented those -- the representations at the end of our --

THE COURT:  Right.

MR. TERRELL:  -- pleading that describe the reasons why we want them removed as guests is not germane to the issue of whether they're a tenant or a guest.  And you know, I would strike that.

MR. BERRY:  Okay.

THE COURT:  All right.  What I'd like to have both you do though is prior to the 27th is give me proposed orders.

MR. BERRY:  Okay.

THE COURT:  So what I'm looking for is I know that you're going to be submitting your memorandums.  What I want is a, you know, one page whatever it is, one page, two page, no more than two pages.

MR. DONAIS:  You can put your signature on it and be


AVTRANZ, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

done with it.

THE COURT:  I'm not saying I'm going to do that, but what I want you to do is -- I'm a fan of that because it forces the parties to review 60 pages or 40 pages, whatever it's going to be, and give me a succinct this is where I think the Court should go and this is why.  And also for appellate purposes, it puts you in a situation where it's very clear for the Supreme Court as to --

MR. BERRY:  Did you say you wanted that before --

THE COURT:  No, can be --

MR. BERRY:  Contemporaneous.

THE COURT:  Contemporaneously, right.

MR. TERRELL:  Your Honor, could -- I would just request because I think this might make the pleading option sit better with my client if we could move Mr. Berry's deadline to the 25th.  You would still be looking at it over the weekend but that would give me a two day window to determine whether I need to do a reply response.

THE COURT:  Counsel?

MR. BERRY:  What day of the week?

THE COURT:  Wednesday.

MR. TERRELL:  25th, which is Wednesday, right.

MR. DONAIS:  That's a week from today.

MR. BERRY:  We couldn't make it the 26th?

THE COURT:  26th is fine.



AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

MR. TERRELL:  By noon?

THE COURT:  The 26th is fine.  That works for both of you.

MR. BERRY:  Okay.

MR. TERRELL:  Okay.

THE COURT:  So the pleadings and the proposed order, the 26th.

MR. TERRELL:  Yeah.

MR. BERRY:  Okay.

MR. DONAIS:  And I guess with respect to myself, Your Honor, at this point, in terms of this conflict issue, it did not pop up until I guess the pleading that was prepared referenced the individual that called my office.  And at this point I guess I'm looking to get out of the case.  So I'm looking for an alternate --

THE COURT:  Certainly.

MR. DONAIS:  -- to serve as the local pro hac counsel and I guess at this point, since that's really not an issue in the case, if the documents we provided up to the bench could be discarded and not part of the file, that'd be great.

THE COURT:  Certainly.  Why don't I just give them back to you.

MR. DONAIS:  Perfect.

MR. BERRY:  Yeah, that just -- and let me just -- give me one minute to talk to my clients.  Okay.  Because the


AVTRANZ, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

issue that I realize I haven't resolved with them is possible spillover, right?  And I just need to --

MR. DONAIS:  And I'll represent --

MR. BERRY:  I don't get to make the decision is the point of that.

THE COURT:  Right.

MR. BERRY:  So I just --

THE COURT:  Just so it's clear, I've had representations from --

MR. BERRY:  Yeah, I know.

THE COURT:  -- both counsel, officers of the court, that there wasn't any in any shape, form or fashion, any discussion relative to the conversation (indiscernible).

MR. DONAIS:  I didn't get names, I didn't get properties, anything specific. It was very high level --

THE COURT:  So you haven't --

MR. TERRELL:  He didn't -- no, he did not, Mr. Donais did not convey to me the substance of any conversation.  He conveyed to me that he had spoken with someone and realized I think after the fact that it was Mr. Bisasor but he did not relay to me the substance of what, you know, was said.

THE COURT:  Why don't you have that conversation now, counsel.  Okay.

MR. BERRY:  Okay.

(Sidebar ended at 3:10 p.m.)

AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

THE COURT: Great. All right. While you're having that conversation, I'm going to move on to this matter. So what you can do is -- well actually, Attorney Berry, I'll give you a minute or two before I start. That way we're not interrupting.

MR. BERRY: Okay. And if could approach just for a moment.

THE CLERK: Judge, hearing (indiscernible).

THE COURT: Hearing on what?

THE CLERK: That case?

THE COURT: No, it's going to be decided on the pleadings.

(Recess at 3:11 p.m., recommencing at 3:17 p.m.)

THE COURT: Yes, counsel.

MR. BERRY: I probably need to approach, Your Honor. Probably need the other side.

THE COURT: All right. Sam, could you -- why don't you come on up while we're waiting.

(Sidebar begins at 3:18 p.m.)

THE COURT: Don't mean to mean rush; I just --

MR. BERRY: Well, look, I totally appreciate how much time you've given us.

THE COURT: Yes.

MR. BERRY: So we, on the issue of the (indiscernible), they're willing to let the case go forward


AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

with the corporate counsel representing -- essentially representing the Defendant with different local counsel.

THE COURT:  Sure.

MR. BERRY:  What I have to make everybody understand is they won't make a commitment one way or the other about whether they would file a complaint not, you know, against Attorney Donais (indiscernible).

THE COURT:  Nothing we can do about that.

MR. BERRY:  That's right.

THE COURT:  It's beyond our --

MR. TERRELL:  Right.

THE COURT:  So if I understand correctly, local counsel, you're going to have a local attorney file a request.

MR. DONAIS:  I got a call into Dan Kalinski right now to see if he'll take it.

THE COURT:  Certainly.  And it shouldn't be an issue so we'll get that taken care of.  That should be done in the next day or two.

MR. DONAIS:  Uh-huh.

THE COURT:  The 26th and proposed order along with a memorandum.

MR. TERRELL:  Okay.

MR. BERRY:  And you'll notify me if you -- by when if you want to respond?

MR. TERRELL:  Well, logistics, if I get it from you


AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

# Exhibit 35

STATE OF NEW HAMPSHIRE

HILLSBOROUGH COUNTY SUPERIOR COURT SOUTH

NATALIE ANDERSON,                    )
                                     )    Superior Court Case No.
              Plaintiff,             )    226-2017-CV-00069
                                     )
         vs.                         )    Nashua, New Hampshire
                                     )    April 27, 2017
ADAM ROBITAILLE, et al.,             )    10:49 p.m.
                                     )
              Defendants.            )
                                     )
_____    )

PRELIMINARY INJUCTION/PENDING MOTIONS
BEFORE THE HONORABLE CHARLES S. TEMPLE
JUDGE OF THE SUPERIOR COURT

<u>APPEARANCES:</u>

Pro Se Plaintiff:            Natalie Anderson
                            Andre Bisasor
                            (Address Unknown)

For the Defendants:         Brian Snow, Esq.
                            2 Wellman Avenue, Suite 340
                            Nashua, NH 03064

                            Karl M. Terrell, Esq.
                            STOKES WAGNER, ALC
                            One Atlanta Center, Suite 2400
                            1201 W. Peachtree Street, NW
                            Atlanta, GA 30309

Audio Operator:             Electronically Recorded
                            By Teresa R. Neill

TRANSCRIPTION COMPANY:      eScribers, LLC
                            7227 N. 16th Street, Suite 207
                            Phoenix, AZ 85020
                            (800) 257-0885
                            www.escribers.net

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.



UNIDENTIFIED SPEAKER:  Your Honor --

MR. BISASOR:  Your Honor --

UNIDENTIFIED SPEAKER:  -- (indiscernible) --

MR. BISASOR:  -- can I just say --

THE COURT:  I just want to wait.  First of all, what I will do is compare the motion filed in the circuit court very carefully with the motion filed before me, since it's an ethical disqualification concern, I want to be very careful about the circumstances of it.  So if Attorney Terrell, who has filed the motion to appear pro hac vice, wants to testify under oath as to the information that was shared or not shared by Attorney Donais or Attorney O'Brien or Attorney Snow, I'll allow him to do that right now and I'll allow you to cross-examine him.

So Attorney Terrell, if you want to come right up here to the stand --

MR. SNOW:  Oh, just a correction, Your Honor, I don't believe he has filed a motion pro hac vice yet.

THE COURT:  Oh, I thought one had been filed.

MR. SNOW:  It was in the district court.

THE COURT:  Oh, it was in the district court?

MR. BISASOR:  There was one pending here too, Your Honor, that was the whole issue.

MR. SNOW:  No, there was one pending here.

UNIDENTIFIED SPEAKER:  Yes, there is.

MR. BISASOR:  There was a request for the family to be able to waive the fee --

MR. SNOW:  Well, that's why it --

MR. BISASOR:  -- and to appear here.

MR. SNOW:  -- was a request, that wasn't a motion.

MR. BISASOR:  Well, a request is a motion, he's asking the Court to grant it, that's being very technical, Your Honor.

MR. SNOW:  Could you please raise your right hand and you'd stand?

KARL TERRELL, WITNESS FOR THE DEFENDANTS, SWORN

MR. BISASOR:  Hold on a second, I have some question before you start.

THE COURT:  I'm going to put him under oath and allow him to testify and allow you to ask him questions.

MR. BISASOR:  But before he starts, Your Honor, I just wanted to just respond to two things he just said really quickly, if I may, Your Honor.

First of all, the affidavit that he submitted in the district court was not submitted in this court, so he can't testify to facts about what Craig Donais said in that affidavit, he's testifying, there's no -- he's not here -- Craig Donais is not here, he should've been here so he could be asked questions as well.  So that's not appropriate, Your Honor.

In that affidavit, Craig Donais also --

THE COURT:  I'm not asking him to testify to the affidavit of Attorney Donais, I'm asking him to testify as to his own direct, personal knowledge, because it's not Mr. Donais who's being asked to be disqualified from this case, it's Attorney Terrell.

MR. BISASOR:  Right.

THE COURT:  So I'm only interested in his personal knowledge, not Attorney Donais' personal knowledge.  I'm interested in the information that was relayed to him, whether it be from Attorney Brown, Attorney Donais.  If any information was relayed to him, what was it?  But he's not going to testify for Attorney Donais here, I won't --

MR. BISASOR:  Well --

THE COURT:  -- allow that.

MR. BISASOR:  Okay, right, but I was saying, Attorney Snow was doing that from the stand.  He was --

THE COURT:  Well, if I --

MR. BISASOR:  -- testifying as to what was in the affidavit from Craig Donais and trying to introduce as evidence here or for your consideration as inappropriate.

MR. SNOW:  He misunderstood what I was saying.

THE COURT:  You misunderstood what he said.  I think he was talking about what had happened in the district court.

MR. SNOW:  Right.

MR. BISASOR:  No, no, he said --

THE COURT:  He went up and filed --

MR. BISASOR:  -- he submitted an affidavit --

THE COURT:  -- an administrative --

MR. BISASOR:  -- there --

MR. SNOW:  In the district --

MR. BISASOR:  -- and he will be willing to give it to you as well.

MR. SNOW:  Yeah, so I have a copy if the Court wants it now.

THE COURT:  He's talking about what happened in the circuit court, he's not -- that would only assist me in terms of what issues and what pieces of affidavits or other documents were in front of Judge Moore.

MR. BISASOR:  Okay, great.

THE COURT:  He's not offering it here, and all I want Attorney Terrell to do for me, subject to your cross-examination is to give me his knowledge of this representation circumstance.

MR. BISASOR:  Would it be appropriate, Your Honor, to have Craig Donais also, because he could contradict what Karl Terrell says, it's just what he shared.

THE COURT:  I don't have him here today and the motion was noticed up for today.  We're going to handle them, no one's got Attorney Donais here, so I'm going to hear from

Attorney Terrell. Nothing I can do about Attorney Donais at this point. And I'm still, I'm not in any way waiving any arguments on the collateral estoppel issue, but Attorney Terrell's here, so I might as well deal with it from an evidentiary standpoint.

MR. SNOW: That's what I'm saying.

THE COURT: So we'll do that.

MR. SNOW: Might as well.

THE COURT: Okay, Attorney Terrell.

DIRECT EXAMINATION

BY MR. SNOW:

Q Could you please state your name and affiliation for the Court, please?

A My name is Karl Terrell and I was admitted as counsel pro hac vice for the Defendants in this case, over in the Ninth District Court.

Q Okay, and you're an attorney in what state, sir?

A In Georgia.

Q Okay, and you're fully licensed in Georgia?

A Yes.

Q Do you have any disciplinary actions that have caused you to be suspended or have that license revoked at any time?

A No.

Q So you're in good standing?

A Yes.



Q   And you made that representation previously to the Ninth Circuit?

A   Yes.

Q   And the Court approved your pro hac vice motion?

A   Yes.

Q   Now turning to the events of this particular case, did you have an opportunity to be aware of a 540-A petition that was filed by Natalie Anderson in the district court on January 9th of 2017?

A   That is how I was brought into this.  My client, the Homewood Suites Hotel or the operating company -- the managing company that operates that hotel, contacted me and informed me of the 540-A action.  I've done work for the parent of the management company for -- for many years, and they asked me to represent them in this case.  I explained, as they were aware, that we would need to retain local counsel in -- in New Hampshire.  My direct contact was Mr. Dave Akridge, who's here in the courtroom.  He had an attorney-client relationship in a completely different area with Craig Donais, and so Dave recommended Craig Donais.

Craig Donais, I can't remember if we spoke before he sent me a particular email, but he sent me an email, dated January 11, 2017, which I believe was two days after -- if I recall correctly, two days after the 540-A action was filed in the district court.  Somewhere just prior to that, Mr. Donais

realized that the -- that he had spoken with Andre Bisasor and he was related to this case.  I'm not trying to testify for Mr. Donais' understanding, but this is how I received it from him.

So right as I was first engaging with Mr. Donais to serve as our local counsel, he advised me -- or maybe Dave advised me before that Craig realized he had had a conversation with someone connected with this case, Andre Bisasor, and so I asked Craig to explain what was the nature of that conversation that you had with Mr. Bisasor, and he sent me an email in which he put it in writing to me.

MR. SNOW:  If I may approach, Your Honor?

THE COURT:  Yes, you may.

MR. SNOW:  Having previously shown this to my brother, may I approach?

BY MR. SNOW:

Q   I show you this document and I ask you to identify it.

A   That's the email I was describing, yes.

Q   And that email was also incorporated in the circuit court objection to a disqualification in Exhibit E, was it not?

A   I believe Mr. Donais, in his affidavit, attached and identified this email.  In any event, it was made a part of the circuit court filing.

MR. BISASOR:  So Your Honor, if I may just point out, as just a point of note, as an objection, I guess, that we're getting into issues about what Donais said, what he wrote, an

email from Donais, and I just want to be careful here, Your Honor, that we -- I don't want the waters to be blurred where I can't cross-examine Craig Donais about the contents of what they're testifying to about what Donais said. It's a very tricky situation, I asked the Defendants to provide Craig Donais here today, they have not.

MR. SNOW: Well, that's --

THE COURT: That is --

MR. SNOW: -- that's not fair, because Craig Donais is out of state, I couldn't get him here if I wanted to, and it was a situation that is manufactured. He didn't ask me to produce Craig Donais, he asked me if he was going to be here, just like he asked if Karl was going to be here and Mr. Akridge too, that's not a demand for their appearance, I have to take issue with that.

THE COURT: I understand that. I'm going to allow the testimony, because I wouldn't be considering anything in these emails in terms of the truth of the matter asserted in terms of what Attorney Donais had to say, but I am considering it in terms of the knowledge that this witness would have had about discussions that were had with you, because that's the issue in this particular case.

BY MR. SNOW:

Q So once you got that email, was there any further discussions you had with Attorney Donais or anyone else about

any conversations involving Mr. Bisasor?

A   I think only in passing.  Let -- let me set the context.  What I understood from Mr. Donais is that he had only had a very brief conversation with Mr. Bisasor, was not representing him, and he -- what he conveyed to me about what he, Craig Donais, knew about the case was simply a summary of what was already a matter of public record in the district court.  I mean, and that's what Mr. Donais' email reflects -- states that, "What I know" -- this is Craig's email to me, "What I know is I received a call from Andre", and he put it in quotes, "who wanted to discuss filing a 540-A petition claiming they were being treated differently for food service because they were minorities and were being overcharged for their use of the room."  Andre claimed that it was a mixed-use property, in which part was rented and part was under innkeeper.

That's the sum and substance of what Mr. Donais conveyed to me about what he learned from his conversation with Andre Bisasor, which is nothing more than a summary of what was in the complaint filed in the Ninth Circuit District Court.  He didn't tell me anything I didn't already know.

He then went on to say in his email, "Given his timeline", and -- and as I recall, he must've contacted Mr. -- spoken with Mr. Donais right before he filed the action in the circuit court, and, as I understand it, Craig doesn't do that kind of work, and also, didn't have the time to devote, because

Mr. Bisasor wanted someone who could take his case immediately and act on it.

So Mr. Donais simply said, "Given his timeline and issues, I was not in a position to assist, and did not engage in any conflict analysis to determine the property, property address or whether there was a conflict.  This is the extent of what I know."  He certainly conveyed no confidences, Mr. Bisasor -- Anderson to me, he simply said, I had a short conversation with this fellow by the name of Andre, and this is the kind of case that they wanted to talk to me about taking.  As I understand it, it was a very short conversation, and that's all Craig conveyed to me, and that was the sum and substance of it.

Q  So did you ever speak to -- did Craig ever indicate he ever spoke to Ms. Anderson at all, or conveyed that to you in any fashion or form?

A  I don't remember, I just remember he -- he said that he spoke to Andre.

Q  All right.  Did he have any follow-up conversations with you or did you have any follow-up conversations with Attorney Donais about --

A  Well, I -- it was --

Q  -- this whole situation?

A  The day we were down here in -- I -- I believe it was on January 17th, and the --

Q  I think it was the 19th.

A  -- in -- was it the 19th -- January 17th, I -- I thought it was the 17th, maybe not, in the district court in front of Judge Moore, and we had a sidebar.  Right, I think it might've been here in this courtroom, could it have been this courtroom?

THE COURT:  No, it would've been upstairs.

MR. SNOW:  No, it was upstairs.

THE WITNESS:  Very similar courtroom.

BY MR. SNOW:

Q  Yeah.

A  And so we had a -- a sidebar with Elliott Berry, the -- who was their lawyer at the time, Mr. Donais and myself, and that's when Elliott Berry brought the issue up about the conflict, and I -- I think we had a -- we talked about the fact that this issue was being raised, and I -- I think per the extent of my conversation with Craig at that point was just to confirm that he didn't convey anything to me beyond what he conveyed in this email, which is really nothing more than a summary of the nature of the claim that Anderson and Bisasor were -- were raising.  It was just simply a -- a short description of the lawsuit that, by the time I had this communication with Craig, had already been filed, and so I already knew everything that Craig was telling me that was conveyed to him in a very short short conversation that Craig

said he had.

Q    But you said that Bisasor and Anderson's claim, but this is really just Mrs. Anderson's claim, correct?

A    Well, she's -- she's the party Plaintiff --

Q    She's the Plaintiff.

A    -- right.

Q    Did you have any further conversations with Craig Donais after that?

A    After that?  I don't think so.

Q    Did you have any conversations with --

A    But Craig -- Craig -- Craig removed himself from the case, he just wanted -- he didn't want any part of it, and then he retained you and I don't think I've had any discussion at all with Craig ever since then.

Q    You ever have any conversations with me other than what's in the pleadings?

A    No.

Q    Thanks.

        MR. SNOW:  Thank you, Your Honor.

        THE COURT:  Thank you.  Mr. Bisasor.

                    CROSS-EXAMINATION

BY MR. BISASOR:

Q    So just to clarify again, how do you know the Defendants?

A    The Defendants?



Q  Yeah.

A  The management company for the Homewood Suite Hotels, I believe is called Nashua Innkeepers, which is a single-purpose entity that manages that hotel for a third-party owner, and the parent of Nashua Innkeepers is Great American Hotels, which has been a client of mine for some 20 years.

Q  Okay.  So you were contacted by who to deal with this case?

A  Dave Akridge.

Q  Dave Akridge, and about what --

THE COURT:  Please spell his last name, just so I'm clear on it.

THE WITNESS:  A-K-R-I-D-G-E.

BY MR. BISASOR:

Q  And about what date was that, do you recall?

A  It was early January.

Q  So the district court filing occurred on January 9th --

A  That sounds right.

Q  -- and you, I believe, entered motion for pro hac vice, I think around the 11th.  The email that you just cited there, I think was on the 10th of January.

A  No, the email's dated January 11th.

Q  January 11.  Okay, so on or about the 11th, you are in communication with Craig.  Did he send you that email or you sent it to him?

A   He -- he sent it to me.

Q   He sent it to you?

A   He sent it to me and my -- and my legal assistant.

Q   To your legal -- okay.

A   I -- I don't even think I'd had a conversation with him at that point.

Q   So what I'm trying to establish is, so you were contacted by Dave prior to the filing of the 540-A filing in the district court on January 9th?

A   Say that again.

Q   Were you contacted by Dave Akridge prior to the filing of the district court 540-A action on January 9th?

A   I believe we had some discussion about the dispute with you and Ms. Anderson prior to your filing the 540-A action, but I don't recall now, I'd have to go back and look at my time records when it was, but I'm pretty sure it was in January.

Q   Is that the first time --

A   Early -- early January.

Q   So somewhere after January 1st was the first time that you talked to Dave or Dave talked to you about this case with the Plaintiff and/or myself?

A   When you say this case, do you mean the lawsuit you filed?

Q   In 540-A in district court, yes.  And the issues related to our residency at the hotel.

A   To the best of my recollection, it was in early January.

Q   Okay.  So when you came on the case, did you talk to Craig Donais at that time, prior to the 9th of January, before the filing --

A   No.

Q   -- of the 540-A?

A   No.  I didn't talk to Craig until after you filed your action -- your 540-A action, or Ms. Anderson filed it, and I needed a local counsel.  The only purpose for my talking to Craig was -- I was directly assisting my clients related to this dispute, they wanted me to come in and make an appearance in the 540-A action you filed in district court, and I said I'd be happy to do it, I need to retain local counsel.  And so they suggested Craig Donais.  I had no prior relationship with Craig Donais whatsoever.

Q   So you were aware that Mr. Akridge -- Dave Akridge had a prior relationship with Mr. Donais?

A   On something completely unrelated to his hotel business.

Q   Okay.  But he had been a long-time attorney for Dave Akridge?

A   I don't know the details of that.

Q   Do you recall that that was said to Judge Moore, that he had represented --

A   Who said that?

Q   Craig Donais, that he represented Dave Akridge for over ten --

A   Yeah.

Q   -- years?

A   Yeah, I've -- I've heard him make that representation, I have no reason to doubt it, but I don't know any of the details.

Q   Okay.  So Mr. Akridge reached out to you to retain you for this case, for the 540-A case --

A   Right.

Q   -- or for the issues related to the residence, because if he contacted you in early January and the 540-A hadn't been filed until the 9th, then he had been, obviously, working up a legal representation situation for the issues that were unfolding or had been unfolded at the hotel prior to the 540-A?

A   You'll have to unpack that question, sir.  You put a lot in that question.

Q   The representation that you were asked to do wasn't only for the 540-A after January 9th.  Is it true that it also had to do with being background legal counsel on the issues related to our residency prior to the filing of 540-A on January 9th?

A   Mr. (Indiscernible) -- am I doing the same thing as she did?



THE COURT:  No, I don't know what's causing that.

THE WITNESS:  Because my foot kicked this wire and that's --

THE COURT:  That's probably what it is.

THE WITNESS:  Probably a loose connection.

THE MONITOR:  Oh, that's probably what it is.

THE WITNESS:  It's a loose connection on the wire. Dave Akridge and Great American Hotel company has been a client of mine for years, they periodically call me and ask me for counsel, and there's nothing unusual about that.  I'm not going to get into, of course, the substance of my discussions with Mr. Akridge, that's attorney-client privilege protected.  So I don't know if that answers your question or not.

BY MR. BISASOR:

Q  I think kind of, I mean, I guess it's almost what you're saying is that you were contacted by Mr. Akridge about us and our hotel stay prior to the 549 (sic) filing on January 9th.

A  I don't know what you mean by that.  He --

Q  You testified that you --

A  -- contacted -- he contacted me and discussed matters relating to this dispute.  I've already testified that I believe it was before you filed your 540-A action --

Q  Yeah.

A  -- but I -- I -- I don't have a specific, clear

recollection of that.  I think he may have discussed it with me, some aspect of what was going on --

Q  Um-hum.

A  -- but that was just me as an attorney having -- having -- having my client consult with me on things that were going on.

Q  Okay.  So when you came onto the case, I guess formally to deal with the 540-A filing and you needed local counsel now, how did it -- how was -- what were the circumstances that prompted you to -- did you solicit this email from Donais?  Because he wrote it to you saying -- let me see here.  It says, "Karl and Felicia, I'm happy to provide local representation to you, support for pro hac vice admission, what I know is that I received a call from Andre who wanted to discuss the filing" --

A  Yes.

Q  -- "of a 540-A petition, treated differently", yada, yada, yada, you've already read through that.

A  Right.  Yeah, I think what -- I -- I -- I think what happened is, I don't remember having a conversation with Mr. Donais before this email, but I had had a conversation with Dave -- Dave Akridge, and I think Dave conveyed to me that Craig told him that he had had a conversation with an Andre -- meaning you, and I think, by that point, they had -- not me, put two and two together, and -- and I might've conveyed to Dave -- I might've conveyed to Dave to have Craig tell me what

he learned or what he knew, what that communication was all about, or I may have had a brief conversation with Craig, asking him to tell me.

You know, obviously I wanted to know, because he raised the concern that he had had a conversation with you, and I guess -- I think he raised this through Dave and then Dave to me, and so that obviously raises a flag.  He -- he wasn't claiming that he represented you, quite the contrary, he did not represent you, he did not take your case.  There was an indication that the conversation between the two of you had been very brief, that it did relate to this dispute, it became your 540-A action, and I wanted to know what he learned from you, I wanted to know what had transpired in their conversation, I wanted to know if there was a problem with having him as local counsel or -- or whether there was no problem.  And the end result was this email he sent me, which as I've said before, simply didn't tell me anything I didn't already know and didn't tell me anything that wasn't already at that point a matter of public record.

Q    So prior to that email, your testimony is that you think you had a conversation with Craig Donais prior to that email?

A    I may have.

Q    You may have?

A    I may have.

Q   And in that conversation, you tried to explore what is it that he knew regarding this conversation with an Andre?

A   I just want to know what happened in that conversation, and --

Q   Um-hum.

A   -- implicit in that request for information is what did you all say, what did the two of you say to each other --

Q   Um-hum.

A   -- so --

Q   How is it that then, if you were needing local counsel, and you suggested that to Dave, how is it that Dave was getting questions from Craig who wasn't on the case and doesn't really represent him on hotel issues?

A   And you have to ask that question again.

Q   You testified that you were contacted by Dave to take the case.

A   Right.

Q   In fact, to deal with issues that were brewing -- the dispute that was brewing prior to the filing of --

A   That's your --

Q   -- the --

A   -- characterization, sir.  I've already given you my testimony.

Q   No, no, no, I'm summarizing, I'm not focusing on that, you've already testified to that, but I'm just trying to lay

the foundation on my question.  You've testified that somewhere on or about the beginning of January, you had conversations about a dispute with us and the hotel stay?

A  Right.

Q  You then testified that somewhere right after the filing of the 540-A on January 9th, you were asked to take this case by Dave Akridge.

A  Yes.

Q  Okay.  You also testified that Mr. Donais doesn't really represent Mr. Akridge on the Homewood Suites Hilton issue.  That you were the one that does that.

A  I think that's fair --

Q  But you also testified --

THE COURT:  You're now allowing him to answer.

MR. BISASOR:  Oh, I'm sorry.

BY MR. BISASOR:

A  I think your characterization was fair.

Q  Yeah, yeah, so I'll ask my question, I'm just laying -- I'm getting to my point now, which is, you also testified that Mr. Donais, apparently on his own, raised concern about a potential conflict to Dave -- on his own, without your prompting, Dave mentioned that to you, you were then concerned about a flag, you may have --

A  Can I ask you, what was that last --

Q  -- you may have a concern about a flag --



A   A flag?  Oh, yeah --

Q   -- to use your term, flag.

A   -- yeah, yeah, yeah.

Q   And so you may have had a conversation with him prior to this email dated January 11th --

A   Yeah, I get it.  I don't remember how the connection -- how I became aware that Craig Donais had had a conversation with you, but at some point, I wanted to know what happened, what that was all about, and -- and what I got was this email.

Q   Um-hum.  Do you -- so when you had that conversation with him, and --

A   Which conversation?

Q   The one prior to him sending you this email.

A   Well, I'd -- I'm not sure that I did.  Now I thought I was pretty clear about that.

Q   You said you may have.

A   I said I may have, so don't ask me when you had that conversation, because I don't specifically recall whether I spoke with Craig before I got this email.  I knew about it at the time I got this email, because I think Craig -- I may have had a brief conversation with Craig, I just don't recall.  Or I may have only gotten that information through Dave after Dave had spoken with Craig.

Q   So the reason why I'm just trying to clarify here is because it says, "Karl and Felicia, I'm happy to provide local

representation."

A   Right.

Q   And what I know is that I have a call from Andre, he sounds like he's responding to --

A   Yes, he is.

Q   -- some kind of conversation.

A   Yeah.

Q   And that conversation sounds --

A   He's --

Q   -- like it was with you.

THE COURT:  He doesn't know.

MR. BISASOR:  He doesn't know if it was a --

THE COURT:  He may have had a conversation, he doesn't recall the conversation, but he's not denying he had a conversation --

THE WITNESS:  Right.

THE COURT:  -- he just doesn't have a recollection of the specific conversation with Mr. Donais.  It may have come through Mr. Akridge, and then to him, but he's not certain, that's all.

MR. BISASOR:  Okay..

THE COURT:  Okay, I understand that --

THE WITNESS:  Yeah.

THE COURT:  -- it's -- he's testified to it on direct --

MR. BISASOR:  Okay.

THE COURT:  -- and he's testified to it at least a couple times on cross.

MR. BISASOR:  I was just trying to see if he could jog his memory, because each time he thinks about it, he seems a little bit more confident that there was a conversation, so I was giving opportunity to jog his memory, if that was what was going to be the case.

All right, I'll move on.

BY MR. BISASOR:

Q  So when you spoke to Mr. Donais or you got this email -- sorry, when you got this email and may have had a discussion with him, did what he share with you raise a concern that there could be a conflict, based on what he said to you?

A  No, because he didn't -- he did not convey to me any confidences that you had conveyed to him, he had no inside scoop or inside story.  What he conveyed to me was that he had a very brief conversation with you in which you tried to engage him as your attorney, and he turned you down.  And that was the end of the matter.  There was really nothing else for Craig and I to speak about concerning his conversation with you.  It was of no value or interest to me, it was just this oddity that you -- the two of you had had a five-minute conversation and you didn't -- he didn't take your case.

Q  So in this email, he actually said that I spoke with

him about being treated differently, that we were overcharged, that it was a mixed use property, that part of it was on the innkeeper, and that there was -- we were going to file a 540-A, so those are not just -- that's -- those are going into substance of --

A   No, sir, those are just your claims --

Q   Um-hum.

A   -- those are just your claims, and everything he has that is stated in this email is just a summary of the lawsuit that you filed, your 540-A lawsuit.  He was doing nothing more than telling me the nature of your claims, filed in the district court, which I already knew of, because by that point, I had had your 540-A action for about a day or two days.  He didn't -- there's nothing confidential or substantive, this is just a description of your lawsuit.

Q   Okay.

A   It added nothing more.

Q   So --

A   And it was all he got from you --

Q   -- what does --

A   -- in his conversation with you.

        THE COURT:  You need to let him finish.

        MR. BISASOR:  Sure.

BY MR. BISASOR:

Q   So the reason why this is important is because there's

a Robert O'Brien, are you aware of Robert O'Brien's involvement in this?

A  I only know about it from having read Craig's affidavit, and -- and I think maybe some of the stuff you filed, and I'm -- and I've seen the statement from Robert O'Brien -- I think that's his name.  I don't know who he is, I've never met him, never spoken with him.

Q  So when Donais described this to you, he did not indicate that there was a nexus between a conversation with Robert O'Brien and him, and Robert O'Brien and the Plaintiff?

A  I think that came out when we were in Judge Moore's courtroom and we had the sidebar.

Q  Um-hum.

A  I think that's the first time I ever heard anything about Robert O'Brien.

Q  Um-hum.

A  And I know nothing about that.

Q  Do you -- okay, so the -- in Craig Donais' affidavit that he filed --

A  The what?  I'm sorry.

Q  In his affidavit that he filed --

A  That Craig Donais filed?

Q  Yes.

A  Okay.

Q  In the district court.



A   Yeah.

Q   He -- and then even with the motion that was submitted to this court, he attaches an exhibit -- well, sorry, Attorney Snow attaches an exhibit, showing a conversation with Robert O'Brien that lasted, I don't know, whatever it was, and he testified that there was a conversation that took place between him and Robert O'Brien about this case involving the Plaintiff, so when -- if, in fact, that conversation had substance of what was discussed from the Plaintiff and Robert O'Brien that was shared with Donais, could that information have been shared with you indirectly without it being labeled as, I'm sharing with you information from Craig.  Could that infection have occurred --

A   I don't understand your question, sir.

MR. SNOW:  Well, I object, Your Honor.  This is asking for speculative comment as to what could've happened or what might've happened.

THE COURT:  Right.

MR. SNOW:  We're here dealing with facts, what was actually --

MR. BISASOR:  All right, let me rephrase --

MR. SNOW:  -- transmitted --

MR. BISASOR:  -- I'm rephrasing, it's --

THE COURT:  Yeah, I would need to --

MR. BISASOR:  -- no problem.



THE COURT:  -- I think it's already been answered, but I would need to know if he received any information directly from Robert O'Brien based on Robert O'Brien's interview of either you or Ms. Anderson.

MR. BISASOR:  Right.  Right, so what happened, Your Honor, is that there was a 20-minute conversation that took place between the Plaintiff --

MR. SNOW:  Well, there can't be -- you can't testify, sir, that's not fair.

MR. BISASOR:  No, I'm addressing the substance -- the foundation --

MR. SNOW:  No, you're providing --

MR. BISASOR:  You already introduced --

MR. SNOW:  -- testimony here.

MR. BISASOR:  -- the issue of the affidavit earlier as well, I'm just trying to lay the foundation.  There was a 20-minute conversation that took place between Robert O'Brien and the Plaintiff.  Robert O'Brien contacted Craig Donais and discussed what was discussed with the Plaintiff in that 20-minute conversation.  Craig Donais then sent -- gave him advice about the details, saying it was a good contract case, but he's not (indiscernible) in discrimination and whatnot, and he laid out his opinion on the case, because Robert O'Brien was trying to bring Donais onto the case at that time.

So Craig Donais was in receipt of a ton of

information in that, based on the conversation that the Plaintiff had with Robert O'Brien, and that Robert O'Brien had with Craig Donais.  So in the shared -- in the discussions that took place with Mr. Terrell and Donais, whether by email or otherwise, I'm trying to establish that, just because he may not have said this came from Andre, that the infection in the case of getting confidential information that was shared to Donais from Brian through the Plaintiff, right, that's one way in which an infection could've incurred (sic) without him even knowing or realizing it, because if the two attorneys are working the case, what Donais knows in his brain, he can share input into the pleadings or in discussions without labeling as such.

THE COURT:  I would only want to know if any of that information was ever shared with Attorney Terrell, that's the question.

MR. BISASOR:  Right.  So I guess the question is that maybe Donais needs to answer that question, because Terrell probably wouldn't know what was that --

THE COURT:  But he's not Attorney Donais, and we're talking about an affidavit, and I just wanted to know what information that Attorney Terrell had --

MR. BISASOR:  Um-hum.

THE COURT:  -- based on whether it was a conversation you or Ms. Anderson had with Attorney O'Brien, or a

232

conversation that you had as Andre with Attorney Donais. That's what I need to know.

BY MR. BISASOR:

Q  Mr. Donais stated in his affidavit that I accused him of discrimination for not taking his case.  Did he ever share that with you?

MR. SNOW:  Well --

THE COURT:  I'll let him answer the --

MR. SNOW:  -- because --

THE COURT:  -- question, I -- he can answer the question.

THE WITNESS:  I don't remember, I really don't remember that.

BY MR. BISASOR:

Q  Why is it that you didn't share the communication about this email, which only surfaced months after the initial sidebar, January 18, before Judge Moore?

A  You're talking about this January 11 email?

Q  Yes.  That --

A  We --

Q  -- information.

A  -- we provided it to the --

Q  Hold on, let me --

A  -- district court.

Q  -- ask my question, let me ask my question.  Before

Judge Moore -- when Judge Moore and Elliott Berry, who's the one that started raising these concerns, I'm just piggy-backing off of that.  When those concerns were raised and Judge Moore was asking about what was shared, do you recall testifying -- saying as an officer of court, we never shared any information about the case --

A   I'm --

Q   -- with Donais?

A   -- I don't think I would've said, we haven't -- I don't recall precisely what I said, but I said words to the effect consistent with what I'm saying here today.  And that is that he and I had had the conversation that's reflected in my -- in this January 11 email from Craig to me.  And I didn't -- we didn't have any sharing of information beyond the information that's in this January 11 email.

Q   Okay, so I guess what I'm going at is the specific email and the sharing of that information, I don't believe was shared with Judge Moore, and Craig Donais and yourself had said that, as an officer of the court, we do not --

A   But the --

Q   -- we did not share information and so Judge Moore said unless I have information to the contrary that you did share information, because Judge Moore's clear that Craig was out, because --

A   No, no --

Q  -- whatever conversation --

A  -- you're wrong.

Q  -- took place with me --

THE COURT:  Now we're just testifying, we're not asking him any questions --

MR. BISASOR:  Okay.

THE COURT:  -- whatsoever.  So I really need you to ask him questions.  You testifying is not helpful to me --

MR. BISASOR:  Okay.

THE COURT:  -- Mr. Bisasor, in terms of judging --

MR. BISASOR:  Sure.

THE COURT:  -- what level of information he had, so I can determine whether, at any point here --

MR. BISASOR:  Yes.

THE COURT:  -- he had a conflict of interest that would disqualify him in this case before me.

MR. SNOW:  If I may, Your Honor --

MR. BISASOR:  What --

THE COURT:  Attorney Snow -- let me hear from Attorney Snow.

MR. SNOW:  Just real quickly, all that information was embodied in my objection that was raised at the circuit court.  It's not a 20-minute conversation they had, it was five minutes, and we have a copy of his phone log, which is Exhibit A.  And the conversation --

MR. BISASOR:  Objection.

MR. SNOW:  -- and there was also Attorney O'Brien's statement that he made as an affidavit, which is Exhibit B, and the seven-minute conversation that Andre had with Attorney Donais is Exhibit C, and then I put in his affidavit as well, and he's arguing, we shouldn't include his affidavit, now he's talking all about it.  I mean, he's trying to have it both ways.

MR. BISASOR:  Well, all those --

MR. SNOW:  It's just not appropriate.

MR. BISASOR:  -- exhibits that you just referenced that you filed in this court were all from Donais.  Donais is not here, I can't ask him questions about that, so that puts me in a situation where you're introducing evidence as part of your objection, but those things all are coming from Donais.

And number 2, the 20-minute conversation was not about me and Donais.  We've already stipulated that was a seven-minute conversation between me and Donais.  The 20-minute conversation was between O'Brien and the Plaintiff, that's what I'm saying, so I think you got it confused.

THE COURT:  I'm just interested in what this --

MR. BISASOR:  Okay.

THE COURT:  -- particular witness had in terms of information and whether it was attorney-client privileged information that would rise to the level of him having a

conflict, whether it be at the district court level, or now at this level.

MR. BISASOR: Okay.

BY MR. BISASOR:

Q   Did that email that you provided, did you provide that to Judge Moore?

A   Yes.  It was filed in his court, attached to the objection that Mr. Snow has been talking about.

Q   On March 14th?

A   I'm -- I don't recall the exact date.

Q   Okay.  It's testified that it's March 14th, that was after it was denied on the 10th of March.  But why didn't you submit -- my question is, why didn't you submit it on January 18th when you guys were contacted by Elliott Berry the day before, raising the concern about the conflict?  You guys came to court with other documents showing the call records, showing the letter from Robert O'Brien, and you didn't include the letter that showed that communication in which -- even though you had it in your possession, why didn't you introduce it then?

A   Introduce it when, on what day?

Q   On January 18th, to Judge Moore at the sidebar when you were discussing the conflict issue?

A   Because it had just come up.  We were standing right here in front of Judge Moore, Berry, Donais and myself --

Q   Um-hum.

A   -- and there was no reason for me to present it. I'm -- I stated in my place as an officer of the court to Judge Moore consistent with what I testified here today at greater length, and Judge Moore appeared to accept that, and I -- I forget exactly how he phrased his ruling at that point, but there really was no issue until you filed a formal motion to disqualify --

Q   I didn't file that, that was Elliott Berry that did.

A   Okay, when Elliott Berry filed it on your behalf, and we responded to it.

Q   Well, he raised it as an officer of the court, because he was concerned about the extraordinary set of events that took place.

THE COURT:  Again, you're testifying.

THE WITNESS:  You're testifying.

MR. BISASOR:  Okay.

THE COURT:  You just need to --

MR. BISASOR:  But --

THE COURT:   -- ask a question.

BY MR. BISASOR:

Q   So are you aware that Craig Donais was contacted by Elliott Berry on the day before January 18th, on January 17th about the conflict issue?

A   Yeah.



Q  Are you aware and did you assist with preparing documents, including the phone records from Donais, including a letter from a -- an affidavit from Robert O'Brien, and a phone log from Robert O'Brien, I believe?  Did you -- were you aware of that or did you assist in presenting that to Judge Moore on January 18th?

A  I had nothing to do with that.  That was in Craig's hands.  It was Craig's problem, he was dealing with it.

Q  It was Craig's problem, he was dealing --

A  I mean, it was his issue to handle, and --

Q  But you were in possession of this email?

A  Yeah, it was in -- it's in my email server.  And then Craig was addressing the issue that Elliott had raised, both the day before the hearing and then in front of Judge Moore at the bench.  That was Craig's issue, he was handling that, I -- I wasn't -- I had no part in that.

Q  When you raised the flag -- concern about Craig in terms of the conversation with me, wouldn't, as in full candor to the tribunal rules, wouldn't that cause you to then present that information so that Judge Moore could review it to determine that communication of what was description of your conversation with him; wouldn't that have been appropriate as an officer of the court in full candor?

A  We were fully -- we were fully candid with the court, and -- and when I use the -- when I use the phrase, raised a

flag, I mean something very simple.  Any time I'm speaking to another lawyer who I am thinking of bringing in on a case and I find out that he has had a conversation with the opposing party, that's important and I was -- obviously wanted to know what was the extent of that communication.  And the answer I got was the answer that's provided in this January 11 email.

At that point, it didn't seem to be an issue, never thought it really was an issue, and then it was raised in the sidebar in front of Judge Moore, and -- and the issue at that point really had to do with Craig's conversation with you, Craig's communications with O'Brien, and I guess O'Brien and -- and the two of you.  I was not a part of that, all of that happened away from any involvement I ever had in this matter.

And that was an issue that Craig Donais had to deal with, and it had nothing to do with me.

Q   Well, except to the extent that you were co-counsel under local counsel of Craig Donais --

A   Right.

Q   -- and if he had a conflict issue, then that would implicate you as well.  Wouldn't that be your understanding?

A   Theoretically, but the facts were that Craig did not know anything, did not convey anything to me of a confidential nature -- or in the nature of confidential information from you.  Again, I've said it a dozen times, all Craig conveyed to me were the basic facts of your claim, that and nothing more,

and he told me that he only had a very short conversation with you and that he did not agree to represent you.

Q  Well, you can't testify --

A  That's his --

Q  -- to what Craig --

A  -- from where I was sitting, that was the sum total, beginning and end of the matter.

Q  I don't think you can testify as to what Craig knew or didn't know.

A  I'm not trying --

Q  You can only say --

A  -- to do that, and I didn't --

Q  -- he told you.

A  -- do that.

Q  That's fine, but what I'm saying is that your -- I guess, the fact that you did not disclose that letter to the judge is concerning, because it didn't allow the judge to have the full information --

THE COURT:  That's not a question, you're just --

MR. BISASOR:  Okay.

THE COURT:  -- lecturing him on --

MR. BISASOR:  All right, so --

THE COURT:  -- be concerning.  I'm at the point where I --

MR. BISASOR:  Well, it was presented --

THE COURT:  -- think I'm very well educated as to what Attorney Terrell knew and didn't know as he became involved in this case.  We're starting to really beat --

MR. BISASOR:  Okay.

THE COURT:  -- a dead horse here.

MR. BISASOR:  That's to --

THE COURT:  I have to leave for Concord at 4:15, so I'll --

MR. BISASOR:  Just two more question.

THE COURT:  -- I'll allow you to ask your two questions.

MR. BISASOR:  Okay.

THE COURT:  Go right ahead.

BY MR. BISASOR:

Q  When you were preparing the pleadings, the motion to dismiss in the district court hearing, I think it was a 60-page document --

A  No, but go ahead.

Q  -- total amount, it was a very involved document, it was a long pleading with a lot of exhibits.  Would you agree it was about 60 pages, I think?  Elliott Berry had counted it to be 60 pages.  In that pleading, did you work with Attorney Donais in drafting that pleading?

A  Not really.

Q  Just you alone did it?

A    Yeah, Craig -- apart from his conversation with you, Craig really, at that point, wasn't involved in this case.  I was communicating and talking directly with Adam and Dave and -- and folks at the hotel and doing my own research and working up the case, and I was working on it at that point, all by myself.

Q    So when he signed his name to it and submitted it to the court and his signature is on it, he wasn't really involved it, it was just --

A    He read the pleadings, he understood the issues, but he wasn't involved in depth in the drafting of that particular pleading.

Q    Okay.

MR. BISASOR:  I guess, Your Honor, I'm at a little bit of a standstill, and I'll conclude my questions here.  I'm a little bit of a standstill because I can't properly engage the engine of truth here without Craig Donais, because there are statements that he's making that I don't believe to be true, that we have reason to believe Craig Donais, based on his affidavits and other statements he made before Judge Moore, contradicts the testimony presented today.  And so without being able to have Donais here, Your Honor, I don't know if there's a way to bring back Donais here on a limited basis on the morning of the 8th, just to conclude this issue for me, 30 minutes.  That would really help us, Your Honor, getting to it,