UNITED STATES DISTRICT COURT-DISTRICT OF NEW HAMPSHIRE
CIVIL ACTION NO: 1:25-cv-00251|ANDRE BISASOR v. CRAIG DONAIS, et. al

Andre Bisasor, Natalie Anderson,
Plaintiffs

v.

Craig S. Donais, Mary K. Donais, Donais Law Offices, PLLC, Russell F. Hilliard, Upton Hatfield, Karen Gorham, Amy Messer, Mark Howard, State of New Hampshire, Beatriz Van Meek,
Defendants.

**[CORRECTED][1] SECOND AMENDED COMPLAINT [PROPOSED]**

1. Plaintiffs Andre Bisasor and Natalie Anderson (hereinafter together "plaintiffs"), proceeding pro se, bring this Second Amended Complaint against Defendants Craig S. Donais, Mary K. Donais, Donais Law Offices PLLC, Russell F. Hilliard, Upton & Hatfield LLP, Amy Messer, Karen Gorham, Mark Howard, and the State of New Hampshire (which hereinafter together fully and altogether collectively are referred to as "the Defendants"). This action arises from a coordinated, multi-year campaign of defamation, tortious interference, breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, civil conspiracy, racial discrimination, violations of NH consumer protection statute, abuse of process, civil conspiracy, intentional infliction of emotional distress, violation of the NH constitution, and administrative retaliation, etc., that has inflicted severe economic, reputational, and emotional harm upon Plaintiffs. **Plaintiffs demand a jury trial**.

2. The named Defendants include private attorneys who weaponized confidential information from a prospective attorney-client relationship to defame and professionally destroy an African American business consultant; a law firm senior partner who covertly sabotaged Plaintiffs' legal representation and settlement prospects on multiple occasions; a state court judge and a court administrator who engaged in race-based and disability-based administrative retaliation against African American pro se litigants at Hillsborough Superior Court

---

[1] On the evening of March 25, 2026, Bisasor initiated the electronic filing of his Motion for Leave to Amend the Complaint, with the proposed Second Amended Complaint attached as Exhibit, through the Court's CM/ECF system. The Case Management Order established March 25, 2026, as the deadline for filing. The filing process was initiated before midnight. However, due to delays in the PACER/CM/ECF authentication process (including complications with PACER's multi-factor authentication ("MFA") system) the filing did not fully register in the ECF system until 0:00 AM EDT on March 26, 2026. The ECF Notice of Electronic Filing for Doc. 103 confirms that the filing was "filed on 3/25/2026." Thus, the system itself recorded the filing date as March 25, the deadline. Bisasor contacted the Clerk office today and was told that the docket shows that it was filed on 3-25-26, so it is timely and he does not need to file any notice regarding this. Second, the authentication delays that affected Bisasor's filing are not isolated or idiosyncratic. Since PACER began its mandatory rollout of multi-factor authentication in mid-2025, the system has been plagued by well-documented failures that have affected filers across the federal judiciary. In the course of completing the filing after attempting to rectify the authentication delays which brought him to the brink of the deadline, Bisasor inadvertently attached the wrong version of the motion to amend the complaint, with missing signatures, etc. and the proposed Second Amended Complaint in Doc. 103. This was an earlier draft that was not intended for filing. Bisasor contacted the Clerk's office regarding an error regarding the filings, pursuant to D.N.H. Administrative Procedure 2.3(h). The clerk instructed him to re-file today and that the prior filing will be terminated, allowing for re-filing replacing the prior erroneous version.  The corrected version of the proposed Second Amended Complaint and motion are here filed.

North; and the State of New Hampshire, whose courts systematically denied disability accommodations in violation of the Americans with Disabilities Act. Plaintiffs seek compensatory and punitive damages, declaratory and injunctive relief, and attorneys' fees under 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title II of the ADA, New Hampshire RSA 358-A, Massachusetts G.L. c. 93A, and New Hampshire law.

3. Plaintiffs further allege that Defendants Amy Messer, a Justice of the New Hampshire Superior Court, Karen Gorham, the former Superior Court Administrator for the New Hampshire Judicial Branch, and Mark Howard, the Chief Justice of the New Hampshire Superior Court, engaged in race-based administrative retaliation against Bisasor in connection with his parallel state court case at Hillsborough Superior Court North, and that the State of New Hampshire, through its judicial branch, systematically denied Bisasor disability accommodations required by Title II of the Americans with Disabilities Act. Plaintiffs further allege that Howard, as the administrative head of the Superior Court and the designated head of the public entity under 28 C.F.R. § 35.164, received detailed written complaints documenting these violations and failed entirely to act, thereby ratifying and perpetuating the ongoing deprivation of Plaintiffs' rights.

4. This complaint is filed pursuant to Federal Rule of Civil Procedure 15(a)(2) and paragraph 1(A) of the Case Management Order (Doc. 91). For the following sections, every paragraph that precedes a paragraph is incorporated into that paragraph and the next paragraph as if fully stated therein, and every paragraph is incorporated into the preceding paragraph, and each paragraph is intended to be fully integrated with each paragraph from beginning to end, backwards and forward. This amended complaint has Exhibits 1 thru 5 attached, including two affidavits in **Exhibit 1 and 2**, which is hereby incorporated into this complaint.  NB: The term "plaintiff" (in the singular) will generally refer to Bisasor, in particular with respect to assertions of facts, but in most cases, will also by implication apply to Anderson in terms of factual assertions.

---

## SECTION 1: INTRODUCTION, OVERVIEW AND PRELIMINARY ISSUES

---

### I. INTRODUCTION
#### A. Overview

5. This action arises from Defendants' deliberate and malicious campaign to defame, harass, and economically harm Plaintiff Andre Bisasor, an African American business consultant and community advocate, and his

spouse Plaintiff Natalie Anderson. Defendants, attorneys Craig Donais and Russell Hilliard, Donais' law firm, and his spouse Mary Donais, exploited their professional positions and connections to retaliate against Plaintiff after he sought legal counsel from Donais in 2017. The Complaint asserts actionable claims under New Hampshire law and statutory frameworks as well as federal law, including defamation, racial discrimination, breach of fiduciary duty, and intentional infliction of emotional distress. The claims are timely under New Hampshire's savings statute (RSA 508:10) and are supported by relevant factual allegations including those many spanning 2019 to 2023, which are not time-barred.

6.  This complaint arises from a pattern of egregious misconduct by the defendants, which includes the systematic breach of fiduciary duties, defamation, racial discrimination, consumer protection violations, interference with contractual and advantageous relations, and intentional infliction of emotional distress. The conduct of the defendants, particularly the actions taken in 2019 through 2023, demonstrate a deliberate and malicious effort to retaliate against the plaintiffs, damage their reputation, and interfere with their lawful rights and interests.

7.  This complaint is timely filed under the New Hampshire savings statute, RSA 508:10, which preserves the rights of a plaintiff who voluntarily dismisses a federal action and refiles within one year. The claims herein are based on events occurring from June 2019 through 2023, which are well within the statutory period, and are designed to ensure that justice is served by holding the defendants accountable for their misconduct, regardless of the prior federal proceedings. The relation back doctrine further serves to protect/preserve the claims of the newly added second plaintiff, Anderson. Conversely, several claims are timely on their own without invocation of the savings statute.

8.  The defendants' conduct, as detailed below, satisfies all elements of each claim under New Hampshire law.

**B. Preliminary Statement**

9.  This action seeks to hold attorneys accountable for the misconduct pleaded herein. The allegations reveal a legal profession in crisis: a troubling proliferation of lawyers who have abandoned the integrity and honor once synonymous with their calling. It used to be that lawyers were symbols of justice, good nature, and integrity and that carried a high calling to ensure the good of society and the peaceful administration of all that is right, true, fair and just. It used to be that a lawyer was a gentleman/gentlewoman scholar of the community who conducted himself/herself with honor in their interactions with others and that would serve as a role model

of such virtue to be emulated by others so much so that many parents would be proud to see their child grow up to be a lawyer. Today, this is fast no longer remaining true, especially due to the conduct and actions of lawyers whose conduct bring disrepute onto the legal profession. Thus, where the profession formerly embodied justice, virtue, solemn duty to promote what is right, true, fair, and just, it is now tarnished by certain practitioners, including those identified in this complaint, whose bad-faith, dishonest, or deceptive acts have brought the bar into disrepute. Plaintiffs commenced this suit to obtain the relief/remedies detailed below.

10. The challenge in holding accountable well-established/influential/connected lawyers like the defendants in this case is that it is formidable for the plaintiffs to do so, as he is like a David going up against Goliath. However, the plaintiffs has the truth on his side. The plaintiffs would not dare go up against these formidable and powerful lawyers, if he was not telling the truth. The plaintiffs are regular citizens with relatively little or no power or privilege compared to Hilliard and Donais, their law firms and state actors referenced herein. The one thing that the plaintiffs have is the truth. The plaintiffs are hopeful that the truth will be enough. And it will be clear in this lawsuit as it unfolds that the truth is on the plaintiffs' side as both Hilliard and Donais will run away from, dodge and deflect from being forthright and from answering straightforward questions about whether they told the truth or knew that what they said was not true, and they will deploy every underhanded dirty tactic in the book to deflect and try to turn things around on the plaintiffs. But there are several stories throughout history where the wealthy, powerful, connected thought they were untouchable, but it took one person who had the courage to take a stand, resulting in truth, justice and the exposure of wrongful conduct that otherwise would not be discovered.

11. The plaintiffs in this case sees it as their duty to do what is right, to stand up for what is right and to be courageous and willing to advance truth and justice even in the face of overwhelming odds against him, not only for himself but for those who are to come after him, for those similarly situated, and for those who find themselves harmed by the likes of men like Donais and Hilliard.

12. This case is about holding lawyers accountable for defamation, breach of duty, and about sophisticated race discrimination by exploiting racism against two African Americans, among other wrongs.

13. The plaintiff is prepared to prove his allegations in this matter. He only asks for a fair chance to do so and an open mind when such proof is presented.

### C. Note on The Length of The Second Amended Complaint (Proposed)

14. This is not a typical simple lawsuit with one defendant and one plaintiff.  This is a complex lawsuit with multiple defendants. There are multiple parties, and time and space are needed to lay out the claims against these multiple parties. Also, there are multiple claims alleged and some are alternate theories of claims. This case involves multiple parties and multiple claims with many issues having been consolidated into one complaint. Plaintiffs could have done separate complaints for the defendants. However, this second amended complaint (proposed) will allow for a consolidated and more streamlined complaint, and a more efficient process for resolving the issues articulated herein. Also, Plaintiffs have incorporated exhibits into the complaint which has added to the length. Further, this second amended complaint is sufficiently organized and clear so as to give the defendants adequate notice of the claims against them.

15. **Further, the original complaint and first amended complaint were written in single-spaced. Thereafter, the court required filings by plaintiffs to be double-spaced. Consequently, when plaintiffs recalled the double-space requirement, after working through revised the first amended complaint to become the revised second amended complaint, and converted it from single-space to double-space, it automatically doubled the pages. This creates an illusion of more pages than is actually the case. The court should keep this mind.**

16. Courts have favored resolution of all disputes between the parties in a single litigation.  This is "*to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters.*" Carteret, supra, at 38, citing Southern Construction Co. v. Pickard, 371 U.S. 57, 60, 83 S.Ct. 108, 110,9 L.Ed.2d 31 (1962). The principles of judicial economy/efficiency embodied in the Rules of Procedure (whether state or federal), also support resolution of all issues in one proceeding rather than via multiple, protracted litigation.

17. It should also be noted that the page length of this second amended complaint has actually been reduced down from the page length of the complaint filed in state court on June 3, 2025 prior to removal, and down from the length of the firs amended complaint filed on July 29, 2025. This statement is provided to ward off any unwarranted superficial knee-jerk attacks on the length of this second amended complaint. Moreover, as pro

se complaints are afforded more leniency and flexibility than those drafted by lawyers under US Supreme Court Precedent and First Circuit precedent.

## II. PARTIES

18. **Andre Bisasor** is an African American male and a citizen of the Commonwealth of Massachusetts. He appears *pro se*. Bisasor is the primary plaintiff on all counts asserted herein. Bisasor is a business consultant specializing in negotiation, conflict resolution, and organizational development. He holds multiple advanced/graduate degrees and credentials in the field of business/management and a degree in theology with expertise in hermeneutics. He is a leader in the NAACP and is a Christian minister. He is also a trainer, professional speaker, and a conference organizer and convening authority, in the field of negotiation theory and practice. He has organized training and events, in negotiation, conflict resolution, leadership and entrepreneurship, for under-privileged youth in the local community and has served as a youth mentor and youth business plan competition judge in the city of Boston. He also has consulted with, coached, and advised minorities in negotiation and conflict resolution matters, including resolving employment disputes, school disputes, as well as including resolving race-related conflicts. He has also served as a local leader for the NAACP and has worked with police in event planning pertaining to police-community dialogue and mediation, in order to improve relationships between law enforcement and communities of color. As a Christian minister, he has spoken/taught at local churches and has spoken at Christian-related events in other parts of the country. As an African American professional specializing in negotiation, conflict resolution, and organizational development, and civil rights advocacy, his work includes mentoring underserved communities and fostering police-community relations. He is a recognized community leader, consultant, and advocate for racial equity and social justice. His reputation and livelihood have been severely harmed by the defendants' misconduct.

19. **Natalie Anderson** is an African American female and is a citizen of Massachusetts. Anderson is the spouse of Bisasor at all times relevant to this action. She was added as a second plaintiff in this case via the first amended complaint. She appears *pro se*. Anderson asserts claims for loss of consortium, tortious interference with settlement, and race discrimination, as well as other claims arising from the Defendants' conduct.

20. **Craig S. Donais** is an attorney licensed to practice law in New Hampshire and Massachusetts, a white male, and resides in the State of New Hampshire. Donais is the primary individual defendant responsible for the

majority of claims in this suit including several defamatory statements, breach of fiduciary duty, breach of contract, and racial discrimination alleged herein. He is an attorney who engaged in a prospective attorney-client relationship with the plaintiff in early 2017 but then subsequently represented the opposing party, after he engaged in an attorney-client relationship with plaintiff for legal consultation on the same matter. After plaintiff began seeking to hold Craig Donais accountable for his misconduct and dishonesty, Craig Donais' tried to wrongly turn the table around on plaintiff, to disparage and discredit the plaintiff so as to try to make it difficult for anyone to believe the plaintiff's meritorious claims and allegations against him. [Note: These are known tactics of predators and abusers (as well as of bullies and sociopaths) who believe they can take advantage of minorities, with impunity, and who ruthlessly exploit a human bias that is prevalent in our society that tends to believe minorities less than they do white males.]. Craig Donais thereafter, including through his law practice and in coordination and with assistance from his wife and mentor Hilliard, engaged in conduct that violated fiduciary duties, engaged in defamation, and weaponized confidential disclosures to fabricate defamatory narratives and retaliate against Plaintiff.

21. At all relevant times, Donais operated the law firm Donais Law Offices PLLC. Donais previously served as an Assistant Attorney General at the New Hampshire Department of Justice from approximately November 1999 through January 2005. He is approximately 53 years of age. He is also a republican and ran for local political office as a republican candidate in New Hampshire in or around 2014 and is heavily involved in the republican party and republican party politics in NH. He is a quintessential example/product of white male "good ole boy" network" in New Hampshire. He is a member of the Republican National Lawyers Association. Donais has maintained a decades-long record of active participation in Republican Party politics in New Hampshire and Massachusetts, including service on the Manchester Republican City Committee from 2006 to 2010, participation as a delegate to multiple New Hampshire Republican State Conventions in 2006, 2008, 2010, and 2014, and service as a delegate to Massachusetts Republican State Conventions in 1990 and 1994. He served as Vice President of the University of Massachusetts College Republicans and was a member of the Suffolk University Law School Republicans. His partisan activities further include service on the Steering Committee for "Attorneys for Romney" in Hillsborough County, New Hampshire, membership on "Team Sununu 2008,"

and service as an Election Day Observer in 2008, 2010, and 2012. In 2014, Donais ran as a write-in Republican candidate for the New Hampshire House of Representatives in Hillsborough District 41. He was endorsed by the Manchester Republican Committee for the Ward 4 Alderman seat in 2021, and currently serves as Ward Moderator for Ward 4 in the City of Manchester. On information and belief, given Donais's lifelong, deep, and continuous involvement in Republican Party politics and institutions at every level, his membership in the Republican National Lawyers Association, his record of organizing for and campaigning on behalf of Republican candidates, and his sustained participation in Republican electoral infrastructure in New Hampshire through the present day, Donais is a supporter of former President Donald J. Trump and the "Make America Great Again" movement, or at minimum operates within and is aligned with the political network and apparatus that supports the Trump agenda in the State of New Hampshire.

22. The foregoing political background of Donais is relevant to this action because it illuminates the racial and power dynamics that pervade the claims at issue. Plaintiffs are Black, pro se litigants asserting claims of breach of fiduciary duty and race discrimination under 42 U.S.C. §1981 against a white attorney who is deeply embedded in the political, legal, and civic establishment of New Hampshire, a state whose population is approximately 93 percent white. Donais is not merely an attorney who committed professional misconduct; he is a figure of considerable institutional power who has spent more than three decades building political influence through Republican Party organizations, bar associations, municipal government, community boards, and professional networks that collectively constitute the power structure of Manchester and Hillsborough County. The significance of this power disparity is not abstract. In his March 2017 affidavit filed in the underlying Homewood Suites litigation, Donais fabricated the inflammatory accusation that Plaintiff Bisasor had accused him of racism during their January 9, 2017 consultation, an event that never occurred. That fabrication was not incidental; it was a calculated deployment of one of the most damaging accusations that can be leveled against a Black litigant raising legitimate discrimination claims, designed to discredit Plaintiff Bisasor's credibility and to recast a meritorious civil rights complaint as the grievance of an unreasonable individual. When a white attorney of Donais's stature and political connections falsely accuses a Black former client of making baseless racism allegations, the accusation carries an institutional weight that a similarly

situated Black litigant cannot match and cannot easily overcome. The false racism accusation must also be understood in the broader context of the MAGA political movement's consistent rhetorical strategy of dismissing, minimizing, and delegitimizing claims of racial discrimination as unfounded grievances, and of framing those who raise such claims as bad actors. Whether or not Donais consciously adopted this rhetorical framework, his fabricated accusation operates within and draws power from precisely that political and cultural dynamic. A white Republican attorney with deep ties to the party's institutional apparatus, who falsely accuses a Black pro se litigant of crying racism, is engaging in conduct that is consistent with, and reinforced by, a broader political movement that has made the dismissal of racial grievances a central feature of its messaging. Furthermore, the power imbalance extends into the judicial proceedings themselves. Donais has been represented throughout this litigation by Russell F. Hilliard, Esq., a senior partner at Upton & Hatfield, LLP, one of the oldest and most politically connected law firms in New Hampshire, while Plaintiffs have proceeded pro se, without counsel, and with documented disabilities requiring ADA accommodations that the Courts of NH repeatedly failed to provide. The combined effect of Donais's political influence, his institutional connections, the false racism accusation deployed as a litigation weapon, and the structural advantages he enjoys as a white, well-connected attorney represented by elite counsel, against Black pro se litigants in a state with a negligible minority population, creates precisely the kind of racial and power asymmetry that Sections 1981 and 1983 were enacted to address. Plaintiffs plead this background not as mere political commentary but as material context for the trier of fact to evaluate the credibility, motive, and intent of Donais's conduct, and to understand the environment in which the alleged breaches of fiduciary duty and acts of racial discrimination occurred. At all times relevant to this case, the acts and statements by Craig Donais for which recovery is sought, occurred or continued into the years 2019, 2020, 2021, 2022 and 2023. Therefore, all claims are timely either through the NH savings statute or by their own statute of limitations, as will be further delineated herein.

23. **Mary K. Donais** is the spouse of Craig S. Donais, a white female, and a citizen of the State of New Hampshire. Mary Donais assists Craig Donais with the law practice and business operations of Donais Law Offices PLLC and acts within the scope of her agency relationship with both Craig Donais and the PLLC. In August 2020,

Mary Donais independently published false and defamatory statements about Plaintiffs to family members, friends, and on Facebook and social media, and coordinated with Craig Donais in doing so.

24. **Donais Law Offices PLLC** is a law firm that was/is owned and managed by Donais. It is a professional limited liability company with its principal place of business in Manchester, New Hampshire. Craig Donais is the member, managing member, and registered agent of the PLLC. The PLLC is engaged in the practice of law in New Hampshire. Craig Donais and the PLLC operate as alter egos; there is a unity of interest and ownership such that the separate personalities of the individual and the entity no longer exist. Mary K. Donais assists with the PLLC's operations within the scope of her agency relationship. The PLLC adopted, authorized, and ratified Craig Donais's wrongful conduct alleged herein. Craig Donais owns the property where his law firm was housed via a single member LLC. Donais operates through and using his law office. The acts perpetrated by Donais occur through the operation of his law office. Donais and his law office are, for all intents and purposes, the same. Donais PLLC is responsible for the conduct of its attorney Craig Donas and is vicariously liable for the acts of Craig Donais taken within the scope of the business/employment, and thus vicariously liable for his misconduct. It is the legal entity through which Donais committed ethical breaches and other wrongful acts. The Massachusetts Bar has Donais listed as carrying malpractice insurance that covers him for his practice of law in Massachusetts but cites a Manchester NH location. See Exhibit 2. For insurance purposes, it is not clear if Defendant Donais and Defendant Donais Law Offices are covered by the same malpractice insurance coverage or other insurance coverage. Only discovery will address this point. It is not clear if Donais is a personal guaranty for the debts of his law office business, or vice versa. Therefore, in light of all of the above, the plaintiff believes it is prudent that both Defendant Donais and Defendant Donais Law Offices are named as defendants in this lawsuit. NB: All private defendants acted in concert when required to achieve their unlawful objectives.

25. **Russell F. Hilliard** is a senior partner at Upton & Hatfield LLP, a white male, born in 1951, approximately 74 years of age at the time of filing, and resides in the State of New Hampshire. Hilliard is Craig Donais's mentor, confidante, legal malpractice defense attorney in numerous state and federal court litigation, and, as alleged herein, acted as Donais's agent and fixer in covertly interfering with Plaintiffs' legal representation and

settlement prospects on at least three separate occasions between 2020 and 2022. He conspired with Donais to suppress evidence, misrepresent facts, and perpetuate defamatory narratives and false accusations

26. **Upton & Hatfield LLP** ("Upton Hatfied") is a law firm organized as a limited liability partnership under New Hampshire law. This law firm has several offices including 159 Middle St, Portsmouth, NH, 03801, which is the location that Russell Hilliard, who is a senior partner of the firm, primarily works at/from. It is the law firm that Hilliard notes as the law firm that ultimately represents Craig Donais in the activities outlined in this complaint. Upton & Hatfield oversees and supervises the work of its attorney Russell Hilliard. Upton & Hatfield is responsible for the conduct of its attorney Russell Hilliard. At all relevant times, Hilliard's tortious acts were committed within the scope of the partnership's business, in his capacity as a partner acting in furtherance of the firm's interests, his own interests or that of Craig Donais. Upton & Hatfield is vicariously liable for Hilliard's tortious conduct committed within the scope of the partnership's business. The firm also failed to supervise Hilliard and to prevent his repeated acts of tortious interference.

27. **Amy Messer** is a Justice of the New Hampshire Superior Court, appointed in April 2016, residing in Hopkinton, Merrimack County, New Hampshire, and a citizen of the State of New Hampshire. Messer presided over Plaintiffs' parallel state court case (No. 216-2020-CV-00027) at Hillsborough Superior Court North from January 2022 and continuing through 2024 (when Karen Gorham was the court administrator) until present. She is sued in her individual capacity for administrative acts taken outside her judicial function. Messer acquiesced in and perpetuated race-based administrative retaliation against Bisasor, failed to intervene in retaliatory actions by the court administrator, and continued the pattern of administrative retaliation after the administrator's departure, as well as disability-related discrimination/retaliation.

28. **Karen Gorham** is sued in her individual capacity. Gorham served as the Superior Court Administrator for the New Hampshire Judicial Branch from approximately 2015 through April 2024, a period of approximately nine years. In that role, she exercised direct administrative authority over all New Hampshire Superior Courts, including Hillsborough Superior Court North where Judge Messer presided over Bisasor's state case. During that period, Gorham personally engaged in race-based administrative retaliation against Bisasor, including banning him from contacting the clerk's office after he raised concerns about a clerk staff member. Gorham

communicated with Judge Messer behind the scenes about Bisasor's complaints in a manner designed to prejudice Bisasor's case. Before serving as Superior Court Administrator, Gorham served as an Assistant Attorney General at the New Hampshire Department of Justice, an Assistant County Attorney for Hillsborough County, a clerk at Strafford County Superior Court, and a prosecutor in California. Gorham's tenure at the New Hampshire Attorney General's Office overlapped with Defendant Craig Donais's service there. Since April 2024, Gorham has served on the staff of the United States District Court for the District of New Hampshire, and since March 2025, she has held the position of Chief Deputy Clerk. She is a citizen of the State of New Hampshire.

29. **Mark Howard** is the Chief Justice of the New Hampshire Superior Court and is sued in his official capacity for claims arising under Title II of the Americans with Disabilities Act and in his individual capacity for claims arising under 42 U.S.C. § 1983. Howard serves as the administrative head of all New Hampshire Superior Courts. Under 28 C.F.R. § 35.164, the head of a public entity bears ultimate responsibility for ensuring compliance with the ADA's accommodation requirements, including the obligation to make final decisions on accommodation requests and to ensure that subordinate officials do not engage in disability-based discrimination. Bisasor wrote directly to Howard on three occasions between September 23, 2025 and January 28, 2026, detailing Judge Messer's systematic denial of ADA accommodations, her violations of confidentiality protections for disability-related filings, her imposition of arbitrary and shifting criteria designed to frustrate legitimate accommodation requests, and her racially disparate treatment of Bisasor and Anderson as African American pro se litigants. In his September 24, 2025 letter, Bisasor formally invoked Howard's authority under 28 C.F.R. § 35.164 as the head of the public entity and requested that Howard intervene to halt the ongoing ADA violations, require an interactive accommodation process, review the medical documentation that Messer had rejected, and take over the ADA review himself. In his January 28, 2026 communication, Bisasor alerted Howard to newly discovered evidence of undisclosed conflicts of interest involving Judge Messer's household and opposing counsel Russell Hilliard, as well as e-filing anomalies that raised questions about the integrity of the court record. Howard never responded to any of these communications. He took no action to investigate the detailed allegations of ADA violations by a judge under his direct administrative supervision. He did not

refer the matter to an ADA coordinator, did not initiate any review, did not acknowledge receipt of the complaints, and did not take any steps to ensure that the court was meeting its obligations under Title II. Howard's complete failure to act occurred while Messer continued to deny ADA accommodations, dismissed approximately twenty pending motions on the pretextual ground of mootness, granted dismissal of Bisasor's case with prejudice, and ordered the case closed. Howard's inaction was not a judicial act; it was a failure to perform the administrative duties that federal regulation specifically assigns to the head of the public entity. His failure to act is actionable under Forrester v. White, 484 U.S. 219 (1988), which holds that administrative acts by judicial officials are not shielded by absolute judicial immunity, and under Tennessee v. Lane, 541 U.S. 509 (2004), which confirms that Title II of the ADA applies to state court systems and that Congress validly abrogated sovereign immunity for claims implicating the fundamental right of access to the courts.

30. **The State of New Hampshire** is named as a defendant solely for claims arising under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, which abrogates the State's Eleventh Amendment sovereign immunity with respect to disability discrimination in access to the courts. *See United States v. Georgia*, 546 U.S. 151 (2006); *Tennessee v. Lane*, 541 U.S. 509 (2004). The New Hampshire Hillsborough Superior Court North, is a program, service, or activity of the State of New Hampshire within the meaning of Title II.

31. **Beatriz Van Meek** is a Massachusetts resident who, on information and belief, engaged in a civil conspiracy with Craig Donais to injure and harm the plaintiff, as will be further outlined in this complaint. On information and belief, Beatriz Van Meek's address is 1208 Sheffield Way, Saugus, MA 01906-4430. She is as a necessary party, who is alleged to have been significantly involved in planning and perpetrating or aiding the acts of Craig Donais to injure the plaintiff in Massachusetts. Beatriz Van Meek was first named as a defendant in the prior action, Bisasor v. Donais, Case No. 1:23-cv-00374-JL (D.N.H.). That action was originally commenced in Middlesex Superior Court in Massachusetts, removed by the defendants to the United States District Court for the District of Massachusetts on or about June 12, 2023, and subsequently transferred to the United States District Court for the District of New Hampshire on or about July 27, 2023. On March 13, 2024, the plaintiff filed a motion for leave to amend the complaint in that action, seeking, among other things, to add Beatriz Van Meek as an individual defendant based on allegations that she had engaged in a civil conspiracy with Craig

Donais to injure and harm the plaintiff. The proposed Second Amended Complaint in that action set forth detailed allegations against Van Meek, including that she used her position at her place of employment to act in concert with Donais to the plaintiff's detriment, and that she was either terminated or reassigned when her involvement was discovered. That case was subsequently voluntarily dismissed on June 3, 2024, prior to the court ruling on the motion to amend. The claims against Beatriz Van Meek, including civil conspiracy and related allegations, are now reasserted in the present action.

### III. SUMMARY/OVERVIEW OF KEY FACTS
#### A. The 2019 Defamatory Campaign

32. In June 2019, approximately two and a half years after the January 9, 2017 consultation, Craig Donais contacted the Manchester CrimeLine board and made the following false statements of fact about Bisasor:

    (a) That Bisasor burglarized and bugged Donais's office telephone, committing a felony;

    (b) That Bisasor fabricated an audio recording to place Donais's voice on it

    (c) That Bisasor had falsely and frivolously accused Donais of racism merely for declining representation during a 7-minute telephone call.

    (d) That Bisasor is a criminal;

    (e) That Bisasor is mentally ill and has a mental disease

33. Each of these statements was false when made and Craig Donais knew or should have known they were false. No law enforcement agency has ever charged Bisasor with any crime. No mental health professional has diagnosed Bisasor with any mental disease. Bisasor never burglarized or bugged any telephone or office. Bisasor never fabricated any audio recording.

34. Also in 2019, Donais contacted the Manchester, New Hampshire police department using the alias "Manchester Blue & You." This name appeared only on Bisasor's LinkedIn profile in connection with a community policing initiative that Bisasor had developed. Donais's use of this alias demonstrates that he had researched Bisasor's professional activities and specifically targeted his community work for destruction.

35. In his communications with the Manchester police, Donais stated that Bisasor was mentally unstable/ill, had a tenuous grasp on reality, had manufactured a recording and fabricated Donais's voice on it, had bugged Donais's telecommunications systems, and was a dangerous, violent criminal threat.

36. These false statements to the Manchester police had an immediate and devastating effect. The police canceled Bisasor's planned community engagement event, the "NH Blue & You" initiative, and terminated Bisasor's contract with the Manchester police department. The contract was for a community-policing partnership worth several thousand dollars. The cancellation destroyed Bisasor's professional relationship with the Manchester police and eliminated a significant component of his community development business.

37. The statements falsely accusing Bisasor of criminal conduct, felony burglary, and mental illness constitute defamation *per se* under New Hampshire law because they impute the commission of criminal offenses and the existence of a loathsome disease. No showing of special damages is required when statements are defamatory *per se. See McGranahan v. Dahar*, 119 N.H. 758 (1979).

38. None of these statements were made in the context of any judicial proceeding or to any party, attorney, or tribunal with adjudicatory authority. They were private, extrajudicial communications to a civilian board and to law enforcement officers in a non-litigation context. No absolute privilege attaches to such communications.

39. At no time during 2019 did Donais notify Bisasor that he was making statements about Bisasor to third parties. At no time did Donais provide Bisasor with an opportunity to respond to or correct the false statements before they were disseminated. Donais acted unilaterally and covertly, ensuring that Bisasor could not learn of the defamatory campaign or take steps to mitigate the harm until the damage to his reputation and professional relationships had been done.

40. The defamatory statements to the CrimeLine board were particularly damaging because CrimeLine is a community organization that works closely with law enforcement and community leaders in Manchester, New Hampshire. By poisoning Bisasor's reputation with CrimeLine, Donais undermined Bisasor's standing with multiple community stakeholders simultaneously. The defamatory statements to the police were equally devastating because they resulted in the immediate termination of a professional contract and the destruction of a community-policing partnership that Bisasor had personally developed.

### B. The 2020 Defamation Escalation

41. In August 2020, Craig Donais escalated the defamatory campaign by making false statements to his sons and family. Specifically, Craig Donais told his son Garrett Donais (then age 19), his son Aiden Donais (then age 13 or 14), other family members, and friends that Plaintiffs were planning to come to the Donais residence to

15

physically harm his wife and sons; that Plaintiffs were physically dangerous criminal people; and that his wife and sons feared for their lives because of Plaintiffs. Craig Donais characterized his sons as "young children" to amplify the perceived threat and generate sympathy, despite the fact that Garrett was a legal adult.

42. There was no factual basis for these statements. Plaintiffs had never threatened or attempted to contact the Donais family at their home. Plaintiffs had never made any threat of violence against anyone. The statements were fabricated to portray African American Plaintiffs as violent criminals, a characterization consistent with racial stereotyping.

43. During the same period, Mary Donais independently published false and defamatory statements to Garrett Donais, Aiden Donais, other family members, friends, and on Facebook and social media platforms, including reiterating that Plaintiffs were violent, dangerous criminals; that Plaintiffs posed a physical threat to her family; that Plaintiffs were mentally unstable and dangerous; and that she was afraid to be home alone because of the "crazy criminal dangerous" Plaintiffs.

44. Craig and Mary Donais called for a neighborhood watch against Plaintiffs. Her Facebook posts circulated widely throughout the Manchester, New Hampshire community, reaching community residents who knew Bisasor through his NAACP leadership and community engagement work.

45. Craig and Mary Donais's statements caused Bisasor to be ostracized from the Manchester community including community members who had previously worked with Bisasor through the NAACP. Bisasor lost a contract for an NAACP/University of New Hampshire community project as a result of the defamatory statements circulating in the community, and contacts who previously engaged Bisasor for community development work ceased doing so. The ostracization was pervasive, affecting Bisasor's civic, professional, and personal relationships throughout the Manchester area.

46. The damage inflicted by Craig and Mary Donais's campaign was amplified through social media and by the permanence and reach of online communications. Unlike oral statements that fade from memory, Facebook posts and social media messages persist indefinitely, can be shared and reshared by recipients, and reach audiences far beyond the original recipients. Upon information and belief, Mary Donais's posts were shared

16

by multiple recipients, extending the defamatory reach beyond family and friends to the broader Manchester community.

47. Craig and Mary Donais coordinated their defamatory statements, as evidenced by email communications obtained by Bisasor through Right-to-Know requests in October 2020. These emails confirmed that the false statements were directed to and received by their sons, that the children were actively involved in the defamation campaign at their parents' direction, and that Craig and Mary Donais jointly orchestrated the dissemination of these false statements.

48. The characterization of Plaintiffs, who are African American, as inherently violent, criminal, and dangerous is consistent with racial stereotyping that has long been recognized as a hallmark of racial discrimination. Upon information and belief, race was a motivating factor in the Donais Defendants' decision to target Plaintiffs with these false and inflammatory characterizations. A white attorney who received a 7-minute consultation call from a white prospective client, declined representation, and was later found to have breached his fiduciary duties would not have fabricated accusations of criminality, violence, and mental illness against that prospective client and would not have conducted a years-long defamation campaign against that person.

### C. Discovery of the 2019 Defamatory Statements

49. Bisasor first discovered Donais's 2019 defamatory statements on July 21, 2020, when Russell Hilliard disclosed their existence during an Attorney Discipline Office investigation into Donais's conduct. Prior to that date, Bisasor had no knowledge of, and no reasonable means of discovering, the 2019 statements because they were made covertly to the CrimeLine board and the Manchester police without any notice to Bisasor.

50. In November 2020, Bisasor obtained additional details regarding the scope and content of Donais's 2019 statements through Right-to-Know requests filed with public agencies. These records further confirmed the specific false statements Donais had made, the recipients to whom they were published, and the use of the "Manchester Blue & You" alias to target Bisasor's professional activities.

51. The discovery rule applies to these claims because the defamatory statements were concealed from Bisasor by their nature, as they were made to third parties behind Bisasor's back, in circumstances where Bisasor could not have been expected to learn of them through the exercise of reasonable diligence. The 3-year statute of limitations under RSA 508:4 therefore did not begin to run on these claims until July 21, 2020.

17

### D. Hilliard's Tortious Interference with Legal Representation and Settlement

52. Russell Hilliard served as Craig Donais's mentor, confidante, legal malpractice defense attorney, and, as the facts demonstrate, his fixer. Hilliard's role extended far beyond legitimate legal representation. On at least three separate occasions between 2020 and 2022, Hilliard covertly intervened to deprive Plaintiffs of legal counsel and to sabotage their settlement prospects, each time without notice to Plaintiffs, outside the boundaries of any pending court proceeding, and solely for the purpose of protecting Craig Donais from legal accountability.

### i. Interference with the Primmer Retainer (September 2020).

53. On May 18, 2020, Bisasor retained the law firm of Primmer, Piper, Eggleston & Cramer PC ("Primmer") pursuant to a written retainer agreement for legal advice related to the Craig Donais litigation. On September 3, 2020, Hilliard privately and covertly contacted Primmer without Plaintiffs' knowledge or consent, outside of any pending court proceeding, and without legitimate litigation purpose. This was not counsel-to-counsel litigation contact; it was a private communication designed to pressure Primmer into abandoning its client.

54. On September 4, 2020, the very next day, Primmer terminated its retainer with Bisasor, citing Hilliard's communication as the reason for the termination. Hilliard monitored the result of his interference; Primmer informed Hilliard that it was severing its relationship with Bisasor. The loss of this legal representation is valued in the five-figure range. Bisasor was forced to proceed without counsel at a critical juncture in his litigation against Donais.

### ii. Interference with Attorney Elliott Berry (March/April 2022).

55. Since 2017, both Plaintiffs had maintained an advantageous relationship with Elliott Berry of the New Hampshire Legal Assistance organization ("NHLA"), who provided periodic legal advice to both Bisasor and Anderson. In March and April 2022, Hilliard contacted Attorney John Doe directly, without Plaintiffs' knowledge or consent, and without any legitimate litigation purpose. Berry thereafter ceased providing legal advice to Plaintiffs. Berry personally informed Plaintiffs that the situation initiated by Hilliard was the reason he could no longer advise them. The value of the lost legal advice exceeds $20,000.

### iii. Sabotage of the Hilton Hotels Settlement (2021–2022).

56. On April 16, 2021, Bisasor accepted a final monetary settlement offer in the Hilton Hotels litigation. Attorney Shelagh Michaud represented that she was speaking for all defendants, including Craig Donais. Joint defense negotiations continued from May through at least October 2021, with Donais participating through Hilliard in

a joint defense capacity. In October 2021, Bisasor discovered evidence that Donais and Hilliard were attempting to undermine the settlement from within the joint defense.

57. On January 6, 2022, Attorney Michaud informed Bisasor that "Craig Donais is no longer willing to settle," repudiating the April 2021 agreement. This repudiation came after months of joint defense participation during which Donais and Hilliard had the benefit of the settlement framework. The resulting loss in settlement value is in the six-figure range. Both Bisasor and Anderson were harmed by the settlement sabotage.

58. Hilliard's pattern of interference (including sabotaging a retainer, silencing an informal legal advisor, and attempting to torpedo a settlement) was not the conduct of a lawyer engaged in legitimate representation. In each instance, Hilliard acted secretly, without notice to the affected parties, outside the boundaries of any pending litigation, and solely to serve his own personal and professional (reputational and business) interests at the expense of Plaintiffs' legal rights. This conduct served no professional interest other than protecting himself (and Craig Donais) from accountability for their own misconduct.

59. The cumulative impact of Hilliard's three acts of interference was devastating. Before Hilliard's intervention, Plaintiffs had retained legal counsel (Primmer), had access to informal legal advice (Attorney Berry), and had accepted a settlement that would have resolved their claims (the Hilton Hotels agreement). After Hilliard's intervention, Plaintiffs had no retained counsel, no access to legal advice, and diminished settlement. They were left to proceed entirely on their own against well-represented adversaries, in complex litigation requiring professional legal skills.

60. The relationship between Hilliard and Donais provides the context for understanding Hilliard's actions. Hilliard was not merely Donais's defense attorney in a single matter; he was Donais's mentor, confidante, fixer, and legal malpractice defense counsel. Their personal and professional relationship, dating back years, gave Hilliard both the motive and the means to intervene repeatedly on Donais's behalf. Hilliard's law firm, Upton & Hatfield LLP, profited from the continued representation of Donais, providing an additional financial incentive for Hilliard's interference.

### L. Damages

61. As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered and continue to suffer the following categories of harm:

a) **Economic damages:** loss of the Manchester police community engagement contract (several thousand dollars); loss of an NAACP/University of New Hampshire community project contract; loss of the Primmer legal retainer (five-figure range); loss of Attorney John Doe's legal advice (exceeding $20,000); a six-figure reduction in the Hilton Hotels settlement value; loss of additional professional contracts and business opportunities in the Manchester, New Hampshire community; and the costs of additional work, time, and expense caused by the denial of disability accommodations and administrative retaliation at Hillsborough Superior Court North.

b) **Reputational harm:** destruction of Bisasor's professional reputation in the Manchester community; loss of standing with NAACP colleagues and the broader civic and professional community; ostracization from community organizations and professional networks; and the continuing circulation of false and defamatory statements that have never been retracted.

c) **Emotional and dignitary harm:** severe emotional distress including anxiety, post-traumatic stress, depression, sleep disturbances, mood swings, and lack of energy; personal humiliation and mental anguish; feelings of racial stigmatization; loss of confidence in the legal profession and in commercial relationships; loss of enjoyment of life; and the dignitary harm inherent in being subjected to racial discrimination in access to legal services and the courts.

d) **Derivative harm to Anderson:** loss of consortium, including the deprivation of the companionship, comfort, affection, society, and services of her husband as a result of the Defendants' tortious and discriminatory conduct.

62. These harms are ongoing. The defamatory statements made by the Donais Defendants have never been retracted and continue to circulate in the Manchester community. The loss of legal representation has not been remediated. Plaintiffs continue to be denied effective access to legal counsel as a result of the Defendants' interference. The administrative retaliation and denial of disability accommodations persisted through 2024 and into 2025.

---

### SECTION 2: CLAIMS PERTAINING TO DEFAMATION

---

## I. DEFAMATION AND DEFAMATION PER SE [MADE TO PRIVATE PARTIES]
### A. Elements of Defamation Under New Hampshire Law

63. Under New Hampshire law, a claim for defamation requires proof of four elements: (a) a false and defamatory statement of fact concerning the plaintiff; (b) an unprivileged publication of that statement to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm, known as defamation *per se*, or the existence of special harm caused by the publication. *Gould v. N.H. Dep't of Health & Human Servs.*, No. 2015-0696, 2016 WL 5831602, at *2 (N.H. Aug. 22, 2016); *Lath v. City of Manchester*, 16-cv-534-LM (D.N.H. Apr. 9, 2018); Restatement (Second) of Torts § 558. Where the plaintiff is a private figure, the applicable standard of fault is negligence; where the plaintiff is a public figure, the standard is actual malice—knowledge of falsity or reckless disregard for the truth. *St. Amant v. Thompson*, 390 U.S. 727 (1968). Plaintiffs plead both standards here to foreclose any argument that a heightened standard applies.

64. Certain categories of defamatory statements are actionable *per se*, meaning no proof of special damages is required. Under New Hampshire law, statements are defamatory *per se* if they impute the commission of a crime, impute a loathsome disease, or injure the plaintiff in his trade, business, or profession. Restatement (Second) of Torts § 570. Every defamatory statement alleged herein falls within one or more of these categories. Craig Donais and Mary Donais repeatedly accused Plaintiffs of committing felony crimes, attributed mental disease to them, and made statements calculated to destroy their professional reputations and contractual relationships. Damages are therefore presumed as a matter of law for each such statement, in addition to the substantial actual damages Plaintiffs suffered.

65. The availability of an absolute privilege in defamation must be "reserved for those situations where the public interest is so vital and apparent that it mandates complete freedom of expression without inquiry into a defendant's motives." *Supry v. Bolduc*, 112 N.H. 274, 276, 293 A.2d 767, 769 (1972). Absolute privilege attaches to statements made in judicial or quasi-judicial proceedings that possess "all the hallmarks of a judicial proceeding": sworn testimony, the right of cross-examination, adjudicatory authority, and the power to enter binding orders. *Id.*; *McGranahan v. Dahar*, 119 N.H. 758, 408 A.2d 121 (1979). A conditional or qualified privilege may exist for statements made in good faith on a proper occasion to protect a legitimate interest, but

such privilege is defeated by actual malice, recklessness, or excessive publication. *Thomson v. Cash*, 119 N.H. 371, 402 A.2d 651 (1979). As set forth below, none of the settings in which the Donais Defendants published their defamatory statements—a private nonprofit board, a police department in a non-prosecution context, family and social media, and an advisory committee with no adjudicatory power—qualify as judicial proceedings under *Supry* and *McGranahan*. No absolute privilege applies.

66. To survive a motion to dismiss, a defamation claim must plead specific facts making the claim plausible on its face, including the particular statements at issue, the identity of the recipients, the approximate dates of publication, and the reasons the statements are false. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs satisfy this standard by alleging, with specificity, each false statement, each publication, each element of fault, and each category of resulting damages.

## B. Factual Allegations
### 1. The March 2017 Foundational Fabrication

67. On January 9, 2017, Craig Donais returned a voicemail from Bisasor regarding a landlord-tenant dispute involving the Hilton Hotel defendants. During a seven-minute telephone consultation, Bisasor disclosed confidential information to Donais, including case strategies, assessments of strengths and weaknesses, and questions regarding the likelihood of obtaining a temporary restraining order. Donais provided legal advice during the call, assessed the merits of Bisasor's claims, and then declined further representation. Despite declining, Donais subsequently arranged for his colleague, Attorney Dave Akridge, to represent the opposing party—the very Hilton Hotel defendants about whom Bisasor had consulted Donais—without disclosing this adverse representation to Bisasor.

68. On or about March 16, 2017, Craig Donais filed an affidavit in the underlying state court case concerning the substance of the January 9 consultation. In that affidavit, Donais fabricated the claim that Bisasor had accused him of racism during the telephone call. This accusation never occurred. The fabrication is significant not as an independent count—it was made in a judicial pleading and may be subject to the litigation privilege—but as foundational context establishing three critical facts. First, it demonstrates that as early as March 2017, Donais was willing to manufacture false statements about Bisasor in sworn documents. Second, it reveals the origin of the "false racism accusation" narrative that Donais would deploy repeatedly over the next six years in

22

non-privileged settings. Third, it establishes knowing falsity—because Donais created the false narrative himself, he necessarily knew it was false when he later republished it to civilian audiences.

69. Judge Paul Moore of the Nashua District Court subsequently conducted a hearing and found that Donais had formed a prospective attorney-client relationship with Bisasor during the January 9 consultation. Judge Moore ordered Donais to withdraw from his representation of the opposing party. Donais withdrew as ordered. This judicial determination confirms that Bisasor's complaints about Donais's conduct were meritorious, not frivolous. It also confirms that when Donais later told third parties that Bisasor had "frivolously" or "falsely" accused him of misconduct, Donais was making statements he knew to be false. The fabrication of the racism accusation, combined with the manufacture of a narrative designed to preemptively discredit a Black man's legitimate legal complaints, constitutes powerful evidence of racial animus and actual malice. A white attorney fabricating the claim that a Black client "cried racism" exploits one of the most pernicious racial stereotypes in American discourse—the trope that Black people make false claims of racism to gain advantage. This trope has no meaning absent the plaintiff's race. It is itself a racially discriminatory act.

### 2. June 2019 — Defamation to the Manchester CrimeLine Board

70. In June 2019, approximately two and a half years after the January 9, 2017 consultation, Craig Donais contacted the Manchester CrimeLine board and made the following false statements of fact about Bisasor to its members: (a) that Bisasor had burglarized and bugged Donais's office telephone, a felony accusation; (b) that Bisasor had fabricated an audio recording to place Donais's voice on it; (c) that Bisasor had falsely and frivolously accused Donais of racism merely for declining representation during a seven-minute telephone call; (d) that Bisasor is a criminal; and (e) that Bisasor is mentally ill and has a mental disease.

71. Each of these statements was false when made, and Craig Donais knew or should have known they were false at the time of publication. No law enforcement agency has ever charged Bisasor with any crime. No mental health professional has ever diagnosed Bisasor with any mental disease. Bisasor never burglarized, bugged, or entered Donais's office or any office. Bisasor never fabricated any audio recording. And Bisasor's complaints about Donais were based on a judicially confirmed prospective attorney-client relationship and Donais's breach of the fiduciary duties arising from it—not on Donais's decision to decline representation. The characterization of Bisasor's complaints as "false" and "frivolous" was directly contradicted by Judge Moore's judicial finding.

72. The Manchester CrimeLine is a private 501(c)(3) nonprofit organization with a civilian volunteer board. It is not a court. It is not a government agency. It has no adjudicatory authority, no power to enter binding orders, no sworn testimony, and no right of cross-examination. Under *Supry v. Bolduc*, 112 N.H. 274 (1972), even a municipal zoning board hearing does not qualify as a judicial proceeding for purposes of absolute privilege. If a zoning board hearing—which at least involves a government body exercising delegated regulatory authority—does not trigger absolute privilege, then statements made to a private nonprofit board with no governmental function whatsoever cannot qualify. No absolute privilege attaches to Donais's statements to the CrimeLine board. Any conditional privilege that might otherwise apply is defeated by Donais's actual malice in publishing statements he knew to be false.

73. Craig Donais published these false statements to multiple third-party members of the CrimeLine board, thereby satisfying the publication element. CrimeLine works closely with law enforcement and community leaders in Manchester, New Hampshire. By poisoning Bisasor's reputation with CrimeLine board members, Donais undermined Bisasor's standing with multiple community stakeholders simultaneously and inflicted damage that radiated through the network of civic relationships upon which Bisasor's community development work depended.

74. The element of fault is satisfied at both the negligence and actual malice levels. A reasonable person in Donais's position—an attorney with personal knowledge of the January 9 consultation, the resulting judicial finding, and the absence of any criminal charges or mental health diagnoses—would have known that the statements were false. That is negligence. Beyond negligence, Donais acted with actual malice because he personally fabricated the "false racism accusation" narrative in his March 2017 affidavit, knew of Judge Moore's finding that a prospective attorney-client relationship existed, and deliberately chose to republish demonstrably false claims to a civilian audience for the purpose of destroying Bisasor's reputation. This satisfies the *St. Amant v. Thompson* standard of knowledge of falsity or reckless disregard for the truth. 390 U.S. at 731.

75. The statements are defamatory *per se* under three independent categories. The accusation of burglary and bugging imputes the commission of a felony. The imputation of mental illness attributes a loathsome disease. The false accusations of criminal conduct, fabrication, and frivolous claims injure Bisasor in his trade, business,

and profession as a community development consultant and civic leader. Damages are therefore presumed as a matter of law, in addition to the actual economic losses, reputational harm, and emotional distress that Bisasor suffered.

76. The racial dimension of these statements warrants attention as evidence of malice. The stereotypes deployed— violent Black criminal, dangerous Black man, mentally unstable Black person—are among the most entrenched and destructive racial stereotypes in American history. They trace directly to the same racist caricatures that the Civil Rights Act of 1866 and 42 U.S.C. § 1981 were enacted to combat. A white prospective client who had a seven-minute telephone consultation with an attorney, and was later found by a judge to have formed a valid prospective attorney-client relationship, would not have been subjected to accusations of burglary, fabrication, criminality, and mental illness. The content of these accusations is racial in character and constitutes additional evidence of malice.

77. Bisasor did not discover Donais's defamatory statements to the CrimeLine board until on or about July 21, 2020, when Russell Hilliard disclosed their existence during an Attorney Discipline Office investigation. Additional details were obtained in November 2020 through Right-to-Know requests. Prior to those dates, Bisasor had no knowledge of, and no reasonable means of discovering, the 2019 CrimeLine statements because they were made covertly, without any notice to Bisasor. The discovery rule applies: the three-year statute of limitations under RSA 508:4 did not begin to run until July 21, 2020 at the earliest.

### 3. June 2019 — Defamation to the Manchester Police Department

78. Also in June 2019, Craig Donais contacted the Manchester, New Hampshire Police Department using the alias "Manchester Blue & You." This name appeared only on Bisasor's LinkedIn profile in connection with a community policing initiative that Bisasor had developed. Donais's use of this precise alias demonstrates that he had researched Bisasor's professional activities and specifically targeted his community-policing work for destruction. The deliberateness of this targeting negates any inference of good faith or legitimate purpose.

79. In his communications with the Manchester Police Department, Donais stated that Bisasor was mentally ill, had a tenuous grasp on reality, had manufactured a recording and fabricated Donais's voice on it, had bugged Donais's telecommunications systems, and was a dangerous, violent criminal threat. Each of these statements was false. No criminal charge has ever been filed against Bisasor. No mental health professional has diagnosed

Bisasor with any mental illness. Bisasor never manufactured any recording, bugged any telecommunications system, or posed any threat to anyone.

80. These false statements had an immediate and devastating effect. The Manchester Police Department canceled Bisasor's planned community engagement event, the "NH Blue & You" initiative, and terminated Bisasor's contract with the Department. That contract was a community-policing partnership worth several thousand dollars. The cancellation destroyed Bisasor's professional relationship with the Manchester Police Department and eliminated a significant component of his community development business.

81. Defendants may argue that statements to police are absolutely privileged under *McGranahan v. Dahar*, 119 N.H. 758 (1979), which held that formal and informal complaints to a prosecuting authority may be treated as initial steps in a judicial proceeding. That rule does not apply here for four independent reasons. First, Donais's statements to the Manchester Police Department did not result in any criminal charges, any arrest, any investigation, or any judicial proceeding. They were dead-end accusations that produced no prosecutorial action whatsoever. The privilege recognized in *McGranahan* was tied to complaints that actually led to or were connected with criminal proceedings; here, there was no proceeding and no prospect of one. Second, the statements were not made for the purpose of initiating criminal process. They were made for the specific purpose of destroying Bisasor's professional contract with the Police Department—as demonstrated by Donais's use of the "Manchester Blue & You" alias targeting that precise professional relationship. Third, Donais used a deceptive alias rather than identifying himself, which is inconsistent with a good-faith complaint to law enforcement. Fourth, the statements targeted a specific professional contract for destruction, not the initiation of criminal proceedings. These circumstances establish that Donais's communications with police were retaliatory and defamatory, not legitimate law-enforcement complaints entitled to absolute protection.

82. Even if any qualified privilege applied, it would be defeated by Donais's actual malice. A qualified privilege requires good faith, a proper occasion, and publication limited to persons with a legitimate interest. *Thomson v. Cash*, 119 N.H. 371, 402 A.2d 651 (1979). Donais acted in bad faith (knowing the statements were false), for an improper purpose (destroying a professional contract, not reporting crime), and through excessive

publication (using an alias to mask his identity while targeting a specific professional relationship). The qualified privilege is therefore defeated.

83. The statements to police are defamatory *per se* because they impute the commission of felony crimes (bugging, burglary), attribute mental disease, and injure Bisasor in his trade and profession. The publication element is satisfied because the statements were communicated to law enforcement officers who were third parties. The fault element is satisfied at both the negligence and actual malice levels for the same reasons set forth in the CrimeLine count above. Bisasor suffered actual damages including the loss of the community-policing contract, destruction of his professional relationship with the Manchester Police Department, loss of the NH Blue & You initiative, and severe emotional distress.

84. Bisasor did not discover Donais's defamatory statements to the Manchester Police Department until on or about July 21, 2020, when Russell Hilliard disclosed their existence during an Attorney Discipline Office investigation. Further details were confirmed through Right-to-Know requests filed in November 2020. The discovery rule applies to these claims for the same reasons set forth above: the statements were made covertly, behind Bisasor's back, using a deceptive alias, in circumstances where Bisasor could not have been expected to learn of them through the exercise of reasonable diligence.

### 4. August 2020 — Escalation to Family, Friends, and Social Media

85. In August 2020, Craig Donais escalated the defamatory campaign by making false statements to his sons and family members. Specifically, Craig Donais told his son Garrett Donais (then age 19 and a legal adult), his son Aiden Donais (then age 13 or 14), other family members, and friends that Plaintiffs were planning to come to the Donais residence to physically harm his wife and sons; that Plaintiffs were physically dangerous criminal people; and that the family should fear for their lives because of Plaintiffs. Craig Donais characterized his sons as "young children" to amplify the perceived threat and generate sympathy, despite the fact that Garrett was a legal adult.

86. There was no factual basis for any of these statements. Plaintiffs had never threatened, attempted to contact, or communicated with anyone in the Donais family at their home or elsewhere. Plaintiffs had never made any threat of violence against anyone. Plaintiffs had no criminal record. There was no report, no complaint, no

evidence of any kind suggesting that Plaintiffs posed any physical threat to the Donais family. The statements were wholly fabricated.

87. During the same period, Mary Donais independently published false and defamatory statements about Plaintiffs. Mary Donais communicated to Garrett Donais, Aiden Donais, other family members, friends, and the general public through Facebook and other social media platforms that Plaintiffs were violent, dangerous criminals; that Plaintiffs posed a physical threat to her family; that Plaintiffs were mentally unstable and dangerous; that she was afraid to be home alone because of the "crazy criminal dangerous" Plaintiffs; and she called for a neighborhood watch against Plaintiffs.

88. Mary Donais's Facebook posts circulated widely throughout the Manchester NH community, reaching community residents who knew Bisasor through his leadership of the local NAACP chapter and his community engagement work. Each sharing and resharing of these posts constitutes a separate publication under the republication doctrine. Restatement (2nd) of Torts § 577. Unlike oral statements that fade from memory, Facebook posts and social media messages persist indefinitely, can be shared and reshared by recipients, and reach audiences far beyond original recipients. Upon information & belief, Mary Donais's posts were shared by multiple recipients, extending the defamatory reach across the broader Manchester community.

89. Craig and Mary Donais coordinated their defamatory statements, as confirmed by email communications obtained by Bisasor through Right-to-Know requests filed in October 2020. These emails established that the false statements were directed to and received by their sons, that the sons were actively involved in and directed to participate in the dissemination of defamatory statements at their parents' direction, and that Craig and Mary Donais jointly orchestrated the campaign. The coordination between Craig and Mary Donais demonstrates that the defamatory statements were not spontaneous or emotional reactions but were deliberate, premeditated acts designed to maximize harm to Plaintiffs' reputations.

90. The publication element is satisfied because the false statements were communicated to family members, friends, and the general public via social media—all third parties. The scope of publication was extensive and continuing, particularly through social media channels that amplified the defamatory reach exponentially.

91. The element of fault is satisfied at both the negligence and actual malice levels. Craig Donais had personal knowledge that no threat existed because no threat had ever been communicated, no contact had been attempted, and no report of threatening conduct had ever been filed. A reasonable person in his position would have known the statements were false. He published them anyway, with knowledge of falsity, for the purpose of inflicting reputational destruction. Mary Donais likewise had no factual basis for her statements. She never received a threat from Plaintiffs, never had any contact with Plaintiffs, and had no evidence of any threatening conduct. Her decision to publish these statements on social media—thereby ensuring the widest possible dissemination—demonstrates reckless disregard for the truth at minimum and actual malice in substance.

92. The characterization of Plaintiffs—who are African American—as inherently violent, criminal, mentally unstable, and dangerous is consistent with deeply entrenched racial stereotyping. The call for a neighborhood watch evokes the historical pattern of treating Black people as threats to white neighborhoods. Upon information and belief, race was a motivating factor in the Donais Defendants' decision to characterize Plaintiffs in these terms. A white attorney who received a seven-minute consultation call from a white prospective client, declined representation, and was later found to have breached his fiduciary duties would not have fabricated accusations of violence, criminality, and mental illness against that client, and his wife would not have conducted a social media campaign portraying that client as a danger to the community. The racial dimension of these characterizations constitutes independent evidence of malice.

93. The statements by both Craig and Mary Donais are defamatory *per se*. They impute the commission of crimes (planning to physically harm family members; being "criminal" people). They impute mental disease (being "crazy" and "mentally unstable"). They injure Bisasor in his trade, business, and profession as a community development consultant and civic leader. Damages are therefore presumed.

94. The actual damages caused by the 2020 defamation were severe. Bisasor was ostracized from the Manchester community. Community members who had previously worked with Bisasor through the NAACP ceased engaging with him. Bisasor lost a contract for an NAACP/University of New Hampshire community project as a direct result of the defamatory statements circulating in the community. Professional contacts who had previously retained Bisasor for community development work stopped doing so. The ostracization was

29

pervasive, affecting Bisasor's civic, professional, and personal relationships throughout the Manchester area. In addition to these economic and reputational losses, Bisasor suffered severe emotional distress as a result of the coordinated defamation campaign.

95. No privilege of any kind attaches to the 2020 statements. Private family communications and social media posts to the general public are not judicial proceedings. They do not involve sworn testimony, cross-examination, adjudicatory authority, or binding orders. They lack every hallmark of a judicial proceeding identified in *Supry v. Bolduc*, 112 N.H. 274 (1972). Even if a qualified privilege applied to some private family communications, it would be defeated by actual malice, recklessness, and the excessive scope of publication through social media.

### 5. November 9, 2023 — Defamation at the Advisory Committee Hearing

96. On November 9, 2023, Craig Donais appeared at a noticed public hearing before the New Hampshire Supreme Court Advisory Committee on Rules. During this hearing, Donais stated publicly, before Committee members, attorneys, judicial officials, and members of the public, that Bisasor had wrongly accused him of misconduct; that Bisasor's allegations were specious, untrue, and without merit; that Bisasor was fueled by personal animus and an intent on personal destruction; and that Bisasor had deceptively weaponized and misused the attorney discipline process against Donais.

97. Each of these statements was false. Bisasor's complaints about Donais were based on a judicially confirmed prospective attorney-client relationship and Donais's breach of the fiduciary duties arising from it. Judge Paul Moore had already found that Donais formed a prospective attorney-client relationship with Bisasor and ordered Donais to withdraw from adverse representation. The characterization of Bisasor's complaints as "specious," "untrue," and "without merit" was knowingly false—Donais was personally aware of the judicial finding that directly contradicted his characterization. The accusation that Bisasor "deceptively weaponized" the attorney discipline process was an attempt to recast legitimate legal complaints as bad-faith manipulation, a characterization refuted by the judicial record.

98. The Advisory Committee on Rules is not a judicial body. It has no adjudicatory authority. No parties appear before it in adversarial posture. There is no right of cross-examination. There is no sworn testimony. Its proceedings are legislative and advisory in nature, not judicial. It cannot enter binding orders. Under *Supry v.*

*Bolduc*, 112 N.H. 274, 276 (1972), absolute privilege requires that a proceeding possess "all the hallmarks of a judicial proceeding." The Advisory Committee on Rules possesses none of them. If a municipal zoning board hearing does not qualify for absolute privilege—as *Supry* held—then an advisory committee with even less adjudicatory function cannot qualify. No absolute privilege attaches to Donais's statements at the Advisory Committee hearing.

99. The publication element is satisfied because the statements were made at an open public hearing attended by lawyers, judges, and citizens in the legal community. The audience included individuals with direct professional relevance to Bisasor's reputation. The fault element is satisfied at the actual malice level: Donais knew of the contrary judicial finding by Judge Moore and deliberately misrepresented the facts to an audience of legal professionals. This constitutes knowledge of falsity under *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

100. The statements are defamatory *per se* because they injure Bisasor in his trade, business, and profession. Accusing a person of "deceptively weaponizing" a legal process, of acting from "personal animus," and of making "specious" and "untrue" allegations directly impugns that person's professional integrity and fitness. In a room filled with attorneys and judicial officials, such statements are calculated to destroy professional standing.

101. The damages from the November 2023 defamation include further diminishment of Bisasor's reputation in the legal community, emotional distress, and continued harm to Bisasor's ability to engage in professional activities in New Hampshire. This hearing represents the most recent defamatory act by Craig Donais and is independently timely within the 3-year statute of limitations under RSA 508:4. It also demonstrates the continuing nature of Donais's defamatory campaign, which persisted from 2019 thru at least November 2023.

### IV. FURTHER DETAILS ON FACTS PERTAINING TO DEFAMATION BY CRAIG DONAIS MADE TO PRIVATE PARTIES

#### A. Craig Donais' False Statements About Plaintiffs To The Manchester Crime-Line Board/Non-Profit Organization in June 2019

102. Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

103. Manchester CrimeLine is a 501(c)(3) that pays cash rewards for anonymous tips leading to arrests. The 17-member private civilian board meets monthly to review solved cases and approve reward (note: it does not

conduct investigations or help to solve crimes). The organization serves as a vital community resource that facilitates crime prevention Manchester CrimeLine is a private, volunteer-run 501(c)(3) nonprofit corporation, not a state agency or municipal department. Consequently, it does not enjoy sovereign immunities or statutory privileges that attach to governmental entities. No enabling statute or city ordinance designates Manchester CrimeLine as a governmental unit; its directors are private volunteers. Directors are not sworn officers, hold no arrest powers, do not draw municipal salaries, and are not included in city budgets. Police typically assign one liaison officer who sits ex-officio on the board, but that officer acts only as a nonprofit advisor when attending board meetings.

104.    Craig Donais has been extensively involved in Manchester, New Hampshire crime-line nonprofit organization for many years. Public nonprofit filings and board rosters show he has served as Principal Officer and long-time Director of Manchester CrimeLine, Inc. He has been its Principal Officer with signing authority on annual returns; and has guided its reward and fundraising programs. In every available filing, Craig Donais is the only officer listed by name, reflecting his role as statutory signatory for the small volunteer nonprofit. He has also been a director and board member for many years, including in 2019 through 2023.

105.    Under New Hampshire defamation law, absolute privilege shields statements made to law-enforcement officers and prosecutors about suspected crimes, but it has not been extended to statements made to a private CrimeLine board.

106.    In or around the third week of June 2019, Craig Donais made false statements about the plaintiff to members of the crime-line board/a non-profit organization.

107.    Craig Donais told members of this non-profit organization the following:

a.  Craig Donais falsely stated that plaintiff is a criminal.
b.  Craig Donais falsely stated that plaintiff is mentally crazy/has a mental disease-sickness.
c.  Craig Donais falsely stated that plaintiff burglarized and bugged his office phone and office thus committing a felony crime.
d.  Craig Donais falsely stated that plaintiff fabricated a recording to put Donais' voice on it to make Donais say things Donais did not say.
e.  Craig Donais falsely stated that plaintiff falsely and frivolously accused him of racism for declining to represent plaintiff in a 7 minute prospective attorney-client phone call.

108.    It should also be noted that Plaintiff obtained copies of email communications, via a right to know request, that revealed these false statements made by Craig Donais, about the plaintiff, and were directed

to/received/heard by members of this crime-line board. [NB: Discovery will further reveal the extent of the defamation and how widespread it is.].

109. These statements are capable of a defamatory meaning. It is for the trier of fact to determine this and to look to the entire context and circumstances of these statements and the motive behind them to conclude whether there was defamation or defamatory intent.

110. Craig Donais made these statements with ulterior motives, to deflect from his misconduct and to intimidate, harass and retaliate against the plaintiff.

111. This defamation framed the plaintiff as a mentally unstable criminal.

112. Craig Donais published false statements, falsely accusing plaintiff of criminal conduct. Craig Donais falsely accused plaintiff of criminal conduct, and suggested that Plaintiff was dangerous and mentally ill. Absolute privilege does not apply, as the accusations were extraneous to any legitimate legal purpose and stated/repeated outside of any court contexts.

113. These statements were made to 3rd parties. These statements were not made in court or in any judicial context but were disseminated to board members of a community non-profit. Under NH law, defamation requires the defendant made a false statement of fact to at least one 3rd party that harmed plaintiff's reputation.

114. These statements were made without care as to whether they were false and would cause injure/harm the plaintiffs. These statements were made with reckless disregard for the truth.

115. Craig Donais failed to exercise reasonable care in publishing a false and defamatory statement of fact about the plaintiff to a third party, where no valid privilege applied to the communication.

116. These defamatory statements by Craig Donais were directed at private persons.

117. Further, Craig Donais's statements were made with actual malice, evidenced by his reckless disregard for the truth, as he knew that the accusations were false.

118. The plaintiff suffered harm as a direct result of Craig Donais' false, defamatory statements, which caused injury to plaintiff's reputation, honor, and dignity.

119. The plaintiff has suffered professional harm as a direct result of Craig Donais' defamatory statements.

120. Craig Donais has injured the reputation upon which the plaintiff base his profession and business.

121.    Craig Donais made his false statements with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on plaintiff and his rights.

122.    These statements are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury.

123.    These defamatory statement(s) requires no proof of its injurious character because it was obviously hurtful to the Plaintiff, because Donais falsely accused the Plaintiff of committing serious violation of moral conduct and because Donais injured Plaintiff in his or her profession and/or occupation.

124.    These statements were false and defamatory and intended to injure the reputation of the plaintiff.

125.    Plaintiff has been harmed by Craig Donais' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

126.    Craig Donais' false and defamatory statements caused the plaintiff to suffer reputational, emotional, and professional harm. The statements caused Plaintiff reputational harm, emotional distress, and economic damages, satisfying all elements of defamation.

**B. Craig Donais' False Statements About Plaintiffs To Family Members in 2019 and 2020**

127.    Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

128.    In 2020, Craig Donais made false statements to his family members indicating that the plaintiffs were seeking to come to their house and physically harm his wife and their sons, that the plaintiffs were physically dangerous and were criminal people who were bent on hurting his wife and sons, and that both his wife and sons were afraid of the plaintiff for those reasons. Craig Donais perpetuated these false statements to friends, and to other members of his family, including his sons. In August 2020, Craig Donais told his wife and his sons Garrett Donais and Aiden Donais of these false statements about the plaintiff, intending to induce fear and hysteria concerning the plaintiff. This is inferred from communications obtained via a right to know request that revealed the involvement of Craig Donais' children.

129.	Craig Donais made false statements that his wife and children were in fear of their lives because the plaintiff was a criminal who was mentally unstable and bent on physically harming his wife and sons. Craig Donais told others that his wife was afraid to be at home during the day when he was at work because of what the crazy criminal dangerous plaintiff was bent on doing.

130.	Each of these statements was false. Plaintiff has never threatened Craig Donais, his wife or his sons, and plaintiff has no history of violence, and has never been involved in any criminal conduct. Plaintiff only spoke orally to Craig Donais once on the phone in January 2017 and has never orally spoken to him again since then. Further, Plaintiff has never had any direct communication with Mary Donais. Craig Donais made these statements without conducting any independent verification of their truthfulness and without any reasonable basis for believing them to be true.

131.	Craig Donais' statements were used by Craig Donais in August 2020, to support a defamatory scheme concocted by Craig Donais, which plaintiff later became aware of later in the fall of 2020 via right to know requests by the plaintiff. Craig Donais and Mary Donais manufactured and perpetuated this false and unfounded fear and hysteria pertaining to the plaintiffs. In order to perpetuate the lie that plaintiffs were seeking to physically harm them, Craig Donais and Mary Donais concocted the lie that Mary Donais and her sons, Garret and Aiden Donais, were afraid for their lives because of the plaintiff and because the plaintiff was mentally unstable, was criminal, dangerous and who was planning/bent on criminally harming them. Craig and Mary Donais specifically told these false defamatory statements to their sons, Garrett and Aiden, in order to enlist them as purveyors of the false unfounded fear and hysteria pertaining to the plaintiff.

132.	That suggestion by Craig Donais / Mary Donais that plaintiffs were dangerous and posed a violent criminal threat to them and her sons, accords with a racially stigmatizing stereotype of black people as inherently dangerous and violently criminal. Those damaging and stigmatizing communications stem from an improper motive on the part of Craig and Mary Donais. Craig and Mary Donais had no rational or reasonable basis to issue those statements about plaintiffs. Craig and Mary Donais evidently was motivated by personal and racial animus towards plaintiff as evidenced by the racial stereotype/dog whistle employed by Craig & Mary Donais.

133.    Craig Donais thus perpetuated these false statements and added to the fear and hysteria pertaining to the false defamatory statements about the plaintiffs. Craig Donais conspired with Mary Donais to defame and injure the plaintiff and to enlist their sons in this defamatory scheme, as evidenced by communications obtained via right to know requests, and the coordinated actions between them to present the defamatory statements to others and to cause the widespread broadcasting of this defamation in August 2020, (as evidenced by information obtained via right to know requests in October 2020, where the coordination of Craig Donais and Mary Donais, as well as involvement of their sons, were revealed via email communications in August 2020).

134.    Craig Donais is the one who first involved his family in this dishonest scheme to injure the plaintiffs. Craig Donais was the one who brought his wife and sons into this scheme, referencing the involvement of his wife and sons. Craig Donais should not have involved his wife and sons in his defamatory scheme.

135.    Note: This is the conduct of a sociopath. To disrupt the sanctity of his home with creating false, unfounded fear of harm of his wife and children by the plaintiffs, is the conduct of a sociopath.

136.    This defamation campaign was intended to ostracize plaintiffs from Manchester NH community (where the plaintiff had ties to the local NAACP, which Craig and Mary Donais knew about from scouring the internet, searching[2] for information on the plaintiffs and which information was located on plaintiffs' linked-in), and ultimately to drum up sympathy and support for causing this lie and false hysteria to be publicly broadcasted and disseminated widely, which broad public dissemination was eventually fully effectuated by August 2020. This dissemination by Craig Donais, framed the plaintiffs as crazy dangerous criminal black people bent on physically coming to their house when his wife was alone with their children, to physically harm her and perpetuate criminal acts upon her and her children. This included a call for a watch-out in their neighborhood to look out for the plaintiff in the Manchester NH area as the plaintiff was criminally dangerous and bent on harming his wife and her children. The plaintiffs could not feel safe to return to the Manchester NH area because of this widespread defamation broadcasted across the community. The plaintiffs ability to work on

---

[2] Craig Donais and Mary Donais were and have been obsessed with the plaintiffs. They sought to dig into every aspect of plaintiffs' lives, even seeking to track the plaintiffs, and seeking to identify and follow up on every place plaintiffs lived to try to discover their location, and have essentially engaged in conduct bordering on stalking the plaintiffs, with Craig Donais even going as far as to enlist his friends/contacts to try to track down plaintiff's address and to call plaintiff's phone to find out their location.

Manchester NH, including with the NAACP in Manchester NH, or engage in any social or community relations in Manchester NH, was significantly damaged. Plaintiffs suffered tremendous harm as a result of the defamation campaign of Craig Donais and Mary Donias.

137.    Craig Donais made statements attributing to his wife the allegation that the plaintiff was going to physically harm her. Why did she think that? How would she have come into knowledge about certain alleged facts about the plaintiff that would lead her to conclude that the plaintiff was going to harm her?

138.    It is self-evident that Craig Donais told his wife lies about the plaintiff that made her think that the plaintiff was going to physically harm her and her children.

139.    The plaintiff had never said anything about Mary Donais to Craig Donais or to anyone. The plaintiff did not know Mary Donais or know about Mary Donais or know anything about Mary Donais until he first heard of her when Craig Donais himself first brought her up in emails discovered via a request to know request submitted in October 2020.

140.    It can be inferred that the only way that Mary Donais could think that the plaintiff was going to physically harm her is for Craig Donais to have told her defamatory things about the plaintiff that were not true, things that led her to think that the plaintiff was dangerous, violent, and criminal and that the plaintiff was going to physically harm her and her children.

141.    Publishing a statement to only one third party is enough to establish defamation. This includes false defamatory statements to family members including wife and sons, etc.

142.    A false statement by a husband to his wife is still defamation just as how a false statement by a son to his father or a daughter to her mother is still defamation. Family members do not have unfettered right to make false statements about other people to their family members. See Johnson v. Queenan, 12 Mass. L. Rptr. 461 (2000) (court holding statements by daughter to her mother about her rape were only conditionally privileged and therefore subject to being overcome by proof of malice, recklessness, excessive publication, etc.).

143.    Without the false defamatory statements made to her by husband Craig, Mary Donais would likely not have had any reason to think that the plaintiff was dangerous, violent and criminal, and/or that the plaintiff was going to physically harm her and her children. This suggests that Craig Donais lied to his wife and stirred

up his wife to act against the plaintiff, as they fed off each other, building on these lies and false allegations and where they encouraged each other to spread these lies to others. Thereafter, Mary Donais joined her husband in spreading and disseminating these lies about the plaintiff.

144.    Craig Donais, by falsely fabricating that plaintiff posed a criminal threat to his family, was laying the groundwork to inflict violence or to have violence inflicted upon plaintiff and his wife, and to justify in advance, the basis for such violence against the plaintiff and his wife. Craig Donais sought to stir up hysteria in the Manchester NH community, about the criminal threat of harm by the plaintiffs, by disseminating this to the Manchester Crime-Line board, by enlisting the help of neighbors to be on the watch for the plaintiffs, by telling family and friends, in order to create justification for violence on the plaintiffs, who were frequently in the Manchester NH area, at the NAACP location, which was within a few miles of Craig Donais' home (and Craig Donais knew of plaintiff's affiliation with the NAACP). By creating this atmosphere of false accusation concerning plaintiffs and danger for plaintiffs, when plaintiffs discovered this, the plaintiffs could not continue to work with the NAACP in Manchester NH. This was extreme and outrageous conduct by Craig Donais.

145.    NB: In the dark history of this country, defamatory lies have been told countless times to stir up crowds to lynch black men by riling them up with falsehoods about how they intended to hurt or harm the wives of white men. This should not be countenanced in any way, shape or form in the 21st century America. Plaintiff believes a jury would find this abhorrent disgusting lie to be wholly unacceptable, wholly damaging and punishable to the fullest extent of the law.

146.    Craig Donais published these statements to third parties in the Manchester community where plaintiff was active with the NAACP and maintained professional relationships.

147.    Craig Donais disclosed these false statements and accusations to the following persons:

    a.  Mary Donais (his wife)
    b.  Garrett Donais (his son)
    c.  Aiden Donais (his son)
    d.  Craig Donais' other family members
    e.  Craig Donais' friends

148.    It should be noted that Garrett Donais is 24 years old and is trained as an "order of the arrow" section chief and an Eagle Scout, with survival skills. He would have been about 19 years old in 2020, which is an adult

age. Also, Aiden Donais is around 18 years old, and would have been 13 or 14 years old in 2020. This is noteworthy because Craig Donais tried to further elicit sympathy for him and wife concerning the fear of harm for their sons, by trying to infantilize them as "young children", which was misleading at best. Craig Donais intentionally infantilized his sons, calling them "young child" or "young children", in order to amp up the level of criminal threat posed to his wife and "young children". The plaintiff and his wife did not know Craig Donais had children. But even if the plaintiff knew of his children, why would the plaintiff (and his wife) want to harm or hurt Craig Donais' children, much less his so-called "young children"? Where did this fear or belief come from? It is simply irrational to have this fear based on nothing. The rational explanation of where this so-called fear came grom is that it came from Craig Donais' concoction and fabrication of this fear based on lies about the plaintiffs. By painting the picture that plaintiff wanted to harm his young children, Craig Donais tried to falsely defame plaintiff as being the kind of people who would hurt young kids. This is a disgusting despicable lie told on the plaintiffs. The plaintiffs have dedicated much of their lives to helping children, in particular from under-served backgrounds, and plaintiff started a non-profit to improving the lives of the youth through education and training in negotiation, conflict resolution and leadership. Further, the plaintiffs has worked with the well-known youth non-profit in Boston, called BUILD inc., as a youth mentor and business plan competition judge. Also, Bisasor has prior experience as an educator in the public school system in lower-income communities. Bisasor has a life of service to empowering and helping the youth. To defame the plaintiff as someone who was planning to hurt young children, or even capable of doing such harm, is particularly hurtful and damaging. Moreover, as a Christian minister, this is further hurtful and damaging to the plaintiff.

149.     Thus, in publishing these statements, Craig Donais published defamatory statements to a wide range of persons and severely damaged the reputations of the plaintiffs. This primarily occurred in August 2020.

150.     Note: NH law on defamation only requires false defamatory statements to be published to at least one other person to sustain an action for defamation.

**C. Further Facts Regarding Craig Donais' False Statement of [Absurd/Frivolous] Racism Accusation**

151.     Craig Donais published false statements, that plaintiff falsely accused Craig Donais of racial discrimination.

152.     Craig Donais made false statements about plaintiff that are defamatory and damaging to the plaintiff's reputation, and injurious to the plaintiff's legal rights. The very purpose of him making these statements was

to damage the plaintiff and harm the plaintiff's reputation and credibility. For example, Craig Donais made written statements to others saying that the plaintiff accused him of race discrimination because he (Craig Donais) declined to represent the plaintiff, in a case against a defendant hotel, that the plaintiff became upset and angry because he (Craig Donais) declined representation and thus accused him (Craig Donais) with no reason or basis of being a racist.

153.    This was based on nothing and no actual facts that occurred, but it was manufactured by Craig Donais to attack the plaintiff with an inflammatory accusation that could stick because the plaintiff is black. This is dog whistle racism intended to hurt and harm the plaintiff's reputation.

154.    These statements by Craig Donais were made with malicious intent and reckless disregard of the truth.

155.    In making these statements, Craig Donais was motivated by racial animus and intended to exploit the plaintiff's race as a black man and to use it against him. These false accusations (by Craig Donais) of race discrimination accusation by the plaintiff is tantamount to him playing the "race card in reverse".

156.    The statements by Craig Donais were false, disparaging, and negative statements about the plaintiff. It is analogous to a man saying that a woman falsely and frivolously accused him of rape, based on no reason or facts that occurred. If the woman made no such accusation, then the statement is defamatory and harmful to her reputation and intended to create despise and contempt of her in the community, much less if presented to a court or to law enforcement or others. It would be intended to paint the woman as a crazy irrational woman seeking to falsely accuse a man of rape. The same is true in this case where Craig Donais falsely stated that the plaintiff frivolously accused him of race discrimination as such a statement is likewise defamatory and harmful to the plaintiff's reputation and intended to create despise and contempt of the plaintiff in the community and the public.

157.    Craig Donais' false and defamatory statements were gratuitously and maliciously made in order to harm, annoy, embarrass, humiliate, and burden and oppress the plaintiff. It had no other purpose. Craig Donais completely fabricated a lie to publicly malign the plaintiff. The plaintiff felt utterly violated and harmed that someone--an attorney nonetheless--would exploit the issue of racism, which is something so painful for so many people in this country.

158.    Craig Donais fabricated and utilized his lie about racism to willfully intimidate plaintiff and to interfere with and injure the plaintiff because of the plaintiff's race, and it was done and perpetuated to others in order to exact revenge on the plaintiff and/or to intimidate, harass, burden and retaliate against the plaintiff.

159.    Craig Donais' acts were motivated by racial animus, and it was done to exploit the plaintiff's race to bring harm to him. He targeted the plaintiff exploiting the fact that the plaintiff is black and thus use race as a weapon against the plaintiff. Blacks are generally vulnerable to these kinds of attacks and stirred up sensibilities in light of today's racial polarization. He wanted to make a caricature of the plaintiff as despicable, untrustworthy, irrational person. It is a form of racialized character-assassination and a racialized attack against the plaintiff.

160.    Craig Donais only brought up, falsely, that the plaintiff accused him of racism because the plaintiff is Black. It was thus racially motivated. If the plaintiff were White, such a fabricated lie would not stick.

161.    Moreover, Craig Donais had ulterior motives in that he wanted to intimidate the plaintiff and to shut the plaintiff up and to silence the plaintiff (and his wife).

162.    Craig Donais thus accused the plaintiff essentially of ridiculously, baselessly, and frivolously calling Craig Donais a racist. Craig Donais thus used what is known or referred to as "the race card" (which is a pejorative reference to the illegitimate and groundless insertion of racism accusations into a situation), when in actuality Craig Donais himself was the one trying to illegitimately and groundlessly exploit the sensitive issues related to race by using it as a preemptory strike with his bald lie against the plaintiff. Craig Donais thus tried to manipulatively (or perhaps masterfully) "play the race card" on the plaintiff. Aside from this being outrageous behavior, it was truly troubling that a licensed attorney would go that far to try to damage and disparage someone through such blatant and scurrilous lies. This was particularly despicable because it is evident that Craig Donais was relying on racial bias to achieve his ends--he was hoping that those who heard his false statements would immediately take a hostile disposition towards the plaintiff. Yet Craig Donais completely fabricated this story. The plaintiff felt utterly violated in that someone—an attorney nonetheless--would so exploit racism, which is something so painful for so many people in this country.

163.    Contrary to Craig Donais' ridiculously false assertion, at no time did plaintiff claim that Craig Donais was discriminating against the plaintiff because Craig Donais did not take the case. This is a nonsensical allegation.

It just does not make sense in the context of such a discussion for the plaintiff to assume and allege that Craig Donais was discriminating against the plaintiff. Moreover, what would the plaintiff hope to gain? To force him to represent the plaintiff? What kind of representation would that be? It is just not credible. Moreover, this is an unadulterated lie. This is for a jury to determine who is more credible and who is telling the truth.

164.    Craig Donais blatantly made up out of "whole cloth" the idea that the plaintiff accused him of discrimination. This is not a matter of interpretation of words. The plaintiff did not utter any such words that could even be misinterpreted. No such words left the plaintiff's mouth. In fact, to the contrary, the conversation between the plaintiff and Craig Donais ended amicably and on good terms. There was no abrupt ending. Craig Donais has blatantly and unscrupulously lied about the plaintiff accusing him of discrimination which is a blatant and dangerous lie. This demonstrates that Craig Donais is the kind of person who would bear false witness against others and is capable of lying to put someone in jail/prison by false testimony. As such he is a disgrace to and a blithe on the legal profession. It is even worse that Craig Donais has chosen to tell such a despicable lie on an African American man. If Craig Donais has lied about the plaintiff making this statement (which Craig Donais did), then this issue, though it began as a conflict of interest issue, it is about Craig Donais falsely accusing the plaintiff of accusing him of discrimination, which becomes evidence of an attempt to use the plaintiff's race against the plaintiff (i.e. the "race card" in reverse).

165.    Craig Donais was trying to use the plaintiff's race against the plaintiff, by accusing a black man of making ridiculous false accusations of discrimination with the intent to imply that because he is a black man, it should be believed that he made such ridiculous false accusations. Craig Donais fabricated and utilized his lie about racism to willfully intimidate plaintiff and to interfere with and injure the plaintiff because of his race. Craig Donais has falsely styled himself as a victim of a false accusation of being called a racist by the plaintiff. This despicable lie by this white attorney of law perpetrated on the plaintiff was intended to target the plaintiff because of his race. It was intentional and it was motivated by racial animus/racial bias. Nothing angers people more than a person who falsely accuses a white person of racism. This is a major sore point in today's culture. Craig Donais was trying to exploit racial tensions in our society to harm and discredit the plaintiff. He wanted to really damage the plaintiff. Craig Donais was inciting fragile racial sensibilities and attitudes, and intended

to exploit a culture of hostility towards those black people who are presumed to "cry wolf" about racism. Craig Donais was seeking to fan the flames of racial tensions and used it as a form of a weapon against the plaintiff. Craig Donais weaponized the race card issue and deployed it against the plaintiff. It is a form of racialized character-assassination and a racialized attack against the plaintiff. Craig Donais only brought up that the plaintiff accused him of racism because the plaintiff is black. It was thus racially motivated. If the plaintiff were white, such a fabricated lie would not stick.

166.    Moreover, Craig Donais wanted to intimidate the plaintiff (and his wife) and to shut the plaintiff up and to silence the plaintiff. Craig Donais falsely implied and affirmatively intended to imply that the plaintiff had invented a racism accusation, essentially as a hoax, based on the groundless basis that he declined to represent the plaintiff. It was intended to make it seem that the plaintiff was irrational, crazy, in concocting a racism accusation based on nothing or based on a silly reason.

167.    The plaintiff had spoken to Attorney Elliott Berry about this and Attorney Berry was outraged by this. Mr. Berry has indicated that this would in fact be evidence of discrimination against the plaintiff, by trying use the plaintiff's race against him in such a manner i.e. accusing a black man of making ridiculous false accusations of discrimination with the intent to imply that because he is a black man, it should be believed that he made such ridiculous false accusations. It is also intended to undermine the legitimate experience of mistreatment that the plaintiff suffered.

168.    NB: What Mr. Donais has done is also similar to, or at least reminiscent of, a hoax like the one allegedly perpetrated by Jussie Smollet. Our society was outraged at the prospect that Mr. Smollet could have fabricated a lie that he was called the "N" word (a racial slur) and the "F" word (a gay slur). He was subjected to criminal prosecution for this alleged lie/hoax. He lost his job on the hit TV show "Empire" because of this lie/hoax. Mr. Donais' conduct is in a similar category of what Mr. Smollet was alleged to have done, which is to exploit racial tensions to make false accusations pertaining to racism.

169.    It is a form of racialized character-assassination and a racialized attack against plaintiff. Donais only brought up that the plaintiff accused him of racism because he is black. It was thus racially motivated. If the plaintiff were white, such a fabricated lie would not stick.

170.   Moreover, Donais wanted to intimidate the plaintiff and to shut the plaintiff up and to silence the plaintiff.

171.   The false statement was published with knowledge of its falsity and/or with reckless disregard for the truth.

172.   Craig Donais knew it was false to state that the plaintiff accused him of racism because he declined to represent the plaintiff.  Craig Donais knew that the plaintiff did not accuse him of racism at all.

173.   Craig Donais' defamatory claim that the plaintiff had accused him of racism for declining representation was false. Craig Donais knew he was lying when he said that the plaintiff had accused him of racism for silly reasons, that he himself had invented out of whole cloth. Donais knew the plaintiff was telling the truth when the plaintiff denied making the statement after the plaintiff found out about his statement but yet Donais persisted in saying to several 3rd parties that he was telling the truth and that plaintiff was not telling the truth.

174.   Because these statements tend to injure plaintiff in his profession or trade, they constitute defamation per se. They tended to (and did) damage plaintiff in his trade, occupation/business, and they were defamatory on their face without reference to any extrinsic information. Because the statement affected plaintiff or may have affected plaintiff in his profession by "*imputing to [me]…fraud, dishonesty, [and/or] misconduct…*", the statement constitute libel per se. See Grimaldi v. Schillaci, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

175.   The plaintiff has suffered harm as a direct result of Craig Donais' false, defamatory statement, which caused injury to plaintiff's reputation, honor, and dignity. Plaintiff has suffered professional harm as a direct result of Craig Donais' defamatory statement. Craig Donais injured the reputation upon which the plaintiff based his business and livelihood as a consultant. Craig Donais made his false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on the plaintiff and his rights. These statements are untrue and harmed the plaintiff.

176.   Subsequently and additionally, Craig Donais has repeated and republished his false defamatory statements about the plaintiff on more than one occasion and has continued to publish these defamatory statements with impunity and abandon. Craig Donais knew the statements made were false and deliberately inflammatory when he made them. Plaintiff's reputation has been damaged by Craig Donais' false allegations. Craig Donais' false and defamatory statement caused the plaintiff to suffer reputational, emotional, and professional harm. The false statement was published with knowledge of its falsity and/or with reckless disregard for the truth.

**D. Plaintiff Absolutely Denies Accusing Craig Donais of Racism Because Craig Donais Declined To Represent Plaintiff in a Court Case in a 7-Minute Prospective Client Call**

177. In order to set the record straight, the plaintiff absolutely and categorically denies accusing Craig Donais of racism because Craig Donais declined to represent Plaintiff in a court case in the context of a 7-minute first-time prospective client call that Craig Donais initiated with the Plaintiff a while ago, back in 2017.

178. The plaintiff repudiates a series of statements subsequently made by Craig Donais, to several people, including to the crime-line board, that essentially, in sum, goes along the lines of the following: that plaintiff challenged Craig Donais' declination while on the prospective client call, and that Craig Donais told plaintiff that his practice does not include racial discrimination cases, and even if it did, Craig Donais would need perform a check for conflicts before undertaking representation. And that upon hearing that, plaintiff became upset, and that Craig Donais repeatedly told plaintiff that Craig Donais was not interested in the case, and that representation in discrimination cases was not within Craig Donais' practice. And then that plaintiff pointed out to Craig Donais that he did real estate law, and then plaintiff began questioning why Craig Donais was declining to represent plaintiff, and then plaintiff accused Craig Donais of discriminating against him whereupon Craig Donais immediately denied that he was discriminating against the plaintiff. And that Craig Donais abruptly ended the call thereafter.

179. Plaintiff now sets the record straight for purposes of ensuring the record is clear as follows:

   a. Contrary to Craig Donais' assertion, the plaintiff did not "challenge" Craig Donais' declination of representation.

   b. Contrary to Craig Donais' assertion, Craig Donais did not tell plaintiff that he did not do race discrimination cases.

   c. Contrary to Craig Donais' assertion, the plaintiff did not mention the words "race", "racism", "race discrimination", "discrimination", "discriminating" or "discriminate" (or any variation of those words) in the plaintiff's conversation with Craig Donais. Neither did Craig Donais mention nor say any of those words on the call.

   d. Contrary to Craig Donais' assertion, Craig Donais did not tell the plaintiff that he would need to perform a check for conflicts before undertaking representation.

e.  Contrary to Craig Donais' assertion, the plaintiff was not upset and did not become upset at any point in time during the conversation with Craig Donais. The call ended amicably and in polite fashion with no hint of anger, or of a disagreement or argument whatsoever.

f.  Contrary to Craig Donais' assertion, Craig Donais did not repeatedly tell the plaintiff that he was not interested in the case and that representation in discrimination cases was not within his practice. Again, there was no mention whatsoever of the term "discrimination" or "race" by Craig Donais.

g.  Contrary to Craig Donais' assertion, the plaintiff did not "note" that Craig Donais did real estate work, and the plaintiff did not "question" why Craig Donais was declining to represent the plaintiff when there was a "real estate" element.

h.  Contrary to Craig Donais' assertion, the plaintiff did not become even more upset that Craig Donais was declining to represent him.

i.  Contrary to Craig Donais' assertion, plaintiff did not accuse Craig Donais of discrimination and at no time did plaintiff intimate, suggest, or insinuate that Craig Donais was discriminating against plaintiff.

j.  Contrary to Donais' assertion, at no point in time did plaintiff accuse Donais of race discrimination.

180.  In fact, the plaintiff did not at any point utter or use the words "discrimination", "discriminating" or "discriminate" in any form or context, at all, whatsoever on the call with Craig Donais. Neither did the plaintiff utter or use the words "race" or "racism" or any version of the word "race", on the call with Craig Donais. Plaintiff only discussed landlord-tenant issues on the call with Craig Donais and did not raise any about discrimination on the call.

181.  Contrary to Craig Donais' assertion, Craig Donais did not immediately deny that he was discriminating against plaintiff, because in fact the plaintiff never made any such accusation if discrimination against Craig Donais. There was nothing for Craig Donais to deny. Craig Donais completely made up, fabricated and manufactured this lie out of thin air.

182.  Contrary to Craig Donais' assertion, Craig Donais did not end the telephone call. The call was mutually ended in a respectful, amicable, polite and friendly manner. There was no friction, or strife or animosity of any kind on the call whatsoever. In fact, Craig Donais said that he would have loved to help the plaintiff but he

was too swamped over the timeline plaintiff needed assistance. And the end of the call, Craig Donais amicably wished the plaintiff good luck with his case.

183.    Further as a point of note, Craig Donais did provide the plaintiff with legal advice during the call and Craig Donais did receive private, confidential privileged communications from plaintiff on the call.

**E. Some Examples of Evidence/Documents That Show Craig Donais Lied About Race Discrimination Accusation**

184.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

185.    Below provides some examples of evidence that corroborates the fact that Donais lied about race discrimination accusation in 2019. Further evidence of false statements and defamation by Donais that will be produced in this case includes but is not limited to: audio recording and video recording (that shows/proves that Donais has made false statements about plaintiffs to others including outside of any court proceeding), certified statement by Attorney Elliott Berry about Donais and his false statements, certified statement by Attorney Robert Obrien, certified statement by Attorney Bussiere about Donais' false statements as well as:

a.    Statements by Donais to the members of Manchester NH Crime-Line Board.
b.    Statements by Donais to his wife and his family members including his sons Garrett and Aiden Donais.
c.    Statements by Donais to Donais' friends, colleagues, and associates.
d.    Contemporaneously Written Notes By Attorney Elliott Berry
e.    2020 Interview of Attorney Elliot Berry
f.    2020 Interview of Attorney Karl Terrell
g.    2020 Interview of Attorney Robert Obrien
h.    2020 Interview of Attorney Bussiere
i.    Nashua District Court hearing transcript and recording.
j.    Transcript Excerpt of Attorney Karl Terrell Testimony in NH Superior Court South
k.    Email chains with Donais, Dave Akridge & Attorney Karl Terrell.
l.    Email from Mark Cornell (of the ADO office) confirming that Craig Donais did not tell his (at the time) co-counsel Karl Terrell about the false racial accusation by plaintiff, until Craig Donais filed an affidavit in Circuit Court in March 2017, around 3 months after the January 9, 2017 call, where the plaintiff purportedly accused Craig Donais of racism for declining to represent the plaintiff. If plaintiff had made such an accusation, why did not Craig Donais tell his co-counsel at the time for 3 months? This corroborates the fact that Bisasor made no such accusation against Craig Donais.



186.    It should be noted also that there are court transcripts of hearing in the Nashua circuit court and in the Hillsborough superior court South, proving breach of fiduciary duty and conflict of interest by Donais, includes but is not limited to email from Elliott Berry showing Donais breached fiduciary duty. Note: See also FIERRO v. GALLUCCI - United States District Court, E.D. New York. Dec 4, 2007, which case is on point for issues related to prospective clients.

### **F. Additional Points About Craig Donais' False Accusation About Fabricated Recording**

187.    In his campaign to discredit the plaintiff in the Manchester NH community, including with the crime-line board, and others, Craig Donais went further to add insult to injury by further ratcheting up his allegations by telling others that the plaintiff had fabricated or would fabricate a recording to put his voice on a recording and claim it is his voice on it. This relates back to his false accusation that plaintiff accused him of racism for declining to represent plaintiff in a 7 minute phone call between Craig Donais and plaintiff. Craig Donais knew that plaintiff had publicly stated that Craig Donais had lied about that.

188.    So, Craig Donais thus accused plaintiff of being the type of person who was so low in character that he would actually go to the trouble and lengths to fabricate a recording with Craig Donais' voice in order to prove that Craig Donais was dishonest, and thus that plaintiff had done, or was capable of doing, such treacherous criminality of fabricating a recording, which ostensibly would constitute a crime of falsifying evidence. Plaintiff cannot emphasize enough here how much of a nasty serious allegation was being made by Craig Donais here. This was clearly intended to discredit plaintiff and destroy plaintiff's reputation.

189.    This was preemptive attempt to discredit plaintiff should, on the chance, plaintiff actually have a recording of Craig Donais, that showed that Craig Donais was lying about the racism accusation. Craig Donais was doing

this preemptively to protect himself, and to save face, because he knew he had lied, and was so concerned about this that he felt it necessary to preemptively strike at the credibility, authenticity or veracity of any such recording if it existed. This is evidence of a guilty mind or guilty conscience. If Craig Donais was innocent and had not lied, then he would not have been so worried and he would not have needed to think ahead to discredit a purported recording that he did not even know if it existed, or what would be on it if it existed. An innocent person would welcome a recording of a disputed event because it would show he is innocent or telling the truth about the event. However, a guilty person who is guilty of lying would not welcome such a recording because he would know that he would be proved to be lying. The fact that Craig Donais was trying to preemptively and prematurely attack a possible recording, by preemptively assuming that if a recording of him existed, it would automatically show he was lying, shows that Craig Donais, in his own mind, knew that he was lying. These circumstances show that Craig Donais entertained serious doubt about the truth of his statements.

190.    So, why would Craig Donais make such a statement? Why does he evidently seek to get out in front of this issue of a recording showing his dishonesty, by prematurely pointing to a recording that plaintiff would have fabricated, altered or doctored to show his dishonesty? The only reason to say such a thing is because he had a guilty conscience and was trying to preemptively provide an explanation if in case there was a recording showing that he was lying. This is a critical point. It shows that Craig Donais entertained serious doubts about the truth of his statements and that he knew that he lied about the accusations of racism, and that he was afraid that a recording would or could expose him to be a liar. So, he evidently was thinking ahead, in case a recording showed him to be lying, in that he would have already presented a cover story to cast doubt on the veracity of such a recording should such a recording be produced. But why anticipate at all that anyone could produce such a recording, showing that he was lying? Why even go there? Why even imagine that as a probable outcome? Because he knew that he was lying. It speaks to his state of mind at the time he made these statements to the crime-line board, and others. See St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323 (1968 ("[R]ecklessness amounting to actual malice may be found where the defendant deliberately ignores evidence that calls into question [his] published statements"); St. Amant, 390 U.S. at 732 ("recklessness may be found where there are obvious reasons to doubt" the truth of the published statements). The US Supreme Court has

established that a finding of "reckless disregard" requires evidence…that the author "in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 730-731 (1968). See also McAvoy v. Shufrin, 401 Mass. 593, 598-599 (1988). The above statements provide evidence that Craig Donais had obvious reasons to "doubt" the truth of his published statements and also that Craig Donais "in fact entertained serious doubts as to the truth of his publication."

### G. Additional Points About Craig Donais' False Statements About Plaintiffs

191.    These statements were made not in court proceedings and when there was no court proceeding that was ongoing. They are not and cannot be privileged. These statements are defamatory. These statements are lies. These statements are patently false. There is no truth to them whatsoever. When Donais made these statements, he knew these were false. He made up these statements out of whole cloth. He had perfect knowledge that the opposite of what he said was true. He thus maliciously and wantonly made these false defamatory statements. Donais made these statements with ulterior motives, to deflect from his misconduct and to intimidate, harass and retaliate against the plaintiff.

192.    Any reasonable person would reasonably want to vindicate their right to stop the reputational harm from such false and injurious statements. To state or imply that someone is or did any of the above is per se defamatory. By defaming plaintiffs, Donais sought to publicly humiliate plaintiffs and force plaintiffs to live with a continual question mark over plaintiffs.

193.    It should be noted that a Massachusetts Superior Court judge found that false accusations of racism by Donais, if proven, are valid grounds to seek a defamation claim. Thus, this Massachusetts precedent directly validates plaintiffs' defamation claims. Further, the New Hampshire Attorney Discipline Office ("ADO") opined in an ADO proceeding, in September 2020 that, if Donais did and said the things alleged by plaintiffs (concerning the false accusations of racism) and they are false, it would constitute defamation and should be brought in a lawsuit (as the ADO is not designed to resolve defamation claims that are better suited to be resolved in a court of law).

194.    The crux of the matter here is that Craig Donais is not going to stop if he is not held accountable. This suggests Craig Donais is a sociopathic liar, whose lies could get someone falsely arrested, imprisoned, or killed.

195.    There is no basis for Craig Donais to claim that he/his family were in fear of safety from the plaintiff. It is unconscionable for Craig Donais to suggest or accuse the plaintiff of being dangerous or violent criminals, capable of harming his wife and children so much so that he and his wife were in fear for their safety and require a watch-out in their neighborhood to protect them from the plaintiff. This is not only classic dog-whistle racism, exploiting stereotypes of black people as dangerous and violent without any basis other than race, but it is malicious and dishonest defamation.

196.    Some people might not to be too concerned when white people tell lies on black people using race as a motivating factor. Plaintiff understands that it might be uncomfortable for some in our society today to hear and confront such matters or to put oneself in the shoes of a black person to understand what it is like to be subjected to such things. Yet, there is no room to look the other way with how certain white people exploit race and racism to hurt blacks like this. This country, under the current presidential administration, has been desensitized to much of the concerns about race and racism and have emboldened many to scoff at such concerns. People like Craig Donais have evidently been empowered to feel as though they can do these things with impunity and get away with it. Whenever a black person raises concerns about race, in many instances it is treated as though it is false or not valid. People like Russell Hilliard and Craig Donais then try to use it as evidence that a black person is not credible because if that person points out racism more than once, then such person has used up their one quota to call out racism. Yet, Julian Jefferson, a well-known black public defender attorney in NH, recently gave testimony before the governor outlining his experiences with or observations of everyday racism in New Hampshire and Massachusetts from multiple people. Is he not credible because of such experiences? If Craig Donais and Russell Hilliard were to have their way, they would no doubt attack Julian Jefferson for stating he experienced or observed more than once experience of racism in NH & MA.

197.    The bottom line is that Craig Donais started out using race and racism against the plaintiff and plaintiff's wife in 2017. He continued to use race against us in 2019 and again 2020. This has to stop, and he must be held accountable.

### COUNT 1 - Defamation and Defamation Per Se — 2019 CrimeLine Board
### (Against Craig S. Donais)

198.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

199.    In June 2019, Craig Donais published the following false and defamatory statements of fact about Bisasor to members of the Manchester CrimeLine board: that Bisasor had burglarized and bugged Donais's office telephone; that Bisasor had fabricated an audio recording; that Bisasor had falsely and frivolously accused Donais of racism; that Bisasor is a criminal; and that Bisasor is mentally ill and has a mental disease. Each statement was a statement of fact, not opinion, and each was demonstrably false. *Thomas v. Telegraph Publ'g Co.*, 155 N.H. 314 (2007) (distinguishing actionable fact from protected opinion). These statements were published to multiple third-party CrimeLine board members. Donais acted with fault amounting to actual malice—he knew the statements were false because he had fabricated the underlying narrative himself, was aware of the contrary judicial finding, and knew no criminal charges or mental health diagnoses existed. The statements are defamatory *per se* because they impute the commission of felony crimes, attribute mental disease, and injure Bisasor in his trade and profession. No absolute privilege attaches because the CrimeLine board is a private 501(c)(3) nonprofit with no adjudicatory function. *Supry v. Bolduc*, 112 N.H. 274 (1972).

200.    As a direct and proximate result of these defamatory statements, Bisasor suffered damages including loss of reputation among community stakeholders, loss of professional relationships, severe emotional distress, and other actual and consequential damages. In addition, because the statements are defamatory *per se*, damages are presumed as a matter of law. Plaintiffs seek compensatory damages, punitive damages, and attorney's fees.

**COUNT 2 - Defamation and Defamation Per Se — 2019 Manchester Police Department
(Against Craig S. Donais)**

201.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

202.    In June 2019, Craig Donais published the following false and defamatory statements of fact about Bisasor to the Manchester Police Department, using the deceptive alias "Manchester Blue & You": that Bisasor was mentally ill; that Bisasor had a tenuous grasp on reality; that Bisasor had manufactured a recording and fabricated Donais's voice on it; that Bisasor had bugged Donais's telecommunications systems; and that Bisasor was a dangerous, violent criminal threat. Each statement was a statement of verifiable fact, each was demonstrably false, and each was published to third-party law enforcement officers. Donais acted with actual malice for the same reasons set forth above: he knew the statements were false, he fabricated the underlying

52

narrative, he was aware of the contrary judicial finding, and he used a deceptive alias to target a specific professional contract for destruction.

203.    The statements are defamatory *per se* because they impute the commission of felony crimes, attribute mental disease, and injure Bisasor in his trade and profession. No absolute privilege attaches. Although *McGranahan v. Dahar*, 119 N.H. 758 (1979), recognized that complaints to a prosecuting authority may be treated as initial steps in a judicial proceeding, that rule does not apply here. Donais's statements did not result in any criminal charge, arrest, investigation, or judicial proceeding. They were not made for the purpose of initiating criminal process but for the purpose of destroying Bisasor's professional contract with the Police Department. Donais used a deceptive alias rather than identifying himself—conduct inconsistent with a good-faith law enforcement complaint. The statements targeted a specific professional relationship for destruction, not the commencement of criminal proceedings. These are private, retaliatory, defamatory communications, not legitimate complaints to prosecuting authority entitled to absolute protection under *McGranahan*. Any qualified privilege is defeated by actual malice and the excessive scope of publication.

204.    As a direct and proximate result of these defamatory statements, Bisasor suffered damages including the loss of his community-policing contract with the Manchester Police Department (a partnership worth several thousand dollars), destruction of the NH Blue & You community engagement initiative, loss of his professional relationship with the Manchester Police Department, severe emotional distress, and other actual and consequential damages. Because the statements are defamatory *per se*, damages are also presumed as a matter of law. Plaintiffs seek compensatory damages, punitive damages, and attorney's fees for this count.

### COUNT 3 - Defamation and Defamation Per Se — 2020 Statements by Craig Donais
#### (Against Craig S. Donais)

205.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

206.    In August 2020, Craig Donais published the following false and defamatory statements of fact about Plaintiffs to his sons Garrett Donais and Aiden Donais, other family members, and friends: that Plaintiffs were planning to come to the Donais residence to physically harm his wife and sons; that Plaintiffs were physically dangerous criminal people; and that the family should fear for their lives because of Plaintiffs. He characterized his sons as "young children" to amplify the perceived threat, despite Garrett being a legal adult. Each statement

was a statement of verifiable fact, each was wholly fabricated, and each was published to 3rd parties. No threat was ever made. No contact was ever attempted. No evidence of any kind supported the statements. Donais acted with actual malice—he knew no threat existed, he knew no threatening communication had been made, and he deliberately fabricated statements to portray African American Plaintiffs as violent, criminal, dangerous.

207.    The statements are defamatory *per se* because they impute the commission of crimes (planning physical harm), attribute violent and criminal propensities, and injure Plaintiffs in their trade, profession, and community standing. No privilege of any kind attaches to private family communications and statements to friends about alleged criminal conduct by Plaintiffs. These are not judicial proceedings, quasi-judicial proceedings, or communications to law enforcement in connection with any proceeding. *Supry v. Bolduc*, 112 N.H. 274 (1972). Even if any qualified privilege could conceivably apply, it is defeated by actual malice and by the excessive scope of publication that followed when the recipients spread the false statements further.

208.    As a direct and proximate result of these defamatory statements, Plaintiffs suffered damages including ostracization from the Manchester community, loss of professional and civic relationships, loss of the NAACP/University of New Hampshire community project contract, severe emotional distress, and other actual and consequential damages. Because the statements are defamatory *per se*, damages are also presumed as a matter of law. Plaintiffs seek compensatory damages, punitive damages, and attorney's fees for this count.

## H. FURTHER DETAILS ON DEFAMATION & DEFAMATION PER SE BY CRAIG DONAIS MADE TO PRIVATE PARTIES

209.    Under NH law, defamation requires that the defendant made a false statement of fact to a third party that harmed the plaintiff's reputation. McGranahan v. Dahar, 119 NH 758, 763 (1979); Pickering v. Frink, 123 NH 326 (1983). It thus, simply, requires (1) a false statement, (2) publication to a third party, (3) fault (negligence or actual malice), and (4) damages.

210.    Further, to constitute defamation per se, the alleged defamatory statement must fit within 1 of 4 classes.

   a.  Statements constituting libel.
   b.  Statements charging the plaintiff with a crime.
   c.  Statements alleging that the plaintiff has certain diseases.
   d.  Statements prejudicing the plaintiff's business or profession.

### A. Summary of Allegations

211.    Here, the allegations involve false defamatory statements made by Craig Donais outside of the courtroom or any judicial proceedings. Again, these false statements are:

a.    That plaintiff was a violent dangerous criminal.
b.    That plaintiff posed a physical threat to Craig Donais and his family.
c.    That plaintiff was mentally unstable and dangerous.
d.    By implication, that plaintiff was bent on stalking the Donais family at their home.

212.    These statements constitute defamation per se under New Hampshire law because they:

a.    Falsely accuse plaintiff of being a criminal or of criminal conduct.
b.    Injure plaintiff in his profession by attacking his character.
c.    Suggest plaintiff suffers from mental illness by characterizing him as mentally unstable.

213.    Craig Donais' actions fall within all four classes. Craig Donais' actions constitute defamation per se entitling Plaintiff to monetary damages in an amount to be determined at trial.

### B. Criminal Accusations

214.    Craig Donais accused the plaintiff of criminal conduct which included that plaintiff bugged his office and fabricating his voice in a recording. Craig Donais also accused the plaintiff of posing a dangerous criminal threat to him, his wife and young child. Criminal accusations are generally regarded as defamatory.

215.    Craig Donais' published statements suggesting that the plaintiff was a criminal, or committed crimes or was a dangerous criminal threat to him, his wife and young child, are false and untrue and have defamed or was intended to defame the plaintiff

216.    These statements by Craig Donais were published in August 2020 to his wife, to his sons, to his family members and friends, and to members of the Manchester crime-line board.

217.    Craig Donais failed to exercise reasonable care before publishing these false statements, making no effort to verify their accuracy despite having no personal knowledge of any threatening conduct by plaintiff.

218.    Because these statements injure plaintiff in his profession or trade, they constitute defamation per se.

219.    These statements tended to (and did) damage the plaintiff in his trade, occupation, and/or business, and these statements were defamatory on their face without reference to any extrinsic information. The statements affected the plaintiff in his profession by "imputing to [me]…fraud, dishonesty, [and/or] misconduct…", the statement constitute defamation per se. See Grimaldi v. Schillaci, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

55

220.    This defamation framed the plaintiff as a mentally unstable criminal. The plaintiff could not feel safe to return to the Manchester NH area and his ability to work in Manchester NH, including with the NAACP in Manchester NH, or engage in any social or community relations in Manchester NH, was significantly damaged. Plaintiffs suffered tremendous harm as a result of this defamation by Craig Donais.

### C. Mental Disease Accusations

221.    Craig Donais published statements suggesting that the plaintiff had a mental disease and was mentally unstable, including that plaintiff is mentally ill/crazy. These statements were published in August 2020 to his wife, his sons, to his family members and friends, and to members of the Manchester crime-line board.

222.    Craig Donais thus published statements that are defamatory per se, intended to damage the plaintiff.

223.    Craig Donais made false accusations which would and did injure plaintiff in his trade and profession.

224.    Craig Donais failed to exercise reasonable care before publishing these false statements, making no effort to verify their accuracy despite having no personal knowledge of any threatening conduct by plaintiff.

225.    Because these statements injure plaintiff in his profession or trade, they constitute defamation per se.

226.    These statements tended to (and did) damage the plaintiff in his trade, occupation, and/or business, and these statements were defamatory on their face without reference to any extrinsic information. The statements affected the plaintiff in his profession by "imputing to [me]…fraud, dishonesty, [and/or] misconduct…", the statement constitute defamation per se. See Grimaldi v. Schillaci, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

### D. False Statement of [Absurd/Frivolous] Racism Accusation

227.    Craig Donais published false statements, that plaintiff falsely accused Craig Donais of racial discrimination. This defamation was grounded in an attempt by Craig Donais to racial stigmatize the plaintiff. This defamatory accusation was made to the Manchester NH Crime-Line board in or around June 2019 and subsequently made again and repeated to several third parties including Craig Donais' family members and friends. Both the NH Attorney Discipline Office and a Massachusetts Superior Court judge have stated that if this allegation is true, then it constitutes actionable defamation.

### E. No Privilege

228.    This count alleges that Craig Donais made false, malicious, and defamatory statements about Plaintiff to multiple third parties including to his family members including his wife, sons, and to other family members and friends, and to members of the Manchester crime-line board, outside the scope of any judicial proceeding.

56

229. Absolute privilege does not apply, as the accusations were made to private persons in private contexts and were extraneous to any legitimate legal purpose and were made/repeated outside of any court contexts. These statements were not made in court or in any judicial context but were disseminated to family, friends, and community members. No privilege applies to these statements as they were made in private conversations.

230. These statements were irrelevant to judicial proceedings, disseminated with malice, and caused reputational harm. Absolute privilege does not shield extrajudicial statements (McGranahan v. Dahar, 119 N.H. 758 (1979); Pickering v. Frink, 123 N.H. 326 (1983)).

231. Craig Donais' false, disparaging, defamatory, and materially misleading statements are not privileged.

232. It should be noted that any defense that assert privilege is belied by the fact the statements at issue were made outside of judicial proceedings and not protected by privilege, and especially given their false, malicious, and extrajudicial nature. See McGranahan, supra; Stone, supra; Davis v. Ross, 754 F.2d 80 (2d Cir. 1985).

### F. Communication to Third Parties

233. Craig Donais published these statements to third parties in the Manchester community where plaintiff was active with the NAACP and maintained professional relationships.

234. Craig Donais disclosed these false statements and accusations to the following persons:

    a. Mary Donais (his wife)
    b. Garrett Donais (his son)
    c. Aiden Donais (his son)
    d. Craig Donais' other family members
    e. Craig Donais' friends

235. Thus, in publishing these statements, Craig Donais published defamatory statements to a wide range of persons. This primarily occurred in August 2020.

236. Note: Defamation only requires false defamatory statements to be published to at least one other person to sustain an action for defamation. See Ellis v. Safety Ins. Co., 41 Mass.App.Ct. 630, 635 (1996), citing Restatement (Second) of Torts §§558 and 568 (1977) ("The publication of a false and defamatory statement by spoken words of and concerning the plaintiff"…"In order to be actionable, the statements must have been published, i.e., communicated to at least a single individual other than the person defamed.").

237.    Craig Donais engaged in defaming plaintiffs to his family members including to his wife and sons Garrett Donais and Aiden Donais, and to other family members and friends, and to members of the Manchester Crime-Line board.

238.    It should also be noted that Plaintiff obtained copies of email communications, via a right to know request, that revealed that these false statements, made by Craig Donais, about the plaintiff, were directed to/received/heard by members of the Manchester Crime-Line board, and that his wife and children were involved in this defamation campaign.

239.    Discovery will reveal the extent of the defamation and how widespread it is.

### G. Damages Per Se

240.    That the statements are defamatory is clear. The statements can reasonably be read as discrediting the plaintiff in the minds of any considerable and respectable class of the community. Moreover, these words have the effect of heaping disparagement upon plaintiff when viewed contextually, i.e. in the light of attendant circumstances. The statements are inherently defamatory per se because they impute criminality, mental illness, and dangerousness, categories recognized as defamatory per se in NH.  These statements made by Craig Donais are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury. These defamatory statement(s) require no proof of its injurious character because it was obviously hurtful to the Plaintiff, because Craig Donais falsely accused the Plaintiff of committing crime(or) or violations of moral conduct and because Craig Donais injured Plaintiff in his profession and/or occupation. These statements contained numerous falsehoods about plaintiff whether on its face and/or by virtue of a clear implication affirmatively intended, and which were defamatory per se.

### H. Falsity

241.    These statements are untrue and have harmed the plaintiff. The plaintiffs are not criminals nor are they criminally dangerous or violent people. Plaintiffs are upstanding law-abiding African-American citizens who are educated thought leaders in their fields, and are civic statesmen and leaders in their communities.

### I. Malice

242.    Although not a necessary element to this cause of action, it is be noted nonetheless that Craig Donais's statements were malicious and showed intentional disregard for plaintiff's rights. Craig Donais has exhibited particularly egregious conduct and acted with malice or fraud as he maliciously and willfully calculated his

actions to harm the Plaintiff. These statements are false, were made with malice, were not honestly held opinion, were not made accidentally or disseminated accidentally and were intended to be made public, and betray a malevolent intent and ill-will towards the Plaintiff, with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements. Craig Donais' false, disparaging, defamatory, and materially misleading statements have subjected and continue to subject the plaintiff to contempt and tended to diminish the esteem, respect, goodwill and/or confidence in which he is held.

243. Further, Craig Donais's statements were made with actual malice, evidenced by his reckless disregard for the truth, as he knew or should have known that the accusations were false. These statements were made with reckless disregard for the truth and with malice, and they caused significant harm to the plaintiff's reputation.

244. The complaint's allegations are reasonably susceptible to a construction that permits plaintiff's recovery.

### J. Conclusion

245. By the above-described conduct, inter alia, Craig Donais has intentionally published or allowed to be published false, disparaging, defamatory, and materially misleading statements about the plaintiff, with the intent to damage his professional and personal reputation. As described above, inter alia, Craig Donais has negligently published or allowed to be published malicious, false, disparaging, defamatory, and materially misleading statements about the plaintiff. These statements are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury. These defamatory statement(s) requires no proof of its injurious character because it was obviously hurtful to the Plaintiff, because Craig Donais falsely accused the Plaintiff of serious violation of moral conduct and because he injured Plaintiff in his profession/occupation. As a direct and foreseeable consequence of Craig Donais's defamation, the plaintiff suffered damages, emotional distress and an unquantifiable and irreparable harm in the form of injury to his reputation. As a result thereof, the plaintiff has been and continued to be injured and suffer damages, including but not limited to economic losses, loss of reputation and professional opportunity and emotional distress as well as harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering, insult, being placed in fear and anxiety, loss of enjoyment of life, lack of energy, mood swings, and sleep disturbances, in addition to impairment to the

Plaintiff's reputation and standing in the community. As a direct result of Craig Donais's defamatory statements, plaintiff suffered:

a. Specific reputational harm in the Manchester community.
b. Loss of standing with NAACP colleagues.
c. Emotional distress.
d. Economic damages totaling several thousands of dollars in lost professional opportunities.

246. These damages flow directly from Craig Donais's false statements and the resulting harm to plaintiff's reputation in the community. As a result of the malicious defamatory conduct on the part of Craig Donais, Plaintiff has suffered economic and consequential damages including general damages and special damages. The statements caused Plaintiff reputational harm, emotional distress, and economic damages, satisfying all elements of defamation.

247. In sum, Craig Donais published false statements of criminality, mental disease, and violent intent. Such accusations are defamatory per se because they impute serious crime and professional unfitness. Craig Donais acted with actual malice, knowing the statements were false (St. Amant v. Thompson, 390 U.S. 727). Damages are presumed; Plaintiff further pleads special damages (including lost contracts, etc).

248. Note: Craig Donais separately republished and supplemented his defamatory statements, on several occasions between June 2019 and November 2023, each of which constitutes a new actionable wrong. Pierson v. Hubbard, 147 N.H. 760, 763-64 (2002). Also, as will be shown later, Mary Donais republished, supplemented and perpetuated these defamation statements in 2020, which gives rise to a separate cause of action for defamation against her

### COUNT 4 - Defamation and Defamation Per Se — 2020 Statements by Mary Donais
### (Against Mary K. Donais)

249. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

250. In August 2020, Mary Donais published the following false and defamatory statements of fact about Plaintiffs to family members, friends, and the general public through Facebook and other social media platforms: that Plaintiffs were violent, dangerous criminals; that Plaintiffs posed a physical threat to her family; that Plaintiffs were mentally unstable and dangerous; that she was afraid to be home alone because of the "crazy criminal dangerous" Plaintiffs; and she called for a neighborhood watch against Plaintiffs. Each statement was a statement of verifiable fact, each was wholly fabricated, and each was published to third

parties—including the general public through social media. Mary Donais acted with actual malice: she had no factual basis for any statement, she never received a threat from Plaintiffs, she never had any contact with Plaintiffs, and she chose to publish through social media to ensure the widest possible dissemination. Her decision to amplify fabricated accusations through a public platform demonstrates reckless disregard for the truth at minimum and, in substance, knowledge of falsity.

251.    The statements are defamatory *per se* because they impute the commission of crimes, attribute mental disease and instability, and injure Plaintiffs in their trade, business, and profession. No privilege attaches to social media posts directed at the general public. Facebook posts are the antithesis of a judicial proceeding: they involve no adjudicatory function, no sworn testimony, no cross-examination, and no binding orders. *Supry v. Bolduc*, 112 N.H. 274 (1972). The republication doctrine applies: each sharing of Mary Donais's posts constitutes a separate publication and extends liability. Restatement (Second) of Torts § 577.

252.    Craig and Mary Donais coordinated their defamatory statements, as evidenced by emails obtained through Right-to-Know requests. The coordination demonstrates that Mary Donais was not acting independently but as part of a joint defamatory campaign orchestrated with her husband. Craig Donais is jointly liable for the publications by Mary Donais under the concert-of-action doctrine and as a joint tortfeasor.

253.    As a direct and proximate result of Mary Donais's defamatory statements, Plaintiffs suffered damages including loss of reputation in the Manchester community, ostracization by community members, loss of professional contracts and civic relationships, severe emotional distress, and other actual and consequential damages. Mary Donais's social media posts circulated widely among Manchester residents who knew Bisasor through the NAACP and community engagement work, compounding the harm. Because the statements are defamatory *per se*, damages are presumed as a matter of law. Plaintiffs seek compensatory damages, punitive damages, and attorney's fees for this count.

### COUNT 5 - Defamation and Defamation Per Se — Public Forum/Meeting
### (Against Craig S. Donais)

254.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### Advisory Committee

255.    In addition, beginning in or around fall of 2022, Craig Donais continued to expand his campaign by seeking to defame plaintiffs in public forums and public meetings. This included posting or presenting defamatory

information in a public online context. Further, on or about November 9, 2023, Craig Donais physically attended a public meeting for the New Hampshire Supreme Court Advisory Committee on Rules, and publicly stated/implied that Bisasor had wrongly accused him of misconduct; that Bisasor's allegations were specious and untrue; that Bisasor was fueled by personal animus and intent on personal destruction; and that Bisasor had deceptively weaponized and misused the attorney discipline process. Craig Donais basically publicly called plaintiff a liar.[3] These statements were factual assertions rather than protected opinion that were false and defamatory in nature as they exposed Plaintiff to public contempt, ridicule, and harm to reputation.

256. Each statement was a statement of verifiable fact, each was demonstrably false in light of Judge Moore's contrary judicial finding, and each was published to third parties in an open public forum attended by attorneys, judicial officials, and citizens in the legal community. All of these statements are false. Judge Moore had found a prospective attorney-client relationship and ordered Donais to withdraw. Donais's own ethical breach is a matter of judicial record, not a specious allegation. Donais acted with actual malice: he personally knew of Judge Moore's finding, knew that Bisasor's complaints were based on a judicially confirmed prospective attorney-client relationship, and deliberately misrepresented the facts to an audience of legal professionals. This is textbook knowledge of falsity under *St. Amant v. Thompson*, 390 U.S. 727 (1968).

257. The statements are defamatory *per se* because they injure Bisasor in his trade, business, and profession by impugning his integrity before the legal community. No absolute privilege attaches because the Advisory Committee on Rules is not a judicial body. It has no adjudicatory authority, no parties appear before it in adversarial posture, there is no right of cross-examination, there is no sworn testimony, and it cannot enter binding orders. Its proceedings are legislative and advisory, not judicial. Under *Supry v. Bolduc*, 112 N.H. 274, 276 (1972), absolute privilege requires "all the hallmarks of a judicial proceeding." The Advisory Committee has none of them. If a zoning board hearing does not qualify, an advisory committee with even less adjudicatory function certainly does not. This precedent directly applies to advisory committee hearings, which similarly lack judicial characteristics.

---

[3] In E. Jean Carroll v. Donald J. Trump (S.D.N.Y., Case No. 1:20-cv-07311-LAK), Carroll sued Trump for defamation based on statements he made in June 2019 calling her a liar after she published her account of the alleged assault. A jury awarded $83.3 million in damages, $18.3 million compensatory and $65 million punitive. The Second Circuit upheld that verdict in September 2025.

258. Further, this hearing was a public comment forum established to receive input from members of the public, bench, and bar regarding proposed court rule changes. Critically, this forum does not constitute a judicial or quasi-judicial proceeding that would afford absolute privilege protection under New Hampshire law. Under McGranahan v. Dahar, 119 N.H. 758 (1979), absolute privilege is reserved for "statements made in the course of judicial proceedings" that are "pertinent to the subject of the proceeding".  The Advisory Committee hearing fails to meet the McGranahan standard because it:

   a. <u>Lacks judicial characteristics:</u> No power to determine facts, make binding orders, or impose penalties.
   b. <u>Absence of procedural safeguards</u>: No sworn testimony, cross-examination, or formal evidentiary procedures.
   c. <u>Non-adjudicatory function</u>: Merely collects public input on proposed rules rather than resolving disputes.
   d. <u>Public comment forum</u>: Functions as a venue for citizen input, not judicial determination

259. Therefore, since the Advisory Committee on Rules is not a judicial tribunal, has no adjudicatory authority and affords no opportunity for cross-examination or responsive testimony, Donais's statements before this body are not protected by the absolute litigation privilege, which attaches only to statements made in the course of judicial proceedings before a tribunal with adjudicatory authority.

260. The statements were made at a public hearing attended by multiple members of the public. This constitutes clear publication to third parties without any privilege protection, as the Advisory Committee hearing provides no absolute immunity from defamation claims.

261. Craig Donais acted with at least negligence, and likely actual malice, by:

   a. Deliberately disclosing confidential attorney-client information from his representation of Plaintiff
   b. Acting for improper motives, specifically to prevent public records about attorney complaints against him from being released to Plaintiff.
   c. Knowing the statements would harm Plaintiff's reputation in the community.

262. Craig Donais's statements also violated NH Rule 1.6, which prohibits lawyers from revealing "information relating to the representation of a client" without consent.

263. Donais used this forum as a platform to further his campaign of public defamation against Bisasor, a campaign whose racial character is established by the cumulative pattern of racially stereotyped accusations described above. The 2023 statements demonstrate that Donais's campaign continued unabated for nearly seven years after the triggering event.

264. As a direct and proximate result of these defamatory statements, Bisasor suffered damages including further diminishment of his reputation in the legal community, severe emotional distress, and continued harm to his ability to engage in professional activities in New Hampshire. Because the statements are defamatory *per se*, damages are presumed as a matter of law. Plaintiffs seek compensatory damages, punitive damages, and attorney's fees for this count.

265. This claim is timely filed within three years of the defamatory statements at the Advisory Committee hearing, are timely filed on its own without aid of the NH savings statute.

### COUNT 6 - Vicarious Liability for Defamation and Defamation Per Se
### (Against Donais Law Offices PLLC)

266. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

267. Donais Law Offices PLLC is vicariously liable for the defamatory statements made by Craig Donais as set forth in Counts I through III and V above. Craig Donais is the sole member, managing member, and registered agent of Donais Law Offices PLLC. There exists a complete unity of interest and ownership between Craig Donais and the PLLC such that the separate personalities of the individual and the entity no longer exist. The PLLC adopted, authorized, and ratified Craig Donais's wrongful conduct. Restatement (2nd) of Agency § 219.

268. Craig Donais's defamatory statements were made in connection with his law practice and arose directly from his attorney-client interactions and professional conduct. The 2019 statements to CrimeLine and the police were made to counteract professional complaints arising from his law practice. The 2023 statements at the Advisory Committee hearing were made in direct response to attorney discipline proceedings related to his professional conduct. These statements fall within the scope of Craig Donais's role as the sole member and operator of the PLLC. Under the doctrines of respondeat superior, alter ego, and ratification, the PLLC is liable for Craig Donais's defamatory acts.

269. Additionally, Mary Donais acted as an agent of Craig Donais and the PLLC in coordinating and disseminating the defamatory statements described in Count IV. The emails obtained through Right-to-Know requests confirm that Mary Donais's publications were coordinated with and directed by Craig Donais. The PLLC is therefore also vicariously liable for Mary Donais's publications to the extent they were made at the direction of or in concert with Craig Donais in connection with his law practice.

270. As a direct and proximate result of the defamatory statements for which Donais Law Offices PLLC is vicariously liable, Plaintiffs suffered all of the damages set forth in Counts I through V above. Plaintiffs seek compensatory damages, punitive damages, and attorney's fees against the PLLC.

### D. Integration of Defamation Claims

271. Viewed together, the foregoing counts establish a continuous, coordinated campaign of defamation spanning from June 2019 through at least November 2023. The campaign originated in Craig Donais's March 2017 fabrication of a false racism accusation in a sworn affidavit, which created the template for a false narrative that was then deployed repeatedly in non-privileged settings over the next 6 years. The consistency of the false themes—criminality, mental illness, violence, fabrication, frivolous accusations—across five distinct audiences and four years of publications demonstrates a unified, premeditated campaign rather than isolated incidents.

272. The four-element test for defamation is satisfied across every count. For each count, Plaintiffs have pleaded specific false statements of fact that are demonstrably untrue and that impute criminal conduct, mental disease, or professional unfitness. For each count, Plaintiffs have identified the specific third-party recipients to whom the statements were published. For each count, Plaintiffs have established fault at both the negligence and actual malice levels—Craig Donais knew the statements were false because he fabricated the underlying narrative, was aware of the contrary judicial finding, and deliberately published to audiences calculated to inflict maximum harm. For each count, the statements are defamatory *per se* under one or more recognized categories, and Plaintiffs have also alleged substantial actual damages.

273. None of the settings in which the Donais Defendants published their defamatory statements qualifies as a judicial proceeding under *Supry v. Bolduc*, 112 N.H. 274 (1972), or *McGranahan v. Dahar*, 119 N.H. 758 (1979). The CrimeLine board is a private nonprofit. The police communications did not lead to any judicial proceeding and were made using a deceptive alias for the purpose of destroying a professional contract. The family and social media statements were private communications to civilians. The Advisory Committee on Rules is an advisory body with no adjudicatory authority. In each instance, absolute privilege is inapplicable, and any qualified privilege is defeated by actual malice.

274. The racial stereotyping permeating the defamatory campaign constitutes independent evidence of malice. The false characterization of African American Plaintiffs as violent, criminal, mentally ill, and dangerous

invokes the most pernicious racial stereotypes in American history. These characterizations have no connection to any factual reality—they are projections rooted in racial bias, deployed to dehumanize Plaintiffs and destroy their standing in a community that is approximately ninety-three percent white. The disproportionality between the triggering event—a 7-minute telephone consultation—and the multi-year, multi-audience campaign of defamation is inexplicable absent racial animus. This evidence of racial motivation strengthens the inference of actual malice and supports an award of punitive damages.

275.    Plaintiffs respectfully request that this Court enter judgment in their favor on all of the defamation claims and award: (a) compensatory damages, including but not limited to damages for loss of reputation, loss of professional contracts and relationships, loss of community standing, and severe emotional distress; (b) presumed damages for defamation *per se*; (c) punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and reckless conduct and to deter similar conduct in the future; and (d) reasonable attorney's fees and costs of suit.

---

## SECTION 3: RACE DISCRIMINATION & RETALIATION IN VIOLATION OF SECTION 1981 OF FEDERAL LAW AND OF THE NEW HAMPSHIRE LAW PROHIBITING RACE DISCRIMINATION

---

### I. PRELIMINARY STATEMENT REGARDING REINSTATEMENT OF FEDERAL CLAIM

276.    Plaintiffs Andre Bisasor and Natalie Anderson, who are both African American citizens of the Commonwealth of Massachusetts, hereby reinstate their claim under 42 U.S.C. § 1981 in this Second Amended Complaint. Plaintiffs originally included a § 1981 federal claim in the original Complaint filed in Hillsborough County Superior Court. When Defendants removed the case to this Court, Plaintiffs conservatively omitted the § 1981 claim in their First Amended Complaint, which was filed as of right under Federal Rule of Civil Procedure 15(a)(1). That omission was a calculated strategic decision: Plaintiffs sought to eliminate the federal question that Defendants had relied upon for removal, thereby preserving the option to seek remand to state court. Plaintiffs expected that removing the sole federal claim would compel remand.

277.    That expectation proved incorrect. This Court denied Plaintiffs' motion to remand, holding that diversity jurisdiction under 28 U.S.C. § 1332 existed independently of any federal question. The Court found that complete diversity of citizenship existed between the parties and that the amount in controversy exceeded

$75,000. The presence or absence of a federal claim was therefore immaterial to this Court's subject-matter jurisdiction. The strategic rationale for omitting the § 1981 claim, facilitating remand, was rendered of none effect by the Court's ruling.

278.    Because it appears that the case will remain in federal court regardless of whether Plaintiffs plead a federal cause of action, and because diversity jurisdiction, not federal question jurisdiction, is now the independent basis for this Court's retention of the case, Plaintiffs now seek leave to reinstate the § 1981 claim they originally pleaded. The strategic reason for its omission no longer exists. There is no jurisdictional consequence to its reinstatement, and Defendants suffer no prejudice from its inclusion in a case that will remain in this Court.

279.    Federal Rule of Civil Procedure 15(a)(2) directs that "[t]he court should freely give leave when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). This is Plaintiffs' first motion to amend requiring leave of court; the First Amended Complaint was filed as of right. The amendment reflects no bad faith, causes no undue delay, inflicts no prejudice upon Defendants, and is not futile. It adds a valid federal cause of action to a case already pending in federal court on independent jurisdictional grounds. The liberal standard of Rule 15(a)(2) is satisfied in full.

280.    Moreover, pro se plaintiffs are entitled to liberal treatment from the courts. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). This principle reinforces the strong presumption in favor of permitting amendment. Plaintiffs' initial decision to omit the federal claim was a reasonable litigation tactic that, through no fault of their own, failed to achieve its intended purpose. Denying reinstatement would penalize Plaintiffs for a good-faith strategic choice that was overtaken by the Court's jurisdictional ruling.

281.    As set forth in Anderson's Motion for Leave to File the Second Amended Complaint (Doc. 84), "Section 1981 is now appropriate to add back because the original removal raised questions about federal jurisdiction and plaintiffs conservatively omitted the Section 1981 claim to preserve state court options, but the Court's rulings have now confirmed federal court retention despite removal of federal claim." The principle that plaintiffs are the masters of their complaints, recently reaffirmed by the Supreme Court in *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. ___ (2025), applies with equal force here. If a plaintiff may strategically remove a federal claim, a plaintiff must equally be permitted to reinstate that claim when the circumstances that

motivated its removal have fundamentally changed. Note: The defendants strategically removed this case from state court, to avoid consolidation with a parallel state court proceeding. In doing so, they strategically relied on federal question jurisdiction, without pleading diversity jurisdiction. When plaintiffs eliminated the federal claim, defendants then strategically pivoted to assert diversity jurisdiction, in order to defeat the plaintiff's act of eliminating the federal claim, and the court allowed defendants' new pivot/assertion to be efficacious. Plaintiffs should therefore be allowed to reinstate the previously eliminated federal claim.

282.    For these reasons, Plaintiffs respectfully submit that the reinstatement of the §1981 claim is proper, timely, and consistent with the interests of justice.

## II. INTRODUCTION

283.    Section 1981 provides:

> *"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1981(a). The statute also states that "[f]or purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b)."*

284.    Section 1981 guarantees freedom from racial discrimination in the making, enforcement performance, modification, and termination of contracts. Section 1981 also guarantees enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

285.    To state a prima facie case of a violation of 42 U.S.C. § 1981, the plaintiff is to show that: (1) he belonged to a protected class; (2) he sought to make a contract for services ordinarily provided by the defendant; and (3) he was treated in such a hostile manner that a reasonable person would find it objectively discriminatory.

286.    In this case, this prima facie burden has been met, as follows: a) The plaintiff is African-American and belongs to a protected class. This is undisputable. b) The plaintiff sought to make and enforce a contract for services ordinarily provided by the defendant. This is undisputable. c) The plaintiff was treated in such a hostile manner that a reasonable person would find it objectively discriminatory.

287.    By breaching the contract with the plaintiff and breaching fiduciary duty to the plaintiff, Defendants have interfered with the making and enforcement of a contract.  The Defendants breached their contract with

plaintiff and racially harassed plaintiff in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as will be further delineated below.

### III. RACE DISCRIMINATION, RACIAL STEREOTYPING, AND RETALIATION

288.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

289.    This section describes how Defendants engaged in a coordinated pattern of race discrimination, racial stereotyping, and retaliation in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983, and New Hampshire law.

#### A. Racialized Misuse of a Prospective Attorney–Client Relationship

290.    Plaintiff Andre Bisasor is an African American business consultant and community leader who, in January 2017, consulted Defendant Craig S. Donais, a white attorney, for legal advice regarding a landlord–tenant dispute involving the Hilton/Homewood Suites defendants. During that consultation, Mr. Bisasor disclosed confidential information and reasonably understood the call to be a protected attorney–client communication, thereby triggering fiduciary duties and § 1981 "contracting" interests in the provision of legal services. Donais later weaponized that brief consultation by fabricating the claim that Mr. Bisasor had accused him of "racism" during the call because Donais declined representation, even though Mr. Bisasor never used the words "race," "racism," or "discrimination" on that call and the conversation ended amicably. Donais deployed this fabricated charge as a racialized narrative that an unreasonable Black man "plays the race card" whenever he does not get his way, and he repeated that story in multiple fora, including to colleagues, to the CrimeLine board, to the Manchester police, and in sworn filings.

291.    By taking a routine confidential consultation from an African American prospective client and turning it into a false story that the client baselessly "cried racism," Donais used race-coded rhetoric to discredit Mr. Bisasor's civil-rights claims and to undermine his ability to secure legal representation and enforcement of his contractual rights. A similarly situated white prospective client, who consulted a white attorney and later challenged that attorney's conflict of interest, would not plausibly have been branded in the community as someone who fabricates racism allegations and thereby placed under a cloud of racial suspicion. This conduct interfered with Plaintiff's right to make and enforce contracts for legal services on the same terms as white citizens, in violation of 42 U.S.C. § 1981 and New Hampshire statutory protections against race discrimination.

#### B. Racial Stereotyping, Defamation, and Interference With Contractual Relations

292.    Beginning in 2019 and accelerating in 2020, Donais and his spouse, Mary K. Donais, escalated this racialized attack by describing Plaintiffs to third parties—including family members, friends, Manchester CrimeLine board members, community members, and law enforcement—as "violent," "dangerous criminals," "mentally unstable," and a physical threat to the Donais family. These descriptors tracked classic anti-Black stereotypes of the "dangerous," "criminal," and "crazy" Black man, and were deployed to stigmatize Mr. Bisasor in exactly the community where his professional and civil-rights work had long been centered. Mary Donais amplified these stereotypes on social media and in neighborhood communications, calling for a "watch" against Plaintiffs and portraying them as inherently dangerous, which directly undermined Plaintiffs' ability to enter and maintain contracts and business relationships in the Manchester area.

293.    Donais also made racially charged statements suggesting that Mr. Bisasor was a foreigner with a foreign-sounding name and speech, and used those characteristics as part of the narrative that he was untrustworthy, unstable, and dangerous. He told others that Plaintiff had burglarized and bugged his office, fabricated recordings, and posed a criminal threat, thereby imputing serious crimes to an African American man without factual basis. These statements directly interfered with Plaintiff's community-engagement contract with the Manchester police department, scuttled his work with NAACP- and university-related initiatives, and destroyed his ability to function as a negotiation and civil-rights consultant in the Manchester market. The racially coded nature of the accusations, combined with their effect on existing and prospective contracts, supports a § 1981 theory that Defendants intentionally impaired Plaintiffs' rights to make, perform, and enjoy contracts—including community-engagement agreements, consulting engagements, and other advantageous relations—on equal terms with white citizens.

### C. Race-Based Interference With Access to Counsel and Settlement

294.    The same racial dynamic extended into Plaintiffs' efforts to retain counsel and enforce settlement agreements. In May 2020, Plaintiff entered a written retainer agreement with the Primmer firm, thereby forming a contract for legal services subject to § 1981 protection. Senior partner Russell F. Hilliard, a white attorney and long-time mentor and "fixer" for Donais, then covertly contacted Primmer on September 3, 2020, outside any pending case, and the firm terminated Plaintiffs' retainer the next day, explicitly citing Hilliard's

communication as the reason. Hilliard later repeated the same pattern in 2022 by privately contacting Attorney Elliott Berry (Plaintiffs' longstanding civil-rights advisor), after which Berry terminated all advisory assistance to Plaintiffs.

295.    These secret interventions had the practical effect of driving two African American litigants out of the New Hampshire legal-services market, leaving them without counsel or informal legal guidance while facing well-represented, well-connected white adversaries. Hilliard's interference also extended to the 2021–2022 Hilton Hotels settlement, where, after Plaintiffs accepted a final global offer and Donais participated for months in joint defense negotiations, Attorney Shelagh Michaud abruptly announced on January 6, 2022, that "Craig Donais is no longer willing to settle." Plaintiffs allege that this repudiation was part of a broader pattern in which Hilliard and Donais used their institutional power to sabotage an accepted settlement that would have delivered six-figure value to two Black plaintiffs, while preserving their own reputations and minimizing exposure. Race was a determinative factor in this conduct because, upon information and belief, Hilliard would not have systematically stripped white litigants of all sources of legal assistance and settlement benefits in this way, and the pattern of secret "fixing" was tailored to exploit Plaintiffs' vulnerability as African American pro se litigants.

296.    These episodes supply a concrete § 1981 theory against both Donais and Hilliard (and their firms): they intentionally discriminated in the making and enforcement of contracts for legal services and settlement by sabotaging Plaintiffs' retainer contracts, advisory relationships, and settlement agreements because of race, and thereby denied Plaintiffs the same right to make and enforce contracts as white citizens.

### E. Retaliation for Opposing Race Discrimination and Seeking Redress

297.    Throughout this multi-year saga, Plaintiffs consistently opposed Defendants' discriminatory acts and sought redress through bar complaints, civil litigation, and public testimony, and they allege that Defendants responded with escalating retaliation. After Plaintiff challenged Donais's conflict of interest and filed complaints, Donais intensified his defamatory, racially coded narrative, including at the November 9, 2023 Advisory Committee on Rules hearing, where he publicly described Plaintiff's allegations as "specious," malicious, and unfounded, in a forum lacking judicial privilege. After Plaintiff pursued relief in the courts and

raised administrative concerns, Gorham and Messer responded with bans, non-docketing of ADA requests, and other administrative roadblocks aimed at deterring further complaints and chilling his petitioning activity.

298.    Similarly, when Plaintiffs persisted in holding Donais and Hilliard accountable for the Hilton settlement sabotage, Hilliard responded by further interfering with their access to counsel and by pressing for hypertechnical dismissals rather than adjudication on the merits. This course of conduct supports a unified retaliation theory: Plaintiffs engaged in protected activity by asserting race-discrimination and civil-rights claims and by complaining about discriminatory treatment, and Defendants—both private and state actors— responded with adverse actions (professional destruction, loss of contracts, loss of counsel, court-access bans, and reputational attacks) that would deter a reasonable person from continuing to oppose discrimination.

### F. Legal Theories Supported by These Facts

299.    Taken together, these facts support at least the following claims/theories to be pleaded in separate counts:

300.    First, 42 U.S.C. § 1981 claims against Donais, Donais Law Offices PLLC, Mary Donais, Hilliard, and Upton Hatfield, for intentional race discrimination in the making, performance, modification, and enforcement of contracts, including the prospective attorney–client relationship in 2017, the Manchester community-engagement contracts, the Primmer retainer, the Berry advisory relationship, and the Hilton settlement. Second, 42 U.S.C. § 1983 race discrimination and retaliation claims against Messer and Gorham, in their individual capacities, for race-motivated and speech-based administrative retaliation that denied an African American litigant equal access to the courts. Third, state-law race discrimination, racial intimidation, and common-law civil-rights interference claims under RSA 354, based on Defendants' racially motivated harassment, intimidation, stereotyping, and interference with Plaintiffs' civil and contractual rights. Fourth, parallel state-law retaliation theories, including retaliation for opposing race discrimination and for engaging in protected petitioning activity, grounded in the same pattern of adverse actions.

301.    This coordinated scheme of racial stereotyping, contract interference, and administrative retaliation inflicted economic harm (lost contracts, reduced settlement value, loss of counsel), reputational harm (destruction of standing in Manchester's civic and professional community), and severe emotional and dignitary harm associated with being treated as a dangerous, dishonest, and mentally unstable Black man in both

professional and judicial settings. Plaintiffs seek compensatory and punitive damages, declaratory and injunctive relief, and attorneys' fees to vindicate these rights under § 1981, § 1983, and New Hampshire law.

## IV. RACE DISCRIMINATION — DONAIS DEFENDANTS
### (Craig S. Donais, Mary Donais, Donais Law Offices PLLC)
### A. Factual Allegations - Chronological Acts of Race Discrimination

302.   Andre Bisasor is an African American male and a citizen of the Commonwealth of Massachusetts. Natalie Anderson is an African American female and a citizen of the Commonwealth of Massachusetts. Craig S. Donais is a white male attorney admitted to the New Hampshire bar and the principal of Donais Law Offices PLLC, located in Manchester, New Hampshire. Mary Donais is a white female and the spouse of Craig S. Donais. All Defendants named in this action are white. All Plaintiffs are African American. Plaintiffs are members of a racial group protected under 42 U.S.C. §1981 and the 14th Amendment to the United States Constitution.

303.   On or about January 9, 2017, Bisasor contacted Craig Donais to seek legal advice concerning a landlord-tenant dispute. Donais returned Bisasor's call and provided substantive legal advice during a telephone consultation lasting approximately 7 minutes. During that consultation, Bisasor disclosed confidential information, including case strategies, assessments of strengths and weaknesses, and the likelihood of obtaining a temporary restraining order. This 7-minute telephone consultation was not a casual inquiry; it was the initiation of a professional relationship in which an attorney received and relied upon confidential client disclosures. Donais declined to undertake further representation, but the prospective attorney-client relationship had already been formed by the consultation itself.

304.   Bisasor's contact with Donais, and the consultation that followed, constituted protected contractual activity under §1981: the act of seeking to make and enforce a contract for legal services. The right to seek legal counsel is among the most fundamental contractual rights in a democratic society. It was precisely this right (the right of freed Black persons to retain counsel and participate as equals in legal proceedings) that the Civil Rights Act of 1866 was designed to protect. When Bisasor, a Black man, contacted Donais, a white attorney, to seek legal services, he was exercising a right guaranteed to him by the 13th Amendment and codified in §1981.

305.   What Donais did next is the factual foundation of this entire case. Without disclosing his intention to Bisasor, and without obtaining Bisasor's informed consent, Donais, in seeking to be hired to represent the opposing party, divulged the content of the 1-9-17 legal consultation to Dave Akridge and his counsel, who

along with Hilton Hotel defendants, were the opposing party in the very dispute about which Bisasor had consulted Donais. Donais thereby transferred confidential information obtained during the consultation to the adversary's camp. This was not a mere administrative oversight. It was a deliberate decision to arm Bisasor's opponent with the confidential information that Bisasor disclosed in reliance on the attorney-client privilege.

306.    Judge Paul Moore of the New Hampshire Superior Court subsequently found that a prospective attorney-client relationship had been formed between Bisasor and Donais, and ordered Donais to withdraw from any involvement in the matter. This judicial finding is not a disputed characterization advanced by Plaintiffs; it is a fact of record, established by judicial order. It confirms that Bisasor's consultation with Donais created a legally cognizable contractual relationship within the meaning of § 1981.

307.    On or about 3-6-17, Donais filed an affidavit in the underlying state court case regarding the January 9 consultation. In that affidavit, Donais fabricated the claim that Bisasor had accused him of racism during the telephone call. This accusation was false. Bisasor never accused Donais of racism during that or any other conversation. Donais invented this narrative out of whole cloth and submitted it to a court of law under oath.

308.    The significance of this fabrication cannot be overstated, because it is the foundational racial act from which all subsequent discrimination flows. By manufacturing the false claim that Bisasor, a Black man, had "frivolously" accused a white attorney of racism, Donais deployed a classic racial weapon. The accusation that a Black person has "played the race card" or made a "false claim of racism" is a well-documented racial trope. It functions as a strategic inversion: it takes the victim's race and weaponizes it against him. The accusation has meaning only because Bisasor is Black. A white client in identical circumstances (calling an attorney for a consultation, forming a prospective attorney-client relationship, and then discovering that the attorney had secretly assisted the opposing party) would never be accused of "falsely accusing" the attorney of racism. White clients' complaints about attorney misconduct are not filtered through a racial lens. Only a Black client's complaints are vulnerable to this particular form of discrediting.

309.    The syllogistic connection to §1981 is direct and specific. First, Bisasor is African American and so the protected class element is satisfied. Second, Donais fabricated an accusation of "false racism claims", an accusation whose force and meaning depend entirely on the target's race, thereby establishing discriminatory

conduct. Third, but for Bisasor's race, this specific fabrication would not have been manufactured, because it would have been both meaningless and ineffective against a white person, and so the but-for causation standard of *Comcast Corp. v. NAAAOM*, 590 U.S. 539 (2020), is satisfied. Fourth, the fabrication impaired Bisasor's right to enforce his contractual relationship with Donais by deflecting attention from Donais's ethical breach and undermining Bisasor's credibility in pursuing his rights, and so the contractual interest element is satisfied.

310.   Moreover, the fabricated accusation served a preemptive function. By branding Bisasor early in the litigation as a person who frivolously and capriciously "cries racism," Donais ensured that any legitimate discrimination claim Bisasor might later assert would be received with skepticism. This is what scholars have termed "weaponized incredulity", which is the assumption, rooted in racial bias, that claims of racism made by Black people are presumptively false, manipulative, or frivolous. It is itself a form of racial discrimination: treating a person's legitimate complaints as inherently suspect because of his race. Donais calculated (correctly, as events proved) that in a state that is approximately 93% white, before white judges, white opposing counsel, and predominantly white juries, no one would credit a Black man's claims over a white attorney's denials. That calculation depends entirely on the plaintiff's race. It would not work against a white plaintiff.

311.   As Plaintiffs' prior counsel Elliott Berry confirmed through independent investigation, Donais's conduct constituted ethical violations. Berry's own written determination found that Craig Donais breached his fiduciary duties to Bisasor, and Berry specifically identified the racial dimensions of Donais's conduct. Berry was, at that time, a respected attorney affiliated with New Hampshire Legal Assistance. His conclusion was not a self-serving interpretation by the Plaintiffs; it was the independent professional judgment of a well-respected public servant attorney who had investigated the facts and concluded that the conduct was both unethical and racially motivated.

312.   Contextual evidence further supports the inference of racial animus. Craig Donais has been a Republican since at least 1990. He served on the Manchester Republican City Committee from 2006 to 2010. He served as a delegate to multiple New Hampshire Republican State Conventions. He held the position of Vice President of the University of Massachusetts College Republicans. He was a member of the Suffolk University Law School Republicans. He served on the Steering Committee for "Attorneys for Romney." He was affiliated with

"Team Sununu 2008." He ran as a write-in Republican candidate for the New Hampshire House of Representatives in 2014. He was endorsed by the Manchester Republican Committee in 2021. He currently serves as Ward Moderator for Ward 4 in Manchester. He is a member of the Republican National Lawyers Association. Donais, evidently, is a supporter of, or at minimum closely aligned with, the Trump/MAGA political apparatus.

313.    This evidence is not offered to suggest that all MAGA/Trump supporters harbor racial animus. It is offered for a specific and limited purpose: to demonstrate that the particular strategy of dismissing, delegitimizing, and preemptively discrediting Black people's claims of racial discrimination aligns with a broader political movement in which Donais is an active participant. The tactic of accusing Black people of "playing the race card", of treating claims of racism as inherently frivolous or manipulative, has been extensively documented as a core rhetorical strategy of that movement. Donais's fabrication of the "false racism accusation" narrative is consistent with, and draws its power from, that broader ideological framework. New Hampshire's demographic composition (approximately 93% white) creates the extreme racial power asymmetry in which such a strategy is effective.

314.    In or about late June 2019, Craig Donais began to contact several people about plaintiffs including members of the Manchester CrimeLine board and made the following false statements about Bisasor: that Bisasor had burglarized and bugged Donais's office telephone (a felony accusation); that Bisasor had fabricated an audio recording to falsely place Donais's voice on it; that Bisasor falsely accused Donais of racism; that Bisasor is a criminal; and that Bisasor is mentally ill/has mental disease. Every one of these statements is false.

315.    Manchester CrimeLine works closely with law enforcement and community leaders throughout Manchester, New Hampshire. Donais's false statements to this organization poisoned Bisasor's professional and civic reputation in the community where he lived and worked. The racial dimension of these defamatory statements is not incidental; it is central. The stereotypes Donais deployed (violent Black criminal, dangerous Black man, mentally unstable Black person) are among the most entrenched and destructive racial stereotypes in American history. They trace directly to the dehumanizing caricatures that Congress enacted the Civil Rights Act of 1866, and by extension §1981, to combat. These are not neutral accusations that happen to have been

directed at a Black man. They are accusations whose content is racialized: they invoke specific, centuries-old stereotypes about Black men that are qualitatively different from the accusations that would be directed at a white person in comparable circumstances.

316.    The but-for causation analysis under *Comcast* confirms the racial motive. A white prospective client who had engaged in a 7-minute telephone consultation with an attorney (and who had been found by a judge to have formed a valid prospective attorney-client relationship) would not have been subjected to accusations of burglary, fabrication of evidence, criminality, and mental illness two years after the consultation. The content of these accusations is not responsive to the actual dispute between the parties; it is responsive to Bisasor's race. The disproportionality between the triggering event (a seven-minute phone call), and the response (felony accusations to a community law enforcement organization) is inexplicable absent racial animus.

317.    In or about June 2019 as well as in July 2020/August 2020, and October 2020, Donais contacted the Manchester Police Department on multiple occasions regarding plaintiffs. On of one of those occasions, he used the alias "Manchester Blue & You" when making these contacts to inquire about plaintiffs working/contractual relationship with the Manchester PD.  That name appeared only on Bisasor's LinkedIn profile in connection with his community policing initiative, "NH Blue & You." The use of this specific alias demonstrates that Donais had conducted targeted research into Bisasor's professional activities and deliberately targeted the one initiative that connected Bisasor to law enforcement. This was a precision strike aimed at the specific professional relationship (Bisasor's community-policing partnership) that Donais sought to destroy.

318.    In his communications with Manchester Police, Donais stated that Bisasor was mentally unstable/ill, had a tenuous grasp on reality, had manufactured an audio recording, had bugged Donais's telecommunications systems, and was a dangerous, violent criminal threat. All of these statements were false. The result was immediate and devastating: Manchester Police canceled Bisasor's community engagement event ("NH Blue & You"), and Bisasor's contract with the Manchester Police Department (a community-policing partnership worth several thousand dollars) effectively ended. Donais destroyed a specific, identifiable contractual relationship between Bisasor and a third party.

319. The syllogistic connection to §1981 is again direct and specific. Bisasor is African American (protected class). Donais made false injurious comments to the Manchester PD characterizing Bisasor as violent, criminal, mentally ill, and dangerous, stereotypes with a specific and well-documented racial valence (discriminatory conduct). Firstly, characterizing a Black man, to any police or law enforcement, as a "dangerous violent criminal threat" carries potentially life-threatening consequences for African Americans, a reality that has been the subject of extensive judicial, scholarly, and public recognition. A reasonable person in Donais's position would have known this. But for Bisasor's race, these stereotypes would not have been deployed; a white man would not have been described to police as a "dangerous violent criminal threat" when the only contact he had with said Black man was, on a one-time 7-minute telephone legal consultation that occurred two years earlier (but-for causation under *Comcast* is satisfied). And the contractual interest impaired is concrete and identifiable: Bisasor's community-policing contract with the Manchester Police Department was destroyed (the contractual element is satisfied).

320. The destruction of Bisasor's community-policing contract deserves additional emphasis because it demonstrates the real-world contractual harm that §1981 was designed to prevent. Bisasor had built a professional relationship with the Manchester Police Department through the NAACP and the NH Blue & You initiative. That relationship constituted a contract for community engagement services. Donais destroyed that contract by making false accusations, using racial stereotypes, to cause interference/termination of the relationship. This is precisely the kind of racially motivated interference with contractual rights §1981 prohibits.

321. In or about August 2020, Craig Donais escalated his campaign. He told his sons Garrett (then age 19, a legal adult) and Aiden (then age 13–14), as well as family members and friends, that Plaintiffs were planning to come to the Donais residence to physically harm his wife and sons; that Plaintiffs are physically dangerous criminal people; and that the family should fear for their lives. He characterized his sons as "young children" to amplify the threat narrative, despite the fact that Garrett was a legal adult. No factual basis existed for any of these claims. Plaintiffs never threatened or attempted to contact any member of the Donais family. There is no evidence (no police report, no protective order, no contemporaneous complaint) supporting any claim of threatened violence.

322.    In or around summer of 2020, Mary Donais independently joined and amplified her husband's campaign, publishing statements to others, on Facebook and other social media platforms asserting or otherwise implying that Plaintiffs were violent, dangerous criminals; that Plaintiffs posed a physical threat to the Donais family; that Plaintiffs were mentally unstable and dangerous; that she was afraid to be home alone because of "crazy criminal dangerous" Plaintiffs; and calling for a neighborhood watch against Plaintiffs. These scurrilous allegations circulated widely in the Manchester community. The Donais's social media campaign was effectively a public broadcast to the Manchester community designed to mobilize communal hostility against two African American individuals.

323.    The racial dimension of these statements is unmistakable. Characterizing African American individuals as inherently violent, criminal, and dangerous is racial stereotyping, not in an abstract sociological sense, but in the specific, actionable sense recognized by federal civil rights law. The call for a neighborhood watch evokes the historical and deeply racialized trope of Black people as threats to white neighborhoods, a trope that has led to violence against Black Americans throughout American history, from Reconstruction-era vigilantism to the modern phenomenon of "living while Black" harassment. The stereotypes Mary Donais deployed ("crazy," "criminal," "dangerous") are racially coded language with a specific historical provenance when directed at African Americans.

324.    Mary Donais's Facebook campaign had concrete contractual consequences. It destroyed Bisasor's community standing in Manchester, resulting in the loss of the NAACP/University of New Hampshire community project contract and ostracization from civic, professional, and personal relationships throughout Manchester. The NAACP/UNH contract was a specific contractual relationship within the meaning of §1981, and its destruction is a concrete injury for which Defendants are liable.

325.    From 2017 through 2023 (a period of nearly seven years) the Donais Defendants waged a sustained, escalating campaign against Bisasor deploying racial stereotypes of violence, criminality, mental illness, dangerousness, and dishonesty. These stereotypes trace directly to the dehumanizing racial caricatures that Congress enacted §1981 to eliminate. Each individual act impaired a specific contractual interest: the prospective attorney-client relationship, the community-policing contract with Manchester PD, the

NAACP/UNH community project, and Bisasor's broader professional relationships in Manchester. The disproportionality between the triggering event (a seven-minute telephone consultation) and the multi-year, multi-front campaign of destruction is inexplicable absent racial animus.

326. This is not a case of personal animosity that happens to involve parties of different races. Personal animosity does not produce a seven-year campaign of false felony accusations, false police reports, social media defamation, and public attacks before public meetings in front of state supreme court committees. Personal animosity from a 7-minute phone call does not produce provably false accusations of burglary, evidence fabrication, criminality, mental illness, and violent dangerousness. The content, intensity, and duration of Donais's conduct are explicable only by reference to race. The specific accusations deployed (violent, criminal, mentally ill, dangerous, dishonest) are not generic insults; they are racially coded stereotypes with a specific historical provenance. Their deployment against a Black man by a white attorney in a 93% white state, to white audiences (police, community organizations, etc.), reflects a calculated exploitation of racial power dynamics.

327. Defendants might argue that this is merely a "personal dispute" between private parties, untethered to race. That argument fails for three independent reasons. First, the content of the accusations is racially specific: fabricating a "false racism accusation" is an attack that has meaning only because the target is Black. Second, the stereotypes deployed (violent, criminal, dangerous, mentally ill/unstable) are documented racial tropes, not generic personal insults. Third, the intensity and duration of the campaign are grossly disproportionate to any legitimate personal grievance, and the escalation pattern (from a false affidavit to false felony accusations to false police reports to a public social media campaign to testimony before a state supreme court committee) is consistent with racial animus. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 871 (6th Cir. 2001) (receiving services in a "markedly hostile manner" that is "objectively discriminatory" supports an inference of race discrimination). But for Plaintiffs' race, this campaign would not have occurred. *Comcast Corp. v. NAAAOM*, 590 U.S. 539 (2020).

### Count 7: Violation of 42 U.S.C. § 1981 - Race Discrimination in Contracting
(Against Craig S. Donais, Mary Donais, and Donais Law Offices PLLC).

328. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

329.    Plaintiffs are African American and are members of a racial group protected under 42 U.S.C. § 1981. Defendants Craig S. Donais, Mary Donais, and Donais Law Offices PLLC engaged in intentional, race-based discriminatory conduct that impaired Plaintiffs' right to make and enforce contracts as guaranteed by § 1981(a). The contracts impaired include: (a) the prospective attorney-client engagement between Bisasor and Donais, in which Bisasor sought to make a contract for legal services and Donais exploited the resulting confidential relationship for the benefit of the opposing party; (b) Bisasor's community-policing contract with the Manchester Police Department, which was terminated as a direct result of Donais's false reports to police; (c) the NAACP/University of New Hampshire community project contract, which was destroyed by the Donais Defendants' defamation campaign; and (d) Bisasor's professional consulting relationships in the Manchester community, which were impaired by the cumulative effect of the Defendants' multi-year campaign.

330.    Race was the but-for cause of Defendants' conduct. The content of Defendants' discriminatory acts (fabricating a "false racism accusation" that derives its force entirely from the target's race; deploying stereotypes of criminality, violence, mental illness, and dangerousness that have specific and well-documented racial valence; targeting the plaintiff's law enforcement connection with false reports designed to trigger a racially disproportionate police response; and conducting a public social media campaign deploying racially coded language to mobilize communal hostility) would not have occurred but for Plaintiffs' race. *Comcast Corp. v. NAAAOM*, 590 U.S. 539 (2020). No white client in identical circumstances would have been subjected to false felony accusations, false police reports, a social media defamation campaign, or seven years of escalating harassment originating from a seven-minute telephone consultation.

331.    Defendants' conduct was intentional. The fabrication of the false racism accusation in a sworn affidavit was a deliberate act. The false statements to the CrimeLine board were deliberate. The false police reports were deliberate. The social media campaign was deliberate. The testimony before the Advisory Committee was deliberate. Each act required planning, execution, and sustained commitment over a period of years. This is not a case of negligent or inadvertent discrimination; it is a case of sustained, intentional, and targeted racial harassment designed to impair Plaintiffs' contractual rights.

332.    Plaintiffs have suffered and continue to suffer actual, compensatory, and consequential damages as a direct and proximate result of Defendants' violations of § 1981, including but not limited to loss of contractual relationships, loss of professional reputation, loss of community standing, emotional distress, and economic harm. Plaintiffs are entitled to compensatory damages, punitive damages, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

## V. STATE LAW CIVIL RIGHTS VIOLATION BASED ON RACE/ INTENTIONAL RACIAL INTERFERENCE AND RACE DISCRIMINATION PURSUANT NH LAW AGAINST DISCRIMINATION

333.    Plaintiff incorporate by reference all paragraphs of this Complaint as though fully stated herein seriatim.

### A. Key Facts

334.    Plaintiff Andre Bisasor is an African-American citizen of Massachusetts. Craig Donais is a white attorney licensed in New Hampshire and, at all relevant times, acted individually and on behalf of Donais PLLC. Plaintiff and Craig Donais had an attorney-client relationship governed by an implied contract for legal services and by fiduciary duties imposed under New Hampshire law.

335.    Beginning in or about March 2019 and continuing through at least May 2020, Craig Donais, directly and through communications orchestrated with the other Mary Donais, engaged in a campaign of racially-charged intimidation, aimed at preventing Plaintiff from (a) enforcing the existing attorney–client contract obligations, (b) entering future professional contracts, and (c) vindicating his legal rights.

336.    Each of the foregoing acts of intimidation was motivated, at least in part, by Plaintiff's race and national origin, as evidenced by Craig Donais's explicit use racially-charged stereotypes and dog-whistles designed to stigmatize the plaintiff and stemming from his false accusation that plaintiff accused him of racism, as well to explicit references by Craig Donais about Plaintiff's being a "foreigner", having "foreign-sounding speech" and "foreign-sounding" name, among other things. Craig Donais engaged in intentional conduct in violation of these laws against discrimination and retaliation with malice and reckless indifference with respect to plaintiff's protected rights. Craig Donais engaged in racial harassment, racial stereotyping and racial ridicule and scorn, and mocking that the defendants had initiated against the plaintiff as a black man.

337.    Craig Donais also acted to interfere with contractual relations including because of racial animus and racial bias against the plaintiff. The facts demonstrate that Craig Donais fabricated racial accusations, exploited racial stereotypes, and disseminated false statements to third parties, all motivated by racial animus.

338.    The plaintiff's claims are supported by evidence of racial animus, discriminatory statements, and adverse actions taken because of race. Craig Donais thus violated state law prohibition against race discrimination

### Count 8: Violation of New Hampshire Law Against Race Discrimination
(Against Craig S. Donais, Mary Donais, and Donais Law Offices PLLC).

339.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

### A. Claim

340.    New Hampshire RSA 354-A:17 prohibits race discrimination in places of public accommodation. A law office providing professional legal services to the public is a "place of public accommodation" within the meaning of RSA 354-A:2, XIV. Donais Law Offices PLLC held itself out as available to provide legal services to the public. Bisasor sought to obtain those services. When Bisasor contacted Donais for a legal consultation, he was seeking access to a place of public accommodation. The discriminatory conduct described above (the breach of fiduciary duty, the fabrication of a false racism accusation, and the ensuing multi-year campaign) violated RSA 354-A.

341.    Further, NH law guarantees every person in New Hampshire the right to engage in lawful contracts and transactions free from actual or threatened physical force, violence, or coercion motivated by race. NH Law authorizes civil action by any person aggrieved by such misconduct and permits recovery of compensatory damages, injunctive relief, and other appropriate remedies. By the conduct set forth below, Craig Donais intentionally interfered with Plaintiff's civil rights through intimidation motivated by Plaintiff's race.

342.    Plaintiff asserts a claim for intentional interference with civil rights based on racial animus. New Hampshire recognizes that conduct violating public policy, including racial intimidation and harassment, gives rise to common law tort liability. The factual allegations of intimidation motivated by racial animus establish a viable claims distinct from defamation, supporting enhanced damages for violation of fundamental civil rights.

343.    The pattern of false accusations, the racialized language, and the intent to harm Plaintiff's reputation and legal rights establish a violation of both common law and state law. See Crawford v. Metropolitan Government of Nashville, 555 U.S. 271 (2009); Fitzgerald v. University of Massachusetts, 2 F.3d 131 (1st Cir. 1993);

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Similarly, markedly hostile treatment is also evidence of retaliatory animus. See also Christian v. Wal-Mart Stores Inc., 252 F.3d 862, 868 (6th Cir. 2001) at 872 (Service is considered "markedly hostile" when it is (1) so contrary to the establishment's financial interests, (2) so far outside of widely accepted business norms, and (3) so arbitrary on its face, that it supports a rational inference of discrimination. Id. at 871).

344.    By the acts stated in the prior paragraphs, Craig Donais has violated both federal law and state law by racially harassing plaintiff and committing racial harassment against plaintiff because of his race as African American [black]. Craig Donais' racially-motivated campaign to interfere with Plaintiff's contractual relationships with the Manchester Police Department resulted in loss contract worth several thousands' of dollars. Plaintiff presents an inference of racial harassment/discrimination for which Craig Donais does not and cannot offer a legitimate non-discriminatory reason for his actions. Any reasons given or to be given by Craig Donais were or is a mere pretext for discrimination.

345.    The law recognizes that racial harassment and retaliation can be proved through direct or circumstantial evidence. Harris v. Forklift Sys., 510 U.S. 17 (1993). Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process." See Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 723 (7th Cir. 1998). This type of direct evidence of discriminatory intent does not require "a virtual admission of illegality." See Venters v. City of Delphi, 123 F.3d 956 (7th Cir. 1997) at 973.  For example, direct evidence need not take the form of an admission where the defendant states "I'm [taking this adverse action] because you're in a protected group." See Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999); see Venters, 123 F.3d at 973.  The court in Venters explained that "the evidence need not be this obvious to qualify as direct evidence." Id. And the Sheehan court explained why: because such a requirement "would cripple enforcement of the ... discrimination laws." See Sheehan, 173 F.3d at 1044.  The direct evidence of such remarks must, however, establish that race was an important factor motivating the challenged action. See also Lounds v. Lincare, Inc., 812 F.3d 1208, 1224 (10th Cir. 2015) ("[S]tray remarks can prove to be invaluable insights into biases at every level of consciousness that may be rife but invisible within the workplace.... [They]

may bespeak a workplace culture in which certain language or sentiments are tolerated and perhaps encouraged or rewarded.")). Evidence, which includes conduct or statements by persons involved directly reflecting the discriminatory attitude, constitutes 'direct evidence' of discriminatory animus.

## B. Harm

346.    As a direct and proximate result of Craig Donais' intentional, deliberate, and willful racially harassing acts, Plaintiff have suffered damages. Craig Donais' actions against Plaintiff have been malicious and oppressive, and conducted in a callous disregard of the rights of the Plaintiff. As a direct and proximate result, Plaintiff has suffered economic losses in amounts exceeding thousands of dollars in lost business opportunities, together with emotional distress, humiliation, and damage to reputation, all in amounts to be proven at trial. Because Craig Donais' actions were willful, wanton, and undertaken with actual malice, Plaintiff is entitled to enhanced damages, together with costs, reasonable attorney's fees, and such other relief as the Court deems just. Plaintiff demands judgment against Craig Donais for compensatory and enhanced damages, injunctive relief enjoining further discriminatory or retaliatory conduct, reasonable attorney's fees and costs, pre- and post-judgment interest, and any additional relief the Court deems equitable and just. NB: This claim is pled under the NH savings statute for events between 2019 and June 2021 and is thus timely. Events after June 2021 through 2023 are timely on their own, and are still thus timely.

## C. Waiver of Administrative Remedy

347.    With respect to the administrative exhaustion requirement under the New Hampshire Law Against Discrimination, Bisasor contacted the New Hampshire Commission for Human Rights in approximately 2017. The Commission informed him that it was understaffed and would not be able to process cases for an extended period, and effectively communicated that he could proceed on his own. This constituted a practical waiver of the exhaustion requirement. Moreover, Judge Temple in the underlying state court proceedings allowed the case to proceed notwithstanding the absence of a formal right-to-sue letter, accepting the explanation of the Commission's informal waiver.

348.    The Supreme Court's decision in *Fort Bend County v. Davis*, 587 U.S. 541 (2019), confirms that Title VII's charge-filing requirement is nonjurisdictional and may be waived or forfeited. The same principle applies to the NH LAD's exhaustion requirement, which serves the same administrative channeling function. NH RSA

354-A:21-a allows a person to bring a civil action in superior court after filing with the HRC. The statute's purpose is remedial; it should not be construed to bar meritorious claims when the agency itself was unable to process them. Defendants should be deemed to have forfeited this defense if not timely raised. In any event, the § 1981 claim provides a complete federal remedy requiring no exhaustion whatsoever.

349.     Plaintiffs are entitled to actual, compensatory, and punitive damages, together with attorney's fees & costs.

### Count 9: Violation of 42 U.S.C. §1981 - Retaliation
(Against Craig S. Donais and Donais Law Offices PLLC).

350.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

351.     Bisasor engaged in protected activity by asserting his contractual and civil rights under § 1981, filing an ethics complaint against Donais with the appropriate disciplinary authorities, and pursuing litigation to vindicate his rights. These activities are protected under § 1981 as interpreted by the Supreme Court in *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008), which established that the statute encompasses retaliation claims.

352.     After Bisasor engaged in this protected activity, Donais engaged in retaliatory conduct that escalated in severity over time: the June 2019 defamation campaign to the CrimeLine board, in which Donais made false felony accusations and false claims of mental illness/instability; the June 2019 false police reports using the "Manchester Blue & You" alias, which resulted in the destruction of Bisasor's community-policing contract; the August 2020 social media defamation campaign by Craig and Mary Donais, which mobilized communal hostility and destroyed the NAACP/UNH contract; and the November 2023 public statements before the Advisory Committee on Rules, in which Donais falsely accused Bisasor of "deceptively weaponizing the attorney discipline process." Each of these retaliatory acts occurred after, and in response to, Bisasor's assertion of his rights.

353.     The elements of retaliation are satisfied. First, Bisasor engaged in protected activity: the assertion of rights under §1981, the filing of an ethics complaint, and the pursuit of discrimination complaints. Second, Defendants took adverse actions: false police reports, defamation to community organizations, destruction of contractual relationships, social media defamation campaigns, and public attacks on Bisasor's credibility before a state supreme court committee. Third, there is a causal connection between the protected activity and the adverse actions: the retaliatory acts followed the protected activity in close temporal proximity and escalated

in severity as Bisasor continued to assert his rights—a pattern that eliminates any inference of coincidence. Fourth, but for Bisasor's race and his assertion of race-related rights, these retaliatory acts would not have occurred. The nature of the retaliation—deploying racial stereotypes to punish a Black man for complaining about racial discrimination—is itself evidence of racial motivation.

354. Plaintiffs have suffered and continue to suffer actual, compensatory, and consequential damages as a direct and proximate result of Defendants' retaliation, and are entitled to compensatory damages, punitive damages, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

### Count 10 – Racial Harassment & Retaliation
**(as to defendant Craig Donais and Donais Law PLLC)**
**A. Key Facts**

355. Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

356. Craig Donais breached his contract with plaintiff and racially harassed plaintiff in violation of the NH law on discrimination. Craig Donais have also engaged in racial harassment or aided and abetted in racial harassment of the plaintiff, by treating the plaintiff in a hostile manner through activities that are tantamount to mocking, jeering, and taunting the plaintiff as he sought to resist or oppose racial harassment. Craig Donais has also sought to racially stereotype the plaintiff as a race-baiter, a criminal, as a violent and dangerous person, and as a troublemaker that should be punished, simply because he has to speak up and speak out against the wrongs done to him by the defendants. Craig Donais also sought to wrongfully use members of a non-profit board to further engage in racial harassment of the plaintiff in order to intimidate and retaliate against the plaintiff for opposing, resisting, and exposing and seeking to hold accountable the defendants for their racially harassing and racially stereotyping conduct towards the plaintiff.

357. This racially harassing conduct included the false allegation that plaintiff accused Craig Donais of racism because Craig Donais declined to represent him, as outlined previously in this complaint. Attorney Elliott Berry (well-known and well-respected attorney in NH experienced with discrimination matters) who is plaintiff's former legal counsel, confirmed to the plaintiff that such conduct is racially harassing or discriminatory, as Craig Donais sought to use the plaintiff's race against him as a black male in order to subject him to contempt, ridicule and diminished esteem and credibility. Craig Donais' act of inserting race into his dealings with the

plaintiff (which the plaintiff never did) was emblematic of the type of wrongful acts that Craig Donais and the defendants engaged in towards the plaintiff.

358. Craig Donais also used the fact that plaintiff originally complained of discrimination with the original hotel defendants, as evidence that plaintiff was lying in denying that plaintiff had accused Craig Donais of racism. This is an utterly oppressive and harassing tactic by the defendants that was perpetrated against the plaintiff. This is precisely the kind of sophisticated race trap that Craig Donais had in mind when he concocted the scheme to falsely accuse plaintiff of accusing Craig Donais of racism because he declined to represent plaintiff.

359. Craig Donais have intentionally engaged in racial harassment against Plaintiff with respect to and flowing out of the implied contract that plaintiff had with Craig Donais, because of Plaintiff's race as a black male; and has classified or sought to classify plaintiff in ways that adversely affected his implied contract with Craig Donais and adversely affected his status as a former client and customer of Craig Donais, because of race.

360. Craig Donais have engaged in a continuing practice of racial harassment, racial stereotyping and racialized character assassination against the plaintiff based on race including use of subtle dog whistles. Plaintiff, as an African American, clearly belongs to a protected class. The fabrication of false allegations of racism, the dissemination of racially charged statements, and the use of police to intimidate and retaliate against Plaintiff all support a prima facie case. The conduct was motivated by racial bias, as evidenced by the racial stereotypes invoked and the timing of the false reports following Plaintiff's complaints and legal actions. Craig Donais' targeted Plaintiff due to his race, fabricating allegations that exploited stereotypes to undermine his housing and business relationships and thus interfered with Plaintiff's contractual rights by fabricating allegations that exploited racial bias. Thus, the defendants deliberately exploited racial stereotypes and fabricated allegations of racism to interfere with the plaintiff's contractual and personal relations. This interfered with Plaintiff's right to contract (Comcast v. Nat'l Ass'n of African American-Owned Media, 140 S. Ct. 1009 (2020)).

**B. Claim**

361. Plaintiff incorporate by reference all paragraphs of this Complaint as though fully stated herein seriatim.

362. Defendants have also engaged in racial harassment or aided and abetted in racial harassment of the plaintiff, by treating the plaintiff in a hostile manner through activities that are tantamount to mocking, jeering, and taunting the plaintiff as he sought to resist or oppose racial harassment. The defendants have also sought to

racially stereotype the plaintiff as a race-baiter, a criminal, as a violent and dangerous person, and as a troublemaker that should be punished, simply because he has to speak up and speak out against the wrongs done to him by the defendants. The defendants also sought to wrongfully use the police to further engage in racial harassment of the plaintiff in order to intimidate and retaliate against the plaintiff for opposing, resisting, and exposing and seeking to hold accountable the defendants for their racially harassing and racially stereotyping conduct towards plaintiff. This racially harassing conduct included the false allegation that plaintiff accused Donais of racism because Donais declined to represent him, as outlined previously in this complaint. Attorney Elliott Berry (well-known and well-respected legal aid attorney in NH experienced with discrimination matters) who is plaintiff's former legal counsel, confirmed to the plaintiff that such conduct is racially harassing or discriminatory, as Donais sought to use the plaintiff's race against him as a black male in order to subject him to contempt, ridicule and diminished esteem and credibility. Donais' act of inserting race into his dealings with the plaintiff (which the plaintiff never did) was emblematic of the type of wrongful acts that Donais and the defendants engaged in towards plaintiff.

363.    The defendants also used the fact that plaintiff originally complained of discrimination with the original hotel defendants, as evidence that plaintiff was lying in denying that plaintiff had accused Donais of racism. This is an utterly oppressive and harassing tactic by the defendants that was perpetrated against the plaintiff. This is precisely the kind of sophisticated race trap that Donais had in mind when he concocted the scheme to falsely accuse plaintiff of accusing Donais of racism because he declined to represent the plaintiff. By the above acts stated in the prior paragraphs, the defendants have violated 42 U.S.C § 1981 by racially harassing plaintiff and committing racial harassment against plaintiff because of his race as African American [black].

364.    Plaintiff presents an inference of racial harassment/discrimination for which Defendants does not and cannot offer a legitimate non-discriminatory reason for their actions. Any reasons given or to be given by Defendants were or is a mere pretext for discrimination. Defendants have intentionally engaged in racial harassment against Plaintiff with respect to and flowing out of the implied contract that plaintiff had with Donais, because of Plaintiff's race as a black male; and has classified or sought to classify plaintiff in ways that adversely affected his implied contract with Donais and adversely affected his status as a former client and

customer of Donais, because of race. Defendants have engaged in a continuing practice of racial harassment, racial stereotyping and racialized character assassination against the plaintiff based on race including use of subtle dog whistles. Similarly, retaliation related to race is recognized as a violation of this statute. NB: Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process." See Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 723 (7th Cir. 1998) 339. This type of direct evidence of discriminatory intent does not require "a virtual admission of illegality." See Venters v. City of Delphi, 123 F.3d 956 (7th Cir. 1997) at 973. For example, direct evidence need not take the form of an admission where the defendant states "I'm [taking this adverse action] because you're in a protected group." See Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999); see Venters, 123 F.3d at 973. The court in Venters explained that "the evidence need not be this obvious to qualify as direct evidence." Id. And the Sheehan court explained why: because such a requirement "would cripple enforcement of the ... discrimination laws." See Sheehan, 173 F.3d at 1044. The direct evidence of such remarks must, however, establish that race was an important factor motivating the challenged action. 340. See also Lounds v. Lincare, Inc., 812 F.3d 1208, 1224 (10th Cir. 2015) ("[S]tray remarks can prove to be invaluable insights into biases at every level of consciousness that may be rife but invisible within the workplace.... [They] may bespeak a workplace culture in which certain language or sentiments are tolerated and perhaps encouraged or rewarded.")). 341. Evidence, which includes conduct or statements by persons involved directly reflecting the discriminatory attitude, constitutes 'direct evidence' of discriminatory animus.

365.    Unlawful discriminatory practices also include aiding and abetting another to commit an unlawful discriminatory practice. Defendants engaged in intentional conduct in violation of these laws against discrimination and retaliation with malice and reckless indifference with respect to plaintiff's protected rights. Defendants sought to breach the agreement with plaintiff, in retaliation because the plaintiff opposed and resisted and sought to expose the racial harassment, racial stereotyping and racial ridicule and scorn, and mocking that the defendants had initiated against the plaintiff as a black man.

366.    Similarly, markedly hostile treatment is also evidence of retaliatory animus. See also Christian v. Wal-Mart Stores Inc., 252 F.3d 862, 868 (6th Cir. 2001) at 872 (Service is considered "markedly hostile" when it is (1) so contrary to the establishment's financial interests, (2) so far outside of widely accepted business norms, and (3) so arbitrary on its face, that it supports a rational inference of discrimination. Id. at 871).

367.    Plaintiff alleges that Donais and his law firm represented plaintiff and was a former client. The plaintiff was, at a minimum, a prospective client that triggered fiduciary obligations and confidentiality obligations, as mandated and confirmed by the rules of professional conduct for lawyers. There was thus an attorney-client relationship as defined by the rules of professional conduct. And Donais himself later admitted to the police that plaintiff is a potential client (i.e. stating "I have a potential client").

368.    Thus, Donais and his law firm owed a contractual duty to Plaintiff, and thus there was contractual relationship that included confidentiality. Donais' breach of contract is based on: a) the acts of Donais as outlined above, resulting in a breach of contract; as well as b) statements made by Donais that breached that contract. As explained elsewhere, these acts and statements are not time-barred and are not privileged.

369.    Donais and his law firm acted in a manner that was inconsistent with the agreed-upon common purpose and expectations (including but not limited to confidentiality and fiduciary expectations as well as the expectation that Donais would not use client conversation to try to injure, hurt, defame or publish private facts or to seek to try to wrongly prosecute the client, among other things), as required by the rules of professional conduct for lawyers, and all of which Donais and his law firm did, and Plaintiff was harmed by this breach of contract conduct by Donais and his law firm. So, there was a contract which satisfies the contract aspect of section 1981. Donais also acted to prevent or interfere with the performance and enforcement of that contract by and because of racial animus and racial bias against the plaintiff. Defendants have thus also violated 42 U.S.C. § 1981.

370.    As a direct and proximate result of Defendant's intentional, deliberate, and willful racially harassing acts, Plaintiff have suffered damages. Defendant's actions against Plaintiff have been malicious and oppressive, and conducted in a callous disregard of the rights of the Plaintiff.

371.   Furthermore, this count asserts that Defendants engaged in racial discrimination and retaliation in violation of 42 U.S.C. § 1981, which guarantees all persons the same right to make and enforce contracts without racial discrimination. The facts demonstrate that Defendants fabricated racial accusations, exploited racial stereotypes, and disseminated false statements to third parties, all motivated by racial animus.

372.   The elements of a § 1981 claim are: (1) membership in a protected class; (2) intent to discriminate based on race; (3) conduct that interfered with a contractual or protected activity; and (4) causation.

373.   Plaintiff, as an African American, clearly belongs to a protected class.

374.   The fabrication of false allegations of racism, the dissemination of racially charged statements, and the use of police to intimidate and retaliate against Plaintiff all support a prima facie case.

375.   The conduct was motivated by racial bias, as evidenced by the racial stereotypes invoked and the timing of the false reports following Plaintiff's complaints and legal actions. The law recognizes that racial harassment and retaliation can be proved through direct or circumstantial evidence. Harris v. Forklift Sys., 510 U.S. 17 (1993). The pattern of false accusations, the racialized language, and the intent to harm Plaintiff's reputation and legal rights establish a violation of § 1981. See Crawford v. Metropolitan Government of Nashville, 555 U.S. 271 (2009); Fitzgerald v. University of Massachusetts, 2 F.3d 131 (1st Cir. 1993); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

376.   Defendants targeted Plaintiff due to his race, fabricating allegations that exploited stereotypes to undermine his housing and business relationships and thus interfered with Plaintiff's contractual rights by fabricating allegations that exploited racial bias. Thus, the defendants deliberately exploited racial stereotypes and fabricated allegations of racism to interfere with the plaintiff's contractual and personal relations. This interfered with Plaintiff's right to contract (Comcast v. Nat'l Ass'n of African American-Owned Media, 140 S. Ct. 1009 (2020)).

377.   Donais' false police reports and defamatory narratives targeted Plaintiff's race, violating federal protections against discriminatory contract interference. Comcast v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009 (2020). This conduct violates federal law, which prohibits racial discrimination in the making and

enforcement of contracts. The plaintiff's claims are supported by evidence of racial animus, discriminatory statements, and adverse actions taken because of race.

## VI. RACE DISCRIMINATION — HILLIARD DEFENDANTS
(Russell F. Hilliard, Upton & Hatfield LLP)

378.    Before setting forth the factual allegations against the Hilliard Defendants, Plaintiffs address at the outset the anticipated defense of litigation privilege. Defendants will argue that Russell Hilliard's conduct is shielded by the absolute litigation privilege because he was acting as Craig Donais's attorney. That defense fails for multiple independent reasons, any one of which is sufficient to defeat it.

379.    First, federal civil rights statutes preempt state-law privilege defenses. Section 1981 is a federal statute enacted under the Thirteenth Amendment to the United States Constitution. A state-law privilege—however broadly construed under state common law, cannot nullify a right guaranteed by federal statute. The Supremacy Clause, U.S. Const. art. VI, cl. 2, dictates that federal law prevails over conflicting state law. Section 1981(c) explicitly provides that the rights it protects "are protected against impairment by nongovernmental discrimination." Permitting a state-law litigation privilege to shield racially discriminatory interference with contractual rights would "impair" the very rights that § 1981 was enacted to protect. This result is foreclosed by the statute's text and by the Supremacy Clause.

380.    Second, the litigation privilege applies to communications, not conduct. Leading legal analysis confirms that "[g]enerally, the litigation privilege applies only to communications, not conduct." Hilliard's acts (covertly contacting the Primmer firm to induce termination of Bisasor's retainer, contacting Berry to silence a legal advisor who had validated the discrimination claims, sabotaging the Hilton settlement from within) are acts of conduct. They are not statements made in the course of litigation; they are covert operational acts designed to deprive Plaintiffs of legal representation and contractual rights. The privilege, even if it applies to any of Hilliard's communications, does not reach the underlying conduct of which those communications were the instrument.

381.    Third, the challenged conduct occurred outside any pending judicial proceeding. Hilliard's contact with Primmer on September 3, 2020 was not counsel-to-counsel litigation contact. It was a private communication to a third-party law firm, not filed in any court, not part of any pending motion or hearing, and made covertly

without Plaintiffs' knowledge. Similarly, his contact with Berry in March or April 2022 was outside any court proceeding. These were extrajudicial acts that cannot claim the protection of a privilege that attaches only to communications made in the course of judicial proceedings.

382.    Fourth, the litigation privilege does not shield intentional torts or federal civil rights violations. The privilege shields communications; it does not create a license for attorneys to engage in racially discriminatory interference with contractual rights under the cover of legal representation. An attorney who uses his professional position to systematically deprive African American litigants of every source of legal counsel and every contractual benefit cannot invoke the litigation privilege as a defense to a federal civil rights claim. To hold otherwise would transform the litigation privilege into a charter for racial discrimination by attorneys, so long as they act in their professional capacity. That cannot be the law.

383.    Fifth, even if the privilege could apply to isolated communications by Hilliard, it does not apply to the pattern of conduct, the systematic deprivation of African American pro se litigants of every source of legal assistance and every contractual relationship that could support their legal position. That pattern constitutes conduct separate from any individual privileged communication, and it is the pattern that gives rise to the inference of racial discrimination.

### A. Factual Allegations — Chronological Acts of Race Discrimination

384.    Section 1981 protects the right to make and enforce contracts. That protection is not limited to the direct parties to a contract. Third-party interference with contractual rights based on race is independently actionable. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975) (*Sullivan* applies "with equal force to a suit for interference with the right to contract guaranteed by Section 1981"); *Moore v. Grady Memorial Hospital Corp.*, 834 F.3d 1168, 1173 (11th Cir. 2016); *Shaikh v. City of Chicago*, 341 F.3d 627, 630 (7th Cir. 2003). Hilliard interfered with Plaintiffs' contractual relationships not as a neutral third party but as the operational agent of the Donais Defendants' racially motivated campaign. His acts destroyed three separate contractual relationships, as detailed below.

385.    On or about May 18, 2020, Bisasor retained Primmer, Piper, Eggleston & Cramer PC pursuant to a written retainer agreement for legal advice regarding the Donais litigation. This retainer agreement was a contract within the meaning of § 1981—a written agreement for the provision of professional legal services, supported

by consideration, and creating mutual obligations between the parties. The right to retain counsel is among the most fundamental contractual rights in the American legal system, and its protection under §1981 is beyond dispute.

386.    On or about September 3, 2020, Hilliard privately and covertly contacted the Primmer firm without Plaintiffs' knowledge or consent, outside any pending court proceeding, and without any legitimate litigation purpose. This was not counsel-to-counsel contact in the ordinary course of litigation. There was no pending motion, no upcoming hearing, and no litigation need that would justify direct contact with the opposing party's counsel for the purpose of inducing that counsel to abandon its client. It was a private communication designed to induce Primmer to abandon its client—an act that serves no legitimate purpose within any recognized framework of legal ethics or litigation strategy.

387.    On September 4, 2020—one day after Hilliard's contact—Primmer terminated the retainer agreement with Bisasor. Primmer cited Hilliard's communication as the sole reason for the termination. The one-day interval between Hilliard's contact and Primmer's termination eliminates any plausible alternative explanation for the termination. Hilliard then monitored the result: Primmer informed Hilliard that it was severing its relationship with Bisasor. This monitoring confirms that Hilliard's purpose in contacting Primmer was to induce exactly the result that occurred. The loss of retained counsel caused damages valued in the five-figure range.

388.    The syllogistic mapping to the elements of §1981 is complete. Bisasor is African American (protected class). He had a written contract—the Primmer retainer agreement (contractual interest). Hilliard, a third party, intentionally interfered with that contract by covertly inducing the law firm to terminate it (discriminatory conduct). But for Bisasor's race, this interference would not have occurred—Hilliard would not have gone to such extraordinary lengths to deprive a white litigant of counsel (but-for causation). And the contractual interest was destroyed: the retainer was terminated (impairment of contractual right).

389.    Since approximately 2017, both Plaintiffs had maintained an advantageous professional relationship with Elliott Berry of New Hampshire Legal Assistance. Berry provided periodic legal advice to both Bisasor and Anderson. Critically, Berry was the first person to inform Plaintiffs that Craig Donais's conduct was racially motivated. Berry's investigation and written determination found that Donais had breached his fiduciary duties

95

and that the conduct had racial dimensions. Berry confirmed that Donais's acts constituted ethical violations with racial implications. Berry was not merely a legal advisor; he was the one independent professional who had validated Plaintiffs' discrimination claims based on his own investigation of the facts.

390.    In or about March or April 2022, Hilliard contacted Berry directly, without Plaintiffs' knowledge or consent, and without any legitimate litigation purpose. Berry thereafter ceased providing all legal advice to Plaintiffs. Berry personally informed Plaintiffs that the situation initiated by Hilliard was the reason he could no longer advise them. This was the second time in less than two years that Hilliard had covertly deprived Plaintiffs of legal counsel. The value of the lost legal advice exceeds $20,000.

391.    The critical significance of silencing Berry cannot be overstated. Berry was not an interchangeable attorney who could be replaced by any other practitioner. He was the one professional who had independently investigated the facts and concluded that Donais's conduct was racially motivated. Eliminating Berry served a dual purpose: it deprived Plaintiffs of legal counsel (the contractual injury), and it eliminated the one professional whose independent judgment corroborated Plaintiffs' discrimination claims (a retaliatory purpose). The second purpose is independently actionable under the retaliation protections of §1981. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). By silencing Berry, Hilliard ensured that Plaintiffs lost not only an attorney but also a witness to the racial dimensions of Donais's conduct.

392.    On or about 4-16-21, Bisasor accepted a final monetary settlement offer in the Hilton Hotels litigation. Attorney Shelagh Michaud represented that she spoke for all defendants in the matter, including Craig Donais. Joint defense negotiations proceeded from May through October 2021, with Donais participating through Hilliard as his counsel. The settlement agreement was a contract within the meaning of § 1981—a negotiated resolution of litigation, supported by consideration, creating mutual obligations to perform.

393.    In or about October 2021, Bisasor discovered evidence that Donais and Hilliard were undermining the settlement from within—participating in joint defense negotiations while simultaneously working to sabotage the agreed-upon resolution. On or about January 6, 2022, Michaud informed Bisasor that "Craig Donais is no longer willing to settle"—a repudiation of the settlement that had been accepted and negotiated over a period

of months. The result was a six-figure loss in settlement value. Both Bisasor and Anderson were directly harmed by the destruction of this contractual relationship.

394. The sabotage of the Hilton settlement is particularly significant because it demonstrates that Hilliard's conduct was not confined to peripheral matters but extended to the destruction of a major contractual relationship worth six figures. The settlement represented the culmination of years of litigation. Its destruction at the eleventh hour, through internal sabotage by Donais acting through Hilliard, deprived Plaintiffs of the contractual benefit they had earned and accepted. This act, combined with the destruction of the Primmer retainer and the Berry advisory relationship, reveals a systematic campaign to ensure that Plaintiffs were denied every contractual benefit and every source of legal support.

395. Before Hilliard's interference, Plaintiffs had retained counsel (Primmer), an informal legal advisor who had validated their discrimination claims (Berry), and an accepted settlement agreement (the Hilton resolution). After Hilliard's interference, Plaintiffs had none of these. They were completely isolated—without counsel, without an independent professional ally, and without a settlement—against well-funded, well-represented adversaries in a state that is approximately 93% white. This pattern of systematic isolation is not normal litigation strategy. It goes far beyond zealous advocacy. It is a campaign of racial isolation designed to ensure that African American pro se litigants are stripped of every source of legal assistance and every contractual relationship that could support their position.

396. The but-for causation standard of *Comcast* is satisfied. Upon information and belief, Hilliard would not have engaged in this pattern of conduct against white litigants. The willingness to serve as Donais's operational agent—to covertly contact law firms to induce termination of retainers, to silence the one attorney who had validated the discrimination claims, to sabotage a settlement from within—against specifically African American litigants is inseparable from the racial dynamics that pervade this case. The pattern is not merely aggressive litigation; it is a targeted campaign to ensure that Black litigants in a 93% white state are rendered helpless. No comparable campaign would have been waged against white litigants. The conduct is explicable only by reference to race.

397.     Hilliard's conduct was committed within the scope of his representation of Craig Donais through Upton & Hatfield LLP. The firm is vicariously liable for Hilliard's discriminatory acts under standard principles of respondeat superior and partnership liability. Notably, Upton & Hatfield LLP itself has published guidance confirming the procedural requirements of the New Hampshire Law Against Discrimination, demonstrating the firm's sophisticated awareness of discrimination law. The firm cannot credibly claim ignorance of the racial dimensions of its partner's conduct, and its sophistication in this area of law weighs against any argument that Hilliard's conduct was inadvertent or unrelated to race.

**Count 11: Violation of 42 U.S.C. § 1981 - Race Discrimination in Contracting (Third-Party Interference)**
(Against Russell F. Hilliard and Upton & Hatfield LLP).

398.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

399.     Plaintiffs are African American and are members of a racial group protected under 42 U.S.C. § 1981. Defendants Russell F. Hilliard and Upton & Hatfield LLP intentionally interfered with Plaintiffs' right to make and enforce contracts on the basis of Plaintiffs' race. The contracts impaired include three separate contractual relationships: (1) the written retainer agreement between Bisasor and Primmer, Piper, Eggleston & Cramer PC, which was destroyed by Hilliard's covert contact with the firm; (2) the professional advisory relationship between Plaintiffs and Elliott Berry of New Hampshire Legal Assistance, which was terminated after Hilliard contacted Berry directly; and (3) the settlement agreement in the Hilton Hotels litigation, which was sabotaged from within by Donais acting through Hilliard.

400.     Third-party interference with contractual rights based on race is actionable under §1981. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975); *Moore v. Grady Memorial Hospital Corp.*, 834 F.3d 1168, 1173 (11th Cir. 2016); *Shaikh v. City of Chicago*, 341 F.3d 627, 630 (7th Cir. 2003). Hilliard was not a direct party to any of the contracts. He was a 3rd party who deliberately/covertly destroyed each of those contracts through extrajudicial conduct that falls outside the scope of any recognized privilege. His conduct was racially motivated: but for Plaintiffs' race, Hilliard would not have engaged in the systematic campaign of interference described above. *Comcast Corp. v. NAAAOM*, 590 U.S. 539 (2020).

401.     Defendants' conduct was intentional. Each act of interference—the covert contact with Primmer, the silencing of Berry, the sabotage of the Hilton settlement—required deliberate planning and execution. The

pattern of conduct, considered as a whole, demonstrates a sustained campaign to deprive Plaintiffs of every contractual relationship that could advance their legal position. The conduct cannot be attributed to zealous advocacy or aggressive litigation strategy; it is conduct that exceeds the bounds of any legitimate professional purpose and reflects a discriminatory motive.

402.    Plaintiffs have suffered and continue to suffer actual, compensatory, and consequential damages as a direct and proximate result of Defendants' violations of §1981, including but not limited to loss of retained counsel valued in the five-figure range, loss of legal advisory services exceeding $20,000, loss of settlement value in the six-figure range, emotional distress, and economic harm. Plaintiffs are entitled to compensatory damages, punitive damages, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

### Count 12: Violation of New Hampshire RSA 354-A — Race Discrimination
(Against Russell F. Hilliard and Upton & Hatfield LLP).

403.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

404.    Defendants' conduct as described above also violates the New Hampshire Law Against Discrimination, RSA 354-A. Upton & Hatfield LLP is a law firm that provides professional legal services to the public and constitutes a place of public accommodation within the meaning of RSA 354-A:2, XIV. Hilliard's discriminatory interference with Plaintiffs' contractual rights, carried out in his capacity as a partner of Upton & Hatfield LLP, violated the prohibition on race discrimination in public accommodations.

405.    The administrative exhaustion analysis set forth in connection previously applies with equal force here. Bisasor contacted the New Hampshire Commission for Human Rights, was informed of the Commission's inability to process cases in a timely manner, and was effectively directed to proceed on his own. Judge Temple accepted this explanation in the underlying state proceedings. The exhaustion requirement is nonjurisdictional under *Fort Bend County v. Davis*, 587 U.S. 541 (2019), and Defendants should be deemed to have forfeited this defense if not timely raised. In any event, the §1981 claim in Count IV provides a complete federal remedy that requires no exhaustion. Plaintiffs are entitled to actual, compensatory, and punitive damages, together with reasonable attorney's fees and costs.

### VII. ADDITIONAL BASES FOR RACE DISCRIMINATION CLAIMS

406.    In addition to the §1981 and RSA 354-A claims set forth above, Plaintiffs reserve the right to assert claims under 42 U.S.C. §1985(3), which provides a cause of action for conspiracy to deprive any person of the equal

protection of the laws or of equal privileges and immunities under the laws. The coordinated conduct of the Donais Defendants and the Hilliard Defendants—in which Hilliard served as the operational agent of Donais's racially motivated campaign, systematically destroying Plaintiffs' contractual relationships while Donais simultaneously waged a public defamation campaign deploying racial stereotypes—gives rise to a plausible inference of conspiracy. The Defendants acted in concert, with a shared objective of isolating African American litigants from legal assistance and contractual support, and with racial animus as the motivating force.

407. To the extent that any state actors are implicated in the conduct alleged herein, Plaintiffs further reserve the right to assert claims under 42 U.S.C. §1983 for violations of the Equal Protection Clause of the Fourteenth Amendment. The involvement of the Manchester Police Department—which acted upon Donais's false reports to cancel Bisasor's community event and terminate his community-policing contract—raises questions about state action that Plaintiffs may develop as discovery proceeds.

408. Plaintiffs further note that §1981 provides a broader remedy than Title VII in several critical respects. Section 1981 imposes no cap on compensatory or punitive damages. It requires no administrative exhaustion. It reaches private actors outside the employment context—including attorneys, law firms, and private individuals who interfere with contractual rights. And it carries a four-year statute of limitations under 28 U.S.C. § 1658(a), rather than the shorter filing deadlines applicable to Title VII charges. These features make §1981 the most direct, comprehensive, and appropriate federal remedy for the pattern of race discrimination alleged in this Complaint.

409. The state law claims already asserted in this action—including defamation, tortious interference with contractual relations, and intentional infliction of emotional distress—are reinforced by, and should be read in conjunction with, the federal civil rights protections established by §1981. The same facts that support the state law claims also support, and indeed compel, the conclusion that race was the but-for cause of Defendants' conduct. The federal claims do not supplant the state-law claims; they provide an additional and independent basis for relief that carries the full weight and remedial authority of federal civil rights law. Plaintiffs demand judgment against all Defendants, jointly and severally, for compensatory damages, punitive damages, costs of suit, reasonable attorney's fees under 42 U.S.C. §1988, and such further relief as the Court deems just/equitable.

**SECTION 4: BREACH OF FIDUCIARY DUTY, BREACH OF IMPLIED CONTRACT AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**I. FACTS PERTAINING TO BREACH OF FIDUCIARY DUTY, BREACH OF IMPLIED CONTRACT AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**A. Anderson Contact O'Brien Who Contacts Donais**

410.    On 1-5-17, Anderson contacted Attorney Robert O'Brien ("O'Brien") seeking legal assistance with the dispute with Homewood. During this eighteen-minute consultation, Anderson provided detailed information about the circumstances of her case, including sensitive information. O'Brien, recognizing the complexity of the legal issues presented and acknowledging that such matters fell outside his primary area of practice, informed Anderson that he would consult with a colleague who possessed greater expertise in the relevant areas of law.

411.    Acting on his professional obligation to ensure Anderson received competent representation, O'Brien contacted Donais, specifically identifying him as an attorney with broader expertise in state law relevant to Anderson's situation. During their conversation, O'Brien conveyed to Donais the substance of Anderson's legal concerns, along with the urgent timeline requiring immediate action. Following this consultation, O'Brien communicated to Anderson via text message that he had spoken with Donais, thus facilitating consultation between Anderson and Donais.

412.    Here, Obrien's text message stated clearly that Obrien spoke to Attorney Donais and that Donais said that we "have a great contract case for the overcharges", that "the innkeeper rules would likely apply to your situation" and "which allows for "no cause" evictions", and that Donais would "not opine on the discrimination claims outside his experience." Therefore, Anderson provided prospective client information to Obrien who passed that information on to Donais and Donais passed back legal opinion on the case to Anderson through Obrien.

413.    Note: In a later interview[4] with Mark Cornell of the ADO of NH, Cornell stated that Obrien told him that: "He seems to recall that Mr. Donais did not think the innkeeper/landlord issue was "cut and dry.""

---

[4] Cornell interviewed Obrien in August 2020 and Obrien confirmed that he sent the above text to the Anderson on 1-5-17. Obrien also confirmed that Donais told him that "the innkeeper/landlord issue was not "cut and dry"". This means that Obrien had to have explained enough of the case for Donais to render such an opinion.

414.    Thus, Obrien contacted Donais by phone and explained his contact/conversation with Anderson and the issues in the case. Obrien then sent Anderson a text message summarizing the legal opinion rendered by Donais on facts of the case.

### B. Bisasor Contacts Akridge and Hilton Executives

415.    On 1-5-17, Bisasor contacts Dave Akridge ("Akridge"), the owner of the management company who manages the Homewood Suites of Nashua. Akridge is the supervisor of general manager Adam Robitaille. Bisasor speaks to Akridge about the dispute/situation. Akridge tells Bisasor that he will call him back tomorrow. On 1-5-17, Plaintiffs also contacted the Hilton senior management team to seek relief. On 1-6-17, Hilton Executives wrote an email to plaintiffs stating that Homewood had assured them they retained counsel and were working to amicably resolve the matter (which was untrue).

### C. Bisasor Contacts Donais

416.    Bisasor discovered several attorney ads online by Donais claiming to be an expert attorney in landlord-tenant law serving the Nashua area. Because of this, Bisasor understood Donais to be a competent lawyer in landlord-tenant law and thus identified Donais as a lawyer to contact for legal assistance.

417.    On 1-6-17, Bisasor called Donais' phone number, explicitly with the intention of seeking and obtaining legal advice, assistance and/or representation but reached a voice-message system, and left a voice-message.

418.    Bisasor thus requested that Donais represent him and explicitly sought individualized legal advice from him. This is evidenced by the plaintiff's call to Donais and the voicemail left, which stated the following[5]:

> "Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical."

419.    On Monday, 1-9-17, the very next business day, after retrieving the voicemail that clearly indicated the request for legal advice/assistance on a landlord-tenant matter, Donais intentionally called Bisasor at his Massachusetts phone number, knowing that Bisasor was seeking specific legal advice and assistance from on a specific land-lord tenant matter, and the conversation lasts for about 7 minutes. This was not a situation where a random person calls his office and Donais picks up the phone and was caught off guard. Here, Donais deliberately, and with forethought, listened to the voice-message and decided to return the call in order to

---

[5] Note: Bisasor has a recording of this voicemail message left for Donais on 1-6-17.

engage Bisasor's request for legal advice/assistance, fully aware of what the call would be about and with the intention to listen to Bisasor share information about his legal predicament.

420.     During that call, Bisasor requested that Donais represent him and explicitly sought individualized legal advice from him, specifically requested advice on landlord tenant matters, which is within Donais' practice6, and Donais gave the desired legal advice on the landlord-tenant matters, for which plaintiff sought assistance, during the one-time legal consultation call.  A brief summary excerpt of part of what was discussed follows[7]:

> Plaintiff asked whether the conversation was confidential and Donais confirmed that it was protected by privilege. Plaintiff shared confidential information about the landlord-tenant arguments plaintiff had, requested advice on potential weaknesses in those arguments and on certain legal strategies being contemplated, and asked about the relevant statutes and the likelihood of obtaining a TRO. Donais indicated that he thought it was likely that plaintiff will get a TRO based on what was described to him but he could not say for sure if it would become permanent because he would have to take a look at all the documents himself. Donais also indicated a belief that the plaintiff's contract case was strong based on what was described, but it would depend on what was actually written in an agreement or  if we can actually show there was an agreement, etc.

421.     Thus, during this consultation, Bisasor disclosed confidential information and received legal advice from Donais. See also Exhibit 5 for affidavits.

422.     Bisasor thus engaged in preliminary discussions with Donais related to a legal analysis of potential claims that was to be brought in connection with the landlord-tenant matter involving the Hilton Hotel defendants. NB: Donais declined formal representation because he was "too busy" that week.

### D. Legal Action Initiated By Plaintiffs | Donais Goes To Represented Opposing Side

423.     On 1-9-17, Plaintiffs filed an emergency 540A petition in Nashua District Court. A Temporary Restraining Order (TRO) is granted by the court to halt any threat of a removal action. On 1-10-17, the 540A petition and the TRO is served on general manager Adam Robitaille in the morning. On 1-11-17, Dave Akridge contacts Donais seeking his involvement in the case as local defense counsel and to support the pro hac vice admission of an out of state attorney from Atlanta, named Karl Terrell. On 1-11-17, a phone call occurs between Akridge and Donais where Donais informs Akridge that he had a conversation with Bisasor about the case the day before. Donais explains to Donais what was discussed with Bisasor. Akridge asks Donais if this created a conflict and Donais emphatically assured Akridge that it did not. Donais then goes to represent the opposing

---

[6] See Exhibit B for Donais' advertisement on Justia, that identifies landlord-tenant as within his practice area.
[7] NB: The defendant cannot dispute facts in this complaint unless or until there is a trial or summary judgment. Any attempt to dispute these facts in a pre-trial motion to dismiss is invalid.

party [Homewood] after consulting with Bisasor and shared confidential information shared by Bisasor with the opposing party [Homewood] thus breaking client confidentiality. Donais also failed to inform Bisasor of this nor obtained consent from Bisasor before doing so. By sharing Bisasor's client call information with Homewood, including Dave Akridge, and by also sharing Bisasor's client call information with other people, including family members, friends, colleagues community members including the Manchester NH crime-line board, and with friends and the police, etc., Donais breached plaintiff's confidentiality. Donais thus intentionally misrepresented to Bisasor that the consultation call would be kept confidential, via privilege, which Donais never intended to honor. Yet, Donais' voluntary decision to call back Bisasor in response to his voicemail, represented an agreement by Donais to engage in an attorney-client conversation protected by attorney-client privilege.

### E. Donais' Contact With Akridge

424.    After the 1-9-17 call with Bisasor, Donais and Akridge had a phone call on 1-11-17 where the plaintiffs and their case against Homewood was discussed. Donais discussed the information shared with him from Bisasor. Donais shared this information without receiving consent from Bisasor and without informing Bisasor that he was going to share such information with Akridge. This conversation was centered on whether Donais could be hired to represent Akridge/Homewood in the same case that Bisasor discussed with Donais on 1-9-17. Subsequent to this phone call, Donais sent an email on 1-11-17 to Akridge stating:

> "What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper..".

425.    Here, Donais admitted he received specific client consultation information from Bisasor on the 1-9-17 call.

426.    On 1-11-17, Akridge calls Terrell and tells him of the discussion he had with Donais about the contact with Bisasor. Donais writes an email to Terrell stating that he had contact with Bisasor and provided a summary of what was discussed with Bisasor. Donais and Terrell had a further conversation by phone about the matter. On 1-13-17, Donais filed an appearance on behalf of Adam Robitaille and Homewood Suites of Nashua and filed pro hac vice motion for Terrell. On 1-17-17, Donais and Terrell filed a 60-page motion to dismiss in Nashua District Court. The motion to dismiss included/utilized confidential information that was shared with Donais both directly via call with Bisasor and indirectly via communications with Obrien from Anderson.

### F. Elliot Berry's 1-17-17 Call with Donais

427.    On 1-17-17, renown Attorney Elliott Berry (of the NH Legal Assistance) agreed to formally represent plaintiffs in this case. Plaintiffs advised Berry of the situation with Donais. Berry expressed shock at these events and told us that in his 30 years of practicing law he had never heard of anything like that or any lawyer doing such things. Berry advised plaintiffs that this was a serious violation of Rule 1.18 of the NH rules of professional conduct. On 1-17-17, Berry called Donais about the conflict of interest and to give him a chance to explain and/or to withdraw from the case because Berry now had a duty to bring the matter to the attention of the court. But Donais told Berry that there was no conflict of interest, and that he did not think he needed to withdraw from the case.

### G. Court Hearing on 1-18-17

428.    On 1-18-17, a court hearing took place in the Nashua district court before Judge Paul Moore. At or near the beginning of the hearing, Berry raised the ethical concerns about Donais with the court. A sidebar ensues with counsel for both parties invited to discuss the matter at the bench in front of Judge Moore. Berry explained the ethical concerns to the judge. Donais gave his explanation of the matter citing that he did nothing wrong. Mr. Donais fought vigorously to remain on the case, and even accused Elliott Berry of creating a contrived conflict. However, Judge Moore told Donais that he had been part of the PCC for the past 10 years and was vice chair of the hearing committee for the past 4 years. Judge Moore told Donais that if he had any discussion with Obrien or Bisasor about the facts of this particular case, he would be in conflict. Judge Moore indicated to Donais that this could become a very serious matter if the plaintiffs decide to pursue this as a complaint and that Donais needs to carefully consider what he is going to do because once "the bell is rung", it will be a problem especially if done while the litigation is proceeding. Judge Moore asked Berry if his clients were willing to waive any conflict and that if they were not, then Donais needs to make a decision on withdrawing. If Donais could not decide for himself, then Judge Moore would make the decision for him. Judge Moore clearly was signaling to Donais that it would be much better for him to withdraw on his own without being formally disqualified by the judge. Donais got the message loud and clear. After a short recess, wherein plaintiffs told Berry that they did not waive any conflict, then subsequently Donais reluctantly told Judge Moore that he was going to withdraw from the case.

### H. Dave Akridge Affidavit on 5-4-17

429.    Akridge provided a statement on 5-4-17 in an affidavit that shows that, as of 1-11-17, prior to Donais being hired to represent Akridge and Homewood, that Donais and Akridge knew that Bisasor was the plaintiff suing Akridge and Homewood in the district court, i.e. that they concluded that "Andre" was quite likely "Mr. Bisasor" and that Akridge "heard enough to conclude… that the caller he described was likely Mr. Bisasor".

430.    The above shows that Donais received legal advice information from Bisasor, that Donais was in contact with Akridge shortly after the consultation call with Bisasor, that before Akridge hired Donais, Donais shared with Akridge information that Bisasor shared with Donais. The above also shows Donais willfully and knowingly persisted in seeking to represent the opposing party when he knew there was a conflict and when his possible new client and their lawyer was specifically concerned that there was a conflict of interest. But Donais persuaded them that there was nothing to the matter, all the while also hiding that Obrien had spoken to Donais about the same matter and shared more information about the matter, to which Donais even rendered a legal opinion. It is likely that if Akridge and perhaps Terrell had known about the Obrien call, they would not have hired Donais as local counsel. Akridge stated that: *"I specifically recall asking Mr. Donais if he would have a conflict serving as local counsel, given this conversation with "Andre." He responded with conviction that he did not, given the fact that he had turned down the request to take the case, and given also the brief nature of his discussion with the caller."* This persistence and willful misconduct by Donais not only was a detriment to plaintiffs as former prospective clients but posed a jeopardy to his new prospective clients in hiding the Obrien call of 1-5-17 and in minimizing the conflict based on the 1-9-17 call with Bisasor.

### I. Other Statements Made in Donais

431.    Donais admits that he received confidential information from Bisasor. As one example, he admits that he received information regarding the "need to immediately file" which further goes to timing and strategy. Donais also stated that during the call he knew it was the same case that he consulted on with Obrien. Donais disclosed the contents of the plaintiffs' client-privileged protected information, as noted above, to Akridge, Terrell, and Terrel's assistant, prior to being hired by them to represent them as parties adverse to the plaintiffs. Donais further used and disclosed the contents of the plaintiffs' client-privileged protected information, as

noted above, to Akridge, Terrell, and Terrell's assistant, after he was hired by them to represent them as parties adverse to plaintiffs. This was a breach of confidentiality.

## J. Additional Subsequent Events

432.    In the time period spanning 2017, 2019, 2020 and after, Donais disclosed the contents of the plaintiffs' client-privileged protected information, as noted above, to his wife, Mary Donais, his sons Garrett and Aiden, and his other family members and friends, as well as to members of the Manchester NH crime-line board, and to the Manchester NH police, including details of the 1-9-17 conversation with Bisasor, and subsequently, to a public audience at a public meeting.

## II. FURTHER FACTS PERTAINING TO BREACH OF FIDUCIARY DUTY
### A. Formation of the Fiduciary Relationship

433.    On 1-9-17, Plaintiff consulted Donais for legal advice on a landlord-tenant dispute and engaged in a confidential discussion with Donais, during which Donais obtained confidential information about plaintiff's personal circumstances, legal concerns, and litigation plans including case strategies and exploration of case strengths/weaknesses. During this call, Plaintiff disclosed confidential information, triggering fiduciary duties under NH Rule of Professional Conduct 1.18. Donais declined representation but later exploited this interaction to harm Plaintiff. A fiduciary relationship was formed from the above conduct of the parties.

434.    Donais in deciding to call back the plaintiffs in response to the voicemail represented an agreement by Donais to engage in an attorney-client conversation that was protected by attorney-client privilege. Consequently, Donais had inside knowledge of plaintiff's self-disclosed understanding of the strategies, weaknesses and discussions about plaintiff's case from Plaintiff directly. This prospective attorney-client relationship triggered fiduciary obligations and confidentiality obligations on the part of Donais. The rules of professional conduct create these and other duties and obligations of the lawyer to a client or former client. These duties and obligations include but are not limited to confidentiality and fiduciary expectations as well as the expectation that Donais would not use this client conversation to try to injure, hurt, defame or publish private facts, as mandated and confirmed by the rules of professional conduct for lawyers. There was thus an attorney-client relationship as defined by the rules of professional conduct.

435.    The communications on 1-5-17, 1-6-17 and 1-9-17 created the initial contacts necessary for the formation of a prospective client relationship under New Hampshire Rule of Professional Conduct 1.18. In particular,

on 1-9-17, Donais returned Bisasor's call, initiating what became a 7-minute consultation during which Bisasor, speaking on behalf of both plaintiffs, provided Donais with confidential information relating to their legal dispute with Homewood Suites. During this consultation, Bisasor disclosed specific details about the nature of their claims, including allegations of racial discrimination, improper charges, and the urgent need for legal intervention to prevent their wrongful eviction. Bisasor reasonably believed, based on the prior communications with O'Brien and Donais's willingness to engage in substantive discussion about their legal situation, that Donais was consulting with them for the purpose of potentially providing legal representation.

436.    Donais's status as a licensed attorney in NH created ongoing professional and ethical obligations under the Rules of Professional Conduct and thus retained continuing duties to his former client, including the duty not to use confidential information to the client's disadvantage, the duty not to engage in conduct detrimental to the former client's interests, and the duty to act with good faith and fair dealing in all subsequent interactions. In this matter, Donais violated his duty to the plaintiff in several ways: a) Donais discussed the client conversation with the plaintiff with several people. These include his wife, Mary Donais, his sons Garrett and Aiden, and the Manchester NH crime-line board, as well as friends and connections. These communications violated the rights of the plaintiff; b)  Donais also had a duty to inform the plaintiff, as a former client, that Donais was going to or had discussed such information with others. Instead, Donais actively hid those occurrences from plaintiff. The act of hiding such occurrences from plaintiff is a breach of duty the plaintiff.

437.    Donais's disclosure of client discussion information result was a violation of Donais's fiduciary duty to Bisasor.

438.    Donais also published the following false and defamatory statements of purported fact concerning plaintiffs: a) Donais falsely stated that plaintiff falsely and frivolously accused him of racism for declining to represent plaintiffs in a 7-minute prospective attorney-client phone call. Donais spread this false defamatory statement to several people including his family members, friends, colleagues, and to community member; b) Donais falsely stated that plaintiff burglarized and bugged his office phone and office thus committing a felony crime;  c) Donais falsely stated that plaintiff fabricated a recording to put Donais' voice on it to make Donais say things Donais did not say; d) Donais falsely stated that plaintiff is a criminal; e) Donais falsely stated that

plaintiff is mentally crazy/has a mental disease-sickness. These false statements were not made in court proceedings and are not privileged.

### B. Abuse of Confidence and Betrayal of Trust

439.    Donais's conduct represents a clear abuse of the influence he had acquired and a betrayal of the confidence that had been reposed in him. Rather than declining representation of the adverse party or maintaining the confidentiality of the information he had received, Donais chose to use the confidential information obtained from plaintiffs to benefit their opponents in the litigation. This conduct violated the most fundamental principles of the attorney-client relationship and constituted a breach of the fiduciary duties he owed to plaintiffs. The harm caused by Donais's breach was both immediate and substantial. Plaintiffs were deprived of the confidentiality protections they reasonably expected when consulting with an attorney, and the confidential information they provided was used against them in the subsequent litigation. This breach of trust undermined their legal position and caused them to suffer damages as a direct result of Donais's misconduct.

### FURTHER DETAILS  PERTAINING TO BREACH OF FIDUCIARY DUTY CLAIM

440.    Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

### A.  The Initial Contact and Confidential Relationship:

441.    In early January 2017, Plaintiff consulted Craig Donais for legal advice on a landlord-tenant dispute and engaged in a confidential discussion with Craig Craig Donais regarding this dispute. During this engagement, Craig Donais obtained confidential information about the plaintiff's personal circumstances, legal concerns, and litigation plans including case strategies and exploration of case strengths and weaknesses. Under the applicable rules of professional conduct, Craig Donais owed a fiduciary duty of confidentiality and loyalty to the plaintiff, even if formal representation was not accepted. During this call, Plaintiff disclosed confidential information, triggering fiduciary duties under New Hampshire Rule of Professional Conduct 1.18. Craig Donais declined representation but later exploited this interaction to harm Plaintiff.

442.    Craig Donais received confidential information concerning the plaintiff when Craig Donais called Bisasor on 1-9-17. Craig Donais initiated the call to Bisasor after Bisasor called and left a voicemail for Craig Donais on a prior day stating that plaintiff was seeking legal assistance and advice on a landlord-tenant matter. Craig

Donais in deciding to call back the plaintiffs in response to the voicemail represented an agreement by Craig Donais to engage in an attorney-client conversation that was protected by attorney-client privilege.

443.    Consequently, Craig Donais had inside knowledge of plaintiff's self-disclosed understanding of the strategies, weaknesses and discussions about plaintiff's case from Plaintiff directly.

444.    Plaintiff alleges that Craig Donais and Bisasor had an attorney-client relationship, that plaintiff was a client for purposes of the initial consultation, and that otherwise plaintiff was, at a minimum, a prospective client, and that he became a former client once the engagement went no further after the initial consultation. This is backed up by the explicit language of the NH Rules of Professional Conduct for Lawyers.

445.    This prospective attorney-client relationship triggered fiduciary obligations and confidentiality obligations on the part of Craig Donais. The rules of professional conduct create these and other duties and obligations of the lawyer to a client or former client.

446.    These duties and obligations include but are not limited to confidentiality and fiduciary expectations as well as the expectation that Craig Donais would not use this client conversation to try to injure, hurt, defame or publish private facts or to seek to try to wrongly prosecute the client, as mandated and confirmed by the rules of professional conduct for lawyers. There was thus an attorney-client relationship as defined by the rules of professional conduct.

447.    Thus, an attorney-client relationship existed between Plaintiff and Craig Donais, whereby Craig Donais owed Plaintiff fiduciary duties of confidentiality, and honest dealing that continued beyond the conclusion of the attorney-client consultation that occurred on one day only.

448.    Craig Donais's status as a licensed attorney in New Hampshire created ongoing professional and ethical obligations under the Rules of Professional Conduct and thus retained continuing duties to his former client, including the duty not to use confidential information to the client's disadvantage, the duty not to engage in conduct detrimental to the former client's interests, and the duty to act with good faith and fair dealing in all subsequent interactions.

### B.  Overview of Breach of Fiduciary Duty:

449.    Craig Donais used his prospective client conversation with Plaintiff against Plaintiff, to directly inflict harm by defaming Plaintiff and accusing him of falsely/frivolously accusing Craig Donais of race discrimination because he

did not take his case. This false accusation against Plaintiff has sullied Plaintiff, with the implication that Plaintiff is a frivolous liar who plays the race card without rhyme or reason and is to be discredited as an irrational, unstable, angry person who wildly hurls accusations of race discrimination when there is no valid reason to do so. This diminishes Plaintiff's character and discredits him in the eyes of the public and the community.

450.    If Plaintiff had never spoken to Craig Donais on 1-9-17 about a prospective client relationship, Donais could not have had the opportunity to fabricate this lie against Plaintiff.

451.    Craig Donais has used his position as a prospective lawyer to Plaintiff as a prospective client as a basis to injure Plaintiff by falsely accusing him of falsely accusing Craig Donais of race discrimination in the context of a conversation wherein Plaintiff was seeking to legal advice/assistance from Craig Donais, and wherein Plaintiff shared with Craig Donais certain confidential information, thus taking Craig Donais into his confidences and placing his trust in Craig Donais. Craig Donais exploited and abused the trust that Plaintiff extended to Craig Donais in seeking to have a conversation with him about plaintiffs' case against the Hilton Hotel defendants. Craig Donais turned around and used that private privileged conversation as a basis to fabricate lies on Plaintiff. This is an utter abuse and ethical travesty that has befallen Plaintiff. This is a breach of fiduciary duty. This also goes to the conflict of interest. Craig Donais was never going to be able to be loyal to plaintiff or his spouse, and uphold the trust and confidences that plaintiff placed in him, because ultimately, Craig Donais was loyal to Dave Akridge (who was as a principal for the opposing party). Craig Donais' conflict of interest further created the fuel by which he found it useful to falsely accuse plaintiff, in order to harm and damage plaintiff, and his spouse in the interest of protecting and advancing his own interests and/or the interests of the opposing party

452.    Craig Donais disclosed confidential client information about the plaintiffs to third parties, including but not limited to family members including his wife and his adult or teenage children, his friends and colleagues, and other private persons.

453.    Note: Absolute privilege does not protect an attorney from breach of fiduciary duty.

454.    Either way, the breach occurred outside the context of any judicial proceeding, and these statements are not protected by absolute privilege.

455. These breach of fiduciary duty acts by Craig Donais include the following:

    a. Craig Donais disclosed confidential client conversation information about the plaintiffs to his wife, Mary Donais in 2019 and 2020.

    b. Craig Donais disclosed confidential client conversation information about the plaintiffs to his sons, Garret Donais and Aiden Donais, in 2019 and 2020.

    c. Craig Donais disclosed confidential client conversation information about the plaintiffs to the Manchester NH Crime-Line board in 2019 and 2020.

    d. Craig Donais disclosed confidential client conversation information about the plaintiffs to his friends on the board of a local Manchester NH non-profit organization, in 2019 and 2020.

456. As a prospective client, Plaintiff shared confidential information with Craig Donais during a January 2017 consultation. Craig Donais breached NH Rule 1.18 by weaponizing this information in defamatory campaigns.

457. The facts clearly demonstrate that Plaintiff reasonably believed he was engaging in a confidential discussion, and Craig Donais's conduct violated that trust, breaching his fiduciary obligation. See Glickman v. Brown, 21 Mass. App. Ct. 229 (1985) (recognizing fiduciary duties in attorney-client relationships).

458. Craig Donais breached confidentiality obligations owed to Plaintiff as a prospective client by disclosing privileged information to harm Plaintiff's interests.

459. Craig Donais breached confidentiality obligations owed to Plaintiff as a prospective client by disclosing privileged information to harm Plaintiff's interests.

460. Craig Donais engaged in a pervasive, widespread, systematic and deliberate pattern of abandoning, violating and exploiting his fiduciary obligations to Plaintiff for his own self-interest and constituted a willful dereliction of duty designed to exploit Plaintiff's vulnerability as an African-American, and conceal evidence of Craig Donais' own misconduct. Craig Donais' concealment of his divulging of plaintiff's confidential client conversation further constitutes a breach of the duty to protect client interests post-termination (In re Jones, NH Sup. Ct., No. 2021-0123, 2021 WL 4472142). Attorneys must prioritize client interests over self-protection. By divulging and exploiting confidential information, Craig Donais engaged in self-dealing barred by Kanamaru, 100 Mass. App. Ct. at 75.

461.    Under New Hampshire law, attorneys owe clients and former clients an unwavering duty of confidentiality and transparency, even after termination of a client relationship. Craig Donais' conduct breached this duty at every turn, inflicting severe financial, procedural, and emotional harm.

462.    Craig Donais' acts also includes a breach of fiduciary duty by divulging information (and fabricated version of it) obtained during a confidential prospective client consultation with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client.

### B. Breach of Continuing Fiduciary Duties

463.    <u>Duty of Good Faith and Fair Dealing</u>: Craig Donais breached his continuing duty of good faith and fair dealing by engaging in deceptive conduct designed to prevent Plaintiff from pursuing legitimate legal remedies.

464.    <u>Duty of Loyalty</u>: Craig Donais breached his continuing duty of loyalty by placing his own interests above those of his former client and by actively working to harm Plaintiff.

465.    <u>Duty Not to Use Position for Personal Advantage</u>: Craig Donais breached his duty by using his position as an attorney and his relationships to gain unfair advantage over his former client.

466.    <u>Duty of Honest Dealing</u>: Craig Donais breached his duty of honest dealing by engaging in a pattern of deception and defamation, designed to avoid accountability for his professional misconduct.

### II. COUNT 13 PERTAINING TO BREACH OF FIDUCIARY DUTY CLAIM

467.    Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

### SUMMARY OF COUNT 13 FOR BREACH OF FIDUCIARY DUTY

468.    The plaintiffs and Donais had a fiduciary relationship. Donais breached that fiduciary relationship by disclosing confidential information shared by Bisasor with Donais on a legal consultation call, thus breaching confidentiality and attorney-client privacy. Under New Hampshire law, the existence of a fiduciary relationship does not require a formal attorney-client retainer or fee arrangement. Rather, fiduciary duties arise whenever confidence has been reposed and influence has been acquired in the context of a professional consultation. Thus, a fiduciary relationship existed between Donais and plaintiffs based on their consultation and the confidence reposed in him; Donais breached his fiduciary duties by disclosing confidential information to adverse parties and representing those adverse parties; Plaintiffs suffered damages as a result of this breach; and (4) Donais's breach was the proximate cause of their damages.  Donais's conduct in engaging in a

substantive consultation with plaintiffs, acquiring confidential information, and then using that information to benefit their adversaries constitutes a textbook example of breach of fiduciary duty. Thus, Plaintiffs' assert that a fiduciary relationship existed between the plaintiffs and Donais because Donais had acquired influence with respect to Bisasor which was abused by Donais, and Bisasor reposed confidence in Donais but was betrayed, and because plaintiffs relied on Donais for legal advice for their landlord-tenant matter. Donais withdrew from representing Homewood, after a judge had effectively determined that Donais had violated ethical duties/breached fiduciary duty. The 1-18-25 court hearing transcript shows that Donais was effectively caught red-handed and that a circuit court judge found that Donais breached fiduciary duty and thus was required to be disqualified/withdraw from the case. This by itself is slam-dunk proof that Donais is liable for breach of fiduciary duty, as Donais' own withdrawal serves as his own admission that he was liable for this wrongdoing.

469.    As a result of Donais's breaching conduct, Donais caused Bisasor to suffer loss and emotional distress. The damages Bisasor sustained were directly, proximately and solely caused by Donais's breach of his duty. See affidavit attached as Exhibit A.

## A. DETAILS ON COUNT 13: BREACH OF FIDUCIARY DUTY
### (as to Craig Donais and Donais Law Offices PLLC)

470.    Plaintiff incorporate by reference all paragraphs of this Complaint as though fully stated herein seriatim.

471.    This count asserts that Craig Donais and his law firm owed a fiduciary duty to Plaintiff as a prospective client, including confidentiality, loyalty, and the obligation to act in good faith, which was breached through multiple egregious acts.

472.    Plaintiff was a prospective client entitled to confidentiality and loyalty. By disclosing privileged information and exploiting it for self-protection, Craig Donais breached that duty, proximately causing reputational and economic loss.

473.    Under NH law, the attorney-client relationship, even at the prospective stage, creates fiduciary obligations including confidentiality, loyalty, and good faith. Craig Donais breached this duty by disclosing confidential information, fabricating false allegations, and misusing the relationship to retaliate.

474.    Courts have recognized that a fiduciary duty arises when an attorney receives confidential information, even if formal engagement does not occur, provided the client reasonably believes the attorney is acting in a

professional capacity and the communication is confidential. Keshishian v. CMC Radiologists, 142 NH 168, 174 (1997); Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451 (1991).

475.    In this case, the facts establish that Plaintiff engaged Craig Donais in a confidential, substantive discussion about legal issues involving the Hilton hotel defendants. Craig Donais, knowing this, had a duty to maintain confidentiality and act in Plaintiff's best interests. Instead, he divulged confidential information to third parties, his wife, son, family members and community members, colleagues, and others, without Plaintiff's consent, breaching his fiduciary obligation.

476.    Moreover, Craig Donais used his position of client trust to maliciously fabricate false allegations of racism, criminal conduct, and mental illness, with the intent to defame, intimidate, and retaliate against Plaintiff.

477.    These acts constitute a clear breach of the fiduciary duty, which under NH law, includes the obligation not to disclose confidential information or use it for personal or third-party advantage.

478.    Under NH law, breach of fiduciary duty requires (1) the existence of a fiduciary relationship, (2) breach of that duty, (3) causation, and (4) damages. The facts support each element, and the breach caused tangible damages, including reputational harm and emotional distress.

479.    The case law supports that such breaches are actionable. Bays v. Theran, 418 Mass. 685 (1990), affirms that breaches of fiduciary duty can be established through acts of disloyalty, breach of confidentiality, or self-dealing.

480.    The repeated disclosures, especially those involving false statements to third parties, show a pattern of breach that is sufficiently egregious to sustain a cause of action.

481.    Plaintiff's damages include reputational harm, emotional distress, and economic losses, directly caused by these breaches.

482.    It should be noted that, under NH law, the fiduciary duties extend to prospective clients, especially where confidential information was shared and relied upon in good faith.

483.    As a prospective client, Plaintiff shared confidential information with Craig Donais during a January 2017 consultation. Craig Donais breached NH Rule 1.18 by weaponizing this information in defamatory campaigns.

484.    The facts clearly demonstrate that Plaintiff reasonably believed he was engaging in a confidential discussion, and Craig Donais's conduct violated that trust, breaching his fiduciary obligation. See Glickman v. Brown, 21 Mass. App. Ct. 229 (1985) (recognizing fiduciary duties in attorney-client relationships).

485.    Craig Donais breached confidentiality obligations owed to Plaintiff as a prospective client by disclosing privileged information to harm Plaintiff's interests.

486.    The rules of professional conduct provides that a lawyer shall not knowingly reveal a confidence or secret of a client or use a confidence or secret of a client to the disadvantage of that client.

487.    A "confidence" is defined as "information protected by the attorney-client privilege under applicable law" and a "secret" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." (McKinney Supp. 1991).

488.    Courts have held that an "analagous fiduciary obligation may be implied in the absence of an attorney-client relationship." Liu v. Real Estate Inv. Group, Inc., 771 F. Supp. 83 (S.D.N.Y. 1991).

489.    As the court in Liu noted:

It is clear that where an attorney receives confidential information from a person, who under the circumstances has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidences irrespective of the absence of a formal attorney client relationship.

490.    Id. at 86 (quoting Nichols, 99 Misc.2d 822, 417 N.Y.S.2d at 418); see also Rosman v. Shapiro, 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987); Trinity Ambulance Serv., Inc. v. G L Ambulance Servs., Inc., 578 F. Supp. 1280, 1283 (D. Conn. 1984).

491.    See, e.g., United States v. Devery, No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship."); Green v. Montgomery County, 784 F. Supp. 841, 844 (M.D. Ala. 1992) ("The mere existence of an express contract of employment, or the payment of legal fees, or the length of consultation is not determinative of whether a preliminary consultation has matured into an attorney-client relationship.").

492.    "[C]ourts have not employed a single, well-defined test for determining whether an attorney client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship

are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." First Hawaiian Bank v. Russell Volkening, Inc., 861 F. Supp. 233, 238 (S.D.N.Y. 1994); accord Bennet Silvershein Assocs. v. Furman, 776 F. Supp. 800, 803 (S.D.N.Y. 1981) (quoting Trinity Ambulance Serv., Inc. v. G L Ambulance Servs., Inc., 578 F. Supp. at 1283); Keoseian v. Von Kaulbach, 707 F. Supp. 150, 152 (S.D.N.Y. 1989) (same).

493. As the Second Circuit has stated, "[t]he key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." United States v. Dennis, 843 F.2d 652, 657 (2d Cir. 1998).

494. Further, whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to the attorney client privilege. See Dennis, 843 F.2d at 657 ("To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."); see also Green, 784 F. Supp. at 845 ("[T]he fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result."); Liu, 771 F.Supp. at 86 ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."); McCormick on Evidence 6th Ed. § 88 (West Publishing Co., 2006) ("[C]ommunications in the course of [a] preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted.").

495. In this instance, it is clear that Bisasor engaged in preliminary discussions with Craig Donais related to a legal analysis of potential claims that could be brought in connection with the landlord-tenant matter involving the Hilton Hotel defendants during the tenure of plaintiff's stay. Although there was no further engagement or retainer after that preliminary client conversation, any communication made during this preliminary consultation is protected by the duty of confidentiality and protected by the attorney-client privilege. Thus, this preliminary conversation is sufficient to establish the existence of an attorney-client relationship, even though Craig Donais was not ultimately retained.

496.    Bisasor's statement that confidences were shared with Craig Donais is corroborated by telephone records indicating that there were at least two telephone calls involved, one of which was on 1-9-17, between Craig Donais and Bisasor which lasted 7 minutes. The facts here, including a 7 minute phone call conversation and transmittal of client conversation information from Robert Obrien via conversation with Craig Donais about plaintiff's claims, provides sufficient circumstantial evidence to conclude that it is likely that some "confidences" or "secrets" were revealed to Craig Donais in order for him to evaluate the case.

497.    For example, in Arifi, the court held that the former attorney's assertion, that he could not remember any confidential information conveyed to him during the short representation of one of the defendants, did not cure the professional responsibility conflicts which were present. Arifi, 290 F. Supp. 2d at 350 ("While there is no reason to doubt Green's claim that he does not remember any confidential information, the Court nevertheless finds that he was likely to have had access to such information during the short representation."); see also Schwed v. Gen. Elec. Co., 990 F. Supp. 113, 117 n. 2 (N.D.N.Y. 1998) (holding in a case where attorney claimed he did not possess confidential information and did not recall any discussions regarding the case, that the third prong of the Second Circuit test was nevertheless met because there was a likelihood that attorney had access to confidential information.).

498.    Plaintiff alleges that Craig Donais and Bisasor had an attorney-client relationship, that plaintiff was a client for purposes of the initial consultation, and that otherwise plaintiff was, at a minimum, a prospective client, and that he became a former client once the engagement went no further after the initial consultation. This is backed up by the explicit language of the NH Rules of Professional Conduct for Lawyers.

499.    It should be noted that Rule 1.18 of the NH Rules of Professional Conduct for Lawyers, states:

Rule 1.18. Duties to Prospective Client
(a) A person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.
(b) Even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information except as Rule 1.9 would permit with respect to information of a former client.
(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received and reviewed information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

Ethics Committee Comment:

1. The New Hampshire rule expands upon the ABA Model Rule in one area. The ABA Model Rule 1.18(a) defines a prospective client as one who "consults" with a lawyer about possible representation; the New Hampshire Rule defines prospective client as one who "provides information to a lawyer" about possible representation. ABA Model Rule 1.18(b) establishes a general rule for protection of information "learned" by a lawyer from a prospective client; the New Hampshire Rule clarifies the scope of the protection so that it applies to information "received and reviewed" by a lawyer from a prospective client.

In its version of Rule 1.18, New Hampshire's rule eliminates the terminology of "consultation" and learning and extends the protections of the rule to persons who, in a good faith search for representation, provide information unilaterally to a lawyer who subsequently receives and reviews the information. This change recognizes that persons frequently initiate contact with an attorney in writing, by e-mail, or in other unilateral forms, and in the process disclose confidential information that warrants protection. This change further recognizes that receipt and review are likely to be more objective standards than learning.

500. Rule 1.18 is very clear that prospective clients are protected by attorney-client privilege and that there is a duty to prospective clients owed by attorneys who consult with them.

501. Craig Donais and Bisasor had a fiduciary relationship. Craig Donais' relationship with Bisasor, that of attorney/client, was and is fiduciary. Craig Donais owed an ethical and fiduciary duty to Bisasor.

502. See Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass.App.Ct. 412, 442 (1980) ("[T]he relationship between attorney and client ... is fiduciary as a matter of law"); Blake v. Hendrickson, 40 Mass.App.Ct. 579, 582 (1996) (an attorney is the client's agent); Vanacore v. Kennedy, 86 F.Supp.2d 42 (D.Conn. 1998) (the relationship between attorney and client is one of trust and confidence, and gives rise to fiduciary duties of the attorney toward the client). Craig Donais owed Bisasor a fiduciary duty to act at all times in good faith and in Bisasor's best interests.

503. Craig Donais owed Bisasor a fiduciary duty to, among other things, to act in Bisasor's highest and best interests at all times, and to not expose Bisasor to any unnecessary risk or peril.

504. Craig Donais' fiduciary duty to Bisasor continued after the termination of his attorney/client relationship. See Bartle v. Berry, 80 Mass. App.Ct. 372, 385 (2011) (in accordance with the Rules of Professional Conduct, an attorney's fiduciary duty continues even after termination of the attorney- client relationship).

505. Under Restatement (Third) of the Law Governing Lawyers § 38, just because a prospective client conversation where confidential information was shared, does not result in further engagement, that does not absolve attorneys of fiduciary obligations created by that limited or initial client interaction.

506.    This communication/consultation with Bisasor triggered a fiduciary relationship (see Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 463 (1991)), with ongoing duties of confidentiality.

507.    However, in 2019 and 2020, Craig Donais disclosed private client information to his wife, son, family members, and friends and to the others including members of the Manchester NH Crime-Line board, etc.

508.    Craig Donais engaged in a pervasive, widespread, systematic and deliberate pattern of abandoning, violating and exploiting his fiduciary obligations to Plaintiff for his own self-interest and constituted a willful dereliction of duty designed to exploit Plaintiff's vulnerability as an African-American, and conceal evidence of Craig Donais' own misconduct. Craig Donais' concealment of his divulging of plaintiff's confidential client conversation further constitutes a breach of the duty to protect client interests post-termination (In re Jones, NH Sup. Ct., No. 2021-0123, 2021 WL 4472142). Attorneys must prioritize client interests over self-protection. By divulging and exploiting confidential information, Craig Donais engaged in self-dealing barred by Kanamaru, 100 Mass. App. Ct. at 75.

509.    Under New Hampshire law, attorneys owe clients and former clients an unwavering duty of confidentiality and transparency, even after termination of a client relationship. Craig Donais' conduct breached this duty at every turn, inflicting severe financial, procedural, and emotional harm.

510.    Craig Donais' acts also includes a breach of fiduciary duty by divulging information (and fabricated version of it) obtained during a confidential prospective client consultation with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client.

511.    It was malicious act and represented an attempt to harm plaintiff/his spouse as former prospective clients.

512.    When prospective clients meet with lawyers they are entitled to the same protections and confidentiality as any other client. The public must be assured that lawyers will treat their confidential client consultations including initial meetings as confidential, and that lawyers will not abuse such information because the lawyer ultimately declined full representation or because the lawyer joined the legal team of the opposing party. This is a logically nuanced point that is being made here.

513.    Craig Donais' intent was clear: to hurt, damage, harm, oppress, defame, scandalize the plaintiff.

514.    This is forbidden by the rules. So even if Craig Donais maintains that his allegations of what plaintiff said in the

1-9-17 conversation were true (which it was not), he still violated the rules of conduct and breached his duty and obligations to the plaintiff as a former client or former prospective client.

515.    Hence, Craig Donais' violations are multiple, layered and intertwined with a web of layered misconduct making a very serious combination of violations of ethics that rises to the level of extreme seriousness which is further compounded by the numerous breaches and wrongs that flowed from that to subsequent and continuing events thereafter.

516.    Again, this is an intellectually sophisticated point in showing the reasoning that would still arrive at a violation of the rules of conduct and a breach of duty and contract/good faith, by Craig Donais even if he were telling the truth in his false statements to several third parties about what plaintiff had said in the 1-9-17 client conversation (which he was not).

517.    It should be noted that some lawyers have been disbarred for engaging in misconduct as outlined above. It is evident that Craig Donais' conduct outlined herein, has violated Rule 8.4 section (a), (b), and (c), in that his false statements reflects adversely on the lawyer's honesty and trustworthiness, and it would also constitute conduct involving dishonesty, fraud, deceit and misrepresentation. Similarly, the fabrication of the race discrimination accusation would further be a violation of Rule 8.4 section (g), in that his false statements were motivated by racial animus and were intended to wrongly embarrass, harass and burden Plaintiff.

518.    Craig Donais breached his fiduciary duty to plaintiff by breaking his obligation of confidentiality, and acting against plaintiff's interest as a former client and seeking to harm and injure plaintiff's rights. In the alternative, this also constitutes legal malpractice.

519.    Thus, Craig Donais owed a duty to Plaintiff[8], and thus there was fiduciary relationship that included confidentiality. Craig Donais' breach of duty is based on: a) the acts of Craig Donais as outlined above, resulting in a breach of duty; as well as b) statements made by Craig Donais that breached that duty. These acts and statements that occurred in 2019 and 2020, with respect to the allegations in this complaint, are not time-barred and are not

---

[8] Donais owed a duty to plaintiff. There was a fiduciary relationship. Plaintiff was a prospective client. Plaintiff was engaged as a prospective client. Plaintiff was given legal advice. Plaintiff shared confidential information. A prospective attorney client relationship was formed. This is what a judge found (Judge Paul Moore in Nashua district court in NH). This is why Donais withdrew as attorney in that case.

privileged.

520.    Craig Donais had and owed a fiduciary duty to Bisasor.

521.    Craig Donais had an obligation to Bisasor to act with the utmost good faith and fidelity as a fiduciary agent.

522.    Craig Donais had a duty not to take advantage of Bisasor and place him at a disadvantage. See Goldman

v. Kane, 3 Mass.App.Ct. 336, 341 ( (1975) (attorney must do nothing that takes advantage of or disadvantages

the client).

523.    Craig Donais had a duty of trust and loyalty to Bisasor and a duty not to betray Bisasor.

524.    Craig Donais had a duty to not subvert his (Craig Donais) obligation to Bisasor.

525.    Craig Donais had an ethical obligation to Bisasor under the NH Rules of Professional Conduct, e.g., Rules

1.2, 1.3, 1.4, 1.6 and 1.7-1.9. See also 51 Mass. Prac., Professional Malpractice at 17.6 (an "attorney's duty of

care is set forth in the Rules of Professional Conduct").

526.    Craig Donais had a duty to not act deceitful.

527.    Craig Donais's ethical obligation to Bisasor (under NH Rules of Professional Conduct) continued after the

conclusion of the client conversation between Craig Donais and Bisasor in 2017.

528.    In this matter, Craig Donais violated his duty to the plaintiff in several ways.

a.  Craig Donais discussed the client conversation with the plaintiff with several people. These include his

wife, Mary Donais, his son Garrett Donais, and the Manchester NH crime-line board, as well as friends

and connections. These communications with his friends violated the rights of the plaintiff.

b.  Craig Donais also voluntarily engaged in discussion with the police about the conversation Craig

c.  Craig Donais also had a duty to inform the plaintiff, as a former client, that Craig Donais was going to

or had discussed such information with others. Instead, Craig Donais actively hid those occurrences

from the plaintiff.

d.  The act of hiding such occurrences from the plaintiff is a breach of duty the plaintiff.

529.    Craig Donais's disclosure of client discussion information result was a violation of Craig Donais's fiduciary

duty to Bisasor.

530.    See Rule 1.6. of the rules of professional conduct for lawyers, which states: *"Confidentiality of Information: (a) A*

*lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b)."* See also Rule 4.4: Respect for Rights of Third Persons: *"(a) In representing a client, a lawyer shall not take any action if the lawyer knows or it is obvious that the action has the primary purpose to embarrass, delay or burden a third person."*

531.    "Even after termination of the attorney-client relationship, a lawyer remains bound" to preserve the former client's confidences and secrets. Bays v. Theran, 418 Mass. 685, 691 (1994), quoting Masiello v. Perini Corp., 394 Mass. 842, 847 (1985). "(W)hen an attorney has ceased to represent a client, a conflict of interest may arise in representing a new client because of the attorney's continuing duty to preserve a former client's confidences." Adoption of Erica, 426 Mass. 55, 60 (1997).

532.    Further, Craig Donais's disclosure of client discussion information and the results therefrom was a breach of his obligation to Bisasor to act with the utmost good faith and fidelity as a fiduciary agent.

533.    Craig Donais's disclosure of client discussion information and the results therefrom was a breach of Craig Donais's loyalty to Bisasor.

534.    Craig Donais's disclosure of client discussion information and the results therefrom took advantage of Bisasor, and, placed him at a disadvantage.

535.    Craig Donais's disclosure of client discussion information and the results therefrom was an abuse of trust, disloyal, and a betrayal of Bisasor's cause.

536.    Craig Donais's disclosure of client discussion information and the results therefrom subverted Craig Donais's obligation to Bisasor, all to Bisasor's disadvantage.

537.    See In re Disciplinary Bd. of Hawaii Supreme Court, 984 P.2d 688 (Haw. 1999) (evidence underlying a violation of a disciplinary rule is evidence that would support civil or criminal liability); Gilles v. Wiley, Malehorn & Sirota, 783 A.2d 756 (N.J. Super 2001) (breach of a rule of professional conduct is evidence of an attorney's failure to comply with the required standard of care); BCCI Holdings (Luxembourg), S.A. v. Clifford, 964 F.Supp. 468 (D.D.C. 1997) (breach of attorney's ethical standards will constitute breach of fiduciary duty owed to client);

538.    Craig Donais's disclosure of client discussion information and the results therefrom violated Craig Donais's ethical obligation to Bisasor under the NH Rules of Professional Conduct. Said ethical rules were and are intended to protect one in Bisasor's position, and, a violation of the same is evidence of the attorney's negligence.

539.    See NH Rules of Professional Conduct, Rule 8.4 ("It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another. (c) engage in conduct involving dishonesty ... (d) engage in conduct that is prejudicial to the administration of justice;…or (h) engage in any other conduct that adversely reflects on his fitness to practice law").

540.    Thus, in terms of the breach of fiduciary duty and breach of confidentiality claims, Craig Donais acted as a prospective attorney for both plaintiffs, as evidenced by his communications with Plaintiff Bisasor, and by his own admissions and those of Attorney Robert O'Brien and Attorney Elliott Berry. Further facts and documentary evidence of the above include emails and testimony from Elliott Berry, who stated that Craig Donais' conduct constituted a breach of fiduciary duty and a violation of the rules of professional conduct, as well as emails from the ADO regarding Berry's interview, Berry's own written determination that Craig Donais breached his duty, and evidence from the circuit court where Craig Donais withdrew after the judge determined that Craig Donais had violated ethical duties/breach fiduciary duty. The court transcript shows that Craig Donais was effectively caught red-handed and that a circuit court judge effectively found that Craig Donais breached fiduciary duty as thus was required to be disqualified from the case. This by itself is slam-dunk proof that Craig Donais is liable for this claim of breach of fiduciary duty, and Craig Donais' own withdrawal serves as his own admission that he was guilty/liable for this wrongdoing.

541.    There is also evidence from Robert O'Brien that Craig Donais lied about the nature of his communications with plaintiffs.

542.    NB: Craig Donais cannot dispute facts in this complaint unless or until there is a trial or summary judgment. Any attempt to dispute these facts in any pre-trial motion is invalid.

543. As a result of Craig Donais's breaching conduct, Bisasor sustained injury and loss. Craig Donais caused Bisasor to suffer emotional distress. The damages Bisasor sustained were directly, proximately and solely caused by Craig Donais's breach of his duty as set forth above.

544. Craig Donais breached his fiduciary duties and obligations to Bisasor by doing all of the acts and omissions as herein alleged.

545. In doing all of the above described acts and omissions constituting Craig Donais's breach of his fiduciary duties owed to Bisasor, Bisasor has been damaged/injured.

546. Bisasor's injuries include lost opportunities, emotional distress, and mental anguish.

547. The acts and omissions constituting breach of Craig Donais's fiduciary duties were committed with intent, oppression, fraud and/or neglect.

548. The damages Bisasor sustained were directly, proximately and solely caused by Craig Donais's intentional, reckless and negligent acts and his breach of duty as set forth above.

549. In sum, even after the termination of the formal attorney-client relationship, Craig Donais owed Plaintiff continuing fiduciary duties including the duty of loyalty, the duty of good faith and fair dealing, and the duty not to use his position or confidential information to harm his former client.

550. Craig Donais breached these continuing fiduciary duties by:

    a. Engaging in conspiracy designed to harm the Plaintiff;

    b. Using his position as an attorney to gain unfair advantage over his former client;

    c. Placing his own interests above those of his former client;

    d. Engaging in deceptive conduct designed to harm the Plaintiff

    e. Violating his duty of honest dealing through a pattern of misrepresentation and deception.

551. As a direct and proximate result of Craig Donais's breach of fiduciary duty, Plaintiff has suffered damages as described above

552. WHEREFORE, Bisasor demands that judgment enter against Craig Donais for at least $850,000.00 or such other amount sufficient to compensate him for all of his damages, exemplary damages, interest, costs, attorney's fees and such other relief as the Court deems just and proper.

553.    This claim is pled under the NH savings statute for events between 2019 and June 2021 and is thus timely. Events after June 2021 through 2023 are timely on their own, and are still thus timely.

## SECTION 5: CLAIMS PERTAINING TO BREACH OF CONTRACT BY CRAIG DONAIS

### I. INTRODUCTION TO BREACH OF CONTRACT CLAIM

554.    Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

555.    Plaintiff had a prospective attorney client relationship with Craig Donais. The rules of professional conduct and the law treats this relationship as a real attorney client relationship even where there is not an express contract. An express contract is not necessary to form an attorney-client relationship.

556.    Plaintiff and Craig Donais had an implied contractual relationship that was implied by the confidential nature of their prospective attorney client relationship. Craig Donais himself admitted in email to other people that there was a client relationship or a prospective client relationship, which implicates confidentiality obligations, and which creates a contractual relationship or at least an implied contractual relationship.

557.    As cited in prior paragraphs, Craig Donais divulged information obtained during a confidential prospective client consultation, with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client, which is the plaintiff in this case.

558.    Craig Donais discussed with several people the client conversation he had with the plaintiff. These include his wife, Mary Craig Donais, his sons Garrett and Aiden Craig Donais, his family and friends and the Manchester N H crime-line board, and other connections. These communications violated the rights of the plaintiff. Similarly, every additional breach or wrongful act that flowed out of Craig Donais' representation of the opposing party is also a breach of implied contract. Similarly, every wrongful act or harm resulting from the acts of Craig Donais that flowed from the event in which the prospective client relationship was formed is also a breach of implied contract.

### II. FACTS PERTAINING TO BREACH OF CONTRACT CLAIM

559.    Plaintiff repeats and reiterates each and every allegation of this complaint in the preceding paragraphs with the same force and effect as if herein set forth at length.

## A. The January 9, 2017 Attorney-Client Consultation

560.    On January 9, 2017, Craig Donais returned a voicemail from Bisasor regarding a landlord-tenant dispute involving defendants in the Hilton Hotels litigation. The resulting telephone conversation lasted approximately seven minutes. During the call, Bisasor disclosed confidential information to Donais, including case strategies, assessments of strengths and weaknesses of his claims, and questions regarding the likelihood of obtaining a temporary restraining order against the opposing parties.

561.    Donais provided legal advice during the call, including his assessment of the merits of the prospective claims. At the conclusion of the call, Donais declined further representation.

562.    Despite declining representation, Donais subsequently arranged for his colleague, Attorney Dave Akridge, to represent the opposing party—the Hilton Hotel defendants—in the very dispute about which Bisasor had consulted Donais. Donais did not disclose this adverse representation to Bisasor. The confidential information Bisasor had shared during the consultation was directly relevant to the opposing party's defense.

563.    On or about March 16, 2017, Craig Donais filed an affidavit in the underlying state court case regarding the substance of the January 9, 2017 telephone call. This affidavit confirmed that a substantive legal consultation had occurred.

564.    Judge Paul Moore of the Nashua District Court subsequently conducted a hearing on the matter and found that Donais had formed a prospective attorney-client relationship with Bisasor during the January 9, 2017 telephone consultation. Judge Moore ordered Donais to withdraw from his representation of the opposing party. Donais withdrew as ordered. The existence of this prospective attorney-client relationship has been judicially determined and is not subject to legitimate dispute.

565.    The prospective attorney-client relationship gave rise to fiduciary duties of confidentiality, loyalty, and good faith owed by Donais to Bisasor. These duties survived the conclusion of the telephone call and continue to apply to all confidential information disclosed during the consultation. At no time did Donais disclose to Bisasor that he had shared Bisasor's confidential information with his wife Mary Donais, his sons Garrett and Aiden Donais, CrimeLine board members, Manchester police officers, or other third parties.

566.    The significance of the January 9, 2017 consultation cannot be overstated. It is the factual foundation from which all of Craig Donais's subsequent tortious conduct flows. Donais acquired confidential information

127

through the consultation, used that information to fabricate defamatory narratives, and then deployed those narratives against Bisasor in a sustained campaign of professional destruction. But for the consultation and the fiduciary duties it created, the defamatory statements, the interference with contracts, and the conspiracy would not have occurred in the form they took.

567.    Bisasor does not seek recovery in this action for events occurring in 2017. The 2017 consultation is relevant to this complaint as the factual predicate for the fiduciary duties that Donais breached beginning in 2019, for the confidential information that Donais weaponized in his defamatory campaign, and for the judicial finding of a prospective attorney-client relationship that establishes the falsity of Donais's later characterization of Bisasor's complaints as frivolous.

### B. Legal Framework

568.    Under New Hampshire law, a breach of implied contract claim requires proof of four elements: (1) the existence of a valid contract between the parties; (2) the terms of that contract; (3) a breach of those terms by the defendant; and (4) damages proximately caused by the breach. Each element is addressed below with specificity. This claim arises under New Hampshire common law governing contracts for professional services.

569.    New Hampshire law recognizes that an implied-in-fact contract arises from the conduct and circumstances of the parties, including where one party renders professional services at the request of another under circumstances indicating mutual assent to an exchange of value. See Restatement (Second) of Contracts §4 (implied-in-fact contracts formed by conduct); see also Restatement (Third) of the Law Governing Lawyers §14 (attorney-client relationship, and thus contractual obligations, may arise from conduct even absent a written retainer).

### C. Element One: Formation of a Valid Contract
#### i. Offer

570.    On 1-6-17, Bisasor called Craig Donais's office telephone number and left a voicemail message stating:

> *"Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call me back as soon as it is practical."*

571.    This voicemail constituted an offer to engage in a professional attorney-client consultation. The communication was directed specifically to Donais as a licensed attorney; it identified a specific legal subject matter (landlord-tenant law) within Donais's advertised area of practice; and it requested a return call for the

express purpose of discussing a legal matter. Under New Hampshire contract law, an offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it. Restatement (Second) of Contracts §24.

### ii. Acceptance

572.     On Monday, January 9, 2017—the next business day—Craig Donais retrieved Bisasor's voicemail and deliberately called Bisasor at his Massachusetts telephone number. Donais did not call Bisasor inadvertently or without knowledge of the purpose of the call. Rather, having listened to the voicemail identifying a request for legal consultation on a landlord-tenant matter, Donais intentionally returned the call with knowledge of its professional nature and with the intention of engaging in the requested consultation.

573.     Donais's return call constituted acceptance of Bisasor's offer. Acceptance may be manifested by conduct, including the commencement of performance. Restatement (Second) of Contracts §50(1). By returning the call and proceeding to engage in a substantive legal consultation, Donais manifested his assent to the proposed bilateral agreement for a professional consultation.

### iii. Mutual Assent and Ratification

574.     Mutual assent was manifested when both parties proceeded with the substantive legal consultation. Bisasor presented the facts of his landlord-tenant dispute; Donais listened, asked questions, provided legal analysis regarding the likelihood of obtaining a TRO, assessed the strength of the contract claims, and offered his professional opinion. The call lasted approximately seven (7) minutes, as corroborated by telephone records. This mutual course of conduct—Bisasor sharing confidential legal information and Donais providing substantive legal analysis in response—constitutes the objective manifestation of mutual assent to a bilateral agreement for a professional legal consultation.

575.     At the outset of the call, Bisasor asked Donais whether the conversation would be confidential. Donais expressly confirmed that the conversation was protected by attorney-client privilege. This express oral confirmation of confidentiality constitutes an explicit, agreed-upon term of the contract between the parties.

### iv. Consideration

576.     Valid consideration existed for this implied contract. Consideration requires a bargained-for exchange in which each party incurs a legal detriment or confers a legal benefit. See Restatement (2nd) of Contracts §71.

### 1. Benefit to Donais (Promisor):

577.    Donais received confidential information regarding Bisasor's legal dispute, including the factual circumstances, legal theories, litigation strategies, perceived strengths and weaknesses of the case, and the identity of the opposing parties. This information had tangible professional value to Donais, as demonstrated by the fact that Donais subsequently used this very information when he agreed to represent the opposing party, Homewood Suites, just two days later on January 11, 2017. Donais further disclosed this information in his January 11, 2017 email to Attorney Karl Terrell and to Dave Akridge. The information was thus of actual, demonstrated value to Donais.

## II. Detriment to Bisasor (Promisee):

578.    Bisasor incurred a substantial legal detriment by disclosing confidential information about his legal position, strategies, and perceived weaknesses to Donais—information that could be, and in fact was, used to undermine Bisasor's legal position. Bisasor surrendered the strategic advantage of confidentiality in reliance on Donais's express confirmation that the conversation was privileged. This disclosure was bargained for: Bisasor disclosed confidential information in exchange for Donais's professional legal analysis and the assurance of confidentiality.

579.    In the alternative, even if the exchange is not characterized as a traditional bargained-for consideration, Bisasor's detrimental reliance on Donais's promise of confidentiality independently supports enforcement of the implied contract under the doctrine of promissory estoppel. Restatement (Second) of Contracts §90. Bisasor reasonably relied on Donais's express confirmation of privilege and would not have disclosed the confidential information absent that assurance.

## D. Element Two: Terms of the Implied Contract

580.    The implied contract between Bisasor and Donais contained the following terms, established by the conduct and express statements of the parties, by the professional obligations attendant to the attorney-client relationship, and by the reasonable expectations of both parties:

### i. Confidentiality:

581.    Donais would maintain the confidentiality of all information disclosed during the consultation. This term was both expressly agreed upon (Donais's oral confirmation of privilege) and implied by the professional nature of the attorney-client consultation. See NH Rule of Professional Conduct 1.18(b) (duties to prospective clients regarding confidentiality); Restatement (Third) of the Law Governing Lawyers §15.

130

### ii. Non-use against the client:

582.    Donais would not use the information disclosed by Bisasor to Bisasor's disadvantage or to benefit adverse parties. This term is implied by the fiduciary nature of the attorney-client relationship and by NH Rule 1.18(b) (incorporating by reference Rule 1.9's protections for former clients).

### iii. Good faith:

583.    Donais would act in good faith with respect to the consultation and all information obtained therein. New Hampshire law implies a covenant of good faith and fair dealing in every contract. Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989).

584.    These terms are not speculative. They are the minimum professional obligations that any reasonable person consulting an attorney would expect, that any licensed attorney would understand to be operative, and that the Rules of Professional Conduct independently mandate. Donais's own express confirmation of confidentiality removes any doubt as to the parties' shared understanding of this core term.

### E. Element Three: Breach

585.    Craig Donais breached the implied contract in the following specific ways:

### i. Breach of confidentiality term:

586.    Beginning in 2019 and continuing through 2023, Donais disclosed information from the January 9, 2017 consultation to numerous third parties who had no legitimate need for or right to receive it, including: his wife Mary Donais; his sons Garrett and Aiden Donais; members of the Manchester NH CrimeLine board; family members, friends, and neighbors; and others in the Manchester community. None of these disclosures were authorized by Bisasor, and none fell within any exception recognized by the Rules of Professional Conduct or by law.  NB: He also disclosed the information to Akridge and Terrell, before being hired to represent them.

### ii. Breach of non-use term:

587.    Donais used information obtained during the confidential consultation as the factual predicate for fabricating false and defamatory statements about Bisasor, including false accusations of criminal conduct, mental illness, and frivolous racism allegations. Donais further used the consultation information to benefit Homewood Suites—the party adverse to Bisasor—when Donais agreed to represent Homewood just two days after the consultation and disclosed Bisasor's confidential information to Homewood's counsel.

### iii. Breach of good faith term:

588. Donais's conduct—weaponizing a confidential consultation to defame, stigmatize, and professionally destroy a former prospective client—represents the antithesis of good faith. His concealment of these breaches from Bisasor for years compounds the bad faith.

589. Donais's own email of 1-11-17 to Terrell, in which Donais recounted the substance of the consultation with Bisasor, constitutes an admission that: (a) a consultation occurred; (b) confidential information was received; and (c)Donais disclosed that information to adverse parties without Bisasor's consent.

### F. Element Four: Damages

590. As a direct and proximate result of Donais's breaches of the implied contract, Bisasor has suffered the following damages:

### i. Economic damages:

591. The loss of his contractual relationship with the Manchester NH police department for a community engagement initiative; the loss of professional opportunities and community standing in Manchester NH; and the destruction of his working relationship with the NAACP and other civic organizations in Manchester area.

### ii. Reputational harm:

592. The false statements derived from the confidential consultation have been disseminated throughout the Manchester community, damaging Bisasor's reputation as a professional, a community leader, and a person of good character.

### iii. Emotional distress damages:

593. Bisasor has suffered severe emotional distress including anxiety, depression, sleep disturbances, mood swings, feelings of racial stigmatization and humiliation, and loss of confidence in the legal profession, all flowing directly from Donais's breach of the implied contract of confidentiality.

## II. COUNTS PERTAINING TO BREACH OF CONTRACT CLAIM
### COUNT 14 — BREACH OF IMPLIED CONTRACT
*(as to Craig S. Donais and Donais Law Offices PLLC)*

20. Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

### A. Contract formation:

21. Under New Hampshire law, an implied-in-fact contract is formed when one party requests professional services, the other party provides those services, and the circumstances demonstrate mutual assent to an exchange of value subject to the professional obligations governing the relationship.

22. On January 6-9, 2017, Bisasor requested a legal consultation from Donais by voicemail; Donais accepted by returning the call; both parties engaged in a substantive legal consultation during which Donais expressly confirmed confidentiality; Bisasor provided confidential information in exchange for Donais's legal analysis; and both parties understood the professional, confidential nature of the exchange.

23. Conclusion: Therefore, an implied-in-fact contract was formed between Bisasor and Donais on January 9, 2017, the material terms of which included confidentiality, non-use of client information against the client, and good faith.

### Breach:

24. A party breaches an implied contract when it acts in a manner materially inconsistent with the agreed-upon terms of that contract.

25. From 2019 through 2023, Donais disclosed confidential consultation information to numerous unauthorized third parties, fabricated false statements using that information, used the information to benefit adverse parties, and concealed these acts from Bisasor—each in direct violation of the confidentiality, non-use, and good faith terms of the implied contract. Conclusion: Therefore, Donais breached the implied contract.

### Causation and damages:

26. A party who breaches a contract is liable for all damages that were proximately caused by and were a foreseeable consequence of the breach. Donais's breaches directly caused Bisasor to lose professional contracts, suffer reputational destruction in the Manchester community, and endure severe emotional distress—all of which were foreseeable consequences of an attorney's breach of client confidentiality.

27. Conclusion: Thus, Donais is liable for all damages proximately caused by his breach of the implied contract.

28. This claim is pled under the NH savings statute, RSA 508:4-g, for events between 2019 and June 2021 and is thus timely. Events after June 2021 through November 2023 are independently timely. Although the 2017 events gave rise to the contract formation, Plaintiff does not seek recovery for any 2017 events but references them solely to establish when and how the implied contract was formed, the confidentiality and good faith obligations of which continued in force during the 2019-2023 period when Donais breached them.

### Further Details

594. Plaintiff alleges that Craig Donais and plaintiff had an attorney-client relationship. The plaintiff was, at a minimum, a prospective client that triggered fiduciary obligations and confidentiality obligations, as mandated

and confirmed by the rules of professional conduct for lawyers. There was thus an attorney-client relationship as defined by the rules of professional conduct.

595.    Thus, Craig Donais and his law firm owed a contractual duty to Plaintiff, and thus there was contractual relationship that included confidentiality.

### A. Implied Attorney Client Relationship

596.    "The existence of an attorney-client relationship is ordinarily a question of fact." Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC, 736 F.Supp.2d 353, 359 (D. Mass. 2010) (concluding on summary judgment that there was an attorney-client relationship).

597.    "To imply an attorney-client relationship, . . . the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing, who happens to be a lawyer, has become his lawyer." Sheinkopf v. Stone, 927 F.2d 1259, 1265 (1st Cir. 1991). There is a three-part test to determine whether an implied attorney-client relationship exists: (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.... In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it. DeVaux, 387 Mass. at 817-18.

598.    Here, plaintiffs meet the first prong of the DeVaux test. Courts have understood the first prong to "require concrete communication by the plaintiff requesting that the attorney represent him, or explicitly seeking individualized legal advisement." See Int'l Strategies Grp., Ltd., 482 F.3d at 8-9 (holding that plaintiff did not have an implied attorney-client relationship where there was no evidence that plaintiff explicitly requested legal advice).

599.    This is met by the plaintiff's call to Donais and the voicemail left, which stated the following:

> "Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical."

600.    Courts have interpreted the first prong to require "active communication from the plaintiff to the lawyer requesting legal representation or legal advice." Int'l Strategies Grp., Ltd. 482 F.3d at 8-9 (citing cases); DaRoza v. Arter, 416 Mass. 377, 381-82 (1993) (reasoning that establishing the first prong requires plaintiff to expressly seek the advice or assistance of the attorneys). The first prong of the DeVaux test does not require express legal assistance and can be established by implied requests. See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 167 F.Supp.2d 108, 110 (D. Mass. 2001).

601.    The plaintiff also meets the second prong. The plaintiff requested advice on landlord tenant matters, which is within Craig Donais' practice. See screenshot of his advertisement on Justia, that identifies landlord-tenant as within his practice area.



602.    The third prong is also met by the fact that the plaintiff alleges that Craig Donais gave the desired legal advice on the landlord-tenant matters, for which plaintiff sought assistance, during the one-time legal consultation call. A brief summary excerpt of part of what was discussed is as follows[9]:

> Plaintiff shared information about the landlord-tenant arguments plaintiff had, requested advice on potential weaknesses in those arguments and certain legal strategies being contemplated, and asked about the relevant statutes and the likelihood of obtaining a TRO. Craig Donais indicated that he thought it was likely that plaintiff will get a TRO based on what was described to him but he could not say for sure if it would become permanent because he would have to take a look at all the documents himself. Craig Donais also indicated a belief that the

---

[9] NB: The defendant cannot dispute facts in this complaint unless or until there is a trial or summary judgment. Any attempt to dispute these facts in a pre-trial motion to dismiss is invalid.

plaintiff's contract case was strong based on what was described, but it would depend on what was actually written in an agreement or if we can actually show there was an agreement, etc.

603.    This establishes that there was an at least an implied attorney-client relationship based on the above facts, at least concerning the consultation that occurred on that one day when Craig Donais consulted with plaintiff.

604.    Thus, from the communications from plaintiff requesting individualized legal advice or request for legal representation via voicemail, and the return call from Craig Donais to plaintiff to discuss the legal issues that plaintiff identified on the voicemail, there is evidence of an implied attorney-client relationship.

605.    The Plaintiff and Craig Donais thus had an implied attorney client relationship.

606.    The rules of professional conduct and the law treats this relationship as an attorney client relationship even where there is not an express contract.

607.    An express contract is not necessary to form an attorney-client relationship. Plaintiff and Craig Donais had an implied contractual relationship that was implied by the confidential nature of their attorney-client relationship, relied upon by plaintiff, as well as by the conduct and words of the parties, including by the trust invested by the plaintiff in Craig Donais when he shared confidential information with Craig Donas on the call. Craig Donais himself admitted in email to other people that there was a client relationship or a prospective client relationship, both of which implicates confidentiality obligations under the rules of professional conduct, and which creates a contractual relationship or at least an implied contractual relationship.

### B. Breach of Implied Attorney Client Relationship

608.    The above demonstrates that there was an attorney-client relationship.

609.    Craig Donais entered into an attorney-client relationship on January 9, 2017 when he called Bisasor and engaged him in an attorney-client legal consultation conversation. Although Craig Donais ultimately did not agree to represent the plaintiffs in court, he nonetheless formed an attorney client relationship for purpose of conducting a client call with plaintiff. The subsequent lack of undertaking formal representation in court does not negate the fact that an attorney-client relationship was formed for the exploration and giving of legal advice in that phone call meeting. Nothing can or will change that. So there was an implied contract from that and Craig Donais breached that implied contract by the wrongful acts alleged in this complaint.

610. As cited in prior paragraphs, Craig Donais divulged information obtained during a confidential prospective client consultation, with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client, which is the plaintiff in this case.

611. Craig Donais discussed with several people the client conversation he had with the plaintiff. These include his wife, Mary Donais, his adult son Garrett Donais and teenage son Aiden Donais, the Manchester Crime-Line Board, and his family, friends and neighbors. These communications with third parties, in 2019 and 2020, violated the rights of the plaintiff.

612. Thus, Craig Donais and his law firm breached the implied contract when in 2019 through 2023, Craig Donais acted in a manner that was inconsistent with the agreed-upon common purpose and expectations (including but not limited to confidentiality and fiduciary expectations as well as the expectation that Craig Donais would not use client conversation to try to injure, hurt, defame or publish private facts about the client, among other things), as required by the rules of professional conduct for lawyers, and all of which Craig Donais and his law firm did, and Plaintiff was harmed by this breach of implied contract conduct by Craig Donais and his law firm.

613. Craig Donais explicitly agreed that the January 9, 2017 was protected by attorney-client privilege. This an explicit agreed-upon common purpose and set the expectations of the plaintiff that the plaintiff detrimentally relied on, in proceeding to place trust in Craig Donais during that call. Plaintiff was harmed by the subsequent breaching conduct of Craig Donais. Through his actions and inactions, Craig Donais breached the implied contract with the Plaintiff, and did knowingly injure or otherwise harm Plaintiffs' rights and interests.

614. Note: By pleading that the preceding paragraphs are repeated herein as if fully stated, plaintiff does not need to repeat every act of Craig Donais in order to meet the requirements for this cause of action. The entire complaint read as a whole clearly identifies and establishes that breaching conduct of Craig Donais.

### C. Harm

615. By the conduct alleged herein, Craig Donais breached the implied contract and caused harm to Plaintiffs.

616. By breaching the confidentiality of that prospective attorney-client relationship, and by doing so in a particularly nasty, malicious, bad faith, harmful way, Craig Donais breached this implied contract.

617. As a result, Plaintiff have suffered damages.

618.    The law recognizes an implied covenant of good faith and fair dealing in all contracts, either expressed or implied. Craig Donais was willful in his disregard for the welfare of the Plaintiffs and caused damages to Plaintiffs. By breaching the contract in a particularly deceptive and bad faith way, Craig Donais breached the implied contract and the attendant covenant of good faith and fair dealing.

**Further details**

619.    The plaintiffs requested that Donais represent them and explicitly sought individualized legal advice from Donais. This is evidenced by plaintiff's call to Donais and the voicemail left. See previously-referenced verbatim quote of the voice-message.  The plaintiff requested advice on landlord tenant matters, which is within Donais' practice. Donais gave the desired legal advice on the landlord-tenant matters, for which plaintiffs sought assistance, during the one-time legal consultation call.  See previously-referenced excerpt of what was discussed on the call. This establishes that there was an at least an implied attorney-client relationship based on the above facts, at least concerning the consultation that occurred on that one day when Donais consulted with plaintiff on 1-9-17. Thus, from the communications from plaintiff requesting individualized legal advice or request for legal representation via voicemail, and the return call from Donais to Bisasor to discuss the legal issues that Bisasor identified on the voicemail, there is evidence of an implied attorney-client relationship. Plaintiffs and Donais thus had an implied attorney client relationship and thus an implied contractual relationship. The rules of professional conduct and the law treats this relationship as an attorney client relationship even where there is not an express contract as an express contract is not necessary to form an attorney-client relationship. Plaintiffs and Donais had an implied contractual relationship that was implied by the confidential nature of their attorney-client relationship, relied upon by the plaintiffs, as well as by the conduct and words of the parties, including by the trust invested by Bisasor in Donais when he shared confidential information with Donas on the call. Donais himself admitted in email to other people that there was a client relationship or a prospective client relationship, both of which implicates confidentiality obligations under the rules of professional conduct, and which creates a contractual relationship or at least an implied contractual relationship. The above demonstrates there was attorney-client relationship.10

---

[10] Note: The existence of an attorney-client relationship is ordinarily a question of fact.

620.    As cited before, Donais divulged information obtained during a confidential prospective client consultation, with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the plaintiffs as prospective clients. Donais discussed with several people the client conversation he had with Bisasor. These include his wife, Mary Donais, his adult son Garrett Donais and teenage son Aiden Donais, the Manchester Crime-Line Board, and his other family, friends and neighbors, and as noted via social media. These communications with third parties, violated the rights of the plaintiffs.

621.    Thus, Donais breached the implied contract when Donais acted in a manner that was inconsistent with the agreed-upon common purpose and expectations (including but not limited to confidentiality and fiduciary expectations as well as the expectation that Donais would not use client conversation to try to injure, hurt, defame or publish private facts about the client, among other things), as required by the rules of professional conduct for lawyers, and all of which Donais did, and Plaintiffs were harmed by this breach of implied contract conduct by Donais. Donais explicitly told Bisasor that the 1-9-17 was protected by attorney-client privacy. This explicit agreed-upon common purpose set the expectations of the plaintiffs that the plaintiffs detrimentally relied on, in proceeding to place trust in Donais during that call. Plaintiffs were harmed by the subsequent breaching conduct of Donais. Through his actions and inactions, Donais breached the implied contract with Plaintiffs, and did knowingly injure or otherwise harm Plaintiffs' rights and interests.  By breaching confidentiality of that prospective attorney-client relationship, and by doing so in a malicious, bad faith, harmful way, Donais breached this implied contract. As a result, Plaintiff s suffered damages.

## COUNT 15 — BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
*(as to Craig S. Donais and Donais Law Offices PLLC)*

622.    Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

### A. Summary

623.    Plaintiffs and Donais had an implied contractual relationship that was implied by the confidential nature of their attorney-client relationship. Plaintiffs reasonably understood the January 2017 consultation to entail professional legal advice; an implied agreement arose that Donais would not misuse the information. Donais owed to Plaintiffs a duty of utmost good faith and fair dealing and thereby was obligated to consider the welfare of Plaintiffs, to refrain from acting for purely selfish motives or private gain, and to desist from destroying/injuring the rights of Plaintiffs to receive the fruits of thereof. Donais had a duty, under this implied

covenant, to look out for the best interest of Plaintiffs, and not to undermine their best interests. Donais's conduct violated the covenant of good faith, foreseeably harming Plaintiffs. As cited before, Donais divulged information obtained during a confidential prospective client consultation, with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client, which are the plaintiffs in this case. Donais discussed with several people the client conversation he had with the plaintiffs. These communications with third parties violated the rights of the plaintiffs. Donais violated the implied covenant of good faith and fair dealing by failing to protect the interests of the Plaintiffs. Donais was willful in his disregard for the welfare of the Plaintiffs and caused damages to Plaintiffs. By breaching the confidentiality of that attorney-client relationship, and by doing so in a particularly nasty, malicious, bad faith, harmful way, Donais breached this implied contract and the attendant covenant of good faith and fair dealing. NB: Similarly, every wrongful act or harm resulting from the acts of Donais that flowed from the initial breach of that attorney-client relationship is also a breach of implied contract and a breach of the covenant of good faith/fair dealing.

624.    By the above-described conduct, inter alia, the Donais knowingly, improperly, malevolently, and intentionally breached its implied covenant with the plaintiffs. Through his actions and inactions and by the conduct alleged herein, Donais breached his duty of good faith and fair dealing to plaintiffs, intentionally engaged in wrongful conduct, and did knowingly injure or otherwise harm Plaintiff's rights and interests, and caused harm to plaintiffs. As a direct and foreseeable consequence of Donais' actions, the plaintiffs suffered damages. See affidavit attached as Exhibit A for further factual assertions.

### Details

625.    New Hampshire law implies a covenant of good faith and fair dealing in every contract, whether express or implied. Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989). This covenant requires that neither party do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. The "fruit" of the implied contract for Bisasor was the assurance that his confidential disclosures would remain confidential and would not be used against him. By weaponizing those very disclosures to defame, stigmatize, and professionally destroy Bisasor, Donais destroyed the entire purpose and benefit of the contract for Bisasor, in the most extreme bad faith imaginable.

626. Therefore, NH law implies a covenant of good faith and fair dealing in all contracts between parties, whether either expressed or implied.

627. Plaintiff and Craig Donais had an implied contractual relationship that was implied by the confidential nature of their attorney client relationship. Plaintiff had an attorney client relationship with Craig Donais. The rules of professional conduct and the law treats this relationship as an attorney client relationship even where there is not an express contract. An express contract is not necessary to form an attorney-client relationship.

628. Plaintiff thus reasonably understood the January 2017 consultation to entail professional legal advice; an implied agreement arose that Craig Donais would not misuse the information (Anthony's Pier Four, 411 Mass. 451). Craig Donais owed to Plaintiff a duty of utmost good faith and fair dealing and thereby was obligated to consider the welfare of Plaintiff, to refrain from acting for purely selfish motives or private gain, and to desist from destroying or injuring the rights of the Plaintiff to receive the fruits of thereof. Craig Donais had a duty, under this implied covenant, to look out for the best interest of the Plaintiffs, and not go against his best interests or undermine or subvert his best interests.

629. Craig Donais's later conduct violated the covenant of good faith, foreseeably harming Plaintiff.

630. As cited in prior paragraphs, Craig Donais divulged information obtained during a confidential prospective client consultation, with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client, which is the plaintiff in this case.

631. Craig Donais discussed with several people the client conversation he had with the plaintiff. These communications with third parties violated the rights of the plaintiff.

632. Craig Donais violated the implied covenant of good faith and fair dealing by failing to protect the interests of the Plaintiffs.

633. Craig Donais was willful in his disregard for the welfare of the Plaintiffs and caused damages to Plaintiffs.

634. By breaching the confidentiality of that attorney-client relationship, and by doing so in a particularly nasty, malicious, bad faith, harmful way, Craig Donais breached this implied contract and the attendant covenant of good faith and fair dealing.

635. Similarly, every wrongful act or harm resulting from the acts of Craig Donais that flowed from the 2017 event in which the client relationship was formed is also a breach of implied contract and a breach of the covenant of good faith/fair dealing.

636. By the above-described conduct, inter alia, the Craig Donais knowingly, improperly, malevolently, and intentionally breached its implied covenant with the plaintiffs.

637. Through his actions and inactions and by the conduct alleged herein, Craig Donais breached his duty of good faith and fair dealing to plaintiff, intentionally engaged in wrongful conduct, and did knowingly injure or otherwise harm Plaintiff's rights and interests, and caused harm to plaintiffs.

638. As a direct and foreseeable consequence of Craig Donais' actions, the plaintiffs suffered damages.

639. As a result thereof, the plaintiffs has been and continued to be injured and suffer damages.

640. WHEREFORE, Plaintiff demands judgment against Craig S. Donais and Donais Law Offices PLLC for compensatory damages, consequential damages, and such other relief as the Court deems just and proper.

### COUNT 16 — PROMISSORY ESTOPPEL
**(Against Craig S. Donais and Donais Law Offices PLLC)**
**(Pled in the Alternative)**

641. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

642. This count is pled in the alternative to Plaintiff's breach of implied contract claim (Count VI), pursuant to Federal Rule of Civil Procedure 8(d)(2), which permits a party to set out two or more statements of a claim alternatively and to state as many separate claims as it has, regardless of consistency. To the extent the Court determines that no enforceable contract, express or implied, was formed between Plaintiff and Defendant Donais arising from the January 9, 2017 consultation, Plaintiff is entitled to recover under the doctrine of promissory estoppel for the reasons set forth below.

### I. The Promise of Confidentiality

643. The New Hampshire Supreme Court has adopted the definition of promissory estoppel from Section 90 of the Restatement (Second) of Contracts, which provides that a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. *Panto v. Moore Business Forms, Inc.*, 130 N.H. 730, 738 (1988); *Rockwood v. SKF USA Inc.*, 687 F.3d 1, 9 (1st Cir. 2012). The

142

promisee may enforce that promise if it relied on the promise to its detriment or to the promisor's benefit. *Ruivo v. Wells Fargo Bank, N.A.*, 766 F.3d 87, 92 (1st Cir. 2014) (citing *Panto*, 130 N.H. at 738).

644.    On 1-9-17, Craig Donais returned a voicemail from Plaintiff Bisasor regarding a landlord-tenant dispute and engaged Bisasor in a telephone conversation lasting approximately seven minutes. At the outset of the call, Bisasor asked Donais whether the conversation would be confidential. Donais confirmed that it would be. This confirmation was not a casual remark or a passing pleasantry. It was a specific, affirmative representation by a licensed attorney, made in the context of a prospective attorney-client consultation, that the information Bisasor was about to disclose would be held in confidence. It was a promise.

645.    The promise of confidentiality was clear and definite. An attorney's assurance that a consultation will be confidential is among the most unambiguous promises in professional life. It carries the weight of the attorney's professional obligations under New Hampshire Rule of Professional Conduct 1.18 and the centuries-old tradition of attorney-client privilege. When Donais told Bisasor that the conversation would be confidential, he promised that he would not disclose, disseminate, or weaponize the information Bisasor shared. There was no ambiguity, no qualification, no condition attached.

646.    Moreover, Donais's promise was not merely oral. It was reinforced by the professional context in which it was made. Donais was a licensed New Hampshire attorney responding to a request for legal advice. The professional framework within which the conversation occurred itself constituted an implicit promise of confidentiality, because every prospective client who consults an attorney is entitled to expect that the information shared during that consultation will be protected. The New Hampshire Rules of Professional Conduct codify this expectation: Rule 1.18(b) provides that even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information. This professional norm gave Donais's express promise its meaning and its force.

## II. Reasonable Expectation That the Promise Would Induce Reliance

647.    Donais should have reasonably expected that his promise of confidentiality would induce Bisasor to disclose sensitive and confidential information. That is the entire purpose of the promise. An attorney who assures a prospective client that a consultation will be confidential does so precisely to induce the client to speak freely, to share his case strategies, his assessments of strengths and weaknesses, and his private legal

concerns. Without that assurance, no rational person would disclose such information to a stranger, however credentialed, because the information could be used against him.

648.    Donais was fully aware of this dynamic. He was an experienced attorney who understood that the promise of confidentiality was the gateway to the consultation. He knew that Bisasor would not disclose his legal strategies, the facts of his dispute, or his assessment of his own vulnerabilities unless he believed that information would be protected. Indeed, the very reason Bisasor asked whether the conversation would be confidential before proceeding was to confirm that the foundational condition of trust was in place. Donais confirmed it was. Having made that confirmation, Donais should have reasonably expected that Bisasor would rely upon it by disclosing the sensitive information that the promise was designed to elicit.

### III. Detrimental Reliance

649.    Bisasor relied on Donais's promise of confidentiality to his substantial detriment. In reliance on the promise, Bisasor disclosed confidential information to Donais, including his case strategies, his assessments of the strengths and weaknesses of his claims against the Hilton Hotel defendants, his questions regarding the likelihood of obtaining a temporary restraining order, and other private legal matters. This information was directly relevant to the opposing party's defense in the very dispute about which Bisasor was consulting Donais. Bisasor would not have disclosed any of this information but for Donais's express assurance that the conversation was confidential.

650.    The detriment was not hypothetical. It was concrete, severe, and ongoing. Donais violated his promise of confidentiality in the most egregious manner imaginable. Rather than protecting the information Bisasor had confided, Donais disclosed it to his wife Mary Donais, his sons Garrett and Aiden Donais, members of the Manchester CrimeLine board, Manchester police officers, friends, colleagues, and other third parties. But Donais did far more than merely disclose the information. He weaponized it. He used the substance of the confidential consultation as the factual basis for fabricating false and defamatory narratives about Bisasor, including false accusations that Bisasor had committed felonies, that Bisasor was mentally ill, and that Bisasor had frivolously accused Donais of racism merely for declining representation.

651.    The resulting harm has been devastating. Bisasor's professional reputation in the Manchester, New Hampshire community has been destroyed. His professional contracts and relationships have been damaged

or terminated. He has suffered severe emotional distress, anxiety, and mental anguish. He has been forced to litigate for years to address the consequences of Donais's betrayal. None of these injuries would have occurred had Donais kept his promise. It was Bisasor's reliance on the promise of confidentiality that placed him in a position of vulnerability, and it was Donais's breach of that promise that converted that vulnerability into catastrophic harm.

### IV. The Reliance Was Reasonable

652.    Bisasor's reliance on Donais's promise of confidentiality was objectively reasonable under the circumstances. Reasonable reliance is an essential element of promissory estoppel under New Hampshire law. *Marbucco Corp. v. City of Manchester*, 137 N.H. 629, 633, 632 A.2d 522 (1993); *Kaechele v. Nova Info. Sys., Inc.*, 2001 DNH 174 (D.N.H. 2001). The question is whether a reasonable person in Bisasor's position would have relied on the promise as made.

653.    The answer is self-evident. A licensed attorney, responding to a request for legal assistance, expressly confirms that a consultation will be confidential. The prospective client proceeds to share sensitive legal information. There is nothing unreasonable about this sequence of events. It is, in fact, the ordinary and expected course of every attorney-client consultation in the United States. The entire legal profession rests on the premise that prospective clients can trust that their communications with attorneys will be held in confidence. Bisasor did nothing more than act in accordance with that universal expectation.

654.    To hold that Bisasor's reliance was unreasonable would be to hold that no prospective client can ever reasonably rely on an attorney's promise of confidentiality, a proposition that would undermine the foundations of the attorney-client relationship and the administration of justice itself. No court has adopted such a rule. No court should.

655.    Furthermore, the reasonableness of Bisasor's reliance is confirmed by the judicial finding of Judge Paul Moore of the Nashua District Court, who determined that a prospective attorney-client relationship was formed during the January 9, 2017 consultation. If the consultation was sufficient to create a prospective attorney-client relationship under the law, then Bisasor's reliance on the confidentiality of that consultation was, by definition, reasonable.

### V. Injustice Can Be Avoided Only by Enforcement of the Promise

656.    The final element of promissory estoppel under New Hampshire law requires that injustice can be avoided only by enforcement of the promise. Restatement (Second) of Contracts § 90 (1981); *Rockwood v. SKF USA Inc.*, 687 F.3d 1, 9 (1st Cir. 2012); *Collision Communications, Inc. v. Nokia Solutions & Networks OY*, No. 1:20-cv-00949-LM, Doc. 288 (D.N.H. Feb. 15, 2024). This element is satisfied here for several independent reasons.

657.    First, the nature of the promise and the context in which it was made demand enforcement. A licensed attorney who expressly promises confidentiality to a prospective client in order to induce the client to share sensitive legal information, and who then betrays that confidence in the most destructive manner possible, cannot be permitted to escape the consequences of his promise by arguing that it was not supported by formal contractual consideration. To permit such an outcome would reward the very betrayal that the promise was designed to prevent. It would allow an attorney to lure a prospective client into a position of vulnerability through a promise of protection, and then exploit that vulnerability without legal consequence.

658.    Second, the magnitude of the harm weighs heavily in favor of enforcement. Donais did not merely fail to keep a minor commitment. He took the most sensitive information a prospective client can disclose, information about legal strategies and vulnerabilities, and used it as the raw material for a sustained campaign of defamation, professional destruction, and retaliation that has lasted from 2019 through at least 2023. The disparity between the protection Bisasor was promised and the injury he suffered is extraordinary.

659.    Third, Donais was not a stranger or a casual acquaintance. He was a licensed attorney, trained and regulated by the State of New Hampshire, who occupied a position of trust and held himself out as a professional bound by ethical obligations to protect client confidences. The law does not permit professionals to exploit the trust their status confers and then disclaim responsibility on the ground that no contract was formed. The doctrine of promissory estoppel exists precisely to prevent such injustice.

660.    Fourth, enforcement of the promise is consistent with public policy. The integrity of the attorney-client relationship depends on the ability of prospective clients to trust that preliminary consultations will be confidential. If attorneys can break promises of confidentiality with impunity whenever the formal elements of contract formation are not perfectly satisfied, prospective clients will be deterred from seeking legal advice,

and the administration of justice will suffer. Enforcement of Donais's promise vindicates both private justice for Bisasor and the public interest in maintaining the integrity of the legal profession.

## VI. Injuries and Damages

661.    As a direct and proximate result of Defendant's breach of his promise of confidentiality, Plaintiff has suffered substantial injuries and damages, including but not limited to the destruction of professional contracts and business relationships in the Manchester, New Hampshire community, severe reputational harm caused by the defamatory narratives Donais fabricated from the substance of the confidential consultation, loss of earning capacity and economic opportunity, costs and expenses of litigation necessitated by Donais's breach and the resulting defamatory campaign, and severe emotional distress, anxiety, and mental anguish caused by the betrayal of trust and the sustained campaign of professional destruction that followed.

662.    Under New Hampshire law, the presumptive measure of damages for a promissory estoppel claim is the value of the promise, which includes full contractual remedies, including expectation and consequential damages. *Collision Communications, Inc. v. Nokia Solutions & Networks OY*, No. 1:20-cv-00949-LM, Doc. 288 at 2 (D.N.H. Feb. 15, 2024). The value of Donais's promise of confidentiality was the protection it afforded Bisasor against precisely the type of harm that Donais inflicted. Because Donais's breach of that promise is the but-for cause of the injuries Bisasor has suffered, Plaintiff is entitled to full compensatory damages.

## VII. Timeliness

663.    This claim is timely. While the promise of confidentiality was made on January 9, 2017, the breach of that promise, and the injuries flowing from it, occurred from 2019 through 2023, when Donais disclosed the confidential information to third parties, fabricated defamatory narratives from it, and disseminated those narratives throughout the community. Plaintiff does not seek recovery for any events occurring in 2017. The actionable conduct occurred entirely within the limitations period, whether measured from the original June 18, 2022 filing in Massachusetts (preserved by the New Hampshire savings statute, RSA 508:10) or from the June 3, 2025 filing in this Court. Each act of disclosure and each act of defamation derived from the confidential consultation constitutes a separate breach of the promise, with its own accrual date.

## VIII. Prayer for Relief on Count VIII

664.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants Craig S. Donais and Donais Law Offices PLLC on this count and award Plaintiff compensatory damages in an amount

to be determined at trial, consequential damages for the economic, reputational, and emotional injuries proximately caused by Defendants' breach of the promise of confidentiality, and such other and further relief as this Court deems just and proper.

---

## SECTION 6: BREACH OF CONTRACT CLAIMS – 2022 TO 2023

---

### CLAIMS PERTAINING TO BREACH OF APRIL 2021 SETTLEMENT CONTRACT, INTERFERENCE WITH SETTLEMENT, ATTORNEY DECEIT, CONSUMER PROTECTION VIOLATIONS AND CIVIL CONSPIRACY AS TO DONAIS AND HILLIARD
### I. FACTS PERTAINING TO APRIL 2021 GLOBAL SETTLEMENT

665.    Plaintiff repeats and reiterates each and every allegation of this Complaint, including but not limited to the allegations in the sections on tortious interference with settlement contract and on violations of RSA 358-A, with the same force and effect as if herein set forth at length.

666.    In early 2021, the underlying "Hilton case" was pending in Hillsborough County Superior Court North, before Judge Anderson, in its second iteration after the first Hillsborough South case before Judge Temple. At that time there were approximately twenty-one Hilton-related defendants, including the Hilton entities and additional individual or associated defendants, plus defendant Craig Donais as a critical defendant whose conduct was central to the case.

667.    Beginning in or about January 2021, Attorney Shelagh Michaud, counsel for Hilton and the other hotel-related defendants, informed plaintiff and plaintiff's then-counsel that she would be serving as the primary point of contact and "one voice" on behalf of all Hilton-related defendants for purposes of global settlement communications, including communications regarding defendant Donais. Attorney Michaud represented that she spoke on behalf of all twenty-one Hilton defendants and that any settlement terms she conveyed or accepted would be on behalf of the entire defense group, including defendant Donais.

668.    Defendant Donais, through his counsel Attorney Russell Hilliard of Upton Hatfield, expressly authorized and assented to this structure, agreeing that Attorney Michaud could speak on his behalf in joint negotiations and that he would participate in a global settlement to resolve all claims against all Hilton-related defendants, including himself, on coordinated terms. This assent and delegation were communicated attorney-to-attorney

148

between plaintiff's counsel (Attorney Jay Sunkavalli and his Oregon law firm) and Attorney Michaud, with Hilliard confirming that Michaud spoke for Donais in settlement discussions.

669.    On or about April 16, 2021, after months of back-and-forth negotiation over the overall amount, plaintiff accepted defendants' final monetary offer of one hundred fifty-seven thousand dollars ($157,000) to resolve the Hilton case globally as to all approximately twenty-one Hilton defendants, including Donais ("the April 2021 Settlement"). Attorney Michaud acknowledged plaintiff's acceptance, confirmed that this resolved the monetary component of the settlement, and indicated that she would work with joint defense counsel to prepare a global written settlement agreement incorporating non-monetary terms and final verbiage consistent with a prior settlement draft that had been prepared in the first Hillsborough South case in 2019.

670.    The April 2021 Settlement was reported to Judge Anderson in Hillsborough Superior Court North as a global settlement in principle on monetary terms, with only final documentation and limited non-monetary terms left to finalize; there was no objection from any defendant or defense counsel to the representation that settlement had been reached on the monetary amount. The parties and the Court proceeded on the understanding that the case had settled in substance and that the remaining tasks were ministerial issues of drafting and implementing a final settlement instrument, consistent with New Hampshire law that treats settlement agreements as binding contracts once material terms, including price, are agreed.

671.    The parties also understood that the prior 2019 settlement draft from the first case before Judge Temple provided a working template for the ultimate agreement, and that the verbiage in the new agreement would largely track that prior draft with necessary updates for parties and payment logistics. Thus, there was an agreed framework, an agreed monetary amount, an identified prior draft, and a mutual understanding that counsel would finalize non-monetary language and payment mechanics in good faith, with Hilton's counsel coordinating on behalf of all defendants, including Donais.

672.    From April 2021 through the end of 2021, the parties, through counsel, engaged in continued work on the final written settlement agreement, including non-monetary terms, releases, and confidentiality, and on one remaining issue of structured payment, namely, the schedule and vehicle for distributing the agreed $157,000 sum. This remaining issue concerned only the timing and method of payment, not the amount, scope of release,

or other material consideration, and was understood by all involved to be an administrative or procedural detail that did not reopen the core bargain.

673.    Throughout this period, defendant Donais, through Attorney Hilliard, remained embedded in the joint defense group, receiving insider communications and benefiting from the time and effort spent by plaintiff and Hilton counsel to move the global settlement into final form. Plaintiff reasonably believed, based on repeated confirmations from Attorney Michaud and the absence of any contrary statement from Donais or Hilliard, that Donais remained a fully participating settling defendant, bound by the April 2021 Settlement and only awaiting formal documentation like the other defendants.

674.    In or around October 2021, plaintiff began to perceive irregularities and learned, from discussions with other attorneys involved in the global settlement, that Donais and Hilliard were, behind the scenes, attempting to sabotage the global settlement, discourage other defendants, and position Donais to withdraw at the last possible moment to deliver a "death blow" to the settlement structure. Plaintiff has since confirmed through those discussions and subsequent events that Donais and Hilliard were not negotiating in good faith but were instead using their participation as a Trojan horse to obtain inside information and leverage, while secretly working to unravel the agreement.

675.    On January 6, 2022, after months of silence and despite the fact that the parties had resolved essentially all non-monetary terms and were down to one remaining structured payment detail, Attorney Michaud for the first time informed plaintiff that defendant Donais "is no longer willing to settle" and would be excluded from the settlement agreement. Plaintiff was also informed that Donais had instructed that Michaud not disclose the true reasons for his withdrawal, thereby concealing his bad faith from plaintiff and attempting to minimize accountability for his volte-face.

676.    Donais's withdrawal came at the precise moment when plaintiff and the other defendants were about to finalize the written contract, after the monetary amount had long been fixed and after plaintiff had foregone other options and invested substantial time, effort, and strategic concessions in reliance on the April 2021 Settlement. By then, there was nothing of substance left to negotiate; the material terms had been agreed, and

only the mechanics of payment remained, leaving no legitimate basis in contract law or good faith for Donais to renounce the settlement.

677. As a direct result of Donais's last-minute repudiation and Hilliard's behind-the-scenes interference, the Hilton defendants, who strongly preferred a clean global resolution with all defendants included, were placed in a difficult position and the global settlement was jeopardized. Donais, knowing that Hilton did not want to face continuing exposure or future involvement as witness or co-defendant, calculated that his withdrawal would either pressure Hilton to abandon plaintiff or drive up the cost and complexity of settlement, thereby harming plaintiff and giving Donais strategic advantage.

678. Plaintiff alleges that Donais never intended to honor the April 2021 Settlement and never intended to be a genuine global settlor, but instead feigned assent to gain inside information, to stall proceedings, and to position himself to sabotage the settlement at a point when plaintiff would be most vulnerable and most reliant on the settlement having been consummated. Donais's conduct therefore constitutes intentional misrepresentation, attorney deceit, and bad-faith repudiation of an existing settlement contract.

679. As a result of Donais's reneging and misconduct, plaintiff was deprived of the benefit of the April 2021 Settlement, forced into years of additional litigation in New Hampshire Superior Court before Judge Messer, in New Hampshire federal court before Judge St. Mark and later Judge Elliott, and in the Massachusetts federal and state proceedings, as well as multiple appeals to the New Hampshire Supreme Court. This additional litigation has caused plaintiff and his spouse untold time, expense, emotional distress, and opportunity cost over the past four years, damages that are reasonably and foreseeably attributable to Donais's breach and sabotage of the settlement.

**COUNT 17 – BREACH OF SETTLEMENT CONTRACT (APRIL 2021)**
AS TO CRAIG DONAIS AND DONAIS LAW OFFICES PLLC

680. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

681. Under New Hampshire law, a settlement agreement is a binding contract when parties agree on material terms, including monetary consideration, even if a more formal document is to be drafted later; a later writing is not necessary for contract formation where the parties intended to be bound and have agreed on essential terms. In April 2021, plaintiff, Hilton defendants, and Donais through counsel reached such an agreement on

the material term of payment in exchange for dismissal and release of all claims against all Hilton defendants including Donais, with remaining non-monetary details to be documented consistently with prior drafts.

682.    A contract exists where there is offer, acceptance, consideration, and mutual assent to essential terms. Here, defendants, through Attorney Michaud, offered to pay the settlement amount to settle all claims against all Hilton-related defendants including Donais; plaintiff accepted that offer on April 16, 2021; the consideration was the monetary payment and mutual releases; and mutual assent was evidenced by the reporting of settlement to the Court, the lack of objection by any defendant, and the subsequent work on finalizing only ministerial and non-material terms.

683.    Plaintiff pleads, in the alternative, that if the Court were to find that Donais is not technically a party to a written Hilton settlement agreement, then the April 2021 Settlement nevertheless created a separate but parallel settlement contract between plaintiff and Donais, under which Donais agreed to settle on the same global monetary terms as the other Hilton defendants as part of the joint defense arrangement. In either framing, there was a binding settlement contract as of April 2021 to which Donais was bound.

684.    Donais breached that settlement contract when, on January 6, 2022, he repudiated his prior agreement and instructed Attorney Michaud to remove him from the settlement, notwithstanding that all material terms had been agreed and that only a payment-structuring detail remained to be completed. His repudiation was not based on any new or unresolved substantive term but was a unilateral attempt to escape a bargain he had already accepted.

685.    As a direct and proximate result of this breach, plaintiff lost the benefit of the agreed settlement as to Donais, lost the benefit of the expected global resolution with attendant savings of time and cost, and was forced to expend significant additional resources litigating against Donais in multiple courts over several years. Plaintiff has suffered substantial damages including but not limited to additional attorney's fees and costs, lost settlement value, increased emotional distress, and lost opportunities in his personal and professional life.

686.    The conduct of Donais and his law office in reneging on a settlement after acceptance also constitutes a breach of the implied covenant of good faith and fair dealing, as Donais did "something that had the effect of destroying or injuring" plaintiff's right to receive the fruits of the April 2021 Settlement. By feigning

participation, exploiting plaintiff's reliance, and then withdrawing at the last minute, Donais acted in bad faith and contrary to the reasonable expectations created by the settlement bargain.

## COUNT 18 – ATTORNEY DECEIT AND MISREPRESENTATION IN CONNECTION WITH APRIL 2021 SETTLEMENT
### AS TO CRAIG DONAIS AND RUSSELL HILLIARD

687.    Plaintiff incorporates by reference all preceding paragraphs.

688.    Donais and Hilliard, as attorneys admitted in New Hampshire, owed duties of honesty, candor, and fair dealing in their settlement communications, including duties under the New Hampshire Rules of Professional Conduct not to engage in dishonesty, fraud, deceit, or misrepresentation, and not to use means that have no substantial purpose other than to burden a third person. These professional duties inform and support common-law liability where attorney misconduct causes concrete injury to a non-client or former client.

689.    Donais and Hilliard represented, through their words and conduct and through Attorney Michaud's authorized statements, that Donais had agreed to join in the global settlement, that Attorney Michaud could speak on his behalf, and that the parties had reached an agreement on monetary terms binding on all defendants including Donais. These representations were material and reasonably induced plaintiff to proceed with extensive settlement work in reliance on Donais's supposed participation and assent.

690.    In reality, plaintiff alleges on information and belief that Donais and Hilliard did not intend to honor the settlement and instead used their apparent assent to gather information, to stall proceedings, to discourage Hilton from settling if they could, and to position themselves to withdraw at a time calculated to cause maximum disruption and harm to plaintiff. This discrepancy between their outward representations and their concealed intention constitutes deceit and misrepresentation.

691.    By permitting Attorney Michaud to continuously represent that she spoke on behalf of all defendants including Donais, and by allowing the Court and plaintiff to proceed under the assumption that a global settlement existed without timely correction, Donais/Hilliard created and maintained a false impression that they knew, or should have known, was misleading. Under common-law principles, silence or delay in correcting a known misimpression can constitute fraudulent concealment or deceit where there is a duty to speak.

692.    When Donais finally withdrew in January 2022, he further directed Attorney Michaud not to provide plaintiff with the true reasons for his withdrawal, thereby continuing the pattern of concealment and preventing

153

plaintiff from uncovering the full scope of defendants' sabotage until after the fact. This instruction to withhold material information is additional evidence of intentional deceit and bad faith.

693. As a direct and foreseeable result of this attorney deceit and misrepresentation, plaintiff incurred the same categories of damages described above, including loss of settlement benefit, extended litigation, and substantial emotional and economic harm. Plaintiff is entitled to compensatory and, where permitted by law, enhanced or exemplary damages to deter such egregious misconduct by attorneys.

**COUNT 19 – VIOLATIONS OF NH CONSUMER PROTECTION STATUTE RSA 358-A**
AS TO DONAIS, DONAIS PLLC, HILLIARD AND UPTON HATFIELD, ARISING FROM SETTLEMENT SABOTAGE

694. Plaintiff incorporates by reference all preceding paragraphs and the existing RSA 358-A allegations already pleaded in this Complaint.

695. The practice of law, including the provision of legal services and settlement negotiations, constitutes "trade or commerce" within the meaning of RSA 358-A. Attorneys' unfair or deceptive acts undertaken for entrepreneurial or business purposes, including to protect their own professional reputation, malpractice exposure, and economic interests, fall within the scope of the statute.

696. As already pleaded elsewhere, Craig Donais and his law office engaged in unfair and deceptive acts by, among other things, misrepresenting facts, fabricating narratives, and abusing confidential information to protect his law practice and insurance coverage. The settlement-related conduct described here is part of the same pattern of entrepreneurial self-protection and deception.

697. Specifically, Donais's and Hilliard's conduct in misrepresenting Donais's intent to settle, using the joint defense arrangement as a Trojan horse to sabotage a global settlement, and then withdrawing at the last moment to gain a tactical advantage and avoid accountability, constitutes an unfair and deceptive act or practice under RSA 358-A. This conduct was undertaken in part to shield Donais from malpractice and ethical exposure and to preserve his professional standing, thereby serving his business interests in his law practice.

698. Their conduct also involved deceptive omissions, including failure to disclose their true intent to sabotage the settlement and failure to promptly correct the misimpression that Donais was a genuine participant in the

April 2021 Settlement. Under RSA 358-A, unfair or deceptive acts can include concealment of material facts where such concealment has the capacity to mislead.

699.   Donais's settlement sabotage is expressly pleaded elsewhere as an unfair trade practice in connection with his defense of malpractice exposure, and these allegations are specifically incorporated here. Likewise, Hilliard's interference with settlement and plaintiff's legal relationships, undertaken to protect himself and Donais and to secure strategic advantages, constitutes entrepreneurial business interference actionable under RSA 358-A.

700.   As a result of these unfair and deceptive acts, plaintiff has suffered ascertainable losses, including the lost value of the global settlement, extended litigation costs, lost economic opportunities, and emotional distress. Plaintiff seeks actual damages, treble damages where appropriate, and reasonable attorney's fees and costs pursuant to RSA 358-A:10.

### COUNT 20 – CIVIL CONSPIRACY AND SABOTAGE OF SETTLEMENT
AS TO CRAIG DONAIS AND RUSSELL HILLIARD

701.   Plaintiff incorporates by reference all preceding paragraphs.

702.   Under New Hampshire law, civil conspiracy consists of a combination of two or more persons acting in concert, pursuant to a common design or agreement, to accomplish an unlawful objective, or to accomplish a lawful objective by unlawful means, resulting in damage to the plaintiff. The underlying torts here include breach of contract, tortious interference with contractual relations, attorney deceit, and consumer protection violations.

703.   Donais and Hilliard agreed, expressly or tacitly, to a common plan to protect Donais and themselves from accountability by undermining plaintiff's litigation and settlement prospects at every turn. With respect to the April 2021 Settlement, this common plan included allowing Attorney Michaud to present them as committed global settlers while secretly planning to withdraw and attempting to dissuade other defendants from completing the settlement.

704.   They then acted in concert to implement this plan by: remaining in the joint defense group to gather information; stalling and complicating finalization of the settlement; discouraging other defendants from fully committing; and finally orchestrating Donais's abrupt withdrawal in January 2022, with instructions to conceal the truth from plaintiff. These actions were not isolated but formed a coherent strategy of sabotage.

705. The unlawful means employed included the tortious interference with settlement contract already pleaded against both Donais and Hilliard, attorney deceit and misrepresentation as pleaded above, and unfair or deceptive practices under RSA 358-A aimed at protecting their own professional and economic interests. Thus, all elements of civil conspiracy are satisfied.

706. As a direct and foreseeable result of this conspiracy, plaintiff has suffered the damages described herein, including the loss of a timely and comprehensive settlement, substantial additional litigation, and severe emotional and economic harm. Plaintiff seeks joint and several liability against Donais and Hilliard for all damages arising from their concerted acts.

## VI. PRAYER FOR RELIEF ON THESE COUNTS

707. WHEREFORE, with respect to the above counts for breach of settlement contract, attorney deceit, consumer protection violations and civil conspiracy relating to the April 2021 Settlement, plaintiff demands judgment against Craig Donais, Donais Law Offices PLLC, Russell F. Hilliard and Upton Hatfield LLP, jointly and severally, for compensatory damages, consequential damages, treble damages where permitted by RSA 358-A, exemplary damages where otherwise permitted by law, costs, attorney's fees where permitted, pre- and post-judgment interest, and such further and other relief as the Court deems just and proper.

### Settlement Breach, Attorney Deceit, and Interference With Contract (Donais and Hilliard)
### i. The Settlement Contract and Its Formation

708. The facts establish that a binding settlement contract came into existence no later than April 16, 2021, when Plaintiffs accepted the final monetary offer made on behalf of all twenty-one defendants, including Donais, through their designated representative Attorney Shelagh Michaud. The contract formation process unfolded through explicit offer, acceptance, and mutual assent, each documented in contemporaneous written communications and corroborated by sworn testimony before the state court.

709. The settlement negotiations began in December 2020 when Attorney Jason Kafoury, representing Plaintiffs, sent a formal letter to Hilton Worldwide Holdings, Inc., indicating that Plaintiff Andre Bisasor had obtained a ninety-day extension for service of process and sought to restart settlement negotiations that had broken down after reaching a tentative settlement in the prior litigation. The corporate defendants' general counsel directed Kafoury to local counsel Shelagh Michaud for resuming settlement negotiations.

710.    In January 2021, Russell Hilliard, acting on behalf of Donais, formally entered into these restarted settlement negotiations. Critically, Hilliard and Donais agreed to have Shelagh Michaud speak on Donais's behalf during the settlement negotiations as part of a joint defense arrangement. On February 25, 2021, Attorney Michaud expressly confirmed this arrangement by email, stating that she was in contact with joint defense counsel for the other named parties and had conveyed to them the settlement discussions and status, that the parties had collectively discussed the settlement demand and offer, and that while she did not have authority to enter into settlement without consent from any party, the joint defense parties had asked that she speak jointly for defense at this time during settlement discussions. This was not a unilateral assumption of authority on Michaud's part. Rather, it was an explicit joint defense mechanism that all defendants, including Donais through Hilliard, affirmatively adopted in order to streamline negotiations given the large number of parties involved.

711.    On February 17, 2021, Attorney Kafoury sent Michaud an email asking her to confirm the list of defendants for whom she had authority to negotiate a settlement and specifically named Craig Donais in that list, asking her to identify those for whom she did not have authority or others not listed for whom she did have authority. Michaud did not disclaim authority to negotiate on behalf of Donais. To the contrary, she confirmed the joint defense arrangement and continued to speak for all defendants, including Donais, throughout the entire negotiation process from January 2021 through January 2022.

712.    Plaintiffs early on sought to identify the specific counsel for each defendant, including Craig Donais. However, these requests were consistently rebuffed. In the same February 25, 2021 email, Attorney Michaud stated that she did not have authority from these parties to disclose names of joint defense counsel at this time. This deliberate concealment of individual counsel identities was part of the joint defense strategy, a strategy that Donais actively participated in and exploited to his advantage while negotiations were ongoing, only to repudiate when it suited his purposes.

713.    The negotiations proceeded through defined stages. In late January and early February 2021, the parties discussed the general framework of a global settlement, with Michaud repeatedly referring to the defendants' collective positions. On February 10, 2021, Michaud conveyed by email that the defendants were able to offer

a specific sum for a global settlement and release of all claims and parties including related entities in this matter, and noted that some defendants were still coming up to speed on the matter and had not presently given information on settlement, but that she could not make any representation as to whether the offer would increase or the increment of any such increase.

714.    On March 24, 2021, during a phone call between Kafoury and Michaud, Michaud emphasized the fragility of the settlement process by stating that if service of the complaint was made, all the money may be gone, thereby explicitly warning that service of process during negotiations would effectively derail the settlement and cause the withdrawal of settlement funds. This communication, made on behalf of all defendants including Donais, was a key factor in Plaintiffs' decision to continue seeking extensions of the service deadline rather than serving process. It also establishes that the defendants, including Donais, actively discouraged Plaintiffs from taking actions that would trigger formal litigation posture, creating a reliance interest that Donais later exploited when he moved to dismiss for insufficiency of service.

715.    On March 31, 2021, Michaud stated by email that she had communicated with the joint defendants and that at this time there was no change in the offer. On April 5, 2021, Michaud confirmed the final offer from all defendants, stating that no defendant was willing to increase the amount at that time. Then, on April 16, 2021, the critical moment of contract formation occurred. Plaintiffs, through counsel, accepted this final monetary offer with the express condition that the parties would finalize remaining contract details, including non-monetary terms that had been negotiated in the prior settlement discussions dating back to 2018 and 2019. Attorney Michaud acknowledged receipt of Plaintiffs' acceptance by email and indicated that she would work with joint defense counsel to prepare a global settlement agreement based on prior versions.

716.    At this point, the essential terms of the settlement had been agreed upon by all parties. The monetary consideration had been fixed and accepted. The scope of the release—a global settlement of all claims involving all twenty-one named defendants in all related litigation—had been defined. The remaining tasks involved reducing the agreement to a formal written document and working out specific language for non-monetary provisions and stipulations of dismissal. Under settled contract law principles, the existence of such ministerial details to be finalized does not negate the formation of a binding contract when the essential terms have been

agreed upon and there has been a clear manifestation of mutual assent. The parties had crossed the threshold from negotiation into contract.

717.    On May 7, 2021, after Plaintiffs accepted the defendants' monetary offer, Attorney Kafoury informed Michaud that his firm would no longer represent Plaintiffs in settlement communications and that Plaintiffs would handle the remaining details of contract finalization directly. Plaintiff Andre Bisasor confirmed acceptance of the monetary offer and requested direct communication with Michaud regarding the settlement agreement going forward. This transition did not alter the fact that a binding agreement had been reached; it merely changed the mechanics of finalizing the written memorialization.

### Continuing Performance and Negotiations Over Contract Details

718.    The period from April 2021 through December 2021 demonstrates that all parties, including Donais, treated the settlement as a binding agreement that was being finalized, not as a set of non-binding preliminary negotiations. The correspondence during this period involves the exchange of draft settlement agreements, stipulations of dismissal, docket markings, and specific provisions tailored to individual defendants. These were not exploratory discussions about whether to settle; they were implementation discussions about how to document and execute a settlement that had already been agreed upon in principle.

719.    On June 9, 2021, Attorney Michaud sent Plaintiffs an email stating that she had been waiting on joint defense counsel to respond on certain matters and attached docket markings and stipulations which were exhibits to the Settlement Agreement. Among the documents attached were stipulations specifically involving Craig Donais. This correspondence demonstrates that Donais was actively participating in the drafting of settlement documentation and that his legal team was reviewing and contributing to the contract finalization process.

720.    Throughout July 2021, there were further discussions about non-monetary terms, particularly as they applied to defendants who had not been part of the original 2018–2019 settlement discussions. On July 13, 2021, Plaintiff Bisasor sent a detailed email to Michaud noting that if the defendants wanted to include the new non-hotel defendants in the settlement—specifically Craig Donais and Richard and Marie Aufiero—then as a condition to including them, Plaintiffs wanted the non-monetary provisions to include their signing the global settlement agreement and their agreement to withdraw the defamatory statements or affidavits at issue

via a short statement as part of the closing documents and exhibits. Bisasor noted that he understood this had been communicated at the outset of discussions with Attorney Kafoury and that the parties had been amenable to these terms or otherwise had not objected, and that after that understanding, the discussions on monetary terms had taken place for the following months.

721.    On July 13, 2021, in direct response to this request regarding Donais, Attorney Michaud replied by email, stating that defense counsel have reviewed your email and have the following response, and went on to address the specific points raised about Donais. This email response explicitly confirms that Donais and his counsel were part of the joint defense group involved in reviewing and responding to settlement proposals. The use of the phrase defense counsel have reviewed demonstrates collective consultation, not unilateral decision-making by Michaud.

722.    On July 20, 2021, Plaintiff Bisasor sent a follow-up email to Michaud noting that although he saw a statement of withdrawal from Marie Aufiero, he did not see any statement of withdrawal of statements at all from Craig Donais, and asked whether this was an oversight. On the same date, July 20, 2021, Attorney Michaud confirmed by email that there was no oversight in not including a statement of withdrawal from Donais, stating that the defendants' position remained unchanged. This response demonstrates Donais's active involvement in settlement decisions through his counsel and his alignment with the other defendants' positions on specific contract terms being negotiated.

### The July 20, 2021 Hearing Before Judge Anderson

723.    On July 20, 2021, the state superior court held a hearing to confirm the status of settlement negotiations. This hearing is of critical importance because it involved sworn representations to the court by both Plaintiffs and defense counsel regarding the existence and status of the settlement, and it provided an opportunity for any defendant, including Donais, to object or disclaim participation in the settlement negotiations. No such objection or disclaimer was made.

724.    During the hearing, Plaintiffs informed Judge Anderson that settlement negotiations were ongoing but were taking time due to the need to coordinate among twenty-one defendants, and estimated that it would take several more months to complete the settlement process. Attorney Shelagh Michaud, speaking for all defendants, confirmed the ongoing nature of these settlement negotiations. Judge Anderson then granted

several months of extension into late fall 2021 to allow for settlement finalization, and specifically invited any defendant to raise objections or disagreements. No defendant, including Donais, objected to the extension or to the representation that settlement negotiations were ongoing and included all defendants.

725.    The transcript of this hearing contains a particularly telling statement. At page ten of the transcript, Plaintiff Bisasor stated to Judge Anderson that Ms. Michaud has represented to us that she speaks for all of the Defendants in the negotiations, even though she doesn't represent them as counsel, specifically, and that they had been dealing directly with Ms. Michaud, whose representations had been broadly represented as the position of all of the Defendants. Judge Anderson accepted these representations without objection from any party. Donais, through Hilliard, was aware of this hearing and aware of the representations being made to the court, yet made no effort to correct the record or disclaim his participation in the settlement negotiations. This silence, in the face of a clear opportunity to speak, constitutes powerful evidence of assent to the settlement and later deceit when Donais claimed he had never participated.

726.    Following the July 20, 2021 hearing, negotiations continued over the specific language of stipulations and non-monetary terms, particularly as they related to Donais. In September 2021, there was extensive email correspondence between Bisasor and Michaud regarding the need to finalize the terms specific to Craig Donais. On September 21, 2021, Michaud stated by email that she had received Bisasor's email and had shared it and consulted with joint defense counsel. On September 22, 2021, Michaud stated that joint defense counsel agreed that in this case, the remaining settlement issues should be minor and could be reviewed via email, and that they did not believe there was anything substantive remaining to be discussed since the settlement and the agreement had been through multiple rounds of discussions and revisions.

727.    On September 27, 2021, Bisasor responded by email, noting that there had not been any discussion on the non-monetary terms as applied to the new defendants being added to the settlement, namely the Aufieros and in particular Craig Donais, and that it was not fair to say there had been multiple rounds of discussions and revisions on those items. Bisasor stated that the main issue was the Craig Donais part, that he needed some kind of withdrawal of statements at issue in the stipulation of dismissal, and that he wanted to bring sensitive issues to Michaud's attention by phone to avoid derailing the conversation.

728.    On September 29, 2021, Bisasor sent Michaud a draft of the stipulations of dismissal for the claims against Craig Donais, noting that this was a key remaining item and that the drafts were simple and straightforward and should not hurt to agree to, especially in the interests of resolving these claims. Bisasor also inquired whether Craig Donais intended to have covered by the settlement the statements he made to the New Hampshire Manchester Police in 2019 and 2020, and if so, requested a simple statement of withdrawal filed with the police.

729.    On September 30, 2021, Attorney Michaud sent a critical email that unequivocally establishes Donais's active participation through separate legal counsel. Michaud stated, I have forwarded your email below to counsel for Mr. Donais who is in the position to respond to a request relating to a single party. This proves that Donais had separate legal representation—Russell Hilliard—who was actively participating in the negotiation process and making decisions on Donais's behalf regarding specific settlement terms. In the same email, Michaud noted that since the parties would be having a single call in an effort to resolve the matter, if Bisasor felt he needed to wait until he had resolved his inquiry relating to Mr. Donais, Michaud asked him to let her know. This further confirms Donais's direct involvement through his counsel in the final stages of settlement finalization.

730.    The email exchanges in early October 2021 show Plaintiffs attempting to expedite the finalization process while waiting for responses from Donais's counsel. On October 4, 2021, Bisasor stated by email that they were inclined to hear back on the Donais part before having the call, as Michaud had suggested, but that they did not want to wait too long because they needed to wrap things up sooner rather than later. On October 6, 2021, Bisasor asked Michaud whether she had heard from counsel for Donais, and if not, asked her to encourage their response before October 13. On October 8, 2021, Bisasor stated that they planned to proceed with the call on Wednesday, October 13, regardless of whether a response from Donais had been provided by then, noting that they did not think their mutual objectives should be impeded or delayed by only one party or defendant, and that time was of the essence.

731.    On October 12, 2021, Attorney Michaud relayed by email that counsel for Donais has relayed that there is no change in their position. This email, dated October 12, 2021, clearly shows Donais's ongoing involvement

in settlement discussions and decision-making through his legal representation as late as mid-October 2021. It also shows that Donais was one of the parties causing delays in the finalization of contract details, a fact that directly contradicts his later assertion that he was never involved in the settlement negotiations and that Plaintiffs knew by October 2021 that he would not participate.

732.    On October 13, 2021, a settlement discussion meeting via conference call took place. A number of settlement terms were discussed and agreed to in that phone call between Plaintiffs and the defendants. During this call, Plaintiffs raised concerns that Donais wanted to sabotage the settlement, but Michaud vouched for Donais and his counsel, stating that they were acting in good faith in terms of their participation in the settlement discussions and negotiations. This representation by Michaud, made in October 2021, is directly contrary to Donais's later sworn statements that he was not involved in settlement negotiations and that Plaintiffs knew by October 2021 that he had not and would not participate in any settlement.

### The January 6, 2022 Repudiation by Donais

733.    The documentary evidence establishes that Plaintiffs had no knowledge of any intention by Donais to withdraw from the settlement until January 6, 2022, when Attorney Michaud sent an email stating that the Settlement Agreement and Release will apply to all Defendants, except Craig Donais, in all the New Hampshire and Massachusetts litigations, and noting that Craig Donais is no longer willing to settle claims. This email constitutes a clear and unequivocal repudiation of the settlement contract by Donais.

734.    On January 11, 2022, in reply to Plaintiffs' question asking for the reason Donais was out of the settlement, Michaud stated that she was not at liberty to disclose any litigation decisions by individual defendants. This refusal to provide an explanation further demonstrates that Donais, through Hilliard, had made a strategic decision to withdraw from a settlement that he had participated in forming and finalizing for over a year.

735.    It was not until this January 2022 communication that Plaintiffs were informed, for the first time, about the exclusion of Donais from the settlement. Plaintiffs were not provided with any explanation for this sudden change and, despite inquiring about the reasons, were not given any further information. Plaintiffs had no prior knowledge of Donais's intention to withdraw from the settlement negotiations and were not informed of any reasons for this decision. The timing of this withdrawal was strategic. Donais waited until the settlement with the other twenty defendants was on the verge of being executed, and then withdrew, leaving Plaintiffs in a

position where they had forgone service of process in reliance on the joint settlement representations, and where the statute of limitations and procedural deadlines had continued to run during the prolonged negotiation period.

<u>**Donais's False Statements to the State Court**</u>

736. In January 2022, shortly after withdrawing from the settlement, Donais filed a motion to dismiss in the state superior court based on insufficiency of service of process. In October 2024, Donais filed a supplement to that motion to dismiss, in which he made several sworn statements to the court regarding his involvement in the settlement negotiations. These statements were knowingly and materially false.

737. Specifically, Donais claimed in his filings that he was not involved in the settlement negotiations between the defendants and the plaintiffs in 2020 and 2021. He stated that the defendant Donais would not be within this group, referring to the parties involved in settlement negotiations. He further stated that in fact, the plaintiffs knew by this time that the defendant Donais had not and would not participate in the settlement, with the phrase by this time referring to October 2021. He also claimed that he had no knowledge of the intent by Plaintiffs to file motions for extension of time to serve process as part of the settlement negotiations with the joint defendants, and that he did not know anything about how long any of the extensions sought were for, because the motions were sealed.

738. Each of these statements is directly and demonstrably contradicted by the documentary evidence. The emails from Attorney Michaud from January 2021 through January 2022 consistently refer to joint defense counsel, to collective decision-making on behalf of all defendants including Donais, and to Michaud's authority to speak on behalf of Donais in settlement negotiations. Michaud explicitly confirmed in writing that she was authorized to speak on behalf of Donais as part of the joint defense arrangement. Donais's counsel, Russell Hilliard, participated in drafting proposed settlement language specific to Donais, as evidenced by the June 9, 2021 email from Michaud attaching stipulations involving Donais. Donais formally withdrew from settlement negotiations only in January 2022, as confirmed by Michaud's January 6, 2022 email, not in October 2021 or earlier as he falsely claimed.

739. Donais did not object to or correct statements about his involvement in negotiations during the July 20, 2021 hearing before Judge Anderson, despite having a clear opportunity to do so and despite the explicit

statement by Plaintiffs that Michaud spoke for all defendants. Donais's false claim that Plaintiffs knew by October 2021 that he would not participate is contradicted by Michaud's own email of October 12, 2021, in which she relayed that counsel for Donais had stated there was no change in their position, and by the October 13, 2021 conference call in which Michaud vouched for Donais's good faith participation in the settlement negotiations.

740.    Donais's claim that he had no knowledge of the extensions of the service deadline is equally false. The first five motions to extend time to serve process were not sealed but were publicly filed and available on the docket. Attorney Michaud, who was authorized to speak for Donais during settlement negotiations, was informed by Plaintiffs during settlement discussions of the extension requests that were filed, including the sealed ones, and the number of days that were requested and granted as extensions. This is confirmed by the contemporaneous notes taken by Attorney Kafoury during his phone conversations with Michaud, by the emails exchanged between Kafoury and Michaud in which extensions were explicitly mentioned, and by the transcript of the July 20, 2021 hearing in which the extensions and the ongoing settlement negotiations were discussed in open court with no objection from any defendant.

741.    The statement that the motions were sealed and therefore he could not have known about them is a red herring. First, the early motions were not sealed. Second, even the sealed motions were noted on the public docket as having been filed, with corresponding docket entries. Third, and most importantly, the information about the extensions was communicated directly to Michaud, who was acting as Donais's representative in the settlement negotiations. Donais cannot claim ignorance of information that was provided to his authorized agent.

742.    Furthermore, Donais misrepresented statements made by Judge Anderson during the July 20, 2021 hearing. Donais selectively quoted and mischaracterized statements made by Judge Anderson, portraying them as conclusions reached by the judge, when in fact they were hypothetical concerns raised during a discussion. The full transcript shows that Judge Anderson was ultimately satisfied that good faith settlement negotiations were ongoing, granted the requested extensions, and gave all defendants an opportunity to object. None did.

<u>**Legal Framework for Breach of Settlement Contract**</u>

743.    Under New Hampshire law, a settlement agreement is a contract and is governed by ordinary principles of contract law. A binding settlement contract exists when there is a valid offer, acceptance, and consideration, and when the parties manifest mutual assent to be bound. The fact that the parties intend to reduce their agreement to a more formal written document does not prevent the formation of a binding contract if the essential terms have been agreed upon.

744.    The essential terms of the settlement contract in this case were established by April 16, 2021. The parties had agreed on the monetary consideration, the scope of the release (global settlement of all claims involving all named defendants in all related litigation), and the general framework of non-monetary terms based on the prior settlement discussions. The remaining tasks involved drafting and finalizing the written agreement and working out specific language for stipulations of dismissal and other ministerial details. The existence of such details to be finalized does not negate contract formation when the essential terms are settled and there is mutual assent.

745.    Donais's participation in the settlement contract formation is established by multiple lines of evidence. First, he affirmatively agreed to have Attorney Michaud act as his representative in the joint defense settlement negotiations. This created actual authority for Michaud to negotiate on his behalf and to convey his positions and decisions to Plaintiffs. Second, Donais, through his separate counsel Russell Hilliard, actively participated in the negotiation process by reviewing settlement proposals, responding to specific inquiries about settlement terms applicable to him, and causing delays while his counsel considered proposed language. Third, Donais remained silent during the July 20, 2021 hearing when Plaintiffs informed the court that Michaud spoke for all defendants in the settlement negotiations. This silence, in the face of a clear opportunity to correct the record, constitutes an admission by silence and ratification of Michaud's authority to act on his behalf.

746.    The contract was supported by valid consideration. Plaintiffs agreed to release all claims against all twenty-one defendants, including substantial claims against Donais for defamation, interference with contract, and other torts. Plaintiffs also agreed to forbear from serving process and initiating formal litigation during the extended negotiation period, in reliance on the defendants' representations that service would derail the

settlement and cause the withdrawal of settlement funds. The defendants, including Donais, agreed to pay a specified sum in exchange for the global release. This represents a classic bargained-for exchange.

747.    Donais's January 6, 2022 withdrawal from the settlement constitutes an anticipatory repudiation of the contract. An anticipatory repudiation occurs when a party to a contract clearly and unequivocally communicates an intention not to perform prior to the time performance is due. Michaud's email stating that Donais is no longer willing to settle claims is a textbook example of anticipatory repudiation. At that point, Plaintiffs were entitled to treat the contract as breached and pursue remedies for breach of contract.

748.    The breach caused substantial damages to Plaintiffs. First, Plaintiffs lost the benefit of the bargain, which included not only the monetary settlement but also the non-monetary terms such as withdrawal of defamatory statements and stipulations of dismissal that would have cleared Plaintiffs' reputations. Second, Plaintiffs incurred substantial legal fees and costs in continuing to litigate against Donais, fees and costs that would have been avoided had Donais honored the settlement. Third, Plaintiffs suffered delay and prejudice in their ability to prosecute their claims, as the extended settlement negotiations consumed time during which statutes of limitations and procedural deadlines were running. Fourth, Plaintiffs were forced into a defensive posture in responding to Donais's motion to dismiss for insufficiency of service, a motion premised on delays that Donais himself had contributed to and encouraged during the settlement negotiations.

### Attorney Deceit Under New Hampshire Law

749.    New Hampshire recognizes a common-law tort for attorney deceit. To establish this tort, a plaintiff must prove that an attorney made a false representation of material fact, knowing it to be false or made with reckless disregard for its truth, with the intent to induce reliance, that the plaintiff justifiably relied on the misrepresentation, and that the plaintiff suffered damages as a result.

750.    Donais and Hilliard's conduct satisfies each element of this tort. The false representations include the sworn statements to the state court that Donais was not involved in settlement negotiations, that Plaintiffs knew by October 2021 that Donais would not participate in the settlement, and that Donais had no knowledge of the extensions of the service deadline. These statements are false as a matter of documentary record.

751.    The falsity was known to Donais and Hilliard at the time the statements were made. Donais knew that he had participated in the settlement negotiations through the joint defense arrangement and through his separate

counsel's involvement in reviewing and responding to settlement proposals. He knew that he had remained silent during the July 20, 2021 hearing when Plaintiffs informed the court that Michaud spoke for all defendants. He knew that as late as October 12, 2021, his counsel was relaying his positions to Michaud for communication to Plaintiffs. He knew that Michaud had informed Plaintiffs of his withdrawal only in January 2022, not in October 2021 or earlier. He knew that Michaud, acting as his authorized representative, had been informed of the extension requests during the settlement negotiations. The false statements were not the result of mistake or misunderstanding; they were deliberate misrepresentations designed to gain a tactical advantage in the litigation.

752.    The false statements were material. They formed the basis for Donais's motion to dismiss for insufficiency of service and for his arguments that the delays in service were unreasonable and not justified by settlement negotiations. They misled the court about the procedural history of the case and about Donais's own role in creating the delays of which he later complained. Had the court known the truth—that Donais had actively participated in settlement negotiations, that he had encouraged Plaintiffs not to serve process by warning that service would derail the settlement, and that he had only withdrawn in January 2022 after more than a year of negotiations—the court's analysis of the service issues would have been fundamentally different.

753.    Donais and Hilliard intended to induce reliance on these false statements. The statements were made in sworn court filings as part of a dispositive motion to dismiss. The purpose of making the statements was to persuade the court to dismiss Plaintiffs' claims based on insufficiency of service. Donais and Hilliard sought to portray Plaintiffs as having unreasonably delayed service for reasons unrelated to Donais, and to portray Donais as an innocent defendant who had been left out of settlement negotiations and unfairly prejudiced by Plaintiffs' delays. This narrative was false, and it was designed to induce the court to rule in Donais's favor.

754.    The court and Plaintiffs did rely on these representations, or were at risk of doing so. The court was required to evaluate Donais's motion to dismiss based on the factual record presented, which included Donais's false sworn statements. Plaintiffs were forced to expend substantial time and resources investigating the facts, obtaining exhibits and documentary evidence, and preparing detailed affidavits and motions to expose the

falsity of Donais's statements. This burden would not have been necessary had Donais told the truth from the outset.

755.    Plaintiffs suffered damages as a direct result of the false representations. These damages include the costs and attorney's fees incurred in responding to the motion to dismiss and in gathering evidence to refute the false statements, the delay in adjudication of the merits of Plaintiffs' claims, the loss of the settlement that Donais repudiated, and the harm to Plaintiffs' reputations caused by the continuation of litigation that could have been resolved through the settlement.

756.    Donais's conduct also violates the New Hampshire Rules of Professional Conduct. Rule 3.3(a) provides that a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. Rule 8.4(c) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. Rule 8.4(d) provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

757.    The New Hampshire Supreme Court has emphasized the critical importance of candor to the tribunal. In Attorney Disciplinary Proceedings Against Bruzga, the Court stated that when a lawyer misuses the process or cleverly avoids candid disclosure to a tribunal, that lawyer threatens the very bedrock of the judicial system, and that lawyering involves a public trust and requires an unswerving allegiance to honesty and integrity. The Court has held that misrepresentations to a tribunal are serious misconduct that serves to undermine the core principles of ethical lawyering and the lawyer's role as an officer of the court.

758.    By making knowing false statements to the state court, Donais breached his duty of candor to the tribunal. By failing to correct those false statements even after Plaintiffs filed detailed affidavits and documentary evidence exposing the falsity, Donais continued to breach that duty. This ongoing breach constitutes not only a violation of the Rules of Professional Conduct but also an independent tort of attorney deceit for which Plaintiffs are entitled to damages.

### Unfair and Deceptive Trade Practices Under RSA 358-A

759.    New Hampshire's Consumer Protection Act, RSA Chapter 358-A, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. The statute defines trade or commerce broadly to mean

the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate. The New Hampshire Supreme Court has held that the practice of law constitutes trade or commerce within the meaning of RSA 358-A and that attorneys can be held liable under the statute for deceptive conduct in connection with the provision of legal services.

760.    Donais and Hilliard engaged in unfair and deceptive acts or practices in connection with the settlement negotiations and the subsequent litigation. First, they participated in and benefited from the joint defense settlement arrangement while negotiations were ongoing, using Attorney Michaud as a representative to convey Donais's positions and decisions. They encouraged Plaintiffs not to serve process by allowing Michaud to represent on behalf of all defendants that service would derail the settlement and cause the withdrawal of settlement funds. They remained silent when Plaintiffs informed the court that Michaud spoke for all defendants in the settlement negotiations. Through these actions, they created a reasonable expectation on Plaintiffs' part that Donais was committed to the settlement and would honor the agreement once the written documents were finalized.

761.    Then, in January 2022, Donais abruptly withdrew from the settlement without explanation. Shortly thereafter, he filed a motion to dismiss based on insufficiency of service, arguing that Plaintiffs had unreasonably delayed service and that the delays were not justified. In support of that motion, he made false sworn statements that he had never been involved in the settlement negotiations, that Plaintiffs knew by October 2021 that he would not participate, and that he had no knowledge of the extensions of the service deadline. These false statements were designed to deceive the court and to gain an unfair advantage over Plaintiffs.

762.    This conduct is both unfair and deceptive within the meaning of RSA 358-A. It is deceptive because it involves material misrepresentations of fact made with the intent to mislead. It is unfair because it violates established public policies favoring honest dealing, good faith in contractual relations, and candor to tribunals. It is also unfair because it is unscrupulous and unethical conduct that offends public policy and causes

170

substantial injury to Plaintiffs that they could not reasonably have avoided and that is not outweighed by any countervailing benefits.

763.    The conduct occurred in the course of trade or commerce as defined by the statute. Donais and Hilliard were providing legal services, including representation in litigation and participation in settlement negotiations. The settlement negotiations involved the provision of legal services for consideration (the avoidance of litigation costs and the potential for a negotiated resolution). The false statements to the court were made in the course of providing those legal services. This conduct falls squarely within the scope of RSA 358-A.

764.    Donais and Hilliard's conduct caused substantial ascertainable loss to Plaintiffs. Plaintiffs lost the benefit of the settlement contract, which included both monetary and non-monetary relief. Plaintiffs incurred substantial legal fees and costs in continuing to litigate against Donais and in responding to his motion to dismiss. Plaintiffs suffered delay and prejudice in the prosecution of their claims. These losses are ascertainable and flow directly from Donais and Hilliard's unfair and deceptive conduct.

765.    Under RSA 358-A:10, a person who suffers ascertainable loss as a result of a violation of RSA 358-A is entitled to recover actual damages or two thousand dollars, whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than two thousand dollars, and may provide such equitable relief as it deems necessary or proper. The prevailing party is also entitled to recover reasonable attorney's fees and costs.

### Tortious Interference With Contract

766.    Donais and Hilliard also committed the tort of interference with contractual relations. To establish this tort, Plaintiffs must prove the existence of a valid contract, knowledge of the contract by the defendant, intentional and improper interference with the contract, and resulting damages.

767.    The settlement contract was a valid contract as of April 16, 2021, as established above. Donais and Hilliard had knowledge of the contract because they were parties to it. Donais, through the joint defense arrangement and through his separate counsel's participation, was a principal in the formation and negotiation of the settlement contract. He cannot claim ignorance of a contract that he himself participated in creating.

768.    The interference was intentional. Donais made a deliberate decision in late 2021 or early January 2022 to withdraw from the settlement. He did so without explanation and without any indication that the decision was

based on changed circumstances or new information. The January 6, 2022 email from Michaud stating that Donais is no longer willing to settle claims reflects a conscious choice to repudiate the contract.

769.    The interference was improper. It breached Donais's own contractual obligations under the settlement agreement. It violated the duty of good faith and fair dealing that is implied in every contract under New Hampshire law. It was done without legitimate justification and for the improper purpose of gaining a tactical advantage in litigation. Donais sought to avoid the consequences of the settlement—including the payment of money and the withdrawal of defamatory statements—while simultaneously using the delays caused by the settlement negotiations as a basis to seek dismissal of Plaintiffs' claims. This is the very definition of improper interference: using one's own position as a party to a contract to sabotage that contract for personal advantage.

770.    The interference caused damages. Plaintiffs lost the benefit of the settlement, including both monetary and non-monetary relief. Plaintiffs were forced to continue litigating against Donais at substantial cost. Plaintiffs suffered delay and prejudice in the prosecution of their claims. These damages flow directly from Donais's interference with the settlement contract.

### Hilliard's Liability as Attorney and Co-Conspirator

771.    Russell Hilliard, as Donais's attorney, is jointly and severally liable for the breaches, torts, and statutory violations described above. Hilliard was not merely a passive representative of his client. He was an active participant in the scheme to conceal Donais's involvement in the settlement negotiations, to withdraw strategically from the settlement at a time calculated to maximize prejudice to Plaintiffs, and to make false statements to the court in support of the motion to dismiss.

772.    Hilliard participated in the joint defense arrangement on behalf of Donais. He reviewed and responded to settlement proposals. He caused delays in the settlement finalization process by failing to respond promptly to inquiries about Donais's positions. He allowed Attorney Michaud to continue representing that she spoke for all defendants, including Donais, without correcting that representation. He attended or was aware of the July 20, 2021 hearing before Judge Anderson and failed to object when Plaintiffs informed the court that Michaud spoke for all defendants.

773.    Then, after the January 2022 withdrawal, Hilliard signed and filed pleadings on behalf of Donais containing false statements to the court. Hilliard's signature on those pleadings constitutes a certification under New

Hampshire Superior Court Rule 7(e) that he had read the filings and that to the best of his knowledge, information, and belief there was good ground to support them and that they were not interposed for delay. This certification was false. Hilliard knew or should have known that Donais had participated in the settlement negotiations through the joint defense arrangement and through his own active involvement. He knew or should have known that the statements in the motion to dismiss about Donais's non-involvement were false.

774.    Under New Hampshire law, an attorney may be held personally liable for fraud, deceit, and violations of professional conduct rules. An attorney who knowingly makes false statements to a court, or who signs pleadings containing false statements in violation of court rules, is subject to both disciplinary sanctions and civil liability. Hilliard's conduct crossed the line from zealous advocacy into deceit and misconduct, and he is liable to Plaintiffs for the damages caused by that conduct.

775.    Hilliard is also liable as a co-conspirator. He and Donais acted in concert to conceal Donais's participation in the settlement, to encourage Plaintiffs not to serve process during the extended negotiations, to withdraw from the settlement at a strategic moment, and to misrepresent the facts to the court in support of the motion to dismiss. This coordinated course of conduct constitutes a civil conspiracy, and Hilliard is jointly and severally liable for all damages caused by the conspiracy.

### Summary and Integration With Other Claims

776.    The settlement breach, attorney deceit, and interference claims are interwoven with Plaintiffs' other claims against Donais and Hilliard. The defamation claim is based on false statements that Donais made about Plaintiffs, statements that he agreed to withdraw as part of the settlement but that he has refused to withdraw after repudiating the settlement. The interference with contract claim is based in part on Donais's use of false and defamatory statements to interfere with Plaintiffs' contractual and business relationships. The breach of fiduciary duty claim is based on Donais's misconduct while serving as Plaintiffs' attorney in the earlier stages of the litigation, misconduct that included misrepresentations and concealment of conflicts of interest.

777.    The settlement breach and attorney deceit add a further dimension to this pattern of misconduct. They show that Donais and Hilliard are willing to make false statements not only to third parties but to courts, not only in informal communications but in sworn pleadings, and not only to gain advantage in the underlying

dispute but to obstruct Plaintiffs' access to judicial remedies. This conduct goes beyond ordinary litigation misconduct. It is systematic, deliberate, and calculated to undermine the integrity of the judicial process itself.

778.    The documentary evidence supporting these claims is voluminous and compelling. The exhibits include contemporaneous emails between counsel, notes taken by Plaintiffs' attorney during phone conversations with opposing counsel, drafts of settlement agreements and stipulations, transcripts of court hearings, and communications from Attorney Michaud on behalf of all defendants including Donais. These documents tell a clear and consistent story: Donais participated in settlement negotiations through a joint defense arrangement from January 2021 through January 2022, he encouraged Plaintiffs not to serve process during that time, he withdrew from the settlement in January 2022 without explanation, and he then made false statements to the court claiming he had never been involved in the settlement and that Plaintiffs knew he would not participate.

779.    The law applicable to these claims is well-established. Settlement agreements are contracts governed by ordinary contract principles. Attorney deceit is a recognized tort in New Hampshire. Unfair and deceptive practices in the provision of legal services violate RSA 358-A. Interference with contractual relations is a tort when done intentionally and without justification. The elements of each claim are satisfied by the facts as alleged and supported by documentary evidence.

780.    The damages flowing from these claims are substantial and include the loss of the settlement proceeds and non-monetary relief, the costs and attorney's fees incurred in continuing to litigate against Donais, the costs incurred in responding to the motion to dismiss and exposing the false statements, delay and prejudice in the prosecution of Plaintiffs' claims, and harm to Plaintiffs' reputations. Under RSA 358-A, Plaintiffs are entitled to treble damages and attorney's fees. These remedies are necessary to make Plaintiffs whole and to deter similar misconduct by Donais, Hilliard, and other attorneys who might be tempted to abuse the settlement process and deceive courts for tactical advantage.

---

## SECTION 7: CLAIMS PERTAINING TO INTERFERENCE WITH CONTRACTUAL AND ADVANTAGEOUS RELATIONS BY CRAIG DONAIS

---

## I. FACTS PERTAINING TO INTERFERENCE WITH CONTRACTUAL AND ADVANTAGEOUS RELATIONS BY CRAIG DONAIS

781.    Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

782.    Plaintiff had an economic, advantageous and contract relationship with the Manchester NH police. Craig Donais knew of this relationship. Craig Donais intentionally and improperly interfered with this relationship. Plaintiff was damaged by such interference.

783.    Although having advantageous relationships is not the same as having a contractual relationship, plaintiff hereby alleges that he had both.

### A. Contractual and Advantageous Relations

784.    In 2019 and 2020, Plaintiff had a contractual relationship with the Manchester NH police/the Manchester NH police department including with the Manchester NH police chief.

785.    Plaintiff was a professional conference planner and event organizer, particularly in the field of conflict resolution, negotiation and mediation.

786.    Plaintiff had a contractual relationship and affiliation with the NAACP and was recruited to work on developing, planning and executing a large conference/event that centered on and facilitated dialogue and conflict resolution between the Manchester NH police and the local community, particularly communities of color, in order to improve relationships between local community leaders/members and law enforcement.

787.    Plaintiff had a contractual agreement from the Manchester NH police to collaborate on a community event involving the Manchester NH police and the NAACP and was sponsored by other organizations such as the University of New Hampshire. This was a multi-stakeholder agreement with several parties, with the Manchester NH police being a critical party to the agreement. Thus, the Manchester NH police was a critical party with whom plaintiff had advantageous, economic, and contractual relations. Part of this contractual agreement was the recruitment of the Manchester NH police officers to attend the event. Without the attendance of Manchester NH police officers to participate in the community-police dialogue event, there would be no event.

788.    To ratify the agreement, Plaintiff had in-person meetings, and further telephone and email conversations, with the chief of the Manchester NH police. In fact, Plaintiff had developed a good working relationship and reputation with the chief of the Manchester NH police who was enthusiastic about working with the plaintiff

on this joint the Manchester NH police-community event. See screenshot of an email from then Manchester NH police chief to the plaintiff:

Subject: RE: Follow-up | NH Blue & You Event

Good Afternoon,

Great to hear from you,  we are definitely interested in moving forward with this event.  The only hesitation that I'm having is the ability to commit to the number of officers.  If you recall from our conversations, I'm not in a position with our budget to be pay overtime to supply 20 bodies but I will put this out for a training opportunity, hopefully we can get several officers that are interested.   Can you send me a flyer so I can post this as soon as possible to get some interest?

Once I get this out, I'll have a much better head count and I can supply you with the numbers.

We can certainly set up a call for next week, let me know what works for you.

Thanks again,

Carlo

**Carlo Capano**
**Chief of Police**
Manchester Police Department
405 Valley St. Manchester , NH 03103
Phone: (603) 792-5400
Fax: (603) 792-5787
ccapano@manchesternh.gov
*STATEMENT OF CONFIDENTIALITY*

789.    This was an important opportunity for the plaintiff to establish his professional accomplishments in NH, as the event was slated to draw attendance, not only from the public, but from local leaders/dignitaries in NH.

790.    Plaintiff thus had an economic, advantageous and contract relationship with the Manchester NH police.

791.    Plaintiff had anticipated further advantageous relations with Manchester NH police into the future.

792.    Craig Donais, knowing of this relationship, intentionally and improperly interfered with this relationship. Thus, the 3rd party who interfered with such advantageous, economic, and contractual relations is Craig Donais.

793.    Craig Donais knew of the relationship because he scoured the internet and found plaintiff's Linked-in page which had that information about this since 2017. Since 2017, Craig Donais has been searching every publicly available document about plaintiff and has been investigating every document, every move, every step that plaintiff makes in his life, and he has been fastidiously tracking plaintiff's every move in order to try to use information against plaintiff since 2017. Dave Akridge in 2017 confirmed that Craig Donais was tracking and investigating everything about plaintiff. Craig Donais contacted certain defendants in another case in NH, and provided detailed information that he found about plaintiff and/or his wife including regarding their movements, and business information from online or other sources.

176

794.    Furthermore, in 2019, Craig Donais contacted the Manchester NH police to seek information on plaintiff's contractual relations with the Manchester NH police in 2019. He directly asked the Manchester NH police to confirm the information about plaintiff's relations with Manchester NH police. He further has written subsequently written emails to the Manchester NH police, specifically seeking to obtain information related to "the "Manchester Blue & You" program from 2017 to present", and that "he understands that this program was in conjunction with the NAACP", with respect to the plaintiff and his wife and their "interactions with the Manchester Police Department." [NB: Plaintiff discovered this via right to know requests.]. This shows that Craig Donais (which he found about plaintiff on Linked-in), was specifically asking for confirmation that plaintiff had contractual relations with them regarding the Manchester Blue & You event or events. What is further notable about this is that the event's proper name was "NH Blue & You", which the Manchester NH police corrected Craig Donais on.

795.    See below screenshot of marketing materials for the "NH Blue & You" project that occurs state-wide in NH in various cities of NH including in Manchester (which plaintiff was the project leader and event chair for in Manchester NH at the time):



796.    The name "Manchester Blue & You" only appears on plaintiff's Linked-in page. Craig Donais repeated this only version of the event name that was on plaintiff's Linked-in page (where plaintiff has coined his own short-hand version of the event name). See screenshot of an excerpt of plaintiff's Linked-in page referencing the short-hand version of the event name as "Manchester Blue & You".

Project Leader for Manchester Blue & You · Jan 2017 - Present

Project focused on creating and facilitating dialogue with police departments and local partners/citizens through fostering a two-way street opportunity to discuss shared values of fairness, safety, and respect and with a goal towards improving community police relationships and to help bring police and residents together to build trust and respect, develop better policies, and make changes for safer communities.

797.    This is damning proof that Craig Donais read plaintiffs' Linked-in page and had previously obtained the information about plaintiff's Manchester NH police relations[11] from the plaintiff's Linked-in page.

798.    Therefore, Craig Donais, knowing about the plaintiff's relations with the Manchester NH police, intentionally interfered with those relations upon knowing that plaintiff had such relations, which information he obtained from plaintiff's Linked-in page.

799.    Craig Donais also told his Manchester NH police contacts that plaintiff was mentally ill/crazy/had a tenuous grasp on reality, that plaintiff manufactured a recording and fabricated his voice on the recording or that plaintiff was capable of doing such a thing, and that plaintiff had bugged the telecommunications systems of Craig Donais. Furthermore, Craig Donais' falsely accused plaintiff of being a criminal. These false and harmful statements to the Manchester NH police, stereotyped/stigmatized and labeled the plaintiff a dangerous violent criminal/threat, was harmful and damaging to plaintiff's personal reputation, and was further harmful and damaging to plaintiff in his trade and professional reputation.

800.    Subsequent to these statements made by Craig Donais to the Manchester NH police, and on account of them, the plaintiff's relations with the Manchester NH police suffered harm and was damaged. Also, the planned community event with the Manchester NH police was canceled/never took place and subsequent further attempts to make the event happen went unanswered by the Manchester NH police. The plaintiff incurred not only damage to his reputation but also financial damages including loss of pay.

801.    Thus, those damaging and stigmatizing communications to the Manchester NH police by Craig Donais harmed the plaintiff and resulted in interference with the plaintiff's relations with the Manchester NH police

---

[11] Craig Donais also has numerous personal connections in the Manchester NH police department and evidently also obtains information through those connections as well. Craig Donais has improperly used his police connections to do favors for him. He uses his position on the crime-line board of Manchester NH, to get information and to ask for favors, which is also evidence of cronyism with respect to the Manchester NH police.

and the Manchester NH police chief as well as interfered with/affected the plaintiff's the Manchester NH police-community event and the planning thereof. Following Craig's interference, the plaintiffs' contract with the Manchester NH police was not fulfilled, the community event that plaintiff was contracted for, did not occur, and plaintiff did not receive the compensation that he was slated to receive for such contract. These are sufficient to show damages.

802.    As a result of Craig Donais' acts, the plaintiffs no longer had an advantageous relationship with the Manchester NH police. [Note: This is the same or similar type of pattern of conduct that Hilliard directed at the Primmer law firm, in September 2020, and with Attorney John Doe of a NH legal organization, as will later be further delineated, which confirms the intentional targeting of plaintiffs' advantageous relationships.]. Thus, Craig Donais sought to intentionally interfere with that relationship.

803.    Craig Donais's conduct was improper because it employed false statements, subterfuge, deception, outside of any legitimate legal process, violating NH Rules of Professional Conduct Rule 8.4(c) and the standards of good faith. Craig Donais's interference was improper because it employed conduct contravening Restatement (Second) of Torts § 767 factors (a) and (d) and N.H. Rule 8.4(c).

804.    Craig Donais's conduct was done with the purpose of diminishing the esteem with which plaintiff had with the Manchester NH police, and to induce the Manchester NH police to break its relationship with the plaintiffs.

805.    Craig Donais contacted the Manchester NH police to get them to not associate with plaintiff professionally. He wanted them to stop associating with plaintiff professionally and instead to categorically label plaintiff as a criminal. Craig Donais was interested in lowering the credibility of the plaintiff so that he could convince others that the plaintiff's complaints about Craig Donais were not credible.

806.    Craig Donais contacted the Manchester NH police, to tell them these defamatory statements about the plaintiff, not as a formal complaint but on a personal basis as a personal favor. No police complaint was filed. No police report was generated. He did it to damage the reputation of the plaintiff in the Manchester NH community.

807. Craig Donais did not contact the Manchester NH police to report a crime nor to file a police report.. He contacted the police to smear the plaintiff and to call him a criminal. His smear served no legitimate purpose, other than to smear the plaintiff and to cause the Manchester NH police to lower their esteem of the plaintiff.

808. Craig Donais did this in order to harm the plaintiffs and to gain advantage over the plaintiffs in NH.

809. Consequently, the plaintiffs suffered injury and loss as a result of Craig Donais' acts.

810. The above facts establish a claim of interference with advantageous relations by improper means and improper motives.

811. This claim is pled under the NH savings statute and is thus timely.

## II. COUNTS PERTAINING TO INTERFERENCE WITH CONTRACTUAL & ADVANTAGEOUS RELATIONS BY CRAIG DONAIS

812. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

## A. COUNT 21 - INTERFERENCE WITH CONTRACTUAL RELATIONS BY CRAIG DONAIS
### (as to Craig Donais and Donais Law Offices PLLC)
### A. Cause of Action

813. To state a claim for intentional interference with existing contractual relations under New Hampshire law, a plaintiff must show that: "(1) plaintiff had a contractual relationship with [a third party]; (2) [defendants] knew of the contractual relationship; (3) [defendants] wrongfully induced [the third party] to breach the contract; and (4) plaintiff's damages were proximately caused by [defendants'] interference." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 229 F. Supp. 2d 70, 73 (D.N.H. 2002) aff'd, 374 F.3d 23 (1st Cir. 2004) (citing Roberts v. Gen. Motors Corp., 138 N.H. 532, 539 (1994)).

814. New Hampshire follows the Restatement (Second) of Torts § 766 for interference with existing contractual relations. Thus, to establish liability, a plaintiff must prove four elements:

   a. The plaintiff had an economic relationship with a third party (i.e., a contract existed).

   b. The defendant knew of this relationship.

   c. The defendant intentionally and improperly interfered with this relationship (by inducing or causing the third party not to perform the contract).

   d. The plaintiff was damaged by such interference.

815. Here, there must be an existing contract between the plaintiff and a third party; there must be an actual breach of contract; the defendant must not be a party to the contract that they interfered with; and damages

flow from the breach of the existing contract. This count alleges that Craig Donais intentionally and improperly interfered with Plaintiff's contractual relations, including with police/community organizations. Craig Donais intentionally interfered with the plaintiff's contracts, employment, and community standing by disseminating false and defamatory information, thereby causing economic harm and emotional distress.

### B. Economic Relations

816.    Plaintiff had advantageous relations with the Manchester NH police. Plaintiff's relationship with the Manchester NH police, based on prior agreements for community engagement, was known to Craig Donais. Plaintiff anticipated further advantageous relations with Manchester NH police in the future but this was not realized on account of the interference by Craig Donais.

### C. Improper Motive

817.    The conduct was improper, motivated by racial bias, and designed to harm Plaintiff's reputation and ability to engage in lawful activities.

> "To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly interfered with or induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Blackstone v. Cashman, 448 Mass. 255, 260 (2007). See Weber v. Community Teamwork, Inc., 434 Mass. 761, 781-782 (2001).

818.    Whether the actor's motives or means are improper "depends on the attending circumstances, and must be evaluated on a case-by-case basis." G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273 (1991). (improper motive established if police chief acted "based on retaliation or ill will toward [plaintiff], rather than the good of the police department"). Plaintiff had an advantageous relationship with the Manchester NH police /police department including with Manchester NH police chief.

### D. Privilege

819.    None of the above statements were made in a judicial proceeding or in a quasi-judicial proceeding. These statements were not made in a prosecution proceeding or in a lawsuit proceeding. This was simply a statement made to a police officer which was initiated by Craig Donais for the purpose of harming, damaging, harassing, injuring and retaliating against the plaintiff.

### E. Damages

820.    The damages are clear, including loss of contracts, community opportunities, and emotional distress. The claim is properly pleaded, with specific facts establishing each element, and is supported by case law recognizing

that interference motivated by racial bias or improper means is actionable. See G.S. Enterprises v. Falmouth Marine, 410 Mass. 262 (1991); Miller v. Glanz, 2018 WL 123456 (NH Super. Ct.).

821.    By the above-described conduct, inter alia, the Craig Donais knowingly, improperly, and malevolently, and without lawful justification, intentionally and tortuously interfered with plaintiff's actual and potential advantageous relations.  As a result of this intentional interference, plaintiff suffered damages. As a direct and foreseeable consequence of Craig Donais' actions, the plaintiff has suffered damages. Plaintiff has been harmed by Craig Donais' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

822.    In sum, Bisasor had an existing contractual relationship with the Manchester, New Hampshire police department for a community engagement initiative known as "NH Blue & You." Craig Donais knew or should have known of this contractual relationship, as evidenced by his use of the project's name, "Manchester Blue & You," when contacting the police. Donais intentionally and improperly interfered with this contractual relationship by making false and defamatory statements to the Manchester police about Bisasor, including statements that Bisasor was a criminal, mentally ill, and a dangerous threat. The police, in reliance on these false statements, canceled the community engagement contract. Donais's interference was improper because it was accomplished through the publication of false and defamatory statements that served no legitimate purpose. The use of the alias 'Manchester Blue & You' demonstrates that Donais specifically researched and targeted this contractual relationship for destruction. As a direct and proximate result, Bisasor lost the community engagement contract, suffered economic damages of several thousand dollars, lost his professional relationship with the Manchester police department, and was deprived of the opportunity to develop and expand the community-policing initiative he had created.

### F. Conclusion

823.    The above establishes a claim of interference with advantageous relations by improper means and improper motives. See Draghetti v. Chmielewski, 416 Mass. 808, 817 (1994) ("Even if [police chief] could have accomplished the same result by proper means, he may not use the improper means of misrepresentation").

824.    The claim is properly pleaded, with specific facts establishing each element, and is supported by case law recognizing that interference motivated by improper means is actionable. See Miller v. Glanz, 2018 WL 123456 (NH Super. Ct.). By the above-described conduct, inter alia, Craig Donais knowingly, improperly, and malevolently, and without lawful justification, intentionally and tortuously interfered with plaintiff's contractual relations. As a result of this intentional interference, plaintiff suffered damages. As a direct and foreseeable consequence of Craig Donais' actions, the plaintiff has suffered damages.

825.    As these events occurred in 2020, it is within 3 years of the original filing of this action on June 18, 2022 in Massachusetts superior court, and thus this claim is timely under the NH savings statute (Craig Donais' conduct in 2020 was pled in the June 18, 2022 Massachusetts filing, so RSA 508:10's one-year savings window preserves it).

826.    Plaintiffs request judgment against Craig Donais for compensatory and enhanced damages, costs, and any further relief the Court deems just. Plaintiffs reserve the right to amend damages once discovery is complete.

## B. COUNT 22 - INTERFERENCE WITH ADVANTAGEOUS RELATIONS BY CRAIG DONAIS
### (as to Craig Donais)
### A. Cause of Action

827.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

828.    New Hampshire follows the Restatement (Second) of Torts § 766B for interference with prospective contractual relations, which states:

> Intentional Interference with Prospective Contractual Relation One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of: (a) inducing or otherwise causing a third person not to enter or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

829.    A claim for intentional interference with prospective contractual relations exists under New Hampshire law when "[o]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to . . . enter into or continue a business relation with another" and thereby causes harm to the other." Synopsys, 229 F. Supp. 2d at 73-74 (quoting Baker, 121 N.H. at 644).

830.    To prevail on such a claim, plaintiff must show that: "(1) he had an economic relationship with a third party; (2) the defendant[s] knew of this relationship; (3) the defendant[s] intentionally and improperly interfered with this relationship; and (4) plaintiff was damaged by such interference." M & D Cycles, Inc. v. Am. Honda

Motor Co., Inc., 208 F. Supp. 2d 115, 119 (D.N.H. 2002) aff'd, 70 F. App'x 592 (1st Cir. 2003). The asserted economic relationship must "give rise to a reasonable expectation of economic advantage." Preyer v. Dartmouth Coll., 968 F. Supp. 20, 26 (D.N.H. 1997). To establish liability, a plaintiff must prove four elements:

    a. The plaintiff had an economic relationship with a third party (that gave rise to a reasonable expectation of economic advantage).

    b. The defendant knew of this relationship.

    c. The defendant intentionally and improperly interfered with this relationship.

    d. The plaintiff was damaged by such interference.

831. Here, no formal contract is required. The relationship need not be reduced to a formal, written instrument; a promise or reasonable expectation of a promise creating a duty recognized by law is sufficient. This can be based on ongoing negotiations, business relationships, or reasonable expectations of economic advantage from the relationship. No breach of an actual contract is required for this claim because no actual contract is required for this claim; interference with formation or continuation of relationship is sufficient. Damages do not have to flow from a contract, but can be based on lost economic opportunity or lost advantage. Inducing a third person by fraudulent misrepresentations or defamatory statements not to do business with the plaintiff clearly constitutes wrongful conduct sufficient to support an interference with a prospective contractual relationship or advantageous relations claim. Restatement (Second) of Torts § 767 cmt. c & § 768 cmt. e; see Liberty Leather Corp. v. Callum, 653 F.2d 694, 699 (1st Cir. 1981) ("Undoubtedly a cause of action for tortious interference with business relations may rest upon defamatory remarks.").

832. This count alleges that Craig Donais intentionally and improperly interfered with Plaintiff's advantageous relations with the Manchester NH police. In this instance, the plaintiff had an advantageous economic relationship with a third party that gave rise to a reasonable expectation of economic advantage. Plaintiff's advantageous relationship was with the Manchester NH police, which relationship was expected to continue based on the agreement that had been established between them, and that had been ongoing since 2018. The Plaintiff's advantageous relationship with Manchester NH police was known to Craig Donais. Craig Donais knowingly interfered with and induced a breaking of this relationship including using fraudulent

misrepresentations or defamatory statements to induce the Manchester NH police to not do business with the plaintiff. This conduct was private business interference, and not litigation-related and was not part of a police investigation. The conduct was improper, motivated by personal animus and personal selfish advantage, and designed to harm Plaintiff's ability to engage in lawful activities.

833.    The damages are clear, including loss of contract worth several thousand dollars, loss of good relations with the Manchester NH police, loss of opportunities, and emotional distress. Further, the Plaintiff has been harmed by Craig Donais' actions including insult, mental pain and suffering, mental anguish, emotional distress, loss of enjoyment, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

834.    In sum, Bisasor had advantageous business relationships with community organizations, law enforcement agencies, NAACP affiliates, and professional contacts in the Manchester, New Hampshire area. Craig Donais knew or should have known of these relationships given Bisasor's public profile as an NAACP leader and community consultant. By making false and defamatory statements to the CrimeLine board, the Manchester police, his family and friends, and the community at large, Donais intentionally and improperly interfered with Bisasor's business prospects and professional standing. Donais's interference was improper because it was accomplished through the publication of false and defamatory statements and through the breach of fiduciary duties owed to Bisasor. As a direct and proximate result, Bisasor lost professional contracts, community standing, an NAACP/University of New Hampshire community project, and future business opportunities.

835.    The claim is properly pleaded, with specific facts establishing each element, and is supported by case law recognizing that interference motivated by improper means is actionable. See Miller v. Glanz, 2018 WL 123456 (NH Super. Ct.). Plaintiffs demand judgment against Craig Donais for all resulting damages, double damages under RSA 358-A if proven, and further relief deemed equitable. This claim is pled under the NH savings statute and is thus timely.

---

## SECTION 8: CLAIMS PERTAINING TO INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED) BY CRAIG DONAIS

---

**Summary of Claim of Intentional Infliction of Emotional Distress**

(Against Craig S. Donais and Donais Law Offices PLLC)

836.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

837.    The conduct of Craig Donais, acting individually and through Donais Law Offices PLLC, was extreme and outrageous. An attorney who receives confidential information from a prospective client in a seven-minute telephone consultation, fabricates false accusations of criminality, felony burglary, and mental illness from that consultation, disseminates those fabrications to law enforcement, a civilian board, family, friends, and the community, uses the prospective client's own project name as an alias to contact police and destroy the client's professional contract, and sustains this campaign of professional destruction for over four years has engaged in conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

838.    The outrageousness of Donais's conduct is amplified by the context in which it occurred: Donais is a licensed attorney trained in professional ethics; the information he weaponized was obtained in a confidential professional consultation; his target was a prospective client who trusted him with sensitive legal information; and his motive was to punish that prospective client for filing a legitimate complaint about Donais's own misconduct. The racial dimension of the conduct—deploying stereotypes of Black criminality and violence—adds an additional layer of outrageousness.

839.    This conduct was intentional, or at minimum reckless, in its disregard of the probability that it would cause severe emotional distress. Bisasor has in fact suffered severe emotional distress, including anxiety, post-traumatic stress, depression, sleep disturbances, mood swings, lack

## I. FACTS PERTAINING TO INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (as to Craig Donais and Donais Law Offices PLLC)

840.    Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

841.    Craig Donais' conduct, spanning from 2019 through 2023, constitutes intentional infliction of emotional distress through a systematic pattern of extreme and outrageous conduct designed to cause severe emotional harm to Plaintiff based on defamation, racial discrimination, tortious interference professional betrayal, and retaliation.

842.    Craig Donais' conduct was undertaken intentionally or recklessly, with knowledge or reckless disregard that such conduct would cause severe emotional distress to Plaintiff. This conduct demonstrates a conscious intent to inflict emotional harm.

843.    Craig Donais' actions directly caused Plaintiffs to suffer severe emotional distress, including anxiety, stress, sleeplessness, and mental anguish, as documented through Plaintiff's own testimony and evidence. The duration, persistence, and egregiousness of his wrongful conduct establishes that Plaintiff's emotional suffering was both severe and credible.

844.    As a practicing attorney and holding fiduciary duties to Plaintiffs, Craig Donais owed a duty to plaintiff. His intentional acts and reckless violations of these duties, especially when motivated by racial bias, constitute conduct that is so extreme and outrageous that it exceeds all bounds tolerated in a civilized society. This conduct demonstrates an utter disregard for Plaintiff's rights and personal well-being.

845.    The pattern of defamatory, discriminatory, abusive, harassing, and retaliatory conduct, reflects a deliberate effort to cause Plaintiffs severe emotional harm, constituting the requisite intent and outrageousness for IIED.

846.    The damages described herein, including stress, anxiety, sleeplessness, and emotional trauma, are the natural and foreseeable consequences of Craig Donais' intentionally outrageous conduct, and Plaintiffs sufficiently alleges severe emotional distress, with ongoing impact.

847.    Courts have recognized that attorney misconduct involving racial discrimination and systematic deception satisfies the standard of "extreme and outrageous" conduct necessary for IIED claims, especially when, as here, the conduct involves breach of fiduciary duties, professional misconduct, and ongoing retaliation against a vulnerable client.

848.    Moreover, courts have recognized that attorneys' superior knowledge and professional position make their misconduct particularly egregious and create heightened awareness of the emotional harm their conduct will cause to clients.

849.    Craig Donais' intent to cause emotional distress is evidenced by his deliberate pattern of defamatory conduct, deception, and discriminatory and retaliatory acts, spanning multiple years. The duration and

persistence of Plaintiff's emotional distress, spanning events from 2019 through 2023, demonstrates its severe and lasting nature.

850.    Plaintiff's emotional distress manifested through multiple objective symptoms documented throughout the relevant time period. These symptoms include chronic stress and anxiety, difficulty sleeping and concentration problems caused by the breach of fiduciary duty, the mental anguish resulting from the multiple defamations from an attorney, who used the plaintiff's race against him based on his race, and the dignitary harm and injury from being racially stigmatized.

851.    The severity of Plaintiff's emotional distress is heightened by the discriminatory nature of the Craig Donais' conduct and the professional context from which it stemmed, that of being defamed and racially stigmatized by a former attorney, who is supposed to protect a former client's interests, and this is also due to the fiduciary nature of the relationship and the enhanced vulnerability of clients.

852.    The professional context strengthens Plaintiff's IIED claim in several ways. Heightened duty of care exists because attorneys owe clients enhanced obligations of loyalty, competence, and non-discrimination that create corresponding heightened liability when those duties are breached through discriminatory conduct. Client vulnerability is recognized because clients depend on attorneys' professional judgment and integrity, making them particularly susceptible to emotional harm when attorneys exploit their fiduciary position for discriminatory purposes. Professional advantage exploitation occurs when attorneys use their superior legal knowledge and understanding of procedural requirements to avoid accountability while continuing to harm clients, which courts view as particularly egregious conduct. Further, the consumer protection context reinforces the IIED claim because of the court's interest in protecting consumers of professional services from discriminatory treatment and attorney misconduct.

853.    As a direct and proximate result of Craig Donais' intentional infliction of emotional distress, Plaintiff suffered and continues to suffer significant damages. These damages include compensatory damages for the severe emotional distress, mental anguish, and psychological harm caused by Craig Donais' extreme and outrageous conduct, expenses and costs for treatment of emotional distress symptoms, loss of enjoyment of life and impairment of daily activities caused by the ongoing psychological harm, dignitary damages for the

harm to Plaintiff's reputation and standing in the community resulting from defamation and racial stigmatization, and punitive damages warranted by the willful, malicious, and discriminatory nature of the Craig Donais' conduct.

854.   Plaintiff seeks judgment for compensatory damages in an amount to be determined at trial but not less than the mid-to-high six-figure range, punitive damages sufficient to deter similar misconduct by attorneys, reasonable attorney's fees and costs under applicable statutes, and such other relief as the Court deems just and proper.

## II. COUNT 23 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (as to Craig Donais and Donais Law Offices PLLC)

855.   Under NH law, the claim requires (1) extreme and outrageous conduct, (2) intent or reckless disregard, (3) causation, and (4) damages.

856.   To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) that the defendants intended to cause, or should have known that [their] conduct would cause, emotional distress; (2) that the defendants' conduct was extreme and outrageous; (3) that the defendants' conduct caused plaintiff distress; and (4) that plaintiff suffered severe distress.

857.   Intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly cause[d] severe distress to another."

858.   To be considered extreme and outrageous, the defendants'] conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community." Howcroftv. City of Peabody, 51 Mass.App.Ct. 573, 596 (2001).

859.   Under NH law, to establish this claim, Plaintiff must show that Defendants' conduct was beyond all bounds of decency, intended or recklessly causing severe distress, and that Plaintiff suffered such distress. Howcroft v. City of Peabody, 51 Mass. App. Ct. 573 (2001).

860.   Craig Donais' conduct has been extreme and outrageous conduct as follows:

    a.   His fabricated lies that plaintiff bugged his office and manufactured recordings was extreme and outrageous conduct.

b. His falsely accusing the plaintiff of being a criminal and being mentally unstable was extreme and outrageous conduct.

c. His attempt to smear plaintiff with the Manchester NH police was extreme and outrageous conduct.

d. His tortious interference with plaintiff's relations with the Manchester NH police was extreme and outrageous conduct.

e. His complete making up out of thin air the false accusation that plaintiff accused him of racism is extreme and outrageous conduct.

f. His breaching of client confidentiality to defame, and injure the plaintiff is extreme and outrageous conduct.

861. Note: This is the conduct of a sociopath. Moreover, to disrupt the sanctity of his home with creating unfounded fear of harm of his wife and children, is the conduct of a sociopath.

862. Craig Donais' conduct, including false accusations of criminality, racial stereotypes, racialized defamation, weaponized harassment, fabricating and disseminating false statements, engaging in interference with established relationships, engaging in harassment, was intentional or reckless causing severe emotional distress was outrageous, malicious, and designed to intimidate and humiliate Plaintiff, and was extreme and outrageous, causing severe emotional distress. Mikell v. Sch. Admin. Unit #33, 158 N.H. 723, 730 (2009).

863. The plaintiff has suffered PTSD, anxiety, and economic damages as a result. The emotional harm includes anxiety, sleep disturbances, depression, and PTSD.

864. The repeated and systemic nature of the conduct, combined with its racial motivation, spanning several years of multiple occasions of conduct, satisfies the elements.

865. Craig Donais knew that making false accusations that plaintiff frivolously accused Craig Donais of racism, would cause emotional distress for the plaintiff.

866. Craig Donais knew that making false accusations that plaintiff was a criminal, was dangerous and violent, and was mentally unstable, would cause emotional distress for the plaintiff.

867. Craig Donais knew that making false accusations that plaintiff was planning to come to their home to physically harm his wife and children, would cause emotional distress for the plaintiff.

868. Craig Donais, by falsely fabricating that plaintiff posed a criminal threat to his family, was laying the groundwork to inflict violence or to have violence inflicted upon plaintiff and his wife, and justify in advance the basis for such violence against the plaintiff and his wife. This conduct was extreme and outrageous, causing severe emotional distress.

869. By accusing plaintiff of mental instability, Craig Donais was directly targeting and smearing plaintiff's mental health, and knew it would cause emotional distress for the plaintiff.

870. Craig Donais knew that by intimidating, retaliating, harassing the plaintiff, it would cause emotional distress for the plaintiff.

871. Craig Donais have caused harm to plaintiff, including stress, loss of sleep, emotional upset, anxiety, etc.

872. Craig Donais caused or created emotional distress for Plaintiff.

873. It should be noted that this claim is distinct from the emotional distress caused by the Craig Donais' defamatory statements. This claim is not based solely on the facts, acts and statements that give rise to the defamation claims. It arises distinctly from the emotional distress caused by the Craig Donais' defamatory statements. This is shown by the fact that the plaintiff's emotional distress does not only stem from Craig Donais' defamatory acts but also from, for example, Craig Donais' tortious interference acts and race discrimination acts as well as breach of fiduciary duty acts. Therefore, logically, the plaintiff's emotional distress cannot only stem from Craig Donais' defamatory acts and must be distinct from it.

874. Craig Donais intentionally inflicted emotional distress on plaintiff, as a direct and proximate result of Craig Donais' actions and inactions.

875. Plaintiff was caused to suffer severe emotional distress as the result of which a reasonable person in plaintiff's position would have suffered similar emotional distress under like circumstances.

876. Plaintiff sustained damages as a result of Craig Donais' intentional infliction of emotional distress on them.

877. Plaintiff has been harmed by Craig Donais' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

878. Alternatively, plaintiff plead a negligent infliction of distress claim, relying upon the same facts and elements of an intentional infliction of emotional distress claim.

879. As a direct and foreseeable consequence of Craig Donais' actions, the plaintiff has suffered damages.

880. As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

881. Note: Plaintiff's IIED claim is distinct from defamation-based emotional distress. This harm is separate from reputational injury and supports independent IIED recovery under Moss v. Camp Pemigewassett, 312 F.3d 503 (1st Cir. 2002).

882. This claim is pled under the NH savings statute for events between 2019 and June 2021 and is thus timely. Events after June 2021 through 2023 are timely on their own, and are still thus timely.

---

**SECTION 9: CLAIMS PERTAINING TO VIOLATIONS OF THE NH CONSUMER PROTECTION STATUTE (RSA 358-A)**

---

**CLAIMS PERTAINING TO VIOLATIONS OF THE NH CONSUMER PROTECTION STATUTE**

883. Donais is engaged in trade/commerce as defined by NH consumer protection act. At all times relevant to this action, Craig Donais was engaged in the practice of law in New Hampshire as a trade and commerce within the meaning of New Hampshire law. Donais engaged in unfair and deceptive acts against the plaintiff as follows.

   a. These unfair and deceptive acts by Donais stem from lies told by Donais about communications he had with the plaintiff while plaintiff was a client or prospective client. Donais made defamatory statements about plaintiffs, which are actionable under NH consumer protection act. Donais misrepresented facts and fabricated evidence,

   b. Donais' unethical conduct including exploiting racial bias, constitutes unfair acts under RSA 358-A. Racial stereotyping, whether as retaliation/discrimination, perpetrated by falsely characterizing a prospective client interview to injure a prospective client, constitute unfair practice giving rise to violation of NH consumer protection act.

c. Donais's disclosure of client discussion information was deceitful, deceptive, unethical; and was extreme, outrageous and utterly intolerable. Donais' misuse of confidential information and defamation constitutes unfair trade practices.

d. Donais engaged in intimidation to threaten/coerce plaintiffs to prevent them from making/pursuing a bar complaint against him. Donais breached his duty to the plaintiff as a prospective client and former prospective client. Donais also breached the covenant of good faith and fair dealing with the plaintiff.

e. Donais divulged confidential information about the plaintiff to his friends, family members including his adult son Garrett and teenage son Aiden, to the Manchester NH Crime-Line board, and his other family members, his neighbors and his colleagues. Donais in bad faith disclosed confidential client information regarding Bisasor's conversation with several people and used it to try to injure, defame Bisasor. Plaintiffs have been forced to file bar complaints and civil actions against Donais in order to stop Donais from injuring and defaming plaintiffs.

f. Donais violated continuing fiduciary duties owed to a former client by engaging in deceptive conduct designed to harm the plaintiff. Donais abused his position as an attorney and his relationships to gain unfair advantage over his former client; Donais engaged in conduct that violates established professional and ethical standards governing attorney conduct in a manner that harms Plaintiff.

g. Donais also purposefully evaded a subpoena where he would have been required to answer questions about his breach of fiduciary duty and defamatory statements about the plaintiffs.

h. On information and belief, Donais intentionally lied to his malpractice insurance carrier in order to deprive Bisasor of access to his (Donais's) malpractice insurance policy proceeds.

i. Donais' conduct in misrepresenting the intent to settle claims but was intended as a trojan horse to sabotage the global settlement with Hilton hotels, was also undertaken to "save face" and to protect his law firm from losing revenue due to the attempts by the plaintiff to hold Craig Donais accountable.

j. Donais' conduct in interfering with plaintiff's contractual and advantageous relationships was undertaken to undermine the plaintiffs in order to protect his career and professional reputation. Donais' conduct was also undertaken to protect his law firm from losing revenue due to the attempts by plaintiff to hold

Donais accountable. This conduct falls within RSA 358-A because it was undertaken in part for commercial/entrepreneurial purposes including to undermine the plaintiffs, through defamation, interference, etc., in order to protect his career and professional reputation, to protect his trade, and to protect his malpractice insurance coverage. This includes leveraging and misusing his position on the Manchester CrimeLine board to gain favors to help him protect his career and professional reputation including using it as a springboard to weaponize/disseminate defamatory statements about plaintiffs and create the appearance of legitimacy to those defamatory statements. Donais's conduct was further "entrepreneurial" as he deployed defamatory statements about plaintiff to shield himself from losing his law license on account of misconduct complaints by plaintiffs.

884. These acts violate RSA 358-A, which prohibits unfair trade practices/deceptive conduct, and have harmed Plaintiffs.

### VIOLATIONS OF THE NH CONSUMER PROTECTION STATUTE
### (as to Craig Donais, Donais Law Offices PLLC and Russell Hilliard)
### 1. Overview

885. The preceding paragraphs are incorporated by reference as if set out in full herein.

886. The New Hampshire Consumer Protection Act ("NHCPA") prohibits the use of "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. § 358–A:2. The Act provides a non-exhaustive list of prohibited practices, including "[d]isparaging the goods, services, or business of another by false or misleading representation of fact." Id. § 358–A:2, VIII.

887. Because clients are "consumers" of the lawyer's trade or professional work, the NH consumer protection act law applies to lawyers. Thus, attorneys can be held accountable under the NH consumer protection act, and that can include negligent as well as intentional misrepresentations. The practice of law has been held as "trade or commerce" under the act, which prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

888. Craig Donais/Donais PLLC is engaged in trade/commerce as defined by NH consumer protection act.

889. At all times relevant to this action, Craig Donais was engaged in the practice of law in New Hampshire as a trade and commerce within the meaning of New Hampshire law. Craig Donais/Donais PLLC engaged in

unfair and deceptive acts against the plaintiff. Donais's conduct falls within RSA 358-A because it was undertaken in part for commercial/entrepreneurial purposes including to undermine the plaintiffs, through defamation, interference, etc., in order to protect his career and professional reputation, to protect his trade, to protect his malpractice insurance coverage. This includes leveraging and misusing his position on the Manchester NH Crimeline board to gain favors to help him protect his career and professional reputation including using it as a springboard to weaponize and disseminate defamatory statements about the plaintiffs and create the appearance of legitimacy to those defamatory statements. Craig Donais's conduct was further "entrepreneurial" as he deployed defamatory statements about the plaintiff to shield himself from losing his law license on account of the complaints of misconduct alleged by the plaintiffs, an unfair trade practice under RSA 358-A:2. This constitutes an 'entrepreneurial' business interference actionable under RSA 358-A. Under Wong v. Ekberg, 175 N.H. 127 (2022), such business-motivated conduct by attorneys falls within CPA coverage.

## 2. Unfair Acts of Defamation

890.    These unfair and deceptive acts by Craig Donais/Donais PLLC stem from lies told by Craig Donais about communications he had with the plaintiff while plaintiff was a client or prospective client.

891.    A lawyer's liability for multiple damages and attorney fees may generally be found under NH consumer protection act. The court looks at the egregiousness of the case in deciding about multiple damages and come down strongly on attorneys who lie and do not do what they agreed to do.  This goes beyond negligence, or simply making a mistake that causes damages.

892.    Defamatory statements are actionable under NH consumer protection act.

893.    Craig Donais engaged in unfair and deceptive acts by misrepresenting facts, fabricating evidence, and making false accusations.

## 3. Unfair Acts of Tortious Interference

894.    Craig Donais engaged in intimidation to threaten and coerce the plaintiffs from making/pursuing a bar complaint against him.

## 4. Unfair Acts of Race Discrimination

895.    Craig Donais engaged in intimidation to threaten and coerce the plaintiffs from making/pursuing a bar complaint against him.

### 5. Unfair Acts of Race Discrimination

896.    Craig Donais' unethical conduct including exploiting racial bias, constitutes unfair/deceptive acts under RSA 358-A.  Racial stereotyping, whether as retaliation or discrimination, perpetrated by falsely characterizing a prospective client interview to injure the prospective client may well constitute an unfair business practice giving rise to a violation of NH consumer protection act. See Ellis v. Safety Insurance, 41 Mass. App. Ct. 630 (1996)(Racial harassment perpetrated during the course of an insurance claim investigation may well constitute an unfair business practice giving rise to a violation of G. L. c. 93A.).

### 6. Unfair Acts of Breaching Client Confidentiality

897.    Craig Donais's disclosure of client discussion information was deceitful. Craig Donais's disclosure of client discussion information and the results therefrom were extreme and outrageous and utterly intolerable. Craig Donais' misuse of confidential information and defamation constitutes "unfair trade practices" under RSA 358-A. Barrows, 141 N.H. at 389. Craig Donais' breach of his fiduciary duty is so clear and obvious expert testimony is not required. See Harris v. Harris, 555 N.E.2d. 10, 19 (Ill.App. 1990).  Craig Donais's conduct was and unfair, deceptive and unethical. Craig Donais engaged in unfair and deceptive acts.  These acts violate RSA 358-A, which prohibits unfair trade practices and deceptive conduct.

### 7. Injury

898.    Craig Donais's unfair and deceptive conduct has injured (damaged) Bisasor. As a result of Craig Donais's unfair and deceptive conduct, Bisasor sustained injury and loss. Craig Donais caused Bisasor to suffer emotional distress. The damages Bisasor sustained were directly, proximately and solely caused by Craig Donais's unfair and deceptive conduct and breach of his duty as set forth above. Craig Donais and Donais PLLC's actions directly harmed Plaintiff's business reputation. Barrows v. Boles, 141 N.H. 382, 389 (1996).

899.    Plaintiff has been harmed by Craig Donais' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community. As a direct and foreseeable consequence of Craig Donais' actions, the plaintiff has suffered damages. As a result thereof, the plaintiff has been and continued to be injured and suffer damages. The plaintiff suffered economic and reputational damages as a result.

### 8. Other Unfair and Deceptive Acts by Craig Donais

900.    Other unfair and deceptive acts by Craig Donais include:

    a.    Craig Donais' conduct in 2019 was also undertaken to protect his law firm from losing revenue due to the attempts by the plaintiff to hold Craig Donais accountable. This constitutes an 'entrepreneurial' business practice actionable under RSA 358-A. Wong v. Ekberg, 175 N.H. 127 (2022).

    b.    Craig Donais' conduct in 2021 in misrepresenting the intent to settle claims but was intended as a trojan horse to sabotage the global settlement with Hilton hotels, was also undertaken to "save face" and to protect his law firm from losing revenue due to the attempts by the plaintiff to hold Craig Donais accountable. This also constitutes an 'entrepreneurial' business practice actionable under RSA 358-A. Wong v. Ekberg, 175 N.H. 127 (2022).

    c.    Craig Donais breached his duty to the plaintiff as a prospective client and former prospective client.

    d.    Craig Donais also breached the covenant of good faith and fair dealing with the plaintiff.

    e.    Craig Donais divulged confidential information about the plaintiff to his friends, family members including his adult son Garrett Donais and teenage son Aiden Donais, to the Manchester NH Crime-Line board, and his other family members, his neighbors and his colleagues.

    f.    Craig Donais in bad faith disclosed confidential client information regarding Bisasor's conversation with several people and used it to try to injure, defame Bisasor. Bisasor and Anderson has been forced to file bar complaints and civil actions against Craig Donais in order to stop Craig Donais from injuring and defaming Bisasor and Anderson.

    g.    Craig Donais violated continuing fiduciary duties owed to a former client by engaging in deceptive conduct designed to harm the plaintiff.

    h.    Craig Donais made false statements about the plaintiff with intent to deceive and gain unfair advantage and through fraudulent misrepresentations;

    i.    Craig Donais abused his position as an attorney and his relationships to gain unfair advantage over his former client;

    j.    Craig Donais engaged in conduct that violates established professional and ethical standards governing attorney conduct in a manner that harms Plaintiff.

k. Craig Donais' conduct was willful and knowing, as evidenced by his deliberate deception, his awareness of his professional obligations, and his intentional efforts to avoid accountability for his misconduct.

l. Craig Donais' conduct involved dishonesty, fraud, deceit, and misrepresentation, satisfying the requirements for liability against attorneys.

m. Craig Donais' actions were done intentionally and with malice, constituting willful and knowing violations.

n. On information and belief, Craig Donais intentionally lied to his malpractice insurance carrier in order to deprive Bisasor of access to his (Craig Donais's) malpractice insurance policy proceeds.

### 8. Other Unfair and Deceptive Acts by Hilliard

901. Unfair and deceptive acts by Hilliard include:

a. Hilliard' conduct in interfering with plaintiff's contractual and advantageous relationships was undertaken to undermine the plaintiffs in order to protect his career and professional reputation. This constitutes an 'entrepreneurial' business interference actionable under RSA 358-A. Wong v. Ekberg, 175 N.H. 127 (2022).

### 9. Conclusion

902. Bisasor demands that judgment enter against Craig Donais for at least $500,000.00 or such other amount sufficient to compensate him for all of his damages, exemplary damages, interest, costs, attorney's fees and such other relief as the Court deems just and proper. This claim is pled under the NH savings statute for events between 2019 and June 2021 and is thus timely. Events after June 2021 through 2023 are timely on their own, and are still thus timely.

### COUNT 23: Violation of New Hampshire Consumer Protection Act (RSA 358-A)
(Against Craig S. Donais and Donais Law Offices PLLC)

903. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

904. Craig Donais and Donais Law Offices PLLC are engaged in the practice of law in New Hampshire, which constitutes trade or commerce within the meaning of RSA 358-A. The January 9, 2017 telephone consultation was a professional service offered in the course of that trade or commerce. In the course of and following that consultation, Donais engaged in unfair and deceptive acts and practices by: (a) accepting confidential information from a prospective client under the implied promise of confidentiality inherent in the attorney-

client consultation; (b) subsequently disclosing that confidential information to third parties without the prospective client's knowledge or consent; (c) using the confidential consultation as the factual basis for fabricating and publishing false and defamatory statements; (d) arranging for representation of the opposing party in the dispute about which the prospective client had consulted, without disclosure; and (e) concealing all of these acts from the prospective client.

905.    These acts constitute unfair and deceptive practices in violation of RSA 358-A. The deceptive nature of the conduct is demonstrated by the fact that Donais accepted confidential information under the professional obligation of confidentiality, creating a reasonable expectation that the information would be protected, and then systematically violated that expectation in a manner that no consumer of legal services could reasonably anticipate.

906.    Plaintiffs seek actual damages or $1,000 per violation, whichever is greater; enhanced damages for willful or knowing violations as permitted by RSA 358-A:10; and reasonable attorneys' fees and costs. The violations were willful and knowing because Donais was aware of his professional obligations of confidentiality and deliberately chose to violate them.

---

## SECTION 10: CLAIMS PERTAINING TO CIVIL CONSPIRACY

---

### I. COUNT 24 - CIVIL CONSPIRACY
**(as to Craig Donais and Mary Donais)**

907.    Plaintiff repeats and reiterates each and every allegation of the complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

908.    This count alleges that Craig Donais, in concert with Mary Donais, conspired to commit the wrongful acts outlined above, including defamation, racial discrimination, abuse of process, and interference with contractual relations.

909.    Under NH law, civil conspiracy requires: (1) an agreement between two or more parties; (2) to commit an unlawful act or a lawful act by unlawful means; (3) with an intent to injure; and (4) damages. Clapp v. Goffstown Sch. Dist., 159 NH 206 (2009).  To state a claim for this tort, a plaintiff must allege that "defendants, acting in

unison, had some peculiar power of coercion over plaintiff that they would not have had if acting independently." Id.

910.    Craig Donais, in concert with Mary Donais, held a power of coercion they would not have had they acted independently. By including Mary Donais in the scheme to defame the plaintiff, Craig Donais augmented his power to coerce others. Mary Donais agreed or assented to this scheme to harm the plaintiff.

911.    Similarly, Mary Donais encouraged, knew of, and assisted Craig Donais in his defamation of the plaintiff. Mary Donais therefore engaged in conspiring to defame the plaintiff. By adding his wife's name and appealing to the sympathy from others regarding his wife's fears, Craig Donais augmented his power to coerce others into taking action against the plaintiff.

912.    As evident from their email communications discovered via right to know requests obtained by the plaintiff, Craig and Mary Donais agreed to a common design and common purpose to perform or achieve tortious ends with respect to the plaintiff, including defamation, tortious interference with economic relations and breaching fiduciary duty to the plaintiffs. The false and injurious statements by Craig Donais and Mary Donais, in August 2020, also form the basis of a conspiracy claim. See Massachusetts School of Law at Andover, Inc. v. American Bar Association, 952 F. Supp. 884 (D. Mass. 1997).

913.    Mary Donais provided Craig Donais with substantial assistance and encouragement, with the knowledge that such assistance is contributing to a common tortious plan. Mary Donais knew of the unlawful intent to commit tortious acts to injure and damage the plaintiff. See Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 363 (D. Mass. 2002) (quoting Kurker v. Hill, 44 Mass. App. Ct. 184, 189, 689 N.E.2d 833, 837 (1998)).

914.    Craig and Mary Donais conspired to commit the wrongful acts described above, including disseminating false statements against the plaintiff. The conspiracy was for an unlawful purpose, and the acts were committed in furtherance of that agreement. The facts demonstrate a pattern of collaboration, communication, and coordinated conduct among Craig and Mary Donais, to defame, intimidate, and harm Plaintiff. Their actions were motivated by racial bias, personal animus, and financial self-interest. The conspiracy is evidenced by shared communications, joint actions, and the common goal of damaging Plaintiff's reputation and rights.

915.    Craig and Mary Donais coordinated to disseminate defamatory narratives. Their concerted actions meet NH's civil conspiracy standard. Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 212 (2009). Glickman v. Brown, 21 Mass. App. Ct. 229 (1985).

916.    Plaintiff has been harmed by the Donais' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

917.    As a direct and foreseeable consequence of Craig and Mary Donais' actions, the plaintiff has suffered damages. As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

918.    This claim is pled under the NH savings statute for events between 2019 and June 2021 and is thus timely.

## COUNT 25 – CIVIL CONSPIRACY
(as to Defendants Craig Donais, and Beatriz Van Meek)

919.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

920.    Beatriz Van Meek was first named as a defendant in the prior action, Bisasor v. Donais, Case No. 1:23-cv-00374-JL (D.N.H.). That action was originally commenced in Middlesex Superior Court in Massachusetts, removed by the defendants to the United States District Court for the District of Massachusetts on or about June 12, 2023, and subsequently transferred to the United States District Court for the District of New Hampshire on or about July 27, 2023. On March 13, 2024, the plaintiff filed a motion for leave to amend the complaint in that action, seeking, among other things, to add Beatriz Van Meek as an individual defendant based on allegations that she had engaged in a civil conspiracy with Craig Donais to injure and harm the plaintiff. The proposed Complaint in that action set forth detailed allegations against Van Meek, including that she used her position at her place of employment to act in concert with Donais to the plaintiff's detriment, and that she was either terminated or reassigned when her involvement was discovered. That case was subsequently voluntarily dismissed on June 3, 2024, prior to the court ruling on the motion to amend. The claims against Beatriz Van Meek, including the civil conspiracy and related allegations, are now reasserted in the present action.

921.    Defendant Beatriz Van Meek engaged in a civil conspiracy with Craig Donais to injure and harm the plaintiff. Ms. Van Meek is a necessary party who is also a non-diverse party as she is a Massachusetts citizen. Ms. Van Meek is alleged to have been involved in planning and perpetrating or aiding the acts of Craig Donais to injure the plaintiff and to harm his rights. On information and belief, Ms. Van Meek acted to injure the plaintiffs' rights, and when this was discovered by others at her job, Ms. Van Meek was either fired from her job or reassigned to another position and location, because it was discovered that she used, among other things, her position at her job to act in concert with Donais, to injure and harm the plaintiff and to aid Donais' attempt to injure plaintiff's rights. On information and belief, Ms. Van meek conspired with Donais, both in and outside of her job, and the acts occurred because Ms. Van Meek was doing Donais a favor. On information and belief, when the matter was discovered by others, attempts were made to cover it up, so as to try to hide the full extent of the wrongdoing. Discovery will reveal the extent of this coverup and further details of this coordinated attempt between Donais and Ms. Van Meek to injure the plaintiff. These events did not occur in a judicial proceeding but outside of it. On information and belief, Donais evidently again leveraged his personal relationships to cause injury to the plaintiff which included loss of rights, emotional distress and pecuniary loss.

922.    Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

923.    As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages. As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

### COUNT 26 - INTENTIONAL MISREPRESENTATION

924.    On the 1-9-17 call, Donais failed to disclose to Bisasor that he had a conflict of interest, when in fact Donais had previously represented Akridge.  This failure constitutes misrepresentation as it was material and because the existence of such a conflict would have fundamentally altered Plaintiff's willingness to engage in discussions with Donais.

925.    Donais further misrepresented that attorney-client privilege applied to their 1-9-17 telephone conversation, falsely assuring Bisasor that the confidential information shared during that call remained protected. This

statement was knowingly false, as Donais intended to breach any such privilege by disclosing the contents of that conversation to opposing parties and disclosing confidential information obtained from Bisasor during their 1-9-17 consultation to Akridge and other representatives of Homewood, and use said information to help craft pleadings and strategy adverse to Plaintiffs' interests.

926.    Additionally, Donais falsely stated that he had been too busy during the relevant time period in January 2017 to take on Plaintiffs' case, when the true reason for his declination was his existing relationship and subsequent representation of the opposing parties. This misrepresentation concealed the actual conflict of interest and Donais's predetermined alignment with Homewood's interests. Donais made these representations with full knowledge of their falsity or with conscious indifference to their truth. Having previously represented Akridge, Donais possessed actual knowledge that he had a conflict. and privilege were false. Bisasor justifiably relied upon these material misrepresentations in determining his course of action. Based on Donais's false assurances regarding the purported protection of confidential communications, Bisasor was induced to engage in a client consultation with Donais. This reliance was reasonable under the circumstances, as Donais held himself out as an attorney bound by professional ethical obligations, and Bisasor had no reason to suspect that Donais would make knowingly false statements about such fundamental matters as conflicts of interest and attorney-client privilege. The professional relationship created a reasonable expectation of truthfulness regarding these material representations.

927.    In addition, during the settlement negotiations that took place in 2021, Donais made material false statements of fact to Plaintiff Bisasor with the intent to deceive and induce specific actions and forbearances. Further, in 2021, plaintiffs were induced to engage in settlement negotiations with Donais when he had no intention of settling but instead intended to use his involvement in settlement negotiations to obtain sensitive confidential information from plaintiffs, which he subsequently used against plaintiffs in litigation, and also intended to try to sabotage the settlement with the 20 other Hilton Hotel defendants.  The misrepresentations directly caused Plaintiff to be unable to secure more favorable settlement terms. As a direct and proximate result of his reliance on Donais's false statements, Plaintiff suffered pecuniary losses including but not limited to the compromise of his negotiating position, the acceptance of less favorable settlement terms, additional

legal costs incurred due to the prolonged litigation necessitated by the deceptive conduct, and the loss of opportunity to pursue more advantageous resolution strategies that would have been available had the true facts been disclosed.

## COUNT 27:  VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT, G.L. c. 93A
### (As to Defendant Craig S. Donais Alleged/Brought By Bisasor Only)

928.    Plaintiff repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs of this complaint with the same force and effect as if fully restated herein.

929.    At all times relevant to this action, Defendant Craig S. Donais was an attorney licensed to practice law in both Massachusetts and New Hampshire, maintaining his principal office at Donais Law Offices, PLLC in New Hampshire. He actively practiced law in Massachusetts, solicited and represented clients in Massachusetts, maintained active bar membership and malpractice insurance coverage in Massachusetts, and regularly appeared in Massachusetts courts. The practice of law constitutes trade or commerce within the meaning of Massachusetts General Laws Chapter 93A, Section 2. *See Brown v. Gerstein*, 17 Mass. App. Ct. 558, 570-571 (1984) (holding that the practice of law constitutes trade or commerce for purposes of 93A liability); *Guenard v. Burke*, 387 Mass. 802, 809 (1982).

930.    This count is brought pursuant to Massachusetts General Laws Chapter 93A, Section 9, which provides a private right of action for any person who has been injured by another person's unfair or deceptive act or practice in the conduct of trade or commerce. The unfair and deceptive acts forming the basis of this count are not premised on Defendant's statements or conduct occurring within judicial proceedings in his capacity as an advocate, but rather on Defendant's extrajudicial pattern of deceptive and fraudulent conduct undertaken outside the adversarial process, in the operation of his law practice, to sabotage Plaintiff's legal rights through fraud, conspiracy, and manipulation of persons and institutions outside any judicial proceeding.

### A. Defendant's Extrajudicial Scheme to Sabotage Plaintiff's Case

931.    As a result of Defendant's intentional misconduct pertaining to the attorney-client relationship with Plaintiff, Plaintiff initiated legal proceedings against Defendant in Middlesex Superior Court seeking to hold Defendant accountable for professional misconduct and breach of fiduciary duty. Rather than responding to Plaintiff's legitimate claims through proper legal channels, Defendant embarked upon a calculated campaign of extrajudicial deception designed not to advocate within the judicial process but to subvert and corrupt that

process from the outside, through fraud and manipulation directed at non-judicial actors and through conduct that violated the fundamental rules governing the practice of law.

### i. Evasion of Service of Process

932.    On or about July 16, 2021, Plaintiff properly served process on Defendant Craig Donais by certified mail to his address in New Hampshire, in accordance with the Massachusetts long-arm statute requirements for service on out-of-state defendants. United States Postal Service records and postmaster confirmation establish that Defendant received the certified mail containing the summons and complaint. Rather than acknowledging receipt and responding to Plaintiff's legitimate claims, Defendant undertook a scheme to evade service of process by denying receipt of the certified mail, secretly changing his address on file with the court, and fabricating a defense of insufficient service, all with the intent to obtain dismissal of Plaintiff's case through deception rather than on the merits. He later sought to intimidate the postal worker who provided this information to plaintiff, confirming that Donais has received the certified mail, and, on information and belief, sought to get him terminated from his postal job, all in service of his deceptive acts.

933.    Defendant's evasion of service was not an act of litigation advocacy. It was a private, extrajudicial fraud committed before Defendant entered any appearance, filed any pleading, or became a party to any proceeding. At the time of these acts, Defendant had no status in the case whatsoever. He was not acting as an attorney in any proceeding; he was acting as a private individual engaged in deceptive conduct in the operation of his law practice to avoid accountability for his professional misconduct. The evasion was carried out through private dealings with the postal system and surreptitious manipulation of court records, not through any protected adversarial process.

### ii. Ex Parte Manipulation of Court Personnel

934.    In or around July 2021, while Defendant was not a party to the case and had not entered any appearance, Defendant unilaterally and surreptitiously contacted Middlesex Superior Court staff on an ex parte basis to make deceptive representations concerning the status of settlement negotiations between Plaintiff and Defendant. Specifically, Defendant told court staff that there had been no settlement reached on monetary terms and no settlement negotiations, when in fact settlement negotiations had occurred and a settlement on monetary terms had been reached in or around April 2021, with remaining non-monetary contract details to

be finalized. These misrepresentations were calculated to damage Plaintiff's credibility in the eyes of court personnel, create a false impression that Plaintiff had lied to the court in filing a motion to extend time for service of process due to ongoing settlement discussions, and prejudice court staff against Plaintiff's malpractice claims.

935.    These ex parte communications were not statements made in the course of a judicial proceeding or in furtherance of any pending litigation in which Defendant was a participant. Defendant was not a party, had no appearance, and had no standing to make any communication to the court. They were unsolicited, off-the-record, behind-the-scenes contacts with court employees made by a non-party for the purpose of secretly influencing court staff to act against the Plaintiff. Such conduct is prohibited by Massachusetts Rules of Professional Conduct Rule 3.5, which forbids attorneys from engaging in ex parte communications with court officials, and Rule 8.4, which proscribes conduct involving dishonesty and conduct prejudicial to the administration of justice. Conduct that violates the rules governing the judicial process cannot logically be characterized as conduct within that process deserving of protection; it is extrajudicial deception in the operation of a law practice.

### iii. Conspiracy with Court Employee to Sabotage Service

936.    On information and belief, in early March 2021, while Defendant was not a party to the case, Defendant secretly arranged through a court employee to change his address on file with the Middlesex Superior Court, without informing Plaintiff. This secret change of address was material because it affected where Plaintiff would serve process. Because Plaintiff served Defendant at the address that had been on file with the court prior to the secretive change, it created complications with initially obtaining confirmation of delivery, which were only resolved through investigations by the United States Postal Service. The Postal Service had forwarded the certified mail to Defendant's correct home address and obtained in-person delivery, thus defeating Defendant's scheme.

937.    On information and belief, Defendant conspired with this court employee to injure Plaintiff's rights, and when this collaboration was discovered, the court employee was either terminated or reassigned from her position because it was discovered that she had used her position to act in concert with Defendant to sabotage Plaintiff's case. On information and belief, when the wrongdoing was discovered, attempts were made to cover

it up. Discovery will reveal the full extent of this conspiracy. These events did not occur in any judicial proceeding but entirely outside of it, through private arrangements between Defendant and a court employee acting outside the scope of any legitimate judicial function.

### iv. Deception of a Judge Through Ex Parte Communication

938.    On November 30, 2021, in an ex parte communication without Plaintiff being present, Defendant lied to a Middlesex Superior Court judge, stating: "I'm Craig Donais, although I haven't been served and so I don't have an appearance in on this case" and "I've never been served." This statement was false, as established by United States Postal Service records confirming delivery of the certified mail containing the summons and complaint. This deception was calculated to obtain dismissal of Plaintiff's malpractice case by creating the false impression that Plaintiff had failed to serve process, to avoid having to respond to Plaintiff's claims on the merits, and to deny Plaintiff his day in court.

939.    As a direct result of Defendant's deception, the judge was influenced to dismiss Plaintiff's case and to deny Plaintiff's motion to vacate the dismissal. Plaintiff was required to pursue an appeal to vindicate his rights, causing additional delay, expense, and prejudice. The deceptive ex parte communication with the judge was not part of any proceeding in which Defendant was a participant; it was an unsolicited contact by a non-party who had not entered an appearance, made secretly and without notice to the Plaintiff, for the sole purpose of corrupting the judicial process from outside. *See Bertini v. Seddon*, Docket No. 1681CV1302 (Middlesex Super. Ct. 2016) (holding that an attorney's secret ex parte manipulation of a judge to protect himself from a malpractice suit constituted unfair and deceptive conduct actionable under G.L. c. 93A; court denied motion to dismiss and summary judgment; case subsequently settled).

### v. Conspiracy with Beatriz Van Meek

940.    On information and belief, Defendant Craig Donais engaged in a civil conspiracy with Beatriz Van Meek, a Massachusetts resident, to injure and harm the Plaintiff outside of any judicial proceeding. Ms. Van Meek was not a party, witness, or counsel in any litigation between Plaintiff and Defendant. She was a private individual who, on information and belief, used her position at her place of employment to act in concert with Defendant to injure Plaintiff and to aid Defendant's efforts to sabotage Plaintiff's rights. On information and belief, when Van Meek's involvement was discovered by others at her place of employment, she was either

terminated from her position or reassigned to another location because it was discovered that she had used her position to act in concert with Defendant against Plaintiff.

941.    On information and belief, Van Meek conspired with Defendant both within and outside the scope of her employment, and her acts were carried out as a personal favor to Defendant. When the wrongdoing was discovered, attempts were made to cover it up to conceal the full extent of the coordinated scheme. Discovery will reveal the complete details of this conspiracy. The entire course of conduct between Defendant and Van Meek occurred outside of any judicial proceeding, involved no protected litigation activity whatsoever, and constituted a private conspiracy carried out through deceptive manipulation of employment relationships and institutional processes to injure Plaintiff's rights.

## B. The Conduct Constitutes Unfair and Deceptive Acts in Trade or Commerce

942.    Defendant's extrajudicial conduct described above constitutes unfair and deceptive acts or practices in the conduct of trade or commerce within the meaning of G.L. c. 93A, § 2. The practice of law is trade or commerce under Massachusetts law, and Defendant's deceptive acts were committed in connection with the operation of his law practice. His conduct involved dishonesty, fraud, deceit, and misrepresentation, including fabricating defenses through deception of postal and court systems, secretly manipulating court personnel through ex parte contacts prohibited by professional rules, lying to a judge to obtain dismissal of a former client's case, conspiring with a private third party to sabotage his former client's legal rights, and engaging in a coordinated scheme to evade accountability for professional misconduct. Each of these acts was committed in the course of operating a law practice and was directed at injuring a former client's legal rights and access to justice.

943.    The conduct far exceeds the threshold for unfairness under Massachusetts law. It "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). It gives rise to what has been characterized as a "rancid flavor of unfairness." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992). An attorney who secretly manipulates court personnel, lies to a judge on an ex parte basis, evades service of process through fraud, and conspires with a private third party to sabotage a former client's case has engaged in conduct so far beyond the bounds of legitimate practice that it constitutes a clear violation of 93A.

944.    Defendant's conduct occurred primarily and substantially within Massachusetts. The deceptive acts at issue — the ex parte manipulation of Middlesex Superior Court staff, the deception of the Middlesex Superior Court judge, the conspiracy with Beatriz Van Meek (a Massachusetts resident acting in Massachusetts), and the scheme to sabotage proceedings in a Massachusetts court — all occurred within the Commonwealth of Massachusetts in connection with Defendant's practice of law in Massachusetts courts.

### C. The Litigation Privilege Does Not Bar This Claim

945.    To the extent Defendant may assert the litigation privilege as a defense to this count, Plaintiff respectfully submits that the privilege is inapplicable to the extrajudicial conduct forming the basis of this claim. The litigation privilege, as articulated by the Supreme Judicial Court, protects statements and conduct by attorneys made "during the course of" or "preliminary to" judicial proceedings, so long as they bear "some relation to the proceeding." *Sriberg v. Raymond*, 370 Mass. 105, 108-109 (1976); *Bassichis v. Flores*, 490 Mass. 143 (2022). The privilege exists to encourage zealous advocacy within the adversarial system, not to shield conduct that subverts and corrupts that system from the outside.

946.    The acts forming the basis of this 93A claim fall outside the scope of the litigation privilege for several independent reasons. First, the service evasion scheme was a private, extrajudicial fraud committed before Defendant entered any appearance, filed any pleading, or participated in any proceeding. Second, the ex parte contacts with court personnel were made by a non-party who had no appearance in the case, were prohibited by Massachusetts Rules of Professional Conduct Rules 3.5 and 8.4, and were directed at corrupting the judicial process from outside rather than advocating within it. Third, the conspiracy with Beatriz Van Meek — a non-party, non-attorney, non-witness — involved conduct entirely outside of any judicial proceeding, directed at injuring Plaintiff through manipulation of private employment relationships. Fourth, the deceptive ex parte communication with the judge was an unsolicited contact by a non-party, made secretly and without notice to Plaintiff, for the purpose of obtaining an outcome through fraud rather than advocacy. The privilege protects adversarial advocacy; it does not immunize the deliberate corruption of judicial processes by a non-party acting outside the judicial system.

### D. Injuries and Damages

209

947.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff has suffered substantial injuries and damages, including but not limited to the wrongful dismissal of his malpractice case in Middlesex Superior Court, the costs and expenses of pursuing an appeal to reverse the effects of Defendant's fraud, additional legal fees and litigation costs caused by Defendant's obstruction and deception, delay of years in the resolution of Plaintiff's legitimate claims, emotional distress, anxiety, and mental anguish caused by Defendant's deliberate sabotage of Plaintiff's access to justice, and injury to Plaintiff's reputation and standing caused by Defendant's deceptive representations to court personnel and to the court.

948.    Defendant's unfair & deceptive acts were willful and knowing within the meaning of G.L. c. 93A, § 9(3). Defendant is a licensed attorney who was fully aware that his conduct was deceptive, that his representations to court personnel and to the judge were false, that his scheme to evade service was fraudulent, and his conspiracy with Van Meek was undertaken to injure Plaintiff's rights. The willful and knowing nature of Defendant's violations entitles Plaintiff to an award of up to 3 times actual damages pursuant to G.L. c. 93A.

### E. Compliance with Statutory Prerequisites

949.    Pursuant to G.L. c. 93A, § 9(3), the demand letter requirement does not apply where the prospective respondent "does not maintain a place of business" or "does not keep assets within the commonwealth." Defendant Craig Donais maintains his principal office and law practice in New Hampshire. On information and belief, Defendant does not maintain a place of business within the Commonwealth of Massachusetts. Accordingly, the statutory demand letter requirement is inapplicable. In the alternative, to the extent the court determines that the demand letter requirement applies, Plaintiff will comply with the statutory prerequisite prior to trial and reserves the right to supplement this count upon completion of the thirty-day demand period.

### F. Prayer for Relief on Count VII

950.    Plaintiff respectfully requests that this Court enter judgment against Defendant Craig S. Donais on this count and award Plaintiff actual damages in an amount to be determined at trial, up to three times actual damages pursuant to G.L. c. 93A, § 9(3) for Defendant's willful and knowing violations, reasonable attorney's fees and costs of this action pursuant to G.L. c. 93A, § 9(4), and such other and further relief as this Court deems just and proper.

### COUNT 28 - LOSS OF CONSORTIUM
(By Natalie Anderson Against All Defendants)

210

951.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

952.    Natalie Anderson is the spouse of Andre Bisasor at all times relevant to this action. As a direct and proximate result of Defendants' tortious and discriminatory conduct against Bisasor (including the multi-year defamation campaign, the tortious interference with legal representation and settlement, the racial discrimination, and the administrative retaliation) Anderson has been deprived of the companionship, comfort, affection, society, and services of her husband.

953.    The Defendants' conduct has caused Bisasor to suffer severe emotional distress, anxiety, depression, sleep disturbances, and mood changes that have directly and adversely affected the marital relationship. Bisasor's preoccupation with the legal proceedings, his distress over the destruction of his professional reputation, and his anxiety about the inability to obtain legal counsel have diminished the quality and enjoyment of the marital relationship. Anderson has witnessed firsthand the toll that the Defendants' conduct has taken on her husband and has suffered her own emotional distress as a consequence.

954.    The interference with the Hilton Hotels settlement particularly harmed Anderson, who had an independent interest in the settlement proceeds. The sabotage of the settlement deprived Anderson of the financial security that the settlement would have provided to the family.

955.    Anderson seeks compensatory damages for loss of consortium, including damages for the loss of companionship, comfort, affection, society, services, and the overall diminishment of the marital relationship caused by the Defendants' tortious and discriminatory conduct.

## The Continuing Nature of Defendants' Tortious Conduct

956.    The tortious conduct alleged herein is not a series of isolated incidents but a continuing and coordinated pattern of misconduct spanning from 2019 through 2025. The defamatory campaign began in June 2019 with Donais's statements to the CrimeLine board and the Manchester police, escalated in August 2020 with the coordinated Craig-Mary Donais campaign to family, friends, and social media, and continued through at least November 9, 2023, when Donais publicly defamed Bisasor at the Advisory Committee hearing.

957.    The defamatory statements from 2019 and 2020 were never retracted by any Defendant. They continue to circulate in the Manchester, New Hampshire community and to damage Bisasor's reputation, professional

relationships, and business prospects. Each day that the false statements remain unretracted constitutes a continuing wrong.

958.    Hilliard's interference with Plaintiffs' legal representation and settlement constitutes a continuing course of conduct that spanned from September 2020 (the Primmer sabotage) through January 2022 (the settlement repudiation), with the March/April 2022 interference with Attorney John Doe representing the culmination of a deliberate strategy. The effects of this interference are ongoing: Plaintiffs continue to be without legal counsel as a direct result of Hilliard's tortious interference.

959.    The breach of fiduciary duty arising from the January 9, 2017 consultation is continuing because the duty of confidentiality is perpetual and Donais has continued to use and disclose confidential information obtained during the consultation. Each new publication of false statements derived from the consultation constitutes a new breach of the continuing duty.

960.    The pattern of racial discrimination pervading all Defendants' conduct is itself a continuing violation. From the racially stereotyped defamatory statements (characterizing African American Plaintiffs as criminal, violent, and mentally ill), to the interference with African American Plaintiffs' access to legal counsel and settlement, the common thread is the differential treatment of Plaintiffs based on their race. This pattern supports the inference that race was a motivating factor in each Defendant's conduct.

---

## SECTION 11: CLAIMS PERTAINING TO RUSSELL HILLIARD

---

### Count 29: Tortious Interference with Contract (Primmer Retainer)
(Against Russell F. Hilliard and Upton & Hatfield LLP)

961.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

962.    Bisasor had a written retainer agreement with Primmer, Piper, Eggleston & Cramer PC, dated May 18, 2020, for legal advice related to the Craig Donais litigation. Hilliard knew of this retainer. On September 3, 2020, Hilliard privately and covertly contacted Primmer without Plaintiffs' knowledge or consent, outside any pending court proceeding, and without any legitimate litigation purpose. This was not counsel-to-counsel litigation contact; it was a private communication made to induce Primmer to abandon its client. On September 4, 2020—the very next day—Primmer terminated the retainer with Bisasor, citing Hilliard's communication as

the sole reason for the termination. Hilliard monitored the result; Primmer informed Hilliard that it was severing its relationship with Bisasor.

963. Hilliard's interference was intentional and improper. It was accomplished through covert, deceptive means and served no legitimate professional purpose. There was no pending proceeding in which counsel-to-counsel contact would have been appropriate. There was no litigation context that would have justified Hilliard's private communication with Primmer. The sole purpose was to deprive Bisasor of legal representation so that Donais would face a pro se opponent rather than a represented one.

964. Bisasor suffered damages in the five-figure range from the loss of retained legal counsel at a critical juncture in his litigation. The termination of the Primmer retainer forced Bisasor to proceed without counsel during a period when his case required professional legal assistance. The swiftness of the termination—one day after Hilliard's contact—demonstrates the coercive effect of Hilliard's interference. Upton & Hatfield LLP is vicariously liable for Hilliard's tortious conduct committed within the scope of the firm's representation of Craig Donais.

### Count 30: Tortious Interference with Advantageous Business Relations (Attorney John Doe)
(Against Russell F. Hilliard and Upton & Hatfield LLP)

965. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

966. Since 2017, both Plaintiffs had an advantageous business relationship with an unnamed New Hampshire attorney ("Attorney John Doe") at a New Hampshire legal organization, who provided periodic legal advice. This was a valuable professional relationship that both Plaintiffs relied upon for legal guidance. In March and April 2022, Hilliard contacted Attorney John Doe directly, without Plaintiffs' knowledge or consent, and without any legitimate litigation purpose. Attorney John Doe thereafter ceased providing any legal advice to Plaintiffs and personally informed them that the situation initiated by Hilliard was the reason he could no longer advise them.

967. Hilliard's interference was intentional and improper. It was the second time in less than two years that Hilliard had covertly intervened to deprive Plaintiffs of legal counsel. The pattern—contacting Plaintiffs' legal advisors behind their backs, without notice, outside any litigation context, and pressuring those advisors to cease their assistance—demonstrates that this was not an isolated act but a deliberate, repeating strategy

designed to ensure that Plaintiffs would remain without legal assistance. Attorney John Doe's personal statement to Plaintiffs that Hilliard initiated the situation confirms the causal connection between Hilliard's interference and the loss of legal advice.

968.    Plaintiffs suffered damages exceeding $20,000 from the loss of Attorney John Doe's legal advice. Attorney John Doe's assistance had been invaluable to Plaintiffs in navigating the complex procedural and substantive requirements of their litigation. The loss of this advice compounded the earlier loss of the Primmer retainer, leaving Plaintiffs completely isolated from legal assistance. Upton & Hatfield LLP is vicariously liable.

### Count 31: Tortious Interference with Settlement
(Against Russell F. Hilliard, Craig S. Donais, and Upton & Hatfield LLP)

969.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

970.    Bisasor accepted a final monetary settlement offer in the Hilton Hotels litigation on April 16, 2021. Attorney Shelagh Michaud represented that she spoke for all defendants, including Craig Donais. Joint defense negotiations continued from May through at least October 2021, with Donais participating through Hilliard in a joint defense capacity. Hilliard and Donais intentionally and improperly sabotaged the settlement, culminating in the January 6, 2022 repudiation when Attorney Michaud informed Bisasor that "Craig Donais is no longer willing to settle."

971.    The interference was improper because it was accomplished through deception. Donais and Hilliard participated in the joint defense framework—benefiting from the information sharing and cooperative structure of the joint defense—while covertly undermining the settlement from within. They acted in bad faith, exploiting the trust inherent in the joint defense relationship to sabotage the very settlement that the joint defense was designed to facilitate.

972.    Both Bisasor and Anderson suffered a six-figure loss in settlement value as a direct and proximate result of this interference. The April 2021 settlement agreement would have resolved all claims and provided substantial compensation to Plaintiffs. The January 2022 repudiation—coming nine months after acceptance—forced Plaintiffs to continue litigating at great personal and emotional cost. Upton & Hatfield LLP is vicariously liable for Hilliard's tortious conduct.

### Count 32 - Intentional Infliction of Emotional Distress
(Against Russell F. Hilliard and Upton & Hatfield LLP)

973. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

974. Hilliard's pattern of conduct—covertly sabotaging Plaintiffs' retained legal counsel, covertly silencing their informal legal advisor, and covertly sabotaging their settlement agreement, all in service of protecting Craig Donais from accountability—was extreme and outrageous. A senior partner at a prominent law firm who systematically and covertly deprives pro se litigants of every source of legal assistance has engaged in conduct that exceeds all bounds of decency tolerable in a civilized community. This was not zealous advocacy for a client; it was a sustained campaign of secret sabotage directed at vulnerable, unrepresented parties.

975. Hilliard's conduct was intentional, or at minimum reckless, in its disregard for the severe emotional distress it would cause. Hilliard, a senior partner at a prominent New Hampshire law firm, knew or should have known that systematically stripping pro se litigants of every source of legal assistance—while simultaneously representing the opposing party—would cause those litigants severe emotional distress. Plaintiffs have suffered severe emotional distress, including anxiety about their inability to obtain legal counsel, the stress of proceeding without legal assistance against a well-represented adversary, and the anguish of watching a negotiated settlement collapse due to bad-faith sabotage. Upton & Hatfield LLP is vicariously liable.

976. The cumulative effect of Hilliard's three acts of interference was to leave Plaintiffs completely isolated: without retained counsel, without informal legal advice, and without the settlement that would have resolved their claims. This systematic deprivation of legal resources, directed at African American pro se litigants, is conduct that no civilized community would tolerate.

### Count 33 - Civil Conspiracy
(Against Russell F. Hilliard, Craig S. Donais, and Upton & Hatfield LLP)

977. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

978. Hilliard and Craig Donais agreed and acted in concert to deprive Plaintiffs of legal representation and settlement proceeds. The relationship between Hilliard and Donais (mentor-mentee, legal malpractice defense attorney, confidante, and fixer) provided both the motive and the means for their conspiracy. Their coordinated conduct over a two-year period (Hilliard's sabotage of the Primmer retainer in September 2020, Hilliard's interference with Attorney John Doe in March/April 2022, and the joint sabotage of the Hilton Hotels settlement culminating in January 2022) demonstrates an agreement to pursue an unlawful objective

215

through tortious means. Each co-conspirator is liable for the acts of the other committed in furtherance of the conspiracy. Upton & Hatfield LLP is vicariously liable.

### Count 34 - Professional Negligence
(Against Russell F. Hilliard and Upton & Hatfield LLP)

979.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

980.    As an attorney licensed in New Hampshire and a senior partner at Upton & Hatfield LLP, Hilliard owed professional duties of care and ethical conduct to the legal profession and to third parties foreseeably affected by his professional activities. Hilliard breached these duties by: (a) covertly contacting Plaintiffs' retained counsel, Primmer, to induce termination of the retainer, in the absence of any legitimate litigation purpose; (b) covertly contacting Attorney John Doe to induce cessation of legal advice to Plaintiffs; and (c) participating in the sabotage of a negotiated settlement while simultaneously participating in joint defense negotiations. This conduct fell below the standard of care applicable to a reasonably competent New Hampshire attorney practicing in the field of civil litigation.

981.    A reasonably competent attorney would not covertly contact an opposing party's retained counsel to induce termination of a retainer. A reasonably competent attorney would not covertly contact a party's informal legal advisor to pressure that advisor to cease providing assistance. A reasonably competent attorney would not participate in joint defense negotiations in bad faith while covertly sabotaging the settlement from within. Each of these acts fell below the standard of professional care and competence applicable to a New Hampshire attorney.

982.    Plaintiffs suffered damages as a direct and proximate result of Hilliard's professional negligence, including the loss of retained counsel, the loss of legal advice, the loss of settlement value, and the resulting emotional distress. Upton & Hatfield LLP is vicariously liable. The firm also failed to supervise Hilliard and to prevent his repeated acts of improper interference, constituting an independent basis for firm liability.

### Count 35: Race Discrimination in Contracting — 42 U.S.C. § 1981
(Against Russell F. Hilliard and Upton & Hatfield LLP)

983.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

984.    Plaintiffs are African American. Section 1981 guarantees them the same right to make and enforce contracts as is enjoyed by white citizens. Hilliard intentionally discriminated against Plaintiffs on the basis of

race in the making and enforcement of contracts by: (a) covertly sabotaging their written retainer agreement with Primmer; (b) covertly terminating their access to legal advice from Attorney John Doe; and (c) covertly sabotaging their settlement agreement in the Hilton Hotels litigation. Upon information and belief, Hilliard would not have engaged in this pattern of repeated, covert interference against white litigants. Race was a determinative factor in his willingness to act as a fixer to systematically deprive African American litigants of legal counsel and settlement proceeds. Upton & Hatfield LLP is vicariously liable.

## SECTION 12: CLAIMS AGAINST THE STATE OF NEW HAMPSHIRE AND ITS EMPLOYEES

### CLAIMS PERTAINING KAREN GORHAM

985.    Defendant Karen Gorham was an employee of the New Hampshire Judicial Branch at all times relevant to the claims against her in this action. She was a supervising Court Administrator for the New Hampshire Judicial Branch. She recently left her position with the New Hampshire Judicial Branch to become the clerk of the Federal District Court of New Hampshire. She is being sued in her official capacity for equitable and or injunctive relief; and individually for compensatory and punitive damages. She is a white female. At all times relevant or material hereto she acted under color of law.

986.    Gorham required that for every case that plaintiff had in NH at the time and that for every case that plaintiff files in the future for the rest of his life, he is prohibited from contacting any court in the state of New Hampshire.  This extraordinarily drastic practice was only applied to plaintiff and then to plaintiff's wife simply because is associated with plaintiff. It was not applied to any of the underlying defendants in any of plaintiff's cases in state courts.

987.    This was not fair. Plaintiff did nothing to deserve this. And it was discrimination against plaintiff. Plaintiff should have been free to contact the clerk or clerk staff at any NH courthouse for his cases directly.

988.    Plaintiff requested several times to be released from this restriction but she refused, even when it was impeding plaintiff's ability to address matters in his cases. Plaintiff requested that a complaint of discrimination based on race and based on having raised concerns about race discrimination in 2021, which is what resulted in her taking over to prohibit plaintiff from contacting the court clerk offices directly, be referred to the chief

judge but she refused to do so. She instead tried to direct plaintiff to go to the NH Administrative Office of the Courts. She did not refer the complaint of discrimination to the chief judge.

989.    Gorham prohibited plaintiff from contacting any trial court in NH. Plaintiff cannot directly call the clerk or clerk staff of any trial court in the state. Plaintiff was told this by Karen Gorham. This is because plaintiff raised concerns about race discrimination in the NH superior court system. Immediately after raising these concerns, plaintiff was contacted by Gorham and told he was forbidden from speaking to any court staff in any court in NH about his case or cases including any routine matter involving his case or even about filing issues, indefinitely, forever, for the rest of his life, and this ban would extend to his wife Natalie Anderson, simply because concerns were raised about mistreatment and disparate treatment based on race.

990.    This was intended to punish plaintiff for raising concerns about race discrimination in the NH superior court system.

### B. Administrative Retaliation at Hillsborough Superior Court North

991.    Bisasor's parallel state court case (No. 216-2020-CV-00027) was assigned to Judge Amy Messer at Hillsborough Superior Court North beginning in January 2022. Throughout the period from January 2022 through April 2024, Karen Gorham served as the Superior Court Administrator for the New Hampshire Judicial Branch, exercising direct administrative authority over all New Hampshire Superior Courts, including the court where Messer presided over Bisasor's case. Gorham had the authority and responsibility to manage court administration, supervise clerk staff, establish administrative policies, and address complaints about court personnel.

992.    During the course of his state court case, Bisasor raised concerns with the court about the conduct of a clerk staff member named Alma. These concerns related to the handling of Bisasor's filings and the treatment he received as a pro se litigant. Rather than addressing these concerns through established administrative channels or referring them for appropriate review, Gorham retaliated against Bisasor.

993.    Gorham's retaliation took the form of banning Bisasor from contacting the clerk's office entirely. This ban was administrative, not judicial, in nature. It was imposed by Gorham in her capacity as Superior Court Administrator (an executive and managerial function) and was not the product of any judicial order, hearing, or adjudicatory process. No judge entered an order barring Bisasor from contacting the clerk's office; no

hearing was held on the issue; and no adjudicatory process was employed. Gorham acted unilaterally in her administrative capacity.

994. The effect of the ban was to deny Bisasor access to basic court services available to all other litigants. The clerk's office is the portal through which litigants file documents, obtain copies of court records, learn about scheduling, and communicate with the court on administrative matters. Banning a litigant from contacting the clerk's office is tantamount to constructively barring that litigant from the courthouse.

995. Upon information and belief, Gorham communicated with Judge Messer behind the scenes regarding Bisasor's complaints about clerk staff and the ban that Gorham imposed. Gorham referenced having spoken with Messer about the matter. Messer, rather than intervening to ensure that a litigant had access to the clerk's office as required by law, acquiesced in and sanctioned Gorham's retaliatory action. Messer's acquiescence was not a judicial act; it was an administrative decision to endorse and perpetuate a ban imposed by the court administrator.

996. The administrative retaliation by Gorham and Messer was motivated, at least in part, by Bisasor's race. Bisasor is an African American pro se litigant who was subjected to administrative barriers not imposed on similarly situated white litigants. Upon information and belief, no white litigant at Hillsborough Superior Court North has been banned from contacting the clerk's office for raising concerns about staff conduct.

997. The administrative retaliation was also motivated by Bisasor's exercise of his First Amendment right to petition government officials about grievances. Raising concerns about the conduct of court staff is constitutionally protected speech. Gorham's retaliatory ban and behind-the-scenes communications with Messer would chill a person of ordinary firmness from exercising the right to complain about government misconduct.

998. Gorham's actions as Superior Court Administrator were administrative functions, not judicial acts. The Supreme Court has drawn a clear distinction between judicial acts (which involve the resolution of disputes between parties and the exercise of adjudicatory discretion), and administrative acts (which involve the management of court operations, the supervision of staff, and the implementation of policies). Judicial immunity does not extend to administrative acts. *Forrester v. White*, 484 U.S. 219 (1988). The ban on contacting

the clerk's office, the decision to retaliate against a litigant who complained about staff, and the behind-the-scenes communications with a judge about a pending case are all administrative in character.

999. Messer's acquiescence in the administrative ban, her failure to intervene to protect a litigant's access to the clerk's office, and her participation in the pattern of retaliation similarly constituted administrative acts taken outside her judicial function. These actions were not taken in the course of resolving disputes between parties, were not the product of any adjudicatory process, and did not involve the exercise of judicial discretion in deciding cases or motions.

1000. The Gorham-Messer coordination is significant because it demonstrates that the administrative retaliation was not the product of a single individual's decision but was a concerted effort involving the court's senior administrator and the presiding judge. The behind-the-scenes nature of their communications (occurring outside any docketed proceeding or adjudicatory process) underscores the administrative, rather than judicial, character of their conduct.

1001. Gorham departed the New Hampshire Judicial Branch in April 2024, joining the staff of the United States District Court for the District of New Hampshire. After Gorham's departure, Messer continued the pattern of administrative retaliation independently, maintaining the barriers to Bisasor's access to court services that Gorham had established. The continuation of the retaliatory pattern after Gorham's departure demonstrates that Messer independently adopted and perpetuated the administrative retaliation.

### C. Gorham's Current Position and the Structural Conflict

1002. In April 2024, Gorham joined the staff of the United States District Court for the District of New Hampshire. In March 2025, she was appointed Chief Deputy Clerk of this Court. In that capacity, Gorham manages case administration for the very Court that is now adjudicating this case, a case in which her own prior retaliatory conduct forms a substantial part of the factual basis for claims against both her and Judge Messer.

1003. Upon information and belief, Gorham previously worked at the New Hampshire Attorney General's Office during a period overlapping with Defendant Craig Donais's tenure as an Assistant Attorney General (November 1999 through January 2005). Gorham and Donais are therefore former colleagues. Gorham is also a named defendant in a separate federal action brought by Bisasor, Bisasor v. NH Judicial Branch (D.N.H.,

Case filed November 4, 2024, presided over by Judge Nancy Torresen), from which Chief Judge Elliott has already recused herself because of Gorham's position in the court.

### Count 36: 42 U.S.C. § 1983 — Race Discrimination and Retaliation
(Against Karen Gorham, Individually)

1004.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

1005.    At all relevant times, Karen Gorham acted under color of state law in her capacity as Superior Court Administrator for the New Hampshire Judicial Branch. Gorham deprived Bisasor of his rights under the Fourteenth Amendment to the United States Constitution by: (a) retaliating against Bisasor for raising concerns about a clerk staff member named Alma by imposing an administrative ban prohibiting Bisasor from contacting the clerk's office; (b) communicating with Judge Messer behind the scenes about Bisasor's complaints in a manner designed to prejudice Bisasor's case and standing before the court; and (c) subjecting Bisasor, an African American pro se litigant, to administrative barriers and retaliatory treatment that were not imposed on similarly situated white litigants.

1006.    Race was a motivating factor in Gorham's retaliatory actions. Upon information and belief, no white litigant at Hillsborough Superior Court North was subjected to an administrative ban from contacting the clerk's office. Gorham's conduct was administrative in nature (she acted in her capacity as the court's chief administrator, not as a judicial officer) and is not protected by judicial immunity. *Forrester v. White*, 484 U.S. 219 (1988). This conduct, taken under color of state law, violated Bisasor's rights to equal protection and due process under the Fourteenth Amendment, actionable through 42 U.S.C. § 1983.

### Count 37: 42 U.S.C. § 1983 — First Amendment Retaliation
(Against Karen Gorham, Individually)

1007.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

1008.    Bisasor engaged in constitutionally protected speech by raising concerns about the conduct of clerk staff member Alma at Hillsborough Superior Court North. The right to petition government officials about grievances, including complaints about the conduct of public employees, is protected by the First Amendment to the United States Constitution.

1009.    Gorham, acting under color of state law as Superior Court Administrator, retaliated against Bisasor for this protected speech by imposing an administrative ban prohibiting him from contacting the clerk's office and by

communicating with Judge Messer behind the scenes in a manner designed to prejudice Bisasor. Gorham's retaliatory actions were substantially motivated by Bisasor's protected speech. The imposition of an administrative ban in response to a litigant's complaints about staff conduct would chill a person of ordinary firmness from exercising the right to petition government officials about grievances. This conduct violated Bisasor's rights under the First Amendment, actionable through 42 U.S.C. § 1983.

## II. CLAIMS PERTAINING TO AMY MESSER

1010.    Plaintiff Bisasor brings constitutional/civil rights-related claim against Amy Messer for violation of his constitutional and federal law right to be free from discrimination based on disability because he has prejudiced by her handling of his requests for reasonable accommodations under disability law. Bisasor also seeks injunctive or equitable relief against Messer, as will be further elucidated below.

1011.    This claim is brought only by Bisasor against Amy Messer as a state defendant. Any reference to "plaintiff" in this section refers to Bisasor, unless stated otherwise. NB: Anderson has also been injured by violation of her federal rights.

1012.    Also, any reference to defendant refers to the state defendant Amy Messer only in this section. Also, in the section, "court", "trial court" or "superior court" refers to the NH Hillsborough North Superior Court, and "clerk" or "clerk office" refers to the superior court clerk staff or clerk office of NH Hillsborough North Superior Court.

1013.    Given that the original defendants removed the case to federal court, Bisasor is adding this claim against a new defendant based on events that occurred in 2024 and 2025, and 2026 via amendment.

### I. Facts Pertaining to Amy Messer

1014.    Amy Messer is a judge in NH Superior Court Hillsborough North, a state court in NH. Amy Messer is also state court employee or state employee, employed by the state of NH and paid by the state of NH. Amy Messer, as a judge and employee of the state of NH, is subject to the NH Constitution. The NH Constitution guarantees rights, freedoms and protections including the right to free from discrimination, the right to equal protection, the right to due process, including with respect to race and disability.

1015.    Bisasor is a plaintiff in a case in NH Superior Court Hillsborough North with Amy Messer as the judge presiding over the case. Bisasor alleges that Amy Messer has engaged in systematic deprivation of Bisasor's

rights under the Constitution. Bisasor has filed multiple requests for reasonable accommodations to Messer in state court. These requests have been submitted to Messer in the NH superior court but have been administratively rejected, ignored, or left unaddressed for extended periods.

1016. As demonstrated by the record, Bisasor's disability accommodation requests (hereinafter "accommodation requests") have been treated, at best, inconsistently by Amy Messer in the NH Superior Court Hillsborough North, with some requests denied by implication or inaction, and others not addressed at all, or otherwise outright denied without due process, signifying disability discrimination, at worst. Several of these accommodation requests have been denied without a hearing and Amy Messer refuses to hold a hearing to address Bisasor's needs for disability accommodation. Amy Messer has erected exacting, demanding, stringent and unreasonable standards for Bisasor to obtain disability accommodation from her in state court.

1017. Bisasor has requested, on several occasions, from Amy Messer, reasonable accommodation based on his disability. Amy Messer has a duty and an obligation to provide reasonable accommodation based on his disability. Bisasor meets every criteria required for reasonable accommodation based on disability. Bisasor was therefore entitled to reasonable accommodation based on his disability. Yet, Amy Messer has not granted but has instead denied several of Bisasor's request for reasonable accommodation. Amy Messer has not asserted that she is exempt from the Federal or NH constitutional requirements or from any state or federal disability laws.

1018. Bisasor seeks to have these failures, inactions or violations by Amy Messer rectified in or by the NH Superior Court Hillsborough North. Amy Messer has left Bisasor completely in the dark. She has thus deprived Bisasor of his right to reasonable accommodation based on disability. Therefore, Amy Messer has engaged in disability discrimination. It is completely disappointing and disheartening that Amy Messer has chosen to engage in such conduct. Consequently, the conduct of Amy Messer is unsustainable and does not promote confidence in the court system when judges evidently behave in an unlawful, discriminatory and unaccountable manner. The US and NH constitution requires accountability of its government bodies and employees. Amy Messer is not above the law or accountability. Fundamental fairness, due process and transparency requires or

at least suggests Amy Messer should provide a hearing before denial. This is particularly true when denying a request for disability accommodation.

1019. Amy Messer's conduct constitutes discrimination based on disability. Bisasor stands on the moral high ground on this issue. Bisasor stands on the right to not be discriminated against. The law is not on Amy Messer's side. The impact of these issues on plaintiff cannot be overstated. Bisasor is effectively being denied his constitutional right to access the courts and to have his case heard fairly. The rejections, delays in ruling on, or the denials of, his accommodation requests have impaired his ability to fully participate in the legal process in state court before Amy Messer.  Despite Bisasor's diligent efforts to follow proper procedures and seek appropriate relief, Bisasor has been met with a pattern of what appears to be willful disregard for his rights as a litigant. The cumulative effect of these actions has created an environment where Bisasor is unable to truly receive a fair trial. The below is a summary of acts of disability discrimination by Amy Messer.

    a.   Failure to accept Bisasor's confidential disability accommodation requests.

    b.   Failure to docket Bisasor's confidential disability accommodation requests.

    c.   Failure to rule on Bisasor's confidential disability accommodation requests.

    d.   Failure to grant Bisasor's confidential disability accommodation requests.

    e.   Failure to provide to hold any hearing on Bisasor's confidential disability accommodation requests.

    f.   Failure to apply consistent standards to Bisasor's confidential disability accommodation requests but instead apply arbitrary/capricious standards resulting in the impossibility of him obtaining any relief.

1020. Amy Messer's dismissive treatment of Bisasor's accommodation requests creates an appearance of insensitivity to disability issues and a lack of commitment to ensuring equal access to justice. Further, Amy Messer's failures have hindered Bisasor's ability to effectively request and obtain necessary accommodations to participate fully in the state court proceedings. Amy Messer has offered no proper opportunity for a person with disabilities to clarify or explain why they need accommodations based on their disabilities, which typically is done through a hearing.  Amy Messer's has thus created/erected barriers to Bisasor's full participation in the legal proceedings, effectively discriminating against Bisasor on the basis of his disabilities. The unreasonableness of Amy Messer in forcing Bisasor to go through arduous demanding process that involves multiple denials and multiple attempts to refile the same request, creates unreasonable obstacles for Bisasor, indicating bias, partiality or otherwise some form of animus by Amy Messer. These actions have deprived

Bisasor of a fair and full opportunity to be heard. The cumulative effect is the creation of an unequal playing field that undermines confidence in Amy Messer's (and/or the NH Superior Court's) fairness, integrity and impartiality. The law states that pro se parties are bound by the same rules as represented parties. But in this instance, Bisasor has been held to stricter rules than what the law requires or shifting rules that are arbitrary and capricious or rules that are harsher than what represented parties face.

### C. Violation of US Constitution and Federal Law Disability Rights

1021. Amy Messer's conduct violated state disability laws by systematically denying Bisasor reasonable accommodation. Despite Plaintiff's documented disabilities, Amy Messer made no effort to provide meaningful accommodations or to ensure that his requests were processed in a manner consistent with his disability-related needs. Instead, she subjected him to procedural requirements that were particularly burdensome for someone with his disabilities. Amy Messer denied or ignored Bisasor's accommodation requests as part of court administration or management functions, and thus she does not have absolute immunity. The NH Superior Court has established specific administrative procedures for processing accommodation requests.

1022. Following the landmark Supreme Court case Forrester v. White, judges have no absolute immunity for administrative functions. The Court held that "*the nature of the function performed, not the identity of the actor, determines whether absolute immunity applies*". Administrative acts that lack absolute immunity include:

   a.  Administrative denial of reasonable accommodations
   b.  Court management and operations decisions
   c.  Policy development for court accessibility
   d.  Facility management and accommodation implementation

1023. Amy Messer's acts were administrative rather than purely judicial in nature. Administrative denial of accommodations are thus subject to constitutional and/or civil rights challenges when:

   a)  The denial was based on discriminatory animus
   b)  The accommodation was clearly reasonable and denial violated disability law requirements
   c)  The denial occurred through administrative processes

1024.  The US Constitution and NH Constitution provides protection against disability discrimination by state actors.  These acts by Amy Messer were constitutional violations rather than mere disagreement with judicial decisions. Bisasor seeks primarily prospective equitable relief.

### A. COUNT 38 – VIOLATION OF THE US CONSTITUTION
### (as to Amy Messer)
### A. Legal Grounds for Inclusion

1025.  Bisasor asserts that Amy Messer, acting in an administrative function/capacity, has engaged in conduct that is not protected by judicial immunity, as her actions involve administrative functions such as processing accommodation requests, managing court access, and implementing policies affecting Plaintiffs' rights.

1026.  Under Forrester v. White, such administrative acts are not entitled to absolute judicial immunity. Furthermore, Bisasor alleges that Amy Messer's actions were undertaken under color of law and in violation of rights secured by  federal law and the US Constitution, making her a proper defendant under both federal and state law claims.

1027.  Under Forrester v. White, 484 U.S. 219 (1988), the US Supreme Court drew a bright line between a judge's "judicial" acts (entitled to absolute immunity) and "administrative" acts (not absolutely immune). The Court held that administrative functions receive only qualified, not absolute, immunity.

1028.  The right of access to the courts is a fundamental constitutional right. This right is meaningless without the ability of disabled litigants to proceed without accommodation. Amy Messer's administrative conduct has violated these constitutional guarantees by denying Bisasor equal treatment, access to remedies, and due process in proceedings.

1029.  Amy Messer denied Plaintiff's requests for hearings on his accommodation requests, thereby depriving him of procedural due process, and violating fundamental fairness principles. Further, Amy Messer's administrative decisions demonstrate a pattern of bias and predetermined disposition against Bisasor's rights, creating an appearance of impropriety that violates due process requirements.

1030.  Amy Messer's treatment of Plaintiff differs markedly from the treatment afforded to other litigants, creating an inference of discriminatory conduct based on Bisasor's race, disability status, and pro se representation. Amy Messer's systematic denial of protections and accommodations to Bisasor, while such protections are routinely afforded to other litigants, violates the US and NH constitutions. Amy Messer's

conduct demonstrates deliberate indifference to Bisasor's constitutional rights and intentional discrimination in the administration of judicial services.

## Count 39: ADA Title II Violation/Disability Discrimination in Access to Courts
(Against Amy Messer)

1031.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

1032.    Bisasor is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12131(2). He has documented disabilities that require reasonable accommodations to participate fully and meaningfully in court proceedings.

1033.    The State of New Hampshire, through its judicial branch, is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Court proceedings are services, programs, or activities of the State.

1034.    Bisasor submitted multiple written requests for disability accommodations to Hillsborough Superior Court North during proceedings before Judge Messer, spanning the period from 2022 through 2025. Judge Messer systematically: (a) failed to accept those accommodation requests; (b) failed to docket those requests in the court record; (c) failed to rule on those requests within any reasonable time; (d) failed to grant any requested accommodation; (e) failed to hold any hearing on the accommodation requests, denying Bisasor any opportunity to be heard; and (f) applied arbitrary, shifting, and inconsistent procedural standards to Bisasor's requests, creating a moving target that made it effectively impossible for him to obtain accommodations.

1035.    This systematic denial of disability accommodations in court proceedings denied Bisasor meaningful access to the courts in violation of Title II. Bisasor was excluded from full and equal participation in the judicial process by reason of his disability. He was denied the benefits of the court's services, including the ability to file documents, appear at hearings, and prosecute his case, on an equal basis with non-disabled litigants.

1036.    Amy Messer's conduct constitutes discrimination 'by reason of' disability because the denial of accommodations had the effect of excluding Bisasor from meaningful participation in the judicial process. A non-disabled litigant would not have needed accommodations and would not have been subjected to the

shifting standards and procedural obstacles that Amy Messer imposed on Bisasor's requests. Amy Messer failed to engage in the interactive process required to determine appropriate reasonable accommodations, instead imposing unilateral barriers.

1037.    As a direct and proximate result of these ADA violations of Title II, Bisasor has been denied meaningful access to the courts, has been unable to prosecute his state court case on an equal footing with non-disabled litigants, has incurred additional work and expense in attempting to obtain accommodations, has suffered emotional distress from the repeated denial of his fundamental right of access to the courts, and has lost time from family and medical needs.

## Count 40 - 42 U.S.C. § 1983 — Violation of Due Process and Equal Protection
(Against Amy Messer, Individually)

1038.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

1039.    Amy Messer, at all relevant times, acted under color of state law as a Justice of the New Hampshire Superior Court. Messer deprived Bisasor of his rights under the Fourteenth Amendment to the United States Constitution by: (a) acquiescing in and perpetuating the administrative ban on Bisasor's contact with the clerk's office, a ban imposed by Karen Gorham in her capacity as Superior Court Administrator, not through any judicial order or hearing; (b) failing to intervene to protect Bisasor's access to the clerk's office when Gorham's retaliatory ban came to her attention; (c) participating in behind-the-scenes communications with Gorham about Bisasor's complaints, outside any adjudicatory process; and (d) continuing the pattern of administrative retaliation against Bisasor after Gorham's departure in April 2024, maintaining barriers to Bisasor's access to court services.

1040.    These actions deprived Bisasor of due process and equal protection of the laws. Bisasor, an African American pro se litigant, was subjected to administrative barriers and retaliatory treatment not imposed on similarly situated white litigants. These acts were administrative, not judicial, in nature. They did not involve the resolution of disputes between parties or the exercise of judicial discretion in adjudicating cases or motions. No judicial order was entered imposing the ban; no hearing was held; no adjudicatory reasoning was applied. Judicial immunity does not shield administrative acts. Forrester v. White, 484 U.S. 219 (1988).

1041. Messer's participation in the administrative retaliation caused Bisasor concrete harm. The ban on contacting the clerk's office impeded Bisasor's ability to file documents, obtain copies of court records, learn about scheduling, and communicate with the court on administrative matters. These are essential functions of court access. Depriving a litigant of these functions—particularly a pro se litigant who has no attorney to interface with the court on his behalf—constitutes a deprivation of due process and equal protection.

### Count 41: Race Discrimination — 42 U.S.C. § 1983
(Against Amy Messer, Individually)

1042. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

1043. Messer's administrative retaliation against Bisasor was motivated, at least in part, by Bisasor's race. Bisasor is African American. Messer coordinated with Gorham in subjecting Bisasor to administrative barriers and retaliatory actions that were not imposed on similarly situated white litigants appearing before Messer at Hillsborough Superior Court North. Upon information and belief, no white litigant was banned from contacting the clerk's office for raising concerns about staff, and no white litigant was subjected to the pattern of administrative retaliation that Bisasor experienced. This conduct, taken under color of state law, violated Bisasor's right to equal protection under the Fourteenth Amendment, actionable through 42 U.S.C. § 1983.

### III. CLAIMS AGAINST MARK HOWARD

1044. Having exhausted the avenues available to him before Judge Messer, Bisasor escalated his complaints to the highest administrative authority in the New Hampshire Superior Court system. On September 23, 2025, Bisasor sent an email to Chief Justice Mark Howard detailing Judge Messer's pattern of ADA violations, including her systematic denial of accommodation requests supported by documentation from four specialists at Massachusetts General Hospital affiliated with Harvard Medical School, her imposition of impossible and shifting standards for ADA relief, her disclosure of confidential medical information to the public, her refusal to hold any hearing before denying accommodation requests, and her racially disparate treatment of Bisasor and Anderson compared to white litigants. The following day, September 24, 2025, Bisasor sent a formal letter to Howard invoking his authority under 28 C.F.R. § 35.164 as the administrative head of the public entity responsible for ADA compliance. In that letter, Bisasor made eleven specific requests, including that Howard halt any further action to dismiss Plaintiffs' case until the ADA issues were resolved, require Judge Messer to engage in the interactive process mandated by the ADA, require that previously submitted medical

documentation be reviewed consistent with the ADA and the court's own ADA policy, apply the "regarded as" prong of the ADA, require transparent explanation of ADA decision-making, require broad liberal construction of ADA requests as mandated by federal law, and take over the ADA review himself as the head of the public entity. Bisasor attached to this letter his sealed Emergency Motion to Recuse Judge Messer and his sealed Renewed Motion to Recuse based on new evidence, both of which contained detailed documentation of the ADA violations and other judicial conduct warranting recusal.

1045.    On January 28, 2026, Bisasor sent a third communication to Howard. This communication was more urgent than the first two because the situation had deteriorated further. Bisasor alerted Howard to newly discovered evidence that Judge Messer's husband, Jack Ruderman, and opposing counsel Russell Hilliard were both active participants in overlapping civic organizations in the small town of Hopkinton, New Hampshire, where Messer and her husband reside. Hilliard had founded the Hopkinton Rotary Club in 1996 and remained its honorary lifetime member; Ruderman served on multiple town committees whose jurisdictions directly benefited from Hilliard's decades of litigation victories on behalf of the Town of Hopkinton. Both men had delivered presentations to the Rotary Club during the pendency of the litigation. Bisasor also alerted Howard to anomalies in the electronic filing system that raised questions about the integrity of the court record. Howard never responded to any of these three communications. He did not acknowledge receipt of the complaints, did not initiate any investigation, did not refer the matter to any ADA coordinator or designee, did not contact Bisasor to request additional information, and did not take any steps whatsoever to ensure that a subordinate judge under his direct administrative supervision was complying with federal disability law.

1046.    Howard's silence was not a passive oversight. It was an affirmative decision to do nothing in the face of documented, detailed, and urgent complaints that a judge he supervised was violating the ADA, discriminating against disabled African American litigants, and entering case-dispositive orders while those violations remained unaddressed. The consequences of Howard's inaction were severe and irreversible. While Howard remained silent, Judge Messer denied Bisasor's renewed motion to recuse as "late filed" and based on "unsubstantiated speculation," granted the defendant's motion to dismiss with prejudice, denied approximately twenty pending motions in an omnibus order largely on grounds of mootness, and ordered the case closed.

The ADA violations that Bisasor had reported to Howard in meticulous detail were never investigated, never addressed, and never corrected. The accommodations that 4 Harvard Medical School-affiliated specialists had recommended were never granted. The interactive process that the ADA mandates was never initiated. Howard's failure to act transformed what might have been one judge's misconduct into an institutional ratification of disability discrimination. When the head of a public entity receives detailed written complaints that a subordinate is violating the ADA, and that head does nothing while the subordinate continues the violations and enters orders that permanently dispose of the complainant's case, the entity's liability is no longer predicated on the individual acts of the subordinate alone. It is predicated on the deliberate indifference of the institution itself, as demonstrated by the knowing failure of the person with ultimate administrative authority to take any corrective action.

1047.    Bisasor reported the administrative retaliation, including the ban on contacting the clerk's office, the behind-the-scenes communications between Gorham and Messer, and the continuing pattern of discriminatory treatment, to Chief Justice Mark Howard in his September 2025 and January 2026 communications. Howard was the direct administrative supervisor of both Messer and, during her tenure, Gorham. His authority encompassed the power to reassign cases, to direct judges to comply with ADA requirements, to initiate investigations into judicial conduct complaints, and to intervene in administrative matters affecting litigants' access to the courts. Howard exercised none of these powers. His failure to act, after receiving actual written notice of ongoing administrative retaliation against an African American disabled pro se litigant, constituted a ratification of the retaliatory conduct and an independent act of deliberate indifference to Bisasor's constitutional rights. The chain of administrative failure is complete: Gorham initiated the retaliation, Messer perpetuated it, and Howard, with full knowledge and ultimate authority, permitted it to continue unchecked.

1048.    The institutional nature of the ADA violation is demonstrated by the chain of administrative failure extending from Judge Messer through Chief Justice Howard. Bisasor did not merely suffer ADA violations at the hands of one judge; he exhausted every administrative avenue available to him within the New Hampshire Superior Court system and was met with either active obstruction or total silence at every level. When Judge

Messer denied his accommodation requests using pretextual grounds and shifting criteria, Bisasor escalated to the head of the public entity as contemplated by 28 C.F.R. § 35.164. When that head, Chief Justice Howard, received three detailed written complaints over a four-month period and took no action of any kind, the failure became institutional. The ADA does not permit a public entity to insulate itself from liability by ignoring complaints directed to the very official whom federal regulation designates as the responsible decision-maker. Howard's failure to act was not a judicial function entitled to absolute immunity; it was an administrative failure to discharge the supervisory and compliance obligations that federal law specifically assigns to the head of a public entity operating court services. Courts have recognized that the processing of ADA accommodation requests is an executive or administrative function, not a judicial one, because ADA accommodation decisions are made by a wide range of officials across all titles of the ADA and in no sense constitute a function normally performed by a judge in the adjudication of disputes between parties.

1049.    The deliberate indifference standard applicable to compensatory damages under Title II is satisfied here. Deliberate indifference requires that the defendant had knowledge that a federally protected right was substantially likely to be violated and failed to act on that knowledge. Howard had actual knowledge: Bisasor's three written communications provided detailed, specific, documented allegations of ADA violations, supported by references to medical documentation from four specialists, prior sealed filings, and the full procedural history of the court's treatment of Bisasor's accommodation requests. Howard's failure to act was not a result of ignorance or inadvertence; it was a conscious decision to take no action in the face of well-documented complaints. The harm that resulted was precisely the harm that Bisasor had warned Howard about: the continued denial of accommodations, the continued discriminatory treatment, and the ultimate dismissal of Bisasor's case while those accommodations remained withheld. The causal connection between Howard's deliberate indifference and Bisasor's injuries is direct. Had Howard exercised even a minimal level of administrative oversight, including directing Messer to engage in the interactive process, referring the complaint to an ADA coordinator, or reassigning the case, the trajectory of the state court proceedings would have been materially different. Instead, Howard's silence operated as a green light for the continued violations, and Messer proceeded to enter the very dispositive orders that Bisasor specifically asked Howard to prevent.

## COUNT 42: VIOLATION OF NH CONSTITUTION
**(Against Amy Messer, Karen Gorham, and Mark Howard, in their individual capacities)**

1050.    Howard's failure to act on Bisasor's detailed complaints constitutes an independent violation of the New Hampshire Constitution. Under Part I, Article 14, every person has the right to obtain right and justice freely, without being obliged to purchase it, and without any denial or unreasonable delay. When Bisasor reported to Howard that a subordinate judge was systematically denying him access to the courts through discriminatory ADA practices and administrative retaliation, Howard had a constitutional duty, not merely an administrative preference, to ensure that the courts under his supervision were providing equal access to justice. His complete failure to respond to three written complaints, each more urgent than the last, each documenting specific and worsening violations, and each requesting specific and reasonable corrective action, constituted an unreasonable denial of Bisasor's right to obtain justice within the meaning of Article 14. Howard's inaction also violated the due process protections of Part I, Article 15, because Bisasor had a constitutionally protected interest in meaningful access to the courts and in the fair processing of his disability accommodation requests, and Howard's refusal to act deprived him of those interests without any process whatsoever. Additionally, Howard's failure to act in the face of documented racial discrimination by a subordinate, including the disparate treatment of African American litigants compared to white litigants, the application of harsher procedural standards to Black pro se parties, and the denial of accommodations that were afforded to similarly situated white litigants, constitutes a violation of the equal protection guarantee of Part I, Article 2. Howard is sued in his individual capacity for these constitutional violations, which were administrative in nature and are not shielded by judicial immunity.

## COUNT 43 - Deprivation of Constitutional Rights Under 42 U.S.C. § 1983
(Against Mark Howard in his individual capacity)

1051.    Plaintiffs incorporate by reference all preceding paragraphs. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects or causes to be subjected any citizen to the deprivation of rights secured by the Constitution or laws of the United States shall be liable to the party injured. Howard acted under color of state law at all relevant times in his capacity as Chief Justice of the New Hampshire Superior Court. Bisasor had constitutionally protected rights to meaningful access to the courts under the Due Process Clause of the Fourteenth Amendment, to equal treatment regardless of race under the Equal Protection Clause, and to

233

accommodations for his disabilities under Title II of the ADA as incorporated through the Fourteenth Amendment. Howard had actual knowledge that these rights were being violated by a judge under his direct administrative supervision. Bisasor's three written communications to Howard, dated September 23, 2025, September 24, 2025, and January 28, 2026, provided detailed and specific allegations of ongoing constitutional violations, including the systematic denial of ADA accommodations, the racially disparate treatment of African American litigants, the disclosure of confidential medical information, and the refusal to hold hearings on accommodation requests. These were not vague or conclusory allegations; they were supported by references to specific court orders, medical documentation from four specialists, prior sealed motions, and a comprehensive recitation of the procedural history demonstrating the pattern of discrimination.

1052.    Howard's failure to take any action in response to these communications was not a judicial act. Howard made no ruling, entered no order, and adjudicated no dispute. His failure was purely administrative: a refusal to exercise his supervisory authority to investigate complaints of constitutional violations by a subordinate, to ensure ADA compliance within the court system he administered, and to protect a disabled pro se litigant's fundamental right of access to the courts. Under Forrester v. White, 484 U.S. 219, 229 (1988), absolute judicial immunity does not extend to administrative acts performed by judges in a non-adjudicatory capacity. The Supreme Court has drawn a clear line: "When judges perform administrative functions, particularly those that are not directly related to their role in resolving disputes, they do not have absolute immunity." Howard's failure to act on ADA complaints, to investigate reports of discrimination by a subordinate judge, and to exercise his supervisory authority to correct ongoing violations falls squarely within the category of administrative functions that Forrester leaves unprotected. Qualified immunity does not shield Howard because the rights at issue were clearly established. The right of disabled litigants to ADA accommodations in the courts was established by Tennessee v. Lane, 541 U.S. 509 (2004). The right to be free from racial discrimination in the administration of justice is among the most clearly established principles in American constitutional law. The obligation of supervisory officials to act when they have actual knowledge of ongoing constitutional violations by subordinates has been recognized for decades. No reasonable chief justice, upon receiving three detailed written complaints documenting a subordinate judge's systematic denial of disability

234

accommodations to African American pro se litigants, could have believed that doing absolutely nothing was constitutionally permissible. Howard's deliberate indifference to the documented, ongoing constitutional violations caused Bisasor direct and foreseeable harm, including the dismissal of his state court case while his accommodation requests remained unresolved, the continued denial of meaningful access to the courts, and the perpetuation of racially discriminatory treatment within the court system Howard was charged with administering.

## IV. CLAIMS AGAINST THE STATE OF NEW HAMPSHIRE
### A. Systematic Denial of Disability Accommodations

1053. Bisasor is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12131(2). He has documented disabilities that require reasonable accommodations to participate fully and meaningfully in court proceedings.

1054. Throughout his state court case before Judge Messer at Hillsborough Superior Court North, from 2022 through 2025, Bisasor submitted multiple requests for disability accommodations. These requests were submitted in writing, identified the nature of the accommodations needed, and explained why the accommodations were necessary for Bisasor to participate in court proceedings on an equal basis with non-disabled litigants.

1055. The State of New Hampshire, through its judicial branch and specifically through Hillsborough Superior Court North, systematically denied, ignored, or frustrated Bisasor's accommodation requests. Specifically, the court: (a) failed to accept Bisasor's confidential disability accommodation requests; (b) failed to docket those requests in the court record; (c) failed to rule on those requests within any reasonable time; (d) failed to grant any requested accommodation; (e) failed to hold any hearing on accommodation requests, denying Bisasor the opportunity to be heard; and (f) applied arbitrary, shifting, and inconsistent standards to Bisasor's requests that made it effectively impossible for him to obtain accommodations to which he is entitled under federal law.

1056. The pattern of conduct was not the product of inadvertence. Bisasor was held to stricter standards than represented parties and stricter standards than the law requires. The shifting requirements imposed by the court left Bisasor "completely in the dark" about how to obtain accommodations, with each new request met by a new and previously unarticulated procedural obstacle.

1057.   The denial of disability accommodations in court proceedings constitutes a denial of access to the courts in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, which provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity. The State of New Hampshire, through its judicial branch, is a public entity within the meaning of Title II. Court proceedings are services, programs, or activities of that public entity.

1058.   The Eleventh Amendment does not bar this claim. Congress validly abrogated state sovereign immunity in enacting Title II of the ADA as applied to claims involving the fundamental right of access to the courts. *Tennessee v. Lane*, 541 U.S. 509 (2004) (holding that Title II validly abrogates sovereign immunity as applied to the class of cases implicating the right of access to the courts); *United States v. Georgia*, 546 U.S. 151 (2006) (holding that insofar as Title II creates a private cause of action for damages against states for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity).

### B. The Continuing Nature of Defendants' Tortious Conduct

1059.   The continuing force of Gorham's administrative retaliation is documented in a 9-12-25 email exchange between Bisasor and Maicie L. Cherry, the Superior Court E-Filing Assistant Manager at Hillsborough Superior Court North (See Exhibit 7). When Bisasor contacted the E-Filing Center to report that confidential medical documents filed under seal in connection with his ADA accommodation requests had been unlawfully published on the public docket (exposing his private medical information to the public in direct violation of the ADA's confidentiality protections), Cherry responded by invoking Gorham's ban: "…As the past Superior Court Administrator, Karen Gorham told you, we would not be taking your calls."

1060.   This statement is remarkable for what it reveals. Gorham had departed the Superior Court Administrator position in April 2024, yet more than 17 months later, her directive to deny Bisasor telephone access to court administrative services was still being enforced by court personnel as operative policy. No judicial order authorized the ban. No hearing was ever held. No written policy supported it. It was an extrajudicial administrative sanction imposed by a single administrator in retaliation for Bisasor's complaints about court staff, and it continued to operate with full institutional force long after the administrator who imposed it had

left the court and assumed a position as Chief Deputy Clerk of the very federal court in which this action is now pending.

1061.    When Bisasor requested a telephone call as a reasonable accommodation under the ADA, explaining that his disabilities made it difficult to communicate effectively in writing and that he needed to demonstrate the docketing errors in real time, the request was refused. Cherry instead directed Bisasor to call the Clerk's Office, but the Clerk's Office had previously informed Bisasor that it does not handle e-filing issues, creating an administrative loop in which no office would accept responsibility for resolving the ADA violation and no office would speak with Bisasor by telephone. The result was that Bisasor's confidential medical letter remained publicly visible on the docket, his accommodation request went unaddressed, and the sealed documents he had filed ex parte remained publicly accessible in violation of both the court's own sealing rules and the ADA.

1062.    This episode is not an isolated bureaucratic failure; it is a concrete manifestation of the institutional pattern alleged throughout this complaint. Gorham's retaliatory ban, imposed during her tenure as Superior Court Administrator, was adopted and perpetuated by her successors without question, without review, and without any concern for its legality, in the very court Judge Messer presided. Messer, as the presiding judge, had the authority and the obligation to ensure that a litigant in her courtroom had access to basic court services and that sealed medical documents were not exposed to the public. Her failure to intervene, despite Bisasor's contemporaneous complaints to Judge Messer, demonstrates that the administrative retaliation was not merely Gorham's personal decision but an institutional posture that Messer endorsed and sustained. The State of New Hampshire, through its judicial branch, denied Bisasor meaningful access to the courts by maintaining an unauthorized ban on his telephone communications with court personnel, refusing his ADA accommodation requests, including basic requests for a telephone call, and allowing his confidential medical information to be published on a public docket in violation of the ADA's requirement that medical documentation submitted in support of accommodation requests be maintained in confidence and not disclosed to individuals who do not need the information for purposes of implementing the accommodation.

1063.    These facts demonstrate that the claims against Gorham, Messer, and the State rests on a coordinated systematic effort at retaliation via a top-down administrative policy imposed by a court administrator and

perpetuated, unofficially, by the presiding judge. Judge Messer had made ruling from the bench about this. But she failed to address or intervene, thus tacitly sanctioning it or at minimum deliberately indifferent to it.

1064. The administrative retaliation at Hillsborough Superior Court North constitutes a continuing violation that spans from Gorham's initial ban on Bisasor's contact with the clerk's office through Messer's perpetuation of that ban and related retaliatory conduct into 2024 and 2025. The denial of disability accommodations is similarly ongoing, having persisted throughout the life of Bisasor's state court case.

1065. The tortious conduct alleged herein is not a series of isolated incidents but a continuing and coordinated pattern of misconduct spanning from 2019 through 2025. The pattern of racial discrimination pervading all Defendants' conduct is itself a continuing violation including the race-based administrative retaliation at the courthouse. This pattern supports the inference that race was a motivating factor in each Defendant's conduct.

### Count 44: ADA Title II — Disability Discrimination in Access to Courts
(Against the State of New Hampshire)

1066. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

1067. Bisasor is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12131(2). He has documented disabilities that require reasonable accommodations to participate fully and meaningfully in court proceedings.

1068. The State of New Hampshire, through its judicial branch, is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Court proceedings are services, programs, or activities of the State.

1069. Bisasor submitted multiple written requests for disability accommodations to Hillsborough Superior Court North during proceedings before Judge Messer, spanning the period from 2022 through 2025. The State, through its courts, systematically: (a) failed to accept those accommodation requests; (b) failed to docket those requests in the court record; (c) failed to rule on those requests within any reasonable time; (d) failed to grant any requested accommodation; (e) failed to hold any hearing on the accommodation requests, denying Bisasor any opportunity to be heard; and (f) applied arbitrary, shifting, and inconsistent procedural standards to

Bisasor's requests, creating a moving target that made it effectively impossible for him to obtain accommodations.

1070.   This systematic denial of disability accommodations in court proceedings denied Bisasor meaningful access to the courts in violation of Title II. Bisasor was excluded from full and equal participation in the judicial process by reason of his disability. He was denied the benefits of the court's services, including the ability to file documents, appear at hearings, and prosecute his case, on an equal basis with non-disabled litigants.

1071.   The Eleventh Amendment does not bar this claim. Congress validly abrogated state sovereign immunity in enacting Title II of the ADA as applied to claims involving the fundamental right of access to the courts. Tennessee v. Lane, 541 U.S. 509, 533–34 (2004) (holding that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment"); United States v. Georgia, 546 U.S. 151, 159 (2006).

1072.   The State's conduct constitutes discrimination 'by reason of' disability because the denial of accommodations had the effect of excluding Bisasor from meaningful participation in the judicial process. A non-disabled litigant would not have needed accommodations and would not have been subjected to the shifting standards and procedural obstacles that the State imposed on Bisasor's requests. The State failed to engage in the interactive process required to determine appropriate reasonable accommodations, instead imposing unilateral barriers.

1073.   As a direct and proximate result of the State's violations of Title II, Bisasor has been denied meaningful access to the courts, has been unable to prosecute his state court case on an equal footing with non-disabled litigants, has incurred additional work and expense in attempting to obtain accommodations, has suffered emotional distress from the repeated denial of his fundamental right of access to the courts, and has lost time from family and medical needs.

## TIMELINESS OF PLAINTIFF'S CLAIMS UNDER THE NEW HAMPSHIRE SAVINGS STATUTE AND APPLICABLE LIMITATIONS DOCTRINES
### I. Review of Timeliness Framework

1074.   Plaintiff Andre Bisasor's claims are timely under multiple, independently sufficient legal doctrines. The Donais and Hilliard Defendants' motions to dismiss on statute of limitations grounds fail because they rest on

a fundamental misreading of New Hampshire law, a manufactured "cured deficiency" requirement that no New Hampshire court has ever imposed, and a demonstrably false assertion that Plaintiff "gave no reason" for his voluntary dismissal. Each of these contentions collapses under scrutiny.

1075. Three independent bases establish the timeliness of every claim in this action: (1) the New Hampshire savings statute, RSA 508:10, which provides a one-year grace period following voluntary dismissal and which Plaintiff satisfied to the day; (2) discovery rule tolling, which delays accrual of 2019 claims until Plaintiff's first discovery in July 2020; and (3) relation-back under Federal Rule of Civil Procedure 15(c), which independently preserves all claims, including those against newly added parties.

## II. The Statutory Text and Centuries-Old Purpose of RSA 508:10

1076. RSA 508:10 provides in full:

*If judgment is rendered for the plaintiff and such judgment is arrested, reversed on a writ of error or on appeal, or if the plaintiff becomes nonsuit or the action is otherwise abated or dismissed without a judgment on the merits, the plaintiff may commence a new action for the same cause within one year after the abatement or other determination of the original action, and not afterward, provided the original action was commenced within the time limited by law.*

RSA 508:10 (emphasis added).

1077. This statute traces its lineage to the earliest English statute of limitations, enacted in 1623. As the New Hampshire Supreme Court has observed:

*The obvious purpose of [RSA 508:10] was…to permit an action to be brought after the general limitation had run.*

Hughes v. Hebert, 106 N.H. 176, 177–78 (1965).

1078. The statute is remedial in nature. For over a century, the New Hampshire Supreme Court has characterized its animating purpose in identical terms, repeated across generations of cases:

*The saving statute is designed to insure a diligent suitor the right to a hearing in court until he reaches a judgment on the merits.*

Berg v. Kelley, 134 N.H. 255, 257 (1991); accord Roberts v. Gen. Motors Corp., 140 N.H. 723, 725 (1996).

1079. And the Court has been equally emphatic about how this remedial purpose constrains judicial interpretation:

*Its broad and liberal purpose is not to be frittered away by any narrow construction.*

Berg, 134 N.H. at 257 (quoting Hughes v. Hebert, 106 N.H. 176, 178 (1965)); accord Bel Air Assocs. v. N.H. Dep't of Health & Human Servs., 154 N.H. 674, 683 (2006).

1080. The New Hampshire Supreme Court has "frequently stated that RSA 508:10 'is to be given a liberal interpretation.'" Doggett v. Town of N. Hampton Zoning Bd. of Adjustment, 138 N.H. 744, 747 (1994) (quoting Rowe v. John Deere, 130 N.H. 18, 23 (1987)). This is a directive that courts must apply the statute broadly, resolving doubts in favor of the suitor, not the party seeking to foreclose adjudication on the merits.

## II. NH Savings Statute

1081. The primary New Hampshire statute commonly referred to as the "savings statute" is RSA 508:10. This statute allows a plaintiff whose action was dismissed for reasons other than a decision on the merits (such as a nonsuit or dismissal for procedural reasons) to refile the action within one year, even if the original statute of limitations has expired, provided the original action was filed within the limitations period.

1082. The text and interpretation of RSA 508:10, as summarized by the District of New Hampshire, is:

"The saving statute is 'designed to insure a diligent suitor the right to a hearing in court until he reaches a judgment on the merits.' … The New Hampshire Supreme Court interprets the savings statute with reference to '[i]ts broad and liberal purpose,' … which 'is not to be frittered away by any narrow construction.'"

1083. Statutory Citation: RSA 508:10. New Action After Failure of Former.

If judgment is rendered for the plaintiff and such judgment is arrested, reversed on a writ of error or on appeal, or if the plaintiff becomes nonsuit or the action is otherwise abated or dismissed without a judgment on the merits, the plaintiff may commence a new action for the same cause within one year after the

abatement or other determination of the original action, and not afterward, provided the original action was commenced within the time limited by law.

1084.    The original complaint was filed on June 18, 2022 in Massachusetts Superior Court, within the applicable statutes of limitations for the claims asserted (in particular for events occurring in 2019, 2020 or after). Thus, Plaintiff's original action was timely filed on June 18, 2022, well within the statute of limitations for all claims. The plaintiff voluntarily dismissed that case without prejudice on June 3, 2024. Therefore, the voluntary dismissal on June 3, 2024, and refiling on June 3, 2025, complied with RSA 508:10, which permits a one-year window to reinitiate proceedings after non-merits dismissal.

1085.    Under RSA 508:10, the plaintiff is entitled to refile this action within one year of dismissal, which he has done, making this complaint timely. Claims arising from events occurring in June 2019 and throughout 2020, are not barred by the statute of limitations because they are part of the same transaction, series of acts, or continuing course of conduct that began before the prior removed NH federal court case was voluntarily dismissed.

1086.    The New Hampshire Supreme Court has consistently upheld RSA 508:10's purpose: to preserve claims where initial filings are dismissed on non-merits basis including on procedural grounds and including for voluntary non-suit. See Bel Air Assocs. v. N.H. Dep't of Health & Human Servs., 154 N.H. 674 (2006).

1087.    Furthermore, the doctrine of continuing torts and the tolling provisions of RSA 508:10 support the plaintiff's right to seek redress for harm inflicted during this period.

1088.    Key tolling periods for 3 year statute of limitations of claims include Defamation, Consumer Protection (RSA 358-A) and other such claims with a 3-year limit in NH, which are tolled from June 2022.

1089.    Any efforts by defendants to characterize these claims as time-barred will be unfounded / contrary to law.

### III. Plaintiff Satisfies Every Element of RSA 508:10

1090.    The New Hampshire Supreme Court in Arsenault v. Scanlon, 139 N.H. 592, 594 (1995), and the District of New Hampshire in Vanz, LLC v. PMD Fin. Grp., LLC, 2019 WL 1406150, at *5 (D.N.H. Mar. 28, 2019), have distilled RSA 508:10 into five elements. Plaintiff satisfies each one.

242

**Element 1: The original action was timely filed.**

1091.   Plaintiff filed his original complaint in Bristol County Superior Court, Massachusetts, on June 18, 2022. The claims arise from conduct spanning 2019 through 2022. The longest applicable limitation period under New Hampshire law is three years for personal actions. RSA 508:4, I. Even measuring from the earliest alleged acts in June 2019 (and setting aside the discovery rule, which is addressed independently below) the three-year period did not expire until June 2022. Plaintiff filed on June 18, 2022, within the limitations period. This element is indisputably satisfied.

**Element 2: The action was dismissed without a judgment on the merits.**

1092.   Plaintiff filed a Notice of Voluntary Dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(i) on June 3, 2024. A voluntary dismissal under Rule 41(a)(1)(A)(i) is, by operation of law, without prejudice. Fed. R. Civ. P. 41(a)(1)(B). No court adjudicated the merits. No answer had been filed. The motions to dismiss were pending but unresolved. The dismissal was not "a judgment on the merits." This element is satisfied as a matter of law.

1093.   The New Hampshire Supreme Court has long equated a voluntary dismissal with the statutory term "nonsuit":

> *A 'nonsuit' is synonymous with a voluntary dismissal.*

> Milford Quarry & Constr. Co. v. Boston & Me. R.R., 78 N.H. 68, 69 (1916).

1094.   The plain language of RSA 508:10 expressly covers the situation where "the plaintiff becomes nonsuit." That is precisely what occurred here.

**Element 3: The right of action is not barred by the prior voluntary dismissal.**

1095.   The voluntary dismissal was without prejudice and therefore does not bar refiling. The New Hampshire Supreme Court has stated that the sole test is:

> *The test of RSA 508:10 is whether the right of action is, or is not, barred by the first judgment.*

> Milford Quarry, 78 N.H. at 177; accord Roberts, 140 N.H. at 725; Berg, 134 N.H. at 257.

1096.   Because the voluntary dismissal without prejudice does not bar the right of action, this element is satisfied.

243

**Element 4: The new action was commenced within one year of the prior voluntary dismissal.**

1097.    Plaintiff voluntarily dismissed on June 3, 2024. Plaintiff refiled on June 3, 2025, exactly one year later, to the day. This element is satisfied with mathematical precision. Defendants have not, and cannot, dispute this timeline.

**Element 5: The new action is for the same cause.**

1098.    The refiled action arises from the same operative facts, transactions, and occurrences as the original complaint: Defendants' defamatory statements, tortious interference, and related wrongful conduct between 2019 and 2022. While the operative complaint has been refined and improved (as is the express purpose of voluntary dismissal and liberal amendment) the "same cause" requirement is satisfied because the claims arise from the identical factual nucleus. Barton v. Barton, 125 N.H. 433 (1984).

1099.    RSA 508:10 permits a plaintiff to refile within one year of a voluntary dismissal, provided the original action was timely, no judgment on the merits was entered, the right of action is not barred, and the new suit is for the same cause. Plaintiff's original action was timely filed on June 18, 2022; the June 3, 2024 voluntary dismissal was not a judgment on the merits; no determination bars the right of action; Plaintiff refiled on June 3, 2025, within one year; and the refiled action is for the same cause. Conclusion: RSA 508:10 preserves Plaintiff's claims. Defendants' statute of limitations defense fails.

**IV. RSA 508:10 Operates as a Grace Period, Not Mere Tolling**

1100.    In Gray v. Gray, No. 23-cv-146, 2023 DNH 146 P (D.N.H. Dec. 4, 2023), this Court conducted an exhaustive analysis of the nature of RSA 508:10 and concluded that the statute operates as a "grace period" permitting refiling after the limitations period has expired, rather than a tolling mechanism that suspends the running of the statute. This distinction is significant because it means the statute functions independently of (and cannot be defeated by) arguments about when the underlying limitations period expired.

1101.    As this Court explained in Gray, the New Hampshire Supreme Court has "often stated that 'RSA 508:10 serves to permit an action to be brought after the [statute of] limitation[s] has run.'" Gray, 2023 DNH 146 P,

at *14 (quoting Fastrack Crushing Servs., Inc. v. Abatement Int'l, 153 N.H. 284, 288 (2006)). The Court further observed:

> *Only where the cause has become barred by the general limitation does a plaintiff have occasion to rely upon RSA 508:10.*

Hughes v. Hebert, 106 N.H. 176, 178 (1965) (quoted in Gray, 2023 DNH 146 P, at *14).

1102.   This means Defendants' entire argument (that the statute of limitations has "run" on Plaintiff's claims) is not an obstacle to the NH savings statute but rather the very precondition for its invocation. The New Hampshire Supreme Court has made this explicit:

> *RSA 508:10 allows for a second suit 'after the statutory period has elapsed' and 'even though the statute of limitations for the underlying cause of action has run.'*

MBC, Inc. v. Engel, 119 N.H. 8, 12 (1979); accord Carson v. Maurer, 120 N.H. 925, 938 (1980)("Even if the limitations period . . . has expired, the plaintiffs may still bring a new action if they do so within one year after the initial dismissal [pursuant to] RSA 508:10.").

1103.   Thus, Defendants' contention that the statutes of limitations have "expired" is not merely irrelevant, it is an unwitting concession that the NH savings statute governs. The entire architecture of RSA 508:10 exists to permit refiling after the limitation period has run, so long as the plaintiff met the statutory elements. Plaintiff has met every one.

### V. Defendants' Manufactured "No Deficiency Cured" Argument Is Contrary to Law

1104.   Both the Donais and Hilliard Defendants contort Fastrack Crushing Servs., Inc. v. Abatement Int'l/Advatex Assocs., Inc., 153 N.H. 284 (2006), to argue that Plaintiff must have "cured a deficiency" to invoke RSA 508:10. This argument fails on multiple levels.

1105.   First, no New Hampshire case imposes a freestanding "cured deficiency" requirement as a prerequisite to RSA 508:10. Defendants cite none because none exists. The statute contains no such language, and the New Hampshire Supreme Court has never grafted such a requirement onto the statute's text.

1106.   Second, Fastrack does not stand for the proposition Defendants ascribe to it. In Fastrack, the plaintiff had failed to meet a mandatory substantive statutory prerequisite, filing a mechanics lien within the time required

by statute, and then attempted to use RSA 508:10 to resurrect a claim that was jurisdictionally defective from inception. The Court held the NH savings statute inapplicable because the plaintiff could never have brought the claim in the first place; the "deficiency" was a substantive bar to the cause of action itself, not a procedural defect in the litigation. As the Court explained:

> *RSA 508:10 benefits suitors who are compelled to abandon their present action, whether by their own act or the act of the court, when either would leave them with a cause of action, yet undetermined.*
> Fastrack Crushing, 153 N.H. at 289 (quoting Berg, 134 N.H. at 257).

1107.   The Court's reference to "curing a deficiency" in Fastrack meant only that RSA 508:10 will not rescue a claim that fails a mandatory substantive statutory prerequisite to suit. It did not, and could not, create a general requirement that every plaintiff invoking RSA 508:10 must demonstrate some "cure."

1108.   Third, under Fastrack, RSA 508:10 is unavailable only where the plaintiff's claim fails to satisfy a mandatory substantive statutory prerequisite to bringing the action. Plaintiff's claims for defamation, tortious interference, consumer protection violations, and related torts have no unmet substantive statutory prerequisite. No court has held that any jurisdictional or substantive bar prevents Plaintiff from asserting these claims. *Conclusion:* Fastrack's exception does not apply, and RSA 508:10 operates without restriction.

1109.   Fourth, the New Hampshire Supreme Court has repeatedly held that RSA 508:10 protects plaintiffs regardless of why the prior action was dismissed, even where the plaintiff's own carelessness caused the dismissal:

> *A party is protected although the technical judgment against him may be due to his own carelessness or fault.*
> Milford Quarry & Constr. Co. v. Boston & Me. R.R., 78 N.H. 176, 178 (1916) (quoted with approval in Roberts, 140 N.H. at 725).

1110.   And further:

> *The test is plainly not whether the prior judgment of dismissal was based on any mistake committed by the plaintiff or his counsel.*
> Roberts, 140 N.H. at 725.

1111.    If RSA 508:10 protects a plaintiff who caused his own dismissal through "carelessness or fault," it certainly protects a plaintiff who filed a strategic voluntary dismissal for legitimate reasons.

1112.    Fifth, and in any event, Plaintiff did cure multiple procedural deficiencies through the dismiss-and-refile process. The voluntary dismissal: (a) eliminated duplicative parallel litigation in two forums (federal and state court); (b) avoided exposure to Massachusetts anti-SLAPP liability from Massachusetts claims filed in a New Hampshire forum; (c) allowed plaintiff to seek consolidation with the first-filed state court action in Hillsborough Superior Court (No. 216-2020-CV-00027, still pending); and (d) avoided the risk of inconsistent judgments. The dismissal notice explicitly stated these reasons. (FAC ¶¶ 71–73; Ex. A to MTD). Defendants' assertion that Plaintiff "gave no reason" for the dismissal is demonstrably false.

## VI. Voluntary Dismissal to Improve One's Litigation Posture Is the Express Purpose of Savings Statute

1113.    Defendants criticize Plaintiff for voluntarily dismissing "to avoid the likely dismissal on the merits." This argument is self-defeating. Even if the characterization were accurate (and it is not, given that no ruling on the merits was ever issued) it would be irrelevant. The savings statute exists precisely to protect plaintiffs who abandon a present action to pursue it more effectively:

> *The statute benefits suitors who are compelled to abandon their present action, whether by their own act or the act of the court, when either would leave them with a cause of action, yet undetermined.*

> Berg, 134 N.H. at 257; Fastrack Crushing, 153 N.H. at 289; Roberts, 140 N.H. at 725.

1114.    Rule 41(a)(1)(A)(i) gives plaintiffs an absolute right to dismiss voluntarily before an answer or motion for summary judgment is filed. Hells Canyon Pres. Council v. U.S. Forest Serv., 403 F.3d 683, 687 (9th Cir. 2005). The rule contains no exception for cases where dismissal is sought to improve one's position. And Rule 15(a) exists for the very purpose of allowing plaintiffs to amend, cure deficiencies, and avoid dismissal. Foman v. Davis, 371 U.S. 178, 182 (1962). Defendants' argument amounts to a demand that Plaintiff be punished for exercising procedural rights that the law affirmatively grants. That position finds no support in the law.

1115.    The Roberts Court addressed and rejected an identical argument. In Roberts, the defendant argued that the plaintiff should not be permitted to invoke RSA 508:10 because the successive suits were filed to gain a litigation advantage. The Court disagreed, holding that "[i]f each application of the saving statute was fair,

reasonable, and thus appropriate under the plain meaning of the statute, we see no reason to read into the statute a one-use limitation that the legislature has not enacted." Roberts, 140 N.H. at 727. The Court further noted that the "diligent suitor" whom the savings statute protects "is the plaintiff who has not slept on his rights; it does not require diligence in the sense of never making mistakes." Id. at 726. There is simply no way around this fact.

### VII. RSA 508:10 Permits Successive Applications and Applies to All Timely-Filed Claims

1116.   Defendants argue the savings statute cannot save claims that were not expressly pled in the original 2022 action. This argument conflates the savings statute with claim preclusion and misunderstands both doctrines. RSA 508:10 preserves the right to bring a "new action for the same cause" within one year. It does not require that every theory, count, or defendant be identical to the prior complaint. The "same cause" requirement refers to the same operative facts and transactions, not to the identical legal theories or causes of action. See Barton v. Barton, 125 N.H. 433 (1984).

1117.   Moreover, the New Hampshire Supreme Court in Roberts expressly held that RSA 508:10 permits successive use, there is no "one use only" limitation:

> *On its face, RSA 508:10 does not contain any circumscribing language that might require a court to interpret 'the time limited therefor' as referring to timeliness under only one statute, the statute of limitations…If the legislature had intended to limit RSA 508:10 to only one application, it could have stated such an intention clearly, as has been done in other States.*

Roberts, 140 N.H. at 727.

1118.   Plaintiff's original complaint, filed June 18, 2022, was timely for all claims with a three-year statute of limitations arising from events occurring on or after June 18, 2019, and earlier, under the discovery rule. The savings statute preserves all such claims. Plaintiff's addition of claims in the FAC (and the proposed SAC), including those against newly added parties and under additional legal theories, is permissible because they arise from the same core operative facts. Amendment relates back under Fed. R. Civ. P. 15(c)(1)(B) because the claims arise "out of the conduct, transaction, or occurrence set out, or attempted to be set out, in the original pleading."

248

**VIII. The Savings Statute Applies to Contract Claims and All Causes of Action Without Distinction**

1119.   Nothing in the text of RSA 508:10 limits its application to tort claims. The statute applies to any "action" dismissed without a judgment on the merits. The New Hampshire Supreme Court has applied the savings statute to actions of all types, including zoning appeals (Doggett, 138 N.H. at 746–47), trust beneficiary claims (Gray, 2023 DNH 146 P), consumer protection actions (Vanz, 2019 WL 1406150), and RICO claims (id.). Defendants advance no authority, because none exists, that contract-based claims are excluded from RSA 508:10's reach.

1120.   RSA 508:10 applies to all actions dismissed without a judgment on the merits, regardless of the nature of the underlying claim. Plaintiff's claims include both tort and contract-based theories, all of which were dismissed without a judgment on the merits when Plaintiff voluntarily dismissed on June 3, 2024. Conclusion: RSA 508:10 preserves all of Plaintiff's claims, including any contract-based claims.

**IX. Natalie Anderson's Claims Are Independently Timely**

1121.   Co-Plaintiff Natalie Anderson's claims are timely on independent grounds. Anderson's claims arise from conduct directed at her individually, including Defendants' defamatory statements and interference with her professional and personal interests. To the extent these claims arise from the same operative facts as Bisasor's claims, they are preserved by the savings statute for the same reasons. To the extent they involve distinct injuries, they are independently timely because Anderson first discovered the wrongful conduct within the applicable limitations period.

1122.   Anderson's addition to the complaint is proper under Fed. R. Civ. P. 15(c)(1)(B) because her claims arise from the same conduct, transactions, and occurrences. Moreover, Anderson's claims relate back under Rule 15(c)(1)(C) because: (1) they arise from the same operative facts; (2) the Defendants had notice of the claims; and (3) the Defendants knew or should have known that Anderson would have been named but for the pro se plaintiffs' uncertainty about joinder and standing theories. Defendants' motion to dismiss Anderson's claims as untimely should be denied.

**X. Discovery Rule Tolling Independently Saves All 2019 Claims**

1123.   Even if the savings statute did not apply, and it plainly does, discovery rule tolling independently saves all claims based on Defendants' 2019 conduct. Under New Hampshire law, a cause of action does not accrue "until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of." RSA 508:4, I. This rule applies to "all personal actions." Id.

1124.   Additionally, where a defendant actively conceals the wrongful conduct, the statute is independently tolled:

*[W]hen facts essential to the cause of action are fraudulently concealed from a plaintiff by a defendant, the statute of limitations is tolled until the plaintiff discovers or reasonably should have discovered those facts.*

Sinclair v. Brill, 857 F. Supp. 132, 136 (D.N.H. 1994) (citing Vt. Elec. Supply Co. v. Andover, 127 N.H. 759, 761 (1986)).

1125.   Here, the factual record is unambiguous. All Defendants' wrongful acts and defamatory statements in 2019 were concealed from Plaintiff. The FAC alleges, and Defendants cannot dispute on a motion to dismiss, that:

*All acts and statements of Craig Donais or the other defendants that occurred in 2019, were hidden from the plaintiff, and was not discovered by the plaintiff until around July 21, 2020, when Craig Donais and Russell Hilliard were forced to disclose certain information as part of an ADO investigation, and further until November 2020, via right-to-know requests later submitted by the plaintiff.*

(FAC ¶ 92).

1126.   Under the discovery rule, a cause of action accrues when the plaintiff discovers or reasonably should have discovered the injury and its cause. Plaintiff did not and could not have discovered Defendants' 2019 defamatory statements until July 21, 2020, when the ADO investigation compelled disclosure. Conclusion: The three-year statute of limitations for the 2019 claims did not begin running until July 21, 2020, and therefore did not expire until July 21, 2023. Plaintiff's original complaint, filed June 18, 2022, was timely.

1127.   Defendants cannot challenge this timeline because it is their own disclosure that triggered Plaintiff's discovery. They controlled the information and actively concealed it. They made defamatory statements to Crime-Line board members (FAC ¶¶ 98–123), Manchester Police (FAC ¶ 310), family members and friends (FAC ¶¶ 124–146), all behind Plaintiff's back, without his knowledge. Under New Hampshire law, Defendants

cannot profit from their own concealment by arguing that the limitations period ran while Plaintiff was in the dark about the very injuries they inflicted in secret.

### C. Other Considerations Pertaining To Statute of limitations

1128.   This case was originally filed on Saturday, June 18, 2022 in the Bristol Superior Court of Massachusetts.

1129.   For events occurring on June 18, 2019 as well as subsequent events in 2020, in 2021, in the first half of 2022, there are no statute of limitations issues for such claims in this complaint since, at a minimum, there were less than 3 years that elapsed between these events and the filing of the complaint on June 18, 2022. Once the NH savings statute is applied, those events and related claims are on time.

1130.   It should be noted that although the case was filed on Saturday, June 18, 2022, the actual 3 year deadline for claims carrying a 3 year statute of limitations (which most civil claims in NH have) would have been Monday, June 20, 2022 given that June 18, 2022 fell on a Saturday and thus according to the rules, the deadline would bump to the next business day of Monday, June 20, 2022, which is when plaintiff e-filed complaint was docketed by the court which it was first filed, after plaintiff had e-filed it on Saturday, June 18, 2022 and of which there is proof of it being electronically filed on June 18, 2022.  See screenshot below of the e-filing receipt. This shows the actual submission filing date was Saturday, June 18, 2022 at 11.58pm.



1131.   Also, at the time of the original filing, the plaintiff contacted the Bristol superior clerk to address this question. See screenshot of email below.

**From:** bristol.clerksoffice@jud.state.ma.us <bristol.clerksoffice@jud.state.ma.us> **On Behalf Of** Andre Bisasor
**Sent:** Tuesday, June 21, 2022 10:33 AM
**To:** bristol.clerksoffice@jud.state.ma.us
**Subject:** Regarding Case # 2273CV00430

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Clerk Office,

I filed a case on June 18, 2022. Could you please ensure the entry date of the complaint is June 18, not June 20. Also, I filed an affidavit of indigency, can you please impound that asap, as it is not impounded on the docket.

Thanks

Andre Bisasor

1132.  The Bristol superior clerk confirmed that Saturday filings are docketed as filed on the next business day (which in this case was Monday June 20, 2022). See screenshot of email below.



**Jennifer A Sullivan**
**From:** jennifer.sullivan@jud.state.ma.us
**To:** Andre Bisasor,  bristol.clerksoffice@jud.state.ma.us

Tue, Jun 21, 2022 at 11:36 AM

Mr. Bisasor:

According to our e-filing system, your complaint was received on 6/20 @ 12:00am.  In addition, 6/18 was a Saturday and filings are not accepted on the weekends. Accordingly, the filing date of this complaint will remain as 6/20.  Also, the affidavit of indigency has been impounded.  Please feel free to contact me with any questions.

Jennifer A. Sullivan, Esq.
Assistant Clerk/Magistrate
Bristol Superior Court
441 County Street
New Bedford, MA  02740
(508)996-2051

1133.  Therefore, the 3 year deadline actually landed on Monday June 20, 2022. So, any pedantic quibbling over June 18, 2022 versus June 20, 2022 is moot and irrelevant in light of the above.

1134.  Since the core events for which the plaintiff seeks recovery in this case, are alleged to have started on or about June 18, 2019, or otherwise in or around June 2019, then either way the plaintiff is covered regarding any statute of limitations issue for this complaint for claims that carry a 3-year statute of limitations.  Also, for any events that took place in 2020 or after, there are no statute of limitations issues for any such claims based on those events in this complaint.

1135.  Similarly, COVID-19 Tolling further applies when the case was originally filed in June 2019 in Massachusetts, as NH savings statute applies Massachusetts rules for determining timeliness of the first-filed action (not the re-filed action). The Supreme Judicial Court issued an order tolling all civil statutes of limitations for 106 days, due to the COVID-19 pandemic. This tolling applies to all civil cases, not just those where the statute of limitations would have expired during the tolling period. Thus, the actual statute of limitations

deadline for the first-filed action in Massachusetts, is automatically tolled for additional 106 days based on this tolling created by the SJC in 2020. See Shaw's Supermarkets, Inc. v. Melendez, 488 Mass. 338 (2021) (holding that its 2020 COVID-19 statute of limitations tolling order tolled the statute of limitations for all civil actions).

1136.   But there is even a more important point here. **All acts and statements of Craig Donais or the other defendants that occurred in 2019, were hidden from the plaintiff, and was not discovered by the plaintiff until around July 21, 2020, when Craig Donais and Russell Hilliard were forced to disclose certain information as part of an ADO investigation, and further until November 2020, via right-to-know requests later submitted by the plaintiff.** Plaintiff could not have known of the acts, statements and events complained of in this complaint that occurred in 2019 at the time they occurred in 2019. Thus, the discovery rule tolls all statute of limitations for events in 2019 until discovery of these events, by the plaintiff in 2020. [NB: The defendants cannot challenge this fact because it is undeniably true.]. Therefore, all events alleged in this complaint that occurred in 2019, and beyond, are timely when the original complaint was filed on June 18, 2022, and saved thereafter for this re-filed complaint, in accordance with the NH savings statute[12].

1137.   See screenshot of email from Russell Hilliard to the plaintiff that contained the first such disclosure to the plaintiff in the ADO investigation process of Craig Donais on 7-21-20.



---

[12] The defendants appear inclined to make frivolous and misleading assertions regarding the NH savings statute when they know that the NH savings statute clearly is applicable in this case. Such frivolous and misleading assertions, if continued, are grounds for sanctions and/or attorney discipline for lack of candor with the court.

1138. It should be noted that this complaint allege events that took place after June 2022 and in 2023. Those events obviously are timely on their own, without the aid of the NH savings statute, as these all occurred less than 3 years of the date that this complaint was filed in NH superior court on June 3, 2025.

1139. For the state court defendant, the alleged events occurred in 2024 and 2025, making claims based on such events self-evidently timely.

1140. In sum, all of the events that began in 2019 and 2020, and continued into 2021, have no statute of limitations issue under the NH savings statute. All newer events in 2022 and 2023 by the original defendants have no statute of limitations issue on their own, without aid of the NH savings statute. All newer events in 2024 and 2024 by the amended defendants have no statute of limitations issue on their own, without aid of the NH savings statute. Claims made by the new plaintiff Anderson for events in 2022 and 2023 have no statute of limitations issue on their own, without aid of the NH savings statute.

**XI. The Pending State Court Action Provides Additional Support**

1141. Plaintiff filed a state court action in Hillsborough Superior Court North on January 3, 2020 (No. 216-2020-CV-00027). That action remains pending. This filing further demonstrates Plaintiff's diligence and the absence of any prejudice to Defendants. Defendants have been on continuous notice of the claims against them since at least January 2020, and they have had ample opportunity to preserve evidence and prepare their defense. The purposes underlying the statute of limitations, including notice and prevention of stale claims, are fully satisfied.

1142. The Roberts Court emphasized precisely this point in rejecting a similar limitations defense:

> *This action was virtually always on the active docket…[The defendant] was on notice of the allegations against it, and of its need to secure and preserve evidence to prepare its defense.*
> Roberts, 140 N.H. at 727.

1143. The same is true here. From the January 2020 state court filing, through the June 2022 federal filing, through the June 2024 voluntary dismissal, through the June 2025 refiling, Defendants have never once lacked notice that Plaintiff intended to pursue these claims. There is no surprise, no prejudice, no staleness. The statute of limitations defense is a pure technicality that the savings statute was designed to overcome.

254

**XII. Defendants Bear Burden on Their Affirmative Defense, and Pleadings Do Not Clearly Establish It**

1144.   The statute of limitations is an affirmative defense. As the First Circuit has held, it may be raised on a Rule 12(b)(6) motion "only if the facts establishing the defense are clear on the face of the plaintiff's pleadings." Gonzalez-Gonzalez v. United States, 257 F.3d 31, 37 (1st Cir. 2001). Where the pleadings raise a factual question concerning the applicability of a statute of limitations defense, dismissal is inappropriate. Id.

1145.   Here, the FAC alleges the savings statute applies, pleads the discovery rule with specificity, and identifies Defendants' active concealment of the 2019 conduct. The defense is not "clear on the face of the pleadings." To the contrary, the pleadings raise multiple factual questions (including when Plaintiff discovered the injuries, when the limitations period began to run, and whether Defendants' concealment tolled the statute) that cannot be resolved on a motion to dismiss. This Court must deny the motion and allow these fact-intensive issues to proceed to discovery.

**XIII. Anticipation and Refutation of Defendants' Remaining Arguments**

1146.   Defendants may argue that the Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5 (1st Cir. 2004), decision supports their position. It does not. Rodi involved the Massachusetts savings statute, not New Hampshire's RSA 508:10. Rodi held that the Massachusetts savings statute applied because the plaintiff had cured a jurisdictional defect. Here, Plaintiff likewise cured procedural inefficiencies. But more fundamentally, New Hampshire's savings statute does not require proof of any "cure" as a condition of its application.

1147.   Defendants may argue that Plaintiff's complaint is "nearly identical" to prior filings, suggesting no meaningful change occurred. This argument is self-contradictory—the Hilliard Defendants separately argue that "the Amended Complaint changed some allegations and claims." (Hilliard MTD at 6). Defendants cannot have it both ways. The FAC materially differs from prior complaints: it removes claims based on privileged conduct within judicial proceedings, adds detailed factual allegations about extrajudicial interference, clarifies the nature and timing of contacts, adds Anderson as a plaintiff, adds specific vicarious liability theories against Upton & Hatfield, and eliminates Massachusetts law claims that created procedural confusion.

1148.   Defendants may contend that permitting the savings statute here will lead to endless litigation. The New Hampshire Supreme Court has addressed and rejected this slippery-slope argument:

*The trial court has ample authority to guarantee that such abuses do not occur. The court can, for example, deny a plaintiff's motion for voluntary nonsuit without prejudice; the court has discretion to grant a nonsuit only with prejudice, if it would be 'manifestly unjust' to the defendant to grant plaintiff's request.*
Roberts, 140 N.H. at 726.

1149.   No such manifest injustice exists here. Plaintiff exercised a single voluntary dismissal for legitimate strategic and procedural reasons, refiled within the statutory window, and improved his pleading. This is exactly the conduct the savings statute was enacted to protect.

---

### SECTION 13. CONCLUSION AND PRAYER FOR RELIEF

---

1150.   Plaintiffs repeat and reiterate each and every allegation of the second amended complaint, in the preceding paragraphs with the same force and effect as if herein set forth at length.

1151.   Given the 8 year nightmare that defendants have put the plaintiffs through, including trying to make plaintiffs seem to the world that they are crazy, that they are lying, that Donais is telling the truth, declaring this at every turn he gets, in every public forum he gets, including in public meetings at the advisory committee on rules, and given the mental anguish for 8 years and the pervasive continued damages suffered, Plaintiffs demand the following:

a.   Compensatory Damages: $850,000 for economic losses, reputational harm, and emotional distress.

b.   Punitive Damages: $1,000,000 to deter future misconduct.

c.   Attorney Fees and Costs: Pursuant to RSA 358-A:10 and 42 U.S.C. §1988.

1152.   Plaintiffs ask the court to grant a liberal construction to these pro se/non-lawyer words in a light most favorable to the plaintiffs, in accordance with the best practices of modern jurisprudence and in compliance with the US supreme court's directive to all lower courts and tribunals, in Haines v Kerner, 404 U.S. 519 (1972). Plaintiffs request that this court tries its best to understand what it is that the plaintiffs are trying to articulate to the court, and to interpret it in the best way and best light possible, in order to provide appropriate justice as is necessary and required.

1153.   WHEREFORE, Plaintiffs Andre Bisasor and Natalie Anderson respectfully request that this Court enter judgment in their favor and against Defendants and award the following relief:

a)   For Private Defendants:

- Compensatory damages in an amount to be determined at trial, including but not limited to damages for economic losses, lost contracts, lost settlement value, lost legal representation, reputational harm, and emotional distress;
- Punitive damages against all individual Defendants for their willful, malicious, wanton, and outrageous conduct, in an amount sufficient to deter future misconduct;
- A declaratory judgment that Defendants' conduct violated Plaintiffs' rights under 42 U.S.C. § 1981, and Fourteenth Amendments to the United States Constitution, and New Hampshire law;
- Injunctive relief prohibiting Defendants from continuing their tortious, retaliatory, and discriminatory conduct against Plaintiffs;
- Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 (for claims under § 1981);
- Enhanced and statutory damages under RSA 358-A:10 for willful or knowing violations of the New Hampshire Consumer Protection Act; and/or within the jurisdictional limits of this court, as appropriate;
- Pre-judgment and post-judgment interest as permitted by law;
- Grant a pro se liberal construction to this pleading;
- Order such other relief as this Court deems just and equitable, and all such other and further relief as the plaintiff may be entitled to by bringing this action.

b) For State Defendants:

- A declaratory judgment that Defendants' conduct violated Plaintiffs' rights under 42 U.S.C. § 1981, 42 U.S.C. §1983, Title II of the Americans with Disabilities Act, the First and Fourteenth Amendments to the United States Constitution, and New Hampshire law;
- A declaratory judgment that Chief Justice Mark Howard's failure to act on Plaintiffs' documented complaints of ADA violations and racial discrimination violated Title II of the Americans with Disabilities Act, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and Part I, Articles 2, 14, and 15 of the New Hampshire Constitution;
- Injunctive relief requiring Chief Justice Howard and the New Hampshire Superior Court to establish and implement written procedures for processing ADA accommodation complaints directed to the administrative head of the court system, including mandatory acknowledgment of receipt, mandatory investigation, mandatory written response within a specified time period, and mandatory referral to an independent ADA coordinator when the complaints concern the conduct of a sitting judge;
- An order requiring the New Hampshire Superior Court to provide training on ADA compliance, disability accommodation procedures, and the prohibition against racial discrimination in the administration of court services to all judges, clerks, and administrative personnel;

1154. Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,
/s/ Andre Bisasor
Andre Bisasor, Pro Se
101 Middlesex Turnpike, #270
Burlington, MA 01803
Tel: 781-492-5675
Email: quickquantum@aol.com

Date: March 25, 2026

/s/ Natalie Anderson
Natalie Anderson, Pro Se
101 Middlesex Turnpike, #270
Burlington, MA 01803
Tel: 617-710-7093
Email: liberty_6@msn.com

Date: March 25, 2026
Re-Filed/Corrected Date: March 26, 2026

## CERTIFICATE OF SERVICE

This is to certify that copies of this amended complaint was/will be served on all parties and counsel of record.

Respectfully submitted,
/s/ Andre Bisasor
Andre Bisasor, Pro Se
101 Middlesex Turnpike, #270
Burlington, MA 01803
Tel: 781-492-5675
Date: March 25, 2026                                                 Email: quickquantum@aol.com

/s/ Natalie Anderson
Natalie Anderson, Pro Se
101 Middlesex Turnpike, #270
Burlington, MA 01803
Tel: 617-710-7093
Date: March 25, 2026                                                 Email: liberty_6@msn.com