UNITED STATES DISTRICT COURT-DISTRICT OF NEW HAMPSHIRE

CIVIL ACTION NO: 1:25-cv-00251|ANDRE BISASOR v. CRAIG DONAIS, et. al

Andre Bisasor, Natalie Anderson,

Plaintiffs

v.

Craig S. Donais, Mary K. Donais, Donais Law Offices, PLLC, Russell F. Hilliard, Upton Hatfield, Karen Gorham, Amy Messer, Mark Howard, State of New Hampshire, Beatriz Van Meek,

Defendants.

# <u>Exhibits</u><br># <u>For</u><br># <u>Second Amended Complaint (Proposed)</u><br># <u>Part 1</u>

By Plaintiffs

# <u>Exhibit 1</u>

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**CONFIDENTIAL | FILED UNDER SEAL[1] | NON-EX PARTE**
**FIRST AFFIDAVIT OF ANDRE BISASOR IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY**

1. I, Andre Bisasor, being duly sworn, hereby depose and say and present the below statements of facts under oath as being the truth, to the best of my recollection, knowledge, understanding and belief.

2. I am a plaintiff in the above-captioned action and am competent to make this affidavit based on my personal knowledge of the facts stated herein.

3. Note: This affidavit is supported by exhibits in the separately filed Exhibits[2] for Motion for Partial Summary Judgment ("PSJ motion").  I hereby aver under oath that the documents in the Exhibits are a true and correct copy of those documents as identified.

## I. INTRODUCTION

4. My name is Andre Bisasor (hereinafter "I", "me", "myself", "Bisasor" or "Mr. Bisasor" is used interchangeably). My wife is  Natalie Anderson (hereinafter I refer to her as "my wife", "my spouse", or as "Ms. Anderson" or "Anderson", or with designations of "her" and "she" as used in context).

5. The facts stated herein are based on my personal knowledge and are true, correct, and accurate. Some of the below stated facts are also supported by documentary evidence, by audio and/or video evidence, by contemporaneous notes including by myself and by others such as Attorney Elliott Berry, and/or by other corroborating evidence[3].

6. This affidavit centers on a phone call that took place between Craig Donais ("Donais") and myself on 1-9-17, and in particular focuses on the content of what was discussed on the call, as well as some of the events leading up to it, and after it, as follows.

## II. EVENTS LEADING TO THE 1-9-17 CONSULTATION
### A. Summary of Underlying Dispute With Hilton Hotels/Homewood Property

7. In or around late 2015, Plaintiffs Bisasor and Anderson entered into a special agreement with an upscale newly built extend-stay mixed use property in Nashua, NH that operated under the Hilton Hotels brand ("Homewood Suites Nashua" or "Homewood"). Because of the promises made by Homewood's employees/management, we believed

---

[1]  This is filed under seal because I did not, have not and do not waive attorney client privilege regarding the 1-9-17 consultation. Also, I include other confidential information protected by privilege.

[2] Hereafter, any reference to "Exhibit" or "Exhibits" is a reference to the exhibits in the PSJ motion.

[3] See **Exhibit 28 - Audio Evidence To Impeach Donais (To Be Submitted via In-Camera and To Be Filed Separately) [as referenced in Pending Motion to Submit Audio Evidence In-Camera].**

had a valid agreement/contract for long-term accommodations, and because it was a mixed use property, we believed that this contract would serve as a basis for tenancy for a certain time period. However, in or around early 2017, we contacted Hilton executives to lodge a formal complaint about certain events that occurred at the property in early January 2017, that we believed constituted discrimination/retaliation based on race, among other things.

8.  As a result of that complaint, the property manager immediately, the next day, sought to break the agreement with us and suddenly asked us to depart the property within a certain short period of time. We believed this constituted a breach of contract and may also have implicated landlord-tenant laws. However, because of the ambiguity of NH law on whether long-term occupants of a hotel property can obtain tenancy rights and because the property was a mixed-use property (i.e., it catered both to long-term residents as well as to short-term transients), we weren't sure about their rights under these circumstances, because although they believed they had strong arguments, they could also perceive weaknesses given the gray area of the law in NH. Either way, we firmly believed we had solid contract rights regardless of whether a tenancy had accrued or not. Thus, we decided to seek legal advice/assistance.

### B. Urgent Search For Legal Assistance/ Representation

9.  After receiving the communication requiring our departure by a certain date, plaintiffs began urgently searching for an attorney for legal advice on the contract/tenancy issue and/or representation on the Homewood matter.

### C. Anderson Contact O'Brien Who Contacts Donais

10. On 1-5-17, Anderson contacted Attorney Robert O'Brien ("O'Brien") seeking legal assistance with the dispute with Homewood. During this 18-minute consultation[4], Anderson provided detailed information about the circumstances of her case, including sensitive information.

11. O'Brien, recognizing the complexity of the legal issues presented and acknowledging that such matters fell outside his primary area of practice, informed Anderson that he would consult with a colleague who possessed greater expertise in the relevant areas of law.

12. O'Brien then contacted Donais[5], specifically identifying him as an attorney with broader expertise relevant to Anderson's situation. During their conversation, O'Brien conveyed to Donais the substance of Anderson's legal concerns, along with the urgent timeline for immediate action[6].

---

[4]See **Exhibit 6 – Natalie Anderson Phone Records showing call from her to Robert Obrien on 1-5-17 (lasting 18mins).**
[5]See **Exhibit 7 – Phone Log of Robert Obrien Provided by Donais (purporting to show call from Obrien to Donais).**
[6]See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17.**

13. Following this consultation, O'Brien communicated to Anderson via text message[7] that he spoke with Donais, facilitating consultation between Anderson and Donais.

14. Obrien's text message to my wife on 1-5-17 stated as follows:

> "+16034599965. *Thursday January 5, 2017. "Here is contact info for attorney who handles discrimination cases Bussiere & Bussiere, P.A., please call 603.622.1002 emiljr@bussierelaw.com. Another attorney in that form (firm) is Keith Diaz. I spoke with Attorney Donais. He said you have a great contract case for the overcharges. He said the innkeeper rules would likely apply to your situation. Which allows for "no cause" evictions. He would not opine on the discrimination claims outside his experience." 6.15pm."*

15. This is a true and correct representation of Obrien's text message to my wife with legal opinion from Donais.

16. Here, Obrien's text message stated clearly that Obrien spoke to Attorney Donais and that Donais said that we "have a great contract case for the overcharges", that "the innkeeper rules would likely apply to your situation" and "which allows for "no cause" evictions", and that Donais would "not opine on the discrimination claims outside his experience." Therefore, Anderson provided prospective client information to Obrien who passed that information on to Donais and Donais passed back legal opinion on the case to Anderson through Obrien.

17. Note: In a later interview[8] with Mark Cornell ("Cornell") of the NH Attorney Discipline Office ("ADO"), Cornell stated that Obrien told him that:

> "He seems to recall that Mr. Donais did not think the innkeeper/landlord issue was "cut and dry.""

18. Thus, Obrien contacted Donais by phone, explaining his conversation with Anderson and the issues in the case. Obrien then sent Anderson a text summarizing the legal opinion rendered by Donais on the facts of the case.

### C. Anderson Contacts Hilton Executives

19. On 1-5-17, my wife contacted Hilton's senior management and on 1-6-17, Hilton executive leadership wrote an email[9] to her stating Homewood had assured them they had retained counsel[10] and were working to resolve the matter.

### D. Bisasor Contacts Akridge

20. On Thursday, 1-5-17, I (by phone) contacted Dave Akridge ("Akridge"), the owner of the company that manages Homewood. Akridge is the supervisor of general manager Adam Robitaille ("Robitaille"). I spoke to Akridge about the dispute that had ensued with Robitaille as it related to my/my wife's stay at Homewood, whereby we were told

---

[7] See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).**

[8] Cornell interviewed Obrien in August 2020 and Obrien confirmed that he sent the above text to the Anderson on 1-5-17. Obrien also confirmed that Donais told him that "the innkeeper/landlord issue was not "cut and dry"". This means that Obrien had to have explained enough of the case for Donais to render such an opinion. See also **Exhibit 3, 12 and 13.**

[9] See **Exhibit 5 – Email from Hilton Executive to Anderson on 1-6-17 (citing Homewood already had legal counsel).**

[10] On information and belief, in or around early January 2017, on or about the first days thereof, Akridge contacts Attorney Karl Terrell ("Terrell"), from Atlanta, for legal assistance regarding the unfolding dispute with the plaintiffs.

that we had to depart by a certain date, and asked him about getting his assistance in resolving the situation. Akridge told me that he would look into it and call me back the next day.

### E. Akridge Calls Back Bisasor

21. On Friday, 1-6-17, Akridge called me and told me that he knew that we were intending to go to court and that he and his lawyers were ready for any litigation. He also expressed anger that my wife had recently made complaints to Hilton Hotels' senior management, by email[11]. I expressed a desire for an amicable resolution, but he stated that the "only amicable resolution" was for us to leave that day. He stated because of the complaints made by email, then any hope that we had that cooler heads would prevail was not going to work out. He said because of these emails, that "things had escalated quickly" and thus it was not going to work out for us. After some further back and forth, wherein I tried to de-escalate the situation, Akridge eventually extended the departure deadline to 1-10-17, at which point if we did not voluntarily depart, Akridge stated we would be subject to force and "it would not be pretty".

### E. Bisasor Contacts Donais

22. Separately and independently from my wife[12], I had searched for and discovered several attorney ads online, including by Donais claiming to be an attorney in landlord-tenant law in the Nashua area. Because of this, I understood Donais to be a competent lawyer in landlord-tenant law and identified Donais as a lawyer to contact for legal assistance.

23. On Friday, 1-6-17 at or around 5:17pm, I placed a call[13] to Donais and got his voicemail and then left a voice-message of about 1 minute and 36 seconds in duration.  I called Donais' phone number, explicitly with the intention of seeking and obtaining legal advice, assistance, and/or representation.

24. In my voicemail, I identified myself as "Andre" (with no mention of my last name), and I proceeded to provide a brief overview of the reason I was calling, as follows:

> "Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical."

---

[11] See **Exhibit 5 – Email from Hilton Executive to Anderson on 1-6-17 (citing Homewood already had legal counsel).**

[12] NB: It should be noted that, at the time, in or around 1-6-17, I had found the name and contact information for Donais from an internet search list of NH attorneys who practiced landlord-tenant law. Given that time was of the essence (i.e., with only a day's notice to leave the property), my wife and I had separately undertaken the task of researching, identifying, and contacting attorneys that might possibly help us with this matter on an urgent basis. By separately undertaking this same task, we had hoped to cover double the ground to increase our chance of finding an attorney to help us on short notice. When, on 1-6-17, I initially contacted Donais through my own research, I didn't realize the connection to Obrien, i.e. that it was the same attorney that was already contacted by Obrien on behalf of my wife on 1-5-17.

[13] See **Exhibit 17 – Screenshot of Bisasor Call to Donais on 1-6-17 with voicemail left lasting 1.36 minutes**.

25. I thus requested that Donais represent me and explicitly sought individualized legal advice from him. This is evidenced by my call to Donais and the voicemail left[14]:

26. It should be noted that the above quote from the voicemail directly contradicts several averments by Donais made in his March 2017 affidavit, and impeaches the credibility of Donais.

### III. THE 1-9-17 CONSULTATION

27. On Monday, 1-9-17, at or around 10:43am, the very next business day, after retrieving the voicemail that clearly indicated the request for legal advice/assistance on a landlord-tenant matter, Donais returned my call (i.e., from my previous voicemail on 1-6-17). Donais thus intentionally called me, knowing that I was seeking specific legal advice/assistance on a specific landlord-tenant matter. This wasn't a situation where a random person calls his office and Donais picks up the phone and was caught off-guard. Here, Donais deliberately, and with forethought, listened to the voice-message and decided to return the call, in order to engage my request for legal advice/assistance, fully aware of what the call would be about and with intention to listen to me share information about my predicament.

28. The duration of the call was about 7 minutes and it ended at approximately 10:50am[15].

29. During that call, I discussed possible representation and I explicitly sought individualized legal advice from him, specifically requested advice on landlord-tenant matters, which is within Donais' practice[16], and Donais gave the desired legal advice on the landlord-tenant matters, for which I sought assistance, during the one-time legal consultation call.  A brief summary excerpt of part of what was discussed is as follows:

> I confirmed that the conversation was confidential and shared confidential information about the landlord-tenant arguments we had, requested advice on potential weaknesses in those arguments and on certain legal strategies being contemplated, and asked about the relevant statutes and the likelihood of obtaining a TRO. Donais indicated that he thought it was likely that we will get a TRO based on what was described to him but he could not say for sure if it would become permanent because he would have to take a look at all the documents himself. Donais also indicated a belief that our contract claim was strong based on what was described, but it would depend on what was actually written in an agreement or if we can actually show there was an agreement, etc.

30. It should be noted that the above-referenced statements by Donais regarding the contract claim, accords with what Donais had told Obrien regarding the contract claim, as reported to Anderson by Obrien via text on 1-5-17.

31. Thus, during this consultation, I disclosed confidential information and received legal advice from Donais.

---

[14] Note: Bisasor has a recording of this voicemail message left for Donais on 1-6-17.

[15] See **Exhibit 18 – Phone Records from Donais Showing Call Placed By Donais to Bisasor on 1-9-17.**

[16] See **Exhibit 16 for Advertisement of Landlord-Tenant Attorneys in NH showing Donais' Landlord-Tenant practice  in 2017.**

32. I thus engaged in preliminary discussions with Donais related to a legal analysis of potential claims that was to be brought in connection with the landlord-tenant matter involving Homewood.

### IV. DETAILS OF THE 1-9-17 TELEPHONE CONSULTATION

33. During this 1-9-17 telephone consultation, I disclosed confidential information about our claims and legal situation for the purpose of obtaining legal advice and potential representation.

34. I understood this consultation to be confidential and protected by attorney-client privilege, which was affirmed by Donais. I then provided information in good faith reliance on Donais's professional obligations as an attorney.

35. The below represents an accurate description of what was said both by myself and Donais on the call.[17]

36. It should be noted that, as I summarized the situation to Donais in the below conversation, Donais listened and periodically responded affirmatively; however, the bulk of his comments came later on in the call.

--------------------------------------------------------------------------------

- **[NB: Throughout the call and the comments made by me, Mr. Donais frequently engaged me by saying "ok", "yes", etc., as he listened to my summary of the situation below. Mr. Donais also affirmed the call was confidential.]**
- **Mr. Bisasor:** Hello
- **Mr. Donais:** Hello, I got a call from an Andre. May I speak to him?
- **Mr. Bisasor:** Who may I say is calling?
- **Mr. Donais:** This is Attorney Craig Donais. I am returning a call I got from him on Friday.
- **Mr. Bisasor:**  Oh, yes. Hi. This is he.
- **Mr. Donais:** How are you doing today?
- **M. Bisasor:** I'm doing OK. Thanks for calling back.
- **Mr. Donais:** Sure. No problem.
- **Mr. Bisasor:**  I just wanted to run by you a legal matter that I have, to see whether or not you could provide some assistance**.**  It is a landlord-tenant issue. But it is a tricky situation because it is at a hybrid property that offers transient guest stays, as well as long-term residential stays. So, my wife and I, as of November 2015, entered into a residential leasing arrangement for a year through the sales office at the property. After a year, this past November 2016, we renewed it for another 6 months until through May 31, 2017.  The problem is that over the year we noticed that we were treated differently in some of the services of the property--they offer some food service complimentarily--so we made some complaints about that, and apparently that angered the general manager. And we began to suffer what we believe is retaliation.  And it culminated in them sending us an email last week Wednesday stating that they wanted us to leave by this past Friday, January 6th.  We escalated the matter to the general manager's supervisor, and essentially they relented a little bit and gave us until tomorrow [Tuesday] to leave. So, what we have is a breach of contract scenario as well as what we would argue is a landlord-tenant issue, but the problem is that on the landlord-tenant issue, we would take the position that we are tenants, but because the property is one that also offers transient guest stays, and it is not clear if it's like an apartment, or simply an extended stay hotel residential property that offers both.  So because of that, management has threatened to call the police on us if we don't leave tomorrow, and that "it's not going

---

[17] The facts asserted herein are supported by multiple pieces of evidence including documentary evidence, audio and video evidence, court transcripts, etc. This description is further supported by other evidence including but not limited to **contemporaneous notes** in January 2017, when the issue of what was said on the call came up in a conversation with Attorney Elliott Berry ("Berry") after he agreed to provide legal counsel to us, and had asked for proof/details, given that the issue would have to be addressed[17] in court in a hearing that was at the time scheduled to take place on 1-18-17. NB: Berry is the well-known/respected housing director of the New Hampshire Legal Assistance ("NHLA"). See **Exhibits 24, 25, 26, 27, 28, 34, 35, 12, 3, and 4**.

6

to be pretty". We have advised them that we believe we are tenants and that they need to go through the tenant eviction process. They said they don't believe they need to do so, and they will call the police if we're not out by tomorrow. We actually called the police department of Nashua last week Friday, and spoke to an officer just to see the position they would take on it. I know that officers are not lawyers, but I just wanted to see how they would view it. The officer I spoke to, indicated generally that if we can show that we have an agreement for or until a certain time, or that we've been there for a certain time (and because I told them we've been here for over a year), they said that they would generally take the position that it is a civil matter that it needs to be sorted out in court. The problem is that I don't know if that one officer represents the views of any other officer that may be called at the time of or at such time that the matter might escalate. So, given all of that, what I really wanted to do today is to go into the Nashua District Court, and file a 540A petition proactively in order to gain an injunction or temporary restraining order and a declaration that we are in fact tenants, and that they need to go through the tenant process.

- **Mr. Donais:** Yeah. I don't have any capacity to be able to do that in the time you need. There is a lot I have got on my side. I know you indicated it is urgent in your voicemail…I'd love to help, but I just don't have the bandwidth to be able to do that in the short term.

- **Mr. Bisasor:** No, that's fine, as I understand the time-crunch is probably going to be the same for anybody I talk to at this juncture. But I drafted something that I believe would be something I can attach to the form that they give out at the court. My concern is that I just want to make sure that I have some of the legal points correct, and just to be able to have a little guidance on what I'm submitting. So I'm fine with doing it myself. So, for example, there are two questions I have: #1, would you agree that, based on what I described to you, the court would likely grant a temporary restraining order based on the facts that I have pointed out?

- **Mr. Donais:** I think that from your facts, it would be decided at a future hearing rather than what you got in the interim...

- **Mr. Bisasor:** Right, it would be decided at a future hearing, but would it be enough for them to enjoin the defendants from calling the police or using self-help?

- **Mr. Donais**: I think it would be likely. Likely is my quick answer, but I don't definitively know.

- **Mr. Bisasor:** Right, of course, you can't know for sure what a judge is going to do. The second question is do you agree that we'd be ok, based on the law, even if the property management were to take the position that we are in fact hotel guests and they are innkeepers?

- **Mr. Donais:** I don't know, but it really depends on if you have got a written agreement, and what exactly your arrangements are. And like you say, it is kind of a weird situation, and without looking at the specifics of what exactly you've got, I would not be in the position to say definitively what's around the corner or what the court would do or not do.

- **Mr. Bisasor:** Right. So in terms of your bandwidth, seeing that I am not really necessarily needing someone to go into court, do you think that you can at least look over what I have prepared?

- **Mr. Donais:** Honestly, I probably won't be able to get much time in between. I don't have much time until Wednesday, at this point, honestly. I've got too many things on the calendar, but I did want to give you a quick call back, so that you were not hanging.

- **Mr. Bisasor:** Right, OK.

- **Mr. Donais:** So, unfortunately, I don't think I'm going to be able to do anything during the timeline that you've got.

- **Mr. Bisasor:** Right. Alright, fair enough. I understand.

- **Mr. Donais:** OK?

- **Mr. Bisasor:** OK, thank you.

- **Mr. Donais:** OK.

- **Mr. Bisasor:** OK, bye, bye.

-----------------------------------------------------------

37. The above represents a true and accurate description of what was discussed on the 1-9-17 call.

7

38. As shown above, I discussed with Donais the underlying facts of the case, the potential claims against Homewood, the potential defenses that may be available to Homewood, and the relevant law and legal issues pertaining thereto, and the likely outcome of certain legal actions, opinions about the perspective the court might take on the issues, among other things, as well as including confidential strategies related to contacting the Nashua police preemptively, and sensitive information about being treated differently in the food service, etc. Furthermore, Donais clearly engaged me on my questions[18], gave responses thereto including his legal opinions on the claims and the likely outcome of the legal action, which opinion was consistent with what he had told Obrien on 1-5-17.

### V. FACTUAL REFUTATIONS & AVERMENTS PERTAINING TO THE 1-9-17 CONSULTATION

39. Based on the above, it is clear that several, if not the majority, of statements made by Donais in his 3-13-17 affidavit[19] are false. These provably false statements[20] are **relevant to the breach of fiduciary claim**, as shown below.

40. First, in his affidavit, Donais stated that Obrien called him and spoke to him about "*an unrelated matter involving a mutual client, and Attorney O'Brien also mentioned a potential case if I was interested. The matter involved three issues - discrimination, overcharges for services, and an improper removal/eviction action, and a need to file something on Monday.*" First, Obrien has stated more than once that he only spoke to Donais about the claims my wife discussed with him, and that he urgently reached out to Donais to speak to him about her case because of the urgent timeline involved. At no point has Obrien stated or indicated that he spoke to Donais about an unrelated matter. See **Exhibit 12** where Obrien makes this clear. Even in the original affidavit that Donais procured from Obrien, it said no such thing. See **Exhibit 10**.[21] But, here, Donais, 2 to 3 months later in his affidavit, now adds this detail, evidently in order to implicitly support his averment that he did not discuss the facts with Obrien. Obviously, even a 5 minute call with Obrien, would still yield a lot of discussion time, so being aware of that, Donais ostensibly seeks to find something else to fill up the time, thus adding in there this detail about discussing an unrelated matter. It is just not believable and it is contradicted by all the facts.

---

[18] Donais himself confirms in his various statements that I asked him questions including the Nashua circuit court on 1-18-17 and to Berry on 1-17-17, among others. See **Exhibit 24 and Exhibit 34**. Obrien in his 1-5-17 text message to my wife confirms that Donais gave his legal opinion on the issues of the case, on 1-5-17. See **Exhibit 9 and Exhibit 12.**

[19] See attached Donais March 2017 affidavit. I have attached Donais' affidavit here, and not in the main PSJ Exhibits, because I did not, have not and do not waive attorney client privilege regarding the 1-9-17 consultation, and because I intend to seal this affidavit.

[20] Note: The falsity of these statements are **not** here being shown to support a claim of defamation **regarding the 2017 affidavit itself**.

[21] I hereby aver under oath that this is a true and accurate copy of the letter submitted by Donais to various tribunals as showing the call log for the call between him and Obrien on 1-5-17. I also aver under oath that, in **Exhibit 12**, the email sent to me by Obrien on 9-20-20 is a true and accurate copy of that email and I also aver that the things stated in that email as attributed to Obrien from my interview with him as part of the ADO process is true and correct, and accurately represents what Obrien told me on 9-20-20, which is confirmed by Obrien's email response to it. See **Exhibit 11** for Bisasor's Email to Robert Obrien For ADO-Related Interview in 2020, showing that the 9-20-20 interview of Obrien was done in the context of ADO proceedings..

41. Further, contrary to Donais' assertion in his affidavit, Donais was the one who called Obrien, after Obrien had first tried to call him but didn't get through.[22] Second, Donais admits that he discussed the facts of the case involving specific claims/allegations and the urgency of the timing involved. Donais further admits that he received information on the "nature of the issues". This contradicts his position that he didn't discuss the case details with Obrien. Also, Donais intentionally excludes the fact that he rendered a legal opinion on the facts of the case as presented by Obrien[23].

42. It should be noted that, in paragraph 2 of his affidavit, Donais uses the term "prospective client" to refer to my wife in relation to the call from Obrien placed to Donais on 1-5-17. This shows an awareness and knowledge by Donais that my wife was in fact a prospective client under NH law, and that all of the rules governing prospective clients would apply to her. This further goes to establishing the fact that my wife was a prospective client of Donais in this matter, which accords with numerous other facts in this case including those supported by the documents in the Exhibits. It further shows that Donais knew that I too was a prospective client, which fact will be further elucidated below. Both my wife and I understood that our conversations were protected by attorney-client privilege in both the 1-5-17 and 1-9-17 consultations. See also **Exhibit 2 for Affidavit of Natalie Anderson**.

43. Contrary to Donais' assertion in his affidavit, that my 1-6-17 message requested "assistance on a real estate matter", I said no such thing. I requested assistance on landlord-tenant/legal matter. There was no mention of "real estate" or "real estate matter", whatsoever. Donais simply made-up the words "real estate matter".

44. Contrary to Donais' assertion in his affidavit, my 1-6-17 voice-message was not hard to understand. It was simple, clear and to the point. I spoke clearly and without disruption. The audio evidence bears this out. Further, in fact, by Donais' own admission, he contradicts himself in that the voice-message was evidently clear enough for Donais to hear my first name "Andre", my phone number, my request to call me back and that it was urgent.

45. Contrary to Donais' assertion in his affidavit, I can aver to the fact that Donais had no difficulty understanding me, as I spoke clearly to him on the call. In fact, during the call, Donais signaled that he understood what I was saying, by periodically making affirmations such as "yes", "ok", etc., throughout the conversation and, at certain points, he made clear comments in response to my statements or questions. So Donais' reference, in his affidavit, to "having difficulty

---

[22] See **Exhibit 7 – Phone Log of Robert Obrien Provided by Donais (purporting to show call from Obrien to Donais).**
[23] See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais),** and **Exhibit 11 – Bisasor Email to Robert Obrien For ADO-Related Interview in 2020,** and **Exhibit 12 – Updated Statement of Robert Obrien on 9-20-20 (via ADO interview process).**

clearly understanding the caller or his pronunciation" appears to be nothing but a veiled attempt to try to cast me as some kind of a foreigner who could not speak proper English. The only language I speak is English. English is not my second language. I am not illiterate or uneducated, nor do I suffer from a speech impediment. I have multiple advanced/graduate degrees and was a double major in my undergraduate studies. I have no problem whatsoever with understanding, speaking or pronunciation of sentences in the English language.

46. Contrary to Donais' assertion in his affidavit, Donais 3-13-17 affidavit (i.e., "*On the morning of Monday, January 9, 2017, I returned the call and spoke with a person who identified himself as "Andre", and what sounded like "Bedsore" as a last name*"),  I did not say or mention my last name[24] on the 1-9-17 call with Donais. In fact, it was Donais who called me on 1-9-17 and when I answered the phone, Donais asked to speak to "Andre", and I simply stated, "this is he". I never actually stated to him on the call that my name was "Andre", I only confirmed it by saying "this is he", when he asked to "speak to Andre" (which, as stated before, I left my first name "Andre" on the 1-6-17 voicemail). Moreover, at no time did I mention my last name whatsoever, and at no time did Donais reference my last name and at no time did Donais ask me about my last name.  In fact, **the only way**[25] for Donais to have known my last name, at the time, was for him to have received that information from Akridge or from the Homewood defendants' out-of-state counsel Karl Terrell[26]. Given that Donais initiated the 1-9-17 call, and given that neither myself nor Donais mentioned or asked about or discussed my last name whatsoever, Donais' reference (made in his 3-13-17 affidavit) to him hearing what sounded like "Bedsore as a last name" on the call is **completely fabricated**.

47. NB: Given that Donais did not hear or know my last name at the time whatsoever, the fact that he chose to fabricate this particular lie makes it a clear attempt to place me in a negative light as the "other" (i.e. by playing to biases against anyone with an unusual or foreign-sounding name) while at the same time mockingly casting aspersions on my name. There is no innocent mistake here with this lie. It is 100% false for Donais to state in his affidavit that I stated my last

---

[24] NB: It should also be noted, for the record, that I didn't say or mention my last name on my 1-6-17 voicemail that I left for Donais, so he could not have gotten my last name from that source either. I only stated my first name "Andre" on the 1-6-17 voicemail. This is corroborated by audio evidence.

[25] NB: My last name could not have come from Obrien either because my wife did not tell Obrien my last name; only my first name was shared with Obrien. See also **Affidavit of Natalie Anderson** that accompanies this document.

[26] This point supports the conclusion that, in order for Donais to have known my full name/last name before 1-9-17, then it follows that Obrien must have shared with Donais (on the 1-5-17 call) the name of Homewood Suites of Nashua and that Donais must have been in contact with Akridge or Terrell (prior to Donais' 1-9-17 call with me), who then in turn must have told Donais my full name including my last name. This is the only way Donais could have known my last name by 1-9-17.  Conversely, if Donais did not know my full/last name by 1-9-17, then he must have learned my full /last name after 1-9-17, and then retroactively applied this knowledge to fabricate this assertion.

name to be something that sounded like "bedsore". It is evident that Donais thought that by adding specific details like this to his 2017 affidavit, it would bolster its credibility. But unfortunately for Donais, there is evidence that refutes his assertion, including but not limited to audio evidence and his own other contradictory statements to Berry, and there is evidence that supports my affidavit, showing that Donais is guilty of making false statements, which he did to aid the credibility of his lying affidavit. The same is true for his many other false statements in his affidavit.

48. It should be noted that Berry stated in his notes about his call to Donais in 1-17-17 that Donais said the following:

> In regard to the phone call with Andre on Jan 9, he says that he spoke to "some guy" he didn't get any specific facts from Andre--that he is not even sure that Mr. Anderson gave him his name or that of the defendant.

49. Here, Berry certifies, in his statement provided to the ADO, that Donais said I did not even give my name[27] to Donais on the 1-9-17 call. How did Donais statements go from "some guy" and "did not give his name", on 1-17-17 with Berry, to Andre "Bedsore" on 3-13-17 in his affidavit? Moreover, we know that Donais sent an email to Akridge on 1-11-17 (just 6 days before the call with Berry) stating that he spoke to an "Andre". So, how could Donais tell Berry on 1-17-17 (6 days later) that Donais was not sure he got my name from me on the 1-9-17 call? This is pure dishonesty and is 100% a lie. It further establishes a consciousness of guilt because why would Donais lie about this to Berry on 1-17-17, unless he knew there was a conflict that he knew of from at least a week prior and before he took on representation of Homewood.

50. Donais further told Berry the following:

> He did say however that he didn't want the information from the caller (Mr. Anderson) because I have represent the defedant before and the principal for a long time. He said that he understands but complained that client was trying to avoid the real issue, and questioned whether he made the call to him just to conflict him out of the case.

51. Here, Donais told Berry that Donais did not want information from me on 1-9-17 because he knew there was a conflict (that he represented the defendant and the principal for a long time). Donais further suggested to Berry that I knew of the conflict before calling Donais and then called Donais just to conflict him out of the case. First, Donais admits there was a conflict prior to my calling Donais on 1-6-17 when I left the voicemail. So, Donais asserted that the conflict existed before I even called Donais on 1-6-17. Well, how could that be, if I had not spoken to Donais as

---

[27] It is not credible that Donais did not know my first name "Andre" at the time when Berry called him on 1-17-17. That Donais would say this to Berry showed Donais' penchant for lying/deception. He was at the time desperately trying to stay on as local counsel for Homewood and evidently was trying to avoid any admission to Berry that would support the existence of a conflict, and thus he lied by denying that he knew my name at all and that it was just "some guy" that called him, that did not give him any specifics or names including my name. Yet, on 1-11-17, 6 days earlier, Donais clearly told Akridge that he spoke to an "Andre" on 1-9-17. This shows that Donais was lying to Berry. Further, Donais must have written down my first name "Andre" from the 1-6-17 voicemail, along with my phone number, in order to call me back on 1-9-17. There is no chance that Donais did not have this information accessible at the time that Berry called him on 1-17-17.

yet? What Donais was saying is that because of his prior relationship with Akridge, there was a conflict with Akridge regardless of whether Akridge hired Donais for this case. This is a damning admission. Because when Donais told Akridge on 1-11-17 that there was no conflict, Donais was evidently lying to Akridge. Either way, all of the facts/ events above establish that Donais knew there was a conflict before he was hired by Akridge on 1-11-17 and that Donais knew there was a conflict before he spoke to Berry on 1-17-17. It also establishes that Donais knew there was a conflict when speaking to me in 1-9-17 as Donais said to the judge in the 1-18-17 hearing[28] that he was aware of a [potential] conflict and that is why he didn't want to take the case. He also told Berry the same thing, that he didn't want the information because he was aware of the conflict. Further, Donais was aware of a conflict when speaking to Obrien on 1-5-17 because Donais stated to the police on 6-18-19 that he was aware of a conflict when speaking to Obrien on 1-5-17 (saying "I don't really want to talk with the person who does potentially create a conflict and a situation for me")[29]. Well, how could he be aware of a conflict if Donais didn't get my name or that of the property?

52. I, again, aver that the audio evidence of the voicemail on 1-6-17 shows the I left the following message:

> "*Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical.*"

53. The above show that Donais made false statements about the message I left for him on 1-6-17.

    a) I did not say my last name.

    b) I did not say "real estate" matter.

    c) I did not leave an unclear message hard to understand.

54. Moreover, Donais has had this voicemail on his own system since 1-6-17. He would have known that his statements were not true or accurate. Yet he still goes and say in his 3-13-17 affidavit (and later to others including the police and others) that I said, "real estate matter", that the message was hard to understand and that I left my last name on the voicemail, which are all false and provably false.

---

[28] See **Exhibit 34 - Transcript of the District Court Hearing with Judge Paul Moore on 1-18-17.**

[29] See **Exhibit 27 – Excerpt of Transcript of Statements of Donais to Police on 6-18-19**. See also **Exhibit 26 – Email from Hilliard on 7-21-20 with police report showing Donais contacted the police about plaintiffs in June 2019|Excerpt of Police Report by Donais divulging Plaintiff's client information.**

55. These statements show a carelessness with the truth by Donais and that the details of his affidavit do not add up or comport with the facts. This undermines credibility for the rest of his statements. This is further supported by Elliott Berry later below.

56. Contrary to Donais' assertion in his affidavit, I did not speak for only one minute before he interjected to ask me about Obrien. First, he did not ask me about Obrien at all at any time. That is a critical lie here. But also, he did not interject at all to stop me from speaking and sharing details of the case. I spoke at least for about 4 to 5 minutes[30] sharing details of the matter with Donais, as he listened intently and throughout indicated conversational affirmations like "ok", "yes", etc. At no point did he interrupt me. He waited until I was finished, and after I asked my first question, before he gave any substantive response.

57. Contrary to Donais' assertion in his affidavit, Donais did not **ask me** if I got Donais' name and number from Attorney Robert O'Brien ("Obrien" or "Attorney Obrien").

58. Contrary to Donais' assertion in his affidavit, I did not **indicate** to Donais that I received Donais' name and number from Obrien. Donais did not ask me about Obrien at all. Note: If I had gotten his name from Obrien, why did Donais have to be the one to ask me about Obrien? Why wouldn't I be the one to state that I got his name from Obrien from the outset of the call? Why would I start from scratch telling Donais about the case, if I knew that Obrien already spoke to him about it and that Obrien had sent a text message to my wife with Donais' legal opinion on the contract case, etc.? If I had gotten Donais' name from Obrien, then why didn't I ask him about his legal opinion that he gave to Obrien[31]? This does not make sense. It does not ring true or natural as the way how the conversation likely went.

59. Contrary to Donais' assertion in his affidavit, I did not "challenge" Donais' declination of representation.

60. NB: It should be noted, however, that when Donais indicated, towards the latter part of the call, that he didn't have the bandwidth to take on representation in the case, I simply asked him a follow-up question to clarify whether he

---

[30] It should be noted that any rough counting of the time it takes to say the words outlined in paragraph 37 above, bears this out.

[31] Donais states in his affidavit that he did not state the legal opinion that Obrien attributes to Donais in the 1-5-17 text message sent by Obrien to my wife. But yet, I would not have known that Donais would later deny that Obrien sent Donais that text message. If I had gotten Donais name from Obrien, then I would've most likely known/remembered at the time of the 1-9-17 call that my wife received a text message on 1-5-17 stating that Donais gave a legal opinion on the contract claim for this case. So, it would have been logical for me to ask Donais about this. Yet, nowhere does Donais say in his affidavit that I first brought up his legal opinion from Obrien, and nowhere does he say in his affidavit that I mentioned the Obrien connection first. If that was present in my mind, why would I not bring it up on the call myself from the outset? By not bringing this up at the outset, it indicates, based on Donais' version, that I effectively was starting this entire separate conversation with him that was unconnected to what my wife discussed with Obrien (which is what I am averring under oath actually happened in that I separately contacted Donais while my wife had separately contacted Obrien, and at the time of the 1-9-17 call I had not yet connected the two…so clearly there are parts of Donais' story accords better with my statement, than his own fabricated story does).

would be willing to at least look over some paperwork, that had already been drafted, before it was submitted to the court later that same day, since we really didn't need someone to actually go into the court to get the 540A petition filed initially. Once he told me that he did not have time for that either, I stated simply that this was "fair enough" and that I understood, and then thanked him before saying goodbye. It is a complete misrepresentation and it is totally misleading for Donais to assert or suggest that I "challenged" his declination of representation. At no point did I challenge his declination of representation. Again, to be clear, when, towards the latter part of the call, Donais declined to take the case, I didn't ask him thereafter if he could still represent me. I simply clarified if he would be willing to minimally look over the filing already drafted before it was submitted, in which I made clear that we were willing to proceed on our own without representation. In my mind, this was a reasonable question to ask Donais given that his only stated reason for not taking the case was that he did not have the time to take on the case, under the short timeline. I simply didn't know, at the time, if he would've had the time to do a shorter and simpler one-time task of reviewing a 540A petition before it was filed in court (without the added burden of representation in the case). And I couldn't or wouldn't have known the answer to that question unless/until I asked. After he answered that question indicating he didn't have the time to at least do that basic one-time task, I didn't ask him any further questions. The outline of the conversation referenced above shows the truth of my statement here. And not only does my statement ring true in terms of how one might imagine that such a first-time consultation might typically go in that it was relatively unremarkable (i.e., Donais' story comes across unnatural and strained, as he dissembles the sequence of what is said and he introduces extraordinary and unusual statements in it such as the discrimination accusation which does not fit and does not make sense), but it accords with what Berry, Obrien, Diaz's statements[32], etc., whereas Donais' statements are inconsistent or outright contradicts these other statements.

61. Contrary to Donais' assertion in his affidavit, Donais did not tell me that he did not do race discrimination cases. I never specifically brought up or mentioned that I had a race discrimination claim. I did not even tell Donais that I was Black nor did I state any form of racial identity[33]. So, there was no basis for Donais to tell me that he did not do

---

[32] See **Exhibit 24 – Elliott Berry's Contemporaneous Notes From Call To Donais About Conflict of Interest on 1-17-17.**  See **Exhibit 12 – Updated Statement of Robert Obrien on 9-20-20 (via ADO interview process). See Exhibit 13 – Statement of Keith Diaz on 9-18-20 (via ADO interview process) showing no call with Obrien). See also Exhibit 14 – Bio of Keith Diaz showing discrimination law practice (proving the text in Ex. 9 didn't apply to him).**

[33] Note: In his 1-11-17 email (see **Exhibit 19**), Donais told Akridge and Terrel that: "*What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services **because they were minorities,** and were being overcharged for their use of the room.*"  But I never told Donais that I was a minority. It is also noteworthy that Donais told the police on 6-18-19 (see **Exhibit**

race discrimination cases. During the call, I only focused on contract/landlord-tenant issues. Thus, I didn't tell Donais that I was Black, African American or a minority. I only indicated parenthetically that we were treated differently in the services of Homewood[34], in particular the food service, but I didn't indicate why, nor did I indicate that I believed it was because of my race or because we were minorities. The focus of the call was only on the legal issues/question pertaining to tenancy/contract in an extended stay hotel, pursuant to a 540A action. Thus, I would've had no logical basis to accuse Donais of racism since I hadn't disclosed my race.

62. Contrary to Donais' assertion in his affidavit, I did not mention or say the words "race", "racism", "race discrimination", "discrimination", "discriminating" or "discriminate" (or any variation of those words) in my conversation with Donais. Neither did Donais mention or say any of those words on the 1-9-17 call.

63. It should be noted here, that after I received notice of the filing of Donais' affidavit in March 2017, I shortly thereafter spoke to Attorney Berry about this, and Attorney Berry was outraged by this accusation by Donais. Berry indicated to me that this would in fact be evidence of racial discrimination against me, by trying to use my race against me in such a manner, i.e., accusing a Black man of making ridiculous false accusations of discrimination with the intent to imply that because I am a Black man, it should be believed that I made such ridiculous false accusation. I did not at the time fully realize that this could constitute racial discrimination, as a matter of law, until Berry mentioned this to me upon hearing the above. I hereby aver under oath that this is what Berry told me with respect to Donais' allegation that I accused him of racism 2 to 3 months after the fact. I also aver to the fact that I did not realize that this was in fact a basis for a valid race discrimination claim until Berry told me about this point.

64. Contrary to Donais' assertion in his affidavit, Donais did not tell me that he would need to perform a check for conflicts before undertaking representation. There was no discussion whatsoever about a conflict or a conflict check. It simply did not come up nor was it mentioned by either myself or Donais. Period.

---

**27**), that "*The second thing is that this was a, an alleged discrimination kind of a claim. Um, apparently the, the* **individual was a minority** *based on what the attorney had told me.*" However, my wife did tell Obrien that we were African-American. Evidently, Donais combined the conversation with Obrien, with his conversation with me, to arrive at "we were minorities." But that information never came from me. This further shows the splicing of information Donais received from Obrien, with the information received from me. And this shows how easy it is for Donais to not be able to compartmentalize the source of information in his head, which goes to how this could bleed into his representation of Homewood and the knowledge base used to draft the 60 page motion to dismiss, etc. Similarly, the information about being treated differently in the food service (because we were minorities) was not placed in the 540A petition, but it was addressed in the 60 page motion to dismiss filed by Donais and Terrell on 1-17-17. This shows that Donais, Terrell, and Akridge benefitted from Donais having this knowledge from his conversations with me and with Obrien about the case.

[34] Based on this fact, I could have been treated differently in the services for a number of other potential reasons that had nothing to do with race. Thus, Donais could not simply infer from logic that I must have been black based on this one reference to being treated differently in the services. In any event, I have averred under oath that I did not accuse Donais of discriminating against me in any way, shape or form.

65. Contrary to Donais' assertion in his affidavit, I was not upset (nor did I become upset) at any point in time during the conversation with Donais on 1-9-17. The call ended amicably and in polite fashion with no hint of anger, or of a disagreement or argument whatsoever by either of us.

66. Contrary to Donais' assertion, I did not tell Donais that Obrien told me that Donais would take our case.

67. Contrary to Donais' assertion in his affidavit, Donais did not repeatedly tell me that he was not interested in the case and that representation in discrimination cases was not within his practice. Again, there was no mention whatsoever of the term "discrimination" or "race" by Donais or by me on our call.

68. Contrary to Donais' assertion, I did not "note" that Donais did real estate work and I did not "question" why Donais was declining to represent me when there was a "real estate" element to his work. I did not, on the call, bring anything up related to "real estate" whatsoever. Donais has completely fabricated this assertion and made it up out of thin air. I did not use or mention the words "real estate" and neither did Donais. Moreover, it was totally unnecessary for me to reference "real estate" or to try to leverage that term, when I already knew that Donais practiced landlord-tenant law and stated as much on my 1-6-17 voicemail. However, even on the 1-9-17 call, I did not state that Donais "practiced landlord-tenant law", nor did I use that fact to try to twist his arm into representing me, neither in the context of the purported (but untrue) accusation against him of "discriminating against me" or in any other context whatsoever. I never used the words "landlord-tenant" or landlord-tenant law" or "real estate" on the 1-9-17 call.  In addition to false race-based accusation, I am completely at a loss for why Donais, in his affidavit, felt it necessary to come up with this particular lie about the use of the term "real estate". It is simply mind-boggling as to why or how Donais could go through such lengths to completely make up and fabricate such details of his lies[35].

69. Contrary to Donais' assertion in his affidavit, I did not at a later point in the call become even more upset that Donais was declining to represent me.

70. Contrary to Donais' assertion in his affidavit, I did not indicate, state, intimate, suggest or insinuate that Donais was discriminating against me. And at no point in time did I accuse Donais of race discrimination. In fact, again, I did not at any point utter or use the words "discrimination", "discriminating" or "discriminate" in any form or context, at all, whatsoever on the call with Donais. Neither did I utter or use the words "race" or "racism" on the call with Donais.

---

[35] I ask the court to put Donais and myself under oath in a hearing to see firsthand the credibility of who is telling the truth here.

71. Contrary to Donais' assertion in his affidavit, Donais did not "immediately deny that he was discriminating against me", because in fact I never made any such accusation. There was nothing for Donais to deny. Donais completely made up, fabricated and manufactured this lie out of thin air.

72. Contrary to Donais' assertion in his affidavit, Donais did not end the telephone call. The call was mutually ended in a respectful, amicable, polite, and friendly manner. I even said "thank you and goodbye" before hanging up the call. The call thus ended amicably with no hint of a problem whatsoever. As far as I was concerned, this was a routine situation of a lawyer not having time to take a case on short notice. I did not think or suspect that there was any problem at all with how the call went or ended.

73. It should be noted (and I hereby aver under oath) that ADO deputy counsel Mark Cornell had interviewed Attorney Robert Obrien, Karl Terrell and Brian Snow in 2020, and asked if Donais had ever told them that I was upset on the 1-9-17 call or had accused Donais of discrimination, and Mr. Cornell reported that they were not told by Donais that I was upset on the call or that I had accused Donais of discrimination (i.e., prior to Donais' March 2017 affidavit).

74. Contrary to Donais' assertion in his affidavit, Donais **did** provide me with legal advice during the call on 1-9-17. For example, as noted above, Donais addressed at least 3 legal questions pertaining to the facts of our case and he gave his legal opinion on possible outcomes from certain legal actions or strategies.

75. Contrary to Donais' assertion in his affidavit, Donais did receive private, confidential or privileged communications from me on the 1-9-17 call, i.e. including but not limited to the information about my conversations with a Nashua police officer to gain strategic insight as to our options, and my disclosure of what I perceived as certain possible weaknesses in our case, as well as certain legal strategies such as preemptively utilizing a 540A petition for a temporary restraining order in Nashua district court (which the Homewood defendants did not know as yet that we were going to do), as well as reference to being treated differently in the food service, among other things, etc. None of the above was mentioned in the 540A petition or anywhere else for that matter. Only Donais had this information from me.

76. NB: It should be noted that, at the time, in or around 1-6-17, I had found the name and contact information for Donais from an internet search list of NH attorneys who practiced landlord-tenant law[36]. Given that time was of the essence (i.e., with only a day notice to leave the property), my wife and I had separately undertaken the task of

---

[36] See **Exhibit 15 – Donais Internet Ad (Printed in 2017)** and **Exhibit 16 – Ad of Landlord-Tenant Attorneys in NH showing Donais' Landlord-Tenant practice  in 2017.**

researching, identifying, and contacting attorneys that might possibly help us with this matter on an urgent basis. By separately undertaking this same task, we had hoped to cover double the ground to increase our chance of finding an attorney to help us on short notice. When, on 1-6-17, I initially contacted Donais through my own research, I didn't realize that it was the same attorney that was already contacted by Obrien on behalf of my wife on 1-5-17.

77. I engaged in preliminary discussions with Donais related to a legal analysis of potential claims that could be brought in connection with the landlord-tenant matter involving Hilton Hotel or the Homewood defendants during the tenure of my stay at Homewood. Although there was no further engagement or retainer after that preliminary client conversation, I was led to believe by Donais that any communication made during this preliminary consultation was protected by confidentiality/attorney-client privilege.

78. The above facts are corroborated by phone records indicating there were at least two telephone calls involved, one on 1-6-17 where I left a voicemail for Donais, and one on 1-9-17 where Donais called me back, which lasted 7 minutes. This constitute circumstantial evidence to show that confidential client information or "confidences" were revealed to Donais in order for him to evaluate our case. [Note: Under NH law, any information shared with an attorney by a client/prospective client for the purpose of giving legal advice is considered to be confidential and/or is protected by attorney-client privilege, even if that information could have been obtained another way by the attorney. If an attorney obtains the information first from the client, then that attorney is bound by confidentiality, even if the same information is later revealed from other sources.].

79. I did not know that Donais knew or had previous ties to Dave Akridge prior to my calling his number on 1-6-17 (and leaving a voicemail), or prior to him calling me back on 1-9-17.

80. I did not consent and have not consented to Donais' decision to represent the adverse party, the Homewood defendants, in 2017, after having consulted with me on 1-9-17 and after having consulted with my wife through Attorney Robert Obrien on 1-5-17. Donais did not, prior to his decision to represent Homewood, inform me that he was deciding to represent the adverse party in the matter with Homewood. I was not given any opportunity to object to Donais going to represent the adverse party, prior to him going to represent the adverse party. This was done surreptitiously without my knowledge or consent. When Donais provided my client information to Akridge and Terrel on or about 1-11-17, I was not informed of this or that Donais was going to be doing this. I later became aware of

18

Donais' decision to engage with or represent Homewood, only because Donais entered an appearance[37], and served me/my wife a motion to dismiss on behalf of Homewood defendants, in the Nashua circuit court on 1-17-17, the day before the 1-18-17 hearing. We were totally blindsided by this.

81. It should be noted that after receiving the motion to dismiss from Donais, I then immediately told Attorney Berry, who had just taken our case to represent us, about the whole chain of events and Berry expressed serious concern about violations of the NH ethics code for lawyers. Initially, at the time of receiving this surprising news that Donais was now representing the adverse party in a case where he said to me he did not have time to take the case, I knew something seemed wrong with that, but I did not even realize the extent of the seriousness of the matter until Berry explained it to me[38]. As a non-lawyer, and being unfamiliar with the NH rules of conduct for lawyers at the time, it initially was not 100% clear to me that this was or could be a serious violation of the attorney ethics code. Once I read the NH rules of conduct myself, after Berry informed me of it and cited the relevant section (i.e., section 1.18), it became clear that this was a huge ethical/breach of duty problem based on the rules governing prospective clients.

82. It should be further noted that I did not and have not consented to the disclosure of my 1-9-17 conversation with Donais or any attendant confidential information shared therein, to any other lawyer or law firm or law firm employee, nor did I nor have I waived attorney-client privilege covering my conversation with Donais on 1-9-17.

83. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between him and myself on 1-9-17, with Akridge, Terrell, Terrell's assistant, or any other person, prior to Donais being hired by Akridge to represent the adverse party, Homewood.

84. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between him and myself on 1-9-17, with Akridge, Terrell, Terrell's assistant, or any other person, after Donais was hired by Akridge to represent the adverse party, Homewood.

85. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between him and myself on 1-9-17 with Akridge, Terrell, Terrell's assistant, or Brian Snow or any other person, after Donais was disqualified from representing the adverse party, Homewood.

---

[37] See **Exhibit 21 – Appearance of Craig Donais in Nashua District Court on 1-13-17.**

[38] See **Exhibit 23 – Email Exchange with Elliott Berry on 1-17-17 showing Berry's Legal Opinion on Donais' Conflict.** See also **Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest.**

86. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between him and myself on 1-9-17 with his police friends[39]/contacts or any other person.

87. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between him and myself on 1-9-17 with his wife, Mary, his sons Garrett & Aiden, his friends, colleagues, the Manchester NH Crime-Line board members, and the Manchester NH police, or any other person or entity.

88. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between him and myself on 1-9-17 in a public document filed publicly in at least two NH courts in 2017.

89. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between him and myself on 1-9-17 nor the use of said contents to fabricate, manufacture, invent statements that I did not make nor to twist statements I did make into something I did not say.

90. Further, it should be noted, that with respect to the 1-18-17 hearing, I did not learn of all of what was said by Donais to Judge Moore at the time of the hearing on 1-18-17 because it was a sidebar conference, that took place directly in front of the Judge's seat, and I was seated away from the bench and could not hear properly all what was discussed. It was only subsequently when I obtained an audio-recording/transcript of the hearing did I learn of all what was said.

91. It should be noted that, on 1-18-17, during the breaks for the hearing with Judge Moore, I did hear certain remarks made by Donais to Akridge and Terrell, including hearing Donais make disparaging/insulting remarks about Elliott Berry including about his job/role, his pay, and his attire. This was deeply troubling to both myself and my wife.

92. Finally, it should be noted that Donais' admissions as well as the lies, fabrications and misrepresentations further support the claim of breach of fiduciary duty.

## VI. FURTHER FACTS
### A. Additional Subsequent Events

93. In the time period spanning 2017, 2019, 2020, and after, Donais disclosed the contents of plaintiffs' client-privileged protected information, as noted above, to his wife, Mary Donais, his sons Garrett & Aiden, and his other family members, friends, and to members of the Manchester NH crime-line board, and to the Manchester NH police, including details of the 1-9-17 conversation with me and of the 1-5-17 conversation with Obrien.

---

[39] Note: Nate Linstad was a personal friend of Donais, who also was a police officer. Donais sought a personal "buddy" favor from Nate Linstad and Donais reached out to Nate Linstad, sharing confidential information with him (about us), to feel out whether Nate Linstad could "help a brother out" (as described by Nate Linstad when seeking to involve other police officers which Donais had asked Nate Linstad to do). Either way, Donais isn't permitted to share any prospective client conversation with his friends or with police contacts that he knows. See also **Exhibit 25 – Donais' 6-11-19 Email to Donais' Police Friend citing "Potential Client" and client info. disclosure.**

94. By sharing my client conversation with other people, including family members, friends, colleagues, community members, the Manchester NH crime-line board, and the local police, Donais breached confidentiality.

**B. Further on Bisasor's Conversation with Donais**

95. During a 7-minute conversation with Donais on the morning of 1-9-17, I divulged information related to my dispute with Homewood and asked for legal advice on a number of issues relevant to that dispute[40].

96. In sum, as shown above, I gave a background on the dispute. I also wanted advice on what I was concerned could be potential weaknesses in the case. I also shared my strategy of filing a 540A petition before 1-10-17, which was a critical date. I shared information with Donais about the landlord-tenant legal arguments that we had and that we told Homewood that they needed to go through lawful procedures under NH law. I mentioned to Donais our strategy of contacting the higher-ups of the general manager and mentioned why we believed we had a contract with the hotel. I admitted to Donais that we felt it was a tricky situation because the property was a hybrid property in the sense that they catered to both transient guests as well as long-term residents, and I expressed concern that Homewood could use the innkeeper statute to override our contract/tenant rights. I described entering into a lease/contract with Homewood since November 2015 and that Homewood renewed that contract until 5-31-17. I also told Donais about Homewood manager's threat to forcibly remove us, thus violating our contract and/or tenancy rights. I shared with Donais my concern that Homewood could use the innkeeper statutes to try to argue against being a landlord, and I also shared my concern that there could be weaknesses in other parts of the case.  I also shared strategies related to using information I gathered from interviewing a Nashua police officer about the situation and what the strengths and weaknesses were based on that, including concerning the Nashua police officer who gave me insight about how the police would view this issue, and that I felt I could use these to enhance the case but I did mention that I didn't know if every officer would have the same views as the officer I spoke to. [Note: Later, during the preliminary injunction hearing in superior court, I had called the Nashua police officer as a witness, but the Homewood defendants had a preview of what the Nashua police officer would say from what I told Donais, and they engaged in preemptive maneuvers to try to neutralize what the Nashua police officer had to say, before he even said it on the witness stand.]. These were among some of the weaknesses/strengths that I discussed with Donais.

---

[40] See **Exhibit 18 – Phone Records from Donais Showing Call Placed By Donais to Bisasor on 1-9-17.**

97. I told Donais about noticing being treated differently in the food service and that we suffered retaliation because we had made complaints. This information was never made public in the filing of the 540A petition, such as being treated differently in the food service. [NB: The 540A filing excluded any reference to differing treatment]. This strategy of not raising the different treatment issues, among other things, was related to the strategy of focusing on the core issues relevant to the TRO and on enhancing the chances of receiving a TRO from the district court on a 540A basis by zeroing on the core "tenancy versus guest" legal issue. It should be noted that Donais states in his 1-11-17 email that he was told about different treatment in the food service, on the 1-9-17 call. Yet, Donais was the one who raised the food services issue preemptively in the district court via his 60 page motion to dismiss including soliciting fabricated false statements about the food service issue in order to undermine any future attempt by us to raise such issues. This was a direct consequence of Donais having a heads up on our legal strategies and on our concerns via the 1-9-17 and 1-5-17 consultations.

98. Donais stated it was likely that a TRO would be granted based on what I described to him but Donais could not say for sure if it would become permanent because Donais would have to take a look at the documents himself.

99. I asked Donais if he could assist us with this matter and Donais said, given the short timeline, that he would not be able to assist because his time is constrained. I indicated that I only first needed him to look over what we had drafted for the 540A petition and we could file that ourselves[41]. But Donais indicated that based on his calendar he just did not think he would be able to find the time to do it. So, I said to Donais that was "okay", and that "I understand". Donais stated in closing that he just wanted to give me a call back and did not want to leave me hanging but that, though he would love to help, unfortunately he can't do more based on the timeline involved. The call ended amicably with no hint of a problem whatsoever. As far as I was concerned, this was a routine situation of a lawyer not having time to take the case on short notice. Period. I did not suspect that there was a problem at all at that time.

100.    Hence, based on the above, I shared with Donais inside confidential information related to the background of the case, strategy for the case, etc.

### C. Impact of the Discussion Between Donais and Bisasor

101.    Based on this, it is clear that I shared confidential information with Donais on the 1-9-17 call.

---

[41] I shared that we could file the 540A petition on our own, but wanted legal advice on making sure it was done with correct legal arguments.

102.     This information was subsequently used against us in court proceedings, thus resulting in compromise to our case. Confidential information was used against us.

103.     Donais benefitted from having this inside information and insight to better prepare his clients, Akridge and Homewood (along with its general manager Robitaille).

104.     Terrell also has benefitted (whether directly or indirectly) from this sharing of information with Donais. Terrell testified in the 4-27-17 preliminary injunction hearing that there was sharing of information through Akridge between the two attorneys regarding my discussion with Donais. This is information beyond the 1-11-17 email between them.

105.     At the very least, by getting a heads up on the strategies and insights of the case directly from me and from Anderson through Obrien[42], Homewood had a major advantage in preparing their defense. It would be tantamount to defense counsel **receiving or intercepting communications between plaintiff's counsel and the plaintiff**.

106.     Getting an insider's view of a roadmap of the litigation approach and strategies of the opposing party was a major advantage to the Homewood defendants, and this was all because Donais did not restrain himself to not go represent the adverse party and share client information with them prior to being hired and also during his representation, and the further even after he was disqualified from representing them.

### D. Further on Contradictions & Comparisons of Donais' Statements

107.     See **Exhibit 4** for tables of comparison of Donais statements with his own various contradictory statements and with statements by Berry, Obrien, Diaz and of myself and my wife. See also **Exhibit 2 and 3**.

### E. Significant Harm Has Occurred from Donais' Conduct

108.     The conduct of Donais has not only been harmful to us because of the information shared with Donais through Anderson indirectly via Obrien and also directly through me but also because the prospective relationship with me was used a basis to attack, defame, and injure me. Thus, Donais inflicted significant harm on us based on the foregoing.

109.     Donais had inside knowledge of our self-disclosed understanding of the strategies, weaknesses and discussions about our case from me directly. Inside knowledge of such information creates an automatic advantage to the Homewood defendants. If the reverse was true, and we had information about the strategies, weaknesses and

---

[42] See **Exhibit 3 – Second Affidavit of Andre Bisasor** and **Exhibit 2 – Affidavit of Natalie Anderson**.

discussions about Homewood's approach to defending the case, there would be no doubt that we would have had an advantage. Such advantage can play out in subtle or not so subtle ways.

110.     Similarly, Donais has used his prospective client conversation with me against me, to directly inflict harm by accusing me of falsely/frivolously accusing Donais of race discrimination because he did not take our case. This false accusation against me has sullied me and subjected me to humiliation in court proceedings, with the false implication that I am a frivolous liar who plays the race card[43] without rhyme or reason and is to be discredited as an irrational, unstable, angry person who wildly hurls accusations of race discrimination when there is no valid reason to do so.

111.     If I had never spoken to Donais on 1-9-17 about a prospective client relationship, Donais could not have had the opportunity to fabricate this lie against me. Donais has used his position as a prospective lawyer to me, as a prospective client, as a basis to injure me by falsely accusing me of falsely accusing Donais of race discrimination in the context of a conversation wherein I was seeking to form an attorney-client relationship with Donais, and wherein I shared with Donais certain confidential information, thus taking Donais into his confidences and placing my trust in Donais. Donais exploited and abused the trust that I extended to and reposed in Donais, in seeking to have a conversation with him about our case. Donais turned around and used that private privileged conversation as a basis to fabricate lies on me. This is an utter abuse and ethical travesty that has befallen plaintiffs. This also goes to the conflict of interest. Donais was never going to be able to be loyal to us, nor honor the trust and confidences I placed in him, because ultimately, he was loyal to Akridge as a principal for the opposing party. Donais' conflict of interest further created the fuel by which he found it useful to falsely accuse me, in order to harm/damage plaintiffs and our case in the interest of protecting/advancing the interests of Homewood and himself.

112.     Thus, in terms of the breach of fiduciary duty and breach of confidentiality claims, Donais acted as a prospective attorney for both plaintiffs, as evidenced by his communications with me, and by his own admissions, and those of O'Brien and Berry. Further facts and documentary evidence of the above include emails and testimony from Berry, who stated that Donais' conduct constituted a breach of fiduciary duty and a violation of the rules of professional conduct, as well as emails from the ADO regarding Berry's interview, Berry's own written determination

---

[43] See **Exhibit 29 – Email from ADO Deputy Counsel Mark Cornell about "Race Card" By Donais.** See also **Exhibit 30 – Excerpt of Transcript of Hearing with Judge Christopher Barry-Smith citing credibility of "Jussie Smollett" analogy supporting harm from alleging racial hoax defamation.**

that Donais breached his duty, and evidence from the Nashua circuit court where Donais withdrew from after the judge determined that Donais had violated ethical duties/breach fiduciary duty. The court transcript shows that Donais was effectively caught red-handed and that the Nashua circuit court judge effectively found that Donais breached fiduciary duty and thus was required to be disqualified from the case. This by itself is slam-dunk proof that Donais is liable for this claim of breach of fiduciary duty, and Donais' own withdrawal serves as his own admission that he was liable for this wrongdoing. Donais also has a pattern of misconduct as evidenced by other ethics complaints including by a superior court judge[44].

## VII. CONCLUSION

113.    Finally, all of the above facts, inferences and supporting evidence go to supporting the claim of breach of fiduciary duty (as well as other claims in this case)[45].

114.    See the attached Exhibits that are hereby incorporated into this Affidavit.

115.    The facts set forth in this affidavit are true and accurate to the best of my knowledge and belief.

116.    I declare under penalty of perjury that the foregoing is true and correct.

### SIGNED UNDER PAINS AND PENALTIES OF PERJURY

I hereby depose and saith under oath, under the pains and penalties of perjury, that the above factual averments and statements of fact made in this document are true and correct to the best of my knowledge and recollection and investigation of these facts, and are based upon my own personal knowledge. The statements made herein are also corroborated by **exhibits that are attached** to the accompanying PSJ motion.

Respectfully submitted,
/s/ Andre Bisasor
ANDRE BISASOR

Dated: October 21, 2025

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was/will be served on defendants.

/s/ Andre Bisasor
Andre Bisasor

---

[44] See **Exhibit 31** – Letter from Connecticut Bar Counsel via Connecticut Superior Court Judge Regarding Donais' Misconduct | Excerpt of Finding by Connecticut Judge Regarding Donais' Misconduct, and see also **Exhibit 32** – Donais' Withdrawal of Connecticut Law License.
[45] This affidavit also rebuts Donais' motion to dismiss the amended complaint as well as the attachments thereto including the 3-13-17 affidavit of Donais.

## AFFIDAVIT

I, Craig S. Donais, Esquire, a New Hampshire attorney with a business address of 444 Willow Street, Manchester, New Hampshire, do hereby swear and affirm that the following statements are true and correct to the best of my knowledge and belief:

1.      On Thursday, January 5, 2017, I received a cell call after business hours from Attorney Robert O'Brien which lasted approximately five (5) minutes. Attorney O'Brien and I talked about an unrelated matter involving a mutual client, and Attorney O'Brien also mentioned a potential case if I was interested.   The matter involved three issues - discrimination, overcharges for services, and an improper removal/eviction action, and a need to file something on Monday.

2.      Upon hearing the nature of the issues, I declined to learn more. Attorney O'Brien did not reveal the prospective client's name, nor did he mention the location where the matter was taking place. At the conclusion of our brief conversation, Attorney O'Brien asked if I was interested and I advised him I was not.  He asked if he could give my name and number to the potential client, and I indicated not to give my name and office number since I had no interest in the case.

3.      On Friday, January 6th, after I had left for the day and after business hours, an office telephone message was received requesting a return call from a Massachusetts phone number requesting assistance on a real estate matter. The caller's message was hard to understand.

4.      On the morning of Monday, January 9, 2017, I returned the call and spoke with a person who identified himself as "Andre", and what sounded like "Bedsore" as a last name. I continued to have difficulty clearly understanding the caller and his pronunciation. I did not recognize his name and do not believe I had ever met or talked with him before.  Our entire conversation lasted about seven (7) minutes in length.

5.      Andre provided me some general details about what he described as a landlord-tenant dispute involving inflated charges and also a concern about the existence of racial discrimination against him, and a need to immediately file. After about a minute, I recognized that he might be the previously unidentified caller that had spoken with Attorney O'Brien.

6.      I asked Andre if he received my name and number from Attorney O'Brien, and he indicated he had. I told Andre that I was unable to provide representation.  When pressed, I told him I could not do anything on the timeline he proffered.  He challenged my declination, at which point I told him my practice does not include racial discrimination cases, and even if I did, I would need

1

to perform a check for conflicts before undertaking representation.

7.    Upon hearing this, Andre became upset and asserted that Attorney O'Brien had represented to him that I would take his case. This was very strange since I had made the exact opposite statement to Attorney O'Brien. I recall repeatedly telling Andre that I was not interested in the case, that the timeline was unworkable, and that representation in discrimination cases was not within my practice. He noted that I did real estate work, and questioned why I was declining representation when there was a real estate element. Andre became even more upset that I was declining to represent him such that he intimated I was discriminating against him which I immediately denied since it was not true. I then ended our telephone conversation.

8.    During the conversation with Andre, I did not provide him with any legal advice nor did I receive or make any private, confidential or privileged communications with Andre. Finally, I did not send, receive or exchange any emails, texts, or documents with Andre before, during or after our rather short telephone conversation.

9.    Since I did not learn from either Attorney O'Brien or Andre about the parties involved in Andre's matter, I thereafter agreed to serve as local counsel when I was contacted by Attorney Karl Terrell, representing Homewood Suites, in the case brought by Ms. Natalie Anderson in this 9th Circuit Court-Nashua District Division landlord-tenant case. I had a chance to review Ms. Anderson's pleading, confirmed the identity of the plaintiff (and that Andre was not a plaintiff) and performed a conflict check before undertaking representation.

10.    A principal affiliated with the defendant has been a client for an extended period of time. On January 11, 2017, I was contacted by him to provide local representation. When the case was generally explained to me by Attorney Terrell, I then briefly advised Attorney Terrell of the prior limited contact that had taken place involving Andre and sent him an email about it on January 11, 2017. To the best of my knowledge and belief, I did not further discuss the prior telephone conversation with Andre with Attorney Terrell beyond the contents in that one email.

11.    Attorney Terrell undertook all aspects of drafting the pleadings, gathering exhibits, and interviewing relevant witnesses. At no time was I involved in any fact gathering, or drafting any pleadings. The extent of my involvement was reviewing the pleadings before signing them.

12.    Thereafter, Attorney Eliot Berry, representing Natalie Anderson, called my office late in the afternoon on January 17, 2017, and indicated the existence of a conflict of interest. I

2

disagreed with him on this issue and informed Attorney Berry that I had never spoken with Ms. Natalie Anderson. Further, I noted that the complaint lacked any reference to "Andre". Even so, Attorney Berry represented that I had sent an opinion regarding the case to Andre and that I had also conversed with Andre for about eleven (11) minutes, both facts which I disputed with him.

13. The next day during the hearing on January 18, 2017, Attorney Berry produced a text message sent by Attorney O'Brien to Andre which I had never previously seen. The text message from Attorney O'Brien attributed statements to me that I simply did not make. These statements also appear in a paragraph referencing Attorney Diaz, so it is not clear whether the statements were intended to be attributable to Attorney Diaz or to me.

14. After learning of Attorney O'Brien's purported communication with Andre, as well as the contents of the text message, and after advising Attorney Terrell of these same facts at the courthouse, it was my decision to file my withdrawal on the case, given the potential appearance of conflict, despite my efforts to avoid any conflict.

15. I did not have any further conversations with Attorney Terrell about the prior telephone conversation I had with Mr. Bisasor.

15. To the best of my knowledge, I have never communicated with Natalie Anderson. Without question, I have never communicated with Ms. Anderson relative to the substance of that action.

Executed on 13th day of March 2017.

_signature_

Craig S. Donais, Esquire

State of New Hampshire
County of Hillsborough

Sworn and subscribed before me this 13th day of March 2017 by Craig S. Donais.

_signature_

Justice of the Peace/Notary Public
My commission expires: _____

BENJAMIN R. ROBERGE
STATE OF
MY
COMMISSION
EXPIRES
FEBRUARY 20,
2018
NEW HAMPSHIRE
JUSTICE OF THE PEACE

3

# Exhibit 2

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**CONFIDENTIAL | FILED UNDER SEAL[1] | NON-EX PARTE**

**AFFIDAVIT OF NATALIE ANDERSON IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY**

1. I, Natalie Anderson, being duly sworn, hereby depose and say and present the below statements of facts under oath as being the truth to the best of my recollection, knowledge, understanding and belief.

2. Note: This affidavit is supported by exhibits in the separately filed Exhibits[2] for Motion for Partial Summary Judgment ("PSJ motion").

## I. INTRODUCTION

3. My name is Natalie Anderson (hereinafter "I", "me", "myself", and "Natalie Anderson" or "Ms. Anderson" are used interchangeably).

4. My husband's name is Andre Bisasor (hereinafter "my husband", "my spouse", "Bisasor" or "Mr. Bisasor" are used interchangeably).

5. I am providing this separate affidavit in support of the motion for partial summary judgment against Attorney Craig Donais ("Mr. Donais", "Attorney Donais" or "Donais").

6. The facts stated herein are based on my personal knowledge and are true, correct, and accurate.

7. This separate affidavit centers primarily on a phone call that took place between Attorney Robert L. O'Brien ("Mr. Obrien", "Attorney Obrien" or "Obrien") and myself on 1-5-17, and in particular focuses on the content of what was discussed on that call.

8. The below represents an accurate description[3] of what was said both by myself and Mr. Obrien.

## II. THE 1-5-17 CONSULTATION

9. On 1-5-17, at around 5:16pm, I by phone contacted Mr. Obrien for legal assistance related to a matter involving Homewood Suites of Nashua ("Homewood"). The duration of the call was 18 minutes. See **Exhibit 8.**

---

[1] This is filed under seal because I did not, have not and do not waive attorney client privilege regarding the 1-9-17 consultation. Also, I include other confidential information protected by privilege.

[2] Hereafter, any reference to "Exhibit" or "Exhibits" is a reference to the exhibits in the PSJ motion.

[3] NB: The facts asserted herein are supported by multiple pieces of evidence. This description is also supported by contemporaneous notes generated around the time of the call back in January 2017, when the issue of what was said on the call came up in a conversation with Attorney Elliott Berry who (after he agreed to provide legal counsel to us) had asked my husband and I for proof/details of what was discussed on the call with Mr. Obrien, given that the issue that arose regarding the conflict of interest with Attorney Craig Donais would have to be addressed in court in a hearing that was at the time scheduled to take place on 1-18-17. See **Exhibits 5 to 14 & 34**.

10. The details of our 18-minute discussion[4] is as follows.

11. I introduced myself, as Natalie, and asked him if he represented tenants in landlord-tenant matters.

12. Mr. Obrien stated that he could give me advice, but that it usually doesn't work out economically to actually do the representation, but that he'd be happy to answer my questions.

13. I restated my first name and also mentioned my husband's first name, Andre, and I told Mr. Obrien that my husband was there with me as well. I also told Mr. Obrien that we were in Nashua at an extended stay hotel for about a year, and had an agreement to be at the property through end of May 2017.

14. I then asked Mr. Obrien if he had any conflicts with Homewood, which was a local Hilton hotel.

15. Mr. Obrien said he did not have a conflict.

16. [NB: At that point, another call came in for my husband, so he left the room to take that call and was not present in the same room for the remainder of the call with Mr. Obrien.]

17. I then proceeded to go into a detailed overview with Mr. Obrien of the situation we were facing.

18. I told Mr. Obrien that we were under a contract for long term housing accommodations with Homewood through the sales office. I gave a description of the unit/property, including that it has a full kitchen, etc.  I mentioned that we were not supposed to be charged taxes after a certain time (per the sales office), and that our understanding was that we were effectively tenants through 5-31-17. I told him about what we had experienced recently at the property. I gave an overview of the complimentary food service including breakfast every day and dinner a couple of nights each week.

19. I told Mr. Obrien that when we would go to utilize the food services, we were being treated differently, in terms of being singled out by the staff.  I mentioned that my husband and I are African American, and that when we would we go to get food, we noticed that we were being watched and stared at or ogled, and that hotel staff was inspecting the food we put on our plate. We thought this was just very strange because we were ultimately paying for the food but that we were generally quiet and stayed to ourselves, and also busy. And so, we initially tried to ignore it, and sometimes we just avoided getting food.

---

[4] See **Exhibit 6 – Natalie Anderson Phone Records showing call from her to Robert Obrien on 1-5-17 (lasting 18mins)**.

20. I told Mr. Obrien that we never really made a big deal about it at first, but then eventually it got to a point where we did finally register a concern or complaint to the general manager, named Adam Robitaille ("Robitaille"), who was white, because it was clear that we had been experiencing different treatment whenever we tried to use the food service compared to other white guests/residents, and that we were concerned that this constituted race discrimination. I shared that while we were complaining to the general manager, he accused us of playing the race card, and abruptly hung up the phone on us.

21. I told Mr. Obrien that we were completely shocked by the general manager's behavior towards us. So, after that, we then notified Hilton because we are Diamond members, which is a top-tier level in terms of loyalty.

22. I told Mr. Obrien that, after the complaint to Hilton, they said the general manager was supposed to follow-up with us, but he did not. Instead, he seemed to be holding a grudge, and he would give us bad looks/the cold shoulder, etc., but he never said anything to us. Then we noticed that the hotel started charging our credit card numerous times, and that ultimately, they charged us thousands of dollars beyond the set arrangement for us to pay.  So, we told them (Homewood's hotel management) about it, and asked them to fix it and credit us, and that they said they would get back to us. However, they did not get back to us. We eventually notified our bank because we had a short period of time to dispute an erroneous charge.

23. I told Mr. Obrien that the bank said they would take care of it, and would follow-up with them (the hotel). However, the hotel never responded or followed up with the bank during the response period, so the bank started to credit us some of those monies. Then, we got an email from the general manager saying he sees that we disputed a charge and because of that we need to leave in a couple of days.  He admitted that he saw that they overcharged us around $3000 extra, and he'll credit that back, but we still need to leave.  So, we thought that made no sense. First, it was more than $3000 that they overcharged us extra, and he acknowledged that we were right to have raised the issue about the overcharges, but he still wanted us to leave.  However, after we contacted Hilton, the general manager seemed to dial things back--he never followed through on having us leave. However, a short time thereafter, my husband went to get food for us during the complimentary dinner service, and a front desk employee, named Cindy, who was white, came over to him, and loudly told him that he needed to wait until everyone else eats, that he should eat last, to get to the back of the line, and that he was

taking too much food!  The person then stormed away. But she had berated him in front of others, and he was completely humiliated and in shock about the situation.

24. I shared with Mr. Obrien a general overview of my husband's background/personality, and that he's not a very antagonistic or confrontational person, but that he went over to show the employee that he didn't take a lot of food just in case it was a misunderstanding.

25. I told Mr. Obrien that my husband also reminded the front desk employee that he was taking food for both him and his wife. The front desk employee yelled that she didn't want to hear it, and told him to go to his room or else she's calling the police.  My husband said he was so humiliated by the entire experience.  This happened in from of a room full of people, and one of the guests came over and said that they could see that he didn't take a lot of food. The front desk employee did call police. My husband said that he was going to wait because he didn't know what that front desk employee was going to tell the police, so he wanted to wait to give his side of the story. He waited some distance away from the front desk in the lobby with another resident who was talking to him, and the police came. The police were flabbergasted that they were even called, and looked at the food that my husband took, and said it didn't look like a lot of food, and that it was ridiculous that they were called in the first place. The police didn't even do an incident report. The police said that my husband did the right thing to wait and give his side of what happened. They talked to the front desk employee, who said there was no threat. So the police determined there was no reason for them to be called and then left.

26. I told Mr. Obrien that this happened on 1-3-17, in the evening. That night, we were trying to figure out what to do, in terms of filing a formal complaint with Hilton about that incident, especially since we had an agreement to be at the hotel through a set date (5-31-17).  Meanwhile, the hotel/the general manager had tied up thousands of dollars, almost $10,000 in excessive charges to our card, tying up our money.

27. I told Mr. Obrien that we decided to call Hilton's customer service, and file a formal complaint about the incident, and they said someone would follow-up with us within 72 hours. However, the next day, we got an email from the general manager saying, because of the incident that happened, we need to leave/checkout by 1-6-17, thus attempting to unwind the agreement we had to stay at the property through 5-31-17, and essentially giving us a day's notice to leave. Yet, we didn't do anything wrong, and we didn't owe them money; also, the

police said there was no reason that they should've been called. And now the general manager was using this as a pretextual reason to say that because of the safety of the hotel, we needed to leave.

28. I told Obrien that previously/prior to the events of 1-3-17, the general manager had said we needed to leave because of the financial security of the hotel, which they were the ones who overcharged us, which he even agreed was the case and that we were owed a refund, though he still hadn't credited that back to us; now he's claiming that it's for the safety of the hotel. Also, regarding the overcharges, we had attempted to meet with him to show him our proof because there was extra money that we were wrongly charged. We had told the general manager by email that we would forego complaining to the bank, and that we wanted to meet to prove it (evidence of overcharging) to him. Apparently, because the hotel had some problem with their credit card processing, and he wasn't on top of it, they never addressed the situation with us or the bank, and was now taking out his frustrations on us. So, we offered to meet, assuming perhaps it was a misunderstanding, as we were trying to give the benefit of doubt. I told Mr. Obrien that, however, the general manager also lied to Hilton that we were not responding to meeting with him. He was completely lying because we have proof that we emailed him asking to meet, but he didn't respond. He hadn't taken us up on our offer to meet, but since it was during the holiday, we assumed that perhaps we would hear from him after the holidays. It was now after the holiday, and then we got this email from him about trying to force us to leave.

29. I told Mr. Obrien that we didn't have bad experiences with all the hotel staff, and that we actually liked the physical living space of the hotel (it was a newer hotel). But frankly, we didn't want to feel as though just because someone wants to discriminate and retaliate that we should just shut up and move, just because they want us to, and break our contract/agreement that we relied on. We wanted to take a stand, especially since we had an agreement, and we wanted to avail ourselves of the law if necessary. Still, we didn't know what to expect the next day, whether they were going to knock on our door, or show up with the police, or what we needed to do with this email from the general manager.

30. **I stopped my summary to Mr. Obrien there**, as I had said a mouthful, and I asked him his thoughts on everything I had said, and confirmed that he was able to follow all that I had said, and whether he had any thoughts on how to remedy the situation.

-------------------------------------------

31. Mr. Obrien said he had a fairly good understanding of my situation, and he had some suggestions. First, Mr. Obrien suggested that I should make copies of our contract/documents, and keep them with us. Mr. Obrien said he wouldn't leave paperwork in the room because they could change the locks, and then I wouldn't have access to it, and mysteriously all my proof could disappear.

32. Mr. Obrien said that secondly, he has a guy/attorney who handles these kinds of cases on a regular basis. Mr. Obrien promised that he was going to call him as soon as we hung up, and ask him to reach out to me. And that the attorney would talk to me about the temporary restraining order, in the event the hotel management show up and try to take any action against us.

33. Mr. Obrien said that thirdly, I could consider reaching out to or emailing Hilton's corporate executives,[5] and tell them that the local manager is trying to throw us out by the next day, and that we have a contract, we don't owe anything, we're not in violation of any rules, and that we should be allowed to stay.

34. Mr. Obrien then confirmed that this was all taking place in Nashua. Then, Mr. Obrien mentioned that there is a pretty aggressive Human Rights Commission, and that this case was a retaliation and/or an outright discrimination case. Mr. Obrien said we could pursue a complaint through the commission to address our grievances, and that they have an investigative branch of their own.

35. Mr. Obrien said that the most important thing was to figure out the merit of the threat from the general manager to throw us out by the next day, so he was going to talk to his attorney contact, to review the matter with him, and get him in touch with me, so that we can take immediate action should it be necessary.

36. Mr. Obrien then told me the attorney's name that he was referring me to was Craig Donais. Mr. Obrien then asked if he could text me at the number I called him from, and I confirmed that he could text me at the same number, which was my mobile phone. So, Mr. Obrien said he would text me attorney Donais' name and contact number, and then he would do the same to Craig Donais (i.e., text him my name and phone). And that he would try to get Mr. Donais on the phone, and hopefully Mr. Donais would reach out to me that same night.

---

[5] After I contacted Hilton's senior management to seek relief, on 1-6-17, Hilton executive leadership wrote an email to me stating Homewood had assured them they retained counsel and were working to resolve the matter. See **Exhibit 5 – Email from Hilton Executive to Anderson on 1-6-17 (citing Homewood already had legal counsel)**.

37. I also asked Mr. Obrien about the property being a somewhat dual purpose hotel, and that we weren't sure that if the hotel called the police, for example, the police would know what to do or that they might think that we were just regular hotel guests as opposed to longer-term residents who should have tenant rights, etc.

38. Mr. Obrien stated that's why he was suggesting that we keep our paperwork with us to show to the police, or whomever shows up, to show that we were long term tenants, and that they (the hotel) had to go through proper channels (via court), and so the police would treat it as a civil matter as opposed to a criminal trespass.

39. Mr. Obrien reiterated that he'd get Craig Donais in touch with me, and also text his information.

40. I told Mr. Obrien again that I appreciated his help, and thanked him for listening. Additionally, I asked if it was realistic to get a Temporary Restraining Order (TRO) by the following day.

41. Mr. Obrien said, it was, as it would be an immediate application for an ex parte temporary restraining order. He said it has to be a genuine threat, and our case qualifies, with the general manager "rattling his chops". Mr. Obrien also said that if the general manager had any brains at all, he won't take any action, but you never know. So, Mr. Obrien reiterated that we should keep our paperwork with us to show that we're not simply hotel guests, but we're long-term tenants.

42. Mr. Obrien said that every cop knows that there are certain procedures to follow in any attempt to throw someone out, etc.

43. I said to Mr. Obrien that I'd wait for his text, and to hear from Mr. Donais, and take it from there. I thanked Mr. Obrien again. Mr. Obrien said absolutely, and that he would get me the information within the hour, and then Mr. Obrien wished me good luck.

------------------------------------------------------
### III. FURTHER FACTUAL AVERMENTS PERTAINING TO THE 1-5-17 CONSULTATION

44. As shown above, I discussed with Obrien the underlying facts of the case, the potential claims against Homewood, the potential defenses that may be available to Homewood, the relevant law and legal issues pertaining thereto. Also, Mr. Obrien answered several questions and provided concrete substantive legal advice.

45. It is noteworthy that after Mr. Obrien spoke with me and then spoke with Mr. Donais regarding my case as a prospective client, Mr. Obrien did send me the text as promised[6]. In the text message, Mr. Obrien first

---

[6] See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).**

mentioned the name of another law firm, Bussiere & Bussiere (and Mr. Obrien mentioned the name of the two attorneys at that firm that he thought could also provide assistance i.e., Emile Bussiere and Keith Diaz). In that same text message, Mr. Obrien also then included some specific commentary from Mr. Donais regarding certain aspects of the case, such as the contract and tenant issues, but said that Mr. Donais did not address the discrimination piece as it was "outside his experience". Mr. Obrien did not include in the text message Mr. Donais' number. In fact, Mr. Obrien did not provide Mr. Donais' number via any other method of communication (whether by email, by phone conversation or otherwise), nor did Mr. Obrien provide me with any other type of contact information (i.e., email address, etc.) for Mr. Donais.[7]

46. Contrary to the assertion made in Mr. Obrien's 1-18-17 affidavit, I did provide my name to Mr. Obrien at least twice (and so I wasn't an "unidentified caller"), and Mr. Obrien stated that he would relay my name and phone contact information to Mr. Donais.

47. Also, the text message sent from Mr. Obrien with commentary from Mr. Donais supports the fact that Mr. Obrien did in fact provide substantive information about my case to Mr. Donais, to which Mr. Donais provided his legal opinion.  This contradicts Mr. Obrien's assertion in his 1-18-17 affidavit that no specific circumstances were discussed by him with Mr. Donais. This is proven by review of the text message itself.[8]

48. Based on the text message from Mr. Obrien, Mr. Obrien did not state that Mr. Donais had declined to take our case. So, contrary to Mr. Obrien's assertion in his 1-18-17 affidavit, Mr. Obrien did not indicate to me in the text message that "Donais was out". This is proven by review of the text message itself (which is attached as an exhibit in the Exhibits to the PSJ motion). This shows that I am telling the truth here. As far as I was concerned, I was to wait until Mr. Donais contacted me since that was what Mr. Obrien had (on the call) told me that he was going to ask Mr. Donais to do (NB: there was no instruction from Obrien, or any expectation, that I was supposed to contact Donais, especially when Obrien did not give me or text me Donais contact information).

49. However, it should be noted that, at the time, my husband independently found the name and contact information for Mr. Donais from an internet search list of NH attorneys who practiced landlord-tenant law.

---

[7]See again **Exhibit 9–Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).** See also **Exhibit 12 – Updated Statement of Robert Obrien on 9-20-20 (via ADO interview process).**

[8]See again **Exhibit 9–Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).**

Given that time was of the essence (i.e., with only a day's notice to leave the property), my husband and I had separately undertaken the task of researching, identifying, and contacting attorneys that might possibly help us with this matter on an urgent basis. By separately undertaking this same task, we had hoped to cover double the ground to increase our chance of finding an attorney to help. When my husband, Andre Bisasor, contacted Mr. Donais, through his own research[9], he did not realize that it was the same attorney that was already contacted by Mr. Obrien on my behalf. As mentioned above, my husband left the room shortly after my call began with Mr. Obrien, so my husband did not hear what was said by Mr. Obrien about Mr. Donais.

50. It should be noted further that I did not know that Donais knew or had previous ties to Homewood's principal Dave Akridge ("Akridge") prior to my calling Obrien on 1-5-17, nor did I know, before I called Obrien, that Obrien would seek to involve Donais in the consultation.

51. I did not consent and have not consented to Donais' decision to represent the adverse party, Homewood/the Homewood defendants, in 2017, after having consulted with my husband on 1-9-17 and after having consulted with me through Obrien.

52. Donais did not inform me that he was deciding to represent[10] the adverse party in the matter with Homewood.

53. Donais did not inform me or consult with me prior to deciding to represent the adverse party in the matter with Homewood.

54. I did not and have not consented to the disclosure of my conversation with Obrien or any attendant confidential information shared therein, to any other lawyer or law firm or law firm employee (except for Donais himself who was contacted by Obrien that same evening of 1-5-17 and for which Obrien had told me in advance that he would contact Donais on my behalf that same evening of 1-5-17, and I did not ask or authorize the sharing of my information by Obrien to anyone else, nor did I authorize Donais to share with anyone else the information conveyed to him by Obrien on my behalf), nor did I/have I waived attorney-client privilege covering my conversation with Obrien on 1-5-17.

---

[9] See **Exhibit 15 – Donais Internet Ad (Printed in 2017)** and **Exhibit 16 – Ad of Landlord-Tenant Attorneys in NH showing Donais' Landlord-Tenant practice in 2017**.

[10] See **Exhibit 19 – Single Email sent on 1-11-17 by Donais to Terrell & Akridge, initially produced without longer email chain, and Longer Email Chain with Akridge, Donais and Terrell dated 1-11-17**, and see also **Exhibit 20 – Affidavit of Dave Akridge dated 5-4-17.**

55. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between myself and Obrien, and between him and Obrien on my behalf on 1-5-17, with Akridge, Attorney Karl Terrell ("Terrell"), Karl Terrell's assistant, or any other person, prior to Donais being hired by Akridge to represent the adverse party, Homewood.[11]

56. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between myself and Obrien, and between him and Obrien on my behalf on 1-5-17, with Akridge, Terrell, Terrell's assistant, or any other person, after Donais was hired by Akridge to represent the adverse party Homewood.

57. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between myself and Obrien, and between him and Obrien on my behalf on 1-5-17, with Akridge, Terrell, Terrell's assistant, or any other person, after Donais was disqualified from representing the adverse party, Homewood.

58. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between myself and Obrien, and between him and Obrien on my behalf on 1-5-17, with his police friends[12]/contacts or any other person.

59. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between myself and Obrien, and between him and Obrien on my behalf on 1-5-17, with his wife, Mary, his sons Garrett & Aiden, his friends/colleagues, Manchester NH Crime-Line board members, and Manchester NH police[13], or any other person or entity.

60. I did not consent and have not consented to Donais' sharing of the contents of the attorney-client conversation between myself and Obrien, and between him and Obrien on my behalf on 1-5-17, with Akridge, Terrell, Terrell's assistant or any other person in a public document filed publicly in two NH courts in 2017.

---

[11] Note: Donais was not authorized whatsoever to share (with anyone else) information about what I discussed with Obrien.

[12] Note: Nate Linstad was a personal friend of Donais, who also was a police officer. Donais sought a personal favor from Nate Linstad and Donais reached out to Nate Linstad, sharing confidential information with him (about us). Either way, Donais is not permitted to share any prospective client conversation with his friends or with police contacts that he knows. See **Exhibit 25 – Donais' 6-11-19 Email to Donais' Police Friend citing "Potential Client" and client info. disclosure.**

[13] See also **Exhibit 26 – Email from Hilliard on 7-21-20 with police report showing Donais contacted the police about plaintiffs in June 2019|Excerpt of Police Report by Donais divulging Plaintiff's client information**, and **Exhibit 27 – Excerpt of Transcript of Statements of Donais to Police on 6-18-19.**

61. Further, I did not learn of all of what was said by Donais to Judge Paul Moore ("Judge Moore"), the judge at the time of the hearing on 1-18-17 because it was a sidebar conference[14] and I was seated away from the bench and could not hear properly all what was discussed. It was only subsequently when my husband obtained an audio-recording and transcript of the hearing did I learn of all what was said.

62. It should be noted that, on 1-18-17, during the breaks between the hearing with the judge, while sitting in the backrooms of the courthouse (presumably used for mediation, etc.), I did hear certain remarks made by Donais to Akridge and Terrell (who were in an adjoining room), including hearing Donais make disparaging/insulting remarks about Elliott Berry including about his job/role, his pay, and his clothes/suit. This was deeply troubling to both me and my husband.

63. Lastly it should be noted that, later on, after the hearing, and after Donais had told the judge he'd withdraw, Donais asked Elliott for a private conversation in the backroom, where he essentially begged Elliott to not report him to the ADO/PCC.

64. Finally, it should be noted that Donais' admissions as well as the lies, fabrications and misrepresentations further support the claim of breach of fiduciary duty.

### IV. FURTHER FACTUAL REFUTATION OF DONAIS' STATEMENTS
#### A. Impact of Mr. Obrien's Conversation with Mr. Donais

65. It is clear that Donais received direct information about plaintiffs and the details of our case from Obrien.

66. After I had an 18-minute conversation with Obrien on or about 1-5-17, Obrien sought to bring Donais onto the case as an expert in Landlord-Tenant law to assist with the case. Obrien had a conversation by phone with Donais wherein Obrien shared details of what I discussed with Obrien and Donais gave his legal opinion on the issues involved with plaintiffs[15]. Donais went as far as to state that plaintiffs had a "***great contract case for overcharges***" but that "***the innkeeper rules would likely apply to your situation***" and that "***he would not opine on the discrimination claims outside of his experience***".[16]

67. This is clearly a situation where Donais received and reviewed sufficient information from Obrien to render legal advice and opinion on the matter. Donais would like everyone to believe that Obrien did not share any

---

[14] See **Exhibit 34 – Transcript of Nashua District Court Hearing with Judge Paul Moore on 1-18-17.**

[15] See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).**

[16] See **Exhibit 9– Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).**

facts about the case with him but this is belied by the fact that he rendered a clear legal opinion on the case to Obrien, which Obrien then passed onto me in a text message.

68. Donais appears to want to cast doubt on or question the veracity of Obrien in writing that text message to me. Yet, it is simply not believable that Obrien would undertake to contemporaneously write such a text message within minutes after concluding the call with Donais, if it did not represent a fairly accurate description of what Donais said to Obrien. These contemporaneous statements represent contemporaneous/real-time written notes that were taken/written at the time of these occurrences by Obrien, within minutes after the conversation took place. The temporal proximity of these written statements indicates a more truthful description of what was said than any subsequent denials by Donais that occurred weeks, months or years later after the ethical issues were raised first by Attorney Elliott Berry ("Berry")[17] and then by plaintiffs. Moreover, why would Obrien write those things in the text message if it were not true? Obrien and Donais are not only colleagues but are also friends. Obrien was trying to help Donais by bringing him more business. Obrien and Donais, by their own admission, were working together on other cases. Obrien had no reason or incentive to make this up or to tell lies on Donais. Any after-the-fact attempt to try to clean up the record, by trying to discount that text message as not being the truth, fails as a desperate attempt to cover-up the truth. Donais stated in his affidavit and the court hearing on 1-18-17 that he did not say the things that Obrien stated he said in the text message to me. This is simply not credible.

69. The court should take judicial note that Donais is lying when he denies that he told Obrien the things attributed to him in that text message. This should count against giving him any benefit of the doubt in this matter since he is willing to lie about obvious details. What makes more sense is that Obrien's text message represents the truth and Donais' denials are a reflection of a self-serving act of attempting to deceive or mislead the court. Moreover, Obrien evidently still tried his best to help out Donais as a friend and colleague by leaving out certain details from his 1-18-17 letter[18] once Obrien was alerted (on the morning of 1-18-17) to the fact that Donais

---

[17] See **Exhibit 23 – Email Exchange with Elliott Berry on 1-17-17 showing Berry's Legal Opinion on Donais' Conflict**, and see **Exhibit 24 – Elliott Berry's Contemporaneous Notes From Call To Donais About Conflict of Interest on 1-17-17**.

[18] See **Exhibit 10 – Letter/Affidavit of Robert Obrien dated 1-18-17 (obtained by Donais just before 1-18-17 hearing).** See also **Exhibit 11 – Bisasor Email to Robert Obrien For ADO-Related Interview in 2020** and see **Exhibit 12 – Updated Statement of Robert Obrien on 9-20-20 (via ADO interview process).**

was now in legal/ethical trouble for taking the Homewood (the same case that was previously referred to Donais by Obrien for representation on the plaintiff side). It is evident that Obrien was constrained between telling the truth and helping to cover for Donais after the fact, and this tension was reflected in certain contradictions in his 1-18-17 affidavit.

70. No one at the time of 1-15-17 knew how the situation was going to play out. If Akridge had not formally asked Donais to take the case, there would have been no conflict issue (or at least no-one else would have known about the conflict issue). This is why Obrien did not need to cover for or protect Donais when he wrote that text message to me on 1-5-17. As far as Obrien knew at the time of 1-5-17, we would all be on the same side, because plaintiffs were the prospective client that could be a source revenue/business to Donais (and potentially with some benefit to Obrien as well). The problem came in when Donais formally came onto the Homewood case as defense counsel instead of plaintiff's counsel. In doing so, Donais wanted to have his cake and eat it too, he still wanted to get paid as local defense counsel and still wanted to come on to the Homewood case as defense counsel when he knew that he had material conversations about the facts of the case from the plaintiffs' side, both with Obrien and with my husband. This is where the egregious nature of the ethical violation and breach of fiduciary duty comes in.

71. Additionally, it should be noted that Donais, in his affidavit submitted in the district court on 3-16-17, stated that Obrien did not tell him my name or my husband's name or the name of the property during their conversation on 1-5-17. Donais therefore argues that there could be no conflict because Donais did not know these names. But even assuming arguendo that this was true (which it is not), it still does not change the fact that Donais claims in his 3-13-17 affidavit that he suddenly realized[19] on 1-9-17 during the first minute of his 7-minute conversation with my husband, that the discussion he was having with my husband related to the same case that Donais discussed with Obrien on 1-5-17. Therefore, it does not change the fact that Donais had attained this inside knowledge about our case, prior to his accepting to become local counsel for the Homewood defendants on 1-11-17.

---

[19] See **Affidavit of Craig Donais dated 3-13-17 (filed in district court on 3-16-17 and in superior court on 4-27-17 and 5-5-17),** which is attached to the First Affidavit of Andre Bisasor.

72. Donais thus had the benefit of two sources of inside information about the plaintiff's case, one from my husband directly and one indirectly from me through Obrien.

### B. Discrepancies with Donais' Statements

73. Donais admitted that Obrien spoke with Anderson and then Obrien spoke with Donais. Yet Donais has tried to argue that Obrien did not identify the name of the caller that spoke to Obrien on 1-5-17. This is neither true[20], nor credible. Plaintiffs have produced telephone records[21] showing an 18-minute conversation with Obrien and myself on 1-5-17. It stretches credulity to believe that we spoke for 18 minutes without Obrien identifying me as the caller. Moreover, I have averred that I immediately at the outset of the call with Obrien identified not only myself, as Natalie, and my spouse as Andre, but also the name of the location Homewood Suites of Nashua. I specifically mentioned the name Homewood Suites of Nashua because I wanted to know if there was a conflict and Obrien stated that he did not have a conflict. In fact, I provided my first name twice on the call with Obrien, and Obrien stated that he would also relay both my name and contact information to Donais, as well as discuss the case with him. Obrien needs to be interviewed as a witness and asked questions about this under oath so as to ferret out the full truth of the matter. This is important because there is reason to believe that Obrien not only told Donais plaintiffs' name but also the name of Homewood Suites of Nashua.

74. Similarly, Obrien curiously states in his 1-18-17 affidavit[22] that no names or specific circumstances were discussed between him and Donais. Yet in Obrien's text message[23] to me on 1-5-17, he confirmed specific circumstances were discussed with Donais, so much so that Donais was able to render a legal opinion on the matter.

75. Similarly, Donais stated in his affidavit that Obrien called him, yet the phone log[24] of Obrien submitted by Donais to the district court on 1-18-17 shows that the call being referenced was an incoming call from someone to Obrien at 5:37pm for 5 minutes. Moreover, Obrien states in his 1-18-17 affidavit that he provided Donais' contact information to me (which he did not do as explained elsewhere in this document and in the

---

[20] See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).**
[21] See **Exhibit 6 – Natalie Anderson Phone Records showing call from her to Robert Obrien on 1-5-17 (lasting 18mins).**
[22] See **line 9 or 10** in **Exhibit 10 – Affidavit of Robert Obrien dated 1-18-17**.
[23] See **line 10 or 11** in **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17**.
[24] See **Exhibit 7 – Phone Log of Robert Obrien Provided by Defendants**.

attachments[25], in that my husband independently found Donais' contact information based on a NH lawyer internet list of ads, which was the same list of ads from which we obtained Obrien's contact information). So, why would Obrien do that if purportedly Donais said not to do so? Obrien, in his affidavit, does not explain why he did that. This seems like an attempt to synchronize stories[26] but fails to consider that it contradicts the facts, i.e., that it also contradicts the contents of what Obrien wrote to me via text message on 1-5-17.

### IV. CONCLUSION

76. Finally, all of the above facts, inferences and supporting evidence go to supporting the claim of breach of fiduciary duty (as well as other claims in this case)[27].

77. See the attached Exhibits that are hereby incorporated into this Affidavit.

78. The facts set forth in this affidavit are true and accurate to the best of my knowledge and belief.

79. I declare under penalty of perjury that the foregoing is true and correct.

### SIGNED UNDER PAINS AND PENALTIES OF PERJURY

I hereby depose and saith under oath, under the pains and penalties of perjury, that the above factual averments and statements of fact made in this document are true and correct to the best of my knowledge and recollection and investigation of these facts, and are based upon my own personal knowledge. The statements made herein are also corroborated by **exhibits that are attached** to the accompanying PSJ motion.

Respectfully submitted,
/s/ Natalie Anderson
Dated:  October 24, 2025                    NATALIE ANDERSON

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was/will be served on defendants.

/s/ Natalie Anderson
Natalie Anderson

---

[25] See **Exhibit 1 - Affidavit of Andre Bisasor**.

[26] NB: It appears that Obrien may have been initially pressured to tailor his story to try to fit or protect Donais. For example, Obrien claims he did not tell Donais the name of the property or of the caller. Yet, Obrien remembered the phone number of Anderson when he sent text messages to her within an hour after the 1-5-17 call with her and Obrien.

[27] This affidavit also rebuts Donais' motion to dismiss the amended complaint as well as the attachments thereto including the 3-13-17 affidavit of Donais.

# Exhibit 3

**Filed**
**File Date: 10/6/2025 8:31 AM**
**Hillsborough Superior Court Northern District**
**E-Filed Document**

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

## [CORRECTED] PLAINTIFFS' [EMERGENCY] MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY

1. Plaintiffs move for partial summary judgment on the breach of fiduciary count of the amended complaint, seeking judgment as a matter of law that Craig Donais ("Donais") breached his fiduciary duty to plaintiffs arising from the prospective attorney-client relationship established in the direct 1-9-17 consultation (and indirect 1-5-17 consultation).

## I. INTRODUCTION

2. This motion seeks partial summary judgment on a narrow issue: whether Donais breached fiduciary duties owed to plaintiffs as prospective clients by disclosing confidential information from their consultation to unauthorized 3rd parties. Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Undisputed facts establish all elements necessary for claim liability as a matter of law.

## II. STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

3. Below are uncontroverted facts established by Donais own admissions/court records, etc with no genuine issue for trial.

### A. Establishment of Prospective Attorney-Client Relationship

4. On 1-6-17, plaintiff Andre Bisasor left a voicemail for defendant Donais seeking legal representation regarding a landlord-tenant dispute with Homewood Suites. On 1-9-17, Donais returned Bisasor's call and engaged in a 7-minute telephone consultation. Donais admits this consultation occurred and lasted approx. 7 minutes. During this consultation, Bisasor disclosed confidential information about plaintiffs' claims against Homewood Suites, the allegations of disparate treatment, and the urgent legal predicament. This consultation was conducted with mutual understanding that it was for the purpose of evaluating potential legal representation and was subject to attorney-client confidentiality.

### B. Judicial Recognition of Attorney-Client Relationship

5. On 1-18-17, in the Nashua District Court case involving plaintiffs and Homewood Suites, during a hearing, Judge Paul Moore found that an attorney-client relationship [and thus fiduciary duty] existed between Donais and plaintiffs based on the 1-9-17 consultation. As a direct result of this finding, Donais was required to withdraw from representing Homewood Suites due to conflict of interest created by his prior consultation with plaintiffs. That Donais withdrew as a result Judge Moore's finding and guidance in the 1-18-17 hearing, is undisputed. NB: This also included indirect consultation with Plaintiff Natalie Anderson through Attorney Robert Obrien. See attached for further on this point.

### C. Subsequent Breaches of Confidentiality

6. Despite the confidential nature of the 1-9-17 consultation, Donais subsequently disclosed information obtained during that consultation to multiple third parties without plaintiff's consent, including his wife Mary Donais, his sons Garrett and Aiden Donais, members of the Manchester Crime Line Board, and other family members and colleagues.

7.  These disclosures occurred well outside of any possible litigation context. The disclosures were made for purposes of harming plaintiff's reputation and protecting Donais's own interests rather than for any legitimate legal purpose.

8.  Further, prior to being hired by Homewood Suites, Donais disclosed confidential information from the 1-9-17 call to Homewood Suites' principals and agents. He did so without obtaining consent from the plaintiffs. This is undisputed. Donais was not required to disclose, and should not have disclosed, this information to them as unauthorized third parties. Donais' desire to represent Homewood Suites does not relieve him of his fiduciary duty to the plaintiffs to protect the confidentiality of the 1-9-17 consultation with him. There is no way around this hard cold fact. Donais has admitted to this unauthorized disclosure to them, prior to being hired by them. See also attached memorandum/exhibits.

### D. Fabricated Allegations

9.  Furthermore, in connection with these disclosures, Donais fabricated false allegations that Bisasor had accused him of racial discrimination during the 1-9-17 consultation. These fabricated allegations were designed to portray Bisasor as an unreasonable person, who makes frivolous accusations of racism, on a whim and without any logical reason or evidence, thereby damaging Bisasor's reputation/credibility, but also breaching the fiduciary duty owed to him.

### III. SUMMARY OF ARGUMENT
### A. Fiduciary Relationship Established as Matter of Law

10. Under NH law and NH Rule of Professional Conduct 1.18, prospective clients are entitled to the same confidentiality protections as actual clients. Rule 1.18 explicitly states: "*a person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client*" and that "*a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information.*"

11. The 1-91-17 consultation unquestionably created a prospective attorney-client relationship. Bisasor contacted Donais seeking legal advice, Donais engaged in a substantive consultation lasting 7 minutes, and confidential information was disclosed for the purpose of evaluating potential representation. Judge Paul Moore's finding that an attorney-client relationship existed confirms this conclusion as a matter of law. The existence of this fiduciary relationship cannot be disputed by defendant. His own affidavit acknowledges the consultation occurred, and his withdrawal from Homewood representation demonstrates his recognition of the ethical obligations created by that consultation.

### B. Breach of Fiduciary Duty Established Without Dispute

12. The elements of breach of fiduciary duty are: (1) existence of a fiduciary relationship, (2) breach of duty arising from that relationship, (3) causation, and (4) damages. Each element is established without genuine dispute.

13. First, the fiduciary relationship exists as established above. Second, Donais breached this duty by disclosing confidential information to unauthorized third parties for improper purposes. The duty of confidentiality owed to prospective clients is absolute and continues indefinitely. Donais disclosed consultation information to family members and colleagues without any legitimate justification. Third, causation is established by the direct connection between Donais's disclosures and harm to plaintiffs' reputation and case. Donais further used confidential information as the foundation for fabricated allegations designed to damage plaintiffs' credibility. Fourth, damages are established through reputational harm, emotional distress, and other injuries flowing from these breaches. See attached memorandum, affidavits & exhibits.

## C. No Legitimate Defense Exists

14. NH Prof. Conduct Rule 1.6(b)(3) permits disclosure only "to defend claims regarding [the lawyer's] conduct," but this exception does not authorize wholesale disclosure to unauthorized 3rd parties including to adverse parties in order to be hired by said adverse parties, nor to family members, colleagues, and community organizations for purposes of damaging a former client's reputation. Donais cannot claim any legitimate defense for disclosures to private parties that occurred years after litigation concluded. Moreover, even if Donais were permitted to defend against specific claims in this instance, he cannot fabricate false allegations or disclose confidential information beyond what is necessary for such defense. His conduct far exceeded any legitimate defensive purpose and was designed to inflict harm.

## D. Undisputed Facts Compel Judgment

15. The critical facts establishing liability are undisputed: the consultation occurred, confidential information was disclosed, Donais subsequently revealed that information to unauthorized 3rd parties, and the disclosures were improperly made. Donais cannot genuinely dispute these facts because they're established by his own admissions, court records, and objective evidence. The only remaining question concerns scope of damages, which is properly reserved for trial or subsequent proceedings. The threshold liability issue should be resolved as a matter of law based on undisputed record.

## IV. CONCLUSION

16. This motion is accompanied by affidavits in support, a supporting memorandum of law and a record of exhibits, and statement of material facts. The undisputed facts establish defendant's breach of fiduciary duty as a matter of law. Judge Paul Moore's finding of an attorney-client relationship, combined with defendant's own admissions regarding the consultation and subsequent disclosures, eliminate any genuine factual dispute regarding liability. Partial summary judgment will narrow the issues for trial and serve judicial efficiency by resolving this clear-cut claim of misconduct.

17. WHEREFORE, plaintiffs respectfully request that this Court grant partial summary judgment on Count 6 of the amended complaint, finding defendant liable for breach of fiduciary duty as a matter of law. See also the attached.

3

Respectfully submitted[1],

/s/ Natalie Anderson
NATALIE ANDERSON

/s/ Andre Bisasor
Date: October 6, 2025                                                                ANDRE BISASOR

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

---

[1] NB: This is submitted as a corrected version of the prior submission of this motion, which is now hereby being submitted by both plaintiffs ( and is also done prior to a response by the defendant). This also is now accompanied by a memorandum of law, affidavits in support and exhibits, which points, facts and arguments are fully incorporated herein as if fully stated herein. As it is a dispositive motion, Plaintiffs request hearing on the motion and also that it is heard/decided at the same time as any other dispositive motion including defendants' motion to dismiss amended complaint.

4

**Filed**
**File Date: 10/6/2025 8:31 AM**
**Hillsborough Superior Court Northern District**
**E-Filed Document**

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM

1. Plaintiffs submit this memorandum for motion for partial summary judgment on the breach of fiduciary duty claim.

2. This partial summary judgment motion addresses breaches of fiduciary duty arising from Craig Donais ("Donais") 1-9-17 consultation with Andre Bisasor ("Bisasor"), and Natalie Anderson's ("Anderson") 1-5-17 consultation with Donais through Robert Obrien, and other undisputed facts that establish a prospective attorney-client relationship, such as Judge Paul Moore's finding of a conflict, requiring Donais's withdrawal from representing Homewood Suites, and breach of confidentiality to unauthorized 3rd parties. The accompanying 3 affidavits and exhibits are fully incorporated herein.

---

### SECTION I: LEGAL STANDARDS

---

### I. SUMMARY JUDGMENT STANDARD

3. Under NH RSA 491:8-a, summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The court views evidence in light most favorable to the non-moving party, but where the material facts are undisputed, legal conclusions flowing from those facts present questions of law appropriate for summary judgment. The NH Supreme Court has held that summary judgment serves the purpose of determining whether genuine factual disputes exist and applying law to undisputed facts.

4. Once the moving party has established the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion.

5. New Hampshire RSA 491:8-a explicitly authorizes partial summary judgment, stating that "A party seeking to recover upon a claim, counterclaim, or crossclaim, or to obtain a declaratory judgment, may, at any time after the defendant has appeared, move for summary judgment in his favor upon all or **any part thereof**." The phrase "any part thereof" establishes clear statutory authority for partial summary judgment on individual claims or issues within a case.

6. The New Hampshire Supreme Court regularly approves partial summary judgment motions when appropriate legal standards are met. In Loeffler v. Bernier, No. 2019-0107 (N.H. 2020), the court affirmed superior court orders "granting partial summary judgment to plaintiff," finding no reversible error in the partial resolution approach, demonstrating standard acceptance of this procedural mechanism for narrowing multi-claim disputes.

7. The NH Supreme Court has thus confirmed that trial courts possess authority under RSA 491:8-a to grant partial summary judgment, indicating partial resolution serves judicial efficiency by determining clear legal issues without

1

requiring full trials on every aspect of multi-faceted cases. Hence, when undisputed facts establish liability on specific claims, partial summary judgment eliminates unnecessary litigation costs while preserving the remaining disputed issues. This approach particularly benefits certain cases involving clear legal standards applied to uncontested facts.

## II. INTRODUCTION

8.  This  motion seeks partial summary judgment on the breach of fiduciary duty count that asserts that Donais and his law firm owed a fiduciary duty to Plaintiffs as prospective client, including confidentiality, loyalty, and the obligation to act in good faith, which was breached through multiple egregious acts.

9.  As a prospective client, Bisasor shared confidential information with Donais during a 1-9-17 consultation. The facts establish that this was a confidential, substantive discussion about legal issues involving the Hilton Hotels/Homewood Suites defendants. The facts clearly demonstrate that Bisasor reasonably believed he was engaging in a confidential discussion, on behalf of himself and his spouse. Bisasor was thus entitled to confidentiality and loyalty. Donais, knowing this, had a duty to maintain confidentiality and act in Plaintiff's best interests. Instead, Donais breached confidentiality obligations owed to Plaintiff as prospective client by disclosing privileged information to harm Plaintiff's interests. Donais used his position of client trust to maliciously fabricate false allegations, with the intent to defame, intimidate, and retaliate against Plaintiffs. Donais weaponized this confidential discussion and turned it into a defamatory campaign. Donais's conduct violated that trust, breaching his fiduciary obligation. Donais divulged confidential information to third parties, his wife, son, family members and community members, colleagues, and others, without Plaintiff's consent, breaching his fiduciary obligation. These acts constitute a clear breach of fiduciary duty, which under NH law, includes the obligation not to disclose confidential information or use it for personal or third-party advantage. Further, Donais' repeated disclosures of the confidential discussion, especially where he manufactured false statements and disclosed them to 3rd parties, under the pretext that it was disclosed to him in a client call, shows a pattern of breach that is sufficiently egregious to sustain a cause of action. By disclosing privileged information and exploiting it for self-protection, Donais breached that duty, proximately causing reputational and economic loss. Plaintiff's damages include reputational harm, emotional distress, and economic loss, directly caused by the breaches.

## III. LAW REGARDING FIDUCIARY DUTIES TO PROSPECTIVE CLIENTS
### A. NH Rules of Professional Conduct 1:18

10. NH Rule 1.18(a) states: "*a person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.*" Rule 1.18(b) requires that "*a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information except as Rule 1.9 would permit with respect to information of a former client.*"

11. Rule 1.18 of the NH Rules of Professional Conduct for Lawyers further states:

Rule 1.18. Duties to Prospective Client
(a) A **person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.**
(b) **Even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information** except as Rule 1.9 would permit with respect to information of a former client.
(c) **A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received and reviewed information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).**

Ethics Committee Comment:
1. The New Hampshire rule expands upon the ABA Model Rule in one area. **The ABA Model Rule 1.18(a) defines a prospective client as one who "consults" with a lawyer about possible representation; the New Hampshire Rule defines prospective client as one who "provides information to a lawyer" about possible representation**. ABA Model Rule 1.18(b) establishes a general rule for protection of information "learned" by a lawyer from a prospective client; the New Hampshire Rule clarifies **the scope of the protection so that it applies to information "received and reviewed" by a lawyer from a prospective client.**

In its version of Rule 1.18, New Hampshire's rule eliminates the terminology of "consultation" and learning and extends **the protections of the rule to persons who, in a good faith search for representation, provide information unilaterally to a lawyer who subsequently receives and reviews the information. This change recognizes that persons frequently initiate contact with an attorney in writing, by e-mail, or in other unilateral forms, and in the process disclose confidential information that warrants protection. This change further recognizes that receipt and review are likely to be more objective standards than learning.**

12. Rule 1.18 is clear that prospective clients are protected by attorney-client privilege and that there is a duty to prospective clients owed by attorneys who consult with them. The NH version of Rule 1.18 is broader than the ABA Model Rule, extending protection to persons who "provide information to a lawyer" rather than limiting it to formal consultations. This expansion recognizes that confidential information warrants protection regardless of the formality of initial contact.

13. Courts have held that fiduciary duties arise when attorneys receive confidential information from prospective clients. The fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result. Thus, fiduciary duty arises when an attorney receives confidential information, even if formal engagement doesn't occur, provided the client reasonably believes the attorney is acting in a professional capacity and the communication is confidential. Such fiduciary duties extend to prospective clients especially where confidential information was shared/relied on in good faith. Hence, under NH law, a prospective attorney-client relationship creates fiduciary obligations of confidentiality, loyalty & good faith.

14. The New Hampshire Rules of Evidence provides the definition of a client:

A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him. [New Hampshire Rules of Evidence, Rule 502(a)(1).]

3

15. NH Rules of Evidence, Rule 502(a)(1) establishes that communications from a prospective client are protected by attorney-client privilege, even though the attorney has not yet formalized (or never formalizes) a representative relationship with the individual. One will be deemed a "client" for purposes of applying attorney-client privilege upon consulting a lawyer "with a view to obtaining professional legal services from [a lawyer]." See also McCabe v. Arcidy, 138 N.H. 20, 25, 635 A.2d 446, 449 (1993) ("[A]n attorney-client relationship 'is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.'").

16. New Hampshire has held that an attorney may not disclose the contents or condition of pre-existing documents delivered to the attorney by the client. See Brown v. Payson, 6 N.H. 443, 448, 1833 WL 1321 (1833) ("The situation and contents of a paper, delivered to an attorney for inspection, in the course of employment as attorney, is as much a matter of professional confidence as an oral statement of its contents or condition can be...An attorney is not at liberty to disclose what is communicated confidentially by a client.").

17. New Hampshire generally provides that once the attorney-client privilege attaches to confidential communications, the privilege survives termination of the attorney-client relationship, or the death of the client. See McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) ("communications made during the course of legal representation…are confidential and permanently protected from disclosure."); Stevens v. Thurston, 112 N.H. 118, 289 A.2d 398, 399 (1972) ("the privilege continues after the death of the client"). The perpetual effectiveness of the privilege's protections is recognized by Rule 502(c), which provides the privilege may be claimed on behalf a client, even if that client has passed.

18. "Even after termination of the attorney-client relationship, a lawyer remains bound" to preserve the former client's confidences and secrets. Bays v. Theran, 418 Mass. 685, 691 (1994). "(W)hen an attorney has ceased to represent a client, a conflict of interest may arise in representing a new client because of the attorney's continuing duty to preserve a former client's confidences." Adoption of Erica, 426 Mass. 55, 60 (1997). See also Bartle v. Berry, 80 Mass. App.Ct. 372, 385 (2011) (an attorney's fiduciary duty continues even after termination of the attorney-client relationship).

### B. Definition of Confidential Information

19. The New Hampshire Rules of Evidence defines a confidential [1]communication as follows:

---

[1] A "confidence" has also been defined by other courts, as "information protected by attorney-client privilege under applicable law", and a "secret" as "information gained in the professional relationship that the client requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." (McKinney Supp. 1991).

(5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication. [New Hampshire Rule of Evidence, Rule 502(a)(5).]

20. Where legal advice of any kind is sought from a lawyer in his capacity as such, the communications relating to that purpose, made in confidence by the client, are permanently protected from disclosure by the client or by the lawyer unless the protection is waived by the client or his legal representatives. See Riddle Spring Realty Co. v. State, 107 N.H. 271, 220 A.2d 751, 755 (1966) (citing 8 Wigmore, Evidence, §§ 2292, 2327–29 (McNaughton rev. 1961)).

21. The attorney-client privilege is applicable in New Hampshire only when the client has consulted the attorney for the purpose of obtaining legal advice or assistance. State v. Gordon, 141 N.H. 703, 706, 692 A.2d 505, 507 (1997).

22. See also State v. Elwell, 132 N.H. 599, 567 A.2d 1002, 1005 (1989) ("Under the attorney-client privilege, a communications made in confidence in the course of obtaining legal advice from a professional legal advisor are protected from disclosure."). See also Professional Fire Fighters of New Hampshire v. New Hampshire Local Government Center, 163 N.H. 613, 44 A.3d 542, 544 (2012).

23. Thus, for the privilege to apply, the client must intend the communications to be kept confidential at the time the communications were made. New Hampshire courts will determine the intent of the client by examination of the circumstances in which the communications were made. For example, if the communications are made in the presence of a third party, the court will infer that the client did not have the intent of confidentiality. State v. Melvin, 132 N.H. 308, 564 A.2d 458, 459 (1989) ("the presence of an 'extraneous' third party during a privileged conversation operates to destroy the privilege."). This concurs with federal law requiring privilege apply only to communications intended to be confidential when made. McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) ("communications made during the course of legal representation…are confidential and permanently protected from disclosure."); Riddle Spring Realty Co. v. State, 107 N.H. 271, 220 A.2d 751, 755 (1966) ("'[T]he essence of a privileged communication between attorney and client and likewise the basis of its exemption from discovery is its confidentiality.'").

24. New Hampshire also extends the privilege to communications between an attorney and a client, and not to the information that is in those communications. Thus, even though the information may be available from another source, an outside party cannot discover whether or not the same information communicated by the client to an attorney for purposes of seeking legal advice. McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) (The plaintiff could not penetrate the attorney-client privilege to discover whether the defendant made the same statements to his attorney

during the course of legal representation.). New Hampshire also recognizes that attorney-client privilege exists for the benefit of the client. Scott v. Grinnell, 102 N.H. 490, 161 A.2d 179, 183 (1960) ("The privilege is that of the client...").

### C. Formation of Attorney-Client Relationship

25. Courts have held that an "analogous fiduciary obligation may be implied in the absence of an attorney-client relationship." Liu v. Real Estate Inv. Group, Inc., 771 F. Supp. 83 (S.D.N.Y. 1991). As the court in Liu noted:

> It is clear that where an attorney receives confidential information from a person, who under the circumstances has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidences irrespective of the absence of a formal attorney client relationship.

26. See also United States v. Devery, No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship."). See also Rosman v. Shapiro, 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987).

27. "[C]ourts have not employed a single, well-defined test for determining whether an attorney client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." See First Hawaiian Bank v. Russell Volkening, Inc., 861 F. Supp. 233, 238 (S.D.N.Y. 1994); accord Bennet Silvershein Assocs. v. Furman, 776 F. Supp. 800, 803 (S.D.N.Y. 1981).

28. Further, whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to attorney client privilege. See Dennis, 843 F.2d at 657 ("To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."); see also Green, 784 F. Supp. at 845 ("[T]he fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result."); Liu, 771 F.Supp. at 86 ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."); McCormick on Evidence 6th Ed. § 88 (West Publishing Co., 2006) ("[C]ommunications in the course of [a] preliminary discussion with a view to employing the lawyer are privileged though the employment is, in the upshot, not accepted."). As the Second Circuit has also stated, "[t]he key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." United States v. Dennis, 843 F.2d 652, 657 (2d Cir. 1998).

29. Under Restatement (Third) of the Law Governing Lawyers § 38, just because a prospective client conversation where confidential information was shared, does not result in further engagement, that does not absolve attorneys of fiduciary obligations created by that limited or initial client interaction.

30. Under NH law, breach of fiduciary duty requires (1) the existence of a fiduciary relationship, (2) breach of that duty, (3) causation, and (4) damages. Case law support such breaches are actionable. See Bays v. Theran, 418 Mass. 685 (1990), affirming breach of fiduciary duty can be established via disloyalty, breach of confidentiality, or self-dealing.

---

### SECTION II:  ARGUMENT FOR BREACH OF CONFIDENTIALITY OF A PROSPECTIVE CLIENT

---

#### I. BREACH OF FIDUCIARY DUTIES TO PLAINTIFFS AS PROSPECTIVE CLIENTS
#### A. Undisputed Establishment of Prospective Client Relationship

31. The 1-9-17 consultation clearly established a prospective attorney-client relationship under any applicable standard. Bisasor contacted Donais seeking legal advice regarding a specific legal matter.  Donais engaged in a substantive consultation lasting 7 minutes. Confidential information was disclosed for the specific purpose of evaluating potential representation. An attorney-client relationship existed because Bisasor divulged confidences and secrets to Donais as an attorney and because Bisasor believed that he was approaching Donais as an attorney in a professional capacity with the intent to secure legal advice and did secure legal advice. Bisasor reasonably understood that the call with Donais was confidential. Thus, Bisasor's intent as a prospective client was that of an attorney/client relationship.

32. Further, whether or not employment occurs, preliminary discussions between Donais as an attorney and Bisasor as a prospective client was subject to attorney client privilege. Thus, the fiduciary relationship existing between Bisasor and Donais extended to preliminary consultation with Bisasor as a prospective client with a view to retention of Donais as lawyer, notwithstanding that actual employment did not result. Thus, Donais' duty to preserve confidentiality extended to this preliminary consultation with Bisasor as a prospective client even though actual employment does not result. In this instance, it is clear that Bisasor engaged in preliminary discussions with Donais related to legal analysis of potential claims that could be brought in connection with the landlord-tenant matter involving the Homewood defendants during the tenure of plaintiff's stay. Although there was no further engagement or retainer after that preliminary client conversation, any communication made during this preliminary consultation is protected by the duty of confidentiality and by the attorney-client privilege. Thus, this preliminary conversation is sufficient to establish the existence of an attorney-client relationship, even though Donais was not ultimately retained.

7

33. Bisasor's statement that he shared confidential information and sought legal advice from Donais is corroborated by telephone records indicating there were at least two telephone calls involved, one on 1-6-17 where Bisasor left a voicemail for Donais, and one on 1-9-17 where Donais called back Bisasor, which lasted 7 minutes. This constitute sufficient circumstantial evidence to show some confidential information was revealed to Donais in order for him to evaluate plaintiffs' case. Yet, the information shared does not have to be some deep dark secret for it to be confidential. Further, the law does not require the information shared to be confidential in the strictest sense of the word. The law simply requires that a person provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter, and he/she is a prospective client. The law simply requires that "even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information." It does not say confidential information. It simply says any information provided t the lawyer with the intent of forming an attorney-client relationship is protected and shall not be revealed. At a minimum, it is undisputed that Bisasor shared information with Donais with the intent of forming an attorney-client relationship and that Donais received and reviewed that information.

34. Thus, Bisasor was a client for purposes of the initial consultation, and at a minimum, was a prospective client, and he became a former client once the engagement went no further after the initial consultation. Rule 1.18 is very clear that prospective clients are protected by attorney-client privilege and that there is a duty to prospective clients owed by attorneys who consult with them. Thus, Donais' relationship with Bisasor, that of attorney/client, was that of a fiduciary. Donais owed an ethical and fiduciary duty to Bisasor. Bisasor placed trust and confidence in Donais. This gave rise to fiduciary duties of the attorney toward Bisasor. Donais owed Bisasor a fiduciary duty to act at all times in good faith and in Bisasor's best interests, and to not expose Bisasor to any unnecessary risk or peril. Donais' fiduciary duty to Bisasor continued after the termination of his attorney/client relationship. The 1-9-17 legal advice consultation with Bisasor triggered a fiduciary relationship with ongoing duties of confidentiality.

35. Most significantly, Judge Moore's finding that an attorney-client relationship existed provides judicial recognition of this relationship. This finding necessitated Donais's withdrawal from representing the adverse party, confirming that the consultation created enforceable ethical/fiduciary obligations.

### B. Establishment of Confidence and Trust

36. Throughout the 1-9-17 consultation, Donais engaged in conduct that demonstrated his professional expertise and willingness to consider plaintiff's case. Donais received from Bisasor the factual circumstances underlying their legal

8

claims and engaged in a substantive analysis of their situation. This conduct created a reasonable expectation on the part of plaintiffs that Donais was evaluating their case for potential representation and that the information being shared would be treated with the confidentiality and professional care accorded to attorney-client communications.

37. Under NH law, a fiduciary relationship exists wherever influence has been acquired, and abused or confidence has been reposed and betrayed. During the 1-9-17 consultation, plaintiffs reposed confidence in Donais by sharing sensitive information about their legal predicament, including details about disparate treatment and their vulnerable position facing imminent ejection from their rented unit, among other things. This disclosure of confidential information in the context of seeking professional legal advice created the necessary foundation of trust and confidence that characterizes a fiduciary relationship. The consultation between Donais and Bisasor entailed a substantive exchange of information for the specific purpose of obtaining legal advice/representation. Donais's conduct during this consultation, including his willingness to listen to the details of their case and engage in discussion about the legal issues presented, created reasonable reliance on his professional expertise/judgment. This reliance was furthered by the referral relationship with Attorney O'Brien, who specifically identified Donais as possessing the expertise to handle their type of legal matter.

### C. Acquisition of Influence and Confidential Information

38. During the 1-9-17 consultation, Donais acquired influence over Anderson and Bisasor's legal situation by positioning himself as a knowledgeable attorney capable of evaluating their claims and providing professional guidance. The very act of consulting with Donais, particularly given the referral context and the urgent timeline of their legal predicament, placed Anderson and Bisasor in a position of dependency on his professional judgment and expertise.

39. Donais acquired material confidential information during this consultation, including specific details about Anderson and Bisasor's allegations of racial discrimination (through Obrien), the nature of their dispute with Homewood Suites, their concerns about improper charges, and their immediate need for legal intervention to prevent unlawful ejection. This information was provided with the reasonable expectation that it would be treated confidentially and used solely for the purpose of evaluating whether Donais would undertake their representation.

40. The confidential nature of this information is demonstrated by its sensitivity and potential harm that could result from disclosure to adverse parties. The information related directly to plaintiffs' legal strategy, their vulnerabilities in the dispute, and their assessment of the strengths/weaknesses of their potential claims. Under NH Rule of Prof. Conduct 1.18, even when no attorney-client relationship ultimately ensues, a lawyer who received and reviewed information from a prospective client owes duties of confidentiality and loyalty that create fiduciary obligations.

9

41. NB: As stated in the accompanying Affidavits of Andre Bisasor, Bisasor was assured by Donais the conversation would be confidential [NB: The same assurance was made by Obrien to Anderson, which extended also to Donais as Donais was consulted by Obrien as part of the prospective client evaluation process]. Beyond that, even without the averments in the accompanying affidavits, the circumstances demonstrate that Bisasor would have had no reason to believe that his conversation with Donais would not be kept confidential. Bisasor contacted Donais as an attorney seeking legal advice from an attorney, leaving a voicemail that made clear he was seeking legal advice/assistance, and Donais then listened to the voicemail and called Bisasor back to have a conversation with Bisasor about the issues that Bisasor identified on the voicemail. Upon calling Bisasor, Donais asked Bisasor to explain the situation identified on the voicemail. Bisasor then shared information about his legal situation with Donais as an attorney. These facts alone demonstrate that Bisasor would've had some expectation of confidentiality. Why would Bisasor discuss/share his legal situation with Donais, as an attorney, but not expect any confidentiality at all? And why would Donais expect that what Bisasor shared with him as an attorney, in seeking legal advice, wouldn't be protected by confidentiality? So Donais expects that he can solicit prospective clients to contact him and discuss their situations with him, and then he is free to divulge everything they tell him to the public or to others? This wholly is unreasonable/erroneous.

**D. Breach of Fiduciary Duties**

42. Despite having acquired this position of trust and confidential information, Donais breached his fiduciary duties to Anderson and Bisasor in multiple ways. First, within days of their consultation, Donais agreed to represent Homewood Suites, the very party against whom plaintiffs had sought his assistance. This representation created a direct conflict of interest that violated his duty of loyalty to plaintiffs as prospective clients. Second, and more egregiously, prior to being retained by Akridge, Donais disclosed the confidential information obtained during his consultation with Bisasor to representatives of Homewood and their counsel. On 1-11-17, Donais sent an email to Attorney Terrell, counsel for Homewood, detailing the substance of his conversation with Bisasor, including specific information about the claims plaintiffs intended to pursue. This disclosure violated the fundamental duty of confidentiality that Donais owed to plaintiffs as prospective clients. Third, Donais compounded his breach by subsequently providing a false affidavit on 3-16-17, in which he misrepresented the nature and content of his consultation with Bisasor. By providing false information in this affidavit[2], Donais further betrayed the trust plaintiffs placed in him during/via their consultation.

---

[2] Although the court previously ruled that Donais' March 2017 affidavit cannot be used to recover on defamation claim under NH law, it didn't /doesn't prohibit recovery for a breach of fiduciary claim with respect to breaches of duty done via Donais' March 2017 affidavit.

**E. Abuse of Confidence and Betrayal of Trust**

43. Donais' conduct represents a clear abuse of the influence he had acquired, and a betrayal of the confidence that had been reposed in him. Rather than declining representation of the adverse party or maintaining the confidentiality of the information he had received, Donais chose to use the confidential information obtained from plaintiffs to benefit their opponents in litigation. This conduct violated the most fundamental principles of the attorney-client relationship and constituted a breach of the fiduciary duties he owed to plaintiffs. The harm caused by Donais' breach was both immediate and substantial. Plaintiffs were deprived of confidentiality protections they reasonably expected when consulting with an attorney, and the confidential information provided was used against them in subsequent litigation. This breach of trust undermined their legal position and caused them to suffer damages as a direct result of Donais' misconduct. Donais used his prospective client conversation with Bisasor, to directly inflict harm by defaming Bisasor and accusing Bisasor of falsely/frivolously accusing Donais of race discrimination because he did not take his case. This false accusation against Bisasor sullied Bisasor, with implication that Bisasor was a frivolous liar who plays the race card without rhyme or reason and is to be discredited as an irrational, angry person who wildly hurls accusations of race discrimination when there is no valid reason to do so. This diminished Bisasor's character and discredits him in the eyes of the public/the community. Notwithstanding the fact plaintiffs do not seek recovery for defamatory statements made in Donais' affidavit, plaintiffs here plead that Donais breached his fiduciary duty therewith, intending to defame Bisasor.

44. If Bisasor had never spoken to Donais on 1-9-17 about a prospective client relationship, Donais could not have had the opportunity to fabricate this lie against Bisasor or to use the consultation as a springboard to launch such lies.

45. Donais used his position as a prospective lawyer to Bisasor as a prospective client as a basis to injure Bisasor by falsely accusing him of falsely accusing Donais of race discrimination in the context of a conversation wherein Bisasor was seeking to legal advice/assistance from Donais, and wherein Bisasor shared with Donais certain confidential information, thus taking Donais into his confidences and placing his trust in Donais. Donais exploited and abused the trust that Bisasor extended to Donais in seeking to have a conversation with him about plaintiffs' case against the Homewood defendants. Donais turned around and used that private privileged conversation as a basis to fabricate lies on Bisasor. This is an utter abuse and travesty that has befallen Bisasor on account of unwittingly and unsuspectingly making the mistake of speaking with a dishonest lawyer like Donais. This is a breach of fiduciary duty. This also goes to the conflict of interest. Donais' conflict of interest further created the fuel by which he found it useful to falsely accuse

Bisasor, in order to harm and damage Bisasor (and his spouse), in the interest of protecting and advancing his own interests and the interests of the opposing party. See accompanying affidavits for further explication of attendant facts.

## F. Clear Breach of Confidential Duties

46. The breach of fiduciary duty is established through Donais's undisputed disclosures of consultation information to unauthorized 3rd parties. These disclosures also include those made years after the 1-9-17 consultation and were made to family members, colleagues, and community organizations (which were also outside of any judicial context).

47. NH Prof. Conduct Rule 1.6(b)(3) permits attorneys to "reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary to defend the lawyer or the lawyer's employees or associates against a claim or charge of wrongdoing." However, this exception is narrowly construed and does not authorize wholesale disclosure to private parties for purposes of damaging a former client's reputation.

48. Under New Hampshire law, the existence of a fiduciary relationship does not require a formal attorney-client retainer or fee arrangement. Rather, fiduciary duties arise whenever confidence has been reposed and influence has been acquired in the context of a professional consultation. Thus, a fiduciary relationship existed between Donais and plaintiffs based on their consultation and the confidence reposed in him; Donais breached his fiduciary duties by disclosing confidential information to adverse parties and representing those adverse parties; Plaintiffs suffered damages as a result of this breach; and (4) Donais's breach was the proximate cause of their damages.  Donais's conduct in engaging in a substantive consultation with plaintiffs, acquiring confidential information, and then using that information to benefit their adversaries constitutes a textbook example of breach of fiduciary duty. Thus, Plaintiffs' assert that a fiduciary relationship existed between the plaintiffs and Donais because Donais had acquired influence with respect to Bisasor which was abused by Donais, and Bisasor reposed confidence in Donais but was betrayed, and because plaintiffs relied on Donais for legal advice for their landlord-tenant matter. Donais later withdrew from representing Homewood, after a judge had determined that Donais had violated ethical duties/breached fiduciary duty. The 1-18-17 court hearing transcript shows that Donais was caught red-handed and that a circuit court judge found that Donais breached fiduciary duty and thus was required to be disqualified/ to withdraw from the case. This by itself is slam-dunk proof that Donais is liable for breach of fiduciary duty, as Donais' own withdrawal serves as his own admission that he was liable for this wrongdoing.

49. It should be noted that it was Donais who called Bisasor on 1-9-17 (in returning Bisasor' call/voicemail from 1-6-17). Donais could have chosen not to call Bisasor back. The fact that Donais initiated the call on 1-9-17 signaled to Bisasor that Donais was interested in pursuing an attorney-client relationship. Bisasor had every right to believe that such a call

12

could lead to full representation by Donais. The fact that Donais eventually declined to take case is irrelevant to the conflict of interest analysis under Rule 1.18 and to analysis of whether Donais violated his duties under Rule 1.18.

50. It should also be noted that according to Dave Akridge's affidavit, at a time prior to representing Homewood, Donais emphatically 'with conviction" assured Akridge that there is no problem with representing Homewood as the adverse party to plaintiffs, because "he did not take the case" and had "brief conversation" [3]. But Donais knew that the standard under Rule 1.18 is not whether he took the case or had a brief conversation. The standard for Rule 1:18 conflict/disqualification is whether he "received and reviewed" information from someone seeking to form an attorney client relationship. It should be further noted that Donais did not have to take the case to represent the Homewood defendants. Similarly, the Homewood defendants were not obligated to hire Donais. Terrell testified on 4-27-17 that he considered the situation with Donais to be a "flag", but yet still Terrell chose Donais as local counsel and Donais still agreed to be local counsel for Homewood, notwithstanding the conflict/potential conflict and the fact plaintiffs would likely object. See Cardona v. General Motors Corp., 942 F. Supp. 968, 978 (D.N.J. 1996) ("by proceeding in reckless disregard of the…Rules of Professional Conduct," firm must suffer "self-inflicted wound").

51. It is evident that Donais had a strong desire to take the Homewood case as defense counsel, so he breached his duty of confidentiality in so doing. Donais's desire to represent an adverse party, no matter how strong, does not allow him to simply jettison the rules of conduct or his fiduciary obligations. Moreover, according to Terrell, Donais did not disclose[4] to Terrell the conversation Donais had with Robert Obrien about this case. Donais did not do that because evidently, he so wanted to be retained by Homewood Suites as local counsel for the defense. Donais was not concerned about violating the law, the rules of ethics, his fiduciary obligations or the plaintiffs' rights.

52. Donais also admitted that, during the conversation he had with Bisasor on 1-9-17, Donais purportedly[5] told Bisasor that one of the reasons he did not want to take the case was because "there might be a potential conflict". This means that during that conversation Donais realized that there was a conflict, because he knew that Homewood suites of Nashua was part of the dispute and that he had a previous client relationship with Dave Akridge. The only basis for Donais to

---

[3] See **page 3 and paragraph 16** in **Exhibit 20 - Affidavit of Dave Akridge dated 5-4-17.** See also all other exhibits attached including affidavits.
[4] See **page 228 line 1-25** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**
[5] Yet, Donais didn't tell Bisasor that there might be a potential conflict. But the fact that Donais admits to saying that, shows that Donais knew it at the time (or it at least shows that he was thinking it). Yet, Donais never stated it to Bisasor. If he had stated that, Bisasor would have definitely asked him the basis for the suspected potential conflict.

have known, realized or suspected that there was a conflict, was for Donais to have realized or suspected that Homewood Suites was involved.  How else could he have known that there was a conflict or potential conflict?

**G. More on Undisputed Establishment of Breach of Fiduciary Duty By Donais**

53. Donais and Bisasor had a fiduciary relationship. Donais' relationship with Bisasor, that of attorney/client, was and is fiduciary. Donais owed an ethical and fiduciary duty to Bisasor, including to act at all times in good faith and in Bisasor's best interests, and to not expose Bisasor to any unnecessary risk or peril. See Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass.App.Ct. 412, 442 (1980) ("[T]he relationship between attorney and client ... is fiduciary as a matter of law"); Vanacore v. Kennedy, 86 F.Supp.2d 42  (D.Conn. 1998) (the relationship between attorney and client is one of trust and confidence, and gives rise to fiduciary duties of the attorney toward the client).

54. The 1-9-17 communication/consultation with Bisasor triggered a fiduciary relationship with ongoing duties of confidentiality. Donais' fiduciary duty to Bisasor continued after the termination of his attorney/client relationship.

55. As a prospective client, Bisasor shared confidential information with Donais during the 1-19-17 consultation. Bisasor reasonably believed he was engaging in a confidential discussion. Donais received confidential information as an attorney from Bisasor who was seeking legal advice and thus he had a right to believe that Donais, as an attorney, would respect such confidences. Bisasor was thus a prospective client entitled to confidentiality and loyalty. Donais breached confidentiality obligations owed to Bisasor as a prospective client by disclosing privileged information to harm Plaintiff's interests, and further exploiting it for self-protection, which is conduct that violated trust.

56. However, in addition to the breaches in 2017, Donais later on in 2019 and 2020, further disclosed private client information to his wife, son, family members, and friends and to the others including members of the Manchester NH Crime-Line board, etc. These breaches of fiduciary duty, that occurred outside the context of any judicial proceeding, by Donais include disclosure of confidential client conversation information about plaintiffs to: a) Akridge in 2017 prior to being hired by Akridge to represent Homewood; b) his wife in 2017, 2019 & 2020; c) his sons, Garret & Aiden, in 2019 & 2020; d) the Manchester NH Crime-Line board in 2019 & 2020; e) the Manchester NH police in 2019 & 2020.

57. Donais breached his duty by disclosing confidential information, fabricating false allegations, and misusing the relationship to retaliate against plaintiffs, which further goes to the malicious and egregious nature of his conduct.

58. Donais engaged in a pervasive, widespread, systematic and deliberate pattern of abandoning, violating and exploiting his fiduciary obligations to Plaintiffs for his own self-interest, and constituted a willful dereliction of duty designed to exploit Plaintiffs' vulnerability as African-American, and to conceal evidence of Donais' own misconduct. Donais'

concealment of his divulging of plaintiff's confidential client conversation to others, further constitutes a breach of the duty to protect client interests post-termination (In re Jones, NH Sup. Ct., No. 2021-0123, 2021 WL 4472142). Attorneys must prioritize client interests over self-protection. By divulging and exploiting confidential information, Donais engaged in self-dealing barred by Kanamaru, 100 Mass. App. Ct. at 75.

59. Under New Hampshire law, attorneys owe clients and former clients an unwavering duty of confidentiality and transparency, even after termination of a client relationship. Donais' conduct breached this duty at every turn, inflicting severe financial, procedural, and emotional harm. Donais' acts also includes breach of fiduciary duty by divulging information (and fabricated version of it) obtained during a confidential prospective client consultation with the sole purpose of embarrassing, oppressing, scandalizing, defaming and harming the prospective client.

60. It was malicious act and represented an attempt to harm plaintiffs as former prospective clients. Donais' intent was clear: to hurt, damage, harm, oppress, defame, scandalize the plaintiffs. When prospective clients meet with lawyers they are entitled to the same protections and confidentiality as any other client. The public must be assured that lawyers will treat their confidential client consultations including initial meetings as confidential, and that lawyers will not abuse such information because the lawyer ultimately declined representation or because the lawyer joined the legal team of the opposing party. This is forbidden by the rules[6]. So, even if Donais maintains that his allegations of what Bisasor said in the 1-9-17 conversation were true (which it was not), he still breached his duty/obligations to plaintiffs as former clients or former prospective clients.  Hence, Donais' breaches are multiple, layered and intertwined with a web of layered misconduct making a very serious combination of violations of ethics that rises to the level of extreme seriousness which is further compounded by further breaches/wrongs that flowed from that to subsequent/continuing events thereafter.

61. Donais breached his fiduciary duty to plaintiffs by breaking his obligation of confidentiality, and acting against plaintiff's interest as a former client and seeking to harm and injure plaintiff's rights. Donais owed a duty to Plaintiffs[7,] via the fiduciary relationship that included confidentiality and an obligation to Bisasor to act with the utmost good faith and

---

[6] Donais' conduct outlined herein, in addition to Rule 1:18, has also violated Rule 8.4 section (a), (b), and (c), in that his false statements reflects adversely on the lawyer's honesty and trustworthiness, and it would also constitute conduct involving dishonesty, fraud, deceit and misrepresentation. Similarly, the fabrication of the race discrimination accusation would further be a violation of Rule 8.4 section (g), in that his false statements were motivated by racial animus and were intended to wrongly embarrass, harass and burden Plaintiff.

[7] Donais owed a duty to plaintiff. There was a fiduciary relationship. Plaintiff was a prospective client. Plaintiff was engaged as a prospective client. Plaintiff was given legal advice. Plaintiff shared confidential information. A prospective attorney client relationship was formed. This is what a judge found (Judge Paul Moore in Nashua district court in NH). This is why Donais withdrew as attorney in that case.

fidelity as a fiduciary agent; to not take advantage of Bisasor and place him at a disadvantage. See Goldman v. Kane, 3 Mass.App.Ct. 336, 341 ( (1975) (attorney must do nothing to take advantage of or disadvantage the client).

62. Donais had a duty of trust and loyalty to Bisasor, to not to betray Bisasor, to not subvert his (Donais) obligation to Bisasor, to not act deceitful. Donais's fiduciary obligation to Bisasor continued after the conclusion of the client conversation between Donais and Bisasor in 2017.

63. In this matter, Donais violated his duty to the plaintiffs in several ways: a) Donais discussed the client conversation with the plaintiffs with several people. These include his wife, Mary Donais, his sons Garrett & Aiden Donais, and the Manchester NH crime-line board, as well as friends and connections, and also the Manchester NH police. These communications with his family, friends, connections, colleagues, violated the rights of the plaintiffs as he had no right to disclose client confidential communications to any of them for any reason; b) Donais also voluntarily engaged in discussion with the Manchester NH police about the confidential 1-9-17 conversation and the 1-5-17 consultation; c) Donais also had a duty to inform plaintiffs, as former clients, that Donais was going to or had discussed such information with others. Instead, Donais actively hid those occurrences from plaintiffs. The act of hiding such from plaintiffs is also a breach of duty to plaintiffs as he is required to seek consent before any such disclosure.

64. As a result of Donais's breaching conduct, plaintiffs sustained injury including lost opportunities, emotional distress, and mental anguish, and the damages sustained were directly, proximately and solely caused by Donais's breach of his duty and his intentional, reckless and negligent acts, which were committed with intent, oppression, fraud and/or neglect, as set forth above, and by doing all of the acts and omissions as herein alleged.

65. NB: It should be noted that Donais did not need to defend himself, for example, with the Manchester crime-line board, his private personal family members, friends and colleagues, etc. The only time and place that the rules contemplate violating confidentiality is in an ADO proceeding against the said attorney or in a proceeding in court where the defendant is called upon to defend himself or herself. None of these things apply here based on the facts that occurred.

66. NB: Based on the above case law, Donais also violated (prospective) attorney-client privilege when he in his March 2017 affidavit stated the false accusation that Bisasor accused him of race discrimination for not taking his case. Even if Donais was telling the truth about that accusation (which he was not), Donais had no need to disclose that (false) statement since it bore no relevance to the motion to disqualify Terrell and since it clearly was an inflammatory and disparaging statement which would only serve to (wrongly) embarrass, annoy or scandalize Bisasor.

## II. RELEVANCE OF FALSE STATEMENTS TO BREACH OF FIDUCIARY DUTY CLAIM
### A. Fundamental Distinction Between Defamation and Fiduciary Duty Claims

67. Although this court determined Donais's March 2017 affidavit had absolute privilege protection from defamation claims under NH law, this ruling didn't preclude recovery for breach of fiduciary duty involving the same false statements.

68. Courts routinely recognize that breach of fiduciary duty claims are "separate and distinct" from other tort claims, including defamation, when premised on conduct involving a culpable state of mind beyond mere negligence. The same principle applies when distinguishing fiduciary duty breaches from defamation claims, as each addresses fundamentally different legal wrongs with distinct elements and protections. The breach of fiduciary duty claim in this case focuses on Donais's abuse of the trust relationship itself and his violation of confidentiality obligations, not merely the publication of false statements to third parties. Fiduciary duty claims arise when an attorney either betrays a confidence or acquires and abuses a position of influence. Donais's fabrication of false statements about confidential consultation content constitutes both a betrayal of confidence and an abuse of his position of influence as a trusted legal advisor.

### B. Absolute Privilege Does Not Extend to Fiduciary Duty Breaches

69. The absolute litigation privilege serves the narrow purpose of promoting candor in judicial proceedings. However, this privilege doesn't immunize claims arising from breaching underlying fiduciary obligations. A fiduciary cannot invoke litigation privilege to escape liability for breaching confidentiality duties owed to former clients. The privilege may protect publication aspects relevant to defamation, but doesn't excuse underlying independent breach of trust violations.

### C. Confidentiality Breach Constitutes Core Fiduciary Violation

70. Under New Hampshire Rule of Professional Conduct 1.18, prospective clients are entitled to the same confidentiality protections as actual clients. Rule 1.18(b) provides that "a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information" except under limited circumstances. Donais's fabrication of false allegations about Bisasor accusing him of racism violates this fundamental obligation. First, Donais revealed confidential information obtained during consultation by creating false statements about its content. Second, he used this information to harm Bisasor by portraying him as someone who makes frivolous racism accusations. Third, he weaponized the confidential relationship to undermine Bisasor's credibility as a discrimination plaintiff. Each of these acts constitutes a separate breach of fiduciary duty independent of any defamation analysis.

### D. Strategic Exploitation of Fiduciary Position

71. The timing & content of Donais's fabricated racism allegation reveal egregious misconduct that transcends ordinary defamation. During the 1-18-17 hearing, when memories were fresh, Donais never mentioned any racism accusation made in the 1-9-17 call. However, months later, in his affidavit, he suddenly "remembered" this inflammatory detail.

17

This demonstrates deliberate fabrication designed to exploit his position as a former attorney to damage client credibility. Fiduciary duties include obligations of candor & good faith that prohibit using confidential relationships to harm former clients. Donais's conduct represents the antithesis of these obligations; he manufactured lies about confidential communications specifically to undermine vulnerable former prospective clients raising legitimate discrimination claims.

### E. Policy Considerations Support Separate Recovery

72. Fiduciary duty claims focus on breach of trust rather than publication of statements. Defamation requires publication, falsity, and reputational harm, while fiduciary duty breach requires relationship, breach of duty, causation, and damages. Breach of fiduciary duty claims address exploitation of confidential information obtained through prospective attorney-client relationship, regardless of whether exploitation occurs via privileged or unprivileged statements. Thus, while absolute privilege may shield Donais from defamation liability for false statements in his affidavit, it cannot excuse his fundamental breach of fiduciary duty in fabricating false statements about confidential consultation content and using his position as a trusted legal advisor to harm his former prospective client's credibility and legal standing.

### III. FURTHER CASE LAW SUPORTING FINDING OF BREACH OF DUTY TO PLAINTIFFS

73. In Fierro v. Galluci (EDNY 2007), the defendants in that case argued that the motion to disqualify should be denied because: (1) there was never an attorney-client relationship established between Dollinger and Fierro; (2) there was no indication there were any "secrets" or "confidences" discussed between Dollinger and Fierro; and (3) even if such secrets or confidences were discussed, Dollinger had no recollection of any such conversations. Thus, the defendants in that case contended there was no conflict of interest in continuing to represent the defendants in that lawsuit. However, that Court concluded that plaintiff made a sufficient showing to warrant disqualification of the Dollinger Firm as follows:

"Fierro's statement in his affidavit — that he consulted with Mr. Dollinger in late 2004 regarding the subject matter of this case, including potential claims, potential defenses, and relevant case law — is corroborated by a phone message and phone records maintained by the Firm. Thus, this preliminary discussion regarding the subject matter of this litigation fell within the umbrella of an attorney-client relationship and was privileged. This prior consultation with Mr. Fierro regarding the exact subject matter of this litigation is sufficient to warrant disqualification. Although Mr. Dollinger does not recall any client confidences revealed to him during the conversation, his failure to recall such conversations does not vitiate the otherwise clear basis for disqualification."

74. Further, the Fierro court also found disqualification was warranted because (1) plaintiffs established that an attorney-client relationship existed as to Fierro's preliminary discussions, (2) the matters were not just "substantially related" to the litigation, but were identical, and (3) it was likely confidential information was shared with Dollinger during these conversations. Although the defendants point to the several factors in arguing there was no attorney client relationship (including the fact that the preliminary conversations were brief, the Dollinger Firm never opened a file related to Fierro, and the Dollinger Firm never charged any fees for the initial consultation), none of those factors, individually or

18

collectively, is necessarily dispositive in analyzing whether there was an attorney-client relationship. See United States v. Devery, No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship.").

75. Furthermore, the Fierro court found that whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to the attorney client privilege. Moreover, the Fierro court stated that, in finding that there was a substantial relationship between Fierro's preliminary consultation and the current litigation, a rebuttable presumption is created that Fierro imparted to Dollinger confidential information relevant to the present litigation. See Arifi, 290 F. Supp. 2d at 350. A party moving to disqualify opposing counsel "is not required to prove that [opposing counsel] had access to confidential information while representing the [moving party] but only that he was likely to have had such access." Id.  It should further be noted that, in the Fierro case, there were telephone records indicating at least 2 telephone calls on 12-14-04 between Dollinger and Fierro, one of which lasted just about 10 minutes. This, among other things, provided sufficient circumstantial evidence for the Fierro court to conclude it is likely that some "confidences" or "secrets" were revealed to Dollinger in order for him to evaluate the case.

76. Although, in the Fierro case, Dollinger stated he had no recollection of any conversation with Fierro, the Fierro court found his failure to recall the conversation didn't change the analysis. NB: Another court held that a former attorney's assertion that he couldn't remember any confidential information conveyed to him during the short representation of one of the defendants, didn't cure the professional responsibility conflicts which were present. Arifi, 290 F. Supp. 2d at 350 ("While there is no reason to doubt Green's claim that he does not remember any confidential information, the Court nevertheless finds that he was likely to have had access to such information during the short representation."); see also Schwed v. Gen. Elec. Co., 990 F. Supp. 113, 117 n. 2 (N.D.N.Y. 1998) (where attorney claimed he didn't possess confidential information and didn't recall any discussions regarding the case, the third prong of the 2nd Circuit test was still met because there was a likelihood that the attorney had access to confidential information).

77. Similarly, in this case, Terrell testified at a preliminary injunction hearing on 4-27-17 that he didn't recall what he and Donais discussed and that he may have had conversations with Donais (about the Donais-Bisasor conversation), but somehow he doesn't recall whether he had such conversations or if information to came to him (Terrell) from Akridge.

78. Also, the Fierro case is similar to this case, in that defense counsel here claims that there was never an attorney-client relationship established between Donais and Bisasor and that there was no "confidences" shared from Bisasor to

19

Donais. Although Bisasor vigorously refutes those assertions (which refutations are supported by incontrovertible evidence), the consideration of such refutation by Bisasor is not necessary for the correct legal analysis to be applied. Based on the above case law, in the Fierro case, the correct standard is that, regardless of whether it can be proven that confidences were or were not shared, it is the fact that confidences could have been or were likely to have been shared that establishes the conflict (or the appearance of one). Based on this standard, Donais definitely had a conflict, and he breached fiduciary duty when he shared client information, not only with Akridge, and with Terrell, but also in statements submitted to two NH courts months after he [Donais] was disqualified. Similarly, as it pertains to infection of Terrell, Terrell claims there was never an attorney-client relationship established between Donais and Bisasor; that there was no "confidences" shared between Donais and Terrell; and that even if such confidences were discussed, Terrell does not recall whether any such conversations occurred. Thus, similar to the finding in the Fierro case, Terrell's failure to recall such conversations does not vitiate the otherwise clear basis for establishment of a conflict or appearance of one. See again Fierro v. Gallucci, 2007 U.S. Dist. LEXIS 89296 (E.D.N.Y. Dec. 4, 2007) (disqualification warranted even though lawyer simply could not remember phone calls). Thus, it is clear from the definitions in the Fierro case, that information shared with and later disclosed by Donais (including Bisasor's purported accusation of racism against Donais) would certainly qualify as "confidences" (i.e. "information protected by the attorney-client privilege under applicable law") and as "secrets" (i.e. "other information gained in the professional relationship that the client requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.").

79. These cases from several state and federal courts around the country support the conclusion that there was a conflict of interest that existed with Donais (and also with Terrell), and that Donais violated the confidences/secrets shared by Bisasor when he communicated statements made (or purportedly made) by Bisasor, to Akridge and Terrell prior to being hired, and to other private persons, and also to two NH courts, in order to harm, injure, disparage Bisasor.

80. In In re Sharplin, Jr., 2006 Tex. App. LEXIS 6834 (Tex. App. Aug. 3, 2006), the court was dealing with a lawyer who changed firms, and citing Nat. Med. Enterprises, Inc. v. Godbey, 924 S.W.2d 123 (Tex. 1996), said there was an irrebuttable presumption he shared information from the earlier case with his new partners and disqualified the firm.

81. Similarly, there should be an irrebuttable presumption that Donais shared confidences from Bisasor with Akridge and Terrell either directly, or indirectly through Akridge. This irrebuttable presumption is warranted because invariably in these types of situations, rarely will an attorney fall on his own sword and admit he did wrong or violated the rules.

20

82. Moreover, the predictable response by lawyers, typically voiced in such situations, in saying "I don't recall" or otherwise outright denials that confidences weren't shared, often makes it difficult to get to the bottom of what was shared. Moreover, it is often difficult for affected parties to prove that secrets were shared because that would involve disclosing those secrets to the court, which presents a catch 22 scenario or a Hobson's choice to require that, in order to vindicate his rights and harm from a conflict, a party must disclose sensitive secrets (protected by attorney-client privilege) to the court, by disclosing to the court such secrets shared with conflicted counsel (which secrets could prejudice the court against the client). This is why the irrebuttable presumption of sharing of confidences is warranted in such situations.

83. Hence, in a situation where lead counsel is in a position to receive client confidences of the aggrieved party, a sharing of confidences should be presumed, even if only by inadvertent disclosure. And the fact that there could have been confidences shared, means that there is at least an appearance of impropriety and of impermissible conflict/breach.

84. This is underscored by the Fierro court's finding that "the dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case." See Fierro, 2007 WL 4287707, at *8 (quoting Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 571 (2d Cir. 1973)). See Best Western Int'l v. CSI Int'l Co., 1995 WL 505565, at *2 (S.D.N.Y. Aug. 25, 1995) ("**misconduct need not be egregious: there need not be intent, bad faith, or actual disclosure of confidential information. Conduct that merely suggests that one side might enjoy the disclosure of confidential information may warrant disqualification.**").

85. Yet, here, both Donais and Terrell were fully aware of the conflict issue before Donais was hired, and they both made knowing/calculated decisions to accept the risk of conflict in violation of Rule 1.18, as well as knowing/calculated decisions not to inform plaintiffs about it. The law doesn't require plaintiffs to suffer risks that their confidential information could be used against them and the rules do not shield Donais (or Terrell) from their knowing calculated but risky decision to proceed in violation of the rules of conduct (Terrell agreed to settle the case, leaving only Donais).

86. Further, plaintiffs' burden is not to show Donais did in actuality taint or harm the case with confidences he received from them, but instead to show that Donais had a conflict, that he was aware of the conflict, which required him to abstain from taking the Homewood case, whose interests were materially adverse to plaintiffs' legal interests, that Donais' conflict posed a risk of prejudice or taint against plaintiffs and that Donais knew of this risk but proceeded to sign on as defense counsel anyway. See Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981) (test is whether

21

conflict "poses a significant risk of trial taint," not that the trial would be tainted"). See also Hempstead Video, 409 F.3d 127 at 133 ("One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client."); See also Cheng v. GAF Corp., 631 F.2d 1052 (2d Cir. 1980)(where there is "too high a risk of inadvertent disclosure of confidences," disqualification is appropriate.").

87. The above case law highlights the prospect that Donais (and by extension Terrell/Homewood) benefited from information about an adverse party obtained through preliminary consultation with local counsel, who was subsequently disqualified, and who breached his duty to plaintiffs by representing the adverse party and sharing attorney-client information with them. Donais indisputably received information from plaintiffs, going to the core issues adjudicated in the case. This led to unacceptable appearance of impropriety which cannot be eliminated by Donais saying he received no confidential information (or by the spouting of "I don't recall" retorts by Terrell in the 4-27-17 hearing).

88. The issues implicated by Donais' consultation directly with Bisasor and indirectly via Obrien, are "substantially related" to the issues implicated by Donais' representation in defending against those issues in the Homewood case. See Chinese Automobile Distributors of America LLC v. Bricklin, 2009 WL 47337, at *2 (S.D.N.Y. Jan. 8, 2009). Similarly, the Fierro court also found that "Client confidences are not so inert as to limit their usefulness to defined legal disciplines or practice areas. They are fungible, and once disclosed can be applied by an experienced lawyer in ways too numerous to anticipate[.]" See Fierro, 2007 WL 4287707, at *8. Moreover, the 2nd Circuit has held that "it is unclear to us how disclosures, admittedly inadvertent, can be prevented" where there is a "continuing danger that [the attorney] may unintentionally transmit information he gained through his prior association" with a disqualified counsel. Id. at 1058. Numerous other courts have held similarly. See Crudele v. New York City Police Department, 2001 WL 1033539, at *3-4 (S.D.N.Y. Sept. 7, 2001) (raising concerns about possibility of unintentional breaches of client confidences").

89. Similarly, in preparing his affidavit for use in the district court and superior court in March, April and May 2017, Donais further engaged in consultation with Snow and Terrell about the case and about what was discussed with Bisasor and what Bisasor shared, as well as what Obrien shared. All of this continued consultation and involvement of Donais in the case, even though he had been disqualified, further created a risk of harm to plaintiffs. Donais should have stayed away from the case after being disqualified in January 2017. The purpose of Donais' disqualification was to prevent further communication or tainting of the case from him due to his conflict of interest arising from the communications

he had with plaintiffs. By continuing to be involved/provide input (including his disparaging statements about Bisasor), Donais did an end run around the purpose of Donais' disqualification in the first place. This is a further breach of duty.

90. Donais wants to have it both ways. On the one hand, Donais has asserted, in one place or another, that he did not know that Bisasor's case was the same case as Anderson's case prior to the 1-18-17 hearing in district court (which has been established as not true). Similarly, in other statements, Donais has tried to give the impression that he only learned there was a conflict when Berry contacted him on 1-17-17 by phone and then further shown in the court hearing on 1-18-17. Yet on the other hand, Donais has claimed that, although he shared with Akridge and Terrell (on or before 1-11-17) that he [Donais] had a conversation with Bisasor, still he [Donais] did not share anything much which could have resulted in a taint on the case by infecting co-counsel Terrell.  Donais [and by extension Terrell] were thus trying to have their cake and eat it too. Everyone was trying to cover their own rear ends. Terrell claimed raised concerns on this "flag"[8] before he proceeded to hire a potentially conflicted local counsel. The same thing with Akridge i.e. Akridge purportedly asked Donais if there is going to be a problem, but according to Akridge, Donais emphatically 'with conviction" assured Akridge that there is no problem because "he did not take the case" and had "brief conversation"[9]. But Donais knew that the standard under Rule 1.18 is not whether he took the case or had a brief conversation, but whether he "received and reviewed" information from someone seeking to form an attorney-client relationship. The result was serious prejudice to plaintiffs, who shouldn't have been put in the position of having client conversations shared with Donais being shared with Terrell or others, or otherwise, used against them[10] .

---

## SECTION III:  CONCLUSION

91. It should be noted that Donais not only disclosed the client conversation with Bisasor to Akridge, Terrell (Homewood) before being hired by them, but then he divulged it publicly in two courts, and then to his family members, non-profit board members and the police, including years later. All of these are separate incidents of breach of fiduciary duty.

92. The undisputed facts establish Donais breached fiduciary duty as a matter of law. No genuine factual disputes exist regarding the consultation and the improper unauthorized disclosures made. Partial summary judgment will serve judicial efficiency by resolving this clear-cut professional misconduct claim, allowing remaining proceedings to focus on damages and other disputed issues. See accompanying affidavits of Bisasor and Anderson and accompanying exhibits.

---

[8] See **page 224** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**
[9] See **page 3 and paragraph 16** in **Exhibit 20 - Affidavit of Dave Akridge dated 5-4-17.** See also all other exhibits attached including affidavits.
[10] See **Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest**. See also all other exhibits attached.

Respectfully submitted,

/s/ Natalie Anderson
NATALIE ANDERSON

/s/ Andre Bisasor

Date: October 6, 2025                                        ANDRE BISASOR

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

24

# Exhibit 4

Filed
File Date: 10/27/2025 12:43 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM

1. Plaintiffs submit this Statement of Material Facts as to which there is no genuine issue to be tried in support of their Motion for Partial Summary Judgment on the breach of fiduciary duty claim against Craig Donais.

### I. UNDISPUTED MATERIAL FACTS ESTABLISHING FIDUCIARY DUTY BREACH
### A. Establishment of Prospective Attorney-Client Relationship

2. On 1-5-17, at approximately 5:16 p.m., Plaintiff Natalie Anderson contacted Attorney Robert O'Brien seeking legal assistance regarding a dispute with Homewood Suites in Nashua, NH. See Anderson Affidavit; Exhibit 6.

3. During their 18-minute consultation, Anderson provided detailed confidential information about plaintiffs' legal situation, including allegations of discriminatory treatment, contract disputes, and urgent need for legal intervention to prevent wrongful ejection. Anderson Affidavit.

4. O'Brien, recognizing the complexity of the legal issues and acknowledging they fell outside his primary practice area, informed Anderson he would consult with Attorney Craig Donais, whom O'Brien specifically identified as possessing greater expertise in landlord-tenant matters. Anderson Affidavit.

5. O'Brien contacted Donais by telephone, conveying the substance of Anderson's legal concerns along with the urgent timeline for action. Anderson Affidavit.

6. Following his consultation with Donais, O'Brien sent Anderson a text message stating that he spoke with Donais, that Donais said plaintiffs "have a great contract case for the overcharges," that "the innkeeper rules would likely apply to your situation" allowing for no cause evictions, and that Donais "would not opine on the discrimination claims outside his experience." Anderson Affidavit; Exhibit 9 [text message from Obrien to Anderson].

7. On 1-6-17, Plaintiff Andre Bisasor left a voicemail for Donais stating: "*Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical.*" First Bisasor Affidavit.

8. On 1-9-17, Donais returned Bisasor's call and engaged in a telephone consultation lasting approximately seven minutes. First Bisasor Affidavit; Donais March 2017 Affidavit. During the 1-9-17 consultation, Bisasor disclosed

1

confidential information about plaintiffs' claims against Homewood, their legal situation, and urgent need for legal representation. First Bisasor Affidavit.

9.  Donais asked Bisasor whether he obtained Donais's contact information from O'Brien, and Bisasor confirmed he had. 1-18-17 Court Transcript p. 11-12. During the consultation, Donais realized the conversation with Bisasor related to the same case O'Brien had discussed with him on 1-5-17. See Exhibit 34 - 1-18-17 Court Transcript p. 11-12; Donais March 2017 Affidavit. Bisasor asked Donais whether the consultation was confidential, and Donais confirmed it was protected by attorney-client privilege. First Bisasor Affidavit.

10. Bisasor shared confidential information including: (a) background circumstances of the dispute with Homewood; (b) strategy for filing a 540-A petition before 1-10-17; (c) concerns about potential weaknesses in their case; (d) information from discussions with a Nashua police officer; (e) details about disparate treatment in food service that was never included in any public filing; and (f) other strategic and factual matters. First Bisasor Affidavit.

11. Donais provided legal advice during the consultation, including his opinion that a TRO would likely be granted based on what Bisasor described, and analysis of their contract claims. First Bisasor Affidavit.

12. Donais told Bisasor during the consultation that there "may even be a potential conflict," indicating Donais recognized potential ethical issues. Exhibit 34 - 1-18-17 Court Transcript p. 12.

## B. Judicial Recognition of Attorney-Client Relationship

13. On 1-18-17, during a hearing in Nashua District Court, Judge Moore found that an attorney-client relationship existed between Donais and plaintiffs based on the consultations. First Bisasor Affidavit; Anderson Affidavit.

14. Judge Moore, who had served on the Professional Conduct Committee for 10 years and as vice chair of the hearing committee for 4 years, told Donais that if he had any discussion with O'Brien or Bisasor about the facts of the case, he would be in conflict. Exhibit 34 - 1-18-17 Court Transcript.

15. As a direct result of Judge Moore's finding, Donais was required to withdraw from representing Homewood Suites due to the conflict of interest created by his consultations with plaintiffs. First Bisasor Affidavit.

## C. Donais' Admissions Establishing Prospective Attorney-Client Relationship

16. In his March 2017 affidavit, Donais admitted that "Andre provided me some general details about what he described as a landlord tenant dispute involving inflated charges and also a concern about the existence of racial discrimination against him, and a need to immediately file." Donais March 2017 Affidavit.

2

17. In his email dated 1-11-17, to Dave Akridge and Karl Terrell, Donais admitted: "*What I know is that I received a call from Andre who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper.*" Exhibit 19 [1-11-17 Email].

18. At the 1-18-17 hearing, Donais admitted he "spoke in for six minutes 37 seconds to get a sense of what this case was about" and that he "figured out what the case was about." Exhibit 34 - 1-18-17 Court Transcript p. 11-12.

19. Donais admitted he received sufficient information during the consultation to realize it was the same case O'Brien had discussed with him, demonstrating he obtained substantive confidential information. Exhibit 34 - 1-18-17 Court Transcript p. 11-12.

### D. Unauthorized Disclosure To Adverse Parties

20. On 1-11-17, Akridge contacted Donais seeking his involvement as local counsel for Homewood Suites, the same parties plaintiffs were pursuing claims against. Exhibit 20 - Akridge Affidavit dated 5-4-17.

21. During their 1-11-17 conversation, Donais told Akridge he had received a call from someone named Andre about a landlord-tenant matter involving "some type of mixed-use property." Exhibit 20 - Akridge Affidavit of 5-4-17.

22. Akridge and Donais "concluded that Andre was quite likely Mr. Bisasor" during this conversation. Exhibit 20 - Akridge Affidavit dated 5-4-17. Then Akridge specifically asked Donais whether he would have a conflict serving as local counsel given the conversation with Andre, Donais responded "with conviction that he did not." Exhibit 20 - Akridge Affidavit 5-4-17.

23. On 1-11-17, prior to being retained by Homewood, Donais sent an email to Akridge, Terrell, and Terrell's assistant disclosing confidential information from his consultation with Bisasor, including details about the 540-A petition, claims of disparate treatment in food services, overcharging allegations, and the mixed-use property nature. Exhibit 19 - 1-11-17 Email Chain.

24. The information Donais disclosed about disparate treatment in food services was never included in plaintiffs' 540-A petition, demonstrating it was confidential information obtained only through the privileged consultation. First Bisasor Affidavit.

25. On 1-13-17, Donais filed an appearance on behalf of Homewood defendants and a motion for pro hac vice admission of Terrell. Court Records. Exhibit 21.

3

26. Donais never sought consent from plaintiffs before disclosing confidential consultation information to adverse parties or before representing those adverse parties. First Bisasor Affidavit.

### E. Continued Breaches of Confidentiality

27. In March 2017, months after his disqualification, Donais filed an affidavit in two New Hampshire courts containing false statements about the January 9, 2017 consultation, including the fabricated allegation that Bisasor accused him of racial discrimination. Donais March 2017 Affidavit.

28. Bisasor categorically denies making any accusation of racial discrimination against Donais and avers that no words relating to race, racism, or discrimination were spoken during their consultation. First Bisasor Affidavit.

29. During the time period of 2017, 2019, and 2020, Donais disclosed contents of the confidential consultation to multiple unauthorized third parties including: (a) his wife Mary Donais; (b) his sons Garrett and Aiden; (c) members of the Manchester NH Crime-Line board; (d) Manchester NH police; and (e) friends, colleagues, and community members. First Bisasor Affidavit; Anderson Affidavit.

30. On 6-18-19, Donais voluntarily provided detailed information about the confidential consultations to Manchester police, including fabricated statements about plaintiffs' conduct and character. Exhibit 27 - Police Interview Transcript.

31. These disclosures occurred well outside any litigation context and were made for purposes of harming plaintiffs' reputation rather than any legitimate legal purpose. First Bisasor Affidavit.

### F. Knowledge of Conflict and Deliberate Misconduct

32. Donais knew as early as 1-9-17, that representing Homewood would create a conflict, as evidenced by his admission that he told Bisasor there "may even be a potential conflict." Exhibit 34 - 1-18-17 Transcript p. 12.

33. Despite this knowledge, Donais agreed to represent Homewood on 1-13-17, and fought vigorously to remain on the case even after the conflict was raised by opposing counsel. Exhibit 34 - 1-18-17 Court Transcript; First Bisasor Affidavit.

34. When contacted by Attorney Elliott Berry on 1-17-17, about the conflict, Donais denied any wrongdoing and refused to withdraw voluntarily. First Bisasor Affidavit.

35. At the 1-18-17 hearing, Donais accused Berry of creating a "contrived conflict," which Judge Moore rejected. Exhibit 34 - 1-18-17 Court Transcript.

36. Donais only withdrew after Judge Moore made clear he would formally disqualify him if Donais did not withdraw voluntarily. Exhibit 34 - 1-18-17 Court Transcript; First Bisasor Affidavit.

### G. Indisputable Facts From Donais' Admissions Establishing Breach of Fiduciary Duty

37. The following facts are established from Donais' own words and admissions:

    a.  Bisasor had the intent to seek legal advice from an attorney. This is indisputable.

    b.  Donais called Bisasor with the intention of having a conversation with a prospective client about that prospective client's legal situation and needs. This is indisputable.

    c.  When Donais called Bisasor, Bisasor then communicated information about his legal situation and needs to Donais, with the intention of securing legal advice and/or legal representation from Donais as an attorney. This is indisputable.

    d.  [Note: Donais states in his affidavit that Bisasor asked him to take his case but he declined. This establishes the intent of Bisasor, in sharing information with Donais, was to secure legal advice and legal representation from Donais as an attorney on a landlord-tenant matter, in the area of practice of Donais].

38. Under the above facts and circumstances, it is virtually impossible that this information shared with Donais would not be confidential information or not be protected by attorney-client privilege.

39. The above indisputably establishes that a prospective attorney-client relationship was formed, as defined by NH law, and that Donais had fiduciary duty of confidentiality with respect to the plaintiffs and that Donais breached that duty of confidentiality when he divulged information shared with him from Bisasor to the opposing parties, as part of an attempt and desire to secure a position with them to be their local counsel.  This represents an intentional egregious breach of fiduciary duty.

### II. FURTHER INDISPUTABLE FACTS FROM ESTABLISHING FIDUCIARY DUTY BREACH
#### A. Overview

40. On or about 1-6-17, Bisasor left a voicemail message for Donais seeking legal representation regarding their dispute with Homewood.

41. On 1-9-17, Donais returned the call and engaged in a telephone consultation with Bisasor that lasted approximately 7 minutes. During this consultation, Bisasor disclosed confidential information about their claims and legal situation for the purpose of obtaining legal advice and potential representation.

42. Bisasor provided this information in good faith reliance on Donais's professional obligations as an attorney. Bisasor understood this consultation to be confidential and protected by attorney-client privilege.

43. Donais then thereafter went to represent the opposing party and disclosed information about Bisasor's conversation to them prior to representing them.

44. On 1-18-17, in Nashua District Court, Judge Paul Moore ("Judge Moore") found that an attorney-client relationship existed between Donais and Bisasor based on the 1-9-17 consultation and based on Obrien's consultation with Donais on behalf of Anderson on 1-5-17. As a result of this finding, Donais was required to withdraw from representing Homewood due to the conflict of interest.

45. Bisasor and Anderson subsequently learned that Donais subsequently disclosed information from those consultations to more third parties.

**B. Legal Action Initiated By Plaintiffs | Donais Goes To Represented Opposing Side**

46. On 1-9-17, Plaintiffs filed an emergency 540A petition in Nashua District Court. A Temporary Restraining Order (TRO) is granted by the court to halt any threat of a removal action. On 1-10-17, the 540A petition and the TRO is served on general manager Adam Robitaille in the morning.

47. On 1-11-17, after Terrell advises Akridge of the need for local counsel, Akridge contacted Donais seeking his involvement in the case as local counsel and to support the pro hac vice admission of Terrell. During phone call, Akridge explained the Homewood matter involving the plaintiffs. Donais then informed Akridge that he had a conversation with Bisasor about the case the day before. Donais explained to Akridge what was discussed with Bisasor. Akridge asked Donais if this created a conflict and Donais emphatically assured Akridge that it did not. Akridge then informed Terrell of the issue and Terrell instructs Akridge to tell Donais that he needs Donais to describe the substance of the Bisasor conversation to Terrell. Donais then writes an email to Akridge, Terrell, and Terrell's assistant, with a brief description of the 1-9-17 conversation, saying that is all he knows, providing his bar # and ending with "let me know how you want to proceed".

48. Donais' description of the 1-9-17 call contained confidential information shared by Bisasor, the sharing of which constituted unauthorized disclosure of private client information to adverse parties, breaking client confidentiality.

49. Then, further, at some point thereafter, around 2 days later, on or about 1-13-17, Donais (after having consulted with Bisasor on 1-9-17) agrees to be hired and is hired by Akridge to represent the opposing party [Homewood].

6

50. Donais also failed to inform Bisasor of this nor obtained consent from Bisasor before doing so.

51. Donais' voluntary decision to call back Bisasor in response to his voicemail, represented at the very least an implied agreement by Donais to engage in an attorney-client conversation protected by privilege, and thus Donais should have known that it was protected by privilege.

### C. Donais' Contact With Akridge

52. After the 1-9-17 call with Bisasor, Donais and Akridge had a phone call on 1-11-17 where the plaintiffs and their case against Homewood was discussed. Donais discussed the information shared with him from Bisasor. Donais shared this information without receiving consent from Bisasor and without informing Bisasor that he was going to share such information with Akridge. This conversation was centered on whether Donais could be hired to represent Akridge/Homewood in the same case that Bisasor discussed with Donais on 1-9-17. Subsequent to this phone call, Donais sent an email on 1-11-17 to Akridge stating:

> "What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper..".

53. Here, Donais admitted that he received specific client consultation information from Bisasor on the 1-9-17 call.

54. On 1-11-17, Akridge calls Terrell and tells him of the discussion he had with Donais about the contact with Bisasor. Donais writes an email to Terrell stating that he had contact with Bisasor and provided a summary of what was discussed with Bisasor. Donais and Terrell had a further conversation by phone about the matter. On 1-13-17, Donais filed an appearance on behalf of the Homewood defendants and filed pro hac vice admission motion for Terrell. On 1-17-17, Donais and Terrell filed a 60-page motion to dismiss in the Nashua District Court. The motion to dismiss included/utilized confidential information that was shared with Donais both directly via call with Bisasor and indirectly via communications with Obrien from Anderson.

### D. Elliot Berry's 1-17-17 Call with Donais

55. On 1-17-17, renown Attorney Elliott Berry (of the NH Legal Assistance) agreed to formally represent plaintiffs in this case. Plaintiffs advised Berry of the situation with Donais. Berry expressed shock at these events. Berry advised plaintiffs that this was a serious violation of Rule 1.18 of the NH rules of professional conduct.

56. On 1-17-17, Berry called Donais about the conflict of interest and to give him a chance to explain and/or to withdraw from the case because Berry now had a duty to bring the matter to the attention of the court. But Donais told Berry that there was no conflict of interest, and that he did not think he needed to withdraw from the case.

7

### E. Court Hearing on 1-18-17

57. On 1-18-17, a court hearing took place in the Nashua district court before Judge Paul Moore. At or near the beginning of the hearing, Berry raised ethical concerns about Donais with the court. A sidebar ensues with counsel for both parties invited to discuss the matter at the bench in front of Judge Moore. Berry explained the ethical concerns to the judge. Donais gave his explanation of the matter citing that he did nothing wrong. Donais fought vigorously to remain on the case, and even accused Berry of creating a contrived conflict. However, Judge Moore told Donais that he had been part of the PCC for the past 10 years and was vice chair of the hearing committee for the past 4 years. Judge Moore told Donais that if he had any discussion with Obrien or Bisasor about the facts of this particular case, he would be in conflict. Judge Moore indicated to Donais that this could become a very serious matter if plaintiffs decide to pursue this as a complaint and that Donais needs to carefully consider what he is going to do because once "the bell is rung", it will be a problem especially if done while the litigation is proceeding. Judge Moore asked Berry if his clients were willing to waive any conflict and that if they were not, then Donais needed to make a decision on withdrawing. If Donais could not decide for himself, then Judge Moore would make the decision for him. Judge Moore clearly was signaling to Donais that it would be much better for him to withdraw on his own without being formally disqualified by the judge. Donais got the message loud and clear. After a short recess, wherein plaintiffs told Berry that they did not waive any conflict, then Donais reluctantly told Judge Moore that he was going to withdraw.

### F. Dave Akridge Affidavit on 5-4-17

58. Akridge provided a statement on 5-4-17 in an affidavit that shows that, as of 1-11-17, prior to Donais being hired to represent Akridge and Homewood, that Donais and Akridge knew that Bisasor was the plaintiff suing Akridge and Homewood in the district court, i.e. that they concluded that "Andre" was quite likely "Mr. Bisasor" and that Akridge "heard enough to conclude… that the caller he described was likely Mr. Bisasor".

59. The above shows that Donais received legal advice information from Bisasor, that Donais was in contact with Akridge shortly after the consultation call with Bisasor, that before Akridge hired Donais, Donais shared with Akridge information that Bisasor shared with Donais. The above also shows Donais willfully and knowingly persisted in seeking to represent the opposing party when he knew there was a conflict and when his possible new client and their lawyer was specifically concerned that there was a conflict of interest. But Donais persuaded them

8

that there was nothing to the matter, all the while also hiding that Obrien had spoken to Donais about the same matter and shared more information about the matter, to which Donais even rendered a legal opinion. It is likely that if Akridge and perhaps Terrell had known about the Obrien call, they would not have hired Donais as local counsel. Akridge stated that: *"I specifically recall asking Mr. Donais if he would have a conflict serving as local counsel, given this conversation with "Andre." He responded with conviction that he did not, given the fact that he had turned down the request to take the case, and given also the brief nature of his discussion with the caller."*

## G. Other Statements Made in Donais

60. Donais admits that he received confidential information from Bisasor. As one example, he admits that he received information regarding the "need to immediately file" which further goes to timing and strategy. Donais also stated that during the call he knew it was the same case that he consulted on with Obrien. Donais disclosed the contents of plaintiffs' client-privileged protected information, as noted above, to Akridge, Terrell, and Terrel's assistant, prior to being hired by them to represent them as parties adverse to plaintiffs. Donais further used/disclosed the contents of plaintiffs' client-privileged protected information, as noted above, to Akridge, Terrell, and Terrell's assistant, after he was hired by them to represent them as parties adverse to plaintiffs. This was a breach of confidentiality.

## H. Additional Subsequent Events

61. In the time period spanning 2017, 2019, 2020, and after, Donais disclosed the contents of plaintiffs' client-privileged protected information, as noted above, to his family including wife/sons, his friends, members of the Manchester NH crime-line board, and the Manchester NH police, including details of the 1-9-17 conversation with Bisasor and the 1-5-17 conversation with Obrien.

## III. FURTHER INDISPUTABLE FACTS PERTAINING TO BREACH OF FIDUCIARY DUTY ESTABLISHED BY DONAIS' STATEMENTS AND ADMISSIONS
### A.  Donais Has Admitted Facts That Establishes Conflict/Breach Of Fiduciary Duty

#### i. 2017 Affidavit

62. Donais' affidavit states: "*Andre provided me some general details about what he described as a landlord tenant dispute involving inflated charges and also a concern about the existence of racial discrimination against him, and a need to immediately file.*"

63. Rule 1.18 states:

    a) A person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

    b) Even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information except as Rule 1.9 would permit with respect to information of a former client.

9

64. So, according to Rule 1.18, Bisasor was a prospective client. Donais provided information to Bisasor, as a lawyer with the possibility of forming a client-lawyer relationship with Donais.

65. Donais states that Bisasor "**_provided some general details about…a landlord-tenant dispute, involving inflated charges_",** along with information about a racial discrimination claim and urgent timing needs, etc.  Here, Donais thus admitted to receiving/reviewing information from a prospective client.

66. Therefore, because Bisasor provided information to Donais regarding the possibility of forming a client-lawyer relationship, making Bisasor a prospective client, and because Donais received and reviewed information from Bisasor as a prospective client, Donais was prohibited from representing a client with interests materially adverse to those of Bisasor as a prospective client.

67. Further, Donais knew that the case in which he was contacted about by Dave Akridge on or about 1-9-17, was the same case that Bisasor spoke to him about on 1-9-17.

### ii. 1-18-17 court hearing

68. In the 1-18-17 court hearing[1], Donais stated:

> "So here's what happened, Your Honor, is on Thursday, January 5th, at 5:37, Rob O'Brien called me and said hey, I've got a potential client, here's what the issues are, is it something that you'd be interested in? He didn't tell me who the plaintiff was, didn't tell me who the defendant was, just generically laid out what some of the issues were.  I said I'm not interested. Rob said can I give your name to the other party so that you can explain that to **him**[2]. I said I'd rather you not since I'm not interested in taking the case. I don't want to take it. I don't have the ability to do it on the timeline. Notwithstanding that, Rob gave contact information. I got a phone call -- I can give you all the records if Your Honor would like. So this is Rob O'Brien's  statement of what transpired. So Rob told me about the case. These come from my phone records and my system, Your Honor. And I redacted out the other entries for the names of -- because they are clients -- and the whole bit. But there were two records. One was on January 5th.  The other was on January 6th. So on the 5th at 6:17 p.m., I had a seven second phone call and that was probably spent navigating the phone tree and it disappeared. There was another phone call on Friday the 6th at 5:16 p.m. for a minute 37. Again, navigating the phone tree. There was a message. Got the message, generically about hey, got a landlord-tenant case, can I talk with you about it. And I said sure. This is my call back the following day on Monday, spoke in for six minutes 37 seconds to get a sense of what this case was about, Your Honor. **Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien** and the answer is yes. And I said I already told him I don't want to do it.  So at that point, there was pressure to what can I do with the case. I really don't want to do it. I'm not interested in doing that. I don't have the time to do it. I can't do it on the timeline that you want. **May even be a potential conflict**. Don't want to take the case. That was the end of the phone call."

69. Here, Donais stated that, during the 1-9-17 phone call with Bisasor, Donais figured out that there "**may even be a potential conflict"**. This could only mean that he connected the case to the Homewood suites case. This means that Donais knew that Homewood and Akridge were involved in a case against Bisasor and his spouse. This is proof that Donais knew of the conflict from 1-9-17, by his own admission.

---

[1] See **Exhibit 34 – Transcript of the District Court Hearing on January 18, 2017.**

[2] NB: Mr. Obrien has stated in his 1-18-17 affidavit that the caller was a "**she**", hence a female, meaning me. This was not a "him".

10

70. Moreover, here Donais also admits that he realized that there was a connection between the conversation Donais had with Obrien on 1-5-17 and the conversation he was having with Bisasor on 1-9-17 i.e. "***Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien and the answer is yes. And I said I already told him I don't want to do it.***"

71. Donais also admitted "*There was another phone call on Friday the 6th at 5:16p.m. for a minute 37. Again, navigating the phone tree.* ***There was a message. Got the message, generically about hey, got a landlord- tenant case, can I talk with you about it. And I said sure. This is my call back the following day on Monday, spoke in for six minutes 37 seconds to get a sense of what this case was about, Your Honor. Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien*** *and the answer is yes.*"

72. Here, Donais states that he received enough information to figure out what the case was about. This establishes that he received confidential information about the legal matter from Bisasor. This also establishes that he received confidential information about the legal matter from Obrien about the same legal matter. It can be inferred from this admission alone that in order to receive enough information to figure out what the case was about, Donais must have received information about the facts of the case, the claims by the plaintiffs, and the alleged wrongdoing by the Homewood defendants. This is even more clear-cut given that Donais states that he figured this all out without having the names of the parties, including without the name of the hotel. Thus, his identification of what the case was about and that it was the same case that Obrien told him about, must have been based on details of the facts and claims of the case, which by definition constitutes confidential information provided via a prospective attorney-client communication. There is no logical way for Donais to avoid the fact that he received confidential information from Bisasor and from Obrien (via Anderson) about the facts and claims of the case, prior to the filing of any lawsuit.

### iii. 1-11-17 Email

73. On 1-11-17, Donais wrote an email to Dave Akridge, Karl Terrell (out of state counsel advising Akridge), and Felicia Brogden (Terrell's assistant), stating:

> Karl and Felicia: I am happy to provide local representation to support your pro hac vice admission. What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper. Given his timeline and his issues, I was not in a position to assist, and did not engage in any conflict analysis to determine the property, property address, or whether there was a conflict. This is the extent of what I know.  I am around and available today

11

with availability until 2pm today, tied up for about 1 hour, and then spotty after that. Tomorrow is clear from 9-10, and 10:30-1, and 2-4:30.  My NH bar # is 12466. Let me know how you wish to proceed. Craig

74. First, Donais here admits that he received information from Bisasor regarding discussing filing a 540A petition, claiming being treated differently for "food services because they were minorities", and were being overcharged for their use of the room, and that it was a "mixed use property", in which part was rented, and part was under innkeeper, and an urgent timeline. Again, this goes to providing confidential information from Bisasor to Donais about the facts of the dispute, and the intent to file a 540A petition (as a legal strategy). Donais further here states he was told about disparate treatment (which was not included in the 540A petition). It should be noted that the motion to dismiss (on page 15 and 16, among others) filed by Donais and Terrell in the Nashua circuit court, fabricated untrue[3] attacks on Bisasor for "misconduct…on numerous occasions during the food service", which was a preemptive attack to undermine any future raising of disparate treatment in the food service, which was a direct function of the information Donais obtained from Bisasor. The motion to dismiss also preemptively raised race issues in order to again neutralize any possible future claim of race discrimination. This is a clear example how Donais' receipt of confidential information from Bisasor and Anderson (via Obrien) compromised the plaintiff's case and disadvantaged them in therein.

75. NB: It should be noted that here Donais stated that this is "all he knows". But yet in his March 2017 affidavit, 3 months later, he then claims to know much more about what was said in the 1-9-17 call way beyond what he said here in this 1-11-17 email. Donais was clearly lying in the email about the extent of what was discussed on the call. The fact that Donais lied about this is undisputed from the record.

76. For instance, in his affidavit, he claims Bisasor accused him of racism for declining the case. Donais also hid the fact that Obrien had contacted him with information from Anderson, that Donais realized it was the same case that Obrien spoke to him about, or that Donais purportedly asked Bisasor if he got the contact info from Obrien. Further, Donais didn't mention that he (purportedly) told Bisasor there may be a potential conflict. This is a lot of information that Donais left out of this email, some of which was later stated in his March 2017 affidavit or in the 1-18-17 hearing.

---

[3] Note: These untrue attacks were withdrawn by the Homewood case defendants in April 2022, pursuant to a settlement agreement that including nullifying the false defamatory statements made in this motion to dismiss.

77. It should be noted that Donais admits here that Akridge/Homewood had not yet hired him, as he gave his "NH bar number" to them and stated "let me know how you want to proceed" in that first email to them. This demonstrates that he had not been hired as yet because he could not have been hired without providing Akridge and Terrell his bar #. Further, his query about how they wanted to proceed, confirms he hadn't been hired as yet.

78. This directly contradicts his statement in the March 2017 affidavit where he stated:

> "Since I did not learn from either Attorney O'Brien or Andre about the parties involved in Andre's matter, I thereafter agreed to serve as local counsel when I was contacted by Attorney Karl Terrell, representing Homewood Suites, in the case brought by Ms. Natalie Anderson in this 9th Circuit Court-Nashua District Division landlord-tenant case. I had a chance to review Ms. Anderson's pleading, confirmed the identity of the plaintiff (and that Andre was not a plaintiff) and performed a conflict check before undertaking representation.

79. The above statement by Donais is clearly false as he clearly learned that Andre was involved in the Homewood case on 1-11-17, in the first conversation he had with Akridge about the case, prior to undertaking representation of Homewood, before reading any pleadings, before performing any so-called conflict check. This is corroborated by Akridge's affidavit. [NB: This alone should impeach Donais' affidavit as being untruthful. He needs to be put under oath and cross-examined about this.]

80. Further, this email indisputably shows that, on or about 1-11-17, Donais divulged confidential information shared with him from Bisasor on the 1-9-17 prospective client call, to Akridge, Terrell, and Terrell's assistant, prior to being representing Akridge/Homewood, which representation was agreed upon/occurred two days later on 1-13-17 (which is the date of a pro hac vice admission motion, on behalf of Terrell, filed by Donais, in circuit court.)

81. Here, Akridge contacted Donais by phone, on 1-11-17, about possibly representing him and his company as local counsel. Donais told Akridge he spoke to "Andre" about the case on 1-9-17 and figured out that Andre was involved in the case. Donais also told Akridge and Terrell about the facts of what Bisasor told Donais including specific facts, specific potential claims, strategic actions being contemplated, and urgent timing factors. This includes information about disparate treatment claims that was never included in the 540A petition and thus Donais clearly revealed to Akridge and Terrell, information that they did not know about plaintiffs' claims from the 540A petition. This is indisputable. Donais should not have divulged any of this information to unauthorized third parties, much less to the opposing parties in the same dispute.

### iv. Akridge Affidavit

82. Below is the relevant excerpt of Akridge's affidavit:

On January 10, we received a copy of the legal action the plaintiffs filed in the Circuit Court in Nashua. I asked Mr. Terrell to represent us. On January 11, at 11:29 am, Mr. Terrell sent me an email stating that he would "need to associate local counsel," and provided a copy of the local court rule on the admission of out of-state counsel. A copy of this email and several subsequent emails, in a single chain dated January 11, is attached. Mr. Terrell and I had discussed, earlier, the likely need to associate local counsel. He concluded his email by stating: "Please ask the lawyer you mentioned if he's willing to provide this service." The lawyer I had in mind was Craig Donais, who I have known for several years. He has provided legal services for me related to the board of a condominium association that I serve on, and he once handled a personal matter for me. Mr. Donais has never been retained to perform work for either Great American Hotel Group or the Homewood Suites by Hilton in Nashua. Shortly after Mr. Terrell's 11:29 am email, I called Mr. Donais. Our discussion was quite short; maybe four or five minutes. This was my first conversation with Donais that had anything to do with the dispute involving Anderson and Bisasor. During that call, I briefly explained the nature of the case, the fact that it involved the Homewood Suites in Nashua, and the need for local counsel. Donais then let me know that he had received a call from an individual named "Andre," who said he was looking for an attorney to represent him in a landlord/tenant matter. The situation, as Donais said he understood it, involved some type of mixed-use property. He said he did not remember the caller identifying this property as the Nashua Homewood Suites. In any event, in piecing this together, we concluded that "Andre" was quite likely Mr. Bisasor.
……

I specifically recall asking Mr. Donais if he would have a conflict serving as local counsel, given this conversation with "Andre." He responded with conviction that he did not, given the fact that he had turned down the request to take the case, and given also the brief nature of his discussion with the caller. Following this call, I sent Mr. Donais an email - at 11:41 am - copying Mr. Terrell and his assistant Felicia Brogden. See the attached email chain. In that email, I offered to "do a phone intro" with Mr. Donais and Mr. Terrell, as the two of them had not yet met or spoken concerning this case (and, to my knowledge, had never met or spoken previously on any other matters). I did not provide Mr. Terrell, in that email, a phone number for Mr. Donais. I stated also to Mr. Terrell, in that email, that Mr. Donais "may have received a call from Bisasor yesterday" (I have since read Mr. Donais' affidavit, in which he states he spoke with Donais on January 9, not January 10, as I apparently thought on Jan 11, when referring to that call as having taken place "yesterday'). I stated further, in this email, that Mr. Donais "did not take his case." I believe I asked Mr. Donais to explain and describe to Mr. Terrell the substance of his conversation with Bisasor.

83. Here, Akridge confirms that Donais learned that Bisasor was involved in the Homewood case on 1-11-17, in the first conversation he had with Akridge about the case, prior to undertaking representation of Homewood, before reading any pleadings, before performing any so-called conflict check. Donais, as of 1-11-17, thus knew that he had received prospective client information on the substance of the Homewood case, from Bisasor on 1-9-17 and from Obrien on 1-5-17. He thus had enough to know there was a conflict, and that to move forward with representing Homewood would constitute a breach of fiduciary duty to the plaintiffs.

**B. Statements & False Statements by Donais in his Affidavit that Support Breach of Fiduciary Duty Claim**

84. Donais made several statements, including false statements in his March 2017 affidavit that establishes the breach of fiduciary duty claim, as follows.

85. In his affidavit, Donais stated that he agreed to serve as local counsel for Homewood because he did know about the parties from Obrien or Bisasor and because he performed a conflict check before undertaking representation and reviewed the pleadings filed in district court, which confirmed that the plaintiff was not Bisasor. But this contradicts his statements made in the 1-11-17 email chain with Donais, Akridge and Terrell, which shows that before Donais undertook representation of Homewood, he had an initial conversation with Akridge who initiated

14

the contact apparently in the morning of 1-11-17 and who explained the case to Donais, and wherein it shows that Donais immediately recognized that "Andre" was involved in the case. This realization took place before representation was undertaken and it prompted Akridge to inform Terrell of the problem and it further prompted an investigation by Terrell into what exactly was discussed between Donais and Bisasor. Because of the sequence of these facts, it would have been totally unnecessary, unnatural, anachronistic for Donais to then perform a conflict check when he already knew who the plaintiffs were by his own admission, before undertaking representation.  Donais' story simply does not make any logical sense and appears to be a rather clumsy attempt to harmonize or massage the facts in order to cover himself. But it cannot be done. The facts are too specific and pronounced to support his tortured story. The facts are not malleable enough to avoid the clear/evident contradictions in his story. The bottom line is that here again it is clear that Donais is not telling the truth. The truth is that he did not need to perform a conflict check because he already knew who the parties were. Plaintiffs have offered evidence that Donais knew who the parties were from 1-5-17 when Obrien contacted him and told him about Homewood. Plaintiffs also offered evidence that Donais knew who the parties were, because he stated/claimed that on the 1-9-17 call with Bisasor, he said that there **may be a potential conflict**. But even if these facts and evidence are not considered for the moment, it is indisputable that Donais knew who the parties at the very least during the purported first contact that Akridge had with Donais wherein Akridge purportedly was first seeking to recruit Donais as local counsel for the case on or about 1-11-17. This is proven by the email record that Donais attached to his motion to dismiss amended complaint filed 8-22-25 in this court.

86. Moreover, Donais' statement that he "**had a chance to review Ms. Anderson's pleading, confirmed the identity of the plaintiff (and that Andre was not a plaintiff)**", simply does not ring true but comes across as a strained attempt to orchestrate the appearance of ignorance and innocence. Moreover, Akridge has stated in his affidavit that when Akridge explained to Donais the broad issues of the case, Donais immediately recognized the facts and the parties (i.e. presumably based on the facts recited to him just a day or two earlier in the call with Bisasor on 1-9-17, as well as on the prior call with Obrien on 1-5-17).  Yet if that is true, then how is it that Donais could (on or about 1-11-17) review the entire pleading filed by the plaintiffs in district court on 1-9-17, without making the same realization, since the district court pleadings went into detail about the facts of the case (the

same facts that Akridge must have covered more broadly with Donais on the phone on 1-11-17, assuming that call took place after Donais review of the pleading). This just simply makes no sense. Donais is trying to have it both ways and, in the process, has created an untenable contradiction. Otherwise, there is an irreconcilable contradiction between the affidavit of Donais and the affidavit of Akridge.

87. NB: This is just not believable and this purported paper trail smacks of orchestration and manipulation. Yet, even assuming the benefit of the doubt, it still makes no sense that Donais would later claim in his affidavit that he relied upon a conflict check performed at the same time and in the same call wherein he admitted that he realized who the parties were and that "Andre" was Anderson's husband at that time on 1-11-17. A conflict check was no longer necessary to be performed or otherwise to be relied upon because Donais had perfect knowledge of the parties at that time and because he therefore at that time had knowledge that there was a conflict or at least a potential conflict or the appearance of a conflict. Hence, Donais' story cannot be credited or believed and reflects a further attempt at deflection, obfuscation and subterfuge to mislead this tribunal.

88. It should be noted that the text messages from Obrien were not sent to Bisasor. Obrien sent them to Anderson. Obrien did not have any contact with Bisasor nor did he text Bisasor anything. Any and all contact with Obrien occurred with Anderson. Donais attempts a sleight of hand by trying to insinuate that he understood that the text messages from Obrien were sent from Obrien to Bisasor. But even this fails because Obrien made it clear to Donais that the person he spoke to on 1-5-17 was a female, not a male. This is made clear even in the affidavit that Donais solicited from Obrien on or about 1-17-17 so that Donais could carry it to court on 1-18-17 to show the judge. In that affidavit of Obrien[4], Obrien references the caller as a **"she"** on at least two occasions[5]. Moreover, during the 1-18-17 court hearing, it was clearly stated the conversation with Obrien occurred with Anderson and that the texts were sent to Anderson. Moreover, in the motion to disqualify counsel that was submitted to the district court on 3-6-17 and to the superior court on 3-1-17 by plaintiff, it was abundantly clear that the conversation with Obrien took place with Anderson and that the text messages from Obrien was sent to

[4] See **Exhibit 10 – Affidavit of Robert Obrien dated 1-18-17.**
[5] Donais tries a "sleight of hand" argument to make it look as though no one knew the gender of the person that had called Obrien on 1-5-17. Yet Obrien clearly identifies the person who called him as a "she", which he did twice in his affidavit. This shows the intent to deceive. Donais knew that Obrien had identified the caller as a female, and thus that it could not have been Bisasor who spoke to Obrien. Yet, he put that misleading statement in his filing in order to confuse the court.

Anderson's phone. Yet, with all those facts made clear from multiple sources and in multiple pleadings, Donais still tries, in his 3-13-17 affidavit, to feign ignorance and attempts to reframe the conversation with Obrien as occurring with Bisasor and the texts from Obrien as going to Bisasor. This just shows the lengths to which Donais was and is willing to go to be deceitful and misleading in order to confuse the triers of fact. But there is a purpose to this deceit and obfuscation: he wants to create the impression that Anderson could not be implicated as a prospective client and so if he misdirects the conversation as taking place between Obrien and Bisasor, so that he can try to make or maintain the argument that there was no contact with Anderson whether directly or indirectly and that Anderson can never be considered to have been a prospective client. This is the level of sophistry and subterfuge that Donais is capable of and it is a warning to this tribunal that he is playing a very nuanced and sophisticated game of deceit.

89. Similarly, Donais again tries to engage in "sleight of hand" and misdirection when Donais stated in his affidavit that "**the text message from Attorney Obrien attributed statements to me that I simply did not make. These statements also appear in a paragraph referencing Attorney Diaz, so it is not clear whether the statements were intended to be attributable to Attorney Diaz or to me**.". First it should be noted that Obrien did not speak with "Attorney Diaz" on 1-5-17. Obrien has made clear that Donais was the one who provided the legal opinion on the facts of the case and that was what was presented in the text message from Obrien to Anderson. Second, the reference to "Attorney Diaz" was in reference to the contact information for Attorney Bussiere. Obrien was simply stating that Attorney Diaz (hereafter "Diaz") is another attorney in the law firm of Attorney Emile Bussiere. Then Obrien turned his attention to the conversation he had with Donais and the legal opinion that Donais had about the facts of the case, as was presented to him by Obrien on Anderson's behalf. It should be noted that the statements attributed to Donais could not have been intended to be attributed to Diaz because Diaz does practice discrimination law as noted on his bio[6] from the Bussiere & Bussiere website (in fact Diaz appears to be only attorney in that law firm that has experience in discrimination law). Hence, Diaz's bio does not comport with the statement that "he would not opine on discrimination cases outside his experience".

---

[6] See **Exhibit 14 – Website Bio Information of Attorney Keith Diaz showing that he practices discrimination law.**

17

Hence, Donais' clever attempt at misdirection again fails. The text message from Obrien to Anderson stated as follows:

> +16034599965
> Thursday January 5, 2017
>
> "Here is contact info for attorney who handles discrimination cases Bussiere & Bussiere, P.A., please call 603.622.1002 emiljr@bussierelaw.com. Another attorney in that form (firm) is Keith Diaz. I spoke with Attorney Donais. He said you have a great contract case for the overcharges. He said the innkeeper rules would likely apply to your situation. Which allows for "no cause" evictions. He would not opine on the discrimination claims outside his experience." 6.15pm.

90. Further, in his affidavit, Donais states that he did not draft any pleadings nor was he involved in the drafting of any pleadings. This is simply not credible. Both he and Terrell signed and filed a 60-page motion to dismiss on 1-17-17 in the district court. It is not believable that he was not involved in any way with the drafting or editing of that pleading that he signed his name to. Moreover, Donais evidently drafted (at the very least) the filings related to his appearance and he must have been involved in the motion to admit pro hac vice, since outside co-counsel was not yet admitted to the case. Beyond that, he must have been involved in the preparation of the pleadings filed on 3-16-17 in district court which relied heavily upon and utilized his affidavit. It is virtually impossible for those pleadings to be drafted without Donais' involvement (especially given what was written in those pleadings).

91. Donais states further in his affidavit that "**After learning of Attorney Obrien's purported communication with Andre, as well the contents of the text message, and after advising Attorney Terrell of these same facts at the courthouse, it was my decision to file my withdrawal on the case, given the potential appearance of conflict, despite my efforts to avoid any conflict.**" But this again is untrue, inaccurate and misleading. First, as stated before, Obrien had no communications with Bisasor. Second, Donais self-purportedly "learned" of the communications between Obrien and Anderson at the very least since the call from Attorney Berry on 1-17-17. He thus had a chance to withdraw at that point but instead he argued with Berry and protested that he did nothing wrong. The reason why Donais had in his possession an affidavit from Obrien dated 1-18-17 was because Donais was advised on 1-17-17 by Berry of the text messages to Anderson from Obrien and thus Donais went to Obrien to solicit an affidavit quickly so that he could carry it to court on 1-18-17. If simply learning of the communications with the plaintiff were sufficient for Donais to withdraw, he would have done so on 1-17-17 upon being apprised of this fact by Berry.

92. NB: But all of this ignores the fact that Donais has also admitted elsewhere that as of 1-9-17, he realized that the communications with Bisasor on the 1-9-17 call and the conversation between Donais and Obrien on 1-5-17 were in fact related, and that as of the 1-9-17 he realized that there may even be a potential conflict. Third, Donais spent significant time arguing to the judge on 1-18-17 why there was no conflict and why he should not be excluded from the case. Donais went as far as to accuse Berry of creating a contrived conflict, for which the judge chided Donais for being inappropriate. Moreover, the judge had to pull rank on Donais in reminding or informing Donais of the fact that the judge had spent about 10 years on the PCC and the vice chair of the hearing committee, signaling that he judge knew exactly how the PCC and the hearing committee would view this situation (i.e. that they would find that there was a conflict). The judge also told Donais that there was a conflict and asked Berry to check with his clients to see if we would waive the conflict. Even then, Donais was still stubbornly trying to convince the judge that he did nothing wrong. The judge finally told Donais that he was trying to help him out by giving him a chance to make the decision on his own, and that otherwise the judge would make the decision for him formally. It was only then that Donais reading the tea leaves that the judge was going to formally remove him from the case due to ethical conflict as an official finding, that Donais "decided" to withdraw "on his own", after talking to his clients. The transcript of the 1-18-17 hearing fully bears this out[7].

93. In taking all of the above together, it is clear that the 3-13-17 affidavit of Donais filed in district court on 3-16-17 (and also used and/or filed in superior court on 4-27-17 and 5-5-17), is full of false, untrue, inaccurate, incredible and misleading statements. Under no conceivable circumstances could Donais' conduct, actions and statements reflected in that affidavit be said to represent the standards of honesty and candor to which the NH rules of ethical and professional conduct hold all lawyers to account. This ultimately supports the point that Donais intentionally breached his fiduciary duty to the plaintiffs.

### C. Statements Made by Donais in the 1-18-17 Court Hearing That Support Breach of Duty Claim

94. Donais denied giving his legal opinion on the facts of the case as presented to him by Obrien. The judge said to Donais "***You're giving that person a really brief (indiscernible) on how to handle it, that's one issue. If you're sitting there and discussing the facts particular to the case, then that's something else***."

---

[7] See attached **Exhibit 34 – Transcript of the District Court Hearing on January 18, 2017.**

19

95. Donais responded to the judge saying "***I don't think we did, Your Honor. It was a generic discrimination over charge and I said I don't want to do it, Your Honor.***"

96. Berry then points to the text message from Obrien to Bisasor summarizing the legal opinion that Donais gave regarding the facts of the case.

97. Donais later then states that "***And that's actually not what I said to Rob but that's okay. And I think Rob gave his own statement of what transpired in that conversation.***"

98. Donais then accuses Berry of making up a contrived conflict to exclude Donais by saying "***I guess, Your Honor, this is kind of a contrived conflict to exclude me when this is my client and has been my client. I've worked with Dave Akridge who is the principal of the defendant for ten years on other matters and the like. So it's easy to call opposing counsel—***".

99. Berry responds saying that Donais cannot call it a contrived conflict, saying "**MR. BERRY: He can't make it a contrived conflict. In some ways it makes it worse.".**  And then the judge steps in and chides Donais for that inappropriate accusation by saying: **"THE COURT: Okay. Two things. Before this gets any further. I think the word contrived is inappropriate**." See Exhibit 34 - page 16 of the 1-18-17 court hearing transcript[8].

100.    NB: The fact that Donais snaps at Berry and lashes out accusing him of a contrived conflict shows the unbecoming character of Donais. Similarly, Donais knew there were legitimate concerns about a conflict because he himself stated that he told Bisasor on the 1-9-17 call that there may be one, and both Dave Akridge and Karl Terrell had previously raised concerns about this conflict as of 1-11-17. Thus, it takes a special kind of dishonesty for Mr. Donais to stand there in court and look both Berry and the judge in the eye and accuse Berry of making up a contrived conflict. Moreover, Donais did this knowing that he had an email chain dated 1-11-17 that showed that he and his client and co-counsel were concerned about a conflict and knowing that he was hiding[9] that email chain from the court on 1-18-17. It shows how Donais is capable of exploiting a situation and to try to turn the tables on the other party who is bringing legitimate concerns to the attention of the court or tribunal. This also shows that Donais cannot be trusted to tell the truth or to be forthcoming with the truth.

---

[8] See **Exhibit 34 – Transcript of the District Court Hearing on January 18, 2017.**
[9] See **page 232-240** in **Exhibit 35  – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court**.

### D. Other False Statements Made by Mr. Donais

101.    Donais has stated that the 1-11-17 email from Donais to counsel for Homewood, occurred prior to Donais learning that Bisasor and Anderson were related. Donais has given the indication in his other pleadings in court that he did not know that Bisasor's wife was involved in the case that was discussed with Donais on 1-9-17, until the court hearing on 1-18-17. This is not true. Bisasor explicitly told Donais that the case involved both Bisasor and his wife. So, Donais knew that his wife was part of the case and that it was not Bisasor alone. This is also confirmed by Donais statement (in the 1-18-17 hearing) that, during the 1-9-17 call with Bisasor, he realized the two conversations (i.e. the one with Obrien on 1-5-17 and the one he was having with Bisasor on 1-9-17) were connected and this realization occurred within one minute into the conversation with Bisasor on 1-9-17, showing that Donais knew from early in the conversation there was a conflict. This also confirms that Donais consolidated in his mind the information shared from both conversations, which means there was a substantial amount of information that Donais had about the plaintiff's case as of 1-9-17.

102.    Donais has also given contradictory statements, in telling the court on 1-18-17 that he told Bisasor on 1-9-17 that there **may be a potential conflict**. If he did not know or suspect that Homewood was involved in the case, then how could Donais purportedly say to Bisasor, on the 1-9-17 call, that there **may be a potential conflict**. Donais evidently did not represent other principals who owned extended stay hotels in Nashua, NH at the time. The only way for there to be a "potential conflict" is if Donais knew that Homewood Suites of Nashua (managed by his longtime client Akridge) was involved in the dispute with Bisasor and his wife.

103.    Anderson explicitly told Obrien that she and her husband, Andre, resided at the Homewood Suites in Nashua NH. It can be inferred that Obrien told this information to Donais when they spoke by phone on 1-5-17. [NB: **It would be important to obtain Donais' phone records and Akridge's phone records to see if Donais had any calls with Akridge just after the 1-5-17 call with Obrien.**]

104.    Even assuming arguendo that Obrien did not share this information with Donais on 1-5-17, it is evident that Donais knew that Homewood was involved in the case that Bisasor was speaking to him about on 1-9-17, because Bisasor told Donais that the case involved an extended stay hotel in Nashua NH and that Bisasor wanted to file a 540A petition in the Nashua District Court and had spoken to a Nashua police officer about the case. Donais also knew that Dave Akridge managed the Homewood Suites in Nashua NH. **Again, it would be important to**

**obtain Donais phone records and Akridge phone records to see if Donais had any calls with Akridge just after the 1-9-17 call with Bisasor.**

105.    The facts point to knowledge on the part of Donais that Homewood was involved. This can be inferred from his own admissions. There is simply no way to explain away his acknowledgement to the Nashua circuit court that he knew on 1-9-17 that there was a **potential conflict**. Donais needs to be placed under oath and questioned about this matter. Further, in his 2017 affidavit, Donais gives himself credit for recusing himself as soon as he discovered at the 1-18-17 hearing that Homewood was a party.  But this is not true or accurate, as he knew that from much earlier. This is undisputed from the record.

106.    The conversation that Attorney Berry had with Donais regarding his concerns about the conflict of interest showed that Donais insisted on his intent to stay-on as counsel in advance of the 1-18-17 hearing in the district court. Thus, Donais after being contacted by Berry on 1-17-17 about the conflict of interest and ethical issue and told about the text from Obrien, still doubled down on not coming off the case and went to the court on 1-18-17 with arguments prepared for why he should stay on the case, which were rejected by the Judge.

107.    Also, Donais fought to stay on the case while in the 1-18-17 hearing before Judge Moore, until he was forced by Judge Moore to disqualify himself from the case (or otherwise the Judge would do it formally). NB: If there was no conflict of interest or ethical issue whatsoever, then why was he removed/disqualified from the case?

108.    Donais simply thought he could take advantage of plaintiffs because they were initially pro se (in filing the 540A petition), and he proceeded with the conflict of interest situation, and was bold enough to think he could get away with it, even after Berry raised concerns about his actions. Donais thus contradicted himself/the facts.

109.    It is also noteworthy that Donais states that he performed a conflict check prior to taking on the case as defense counsel for Homewood. But this contradicts his statements made in the 1-11-17 email chain with Donais, Akridge and Terrell, which shows that before Donais undertook representation of Homewood, he had an initial conversation with Akridge (who initiated the contact apparently in the morning of 1-11-17 and who explained the case to Donais), and wherein it shows that Donais immediately recognized that "Andre" was involved in the case. This realization took place before representation of the Homewood defendants was undertaken. Moreover, this

22

story (about performing a conflict check) simply does not ring true, but comes across as a strained attempt to orchestrate the appearance of ignorance/innocence.

110.    Further, in the 1-11-17 email, Donais writes as though he already had a conversation with both Terrell and his assistant, Felicia. The context and syntax suggest a prior conversation i.e. "**Happy to be provide local representation**", "**What I know is…**", etc. Also, Donais then stated that he was around and available to speak further on a few different dates and times. This indicates further discussion took place. NB: Donais stated that, during the 1-9-17 call with Bisasor, he realized the two conversations (i.e. the one with Obrien on 1-5-17 and the one he was having with Bisasor on 1-9-17) were connected and this realization occurred within one minute into the conversation with Bisasor on 1-9-17. How is it then that the conversation continued for another 6 minutes? This shows that Donais intentionally let the conversation continue on, with Bisasor sharing more confidences/information with Donais, when Donais knew from early in the conversation there was a conflict. This also confirms that Donais consolidated in his mind the information shared from both conversations, which means there was a substantial amount of information that Donais now had about plaintiff's case as of 1-9-17.

### E.  More Proven False Statements in Donais' Affidavit

111.    First, Donais stated that his call with Obrien was for 5 minutes and that Obrien called him. Yet the phone log of Obrien shows that there was an incoming call to Obrien at 5:35pm. So the phone log provided cannot be evidence of the phone call referenced by Donais in his affidavit[10].

112.    On 1-5-17, Donais stated that Obrien told him that the so-called "unknown caller" had a "need to file something on Monday" (presumably Monday 1-9-17). Yet this is contradictory to the actual facts because the departure date was set initially by the Homewood defendants to be on 1-6-17. It was the morning of 1-6-17 that Akridge changed the ejection date to 1-10-17. Therefore, at the time that Anderson spoke with Obrien on 1-5-17, it would have been too late to "file something" on Monday, 1-9-17, given that as far as anyone knew as of 1-5-17, the then departure deadline was 1-6-17 (i.e., Akridge changed the departure deadline to 1-10-17 after a call with Bisasor on 1-6-17). This is another discrepancy with the facts that is created by Donais' affidavit.

---

[10] See **Exhibit 7 – Phone Log of Robert Obrien Provided by Defendants**.

113. Donais states that he took on the local defense counsel role for Homewood because he did not realize that Anderson was the so-called "unknown caller" vis-à-vis Obrien, or that her husband, Bisasor, was the caller in his 1-9-17 call with Bisasor. But this is belied by the facts as stated before[11].

114. Note: The text on 1-5-17 was from Obrien to Anderson, not to Bisasor, as erroneously stated by Donais.

115. Donais states that he never made certain statements to Obrien. Yet Obrien stated clearly that Donais made these statements. If only Obrien had not sent that text message to Anderson, then they both could just deny everything. Unfortunately, the text message[12] stands as the contemporaneous statements and notes made and sent by Obrien at the time that the statements were made to him by Donais.

116. Based on the above, it is clear that Donais' actions did violate Rule 1.18. His taking the case as Homewood's defense counsel, after the communications he had with Bisasor and Obrien show a willful disregard for Rule 1.18. Similarly, his refusal to withdraw from the case when Akridge pointedly asked him if there was a conflict[13], and when Terrell indicated to him that this was a concerning "flag"[14], shows a willful disregard for rule 1.18. Furthermore, Donais' failure to contact Bisasor to inform him that he would be taking the case as defense counsel is further evidence of a willful disregard for rule 1.18. In addition, Donais refusal to withdraw from the case when Berry contacted him on 1-17-17 about the conflict issue, shows a blatant and stubborn disregard for Rule 1.18. Finally, Donais' attempt to fight with Judge Moore in the 1-18-17 hearing, when the judge was signaling to him that there was in fact a conflict, shows an intransigent disregard for rule 1.18 and Donais only buckled when Judge Moore diplomatically threatened to formally remove him from the case if he did not decide to do so himself.  It should be noted that after Donais withdrew from the case in January 2017, he became further involved in the case again at a later point and consulted with the defense lawyers in preparing his affidavit and attendant pleadings filed in two courts for use in April and May 2017. This continued engagement/discussion about the case and discussions with Bisasor and Obrien further resulted in a taint on the case and advantage to the defense.

---

[11] See **page 1 and paragraph 5** in **Affidavit of Craig Donais dated 3-13-17.**
[12] See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17.**
[13] See **page 3 and paragraph 16** in **Exhibit 20  - Affidavit of Dave Akridge dated 5-4-17**.
[14] See **page 221 line 7**, **page 238 line 17-25 and page 239 line 1-15** in **Exhibit 35  – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**

117.     And, further, the fact that Donais used that occasion to fabricate a lie about what Bisasor said in the 1-9-17 prospective client call, in order to attack and disparage Bisasor in Donais' affidavit, violates all bounds of decency and ethics.

### IV. ELEMENTS OF BREACH OF FIDUCIARY DUTY ESTABLISHED

118.     Under NH Rule of Professional Conduct 1.18, Bisasor and Anderson were prospective clients entitled to confidentiality protections equivalent to actual clients. NH Rule 1.18(a)(b).

119.     Rule 1.18(b) explicitly states that "a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information" except under limited circumstances not applicable here. NH Rule 1.18(b).

120.     Donais received and reviewed information from plaintiffs as prospective clients, creating fiduciary obligations of confidentiality and loyalty. First Bisasor Affidavit; Anderson Affidavit.

121.     Donais breached these fiduciary duties by: (a) disclosing confidential consultation information to adverse parties; (b) representing adverse parties against plaintiffs' interests; (c) fabricating false statements about consultation content; and (d) continuing to disclose confidential information to unauthorized third parties for years after the consultation. These are undisputed facts above.

122.     Plaintiffs suffered damages as a direct result of these breaches, including reputational harm, emotional distress, compromise of their legal position, and other injuries. First Bisasor Affidavit; Anderson Affidavit.

123.     Donais's conduct was willful and deliberate, undertaken with full knowledge of his ethical obligations and the harm it would cause plaintiffs. Thes facts are undisputed facts above.

### V. CONCLUSION

124.     The foregoing undisputed material facts establish as a matter of law that Donais breached his fiduciary duties to plaintiffs as prospective clients. No genuine factual disputes exist regarding the establishment of the prospective attorney-client relationship, the confidential nature of the consultations, or Donais's subsequent unauthorized disclosures and misuse of confidential information.

Respectfully submitted,
s/ Natalie Anderson
NATALIE ANDERSON

s/ Andre Bisasor
ANDRE BISASOR

Date: October 24, 2025

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties and counsel of record via the court's electronic filing system.

s/ Andre Bisasor
ANDRE BISASOR