UNITED STATES DISTRICT COURT-DISTRICT OF NEW HAMPSHIRE
CIVIL ACTION NO: 1:25-cv-00251 |BISASOR v. DONAIS, et. al.

## PLAINTIFF BISASOR'S MOTION TO RECUSE JUDGE SAMANTHA D. ELLIOTT AND TRANSFER CASE TO ANOTHER JUDGE/COURT PER 28 U.S.C. § 455(a) and (b)

1. Plaintiff Andre Bisasor ("Bisasor") respectfully moves this Court, pursuant to 28 U.S.C. § 455(a) and (b), Canon 3(C) of the Code of Conduct for United States Judges, and the Due Process Clause of the Fifth Amendment, for the disqualification of Chief District Judge Samantha D. Elliott ("Judge Elliott") from presiding over *Bisasor v. Donais*, Civil No. 1:25-cv-00251-SE (D.N.H.), and for transfer of this case to another judge and/or to another district, and further to disclose all relationships between herself and the defendants, including but not limited to Russell Hilliard, Upton & Hatfield, LLP, Amy Messer, and their counsel, and/or their family members. In support of this motion, Bisasor states as follows[1]:

---

## PREFACE & INTRODUCTION

---

## I. THIS MOTION IS FILED AS A MATTER OF RIGHT UNDER §455
### A. Special Procedural Note

2. This motion is filed as a matter of statutory right. It does not seek leave under the Case Management Order ("CMO," Doc 91) because the recusal obligation under §455 is self-executing and mandatory, and no court order, however styled, can function as a prerequisite to its invocation. The statutory duty to disqualify exists independent of any motion practice and operates directly upon the judge whenever disqualifying facts are present.

### B. The CMO Cannot Override the Self-Executing Recusal Statute

3. The CMO's requirement in Paragraph 2 that Plaintiffs seek leave of court before filing any motions cannot, as a matter of law, bar the filing of a recusal motion under §455. The analysis is straightforward. Section 455 is a duly enacted federal statute that imposes a mandatory, self-executing duty on federal judges to disqualify themselves when the conditions for disqualification are present. The statute does

---

[1] Bisasor asks the court to read every word of this motion carefully and apply a pro se liberal construction and grant the benefit of the doubt to it or treat it in a light most favorable where possible. Bisasor would like to make clear he does not intend to offend the judge by seeking her recusal but felt he had no choice but to act now to preserve his rights before any further time elapses.

not condition that duty, or the litigant's right to invoke it, upon any procedural prerequisite. A case management order, by contrast, is a subordinate exercise of the Court's inherent docket-management authority. Federal courts have inherent authority to manage their caseloads through standing orders and case management directives, but that inherent authority is subordinate to, and must be consistent with, federal statutes. A CMO provision cannot negate or condition a statutory or constitutional right.

4. Applying the CMO's leave requirement to this recusal motion would create an absurd outcome Congress could not have intended and that the law does not tolerate. The statute's purpose is to ensure that disqualified judges are removed from cases. But the leave requirement, if applied to recusal motions, would make the judge the gatekeeper of the motion designed to remove her. The judge whose partiality is at issue would possess the power to decide, through her ruling on a leave motion, whether the recusal motion may be filed at all. If leave is required, and the court denies leave, the recusal motion never reaches the record in any form that could support mandamus review. The CMO would thus operate not merely as a procedural hurdle but as a substantive eraser of statutory/constitutional rights to seek recusal. Congress did not leave room for that outcome under §455 as a mandatory, self-executing provision.

5. The constitutional dimension reinforces this conclusion. The right to a neutral adjudicator is a component of the Due Process Clause of the Fifth Amendment. See Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009). A due process right cannot be procedurally waived involuntarily, and it cannot be foreclosed by the very judge whose neutrality is challenged. Permitting Judge Elliott to condition the filing of a recusal motion on her leave to file that motion would give her unilateral control over whether the due process challenge to her neutrality is ever heard, a result that is constitutionally untenable.

### C. The CMO Cannot Be Used to Block Motion to Recuse Under §455

6. Bisasor further notes that the CMO was issued on 2-9-26, ten days after Plaintiffs' 1-30-26 Notice of Intent listed "*Motion to Recuse and Transfer Case*" as item (m). Whatever the Court's intent in issuing the CMO when it did, the objective effect of applying the CMO's leave requirement to this motion would be to interpose a new procedural barrier between Plaintiff and the recusal motion that had already been announced. The reasonable observer would note this sequence. Bisasor files this motion as a matter of

right, without leave, and respectfully submits that the CMO's leave requirement is inapplicable to §455 recusal motions as a matter of law. Note: Bisasor has filed/will file a mandamus petition in the first circuit court of appeals to address this issue, concurrently with the filing of this motion to recuse.

## D.  There Are Sufficient Facts/Circumstances Known to Judge Elliott Requiring Self-Recusal

7.  The facts and circumstances presented in this case, that are or should be well-known to Judge Elliott, should require her to self-recuse on her own. First, the motion to amend complaint and the proposed amended complaint (which includes the clear involvement of the New Hampshire Legal Assistance, i.e., NHLA, and its Lead Attorney Elliott Berry at a time when Judge Elliott was head of the NHLA and thus meaning the Judge Elliott effectively represented the plaintiffs in related underlying matter, and now the claims against Karen Gorham who is Judge Elliott's own chief deputy clerk in this court and the fact that Judge Elliott self-recused in a related matter involving her), were filed on 3-25-26. If Judge Elliott was inclined to self-recuse, without a formal motion to recuse filed, it seems rational to assume she would have done so by now. The 27 days passing thus far evidently signals that Judge Elliott is not considering or may not have considered the fact that the duty to recuse (or self-recuse) is required when the judge knows that recusal is required based on facts/circumstances known to her that require recusal.

8.  Judge Elliott knows and has known about the NHLA and Elliott Berry conflict. The amended complaint, and certainly the proposed second amended complaint, along with the motion to amend the complaint, as well as the objection to the motion to dismiss materials, have clearly detailed the facts necessary for Judge Elliott to understand the nature of the NHLA/Elliott Berry conflict. Yet, it appears she proceeds despite those facts and circumstances.

9.  Further, and more critically, Judge Elliott knows about the Karen Gorham conflict. The amended complaint, and certainly the proposed second amended complaint, along with the motion to amend the complaint, as well as the objection to the motion to dismiss materials, details the facts necessary for Judge Elliott to understand the nature of the Karen Gorham conflict. Yet, it appears she proceeds despite these known facts and circumstances.

10. It is reasonable to conclude that if Judge Elliott was going to self-recuse on her own, without a recusal motion filed, she would have done so by now. The fact she has not done so, signals that she may rely on the technicality that a motion to recuse must be filed, in order for her to seriously consider recusal.

11. The problem is that she has erected a formidable barrier to the filing of a motion to recuse via her 2-9-26 case management order and her subsequent related orders including ones that struck a motion to correct the record and that denied a motion for extension of time to file motion to reconsider the case management order, all of which stated or implied that she does not want any motions or other filings filed while she considers the merits and viability of the claims in this case. This is, of course, problematic, because a conflicted judge should not be ruling on the merits of a case in which she has a conflict or there is at least the appearance of such.

### E.  Plaintiffs Face an Untenable Conundrum

12. This has created a catch 22 situation where plaintiffs are chilled from filing the very motion needed to address this issue, for fear of reprisal by Judge Elliott, including her potentially using the CMO as a vehicle to dispense adverse action or negative repercussions against plaintiffs. Bisasor is also concerned not only for himself but also for his co-plaintiff Anderson, whereby Judge Elliott could seek to injure Plaintiff Anderson as punishment for Bisasor's motion seeking recusal. Judge Elliott has already effectively imposed restrictions on Anderson, because of Judge Elliott's allegation that Bisasor has filed several emergency motions in the case, among other things that she (wrongly or unfairly) alleged that Bisasor has done. The tendency of Judge Elliott to penalize (or threaten to penalize) Anderson because of Bisasor or on account of Bisasor is well-established in the record of the case.

13. Moreover, the fact that Judge Elliott intends to block a motion to recuse by Bisasor is illustrated by the fact that, on 1-30-26, Bisasor filed a Notice of Intent to File, which listed as item (m) a "Motion to Recuse and Transfer Case." The record is unambiguous on the timing. Plaintiff announced the intention to seek recusal on 1-30-26. Then 10 days later, on 2-9-26, the Court issued the CMO. The Court did not issue a CMO in response to any event on the defense side of the case; it issued the CMO within the 10-day window after Bisasor publicly announced the recusal motion intent.

14. Further, on 2-9-26, a Motion to Correct Record filed by plaintiff was struck for "noncompliance," without specification of the alleged noncompliance. On 2-23-26, the motion for an extension to reconsider the CMO was denied. On 3-5-26, Bisasor filed Document 102 asking the Court to identify the specific CMO provision that had been violated in connection with Document 96. As of the date of this motion, this question has never been answered. So, Judge Elliott struck Bisasor's motion to correct the record, refused to explain why, and then did not respond when Bisasor sought the explanation necessary to comply. The result is that a pro se filing was stricken without receiving any guidance that would allow the filing to be corrected, which is, functionally, a quiet dismissal of the filing without accountability of a reasoned decision.

15. This confirms the oppressive nature of the CMO and how Judge Elliott has used and perhaps intends to further use the CMO against plaintiffs, howbeit in overly restrictive, prejudicial, and perhaps harsh ways. Bisasor's fear is thus justified.

16. Further, because Judge Elliott knew, from the notice of intent, that Bisasor intended to file several motions, including a motion to recuse, and then issued the CMO blocking all motions, including the recusal motion, but allowed filing of a motion to amend the complaint as an exception from the list provided by Bisasor in the notice of intent, indicates that Judge Elliott intentionally excluded the motion to recuse, and intended to chill any such motion from being filed. The chilling effect was palpable especially because the CMO carried with it the threat of potential adverse repercussions.

17. This situation has created a fear of reprisal from this powerful judge. Her CMO order has created a chilling effect on filing any motion to the court. Yet, although plaintiffs have refrained from filing anything with the court leading up to and subsequent to the filing of the motion to amend complaint on 3-25-26, yet, most recently, the Defendants submitted a gratuitous filing on 4-10-26, and it is now 11 days later, and the court has not chided the defendants for it. The defendant filing serves no legitimate purpose and is a transparent attempt to intervene or interfere with the deliberations of the court, when the court has stated that if it wants something further, it will let the defendants know. There was no need

to repeat back to the court, what the court itself instructed. It was a clever implicit attempt to get something on the record and to use reverse psychology to interject an objection without appearing to violate the court's instruction. And it assumes no one is clever enough to see through this clever tactic.

18. Yet, notwithstanding the above, after further review, Bisasor now realizes that the filing of a motion to recuse is not in the same category of the defendants' illicit 4-10-26 filing, and that not only is a motion to recuse constitutionally protected but it is required in order to formally trigger the statutory mechanisms and protections under §455, without which Judge Elliott could potentially claim a waiver.

19. Further, the motion to recuse needs to be filed, in order to preserve both appellate rights and the appellate record, without which there could be a claim of a procedural defect in any appeal. Further, waiting until the judge issues a ruling on the merits, then seeking to raise recusal motion thereafter, and as a basis to challenge that ruling will likely be a daunting challenge for the pro se plaintiffs.

20. So, Bisasor is in a quandary/conundrum. Should he file this motion to recuse, and risk the ire of the judge? Or should he file this motion to recuse, in order to ensure the fair and impartial administration of justice, to protect his rights, and to preserve the record?  The factors weigh strongly in favor of filing this motion now to formally trigger §455's mechanism and process as guaranteed by statutory/constitutional right. Furthermore, it is not clear that the rights under §455 are properly invoked by filing an indirect motion for leave to file a motion to recuse. It reasonably appears that the statutory rights and protections can only be properly invoked by directly filing a motion to recuse under §455.[2]

### F.  Invocation of Mandamus Intervention

21. Because of these technical issues, Bisasor has filed or is filing a petition for a writ of mandamus in the United States Court of Appeals for the First Circuit simultaneously with, or shortly after, the filing of this motion in this court, seeking determination of this issue and further seeking a mandamus directive

---

[2] This is Bisasor's good faith understanding of the procedural requirements under §455. If he is somehow completely wrong, and the CMO does supersede the constitutional and statutory protections enumerated above, then in the alternative, Bisasor requests that this motion be effectively and liberally construed as a motion for leave to file a motion to recuse Judge Elliot, and that the substance of this motion be treated seriously and substantively addressed by the court, and that form not be elevated over the important issues of conflict, bias, or the appearance thereof, and the grounds for recusal that this motion has incisively raised.

to Judge Elliott to recuse herself from this case and/or halt any further ruling or adjudication of this case by Judge Elliott until or unless the recusal motion/issue/question is fully and properly resolved.

22. Bisasor is thus invoking mandamus protection from the First Circuit to protect himself and his rights. Bisasor is mindful of the First Circuit mandamus standard. Under In re Cargill, Inc., 66 F.3d 1256 (1st Cir. 1995), and Cheney v. U.S. District Court, 542 U.S. 367 (2004), mandamus relief in the recusal context requires: (1) a clear and indisputable right to relief; (2) the absence of adequate alternative means of obtaining relief; and (3) an appropriate exercise of the writ given the circumstances. Under In re United States, 666 F.2d 690 (1st Cir. 1981), the First Circuit has recognized that recusal denials may be reviewed by mandamus where the movant establishes clear entitlement to the statutory right. Bisasor believes that this current recusal matter satisfies each prong. The right to relief is clear and indisputable as the connections documented in this motion objectively satisfy § 455(a)'s reasonable-question standard, and the NHLA and Gorham conflict (already acknowledged through prior recusal) satisfies § 455(b)(1).

23. The alternative means of relief are inadequate, including waiting to appeal after final judgment, which requires Plaintiffs to proceed in a process prejudiced by the CMO's structural asymmetry, in order for any appellate court to reach the recusal question, by which point the harm of proceedings conducted by a disqualified judge will have fully materialized and cannot be cleanly undone. And the writ is appropriate here given the circumstances of the combination of a disqualified judge, an asymmetric prejudicial one-sided CMO, and pro se civil rights plaintiffs whose access to the court has been systematically restricted, and further plaintiffs having exhausted all alternative means of relief, including seeking to bring these issues to district court's attention and submitting complaints to the First Circuit Executive.

24. This is precisely the kind of circumstance for which the writ of mandamus exists, as a check on judicial authority exercised outside its proper bounds.

### G. Conclusion of This Section

25. Bisasor therefore respectfully files this motion directly to this court, without first seeking leave. The self-executing character of § 455, as explained by the Supreme Court in Liljeberg, means that the duty of recusal arises by operation of law when the disqualifying facts exist; no motion is or should be technically

required to trigger that duty. A motion such as this one serves the practical purposes of bringing facts to the Court's attention, preserving the issue for appellate review, and establishing the record that supports a petition for mandamus, which is filed or has been filed in the First Circuit.

26. The CMO's leave requirement, even if it were otherwise constitutional as applied to substantive motions, cannot be construed to require leave to file this motion. The structural point, however, bears restating: a rule that requires the conflicted judge's permission to file the motion that seeks her recusal is a mechanism by which the conflicted judge can prevent the recusal motion from ever reaching the record. Congress did not enact § 455 subject to that mechanism.

---

## SECTION 1: THE NHLA AND ELLIOTT BERRY CONFLICT

---

27. This section presents the connections between the presiding judge and the defendants and their counsel. Each connection is independently significant, as well as in their aggregate as further described below.

### A. Judge Elliott's Leadership/Board Service at NHLA and LARC

28. Chief Judge Samantha D. Elliott served for years on the boards of directors of New Hampshire Legal Assistance ("NHLA") and the Legal Advice and Referral Center ("LARC"), ultimately serving as president of both boards and co-chairing the founding board of 603 Legal Aid, the entity created from their merger. These facts are publicly documented.

### i. Judge Elliott's NHLA Board Presidency, Leadership and Membership

29. New Hampshire Legal Assistance is the primary legal aid organization serving the State of New Hampshire. Judge Elliott served on NHLA's board of directors from 2011 to 2018, including as board president from 2014 to 2017 and as co-chair from 2017 to 2018. Board presidency and membership in a legal aid organization are not ceremonial affiliations. The board governs, sets the strategic direction of the organization, oversees its finances, approves its budgets, and is ultimately responsible for its institutional standing and relationships with the legal community and the broader bar. The president of a legal aid board is that organization's public face and its chief governance officer. Judge Elliott held that role for approximately four consecutive years, during a period when plaintiffs were represented by the

8

NHLA and during which multiple parties and counsel in this case maintained active financial and institutional relationships with NHLA. Judge Elliott's service here was not nominal or ceremonial. She held the presidency of two organizations and co-chaired the founding board of a third, reflecting years of deep institutional involvement in New Hampshire's legal aid ecosystem.

30. Judge Elliott's Senate confirmation expressly recounts her NHLA board leadership alongside her co-founding of 603 Legal Aid, and her Legal Advice and Referral Center involvement. These affiliations were presented as the central institutional commitments of her legal career and professional life, that define her professional identity in the NH legal community.

### ii. The NHLA Board Presidency and Elliott Berry

31. During the years Judge Elliott served as NHLA board president, Elliott Berry was a senior attorney at the organization, specifically, the managing attorney of NHLA's Housing Justice Project, the organization's primary legal representation program for underserved tenants in New Hampshire. Berry had devoted most of his legal career years to NHLA before retiring in October 2022. The relationship between Judge Elliott and Berry during the governance years was direct and substantive. As board president, Judge Elliott had institutional responsibility over the programs Berry managed, including the Housing Justice Project's legal representation activities in Hillsborough County courts and courts adjacent to the district where the underlying events in this case occurred. A board president who governs an organization for four years is not a stranger to that organization's senior program attorneys; she is the governance officer responsible for the institutional environment within which those attorneys work. The relationship between Judge Elliott and Berry was active, supervisory in character, and sustained over the years that are now most relevant to the § 455(a) inquiry.

### iii. The Elliott Berry/NHLA Conflict

32. Attorney Elliott Berry represented plaintiffs in an earlier iteration of this case in state court, which involved the same or similar issues now before this court, and involved some of the same parties or counsel in that matter. Therefore, Judge Elliott effectively represented the plaintiffs in that case as the head of the NHLA that represented the plaintiffs then. This is textbook grounds for conflict and recusal.

Judge Elliott is now tasked with evaluating the legal opinions and professional judgment of the NHLA and Berry, at a time that she was the president and/or board member of the NHLA, regarding events that are at the heart of claims against the defendants in this case. Judge Elliott cannot adjudicate claims in a case where she previously effectively represented plaintiffs on similar or related claims.

33. Furthermore, Berry's role in that case is central to this litigation. Berry is a key witness in this case who has provided witness testimony to the New Hampshire Attorney Discipline Office (ADO), and who raised serious ethical concerns about Donais' conduct to a judge in open court (i.e., Judge Paul Moore in Nashua District Court). Berry also wrote contemporaneous documentation of the statements made by Donais to him on a call, that in part forms the basis of the claims against Donais in this case. Moreover, the amended complaint relies substantially on Berry's legal advice to plaintiffs regarding violations of the ethical rules for lawyers, the existence and breach of the fiduciary relationship with Donais, as well as the defamation and race discrimination claims against Donais. Berry's statements and potential testimony are integral to plaintiffs' claims of breach of fiduciary duty, breach of implied contract, and related theories, as well as the defamation and race discrimination claims. Berry is, thus, a necessary witness whose credibility/advice are dispositive of key issues. Judge Elliott is now tasked with evaluating these statements and events that involve the legal opinions and professional judgment of the NHLA and Berry regarding events that are at the heart of claims against the defendants in this case.

34. Berry is also the attorney who is central to allegations of tortious interference conduct by Russell Hilliard in 2022 (Berry was essentially forced into early retirement in late 2022). Hilliard's interactions with the NHLA and Berry in 2022 are a critical part of the claims against Hilliard and Upton & Hatfield. Judge Elliott is now tasked with evaluating these interactions that may implicate the NHLA and Berry in a series of events that are at the heart of claims against the defendants in this case. Although Bisasor does not intend to bring claims against Berry or the NHLA, the fact of the matter is that discovery could reveal further information that may cast them in not the best light. For example, if Berry was forced into

retirement because of Hilliard's interference[3], and he did not disclose the tortious interference of Hilliard with the ADO, that may have further implications. Judge Elliott's protective instincts regarding these issues may arise in ways that Bisasor as a pro se litigant may not be able to fully appreciate or anticipate.

35. Because Berry's advice is central to plaintiffs' claims, making him a de facto material witness, recusal is mandatory because when "*a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it*". New Hampshire RSA 492:1, the state disqualification statute, provides that "*A justice shall not sit in any case in which he has been concerned as party or attorney...or give advice in any matter pending or which may come before the court for adjudication*". By adjudicating Berry's advice and conduct, Judge Elliott will effectively provide judicial advice on his conduct or performance, and by extension, on that of the NHLA as well.

36. Further, under the reasonable questioning standard, because Judge Elliott and Elliott Berry worked for the NHLA at the same time the plaintiffs were represented by the NHLA, application of objective standard mandates recusal "*in any proceeding in which his impartiality might reasonably be questioned". The test is not whether the judge subjectively believes there is a conflict, but whether "a reasonable person, knowing all the circumstances, would harbor doubts about the judge's impartiality*". Federal disqualification law emphasizes that the standard focuses "*not on whether the judge is actually biased, but on whether a reasonable person might question the judge's impartiality*". A judge's subjective belief that no basis exists is irrelevant under this objective standard.[4]

37. Because Berry represented plaintiffs in the underlying case matters and continued to advise plaintiffs for several years thereafter regarding the precise legal matters and claims currently before this court, and because of Berry's involvement in the underlying events, and because of Hilliard's interactions with Berry and the NHLA that evidently led to Berry's retirement in 2022, then Judge Elliot's professional

---

[3] Bisasor will attempt to prove through discovery, that Hilliard's 2022 communications with Berry precipitated or contributed to Berry's retirement.

[4] See also: The Washington State Ethics Opinion 17-03 addresses example of lawyers who *"worked directly with that judicial officer prior to joining the bench"*. The opinion cites that "*disclosure is required when any known past association would lead a reasonable person to infer that the judge is partial or there is a potential for a conflict of interest*. Also, the Maryland Judicial Ethics Opinion 2017-28 emphasizes that recusal may be appropriate "*to avoid even the appearance of impropriety*" and that "*the possible perception by the opposing party that the judge's prior relationship with the attorney...could affect the judge's rulings*" is sufficient grounds for disqualification.

relationship with Berry through NHLA is relevant under §455(a) and these tangible connections to the litigation transforms the attendant problems into a disqualifying relationship.

---

## SECTION 2: THE KAREN GORHAM CONFLICT

---

### A. Karen Gorham's Administrative Role in the Bisasor State-Court Proceedings

38. Karen Gorham served as Superior Court Administrator for the New Hampshire Judicial Branch for approximately 9 years, from roughly 2015 through April 2024. The Superior Court Administrator is the senior administrative official responsible for the day-to-day operations of all New Hampshire Superior Courts. The position carries authority over staffing, case management procedures, clerk's office operations, and the administrative infrastructure through which cases are processed. Gorham had the authority and responsibility to manage court administration, supervise clerk staff, establish administrative policies, and address complaints about court personnel.

39. The scope of Gorham's role is critical. She did not merely occupy a nominal supervisory role at a remove from the day-to-day operations of individual courthouses. In this capacity, Gorham had direct administrative authority over Hillsborough Superior Court North, the courthouse where Judge Amy Messer presided over the state-court proceedings involving Plaintiff Bisasor from January 2022 through at least March or April 2024. As Superior Court Administrator, Gorham oversaw the clerk's office staff at Hillsborough Superior Court North, managed the administrative systems through which Bisasor's state case was processed, and had made decisions affecting how litigants interacted with the court. This was how Gorham became personally entangled in the Bisasor matter. (i.e., the parallel state court case, No. 216-2020-CV-00027, assigned to Judge Messer at Hillsborough Superior Court in January 2022).

### B. Gorham's Personal Involvement in Retaliation Against Plaintiff Bisasor

40. Gorham's involvement in the Bisasor matter was not limited to her institutional role. She was personally and directly involved in administrative retaliation against Bisasor. The sequence of events is as follows. Bisasor raised concerns about the conduct of a clerk's office staff member named Alma at Hillsborough Superior Court North. Rather than investigate these concerns or refer them through appropriate

channels, Gorham responded by banning Bisasor from contacting the entire clerk's office entirely, whether in person, by phone or by email or by mail. This action was administrative, not judicial, and was taken in direct response to a litigant exercising his right to raise concerns about court staff conduct.

41. The retaliatory nature of Gorham's action is evident. Banning a litigant from contacting the clerk's office of the court handling his case is an extraordinary measure. The clerk's office is the administrative interface through which litigants file documents, obtain case information, and navigate procedural requirements. Denying a litigant access to this interface has the practical effect of impeding his ability to participate in his own case. This adverse action was not accompanied by any finding of misconduct by Bisasor; it was a punitive response to a complaint about court staff. Bisasor contends that this retaliatory action was motivated by racial animus and constituted race-based administrative discrimination.

42. Gorham's personal involvement extended further. She communicated with Judge Messer behind the scenes regarding the Bisasor matter and the decision to ban Bisasor from contacting the clerk's office. These communications indicate Gorham was not acting as a passive administrator implementing a policy; she was actively coordinating, off record, with the presiding judge about a specific litigant. The behind-the-scenes nature of these communications, outside the public record and outside any formal administrative process, compounded the problem. Gorham was, clandestinely, shaping the environment in which Bisasor's case was adjudicated, without Bisasor's knowledge, with no opportunity to respond.

43. This retaliatory conduct forms part of the factual foundation for Plaintiffs' claims in the present litigation. The claims against Judge Messer further arise from or are related to a pattern of administrative misconduct that includes the retaliation Gorham initiated. Messer turned a blind eye or otherwise allowed the pattern of adverse treatment to continue after Gorham departed the state court system in April 2024, but the origin of the retaliatory conduct traces to Gorham. Gorham is not a peripheral figure in this case; she is a material participant in the events giving rise to Plaintiffs' claims.

### C. Gorham's Transition to Federal Court and Promotion to Chief Deputy Clerk

44. In April 2024, Gorham departed the state court system and joined the staff of the United States District Court for the District of New Hampshire, the very court now presiding over this case. The timing of

Gorham's move is noteworthy. She left her position as Superior Court Administrator at approximately the same time that her retaliatory conduct against Bisasor was concluding in the state system and as the events giving rise to this federal litigation were crystallizing.

45. In March 2025, Gorham was promoted to Chief Deputy Clerk of the District of New Hampshire, which is the second-highest administrative official in the clerk's office, responsible for the day-to-day management of case administration, case assignment, docketing, and the operational infrastructure through which the court functions. As Chief Deputy Clerk, Gorham manages the administrative machinery through which this Bisasor v. Donais case is processed. She is embedded in the institutional apparatus of the very court adjudicating a case in which her own conduct is at issue.

46. Gorham processes filings in the clerk's office, has access to Bisasor's sealed filings and is in a position to influence how the clerk's office handles his case administratively, the very kind of administrative interference Bisasor alleges she engaged in at the state court level. Even if Gorham is formally recused from handling this specific case file, the optics of suing the Chief Deputy Clerk while the case is being managed in that same clerk's office are deeply problematic for the appearance of impartiality.

47. The significance of this arrangement warrants careful analysis. A person who personally retaliated against Bisasor in the state-court proceedings, whose conduct underlies claims in this very case, who possesses personal knowledge of disputed evidentiary facts, and who has a direct personal interest in the outcome of this litigation, now occupies a senior administrative position in the court adjudicating that case. This is not a situation in which a court employee has a remote or attenuated connection to the proceedings. Gorham's personal conduct is substantively at issue in this case. Her interest in the outcome is immediate and concrete. First, putting aside her being a (proposed) named defendant herself for a moment, if Plaintiffs' claims against Judge Messer succeed, Gorham's own role in initiating and coordinating the retaliatory conduct will be exposed to scrutiny. Gorham will be called as a witness or co-conspirator in the claims against Messer. This structural conflict is not speculative but is based on documented facts and direct personal involvement. Gorham has taken concrete, documented actions in this very case that

Plaintiffs contend are retaliatory. She personally directed that Bisasor be banned from directly contacting the clerk's office. She subsequently mentioned her behind-the-scenes communications with Messer (a named defendant) thereby confirming not only an administrative involvement in this case but an operational entanglement with a party to it. This court's administrative apparatus is thus not neutral. The Chief Deputy Clerk who manages it is a Gorham-Messer institutional ally, is a witness or participant in the acts alleged against Messer, is personally adverse to Plaintiffs, and is herself a defendant in related litigation arising from the same underlying facts. Judge Elliott, who sits atop this administrative structure as Chief Judge, cannot plausibly claim that all of this is somehow irrelevant to the issue of, at least, the appearance of conflict, nor can she plausibly claim unawareness of these facts because her own prior recusal confirms she was aware of the conflict with Gorham before this case was filed.

### D. The Prior Recusal and Its Implications

48. The conflict involving Gorham is further sharpened by the following. In 2024, Plaintiffs filed a federal civil rights action captioned *Bisasor v. New Hampshire Judicial Branch*, in which Karen Gorham is named as a defendant. The case was transferred first from the federal court in Massachusetts and then this court. Judge Elliott recused herself from that action, along with the other judges of this court. The case was then transferred to the federal court in Maine. Thus, Judge Elliott is not merely aware of that case in the general sense, but she is aware that her own recusal from it was required.

49. Thus, Judge Elliott's prior recusal establishes two facts that are legally dispositive for purposes of this motion. The first fact is that Judge Elliott had actual, documented knowledge (memorialized in the court's own records) that Gorham's status as a defendant in Plaintiff's related litigation created a conflict requiring recusal. The prior recusal is not a voluntary act of caution that the judge is now free to reconsider in a new context. It is a legal determination that has already been made. A judge who has formally concluded that she cannot preside impartially over a case in which a specific person is a named defendant cannot credibly maintain that the same person's role as her court's Chief Deputy Clerk creates no analogous conflict in a related proceeding arising from the same underlying events. The logic of § 455(a) does not permit a judge to acknowledge a conflict in one proceeding while simultaneously denying

it in another, when the conflicting relationship has not changed, when the same litigant is on the other side, and when the pending case arises from the same factual matrix that made the original recusal necessary. Judge Elliott already told the judicial system (through the formal mechanism of recusal) that Gorham's involvement in Plaintiff's litigation creates a disqualifying conflict. That determination constitutes an estoppel against any contrary conclusion here.

50. The second fact the prior recusal establishes is that this conflict is not abstract or speculative. The Chief Deputy Clerk who manages it is personally adverse to Plaintiff, is a documented correspondent with one of the defendants in this very case and is herself a named defendant in related litigation from which this Court has already formally acknowledged a conflict. A judge cannot maintain her assigned position over litigation in which the second-highest officer of her court is actively adverse to one of the parties, has communicated behind the scenes with a named defendant about that party, and is herself a defendant in related litigation arising from the same events that gave rise to this case. The structural conflict is not mooted by the passage of time or by any subsequent administrative development. It is instantiated in every case management decision that flows through Gorham's office and in every interaction between this court's administrative apparatus and the parties. Note: There has been no action or order by the court to sequester Gorham from this case or its administrative handling.

### E. The Prior Recusal Estoppel and Continuing Structural Conflict
#### i. The Prior Gorham Involvement Requires Recusal and Transfer

51. The claims against Judge Messer are inextricably intertwined with Gorham's personal conduct. Gorham initiated the administrative retaliation that Messer continued[5]. Gorham communicated with Messer behind the scenes about the Bisasor matter. Gorham has personal knowledge of the facts Plaintiffs will need to prove at trial. The difference between a case in which Gorham is formally named as a defendant and a case in which Gorham's conduct is substantively at issue, and she has a direct personal stake in the outcome is, for purposes of § 455, no difference at all.

---

[5] NB: The underlying facts are alleged in the proposed Second Amended Complaint, and are summarized here solely to establish a predicate for recusal.

52. The test under § 455(a) is not whether the court officer is a party of record. The test is whether a reasonable person, knowing all the relevant circumstances, would question the court's impartiality. A reasonable observer would not draw a meaningful distinction between these two cases. In both, the fundamental concern is identical. The court's Chief Deputy Clerk has a personal interest in the outcome that creates an appearance of partiality. The prior recusal implicitly acknowledges this principle. The failure to apply it with equal force here would be inconsistent with the reasoning that compelled the earlier recusal. The same structural conflict exists here, and it requires the same result.

53. Thus, a threshold question is whether transfer is required where the same Chief Deputy Clerk (whose administrative role is inseparable from the management of every case on this Court's docket) continues to operate as the second-highest court officer over a case in which she is an interested party or where Plaintiffs have named her as a defendant[6], while the judge who has already formally acknowledged her own conflict with Gorham nonetheless presides over these proceedings.

### ii. The Amendment Regarding Gorham's Involvement Requires Recusal and Transfer

54. Gorham's conflict is part of the factual predicate for the motion to amend and pending amendment. No reasonable observer, knowing that the federal judge assigned to this case was being asked to rule on claims against her own Chief Deputy Clerk, could conclude that those proceedings carry the appearance of impartial adjudication.

55. Further, Judge Elliott has to decide whether to permit an amendment that would make her own Chief Deputy Clerk a named defendant in this action. That decision requires a judicial judgment about the potential merit of the proposed claims[7] against Gorham. No judge can make that judgment impartially when the proposed defendant is her own subordinate administrative officer. The decision whether to

---

[6] It should be noted that Karen Gorham was a defendant in related litigation that was transferred to the federal court of Maine. However, that action was voluntarily dismissed to be re-filed with a proper amended complaint, as permitted under the rules and, if necessary, under the NH savings statute. While plaintiff reviews the options thereto, which may or may not be revisited with another action, the addition of Karen Gorham to this case makes coherent sense because of her connection to Judge Amy Messer and her involvement in the very conduct at issue in this case. Further, it allows plaintiff the ability to bring claims against Karen Gorham without having to incur new filing fees in a new separate case. This accords with judicial economy and efficiency as well.
[7] It should be another judge that determines the potential merits of the claims against Gorham given the conflict or appearance of conflict of Judge Elliott.

allow claims against Gorham to proceed is a decision that directly implicates the welfare of an officer whose daily work is entrusted to the judge's administrative supervision. The conflict is irreconcilable.

56. It would be most unseemly for a chief judge to deny a motion to amend complaint to prevent her deputy clerk from becoming a defendant in the case over which the chief judge presides.

---

## SECTION 3: PREJUDICIAL IRREGULARITIES/EVENTS INDICATING PERVASIVE BIAS

---

### I. THE CASE MANAGEMENT ORDER
#### A. Overview of the Problematic Orders and Events

57. For a systematic review of the prejudicial irregularities indicating pervasive bias (which is further grounds for recusal/transfer), the accompanying affidavit to this motion to recuse should be reviewed carefully.

58. To begin, it should be noted that, on 2-9-26, Judge Elliott issued two orders simultaneously, the CMO, as mentioned above, and an Order on the Motion to Compel Diversity Disclosures (Doc. 92). Taken together, these orders contain a filing restriction that functions as a de facto gag order on plaintiffs.

#### B. The Filing Restriction Operates as an Unauthorized Pre-Filing Injunction

59. The Order on Diversity Disclosures (Doc. 92) states: "*Consistent with the case management order also issued today, the plaintiffs are not permitted to file any response to the defendants' sworn statements unless directed to do so by the court*". This language, when read in conjunction with the CMO itself, effectively prohibits plaintiffs from filing anything in the case without prior court permission. This is, in effect, a pre-filing injunction.[8]

60. This is further reinforced by a later court order, on 3-5-26, stating: "*The court will not…entertain matters unrelated to the merits of this case until it can determine whether the plaintiffs have asserted viable claims.*"

61. Federal courts have recognized that pre-filing injunctions are among the most extreme sanctions available and must be approached with particular caution, especially when directed at pro se litigants. The federal circuits have uniformly held that before any such restriction can be imposed, the court must, at a minimum: (1) provide the affected party with notice and an opportunity to be heard; (2) make specific, substantive findings on the record demonstrating that the party's conduct is frivolous in nature;

---

[8] See Cok v. Family Court of Rhode Island, 985 F.2d 32 (1st Cir. 1993) (pre-filing injunctions require notice, opportunity to be heard, substantive findings, and narrow tailoring) and Castro v. United States, 775 F.2d 399 (1st Cir. 1985) (same).

(3) compile an adequate record for appellate review; and (4) narrowly tailor the restriction to address only the specific problematic conduct identified. These requirements derive not merely from prudential considerations but from the fundamental due process guarantees of the Fifth Amendment and the right of access to the courts recognized under the First Amendment and the Petition Clause.

62. Here, Judge Elliott issued the filing restriction without any prior notice to plaintiffs, without any opportunity for plaintiffs to be heard, without any formal or substantive finding that plaintiffs' conduct has been frivolous, and without any narrowly tailored scope. No motion by any party requested such a restriction. Judge Elliott simply inserted this prohibition into its orders sua sponte. Moreover, the court itself acknowledged on 1-23-26 that plaintiffs had raised legitimate questions about the defendants' citizenship disclosures and ordered the defendants to file supplemental sworn statements. It is therefore logically inconsistent and procedurally unjust for the court to simultaneously acknowledge the legitimacy of plaintiffs' jurisdictional challenge while prohibiting them from responding to the very evidence that will determine whether the court possesses subject matter jurisdiction.

### C. The Filing Restriction Violates Due Process and the Right of Access to Courts

63. The right of access to the courts is a fundamental constitutional right, protected under the First Amendment's Petition Clause and the Due Process Clause of the Fifth Amendment. A blanket prohibition on filing, imposed without notice, hearing, or findings, constitutes a deprivation of that right without due process. The Supreme Court has consistently held that even incarcerated individuals retain the right to file pleadings with the court, and restrictions on that right must satisfy stringent constitutional standards. Pro se civil litigants are entitled to at least as much protection. The CMO and Doc. 92 collectively strip plaintiffs of the ability to file motions, or other pleadings unless first granted permission.

### D. The Filing Restriction Impairs Plaintiffs' Ability to Challenge Subject Matter Jurisdiction

64. Subject matter jurisdiction is not a matter of discretion, and the court is obligated to assure itself of its own jurisdiction at every stage of the litigation. The Supreme Court has held that subject matter jurisdiction can be raised at any time, by any party, and even by the court sua sponte, and that it can never be waived or forfeited. If the defendants' supplemental sworn statements reveal a defect in

diversity, the court would be obligated to remand the case for lack of jurisdiction. By prohibiting the plaintiffs from filing any response to those sworn statements unless directed to do so, the court is effectively silencing the only parties who have interest in challenging the adequacy of defendants' jurisdictional showing; yet it is the defendants carry the burden of establishing diversity jurisdiction as removing parties, while the court acknowledged "further limited inquiry into jurisdiction is appropriate".

### E. The Order Was Issued Without a Rule 16 Conference or Meaningful Input from the Plaintiffs

65. Under Federal Rule of Civil Procedure 16(b), a scheduling order is ordinarily issued following a conference with the parties, or at a minimum, after receiving input from the parties on the matters to be addressed. The court denied plaintiffs' motion for a case management conference on 11-17-25. The CMO was therefore issued without any conference, without any input from plaintiffs, and without any opportunity for plaintiffs to raise objections to its terms before it took effect. For a case management order that contains a filing restriction tantamount to a pre-filing injunction, the absence of any participatory process is a serious procedural deficiency.

### F. The Court Has Never Held a Single Hearing in This Case

66. Perhaps one of the most troubling contextual fact is that Judge Elliott has never held a single hearing in this case, not on the motion to remand, not on the motions to dismiss, not on any procedural matter, and not on the CMO itself. The plaintiffs have filed multiple motions for hearing, all of which have been denied or benched. Both Judge William Young (D. Mass.) and Judge Talesha Saint-Marc (D.N.H.) scheduled hearings on the same or similar claims when the case was before them in related proceedings. Plaintiffs are pro se, asserting civil rights claims, including racial discrimination, against represented defendants. The total absence of any opportunity to appear and be heard, combined with a filing restriction that silences them further, raises serious concerns about the appearance/reality of fairness.

### II. OTHER PROCEDURAL/ADMINISTRATIVE IRREGULARITIES INDICATING BIAS

67. There are numerous occurrences in this case that indicate or that give rise to an inference of prejudice or bias permeating this matter. These are documented in the accompanying affidavit to this motion[9].

---

[9] Nothing in this motion asks the Court to find bias from judicial rulings standing alone. Liteky v. United States, 510 U.S. 540, 555 (1994). The main grounds for disqualification here are extrajudicial: Judge Elliott's board service at NHLA during years when

68. An illustration of concrete prejudice arising from the court's administrative apparatus is the sequence involving case manager Vincent Negron. On approximately 2-13-26, Negron admitted in writing that he had failed to process Plaintiff's timely-filed medical documentation: "*My apologies, Mr. Bisasor. Looks like I missed your email containing the medical documentation*." Within 4 days of that written admission, Negron was reassigned from this case.

69. The significance of this sequence extends beyond the administrative failure itself. The Court's 2-9-26 order had cited Plaintiff's alleged failure to file the very medical documents that Negron had already lost as grounds for a warning of potential sanctions for "*knowing and intentional misrepresentation*." The clerk's office lost Plaintiff's documents; the court threatened Plaintiff with sanctions for misrepresentation on the basis of their loss; the case manager was quietly reassigned without explanation; no corrective order was ever issued for the threat of sanctions for conduct that was actually the clerk's error. That sequence is not within the range of normal administrative error. It is evidence of an administrative apparatus operating in a manner consistently adverse to this Plaintiff, under the supervisory authority of the Chief Judge who is the subject of this motion.

70. Prior Chief Judge McCafferty had specifically acknowledged the validity of Plaintiff's concerns about clerk conduct and indicated that the problems would be addressed and would not continue. They were not corrected under Chief Judge Elliott's administration. The administrative record of complaint (documented through formal channels beginning in July 2025, when Plaintiff first filed a formal complaint with the First Circuit) predates the CMO, predates Judge Elliott's tenure, and establishes a sustained pattern that continued through and beyond the issuance of the CMO. On 11-5-25, Plaintiff notified Assistant Circuit Executive for Legal Affairs Gina Riccio that his concerns about the court's treatment of him "*now also includes a judge*." It should be noted Judge Elliott has since received similar

---

NHLA represented plaintiffs; her prior recusal from related litigation involving Karen Gorham; and Gorham's present role as Chief Deputy Clerk of this court. The rulings discussed in Section 3 are pertinent only because Liteky itself recognized the 'pervasive bias' exception, where rulings, taken cumulatively with other evidence, reflect 'deep-seated favoritism or antagonism that would make fair judgment impossible.' Id. at 555. The rulings are offered not as standalone proof of bias but as corroboration of the structural conflict.

complaints forwarded to her via first circuit administrative procedures, but she has not responded to any of them at all, in contrast to what Judge McCaferty did, as she is required to do under said procedures.

71. Separately, the email chain involving Clerk Tracy Uhrin, former case manager Vincent Negron, and Bisasor reveals a troubling sequence of events where Negron admitted to error regarding Bisasor's confidential medical documentation, Judge Elliott had threatened Bisasor with sanctions for allegedly failing to file that very documentation, and Negron was subsequently removed from the case without any corrective order being issued by the court.

72. There are several other examples, which, due to space, will be addressed in an accompanying affidavit.

73. The bottom line is that the individual administrative problems/items noted in this section above, considered individually, may or may not necessarily compel recusal. But the reasonable observer does not evaluate each ruling in isolation. The reasonable observer examines the pattern and asks whether that pattern, in that context, is consistent with the appearance of impartial adjudication. The answer, for the reasonable observer who has been presented with all these facts simultaneously, is that it is not.

---

## SECTION 4: CONCLUSION AND RELIEF REQUESTED

---

### A. THE CUMULATIVE EFFECT OF ALL GROUNDS

74. The law does not require proof of actual bias; only that the circumstances would cause a reasonable, informed observer to question impartiality.

75. The standard is not whether any single factor is disqualifying, it is whether the totality of circumstances would cause a reasonable person to question the judge's impartiality.

76. Section 455(a) does not ask whether the judge is likely to be biased against the moving party. It asks whether a reasonable observer would question her impartiality. A judge who is connected to both the defendants and the plaintiffs' cause (through legal aid affiliations) presents the appearance of a conflict not because the observer can predict the direction of any bias, but precisely because the observer cannot. The statute eliminates that uncertainty through mandatory recusal, allowing the litigation to proceed before a judge whose neutrality is not in question.

77. The governing precedents are uniform in requiring that the reasonable-observer inquiry be conducted cumulatively, not individually. Each ground for recusal is assessed not in isolation but as part of the complete factual picture. The First Circuit has recognized that multiple factors, each of which might be insufficient individually, may together compel recusal when evaluated in their aggregate. In re Martinez-Catala, 129 F.3d 213 (1st Cir. 1997). This principle reflects the structure of the reasonable-observer standard itself. The reasonable observer is shown everything at once, does not apply a checklist of independent tests but forms a holistic judgment about whether, given all of this together, a person of ordinary intelligence and good judgment would question the judge's impartiality. No reasonable observer, presented with this complete picture, could conclude impartiality is not reasonably in question.

78. From a game theory perspective, under the above circumstances, the decisions from Judge Elliott cannot be trusted; not because she is necessarily acting in bad faith, but because the structural incentives are aligned against plaintiffs who have no way to verify neutrality. Neither game theory nor section 455 require bad faith to be proven. It requires assessment of whether the decision-maker's incentive structure is aligned with giving plaintiffs a fair outcome. Here, it is not.

79. Consider the incentives Judge Elliott faces. She is the Chief Judge of a small federal district. Her Chief Deputy Clerk is a (proposed) named defendant in this case. Her Clerk of Court has been the subject of plaintiffs' complaints. A case manager had to be removed from this case. She served as head (and on the board) of an organization connected to this case. She has already invested significant judicial capital in the CMO. Granting plaintiffs' motion to amend the complaint validates the plaintiffs' concerns including against Karen Gorham. Denying the motion to amend the complaint achieves the opposite result. This is a structural incentive for Judge Elliott to view plaintiffs' filings skeptically and to rule against plaintiffs, and there is no external check on that incentive unless recusal is sought.[10]

---

[10] Submitting a recusal motion requires the judge to rule on the conflict before ruling on the motion to amend. This also preserves the appellate record, if recusal is denied, which shows the First Circuit that plaintiffs raised the conflict prior to ruling on the merits, and the judge overruled it.

80. This is what game theorists call a principal-agent problem with adverse selection. The judge is plaintiffs' agent (she is supposed to deliver justice), but she was not selected by plaintiffs, her interests are not aligned with plaintiffs, and plaintiffs cannot monitor whether her decisions are the product of neutral evaluation or structural bias. When the agent has conflicts and the principal has no monitoring mechanism, the rational response is not to trust blindly but seek a safeguarding hedge or remedy.

81. Here, the proper remedy is recusal and transfer under 28 U.S.C. §291 or designation of a judge from another circuit, not the continuation of proceedings before a structurally compromised tribunal.

### B. TIMING

82. This motion is timely. Section 455(a) imposes a continuing duty; there is no fixed deadline for its invocation. Liljeberg, 486 U.S. at 862. Further, the full factual predicate crystallized only after (i) the March 25, 2026 motion to amend added Karen Gorham as a proposed defendant, and clarified the involvement of Berry in the underlying matter; (ii) the combined effect of the 2-9-26 CMO and subsequent orders made clear that Judge Elliott would not self-recuse despite the mounting conflicts of record. Bisasor files this motion promptly thereafter, within approximately 4 weeks of the motion to amend, and contemporaneously with his mandamus petition to the First Circuit.

### B. REQUEST FOR STAY

83. Concomitant to this motion to recuse, Bisasor further requests a stay of all proceedings pending resolution of this motion. A stay is necessary because, if recusal is granted following further proceedings by a disqualified judge, those proceedings will require review by the new judge, imposing duplicative burdens on Plaintiffs and producing no corresponding benefit to the integrity of the judicial process. The mandamus filing also seeks directive that all proceedings be stayed pending that recusal. The pendency of that mandamus petition provides an additional, independent basis for the requested stay.

### C. CONCLUSION

84. This case requires the Court to apply settled law to documented facts. The law requires that federal judges disqualify themselves when a reasonable, fully informed observer would question their impartiality, when they possess personal knowledge of disputed extrajudicial facts, or when the probability of bias is constitutionally intolerable under the Due Process Clause. Each element of this

motion is grounded in documentation. Nothing in it is speculative. Every fact on which this motion relies can be independently verified by any reader of this document. The facts indicate that this court is not the proper venue for this case.

85. The appropriate remedy is recusal and transfer. Chief District Judge Samantha D. Elliott should be recused from all further proceedings in *Bisasor v. Donais*, Civil No. 1:25-cv-00251-SE-AJ, and the case should be transferred to another district judge. The plaintiffs before this Court, like all litigants in the federal system, are entitled to a judge who brings no prior institutional loyalties to the bench.

## D. RELIEF REQUESTED

86. WHEREFORE, Bisasor respectfully requests that the Court:

a) Recuse Chief District Judge Samantha D. Elliott from all further proceedings in this case.

b) Reassign and transfer this case to another Article III judge from another district designated under 28 U.S.C. § 292[11] to the District of Massachusetts or another appropriate district, outside the District of New Hampshire, under 28 U.S.C. § 1404(a) to ensure the appearance of fairness with no connection to the NH legal community organizations, parties, and counsel identified in this motion;

c) Vacate all prior orders in this case, to be reconsidered by the reassigned judge, as permitted by law;

d) Stay all proceedings pending resolution of this motion and any mandamus proceedings; and/or **hold a hearing on this motion[12]**; and/or Grant further relief as the Court deems just and proper.

Respectfully submitted,
/s/ Andre Bisasor
Dated: April 21, 2026                                                                     Andre Bisasor

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served to the defendants in this case.

/s/ Andre Bisasor
Andre Bisasor

---

[11] As the motion seeks to terminate the case in this court, similar to a remand motion, it is Bisasor's understanding that it is considered a case terminating motion.

[12] In addition, for transparency and disclosure under the Canons of Judicial Conduct, Judge Elliott should disclose on the record the nature/extent of all professional, institutional, social, and organizational relationships between Judge Samantha Elliott and Defendants in this case; and the nature and extent of any relationship/communications with Attorney Elliott Berry regarding this litigation or related matters, including at the time plaintiffs were represented by NHLA and Berry.