UNITED STATES DISTRICT COURT-DISTRICT OF NEW HAMPSHIRE
CIVIL ACTION NO: 1:25-cv-00251 |BISASOR v. DONAIS, et. al.

## AFFIDAVIT[1] FOR MOTION TO RECUSE JUDGE SAMANTHA D. ELLIOTT

1. I, Andre Bisasor, a plaintiff in the above-captioned case, hereby provide this accompanying affidavit and further state the following in support of the motion to recuse Judge Samantha D. Elliott. First, I hereby state that the facts averred to in the actual motion to recuse filing are true, correct and accurate to the best of my knowledge. Any facts stated are upon personal knowledge and where personal knowledge is not asserted, such facts are stated upon reasonable inference or upon supportable information and belief. In addition, I further state/aver the following based on the same factors and conditions provided above.

_____

### SECTION 1: FURTHER ON FACTS ESTABLISHING CONFLICT
_____

### A. NHLA's Representation of Plaintiffs and Judge Elliott's Role as NHLA's President During That Representation

2. The connection between Judge Elliott and the attorney of record in Plaintiffs' underlying matter is direct. On or about 1-12-17, Plaintiffs entered into a retainer agreement with New Hampshire Legal Assistance as the organization for representation in the underlying tenancy matter, commonly referred to as the Homewood Suites matter, out of which the claims in this case arose. The attorney of record was NHLA itself. NHLA, as a corporate entity, was the plaintiffs' lawyer. Elliott Berry, then a senior staff attorney at NHLA, was the particular NHLA lawyer assigned to handle the file. The client-lawyer relationship, the duty of loyalty, and the appearance entered in the state-court proceedings all ran to NHLA. NHLA's representation of Plaintiffs continued through 2017, and Berry continued to provide legal advice and assistance on the same or similar underlying matter from 2017 through approximately March 2022, including during the New Hampshire Superior Court proceedings before Judge Amy Messer that are part of the factual predicate for this federal case.

_____

[1] This affidavit is intended as an attachment, to accompany and be read together, with the motion to recuse Judge Elliott filed yesterday. This affidavit, which was referenced/incorporated in the motion to recuse, is to be treated as part of the same filing.

3. During the period of that representation, Judge Elliott was the sitting President of NHLA. She served on NHLA's board from approximately 2011 through 2018 and as NHLA's President from 2014 to 2017. In other words, at the moment the retainer agreement was signed on or about 1-12-17, the head of the organization that was taking Plaintiffs on as clients on this very matter was the person who now sits as Chief District Judge of the District of New Hampshire presiding over the case. She then served as Co-Chair of NHLA's Board in 2017 to 2018, again contemporaneous with the ongoing representation. Judge Elliott was the chief officer of the corporation that was the plaintiffs' attorney of record during the material representation period.

4. These facts are a matter of public record and of the records of NHLA's own engagement with Plaintiffs. They do not require inferences about what Judge Elliott knew personally about Berry, about the file, or about the clients. The relationship is institutional and documented. The organization that was Plaintiffs' lawyer was an organization Judge Elliott led. The representation began while she was president. It continued while she was on the board. The substantive legal work on the matter continued for years thereafter through the same staff attorney, Berry, on behalf of the same organization, NHLA.

**B. Judge Elliott's Service as President of NHLA During NHLA's Representation of Plaintiffs on the Same Underlying Matter Independently Requires Disqualification Under § 455(b)(2) and Canon 3C(1)(b), and Under § 455(a)**

5. This is an independent and significant categorical ground for disqualification. The organization that served as attorney of record for Plaintiffs in the underlying matter was itself an organization Judge Elliott led as President during the material period of representation. This ground does not necessarily depend on any inference about Berry's personal relationship with the judge. It depends firmly on what the court records of the underlying matter and the public records of NHLA's governance already show: NHLA was the plaintiffs' lawyer, and Judge Elliott was NHLA's president at the time.

6. Section 455(b)(2) requires disqualification where "a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter." 28 U.S.C. § 455(b)(2). Canon 3C(1)(b) of the Code of Conduct for United States Judges codifies the identical rule. The Model Code of Judicial

Conduct, Rule 2.11(A)(6)(a), which articulates the nationally recognized standard, provides the same rule in nearly identical terms. These are not appearance provisions; they are per se disqualification provisions. Where their elements are met, recusal is required as a matter of rule.

7. The elements are met here. NHLA was Plaintiffs' attorney of record. A lawyer's client engagement under black-letter agency and ethics doctrine runs to the firm, not to the individual lawyer assigned; the firm is the lawyer, and staff attorneys act as its agents. When a judge was the president of the organization that was the attorney of record, and staff attorneys of that organization "served during such association as a lawyer concerning the matter," the statutory language is satisfied on its face. Berry was NHLA's staff attorney assigned to the file; he "served" as NHLA's lawyer on the matter during the period Judge Elliott was associated with NHLA as its President. The relationship is direct, structural and documented.

8. Independently of the per se analysis, the NHLA-as-attorney-of-record framing also provides the strongest possible ground for disqualification under § 455(a). When the organization that was the plaintiffs' attorney of record was an organization the judge led, the observer does not reach for balancing tests. The observer reaches the only conclusion a fair-minded person can reach. Section 455(b)(2) is triggered on its face. It is a per se rule. No appearance analysis is required. The judge must recuse, and the case must be reassigned.

## C. Prior Notice of Grounds for Recusal and The Procedural Barriers Erected After That Notice

9. On 11-6-25, Bisasor delivered a written "Letter of Concerns to Chief Judge" in this case, captioned "Administrative Concerns Regarding Case Management and Appearance of Bias." A true and correct copy of that letter is attached hereto. The letter was routed through Gina L. Riccio, Assistant Circuit Executive for Legal Affairs for the United States Courts for the First Circuit, who at all relevant times served as the designated channel for complaints and concerns about administration and staff in the district courts of the First Circuit, and who on prior and subsequent occasions in this matter confirmed in writing that correspondence of this kind is forwarded to the Chief Judge of the employing district. In particular, on 12-23-25, Ms. Riccio confirmed in writing to Anderson that "I have forwarded your

correspondence to Chief Judge Elliott of the U.S. District Court for the District of New Hampshire." A true and correct copy of that 12-23-25 email is attached hereto. That forwarding practice was not a one-off: on 7-29-25, Ms. Riccio likewise confirmed in writing that she had "forwarded this correspondence to Chief Judge McCafferty," then the Chief Judge of the District of New Hampshire, and a true and correct copy of that earlier confirmation is attached hereto to show that the channel operated consistently throughout this matter.

10. The 11-6-25 letter identified Judge Elliott's prior service on the board of directors of New Hampshire Legal Assistance, including her service as board president, and her co-chair role on the founding board of 603 Legal Aid at the time of the June 2021 merger. Second, it stated that Attorney Elliott Berry of New Hampshire Legal Assistance is materially involved in this case and that Mr. Berry has made statements that go to the heart of the claims in this litigation. Third, it invoked 28 U.S.C. § 455(a) by name and framed the concern in the statute's own language, stating that "there exists at minimum an appearance of bias that 'might reasonably [cause a person's] impartiality [to be] questioned.'" Fourth, it put on the record that Judge Elliott would have been on the NHLA board during the period NHLA was providing representation to plaintiffs, and that overcompensation arising from that association, including harsher treatment directed at plaintiffs in order not to appear biased in the other direction, could itself trigger recusal. Fifth, it made a formal request that "this potential conflict be examined to determine whether recusal is appropriate," and it asked, in the closing Request for Administrative Review, that the Chief Judge "[r]eview Judge Elliott's prior association with New Hampshire Legal Assistance and determine whether recusal is appropriate given NHLA's involvement in this case through attorney Elliott Berry," and "[c]onsider whether reassignment of this case to a different judge is appropriate."

11. The Berry/NHLA conflict described in the 11-6-25 letter is the same conflict now being asked of this Court to resolve in the pending motion to recuse. The letter placed the grounds before the Chief Judge of this district, through the First Circuit's established administrative channel, more than two and a half months before the 1-30-26 Notice of Intent to File Critically Important Motions, and more than five

months before the filing of the present motion to recuse. No administrative response addressing the Berry/NHLA concern was ever issued, and plaintiffs have received nothing indicating that the conflict was examined, resolved, or even acknowledged on the merits through that channel.

12. Instead of an administrative response to the conflict, the next development of substance was the entry of the CMO on 2-9-26, Doc. no. 91, signed by Judge Elliott in her capacity as the presiding judge. That Order expressly catalogs, as item (13) among the plaintiffs' anticipated motions, "a motion to recuse and transfer the case." Having thus shown that the recusal motion was fully visible to the court, the Order then imposes a general rule that "the plaintiffs may not file any motion, objection, response, reply, surreply or other document in this court, without first seeking the court's permission to file such document." The Order enumerates the narrow categories of filings that are exempt from that leave-of-court gate, and the motion to recuse is not among them. The Order further provides that "[m]otions or other documents filed in violation of this Order may be summarily denied or stricken by the court," and it warns that noncompliance "may result in the imposition of additional filing restrictions or other sanctions, including, but not limited to, monetary sanctions."

13. Taken in combination with the prior 11-6-25 notice, the practical effect of the CMO was to interpose a blocking and chilling mechanism between the plaintiffs and the very motion that would place the § 455(a) conflict formally on the docket and squarely before the court. A pro se litigant faced with this must first prepare and file a three-page "Motion for Leave to File," certify that the proposed filing satisfies enumerated content criteria, attach the proposed motion, and then await a decision by the same judge whose impartiality the proposed motion would call into question, all while exposed to the express warning that a filing deemed out of compliance "may be summarily denied or stricken" and that further filing restrictions and monetary sanctions are on the table.

14. The sequence here is not neutral. Plaintiff raised the Berry/NHLA conflict in writing to the Chief Judge of this district in November 2025. Plaintiff previewed the recusal motion in the 1-30-26 Notice of Intent, Doc. no. 87, as item (m). Ten days later, on 2-9-26, the presiding judge issued the CMO that, on its face,

acknowledges the contemplated recusal motion and, at the same time, places it on the wrong side of a leave-of-court barrier that does not apply to routine categories of filings. At no point during that sequence did the 11-6-25 concern receive any substantive response, and at no point did the presiding judge address, on the record, the possibility that the very barrier being erected would itself delay or impede the motion that was intended to bring the conflict formally before the court.

15. Plaintiff do not offer the above as argument. Plaintiff attest to it as fact. The letter of 11-6-25 exists, is attached, and says what it says. The Gina Riccio email of 12-23-25 exists, is attached, and says what it says. The CMO of 2-9-26, Doc. no. 91, is on the docket of this Court and says what it says. The dates are the dates. Plaintiff brings the sequence to the Court's attention because it bears directly on two issues that are properly before the Court in deciding this motion: whether the present motion is timely, and whether the administrative handling of the Berry/NHLA concern between 11-6-25 and the present is itself a fact a reasonable, well-informed observer would weigh under 28 U.S.C. § 455(a).

16. This further raises concerns and strengthens the appearance-of-impartiality grounds for recusal in showing that the conflict was evidently on the Chief Judge's desk, through the First Circuit's complaint channel, before the rulings that the 2-9-26 ruling of Judge Elliott, and no recusal or administrative response followed.

---

## SECTION 2: FURTHER ON FACTS ESTABLISHING PERVASIVE BIAS
---

### I. THE COURT'S REFUSAL TO CONSIDER A MOTION FOR RECONSIDERATION OF CMO BY DENYING MOTION TO EXTEND TIME IS MANIFEST ERROR

#### A. Overview

17. Recently, the court denied a motion for extension of time to file a motion for reconsideration of the CMO. The court refused to even consider the allowance of filing of the motion for reconsideration of the CMO. This was manifest error and reflects pervasive bias for the following reasons.

18. The CMO or Case Management Order at issue, entered on 2-9-26, imposed sweeping filing restrictions on these *pro se* Plaintiffs. These restrictions were imposed without the scheduling conference required

by Federal Rule of Civil Procedure 16(b)(1), without prior notice, and without any opportunity to be heard. The CMO sharply curtails Plaintiffs' ability to access this Court, limits them to narrowly defined categories of filings, and threatens sanctions for any perceived noncompliance. The CMO was issued unilaterally, at a time when multiple motions remained pending and the case was still in its infancy.

19. When Plaintiff sought a modest extension of time, merely 21 additional days, from 2-23-26 to 3-16-26, to prepare a careful and considered motion for reconsideration of these restrictions, the Court denied the request on the grounds that it would not permit "*further delay*" or entertain "*matters unrelated to the merits of this case*." Doc. 101 at 1–2. That characterization constitutes manifest error. A motion to reconsider the very filing restrictions that govern how Plaintiffs may litigate the merits is, by definition, a matter directly and fundamentally related to the merits.

20. First, it should be noted that this action was commenced on 7-2-26, when Defendants removed the case from the Hillsborough Superior Court North, to this Court. The case involves deeply personal claims with serious consequences for the Plaintiffs, who are navigating the federal court system without the benefit of counsel.

21. On 2-9-26, the Court entered the CMO without first conducting a case management conference as contemplated by Federal Rule of Civil Procedure 16(b)(1) and without consulting with Plaintiffs regarding its terms. The CMO contains extensive filing restrictions including limiting Plaintiffs to filing only those documents that fall within specifically enumerated categories, requires pre-filing certification of good faith, and warns that noncompliant filings will be stricken with potential sanctions. Paragraph 2 enumerates the permitted filing categories; Paragraph 3 imposes the sanctions framework.

22. Paragraph 2(C) of the CMO provides that "*either party may file a single motion to reconsider any order within 14 days of the date of the order at issue*." This provision expressly recognizes the right of the parties to seek reconsideration of court orders, including the CMO itself. By denying the extension of time to prepare such a motion, the Court effectively nullified the very right that the CMO purports to preserve.

23. On 2-23-26, Plaintiffs filed their Motion to Extend Time (Doc. 100), requesting until 3-16-26 to file their motion for reconsideration of the CMO. The request was a mere 21 additional days to allow Plaintiffs adequate time to prepare a substantive and well-supported challenge to the filing restrictions that govern every aspect of their participation in this litigation. The grounds for extension was the same or similar to that articulated for the (granted) extension of the deadline to file motion to amend the complaint.

24. On 3-5-26, the Court denied the motion (Doc. 101) stating that it would not permit "*further delay*" and would not entertain "*matters unrelated to the merits of this case.*" The Court directed Plaintiffs to "*focus their time and energy on matters relevant to the merits.*" Doc. 101 at 1–2. The entirety of the Court's reasoning rested on the premise that challenging the CMO is a matter "*unrelated to the merits.*" As demonstrated below, that premise is legally and logically incorrect.

25. Local Rule 7.2(d) permits a party to move for reconsideration of an order by demonstrating the court committed a "*manifest error of fact or law.*" The First Circuit has recognized that reconsideration is warranted where the court has "*patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, or has made an error not of reasoning but of apprehension.*" *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 82 (1st Cir. 2008). A manifest error of law exists where the court misapplied or overlooked a controlling legal principle. *See Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 7 n.2 (1st Cir. 2005).

**B. Court Manifested Error by Characterizing Motion to Reconsider CMO as Unrelated to Merits**

26. The central error is the Court's characterization of a challenge to the CMO's filing restrictions as a matter "*unrelated to the merits of this case.*" That characterization is manifestly incorrect as a matter of law and logic. The CMO does not address collateral or administrative concerns peripheral to the litigation. It directly governs what Plaintiffs may file, when they may file it, and under what conditions, thereby controlling the very mechanism through which Plaintiffs must prosecute their claims on the merits.

27. A filing restriction, by its nature, stands between a litigant and the merits. If Plaintiffs are unable to file certain motions, to seek discovery on particular issues, or to raise arguments that do not fit neatly within the CMO's enumerated categories, they cannot effectively litigate the merits regardless of how much "time and energy" they devote to the attempt. To characterize a challenge to those restrictions as

unrelated to the merits is to conflate the mechanism of litigation with matters truly collateral to it. The filing restrictions are not peripheral; they are the gateway through which every merits-based argument must pass. The First Circuit has long recognized that procedural barriers that impede a party's ability to present substantive claims implicate the merits themselves, not merely the administration of the docket.

28. The syllogism is straightforward: (a) the CMO restricts what filings Plaintiffs may make; (b) the merits of Plaintiffs' claims can only be advanced through permissible filings; (c) therefore, a challenge to the restrictions directly implicates Plaintiffs' ability to litigate the merits. By denying the extension of time on the basis that such a challenge is "*unrelated to the merits*," the Court committed a manifest error of apprehension, precisely the kind of error that reconsideration under LR 7.2(d) is designed to correct.

**C. CMO Was Entered Without Conference Required by Federal Rule of Civil Procedure 16(b)(1)**

29. Federal Rule of Civil Procedure 16(b)(1) provides that "*the district judge—or a magistrate judge when authorized by local rule—must issue a scheduling order*" but only "*after consulting with the parties' attorneys and any unrepresented parties at a scheduling conference.*" The Advisory Committee Notes emphasize that this consultation is not merely a procedural formality; it ensures that scheduling orders, particularly those imposing significant constraints on litigation, reflect input from all parties and account for the practical realities of the case.

30. No such conference occurred before entry of the CMO in this case. A review of the docket confirms that no scheduling conference was held, no notice of a scheduling conference was issued, and no opportunity was afforded to Plaintiffs to discuss or object to the terms ultimately imposed. The CMO appeared on the docket on 2-9-26, without any prior indication that such sweeping restrictions were under consideration. This procedural deficiency is not trivial. The restrictions contained in the CMO go far beyond ordinary scheduling provisions; they fundamentally reshape the litigation landscape in ways that required party input. Had a conference been held, Plaintiffs would have had the opportunity to explain the complexity of their claims, or the pending motions, and the practical difficulties they face as pro se litigants, all of which bear directly on the reasonableness of the restrictions imposed.

31. The absence of a conference is particularly significant because the CMO was directed at *pro se* litigants. Courts throughout the First Circuit have recognized that *pro se* litigants are entitled to liberal construction

of their filings and should not be held to the same procedural standards as represented parties. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Imposing restrictive filing conditions on unrepresented parties without first providing notice and an opportunity to be heard raises serious due process concerns that warrant reconsideration.

**D. Denial of Extension Nullified Right to Seek Reconsideration Under Paragraph 2(C) of CMO**

32. The CMO at Paragraph 2(C) expressly provides that "*either party may file a single motion to reconsider any order within 14 days of the date of the order at issu*e." This provision implicitly acknowledges that orders may contain errors or impose unintended burdens and that parties should have a meaningful opportunity to seek correction. The provision applies by its plain terms to the CMO itself, which is, after all, an "order."

33. Plaintiffs' Motion to Extend Time (Doc. 100) sought precisely that opportunity. Plaintiffs did not seek an indefinite delay. They asked for 21 days, from 2-23-26, to prepare a single, carefully crafted motion addressing the constitutionality and procedural propriety of the filing restrictions. The request was made in good faith and well within the spirit of Paragraph 2(C).

34. By denying the extension and then characterizing any challenge to the CMO as unrelated to the merits, the Court placed Plaintiffs in an impossible position. The CMO's own Paragraph 2(C) grants a right to seek reconsideration; the Court's 3-5-26 order effectively extinguishes that right by foreclosing the time necessary to exercise it. A right that cannot practically be exercised is no right at all. Denial of Doc. 100 thus creates internal contradiction with the Court's own orders.

**E. Due Process Requires That Filing Restrictions on Pro Se Litigants Be Narrowly Tailored and Imposed Only After Notice and an Opportunity to Be Heard**

35. The First Circuit has consistently held that a court's inherent power to manage its docket, including the power to impose filing restrictions, must be exercised with restraint, particularly when directed at *pro se* litigants. In *Cok v. Family Court of Rhode Island*, 985 F.2d 32, 34 (1st Cir. 1993), the court cautioned that restrictive orders must be "*narrowly tailored*" and based on "*a record of abuse*." Similarly, in *In re Green*, 669 F.2d 779, 786 (D.C. Cir. 1981), the court emphasized that access to the courts is a constitutionally protected right that cannot be restricted without adequate procedural safeguards.

36. Due process requires, at a minimum, that a litigant be given notice that filing restrictions are under consideration and an opportunity to present arguments against their imposition. *See Pavilonis v. King*, 626 F.2d 1075, 1078 (1st Cir. 1980). Here, Plaintiffs received neither. The CMO was entered without warning. Plaintiffs had no opportunity to argue that the restrictions were unnecessary, overbroad, or based on an incomplete understanding of the case. The restrictions were not preceded by any finding that Plaintiffs had engaged in a pattern of frivolous filings. In fact, at the time the CMO was entered, the case was barely 7 months old and the parties were still in the early stages of litigation.

37. The breadth of the restrictions underscores the due process concern. The CMO does not merely set deadlines or establish a discovery schedule, the typical subjects of a scheduling order under Rule 16. Instead, it categorically limits the types of filings Plaintiffs may submit, requires pre-filing certification, and threatens sanctions. These are the hallmarks of a restrictive filing order, not a routine scheduling order, and they warrant the procedural protections attendant to such restrictions. The distinction is critical. A scheduling order governs the pace of litigation, while a restrictive filing order governs the scope of a litigant's access to the court. The latter implicates constitutional interests that demand heightened procedural safeguards, including adequate notice and an opportunity to be heard before the restrictions take effect.

**F. Court's Concern About Delay Is Addressed by Modest Time-Limited Nature of Relief Sought**

38. The Court expressed concern that entertaining the extension would cause "*further delay*." But the record does not support a finding of dilatory conduct. Plaintiffs have at all times endeavored to comply with the Court's orders and to advance their claims in a timely fashion. The request for 21 additional days was neither unreasonable nor dilatory. Federal courts routinely grant extensions of similar duration as a matter of course, particularly when sought by *pro se* litigants navigating complex procedural requirements. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396–98 (1993) (recognizing that *pro se* status is a relevant factor in evaluating excusable neglect and extensions of time).

39. Moreover, granting this motion for reconsideration and permitting Plaintiffs to file a motion to reconsider the CMO would not derail case progress. To the contrary, it would promote efficient

administration of justice by ensuring the procedural framework governing this case is fair, legally sound, and practically workable. A brief delay to address fundamental procedural concerns is far preferable to proceeding under a framework that may be constitutionally infirm. Plaintiff notes the deadline for filing the amended complaint was not until 3-25-26, and no trial date had been set. The litigation was in early stages, and a short pause to ensure procedural rules governing the case are properly calibrated would not have prejudiced any party.

### G. Pattern of Striking Filings & Threatening Sanctions Creates Chilling Effect on Court Access

40. The broader pattern of procedural events in this case is instructive. On 2-19-26, Plaintiffs filed a Motion for Correction of Record (Doc. 96) relating to the handling of medical documents. The Court struck that filing the same day, without briefing or analysis, and subsequently threatened sanctions. On 3-5-26, the same day the Court denied the extension of time, Plaintiffs filed a Motion for Partial Reconsideration (Doc. 102) seeking only to correct the record regarding circumstances surrounding the medical document error that the Court's own case manager acknowledged. Doc. 102 was denied on 3-10-26.

41. This pattern (filing restrictions imposed without conference, filings struck without analysis, reconsideration denied, and sanctions threatened) creates a chilling effect on Plaintiffs' willingness and ability to access the Court. The practical result is that *pro se* Plaintiffs, already at an inherent disadvantage, must navigate an environment where any filing risks immediate sanction. While courts unquestionably possess the authority to manage their dockets, that authority must be exercised in a manner consistent with due process and the fundamental right of access to the courts. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (inherent powers must be exercised with restraint and discretion).

42. The CMO's Paragraph 2(C) appears intended to provide a safety valve mechanism by which parties may challenge orders they believe to be erroneous. If that mechanism is rendered meaningless by denying the time necessary to invoke it, and if attempts to correct the record are summarily struck, then the procedural framework becomes not a tool of judicial efficiency but an impediment to justice.

## II. STRIKING THE MOTION FOR CORRECTION OF THE RECORD WAS ERROR

43. On 1-13-26, this Court directed Bisasor to file medical documentation supporting his request for an extension of time, with such documentation to be sealed at Level II. The order stated: "*Mr. Bisasor shall file medical documentation supporting his request, which shall be sealed at Level II.*"

44. On 1-15-26, Bisasor emailed the confidential medical documentation to case manager Vincent Negron under Level II seal, stating: "*Pursuant to the court's 1-13-26 order that you attached below, I hereby submit a confidential Level II sealed filing containing medical documentation supporting my 1-12-26 confidential motion.*" This submission was made 6 days before the 1-21-26 deadline.

45. On 2-9-26, the Court issued a CMO, stating, in part, that Bisasor "*failed to file such medical documentation*" and that said documentation must be filed by 2-23-26 or else face possible sanctions.

46. Upon reading this order, Bisasor immediately emailed the Court, the Clerk of Court Tracy Uhrin, and case manager Vincent Negron to alert them to the error and forwarded the original 1-15-26 email as proof of timely submission and requested urgent corrective action[2].

47. Within 20 minutes, Vincent Negron replied to Bisasor, copying Tracy Uhrin, stating: "*My apologies, Mr. Bisasor. Looks like I missed your email containing the medical documentation*".

48. On 2-13-26, Tracy Uhrin, Clerk of Court, emailed Bisasor informing him that the case had been "*reassigned to Judge Elliott's other case manager, Lianne.*" Yet, although Vincent Negron was evidently removed from this case, Ms. Uhrin's email did not acknowledge the clerk's office error, did not state that any corrective order would be issued, and did not address the outstanding warning. Instead Clerk Uhrin appeared to try to change the subject to technicalities of confidential submission, notwithstanding that the Cour's order stated Bisasor should email the case manager.

49. The record contained material factual error that, without correction, would have caused harm to Bisasor and his standing before the Court. The Court's 2-9-26 order stated that Bisasor "*failed to file*" medical

---

[2] In light of the threat of imminent sanctions, the failure of the clerk office or case manager in not providing Bisasor's filings to the judge, signaled a substantial breakdown in the processes of the court (or the reliability and integrity thereof) and was an extraordinary situation.

documentation and a possible pending conclusion that he "*made a knowing and intentional misrepresentation to the court.*" This finding was demonstrably wrong[3]. Bisasor submitted the documentation on 1-15-26, a total of 6 days before the deadline. The Court's own case manager admitted to his failure in this regard as it pertains to the submission.

50. The Court's order was also hasty, and lacked the diligence, measuredness and carefulness required of any Court before jumping to such an extreme conclusion about a litigant. The Court should have checked with its own case manager first before issuing such prejudicial (or potentially prejudicial) statements about Bisasor on the record.

51. Federal courts are required to correct clerical errors in their records. See Fed. R. Civ. P. 60(a) (permitting correction of "*a clerical mistake or a mistake arising from oversight or omission*" at any time). The Court has an obligation to ensure the accuracy of its record, particularly when the inaccuracy forms the basis for a threat of sanctions against a pro se litigant. See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) (noting the importance of courts maintaining the accuracy of their records).

52. The sanctions threat is not only factually unfounded but is deeply prejudicial. If left uncorrected, it creates a false impression on the docket. Bisasor is a pro se litigant who has acted in good faith throughout this litigation, and he should not be forced to litigate under a cloud of suspicion created by an error of the Court's own staff.

53. Furthermore, the removal of case manager Vincent Negron from the case 4 days after he admitted the error, without any accompanying corrective order, compounds the appearance of unfairness. While Bisasor does not know for certain the reasons for the reassignment, it is inferred that it was likely related

---

[3] Note: The irony is not lost here that this case, in its substance, involves a lawyer who has engaged in serious pathological dishonesty on an immense and far-reaching scale. Yet, the Court appears so ready to have a big "gotcha" on a medical-based request for a brief extension of time on a procedural issue in the early stages of the case. Further, when Defendants' counsel Linda Smith made clear and unambiguous misrepresentations about service of the motion to dismiss to Anderson to her email and also to her physical address, on 10-21-25 (none of which happened and both of which representations was 100% untrue), and when plaintiff requested sanctions, the Court flatly denied the motion without explanation.

to this episode, in light of the temporal proximity[4]. The plaintiffs have been trying to tell the Court that there are problems with the Clerk's office and the handling of the case in ways that harmed, prejudiced, or even potentially sabotaged plaintiff's case or plaintiffs' rights. The Court evidently did not take these concerns seriously, instead giving unfettered benefit of the doubt to its own staff. This episode demonstrated that plaintiff's concerns were not specious, ill-advised, or a figment of their imagination but real and palpable.

54. Further, Bisasor should not have to deal with hasty, unwarranted or false misjudgments about him, his intent, his motives or his character by a sitting federal judge. It appears that Judge Elliott was too quick to jump to biased or stereotypical conclusions, or was too quick to employ a punitive heavy-handed approach with the pro se African-American plaintiffs, as evidenced by the extraordinarily punitive and restrictive CMO that was unilaterally issued without any request from defendants, without any hearing or opportunity to be heard, or any showing of extreme conduct by plaintiffs, especially for newly added plaintiff Anderson, that warranted such a draconian, heavy-handed and oppressive one-sided order.

## III. THE COURT'S RETROACTIVE CHARACTERIZATION OF EMERGENCY MOTIONS AND FILING CONDUCT
### A. The Pattern of Retroactive Rule Enforcement

55. The CMO issued on 2-9-26 states that Plaintiffs "*have filed more than 35 motions in this case, many of which were mislabeled as 'emergency' motions,*" and relies upon that characterization as central justification for imposing sweeping filing restrictions on both Plaintiffs. The record, however, does not support the premise on which that conclusion rests, and the manner in which the CMO was issued fits in a broader pattern in which this Court has permitted conduct without objection and then punished it retroactively.

---

[4] Moreover, plaintiffs have previously raised several concerns about the clerk's office and the handling or mishandling of this case that create unfairness or the appearance of unfairness in this case, in particular as it relates to case manager Vincent Negron. The plaintiffs have filed several complaints about this and related matters, and about case manager Vincent Negron specifically, and the Court (J. Elliott) has not addressed these concerns. The prior Chief Judge acknowledged there was a valid concern but essentially indicated it would not be ongoing issue. But it was ongoing especially after she was no longer chief judge. Plaintiffs have requested a hearing to address these and other related procedural/administrative, but these have been denied or ignored. If the court had simply held an administrative hearing as requested by the plaintiff, these problems would have been likely addressed from long ago. This is on top of the prior errors by the clerk office in sending important notices to the incorrect address for plaintiffs which cause significant harm to the plaintiffs when the court acted on deadlines (pertaining to certain ADA requests) that the plaintiffs were not aware and never received notice of. Without a hearing, these and other problems will continue to manifest until inevitably the case is so tainted with utter unfairness that any possibility of the fair administration of this case will become impossible.

56. This pattern is not limited to the emergency motions. The Court's first substantive order, the 10-9-25 remand denial (Doc. 35), warned the Plaintiffs about Local Rule 5.1 formatting compliance, noting that "*Plaintiff Bisasor has been warned in other cases in this court that his repeated failure to adhere to the court's local rules, particularly Rule 5.1, 'may result in the court striking the filing without further warning and denying any relief requested.*'" That warning, however, came after the Court had accepted and adjudicated multiple filings in this case without raising the issue. The Court processed those filings, ruled on the merits, and only later announced that the formatting it had previously accepted was unacceptable.

57. The same pattern emerged with respect to joint filings. Before co-plaintiff Anderson was granted electronic filing access, Plaintiff Bisasor filed motions bearing both Plaintiffs' names and signatures on the same document. The Court accepted and adjudicated these filings without objection for months. Only afterward did the Court suggest that this practice was improper and that Bisasor was "*not entitled to request relief on behalf of Anderson.*" The Plaintiffs had no way of knowing, at the time they were filing, that a format the Court was accepting without comment would later be treated as a basis for criticism.

58. The emergency designation follows the identical trajectory. From July 2025 through January 22, 2026, the Plaintiffs filed about 20 motions carrying the emergency designation. Not a single order issued during the first 6 months of this practice warned Plaintiffs that the Court considered their use of the emergency designation improper, excessive, or otherwise objectionable. No order advised Plaintiffs to refrain from using the designation. No order cautioned that continued use could result in consequences. The Court accepted these filings, adjudicated them on the merits, granted the majority of them, and at no point communicated any displeasure with the practice.

**B. The January 23, 2026 Order Contained The First and Only Warning**

59. The first time any judicial officer in this case addressed the emergency designation was 1-23-26, when the Court issued an order denying Anderson's Emergency Motion for Certification for Interlocutory Appeal (Doc. 83). In that order, the Court stated: "*The court also takes this opportunity to instruct Ms. Anderson and Mr. Bisasor to refrain from filing their motions as 'emergency' motions unless there is truly insufficient time to permit*

*the usual objection period. Collectively, the plaintiffs have filed more than 20 'emergency' motions in fewer than six months. Continued abuse will require the court to reject future pleadings with the 'emergency' designation.*"

60. This order is significant for several reasons. First, it confirms that the Court's objection to the emergency designation was first communicated on 1-23-26, more than 6 months after Plaintiffs began using the designation. Every emergency motion filed before that date was filed without any indication from the Court that the practice was objectionable. Second, the order contains a prospective warning: "*continued abuse will require the court to reject future pleadings.*" It does not impose any present sanction or restriction. It warns of future consequences for future conduct. Third, and critically, the Plaintiffs complied. The docket reflects that after 1-23-26, neither Bisasor nor Anderson filed a single motion bearing the emergency designation. The motions filed after that date (including the Motion to Compel Defendants to Supplement Diversity Disclosures (Doc. 89 filed on 2-2-26) and the Motion for Hearing on Defendants' Motions to Dismiss (Doc. 90 filed on 2-3-26) carry no emergency label.

61. Despite the Plaintiffs' immediate and complete compliance with the January 23 instruction, the Court proceeded to issue the CMO on 2-9-26, just 17 days later. The CMO characterizes the emergency motions as "mislabeled" and uses them as a central justification for imposing comprehensive filing restrictions, including leave-to-file, page limit, and certification requirements, and a threat of monetary sanctions. The CMO does not acknowledge that Plaintiffs complied with the January 23 warning. It does not acknowledge that no emergency motions were filed after the warning. It treats the emergency filings that preceded the warning as though they were made in defiance of a court order, when in fact no court order addressing the designation existed until the very end of the filing period. See Appendix A with table of filings, at the end of this document.

### C. The "Excessive and Often Redundant" Characterization Is Unsupported

62. The CMO describes the Plaintiffs' filings as "excessive and often redundant." This language implies that the Plaintiffs filed the same motions repeatedly, seeking relief the Court had already denied. The record does not bear this out. The Plaintiffs have not refiled a motion seeking relief that the Court denied on

the merits. The categories of filings that the CMO apparently treats as "redundant" are, upon examination, filings that the Federal Rules and this Court's own procedures authorize or require.

63. A motion for reconsideration is not a redundant filing. It is a procedure expressly authorized by Local Rule 7.2(d), and the CMO itself recognizes as much by listing *"a single motion to reconsider any order issued by the court"* among the categories of filings that do not require leave. When a court denies a motion without prejudice, a refiled motion raising the same subject is not redundant; it is the exercise of a right the Court itself preserved. When the Clerk issues a filing error notice directing a litigant to refile a document using the correct docket event, the resulting refile is not a second motion; it is the same motion filed in the manner the Clerk instructed. When a plaintiff files a corrected version of a motion because the original contained an error, that is not a new motion; it is a correction. And when a pro se plaintiff with a documented disability files an ADA accommodation motion that the Court denies on a procedural ground or for lack of medical documentation, a subsequent motion that cures the deficiency is not repetitive; it is an effort to comply with the Court's stated requirements.

64. Specifically, the docket reflects the following filings that might superficially appear duplicative but are not. Documents 12 and 16 are the same motion: Doc. 12 was filed on 7-28-25, and the Clerk issued a Notice of ECF Filing Error directing Bisasor to refile using the correct docket event, producing Doc. 16. Documents 66 and 67 are a single motion and its corrected version; Doc. 67 is expressly labeled "CORRECTED." Documents 73 and 74 address the same request, and the Court itself acknowledged this by denying Doc. 73 as moot in light of Doc. 74. These are not independent motions. They are the natural result of a pro se litigant complying with Clerk's instructions and correcting errors in real time without the benefit of counsel. Yet the Court counts each of them toward the "more than 35" figure.

65. As for the ADA accommodation motions, the Plaintiffs filed 5 such motions during the life of the case, all of which were denied. Two pro se plaintiffs with documented disabilities seeking accommodation from a federal court are exercising rights protected by the ADA and Title II of that statute and/or under the Rehabilitation Act and/or under the judicial conference policy guidelines of the federal courts. The

denial of one accommodation request on particular grounds does not preclude a subsequent request on different grounds, under different circumstances, or with supporting documentation. These filings are not evidence of problematic or abusive litigation; they are the type of filings that federal law protects and that courts are obligated to consider in good faith.

### D. The Actual Motion Count Is Inflated

66. A complete review of the docket through the date the CMO was issued identifies the filings by Plaintiffs that carry the word "motion" in their docket text, excluding the 3 motions to participate in electronic filing (Docs. 7, 40, 77) that the CMO itself excludes. The Court's cites "*more than 35*" motions but the number is deeply misleading, because it treats as equivalent, filings that are not equivalent at all. For example, 7 of the filings are companion motions to seal (Docs. 6, 43, 45, 47, 60, 75, and one additional seal motion). Every motion to seal is a procedural appendage required by the Court's own rules whenever a litigant submits sensitive material under seal. A motion to seal is not an independent motion seeking substantive relief. Every seal motion that reached disposition was granted, confirming that each was properly filed. These 7 companion filings should not be treated as part of the count of motions filed.

67. Three additional filings are double-counted duplicates. Doc. 12 and Doc. 16 are the same motion; the Clerk directed the refile. Doc. 66 and Doc. 67 are the same motion; Doc. 67 is expressly labeled "CORRECTED." Doc. 73 and Doc. 74 address the same request; the Court itself acknowledged this by denying Doc. 73 as moot. These three duplicates should not be counted.

68. Of those independent motions remaining, they break down as follows: 8 motions to extend time or synchronize deadlines (routine procedural motions, majority granted); 3 motions to clarify ambiguous orders (two of three granted); 5 ADA accommodation motions (federally protected filings); and 15 substantive motions seeking affirmative relief. Ostensibly, 15 substantive motions filed by 2 pro se litigants over approximately 7 months of contested federal litigation is not excessive. It is approximately 2 motions per litigant per month, in a case involving contested subject-matter jurisdiction, multiple defendants represented by separate counsel, unresolved ADA accommodation requests, and a motion to remand that the Court itself recognized raised a colorable question.

**E. The Court Granted the Majority of Emergency Motions**

69. The docket record through the date of the CMO identifies 20 motions carrying the emergency designation, 17 of which were independent requests for relief after removing duplicates and corrected re-filings. Of those 17 independent emergency motions, the Court granted 10, yielding an adjusted grant rate of approximately 59 percent. The granted motions addressed extensions of time, stays of briefing, clarifications of deadlines, and other procedural relief that the Plaintiffs reasonably believed required prompt attention because of approaching deadlines.

70. That more than half of Plaintiffs' emergency motions were granted on the merits undermines the CMO's characterization that these filings were "mislabeled." A designation is not a mislabel when the Court itself repeatedly agreed that the underlying relief was warranted and acted on the motions promptly. The Court's practice of granting these motions without adverse comment gave Plaintiffs every reason to believe the emergency designation was appropriate and that the Court accepted it as such. For the Court to then characterize those same filings as evidence of abuse, without ever having communicated its displeasure during the months in which the filings were made, reflects a standard that was announced only in retrospect and applied only to these Plaintiffs.

**F. Defendants Employed the Same Designation Without Criticism**

71. The disparate treatment is further illustrated by the defendants' own use of the emergency designation. On 8-14-25, the Hilliard Defendants filed an Emergency Motion for Extension of Time to File a Response to Plaintiffs' Motion to Remand (Doc. 19). Counsel for Hilliard invoked the same rationale that Plaintiffs had relied upon in their emergency filings: an imminent deadline, an inability to meet it without additional time, and a need for prompt judicial action. The Court granted that motion the same day it was filed, without criticism, without suggesting that the designation was improper, and without questioning whether the matter truly warranted the emergency label. The Donais defendants filed a separate emergency motion as well (Doc. 17), which the Court also granted without adverse comment.

72. The Hilliard and Donais emergency motions are particularly significant because the CMO uses the phrase "mislabeled as 'emergency' motions" exclusively with reference to Plaintiffs' filings. The

defendants' emergency motions, resting on the same type of rationale, are not characterized as mislabeled, are not counted against them, and form no part of the basis for any restriction on defendants' filing rights. The CMO restricts only Plaintiffs' ability to file, while defendants are expressly relieved of any obligation to respond to Plaintiffs' filings unless directed to do so by the Court. This asymmetry is difficult to reconcile with the principle that procedural rules should apply evenhandedly to all parties.

73. When a represented defendant invokes emergency designation and the Court grants relief without comment, but the same Court later punishes pro se plaintiffs for using the identical designation under comparable circumstances, the distinction cannot rest on the merits of the designation itself. It rests on some other criterion, and the only visible distinction in this record is the identity of the filer.

### G. The Court's March 5 Order Mischaracterizes the Prior Case

74. These concerns are reinforced by the Court's treatment of the prior litigation in its 3-5-26 order (Doc. 101). In footnote 2 of that order, the Court states that "*It is worth nothing that Bisasor previously brought nearly identical claims against many of the same defendants. See Bisasor v. Donais, et al., No. 23-cv-374 (D.N.H. June 9, 2023). Bisasor litigated that case for nearly a year, unsuccessfully challenged many of the same issues that the plaintiffs continue to challenge here, such as the existence of diversity jurisdiction, and then voluntarily dismissed all his claims without prejudice before the court ruled on the defendants' motions to dismiss.*"

75. However, these characterizations are incorrect or incomplete in ways that make it misleading as follows.

76. The prior case, Bisasor v. Donais, No. 23-cv-374 (D.N.H.), was assigned to Magistrate Judge Saint-Marc, not Judge Elliott. At the time of the voluntary dismissal in 2024, the defendants' motions to dismiss were not about to be ruled on. Those motions had been suspended. What was pending was Plaintiff's motion for leave to amend the complaint. The voluntary dismissal was taken with the right to refile, which is a procedural tool explicitly authorized by Federal Rule of Civil Procedure 41(a) and used regularly by litigants who wish to cure deficiencies in their pleadings and refile stronger claims. The Court's suggestion that the dismissal was taken "*before the court ruled on the defendants' motions to dismiss*" implies that Bisasor fled an adverse ruling. The procedural posture of the case at the time of dismissal does not support that inference. The statements that were contained in or that accompanied the voluntary

dismissal explicitly state several legitimate reasons for filing the voluntary dismissal. The court ignores all of this fact and adopts blindly the intimations of the defendants in their motions to dismiss. This suggests that Judge Elliott may be unable to listen to the facts impartially but inclined to adopt skewed perceptions of the plaintiffs in favor of the defendants.

77. Judge Elliott thus misstated the record from 2024, adopted defendants' inaccurate or incorrect factual position uncritically. This is how bias creeps in, little by little.

78. Further, Judge Elliott's comments about the remand arguments in the present case are also materially different from those raised in the prior case, making the comparison inapt. The present case involves, among other changed circumstances, the Supreme Court's decision in Royal Canin U.S.A., Inc. v. Wullschleger, 604 U.S. 22 (2025), which altered the legal framework governing post-removal jurisdictional analysis. Further, there is a valid issue concerning the retroactive assertion of diversity when it was never pleaded in the removal notice by defendants, no amendment of that notice was ever sought by the defendants, and the defendants then attempted months after removal to suddenly switch horses midstream to assert diversity jurisdiction. This is not some frivolous issue but a valid one which presents an issue of first impression in this circuit (as confirmed by the fact Judge Elliott relied on authority from other circuits in finding against remand). The present case also raises genuine questions about whether diversity jurisdiction exists, including the possible change in citizenship of partners of Upton and Hatfield following a recent firm merger, and the fact that the defendants were never required to submit sworn statements regarding their citizenship until this Court ordered them to do so in the 2-9-26 disclosure order (Doc. 92). None of these issues existed in the prior case. The Court's dismissive treatment of the remand arguments, grounded in a comparison to the prior case that omits these distinctions, further illustrates the pattern of characterizing Plaintiffs' litigation conduct in the least favorable light without engaging with the substance of the arguments.

### H. The CMO's Sanctions Warning Applies Only to the Plaintiffs

79. The asymmetry embedded in the CMO extends beyond filing restrictions to the threat of sanctions. Paragraph 9 of the CMO provides that the "*plaintiffs' failure to comply with this Order may result in the imposition*

*of additional filing restrictions or other sanctions, including, but not limited to, monetary sanctions.*" No comparable warning is directed at the defendants. No paragraph of the CMO addresses the consequences of any failure by defendants to comply with any obligation, procedural or otherwise. The warning of monetary sanctions runs in one direction only: against two pro se plaintiffs, who both are African American and have documented disabilities.

80. The severity of this threat must be measured against the conduct it purports to address. The Plaintiffs have not engaged in frivolous litigation. They have not fabricated claims, misrepresented facts, or filed motions for the purpose of harassment. They have filed motions seeking extensions of time, ADA accommodations, clarification of deadlines, case management conferences, and other procedural relief that any reasonable litigant, particularly one proceeding without counsel, might pursue in the course of a complex multi-defendant civil rights case. The Court has not identified a single filing that was sanctionable under any established standard, whether Federal Rule of Civil Procedure 11, 28 U.S.C. Section 1927, or the Court's inherent authority. Yet the CMO threatens monetary sanctions as though Plaintiffs' conduct had already crossed the line into abuse. Thus, the threat is made even more troubling.

81. Under the CMO, defendants are relieved of any obligation to respond to Plaintiffs' filings unless the Court directs them to do so. It is the Court itself, then, that controls whether/when defendants participate. If Plaintiffs file a motion and the Court does not invite defendants to respond, the filing generates no burden on defendants at all. The only entity that must process the filing is the Court. Monetary sanctions imposed for filing motions that burden no one but the Court itself, would be difficult to justify under any proportionality analysis and would raise serious concerns about the use of judicial power to punish litigants simply for seeking to access the tribunal. The practical effect of tying leave-to-file requirements to a monetary sanctions threat, directed exclusively at two underserved black pro se plaintiffs with documented disabilities, is to create an environment in which they must weigh whether exercising their right to be heard will trigger financial punishment. That chilling effect is the kind of harm that recusal and mandamus are designed to prevent.

**I. The Notice of Intent Was Not Frivolous or Dilatory**

82. The CMO was evidently issued in direct response to Plaintiffs' Notice of Intent to File Critically Important Motions (Doc. 87), filed 1-30-26, in which Plaintiffs identified thirteen motions they intended to file. The Court treats this notice as further evidence of Plaintiffs' intent to delay and obstruct. In the 3-5-26 order (Doc. 101), the Court criticized Plaintiffs for seeking to "*litigate matters that are extraneous to their claims*" and stated that it wished to focus on "*determining whether the plaintiffs' claims are viable*." This characterization misapprehends the relationship between procedural due process and the merits.

83. The motions identified in the Notice of Intent were not extraneous to Plaintiffs' claims. They addressed subject-matter jurisdiction (remand and diversity discovery), the right to amend, ADA accommodations, the integrity of the record, conflicts of interest warranting recusal, and the disqualification of opposing counsel. Each of these issues bears directly on the fairness and validity of the adjudicatory process through which Plaintiffs' claims would be resolved.

84. A determination of whether Plaintiffs' claims are "viable" presupposes the tribunal adjudicating them is properly constituted, free from disqualifying conflicts, and operating under procedural conditions that satisfy due process. Procedural issues do not yield to the merits; they precede or condition the merits. The Court's insistence on reaching the merits before resolving jurisdictional or procedural objections puts the cart before the horse.

85. The Court's characterization of the Notice of Intent as dilatory must also be understood in the context of its earlier denial of Plaintiffs' Motion for a Case Management Conference (Doc. 50 filed on 11-7-25). A case management conference would have provided a forum in which Plaintiffs could have raised, discussed, and potentially resolved many of the issues that the 13 intended motions were designed to address: scheduling, ADA accommodations, sealing procedures, discovery on jurisdiction, amendment of pleadings, and other procedural matters. Had the Court granted the conference, the Plaintiffs would have had no need to file separate motions addressing each of these issues individually. By denying the conference and then penalizing Plaintiffs for filing individual motions to address the very issues the conference would have resolved, the Court created a procedural environment in which Plaintiffs could

not raise their concerns without being accused of excess. The Court denied the hearing, then criticized Plaintiffs for trying to communicate through filings what they would have communicated in the hearing.

86. The matters the Plaintiffs sought to address included ADA accommodations and the sealing of confidential medical information, both of which have caused documented prejudice. The Clerk's office mailed ADA-related orders to co-plaintiff Anderson at an incorrect address (679 Washington St., Ste. 8-206, Attleboro, MA 02703, which was not Anderson's correct address), and those orders were not emailed to Plaintiffs until late December 2025, months after they were issued. The failure to deliver these orders in a timely manner deprived Plaintiffs of knowledge of rulings that directly affected their rights.

**J. The Clerk's Failure to Address Sealing Concerns and the Exposure of Confidential ADA Information**

87. The prejudice from the denial of a case management conference and the Clerk's administrative failures extends to the protection of confidential medical information. On 12-29-25, case manager Vincent Negron emailed Plaintiff Bisasor stating: "*If you have any questions, let us know.*" On 12-31-25, Bisasor responded directly, asking whether the Court had received the notice of correct address filing from 12-12-25, and specifically asking whether the confidential ADA filings that had been denied had "*already been unsealed (i.e. in 7 days)*" and stating: "*I don't want the private medical information to be shared with anyone. Please advise.*" This email was sent to Negron.

88. The record reflects no response to this inquiry. Negron did not answer the question about whether the sealed ADA filings had been unsealed and whether Plaintiffs' private medical information had been exposed. Co-plaintiff Anderson independently attempted to engage the Clerk's Office on the same issues, sending 4 separate emails over the span of 2 days without receiving a single reply. On 1-15-26, Anderson emailed Negron and Uhrin asking whether her motion for e-filing access had been received by the court via the mail. On 1-16-26, she followed up again. The same day, Anderson sent a third email with the subject line "*Urgent Preserving Confidentiality of Sealed Filings and Orders,*" stating: "*It appears that the court has publicly published sealed orders of the court pertaining to ADA requests that should be sealed. Is this the case? Can the clerk office review this issue to ensure that sealed filings and orders are not made public?*" Anderson emphasized

that *"[e]very moment that confidential information is publicly exposed, it creates harm*." No one from the Clerk's Office responded to any of these three emails. Faced with total silence from the district court, Anderson escalated to the First Circuit. That same day, she emailed Gina Riccio and Circuit Executive Susan Goldberg, with copies to Uhrin and Negron, under the subject line "*Request for Urgent Assistance - Outstanding Motions and Docket Issues*." In that email, Anderson described the pattern of non-responsiveness, noted that she relied on timely communication from the court to meet her obligations under Local Rule 77.6, and observed that *"[i]t seems as though if I was an attorney at a big law firm or at the DOJ, the clerks would kindly respond to my emails; yet there appears to be something about me or my case that is resulting in some kind of irregular administrative friction*." Anderson asked: "*Can someone, anyone, please help me?*" Two pro se plaintiffs, independently and through separate emails over multiple weeks, raised the same urgent concerns about the exposure of their confidential medical information and the non-responsiveness of the Clerk's Office, and both were met with silence from the district court.

89. What makes the unanswered sealing inquiry especially troubling is the timing built into the Court's own orders. The 11-17-25 orders on Documents 42 and 46 gave Plaintiffs only 7 days to notify the case manager if they intended to withdraw their ADA filings. If no notification was received within that window, the filings would be sealed at Level I rather than the more protective Level II seal that Plaintiffs had requested, and thus shared with others. But the ECF notices for those 11-17-25 orders were not generated until 12-23-25, more than 5 weeks after the orders were entered. Anderson's copy was mailed to the wrong address entirely (679 Washington St., Ste. 8-206, Attleboro, MA 02703, which is not Anderson's address) and never received, due to the Court's own acknowledged error.

90. This error was noted in the court's 1-2-26 order which states: "…*the court has learned that, due to a clerical error, the clerk's office has mailed copies of the court's orders to Anderson at an incorrect address, and, therefore, she has not received from the court physical copies of any court order. The clerical error has been corrected, and the clerk's office will send Anderson copies of all court orders, including those already issued, to her current address… The court has also learned*

*that the same clerical order led the clerk's office to mail copies of its sealed orders to Bisasor at an incorrect address. The*

*clerk's office will send copies of all sealed orders to Bisasor at his correct address.*"

91. By the time Plaintiffs learned of the orders in late December, the 7-day window had expired by more than a month. The Plaintiffs never had the opportunity to exercise the choice the Court purported to give them. Their confidential medical records may have been downgraded from Level II to Level I protection without their knowledge or consent, and despite Bisasor's direct inquiry on 12-31-25, no one from the Clerk's Office ever confirmed whether that downgrade occurred. Further, Plaintiffs raised this issue about not receiving order on the sealed ADA motions, in more than one motion filings to Judge Elliott prior to 1-2-26 order, and she did not respond nor inform plaintiffs that the orders had been made and mailed from November 2025. Plaintiffs were left in the dark for weeks both by the clerks and by Judge Elliott.

92. The failure of case manager Negron to answer the sealing inquiry is part of a broader pattern. This is the same case manager who, in a separate incident, admitted in writing on 2-9-26, that he had "missed" Bisasor's email containing timely-filed confidential medical documentation. That admission came only after Bisasor sent an urgent email to Judge Elliott, Clerk of Court Tracy Uhrin, and Negron on 2-9-26, subject-lined "*Urgent Alerting to the Judge of Prior Confidential Submission of Medical Documentation.*" In that email, Bisasor explained he had emailed the medical documentation to Negron on 1-15-26, in compliance with the Court's 1-13-26 order, and expressed alarm that the Court's subsequent order was threatening sanctions for a "*knowing and intentional misrepresentation*" based on a failure to file documents that had in fact been timely submitted. Negron responded the same day: "*My apologies, Mr. Bisasor. Looks like I missed your email containing the medical documentation.*" The case manager's own admission confirmed that the filing was timely made and that the Clerk's Office, not Bisasor, was responsible for its absence from the docket.

93. What followed next deepened the contradiction. On 2-13-26, Clerk of Court Tracy Uhrin emailed Bisasor to inform him that his case had been reassigned to Judge Elliott's other case manager, Lianne, and that Negron would no longer handle the case. In that same email, Uhrin instructed Bisasor to follow

Local Rule AP 2.5(b) for filing documents under seal, "*including the requirement that such emails are submitted to ecfintake@nhd.uscourts.gov,*" and further cited Local Rule AP 3.5, noting that "*[t]his ensures that if a case manager is out of the office or unavailable, the person providing coverage has access to the filing for docketing.*" Six days later, on 2-19-26, the Court issued an order striking the Motion to Correct the Record, which cited that "*Mr. Bisasor did not, however, send documentation to the ECF intake box as required by Local Rule AP 3.5.*"

94. The sequence is irreconcilable. The Court's own 11-17-25 orders directed Plaintiffs to "*notify the court's case manager*" regarding the ADA filings. Those orders did not mention the ECF intake box. They did not cite Local Rule AP 3.5. They identified the case manager by name and function as the designated point of contact. When Bisasor later submitted his confidential medical documentation on 1-5-26, he emailed it to Negron, the case manager, because that is what the Court's orders told him to do. The Court never communicated that sealed filings were supposed to go to a different email address until Uhrin's 2-13-26 email, and the 2-19-26 order[5], which came after the medical documentation had already been lost and after the Court had already threatened sanctions for the supposed failure to file it. The 2-19-26 order excused Negron's failure by unfairly blaming Bisasor, claiming that he used the wrong email address, and essentially that Bisasor should not have emailed the case manager, which is person the Court itself had been directing Bisasor to contact previously. The Court changed the rules after the fact and then punished the Plaintiff for following the original instructions.

95. The compounding of these administrative failures (the wrong mailing address for Anderson, the months-long delay in electronic delivery of ADA orders, the unanswered sealing inquiry, the lost medical documentation, and the retroactive substitution of the ECF intake box requirement for the case-

---

[5] See 2-19-26 order as follows: Mr. Bisasor's motion does not comply with the restrictions set forth in the court's Case Management Order (doc. no. 91) and is stricken in accordance with Paragraph 9 of that order. Notwithstanding, the court acknowledges that Mr. Bisasor sent his medical documentation via email to the clerk's office prior to the court's January 21, 2026 deadline to provide medical documentation. **Mr. Bisasor did not, however, send documentation to the ECF intake box as required by Local Rule AP 3.5.** Though the clerk's office attempts to facilitate docketing when parties send filings to the improper address, as it has done on behalf of Mr. Bisasor in the past, filings sent to clerk staff emails are not necessarily discovered in a timely manner. As a result, the court was unaware of Mr. Bisasor's compliance with that deadline at the time it issued its Case Management Order. So Ordered by Chief District Judge Samantha D. Elliott.(lw)."

manager-contact instruction the Court actually gave) illustrates why Plaintiffs needed a case management conference and why the individual motions they filed were not frivolous or dilatory. They were the only available mechanism for raising issues that the Court's own administrative apparatus had failed to address. Negron was reassigned from the case without any corrective order. No order addressed the sealing exposure caused by the delayed notification of the November 17 orders. The administrative failures were absorbed into the record without correction, and the Plaintiffs were left to bear the consequences of errors they did not commit.

### K. Judge Elliott's Failure to Address Administrative Complaints

96. The concerns about partiality raised by the CMO's one-sided restrictions are further compounded by Judge Elliott's treatment of administrative complaints directed to her in her capacity as Chief District Judge. As Chief Judge of the District of New Hampshire, a position Judge Elliott assumed on or about 11-1-25, she bears the statutory and administrative responsibility for overseeing the operations of the court, including receiving and acting upon complaints about court staff and the conduct of proceedings. This duty is not optional; it is inherent in the office.

97. The Plaintiffs have directed multiple complaints to the First Circuit administrative executive regarding the conduct of the Clerk's Office in this case, including the conduct of Clerk of Court Tracy Uhrin and case manager Vincent Negron. On 7-25-25, Bisasor filed a complaint with the Office of the Circuit Executive, directed to Circuit Executive Susan Goldberg. On 7-29-25, Gina Riccio, Assistant Circuit Executive for Legal Affairs of the First Circuit, responded that the complaint "*has been referred to me for review*", and further stated that "*[a] complaint against a clerk of court and clerk's office staff should be directed to the chief judge of the employing court*" and confirmed she had "*forwarded this correspondence to Chief Judge McCafferty.*"

98. Chief Judge Landya B. McCafferty, who held the position at that time, responded in a detailed letter dated 8-26-25. In that letter, Chief Judge McCafferty stated that she had "*reviewed the entirety of your email correspondence with the Clerk's Office*" between July 7 and August 1, 2025, including emails involving Negron. Chief Judge McCafferty acknowledged that Negron's "*initial email to Mr. Negron went unanswered*". While Chief Judge McCafferty ultimately concluded that no member of the Clerk's Office committed

misconduct, she engaged substantively with Plaintiff's concerns, addressed each allegation individually, acknowledged the challenges faced by a pro se plaintiff with a disability dealing with the court system, and expressed that she was "*sorry for your negative experience.*" The letter demonstrated that a chief judge, upon receiving a complaint forwarded by the Circuit Executive, treated the matter seriously, conducted an investigation, and provided a written response.

99. Judge Elliott's conduct presents a stark contrast. After assuming the role of Chief Judge, Judge Elliott became the official responsible for addressing complaints about the Clerk's Office and about judicial conduct within the District. On 11-5-25, Bisasor wrote to Assistant Circuit Executive Riccio stating: "*I have further concerns about the NH federal court and how I am being treated. This now also includes a judge.*" On 11-7-25, Riccio acknowledged receipt. The following day, Bisasor submitted a detailed letter raising concerns about judicial bias, potential conflicts of interest arising from Judge Elliott's prior service as board president of New Hampshire Legal Assistance, inconsistent application of procedural rules, failure to address ADA accommodation requests, and potential retaliation for complaints about court personnel. The letter specifically requested that the Chief Judge review whether reassignment of the case to a different judge was appropriate. The record reflects no response from Judge Elliott to either the forwarded circuit complaint or the direct letter. No acknowledgment. No investigation. No letter. No communication of any kind.

100.  Anderson's experience confirms that Elliott's silence was not confined to Bisasor. On 12-22-25, Anderson independently filed her own complaint with the First Circuit, emailing Riccio directly. In that complaint, Anderson detailed that she had submitted three emails to the clerks containing confidential ADA requests since the beginning of November 2025 and had received no response and no action from either the clerks or the court. She described being unable to access e-filing, unable to paper file because the court said it did not receive her mailed filings, and unable to get her ADA requests acted upon -- leaving her, in her words, "trapped." Anderson further noted that she "*was party to a suit filed against a clerk (who just got hired by the federal court) for claims that preceded her employment at the federal court*" and that "*the entire*

*court recused, as a result, and the case was transferred*." She stated that before that suit, the issues she described "*were not present,*" but "[*a*]*fter the suit, things began to change. The non-responsiveness, the delays, the friction, the hostile vibe began.*" Anderson identified herself as "*an african american female pro se plaintiff with disabilities*" and asked the First Circuit to look into the matter. Riccio responded the following day, 12-23-25, acknowledging the complaint and stating that because it included allegations against the Clerk of Court, she had forwarded Anderson's correspondence to Chief Judge Elliott of the U.S. District Court for the District of New Hampshire. The record reflects no response from Judge Elliott to Anderson's forwarded complaint. No acknowledgment. No investigation. No letter.

101. The Plaintiffs' efforts to obtain a response from the Chief Judge Elliott did not end there. On 1-16-26, Anderson escalated again, this time emailing both Riccio and Circuit Executive Goldberg, with copies to Uhrin and Negron, under the subject line "*Request for Urgent Assistance - Outstanding Motions and Docket Issues.*" Anderson described having sent 4 emails to the Clerk's Office over 2 days (January 15-16, 2026) without a single response, asked for confirmation that her mailed motion for e-filing access had been received and docketed before an imminent January 21 deadline, and raised the possibility that sealed ADA orders had been improperly published on the public docket. She wrote: "*I am not sure what else can be done at this point. . . . Can someone, anyone, please help me? Is there someone who can provide emergency intervention to correct these issues I am experiencing?*" Then 4 days later, on 1-20-26, Bisasor emailed Judge Elliott directly, subject-lined "*URGENT: Request for Intervention by Judge*". The email was sent to Judge Elliott and copied to Uhrin and Negron. No response was received. That same day, Anderson independently filed a formal complaint with the Judicial Council of the Federal Courts under 28 U.S.C. Section 372, documenting three categories of misconduct by the Clerk's Office: a pattern of non-responsiveness to pro se litigant communications over 5 days (January 15-20, 2026), failure to respond to urgent confidentiality concerns regarding sealed ADA filings, and a pattern of discriminatory or unequal treatment of pro se litigants compared to attorney-represented parties. Anderson's complaint was sent to the Judicial Council for

Petition Review and copied to Circuit Executive Goldberg, Riccio, Uhrin, and Negron. The record reflects no response from any court official to Anderson's complaint.

102.    The contrast between Chief Judge McCafferty's handling and Judge Elliott's silence is difficult to explain on neutral grounds. Chief Judge McCafferty received a single complaint about clerks, investigated it, and responded in writing within approximately one month. Judge Elliott received complaints from both Plaintiffs, forwarded on separate occasions by the Circuit Executive's office, including Anderson's 12-22-25 complaint (forwarded by Riccio on 12-23-25), Bisasor's November 2025 complaints, Bisasor's 1-20-26 urgent email, Anderson's 1-16-26 escalation to the Circuit Executive and Riccio, and Anderson's 1-20-26 Judicial Council complaint under Section 372. Not one of these communications received a response. The failure to respond is not merely an administrative oversight. It signals a disposition that is inconsistent with the impartiality and responsiveness that the office of Chief Judge requires. When a chief judge who is also the presiding judge in a case receives complaints from both plaintiffs about her own court's treatment of the litigants before her, forwarded by the very circuit officials charged with overseeing judicial conduct, and does not acknowledge or address a single one of those complaints, the reasonable inference is that the complaints are unwelcome and that the complainants will receive no fair consideration from that quarter. This is precisely the kind of institutional posture that, whether or not it reflects subjective bias, creates an objective appearance of partiality sufficient to warrant the extraordinary remedies of recusal, transfer or mandamus.

### L. Fundamental Fairness and the Timing of the CMO

103.    Fundamental fairness requires that a court affords a litigant notice of what conduct is expected before imposing consequences for departing from that expectation. This principle applies with particular force to pro se litigants who lack the institutional knowledge that comes with regular practice before a particular court. A pro se plaintiff who files an emergency motion, sees it granted without comment, and receives no indication that the Court views the practice unfavorably, has every reason to continue using the same approach when similar circumstances arise.

104. The record shows precisely this pattern. Bisasor filed his first emergency motion in July 2025 (Doc. 12, later re-filed as Doc. 16), which the Court granted. He filed additional emergency motions in August 2025 (Docs. 21, 22, 24, 28, 29), several of which the Court granted. Not once during this period did the Court suggest that the emergency designation was improper. The same pattern continued through the fall and into January 2026, with the Court continuing to adjudicate these motions on the merits, granting many of them, and reserving its first mention of the issue for the 1-23-26 order on Doc. 83. The Plaintiffs complied immediately. No emergency motion was filed after 1-23-26. Yet the CMO arrived 17 days later, imposing restrictions that treated the pre-warning filings as grounds for punishment.

105. The timing of the CMO raises a distinct concern. The CMO was issued in response to Plaintiffs' Notice of Intent to File Critically Important Motions (Doc. 87), filed 1-30-26, in which Plaintiffs identified 13 motions they intended to file, including a motion to recuse and transfer the case. The CMO arrived 10 days later, imposing restrictions that, among other things, require Plaintiffs to seek leave before filing any motion other than a narrow category of permitted filings. The proximity between Plaintiffs' announcement of their intent to seek recusal and the Court's issuance of filing restrictions that would impede precisely that type of motion warrants scrutiny. Even if no improper motive is attributed, the sequence creates an appearance that undermines public confidence in the impartiality of the proceedings.

106. The concern is compounded by the CMO's treatment of defendants. Paragraph 7 of the CMO provides that "*[t]he defendants need not object or respond to any of the plaintiffs' filings, motions or otherwise, unless directed to do so by the court.*" No comparable restriction applies to the defendants, who remain free to file whatever motions they choose without leave of court, without page limits beyond those imposed by the Local Rules, and without any certification requirements. The CMO thus creates a two-tier system in which the Plaintiffs must seek permission to be heard while the defendants enjoy unrestricted access. Whatever the Court's intent, the practical effect is to tilt the procedural playing field decisively against the pro se plaintiffs at a critical juncture in the litigation.

107.    The Court's characterization of the emergency motions as "mislabeled" thus fails on multiple grounds. It lacks any foundation in the pre-January 23 record, which contains no warning or admonition regarding the designation. It is contradicted by the Court's own adjudicatory record, which shows that the majority of emergency motions were granted. It ignores Plaintiffs' immediate compliance once a warning was issued. It reflects a standard applied only to Plaintiffs and not to defendants, who used the same designation without consequence. And it was announced retroactively, at a moment when it served to restrict Plaintiffs' ability to pursue the very relief, including recusal, that Plaintiffs had just signaled they intended to seek. The cumulative effect of these facts, viewed alongside the Court's pattern of retroactive rule enforcement, its unsupported characterization of Plaintiffs' filings as "redundant," its misleading treatment of the prior litigation, its one-sided sanctions threat, its silence in the face of administrative complaints, its denial of a case management conference followed by criticism of Plaintiffs for filing individual motions to address the same issues, and its contradictory treatment of Plaintiffs' filing obligations (directing them to contact the case manager and then blaming them for not using the ECF intake box) raises a serious question about whether the filing restrictions imposed by the CMO are the product of neutral case management or the reflection of a predisposition against these Plaintiffs.

### M. Anderson's Individual Filing Record

108.    Anderson filed only 9 motions before the CMO was issued. Two of those were companion motions to seal. Removing those, Anderson filed 7 independent motions over the life of the case. The CMO imposes identical restrictions on Anderson as on Bisasor, based on an aggregate count that is driven almost entirely by Bisasor's filings. No individualized finding was made that Anderson's 7 independent motions constituted excessive or abusive filing conduct.

109.    A pro se litigant forced to raise every procedural matter by motion because no other avenue exists cannot fairly be charged with over-filing when the filings themselves are the direct product of the Court's and the clerk's office's refusal to resolve them informally.

110.    Further, most of both Plaintiff's motions that have reached disposition were granted, which is the clearest possible indicator that they were meritorious. Motions are not frivolous when the Court itself

found them sufficient to warrant relief. A body of granted motions is not a docket problem to be managed; it is a record of Plaintiffs correctly invoking the rules the Federal Rules provide. The Court cannot simultaneously grant motions on their merits and characterize the filing of those same motions as frivolous or unwarranted.

111.    The mischaracterization is particularly acute as applied to Anderson. Anderson has filed, effectively, only 7 motions in the entire case. Each was directed to an identifiable procedural necessity, and each was meritorious on its face. No rule of federal practice limits a civil litigant to a particular number of motions, and the Court has identified none. To fold Anderson's 7 (or even 9) filings into an aggregate number drawn largely from Bisasor's filings, and then to impose restrictions on Anderson based on that aggregated figure, is to penalize Anderson for Bisasor's conduct rather than her own. The restriction of Anderson's procedural rights on the basis of another litigant's filing volume, without any individualized finding that Anderson herself has engaged in abusive conduct, is indefensible as a matter of procedural fairness and as a matter of due process, which requires that restrictions be tailored to the conduct of the party being restrained.

112.    The Court's treatment of the two Plaintiffs as interchangeable for purposes of restriction, while simultaneously treating them as separate when separation served the Court's procedural convenience, such as denying motions signed by both plaintiffs prior to Amderson being granted formal e-filing access (which access was denied several times for several months until finally granted in mid-January 2026), reveals a selective application of the rules. Anderson was prevented from having her e-filing motion processed because her name appeared on a filing alongside Bisasor, yet both Plaintiffs were treated as a single unit when aggregation supported restriction. The two Plaintiffs are treated as one when aggregation supports the imposition of burdens, and as two when separation supports exclusion. That contradiction is not case management. It is the signature of a Court whose procedural rulings bend to accommodate a predetermined outcome rather than a consistent principle.

113. The bottom line is that the CMO's characterizations do not withstand scrutiny against the docket they purport to describe, and they cannot serve as a fair predicate for the filing restrictions the CMO imposes.

---

## SECTION 3: FURTHER FACTS ON PROCEDURAL IRREGULARITIES & SYSTEMIC BIAS

---

### A. Inconsistent Procedural Enforcement & Procedural Irregularities

114. The Court has enforced procedural requirements against Plaintiff on an uneven and shifting record. On 7-29-25, Plaintiff filed the First Amended Complaint bearing both his signature and the signature of co-plaintiff Anderson. The filing was accepted by the Court without objection or comment. Subsequent filings bearing both signatures were similarly accepted. On 9-15-26, the Court issued a Notice of ECF Filing Error stating that Anderson was required to file conventionally, in paper, unless and until she obtained her own electronic-filing privileges. On 11-5-25, 4 days after Judge Elliott assumed the office of Chief Judge, the Court denied Anderson's motion for e-filing access without prejudice and, in the same order, warned Plaintiff that "continued failure to comply with the court's rules will result in the termination of his electronic filing privileges."

115. The warning was directed at Bisasor, not at Anderson, and was issued without any prior finding that Bisasor's own conduct had violated the Court's rules.

116. The threat to terminate Bisasor's e-filing privileges was **disproportionate and premature**, given:

   a. The Court previously accepted filings with both signatures without objection
   b. The Court provided no clear guidance about when dual signatures are permissible
   c. Bisasor has not engaged in willful or repeated violations
   d. The warning came before any opportunity to correct course

117. This creates an appearance that the Court is applying rules inconsistently and more strictly against pro se Plaintiffs than would be applied to represented parties.

118. Further, the signature practice the Court now identified as non-compliant had been tolerated without comment in multiple earlier filings. The warning arrived in the same cluster of 11-17-25 rulings documented in Paragraph 46, which also denied, without hearing, requests for a scheduling conference

and ADA accommodations. The asymmetric character of the enforcement, tolerance of a practice for months followed by a threat directed only at Bisasor when the practice had produced no prior notice of non-compliance, is a procedural pattern the reasonable observer will weigh alongside the conceptually analogous asymmetry in the CMO itself.

### B. Disparate Treatment on Defendant Service Issues

119.    Prior to end of November 2025, the defendants, in particular the Donais defendants, did not serve Anderson their motion to dismiss in October 2025, or their prior filings before that. Anderson was added as a plaintiff in the First Amended Complaint on 7-29-25. The defendants made incorrect representations regarding service on Anderson. Certifications were made regarding serving by mail and by email but no such service was made and no proof of service on Anderson was produced even after Bisasor raised the concerns. Instead, the defendants purported to serve Anderson again the same items but months after they had purported to have had bee served. This resulted in prejudice because deadlines were attached to any responses to these filings, and when extension was sought to respond by plaintiffs, the defendants vigorously objected. When this was brought to the Court's attention, including via motion for sanctions, the Court simply denied the motion without comment and made no inquiry into defendants' non-compliance with service requirements, issued no order directing Defendants to correct the service record, and imposed no warning or consequences. The contrast with the procedural enforcement directed at Plaintiffs, documented above, is recorded for the reasonable-observer inquiry and no further purpose. A case in which procedural non-compliance by represented Defendants is met with silence while procedural confusion on the pro se side is met with a threat of sanction is a case whose enforcement architecture the observer is entitled to regard as relevant to the Section 455(a) analysis.

### C. Unequal Treatment of Parties

120.    Despite Defendants' failure to serve Anderson, the Court said nothing about Defendants' non-compliance with service requirements. By contrast, the Court threatened to terminate Bisasor's e-filing privileges for procedural issues that stem from confusion created by the Court's own inconsistent enforcement. This disparity, sanctions threatened against pro se Plaintiffs for minor procedural issues

while no consequences for Defendants' failure to properly serve a party, creates a reasonable appearance of unequal treatment and bias in favor of represented defendants over pro se plaintiffs.

121. The Court's silence regarding defendants is not an oversight. It is a pattern, and it is the mirror image of the restrictions imposed on Plaintiff. What is valid when one side does it cannot be invalid when the other side does it. Disparate treatment of materially identical conduct is the definition of disparate treatment, and the Court's own rulings supply the examples.

122. The Court's asymmetric treatment of the "emergency" designation illustrates the point. Earlier in the case, the Court entertained emergency treatment when Plaintiff invoked it and did not criticize Defendants for doing likewise. The Court then changed course midstream, chiding or restricting Plaintiffs' ability to designate matters as emergencies while maintaining no comparable restriction on Defendants. The same pattern has played out with other procedural mechanisms: the Court announces a rule, Plaintiffs conform their conduct to it, the rule changes, and Plaintiffs are then penalized for failing to follow a rule the Court had not yet adopted. The Court creates new procedural requirements and then penalizes Plaintiffs for not following them. That is not case management. It is the construction of a procedural trap, and the trap is sprung only in one direction.

### D. The Pattern of Punitive Treatment and the Court's Rush to Disposition

123. The asymmetry of the Case Management Order does not stand alone. It sits atop a pattern of rulings, characterizations, and assumptions that reveal a Court whose posture toward Plaintiffs is not neutral. The Court has issued at least 6 threats of sanctions in response to what were, in each instance, first-time procedural issues raised by pro se litigants. That frequency is not normal. Sanction threats are a serious judicial tool reserved for conduct that is typically repeated, willful, and in bad faith. To reach for the sanction threat at the first occurrence of an ordinary procedural misstep signals that the Court has adopted a disposition toward Plaintiffs that begins with the presumption of malice or misconduct. The Court appears quick to punish, quick to assume the worst, and does not extend to Plaintiffs the benefit of the doubt that pro se litigants ordinarily receive and represented parties receive as a matter of course.

124.    Judge Elliott's overly stern harsh stance assumes a priori negative predisposition. She appears incentivized to side with her clerk staff, even when they mess up, and predisposed to side with the lawyers and the law firms, and with the represented defendants. See caution of Judge Andrew Schulman.

125.    The rush to adverse characterization is visible across the docket. When Defendants advanced an erroneous account of the circumstances and reasons surrounding Plaintiff's voluntary dismissal of certain claims, the Court appears to have adopted that account without independently examining the record.

126.    In her 3-5-26 order, in footnote 2, Judge Elliott stated: "*It is worth nothing that Bisasor previously brought nearly identical claims against many of the same defendants. See Bisasor v. Donais, et al., No. 23-cv-374 (D.N.H. June 9, 2023). Bisasor litigated that case for nearly a year, unsuccessfully challenged many of the same issues that the plaintiffs continue to challenge here, such as the existence of diversity jurisdiction, and then voluntarily dismissed all his claims without prejudice before the court ruled on the defendants' motions to dismiss.*"

127.    This contains multiple incorrect, untrue or misleading statements and it tracks almost exactly what defendants have asserted in their motions to dismiss or other filing. First, there was only one item that was unsuccessfully challenged in that case, and that was the remand issue (but that case had a different procedure that originated in state court in Massachusetts and transferred multiple times from different courts either by defendant removal or by defendant request for forum transfer, among other things). So, Judge Elliott's reference to "many" of the same issues is incorrect.

128.    Second, bringing a re-filed case under the NH savings statute is a valid procedure so pointing to "*Bisasor previously brought nearly identical claims against many of the same defendants*" is tautological. By framing it like this, Judge Elliott appears to insinuate that something was amiss or illicit about what Bisasor did, in dismissing and re-filing the case.

129.    Third, asserting that *Bisasor litigated that case for nearly a year,* is misleading because although the case was transferred from Massachusetts in July 2024, the case had to go through procedural reset due to having to refile motions that were pending in the Massachusetts federal court at the time of transfer pursuant to the clerk's order, and Bisasor had two critical extraordinary personal events (and attendant

issues) that occurred, in fall of 2024 and beginning of 2025, that resulted in a hiatus on the case for a few months. Thus, the case did not really begin to be heard until around March 2025. So, the effective litigation was from around March 2025 to end of May 2025. Judge Elliott should have realized this if she had engaged in more than a cursory superficial peruse of the docket.

130. Fourth, and most importantly, Judge Elliott incorrectly stated that "*and then voluntarily dismissed all his claims without prejudice before the court ruled on the defendants' motions to dismiss*". This is the most reckless of the statements. Judge Saint-Marc had suspended or stayed the motions to dismiss and plaintiff's reply to it, in order to resolve a pending motion to amend the complaint (a motion which had been sought prior to transfer to NH federal court and had to be re-filed once the case was transferred per the local rules of this court). So, it is incorrect to suggest or imply that Bisasor voluntarily dismissed the case without prejudice before the court ruled on the motions to dismiss. That court was not poised to rule on the motions to dismiss and the motions to dismiss were not yet ripe for ruling in that case. Again, if Judge Elliott had engaged in more than a cursory or superficial peruse of the docket, or not simply adopted defendants' one-sided characterizations, she would have realized this.

131. Similarly, a court cannot read the minds of parties. It can, and must, test the characterizations offered by one side against the record rather than treating those characterizations as dispositive. The Court's acceptance of Defendants' version of dismissal, without checking, is part of a broader pattern in which the Court quietly accepts one side's framing while presuming the other side's conduct to be illegitimate.

132. This goes to a problem of surface impressions and superficiality, devoid of close reading, careful attention and a diligence to the facts, and the nuances of the facts, necessary to ensure that errors or misapprehension do not occur. Yet when such surface-level misapprehension occurs, they are always in favor of the defendants and not in favor of the plaintiffs. This is evidence of a bent mind. Random errors should be distributed randomly, not only in one direction. Every error or mistake by Judge Elliott and by her court staff have all been in the direction of the plaintiffs. The court staff has not mishandled any filings by the defendants, sent any orders to the wrong address for the defendants, lost/misplaced critical

emails or filings from the defendants, or failed to respond to communications from the defendants. Judge Elliott has not made any mistake in wrongly accusing the defendants of anything, nor has she threatened any defendant with sanctions or warn them of anything. Every error or egregious occurrence, of which there have been multiple, have all occurred with the plaintiffs and none with the defendants. Why is that? Statistically-speaking, it is highly improbable that such an error rate is random.

133. Similarly, with respect to issues related to the motion to extend time to file motion to reconsider the CMO, the Court has also evidently conflated distinct procedural issues to Plaintiff's disadvantage. When Plaintiff timely filed for an extension of time on filing reconsideration on the CMO, the Court treated the extension request as though it were the underlying motion itself, evaluating it on the merits of the reconsideration it sought rather than on the extension grounds Plaintiff invoked. The grounds for extension were the same for both the extension of time motion for reconsideration and amendment. Yet, the Court refused the extension request on reconsideration of the CMO. This is a manufactured basis for denial, an approach that is unfair by any measure.

134. Across these incidents the throughline is the same. The Court wants to resolve the merits, to rush past procedure and to reach the substantive disposition it appears to have already contemplated, without being fair on the procedural rights that protect Plaintiff's ability to be heard on those merits. Procedure and substance are not severable. A Court that is unfair on procedure will, inevitably, reach an unfair substantive result, because the record on which the substance is decided will have been shaped by the procedural rulings that came before it. Plaintiff has procedural rights: the right to seek remand, the right to seek discovery, the right to seek an extension based on documented ADA needs, the right to seek a case management conference, the right to seek reconsideration of erroneous rulings, the right to seek partial summary judgment, the right to seek an amendment to the complaint, the right to seek certification of an appeal, and the right to a hearing on contested matters that implicate procedural rights. Each is a legitimate exercise of the rights the Federal Rules confer. None is repetitive. None is gratuitous. Each is necessary because the Court erected roadblocks, i.e., no hearing, that only a motion can address.

**E. Reasonable Concerns about Potential Repercussions for Complaints About Court Personnel**

135.    Plaintiffs have filed complaints about court personnel, specifically: **Clerk Tracy Uhrin**, regarding alleged improper conduct and procedural irregularities;  and **Case Manager Vincent Negron**, regarding case management issues.

136.    Plaintiffs raised concerns about retaliation for making these complaints in good faith.

137.    The timing and tone of Judge Elliott's 11-5-25 order, issued shortly after Plaintiffs' complaints, creates a reasonable appearance that the harsh warning and threat of sanctions that followed in temporal proximity thereafter, may be retaliatory in nature, whether unconsciously or otherwise.

138.    The order's language warning of "termination" of e-filing privileges is unusually stern for what amounts to a first-time procedural confusion about when dual signatures are permissible, especially given that the Court previously accepted such filings without objection.

139.    Courts have recognized that retaliation against litigants for filing complaints about court personnel, even when masked as procedural enforcement, violates due process and creates an appearance of bias.

**F. The Racial Dimension and the Reasonable Observer**

140.    The foregoing patterns do not exist in a vacuum. Plaintiff is African American, proceeds pro se, and the manner in which this Court has treated him corresponds to the documented patterns of how courts have historically treated Black litigants in civil actions. Plaintiff raises this not to inflame but because the reasonable-observer inquiry under 28 U.S.C. Section 455(a) cannot be answered without reference to it. A reasonable observer aware of the documented history of racial disparities in civil adjudication, and aware of the specific record in this case, would be unable to conclude that the pattern of rulings here is race-neutral in either form or effect.

141.    The signature features of that pattern are present in this record: quickness to punish, readiness to assume bad faith, a presumption that filings are illegitimate before they are read, the treatment of a pro se Black plaintiff as though he were to be corrected rather than heard, and a simultaneous institutional empathy extended to the represented defendants and the established law firms that represent them. The Court's posture toward the Defendants, their emergency designations accepted, heir untimely service or

untimely filings accepted, their misrepresentations unchallenged, is the posture of a Court that identifies with the institutional standing of the parties before it. The Court's posture toward Plaintiff, presumption of bad faith, accusations of intentional misrepresentation, sanction threats at every turn, restriction of basic procedural rights, is the posture of a Court that does not extend that identification.

142.    The disparate treatment point follows directly from the docket. When Defendants designate a filing as an emergency, the designation is accepted. When Plaintiff does the same, the designation is challenged. When Defendants fail to confer or to timely file, no consequence follows. But for Plaintiff, any perception of a failure, no matter how small, the Court threatens sanctions, even for a first misstep or when there was no prior corrective act/warning. This is disparate treatment of materially identical conduct, and it is the defining feature of racially differential adjudication that the literature documents and that communities of color have identified for generations as the ordinary experience of seeking redress in American courts.

143.    Plaintiff filed notices of intent to seek recusal, and filed additional motions explaining his reasons, because he does not trust this Court's institutional apparatus, including its clerical aspects, to be fair to him. He has said so directly. He has apologized for doing so, as African Americans often feel compelled to apologize for stating what they have experienced. But the distrust is not invented. It is the product of a specific record in which several actions this Court has taken since Plaintiff voiced that distrust has confirmed, rather than refuted, its basis. A Court that systematically denies the procedural protections the process guarantees, supplies the very evidence the plaintiff cited as his reason for distrust.

144.    The broader significance extends beyond Plaintiff. Plaintiff is educated, articulate, and capable of preparing minimally coherent filings (with the right accommodations). If the treatment he has received in this Court is what the record reflects, the treatment received by Black pro se litigants without his intelligence, education or ability must be worse, and in most cases must be decisive against their claims before the substance is ever reached. This record exposes a dimension of civil adjudication that the reasonable observer cannot ignore. Judges have power, and the structural protection against its abuse is

the requirement of the appearance of impartiality, which is precisely what 28 U.S.C. Section 455(a) protects. When the appearance is as this record presents it, the statutory protection is triggered.

## G. The Cumulative Procedural Situation and the Section 455(a) Inquiry

145.    Each of the foregoing categories, considered in isolation, would be troubling. Considered together, they describe a procedural situation in which Plaintiff cannot be heard. Plaintiff cannot file a motion without permission. He cannot object to Defendants' motions at all. He cannot file replies to which the Rules entitle him. He has never been granted a hearing. He cannot reach the clerk's office. The Court will not answer his requests for clarification. And the Court has now entered an order that in effect instructs Plaintiff to stop filing motions and stop filing objections and stop filing much of anything. A litigant who cannot be heard through a hearing and who cannot be heard through motions, cannot be heard at all. Every protective measure Plaintiff takes, the notices of intent to seek recusal, the motions for reconsideration, the requests for accommodation, is converted by the Court into a further ground for adverse ruling. Plaintiff told the Court, openly and in advance, that he would file additional motions and explained why. The Court responded not by providing the procedural fairness that would have addressed the concern, but by tightening the restrictions and treating the forewarned motions as evidence of over-filing to be blocked.

146.    Under Section 455(a), the reasonable observer does not evaluate procedural events in isolation. The Section 455(a) methodology is cumulative. In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997); Blizard v. Frechette, 601 F.2d 1217, 1220 (1st Cir. 1979). The observer considers the Court's mischaracterization of Plaintiff's filing history, the CMO's constructive-pre-filing-restraint structure and its issuance without a Rule 16 conference, the complete absence of any hearing, the shifting and retroactive enforcement of procedural requirements, Defendants' unrestricted and uncorrected procedural conduct, the service asymmetry, the pattern of punitive treatment, the unresolved ADA accommodation motions and the disability dimension that compounds them, and the racial context in

which those patterns are embedded, and considers those facts alongside the institutional connections documented elsewhere and the pattern of adverse rulings documented herein.

147.    A case in which a pro se civil rights plaintiff, asserting racial-discrimination and disability claims against represented defendants, has been afforded no hearing of any kind over more than a year of docketed litigation, and in which the same Court has simultaneously imposed a filing restriction that further limits the litigant's access to the bench, is a case whose procedural architecture the observer must evaluate in the aggregate.

148.    Evaluated together, and with the documented connections visible in the background, these procedural facts contribute to the aggregate picture that the Section 455(a) reasonable-observer standard is designed to surface. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860 (1988); In re Boston's Children First, 244 F.3d 164, 167 (1st Cir. 2001). That picture, in its entirety, presents proceedings that no reasonable observer, fully informed, could regard as presumptively impartial.

## H. Pattern of Adverse Rulings

149.    While Bisasor does not challenge the legal correctness of rulings in the context of this motion, the **cumulative pattern** of adverse rulings, combined with the other factors described herein, contributes to a reasonable appearance of bias. The Court has issued multiple adverse procedural orders against plaintiffs while declining to hold a case management conference to address Plaintiffs reasonable concerns, including procedural confusion or bottleneck issues related to their ADA requests and sealing thereof, creating an appearance that the Court is quick to enforce rules against Plaintiffs but slow to address their legitimate needs.

## I. Additional Factors Contributing to Appearance of Bias

150.    Plaintiffs are **African Americans** proceeding pro se against well-established, represented defendants in New Hampshire, **Out-of-state residents** (Massachusetts) bringing claims in New Hampshire against New Hampshire citizens and lawyers, **Disabled individuals** with documented accommodation needs that have been ignored, and have raised **racial discrimination claims** against New Hampshire attorneys, which may create institutional defensiveness within the New Hampshire legal community.

151.    The **aggregate effect** of these factors creates a reasonable appearance that the Court may be instinctually and institutionally adverse against Plaintiffs.

_____

## SECTION 4: FURTHER FACTS PERTAINING TO POTENTIAL SOURCES OF CONFLICT
_____

### A. Russell Hilliard's Prior Control of IOLTA Funding to NHLA and LARC

152.    Russell Hilliard, as past Chair of the New Hampshire Bar Foundation controlled the IOLTA funding pipeline that financed NHLA and LARC, the very organizations Judge Elliott led. The Bar Foundation is the primary vehicle for distributing IOLTA (Interest on Lawyers' Trust Accounts) funds in New Hampshire. Its grantees include New Hampshire Legal Assistance (NHLA), Legal Advice and Referral Center (LARC), Pro Bono Referral Program of the NH Bar Association. In other words, Hilliard controlled the primary funding pipeline for the organizations that Judge Elliott led. The Bar Foundation's IOLTA grants represent a significant portion of NHLA's and LARC's budgets. As Chair, Hilliard exercised oversight and decision-making authority over grant allocations to these organizations, creating an institutional relationship of financial dependency and oversight. A reasonable person would question whether a judge can be impartial with a party who controlled funding for organizations she led.

### B. Bar Association Leadership /Hilliard as President of NH Bar Association and Elliott as Chair of Federal Practice Section

153.    Russell Hilliard has served as Past President of the New Hampshire Bar Association. Judge Elliott has served as Chair of the NH Bar Association's Federal Practice Section. Both held senior leadership positions within the same professional organization.

154.    The NH Bar Association is a small organization relative to other states. New Hampshire has approximately 4,000 active attorneys. Leaders of the Bar Association, its president, section chairs, and committee heads, regularly interact at meetings, conferences, CLE events, and social functions. It is implausible that the Past President of the Bar Association and the Chair of the Federal Practice Section had no professional interaction. In a small legal community like New Hampshire, the Past President of the Bar Association is known to every practicing attorney and every judge. Hilliard's decades of

leadership place him at the very center of the state's legal establishment. Judge Elliott, before ascending to the bench, occupied a position of leadership within the same establishment. A reasonable observer would question whether a judge can adjudicate claims against a fellow legal establishment leader with whom she shared prior institutional leadership roles, particularly when that leader had controlled funding for organizations she led in the past.

### C. The DRC-NHLA Institutional Collaboration and the Messer Connection

155.    Amy Messer served as a staff attorney and ultimately as director of the Disability Rights Center of New Hampshire (DRC-NH) from approximately 1999 to 2016 (17 years) before her appointment to the Superior Court bench. During the years when Judge Elliott served as NHLA board president (2014 to 2018), Messer's DRC-NH was in an ongoing collaborative relationship with NHLA. According to NHLA's own website, NHLA "*routinely collaborates with the DRC-NH.*"

156.    The significance of this is relevant. When Judge Elliott was governing NHLA as president, Messer was leading the DRC-NH as director. Their organizations were institutional collaborators, entities that worked together regularly on the shared mission of disability rights and legal access. Now Messer is a named defendant before the judge who governed NHLA while Messer led DRC-NH's collaborative partner. The reasonable observer would not regard this as irrelevant.

### D. The Gorham-Donais Connection to Craig Donais at the NH Attorney General's Office

157.    Lastly, the appearance of conflict is further compounded by the professional relationship between Gorham and Defendant Craig Donais. Donais served as an Assistant Attorney General at the New Hampshire Department of Justice ("NH-DOJ") from November 1999 through January 2005. Gorham also served as an Assistant Attorney General at the same office and was active there at least through 2010. Both were prosecutors in the same state office during or around closely proximate periods. The NH-DOJ is not a large, impersonal bureaucracy in which contemporaneous employees might never cross paths. It is a state-level prosecutorial office where attorneys work in close professional proximity. Both Gorham and Donais, serving as Assistant Attorneys General at the NH-DOJ shared the institutional culture and professional identity of a small state law enforcement office.

158. Gorham now manages the administrative apparatus of the court adjudicating claims against a former prosecutorial colleague. A reasonable observer, knowing these facts, would have cause to question whether the court's administrative apparatus can function with complete neutrality in a case involving a former colleague of its Chief Deputy Clerk. This extrajudicial professional connection between this court's second-ranking administrative officer and another named party compounds the structural conflict, or the appearance thereof, already established by Gorham's status as a defendant in the related litigation and as a named defendant in the pending motion to amend the complaint. Section 455(a) is designed to address these circumstances, situations where, even in the absence of proven misconduct, the factual landscape and aggregate picture would cause a reasonable person to doubt court impartiality.

---

### SECTION 5: FURTHER ON FACTS PERTAINING TO KAREN GORHAM CONFLICT
---

#### A. The Pending Amendment Naming Gorham as Defendant

159. The grounds for recusal arising from the Gorham conflict extend beyond the related action.

160. Plaintiff has filed a proposed Second Amended Complaint in this case (Docs. 103-105) that adds Karen Gorham as a named defendant in this action. The amendment is currently pending before Judge Elliott. Its pendency creates a conflict that is not merely structural but immediate, direct, and unmanageable.

#### B.  Claims Against Karen Gorham

161. Plaintiff alleges that Gorham required that for every case that Bisasor had in NH at the time and that for every case that Bisasor files in the future for the rest of his life, he is prohibited from contacting any court in the state of New Hampshire.  This extraordinarily drastic practice was only applied to Bisasor and then to Bisasor's wife simply because she is associated with Bisasor. It was not applied to any of the underlying defendants in any of Bisasor's cases in state courts. This was not fair. Bisasor did nothing to deserve this. And it was discrimination against Bisasor. Bisasor should have been free to contact the clerk or clerk staff at any NH courthouse for his cases directly.

162. Bisasor requested several times to be released from this restriction, but she refused, even when it was impeding Bisasor's ability to address matters in his cases. Bisasor requested that a complaint of discrimination based on race and based on having raised concerns about race discrimination in 2021, which is what resulted in her prohibiting Bisasor from contacting the court clerk offices directly, be referred to the chief judge but she refused to do so. She instead tried to direct Bisasor to go to the NH Administrative Office of the Courts. She did not refer the complaint of discrimination to the chief judge.

163. Gorham prohibited Bisasor from contacting any trial court in NH. Bisasor cannot directly call the clerk or clerk staff of any trial court in the state, for the present and indefinitely into the future (a lifelong ban). Bisasor was told this by Karen Gorham. This is because Bisasor raised concerns about race discrimination in the NH superior court system. Immediately after raising these concerns, Bisasor was contacted by Gorham and told he was forbidden from speaking to any court staff in any court in NH about his case or cases including any routine matter involving his case or even about filing issues, indefinitely, forever, for the rest of his life, and this ban would extend to his wife, simply because concerns were raised about mistreatment and disparate treatment based on race. This was intended to punish Bisasor for raising concerns about race discrimination in the NH superior court system.

### i. Administrative Retaliation at Hillsborough Superior Court North

164. During the course of his state court case, Bisasor raised concerns with the court about the conduct of a clerk staff member named Alma. These concerns related to the handling of Bisasor's filings and the treatment he received as a pro se litigant. Rather than addressing these concerns through established administrative channels or referring them for appropriate review, Gorham retaliated against Bisasor.

165. Gorham's retaliation took the form of banning Bisasor from contacting the clerk's office entirely. This ban was administrative, not judicial, in nature. It was imposed by Gorham in her capacity as Superior Court Administrator (an executive and managerial function) and was not the product of any judicial order, hearing, or adjudicatory process. No judge entered an order barring Bisasor from contacting the clerk's office; no hearing was held on the issue; and no adjudicatory process was employed. Gorham acted unilaterally in her administrative capacity.

166. The effect of the ban was to deny Bisasor access to basic court services available to all litigants. The clerk's office is the portal through which litigants file documents, obtain copies of court records, learn about scheduling, and communicate with the court on administrative matters. Banning a litigant from contacting the clerk's office is tantamount to constructively barring that litigant from the courthouse.

167. Gorham communicated with Judge Messer behind the scenes regarding Bisasor's complaints about clerk staff and the ban that Gorham imposed. Gorham has referenced having spoken with Messer about the matter. Messer, rather than intervening to ensure that a litigant had access to the clerk's office as required by law, acquiesced in and unofficially sanctioned Gorham's retaliatory action. Messer's acquiescence was not a judicial act nor put on the record or stated in a hearing. It was an administrative act to endorse and perpetuate an illegal ban imposed by Gorham. Messer never publicly issued any order or statement on the record about this. But she administratively looked the other way as Gorham continued with this behind the scenes. Messer conspired with Gorham, off the record, without addressing it or stopping it.

168. The administrative retaliation by Gorham and Messer was motivated, at least in part, by Bisasor's race discrimination complaint about a court staff. Bisasor is an African American pro se litigant who was subjected to administrative barriers not imposed on similarly situated white litigants. Upon information and belief, no white litigant at Hillsborough Superior Court North has been banned from contacting the clerk's office for raising concerns about staff conduct. The administrative retaliation was also motivated by Bisasor's exercise of his First Amendment right to petition government officials about grievances. Raising concerns about the conduct of court staff is constitutionally protected speech. Gorham's retaliatory ban and behind-the-scenes communications with Messer would chill a person of ordinary firmness from exercising the right to complain about government misconduct.

169. Gorham's actions were administrative functions, not judicial acts. The Supreme Court has drawn a clear distinction between judicial acts (which involve the resolution of disputes between parties and the exercise of adjudicatory discretion), and administrative acts (which involve the management of court

operations, the supervision of staff, and the implementation of policies). The ban on contacting the clerk's office, the decision to retaliate against a litigant who complained about staff, and the behind-the-scenes communications with a judge about a pending case are all administrative in character.

170.   Messer's acquiescence in the administrative ban, her failure to intervene to protect a litigant's access to the clerk's office, and her participation in the pattern of retaliation similarly constituted administrative acts taken outside her judicial function. These actions were not taken in the course of resolving disputes between parties, were not the product of any adjudicatory process, and did not involve the exercise of judicial discretion in deciding cases or motions.

171.   The Gorham-Messer coordination is significant because it demonstrates that the administrative retaliation was not the product of a single individual's decision but was a behind the scenes, off-record, concerted effort involving an administrator and the presiding judge. The behind-the-scenes nature of their communications (occurring outside any docketed proceeding or adjudicatory process) underscores the administrative, rather than judicial, character of their conduct. Messer did not admit it publicly. Bisasor only knew about this because during a certain call with Gorham, where Bisasor pressed Gorham about the reason for the ban, Gorham inadvertently, as if almost by accident, insinuated/referenced her contacts with Messer behind-the-scenes, as if in an informal manner, as if to suggest that there is behind-the-scenes power dynamics at play. When Gorham was asked to admit that Bisasor was subjected to this lifetime ban, because of the race-discrimination concerns he raised about a court staff, Gorham did not deny it. In fact, her silence was an admission. She even went as far as almost daring Bisasor that he is free to bring a lawsuit against her if he thinks that will get anywhere (i.e., in the NH court system). When he told her that he did not want to file suit, but he would like to bring this to the attention of the Chief Judge Tina Nadeu, Gorham immediately deflected and directed him elsewhere. Gorham refused to refer the complaint to Chief Judge Tina Nadeu even though he requested she do so multiple times. Gorham was evidently confident that Bisasor as an African-American pro se plaintiff from Massachusetts would be disadvantaged in trying to hold her accountable in NH.

172. Gorham also directed all staff, both in the e-filing center and call center, and in the NH superior courthouses, under her supervision, to carry out the ban against Bisasor, preventing Bisasor from contacting, emailing, calling or speaking to anyone at courthouses in NH, in particular the courthouses where Bisasor had pending cases, which at the time were at least 3 different courthouses throughout NH. When Bisasor tried to get basic information from the courts, he was blocked and even hung upon because of the direction by Gorham. Note: What would anyone have to do in order to be subjected to such a comprehensive lifetime ban from contacting any court in NH? This was absolutely unheard of and unconscionable that a court administrator would abuse power in this way against pro se African-American plaintiffs. This is so extreme and ridiculous that it can only be explained by racial animus. No white similarly-situated plaintiff has had to deal with or has been subjected to this kind of draconian ban. Further, when Bisasor asked if the current defendants in his cases were also banned, she indicated they were not. This meant that the defendants were free to contact the court about Bisasor's cases against them, but Bisasor was not so free to do so. In addition, Gorham told Bisasor that the ban extended to his wife. When asked the reason, Gorham declined to answer but the indication was she was being banned simply for being married to Bisasor and/or for simply being a co-plaintiff, even though she had no contact with the court staff herself. This is arguably one of the most egregious developments in the entire pattern of events that are the subject of the claims against Gorham. This act symbolized a white woman court administrator in NH, so drunk with power that she believed she could simply arbitrarily ban a black man's wife for no reason other than for being married to him. The situation cried out for relief, and it is why plaintiffs eventually filed suit in federal court.

173. Gorham departed her position in the New Hampshire Judicial Branch in April 2024, joining the staff of the United States District Court for the District of New Hampshire. After Gorham's departure, the pattern of administrative retaliation continued independently based on Gorham's instructions to the court staff under her, in particular those in Judge Messer's court, who maintained the barriers to Bisasor's access to court services that Gorham had established. The continuation of the retaliatory pattern after

Gorham's departure further demonstrates that Messer independently adopted/perpetuated the administrative retaliation by Gorham. Unfortunately, the same pattern has now repeated in this federal court with Gorham behind the scenes at the clerk's office. Ever since her arrival, the clerk office in NH federal court has suddenly began to engage in a number of highly irregular, erroneous and prejudicial conduct towards Bisasor and his wife, in this case, which has been documented in multiple emails and complaints including those made to First Circuit administrative executive, which were forwarded to the proper chief judge of this court, Linda Maccaferty and then Samantha Elliott.

### ii. Race Discrimination and Retaliation Claims Against Gorham

174.    Plaintiff alleges that Karen Gorham acted under color of state law in her capacity as Superior Court Administrator for the New Hampshire Judicial Branch. Gorham deprived Bisasor of his rights under the Fourteenth Amendment to the United States Constitution by: (a) retaliating against Bisasor for raising concerns about a clerk staff member named Alma by imposing an administrative ban prohibiting Bisasor from contacting the clerk's office; (b) communicating with Judge Messer behind the scenes about Bisasor's complaints in a manner designed to prejudice Bisasor's case and standing before the court; and (c) subjecting Bisasor, an African American pro se litigant, as well as his wife, to administrative barriers and retaliatory treatment that were not imposed on similarly situated white litigants.

175.    Race was a motivating factor in Gorham's retaliatory actions. No white litigant at Hillsborough Superior Court North was subjected to a lifelong administrative ban from contacting the courts/clerks' office. Gorham's conduct was administrative in nature (she acted in her capacity as the court administrator, not as a judicial officer) and is not protected by judicial immunity. Forrester v. White, 484 U.S. 219 (1988). This conduct, taken under color of state law, violated Bisasor's (and Anderson's) rights to equal protection and due process under the 14th Amendment, actionable through 42 U.S.C. §1983.

### iii. First Amendment Retaliation Claims Against Gorham

176.    Bisasor engaged in constitutionally protected speech by raising concerns about the conduct of clerk staff member Alma at Hillsborough Superior Court North. The right to petition government officials about grievances, including complaints about the conduct of public employees, is protected by the First

Amendment to the United States Constitution. Gorham, acting under color of state law as Superior Court Administrator, retaliated against Bisasor for this protected speech by imposing an administrative ban prohibiting him from contacting the clerk's office and by communicating with Judge Messer behind the scenes in a manner designed to prejudice Bisasor. Gorham's retaliatory actions were substantially motivated by Bisasor's protected speech. The imposition of an administrative ban in response to a litigant's discrimination complaints about staff conduct would chill a person of ordinary firmness from exercising the right to petition government officials about grievances. This conduct violated Bisasor's rights under the First Amendment, actionable through 42 U.S.C. § 1983.

### C. The Continuing Nature of Gorham's Conduct

177.    The continuing force of Gorham's administrative retaliation is documented in a 9-12-25 email exchange between Bisasor and Maicie L. Cherry, the Superior Court E-Filing Assistant Manager at Hillsborough Superior Court North. When Bisasor contacted the E-Filing Center to report that confidential medical documents filed under seal in connection with his ADA requests had been unlawfully published on the public docket (exposing his private medical information to the public in direct violation of the ADA's confidentiality protections), Cherry responded by invoking Gorham's ban: "…*As the past Superior Court Administrator, Karen Gorham told you, we would not be taking your calls.*"

178.    This statement is remarkable for what it reveals. Gorham had departed the Superior Court Administrator position in April 2024, yet more than 17 months later, her directive to deny Bisasor access to court administrative services was still being enforced by court personnel as operative policy. No judicial order authorized the ban. No hearing was ever held. No written policy supported it. It was an extrajudicial administrative sanction imposed by a single administrator in retaliation for Bisasor's complaints about court staff, and it continued to operate with full institutional force long after the administrator who imposed it had left the court and assumed a position as Chief Deputy Clerk of the very federal court in which this action is now pending.

179.    When Bisasor requested a telephone call as a reasonable accommodation under the ADA, explaining that it was necessary to communicate effectively, and that he needed to demonstrate the docketing errors

54

in real time, the request was refused. The result was that Bisasor's confidential medical letter remained publicly visible on the docket, his accommodation request went unaddressed, and the sealed documents he had filed remained publicly accessible in violation of both the court's own sealing rules and the ADA.

180.    This episode is not an isolated bureaucratic failure; it is a concrete manifestation of the institutional pattern alleged throughout this complaint. Gorham's retaliatory ban, imposed during her tenure as Superior Court Administrator, was adopted and perpetuated by her successors without question, without review, and without any concern for its legality, in the very court Judge Messer presided. Messer, as the presiding judge, had the authority and the obligation to ensure that a litigant in her courtroom had access to basic court services and that sealed medical documents were not exposed to the public. Her failure to intervene, despite Bisasor's contemporaneous complaints to Judge Messer, demonstrates that the administrative retaliation was not merely Gorham's personal decision but an informal off-record posture that Messer endorsed and sustained. For these and other similar acts, including those by Gorham, Messer and court staff, the State of New Hampshire, through its judicial branch, denied Bisasor meaningful access to the courts by maintaining an unauthorized ban on his telephone communications with court personnel, refusing his ADA accommodation requests, including basic requests for a telephone call, and allowing his confidential medical information to be published on a public docket in violation of the ADA's requirement that medical documentation submitted in support of accommodation requests be maintained in confidence and not disclosed to individuals who do not need the information for purposes of implementing the accommodation.

181.    These facts demonstrate that the claims against Gorham and Messer rests on a coordinated effort at retaliation via a top-down administrative policy imposed by a court administrator and perpetuated, unofficially, by the presiding judge. Judge Messer had not made any ruling from the bench about these occurrences; and she failed to intervene or address them, when Bisasor brought these occurrences to her attention, thus tacitly sanctioning, or being deliberately indifferent to, such occurrences.

182. The administrative retaliation at Hillsborough Superior Court North constitutes a continuing violation that spans from Gorham's initial ban on Bisasor's contact with the clerk's office through Messer's perpetuation of that ban and related retaliatory conduct into 2024 and 2025. The denial of ADA accommodations was similarly ongoing, having persisted throughout the life of Bisasor's state court case.

183. The conduct alleged herein is not a series of isolated incidents but a continuing coordinated pattern of misconduct spanning from 2021 through 2025. The pattern of racial discrimination pervading this conduct is itself a continuing violation including race-based administrative retaliation at the courthouse. This pattern must be tested in federal court, as it is inconceivable that plaintiffs can or will be barred/banned from contacting the courts in New Hampshire forever. This cannot be maintained or upheld and must be struck by the federal court.

---

## SECTION 6: CONCLUSION

---

184. The cumulative burden of litigating under these conditions imposes a distinct toll on Plaintiffs that is itself relevant to the fairness inquiry. Beyond the ordinary demands of prosecuting a civil rights case pro se, Plaintiffs have been required to devote substantial time and energy to correcting clerical errors, responding to sanction threats, defending against ambiguous procedural warnings, and seeking review of administrative irregularities that should never have arisen in the first place. Each such episode diverts attention from the merits of the case and compounds the prejudice.

185. The terrain of this case has become a procedural minefield for Plaintiffs, where routine filings and ordinary requests carry disproportionate risk of adverse consequence. The dynamic recalls what has been described, in commentary on discrimination and institutional power, as a "privilege escalator", where the represented and the favored move forward by default easily without obstacle, while those who are disfavored must fight to remain in place. See, for reference, the widely-circulated discussion of this dynamic on publicly available platforms, including video commentary on discrimination and the privilege escalator metaphor. https://www.youtube.com/watch?v=vX_Vzl-r8NY.

186.    Further, it bears acknowledging that Judge Elliott may not have direct or real-time visibility into every act or omission of her staff. If clerk personnel act, or fail to act, in ways that prejudice Plaintiffs, and do so quietly or outside the docket, the Court may not become aware of the problem until after Plaintiffs raise it, by which time the harm may already be inflicted. This is not a hypothetical concern; it has occurred at least twice in this case. Judge Elliott evidently did not know that Case Manager Negron had mishandled or failed to docket Plaintiff's confidential medical-documentation email until Plaintiff raised it. Nor does it appear that the Court knew that a court mailing had been sent to Ms. Anderson's wrong address, without any ECF notice to Plaintiffs, until Plaintiffs complained. The pattern is documented in the exhibits and screenshots attached hereto, and is reinforced by the contemporaneous Donovan filing submitted in this case.

187.    Finally, it should be noted that the reasonable-observer test is not a checklist. It is a holistic assessment of whether, taken together, the circumstances would cause a fair-minded person to question the court's impartiality. *In re Martinez-Catala*, 129 F.3d at 220. Each ground for recusal here would, standing alone, present a substantial § 455(a) question. Taken together, the prior recusal involving the same person, Gorham's present role, the NHLA institutional affiliation, Berry's association with that institution, the absence of any hearings, the sua sponte filing restriction, and the Negron sequence leave no fair-minded observer with the impression of neutrality. The balance, if it were in any sense close, must tip toward recusal. *In re Boston's Children First*, 244 F.3d at 167.

188.    Yet, this is not a difficult matter to determine. In addition to the reasonable-observer inquiry, two independent grounds, each separately sufficient, each codified in federal statute and in the Code of Conduct for United States Judges, compel disqualification. First, a sitting judge previously recused herself from related litigation because Karen Gorham, now her own Chief Deputy Clerk, was a named defendant; the present case arises from the very same or similar factual matrix, is brought by the same plaintiff, and involves adding Gorham as a named defendant. Second, and even more directly, the organization that served as attorney of record for Plaintiffs in the underlying matter out of which this

case grew was New Hampshire Legal Assistance, a private nonprofit legal-services corporation. The retainer agreement was with NHLA. NHLA was the plaintiffs' lawyer. Elliott Berry was the staff attorney NHLA assigned to handle the file. During the material period of that representation, Judge Elliott was the sitting President of NHLA. Under 28 U.S.C. § 455(b)(2) and Canon 3C(1)(b) of the Code of Conduct for United States Judges, this arrangement is a per se ground for disqualification, entirely apart from any appearance analysis. Under 28 U.S.C. § 455(a), the appearance question on these facts is not close. A reasonable, informed observer, told that the head of plaintiffs' law firm during the representation now sits as the judge on plaintiffs' case, does not balance factors.

189.    See attached Exhibits which are incorporated herein.

190.    To the best of my knowledge and belief, all statements made in this affidavit are true and accurate.

191.    NB: Plaintiff reserves the right to correct, clarify or update any statements herein if or after discovery or further information is obtained.

**Signed under the pains and penalties of perjury**

Respectfully submitted by:
/s/andre bisasor
Andre Bisasor

Dated: April 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was this day forwarded through the Court's electronic filing system to all counsel of record.

/s/andre bisasor
Andre Bisasor

## APPENDIX A: COMPLETE TABLE OF MOTIONS FILED BY PLAINTIFFS
Bisasor v. Donais, Civil No. 1:25-cv-00251-SE-AJ (D.N.H.)

The following table identifies every motion filed by either Plaintiff before the issuance of the Case Management Order (Doc. 91 on 2-9-26), excluding motions to participate in electronic filing (Docs. 7, 40, 77). For each filing, the table indicates the docket number, date, filing party, title, whether the emergency designation was used, whether the filing was a repeat of a previously denied motion, the disposition, whether the filing was a required procedural motion, and the substance of the Court's order.

| Doc. | Date | Filer | Motion Title | Emg. | Repeat | Disposition | Proc. | Court Order Summary |
|------|------|-------|--------------|------|--------|-------------|-------|---------------------|
| 5 | Jul 10, 2025 | Bisasor | Sealed Motion for Accommodation Under the ADA | No | No | Denied as moot | Yes (ADA) | Denied as moot after Doc. 7 (motion for e-filing) was granted. |
| 6 | Jul 10, 2025 | Bisasor | Motion to Seal at Level II | No | No | Granted | Yes (seal) | Granted. Required companion to ADA motion. |
| 12 | Jul 28, 2025 | Bisasor | Notice of Filing of Assented-To Emergency Motion to Extend Deadline to File Oppositions to MTDs | Yes | No | Filing error | Yes (extension) | Clerk issued ECF Filing Error notice directing refile using correct docket event. Refiled as Doc. 16. |
| 15 | Aug 1, 2025 | Bisasor | Motion to Remand Case to NH Superior Court | No | No | Denied | No | Denied Oct 9, 2025 (Doc. 35). Court warned about LR 5.1 formatting. |
| 16 | Aug 1, 2025 | Bisasor | Emergency Motion to Extend Time to Object/Respond to MTDs (refile of Doc. 12) | Yes | No (refile per Clerk) | Granted | Yes (extension) | Granted. Same motion as Doc. 12, refiled per Clerk instructions. |
| 21 | Aug 15, 2025 | Bisasor | Emergency Motion to Stay Briefing Pending Remand Decision | Yes | No | Granted | Yes (stay) | Granted. |
| 22 | Aug 15, 2025 | Bisasor | Emergency Motion to Clarify Whether Aug 22 MTD Deadline Moot in Light of Amended Complaint | Yes | No | Granted | Yes (clarification) | Granted. Defendants' first MTDs denied without prejudice. |
| 24 | Aug 20, 2025 | Bisasor | Emergency Motion to Extend Time to File Reply to Defendants' Oppositions to Motion to Remand | Yes | No | Granted | Yes (extension) | Granted. |
| 27 | Aug 22, 2025 | Anderson | Emergency Motion to Extend Time to File Replies to Remand Oppositions | Yes | No | Granted | Yes (extension) | Granted. |
| 28 | Aug 22, 2025 | Bisasor | Emergency Motion to File Reply to Donais Defendants' Opposition to Emergency Motion to Stay Briefing | Yes | No | Denied as moot | Yes (reply) | Denied as moot. Underlying dispute resolved. |
| 29 | Aug 26, 2025 | Bisasor | Emergency Motion to Clarify Service Requirements for Defendant Amy Messer | Yes | No | Denied | Yes (clarification) | Denied. |

| Doc. | Date | Filer | Motion Title | Emg. | Repeat | Disposition | Proc. | Court Order Summary |
|---|---|---|---|---|---|---|---|---|
| 33 | Sep 22, 2025 | Bisasor | Emergency Motion for Hearing on Remand Issues | Yes | No | Denied | Yes (hearing) | Denied. |
| 37 | Oct 23, 2025 | Bisasor | Motion for Reconsideration of Order Denying Motion to Remand | No | No | Denied | No | Denied. Reconsideration expressly authorized by LR 7.2(d). |
| 39 | Oct 28, 2025 | Bisasor | Emergency Motion for Clarification on Leave to File Reply to Donais Objection to Reconsideration | Yes | No | Granted | Yes (clarification) | Granted. |
| 41 | Oct 31, 2025 | Bisasor | Emergency Motion to Extend Time to File Response to Donais MTD of Amended Complaint | Yes | No | Granted | Yes (extension) | Granted. |
| 42 | Nov 3, 2025 | Bisasor | Sealed Motion for ADA Accommodations | No | No | Denied | Yes (ADA) | Denied. |
| 43 | Nov 3, 2025 | Bisasor | Motion to Seal Doc. 42 (ADA Motion) | No | No | Granted in part | Yes (seal) | Granted at Level I (not Level II as requested). |
| 45 | Nov 5, 2025 | Bisasor | Motion to Seal Doc. 44 (Medical Documentation) | No | No | Granted in part | Yes (seal) | Granted at Level I. |
| 46 | Nov 6, 2025 | Anderson | Sealed Motion for Accommodation Under the ADA | No | No | Denied | Yes (ADA) | Denied. |
| 47 | Nov 6, 2025 | Anderson | Motion to Seal Doc. 46 (ADA Motion) | No | No | Granted in part | Yes (seal) | Granted at Level I. |
| 50 | Nov 7, 2025 | Bisasor | Emergency Motion for Case Management Conference | Yes | No | Denied | Yes (conference) | Denied. Court declined to hold conference. |
| 51 | Nov 7, 2025 | Bisasor | Motion for Default as to Defendant Russell Hilliard | No | No | Denied | No | Denied. |
| 52 | Nov 7, 2025 | Bisasor | Motion for Sanctions Against Donais Defendants | No | No | Denied | No | Denied. |
| 59 | Nov 21, 2025 | Bisasor | Motion for ADA Accommodation | No | No | Denied | Yes (ADA) | Denied. |
| 60 | Nov 21, 2025 | Bisasor | Motion to Seal Doc. 59 (ADA Motion) | No | No | Granted in part | Yes (seal) | Granted at Level I. |
| 62 | Dec 12, 2025 | Bisasor | Emergency Assented-To Motion to Extend Time to File Oppositions to Hilliard MTD | Yes | No | Granted | Yes (extension) | Granted. Defense counsel assented. |
| 64 | Dec 16, 2025 | Bisasor | Emergency Motion to Extend Time to Synchronize Deadlines for Responses to MTDs | Yes | No | Granted | Yes (extension) | Granted. |
| 65 | Dec 23, 2025 | Bisasor | Emergency Motion to Clarify the Court's December 16, 2025 Order | Yes | No | Granted in part | Yes (clarification) | Granted in part, denied in part. |

| Doc. | Date | Filer | Motion Title | Emg. | Repeat | Disposition | Proc. | Court Order Summary |
|---|---|---|---|---|---|---|---|---|
| 66 | Dec 24, 2025 | Bisasor | Emergency Motion for One-Time ADA Accommodation | Yes | No | Denied | Yes (ADA) | Denied. Superseded by corrected version Doc. 67. |
| 67 | Dec 24, 2025 | Bisasor | Emergency Motion for One-Time ADA Accommodation (CORRECTED) | Yes | No (correction) | Denied | Yes (ADA) | Denied (Doc. 69, Jan 2, 2026). Corrected version of Doc. 66, not independent motion. |
| 70 | Jan 8, 2026 | Bisasor | Emergency Motion to Synchronize Deadlines for Both Plaintiffs' Responses to MTDs | Yes | No | Denied | Yes (synchronize) | Denied. |
| 73 | Jan 12, 2026 | Bisasor | Emergency Motion for Reconsideration of Emergency Motion to Synchronize Deadlines | Yes | No | Denied as moot | Yes (reconsideration) | Denied as moot in light of Doc. 74 requesting same relief. |
| 74 | Jan 12, 2026 | Bisasor | Sealed Motion to Synchronize Deadlines (supersedes Doc. 73) | No | No (supersedes) | Pending/Denied | Yes (synchronize) | Superseded Doc. 73. Court acknowledged same substantive relief. |
| 75 | Jan 12, 2026 | Bisasor | Motion to Seal Doc. 74 | No | No | Granted | Yes (seal) | Granted at Level I. |
| 76 | Jan 20, 2026 | Bisasor | Motion to Extend Time to Object/Respond to Pending MTDs to January 28, 2026 | No | No | Denied (exception granted) | Yes (extension) | Denied, but one-time exception granted to file by email. |
| 80 | Jan 21, 2026 | Anderson | Motion for Reconsideration of Order Denying Motion to Remand | No | No | Denied | No | Denied. |
| 81 | Jan 22, 2026 | Anderson | Motion for Discovery on Remand | No | No | Held in abeyance | No | Held in abeyance. |
| 83 | Jan 22, 2026 | Anderson | Emergency Motion for Certification for Interlocutory Appeal | Yes | No | Denied | No | Denied Jan 23, 2026. FIRST warning re emergency motions: 'refrain from filing motions as emergency unless truly insufficient time.' Cited McGillicuddy v. Clements. |
| 84 | Jan 23, 2026 | Anderson | Motion for Leave to File Second Amended Complaint | No | No | Denied | No | Denied for failure to comply with LR 15.1. |
| 89 | Feb 2, 2026 | Anderson | Motion to Compel Defendants to Supplement Diversity Disclosures | No | No | Granted in part | No | Granted in part, denied in part (Doc. 92, Feb 9, 2026). |
| 90 | Feb 3, 2026 | Anderson | Motion for Hearing on Defendants' Motions to Dismiss | No | No | Pending at CMO | No | Pending at time of CMO issuance. |

Note: The defendants also filed emergency motions (Docs. 17 and 19), both of which were granted without any adverse comment or suggestion the emergency designation was improper. Those filings are not included in this table because they were not filed by Plaintiffs, but they are discussed in the body of the motion.

# Exhibit 1

**Letter of Concerns to Chief Judge**

November 6, 2025

Re: Administrative Concerns Regarding Case Management and Appearance of Bias
Case: Bisasor v. Donais, et al., Case No. 1:25-cv-00251-SE-AJ
United States District Court for the District of New Hampshire

Dear Chief Judge:

1. I write to bring to your attention serious concerns regarding the administration of justice in the above-captioned case, including issues related to the appearance of judicial bias, potential conflicts of interest, inconsistent application of procedural rules, failure to address ADA accommodation requests, and possible retaliation for complaints about court personnel.

## I. BACKGROUND

2. I am a pro se plaintiff in a civil rights action pending in the U.S. District Court for the District of New Hampshire before Judge Samantha D. Elliott. My co-plaintiff is Natalie Anderson, my spouse, who was added to this action via First Amended Complaint filed on July 29, 2025. On November 5, 2025, Judge Elliott issued an order (Doc. 42) denying Ms. Anderson's motion for electronic filing access and warning me that "continued failure to comply with the court's rules will result in the termination of [my] electronic filing privileges."

3. This order, and the pattern of case administration surrounding it, raises substantial concerns about the appearance of bias and unequal application of the Federal Rules of Civil Procedure.

## II. SPECIFIC CONCERNS
### A. Judge Elliott's Prior Association with New Hampshire Legal Assistance

4. Judge Elliott served on the board of directors of New Hampshire Legal Assistance (NHLA), including as board president, before her appointment to the federal bench in 2021. She also served as co-chair of the founding board of 603 Legal Aid when NHLA merged with other legal aid organizations in June 2021.

5. Relevance to this case: Attorney Elliott Berry from NH Legal Assistance is materially involved in this case. Mr. Berry has made statements that go to the heart of the claims in this litigation. Given Judge Elliott's extensive leadership role with NHLA immediately before becoming a federal judge, and given that NHLA/603 Legal Aid is directly involved in this case through Mr. Berry, there exists at minimum an appearance of bias that "might reasonably [cause a person's] impartiality [to be] questioned" under 28 U.S.C. § 455(a).

6. Also, she would have been on the board while NHLA was representing my wife and myself. Any appearance of bias, including overcompensation for having been associated with the NHLA during its representation in order to not appear to be biased by being harsher with us, could trigger recusal.

7. I respectfully request that this potential conflict be examined to determine whether recusal is appropriate.

### B. Inconsistent Application of Electronic Filing Rules

8. On November 5, 2025, Judge Elliott denied plaintiffs' motion for Ms. Anderson to participate in electronic filing because she did not use the court's official form and did not file the motion in paper (Doc. 42). The court also referenced a September 15, 2025 Notice of ECF Filing Error stating that Ms. Anderson's filings must be "conventionally filed and served" until she receives court authorization for e-filing.

9. However, the court has been inconsistent in enforcing this requirement:
1. First Amended Complaint (Doc. 13, filed July 29, 2025): This complaint adding Ms. Anderson as a plaintiff contained both my signature and Ms. Anderson's signature. It was filed electronically. The court accepted this filing without objection.
2. Motion to Remand (Doc. 17, filed July 30, 2025): This motion was styled as filed by "Plaintiffs" and contained both signatures. It was filed electronically using my credentials. No objection was raised.

3. Emergency Motion for Extension (Doc. 26, filed August 20, 2025): I filed this motion, which Ms. Anderson later joined via her own emergency motion for extension (Doc. 27, filed August 22, 2025) that referenced and assented to my motion. Both documents contained both plaintiffs' signatures.

4. Motion to Clarify Service Requirements (Doc. 39, filed October 28, 2025): This motion was filed by both plaintiffs and contained both signatures.

10. Only after months of accepting documents with both signatures did the court suddenly enforce strict compliance. The November 5, 2025 order cites the September 15, 2025 notice, but provides no explanation for why the First Amended Complaint itself, filed before the September 15 notice, was acceptable with both signatures, yet subsequent filings were not.

11. This selective and retroactive enforcement of filing rules creates confusion and suggests an inconsistent application of procedural requirements. As a pro se litigant, I relied on the court's acceptance of our First Amended Complaint as precedent for how joint filings should be handled when one plaintiff lacks e-filing access.

12. Further, this raises a legitimate procedural question: Can one plaintiff with e-filing access file documents signed by both plaintiffs when the second plaintiff doesn't yet have e-filing access?

13. And how am I supposed to know that I can't file a document that contains both my and my wife's signature?

14. There are prior documents that had both signatures and the clerk/court said nothing about it. The judge appears to be taking a rushed punitive stance or tone unnecessarily with me. Moreover, I did not know filing with both signatures of both plaintiffs, even though one plaintiff is not yet added to efiling, is against the court rules. If one plaintiff can file the motion and the other plaintiff assents or joins in on it, why is this against the rules? And which rule states this? It seems Judge Elliott is rigidly construing the rules against me to be punitive. Moreover, I had previously been allowed efiling by emailing to the clerk and not conventionally under the ADA. Anderson recently filed an ADA motion. Yet, Judge Elliott shows no consideration of that. Moreover, a previous ADA filing by me went unanswered when I sought accommodation.  The chiding caution to me that my efiling will be terminated seem premature, harsh and disproportionate, which signals a rush to punish me.

### C. Failure to Address ADA Accommodation Requests

15. Ms. Anderson filed an Emergency Motion for Extension of Time on August 22, 2025 (Doc. 27), which explicitly sought ADA accommodation. The motion stated grounds related to disability. The court has not ruled on this motion or acknowledged the ADA accommodation request.

16. Additionally, I previously filed an ADA accommodation request seeking permission to file motion for efiling access by email to the clerk rather than through the conventional ECF system, and it was granted. I filed thereafter filed another request to email a time-sensitive response to a motion to dismiss because the court took several weeks to rule on the motion for efiling access. That ADA request went unanswered.

17. The November 5, 2025 order makes no reference whatsoever to Ms. Anderson's ADA needs or her pending accommodation request. It treats the e-filing issue as purely procedural, directing her to file the proper form "in paper," without any consideration of whether conventional paper filing creates an undue burden given her disabilities.

18. The Americans with Disabilities Act and Rehabilitation Act requires federal courts to provide reasonable accommodations to individuals with disabilities. By ignoring our ADA requests and imposing strict procedural requirements without consideration of disability-related barriers, the court may be violating its obligations under the ADA.

### D. Unequal Treatment of Parties: Service of Process

19. Ms. Anderson was added as a plaintiff via First Amended Complaint on July 29, 2025 (Doc. 13). Defendants have not served Ms. Anderson in accordance with Federal Rule of Civil Procedure 4. There is no acknowledgment that Ms. Anderson has been served.

20. Despite this failure by defendants to comply with the Federal Rules, the court has:
- Said nothing about defendants' failure to serve Ms. Anderson
- Imposed no deadlines or consequences on defendants for this failure
- Made no inquiry into whether Ms. Anderson has been properly served by defendants

2

21. Yet the court has:
    - Strictly enforced procedural rules against us regarding e-filing signatures
    - Warned me that my e-filing privileges will be terminated for "continued failure to comply with the court's rules"
    - Required Ms. Anderson to comply with specific procedural requirements despite never having been served
22. This disparate treatment, strict enforcement of rules against pro se plaintiffs while overlooking defendants' failures, creates a strong appearance of bias.
23. Further, Judge Elliott asserts "continued failure to comply". When was the first failure to comply? I was not the one who filed Ms. Anderson's reply to remand that triggered the clerk's notice of error on 9-15-25. It was Ms. Anderson who did so, using my login credentials. This inordinate desire to direct warnings to me is unfair.
24. Similarly, Judge Elliott in her order on remand, at the end, sought to hold me accountable for something that another judge more than a year ago in another case said regarding double spacing and warned me that I will be punished if it happens again. This trigger readiness to be punitive signals bias. Note: I did not even remember what that judge said over a year ago about double spacing. Moreover, the court said nothing about double spacing issue in the several filings at the outset of the case after removal to this court. Then suddenly it came with this threat.

### E. Potential Retaliation for Complaints About Court Personnel

25. I previously filed, with the Chief Justice, complaints about Clerk Tracy Uhrin and Case Manager Vincent Negron for their failure to respond to my emails, their inconsistent handling of filings, and what I believe to be discriminatory treatment.
26. The timing and tone of Judge Elliott's November 5, 2025 order raise concerns about whether this order constitutes retaliation for my complaints about court staff. This is on top of prior raised concerns that my lawsuit against Clerk Karen Gorham has triggered retaliatory impulses. Note: Clerk Negron still continue to ignore my emails suggesting continued animus.
27. Judge Elliott's order:
    - Issues a threat to terminate my e-filing privileges
    - Is unusually stern in tone
    - Enforces rules that had not been consistently enforced previously
    - Comes shortly after I filed complaints about court personnel
28. Federal law prohibits retaliation against individuals who complain about discrimination or who exercise their right to access the courts. If this order was motivated in any part by my complaints about court staff, it would constitute improper retaliation.

### F. Pattern of Adverse Rulings and Appearance of Pro Se, Outsider, and Race Bias

29. As an African American pro se litigant from Massachusetts (not New Hampshire), I am concerned about the potential for multiple forms of bias affecting this case:
    1. Pro se bias: The court has applied procedural rules strictly against us while not equally enforcing rules against represented defendants.
    2. Outsider bias: As Massachusetts residents litigating in New Hampshire federal court against New Hampshire defendants, we may be subject to local favoritism toward in-state parties.
    3. Race bias: Both Ms. Anderson and I are African American. The dismissive tone of the November 5 order, the lack of accommodation for our procedural difficulties, and the apparent double standard in rule enforcement raise concerns about whether race is a factor in how our case is being managed.
30. These concerns are not based solely on unfavorable rulings. Rather, they are based on the pattern of:
- Inconsistent enforcement of rules
- Failure to address ADA requests
- Ignoring defendants' non-compliance while threatening sanctions against us
- Judge Elliott's prior association with an organization involved in our case

3

- The timing and tone of warnings following complaints about court staff

### G. The Tone and Proportionality of the November 5, 2025 Order

31. The November 5, 2025 order states: "Plaintiff Bisasor is cautioned that continued failure to comply with the court's rules will result in the termination of his electronic filing privileges."

32. This warning is premature, harsh, and disproportionate because:

    1. I did not knowingly violate any rule. The First Amended Complaint with both signatures was accepted without objection, establishing what appeared to be an acceptable practice.

    2. The September 15, 2025 notice was ambiguous. It stated that Ms. Anderson's filings must be filed conventionally, but did not clearly address whether I could file documents containing both signatures or whether Ms. Anderson could join or assent to my filings.

    3. No prior warning was given. The November 5 order threatens termination of privileges without any prior individualized warning about my specific conduct.

    4. The order is one-sided. It says nothing about defendants' failure to serve Ms. Anderson or comply with other procedural requirements.

33. The harshness of this order, combined with the other factors outlined above, creates a reasonable perception that the court is predisposed against us and is seeking reasons to sanction us rather than facilitate our access to justice.

### III. REQUEST FOR ADMINISTRATIVE REVIEW

34. I respectfully request that the Chief Judge:

    1. Review Judge Elliott's prior association with New Hampshire Legal Assistance and determine whether recusal is appropriate given NHLA's involvement in this case through attorney Elliott Berry.

    2. Review the pattern of inconsistent enforcement of procedural rules in this case and determine whether pro se plaintiffs are being held to a different standard than represented defendants.

    3. Direct the District Court to rule on pending ADA accommodation requests and ensure that Ms. Anderson's disability-related needs are properly considered before imposing procedural requirements.

    4. Investigate whether the November 5, 2025 order constitutes retaliation for complaints filed against court personnel.

    5. Ensure that defendants are required to properly serve Ms. Anderson in accordance with Federal Rule of Civil Procedure 4 before imposing further obligations on her.

    6. Consider whether reassignment of this case to a different judge is appropriate given the appearance of bias and the cumulative concerns outlined above.

### IV. CONCLUSION

35. I am not here challenging the correctness of any substantive ruling in this case. Rather, I am raising concerns about the administration of justice, the appearance of bias, inconsistent application of procedural rules, failure to address ADA needs, and potential retaliation.

36. As a pro se litigant, I am doing my best to comply with all applicable rules and procedures, which I may not be familiar with every rule as a non-lawyer. However, when rules are enforced inconsistently, when ADA requests go unanswered, when defendants' non-compliance is ignored while plaintiffs are threatened with sanctions, and when the judge has prior associations with entities involved in the case, the appearance of impartial justice is compromised.

37. I respectfully request that these concerns be taken seriously and that appropriate administrative action be taken to ensure that this case is handled fairly and impartially.

38. Thank you for your attention to this matter.

Respectfully submitted,<br>
/s/andre Bisasor<br>
Andre Bisasor

4

# Exhibit 2

 **Outlook**

---

## Re: Request for Urgent Assistance – Outstanding Motions and Docket Issues | NH Federal Court | Case No. 1:25-cv-00251 | Bisasor et al. v. Donais et al

---

**From** Liberty _6 <liberty_6@msn.com>

**Date** Tue 1/20/2026 2:01 PM

**To** JCD_PetitionforReview@ao.uscourts.gov <JCD_PetitionforReview@ao.uscourts.gov>

**Cc** susan_goldberg@ca1.uscourts.gov <susan_goldberg@ca1.uscourts.gov>; Gina Riccio <gina_riccio@ca1.uscourts.gov>; Tracy Uhrin <tracy_uhrin@nhd.uscourts.gov>; Vincent Negron <vincent_negron@nhd.uscourts.gov>

〔📎〕 3 attachments (4 MB)

print gina prior-ab.pdf; print gina prior.pdf; print tracy prior.pdf;

**COMPLAINT TO THE JUDICIAL COUNCIL OF THE FEDERAL COURTS**

**REGARDING CONDUCT OF CLERK'S OFFICE STAFF**

**of the United States District Court for the District of New Hampshire**

**Filing Date**: January 20, 2026
**Complainant**: Natalie Anderson
**Email:** Liberty_6@msn.com
**Case Number(s) Affected:** 1:25-cv-00251 (Bisasor, et al. v. Donais, et al.)
**Subject of Complaint**: Conduct of Clerk's Office Staff, U.S. District Court for the District of New Hampshire

### <u>STATEMENT OF FACTS</u>

I, Natalie Anderson, am a pro se plaintiff in the above-referenced federal court action pending in the U.S. District Court for the District of New Hampshire. I file this complaint under 28 U.S.C. § 372 or other applicable policy of the judicial council judicial conference of the federal courts, regarding the conduct of the Clerk's Office staff, specifically Tracy Uhrin, Clerk of Court, and Vincent Negron, Case Clerk, whose conduct I believe has been prejudicial to the effective and expeditious administration of justice and has impeded my ability to prosecute my case.

### Background

I am proceeding pro se in a civil action alleging multiple causes of action including defamation, breach of fiduciary duty, racial discrimination, tortious interference, intentional infliction of emotional distress, civil conspiracy, and related claims against multiple defendants. I am not represented by counsel and, for matters dealing with administrative issues, I rely entirely on clear, timely communication with the Clerk's Office to get informastion needed to meet my obligations including, where relevant, court-imposed deadlines.

### Specific Conduct Complained Of
### 1. Pattern of Non-Responsiveness to Pro Se Litigant Communications (January 15-20, 2026)

Dates: January 15, 16, 20, 2026
Time Period: Five (5) days without substantive response
Parties: Tracy Uhrin, Clerk of Court; Vincent Negron, Case Clerk

## Facts:

On January 15, 2026, at approximately 12:34 PM, I sent an email to the Clerk's Office (tracy_uhrin@nhd.uscourts.gov and vincent_negron@nhd.uscourts.gov) requesting simple confirmation that a motion for electronic filing access, which I had mailed to the court, had been received by the Clerk's Office. This was a straightforward administrative request requiring only a "yes" or "no" response.

The motion for e-filing access was time-sensitive because I faced an imminent deadline on January 21, 2026 (six days from the initial inquiry) to file three documents. Without e-filing access, I will be unable to meet this deadline. This deadline was clearly stated in my communications to the Clerk's Office.

Despite this urgency:
•January 15, 2026 at 12:34 PM: Initial email sent requesting confirmation of receipt
•January 15, 2026 (no response)
•January 16, 2026 at 12:09 PM: Follow-up email sent with explicit notation of Wednesday deadline
•January 16, 2026 at 12:35 PM: Third email sent to same addresses regarding urgent confidentiality concerns
•January 16, 2026 at 1:57 PM: Comprehensive email escalated to Gina Riccio (ca1.uscourts.gov) and Susan Goldberg (Circuit Executive) requesting emergency intervention, explicitly documenting the lack of response
•January 20, 2026 at 12:11 PM: Fourth email sent noting that the deadline is "tomorrow" (January 21) and I have "received no response"
•January 20, 2026 at 12:50 PM: Fifth email expressing frustration at five-day delay in a "simple reply"

It is now 2pm, approaching the close of court, and still no response.

Throughout this five-day period, neither Tracy Uhrin nor Vincent Negron provided any response, not even an acknowledgment of receipt of my emails. The non-responsiveness is particularly striking because:
•The requests were entirely administrative and required minimal effort to answer
•The deadline was explicit and emphasized as urgent
I know for a fact that the clerks have responded to other people in other cases in a helpful friendly expeditious manner.

This failure to respond will/has created concrete harm: if the e-filing motion was not docketed and ruled upon before January 21, I risk default judgment or other harm for failure to timely file required documents.

This is the Clerk's core function: to receive, docket, and track filings and communicate with parties

### 2. Failure to Respond to Urgent Confidentiality Concern Regarding Sealed Filings (January 16, 2026)
Date: January 16, 2026
Time Period: At least 4 days without response
Parties: Tracy Uhrin, Clerk of Court; Vincent Negron, Case Clerk

## Facts:
On January 16, 2026, at 12:35 PM, I sent an urgent email to the Clerk's Office requesting immediate verification of whether sealed orders containing confidential ADA-related information had been

inadvertently published on the public docket in violation of Local Rule 83.12. This was a request that demanded prompt attention because:

•Ongoing Harm: Every moment confidential disability accommodation information remained publicly exposed constituted continued harm to my privacy and rights under the ADA
•Urgency: Confidentiality concerns in federal court are treated as urgent matters
•Simplicity: A clerk could have responded urgently with confirmation that all sealed filings remain sealed (if true) or with information about which filings required correction
•Legal Obligation: The court has a duty under Fed. R. Civ. P. 5.2 and Local Rules to maintain the confidentiality of documents containing sensitive personal information

Despite the obvious urgency and simplicity of this request:
•No response was provided within hours
•No response was provided within 24 hours
•No response was provided within 4+ days (as of January 20, 2026)
The silence on this matter is particularly concerning because continued public exposure of disability-related information causes ongoing, compounding harm each day it remains unaddressed.

### 3. Pattern of Discriminatory or Unequal Treatment of Pro Se Litigants
Dates: Ongoing throughout Case No. 1:25-cv-00251
Parties: Clerk's Office staff (Tracy Uhrin and Vincent Negron, and potentially others)

**Facts and Observations:**
In my communications, I have noted and documented a pattern suggesting that the Clerk's Office treats pro se litigants differently from attorneys, particularly those affiliated with large law firms or government agencies. Specifically, I have stated: "It seems as though if I was an attorney at a big law firm or at the DOJ, the clerks would kindly respond to my emails; yet there appears to be something about me or my case that is resulting in some kind of irregular administrative friction." This inference is supported by:
• Complete non-responsiveness over five days to urgent administrative requests
• Failure to provide even basic courtesy communications (e.g., "We received your mail" or "We are looking into this")
A pattern of non-responsiveness despite multiple attempts to communicate through the channels specified in Local Rule 77.6
This pattern, if part of systemic practice, would constitute conduct prejudicial to the effective and expeditious administration of justice under 28 U.S.C. § 372(c)(4).

Note: This is not the first time I have raised these concerns.  I have encountered ongoing difficulty obtaining confirmation from the Clerk's Office regarding critical filings and docket issues, despite multiple attempts to communicate. In the below chain, you can see recent attempts to communicate with the clerks in the below email chain which is forwarded with this email. I previously raised concerns about such issues but despite that, I continue to experience non-responsiveness from the clerks of the NH Federal Court. If feels as though there is little or no courtesy or respect or regard shown to me.  See attached prior complaint from me. My co-plaintiff has also raised these concerns. See attached prior complaint from him.

This is on top of irregularities like the clerk sending sensitive court rulings by mail to the wrong address resulting in my missing deadlines and other harm involving my ADA rights, and the clerks continued to do this even after a notice of correct address was filed. This appears intentional.

Why would the clerks intentionally do this? I am not certain but It should be noted that shortly after my co-plaintiff raised a separate racial discrimination complaint against a deputy clerk of the court (for acts she committed before she was employed by this court) via a separate lawsuit prior to this suit, the tone

and responsiveness of the Clerk's Office staff noticeably deteriorated. Past inquiries were handled more courteously by Mr. Negron; but after my protected complaint, communications ceased entirely; and Ms. Uhrin also went silent and/or became strident in tone. This suggests retaliatory motif for opposing discrimination by a deputy clerk now employed by this court. I am not sure what else explains this. Retaliation for opposing discrimination or filing a discrimination lawsuit is against the law.

### 4. Practical Harm and Prejudice Resulting from Clerk Misconduct

The non-responsiveness of the Clerk's Office will/has resulted in tangible harm:

• Inability to Meet Court Deadlines: As a pro se litigant without e-filing access, I cannot file three documents due on January 21, 2026, without confirmation that my e-filing motion has been received and ruled upon

• Risk of Default Judgment: Failure to file required documents by deadline could result in default judgment, or dismissal of claims

• Continued Privacy Violations: Confidential ADA information remains publicly accessible on the docket with no clerk response confirming remediation

• Emotional and Mental Burden: The administrative friction and unresponsiveness creates additional stress, frustration, and mental burden, forcing me to escalate to higher court officials (First Circuit) when routine matters should be resolved at the district level

• Lost Time and Opportunity: Time spent writing emails requesting basic administrative assistance is time not spent on substantive case preparation

### Why This Constitutes Grounds for Complaint

Under 28 U.S.C. § 372(c)(4), the Judicial Council may address complaints about conduct that is: "prejudicial to the effective and expeditious administration of the business of the courts". The conduct of the Clerk's Office staff in the above matters meets this standard:

• Prejudicial to Effective Administration: Refusing to respond to pro se litigants impedes the court's core administrative function of docketing, tracking, and communicating about filings

• Prejudicial to Expeditious Administration: Five-day delays in responding to urgent administrative requests (confirmation of mail receipt, sealing verification) directly delay the expeditious processing of cases

• Systematic Nature: This is not a one-time oversight but a documented pattern across five calendar days and multiple urgent communications

• Discriminatory Impact: The apparent differential treatment of pro se litigants versus attorney-represented parties impedes equal access to justice

• Abuse of Discretion/Authority: While clerks have discretion in case management, they do not have discretion to ignore pro se litigants or deny them basic courtesy and responsiveness

### Alleged Failures to Comply with Court Rules

• Local Rule 77.6 Violation: Local Rule 77.6 specifies procedures for communications with the court. The Clerk's Office is obligated to respond to proper inquiries made in compliance with this rule

• Fed. R. Civ. P. 5 Violation (Implicit): The Federal Rules contemplate that parties may communicate with the court regarding procedural matters; silence in response to urgent motions violates the spirit of these rules

• ADA Compliance Concerns: Failure to respond to inquiries about confidentiality of ADA-related information may constitute a failure to provide reasonable accommodations under Title II of the ADA

### Distinction from Judicial Decisions

This complaint does NOT challenge:

• The correctness of any judicial ruling or decision
• The outcome of any motion or order
• The merits of any legal arguments

- The substance of any court opinion

Rather, this complaint addresses the administrative conduct of court staff in responding to pro se litigants, which is a matter of court administration and management, not judicial decision-making.

## IMPACT AND REQUESTED RELIEF
### Harm Suffered

Imminent risk of default judgment due to inability to file documents by January 21, 2026 deadline

- Ongoing privacy violations from publicly exposed confidential ADA information
- Emotional distress, frustration, and mental burden from administrative obstruction
- Apparent unequal treatment based on pro se status

### Requested Relief

- Immediate Investigation: The Judicial Council should conduct an investigation into the administrative practices of Tracy Uhrin (Clerk of Court) and Vincent Negron (Case Clerk) regarding responsiveness to pro se litigants
- Comparative Analysis: The Council should examine whether response times, communication patterns, and courtesy differ systematically between pro se litigants and attorney-represented parties in the Clerk's Office
- Corrective Action: If the investigation confirms a pattern of discriminatory or negligent treatment of pro se litigants, the Judicial Council should:

o      Issue a directive requiring timely responses to pro se communications

o      Require training on pro se litigant accommodations and courtesy

o      Establish a quality assurance mechanism to monitor Clerk's Office responsiveness

o      Require documentation of all pro se inquiries and responses for oversight purposes

•Immediate Emergency Intervention: While the formal complaint process proceeds, the Judicial Council should consider whether emergency intervention is warranted to ensure my January 21 deadline can be met and sealed filings are properly protected

Remedial Action in Case 1:25-cv-00251: The Court should:

- Grant my mailed motion for e-filing access as a matter of course
- Confirm that all sealed ADA-related filings remain sealed and take corrective action if any have been publicly posted
- Extend my filing deadlines to the extent permitted by law to compensate for the administrative delay

Signature: Natalie Anderson
Date: January 20, 2026
Email: Liberty_6@msn.com

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Tuesday, January 20, 2026 12:50 PM
**To:** Tracy Uhrin <tracy_uhrin@nhd.uscourts.gov>; Vincent Negron <vincent_negron@nhd.uscourts.gov>
**Cc:** Gina Riccio <gina_riccio@ca1.uscourts.gov>; susan_goldberg@ca1.uscourts.gov <susan_goldberg@ca1.uscourts.gov>
**Subject:** Re: Request for Urgent Assistance – Outstanding Motions and Docket Issues | NH Federal Court | Case No. 1:25-cv-00251 | Bisasor et al. v. Donais et al

Dear Clerk of Court and Case Clerk:

I do not understand why a simple reply stating "yes the mail has been received" or "no, it has not been

received", cannot be emailed to me in the last hour or over the past 5 days for that matter. Obviously, this is a time sensitive matter. When there is a time sensitive matter, the clerk is supposed to try to address it promptly as possible. But this delay in response comes across as deliberate and intended to teach me a lesson. Do I not have the right to communicate with the clerks of my case or this court? It should not take 5 days to respond to a simple email from a pro se plaintiff.  I do not understand what is happening. Am I being punished or frozen out by the clerks? Am I being retaliated against?  Should I be seeking to have this case transferred to another court if I am going to be encountering this problem continuously?  I am very frustrated and I am at my wits end.  This is not fair to me. I have work and other obligations. I am not a lawyer. I do not get paid for this.  Every moment I spend dealing with administrative friction, it is a harm to me. Moreover, there will be irreparable harm if the deadline passes and I cannot efile my documents. What recourse do I have to get this issue resolved?  Should I start directing my concerns to the Judicial Conference?

Natalie Anderson

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Tuesday, January 20, 2026 12:11 PM
**To:** Tracy Uhrin <tracy_uhrin@nhd.uscourts.gov>; Vincent Negron <vincent_negron@nhd.uscourts.gov>
**Cc:** Gina Riccio <gina_riccio@ca1.uscourts.gov>; susan_goldberg@ca1.uscourts.gov <susan_goldberg@ca1.uscourts.gov>
**Subject:** Re: Request for Urgent Assistance – Outstanding Motions and Docket Issues | NH Federal Court | Case No. 1:25-cv-00251 | Bisasor et al. v. Donais et al

Dear Clerks,

It is now Tuesday Jan 20. My deadlines are tomorrow for 3 documents that must be filed. I have received no response to my emails below.

I urgently need efiling to file the 3 documents due tomorrow. Can you please confirm asap that my efiling motion via the mail was received and that either you as the clerk of court can rule and grant this basic administrative motion today, or that it will be or has been presented to the judge for expedited ruling today, so that I can have access to efile tomorrow?

Please urgently respond.

Thank you,
Natalie Anderson

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Friday, January 16, 2026 1:57 PM
**To:** Gina Riccio <gina_riccio@ca1.uscourts.gov>; susan_goldberg@ca1.uscourts.gov <susan_goldberg@ca1.uscourts.gov>
**Cc:** Tracy Uhrin <tracy_uhrin@nhd.uscourts.gov>; Vincent Negron <vincent_negron@nhd.uscourts.gov>
**Subject:** Request for Urgent Assistance – Outstanding Motions and Docket Issues | NH Federal Court | Case No. 1:25-cv-00251 | Bisasor et al. v. Donais et al

Dear Ms. Ricio and Ms. Goldberg:

I am writing to you as the high level representatives of the federal court in this circuit and attendant matters, seeking your urgent assistance with several unresolved procedural matters in the above-

referenced case that require immediate attention before my upcoming deadline on Wednesday, January 21, 2026.

As a pro se plaintiff proceeding without counsel, I have encountered ongoing difficulty obtaining confirmation from the Clerk's Office regarding critical filings and docket issues, despite multiple attempts to communicate. In the below chain, you can see more recent attempts to communicate.

I previously raised concerns about such issues but despite that, I continue to experience non-responsiveness from the clerks of the NH Federal Court. If feels as though there is little or no courtesy or respect or regard shown to me. It seems as though if I was an attorney at a big law firm or at the DOJ, the clerks would kindly respond to my emails; yet there appears to be something about me or my case that is resulting in some kind of irregular administrative friction. [Note: It would be useful to compare response patterns by the clerks to other such persons and see if they differ in response patterns.]

Either way, I am now seeking urgent intervention to ensure I can meet my upcoming court deadlines and that my case proceeds fairly as I cannot wait until after the MLK holiday to try to resolve the folowing:

1) I mailed a motion requesting electronic filing access to the court, which is essential for meeting my January 21st deadline. Despite emails on January 15th and 16th, 2026, I have not received confirmation that this motion was received, docketed, or submitted to the judge for consideration. I have urgent issues that need to be addressed with imminent deadlines for next week Wed, for which if these issues are not addressed, I could be defaulted.

2) I am concerned that sealed orders containing confidential ADA-related information may have been inadvertently published on the public docket in violation of LR 83.12. I requested verification of this issue on January 16, 2026, as continued public exposure of confidential information creates ongoing harm, but I have not received a response as yet, though it is evidently an urgent matter. If the matter is properly sealed, a quick and simple, "all sealed filings and orders and docket entries are properly sealed".

These unresolved procedural issues directly affect my ability to prosecute this case effectively. Without e-filing access and without confirmation that my motions have been properly processed, I risk being unable to meet the January 21st deadline, which could result in default or other prejudice to my case. The potential public disclosure of sealed ADA accommodations also raises serious confidentiality concerns.

I am not sure what else can be done at this point. Filing a further formal complaint and trying to submit it will take up time I do not have right now as I need to focus on the deadlines I have for next Wed (this is another harm in that I even have to worry about writing emails like this that take up time, energy and mental space). Can someone, anyone, please help me?  Is there someone who can provide emergency intervention to correct these issues I am experiencing? It cannot be thar I must continue to suffer these indignities in silence and suffer prejudice to my rights and my case. Please put yourself in my shoes. What would you do?

I understand that the Clerk's Office manages a substantial caseload. However, as a pro se litigant, I rely on timely communication from the court to navigate federal procedures and meet my obligations. According to Local Rule 77.6, communications with the court should occur through proper filing procedures, which I have followed.

Given the urgency of the January 21st deadline and the potential prejudice to my rights, I respectfully request:

- Confirmation that my mailed motion for e-filing access was received and has been submitted to the judge for expedited consideration before January 21, 2026;
- Verification that all sealed filings and orders remain properly sealed and have not been inadvertently published on the public docket; and
- Guidance on appropriate channels if I need emergency procedural assistance when standard communication methods are unsuccessful.

I am committed to following all court rules and procedures, and I have made good-faith efforts to resolve these matters through direct communication with the Clerk's Office as documented in the below email chain. I now seek your intervention to ensure these time-sensitive issues can be addressed before my deadline.

Thank you for your attention to this urgent matter. If you need any additional information, please let me know.

Respectfully,
Natalie Anderson

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Friday, January 16, 2026 12:35 PM
**To:** vincent_negron@nhd.uscourts.gov <vincent_negron@nhd.uscourts.gov>; tracy_uhrin@nhd.uscourts.gov <tracy_uhrin@nhd.uscourts.gov>
**Subject:** Urgent Preserving Confidentiality of Sealed Filings and Orders / Re: Mailed Motion | 1:25-cv-00251 | Bisasor et. al v. Donais et al.

Dear Clerks,

It appears that the court has publicly published sealed orders of the court pertaining to ADA requests that should be sealed. Is this the case? Can the clerk office review this issue to ensure that sealed filings and orders are not made public?

Please respond to this email to confirm. This is an urgent matter. Every moment that confidential information is publicly exposed, it creates harm. It is important that this is confirmed to me as a plaintiff in the case who may be harmed by this. So, can someone respond to my emails urgently. I do not believe any clerk has ever responded to my emails in this case. I am not sure what else to do if this continues.

Sincerely,
Natalie Anderson

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Friday, January 16, 2026 12:09 PM
**To:** vincent_negron@nhd.uscourts.gov <vincent_negron@nhd.uscourts.gov>; tracy_uhrin@nhd.uscourts.gov <tracy_uhrin@nhd.uscourts.gov>
**Subject:** Re: Mailed Motion | 1:25-cv-00251 | Bisasor et. al v. Donais et al.

Dear Clerks:

Can someone please respond to my email below, to let me know, yay or nay, that my motion for e-filing access was received by the clerk's office, in the mail? I have a deadline next wed to file documents so

time is of the essence in knowing that it has been received, will be promptly docketed and presented to the judge for urgent ruling before next wed.

Thanks,
Natalie Anderson

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Thursday, January 15, 2026 12:34 PM
**To:** vincent_negron@nhd.uscourts.gov <vincent_negron@nhd.uscourts.gov>; tracy_uhrin@nhd.uscourts.gov <tracy_uhrin@nhd.uscourts.gov>
**Subject:** Mailed Motion | 1:25-cv-00251 |  Bisasor et. al v. Donais et al.

Dear All:

Can someone please let me know if my motion for e-filing access has been received by the court via the mail?

Sincerely,
Natalie Anderson

 **Outlook**

---

## Concerns/Complaint Regarding NH Federal Court in Bisasor v. Donais- #1:25-cv-00251

---

**From** Liberty _6 <liberty_6@msn.com>

**Date** Mon 12/22/2025 3:30 PM

**To** gina_riccio@ca1.uscourts.gov <gina_riccio@ca1.uscourts.gov>

Dear Ms. Gina Riccio.

I understand that you are the complaint officer at the First Circuit for complaints or concerns about operations or treatment at the federal district courts in this region.

I am a plaintiff in a federal district court case in New Hampshire. The case is Bisasor v. Donais # 1:25-cv-00251. I am writing to register concerns that I have written to the clerk's office multiple times and I have not received any response. I have submitted 3 emails to the clerks containing confidential ADA requests since the beginning of November 2025 and there has been no response from the clerks and no action on my ADA requests by the court. I also have seeking to obtain permission to access e-filing in this case. There has been no response or action to ensure my access to efiling including my November 6, 2025 request by email submitted as a confidential ADA accommodation request. There has been no response or action. I also submitted two prior confidential ADA requests to the clerk office (in accordance with the applicable instructions) and there also has been no response by the clerks nor from the court. Critical deadlines have come and gone, leaving me without ability to efile my documents. I don't receive e-notices from the court and I don't receive efiling service of prior filings by the opposing side. All of this is severely prejudicing me. I also emailed the request for access to the clerks. It has not been acted on. I subsequently mailed the request for access by paper filing via regular mail to the clerk's office. There was no action and I remain without access to efiling. When the other plaintiff recently raised this issue in a motion to the court, the judge issued an order stating that the paper filing was not received by the court but remained silent about the ADA request filing by email. Then the judge proceeded to issue a stern warning that lack of access to efiling will not be grounds for extensions to file documents in reply to filings by the defendant, or something to that effect. I am therefore trapped. I cannot get access to efiling. I cannot e-file anything. When I paper file, the court says it does not receive it. I have a disability that impedes my ability to physically go to the court. My ADA requests apparently have been ignored. The clerk's office does not respond to my emails or ignores my emails. The court does not act on my ADA requests. My emailed request for access to efiling has not been acted on. I am stuck in a bad nightmare and I can't prosecute my case. I am concerned that I am not being treated fairly for some reason. Moreover, a motion for access to efiiling was jointly e-filed but the judge denied it and castigated the other plaintiff for filing it, even threatening him with sanctions. This feels oppressive. I am an african american female pro se plaintiff with disabilities. I would like the first circuit to address this issue. I am in a vulnerable marginalized category. I should not be treated this way and my access to the court should not be frustrated like this for no apparent good reason.

This delay is unusual. I don't live in NH. I am not able to afford costs of mailing to the court. I am a pro se person with ADA issues. I do not understand why there are these barriers to my simply getting access to efiling. Also, there are deadlines coming up on 12-24-25. I need access to efiling. I should not be put in this position because I am pro se.

The other plaintiff has experienced similar problems. I am concerned that the NH federal court clerk office is hostile to me. This includes because I was party to a suit filed against a clerk (who just got hired by the federal court) for claims that preceded her employment at the federal court. The entire court recused, as a result, and the case was transferred. [NB: The suit in question involves a separate discrimination complaint against the new clerk employee for acts that occurred prior to her employment as a clerk at the federal court]. In the past, prior to that suit, these issues of which I speak were not present. But after the suit, things began to change. The non-responsiveness, the delays, the friction, the hostile vibe began. Even the judge seems irate for no reason (which judge also recused on the suit I mentioned).

I am concerned that there is administrative friction that is due to retaliatory animus. I am sure you understand what I am talking about here as these things happen in all kinds of organizations and can function as a systemic response that is hard to pin-point or prove 100% but there is nonetheless. What is the explanation for the unusual delay or irregularities of which I speak? And why is it happening to both plaintiffs in this case?

I am concerned that there is something wrong with what is going on. If the clerk office is bent on frustrating my rights and my access and this case, then I am concerned that nothing will be done about it because every benefit of the doubt will be given to the clerk staff.  I am concerned that my ADA requests won't be properly handled and that this will constitute a violation of my rights under the ADA.

Consequently, I ask the first circuit look into this matter. If you need more information, please let me know. .

Sincerely,
Natalie Anderson

 **Outlook**

---

**Re: Urgent Follow-up on ADA Motion / |Fw: Additional ADA Motion | Confidential Level II Sealing | EMERGENCY ADA MOTION | For Judge's Eyes Only | 1:25-cv-00251 |  Bisasor et. al v. Donais et al.**

---

**From** Liberty _6 <liberty_6@msn.com>

**Date** Tue 12/23/2025 1:28 PM

**To** vincent_negron@nhd.uscourts.gov <vincent_negron@nhd.uscourts.gov>; tracy_uhrin@nhd.uscourts.gov <tracy_uhrin@nhd.uscourts.gov>

Dear Clerks,

Can someone please respond to my emails?

Natalie Anderson

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Monday, December 22, 2025 2:11 PM
**To:** tracy_uhrin@nhd.uscourts.gov <tracy_uhrin@nhd.uscourts.gov>
**Subject:** Urgent Follow-up on ADA Motion / |Fw: Additional ADA Motion | Confidential Level II Sealing | EMERGENCY ADA MOTION | For Judge's Eyes Only | 1:25-cv-00251 |  Bisasor et. al v. Donais et al.

Dear Clerks,

I submitted a sealed ADA motion on 11-6-25 seeking permission to email my motion for access to e-filing (Please see below email chain with forwarded motion attached showing email to the clerk office email and to the case manager).  I have not received an order on this motion.

I also subsequently mailed a paper filing to the courthouse by regular mail.  In response to a motion by other plaintiff citing the two filings, the Judge issued an order stating that no paper filing had been received by the court. I am not sure why it has not been received (i.e., if the mail was lost or went to the wrong address). However, the court did not say anything about the emailed filing in its order.

Please advise as to the emailed filing below, if it was received and if there was an order. If it was received but there was no order, can it be sent to the judge for action.

Thank you,
Natalie Anderson

---

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Thursday, November 6, 2025 8:35 AM
**To:** ecfintake@nhd.uscourts.gov <ecfintake@nhd.uscourts.gov>
**Cc:** vincent_negron@nhd.uscourts.gov <vincent_negron@nhd.uscourts.gov>
**Subject:** Additional ADA Motion | Confidential Level II Sealing | EMERGENCY ADA MOTION | For Judge's Eyes Only | 1:25-cv-00251 |  Bisasor et. al v. Donais et al.

Dear Clerk staff, et. al

I am hereby submitting a confidential Level II sealed filing pursuant to LR 83.12. [NB: Because this is a level II sealed filing, it should not be uploaded to the public docket and should not be made public nor made accessible to any other party.  It is also my understanding that no court staff will read the attached Levell II confidential filings.]

Please see the attached Levell II sealed documents for confidential submission to the judge, as follows:

1. An emergency ADA request for one-time accommodation to email motion for efiling access to the clerk
2. A motion to seal

Please pass on to the judge as soon as possible.


Sincerely,
Natalie Anderson

## Re: How to update your address information

From:    Andre Bisasor (quickquantum@aol.com)

To:      vincent_negron@nhd.uscourts.gov; tracy_uhrin@nhd.uscourts.gov

Cc:      laura_michalski@nhd.uscourts.gov

Date:    Friday, January 16, 2026 at 09:55 PM EST

Dear Clerks,

I wrote the below indicating that plaintiffs did not wish for their confidential ADA filings to be shared with the defendants from their sealed level II ADA filings. I received notice on 12-23-25 that I was to inform the clerk of the wish not to share confidential information with the defendants, by 7 days. I did so below. Can you confirm that my confidential information was not shared with the defendants?

Note: There was a clerk error where notices from November 2025, were not sent to me electronically nor at the correct mailing address. I did not receive any notice until 12-23-25 by e-notice. The judge acknowledged the error in its 1-2-26 order (i.e., "*The court has also learned that the same clerical order led the clerk's office to mail copies of its sealed orders to Bisasor at an incorrect address. The clerk's office will send copies of all sealed orders to Bisasor at his correct address*."), and extended deadlines for plaintiffs, as a result. Therefore, I cannot be held to act on notice that I did not receive.

Please advise the status of this issue. The notice said that I should inform the clerk, which creates a reciprocal action of the clerk communicating with me about this in a timely manner.

Thank you,
Andre

On Wednesday, December 31, 2025 at 07:50:43 PM EST, Andre Bisasor <quickquantum@aol.com> wrote:

Dear clerks,

I am confused about this email and attachment. Did you receive the notice of correct address filing that was filed on 12-12-25? has that been updated?

Also, am I supposed to let you know about the confidential filings by today? I am referring to the notices I received electronically on 12-23-25 about the ADA orders being denied, for me and my co-plaintiff (i.e. in 7 days)? has that already been unsealed? I am a little confused. I don't want the private medical information to be shared with anyone. Please advise.

-Andre

On Monday, December 29, 2025 at 12:25:19 PM EST, Vincent Negron <vincent_negron@nhd.uscourts.gov> wrote:

If you have any questions, let us know.

Thanks,

Vincent L. Negron

Case Manager

United States District Court

55 Pleasant Street

Concord, NH 03301

603-226-7733

[vincent_negron@nhd.uscourts.gov](mailto:vincent_negron@nhd.uscourts.gov)



## Re: Complaint Regarding NH Federal Court Clerk's Office Conduct in Bisasor v. Donais (No. 1:25-cv-00251)

From:  Andre Bisasor (quickquantum@aol.com)

To:      gina_riccio@ca1.uscourts.gov

Date:   Thursday, August 21, 2025 at 05:21 PM EDT

Dear Gina,

I have not heard from anyone at the NH federal district court regarding the below matter, and I am still experiencing problems.

Can you please let me what are the next steps if nothing happens at or there is no response/follow-up from the district court?

Thanks,
Andre Bisasor

On Tuesday, July 29, 2025 at 01:15:19 PM EDT, Gina Riccio <gina_riccio@ca1.uscourts.gov> wrote:

Good afternoon Mr. Bisasor,

Susan Goldberg forwarded your below email to me. A complaint against a clerk of court and clerk's office staff should be directed to the chief judge of the employing court. Accordingly, I have forwarded this correspondence to Chief Judge McCafferty.

Best,

Gina

Gina L. Riccio
Assistant Circuit Executive for Legal Affairs
United States Courts for the First Circuit
John Joseph Moakley United States Courthouse

1 Courthouse Way, Suite 3700

Boston, MA 02210

Gina_Riccio@ca1.uscourts.gov

Begin forwarded message:

**From:** Andre Bisasor <quickquantum@aol.com>
**Date:** July 25, 2025 at 11:59:23 AM EDT
**To:** Susan Goldberg <Susan_Goldberg@ca1.uscourts.gov>
**Cc:** Tracy Uhrin <Tracy_Uhrin@nhd.uscourts.gov>, Vincent Negron <Vincent_Negron@nhd.uscourts.gov>
**Subject: Complaint Regarding NH Federal Court Clerk's Office Conduct in Bisasor v. Donais (No. 1:25-cv-00251)**

**CAUTION - EXTERNAL:**

Dear  Ms. Goldberg:

I write as a pro se plaintiff in Bisasor v. Donais (No. 1:25-cv-00251) to lodge a formal complaint concerning the handling of my emergency filings by the Clerk's Office of the U.S. District Court for the District of New Hampshire, specifically by Clerk Tracy A. Uhrin and case clerk Vincent Negron.

On July 22, 2025, I submitted three time-sensitive, Level II sealed filings:

-Emergency ADA Accommodation Request

-Emergency Motion for Extension of Time to File Oppositions

-Emergency Motion to Seal

Because I lacked e-filing access, critical deadlines expired on that same date. I therefore complied with the court's own instructions by contacting the Clerk's Office directly to confirm receipt and forwarding of these documents to the assigned judge.

Despite filing a timely motion for e-filing access more than two weeks prior, no ruling was issued while critical deadlines to file oppositions to pending motions to dismiss were expiring on 7-22-25, for a state court case that was recently removed to federal court by the defendants. This delay was unusual since all concerned knew I was waiting on efiling access as I don't live in NH and have ADA issues that prevent me from physically coming to the court to file documents, which was also brought to the attention of the clerk and the court two weeks ago. The efiling access was thus an ADA accommodation issue.

After seeking ADA relief, there was no acknowledgement was given to me from either Clerk of Court Uhrin or Case Clerk Negron despite my request to confirm that the ADA request was correctly submitted and processed. But, I did not make a big deal about the non-responsiveness because I believed or hoped that the ADA request would be granted and the efiling access would be granted promptly.  But the ADA request and efiling access request remained unruled for two weeks.

So, on the day of the expiration of critical deadlines, having not received any word that my requests were granted, I filed another emergency ADA request with the clerk including Clerk Uhrin and Clerk Negron. Again, I asked for confirmation that these requests were processed but neither Ms. Uhrin nor Mr. Negron provided even a one-line confirmation of receipt, leaving me in the dark on whether my emergency ADA requests were properly before the court.

Eventually, after repeated inquiry over the past 3 days, eventually my inquiry was met with a terse, boilerplate response from Ms. Uhrin implying that litigants should not expect individualized responses or confirmation to such requests or any response as to whether the ADA requests were properly submitted, received and processed. The language used was unduly harsh and dismissive toward a pro se, ADA-qualified litigant, undermining my right to access the courts with appropriate accommodations. This failure to respond infringes on my rights under the ADA. Clerks are supposed to treat disabled litigants with courtesy and respect and dignity. I have not been so treated here. I have been spoken to condescendingly and treated as annoyance.

It should be noted that shortly after I raised a separate discrimination complaint against a deputy clerk, the tone and responsiveness of the Clerk's Office staff noticeably deteriorated. Past inquiries were handled more courteously by Mr. Negron; but after my protected complaint, communications ceased entirely; and Ms. Uhrin also went silent and/or became strident in tone.

Please see email chain below that captures some (not all) of the communications. In totality, the events so far either constitutes discrimination under the ADA or borders on it.

In light of these events, I respectfully request that your office:

-Investigate the handling of my emergency filings and the subsequent interactions I had with Ms. Uhrin and Mr. Negron.

-Ensure that the District of New Hampshire's Clerk's Office adopts clear procedures for acknowledging receipt of time-sensitive and ADA-related filings, particularly for pro se litigants.

-Provide guidance or training to Clerk's Office personnel on respectful and timely communication with all litigants, including those proceeding pro se and/or with disabilities.

I appreciate your attention to this matter and stand ready to provide any additional information or documentation you may require. It is essential that all parties, regardless of status, receive fair, respectful, and efficient access to our federal courts.

Respectfully submitted,

Andre Bisasor

Pro Se Plaintiff

On Thursday, July 24, 2025 at 01:44:32 PM EDT, Andre Bisasor <quickquantum@aol.com> wrote:

> Dear Clerk Uhrin,
>
> Just to be clear, I was/am writing simply to confirm whether the documents I submitted have been received and forwarded to the judge. My simple question requires a simple yes or no answer, which should not require more than a moment to answer. Either you or Vincent could have provided a one-line response.

1/20/26, 1:48 PM    AOL Mail - Re: Complaint Regarding NH Federal Court Clerk's Office Conduct in Bisasor v. Donais (No. 1:25-cv-00251)

Case 1:25-cv-00251-SE-AJ    Document 108    Filed 04/22/26    Page 86 of 101

I do not seek to burden anyone. As the plaintiff in a state-court case removed to federal court by the defendants, I did not choose this forum. In fact, I really do not want to be in this court.  Nevertheless, I am now here and I expect to be treated with the same respect and dignity afforded to any party or attorney. I am not a child and should not be spoken to condescendingly as if I am an annoyance.  Please remember you are a public servant whose duty is to assist the public, not dismiss them as an annoyance. I am part of your job, and no person is more important than another.

Again, this situation was irregular. I waited two weeks for ruling on my motion for efiling and there was no action.  It was not improper for me to contact the clerk office about this and to seek emergency relief under the ADA.  Because I lacked e-filing access, I could not submit time-sensitive pleadings electronically. I filed my motion for e-filing access more than two weeks ago, but no ruling was issued, and critical deadlines expired this past Tuesday. The circumstances were clearly an emergency, and the rules instruct litigants to contact the clerk's office in such cases or where there is an emergency. Had I already had e-filing privileges, there would have been no need to reach out directly. Since 99% of filings are handled automatically, routine matters do not require clerk intervention; this situation was an exception.

Hence, it was entirely appropriate for me to seek emergency relief under the ADA, and as an ADA-qualified litigant, I deserve to be treated with respect and dignity, not admonished or chided for using the ADA process available, and/or for asking for confirmation that it was used correctly.

I do not wish to create a negative situation here. I simply want to file my documents properly and receive timely, respectful responses to any procedural questions, that I may have from time to time, to be responded to in a timely manner and with due respect. I hope you can understand that and put yourself in my shoes. If this is not possible, then maybe this case should be transferred out of this court to another federal court where there is no apparent problems (which as I said is at least in part stemming from the fact that I had filed a discrimination complaint against your second chief deputy clerk and this is creating a chilling cold effect with her colleagues or superior such as yourself....why else is the cause of this new hardened tone and approach being taken with me, when for example, in  other prior cases ,Vincent had no problem responding to my questions but now all of a sudden after my complaint is made known, there is abject silence?).

So can you please answer my question. The reason I still asking now is because I need to know if I should re-file my documents via efiling, now that I just received efiling access today. It is a simple question and a reasonable one. I cannot wait in the dark not knowing the answer. So, please let me know whether I need to refile via e-filing now that I have received access today. If I do not receive a reply by 3:00 p.m. today, I will have no choice but to escalate this matter to the First Circuit.

Sincerely,

Andre Bisasor

Pro Se Plaintiff

On Thursday, July 24, 2025 at 12:55:06 PM EDT, Andre Bisasor <quickquantum@aol.com> wrote:

> By the way, my statement below does not apply to Clerk Erin.
>
> -Andre

On Thursday, July 24, 2025 at 12:49:30 PM EDT, Andre Bisasor <quickquantum@aol.com> wrote:

Dear Clerk, I am not asking this on a regular basis. I am asking for a special circumstance where I didnt have efiling access and deadlines were expiring. It is unfair to characterize it in so general terms. The court website and rules give the impression that a litigant, especially pro se, may contact the clerk office for procedural information or questions. Are you saying I should not ask the clerk office any questions? What if I misunderstand the procedure, and do it incorrectly, and thus tit wont be processed? how will i know this without asking? This seems unreasonable. I can't imagine that you treat other litigants this way. I deserve courtesy and respect and dignity especially as a pro se african-american plaintiff. I should not be treated lesser for any reason or treated like an annoyance. Even now, you took the time to chide me rather than simply answer my question. Are you going to answer my question regarding my motion to extend time and ADA request, yes or no?

As I said, this harsh strident tone and non-responsive approach feels retaliatory because of my complaint against a certain clerk.

If you wont answer my question, I will be filing a complaint of discrimination with the first circuit executive by tomorrow.

Sincerely,

Andre Bisasor

On Thursday, July 24, 2025 at 12:36:17 PM EDT, Tracy Uhrin <tracy_uhrin@nhd.uscourts.gov> wrote:

Mr. Bisasor –

All documents filed with the clerk's office are processed consistent with the local and federal rules of procedure. The clerk's office does not have the resources to confirm this for litigants on an individual basis. If your filings comply with local and federal rules, you can expect that they will be processed accordingly.

**Tracy A. Uhrin, Clerk of Court**

United States District Court

District of New Hampshire

55 Pleasant Street, Rm 110

Concord, NH 03301

603.226.7792

**From:** Andre Bisasor <quickquantum@aol.com>
**Sent:** Wednesday, July 23, 2025 4:48 PM
**To:** Vincent Negron <Vincent_Negron@nhd.uscourts.gov>
**Cc:** Erin Callahan <Erin_Callahan@nhd.uscourts.gov>; Tracy Uhrin <Tracy_Uhrin@nhd.uscourts.gov>
**Subject:** Re: Emergency ADA Request & Emergency Motion to Seal with Confidential Level II Sealing | Bisasor v. Donais (1:25-cv-00251)

 **CAUTION - EXTERNAL:**

Hello: I have sent several emails now to you all and no one has replied, except for Erin (on other email). The case clerk Vincent has not responded once to my emails for the past two weeks. Is this acceptable? If anyone else contacts Vincent, does he ignored them in this way? Am I not supposed to contact the case clerk for my case? Is he not supposed to respond to me at all?  I also emails the clerk of Court Tracy about three times now and I have not heard a reply at all. What is going on here? I am concerned that I am being retaliated against because I raised concerns about discrimination of clerk of this court.

-Andre Bisasor

On Wednesday, July 23, 2025 at 11:58:32 AM EDT, Andre Bisasor <quickquantum@aol.com> wrote:

> Hello All: can someone please confirm receipt of the below and attached confidential ADA request and that it will acted on by the clerk office promptly, or passed on to the judge for action, promptly?
>
> Sincerely,
>
> Andre Bisasor
>
> On Tuesday, July 22, 2025 at 05:37:28 PM EDT, Andre Bisasor <quickquantum@aol.com> wrote:
>
> > p.s. Dear Vincent, et. al, please also see separately attached **assented-to emergency motion for extension of time to file oppositions to motions to dismiss**, so that, in the case the ADA request is granted, the motion can be docketed right away on right away.
> >
> > Thanks,

Andre Bisasor

On Tuesday, July 22, 2025 at 05:34:15 PM EDT, Andre Bisasor <quickquantum@aol.com> wrote:

Dear Vincent, et. al

I am hereby submitting a confidential Level II sealed filing pursuant to LR 83.12. [NB: Because this is a level II sealed filing, it should not be uploaded to the public docket and should not be made public nor made accessible to any other party..]

Please see the attached Levell II sealed documents for confidential submission to the judge, as follows:

1. An emergency request for accommodation under the ADA to file by email my motion for extension of deadline for oppositions to motions to dismiss, and the emergency motion to seal

2. An emergency motion to seal

Please pass on to the judge as soon as possible.

Thanks,

Plaintiff Andre Bisasor

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.**

# Exhibit 3

## Re: How to update your address information

From:   Andre Bisasor (quickquantum@aol.com)

To:      vincent_negron@nhd.uscourts.gov

Cc:     laura_michalski@nhd.uscourts.gov

Date:   Wednesday, December 31, 2025 at 07:50 PM EST

Dear clerks,

I am confused about this email and attachment. Did you receive the notice of correct address filing that was filed on 12-12-25? has that been updated?

Also, am I supposed to let you know about the confidential filings by today? I am referring to the notices I received electronically on 12-23-25 about the ADA orders being denied, for me and my co-plaintiff (i.e. in 7 days)? has that already been unsealed? I am a little confused. I don't want the private medical information to be shared with anyone. Please advise.

-Andre

On Monday, December 29, 2025 at 12:25:19 PM EST, Vincent Negron <vincent_negron@nhd.uscourts.gov> wrote:

If you have any questions, let us know.

Thanks,

Vincent L. Negron

Case Manager

United States District Court

55 Pleasant Street

Concord, NH 03301

603-226-7733

vincent_negron@nhd.uscourts.gov



# <u>Exhibit 4</u>

Case 1:25-cv-00351-SE-AJ    Document 108    Filed 04/22/26    Page 94 of 101

## RE: Urgent Alerting to the Judge of Prior Confidential Submissiom of Medical Documentation / Fw: Bisasor v. Donais et al

From:  Vincent Negron (vincent_negron@nhd.uscourts.gov)

To:    quickquantum@aol.com; tracy_uhrin@nhd.uscourts.gov

Date:  Monday, February 9, 2026 at 09:49 AM EST

My apologies, Mr. Bisasor.  Looks like I missed your email containing the medical documentation.

Thank you.

Vincent L. Negron
Case Manager
United States District Court
55 Pleasant Street
Concord, NH 03301
603-226-7733
vincent_negron@nhd.uscourts.gov



**From:** Andre Bisasor <quickquantum@aol.com>
**Sent:** Monday, February 9, 2026 9:30 AM
**To:** Samantha Elliott <Samantha_Elliott@nhd.uscourts.gov>; Tracy Uhrin <Tracy_Uhrin@nhd.uscourts.gov>; Vincent Negron <Vincent_Negron@nhd.uscourts.gov>
**Subject:** Urgent Alerting to the Judge of Prior Confidential Submissiom of Medical Documentation / Fw: Bisasor v. Donais et al

 **CAUTION - EXTERNAL:**

Dear Judge Elliott:

I saw the ruling today, which in part states:

"Documentation from a medical provider substantiating Bisasor's representations in his prior request for an extension of time, which shall be sealed at Level II. **Bisasor failed to file such medical documentation, which he had offered to do in his motion,** by the court's January 21, 2026 deadline. Bisasor shall file such medical documentation no later than February 23, 2026, or the court will conclude that he made a knowing and intentional misrepresentation to the court and may impose sanctions."

I am puzzled by this because I did email to the case clerk my confidential medical documentation under level seal II on 1-15-26. I do not understand why the judge is saying that I failed to do so. Because the order warned of sanctions regarding this issue, I take it as an urgent serious matter that requires swift correction. I am concerned that the case clerk is not handling this case properly.

It appears that the case clerk did not forward to the court this confidential filing. If this is the case, then I would like to understand why it was not presented to the judge?

So, in any event and in the abundance of caution, I am forwarding below my email submission to the case clerk of the confidential medical documentation supporting my last request for extension of time, which was submitted to the case clerk on 1-15-26 in compliance with the court's order of 1-13-26.

Can the judge please issue an order of correction stating that there was an error and I did comply with the court's order regarding providing the medical documentation supporting the last request for extension of time?

Sincerely,

Andre Bisasor

----- Forwarded Message -----

**From:** Andre Bisasor <quickquantum@aol.com>

**To:** Vincent Negron <vincent_negron@nhd.uscourts.gov>

**Sent:** Thursday, January 15, 2026 at 11:24:50 AM EST

**Subject:** Re: Bisasor v. Donais et al

> Dear Clerk Vincent,
>
> Pursuant to the court's 1-13-26 order that you attached below, I hereby submit a confidential Level II sealed filing containing medical documentation supporting my 1-12-26 confidential motion.
>
> I assume that because the court already ordered that this be sealed at level II (i.e., "Mr. Bisasor shall file medical documentation supporting his request, which shall be sealed at Level II"), that I do not need to submit another motion to seal. Please correct me if I am mistaken.
>
> Sincerely,

2/17/26, 2:06 PM    AOL Mail - RE: Urgent Alerting to the Judge of Prior Confidential Submission of Medical Documentation / Fw: Bisasor v. Donais et al

Case 1:25-cv-00351-SE-AJ    Document 108    Filed 04/22/26    Page 96 of 101

Andre Bisasor

On Thursday, January 15, 2026 at 10:23:33 AM EST, Vincent Negron <vincent_negron@nhd.uscourts.gov> wrote:

Vincent L. Negron

Case Manager

United States District Court

55 Pleasant Street

Concord, NH 03301

603-226-7733

vincent_negron@nhd.uscourts.gov



**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# Exhibit 5

Case 1:25-cv-00251-SE-AJ    Document 108    Filed 04/22/26    Page 98 of 101

## FW: Urgent Alerting to the Judge of Prior Confidential Submissiom of Medical Documentation / Fw: Bisasor v. Donais et al

From:   Tracy Uhrin (tracy_uhrin@nhd.uscourts.gov)

To:      quickquantum@aol.com

Date:   Friday, February 13, 2026 at 10:34 AM EST

Mr. Bisasor —

Please be advised that your case has been reassigned to Judge Elliott's other case manager, Lianne. You can find her contact information on the court's website.

I would also like to remind you that you are prohibited from emailing Judge Elliott directly or copying her on your emails. If you have any concerns about a filing, you may email or copy me, but parties are prohibited from corresponding or communicating with a judge regarding a pending matter unless all parties are present, and communications must be by appropriate application or motion filed with the clerk's office, not by email. LR 77.6(a).

Finally, please ensure that you follow local rule AP when filing documents under seal by email. AP 2.5(b) provides the process, including the requirement that such emails are submitted to ecfintake@nhd.uscourts.gov. This ensures that if a case manager is out of the office or unavailable, the person providing coverage has access to the filing for docketing. Please also note that AP 2.5(b)(3) specifies that the court will not read, consider, or respond to any text in the email itself – all requests for relief must be contained within the attached document for filing.

Compliance with this rule will help ensure the timely filing and processing for documents filed by email. The local rules are available on our website at: https://www.nhd.uscourts.gov/pdf/2025%20Local%20Rules%20-%20District%20of%20New%20Hampshire.pdf   LR AP 3.5 begins on page 154 of the .pdf. I would ask that you review this rule before filing by email. If you have any questions about the rule, please let me know.

**Tracy A. Uhrin, Clerk of Court**
United States District Court
District of New Hampshire
55 Pleasant Street, Rm 110
Concord, NH 03301
603.226.7792

---

**From:** Vincent Negron <Vincent_Negron@nhd.uscourts.gov>
**Sent:** Monday, February 9, 2026 9:50 AM
**To:** Andre Bisasor <quickquantum@aol.com>; Tracy Uhrin <Tracy_Uhrin@nhd.uscourts.gov>
**Subject:** RE: Urgent Alerting to the Judge of Prior Confidential Submissiom of Medical Documentation / Fw: Bisasor v. Donais et al

2/17/26, 12:52 PM    AOL Mail - FW: Urgent Alerting to the Judge of Prior Confidential Submissiom of Medical Documentation / Fw: Bisasor v. Donais et…

Case 1:25-cv-00251-SE-AJ    Document 108    Filed 04/22/26    Page 99 of 101

My apologies, Mr. Bisasor.  Looks like I missed your email containing the medical documentation.


Thank you.


Vincent L. Negron

Case Manager

United States District Court

55 Pleasant Street

Concord, NH 03301

603-226-7733

[vincent_negron@nhd.uscourts.gov](mailto:vincent_negron@nhd.uscourts.gov)





---

**From:** Andre Bisasor <[quickquantum@aol.com](mailto:quickquantum@aol.com)>
**Sent:** Monday, February 9, 2026 9:30 AM
**To:** Samantha Elliott <[Samantha_Elliott@nhd.uscourts.gov](mailto:Samantha_Elliott@nhd.uscourts.gov)>; Tracy Uhrin <[Tracy_Uhrin@nhd.uscourts.gov](mailto:Tracy_Uhrin@nhd.uscourts.gov)>; Vincent Negron <[Vincent_Negron@nhd.uscourts.gov](mailto:Vincent_Negron@nhd.uscourts.gov)>
**Subject:** Urgent Alerting to the Judge of Prior Confidential Submissiom of Medical Documentation / Fw: Bisasor v. Donais et al


**CAUTION - EXTERNAL:**


Dear Judge Elliott:

Case 1:25-cv-00251-SE-AJ    Document 100    Filed 04/23/26    Page 100 of 101

I saw the ruling today, which in part states:

"Documentation from a medical provider substantiating Bisasor's representations in his prior request for an extension of time, which shall be sealed at Level II. **Bisasor failed to file such medical documentation, which he had offered to do in his motion,** by the court's January 21, 2026 deadline. Bisasor shall file such medical documentation no later than February 23, 2026, or the court will conclude that he made a knowing and intentional misrepresentation to the court and may impose sanctions."

I am puzzled by this because I did email to the case clerk my confidential medical documentation under level seal II on 1-15-26. I do not understand why the judge is saying that I failed to do so. Because the order warned of sanctions regarding this issue, I take it as an urgent serious matter that requires swift correction. I am concerned that the case clerk is not handling this case properly.

It appears that the case clerk did not forward to the court this confidential filing. If this is the case, then I would like to understand why it was not presented to the judge?

So, in any event and in the abundance of caution, I am forwarding below my email submission to the case clerk of the confidential medical documentation supporting my last request for extension of time, which was submitted to the case clerk on 1-15-26 in compliance with the court's order of 1-13-26.

Can the judge please issue an order of correction stating that there was an error and I did comply with the court's order regarding providing the medical documentation supporting the last request for extension of time?

Sincerely,

Andre Bisasor

----- Forwarded Message -----

**From:** Andre Bisasor <quickquantum@aol.com>

**To:** Vincent Negron <vincent_negron@nhd.uscourts.gov>

**Sent:** Thursday, January 15, 2026 at 11:24:50 AM EST

**Subject:** Re: Bisasor v. Donais et al

> Dear Clerk Vincent,
>
> Pursuant to the court's 1-13-26 order that you attached below, I hereby submit a confidential Level II sealed filing containing medical documentation supporting my 1-12-26 confidential motion.
>
> I assume that because the court already ordered that this be sealed at level II (i.e., "Mr. Bisasor shall file medical documentation supporting his request, which shall be sealed at Level II"), that I do not need to submit another motion to seal. Please correct me if I am mistaken.
>
> Sincerely,

Case 1:25-cv-00251-SE-AJ    Document 108    Filed 04/22/26    Page 101 of 101

Andre Bisasor

On Thursday, January 15, 2026 at 10:23:33 AM EST, Vincent Negron <vincent_negron@nhd.uscourts.gov>
wrote:

Vincent L. Negron

Case Manager

United States District Court

55 Pleasant Street

Concord, NH 03301

603-226-7733

vincent_negron@nhd.uscourts.gov



**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when
opening attachments or clicking on links.