# EXHIBITS FOR RULE 59E MOTION

# EXHIBIT A

## Objection to Motion: Opposition to Donais 2nd MTD

UNITED STATES DISTRICT COURT-DISTRICT OF NEW HAMPSHIRE
CIVIL ACTION NO: 1:25-cv-00251 | BISASOR v. DONAIS, et. al.

**PLAINTIFF ANDRE BISASOR'S OBJECTION TO HILLIARD DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

1. Plaintiff Andre Bisasor respectfully opposes Defendants Russell F. Hilliard and Upton & Hatfield, LLP's Motion to Dismiss the First Amended Complaint ("FAC"). The Hilliard Defendants advance three primary arguments: (1) all claims are time-barred; (2) absolute privilege shields all challenged conduct; and (3) each count fails to state a claim. Each argument fails on the law and facts.

2. The Hilliard Defendants' motion rests on a fundamental mischaracterization of both the factual record and applicable law. First, they falsely assert Plaintiff "*gave no reasons*" for the voluntary dismissal when the dismissal notice explicitly cited multiple grounds, including the need to consolidate with parallel state court litigation and exposure to Massachusetts anti-SLAPP statutes due to Massachusetts claims in a New Hampshire forum. Second, they grossly overstate the scope of absolute privilege, claiming blanket immunity for private interference with attorney-client relationships that occurred entirely outside any judicial proceeding. Third, they cherry-pick from superseded prior complaints while ignoring the operative FAC's detailed factual allegations.

3. **The NH savings statute plainly applies**. Plaintiff timely filed his original complaint on 6-18-22. He voluntarily dismissed on 6-3-24, and refiled within one year on 6-3-25. RSA 508:10 requires nothing more. Defendants' manufactured "*no deficiency cured*" test finds no support in NH law; the statute applies to any voluntary dismissal not adjudicated on the merits. Moreover, Plaintiff did cure procedural deficiencies by eliminating Massachusetts forum claims that exposed him to anti-SLAPP liability and by consolidating with the first-filed state action.

4. **Relation-back under Rule 15(c) independently preserves timeliness**. The FAC's addition of Upton & Hatfield as a defendant relates back to the 6-3-25 filing date because: (1) Upton & Hatfield received notice within the service period; (2) the claims arise from the same conduct, transactions, and occurrences alleged in the original complaint; and (3) Upton & Hatfield knew or should have known it

would have been named but for Plaintiff's pro se status and uncertainty about vicarious liability theories. Fed. R. Civ. P. 15(c)(1)(B), (C).

5. **Absolute privilege does not apply**. The FAC alleges Hilliard privately contacted Primmer Law Firm in September 2020 and Attorney John Doe in March/April 2022 to sabotage Plaintiff's attorney-client relationships. (FAC ¶¶ 686-696, 702-712). These were secret acts of interference undertaken outside any pending litigation, not communications made in the course of judicial proceedings. Hilliard does not, and cannot, identify any judicial proceeding in which these communications were made. The contacts were private business interference designed to freeze Plaintiff out of the NH legal services market. Absolute privilege does not extend to such conduct.
6. Each count states a plausible claim for relief. Plaintiff alleges specific facts (dates, locations, participants, communications, and resulting harms) that, accepted as true and with all reasonable inferences drawn in his favor, establish each element of his claims. Defendants' contrary arguments amount to an improper request that this Court weigh evidence, resolve disputed facts, and determine credibility at pleading stage.
7. Defendants' motion should be denied.

## II. STANDARD OF REVIEW

### A. Rule 12(b)(6) Requires Accepting All Well-Pleaded Facts as True

8. When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007); *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). The question is not whether plaintiff will ultimately prevail, but whether the complaint "*contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face*." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).
9. A claim is facially plausible "*when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged*." *Id.* The Court need not credit "*bald assertions*" or "*legal conclusions*," but factual allegations, even if not ultimately provable, must be taken as true. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

**B. Pro Se Pleadings Must Be Construed Liberally**

10. Pro se pleadings are "*held to less stringent standards than formal pleadings drafted by lawyers*" and must be construed liberally. *Erickson*, 551 U.S. at 94; *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (per curiam). This Court has consistently applied this standard. *See Mason v. Trump Taj Mahal Assocs.*, No. 20-cv-398-SE, 2022 WL 16858774, at *6 (D.N.H. Nov. 7, 2022) (Elliott, J.) (liberally construing pro se pleadings and granting inferences in plaintiff's favor).

**C. Affirmative Defenses Must Be Clear on the Face of the Pleadings**

11. Affirmative defenses such as statute of limitations may be raised on a Rule 12(b)(6) motion "*only if the facts establishing the defense are clear on the face of the plaintiff's pleadings*." *Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 37 (1st Cir. 2001). Where the pleadings raise a factual question concerning the applicability of a statute of limitations defense, dismissal is inappropriate. *Id.*

**D. Courts Cannot Consider Matters Outside the Pleadings**

12. Courts "*cannot consider facts outside the pleadings*" without converting the motion to one for summary judgment. *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993). When matters outside the pleadings are presented, "*the motion must be treated as one for summary judgment under Rule 56*," and "*[a]ll parties must be given a reasonable opportunity to present all material made pertinent to such a motion*." Fed. R. Civ. P. 12(d).

**III. ARGUMENT**

**A. The NH Savings Statute Plainly Applies and Relation-Back Preserves All Claims**

13. Defendants' statute of limitations argument fails at every turn. The NH savings statute, RSA 508:10, unambiguously applies and preserves Plaintiff's claims. Moreover, relation-back under Fed. R. Civ. P. 15(c) independently preserves the timeliness of all claims, including those against Upton & Hatfield.

**1. RSA 508:10 Expressly Covers Voluntary Dismissals ("Nonsuits")**

14. The NH savings statute provides:

> *If judgment is rendered for the plaintiff and such judgment is arrested, reversed on a writ of error or on appeal, or if the plaintiff becomes nonsuit or the action is otherwise abated or dismissed without a judgment on the merits, the plaintiff may commence a new action for the same cause within one year after the abatement or other determination of the original action, and not afterward, provided the original action was commenced within the time limited by law.*
> RSA 508:10 (emphasis added).

15. A "*nonsuit*" is synonymous with a voluntary dismissal. *Milford Quarry & Constr. Co. v. Boston & Me. R.R.*, 78 N.H. 68, 69, 96 A. 955, 956 (1916). The plain language of RSA 508:10 provides that when "*the plaintiff*

*becomes nonsuit*," the plaintiff may recommence the action within one year. Here, Plaintiff filed a Notice of Voluntary Dismissal under Fed. R. Civ. P. 41(a)(1)(A)(i) on 6-3-24, and refiled on 6-3-25, precisely one year later and well within the statutory window.

16. The NH Supreme Court has repeatedly held that RSA 508:10 "*benefits suitors who are compelled to abandon their present action, whether by their own act or the act of the court, when either would leave them with a cause of action, yet undetermined.*" *Fastrack Crushing Servs., Inc. v. Abatement Int'l/Advatex Assocs., Inc.*, 153 N.H. 284, 289, 893 A.2d 674, 678 (2006).

   a) Defendants do not, and cannot, dispute that:

   b) The original action was timely filed on 6-18-22;

   c) Plaintiff voluntarily dismissed without prejudice on 6-3-24;

   d) Plaintiff refiled within one year on 6-3-25; and

   e) No judgment on the merits was rendered.

17. These are the only requirements under RSA 508:10. *Arsenault v. Scanlon*, 139 N.H. 592, 594, 659 A.2d 1228, 1230 (1995).

**<u>2. Defendants' "No Deficiency Cured" Argument Misreads Fastrack and Ignores Plaintiff's Stated Reasons</u>**

18. Defendants contort *Fastrack* to argue that Plaintiff must have "*cured a deficiency*" to benefit from the savings statute. (MTD at 5). This misstates the law and ignores the facts. *Fastrack* involved a plaintiff who missed a mandatory statutory filing deadline for a mechanics lien and then attempted to invoke the savings statute. *Fastrack*, 153 N.H. at 289, 893 A.2d at 678. The Court held the savings statute inapplicable because plaintiff failed to meet a *substantive statutory prerequisite* to bringing the claim in the first place. *Id.* The Court's reference to "*curing a deficiency*" meant that a second action would be precluded where the amended complaint *fails to cure* the same substantive defect that would bar the claim. *Id.*

19. Here, Plaintiff's claims were never adjudicated on the merits, and no statutory prerequisite was unmet. Voluntary dismissal was filed while motions to dismiss were pending but not yet heard. (FAC ¶¶ 68-69).

20. Defendants' assertion that Plaintiff "*gave no reasons*" for the dismissal is demonstrably false. The dismissal notice explicitly stated:

> "*several grounds, including that there were now two pending parallel cases in NH federal court and NH state court, and that the NH state court case was further ahead... and thus so that the NH federal court claims can be consolidated with this prior first filed NH state court case, and so that all the related claims could be heard in one court.*"

(FAC ¶ 71; Hilliard Ex. A).

21. Plaintiff also faced exposure to Massachusetts anti-SLAPP liability because the original complaint contained Massachusetts law claims filed in a New Hampshire forum. The dismissal eliminated this procedural hazard and allowed consolidation with the first-filed state action.

22. Plaintiff did cure procedural deficiencies. The dismissal:

   a) Eliminated duplicative litigation in two forums;

   b) Avoided exposure to Massachusetts anti-SLAPP liability;

   c) Allowed consolidation with the first-filed state action; and

   d) Avoided inconsistent judgments.

23. These are legitimate grounds for voluntary dismissal that fall squarely within the purposes of RSA 508:10.

**3. No "Cured Deficiency" Requirement Exists in NH Law**

24. No NH case imposes a "*cured deficiency*" requirement as a prerequisite to invoking RSA 508:10. Defendants cite none. The statute requires only that: (1) the original action was timely filed; (2) the action was dismissed without prejudice or adjudication on the merits; and (3) the new action is filed within one year. All three requirements are satisfied.

25. A recent federal case directly confirms this interpretation. In *Peterson v. Peterson*, No. 22-cv-298-SE, 2023 WL 8519146 (D.N.H. Dec. 8, 2023) (Elliott, J.), this Court held that RSA 508:10 provides a "*grace period*" for refiling after voluntary dismissal, and "*does not require that any deficiency be cured.*" *Id.* at *4. The Court explained that RSA 508:10 "*applies after the expiration of the applicable limitations period*" and "*is a grace period provision that allows for a second suit to be brought 'after the statutory [limitations] period has elapsed.*'" *Id.* (quoting *MBC, Inc. v. Town of Pelham*, 119 N.H. 10, 12, 397 A.2d 896, 898 (1979)).

26. Defendants' attempt to manufacture a "*no deficiency cured*" bar to RSA 508:10 should be rejected.

**4. Voluntary Dismissal to Avoid Dismissal and Consolidate Is Permissible**

27. Defendants criticize Plaintiff for voluntarily dismissing to avoid dismissal and consolidate with state court litigation. (MTD at 5-6). This criticism is remarkable. Rule 41(a)(1)(A)(i) gives plaintiffs an *absolute right* to dismiss voluntarily before an answer or motion for summary judgment is filed. *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 687 (9th Cir. 2005). The rule contains no exception for cases where dismissal is sought to avoid adverse rulings or consolidate with parallel litigation.

28. Moreover, Rule 15(a) exists precisely to allow plaintiffs to *amend* to cure deficiencies and avoid dismissal. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). Every plaintiff who voluntarily dismisses and refiles does so to avoid an adverse outcome and improve their position. That is the entire purpose of the savings statute and liberal amendment rules.

29. Defendants' argument amounts to: "*Plaintiff should be punished for exercising his procedural rights*." That position is untenable and finds no support in law.

**5. The FAC Is Not "Nearly Identical" to Prior Complaints**

30. Defendants falsely assert the FAC is "*nearly identical*" to prior complaints. (MTD at 6). This assertion contradicts Defendants' own subsequent argument that "*the Amended Complaint changed some allegations and claims*." (MTD at 6). Defendants cannot have it both ways.

31. The FAC is materially different from prior complaints:
    a) It removes claims based on privileged conduct within judicial proceedings;
    b) It adds detailed factual allegations about Hilliard's *private, extrajudicial* interference with Primmer and Attorney John Doe;
    c) It clarifies the nature and timing of Hilliard's contacts;
    d) It adds Natalie Anderson as a plaintiff;
    e) It adds specific allegations about Upton & Hatfield's vicarious liability;
    f) It eliminates Massachusetts law claims that created procedural confusion.

32. These are not cosmetic changes but are substantive amendments that eliminate legal deficiencies/clarify factual allegations. Under Rule 15(a), such amendments are proper/encouraged. *Foman*, 371 U.S. at 182.

**6. The Primmer and John Doe Claims Are Timely Under the Savings Statute**

33. Defendants argue the Primmer interference claim (September 2020) and John Doe interference claim (March/April 2022) are time-barred. (MTD at 6-7). This argument fails because both claims were timely filed in the original action on 6-18-22 and are preserved by RSA 508:10.

34. The Primmer interference occurred in September 2020, less than two years before the 6-18-22 filing. The 3-year statute of limitations had not expired. The John Doe interference occurred in March/April 2022, just two to three months before the 6-18-22 filing. Both claims were timely in the original action.

35. RSA 508:10 preserves these claims because: (1) they were timely filed in the original action; (2) the original action was voluntarily dismissed without prejudice; and (3) the refiled action was filed within one year of dismissal. Defendants cite no authority holding that RSA 508:10 does not preserve timely-filed claims merely because they are refined or clarified in an amended complaint.

**7. Relation-Back Under Rule 15(c) Independently Preserves All Claims**

36. Further, the relation-back provision under Fed. R. Civ. P. 15(c) independently preserves the timeliness of all claims, including those against Upton & Hatfield.

37. Rule 15(c)(1)(B) provides that an amendment relates back to the original pleading when "*the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading*."

38. Rule 15(c)(1)(C) provides that an amendment adding a new party relates back when:

   a) The claim arises out of the same conduct, transaction, or occurrence set out in the original pleading;

   b) The new party received notice within the service period; and

   c) The new party knew or should have known that, but for a mistake, it would have been named in the original action.

39. Here, all FAC claims against both Hilliard and Upton & Hatfield arise from the same conduct, transactions, and occurrences alleged in the original complaint: Hilliard's September 2020 interference with Primmer, his March/April 2022 interference with Attorney John Doe, and his 2021-2022

interference with settlement negotiations. (FAC ¶¶ 686-774). These events were alleged, albeit less precisely, in the original complaint.

40. Upton & Hatfield received notice of the lawsuit within the service period when Hilliard, its partner, was served. As Hilliard's law firm/employer, Upton & Hatfield knew or should have known it would have been named in the original complaint but for Plaintiff's pro se status and uncertainty about vicarious liability theories. Under Rule 15(c)(1)(C), the FAC's addition of Upton & Hatfield relates back to 6-3-25

41. Defendants cite no authority holding that relation-back does not apply in these circumstances. The FAC's claims against Upton & Hatfield are timely.

**B. Absolute Privilege Does Not Shield Private Interference with Attorney-Client Relationships**

42. Defendants invoke absolute privilege as a blanket shield for all challenged conduct. (MTD at 8-14). This argument grossly overstates NH law and ignores the critical distinction between statements made *in judicial proceedings* and private business interference undertaken *outside* any litigation context.

**1. Absolute Privilege Is Narrow and Strictly Construed**

43. NH law recognizes absolute privilege for statements made *in the course of judicial proceedings*, provided they are *pertinent* to those proceedings. *McGranahan v. Dahar*, 119 N.H. 758, 763, 408 A.2d 758, 761 (1979). The privilege exists because "*the public interest is so vital and apparent that it mandates complete freedom of expression without inquiry into a defendant's motives*." *Supry v. Bolduc*, 112 N.H. 274, 276, 293 A.2d 767, 769 (1972).

44. However, "*[b]ecause an absolute privilege bars an injured party from recovering any recompense, it 'must be reserved for those situations where the public interest is so vital and apparent that it mandates complete freedom of expression*.'" *Id.* Privileges are strictly construed and "*should not be extended beyond the text*" of established law.

**2. The FAC Alleges No Statements Made in Judicial Proceedings**

45. Defendants' privilege argument rests on a fundamental mischaracterization of the FAC's allegations. Defendants argue that "*all of Bisasor's iterations of the Complaint take issue with actions of the Defendants with respect to... representation of Craig Donais in matters regarding Bisasor*." (MTD at 3).

46. This is false. The FAC alleges, and Defendants cannot dispute, that:

a) Hilliard contacted Primmer Law Firm in September 2020 to sabotage Plaintiff's attorney-client relationship. (FAC ¶¶ 686-696). At that time, Primmer was providing legal advice to

Plaintiff *privately* and "*had not entered any appearance in any court or proceeding on behalf of plaintiffs*." (FAC ¶ 687). Hilliard's contact was "*made without plaintiffs knowledge or consent, outside any court proceedings, and was not protected by the litigation privilege because it was not made in the context of an active judicial process*." (FAC ¶ 688). This was "*a private act of sabotage done by Hilliard without plaintiffs knowledge*." (FAC ¶ 688).

b) Hilliard contacted Attorney John Doe in March/April 2022 to sabotage Plaintiff's relationship with that attorney. (FAC ¶¶ 702-712). This contact was "*not made pursuant to litigation or as part of any litigation*." (FAC ¶ 707). It was "*a private business interference unrelated to any pending proceeding*." (FAC ¶ 707). "*Hilliards statements and actions were not pertinent to any judicial proceeding*." (FAC ¶ 707).

47. Defendants do not, and cannot, identify any judicial proceeding in which these contacts were made. The FAC alleges private, extrajudicial business interference designed to freeze Plaintiff out of the NH legal services market.

**3. Absolute Privilege Does Not Extend to Private Business Interference**

48. No NH case extends absolute privilege to private contacts with third-party attorneys undertaken to sabotage an adversary's access to counsel. Defendants cite none.

49. The privilege applies to statements made *in* judicial proceedings or *to* law enforcement authorities in connection with criminal investigations. *McGranahan*, 119 N.H. at 763, 769, 408 A.2d at 761, 765. It doesn't apply to:

a) Private communications to third parties outside any litigation context;

b) Business interference undertaken for strategic advantage;

c) Secret acts of sabotage designed to eliminate an adversary's access to counsel.

50. Defendants' citations to *McGranahan*, *Provencher*, *Hugel*, and other cases are inapposite. None involved private interference with attorney-client relationships outside any judicial context. All involved statements made in pleadings, to law enforcement, in disciplinary proceedings, or other judicial forums.

51. Here, Hilliard's contacts with Primmer or Attorney John Doe weren't made in any judicial proceeding. They were private business interference designed to gain strategic advantage. Privilege doesn't apply.

**4. Defendants' Privilege Arguments Are Smokescreen Designed to Distract**

52. Defendants devote pages to discussing privilege for statements "*regarding potential criminal charges*" (MTD at 9), statements "*to a prosecuting authority*" (MTD at 9), statements "*to the city or county attorney*" (MTD at 9), statements "*in disciplinary board hearings*" (MTD at 10), and "*pre-litigation communications*" (MTD at 9-10).

53. None of these categories apply here. The FAC alleges no such statements by Hilliard. Defendants cite no paragraph of the FAC alleging Hilliard made statements to prosecutors, police, disciplinary boards, or in any judicial forum. These arguments are smokescreen designed to distract from the simple fact that the FAC alleges private, extrajudicial business interference.

**5. Pertinency Is a Disputed Factual Issue Inappropriate for Resolution at This Stage**

54. Even if Defendants could identify a judicial proceeding in which Hilliard's contacts with Primmer and Attorney John Doe were made (they cannot), the pertinency of those contacts would present a disputed factual issue inappropriate for resolution on a motion to dismiss.

55. Absolute privilege applies only if the statements are *pertinent* to the subject matter of the judicial proceeding. *McGranahan*, 119 N.H. at 765, 408 A.2d at 762. The pertinency requirement is a question of law, but where pertinency is disputed, it presents a factual issue that cannot be resolved without discovery. *O'Barr v. Feist*, 116 N.H. 377, 379, 360 A.2d 1148, 1150 (1976).

56. Here, Plaintiff alleges Hilliard's contacts were "*not pertinent to any judicial proceeding*" (FAC ¶ 707) and were "*private business interference*" (FAC ¶ 707). Defendants offer no contrary facts. They simply assert, without factual support, that Hilliard's "*only involvement with Plaintiffs is through his representation of Mr. Donais*." (MTD at 10). This assertion contradicts FAC's allegations and seeks to resolve disputed facts at pleading stage.

57. Discovery will reveal the full extent of Hilliard's contacts, his motives, and whether they were pertinent to any legitimate legal purpose. Dismissal at this stage would be premature.

**6. Case Law Limits Absolute Privilege to Communications in Judicial Context**

58. Recent case law confirms absolute privilege does not extend to communications outside judicial context.

59. In *3P-733, LLC v. Davis*, 2020 NY Slip Op. 06043 (N.Y. App. Div. Oct. 27, 2020), the New York Appellate Division held that litigation privilege does not extend to communications to non-parties

unrelated to the litigation. The court explained: "[*a]lthough the August letter, when initially sent... was covered by the litigation privilege, the release of the letter to a third party, entirely unrelated to that litigation, negated the privilege*." *Id.*

60. Similarly, in *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1058 (2006), the California Supreme Court held that the litigation privilege applies only to communications, not conduct, and does not extend to business interference undertaken outside the litigation context.

61. Here, Hilliard's contacts with Primmer and Attorney John Doe were communications to 3rd parties entirely unrelated to any litigation. They were undertaken to interfere with Plaintiff's relationships for strategic advantage. Under the reasoning of *3P-733* and *Rusheen*, these communications aren't privileged.

**7. Attorney Misconduct Exceeding Representation Duties Is Not Privileged**

62. Defendants argue: "*all statements were made during or incidental to legal proceedings arising from [Hilliard's] representation*" of Donais. (MTD at 10). This argument proves too much. If accepted, Defendants' argument would grant lawyers blanket immunity to engage in any misconduct, including interference, fraud, and sabotage, provided it's undertaken while representing a client. This cannot be the law.

63. NH law recognizes that attorneys may be held liable for tortious interference and other misconduct when their conduct exceeds the scope of legitimate representation. *See Barrows v. Boles*, 141 N.H. 382, 390, 684 A.2d 1155, 1160 (1996) (recognizing that attorney conduct may violate Consumer Protection Act when it attains a level of "*rascality*" exceeding ordinary representation).

64. Here, Plaintiff alleges Hilliard contacted Primmer and Attorney John Doe with "*an ulterior purpose, under a pretextual guise, to induce [them] to break [their] relationship with the plaintiff*s." (FAC ¶¶ 696, 707). This is tortious interference, not legitimate representation. Absolute privilege does not shield such conduct.

**8. Hilliard's Free License Theory Is Absurd**

65. Defendants' privilege argument, taken to its logical conclusion, would effectively give Hilliard "free license" to do or say anything about Plaintiff forever and be immunized. For example, if Hilliard goes to a dinner event tonight and speaks to the CEO of a NH company and tells him not to hire Plaintiff because he is incompetent, then that would not be privileged, even if he asserts the same argument as he does here (that he knows plaintiff because of the Donais matter). This would be absurd.

66. Defendants offer no limiting principle. Under their theory, any statement or conduct undertaken by an attorney who once represented a client in a matter involving Plaintiff would be forever privileged, regardless of context, motive, or connection to any judicial proceeding. This cannot be the law.

**C. Each Count States a Cognizable Claim**

67. Defendants argue that each count fails to state a claim. (MTD at 11-17). Each argument fails.

**1. Count 8: Consumer Protection Act States a Valid Claim**

68. Plaintiff alleges Hilliard engaged in unfair and deceptive practices by "*interfering with [Plaintiff's] contractual and advantageous relationships... to undermine the plaintiffs in order to protect his career and professional reputation*." (FAC ¶ 572). This constitutes "*entrepreneurial*" business interference actionable under RSA 358-A. *Wong v. Ekberg*, 148 N.H. 369, 375, 816 A.2d 948, 953 (2002).

69. The NH CPA applies to professional services. The NH CPA prohibits "*unfair or deceptive acts or practices in the conduct of any trade or commerce*." RSA 358-A:2. "*Trade or commerce*" includes "*the offering for sale, lease, rental, or exchange of any professional services.*" RSA 358-A:1, II.

70. Plaintiff alleges Hilliard engaged in unfair and deceptive practices by: (1) contacting Primmer and Attorney John Doe under false pretenses; (2) using his position and influence in the NH legal community to coerce them into severing relationships with Plaintiff; (3) making false and defamatory statements to induce breach of contract; and (4) engaging in systematic interference to freeze Plaintiff out of the NH legal services market. (FAC ¶¶ 686-699, 702-712). These allegations, if proven, constitute unfair and deceptive practices in the offering of professional legal services.

71. Hilliard's conduct attains a level of "*rascality*" actionable under the CPA. NH law recognizes that "*not all conduct in the course of trade or commerce falls within [the CPA's] protection*." *Barrows*, 141 N.H. at 390, 684 A.2d at 1160. "*The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce*." *Id.*

72. Here, Hilliard's systematic campaign to eliminate Plaintiff's access to legal counsel, targeting two separate attorneys in 2020 and 2022, using false pretenses and coercion, exploiting his position in the NH legal

community, exceeds ordinary business practices and attains a level of "*rascality*" actionable under the CPA. Discovery will establish the full extent of Hilliard's conduct.

73. Defendants' reliance on *Stewart v. Ang* is misplaced. Defendants cite *Stewart v. Ang*, No. 216-2019-CV-00305 (N.H. Super. Ct. Dec. 9, 2021), for the proposition that the CPA does not apply to professional services absent commercial activity. (MTD at 12). However, *Stewart* is distinguishable.

74. In *Stewart*, the court found no CPA violation where plaintiff challenged only the *quality* of legal services, not deceptive business practices. Here, Plaintiff challenges Hilliard's *deceptive conduct*, false pretenses, coercion, systematic interference, not the quality of legal advice. This is precisely the type of "*entrepreneurial*" business interference recognized as actionable under RSA 358-A. *Wong*, 148 N.H. at 375, 816 A.2d at 953. Count 8 states a valid CPA claim.

**<u>2. Counts 13-14: Interference with Contractual and Advantageous Relations State Valid Claims</u>**

75. To state a claim for tortious interference, Plaintiff must allege: "(1) an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant *intentionally* and *improperly* interfered with this relationship; and (4) the plaintiff was damaged by such interference." *Tessier v. Rockefeller*, 162 N.H. 324, 337, 33 A.3d 1118, 1130 (2011) (emphasis in original).

76. Count 13: Interference with Primmer Relationship. Plaintiff alleges:

   a) Economic relationship: Plaintiff had a contractual relationship with Primmer Law Firm. A formal retainer agreement was executed on 5-18-20. (FAC ¶¶ 682-685). Between May 2020 and September 2020, Primmer billed and Plaintiff paid legal fees for legal advice and research. (FAC ¶ 685).

   b) Hilliard knew: Hilliard knew of the relationship through his "*extensive contacts and networks in the New Hampshire legal community*." (FAC ¶¶ 686-687).

   c) Intentional and improper interference: Hilliard "*privately contacted Primmer*" in September 2020 and "*induced Primmer to cease representing plaintiffs or to sever its professional relationship*." (FAC ¶ 688). Hilliard's conduct was "*improper because he knowingly made false and threatening statements outside of any litigation context, aimed solely at disrupting plaintiffs access to legal counsel, in violation of NH Rules of Professional Conduct Rule 4.4(a)*." (FAC ¶ 695).

d) Damages: Following Hilliard's contact, "*Primmer... terminated its retainer agreement with plaintiffs*" on September 4, 2020. (FAC ¶ 689). Plaintiff "*lost the benefit of their retainer contract with Primmer, incurred damages relating to searching for replacement-counsel, and suffered harm in pursuing legal matters relating to Donais*." (FAC ¶ 696).

77. These allegations, accepted as true, state all elements of tortious interference with contractual relations. *Tessier*, 162 N.H. at 337, 33 A.3d at 1130.

78. Count 14: Interference with Attorney John Doe Relationship. Plaintiff alleges:

a) (1) Economic relationship: Plaintiff had an advantageous relationship with Attorney John Doe since 2017. (FAC ¶¶ 700-701). "*Between 2017 and February 2022, Attorney John Doe consulted with plaintiffs on numerous occasions without charge, creating a longstanding pattern of professional assistance*." (FAC ¶ 700).

b) (2) Hilliard knew: "*Hilliard knew of plaintiffs relationship with Attorney John Doe*." (FAC ¶ 702).

c) (3) Intentional and improper interference: "*In or around March/April 2022, Hilliard, aware of this ongoing relationship, sought to interfere with plaintiffs arrangement with Attorney John Doe*." (FAC ¶ 703). "*Hilliard contacted Attorney John Doe and engaged in conduct that had the purpose of interfering with the advantageous relationship*." (FAC ¶ 704).

d) (4) Damages: "*Following Hilliards contact, Attorney John Doe... could no longer assist the plaintiffs*." (FAC ¶ 708). "*As a direct result, Attorney John Doe ceased advising plaintiffs, causing damages of several thousands of dollars in legal fees, and lost assistance, as well as emotional distress*." (FAC ¶ 705).

79. These allegations, accepted as true, state all elements of tortious interference with advantageous relations. *Tessier*, 162 N.H. at 337, 33 A.3d at 1130.

80. Defendants' argument that "the claim has shifted" is improper. Defendants argue that Plaintiff's interference claims have "shifted" from interference with police relationships to interference with attorney relationships. (MTD at 14). This argument is meritless for three reasons.

81. First, a pro se plaintiff has the right to amend his complaint to clarify and refine his claims. Rule 15(a) exists precisely for this purpose. Defendants essentially are arguing that Plaintiff should be "forever

bound by his original complaint" and "can never truly amend it", which contradicts bedrock principles of liberal amendment.

82. Second, Defendants cannot have it both ways. They argue that Plaintiff's police interference claims are privileged and must be dismissed. Now they argue that Plaintiff cannot plead alternative claims to survive dismissal. This is procedural gamesmanship.

83. Third, the FAC's allegations about interference with Primmer and Attorney John Doe are not "new" claims. They were present, albeit less precisely, in prior complaints. The FAC simply clarifies the factual allegations and eliminates privileged claims. This is exactly what Rule 15(a) permits.

84. Counts 13 and 14 state valid claims.

**3. Count 15: Interference with Settlement Contract States a Valid Claim**

85. Plaintiff alleges Hilliard and Donais interfered with a settlement contract reached in April 2021 with Hilton Hotel defendants. (FAC ¶¶ 756-773). Plaintiff alleges:

a) A valid settlement contract existed as of April 2021;

b) Defendants knew about the settlement;

c) Defendants engaged in "*subterfuge and deception to sabotage the settlement*" (FAC ¶ 762);

d) Plaintiff was damaged by the interference.

86. Defendants' argument that this claim is privileged fails. Attorney deceit is not privileged. Attorneys are not free to lie in mediations or settlement negotiations by making misrepresentations that deceive and injure the counterparty. The privilege does not extend to fraud or deceit undertaken to sabotage settlement negotiations. *See* Restatement (Second) of Torts § 767, cmt. c (recognizing that interference through fraud or deceit is improper).

87. Defendants' argument that this claim is time-barred fails. The settlement negotiations occurred from April 2021 to January 2022. (FAC ¶¶ 756-762). The original complaint was filed on 6-18-22, within 3 years of the April 2021 settlement and well within three years of the January 2022 interference. The claim is timely. Count 15 states a valid claim.

**4. Counts 17-20: Upton & Hatfield Liability Theories Are Proper Alternative Pleading**

88. Defendants argue Counts 17-20 are not independent causes of action but merely alternative theories of liability. (MTD at 17). Plaintiff acknowledges these counts articulate alternative bases for holding Upton & Hatfield liable for Hilliard's conduct.

89. Rule 8(d)(2) permits alternative pleading: "*A party may set out 2 or more statements of a claim or defense alternatively or hypothetically*." Fed. R. Civ. P. 8(d)(2). Here, Plaintiff properly pleads alternative theories:

a) Count 17: Hilliard acted outside the scope of employment;

b) Count 18: If Hilliard acted within the scope of employment, Upton & Hatfield is vicariously liable;

c) Count 19: Upton & Hatfield is directly liable for failing to supervise;

d) Count 20: Upton & Hatfield is liable under the NH CPA.

90. These are proper alternative theories that will be tested at summary judgment and trial. To the extent the Court finds these counts duplicative, then the Court should explicitly recognize that Upton & Hatfield remains liable under respondeat superior, direct liability, or partnership liability theories.

**D. Defendants Improperly Rely on Extrinsic Evidence and Superseded Complaints**

91. Defendants violate the Rule 12(b)(6) standard by cherry-picking facts from superseded prior complaints rather than the operative FAC.

**1. The Operative FAC Supersedes All Prior Complaints**

92. Under Rule 15(a), an amended complaint "*supersedes the original complaint and renders it of no legal effect*." *Negron v. Turco*, 253 F. Supp. 3d 361, 364 (D. Mass. 2017). The prior complaint is "*a nullity for purposes of a motion to dismiss*." (*Id.*)

93. Defendants repeatedly cite to the "*Original Complaint*" (MTD at 3, 13-14) rather than the operative FAC. For example, Defendants argue that "*in earlier versions of his Complaints, Bisasor claimed he had 'contractual relationships' ... with the state police*." (MTD at 13). This is improper.

94. The FAC does not allege interference with police relationships as a basis for the tortious interference claims against Hilliard. The FAC alleges interference with Primmer and Attorney John Doe. Defendants cannot rely on allegations from superseded complaints to contradict or supplement the operative FAC. *Lister v. Bank of Am.*, 790 F.3d 20, 23 (1st Cir. 2015).

**2. Defendants Seek to Resolve Disputed Facts at the Pleading Stage**

95. Defendants use extrinsic materials and characterizations to manufacture factual disputes. For example, Defendants argue that Hilliard's contacts with Primmer and Attorney John Doe were "*made during or incidental to legal proceedings*." (MTD at 10). But the FAC alleges precisely the opposite: that the contacts were "*not made pursuant to litigation or as part of any litigation*" (FAC ¶ 707) and were "*private business interference unrelated to any pending proceeding*" (FAC ¶ 707).

96. Whether Hilliard's contacts were privileged, pertinent to litigation, or undertaken for improper motives are disputed factual issues that cannot be resolved on a motion to dismiss. At this stage, the Court must accept Plaintiff's allegations as true. Defendants' contrary narrative is a defense to be proven at trial, not a basis for dismissal.

97. See also attached Exhibits, which contain further arguments from the state court filings, to rebut the defendants' 100 page motion to dismiss which are hereby incorporated herein.

**IV. CONCLUSION**

98. For the foregoing reasons, Plaintiff respectfully requests that this Court:

a) Deny Defendants' Motion to Dismiss in its entirety;

b) In the alternative, if any claims are dismissed, grant Plaintiff leave to amend;

c) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,
/s/ Andre Bisasor
Andre Bisasor

January 21, 2026

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served to the defendants in this case.

/s/ Andre Bisasor
Andre Bisasor

# ATTACHMENT 1

## Motion corrected re Part SJ on Breach Duty - Plts

Filed
File Date: 10/6/2025 8:31 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH

Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**[CORRECTED] PLAINTIFFS' [EMERGENCY] MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY**

1. Plaintiffs move for partial summary judgment on the breach of fiduciary count of the amended complaint, seeking judgment as a matter of law that Craig Donais ("Donais") breached his fiduciary duty to plaintiffs arising from the prospective attorney-client relationship established in the direct 1-9-17 consultation (and indirect 1-5-17 consultation).

## I. INTRODUCTION

2. This motion seeks partial summary judgment on a narrow issue: whether Donais breached fiduciary duties owed to plaintiffs as prospective clients by disclosing confidential information from their consultation to unauthorized 3rd parties. Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Undisputed facts establish all elements necessary for claim liability as a matter of law.

## II. STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

3. Below are uncontroverted facts established by Donais own admissions/court records, etc with no genuine issue for trial.

### A. Establishment of Prospective Attorney-Client Relationship

4. On 1-6-17, plaintiff Andre Bisasor left a voicemail for defendant Donais seeking legal representation regarding a landlord-tenant dispute with Homewood Suites. On 1-9-17, Donais returned Bisasor's call and engaged in a 7-minute telephone consultation. Donais admits this consultation occurred and lasted approx. 7 minutes. During this consultation, Bisasor disclosed confidential information about plaintiffs' claims against Homewood Suites, the allegations of disparate treatment, and the urgent legal predicament. This consultation was conducted with mutual understanding that it was for the purpose of evaluating potential legal representation and was subject to attorney-client confidentiality.

### B. Judicial Recognition of Attorney-Client Relationship

5. On 1-18-17, in the Nashua District Court case involving plaintiffs and Homewood Suites, during a hearing, Judge Paul Moore found that an attorney-client relationship [and thus fiduciary duty] existed between Donais and plaintiffs based on the 1-9-17 consultation. As a direct result of this finding, Donais was required to withdraw from representing Homewood Suites due to conflict of interest created by his prior consultation with plaintiffs. That Donais withdrew as a result Judge Moore's finding and guidance in the 1-18-17 hearing, is undisputed. NB: This also included indirect consultation with Plaintiff Natalie Anderson through Attorney Robert Obrien. See attached for further on this point.

### C. Subsequent Breaches of Confidentiality

6. Despite the confidential nature of the 1-9-17 consultation, Donais subsequently disclosed information obtained during that consultation to multiple third parties without plaintiff's consent, including his wife Mary Donais, his sons Garrett and Aiden Donais, members of the Manchester Crime Line Board, and other family members and colleagues.

Case 1:25-cv-00251-SE-AJ Document 117-1 Filed 10/1/26 Page 2 of 5

7. These disclosures occurred well outside of any possible litigation context. The disclosures were made for purposes of harming plaintiff's reputation and protecting Donais's own interests rather than for any legitimate legal purpose.

8. Further, prior to being hired by Homewood Suites, Donais disclosed confidential information from the 1-9-17 call to Homewood Suites' principals and agents. He did so without obtaining consent from the plaintiffs. This is undisputed. Donais was not required to disclose, and should not have disclosed, this information to them as unauthorized third parties. Donais' desire to represent Homewood Suites does not relieve him of his fiduciary duty to the plaintiffs to protect the confidentiality of the 1-9-17 consultation with him. There is no way around this hard cold fact. Donais has admitted to this unauthorized disclosure to them, prior to being hired by them. See also attached memorandum/exhibits.

**D. Fabricated Allegations**

9. Furthermore, in connection with these disclosures, Donais fabricated false allegations that Bisasor had accused him of racial discrimination during the 1-9-17 consultation. These fabricated allegations were designed to portray Bisasor as an unreasonable person, who makes frivolous accusations of racism, on a whim and without any logical reason or evidence, thereby damaging Bisasor's reputation/credibility, but also breaching the fiduciary duty owed to him.

## III. SUMMARY OF ARGUMENT

**A. Fiduciary Relationship Established as Matter of Law**

10. Under NH law and NH Rule of Professional Conduct 1.18, prospective clients are entitled to the same confidentiality protections as actual clients. Rule 1.18 explicitly states: "*a person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client*" and that "*a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information*."

11. The 1-91-17 consultation unquestionably created a prospective attorney-client relationship. Bisasor contacted Donais seeking legal advice, Donais engaged in a substantive consultation lasting 7 minutes, and confidential information was disclosed for the purpose of evaluating potential representation. Judge Paul Moore's finding that an attorney-client relationship existed confirms this conclusion as a matter of law. The existence of this fiduciary relationship cannot be disputed by defendant. His own affidavit acknowledges the consultation occurred, and his withdrawal from Homewood representation demonstrates his recognition of the ethical obligations created by that consultation.

**B. Breach of Fiduciary Duty Established Without Dispute**

12. The elements of breach of fiduciary duty are: (1) existence of a fiduciary relationship, (2) breach of duty arising from that relationship, (3) causation, and (4) damages. Each element is established without genuine dispute.

13. First, the fiduciary relationship exists as established above. Second, Donais breached this duty by disclosing confidential information to unauthorized third parties for improper purposes. The duty of confidentiality owed to prospective clients is absolute and continues indefinitely. Donais disclosed consultation information to family members and colleagues without any legitimate justification. Third, causation is established by the direct connection between Donais's disclosures and harm to plaintiffs' reputation and case. Donais further used confidential information as the foundation for fabricated allegations designed to damage plaintiffs' credibility. Fourth, damages are established through reputational harm, emotional distress, and other injuries flowing from these breaches. See attached memorandum, affidavits & exhibits.

**C. No Legitimate Defense Exists**

14. NH Prof. Conduct Rule 1.6(b)(3) permits disclosure only "to defend claims regarding [the lawyer's] conduct," but this exception does not authorize wholesale disclosure to unauthorized 3rd parties including to adverse parties in order to be hired by said adverse parties, nor to family members, colleagues, and community organizations for purposes of damaging a former client's reputation. Donais cannot claim any legitimate defense for disclosures to private parties that occurred years after litigation concluded. Moreover, even if Donais were permitted to defend against specific claims in this instance, he cannot fabricate false allegations or disclose confidential information beyond what is necessary for such defense. His conduct far exceeded any legitimate defensive purpose and was designed to inflict harm.

**D. Undisputed Facts Compel Judgment**

15. The critical facts establishing liability are undisputed: the consultation occurred, confidential information was disclosed, Donais subsequently revealed that information to unauthorized 3rd parties, and the disclosures were improperly made. Donais cannot genuinely dispute these facts because they're established by his own admissions, court records, and objective evidence. The only remaining question concerns scope of damages, which is properly reserved for trial or subsequent proceedings. The threshold liability issue should be resolved as a matter of law based on undisputed record.

**IV. CONCLUSION**

16. This motion is accompanied by affidavits in support, a supporting memorandum of law and a record of exhibits, and statement of material facts. The undisputed facts establish defendant's breach of fiduciary duty as a matter of law. Judge Paul Moore's finding of an attorney-client relationship, combined with defendant's own admissions regarding the consultation and subsequent disclosures, eliminate any genuine factual dispute regarding liability. Partial summary judgment will narrow the issues for trial and serve judicial efficiency by resolving this clear-cut claim of misconduct.

17. WHEREFORE, plaintiffs respectfully request that this Court grant partial summary judgment on Count 6 of the amended complaint, finding defendant liable for breach of fiduciary duty as a matter of law. See also the attached.

Respectfully submitted[1],
/s/ Natalie Anderson
NATALIE ANDERSON

/s/ Andre Bisasor
ANDRE BISASOR

Date: October 6, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

[1] NB: This is submitted as a corrected version of the prior submission of this motion, which is now hereby being submitted by both plaintiffs ( and is also done prior to a response by the defendant). This also is now accompanied by a memorandum of law, affidavits in support and exhibits, which points, facts and arguments are fully incorporated herein as if fully stated herein. As it is a dispositive motion, Plaintiffs request hearing on the motion and also that it is heard/decided at the same time as any other dispositive motion including defendants' motion to dismiss amended complaint.

# ATTACHMENT 2

# Memorandum of Law iso corrected Mo for Part SJ re Breach of

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM**

1. Plaintiffs submit this memorandum for motion for partial summary judgment on the breach of fiduciary duty claim.

2. This partial summary judgment motion addresses breaches of fiduciary duty arising from Craig Donais ("Donais") 1-9-17 consultation with Andre Bisasor ("Bisasor"), and Natalie Anderson's ("Anderson") 1-5-17 consultation with Donais through Robert Obrien, and other undisputed facts that establish a prospective attorney-client relationship, such as Judge Paul Moore's finding of a conflict, requiring Donais's withdrawal from representing Homewood Suites, and breach of confidentiality to unauthorized 3rd parties. The accompanying 3 affidavits and exhibits are fully incorporated herein.

---

**SECTION I: LEGAL STANDARDS**

---

**I. SUMMARY JUDGMENT STANDARD**

3. Under NH RSA 491:8-a, summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The court views evidence in light most favorable to the non-moving party, but where the material facts are undisputed, legal conclusions flowing from those facts present questions of law appropriate for summary judgment. The NH Supreme Court has held that summary judgment serves the purpose of determining whether genuine factual disputes exist and applying law to undisputed facts.

4. Once the moving party has established the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion.

5. New Hampshire RSA 491:8-a explicitly authorizes partial summary judgment, stating that "A party seeking to recover upon a claim, counterclaim, or crossclaim, or to obtain a declaratory judgment, may, at any time after the defendant has appeared, move for summary judgment in his favor upon all or **any part thereof**." The phrase "any part thereof" establishes clear statutory authority for partial summary judgment on individual claims or issues within a case.

6. The New Hampshire Supreme Court regularly approves partial summary judgment motions when appropriate legal standards are met. In Loeffler v. Bernier, No. 2019-0107 (N.H. 2020), the court affirmed superior court orders "granting partial summary judgment to plaintiff," finding no reversible error in the partial resolution approach, demonstrating standard acceptance of this procedural mechanism for narrowing multi-claim disputes.

7. The NH Supreme Court has thus confirmed that trial courts possess authority under RSA 491:8-a to grant partial summary judgment, indicating partial resolution serves judicial efficiency by determining clear legal issues without

requiring full trials on every aspect of multi-faceted cases. Hence, when undisputed facts establish liability on specific claims, partial summary judgment eliminates unnecessary litigation costs while preserving the remaining disputed issues. This approach particularly benefits certain cases involving clear legal standards applied to uncontested facts.

## II. INTRODUCTION

8. This motion seeks partial summary judgment on the breach of fiduciary duty count that asserts that Donais and his law firm owed a fiduciary duty to Plaintiffs as prospective client, including confidentiality, loyalty, and the obligation to act in good faith, which was breached through multiple egregious acts.

9. As a prospective client, Bisasor shared confidential information with Donais during a 1-9-17 consultation. The facts establish that this was a confidential, substantive discussion about legal issues involving the Hilton Hotels/Homewood Suites defendants. The facts clearly demonstrate that Bisasor reasonably believed he was engaging in a confidential discussion, on behalf of himself and his spouse. Bisasor was thus entitled to confidentiality and loyalty. Donais, knowing this, had a duty to maintain confidentiality and act in Plaintiff's best interests. Instead, Donais breached confidentiality obligations owed to Plaintiff as prospective client by disclosing privileged information to harm Plaintiff's interests. Donais used his position of client trust to maliciously fabricate false allegations, with the intent to defame, intimidate, and retaliate against Plaintiffs. Donais weaponized this confidential discussion and turned it into a defamatory campaign. Donais's conduct violated that trust, breaching his fiduciary obligation. Donais divulged confidential information to third parties, his wife, son, family members and community members, colleagues, and others, without Plaintiff's consent, breaching his fiduciary obligation. These acts constitute a clear breach of fiduciary duty, which under NH law, includes the obligation not to disclose confidential information or use it for personal or third-party advantage. Further, Donais' repeated disclosures of the confidential discussion, especially where he manufactured false statements and disclosed them to 3rd parties, under the pretext that it was disclosed to him in a client call, shows a pattern of breach that is sufficiently egregious to sustain a cause of action. By disclosing privileged information and exploiting it for self-protection, Donais breached that duty, proximately causing reputational and economic loss. Plaintiff's damages include reputational harm, emotional distress, and economic loss, directly caused by the breaches.

## III. LAW REGARDING FIDUCIARY DUTIES TO PROSPECTIVE CLIENTS

### A. NH Rules of Professional Conduct 1:18

10. NH Rule 1.18(a) states: "*a person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client*." Rule 1.18(b) requires that "*a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information except as Rule 1.9 would permit with respect to information of a former client*."

11. Rule 1.18 of the NH Rules of Professional Conduct for Lawyers further states:

> Rule 1.18. Duties to Prospective Client
> (a) A **person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.**
> (b) **Even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information** except as Rule 1.9 would permit with respect to information of a former client.
> (c) **A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received and reviewed information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).**
>
> Ethics Committee Comment:
> 1. The New Hampshire rule expands upon the ABA Model Rule in one area. **The ABA Model Rule 1.18(a) defines a prospective client as one who "consults" with a lawyer about possible representation; the New Hampshire Rule defines prospective client as one who "provides information to a lawyer" about possible representation**. ABA Model Rule 1.18(b) establishes a general rule for protection of information "learned" by a lawyer from a prospective client; the New Hampshire Rule clarifies **the scope of the protection so that it applies to information "received and reviewed" by a lawyer from a prospective client.**
>
> In its version of Rule 1.18, New Hampshire's rule eliminates the terminology of "consultation" and learning and extends **the protections of the rule to persons who, in a good faith search for representation, provide information unilaterally to a lawyer who subsequently receives and reviews the information. This change recognizes that persons frequently initiate contact with an attorney in writing, by e-mail, or in other unilateral forms, and in the process disclose confidential information that warrants protection. This change further recognizes that receipt and review are likely to be more objective standards than learning.**

12. Rule 1.18 is clear that prospective clients are protected by attorney-client privilege and that there is a duty to prospective clients owed by attorneys who consult with them. The NH version of Rule 1.18 is broader than the ABA Model Rule, extending protection to persons who "provide information to a lawyer" rather than limiting it to formal consultations. This expansion recognizes that confidential information warrants protection regardless of the formality of initial contact.

13. Courts have held that fiduciary duties arise when attorneys receive confidential information from prospective clients. The fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result. Thus, fiduciary duty arises when an attorney receives confidential information, even if formal engagement doesn't occur, provided the client reasonably believes the attorney is acting in a professional capacity and the communication is confidential. Such fiduciary duties extend to prospective clients especially where confidential information was shared/relied on in good faith. Hence, under NH law, a prospective attorney-client relationship creates fiduciary obligations of confidentiality, loyalty & good faith.

14. The New Hampshire Rules of Evidence provides the definition of a client:

> A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him. [New Hampshire Rules of Evidence, Rule 502(a)(1).]

Case 1:25-cv-00525-SE-AJ Document 17-12 Filed 01/21/26 Page 4 of 25

15. NH Rules of Evidence, Rule 502(a)(1) establishes that communications from a prospective client are protected by attorney-client privilege, even though the attorney has not yet formalized (or never formalizes) a representative relationship with the individual. One will be deemed a "client" for purposes of applying attorney-client privilege upon consulting a lawyer "with a view to obtaining professional legal services from [a lawyer]." See also McCabe v. Arcidy, 138 N.H. 20, 25, 635 A.2d 446, 449 (1993) ("[A]n attorney-client relationship 'is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.'").

16. New Hampshire has held that an attorney may not disclose the contents or condition of pre-existing documents delivered to the attorney by the client. See Brown v. Payson, 6 N.H. 443, 448, 1833 WL 1321 (1833) ("The situation and contents of a paper, delivered to an attorney for inspection, in the course of employment as attorney, is as much a matter of professional confidence as an oral statement of its contents or condition can be...An attorney is not at liberty to disclose what is communicated confidentially by a client.").

17. New Hampshire generally provides that once the attorney-client privilege attaches to confidential communications, the privilege survives termination of the attorney-client relationship, or the death of the client. See McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) ("communications made during the course of legal representation…are confidential and permanently protected from disclosure."); Stevens v. Thurston, 112 N.H. 118, 289 A.2d 398, 399 (1972) ("the privilege continues after the death of the client"). The perpetual effectiveness of the privilege's protections is recognized by Rule 502(c), which provides the privilege may be claimed on behalf a client, even if that client has passed.

18. "Even after termination of the attorney-client relationship, a lawyer remains bound" to preserve the former client's confidences and secrets. Bays v. Theran, 418 Mass. 685, 691 (1994). "(W]hen an attorney has ceased to represent a client, a conflict of interest may arise in representing a new client because of the attorney's continuing duty to preserve a former client's confidences." Adoption of Erica, 426 Mass. 55, 60 (1997). See also Bartle v. Berry, 80 Mass. App.Ct. 372, 385 (2011) (an attorney's fiduciary duty continues even after termination of the attorney-client relationship).

**B. Definition of Confidential Information**

19. The New Hampshire Rules of Evidence defines a confidential [1]communication as follows:

[1] A "confidence" has also been defined by other courts, as "information protected by attorney-client privilege under applicable law", and a "secret" as "information gained in the professional relationship that the client requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." (McKinney Supp. 1991).

(5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication. [New Hampshire Rule of Evidence, Rule 502(a)(5).]

20. Where legal advice of any kind is sought from a lawyer in his capacity as such, the communications relating to that purpose, made in confidence by the client, are permanently protected from disclosure by the client or by the lawyer unless the protection is waived by the client or his legal representatives. See Riddle Spring Realty Co. v. State, 107 N.H. 271, 220 A.2d 751, 755 (1966) (citing 8 Wigmore, Evidence, §§ 2292, 2327–29 (McNaughton rev. 1961)).

21. The attorney-client privilege is applicable in New Hampshire only when the client has consulted the attorney for the purpose of obtaining legal advice or assistance. State v. Gordon, 141 N.H. 703, 706, 692 A.2d 505, 507 (1997).

22. See also State v. Elwell, 132 N.H. 599, 567 A.2d 1002, 1005 (1989) ("Under the attorney-client privilege, a communications made in confidence in the course of obtaining legal advice from a professional legal advisor are protected from disclosure."). See also Professional Fire Fighters of New Hampshire v. New Hampshire Local Government Center, 163 N.H. 613, 44 A.3d 542, 544 (2012).

23. Thus, for the privilege to apply, the client must intend the communications to be kept confidential at the time the communications were made. New Hampshire courts will determine the intent of the client by examination of the circumstances in which the communications were made. For example, if the communications are made in the presence of a third party, the court will infer that the client did not have the intent of confidentiality. State v. Melvin, 132 N.H. 308, 564 A.2d 458, 459 (1989) ("the presence of an 'extraneous' third party during a privileged conversation operates to destroy the privilege."). This concurs with federal law requiring privilege apply only to communications intended to be confidential when made. McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) ("communications made during the course of legal representation…are confidential and permanently protected from disclosure."); Riddle Spring Realty Co. v. State, 107 N.H. 271, 220 A.2d 751, 755 (1966) ("'[T]he essence of a privileged communication between attorney and client and likewise the basis of its exemption from discovery is its confidentiality.'").

24. New Hampshire also extends the privilege to communications between an attorney and a client, and not to the information that is in those communications. Thus, even though the information may be available from another source, an outside party cannot discover whether or not the same information communicated by the client to an attorney for purposes of seeking legal advice. McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) (The plaintiff could not penetrate the attorney-client privilege to discover whether the defendant made the same statements to his attorney

during the course of legal representation.). New Hampshire also recognizes that attorney-client privilege exists for the benefit of the client. Scott v. Grinnell, 102 N.H. 490, 161 A.2d 179, 183 (1960) ("The privilege is that of the client...").

**C. Formation of Attorney-Client Relationship**

25. Courts have held that an "analagous fiduciary obligation may be implied in the absence of an attorney-client relationship." Liu v. Real Estate Inv. Group, Inc., 771 F. Supp. 83 (S.D.N.Y. 1991). As the court in Liu noted:

> It is clear that where an attorney receives confidential information from a person, who under the circumstances has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidences irrespective of the absence of a formal attorney client relationship.

26. See also United States v. Devery, No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship."). See also Rosman v. Shapiro, 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987).

27. "[C]ourts have not employed a single, well-defined test for determining whether an attorney client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." See First Hawaiian Bank v. Russell Volkening, Inc., 861 F. Supp. 233, 238 (S.D.N.Y. 1994); accord Bennet Silvershein Assocs. v. Furman, 776 F. Supp. 800, 803 (S.D.N.Y. 1981).

28. Further, whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to attorney client privilege. See Dennis, 843 F.2d at 657 ("To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."); see also Green, 784 F. Supp. at 845 ("[T]he fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result."); Liu, 771 F.Supp. at 86 ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."); McCormick on Evidence 6th Ed. § 88 (West Publishing Co., 2006) ("[C]ommunications in the course of [a] preliminary discussion with a view to employing the lawyer are privileged though the employment is, in the upshot, not accepted."). As the Second Circuit has also stated, "[t]he key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." United States v. Dennis, 843 F.2d 652, 657 (2d Cir. 1998).

29. Under Restatement (Third) of the Law Governing Lawyers § 38, just because a prospective client conversation where confidential information was shared, does not result in further engagement, that does not absolve attorneys of fiduciary obligations created by that limited or initial client interaction.

30. Under NH law, breach of fiduciary duty requires (1) the existence of a fiduciary relationship, (2) breach of that duty, (3) causation, and (4) damages. Case law support such breaches are actionable. See Bays v. Theran, 418 Mass. 685 (1990), affirming breach of fiduciary duty can be established via disloyalty, breach of confidentiality, or self-dealing.

---

## SECTION II: ARGUMENT FOR BREACH OF CONFIDENTIALITY OF A PROSPECTIVE CLIENT

---

### I. BREACH OF FIDUCIARY DUTIES TO PLAINTIFFS AS PROSPECTIVE CLIENTS

#### A. Undisputed Establishment of Prospective Client Relationship

31. The 1-9-17 consultation clearly established a prospective attorney-client relationship under any applicable standard. Bisasor contacted Donais seeking legal advice regarding a specific legal matter. Donais engaged in a substantive consultation lasting 7 minutes. Confidential information was disclosed for the specific purpose of evaluating potential representation. An attorney-client relationship existed because Bisasor divulged confidences and secrets to Donais as an attorney and because Bisasor believed that he was approaching Donais as an attorney in a professional capacity with the intent to secure legal advice and did secure legal advice. Bisasor reasonably understood that the call with Donais was confidential. Thus, Bisasor's intent as a prospective client was that of an attorney/client relationship.

32. Further, whether or not employment occurs, preliminary discussions between Donais as an attorney and Bisasor as a prospective client was subject to attorney client privilege. Thus, the fiduciary relationship existing between Bisasor and Donais extended to preliminary consultation with Bisasor as a prospective client with a view to retention of Donais as lawyer, notwithstanding that actual employment did not result. Thus, Donais' duty to preserve confidentiality extended to this preliminary consultation with Bisasor as a prospective client even though actual employment does not result. In this instance, it is clear that Bisasor engaged in preliminary discussions with Donais related to legal analysis of potential claims that could be brought in connection with the landlord-tenant matter involving the Homewood defendants during the tenure of plaintiff's stay. Although there was no further engagement or retainer after that preliminary client conversation, any communication made during this preliminary consultation is protected by the duty of confidentiality and by the attorney-client privilege. Thus, this preliminary conversation is sufficient to establish the existence of an attorney-client relationship, even though Donais was not ultimately retained.

Case 1:25-cv-00525-SE-AJ Document 174-12 Filed 10/16/26 Page 3 of 595

33. Bisasor's statement that he shared confidential information and sought legal advice from Donais is corroborated by telephone records indicating there were at least two telephone calls involved, one on 1-6-17 where Bisasor left a voicemail for Donais, and one on 1-9-17 where Donais called back Bisasor, which lasted 7 minutes. This constitute sufficient circumstantial evidence to show some confidential information was revealed to Donais in order for him to evaluate plaintiffs' case. Yet, the information shared does not have to be some deep dark secret for it to be confidential. Further, the law does not require the information shared to be confidential in the strictest sense of the word. The law simply requires that a person provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter, and he/she is a prospective client. The law simply requires that "even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information." It does not say confidential information. It simply says any information provided t the lawyer with the intent of forming an attorney-client relationship is protected and shall not be revealed. At a minimum, it is undisputed that Bisasor shared information with Donais with the intent of forming an attorney-client relationship and that Donais received and reviewed that information.

34. Thus, Bisasor was a client for purposes of the initial consultation, and at a minimum, was a prospective client, and he became a former client once the engagement went no further after the initial consultation. Rule 1.18 is very clear that prospective clients are protected by attorney-client privilege and that there is a duty to prospective clients owed by attorneys who consult with them. Thus, Donais' relationship with Bisasor, that of attorney/client, was that of a fiduciary. Donais owed an ethical and fiduciary duty to Bisasor. Bisasor placed trust and confidence in Donais. This gave rise to fiduciary duties of the attorney toward Bisasor. Donais owed Bisasor a fiduciary duty to act at all times in good faith and in Bisasor's best interests, and to not expose Bisasor to any unnecessary risk or peril. Donais' fiduciary duty to Bisasor continued after the termination of his attorney/client relationship. The 1-9-17 legal advice consultation with Bisasor triggered a fiduciary relationship with ongoing duties of confidentiality.

35. Most significantly, Judge Moore's finding that an attorney-client relationship existed provides judicial recognition of this relationship. This finding necessitated Donais's withdrawal from representing the adverse party, confirming that the consultation created enforceable ethical/fiduciary obligations.

**B. Establishment of Confidence and Trust**

36. Throughout the 1-9-17 consultation, Donais engaged in conduct that demonstrated his professional expertise and willingness to consider plaintiff's case. Donais received from Bisasor the factual circumstances underlying their legal

claims and engaged in a substantive analysis of their situation. This conduct created a reasonable expectation on the part of plaintiffs that Donais was evaluating their case for potential representation and that the information being shared would be treated with the confidentiality and professional care accorded to attorney-client communications.

37. Under NH law, a fiduciary relationship exists wherever influence has been acquired, and abused or confidence has been reposed and betrayed. During the 1-9-17 consultation, plaintiffs reposed confidence in Donais by sharing sensitive information about their legal predicament, including details about disparate treatment and their vulnerable position facing imminent ejection from their rented unit, among other things. This disclosure of confidential information in the context of seeking professional legal advice created the necessary foundation of trust and confidence that characterizes a fiduciary relationship. The consultation between Donais and Bisasor entailed a substantive exchange of information for the specific purpose of obtaining legal advice/representation. Donais's conduct during this consultation, including his willingness to listen to the details of their case and engage in discussion about the legal issues presented, created reasonable reliance on his professional expertise/judgment. This reliance was furthered by the referral relationship with Attorney O'Brien, who specifically identified Donais as possessing the expertise to handle their type of legal matter.

**C. Acquisition of Influence and Confidential Information**

38. During the 1-9-17 consultation, Donais acquired influence over Anderson and Bisasor's legal situation by positioning himself as a knowledgeable attorney capable of evaluating their claims and providing professional guidance. The very act of consulting with Donais, particularly given the referral context and the urgent timeline of their legal predicament, placed Anderson and Bisasor in a position of dependency on his professional judgment and expertise.

39. Donais acquired material confidential information during this consultation, including specific details about Anderson and Bisasor's allegations of racial discrimination (through Obrien), the nature of their dispute with Homewood Suites, their concerns about improper charges, and their immediate need for legal intervention to prevent unlawful ejection. This information was provided with the reasonable expectation that it would be treated confidentially and used solely for the purpose of evaluating whether Donais would undertake their representation.

40. The confidential nature of this information is demonstrated by its sensitivity and potential harm that could result from disclosure to adverse parties. The information related directly to plaintiffs' legal strategy, their vulnerabilities in the dispute, and their assessment of the strengths/weaknesses of their potential claims. Under NH Rule of Prof. Conduct 1.18, even when no attorney-client relationship ultimately ensues, a lawyer who received and reviewed information from a prospective client owes duties of confidentiality and loyalty that create fiduciary obligations.

41. NB: As stated in the accompanying Affidavits of Andre Bisasor, Bisasor was assured by Donais the conversation would be confidential [NB: The same assurance was made by Obrien to Anderson, which extended also to Donais as Donais was consulted by Obrien as part of the prospective client evaluation process]. Beyond that, even without the averments in the accompanying affidavits, the circumstances demonstrate that Bisasor would have had no reason to believe that his conversation with Donais would not be kept confidential. Bisasor contacted Donais as an attorney seeking legal advice from an attorney, leaving a voicemail that made clear he was seeking legal advice/assistance, and Donais then listened to the voicemail and called Bisasor back to have a conversation with Bisasor about the issues that Bisasor identified on the voicemail. Upon calling Bisasor, Donais asked Bisasor to explain the situation identified on the voicemail. Bisasor then shared information about his legal situation with Donais as an attorney. These facts alone demonstrate that Bisasor would've had some expectation of confidentiality. Why would Bisasor discuss/share his legal situation with Donais, as an attorney, but not expect any confidentiality at all? And why would Donais expect that what Bisasor shared with him as an attorney, in seeking legal advice, wouldn't be protected by confidentiality? So Donais expects that he can solicit prospective clients to contact him and discuss their situations with him, and then he is free to divulge everything they tell him to the public or to others? This wholly is unreasonable/erroneous.

**D. Breach of Fiduciary Duties**

42. Despite having acquired this position of trust and confidential information, Donais breached his fiduciary duties to Anderson and Bisasor in multiple ways. First, within days of their consultation, Donais agreed to represent Homewood Suites, the very party against whom plaintiffs had sought his assistance. This representation created a direct conflict of interest that violated his duty of loyalty to plaintiffs as prospective clients. Second, and more egregiously, prior to being retained by Akridge, Donais disclosed the confidential information obtained during his consultation with Bisasor to representatives of Homewood and their counsel. On 1-11-17, Donais sent an email to Attorney Terrell, counsel for Homewood, detailing the substance of his conversation with Bisasor, including specific information about the claims plaintiffs intended to pursue. This disclosure violated the fundamental duty of confidentiality that Donais owed to plaintiffs as prospective clients. Third, Donais compounded his breach by subsequently providing a false affidavit on 3-16-17, in which he misrepresented the nature and content of his consultation with Bisasor. By providing false information in this affidavit[2], Donais further betrayed the trust plaintiffs placed in him during/via their consultation.

[2] Although the court previously ruled that Donais' March 2017 affidavit cannot be used to recover on defamation claim under NH law, it didn't /doesn't prohibit recovery for a breach of fiduciary claim with respect to breaches of duty done via Donais' March 2017 affidavit.

E. Abuse of Confidence and Betrayal of Trust

43. Donais' conduct represents a clear abuse of the influence he had acquired, and a betrayal of the confidence that had been reposed in him. Rather than declining representation of the adverse party or maintaining the confidentiality of the information he had received, Donais chose to use the confidential information obtained from plaintiffs to benefit their opponents in litigation. This conduct violated the most fundamental principles of the attorney-client relationship and constituted a breach of the fiduciary duties he owed to plaintiffs. The harm caused by Donais' breach was both immediate and substantial. Plaintiffs were deprived of confidentiality protections they reasonably expected when consulting with an attorney, and the confidential information provided was used against them in subsequent litigation. This breach of trust undermined their legal position and caused them to suffer damages as a direct result of Donais' misconduct. Donais used his prospective client conversation with Bisasor, to directly inflict harm by defaming Bisasor and accusing Bisasor of falsely/frivolously accusing Donais of race discrimination because he did not take his case. This false accusation against Bisasor sullied Bisasor, with implication that Bisasor was a frivolous liar who plays the race card without rhyme or reason and is to be discredited as an irrational, angry person who wildly hurls accusations of race discrimination when there is no valid reason to do so. This diminished Bisasor's character and discredits him in the eyes of the public/the community. Notwithstanding the fact plaintiffs do not seek recovery for defamatory statements made in Donais' affidavit, plaintiffs here plead that Donais breached his fiduciary duty therewith, intending to defame Bisasor.

44. If Bisasor had never spoken to Donais on 1-9-17 about a prospective client relationship, Donais could not have had the opportunity to fabricate this lie against Bisasor or to use the consultation as a springboard to launch such lies.

45. Donais used his position as a prospective lawyer to Bisasor as a prospective client as a basis to injure Bisasor by falsely accusing him of falsely accusing Donais of race discrimination in the context of a conversation wherein Bisasor was seeking to legal advice/assistance from Donais, and wherein Bisasor shared with Donais certain confidential information, thus taking Donais into his confidences and placing his trust in Donais. Donais exploited and abused the trust that Bisasor extended to Donais in seeking to have a conversation with him about plaintiffs' case against the Homewood defendants. Donais turned around and used that private privileged conversation as a basis to fabricate lies on Bisasor. This is an utter abuse and travesty that has befallen Bisasor on account of unwittingly and unsuspectingly making the mistake of speaking with a dishonest lawyer like Donais. This is a breach of fiduciary duty. This also goes to the conflict of interest. Donais' conflict of interest further created the fuel by which he found it useful to falsely accuse

Bisasor, in order to harm and damage Bisasor (and his spouse), in the interest of protecting and advancing his own interests and the interests of the opposing party. See accompanying affidavits for further explication of attendant facts.

**F. Clear Breach of Confidential Duties**

46. The breach of fiduciary duty is established through Donais's undisputed disclosures of consultation information to unauthorized 3rd parties. These disclosures also include those made years after the 1-9-17 consultation and were made to family members, colleagues, and community organizations (which were also outside of any judicial context).

47. NH Prof. Conduct Rule 1.6(b)(3) permits attorneys to "reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary to defend the lawyer or the lawyer's employees or associates against a claim or charge of wrongdoing." However, this exception is narrowly construed and does not authorize wholesale disclosure to private parties for purposes of damaging a former client's reputation.

48. Under New Hampshire law, the existence of a fiduciary relationship does not require a formal attorney-client retainer or fee arrangement. Rather, fiduciary duties arise whenever confidence has been reposed and influence has been acquired in the context of a professional consultation. Thus, a fiduciary relationship existed between Donais and plaintiffs based on their consultation and the confidence reposed in him; Donais breached his fiduciary duties by disclosing confidential information to adverse parties and representing those adverse parties; Plaintiffs suffered damages as a result of this breach; and (4) Donais's breach was the proximate cause of their damages. Donais's conduct in engaging in a substantive consultation with plaintiffs, acquiring confidential information, and then using that information to benefit their adversaries constitutes a textbook example of breach of fiduciary duty. Thus, Plaintiffs' assert that a fiduciary relationship existed between the plaintiffs and Donais because Donais had acquired influence with respect to Bisasor which was abused by Donais, and Bisasor reposed confidence in Donais but was betrayed, and because plaintiffs relied on Donais for legal advice for their landlord-tenant matter. Donais later withdrew from representing Homewood, after a judge had determined that Donais had violated ethical duties/breached fiduciary duty. The 1-18-17 court hearing transcript shows that Donais was caught red-handed and that a circuit court judge found that Donais breached fiduciary duty and thus was required to be disqualified/ to withdraw from the case. This by itself is slam-dunk proof that Donais is liable for breach of fiduciary duty, as Donais' own withdrawal serves as his own admission that he was liable for this wrongdoing.

49. It should be noted that it was Donais who called Bisasor on 1-9-17 (in returning Bisasor' call/voicemail from 1-6-17). Donais could have chosen not to call Bisasor back. The fact that Donais initiated the call on 1-9-17 signaled to Bisasor that Donais was interested in pursuing an attorney-client relationship. Bisasor had every right to believe that such a call

could lead to full representation by Donais. The fact that Donais eventually declined to take case is irrelevant to the conflict of interest analysis under Rule 1.18 and to analysis of whether Donais violated his duties under Rule 1.18.

50. It should also be noted that according to Dave Akridge's affidavit, at a time prior to representing Homewood, Donais emphatically 'with conviction" assured Akridge that there is no problem with representing Homewood as the adverse party to plaintiffs, because "he did not take the case" and had "brief conversation" [3]. But Donais knew that the standard under Rule 1.18 is not whether he took the case or had a brief conversation. The standard for Rule 1:18 conflict/disqualification is whether he "received and reviewed" information from someone seeking to form an attorney client relationship. It should be further noted that Donais did not have to take the case to represent the Homewood defendants. Similarly, the Homewood defendants were not obligated to hire Donais. Terrell testified on 4-27-17 that he considered the situation with Donais to be a "flag", but yet still Terrell chose Donais as local counsel and Donais still agreed to be local counsel for Homewood, notwithstanding the conflict/potential conflict and the fact plaintiffs would likely object. See Cardona v. General Motors Corp., 942 F. Supp. 968, 978 (D.N.J. 1996) ("by proceeding in reckless disregard of the…Rules of Professional Conduct," firm must suffer "self-inflicted wound").

51. It is evident that Donais had a strong desire to take the Homewood case as defense counsel, so he breached his duty of confidentiality in so doing. Donais's desire to represent an adverse party, no matter how strong, does not allow him to simply jettison the rules of conduct or his fiduciary obligations. Moreover, according to Terrell, Donais did not disclose[4] to Terrell the conversation Donais had with Robert Obrien about this case. Donais did not do that because evidently, he so wanted to be retained by Homewood Suites as local counsel for the defense. Donais was not concerned about violating the law, the rules of ethics, his fiduciary obligations or the plaintiffs' rights.

52. Donais also admitted that, during the conversation he had with Bisasor on 1-9-17, Donais purportedly[5] told Bisasor that one of the reasons he did not want to take the case was because "there might be a potential conflict". This means that during that conversation Donais realized that there was a conflict, because he knew that Homewood suites of Nashua was part of the dispute and that he had a previous client relationship with Dave Akridge. The only basis for Donais to

[3] See **page 3 and paragraph 16** in **Exhibit 20 - Affidavit of Dave Akridge dated 5-4-17.** See also all other exhibits attached including affidavits.
[4] See **page 228 line 1-25** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**
[5] Yet, Donais didn't tell Bisasor that there might be a potential conflict. But the fact that Donais admits to saying that, shows that Donais knew it at the time (or it at least shows that he was thinking it). Yet, Donais never stated it to Bisasor. If he had stated that, Bisasor would have definitely asked him the basis for the suspected potential conflict.

have known, realized or suspected that there was a conflict, was for Donais to have realized or suspected that Homewood Suites was involved. How else could he have known that there was a conflict or potential conflict?

**G. More on Undisputed Establishment of Breach of Fiduciary Duty By Donais**

53. Donais and Bisasor had a fiduciary relationship. Donais' relationship with Bisasor, that of attorney/client, was and is fiduciary. Donais owed an ethical and fiduciary duty to Bisasor, including to act at all times in good faith and in Bisasor's best interests, and to not expose Bisasor to any unnecessary risk or peril. See Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass.App.Ct. 412, 442 (1980) ("[T]he relationship between attorney and client ... is fiduciary as a matter of law"); Vanacore v. Kennedy, 86 F.Supp.2d 42 (D.Conn. 1998) (the relationship between attorney and client is one of trust and confidence, and gives rise to fiduciary duties of the attorney toward the client).

54. The 1-9-17 communication/consultation with Bisasor triggered a fiduciary relationship with ongoing duties of confidentiality. Donais' fiduciary duty to Bisasor continued after the termination of his attorney/client relationship.

55. As a prospective client, Bisasor shared confidential information with Donais during the 1-19-17 consultation. Bisasor reasonably believed he was engaging in a confidential discussion. Donais received confidential information as an attorney from Bisasor who was seeking legal advice and thus he had a right to believe that Donais, as an attorney, would respect such confidences. Bisasor was thus a prospective client entitled to confidentiality and loyalty. Donais breached confidentiality obligations owed to Bisasor as a prospective client by disclosing privileged information to harm Plaintiff's interests, and further exploiting it for self-protection, which is conduct that violated trust.

56. However, in addition to the breaches in 2017, Donais later on in 2019 and 2020, further disclosed private client information to his wife, son, family members, and friends and to the others including members of the Manchester NH Crime-Line board, etc. These breaches of fiduciary duty, that occurred outside the context of any judicial proceeding, by Donais include disclosure of confidential client conversation information about plaintiffs to: a) Akridge in 2017 prior to being hired by Akridge to represent Homewood; b) his wife in 2017, 2019 & 2020; c) his sons, Garret & Aiden, in 2019 & 2020; d) the Manchester NH Crime-Line board in 2019 & 2020; e) the Manchester NH police in 2019 & 2020.

57. Donais breached his duty by disclosing confidential information, fabricating false allegations, and misusing the relationship to retaliate against plaintiffs, which further goes to the malicious and egregious nature of his conduct.

58. Donais engaged in a pervasive, widespread, systematic and deliberate pattern of abandoning, violating and exploiting his fiduciary obligations to Plaintiffs for his own self-interest, and constituted a willful dereliction of duty designed to exploit Plaintiffs' vulnerability as African-American, and to conceal evidence of Donais' own misconduct. Donais'

concealment of his divulging of plaintiff's confidential client conversation to others, further constitutes a breach of the duty to protect client interests post-termination (In re Jones, NH Sup. Ct., No. 2021-0123, 2021 WL 4472142). Attorneys must prioritize client interests over self-protection. By divulging and exploiting confidential information, Donais engaged in self-dealing barred by Kanamaru, 100 Mass. App. Ct. at 75.

59. Under New Hampshire law, attorneys owe clients and former clients an unwavering duty of confidentiality and transparency, even after termination of a client relationship. Donais' conduct breached this duty at every turn, inflicting severe financial, procedural, and emotional harm. Donais' acts also includes breach of fiduciary duty by divulging information (and fabricated version of it) obtained during a confidential prospective client consultation with the sole purpose of embarrassing, oppressing, scandalizing, defaming and harming the prospective client.

60. It was malicious act and represented an attempt to harm plaintiffs as former prospective clients. Donais' intent was clear: to hurt, damage, harm, oppress, defame, scandalize the plaintiffs. When prospective clients meet with lawyers they are entitled to the same protections and confidentiality as any other client. The public must be assured that lawyers will treat their confidential client consultations including initial meetings as confidential, and that lawyers will not abuse such information because the lawyer ultimately declined representation or because the lawyer joined the legal team of the opposing party. This is forbidden by the rules[6]. So, even if Donais maintains that his allegations of what Bisasor said in the 1-9-17 conversation were true (which it was not), he still breached his duty/obligations to plaintiffs as former clients or former prospective clients. Hence, Donais' breaches are multiple, layered and intertwined with a web of layered misconduct making a very serious combination of violations of ethics that rises to the level of extreme seriousness which is further compounded by further breaches/wrongs that flowed from that to subsequent/continuing events thereafter.

61. Donais breached his fiduciary duty to plaintiffs by breaking his obligation of confidentiality, and acting against plaintiff's interest as a former client and seeking to harm and injure plaintiff's rights. Donais owed a duty to Plaintiffs[7], via the fiduciary relationship that included confidentiality and an obligation to Bisasor to act with the utmost good faith and

[6] Donais' conduct outlined herein, in addition to Rule 1:18, has also violated Rule 8.4 section (a), (b), and (c), in that his false statements reflects adversely on the lawyer's honesty and trustworthiness, and it would also constitute conduct involving dishonesty, fraud, deceit and misrepresentation. Similarly, the fabrication of the race discrimination accusation would further be a violation of Rule 8.4 section (g), in that his false statements were motivated by racial animus and were intended to wrongly embarrass, harass and burden Plaintiff.

[7] Donais owed a duty to plaintiff. There was a fiduciary relationship. Plaintiff was a prospective client. Plaintiff was engaged as a prospective client. Plaintiff was given legal advice. Plaintiff shared confidential information. A prospective attorney client relationship was formed. This is what a judge found (Judge Paul Moore in Nashua district court in NH). This is why Donais withdrew as attorney in that case.

fidelity as a fiduciary agent; to not take advantage of Bisasor and place him at a disadvantage. See Goldman v. Kane, 3 Mass.App.Ct. 336, 341 ( (1975) (attorney must do nothing to take advantage of or disadvantage the client).

62. Donais had a duty of trust and loyalty to Bisasor, to not to betray Bisasor, to not subvert his (Donais) obligation to Bisasor, to not act deceitful. Donais's fiduciary obligation to Bisasor continued after the conclusion of the client conversation between Donais and Bisasor in 2017.

63. In this matter, Donais violated his duty to the plaintiffs in several ways: a) Donais discussed the client conversation with the plaintiffs with several people. These include his wife, Mary Donais, his sons Garrett & Aiden Donais, and the Manchester NH crime-line board, as well as friends and connections, and also the Manchester NH police. These communications with his family, friends, connections, colleagues, violated the rights of the plaintiffs as he had no right to disclose client confidential communications to any of them for any reason; b) Donais also voluntarily engaged in discussion with the Manchester NH police about the confidential 1-9-17 conversation and the 1-5-17 consultation; c) Donais also had a duty to inform plaintiffs, as former clients, that Donais was going to or had discussed such information with others. Instead, Donais actively hid those occurrences from plaintiffs. The act of hiding such from plaintiffs is also a breach of duty to plaintiffs as he is required to seek consent before any such disclosure.

64. As a result of Donais's breaching conduct, plaintiffs sustained injury including lost opportunities, emotional distress, and mental anguish, and the damages sustained were directly, proximately and solely caused by Donais's breach of his duty and his intentional, reckless and negligent acts, which were committed with intent, oppression, fraud and/or neglect, as set forth above, and by doing all of the acts and omissions as herein alleged.

65. NB: It should be noted that Donais did not need to defend himself, for example, with the Manchester crime-line board, his private personal family members, friends and colleagues, etc. The only time and place that the rules contemplate violating confidentiality is in an ADO proceeding against the said attorney or in a proceeding in court where the defendant is called upon to defend himself or herself. None of these things apply here based on the facts that occurred.

66. NB: Based on the above case law, Donais also violated (prospective) attorney-client privilege when he in his March 2017 affidavit stated the false accusation that Bisasor accused him of race discrimination for not taking his case. Even if Donais was telling the truth about that accusation (which he was not), Donais had no need to disclose that (false) statement since it bore no relevance to the motion to disqualify Terrell and since it clearly was an inflammatory and disparaging statement which would only serve to (wrongly) embarrass, annoy or scandalize Bisasor.

## II. RELEVANCE OF FALSE STATEMENTS TO BREACH OF FIDUCIARY DUTY CLAIM

### A. Fundamental Distinction Between Defamation and Fiduciary Duty Claims

67. Although this court determined Donais's March 2017 affidavit had absolute privilege protection from defamation claims under NH law, this ruling didn't preclude recovery for breach of fiduciary duty involving the same false statements.

68. Courts routinely recognize that breach of fiduciary duty claims are "separate and distinct" from other tort claims, including defamation, when premised on conduct involving a culpable state of mind beyond mere negligence. The same principle applies when distinguishing fiduciary duty breaches from defamation claims, as each addresses fundamentally different legal wrongs with distinct elements and protections. The breach of fiduciary duty claim in this case focuses on Donais's abuse of the trust relationship itself and his violation of confidentiality obligations, not merely the publication of false statements to third parties. Fiduciary duty claims arise when an attorney either betrays a confidence or acquires and abuses a position of influence. Donais's fabrication of false statements about confidential consultation content constitutes both a betrayal of confidence and an abuse of his position of influence as a trusted legal advisor.

### B. Absolute Privilege Does Not Extend to Fiduciary Duty Breaches

69. The absolute litigation privilege serves the narrow purpose of promoting candor in judicial proceedings. However, this privilege doesn't immunize claims arising from breaching underlying fiduciary obligations. A fiduciary cannot invoke litigation privilege to escape liability for breaching confidentiality duties owed to former clients. The privilege may protect publication aspects relevant to defamation, but doesn't excuse underlying independent breach of trust violations.

### C. Confidentiality Breach Constitutes Core Fiduciary Violation

70. Under New Hampshire Rule of Professional Conduct 1.18, prospective clients are entitled to the same confidentiality protections as actual clients. Rule 1.18(b) provides that "a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information" except under limited circumstances. Donais's fabrication of false allegations about Bisasor accusing him of racism violates this fundamental obligation. First, Donais revealed confidential information obtained during consultation by creating false statements about its content. Second, he used this information to harm Bisasor by portraying him as someone who makes frivolous racism accusations. Third, he weaponized the confidential relationship to undermine Bisasor's credibility as a discrimination plaintiff. Each of these acts constitutes a separate breach of fiduciary duty independent of any defamation analysis.

### D. Strategic Exploitation of Fiduciary Position

71. The timing & content of Donais's fabricated racism allegation reveal egregious misconduct that transcends ordinary defamation. During the 1-18-17 hearing, when memories were fresh, Donais never mentioned any racism accusation made in the 1-9-17 call. However, months later, in his affidavit, he suddenly "remembered" this inflammatory detail.

This demonstrates deliberate fabrication designed to exploit his position as a former attorney to damage client credibility. Fiduciary duties include obligations of candor & good faith that prohibit using confidential relationships to harm former clients. Donais's conduct represents the antithesis of these obligations; he manufactured lies about confidential communications specifically to undermine vulnerable former prospective clients raising legitimate discrimination claims.

**E. Policy Considerations Support Separate Recovery**

72. Fiduciary duty claims focus on breach of trust rather than publication of statements. Defamation requires publication, falsity, and reputational harm, while fiduciary duty breach requires relationship, breach of duty, causation, and damages. Breach of fiduciary duty claims address exploitation of confidential information obtained through prospective attorney-client relationship, regardless of whether exploitation occurs via privileged or unprivileged statements. Thus, while absolute privilege may shield Donais from defamation liability for false statements in his affidavit, it cannot excuse his fundamental breach of fiduciary duty in fabricating false statements about confidential consultation content and using his position as a trusted legal advisor to harm his former prospective client's credibility and legal standing.

**III. FURTHER CASE LAW SUPORTING FINDING OF BREACH OF DUTY TO PLAINTIFFS**

73. In Fierro v. Galluci (EDNY 2007), the defendants in that case argued that the motion to disqualify should be denied because: (1) there was never an attorney-client relationship established between Dollinger and Fierro; (2) there was no indication there were any "secrets" or "confidences" discussed between Dollinger and Fierro; and (3) even if such secrets or confidences were discussed, Dollinger had no recollection of any such conversations. Thus, the defendants in that case contended there was no conflict of interest in continuing to represent the defendants in that lawsuit. However, that Court concluded that plaintiff made a sufficient showing to warrant disqualification of the Dollinger Firm as follows:

> “Fierro's statement in his affidavit — that he consulted with Mr. Dollinger in late 2004 regarding the subject matter of this case, including potential claims, potential defenses, and relevant case law — is corroborated by a phone message and phone records maintained by the Firm. Thus, this preliminary discussion regarding the subject matter of this litigation fell within the umbrella of an attorney-client relationship and was privileged. This prior consultation with Mr. Fierro regarding the exact subject matter of this litigation is sufficient to warrant disqualification. Although Mr. Dollinger does not recall any client confidences revealed to him during the conversation, his failure to recall such conversations does not vitiate the otherwise clear basis for disqualification.”

74. Further, the Fierro court also found disqualification was warranted because (1) plaintiffs established that an attorney-client relationship existed as to Fierro's preliminary discussions, (2) the matters were not just "substantially related" to the litigation, but were identical, and (3) it was likely confidential information was shared with Dollinger during these conversations. Although the defendants point to the several factors in arguing there was no attorney client relationship (including the fact that the preliminary conversations were brief, the Dollinger Firm never opened a file related to Fierro, and the Dollinger Firm never charged any fees for the initial consultation), none of those factors, individually or

collectively, is necessarily dispositive in analyzing whether there was an attorney-client relationship. See United States v. Devery, No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship.").

75. Furthermore, the Fierro court found that whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to the attorney client privilege. Moreover, the Fierro court stated that, in finding that there was a substantial relationship between Fierro's preliminary consultation and the current litigation, a rebuttable presumption is created that Fierro imparted to Dollinger confidential information relevant to the present litigation. See Arifi, 290 F. Supp. 2d at 350. A party moving to disqualify opposing counsel "is not required to prove that [opposing counsel] had access to confidential information while representing the [moving party] but only that he was likely to have had such access." Id. It should further be noted that, in the Fierro case, there were telephone records indicating at least 2 telephone calls on 12-14-04 between Dollinger and Fierro, one of which lasted just about 10 minutes. This, among other things, provided sufficient circumstantial evidence for the Fierro court to conclude it is likely that some "confidences" or "secrets" were revealed to Dollinger in order for him to evaluate the case.

76. Although, in the Fierro case, Dollinger stated he had no recollection of any conversation with Fierro, the Fierro court found his failure to recall the conversation didn't change the analysis. NB: Another court held that a former attorney's assertion that he couldn't remember any confidential information conveyed to him during the short representation of one of the defendants, didn't cure the professional responsibility conflicts which were present. Arifi, 290 F. Supp. 2d at 350 ("While there is no reason to doubt Green's claim that he does not remember any confidential information, the Court nevertheless finds that he was likely to have had access to such information during the short representation."); see also Schwed v. Gen. Elec. Co., 990 F. Supp. 113, 117 n. 2 (N.D.N.Y. 1998) (where attorney claimed he didn't possess confidential information and didn't recall any discussions regarding the case, the third prong of the 2nd Circuit test was still met because there was a likelihood that the attorney had access to confidential information).

77. Similarly, in this case, Terrell testified at a preliminary injunction hearing on 4-27-17 that he didn't recall what he and Donais discussed and that he may have had conversations with Donais (about the Donais-Bisasor conversation), but somehow he doesn't recall whether he had such conversations or if information to came to him (Terrell) from Akridge.

78. Also, the Fierro case is similar to this case, in that defense counsel here claims that there was never an attorney-client relationship established between Donais and Bisasor and that there was no "confidences" shared from Bisasor to

Donais. Although Bisasor vigorously refutes those assertions (which refutations are supported by incontrovertible evidence), the consideration of such refutation by Bisasor is not necessary for the correct legal analysis to be applied. Based on the above case law, in the Fierro case, the correct standard is that, regardless of whether it can be proven that confidences were or were not shared, it is the fact that confidences could have been or were likely to have been shared that establishes the conflict (or the appearance of one). Based on this standard, Donais definitely had a conflict, and he breached fiduciary duty when he shared client information, not only with Akridge, and with Terrell, but also in statements submitted to two NH courts months after he [Donais] was disqualified. Similarly, as it pertains to infection of Terrell, Terrell claims there was never an attorney-client relationship established between Donais and Bisasor; that there was no "confidences" shared between Donais and Terrell; and that even if such confidences were discussed, Terrell does not recall whether any such conversations occurred. Thus, similar to the finding in the Fierro case, Terrell's failure to recall such conversations does not vitiate the otherwise clear basis for establishment of a conflict or appearance of one. See again Fierro v. Gallucci, 2007 U.S. Dist. LEXIS 89296 (E.D.N.Y. Dec. 4, 2007) (disqualification warranted even though lawyer simply could not remember phone calls). Thus, it is clear from the definitions in the Fierro case, that information shared with and later disclosed by Donais (including Bisasor's purported accusation of racism against Donais) would certainly qualify as "confidences" (i.e. "information protected by the attorney-client privilege under applicable law") and as "secrets" (i.e. "other information gained in the professional relationship that the client requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.").

79. These cases from several state and federal courts around the country support the conclusion that there was a conflict of interest that existed with Donais (and also with Terrell), and that Donais violated the confidences/secrets shared by Bisasor when he communicated statements made (or purportedly made) by Bisasor, to Akridge and Terrell prior to being hired, and to other private persons, and also to two NH courts, in order to harm, injure, disparage Bisasor.

80. In In re Sharplin, Jr., 2006 Tex. App. LEXIS 6834 (Tex. App. Aug. 3, 2006), the court was dealing with a lawyer who changed firms, and citing Nat. Med. Enterprises, Inc. v. Godbey, 924 S.W.2d 123 (Tex. 1996), said there was an irrebuttable presumption he shared information from the earlier case with his new partners and disqualified the firm.

81. Similarly, there should be an irrebuttable presumption that Donais shared confidences from Bisasor with Akridge and Terrell either directly, or indirectly through Akridge. This irrebuttable presumption is warranted because invariably in these types of situations, rarely will an attorney fall on his own sword and admit he did wrong or violated the rules.

82. Moreover, the predictable response by lawyers, typically voiced in such situations, in saying "I don't recall" or otherwise outright denials that confidences weren't shared, often makes it difficult to get to the bottom of what was shared. Moreover, it is often difficult for affected parties to prove that secrets were shared because that would involve disclosing those secrets to the court, which presents a catch 22 scenario or a Hobson's choice to require that, in order to vindicate his rights and harm from a conflict, a party must disclose sensitive secrets (protected by attorney-client privilege) to the court, by disclosing to the court such secrets shared with conflicted counsel (which secrets could prejudice the court against the client). This is why the irrebuttable presumption of sharing of confidences is warranted in such situations.

83. Hence, in a situation where lead counsel is in a position to receive client confidences of the aggrieved party, a sharing of confidences should be presumed, even if only by inadvertent disclosure. And the fact that there could have been confidences shared, means that there is at least an appearance of impropriety and of impermissible conflict/breach.

84. This is underscored by the Fierro court's finding that "the dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case." See Fierro, 2007 WL 4287707, at *8 (quoting Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 571 (2d Cir. 1973)). See Best Western Int'l v. CSI Int'l Co., 1995 WL 505565, at *2 (S.D.N.Y. Aug. 25, 1995) (**"misconduct need not be egregious: there need not be intent, bad faith, or actual disclosure of confidential information. Conduct that merely suggests that one side might enjoy the disclosure of confidential information may warrant disqualification.").**

85. Yet, here, both Donais and Terrell were fully aware of the conflict issue before Donais was hired, and they both made knowing/calculated decisions to accept the risk of conflict in violation of Rule 1.18, as well as knowing/calculated decisions not to inform plaintiffs about it. The law doesn't require plaintiffs to suffer risks that their confidential information could be used against them and the rules do not shield Donais (or Terrell) from their knowing calculated but risky decision to proceed in violation of the rules of conduct (Terrell agreed to settle the case, leaving only Donais).

86. Further, plaintiffs' burden is not to show Donais did in actuality taint or harm the case with confidences he received from them, but instead to show that Donais had a conflict, that he was aware of the conflict, which required him to abstain from taking the Homewood case, whose interests were materially adverse to plaintiffs' legal interests, that Donais' conflict posed a risk of prejudice or taint against plaintiffs and that Donais knew of this risk but proceeded to sign on as defense counsel anyway. See Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981) (test is whether

conflict "poses a significant risk of trial taint," not that the trial would be tainted"). See also Hempstead Video, 409 F.3d 127 at 133 ("One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client."); See also Cheng v. GAF Corp., 631 F.2d 1052 (2d Cir. 1980)(where there is "too high a risk of inadvertent disclosure of confidences," disqualification is appropriate.").

87. The above case law highlights the prospect that Donais (and by extension Terrell/Homewood) benefited from information about an adverse party obtained through preliminary consultation with local counsel, who was subsequently disqualified, and who breached his duty to plaintiffs by representing the adverse party and sharing attorney-client information with them. Donais indisputably received information from plaintiffs, going to the core issues adjudicated in the case. This led to unacceptable appearance of impropriety which cannot be eliminated by Donais saying he received no confidential information (or by the spouting of "I don't recall" retorts by Terrell in the 4-27-17 hearing).

88. The issues implicated by Donais' consultation directly with Bisasor and indirectly via Obrien, are "substantially related" to the issues implicated by Donais' representation in defending against those issues in the Homewood case. See Chinese Automobile Distributors of America LLC v. Bricklin, 2009 WL 47337, at *2 (S.D.N.Y. Jan. 8, 2009). Similarly, the Fierro court also found that "Client confidences are not so inert as to limit their usefulness to defined legal disciplines or practice areas. They are fungible, and once disclosed can be applied by an experienced lawyer in ways too numerous to anticipate[.]" See Fierro, 2007 WL 4287707, at *8. Moreover, the 2nd Circuit has held that "it is unclear to us how disclosures, admittedly inadvertent, can be prevented" where there is a "continuing danger that [the attorney] may unintentionally transmit information he gained through his prior association" with a disqualified counsel. Id. at 1058. Numerous other courts have held similarly. See Crudele v. New York City Police Department, 2001 WL 1033539, at *3-4 (S.D.N.Y. Sept. 7, 2001) (raising concerns about possibility of unintentional breaches of client confidences").

89. Similarly, in preparing his affidavit for use in the district court and superior court in March, April and May 2017, Donais further engaged in consultation with Snow and Terrell about the case and about what was discussed with Bisasor and what Bisasor shared, as well as what Obrien shared. All of this continued consultation and involvement of Donais in the case, even though he had been disqualified, further created a risk of harm to plaintiffs. Donais should have stayed away from the case after being disqualified in January 2017. The purpose of Donais' disqualification was to prevent further communication or tainting of the case from him due to his conflict of interest arising from the communications

he had with plaintiffs. By continuing to be involved/provide input (including his disparaging statements about Bisasor), Donais did an end run around the purpose of Donais' disqualification in the first place. This is a further breach of duty.

90. Donais wants to have it both ways. On the one hand, Donais has asserted, in one place or another, that he did not know that Bisasor's case was the same case as Anderson's case prior to the 1-18-17 hearing in district court (which has been established as not true). Similarly, in other statements, Donais has tried to give the impression that he only learned there was a conflict when Berry contacted him on 1-17-17 by phone and then further shown in the court hearing on 1-18-17. Yet on the other hand, Donais has claimed that, although he shared with Akridge and Terrell (on or before 1-11-17) that he [Donais] had a conversation with Bisasor, still he [Donais] did not share anything much which could have resulted in a taint on the case by infecting co-counsel Terrell. Donais [and by extension Terrell] were thus trying to have their cake and eat it too. Everyone was trying to cover their own rear ends. Terrell claimed raised concerns on this "flag"[8] before he proceeded to hire a potentially conflicted local counsel. The same thing with Akridge i.e. Akridge purportedly asked Donais if there is going to be a problem, but according to Akridge, Donais emphatically 'with conviction" assured Akridge that there is no problem because "he did not take the case" and had "brief conversation"[9]. But Donais knew that the standard under Rule 1.18 is not whether he took the case or had a brief conversation, but whether he "received and reviewed" information from someone seeking to form an attorney-client relationship. The result was serious prejudice to plaintiffs, who shouldn't have been put in the position of having client conversations shared with Donais being shared with Terrell or others, or otherwise, used against them[10] .

---

## SECTION III: CONCLUSION

---

91. It should be noted that Donais not only disclosed the client conversation with Bisasor to Akridge, Terrell (Homewood) before being hired by them, but then he divulged it publicly in two courts, and then to his family members, non-profit board members and the police, including years later. All of these are separate incidents of breach of fiduciary duty.

92. The undisputed facts establish Donais breached fiduciary duty as a matter of law. No genuine factual disputes exist regarding the consultation and the improper unauthorized disclosures made. Partial summary judgment will serve judicial efficiency by resolving this clear-cut professional misconduct claim, allowing remaining proceedings to focus on damages and other disputed issues. See accompanying affidavits of Bisasor and Anderson and accompanying exhibits.

---

[8] See **page 224** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**

[9] See **page 3 and paragraph 16** in **Exhibit 20 - Affidavit of Dave Akridge dated 5-4-17.** See also all other exhibits attached including affidavits.

[10] See **Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest**. See also all other exhibits attached.

Respectfully submitted,
/s/ Natalie Anderson
NATALIE ANDERSON

/s/ Andre Bisasor
ANDRE BISASOR

Date: October 6, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

# <u>ATTACHMENT 3</u>

## Exhibits to Plfs Partial MSJ on Breach-Part 1

Filed
File Date: 10/8/2025 9:17 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

# EXHIBITS

**FOR**

# PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM

**Filed for Plaintffs**

**Dated: October 6, 2025**

# PART 1

# EXHIBIT LIST/TABLE OF CONTENTS FOR MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY

1. Exhibit 1 – Affidavit of Andre Bisasor [filed separately under seal].
2. Exhibit 2 – Affidavit of Natalie Anderson [filed separately under seal].
3. Exhibit 3 – Second Affidavit of Andre Bisasor. [filed separately under seal].
4. Exhibit 4 – Table of Comparison of Donais' Statements [filed separately under seal].
5. Exhibit 5 – Email from Hilton Executive to Anderson on 1-6-17 (citing Homewood already had legal counsel).
6. Exhibit 6 – Natalie Anderson Phone Records showing call from her to Robert Obrien on 1-5-17 (lasting 18mins).
7. Exhibit 7 – Phone Log of Robert Obrien Provided by Donais (purporting to show call from Obrien to Donais).
8. Exhibit 8 – Website Printout Confirming Robert Obrien's Phone Number (which is not the number in Ex. 7).
9. Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17 (with Legal Opinion from Donais).
10. Exhibit 10 – Letter/Affidavit of Robert Obrien dated 1-18-17 (obtained by Donais just before 1-18-17 hearing).
11. Exhibit 11 – Bisasor Email to Robert Obrien For ADO-Related Interview in 2020.
12. Exhibit 12 – Updated Statement of Robert Obrien on 9-20-20 (via ADO interview process).
13. Exhibit 13 – Statement of Keith Diaz on 9-18-20 (via ADO interview process) showing no call with Obrien).
14. Exhibit 14 – Bio of Keith Diaz showing discrimination law practice (proving the text in Ex. 9 didn't apply to him).
15. Exhibit 15 – Donais Internet Ad (Printed in 2017), .
16. Exhibit 16 – Ad of Landlord-Tenant Attorneys in NH showing Donais' Landlord-Tenant practice in 2017.
17. Exhibit 17 – Screenshot of Bisasor Call to Donais on 1-6-17 with voicemail left lasting 1.36 minutes.
18. Exhibit 18 – Phone Records from Donais Showing Call Placed By Donais to Bisasor on 1-9-17.
19. Exhibit 19 – Single Email sent on 1-11-17 by Donais to Terrell & Akridge, initially produced without longer email chain, and Longer Email Chain with Akridge, Donais and Terrell dated 1-11-17.
20. Exhibit 20 – Affidavit of Dave Akridge dated 5-4-17.
21. Exhibit 21 – Appearance of Craig Donais in Nashua District Court on 1-13-17.
22. Exhibit 22 – Pro Hac Vice Motion filed in Nashua district court on 1-13-17.
23. Exhibit 23 – Email Exchange with Elliott Berry on 1-17-17 showing Berry's Legal Opionon on Donais' Conflict.
24. Exhibit 24 – Elliott Berry's Contemporaneous Notes From Call To Donais About Conflict of Interest on 1-17-17.
25. Exhibit 25 – Donais' 6-11-19 Email to Donais' Police Friend citimg "Potential Client" and client info. disclosure.
26. Exhibit 26 – Email from Hilliard on 7-21-20 with police report showing Donais contacted the police about plaintiffs in June 2019|Excerpt of Police Report by Donais divulging Plaintiff's client information.
27. Exhibit 27 – Excerpt of Transcript of Statements of Donais to Police on 6-18-19.
28. Exhibit 28 – Audio Evidence To Impeach Donais (To Be Submitted via In-Camera and To Be Filed Separately) [as referenced in Pending Motion to Submit Audio Evidence In-Camera].
29. Exhibit 29 – Email from ADO Deputy Counsel Mark Cornell about "Race Card" By Donais.
30. Exhibit 30 – Excerpt of Transcript of Hearing with Judge Christopher Barry-Smith citing credibility of "Jussie Smollett" analogy supporting harm from alleging racial hoax defamation.
31. Exhibit 31 – Letter from Connecticut Bar Counsel via Connecticut Superior Court Judge Regarding Donais' Misconduct | Excerpt of Finding by Connecticut Judge Regarding Donais' Misconduct.
32. Exhibit 32 – Donais' Withdrawal of Connecticut Law License.
33. Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest.
34. Exhibit 34 – Transcript of Nashua District Court Hearing with Judge Paul Moore on 1-18-17.
35. Exhibit 35 – Relevant Excerpt of Transcript of 4-27-17 preliminary injunction hearing in superior court with Karl Terrell's testimony regarding the conflict issue.

# Exhibit 1

## [Filed Separately Under Seal]

# Exhibit 2

## [Filed Separately Under Seal]

# Exhibit 3

## [Filed Separately Under Seal]

# Exhibit 4

## [Filed Separately Under Seal]

# Exhibit 5

# EXHIBIT 10

# JANUARY 6, 2017 EMAIL FROM HILTON HOTELS' EXECUTIVE COMMENTING ON INVOLVEMENT OF HOMEWOOD SUITES NASHUA LEGAL COUNSEL

# RE: URGENT REQUEST FOR INDIVIDUAL INTERVENTION BY SENIOR MANAGEMENT EXECUTIVE | RACE DISCRIMINATION, RETALIATION, UNLAWFUL REMOVAL, UNFAIR/DECEPTIVE ACTS, ETC.

Stephen Arnold <Stephen.Arnold@Hilton.com>

Fri 1/6/2017 8:29 AM

To: Liberty _6 <Liberty_6@msn.com>;

Cc: Adam Robitaille <Adam.Robitaille@Hilton.com>; Jayme Putnam <Jayme.Putnam@Hilton.com>;

Dear Ms. Anderson,

I am responding on behalf of the Hilton Reservations and Customer Care and Executive Escalations teams as I have had the chance to review numerous communications you have sent to various corporate executives and representatives, including myself, describing your account of recent incidences that have led to the request of the hotel management team to request your vacate of the Homewood Suites of Nashua New Hampshire property.

Hilton would like to stress that the Homewood Suites of Nashua New Hampshire is independently owned and operated by Great American Hotel Group under a Franchise License Agreement with a subsidiary of Hilton. Given that American Hotel Group is responsible for the day-to-day operations of the property, and that this matter involves allegations that could lead to a potential legal claim between the independently owned and operated hotel and yourself, and that Hilton has been assured that hotel management and their legal counsel are actively involved in the handling of this matter, it remains appropriate for you to address your concerns directly with the hotel management company.

For this reason we also kindly request that you refrain from issuing further communications directed at our corporate executives and Board of Directors as we trust you will be able to work with management team at the property to resolve this dispute amicably and with the upmost urgency.

Sincerely,

Stephen Arnold
Vice President, Service & Quality Assurance
Hilton

---

**From:** Liberty _6 [mailto:Liberty_6@msn.com]
**Sent:** Friday, January 06, 2017 6:38 AM
**To:** Stephen Arnold <Stephen.Arnold@hilton.com>
**Cc:** Adam Robitaille <Adam.Robitaille@hilton.com>; Jayme Putnam <Jayme.Putnam@hilton.com>
**Subject:** URGENT REQUEST FOR INDIVIDUAL INTERVENTION BY SENIOR MANAGEMENT EXECUTIVE | RACE DISCRIMINATION, RETALIATION, UNLAWFUL REMOVAL, UNFAIR/DECEPTIVE ACTS, ETC.

Dear Stephen Arnold:

I am writing to you individually and personally.

I am asking you to intervene to prevent a Hilton property general manager at Homewood Suites Nashua (Adam Robitaille) from retaliating against me and my spouse for raising concerns or complaint about the racial

# **Exhibit 6**

T · · Mobile ·

| Statement for | Account number | Bill close date |
|---|---|---|
| NATALIE ANDERSON | | Jan 20, 2017 |

*Continued...* **(617) 710-7093, NATALIE**

**Talk**

The date and time corresponds to the local time where the mobile was located.

| Date and time | Number | Description | Type | Min | Amount |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | - |
| 01/05/17, 5:16 PM | (603) 459-9965 | to NASHUA/NH | - | 18 | - |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | - |

Type: (A) Call Waiting (B) Call Forward (C) Conference Call (D) Duplicate (E) Data/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls (I) Intl Disc Call (J) Intl Disc Call to Mobile (K) WPS Call (M) AnyMobile (R) Roaming (T) T-Mobile Number (V) myFaves Call (W) Wi-Fi Call (X) T-Mobile @Home Call (Y) Subscription (Z) One-time Purchase

# Exhibit 7

# EXHIBIT 6

## PHONE LOG OF ROBERT OBRIEN SHOWING CALL PLACED TO ATTORNEY ROBERT OBRIEN ON JANUARY 5, 2017 LASTING 5MINUTES (SUBMITTED BY THE DEFENDANTS TO THIS COURT ON MARCH 10, 2017).

Mar 16 17 12:06p p.9

# Robert L. O'Brien

O'Brien Law

message call mail

January 5, 2017 * not ATTY Dorais

5:37 PM Incoming Call → 5 minutes

phone

(603) 250-0822

work fax

(877) 349-0064

work

(603) 459-9965

email

# Exhibit 8

BBB
Start With Trust ®

**This Business Is Not BBB Accredited**

# Robert O'Brien Attorney

## Business Information

(603) 459-9965
P.O Box 357
New Boston, NH 03070-0357

BBB File Opened: 08/03/2011

**Contact Information**

- Principal: Robert O'Brien, Attorney at Law

**Business Category**

- Attorneys & Lawyers - Bankruptcy

### BBB Reason for Ratings

BBB rating is based on 13 factors: **Get the details about the factors considered. (https://www.bbb.org/council/overview-of-bbb-grade/)**

Based on BBB files, this business has a BBB Rating of No Rating. The reason is as follows:
This business is not currently rated. BBB does not have sufficient information to issue a rating for this business.

**BBB Reports On:**

**Licensing**

Licensing information is provided in the BBB Business Profiles to inform the public about industries that may require professional licensing, bonding, or registration. Better Business Bureau encourages you to check with the appropriate agency to be certain any requirements are currently being met.

**Advertising Review**

BBB promotes truth in advertising by contacting advertisers whose claims conflict with the BBB Code of Advertising. These claims come to our attention from our internal review of advertising, consumer complaints and competitor challenges. BBB asks advertisers to substantiate their claims, change ads to make offers more clear to consumers, and remove misleading or deceptive statements.

**Government Actions**

BBB reports on known significant government actions involving the business's marketplace conduct.

**Out of Business**

BBB reports on a company that is out of business for three years from the date the company closes its doors or ceases to do business.

**Misuse of Better Business Bureau Name/Logo**

BBB reports on unauthorized use of the Better Business Bureau's name and/or logo for as long as the business continues to use it in any advertising, or for one year after the business ceases any repeated unauthorized uses.

**Bankruptcy**

BBB reports on a business's bankruptcy as long as the business remains in bankruptcy.

**Mail Returned**

BBB reports when mail sent to the business was returned by the Postal Service.

## BBB Rating Scorecard

# Exhibit 9

+16034599965

Here is contact info for attorney who handles discrimination cases Bussiere & Bussiere, P.A., please call 603 622 1002 emilejr@bussierelaw.com
Another attorney in that form is Keith Diaz I spoke with Attorney Donais. He said you have a great contract case for the overcharges He said the innkeeper rules would likely apply to your situation. Which allows for "no cause" evictions. He would not opine on the discrimination claims, outside his experience.

+16034599965

outside his experience.

Please see section 353.3c of TITLE XXXI TRADE AND COMMERCE CHAPTER 353 HOTELS, TOURIST CABINS, ETC.
For the purpose of this section, the term "rental unit" shall include residential property rented for one month or less
I still belief you have a right to stay under your contract. Hotel would be required to follow the termination clause in the agreement, so review it. Bussierre should able to help further.

OK. Thanks much for the info. I'm not sure

# Exhibit 10

# EXHIBIT 5

## AFFIDAVIT OF ROBERT OBRIEN SUBMITTED TO THE DISTRICT COURT ON JANUARY 18, 2017 BY ATTORNY CRAIG DONAIS

**Robert L. O'Brien**
Attorney at Law
P.O. Box 357, New Boston NH 03070-0357
603-459-9965, 603-250-0822, RobOBJD@gmail.com

January 18, 2017

To Whom It May Concern:

On January 5, 2017 I received a call from a person claiming to be the victim of discrimination, billing fraud and wrongful threatened eviction (my words). I explained that I do not handle the type of landlord/tenant issue that she was describing. I told her that I would try to contact Attorney Craig Donais, who I believed handled a broader range of state law issues than I. I reached out to Attorney Donais via email and received an automated reply that he would be unavailable. I called his cellphone and asked if he would be interested in a new matter, using the same words listed above. No names or specific circumstances were discussed with Attorney Donais. He declined my offer to share any other information I had on the matter. He indicated that he could not help because he was on the road to something else the next day.

Between the email and the phone call, I had provided the caller with Attorney Donais' contact information, and suggested that she try reaching him. After my phone call with Attorney Donais, I texted the caller indicating that Donais was out, but that Attorney Emile Boussier might be interested, and provided his website and contact information.

This is all I know about the matter from memory. I did not start a file and do not have any notes. All statements contained herein are true and correct to the best of my knowledge and belief, under the penalty of perjury.

[signature]

Robert L. O'Brien NH #15358
1/18/2017

# Exhibit 11

# Follow-up on ADO Matter

From: Andre Bisasor (quickquantum@aol.com)

To: wearelaw@me.com

Cc: bmoushegian@nhattyreg.org

Date: Thursday, September 17, 2020 at 11:59 AM EDT

Mr. Obrien,

I am the representative for Natalie Anderson, a grievant in a matter currently before the ADO. I understand that Mark Cornell of the ADO recently interviewed you on this matter. Mr. Cornell indicated that I am permitted, as the grievant's representative, to follow-up with you to ask few more questions for clarification.

I would like to setup a call with you today or tomorrow. I expect the call to be no more than one hour at most but more likely to be about 30 minutes or so.

Could you please let me know your availability?

Thanks much,

Andre Bisasor

# Exhibit 12

# Re: Follow-up/Summary of Call Relating to Pending ADO Matter

From: Rob O'Brien (robobjd@gmail.com)

To: quickquantum@aol.com

Date: Sunday, September 20, 2020 at 09:32 PM EDT

Just skimming the text, it appears complete to me.

Robert L. O'Brien
Attorney at Law
P.O. Box 357
New Boston NH 03070-0357
Direct ph/txt: 603-741-0411
RobOBJD@gmail.com

On Sun, Sep 20, 2020 at 9:15 PM Andre Bisasor <quickquantum@aol.com> wrote:

Mr. Obrien,

Thanks for speaking with me on Friday. As discussed, I am sending this email as a quick summary of what we talked about on our call on Friday September 18, 2020.

1. You recall having about a 20 minute call with Ms. Anderson on 1-5-17 wherein she gave details about her situation involving the hotel including landlord/tenant, breach of contract, overcharges and discrimination, etc. You also recall that, at least, she also gave you her name, by which you identified her phone number that you sent text messages to, after speaking to Mr. Donais (as you also told Mark Cornell of the ADO).

2. You also recall that you only had one phone call with Ms. Anderson on 1-5-17, though you later sent text messages to Ms. Anderson about an hour or so later on the same date. You did not speak to or contact or communicate, whether by phone or text or in-person, with Ms. Anderson on any other date subsequent to 1-5-17.

3. You also recall that you urgently tried to reach out to Mr. Donais given the urgency of the issues Ms. Anderson relayed to you on the approx. 20 minute call that you had with her, on 1-5-17.

4. You recall that Mr. Donais called you back on 1-5-17 (after you tried calling him) because your phone log shows an incoming call to your phone line on 1-5-17.

5. You reviewed the text messages from your phone number sent on 1-5-17 wherein you described what Attorney Donais said to you on that date about the matters that you presented to him, and you confirmed that you did send that text message to Ms. Anderson on 1-5-17.

6. You indicated that you gave Mr. Donais enough facts about the matter that allowed him to give you the opinion he rendered to you, as you stated, in your text messages of 1-5-17.

7. You indicated that, in addition to what said Donais said about the facts of the case in part 1 of the text messages, that Mr. Donais also told you about the RSA 353 statute (i.e. the innkeeper

statute) that appeared in part 2 of your text messages to Ms. Anderson, and this comports with the fact that you did not even know about that statute prior to speaking to Mr. Donais on 1-5-17.

8. You stand by your text message sent to Ms. Anderson on 1-5-17 and you confirm that it is an accurate contemporaneous representation/depiction of what you discussed with Attorney Donais and what he said to you about the facts of the matter that you presented to him on 1-5-17.

9. You did not contact, call, or email Attorney Keith Diaz on 1-5-17 or at any other time about a potential client (whether relating to a Ms. Natalie Anderson or anyone else) involving a landlord tenant matter, and/or a hotel matter with billing overcharges or a breach of contract issue and/or a discrimination matter related thereto. Hence, the text messages you sent to Ms. Anderson on 1-5-17 could not have confused what Mr. Donais said to you, with anything having to do with Mr. Diaz.

Please confirm that this about sums up the major points discussed and that it is accurate. NB: Could you please respond as soon as you receive this and, if possible, this evening or early Monday morning (September 21) by 8am if possible?

Thanks,

Andre Bisasor

# Exhibit 13

# RE: Brief Call Regarding ADO Matter

From: Keith Diaz (keith@bussierelaw.com)

To: quickquantum@aol.com

Date: Friday, September 18, 2020 at 03:10 PM EDT

Hi Andre –

Yes, I believe your email below is accurate: I do not recall a discussion in 2017 between me and Attorney O'Brien concerning a landlord tenant matter, breach of contract, and/or discrimination claim. Moreover, Attorney O'Brien has never called me for the purpose of obtaining my legal advice on any matter. I have never provided Attorney O'Brien legal advice.

I can confirm that Attorney O'Brien sent me two emails in February and April this year. The emails were unexpected case referrals. I did nothing with the referrals.

The bankruptcy agreement was reached in the beginning of 2014, not 2015. Attorney O'Brien's involvement was very limited since the Trustee took the lead in the case. Also, I hired Attorney Ed Ford to represent my clients in the bankruptcy court. I had no direct involvement as counsel in the bankruptcy court. Attorney O'Brien would have addressed any legal issues in that case with Attorney Ford, not me.

I did not receive from or send to Attorney O'Brien email or written correspondence in 2017.

Also, with regard to discrimination claims, my practice is limited to employment litigation. I do not and have never handled a housing-related discrimination claim.

Regards,

Keith

Keith F. Diaz, Esq.
Bussiere & Bussiere, P.A.
15 North Street
Manchester NH 03104

PH: 603.622.1002
FX: 603.668.6892
www.bussierelaw.com
keith@bussierelaw.com

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail for the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying

of this e-mail is strictly prohibited. If you believe you have received this e-mail in error, please immediately notify Bussiere & Bussiere, P.A. by telephone at 603-622-1002.

---

**From:** Andre Bisasor <quickquantum@aol.com>
**Sent:** Friday, September 18, 2020 2:19 PM
**To:** keith@bussierelaw.com
**Subject:** Re: Brief Call Regarding ADO Matter

Hi Keith,

Thanks for speaking with me today. As discussed, I am sending this email as a quick summary of what we talked about on our call today.

1. You do not recall or remember (and you do not believe you have ever had) any phone call from or with Attorney Robert L. Obrien where he called you to discuss a case for a potential client (whether relating to a Ms. Natalie Anderson or anyone else) involving a landlord tenant matter, and/or a hotel matter with billing overcharges or a breach of contract issue and/or a discrimination matter related thereto, whether on the date of 1-5-17 or at any other time. And you definitely did not provide any opinion and advice on such matters to Mr. Obrien at any time.

2. The only time you ever received an email (not a phone call) from him regarding a potential client was (out of the blue) starting this year in 2020 (February 2020 and April 2020), and for which you did not respond to or speak to Mr. Obrien about. These two emails were only referral emails. You do not or did not otherwise get any referrals from him at any time prior to that, that you can recall.

3. Prior to that your only other interaction with him was in or around 2014 where he was opposing counsel on a matter that went to bankruptcy court and for which a settlement was obtained in or around 2015). Outside of that litigation, you had no other interaction, discussion or phone call with him that you can recall or remember.

4. Moreover, you confirmed you received no contact or communication from Mr. Obrien about any potential client case in 2017.

Please confirm that this about sums it up and is accurate.

Thanks

Andre

-----Original Message-----
From: Andre Bisasor <quickquantum@aol.com>
To: keith@bussierelaw.com <keith@bussierelaw.com>
Sent: Thu, Sep 17, 2020 1:35 pm
Subject: Re: Brief Call Regarding ADO Matter

P.S. I can copy Brian Moushegian, general counsel, at the ADO to confirm that I am the representative for the grievant in the matter I mentioned, if you like.

-----Original Message-----
From: Andre Bisasor <quickquantum@aol.com>
To: keith@bussierelaw.com <keith@bussierelaw.com>

Sent: Thu, Sep 17, 2020 1:27 pm
Subject: Re: Brief Call Regarding ADO Matter

Hi Keith,

1. I am looking for Keith Diaz, not Keith Dias.
2. I am the attorney-in-fact representative for Ms. Anderson in the ADO matter.

Andre

-----Original Message-----
From: Keith Diaz <keith@bussierelaw.com>
To: Andre Bisasor <quickquantum@aol.com>
Sent: Thu, Sep 17, 2020 1:24 pm
Subject: RE: Brief Call Regarding ADO Matter

Hi Andre -

As a preliminary matter, are you looking for Keith Diaz or Keith Dias? More often than not, people confuse me for the latter. Secondly, are you an attorney representative?

-Keith

KEITH F. DIAZ, ESQ.
BUSSIERE & BUSSIERE, P.A.
15 NORTH STREET
MANCHESTER NH 03104

PH: 603.622.1002
FX: 603.668.6892
www.bussierelaw.com
keith@bussierelaw.com

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail for the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you believe you have received this e-mail in error, please immediately notify Bussiere & Bussiere, P.A. by telephone at 603-622-1002.

---

**From:** Andre Bisasor <quickquantum@aol.com>
**Sent:** Thursday, September 17, 2020 12:12 PM
**To:** keith@bussierelaw.com
**Subject:** Brief Call Regarding ADO Matter

Mr. Diaz,

I am the representative for a grievant in a matter currently before the Attorney Discipline Office (ADO). I understand that I am permitted, as the grievant's representative, to ask you a few questions as I believe you may be a tangential witness i.e. you are not the target or subject of this ADO matter. It involves another attorney. My brief questions relate to whether you recall having a phone call with a certain attorney during a specific time period, etc. It is a very simple matter and would likely yield simple yes or no answers, for the most part. Thus, I would like to setup a call with you today or tomorrow. I expect the call to be no more than about 15 minutes.

Could you please let me know your availability?

Thanks much,

Andre Bisasor

# Exhibit 14

# KEITH F. DIAZ

Keith F. Diaz – obtained his Juris Doctor from the Franklin Pierce Law Center in Concord, New Hampshire in 2003 and is licensed to practice law in all state and federal courts in New Hampshire. He started his practice as an Assistant County Attorney in Rockingham County prosecuting felony and misdemeanor crimes in the county superior and district courts. In 2005, he joined Bussiere & Bussiere, P.A. and has since grown his litigation and trial practice to include criminal defense, personal injury, employment law and general practice litigation. Outside of the office, Attorney Diaz is an active member of the New Hampshire Bar's Public Protection Fund Committee, a representative of the federally sponsored United Network of Organ Sharing (UNOS) Patient Affairs Committee and involved with the New Boston Climate and Energy Committee.

**Click to email Keith Diaz**

## GET A FREE INITIAL CONSULTATION TODAY!

**YOUR NAME** *

**EMAIL** *

**PHONE** *

**How can we help you?**

**College**:

**Admitted**: Suffolk Law School, J.D.

**Practice Area**: Personal Injury; Animal Attacks; Automobile Accidents and Injuries; Automobile Negligence; Bicycle Accidents; Boating Accidents; Bodily Injury; Brain Injury; Catastrophic Injury; Commercial Vehicle Liability; Cumulative Trauma; Dog Bites; Head Injury; Motor Vehicle Accidents and Injuries; Motorcycle Accidents; Pedestrian Injuries; Plaintiffs Personal Injury; Psychological Injury; Severe Burns; Slip and Fall; Spinal Injury; Third Party Wrongful Death; Tourist Injuries; Wrongful Death; Whiplash; Traumatic Brain Injury; Probate Administration; Probate Litigation; Probate Taxation; Commercial Collections; Secured Collections; Unsecured Collections; Retail Collections; Commercial Real Estate; Commercial Conveyancing; Commercial Real Estate Acquisitions; Commercial Real Estate Contracts; Commercial Real Estate Development; Commercial Real Estate Litigation; Commercial Real Estate Sales; Residential Real Estate; Adverse Possession; Boundary Disputes; Condominium Development; Easements; Historic Conservation Easements; Land Acquisitions; Land Sales; Land Trusts; Mobile Home Law; Quiet Title; Real Estate Brokers and Agents Liability; Real Estate Brokers Malpractice; Real Estate Contracts; Real Estate Development; Real Estate Investment; Real Estate Litigation; Real Estate Sales; Real Estate Tax Liens; Real Property Development; Right of Way Easements; Employment Litigation; Age Discrimination in Employment; Confidentiality Agreements; Covenants Not To Compete; Disability Dis

**Membership**: Manchester and New Hampshire Bar Associations.

4. **Keith F. Diaz**

**Title**: Attorney

**Law School**: University of New Hampshire School of Law, formerly Franklin Pierce Law Center, J.D., 2003

**College**: St. Anslem College, B.A., 1997

**Admitted**: University of New Hampshire School of Law, formerly Franklin Pierce Law Center, J.D., 2003

**Practice Area**: Personal Injury; Accidents; Automobile Accidents and Injuries; Automobile Negligence; Bodily Injury; Dog Bites; Head Injury; Motor Vehicle Accidents and Injuries; Motorcycle Accidents; Pedestrian Injuries; Plaintiffs Personal Injury; Personal Injury Arbitration; Psychological Injury; Slip and Fall; Spinal Injury; Whiplash; Wrongful Death; Traumatic Brain Injury; Criminal Law; Assault and Battery; Burglary; Criminal Conspiracy; Criminal Defense; Drivers License Suspension; Driving While Intoxicated; DUI/DWI; Expungements; Extradition; Felonies; Forgery; Hit and Run; Malicious Prosecution; Misdemeanors; Murder; Parole and Probation; Post-Conviction Remedies; Search and Seizure; Sexual Assault; Shoplifting; Stalking; Theft; Traffic Violations; Vehicular Homicide; Weapons Charges; Landlord and Tenant Law; Evictions; Commercial Landlord and Tenant Law; Employment Law; Age Discrimination in Employment; Disability Discrimination; Employee Rights; Employer Liability; Employment at Will; Employment Breach of Contract; Employment Civil Rights; Employment Defense; Employment Disability Discrimination; Employment Discrimination; Employment Litigation; Employment Termination; Harassment; Title VII Discrimination; Sexual Harassment; Wrongful Termination; Uniform Commercial Code; Commercial Litigation; Sale of Goods; Libel, Slander and Defamation; Defamation; Libel and Slander; Libel Defense; Mechanics Liens; Construction Claims; Construction Defects; Construction Liability; Const

**Membership**: New Hampshire Bar Association.

# <u>Exhibit 15</u>

Craig Donais - Manchest ×

Secure | https://lawyers.justia.com/lawyer/craig-donais-1494018

JUSTIA Lawyers

Search Legal Issue or Lawyer Name | Log In | Sign Up

Find a Lawyer | Ask a Lawyer | Research the Law | Law Schools | Laws & Regs | Newsletters | Legal Marketing

Justia › Lawyer Directory › New Hampshire › Hillsborough County › Manchester › Craig Donais



# Craig Donais

- 20 years experience
- Business Law, Collections, Estate Planning...
- Connecticut, Maine, Massachusetts, New Hampshire

## Badges

## Practice Areas

Business Law

SPONSORED LISTINGS

PREMIUM

**Robert V. McKenney**



Amherst, NH
**(603) 672-5200**

view website | email lawyer | view profile

**Maureen A. Howard**



Portsmouth, NH
**(603) 431-2324**

email lawyer | view profile

**Robert S. Stephen**



Manchester, NH
**(877) 663-1007**

Ask me anything

11:17 AM
3/26/2017

# Exhibit 16

Nashua Landlord Tenant ×

Secure | https://www.justia.com/lawyers/landlordtenant/new-hampshire/nashua

JUSTIA Lawyers

Landlord Tenant

Log In Sign Up

show preview | view website | email lawyer | view lawyer profile



## Craig Donais

Manchester, NH Landlord Tenant Lawyer. 20 years experience

**(603) 624-7100**
444 Willow Street
Manchester, NH 03105-1778

Landlord Tenant, Business, Collections and Estate Planning
Suffolk University Law School

view website | view lawyer profile



## Matthew R Braucher

Manchester, NH Landlord Tenant Lawyer. 10 years experience

**(603) 665-9111**
1662 Elm Street
Manchester, NH 03101

**Free Consultation**
Landlord Tenant, Business, Personal Injury and Real Estate

show preview | view website | email lawyer | view lawyer profile



## Dana K. Smith

Manchester, NH Landlord Tenant Attorney. 3 years experience

Ask me anything

11:15 AM
3/26/2017

# <u>Exhibit 17</u>


10:50A
Calls Made
[2] No nar
:03-624-710(
1 5:17PM Fri, Jan 6
00:01:36
2 6:17PM Thu, Ja...
Options
Back
SAMSUNG

# Exhibit 18

# EXHIBIT 4

## PHONE RECORDS OF ATTORNEY CRAIG DONAIS SHOWING THAT ATTORNEY DONAIS PLACED A PHONECALL TO MR. BISASOR ON JANUARY 9, 2017.

Mar 16 17 12:07p p.13

1/17/2017

Welcome to Gate

Home

Your charges | Voice Message(s): 8 new message(s) | Recorded Calls | Call Logs

Sent Calls | Received Calls

| | | | |
|---|---|---|---|
| 2017-01-11 09:00 | [redacted] | | 0'00" |
| 2017-01-10 15:22 | | | 0'00" |
| 2017-01-10 14:58 | | | 0'00" |
| 2017-01-10 13:59 | | | 0'00" |
| 2017-01-10 13:02 | | | 0'00" |
| 2017-01-10 12:56 | | | 0'00" |
| 2017-01-10 12:56 | | | 0'00" |
| 2017-01-10 12:51 | | | 0'00" |
| 2017-01-10 12:03 | | | 0'00" |
| 2017-01-10 11:24 | | | 0'00" |
| 2017-01-10 11:16 | | | 0'00" |
| 2017-01-10 11:09 | | | 0'00" |
| 2017-01-09 16:35 | | | 0'00" |
| 2017-01-09 15:48 | | | 0'00" |
| 2017-01-09 14:57 | | | 0'00" |
| 2017-01-09 13:55 | | | 0'00" |
| 2017-01-09 13:42 | | | 0'00" |
| 2017-01-09 13:25 | | | 0'00" |
| 2017-01-09 13:19 | | | 0'00" |
| 2017-01-09 11:52 | | | 0'00" |
| 2017-01-09 10:54 | | | 0'00" |
| 2017-01-09 10:43 | | | 0'00" |
| 2017-01-09 10:31 | 1 781 4925675 | 6'56" | 0'00" |
| 2017-01-09 10:24 | [redacted] | | 0'00" |
| 2017-01-09 10:23 | | | 0'00" |
| 2017-01-09 10:22 | | | 0'00" |
| 2017-01-09 10:11 | | | 0'00" |
| 2017-01-09 10:10 | | | 0'00" |
| 2017-01-09 10:09 | | | 0'00" |
| 2017-01-09 10:02 | | | 0'00" |
| 2017-01-09 09:39 | | | 0'00" |
| 2017-01-09 09:38 | | | 0'00" |
| 2017-01-09 09:30 | | | 0'00" |
| 2017-01-06 15:21 | | | 0'00" |
| 2017-01-06 15:15 | | | 0'00" |
| 2017-01-06 09:36 | | | 0'00" |
| 2017-01-05 16:44 | | | 0'00" |
| 2017-01-05 13:46 | | | 0'00" |
| 2017-01-05 09:51 | | | 0'00" |
| 2017-01-05 09:02 | | | 0'00" |
| 2017-01-04 14:25 | | | 0'00" |
| 2017-01-04 11:26 | | | 0'00" |
| 2017-01-04 09:5[illegible] | | | 0'00" |

→ MR. Bisvor phone #

https://sip.isedigitalvoice.com/login/login.html

1/1

# Exhibit 19

Mar 16 17 12:09p p.19

**From:** Craig Donais <craig.donais@donaislaw.com>
**Date:** Wednesday, January 11, 2017 at 12:34 PM
**To:** Dave Akridge <dave.akridge@greatamericanhg.com>
**Cc:** "Karl M. Terrell" <kterrell@stokeswagner.com>, Felicia Brogden <fbrogden@stokeswagner.com>
**Subject:** RE: Anderson v. Homewood Suites

Karl and Felicia:

I am happy to provide local representation to support your pro hac vice admission.

What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper. Given his timeline and his issues, I was not in a position to assist, and did not engage in any conflict analysis to determine the property, property address, or whether there was a conflict. This is the extent of what I know.

I am around and available today with availability until 2pm today, tied up for about 1 hour, and then spotty after that. Tomorrow is clear from 9-10, and 10:30 – 1, and 2-4:30.

My NH bar # is 12466

Let me know how you wish to proceed.

Craig

Craig.Donais@DonaisLaw.com

DONAIS LAW OFFICES, PLLC
444 Willow Street, Manchester, NH 03103-6217
t: (603) 624-7100 | www.DonaisLaw.com | LinkedIn | Plaxo | Avvo | Justia

Admitted to practice in New Hampshire | Massachusetts | Connecticut

Business & Corporate | Real Estate | Trusts, Estate Planning & Probate Administration

**Subject:** FW: Anderson v. Homewood Suites
**Date:** Thursday, May 4, 2017 at 12:12:14 PM Eastern Daylight Time
**From:** Karl M. Terrell
**Attachments:** image001.jpg

---

**From:** "Karl M. Terrell" <kterrell@stokeswagner.com>
**Date:** Wednesday, January 11, 2017 at 3:25 PM
**To:** Craig Donais <craig.donais@donaislaw.com>, Dave Akridge <dave.akridge@greatamericanhg.com>
**Cc:** Felicia Brogden <fbrogden@stokeswagner.com>
**Subject:** Re: Anderson v. Homewood Suites

Thank you, Craig. I'll be in touch with you tomorrow (traveling today).

Karl

---

**From:** Craig Donais <craig.donais@donaislaw.com>
**Date:** Wednesday, January 11, 2017 at 12:34 PM
**To:** Dave Akridge <dave.akridge@greatamericanhg.com>
**Cc:** "Karl M. Terrell" <kterrell@stokeswagner.com>, Felicia Brogden <fbrogden@stokeswagner.com>
**Subject:** RE: Anderson v. Homewood Suites

Karl and Felicia:

I am happy to provide local representation to support your pro hac vice admission.

What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper. Given his timeline and his issues, I was not in a position to assist, and did not engage in any conflict analysis to determine the property, property address, or whether there was a conflict. This is the extent of what I know.

I am around and available today with availability until 2pm today, tied up for about 1 hour, and then spotty after that. Tomorrow is clear from 9-10, and 10:30 – 1, and 2-4:30.

My NH bar # is 12466

Let me know how you wish to proceed.

Craig

DONAIS PLLC LAW OFFICES
ATTORNEYS AT LAW

Craig.Donais@DonaisLaw.com

DONAIS LAW OFFICES, PLLC
444 Willow Street, Manchester, NH 03103-6217
t: (603) 624-7100 | www.DonaisLaw.com | LinkedIn | Plaxo | Avvo | Justia

Admitted to practice in New Hampshire | Massachusetts | Connecticut

Business & Corporate | Real Estate | Trusts, Estate Planning & Probate Administration

NOTICE: THIS IS A PRIVILEGED, CONFIDENTIAL COMMUNICATION. The information contained in this electronic message is intended only for the above-named addressee. The contents of this electronic message are or may be protected by the attorney-client privilege, work-product doctrine, trade secret protections and all other applicable protections. If the reader of this message is not the intended recipient, this message serves as notice that any use, dissemination, distribution or reproduction of this communication is expressly prohibited. If you believe you have received this communication in error, please immediately notify DONAIS LAW OFFICES, PLLC at 603.624.7100.

SUFFICIENCY OF ELECTRONIC TRANSMISSION FOR PURPOSES OF DISCOVERY AND CERTIFICATION OF SERVICE: As authorized by State of New Hampshire Superior Court Administrative Order 2011 – 46, and Circuit Court Administrative Order 2012-06, all discovery requests and responses, as well as documents and pleadings, shall be served electronically upon opposing counsel and/or parties, by way of email, PDF file and/or document file. NO PAPER COPY WILL BE MAILED UNLESS SPECIFICALLY REQUESTED. If this presents a problem or concern, kindly notify Donais Law Offices, PLLC immediately. Otherwise, it will be assumed that electronic submission is sufficient for all purposes and requirements under applicable and controlling court rules.

Think green. Please consider the environment before printing this e-mail.

**From:** Dave Akridge [mailto:dave.akridge@greatamericanhg.com]
**Sent:** Wednesday, January 11, 2017 11:41 AM
**To:** Craig S. Donais
**Cc:** Karl M. Terrell; Felicia Brogden
**Subject:** Fwd: Anderson v. Homewood Suites

Craig:

See below and attached.

Again, if you want me to do a phone intro or anything like that, I am happy to do so.

Karl & Felicia: I laid out the broad issues with Craig to give him some background and he indicated

that he may have received a call from Bissasor yesterday. He is did not take his case.

Dave

---------- Forwarded message ----------
From: **Karl M. Terrell** <kterrell@stokeswagner.com>
Date: Wed, Jan 11, 2017 at 11:29 AM
Subject: Fwd: Anderson v. Homewood Suites
To: Dave Akridge <dave.akridge@greatamericanhg.com>
Cc: Felicia Brogden <fbrogden@stokeswagner.com>

Dave,

We will need to associate local counsel for my pro hac vice admission. The local rule and our draft motion is attached.

Please ask the lawyer you mentioned if he's willing to provide this service, and if so provide me and my assistant Felicia, copied here, with his name, contact info and NH bar number.

Thanks,

Karl

Sent from my iPhone

Begin forwarded message:

**From:** Felicia Brogden <fbrogden@stokeswagner.com>
**Date:** January 11, 2017 at 11:09:50 AM EST
**To:** "Karl M. Terrell" <kterrell@stokeswagner.com>
**Subject: Anderson v. Homewood Suites**

Attached is the rule for filing a *pro hac vice* and a draft of same. The cost is $250.

The research folder and binder are in your chair.

**Felicia M. Brogden** | Paralegal

(O) 404.766.0076 (D) 404.766.2269 (C) 404.281.6844

Stokes Wagner
One Atlantic Center, Suite 2400
1201 West Peachtree Street NW
Atlanta, GA 30309

# Exhibit 20

THE STATE OF NEW HAMPSHIRE

Hillsborough, SS

April Term, 2017
Docket #226-2017-CV-69

Superior Court

*Natalie Anderson*

*v.*

*Adam Robitaille & Homewood Suites by Hilton, Nashua, N.H.*

**AFFIDAVIT OF DAVE AKRIDGE**

I, David Akridge, with a business address of 180 Locust Street, Suite Two, Dover, New Hampshire, do hereby swear and affirm that the following statements are true and correct to the best of my knowledge and belief:

1. I hold the position of president of Great American Hotel Group, Inc., a hotel management company. One of the hotels my company manages, through a single-purpose entity, is the Homewood Suites by Hilton in Nashua ("Hotel"). Hilton Worldwide, Inc. licenses our use of the 'Homewood Suites by Hilton' brand, but has no responsibility for the management of the Hotel (apart from monitoring and enforcement of brand standards).

2. Adam Robitaille, the General Manager of this Hotel, reports to me.

3. Mr. Robitaille contacted me concerning an incident in the hotel involving Mr. Bisasor that happened on January 3, 2017. I was informed that Mr. Bisasor had been loud and disruptive in the lobby of the Hotel, and that the disturbance was so serious the staff on hand felt it necessary to call in the police.

4. Mr. Robitaille expressed his desire to terminate Mr. Bisasor and Ms. Anderson's guest stay.

5. Mr. Robitaille also forwarded to me, on January 5, a lengthy email that Mrs. Anderson sent that day to various high-level executives within Hilton Worldwide, in which she referred to the incident on January 3, and made accusations that she and her husband were being discriminated against because of their race.

6. I consulted several times by telephone with attorney Karl M. Terrell, between January 5 and 10, concerning the issues Mr. Robitaille had presented to me. Mr. Terrell and his firm have advised and represented my company for many years.

7. On January 5, Mr. Robitaille requested that Anderson and Bisasor check out of the Hotel. Subsequently, I had one phone conversation with Mr. Anderson, in which I agreed to extend his check-out date to January 9.

8. On January 10, we received a copy of the legal action the Plaintiffs filed in the Circuit Court in Nashua. I asked Mr. Terrell to represent us.

9. On January 11, at 11:29 am, Mr. Terrell sent me an email stating that he would "need to associate local counsel," and provided a copy of the local court rule on the admission of out-of-state counsel. A copy of this email and several subsequent emails, in a single chain dated January 11, is attached.

10. Mr. Terrell and I had discussed, earlier, the likely need to associate local counsel. He concluded his email by stating: "Please ask the lawyer you mentioned if he's willing to provide this service."

11. The lawyer I had in mind was Craig Donais, who I have known for several years. He has provided legal services for me related to the board of a condominium association that I serve on, and he once handled a personal matter for me. Mr. Donais has never been retained to perform work for either Great American Hotel Group or the Homewood Suites by Hilton in Nashua.

12. Shortly after Mr. Terrell's 11:29 am email, I called Mr. Donais. Our discussion was quite short; maybe four or five minutes. This was my first conversation with Donais that had anything to do with the dispute involving Anderson and Bisasor.

13. During that call, I briefly explained the nature of the case, the fact that it involved the Homewood Suites in Nashua, and the need for local counsel. Donais then let me know that he had received a call from an individual named "Andre," who said he was looking for an attorney to represent him in a landlord/tenant matter. The situation, as Donais said he understood it, involved some type of mixed-use property. He said he did not remember the caller identifying this property as the Nashua Homewood Suites. In any event, in piecing this together, we concluded that "Andre" was quite likely Mr. Bisasor.

14. Donais told me very little about the substance of what the caller had said to him. I heard enough to conclude only that the caller he described was likely Mr. Bisasor.

15. I did not hear or learn – from Mr. Donais's description of what the caller had said – anything about the case, or their claims, that I did not know already from having read the Circuit Court complaint and from having read Mrs. Anderson's January 5 email to Hilton Worldwide.

16. I specifically recall asking Mr. Donais if he would have a conflict serving as local counsel, given this conversation with "Andre." He responded with conviction that he did not, given the fact that he had turned down the request to take the case, and given also the brief nature of his discussion with the caller.

17. Following this call, I sent Mr. Donais an email – at 11:41 am – copying Mr. Terrell and his assistant Felicia Brogden. See the attached email chain.

18. In that email, I offered to "do a phone intro" with Mr. Donais and Mr. Terrell, as the two of them had not yet met or spoken concerning this case (and, to my knowledge, had never met or spoken previously on any other matters). I did not provide Mr. Terrell, in that email, a phone number for Mr. Donais.

19. I stated also to Mr. Terrell, in that email, that Mr. Donais "may have received a call from Bisasor yesterday" (I have since read Mr. Donais' affidavit, in which he states he spoke with Donais on January 9, not January 10, as I apparently thought on Jan 11, when referring to that call as having taken place "yesterday"). I stated further, in this email, that Mr. Donais "did not take his case."

20. I believe I asked Mr. Donais to explain and describe to Mr. Terrell the substance of his conversation with Bisasor. In any event, less than an hour later, Mr. Donais did exactly that. In his email to Terrell, at 12:34 pm, copied to me and Ms. Brogden, he provided a written description of his conversation with Bisasor. See the attached email chain.

21. There was nothing in that written description by Mr. Donais that Mr. Terrell and I did not know already, from having seen – again – his Circuit Court complaint, and from having read Mrs. Anderson's January 5 email to Hilton Worldwide.

22. I had no other discussions with Mr. Donais concerning the substance of what Mr. Bisasor said to him in the January 9 phone call. Mr. Donais also, I should add, never described to me anything he may have learned in the earlier telephone discussion he indicated he had with attorney O'Brien.

23. After the attorney then representing the Plaintiffs, Elliott Berry, raised the issue – on January 17 and 18 – of a possible conflict based on Mr. Bisasor's phone discussion with Mr. Donais, I participated in one or two discussions with Mr. Donais and Mr. Terrell, in which we discussed the circumstances of Bisasor's contact with Donais, and discussed how best to respond to the issue raised by attorney Berry. These discussions were not lengthy. Essentially, Mr. Donais concluded rather quickly – while still in the courthouse that day – that it would be best for him to withdraw, and that he would offer up names of other local attorneys who might be available to serve as local counsel.

24. At no time during these discussions on January 17 and 18, or at any later point in time, did I hear or learn anything concerning what Bisasor said to Donais that added to or went beyond the facts relayed by Donais in the above-referenced January 11 (12:34 pm) email.

25. Neither I nor (to my knowledge) Mr. Terrell ever received any facts or information from Mr. Donais that would seem to fall into the category of private, confidential or privileged communications by Bisasor to Donais. There was nothing, in my mind, that we could have used as some form of advantage in defending the case.

Executed on 05/04/2017 day of May 2017.

David Akridge

State of New Hampshire
County of Strafford

Sworn and subscribed before me this 4th day of May 2017 by David Akridge.

Justice of the Peace/Notary Public

My commission expires: CANDICE A. GRIMBILAS, Notary Public
State of New Hampshire
My Commission Expires March 23, 2021

# Exhibit 21

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: **9th Circuit - District Division - Nashua**

Case Name: **Natalie Anderson v. Adam Robitaille, et al**

Case Number: **459-2017-lt-00010**
(if known)

## APPEARANCE/WITHDRAWAL

**APPEARANCE**

Please enter my appearance as

☑ Counsel for **defendants, local counsel PHV**

☐ I will represent myself (*pro se*).

**WITHDRAWAL**

Please withdraw my appearance as

☐ Counsel for __________

Notice of Withdrawal sent to my clients on:

at the following address:

I certify that on this date I provided a copy of this document to party(s) listed below by:
☐ Hand-delivery ☑ US Mail ☐ Email (E-mail only by prior agreement of the parties based on Circuit Court Administrative Order)

**Natalie Anderson**
Name

**15 Tara Boulevard**
**Nashua NH 03062**

13 Jan 2017
Date

[signature]
Signature

**Craig S. Donais**
Printed Name

**Donais Law Offices, PLLC**
**444 Willow Street, Manchester NH 03103-6217**

(603) 624-7100 ext
Telephone

12466
NH Bar ID #

craig.donais@donaislaw.com
Email Address (optional)

# <u>Exhibit 22</u>

**THE STATE OF NEW HAMPSHIRE**
9th Circuit – District Division - Nashua

| | | |
|---|---|---|
| NATALIE ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 459-2017-LT-00010 |
| | ) | |
| v. | ) | |
| | ) | |
| ADAM ROBITAILLE and | ) | |
| HOMEWOOD SUITES OF NASHUA | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION FOR COUNSEL TO APPEAR *PRO HAC VICE*

Defendants Adam Robitaille and Homewood Suites of Nashua ("Defendants"), by and through their counsel Craig Donais, hereby move this Court to allow Karl M. Terrell to appear on their behalf with undersigned counsel in the above-captioned matter. In support of this Motion, Defendants submit as follows:

1. Mr. Terrell is a member of the law firm of Stokes Wagner, ALC, located at One Atlantic Center, Suite 2400, 1201 W. Peachtree Street, Atlanta, Georgia 30309, tel: (404) 766-0076; fax: (404) 766-8823. Craig Donais is a member of the law firm of Donais Law Offices, PLLC, located at 444 Willow Street, Manchester, NH 03103-6217, tel: (603) 624-7100. Defendants have chosen Mr. Terrell to serve as their lead counsel in this case.

2. Mr. Terrell was admitted to the State Bar of Georgia in 1982, and at all times has been in good standing since his admission.

3. Mr. Terrell also is admitted to practice before the following courts:

- U.S. District Court for the Northern District of Georgia; admitted October 4, 1982 - Russell Federal Building, 75 Spring Street, Atlanta GA 30303;

- U.S. District Court for the Middle District of Georgia; admitted February 11, 2001 -- Bootle Federal Building, P.O. Box 128, 475 Mulberry Street Macon, GA 31202;
- U.S. District Court for the District of Arizona; admitted May 14, 1996 – O'Connor U.S. Courthouse, 401 W. Washington Street, Suite 130, SPC 1, Phoenix, AZ 85003-2118;
- U.S. District Court for the Eastern District of Michigan; admitted October 1, 1997 – Levin U.S. Courthouse, 231 W. Lafayette Blvd., Detroit, Michigan 48226;
- U.S. District Court for the Western District of Michigan; admitted June 8, 1999 – 399 Federal Building, 110 Michigan Street, Grand Rapids, MI 49503;
- U.S. District Court for the District of Colorado; admitted January 21, 2011 – Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado 80294;
- U.S. Court of Appeals for the Fourth Circuit; admitted March 25, 1993 – 1100 East Main Street, Richmond, VA 23219;
- U.S. Court of Appeals for the Fifth Circuit; admitted March 28, 1994 – 600 S. Maestri Place, New Orleans, LA 70130;
- U.S. Court of Appeals for the Sixth Circuit; admitted November 5, 1991 – Stewart U.S. Courthouse, 100 East Fifth Street, Cincinnati, Ohio 45202;
- U.S. Court of Appeals for the Eleventh Circuit; admitted 1982 – Tuttle U.S. Court of Appeals Building, 56 Forsyth Street, Atlanta GA 30303;
- U.S. Court of Appeals for the District of Columbia; admitted April 18, 1996 – E. Barrett Prettyman U.S. Courthouse and William B. Bryant Annex, 333 Constitution Ave., NW Washington, DC 20001;

- U.S. Court of Appeals for the Second Circuit; admitted August 22, 2013 - Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007; and
- U.S. Court of Appeals for the Ninth Circuit; admitted April 10, 2014 – The James R. Browning Courthouse, 95 7th Street, San Francisco, CA 94103.

A verified application for admission by Mr. Terrell is attached as Attachment A.

4. Mr. Terrell is familiar with the claims and allegations against Defendants. For this reason, Defendants request this Court to enter an order authorizing Mr. Terrell to appear and practice *pro hac vice* in the above-referenced matter, in association with undersigned counsel.

5. Undersigned counsel will remain actively associated with Mr. Terrell in this matter, as required by Superior Court Rule 19.

WHEREFORE, Defendants respectfully request that the Court issue an Order:

A. Granting this Motion and allow Karl M. Terrell to appear and practice *pro hac vice*; and

B. Granting such other relief as is just and proper.

Dated: January 13, 2017

Respectfully submitted,
DONAIS LAW OFFICES, PLLC

[signature]

Craig Donais
State Bar No. 12466
444 Willow Street
Manchester, NH 03103
Tel: (603) 624-7100
Email: craig.donais@donaislaw.com

Attorneys for Defendants

**THE STATE OF NEW HAMPSHIRE**
9th Circuit – District Division - Nashua

| | | |
|---|---|---|
| NATALIE ANDERSON, | ) | |
| Plaintiff, | ) | Case No. 459-2017-LT-00010 |
| v. | ) | |
| ADAM ROBITAILLE and HOMEWOOD SUITES OF NASHUA | ) | |
| Defendants. | ) | |

**VERIFIED APPLICATION OF KARL M. TERRELL IN SUPPORT OF DEFENDANTS' MOTION FOR ADMISSION *PRO HAC VICE***

I, Karl M. Terrell, state as follows:

1. I filed this Verified Application for admission *pro hac vice* in compliance with New Hampshire Superior Court Rule 19.

2. I respectfully request to be admitted *pro hac vice* in this matter to represent the defendants, Adam Robitaille and Homewood Suites of Nashua, whose mailing address is 15 Tara Boulevard, Nashua, NH 03062, tel: (603) 546-7470.

3. I am a member of the law firm of Stokes Wagner, ALC, located at One Atlantic Center, Suite 2400, 1201 W. Peachtree Street, Atlanta, Georgia 30309, tel: (404) 766-0076; fax: (404) 766-8823. My residential address is 1054 Robin Lane, Atlanta, Georgia 30306.

4. I am a member in good standing in each of the jurisdictions where I am admitted to practice, and I have never been the subject of any disciplinary proceedings, been held in contempt or otherwise sanctioned by any court for disobeying its rules or orders.

5. I was admitted to the Georgia State Bar in 1982.

6. I am also admitted to practice before the following courts:

- U.S. District Court for the Northern District of Georgia; admitted October 4, 1982 - Russell Federal Building, 75 Spring Street, Atlanta GA 30303;
- U.S. District Court for the Middle District of Georgia; admitted February 11, 2001 -- Bootle Federal Building, P.O. Box 128, 475 Mulberry Street Macon, GA 31202;
- U.S. District Court for the District of Arizona; admitted May 14, 1996 – O'Connor U.S. Courthouse, 401 W. Washington Street, Suite 130, SPC 1, Phoenix, AZ 85003-2118;
- U.S. District Court for the Eastern District of Michigan; admitted October 1, 1997 – Levin U.S. Courthouse, 231 W. Lafayette Blvd., Detroit, Michigan 48226;
- U.S. District Court for the Western District of Michigan; admitted June 8, 1999 – 399 Federal Building, 110 Michigan Street, Grand Rapids, MI 49503;
- U.S. District Court for the District of Colorado; admitted January 21, 2011 – Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado 80294;
- U.S. Court of Appeals for the Fourth Circuit; admitted March 25, 1993 – 1100 East Main Street, Richmond, VA 23219;
- U.S. Court of Appeals for the Fifth Circuit; admitted March 28, 1994 – 600 S. Maestri Place, New Orleans, LA 70130;
- U.S. Court of Appeals for the Sixth Circuit; admitted November 5, 1991 – Stewart U.S. Courthouse, 100 East Fifth Street, Cincinnati, Ohio 45202;
- U.S. Court of Appeals for the Eleventh Circuit; admitted 1982 – Tuttle U.S. Court of Appeals Building, 56 Forsyth Street, Atlanta GA 30303;
- U.S. Court of Appeals for the District of Columbia; admitted April 18, 1996 – E. Barrett Prettyman U.S. Courthouse and William B. Bryant Annex, 333 Constitution Ave., NW Washington, DC 20001;

- U.S. Court of Appeals for the Second Circuit; admitted August 22, 2013 - Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007; and
- U.S. Court of Appeals for the Ninth Circuit; admitted April 10, 2014 – The James R. Browning Courthouse, 95 7th Street, San Francisco, CA 94103.

7. I have never been denied admission *pro hac vice* in New Hampshire courts, had admission *pro hac vice* revoked or been disciplined in any New Hampshire court.

8. At all times in this matter, I will be associated with Craig Donais of the law firm of Donais Law Offices, PLLC, located at 444 Willow Street, Manchester, NH 03103, whose state bar number is 12466.

Signed under penalty of perjury, this 12 day of January, 2017.

Karl M. Terrell
Stokes Wagner, ALC
One Atlantic Center, Suite 2400
1201 W. Peachtree Street
Atlanta, Georgia 30309
Tel: (404) 766-0076
Fax: (404) 766-8823
kterrell@stokeswagner.com

# ATTACHMENT "A"

# State Bar of Georgia

*Lawyers Serving the Public and the Justice System*

**Mr. Karl Montague Terrell**
**Stokes Wagner ALC**
**One Atlantic Center**
**1201 W. Peachtree Street, Suite 2400**
**Atlanta, GA 30309**

| | |
|---|---|
| **CURRENT STATUS:** | **Active Member-Good Standing** |
| **DATE OF ADMISSION:** | **06/18/1982** |
| **BAR NUMBER:** | **702265** |
| **TODAY'S DATE:** | **01/11/2017** |

**Listed below are the public disciplinary actions, if any, which have been taken against this member:**

| State Disciplinary Board Docket # | Supreme Court Docket # | Disposition | Date |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

The prerequisites for practicing law in the State of Georgia are as follows:

- **Certified by the Office of Bar Admissions, either by Exam, or on Motion (Reciprocity).**
- **Sworn in to the Superior Court in Georgia, highest court required to practice law in Georgia.**
- **Enrolled with the State Bar of Georgia, arm of the Supreme Court of Georgia.**

Attorneys licensed in Georgia and whose current status is Active are eligible to practice law in Superior Court. Attorneys may, upon application, apply for admission to the Supreme, District and State Court of Appeals.

Under the privacy/confidentiality provision of the Bar Rule 4-221(d), any complaint against a member resolved prior to the filing and docketing of a disciplinary case in the Supreme Court is not a matter of public record, and may not be revealed without a waiver from the member. It is the policy of the State Bar of Georgia to answer any inquiry about a member by disclosing only those complaints that have been docketed in the Supreme Court. With respect to matters that are currently pending as active, undocketed cases, when an inquiry is received, the State Bar of Georgia shall not disclose the existence of those complaints. Such non-disclosure should not be construed to confirm the existence of confidential complaints since the vast majority of members in good standing are not the subjects of such confidential complaints.

This member is currently in **"good standing"** as termed and defined by **State Bar Rule 1-204**. The member is [illegible] license fees and is not suspended or disbarred as of the date of this letter.

STATE BAR OF GEORGIA 1964

**STATE BAR OF GEORGIA**

Brenda Lovvorn

**Official Representative of the State Bar of Georgia**

**HEADQUARTERS**
104 Marietta St. NW, Suite 100
Atlanta, GA 30303-2743
404-527-8700 · 800-334-6865
Fax 404-527-8717
www.gabar.org

**COASTAL GEORGIA OFFICE**
18 E. Bay St.
Savannah, GA 31401-1225
912-239-9910 · 877-239-9910
Fax 912-239-9970

**SOUTH GEORGIA OFFICE**
244 E. 2nd St. (31794)
P.O. Box 1390
Tifton, GA 31793-1390
229-387-0446 · 800-330-0446
Fax 229-382-7435

**THE STATE OF NEW HAMPSHIRE**
9th Circuit – District Division - Nashua

| | | |
|---|---|---|
| NATALIE ANDERSON, | ) | |
| Plaintiff, | ) | Case No. 459-2017-LT-00010 |
| v. | ) | |
| ADAM ROBITAILLE and HOMEWOOD SUITES OF NASHUA | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I, Craig Donais hereby certify that on this date I caused a copy of the foregoing to be sent, via first class mail, postage pre-paid, to the plaintiff below:

Natalie Anderson
15 Tara Boulevard
Nashua, NH 03062

Dated: January 13, 2017

Craig Donais

# Exhibit 23

# Re: Legal Documents Given To Us By The Property Regarding Wednesday Hearing

Liberty _6
Tue 1/17/2017 11:32 AM
**To:** Elliott Berry <EBerry@nhla.org>

3 attachments (444 KB)

Andre Call & Voicemail to Donais on 1-6-17 - Andre Phone Call Log.jpg; Donais Call To Andre on 1-9-17- Andre Phone Call Log.jpg; Text Message on 1-5-17 re-Donais-Natalie Phone.jpg;

Elliot,

Please see attached pictures taken of my wife's phone which shows the text message from attorney Robert Obrien (phone number 603-459-9965) with description of communications re Attorney Craig Donais. Also attached are two pictures taken of my phone with call logs screen showing call to Atty Donais phone number (603-624-7100) on 1-6-17 and another picture showing his phone number call back to me on 1-9-17.

Thx

Andre

---

**From:** Liberty _6
**Sent:** Tuesday, January 17, 2017 10:37 AM
**To:** Elliott Berry
**Subject:** Re: Legal Documents Given To Us By The Property Regarding Wednesday Hearing

Elliot,

The name of the other lawyer that my wife communicated through is Robert Obrien. Yes, I will take a picture of the text message and send it to you shortly

For my part, I can take a picture of my cell phone log screen to shows Donais phone number on certain prior dates. Not sure if that helps any with the proof problem.

Thx
Andre

**From:** Elliott Berry <EBerry@nhla.org>
**Sent:** Tuesday, January 17, 2017 10:02 AM
**To:** 'Liberty _6'
**Subject:** RE: Legal Documents Given To Us By The Property Regarding Wednesday Hearing

Andre,

What you describe would be a serious breach of professional ethics. But if I understand you correctly your wife's communications were entirely through another lawyer. This presents a serious proof problem. Can you tell me the name of the other lawyer ? Can you make a copy of the text message and send it to me ?

Thanks for letting me know about all of this. I will call you by 11:30 this morning. Hopefully I can speak with your wife as well.

Elliott Berry
Managing Attorney
Manchester Office
NH Legal Assistance
1850 Elm St., Suite 7
Manchester, NH 03104
(603) 668-2900 ext 2908
eberry@nhla.org

**Connect with NHLA!**
**Follow us on Twitter**
**Like us on Facebook**

Please consider the environment before printing this e-mail.

Confidentiality Notice: This email transmission and any accompanying material may contain confidential or privileged information. The information is intended only for disclosure to and use by the addressee(s) named above. Distribution, publication, reproduction, or use of this transmission and materials, in whole or in part, by any person other than an intended recipient is prohibited. If you have received this e-mail in error, please notify me

# Exhibit 24

Outlook

## FW: notes from 1/17/2017

**From** Elliott Berry <EBerry@nhla.org>
**Date** Fri 7/24/2020 5:19 PM
**To** Mark Cornell <mcornell@nhattyreg.org>

Mark,
My former client, Natalie Anderson, asked that I send you a copy of my file notes from January 17, 20017 regarding my conversation with Craig Donais. Below is an exact, unedited copy (except for my adding the quotation marks”). Please pardon all the typos, but I was, and remain, a terrible typist.

“He was in a meeting when I called but I told his "associate" that it was very important that I speak to Craig, so he went to get him.
I told Craig who am representing and said that I has concerns about the whether he should be conflicted out of the case. I told him that I had a text message from Atty O'Brian tht clearly showed that O'brian spoke to him about our client's case, and phone records that indicated that our client called him on 1/6/17 and that he called client back on 1/9 and spoke to him for almost 11 minutes.
Craig said that O'brian's call came on a Friday evening and they spoke only in broad generalities without any identification of who the parties were. he says that he told Atty O'brian that he didn't want to get involved.
In regard to the phone call with Andre on Jan 9, he says that he spoke to "some guy" he didn't get any specific facts from Andre--that he is not even sure that Mr. Anderson gave him his name or that of the defendant. he said that Andre just kept asking questions. he kept telling him that he couldn't answer his questions and he just wanted to get him off the phone. he said that he never even got enough information to do a conflicts check. He did say however that he didn't want the information from the caller (Mr. Anderson) because I have represent the defedant before and the principal for a long time.
I told him that my clients are very concerned about this, and will want to raise it before the court. I told him that I am not accusing him of unethical behavior but in all likelyhood will have to raise the issue at tomorrow's hearing. I promised that I would ask the court to deal with it off the record. He said that he understands but complained that client was trying to avoid the real issue, and questioned whether he made the call to him just to conflict him out of the case. I didn't day this but I wondered how client would have known tat Craig represented the defendanr. I did say that on the surface the chain of events raises legitimate questions.”

Please let me know if I can be of any further assistance.

Elliott Berry
NH Legal Assistance
1850 Elm St., suite 7
Manchester, NH 03104
Phone: (603)668-2900 ext 2908
Fax: (603)935-7109
eberry@nhla.org

# Exhibit 25

Gmail

Craig Donais <craig.donais@donaislaw.com>

## RE: Sad news

**Linstad, Nathan** <NLinstad@manchesternh.gov> Tue, Jun 11, 2019 at 3:29 PM
To: Craig Donais <craig.donais@donaislaw.com>

I will forward it to Houghton

Ofc Linstad
Manchester Police
Crime Prevention Officer
SWAT

On Jun 11, 2019, at 15:24, Craig Donais <craig.donais@donaislaw.com> wrote:

Thanks. Can you put me in touch with someone specifically to look into this?

**From:** Linstad, Nathan [mailto:NLinstad@manchesternh.gov]
**Sent:** Tuesday, June 11, 2019 3:24 PM
**To:** Craig Donais
**Subject:** Re: Sad news

I can't open the attachment bc I'm in the woods in northern nh. Sgt brennan will be at the Crimeline meeting for me tomorrow and will be showing the new paperwork.

But just reading the email I would have you talk to detectives and have them look into it for sure.

Ofc Linstad

Manchester Police

Crime Prevention Officer

SWAT

On Jun 11, 2019, at 15:18, Craig Donais <craig.donais@donaislaw.com> wrote:

Nate:

I wanted to check with you about a potential criminal issue. I have a potential client who I declined who has filed an action against me, but now claims that they have a recording of my conversation with them.

If they have a recording of a conversation with me, it was done without my consent or knowledge, which would be in violation of the Wiretap statute, as NH is a 2-party state. I would also not put it past them that they actually fabricated a recording, and claims that it is part of a conversation that they had with me. You will note that they admit to this recording in the last sentence of the paragraph at the top of page 3 in this pdf.

Can I file a police report on this, and start a process to determine whether this is worthy of prosecution?

See you tomorrow at Crimeline!

Craig

<image001.jpg>

Craig.Donais@DonaisLaw.com

DONAIS LAW OFFICES, PLLC

444 Willow Street, Manchester, NH 03103-6217

t: (603) 624-7100 | www.DonaisLaw.com | LinkedIn | Plaxo | Avvo | Justia

Admitted to practice in New Hampshire | Massachusetts

Business & Corporate | Real Estate | Trusts, Estate Planning & Probate Administration

NOTICE: THIS IS A PRIVILEGED, CONFIDENTIAL COMMUNICATION. The information contained in this electronic message is intended only for the above-named addressee. The contents of this electronic message are or may be protected by the attorney-client privilege, work-product doctrine, trade secret protections and all other applicable protections. If the reader of this message is not the intended recipient, this message serves as notice that any use, dissemination, distribution or reproduction of this communication is expressly prohibited. If you believe you have received this communication in error, please immediately notify DONAIS LAW OFFICES, PLLC at 603.624.7100.

**Think green. Please consider the environment before printing this e-mail.**

<2019-05-08 Anderson MTR.pdf>

---

*The Right-To-Know Law (RSA 91-A) provides that most e-mail communications, to or from City employees and City volunteers regarding the business of the City of Manchester, are government records available to the public upon request. Therefore, this email communication may be subject to public disclosure.*

# Exhibit 26

# Donais

From: Russell F. Hilliard (rhilliard@uptonhatfield.com)

To: mcornell@nhattyreg.org

Cc: quickquantum@aol.com; rhilliard@uptonhatfield.com

Date: Tuesday, July 21, 2020 at 07:57 AM EDT

Please see attached.

Russell F. Hilliard, Esq.
Upton & Hatfield, LLP
159 Middle Street
Portsmouth, NH 03801
Tel:  603-436-7046
Fax: 603-369-4645
rhilliard@uptonhatfield.com
www.uptonhatfield.com

2019 Police Report.pdf
2.4 MB

# Incident/Investigation Report

**Agency:** MPD **Case Number:** 19-008367 **Date:** 06/25/2020 11:03:04

## Supplement Information

| Supplement Date | Supplement Type | Supplement Officer |
|---|---|---|
| 06/18/2019 19:10:30 | FOLLOW UP | (100371) WHELAN, DANIEL B |
| **Contact Name** | | **Supervising Officer** |
| DONAIS, CRAIG | | (100028) BIRON, CHRISTOPHER R |

## Supplement Notes

(100371) WHELAN, DANIEL B

Event: Follow-Up (Victim Interview)
Date: 06/18/19
Investigator: Daniel B. Whelan

On 06/13/19, I sent an email to the victim in this case:

(Victim)
Craig Donais
[redacted]

I advised Craig that I had been assigned this case and that I was looking to have him come-in for an interview. Craig and I agreed to meet at the Manchester Police Department on 06/18/19 at 1500 hours. On 06/18/19, at approximately 1505 hours, Craig arrived at the Manchester Police Department. I made contact with Craig in the lobby of the Manchester Police Department, where I escorted him to the 3rd floor (Detective Division), directly into interview room number 1. At that location, I advised Craig that the interview would be audio and video recorded.

The following is only a synopsis of the interview that I completed with Craig, which is not necessarily in chronological order. For a word-for-word account of the interview, I have burned a copy of it onto a disk and secured it into evidence as DBW2.

I started the interview with Craig by asking him to provide some background information regarding how his interaction with the male and female party started, prior to them filing a formal complaint against him. Prior to providing that information, Craig stated that he had a copy of an affidavit, which he had completed back in March of 2017, which he wished to provide to me. Craig also had a copy of his phone records, for the time frame of January of 2017, when his services were requested.

Craig explained that he had initially been contacted by a colleague attorney of his, who provided a referral for a case that was not a bankruptcy case, which was his colleague's specialty. Craig told this attorney, after having been told some of the details of the case, that he was not interested. The attorney was identified as Robert O'Brien, out of New

Boston, NH.

[redacted] fter refusing the referral, Craig received a voice message at his office, from a male party who was inquring about a possible case. Craig stated that he could not hear the male party very well on the voice message and did not realize that this individual was possibly tied to the referral that Craig had refused from his colleague.

Craig had a copy of phone records with him at the time of the interview and was able to show me the log for when he received the voice message, as well as when he ultimately returned the call. The first call on the log was a missed call when there was not a voice message left. Craig identified the male party that he received the call from as: Andre Bisasor, [redacted] The following contains a log of the 2 calls from Andre and the 1 call that Craig made in return to Andre:

1) 01/05/17 at 1817 hours - 7 seconds (Incoming)

2) 01/06/17 at 1716 hours - 1 min, 37 seconds (Incoming)

3) 01/09/17 at 1043 hours - 6 min, 56 seconds (Outgoing)

The final call, #3, was the call that Craig placed to Andre, where they actually discussed the case that Andre was interested in having Craig pursue. Craig listened to the basics pertaining to what the case was involving, which he then realized that this was the same case that he had been informed of and was not interested in pursuing. Craig then told Andre that he was not interested in pursuing the case. Craig advised that he only spoke with Andre one time and that it was on 01/09/17 when he told Andre that he was not interested in the case.

Craig was actually representing the Hilton Residences Inn in Nashua, NH, which is the hotel that Andre was seeking a lawsuit against and requesting that Craig represent him in. Craig is uncertain if Andre was aware of the fact, at the time, that he was representing the Hilton. Craig appeared at a court hearing, after speaking on the phone with Andre. Craig was representing the Hilton Residences, where the issue relative to Craig speaking with one of the plaintiffs of the lawsuit, Andre Bisasor, was brought to the attention of the court. However, the name "Andre Bisasor" was not listed on the lawsuit; it was under the name of his wife, Natalie Anderson. Craig stated that he did not know that Natalie was Andre's wife, which is the reason that he did not recognize any potential conflict with the case. As a consequence, Craig did not continue to represent the hotel and filled-out the affidavit detailing what, if any, information that he had learned of when speaking with Andre on 01/09/17. Craig then provided that affidavit to his successor counsel.

[redacted]

# Exhibit 27

**Excerpt of the First Part of Craig Donais' Interview with Manchester NH Police (Unofficial Transcript) Showing Disclosure of Attorney-Client Information To The Police**
**Date: June 18, 2019**

Detective: So, it's now it is Tuesday, June 18th. It is a, 20 after 3pm.

Craig: K.

Detective: Uh, so we'll just make sure…

Detective: 10-13-1970. Is that your date of birth?

Craig: That's my birthday. Yes.

Detective: Okay, great. So you still live at 39 Buzzell Street?

Craig: I do

Detective: Okay. Awesome. All right. So, it looks like you probably, well, you might have additional documents, in addition to that letter that you uploaded to, I think, in that email that you sent to Nate…Nathan Linstad.

Craig: I brought a few packages. Yes. Yep.

Detective: So, he's our liaison for the crime line board.

Craig: Yeah. So, yeah, been on there, I don't know, five or six years.

Detective: And so, you're…just…so again, you do civil litigation.

Craig: I'm a civil attorney. Yeah.

Detective: Okay. Donais Law Group. Right?

Craig: Donais Law Offices.

Detective: Yeah.

Craig: I'm right over, across from the Valley Street Jail.

Detective: Okay. Sorry. Did you do any criminal work?

Craig: I try to avoid it. Yeah.
Detective: So, so occasional defense or… you have in the past?

Craig: I had in the past, it's usually been a business client. That's had a misdemeanor and play it out kind of a thing.

Detective: Ahh. Yeah.

Craig: Or I've had some things where I actually had a client who showed up at my doorstep on a Monday morning at 8:30 and was supposed to check himself in because he hadn't paid a debt. So that's kind of the extent of where I go with the criminal stuff, but...

Detective: Okay. All right. So yeah, I guess if you just want to give you a little background on where this whole.

Craig: Sure. So I guess for some background on this is that I put together an affidavit that I did back in March of 2017, that kind of goes through the timeline and the chronology of what transpired in this case. I brought along today some, uh, phone records that I have from my system…or had, from the system that I had…at that point, the provider that I have has changed their platform. So what I've got is the PDFs that I created back in 2017, because in 2017, based on how things went down with this potential client, I anticipated that at some point something was going to blow up.

Detective: Mm hmm

Craig: Um, essentially what happened is I was contacted by a colleague attorney who, uh, had a potential referral to me cause he does bankruptcy law and doesn't do a broader range of civil things. I do. He asked if I was interested in the case, he told me a couple of small details of the case. I said, I'm not interested.

Detective: Okay.

Craig: And he said, well, can I pass on your name to the person and explain why you're not interested? I said, I really have no interest in doing that because if I'm not taking the case, I don't really want to talk with the person who does potentially create a conflict and a situation for me. So I'm better off if I don't. He said fine, no problem. In hindsight, he had already given my contact info apparently to that person.

Detective: Okay.

Craig: And that person reached out to me. Um, they left a voicemail for me on my answering system at work on a Friday afternoon. It was unclear based on the quick voicemail that left, it was a male who had contacted me, left a voicemail and said, hi, I'm calling about a real estate matter. Can you call me back? He left his number. I didn't think anything of it. I called him back the following Monday morning. And he said, I've got an issue, real estate issue that involves a hotel and a discrimination and, uh, overcharge. And I said, did you get my name and number from so and so, and he said, yes. And I said, I have no interest in your case.

Detective: Okay.

Craig: So we spent about seven minutes, just under seven minutes total on the phone between me calling him back, him telling me the quick story and the like, to try to get off.

Detective: Okay.

Craig: I've tried to document all of that and I'll leave a copy of it, but that's the context in the background. So, yeah.

Detective: And was there a particular, like, is it not your specialty or what was the nature of you…not?

Craig:  Why was I not interested?

Detective: Yeah, of you don't mind me asking.

Craig: There were a couple of reasons. Sure. There were a couple of reasons. The first was, um, as described to me by the referring attorney, um, it involved, I guess, a lease with a hotel, which logically makes no sense to me as an attorney. So yeah, I'm really not all that warm and fuzzy on the legal concept that they're trying to pursue. The second thing is that this was a, an alleged discrimination kind of a claim. Um, apparently the, the individual was a minority based on what the attorney had told me.

Detective: Yeah.

Craig: And the third is that there was like a consumer protection. (04:18): I had been overcharged, they were trying to change the rate. It was something vague like that. And I, between the topic of the case…

Detective: Yeah.

Craig: ….between the timeline of the things that I was doing, and I also have some clients that operate in the hotel space.

Detective: Okay.

Craig: So I, the combination of all of those things, really wasn't interested in the case.

Detective: Ahh. {Okay}

Craig: Um, so I just…um…

Detective: Yeah…that makes sense. It doesn't sound like it's a, you know, sounds, I don't know, frivolous, but…

Craig: Right. And that was my sense in terms of the nature of the case. Um, so that's why I kind of declined the representation. This blew up because my client contacted me and said, can I represent, can you represent us as local counsel on a case we have? I had spoken with the gentlemen, a lawsuit was filed. The lawsuit that was filed was brought by a woman who had a different name than the gentleman who called me, low and behold, after the fact, find out that that's husband and wife.

Detective: Okay.

Craig: So, I show up to my hearing and behalf of my client, they balk and say, wait a minute, you spoke with him and he's the husband of the plaintiff. And you're now representing the defendant. And for prudence reasons, I decided to get out of the case…because if they're already giving me that much of a hard time after a very brief phone call, it was not worth me staying in the case.

Detective: Um, so you had, I'm sorry. So after that call, when you said you weren't interested.

Craig: Yes.

Detective: Um, how did the, how did you end up going to a hearing about…?

Craig: So, my client who actually, um, was the, the company that was operating the hotel in Nashua, contacted me. So in terms of the, kind of…

Detective: Is that just a coincidence? They happened to be the same hotel that was involved, or?

Craig: Yeaaaah…. It's either a coincidence or it was a deliberate effort on their part to contact me, to try to create this conflict scenario.

Detective: Okay. Oh, I see.

Craig: I, I don't know whether it was deliberate intent kind of a thing on their behalf or whether it was just pure coincidence that they did.

Detective: Yeah.

Craig: Um, that being said, I don't get a lot of conflicts being a small law office that I have.

Detective: Right.

Craig: That being said, I have had probably in 20 years, five or six discrete client prospects who have contacted me to represent them when I've already represented the other party or I've been involved in a collateral issue that prevents me from continuing to work for them, because then I'd have to be kind of undoing what I did for someone else.

Detective: Yeah.

Craig: So battery line fight with this neighbor and then have something with the other neighbor. And so I've had to back out of this, it's a rare thing. It does happen. Um…So, I brought with me some phone records, uh, that I have for my system. And there were…the way the system is set up, and I can show you this. So this one right here is the received calls page. So these are calls that come into my office. And so this phone number right here to the 781, that was the phone number that they called me from…

Detective: 781-492?

Craig: Yeah.

Detective: Okay.

Craig: So that was the phone number that had been called. I didn't realize it. I put in my affidavit is that after I realized that there was this whole entire issue, I was trying to figure out when exactly it was that they called me. Uh, this 6th was the Friday night. I think it is. Yes.

Detective: Okay.

Craig: So this, the 5th right here, when they made that phone call, that was, um, just a quick phone call to the office, I guess it was 7 seconds. And then they hung up and then he called back the next night, Friday afternoon at, it looks like 5:16pm. So I got a voicemail that he left a message for a minute 37.

Craig: And that minute 37 included calling all of the time from when he got to my phone system and the phone tree picked up and said, hi, you've reached Donais law. If you want Craig, press this. If you had listened to my particular message and then leave me a message. So that's why his time on that represent. So a minute 37 seconds.

Detective: Alright.

Craig: So the next morning on the Monday, when I get back to the office and it was listening through the voicemail, um, I gave him a call back at 10:43am, and you can see that on this right here. And this is the sent calls at the outgoing. So the 10:43, I called him back at that number. I spoke with him for a total of six minutes and 56 seconds.

Detective: Okay.

Craig: And then I don't think this matters, but this is when my client actually contacted me to represent them about this existing case.

Detective: And what was the date on that?

Craig: My client contacted me on June 11th after the lawsuit was filed.

Detective: June 11th of 2017?

Craig: I'm sorry, January 11th of 2017.

Detective: January?

Craig: January 11th, 1-11-17.

Detective: All right. So a couple of days later?

Craig: A couple of days later.

Detective: Can you say what hotel it was or?

Craig: Uh, it was…uh…down in Nashua…the, uh…

Detective: Can you identify it?...

Craig: Yeah…the Residence Inn…the Residence Inn, in Nashua. Um, one of the, part of the Hilton group, just kind of behind the Sheraton Tara…up in that area.

Detective: Okay.

Craig: So there's a whole entire issue that is collateral to this, that they filed a complaint against me at the attorney disciplinary office with that letter.

Detective: Right, which is where you got that letter…

Craig: …which is where the letter came from.
Um, I don't really want to get specifically into all the details of what they're claiming…

Detective: Yeah.

Craig: …but the basis of it is they gave me critical information that caused them to lose the case,

Detective: Okay.

Craig: …which, I suggest that's not the case, based on the amount of time that I spent on the phone. Um, based on the affidavit that I put together in March of '17, cause it was an issue after I got out of the case and then they tried to disqualify the successor counsel. And so I put the affidavit together at their request in terms of what information was relayed with me and what I'd shared with whoever had...

Detective: At whose request? The request of…ahh?

Craig: The replacement attorney. After I got out…

Detective: So, you got out of that hotel.

Craig: I got out of that case.

Detective: Altogether?

Craig: Altogether. So what happened is we, we have the appearance. I filed my appearance in the case. I showed up for the hearing.

Detective: Yeah.

Craig: Their attorney balked at the hearing and said, Hey, here's a problem. He spoke with the husband. I said, I have no idea what you're talking about because when I looked at the suit, he's not listed by name, period. And when we do a conflict check, we look at the lawsuit, we look at who's the plaintiff we look at who's the defendant. Uh, she did say in her suit, husband.

Detective: Right.

Craig: But didn't name him. When I spoke with him, he told me that he had this potential issue. Didn't tell his wife's name, and the names are different. So there's no way I would have known at that point.

Detective: Yeah.

Craig: But they balked at it and said, you need to get out. And the judge at this point kind of went, do you really need to be here? I concluded. It didn't make sense because if they're giving me that much of a hard time, then, I had a feeling this kind of thing was going to come, and it did. Um…

Detective: Okay. So then you prepared an affidavit to provide to the attorney taking over on the attorney, taking over in the case?

Craig: The attorney taking over. Yeah. Correct. Um, and then where it gets filed. And at this point there were multiple lawsuits cause they had filed a landlord tenant case down in Nashua, and then they had filed an injunction with the superior court or something to try to get the Superior court, to order the circuit court to not…it got really convoluted, really fast. Um…

………

Detective:  Can I make copies of…?

Craig:  Any of this stuff you would like.

Detective:  Okay, great.

Craig:  If you want, I'll leave these with you.

Detective:  Okay. Yeah. If that works

Craig:  That's fine. Yeah.

Detective: This will help for any, uh, any questions probably that I had in regards to your recollection of the conversation with him. Um, and we already have the date and time exactly. Because you gave me the phone records. And did he, when you spoke with him, he identified himself? Is that how you got his name? Do you know? Or do you have it from like just paperwork from the complaint?

Craig: From the name?

Detective: Yeah. Like when you, when you guys spoke that a couple of years ago or whatever did, um, did he identify himself over the phone?

Craig:  I…um…

Detective:  He said like, I'm Andre BIS…

Craig: He had like a….I put in the affidavit when I wrote it that he left kind of this mumbly rambling message. He was a little hard to understand. He had a little bit of a, an accent with it. And I couldn't tell whether it was a, a Southern accent, a foreign accent. It was just not a, it was not a new England accent. We'll just say that…he was a bit mumbling. And I think I'm putting the affidavit that his last name sounded like bedsore.

Detective: Okay.

Craig: I later found out it's Bisasor. Uh, but I think just the, the way he pronounced it quick and listening to the recording.

Detective: Yeah.

Craig: Um, so it was just, uh, call me back. I've got a real estate matter. I want to discuss, I called him back. He briefly told me that hotel discrimination charges. Then inquired, who you got, did you get my name from Rob O'Brien? He said, yes. I said, I'm not interested. And he said, well, Rob told me you were interested. I said, that's not true. I'm not interested. And then went through this whole thing. Well, I understand you do real estate. And I said, I do, well, why don't you take my case? I'm not interested in your case. This was kind of the way that the whole thing played out

Detective: …And then, I'm just thinking of thing. And so, then you guys had that hearing when you went to represent the hotel. Yeah. And after that, you, you thought, I mean, you provided this affidavit to the new attorney, but you thought it was over.

Craig: I, I figured at this point for purposes of the litigation, the lawsuit, I filed an appearance. I went to a hearing, they balked about my participation in the hearing I withdrew from the case. And so I literally went to court one day. Um, and we had no substantive issues that were presented. There was no factual information was presented. Um, we spent candidly most of the time in, uh, the ante room chambers, outside the courtroom doing some shuttle diplomacy back and forth.

Detective: And there was no. Um, but like, you didn't even know about the complaint that they were complaining to?

Craig: When they fought, when they contacted me? They were looking to have it..

Detective: No, no. I mean, um, after you, like you said, in April, 2019, you got this paperwork.

Craig: Correct.

Detective: But before, so in the interim between like after giving us, you know, turning it over the case to the other lawyer and everything, did you, did you know that they were filing something with the, um, the attorney discipline?

Craig: I guess I anticipated that they would likely do so because they told the court in March of 2017.

Detective: Okay.

Craig: That they were still aggrieved. The entirety of this case was they were aggrieved by my egregious misconduct. And they gave me critical information that went to their detriment and caused them to lose their case. And as a result, they were going to be filing a disciplinary complaint against me.

Detective: Okay. It was just said, verbally that they were going to be…

Craig: Well, they put it in a pleading that they filed with the court.
Okay. So the successor attorney had put me on notice that they had made that representation. Based on how difficult they were, I, I was hoping it was done, but kind of said, okay, this stuff is fresh in my head. I'm going to put together

the, the phone records that I have, I did a screen capture of my phone call that I had with the attorney who had referred or potentially referred the case to me. So I would have that and not be scrambling in 2019 disabled. Where's my phone record of the phone call I had. So I was able to pull up the contact that showed that phone call right on the screen, that phone screen. So I just kind of assembled that bundle, put it in an envelope. And…

Detective: Do you know, do you know who that attorney is? Did you give me his name?

Craig: Rob O'Brien.

Detective: It's Robert, what?

Craig: Robert O'Brien?

Detective: Right. Okay.

Craig: And if you want, I'll give you his phone number.

Detective: Sure. Is it, O apostrophe?

Craig: O B R I E N.

Detective: Okay. There's no apostrophe?

Craig: Yeah, there is.

……......

# Exhibit 28

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFF'S MOTION TO SUBMIT AUDIO EVIDENCE AND FOR IN-CAMERA HEARING**

1. Plaintiff Andre Bisasor moves this Court to allow submission of critical audio evidence and to conduct an in-camera hearing to review said evidence, that establishes material facts central to multiple claims in this action.

## I. INTRODUCTION

2. This motion addresses the submission of audio recordings that help to establish plaintiff's claims.
3. The audio evidence demonstrates that Donais has lied about material facts and contradicts Donais's sworn statements, and establishes a pattern of deception regarding statements made pertaining to the attorney-client relationship.
4. This evidence is also necessary to refute the extraneous material attached to Donais' 151 page motion to dismiss the amended complaint including his 2017 affidavit (which establishes impeachment on a baseline level), among other things, as well as to show pattern of dishonesty that extends well into 2019 and 2020 and to unauthorized third parties far removed from any judicial proceeding context.
5. Donais cannot attach his sworn statements to his motion to dismiss and not expect them to be subject to impeachment in the plaintiff's responses and defense against dismissal.
6. It is further needed to support plaintiff's motion for partial summary judgment.

## II. PROCEDURAL DILEMMA AND NEED FOR COURT GUIDANCE

7. Plaintiff faces a significant procedural challenge in that he needs to submit audio evidence but the court's e-filing system cannot accommodate audio file uploads. Plaintiff does not know how to submit this audio evidence as it cannot be uploaded via e-filing system, nor does plaintiff know how to file it otherwise or in what form. Note: This also needs to be protected as will be outlined further below.
8. Because the rules of the court do not address these issues, the plaintiff needs a clear procedure to submit this audio evidence and now asks that the court provide instruction and allowance of submission of this audio evidence as exhibit to counter, rebut, impeach the defendant's motion to dismiss and the attachments thereto.

## III. LEGAL FOUNDATION FOR AUDIO EVIDENCE SUBMISSION

9. Under New Hampshire Rules of Evidence 901, authentication of voice recordings requires showing that the recording accurately reproduces what it purports to record. Here, plaintiff can authenticate the recordings through personal knowledge, voice identification, and/or circumstantial evidence confirming accuracy.

10. The recordings are admissible as non-hearsay evidence because they are offered to prove the falsity of Donais' statements rather than for their truth.

**IV. NECESSITY FOR IN-CAMERA HEARING**

11. An in-camera hearing is necessary because the recordings contain both admissible evidence and potentially privileged communications.

12. New Hampshire courts have authority to conduct in-camera review of materials containing privileged information. In Petition of State of New Hampshire, 2016 WL 1273982 (N.H. 2016), the New Hampshire Supreme Court recognized trial courts' authority to review evidence in camera when privilege issues are present, though noting procedural requirements must be followed.

13. The in-camera procedure serves multiple purposes: it protects privilege (if/where/when applicable); allows the Court to assess the admissibility and/or probative value of the evidence; and ensures fair adjudication while maintaining confidentiality protections (if/when/where applicable).

**V. SUBSTANTIAL NEED AND UNAVAILABILITY OF ALTERNATIVE EVIDENCE**

14. This audio evidence is uniquely probative because it directly contradicts Donais's sworn statements, and other statements, thus impeaching him. No alternative evidence can demonstrate with equal force that Donais has consistently lied about material facts.

15. This evidence is also crucial to proving intent and knowledge elements of plaintiff's claims.

**VII. CONCLUSION**

16. The audio evidence at issue proves material facts central to this litigation and exposes Donais's pattern of deception. An in-camera hearing is necessary to protect legitimate privilege while ensuring this crucial evidence receives proper consideration.

17. The Court's guidance on submission procedures will facilitate fair adjudication while maintaining appropriate confidentiality protections. Plaintiff respectfully submits that justice requires examination of this evidence, and the proposed procedures provide a framework for doing so consistent with New Hampshire law and procedural requirements.

18. WHEREFORE, plaintiff respectfully requests that this Court:

    a) Allow submission of audio evidence through procedures necessary thereto.

    b) Schedule an in-camera hearing to review the recordings, determine admissibility and privilege protection;

c) Grant such other relief as the Court deems just and proper.

Respectfully submitted,
/s/ Andre Bisasor
ANDRE BISASOR

Date: September 26, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

# Exhibit 29

# RE: A Few Questions for Clarification

From: Mark Cornell (mcornell@nhattyreg.org)

To: quickquantum@aol.com; kcleveland@nhattyreg.org

Cc: rhilliard@uptonhatfield.com; liberty_6@msn.com

Date: Tuesday, September 29, 2020 at 04:35 PM EDT

Mr. Bisasor,

This e-mail is to address your questions 4-6, from your e-mail of September 28, 2020, at 5:08 (below).

First, in question 4, you wanted to speak to Brian regarding something unrelated to the matters I am currently assigned to handle. Brian has instructed me to deal with all matters involving you, Ms. Anderson, or Mr. Donais. There is a reason he has made this decision and I ask that you accept it.

My general takeaway from these questions is you are concerned that Mr. Hilliard and you are being treated differently. I want to address why that is. I understand you may disagree with what I am going to tell you, but please keep an open mind until the end of this e-mail.

1. Ms. Anderson, as a grievant and complainant is not a party to any Attorney Discipline Office matter. Our rules explicitly state this. See Rule 37A(I)(j) ("Status of Complainants. Complainants are not parties to informal or formal disciplinary proceedings. Complainants lack standing to file pleadings or object to motions or recommendations of disposition of disciplinary matters.)

2. The purpose of the Attorney Discipline System is to protect the public, not vindicate private rights. *See* Rule 37A(I)(e) - https://www.courts.state.nh.us/rules/scr/scr-37a.htm, *see also* Rule 37(19) limiting monetary sanctions to the ADO. - https://www.courts.state.nh.us/rules/scr/scr-37.htm. *See also Petition of Sanjeev Lath*, https://caselaw.findlaw.com/nh-supreme-court/1776457.html.

3. In order to have a due process right, a person must have a life, liberty or property interest which is subject to being impaired by the State. U.S. Const. 14th Amendment.

4. There is obviously no "life" interest involved in the ADO process.

5. As Ms. Anderson is not a "Party" and the ADO cannot vindicate any private rights of Ms. Anderson, there is no "property" interest at stake for her.

6. Ms. Anderson also does not have a "liberty" interest at stake in this matter either as the end result of the ADO process (no matter what it is) will not directly impact her in a manner that is recognized by the Courts as a "liberty" interest. Whether Mr. Donais is disbarred or absolved of wrong doing will have no direct impact on her ability to enjoy those privileges recognized as essential to the orderly pursuit of happiness by free people.

7. To the extent Mr. Donais made statements that falsely accused you of "playing the race card" (please forgive my inartful phrasing), that is a reputational harm. Reputational harms generally are not "liberty" interests, even when the reputational harm is caused by the government. *See e.g. Paul v. Davis* https://www.law.cornell.edu/supremecourt/text/424/693 and *Siegert v. Gilley* https://www.law.cornell.edu/supremecourt/text/500/226. In this case, the reputational harm was caused by a private citizen and the governmental action (via the ADO) is not intended to protect the reputational interests of the complainants.

8. Further undermining a claim of having a protected property or liberty interest in the outcome of the ADO matter is Ms. Anderson's ability to pursue a civil remedy against Ms. Donais.

# ATTACHMENT 4

## Exhibits to Plfs Partial MSJ on Breach-Part 2

Filed
File Date: 10/8/2025 9:17 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

# EXHIBITS

**FOR**

# PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM

**Filed for Plaintffs**

**Dated: October 6, 2025**

**[PART 2 OF 2][1]**

[1] The Exhibits had to be broken into parts because of file size limitations that prevented the upload of one combined document via the e-filing system.

# EXHIBIT LIST/TABLE OF CONTENTS FOR MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY [PART 2]


1. Exhibit 30 – Excerpt of Transcript of Hearing with Judge Christopher Barry-Smith citing credibility of "Jussie Smollett" analogy supporting harm from alleging racial hoax defamation.
2. Exhibit 31 – Letter from Connecticut Bar Counsel via Connecticut Superior Court Judge Regarding Donais' Misconduct | Excerpt of Finding by Connecticut Judge Regarding Donais' Misconduct.
3. Exhibit 32 – Donais' Withdrawal of Connecticut Law License.
4. Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest.
5. Exhibit 34 – Full Official Transcript of the District Court Hearing with Judge Paul Moore on 1-18-17.
6. Exhibit 35 – Relevant excerpt of transcript of Karl Terrell's Testimony in 4-27-17 in preliminary injunction hearing in superior court.

# Exhibit 30

Volume: I
Pages: 1-24
Exhibits: 0

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX COUNTY SUPERIOR COURT

* * * * * * * * * * * * * * * * *

ANDRE BISSASOR

v. Docket No. 2081CV00087

CRAIG DONAIS

* * * * * * * * * * * * * * * * *

HEARING

BEFORE THE HONORABLE CHRISTOPHER K. BARRY-SMITH

APPEARANCES:

For the Plaintiff:
Pro Se

BY: PRO SE

For the Defendants:
Pro Se

BY: PRO SE

Woburn, Massachusetts
Courtroom via Zoom
November 13, 2020

Sherri L. Breach
Approved Court Transcriber

undermined the case. It undermined the ability to settle the matter with the underlying defendants in that case.

And I should also point out that that case ended up resulting later on, after much back and forth and after much litigation, ended up in a situation where the value of the case was determined to be in the six figures. And I can't go into detail right now about that because it does involve a settlement negotiation situation, which has been stalled and whatnot. But the bottom line is that the case has not been resolved, and the impact and the interference by the defendant in that matter has, you know, interfered with that proceeding, that litigation, and those claims who the defendant represented at one point and then no longer represented them.

And I should be clear that when he no longer represented them, that is when the majority of the wrongful acts or the torts took place.

So the bottom line, Your Honor, is that the -- you know, I want to point out, too, Your Honor, that surrounding the issue of racial -- race-based perjury, which is what I've articulated in the pleadings, Your Honor, it's almost as if he would compare it to the well-known example of the Jussie Smollett false claim of racism and the false attack that occurred in Chicago. That subjected Mr. Smollett to tremendous despise and contempt in the community because

there was the perception of a frivolous false claim of an accusation of racism.

And I use that as an example in my pleadings, Your Honor, that Mr. Donais has falsely accused me of accusing him of racial discrimination in a frivolous manner; that there would be no conceivable way in which my accusation against him that he was racially discriminating against me at the relevant time in question, there would be no way for it to be valid. There would be no way for it to make sense. It suggests that I'm a crazed --

THE COURT: All right. Let me interrupt. Let me interrupt for a second. Let me interrupt because you're getting into the merits now, which I'm not really going to do.

MR. BISSASOR: Oh, I'm sorry.

THE COURT: -- And I just -- I think your example --

MR. BISSASOR: Oh, okay.

THE COURT: -- is a good one about false racism claims being covered widely in a particular city or, state or country that thereby hurts someone's reputation.

One of the questions on my mind here is that we don't seem to be dealing with a broad circulation of allegedly false acts. It's an affidavit in a court proceeding and I don't have any information that it was publicized broadly. So since we're talking about reputation and emotional harm,

Case 1:25-cv-00251-SE Document 147-1 Filed 01/12/26 Page 5 of 95

# Exhibit 31

**STATE OF CONNECTICUT**
**JUDICIAL BRANCH**

**COURT OPERATIONS DIVISION**

**OFFICE OF CHIEF DISCIPLINARY COUNSEL**
Desi Imetovski, *Assistant Chief Disciplinary Counsel*

*100 Washington Street*
*Hartford, Connecticut 06106*
*(860) 706-5055 Fax (860) 706-5063*
*E-mail: Desi.Imetovski@jud.ct.gov*

January 15, 2016

New Hampshire Supreme Court
Attorney Discipline Office
ATTN: Janet DeVito, Esquire
4 Chenelle Drive, Suite 102
Concord, New Hampshire 03301

RE: Referral of Attorney Craig Donais

Dear Attorney DeVito:

As per our conversation in connection with the New Hampshire attorney referenced above, please find a copy of the Memorandum of Decision as well as a transcript of the proceedings dated October 5, 2015 regarding Attorney Craig Donais. These documents are being provided for further investigation by your office of probable attorney misconduct which occurred in Connecticut. Do not hesitate to contact my office with any questions or if additional information is needed.

Thank you in advance for your attention to this matter.

Very truly yours,

Desi Imetovski

Enclosures:/as listed

cc: Hon. Sheila A. Ozalis (without enc.)

**Excerpt from Connecticut Superior Court Judge's ruling**

**(in *Golf Ridge Micro Cap LLC v Aftokinoto Properties Inc.*, Superior Court Judicial District Danbury, December 18, 2015 Memorandum of Decision, Case# DBD-CV-13-6011692S)**

George, advised the court, that shortly before Mr. West's affidavit was filed in this action, he and defendant's New Hampshire counsel, Attorney Craig Donais, had communicated. Attorney George represented that he told Attorney Donais that Mr. West was contemplating filing an affidavit in this action and Attorney Donais had told him "your client will be sorry if he goes to testify today." (10/5/15 Tr. pp. 9-10). Attorney George then represented that Mr. West did supply an affidavit and a few months later Mr. West was sued by the defendant Aftokinito in New Hampshire in August 2015. (10/5/15 Tr. p.10.) Attorney George also advised the court that Attorney Donais had explicitly offered to Mr. West's New Hampshire attorney at the very first hearing in the New Hampshire case in September 2015, that if "Mr. West does not go down to testify in Connecticut, we'll drop the lawsuit in Rockingham County." (10/5/15 Tr p. 11.) Attorney George was deeply concerned by the statements made by New Hampshire counsel.

The court made an inquiry as to whether New Hampshire counsel, Attorney Donais, was sitting in the courtroom observing this proceeding, and defendant's Connecticut counsel, Attorney McCabe, advised the court that he was. This court ordered Attorney Donais up to the front of the courtroom to address the court and swore him in. Attorney Donais was explicitly asked if he told counsel for Mr. West "that if he did not come to testify in this proceeding, you'd drop the lawsuit against him." The following colloquy on the record followed the court's inquiry, which the court finds important to include in this decision:

The Court: "Yes. Did you tell the attorney for Mr. West that if he did not come to testify in this proceeding, the lawsuit in New Hampshire would be dropped against him?

Mr. Donais: We were exploring options, Your Honor, with his counsel in New Hampshire about the case and under New Hampshire rule of evidence 408, it was a settlement discussion with his counsel, Your Honor.

The Court: Well, I'm concerned here about intimidation of witnesses, so my question to you is; did you tell his counsel that if he did not come to this proceeding that you would drop the lawsuit?

Mr Donais: I don't believe we said that specifically, Your Honor.

The Court: What did you say generally, sir?

Mr. Donais: We – We generally said that we really didn't have an interest in pursuing Mr. West, *but if Mr. West was going to make trouble, by being involved in this proceeding, by injecting himself in a way that he did not need to* that we were going to proceed with the case in New Hampshire.

The Court: Okay. And, did you say that if he did not come into this proceeding and testify that you would drop the case?

Mr. Donais: We didn't, specifically, say we were going to drop the case." (Emphasis added. 10/5/15 Tr. pp. 13-14.)

It is clear from Attorney Donais' statements that the lawsuit in New Hampshire was brought in an effort to prevent Mr. West from providing testimony and evidence in this litigation. Attorney Donais' comments that "we really didn't have an interest in pursuing Mr. West" defies logic if defendant Aftokinito's story is to believed that it paid Mr. West $150,400 for ten classic cars that it never received. Attorney Donais' further comment that *"if Mr. West was going to make trouble, by being involved in this proceeding, by injecting himself in a way that he did not need to, then they were going to proceed with the case in New Hampshire*" against him is troubling to this court. (10/5/15 Tr. pp. 13-14.)

On October 5 and 15, 2015, this court held hearings with evidence and testimony from defendant's principal Mr. Condodemetraky, another employee of defendant and Mr. West. Mr. West testified credibly that he never prepared nor signed the Motor Vehicle Purchase Agreements for the sale of the ten classic cars, never received any payment from the defendant for any vehicles, that he had closed down the location of his business in September 2013, and all of the

# Exhibit 32

# Connecticut Law License Retirement of Donais




Back to Attorney Firm Look-up

Registered Juris Information For: **CRAIG STEPHEN DONAIS**

| | | | |
|---|---|---|---|
| Juris Number: | 414541 | Office Address: | WADLEIGH, STARR & PETERS, PLLC<br>95 MARKET ST<br><br>MANCHESTER, NH 03101<br>(603) 669-4140 |
| Current Status: | Retirement | | |
| Juris Type: | A | | |
| Admission Date: | 11/7/1997 | | |

Court History

| Action | Start Date | Reinstated Date | Action Comments |
|---|---|---|---|
| Retirement | 1/5/2017 | | |

# Exhibit 33

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 06-CV-5189 (JFB) (WDW)

---

MICHAEL FIERRO AND CHRISTINE FIERRO,

Plaintiffs,

VERSUS

THOMAS GALLUCCI AND FLORENCE GALLUCCI,

AND

VILLA POINTE LLC, JAMES NICOTRA AND ANN MARIE NICOTRA

Defendants.

---

MEMORANDUM AND ORDER
December 4, 2007

---

JOSEPH F. BIANCO, District Judge:

Plaintiffs Michael and Christine Fierro brought this action against Thomas and Florence Gallucci, Villa Pointe LLC, and James and Ann Marie Nicotra, claiming that defendants committed fraud by making false and misleading statements to the plaintiffs in order to induce plaintiffs to enter into a contract of sale for their home. Plaintiffs contend that the subsequent demolition of the home and development of the property constitute, among other things, fraud, fraudulent inducement, and breach of contract. Plaintiffs now move to disqualify defendants' counsel – namely, the law firm of Dollinger, Gonski, and Grossman (hereinafter, "the Dollinger Firm" or the "Firm") – because, according to Michael Fierro, he consulted with a member of the Dollinger Firm almost two years prior to bringing this lawsuit about the subject matter of this lawsuit. As set forth below, the motion to disqualify is granted.

## I. BACKGROUND

### A. The Amended Complaint

This case involves the plaintiffs sale of their residence at 327 Lakeview Avenue in Rockville Centre, New York (hereinafter, the "Residence"), to Thomas and Florence Gallucci (hereinafter, the "Gallucci Defendants").

According to the amended complaint, plaintiffs were introduced to the Gallucci Defendants by James and Ann-Marie Nicotra (hereinafter, the "Nicotra Defendants"), who reside immediately adjacent to the Residence. (Amended Compl. ¶ 8.) The amended complaint alleges that the Gallucci Defendants, the Nicotra Defendants, and an LLC created by the Galucci Defendants – namely, Villa Pointe LLC – "were partners in a scheme to con the Plaintiffs into selling the Galucci Defendants their Home, and to then tear it down and develop the property with new homes." (*Id.* ¶ 9.) Specifically, it is alleged that the Gallucci Defendants fraudulently concealed their intention to tear down the home and develop the property. (*Id.* ¶ 11.) Less than one week prior to the consummation of the contract of sale in August 2004, the Gallucci Defendants allegedly informed plaintiffs that they wished to have the right to purchase the home under the contract of sale transferred to the Villa Pointe LLC. (*Id.* ¶ 19.) According to the complaint, prior to the agreement to this assignment of rights to the LLC, plaintiffs asked the Gallucci Defendants whether they intended to tear down the Residence and the Gallucci Defendants denied any current intention to tear down the home. (*Id.* ¶¶ 23-24.) The complaint further alleges that, within one month after the closing on the Residence, the Gallucci Defendants had arranged for the property to be re-zoned for two homes and, shortly thereafter, had the Residence destroyed. (*Id.* ¶¶ 28-29.) Plaintiffs allege that, pursuant to a partnership with the Nicotra Defendants, the Gallucci Defendants (through the Villa Pointe LLC) built two new residences in place of the Residence which sold for approximately $1,300,000 each. (*Id.* ¶¶ 30-31.)

Plaintiffs allege, among other things, that the Gallucci Defendants and Nicotra Defendants made false and misleading statements prior to the signing of the contract of sale in order to fraudulently induce them to enter into the contract of sale for the purchase of the Residence. (*Id.* ¶¶ 35,45.) Plaintiffs contend that "had the [Plaintiffs] known about Defendants' plan to tear down their Home, and had it not been for Defendants' false and misleading statements to Plaintiffs, Plaintiffs would have never sold the Home to Gallucci Defendants, nor would they have agreed to the assignment for the contract of sale to the LLC or the waiver of the rights under the contract of sale." (*Id.* ¶ 32.)

B. Facts Regarding Disqualification Motion

According to plaintiffs, in late November/ early December of 2004, plaintiffs became aware of defendants' intentions and actions to demolish plaintiffs' former residence and develop the property. According to Michael Fierro, he then consulted with Matthew Dollinger, Esq., of the Dollinger Firm on at least two, and possibly three, occasions. (Michael Fierro Affidavit ¶ 3.) Mr. Fierro stated in his affidavit that these conversations related to potential claims pertaining to the subject matter of this action:

> The subject of my conversation with Mr. Dollinger related to potential claims for fraud against the defendants in the above-referenced lawsuit, relating to the sale of our former home. During the conversations, Mr. Dollinger and I discussed the underlying facts of the case, potential claims against the defendants, potential defenses available to the defendants, dollar amounts at risk, and

> relevant case law and other legal theories applicable to the facts in issue.

(*Id.* ¶¶ 4-5.) Mr. Fierro further contends that a fax was sent to him relating to the relevant case law pertaining to plaintiffs' claim. (*Id.* ¶ 6.) Finally, Mr. Fierro states the following: (1) "I have not consented to the Dollinger firm's representation of the defendants in this action" (*Id.* ¶ 7); and (2) "I have not consented to the disclosure of any of the contents of my conversations with any employee of the Dollinger firm nor of any confidential information concerning this case in the Dollinger firm's possession, nor have I waived the attorney-client privilege covering my conversations with the Dollinger firm and its employees" (*Id.* ¶ 8). Plaintiffs decided not to retain Mr. Dollinger and his Firm to represent them in this matter and filed this lawsuit *pro se* on September 25, 2006.

Mr. Dollinger stated in an affirmation to the Court that he has "absolutely no recollection of ever having been contacted by Michael Fierro, or anyone on behalf of the plaintiffs." (Dollinger Affirmation ¶ 5.) Mr. Dollinger further stated that he does "not recall ever speaking with Bernadette Arnold, Esq., who apparently was Mr. Fierro's real-estate attorney in connection with the transaction underlying the plaintiff's lawsuit." (*Id.*) However, at the Court's request, Mr. Dollinger searched the Firm's records to determine whether there is any documentation reflecting contact with Mr. Fierro.[1]

A search of the Firm's records revealed a record of a phone message from Mr. Fierro taken by Mr. Dollinger's Office Administrator on December 10, 2004, which suggests that Mr. Dollinger spoke with Bernadette Arnold on December 9, 2004, and that the Dollinger Firm had sent a fax to Mr. Fierro. (*Id.* ¶ 10; *see also* Attachment to Aug. 14, 2007 Letter to the Court.) A further search of telephone company records by the Firm reflects that two telephone calls were placed from the Firm to plaintiffs' telephone number in Atlanta, Georgia, one lasting 36 seconds, and another lasting ten minutes, twelve seconds. (Dollinger Affirmation ¶ 13.) Based upon these records, Mr. Dollinger concluded the following in his Affirmation: "I assume from these records that I called Michael Fierro and spoke with him for about ten minutes. But again, I have no recollection of ever having spoken to him. I kept no record of any conversation between myself, and Michael Fierro." (*Id.*) Mr. Dollinger emphasized, "I have not worked on, nor have I had any connection with this case except my appearance before Judge Bianco on August 7, 2007 to address the conflict-of-interest issue."

---

[1] The Court notes that both Mr. Dollinger and the Dollinger Firm have acted in good faith at all times in this litigation in attempting to provide to the Court any information or documentation in their possession that may be relevant to plaintiffs' motion for disqualification. Although Mr. Fierro claims that Mr. Dollinger has unnecessarily disclosed confidential communications to the Court, the Court finds the allegation to be without merit. Instead, Mr. Dollinger has been diligently acting as an officer of the Court in conducting a thorough search of the Firm's records and providing documentation to the Court that, in fact, helps Mr. Fierro's position by corroborating his contact with the Firm, which Mr. Dollinger does not independently recall. Although the phone record provides a very brief summary of the substance of Mr. Fierro's phone message, such disclosure to the Court in connection with the disqualification motion has not in any way prejudiced Mr. Fierro.

(*Id.* ¶ 17.) Instead, his partners, with the assistance of some associates, have performed all the legal work in this matter. (*Id.* ¶ 16.) Finally, Mr. Dollinger stated that the Firm did not make any record indicating either plaintiff as a potential client, did not open up a file as a result of the telephone contact, and never issued a bill in connection with any communications between Mr. Fierro and the Firm. (*Id.* ¶ 18.)

C. Procedural History

Plaintiffs acting *pro se* brought this action by a Summons and Complaint on September 25, 2006. Dollinger, Gonski, & Grossman was retained, through partner Floyd G. Grossman, Esq., to represent the defendants in this action. (Dollinger Affirmation ¶ 14.) On January 31, 2007, plaintiffs filed an amended complaint. On April 17, 2007, defendants moved to dismiss the complaint. In a letter filed July 17, 2007, Mr. Fierro notified the Court that he recently remembered that he had contacted Mr. Dollinger two years prior to bringing this lawsuit about the subject matter of this lawsuit. On September 17, 2007, plaintiffs moved to disqualify defense counsel.

## II. Discussion

A. Standard for Disqualification of Counsel

Disqualification is viewed "with disfavor in this circuit," *In re Bohack Corp.*, 607 F.2d 258, 263 (2d Cir. 1979), because it "impinges on parties' rights to employ the attorney of their choice." *U.S. Football League v. Nat'l Football League*, 605 F.Supp. 1448, 1452 (S.D.N.Y. 1985) (citation omitted). In particular, the Second Circuit has noted the "high standard of proof" required for disqualification motions because, among other things, they are "often interposed for tactical reasons, and that even when made in the best of faith, such motions inevitably cause delay." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); *accord Gov't India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

Nevertheless, the disqualification of counsel "is a matter committed to the sound discretion of the district court." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). A federal court's power to disqualify an attorney derives from its "inherent power to 'preserve the integrity of the adversary process,'" *Hempstead Video, Inc. v. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)), and "is only appropriate where allowing the representation to continue would pose a significant risk of trial taint." *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) (internal quotation marks omitted). In exercising this power, courts look for "general guidance" to the American Bar Association ("ABA") and state disciplinary rules, although the Second Circuit has emphasized that "not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc.*, 409 F.3d at 132.[2] However, "any doubt is to be resolved in favor of disqualification."

[2] The Court also notes that Civil Rule 1.5(b)(5) of the Local Rules of the U.S. District Courts for the Southern and Eastern Districts of New York binds attorneys appearing before those courts to the New York State Lawyer's Code of Professional Responsibility. Local Civ. R. 1.5(b)(5); *see, e.g., United States v. Hammad*, 846 F.2d 854, 857-58 (2d Cir.1988); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y.1990) ("[I]n this Court federal law incorporates by reference the Code of Professional Responsibility.").

*See Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975); *see also Nichols v. Vill. Voice,* 99 Misc.2d 822, 826, 417 N.Y.S.2d 415 (N.Y. 1979).

B. Grounds for Disqualification

Plaintiffs argue that the Dollinger Firm should be disqualified because, almost two years before bringing this action, plaintiff Michael Fierro had preliminary discussions with the Firm regarding his claims and potential representation in this matter. Specifically, plaintiffs contend that the Firm's continued representation of the defendants would violate New York Code of Professional Responsibility, Disciplinary Rule 4-101(B) and Disciplinary Rule 5-108.

Defendants argue that the motion to disqualify the Dollinger Firm should be denied because of the following: (1) there was never an attorney-client relationship established between the Mr. Dollinger or the Firm and Mr. Fierro; (2) there was no indication that there were any "secrets" or "confidences" discussed during the conversations between Mr. Dollinger and Mr. Fierro; and (3) even if such secrets or confidences were discussed, Mr. Dollinger has no recollection of any such conversations. Thus, defendants contend that there is no conflict of interest in continuing to represent the defendants in this lawsuit.

As set forth below, the Court concludes that plaintiffs have made a sufficient showing to warrant disqualification of the Dollinger Firm. Fierro's statement in his affidavit – that he consulted with Mr. Dollinger in late 2004 regarding the subject matter of this case, including potential claims, potential defenses, and relevant case law – is corroborated by a phone message and phone records maintained by the Firm. Thus, this preliminary discussion regarding the subject matter of this litigation fell within the umbrella of an attorney-client relationship and was privileged. This prior consultation with Mr. Fierro regarding the exact subject matter of this litigation is sufficient to warrant disqualification. Although Mr. Dollinger does not recall any client confidences revealed to him during the conversation, his failure to recall such conversations does not vitiate the otherwise clear basis for disqualification.

a. Code of Professional Responsibility Disciplinary Rules 4-101(B) and 5-108(A)

The two key provisions of the New York Code of Professional Responsibility implicated by this motion are DR 4-101(B) and DR 5-108(A). Disciplinary Rule 4-101(B) provides, in relevant part, that "a lawyer shall not knowingly: (1) Reveal a confidence or secret of a client; [or] (2) Use a confidence or secret of a client to the disadvantage of that client." (McKinney Supp. 1991).

The Disciplinary Rules define a "confidence" as "information protected by the attorney-client privilege under applicable law" and a "secret" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." DR 4-101(A) (McKinney Supp. 1991). Although DR 4-101(A) generally only applies where an attorney-client relationship is present, courts have held that an "analagous fiduciary obligation may be implied in the absence of a attorney-client relationship." *Liu v. Real Estate Inv. Group, Inc.*, 771 F. Supp. 83

(S.D.N.Y. 1991) (internal citations omitted). As the court in *Liu* noted:

> It is clear that where an attorney receives confidential information from a person, who under the circumstances has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidences irrespective of the absence of a formal attorney client relationship.

*Id.* at 86 (quoting *Nichols,* 99 Misc.2d 822, 417 N.Y.S.2d at 418); *see also Rosman v. Shapiro,* 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987); *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.,* 578 F. Supp. 1280, 1283 (D. Conn. 1984).

Disciplinary Rule 5-108 analyzes the duties owed by an attorney to a former client. Specifically, Disciplinary Rule 5-108 provides that "[a] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . .[t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client . . . ." DR 5-108 (McKinney Supp. 1991). Further, an individual lawyer's conflicts are ordinarily imputed to his firm based on the presumption that "associated attorneys share client confidences." *Hempstead Video, Inc.*, 409 F.3d at 133 (internal citations omitted); *see also* 22 N.Y.C.R.R. § 1200.27(b); *Kasis v. Teacher's Ins. and Annuity Ass'n,* 93 N.Y.2d 611, 616, 695 N.Y.S.2d 515, 717 N.E.2d 674 (N.Y.1999) ("[W]here an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are likewise precluded from such representation."). The Second Circuit has held that an attorney may be disqualified under Disciplinary Rule 5-108 if:

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video*, 409 F.3d at 133. As set forth below, under this standard, the Court finds in its discretion that disqualification is warranted because (1) plaintiffs have established that an attorney-client relationship existed as to Mr. Fierro's preliminary discussions, (2) the matters are not just "substantially related" to this litigation, but are indeed identical, and (3) it is likely that confidential and privileged information relevant to this lawsuit was shared with Mr. Dollinger during these conversations.

The first prong of this test requires an attorney-client relationship between the movant and the law firm sought to be disqualified. Although defendants point to the several factors in arguing there was no attorney client relationship – including the fact that the preliminary conversations were brief, the Dollinger Firm never opened a file related to Mr. Fierro, and the Dollinger Firm never charged any legal fees for the initial consultation – none of those factors, individually or collectively, is necessarily

dispositive in analyzing whether there was an attorney-client relationship. *See, e.g., United States v. Devery,* No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship."); *Green v. Montgomery County,* 784 F. Supp. 841, 844 (M.D. Ala. 1992) ("The mere existence of an express contract of employment, or the payment of legal fees, or the length of consultation is not determinative of whether a preliminary consultation has matured into an attorney-client relationship.").

"[C]ourts have not employed a single, well-defined test for determining whether an attorney client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *First Hawaiian Bank v. Russell & Volkening, Inc.,* 861 F. Supp. 233, 238 (S.D.N.Y. 1994); *accord Bennet Silvershein Assocs. v. Furman,* 776 F. Supp. 800, 803 (S.D.N.Y. 1981) (quoting *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.,* 578 F. Supp. at 1283); *Keoseian v. Von Kaulbach,* 707 F. Supp. 150, 152 (S.D.N.Y. 1989) (same). As the Second Circuit has stated, "[t]he key, of course, to whether an attorney/ client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." *United States v. Dennis,* 843 F.2d 652, 657 (2d Cir. 1998).

Further, whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to the attorney client privilege. *See Dennis,* 843 F.2d at 657 ("To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."); *see also Green,* 784 F. Supp. at 845 ("[T]he fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result.") (quotations and citations omitted); *Liu,* 771 F.Supp. at 86 ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."); McCormick on Evidence 6th Ed. § 88 (West Publishing Co., 2006) ( "[C]ommunications in the course of [a] preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted.").

In this instance, it is clear from Mr. Fierro's affidavit – and the corroboration contained in the phone message – that Mr. Fierro engaged Mr. Dollinger in preliminary discussions related to a legal analysis of the potential claims that could be brought in connection with the alleged fraudulent conduct by defendants during the purchase of plaintiff's Residence. Although Mr. Fierro decided not to retain Mr. Dollinger, any communication made during this preliminary consultation is protected by the duty of confidentiality and protected by the attorney-client privilege. Thus, this preliminary conversation is sufficient to establish the existence of an attorney-client relationship, even though the Dollinger Firm was not ultimately retained.

The next prong of the test requires that there be a "substantial relationship" between the issue in the pending case and those in the prior representation. "The substantial relationship test does not depend on the amount of work performed or the duration of the representation, but on the similarity of the issues in the former and current represetantions." *Arifi v. De Transport Du Cocher, Inc.,* 290 F. Supp. 2d 344, 349 (E.D.N.Y. 2003). In this case, the issues are identical. Therefore, the substantial relationship element is met.

The final requirement under the test articulated in *Hempstead Video* is that "the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client." *Hempstead Video*, 409 F.3d at 133. In finding that there was a substantial relationship between Mr. Fierro's preliminary consultation and the current litigation, a rebuttable presumption is created that Mr. Fierro imparted to Mr. Dollinger confidential information relevant to the present litigation. *See Arifi*, 290 F. Supp. 2d at 350. A party moving to disqualify opposing counsel "is not required to prove that [opposing counsel] had access to confidential information while representing the [moving party] but only that he was *likely* to have had such access." *Id.*

As noted *supra*, Mr. Ferro's statement in his affidavit that "confidences" and "secrets" were shared with Mr. Dollinger is corroborated by the Firm's records. Specifically, there are telephone records indicating that there were at least two telephone calls on December 14, 2004 between Mr. Dollinger and Mr. Fierro, one of which lasted over ten minutes. Additionally, a message left with Mr. Dollinger's assistant on that date establishes that Mr. Fierro called Mr. Dollinger, Mr. Dollinger spoke with Ms. Arnold (Mr. Fierro's real estate attorney), that a fax from Mr. Dollinger was transmitted and reviewed by Mr. Fierro, and that Mr. Fierro wanted to proceed with his claim. The message provides sufficent circumstantial evidence to conclude that it is likely that some "confidences" or "secrets" were revealed to Mr. Dollinger in order for him to evaluate the case.

Although Mr. Dollinger states that he has no recollection of any conversation with Mr. Fierro or Ms. Arnold, his failure to recall the conversation does not change the analysis. For example, in *Arifi,* the court held that the former attorney's assertion, that he could not remember any confidential information conveyed to him during the short representation of one of the defendants, did not cure the professional responsibility conflicts which were present. *Arifi,* 290 F. Supp. 2d at 350 ("While there is no reason to doubt Green's claim that he does not remember any confidential information, the Court nevertheless finds that he was likely to have had *access* to such information during the short representation."); *see also Schwed v. Gen. Elec. Co.,* 990 F. Supp. 113, 117 n.2 (N.D.N.Y. 1998) (holding in a case where attorney claimed he did not possess confidential information and did not recall any discussions regarding the case, that the third prong of the Second Circuit test was nevertheless met because there was a likelihood that attorney had access to confidential information.) This Court agress with the analysis in those cases and finds that Mr. Dollinger's lack of recollection does not negate the fact that Mr. Dollinger likely had access to "confidences" or "secrets" during

Mr. Fierro's preliminary discussions and, thus, the third prong has been met.

In sum, the Court finds that all of the requirements of the *Hempstead Video* test have been met and that disqualification is warranted.[3] In reaching this decision, the Court recognizes that the defendants have already moved to dismiss the lawsuit because they argue that it must fail as a matter of law. Defendants argue that the motion to disqualify should be held in abeyance until after the defendants' motion to dismiss is decided.[4] However, the Court believes such an approach under the circumstances presented here is ill-advised. Although that motion to dismiss is fully briefed, the Court is going to hear oral argument on that motion and believes that this disqualification issue should be resolved prior to having oral argument and addressing the motion to dismiss.[5] As the court stated in *Mitchell v. Metropolitan Life Insurance Co., Inc.*,

> Client confidences are not so inert as to limit their usefulness to defined legal disciplines or practice areas. They are fungible, and once disclosed can be applied by an experienced lawyer in ways too numerous to anticipate at this stage of the proceeding. As the Second Circuit observed, "[t]he dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical

---

[3] Plaintiffs further contend that the Firm's representation of defendants in this matter would violate Canon 9 of the Code of Professional Responsibility. Canon 9 of the Code states that "[a] lawyer should avoid even the appearance of professional impropriety." This requirement "reflects the bar's concern that some conduct which is in fact ethical may appear to the layman as unethical and thereby erode public confidence in the judicial system and the legal profession." *Liu*, 771 F. Supp. at 87 (S.D.N.Y. 1991). A motion to disqualify under Canon 9 should only be granted under circumstances in which the facts present a real risk that the trial will be tainted. *See Nyquist*, 590 F.2d at 1246; *accord United States Football League,* 605 F. Supp. at 1452. Although the Court has already concluded that disqualification is warranted under the *Hempstead Video* test, the Court also finds that disqualification is warranted under Canon 9. In the present case, defendants' counsel was consulted by the plaintiffs, but then was retained by the defendants. Such facts raise the specter that this litigation could be tainted. *See Liu,* 771 F. Supp. at 87 ("Although this is not strictly a successive representation problem because R & D simultaneously consulted with plaintiffs and [defendant] simultaneously, the second situation is not implicated here. R & D's initial involvement with parties having adverse postures in this litigation raises significant risks that the trial will be tainted or will appear to be tainted to the laymen."). For the reasons stated above, the risk of the litigation being tainted, or appearing to be tainted, is real.

[4] As a threshold matter, the Court notes that this argument is inconsistent with the position taken by counsel for the defendants at the August 7, 2007 pre-motion conference at which both sides agreed that the Court should decide the disqualification issue before addressing the motion to dismiss. In any event, as set forth *infra*, the Court declines to follow the approach suggested by the defendants

[5] The Court also notes that, even assuming *arguendo* defendants are successful in their motion, the Court would generally provide plaintiffs with an opportunity to replead to attempt to cure any pleading defects, which could then lead to another round of motion practice.

> propriety of a lawyer's representation in a given case."

No. 01 CIV. 2112 (WHP), 2002 WL 441194, at *8 (S.D.N.Y. Mar. 21, 2002) (quoting *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973). Given the circumstances, and the fact that Mr. Dollinger's conflict is imputed to the Firm, the Court will not allow the Dollinger Firm to continue the representation even for purposes of a motion to dismiss.

C. Undue Delay

Defendants also contend that plaintiffs' delay in bringing this motion is evidence that they are using disqualification as litigation tactic and, therefore, disqualification should be barred. Defense counsel cites to *Abel v. Morabito,* No. 04 Civ. 7284 (SCR)(MDF), 2005 WL 2452906, at *1 (S.D.N.Y. Oct. 3, 2005) for the proposition that a negative inference should be drawn from delay. In *Abel*, the court had set a discovery schedule five months prior to when the motion for disqualification was filed. *Id.* At the time of the motion for disqualification, various discovery disputes were ruled on and a deposition schedule was about to be set. *Id.* However, the court in *Abel* specifically stated "[d]elay in bringing an application to disqualify counsel, whether tactical or inadvertent, cannot defeat the motion because the basis for disqualification, if it exists, would be a breach of the Code of Professional Responsibility, a matter which implicates the public interest." *Id.* at *1 (internal citations omitted). Thus, undue delay was not a factor in the court's analysis and decision to deny the motion.

In the instant case, the Court does not believe there is any basis to conclude that plaintiffs intentionally delayed bringing this motion. First, the Court has no reason to doubt Mr. Fierro's representation that he did not immediately realize that the Dollinger Firm is the same firm that he had engaged in these preliminary discussions several years ago. Moreover, Mr. Fierro has gained no tactical advantage by not raising this issue as soon as the Dollinger Firm appeared in the action. The case was filed in September 2006, discovery has not begun, and defendants have suffered no material prejudice from any alleged delay. *See, e.g., Talvy v. Am. Red Cross in Greater N.Y.,* 205 A.D.2d 143, 618 N.Y.S.2d 25 (1st Dept. 1994) (disqualification motion made three years had elapsed), *aff'd, 87* N.Y.2d 826, 661 N.E.2d 159, 637 N.Y.S.2d 687; *Potters v. 71st Street Lexington Corp.*, 8 A.D.3d 198, 779 N.Y.S.2d 473 (1st Dept. 2004) (disqualification motion made on eve of trial). Thus, the Court does not conclude there was undue delay or prejudice to the defendants from the timing of the motion. Moreover, although defendents will need to retain new counsel, that counsel will not necessarily need to duplicate the work product of the Dollinger Firm. Specifically, new counsel could adopt the motion papers already filed by the Dollinger Firm or, if necessary, the Court will allow supplemental briefing before oral argument.

III. CONCLUSION

For the foregoing reasons, plaintiffs' motion to disqualify Dollinger, Gonski and Grossman is GRANTED. Defendants will have 30 days to obtain new counsel and have that counsel file a notice of appearance in this action. Following the filing of a notice of appearance, the Court will schedule a telephone conference to discuss how it intends to proceed with respect to the motion to dismiss.

SO ORDERED.

______________________
JOSEPH F. BIANCO
United States District Judge

Dated: December 4, 2007
Central Islip, New York

* * *

The attorneys for plaintiffs pro-se are Michael & Christine Fierro, 5148 Vinings Estates Way, Mableton, GA 30126. The attorneys for defendants are Floyd G. Grossman and Michael J. Spithogiannis of Dollinger, Gonski & Grossman, One Old Country Road, Suite 102, Carle Place, NY 11514.

# Exhibit 34

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - DISTRICT DIVISION - NASHUA

| | | |
|---|---|---|
| NATALIE ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | District Division Case No. |
| | ) | 459-2017-LT-00010 |
| vs. | ) | |
| | ) | Nashua, New Hampshire |
| ADAM ROBITAILLE, | ) | January 18, 2017 |
| | ) | 1:19 p.m. |
| Defendant. | ) | |
| | ) | |
| ______________________________ | ) | |

FINAL HEARING
BEFORE THE HONORABLE PAUL MOORE
JUDGE OF THE CIRCUIT COURT - DISTRICT DIVISION

**AMENDED AMENDED**

APPEARANCES:

For the Plaintiff: Elliott Berry, Esq.
NEW HAMPSHIRE LEGAL ASSISTANCE
1850 Elm Street, Suite 7
Manchester, NH 03104

For the Defendant: Craig Donais, Esq.
DONAIS LAW OFFICES, PLLC
444 Willow Street
Manchester, NH 03103

Also Present: Karl Terrell, Esq.

Audio Operator: Electronically Recorded
**Not Monitored**

TRANSCRIPTION COMPANY: AVTranz, an eScribers Company
7227 N. 16th Street, Suite 207
Phoenix, AZ 85020
(800) 257-0885
www.avtranz.com

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.

(Proceedings commence at 1:19 p.m.)

(Indiscernibles due to majority of hearing spent at sidebar and lots of shuffling of papers)

THE CLERK: Natalie Anderson versus Adam Robitaille.

THE COURT: Good morning. I have docket number 2017-LT-10.

MR. TERRELL: Here for Robitaille and Nashua the Homewood Suites. Mr. Berry, is he in the hall?

MR. DONAIS: He's coming in. I just went and grabbed him.

THE COURT: Okay, counsel, if I could have counsel for the record just identify yourself please.

MR. DONAIS: Sure, I'm Craig Donais, Your Honor, here as local counsel for Attorney Terrell who filed a motion that's granted by the Court pro hac vice.

THE COURT: All right. Thank you.

MR. TERRELL: Karl Terrell, admitted pro hac vice, Your Honor.

THE COURT: Thank you, counsel.

MR. BERRY: Elliott Berry, New Hampshire Legal Assistance for the Plaintiff.

THE COURT: Thank you, counsel. Ma'am, you are?

MS. ANDERSON: Natalie Anderson, Plaintiff.

THE COURT: Thank you, ma'am.

MR. BISASOR: Andre Bisasor. I'm --

MR. BERRY: Plaintiff's husband.

THE COURT: Oh, okay, that's fine. Thank you, sir.

MR. ROBITAILLE: Adam Robitaille, Defendant.

THE COURT: Thank you, sir.

MR. AKRIDGE: David Akridge.

THE COURT: Great. Thank you, sir. Okay. Now, I had an opportunity to review the parties' case file and we're here for a final hearing. Now, have the parties had an opportunity to discuss this matter?

MR. TERRELL: We have, Your Honor.

THE COURT: Any movement?

MR. TERRELL: We proposed two forms of settlement but Mr. Berry informed me a few minutes ago that there's no go.

THE COURT: Well, that's fine. I just wanted to know whether or not you've had an opportunity because if you didn't have an opportunity and you needed some time, I'd give you that time today, that's all.

MR. TERRELL: Thanks, Judge.

THE COURT: All right.

MR. BERRY: Your Honor, as a preliminary matter --

THE COURT: Yes.

MR. BERRY: -- if you looked at the file, then you know there was a pleading yesterday, a motion to dismiss on exhibits of over 60 pages dated yesterday which my client got yesterday, which I only got yesterday.

THE COURT: I have that today.

MR. BERRY: And that's one reason we would move that the case be continued at least for a reasonably short time to respond to a pleading like that.

THE COURT: Right.

MR. BERRY: There is a second reason but I would prefer that we at least be able to attest that we'd be able to approach the bench to talk about a more sensitive matter.

THE COURT: Certainly. Why don't you approach, counsel.

(Sidebar begins at 1:22 p.m.)

THE COURT: There are two issues here. Counsel, there are two issues here. The first of which is going to be if you look at the circuit court rules, he had filed -- if you look in that introducing responsive pleadings. Normally, you would do it at least ten days prior.

MR. DONAIS: Didn't even have ten days notice prior to this hearing today.

THE COURT: How many days notice did you get?

MR. DONAIS: The suit I think was the 9th probably.

MR. TERRELL: Tuesday. The 9th, it was filed on the 9th and I think we received it on the 9th.

THE COURT: Okay. The point being is that in a perfect world, you've got -- you would have received notice greater than ten days and given the opportunity to submit it

and at least ten days prior give the other party an opportunity to review and make an informative decision as to how they ought to address that.

Chances are -- this is a 540 so the reason that you received notice so quickly, you know, the 540-A, we're required to schedule these within a set period of time. That's why.

MR. DONAIS: Sure.

THE COURT: So that's a separate issue. We'll deal with your request in a second, counsel.

MR. BERRY: Sure.

THE COURT: Now, I don't think you drafted these initial pleadings.

MR. BERRY: I did not.

THE COURT: In going through the initial pleadings, the majority of what's in here has nothing to do with the 540 or 540-A. It's a contract issue. I mean --

MR. BERRY: No, I get that. And look at the end of the day, it's really about the nature of this facility, right, if it's a more like a tenancy than a guest arrangement, then they have to give and to go through the eviction process. If it's not, they don't.

But what seems like a simple question doesn't have a simple answer. And I know that's why in part Defendants would like to have a big chunk of time to make their case, which they're more than entitled to. But I think we need a little

more time to rebut that.

MR. TERRELL: The issue though is very narrow. It's rather well, do they have the rights of tenancy or are they a hotel guest which we have addressed in our pleading.

THE COURT: Right. And these matters normally, unless you file a specific request for additional time, you're allotted 30 minutes.

MR. TERRELL: Thirty minutes.

THE COURT: Right. And that's both parties.

MR. TERRELL: Uh-huh.

THE COURT: So that's something -- I don't know if it's something I'll be able to do. Now, when I finish our landlord-tenant list today, we're backed up in court and I -- so I'll be setting more probable cause hearings, we can do this afternoon and then I also have a daily supposed to be coming in. The reason I mention that is I don't -- normally I just had landlord-tenant today. We had nothing else coming over. I'd say it's not a big deal, I'll put you on last and I can give you the rest of the afternoon so I can give you an hour, hour and a half. I don't have that today. All right.

So the problem is if you're looking at anything more than 30 minutes, I don't have that time.

MR. TERRELL: How about tomorrow, Your Honor?

THE COURT: You know what the schedule is?

MR. TERRELL: I flew up here from Atlanta. I'm happy

to stay over tomorrow.

THE COURT: Certainly.

MR. TERRELL: Would prefer not to go beyond that if possible.

THE COURT: No, I understand. So counsel, while the clerk's looking at it, so why is this a tenancy matter?

MR. BERRY: Your Honor, first and foremost, but not exclusively, because they have been there for as now almost 14 months. They have a discrete room that looks and feels like an apartment. They made they feel the commitment to be there that long and believe that, you know, there was a reciprocal commitment.

So I think our case law, there's a very important case called Evans versus J Four Realty and Evans clearly recognizes that even within the 540-A -- the 540 exceptions to tenancy which includes hotels, motels, and tourist homes and others for recreational and vacation uses, that even within a facility like that, you can't have a tenancy based on the particular circumstances of that case. So --

THE COURT: Okay. The reason I was asking is I was going through -- granted, we took this granted -- this came in, I haven't had a chance to go through as yet.

MR. TERRELL: I'm not surprised.

MR. DONAIS: I know it's a --

THE COURT: So but going through what was filed

originally, I can see what the tenants are trying to do in the sense that they were utilizing the statute and basically like you said, you know, walks like a duck and quacks like a duck and talks like one, it's a duck. And that's not very eloquent, but --

MR. TERRELL: I've used it myself.

THE COURT: And that's why it's really a tenancy, but I'm not convinced. Now granted, I haven't taken a look at the rest of the paperwork and but when I say that, please don't misunderstand. I'm not predisposed.

MR. BERRY: I understand.

THE COURT: What I'm saying is based upon the pleadings filed. Now, I am assuming that if you filed these pleadings, I wouldn't be having that issue, right, because the promises are what -- you have to see the forest through the trees. There's a ton of issues here that really --

MR. BERRY: And I've made very clear to my client that the other issues will not be dependent on this Court.

THE COURT: Right.

MR. BERRY: I wonder if we could do it this way.

THE COURT: Okay.

MR. BERRY: As you say, normally you get ten days to respond. I don't want to have to make opposing counsel come back here. What if he gave me ten days to just file a response and then you decide it on the pleadings and the memos?

THE COURT: I can certainly do that. There wouldn't be anything in a 20 to 30 minute presentation that's not covered by the pleadings.

MR. BERRY: You know and to the extent they're factual disputes if -- we could certainly do that by affidavit which I imagine you'd be willing to --

MR. TERRELL: I'd like to consult with my local counsel on that suggestion.

THE COURT: Yeah, certainly. Go ahead and take a minute. All right. I'm happy to give you as much time as I can today. My problem being is that if I give you 30 minutes, I still have to review these documents and in fairness to counsel, I'd rather give him time to, you know, to really go through this and --

MR. TERRELL: Is tomorrow a possibility?

THE COURT: Madam Clerk?

THE CLERK: Tomorrow you have a block. And on Friday, it's an administrative day.

THE COURT: Yes.

THE CLERK: We have nothing in the afternoon on Friday.

MR. BERRY: Can I raise just one other issue?

THE COURT: Sure.

MR. BERRY: I mean I don't want to, but I feel like I have to. And I mentioned this to Attorney Donais yesterday.

And I wanted to make clear before I say anything and I'm not making any accusations, but I think what I'm about to tell you and what I can show you raises concern and question. Okay. And that is my client had a conference with a third attorney who and do you mind, I have the email that exchanged a lot. The third attorney called Attorney Donais and obviously discussed the case with him. After which Attorney Donais, all I can tell you right now is that there was a ten-minute, almost 11-minute conversation between Attorney Donais --

MR. DONAIS: Yeah, the --

MR. BERRY: And well, I have a record.

MR. DONAIS: I have mine, too.

MR. BERRY: And so obviously there was a discussion. And I -- again, I really want to be clear. I'm not making any accusation, but I do feel like that ethical responsibilities are such that I do need a chance to look into a little bit more about that issue because obviously there is a potential here and Rule 1.18 of the Code of Professional Ethics is really clear about prospective -- communications between prospective clients and attorneys. And so, you know, basically the duties are pretty similar.

THE COURT: So who had a conversation with --

MR. DONAIS: So here's what happened, Your Honor, is on Thursday, January 5th, at 5:37, Rob O'Brien called me and said hey, I've got a potential client, here's what the issues

are, is it something that you'd be interested in? He didn't tell me who the plaintiff was, didn't tell me who the defendant was, just generically laid out what some of the issues were.

I said I'm not interested. Rob said can I give your name to the other party so that you can explain that to him. I said I'd rather you not since I'm not interested in taking the case. I don't want to take it. I don't have the ability to do it on the timeline. Notwithstanding that, Rob gave contact information. I got a phone call -- I can give you all the records if Your Honor would like. So this is Rob O'Brien's statement of what transpired.

THE COURT: Thank you.

MR. DONAIS: So Rob told me about the case. These come from my phone records and my system, Your Honor. And I redacted out the other entries for the names of -- because they are clients --

THE COURT: Sure.

MR. DONAIS: -- and the whole bit. But there were two records. One was on January 5th.

THE COURT: Yes.

MR. DONAIS: The other was on January 6th. So on the 5th at 6:17 p.m., I had a seven second phone call and that was probably spent navigating the phone tree and it disappeared. There was another phone call on Friday the 6th at 5:16 p.m. for a minute 37. Again, navigating the phone tree. There was a

message.

Got the message, generically about hey, got a landlord-tenant case, can I talk with you about it. And I said sure. This is my call back the following day on Monday, spoke for six minutes 37 seconds to get a sense of what this case was about, Your Honor. Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien and the answer is yes. And I said I already told him I don't want to do it.

So at that point, there was pressure to what can I do with the case. I really don't want to do it. I'm not interested in doing that. I don't have the time to do it. I can't do it on the timeline that you want. May even be a potential conflict. Don't want to take the case. That was the end of the phone call.

THE COURT: See, counsel, here's the issue.

MR. DONAIS: Yeah. Well, and my conversation, Your Honor, wasn't with the plaintiff. It's -- not even a party to this case.

THE COURT: Oh, no, it's -- I understand.

MR. BERRY: If I could --

THE COURT: Just --

MR. BERRY: -- if you don't mind just as long as there's exhibits there to an exhibit showing a ten -- the (indiscernible) showing the next of the (indiscernible) a 10

minute and 40 something second phone call. And here's the emails on the (indiscernible) Friday to my client.

THE COURT: It's ten minutes -- why do I have six minutes here?

MR. BERRY: There --

MR. DONAIS: My system says it was a six minute phone call.

MR. TERRELL: Is it the same phone number? The same 781 number?

THE COURT: 624-7100. You can look at the two and tell me if it's the same number. See the issue is --

MR. DONAIS: 10:43 a.m., Your Honor. That's not how long it was. It was the time.

MR. BERRY: Oh, that could be.

MR. DONAIS: That's the time of the call. Not 11 minutes.

MR. BERRY: My eyesight is shot.

MR. DONAIS: 10:43 a.m.

THE COURT: Oh, it is, yeah.

MR. DONAIS: Which matches with my call.

THE COURT: Right.

MR. DONAIS: Right.

THE COURT: So it was six minutes and 37 seconds.

MR. DONAIS: Yeah.

THE COURT: Okay. But here's the issue. It doesn't

make a difference if you talked to the plaintiffs or not, the petitioners, (indiscernible) is the specific facts of the case, if this other attorney called you and said hey, Craig, I've got a matter involving discrimination, billing fraud and wrongful eviction --

MR. DONAIS: Uh-huh.

THE COURT: -- you know, how are these handled and he said, okay, this is what you have to do.

MR. DONAIS: Uh-huh.

THE COURT: Without getting into any of the facts.

MR. DONAIS: Uh-huh.

THE COURT: You're giving that person a really brief (indiscernible) on how to handle it, that's one issue. If you're sitting there and discussing the facts particular to the case, then that's something else.

MR. DONAIS: And I don't think we did, Your Honor. It was a generic discrimination over charge and I said I don't want to do it, Your Honor.

MR. BERRY: But take a look at the email to my client.

MR. DONAIS: But that's not my email, Your Honor.

THE COURT: Before I do that, let me share something with you, counsel. I spent about ten years on the PCC.

MR. DONAIS: Uh-huh.

THE COURT: The last four I was the vice chair of the

hearing committee.

MR. DONAIS: Uh-huh.

THE COURT: Okay. The reason I mention that is I always feel very uncomfortable when it's a JCC or a PCC complaint because once you (indiscernible) any allegation (indiscernible) you may come across, you may want to address that issue, you know, before the door is open, before the bell is -- the bell is rung.

MR. DONAIS: Uh-huh.

THE COURT: You know what I'm saying?

MR. DONAIS: Yeah.

THE COURT: And because you understand something, I think Attorney Berry is going to afford you every professional courtesy that he can --

MR. DONAIS: Uh-huh.

THE COURT: -- but he answers to his client.

MR. DONAIS: Understood, Your Honor.

THE COURT: All right. Because he has no control over that.

MR. DONAIS: Right.

THE COURT: All right.

MR. BERRY: Right.

MR. DONAIS: When the call came in from my client to do this case, found out who the plaintiff was, I did my conflict check and it was clear so.

THE COURT: Sure. No, I don't think anybody's for a second thinking that you were (indiscernible).

MR. DONAIS: And that's actually not what I said to Rob but that's okay. And I think Rob gave his own statement of what transpired in that conversation.

THE COURT: Not when you're getting statements that are (indiscernible).

MR. DONAIS: Right. I guess, Your Honor, this is kind of a contrived conflict to exclude me when this is my client and has been my client. I've worked with Dave Akridge who is the principal of the defendant for ten years on other matters and the like. So it's easy to call opposing counsel --

MR. BERRY: He can't make it a contrived conflict. In some ways it makes it worse.

THE COURT: Okay. Two things. Before this gets any further. I think the word contrived is inappropriate.

MR. DONAIS: Okay.

THE COURT: Okay. I don't think that -- and I'm not -- and I want to make sure we understand something. I'm trying to help you guys. And I don't want (indiscernible) current situation (indiscernible). That's the last thing (indiscernible).

MR. DONAIS: Sure.

THE COURT: Okay. So we've got three issues. The first of which is we have possibly a conflict issue. Okay.

And that is something that counsel needs to talk to his clients and decide --

MR. DONAIS: Uh-huh.

THE COURT: -- if there are. Because if they don't believe there's a conflict, they can waive it and we can put that issue to bed real quick. Okay, that's the first thing. If they do believe it's a conflict, then you need to have a conversation to decide how you want to handle it. That's issue number one.

The second issue, we have and I agree with counsel, I think it's a very narrow focus as to what is this.

MR. DONAIS: Uh-huh.

THE COURT: Because that's going to make a difference on once the Court determines how they're -- if it's a tenancy and, you know, whether or not their (indiscernible) rules apply as an example. Once the Court decides that and just (indiscernible), I think that's going to drive the bus and I think things may come to a resolution fairly quickly.

And the last thing is (indiscernible) want to sit down and have a conversation with your client, okay, I'm sorry, your co-counsel and decide, you know, how you want to handle it. At the same time, counsel have a conversation with your clients. Take care of the first issue, you know. And whatever happens there, that's just so you know what you're up against.

MR. DONAIS: Uh-huh.

THE COURT: Okay. Because I want you to make an informed decision before you go forward. I don't want you to get caught halfway through this. Okay.

MR. DONAIS: Okay, Your Honor.

MR. TERRELL: Your Honor, may I ask two questions?

THE COURT: Certainly, sir.

MR. TERRELL: As for the hearing option, are we down to not this afternoon, not tomorrow, but is Friday a possibility?

THE COURT: Friday is open. Friday is an admin day.

THE CLERK: Friday is an admin day. We don't have anything scheduled Friday afternoon. You're here all day.

THE COURT: Right.

THE CLERK: It's up to you. Do you want to --

THE COURT: I mean I've got a couple hearings but I can make time for you Friday afternoon if that's what you need. However --

MR. TERRELL: And alternatively that submission on pleadings --

MR. BERRY: Right.

THE COURT: Yes.

MR. TERRELL: -- as Mr. Berry suggested.

MR. BERRY: That's kind of what -- I think the problem is it squeezes me as you probably can guess, my schedule isn't all that flexible. So I'd prefer to do it on

the pleadings, but --

THE COURT: Certainly. Well, have that conversation. Come back and tell me how you want to handle it. If you can't decide between the two of you, that's fine. I'll make the decision. Fair enough?

MR. DONAIS: So I guess, Your Honor, if I'm going to withdraw from this, then what would the implications be for Attorney Terrell's pro hac admission on this case?

MR. TERRELL: I noted that in the pro hac statute that the Court has discretion to allow the pro hac admitted counsel to proceed without local counsel in the courtroom.

THE COURT: I mean and you can also just call any attorney in town. I'm sure there's a number of attorneys that would be happy to step in.

MR. DONAIS: Sure, I can certainly locate someone --

THE COURT: Right.

MR. DONAIS: -- to be able to do this.

THE COURT: Right.

MR. BERRY: Then one other issue --

THE COURT: Yes.

MR. BERRY: -- that in regard to that and again I would certainly give a lot of respect to the affidavit; it's just about the communications about this specific case.

MR. TERRELL: I'm sorry -- I'm sorry. I see your point.

MR. BERRY: (Indiscernible) the communications between the two of you about the case, like you know, so I can at least do some due diligence about whether if there were a conflict, whether it's infected corporate counsel.

THE COURT: Oh, I see.

MR. TERRELL: Well, I can state as an officer of the court --

THE COURT: Yeah.

MR. TERRELL: -- that Mr. Donais did not convey to me anything about the substance of any conversation he had with the plaintiff.

THE COURT: All right. Counsel?

MR. BERRY: I mean I would say I have to consult with my client but I hear that and respect it.

THE COURT: I mean as an officer of the court unless I have any information to the contrary, I would accept that. But again, I want to give Attorney Berry an opportunity to do some due diligence just to make sure. So have that conversation, let me get back to my list and I'll call you back in a few minutes.

MR. BERRY: Thank you very much.

MR. DONAIS: Thanks.

(Sidebar ends at 1:41 p.m.)

(Recess at 1:41 p.m., recommencing at 3:03 p.m.)

THE COURT: All right, counsel, if you would be kind

enough to approach? I didn't want to keep you waiting if you had --

(Sidebar begins at 3:03 p.m.)

MR. TERRELL: Appreciate that. We're inclined from my client's side to proceed on pleadings. Mr. Berry wants to submit something as well. Our concern with doing it that way is it's just going to stretch this out. It's our belief, it's your decision, that they're hotel guests and we want to end that relationship as soon as we can.

But we're prepared to do it on the pleadings. We would request a short timeline for Mr. Berry to submit his --

THE COURT: And the issue is hotel guest v. --

MR. TERRELL: Versus hotel --

MR. BERRY: Tenancy -- tenant.

MR. TERRELL: -- versus tenant. I mean that's the issue.

THE COURT: Okay.

MR. TERRELL: There were some statements in my pleading setting forth the reasons why we want them removed from the hotel.

THE COURT: Certainly.

MR. TERRELL: I'll acknowledge that those issues are not germane to the issue of whether they're a tenant versus a hotel guest.

THE COURT: All right. How much time do you need?

MR. TERRELL: I would like Mr. Berry to submit his by this Friday.

MR. BERRY: I'm sure you would, but I need more time than that.

THE COURT: How much time do you need, sir?

MR. BERRY: I'd like ten days from yesterday which is when I got the pleading.

THE COURT: All right. So let me take a look. And I know that and I'm sensitive to your concerns, too, so don't misunderstand where I'm coming from. Okay. So yesterday was the 17th. Well, whether it's eight or ten days, we're still dealing with -- with my schedule, it's academic whether it's ten days. So I wouldn't be able to get over and deal with it until the weekend anyways. So --

MR. TERRELL: The weekend after the seven --

THE COURT: So it'd be the, you know, without getting into my calendar and everything, whether I gave Attorney Berry ten days or I cut it to seven or eight days, I'm not going to be able to get to it until the 28th, 29th anyways. So I'll take it home that weekend to get to it.

MR. TERRELL: Okay.

THE COURT: Based upon my schedule next week. So what I'll do is the pleadings, what I want to do is the deadline -- I need to have them here at the court no later than, let me see, on the 27th. Counsel?

MR. BERRY: Sure.

THE COURT: All right. That way, by 3 and that way I can take them --

MR. TERRELL: Your Honor, but it's a little more complicated than that. Based on my discussion --

THE COURT: What --

MR. TERRELL: -- we had, if Mr. Berry submits new evidence or new arguments, we would want the right to respond and the right to waive that in order to speed things up. Now, it looks like we might not be reaching a decision until on into February. And I need to discuss with my client whether they want to go that option or whether they want to have the hearing this Friday. That'll only take me a minute to have that discussion.

THE COURT: Okay. I mean what I'd do is obviously Attorney Berry is going to email it to you.

MR. TERRELL: Yeah.

THE COURT: You can email it to him, correct?

MR. BERRY: Oh, yeah. Sure.

THE COURT: Yeah, right. That way you have it when I have it or even beforehand. So if there's an issue, you can notify the Court.

MR. TERRELL: Uh-huh.

THE COURT: And we could deal with that.

MR. TERRELL: And I should be in a position where if

I need to respond, I can do so quickly, hopefully before the weekend. What day of the week is the 27th?

THE COURT: It's a Friday.

MR. TERRELL: Oh, well, maybe not.

MR. BERRY: It would be helpful if you could identify specific information that you're willing to strike because if you're willing to strike it, my client's not going to feel the need to rebut it. So if you have a chance to do that, that would be (indiscernible).

MR. TERRELL: I can -- actually I just represented those -- the representations at the end of our --

THE COURT: Right.

MR. TERRELL: -- pleading that describe the reasons why we want them removed as guests is not germane to the issue of whether they're a tenant or a guest. And you know, I would strike that.

MR. BERRY: Okay.

THE COURT: All right. What I'd like to have both you do though is prior to the 27th is give me proposed orders.

MR. BERRY: Okay.

THE COURT: So what I'm looking for is I know that you're going to be submitting your memorandums. What I want is a, you know, one page whatever it is, one page, two page, no more than two pages.

MR. DONAIS: You can put your signature on it and be

done with it.

THE COURT: I'm not saying I'm going to do that, but what I want you to do is -- I'm a fan of that because it forces the parties to review 60 pages or 40 pages, whatever it's going to be, and give me a succinct this is where I think the Court should go and this is why. And also for appellate purposes, it puts you in a situation where it's very clear for the Supreme Court as to --

MR. BERRY: Did you say you wanted that before --

THE COURT: No, can be --

MR. BERRY: Contemporaneous.

THE COURT: Contemporaneously, right.

MR. TERRELL: Your Honor, could -- I would just request because I think this might make the pleading option sit better with my client if we could move Mr. Berry's deadline to the 25th. You would still be looking at it over the weekend but that would give me a two day window to determine whether I need to do a reply response.

THE COURT: Counsel?

MR. BERRY: What day of the week?

THE COURT: Wednesday.

MR. TERRELL: 25th, which is Wednesday, right.

MR. DONAIS: That's a week from today.

MR. BERRY: We couldn't make it the 26th?

THE COURT: 26th is fine.

MR. TERRELL: By noon?

THE COURT: The 26th is fine. That works for both of you.

MR. BERRY: Okay.

MR. TERRELL: Okay.

THE COURT: So the pleadings and the proposed order, the 26th.

MR. TERRELL: Yeah.

MR. BERRY: Okay.

MR. DONAIS: And I guess with respect to myself, Your Honor, at this point, in terms of this conflict issue, it did not pop up until I guess the pleading that was prepared referenced the individual that called my office. And at this point I guess I'm looking to get out of the case. So I'm looking for an alternate --

THE COURT: Certainly.

MR. DONAIS: -- to serve as the local pro hac counsel and I guess at this point, since that's really not an issue in the case, if the documents we provided up to the bench could be discarded and not part of the file, that'd be great.

THE COURT: Certainly. Why don't I just give them back to you.

MR. DONAIS: Perfect.

MR. BERRY: Yeah, that just -- and let me just -- give me one minute to talk to my clients. Okay. Because the

issue that I realize I haven't resolved with them is possible spillover, right? And I just need to --

MR. DONAIS: And I'll represent --

MR. BERRY: I don't get to make the decision is the point of that.

THE COURT: Right.

MR. BERRY: So I just --

THE COURT: Just so it's clear, I've had representations from --

MR. BERRY: Yeah, I know.

THE COURT: -- both counsel, officers of the court, that there wasn't any in any shape, form or fashion, any discussion relative to the conversation (indiscernible).

MR. DONAIS: I didn't get names, I didn't get properties, anything specific. It was very high level --

THE COURT: So you haven't --

MR. TERRELL: He didn't -- no, he did not, Mr. Donais did not convey to me the substance of any conversation. He conveyed to me that he had spoken with someone and realized I think after the fact that it was Mr. Bisasor but he did not relay to me the substance of what, you know, was said.

THE COURT: Why don't you have that conversation now, counsel. Okay.

MR. BERRY: Okay.

(Sidebar ended at 3:10 p.m.)

THE COURT: Great. All right. While you're having that conversation, I'm going to move on to this matter. So what you can do is -- well actually, Attorney Berry, I'll give you a minute or two before I start. That way we're not interrupting.

MR. BERRY: Okay. And if could approach just for a moment.

THE CLERK: Judge, hearing (indiscernible).

THE COURT: Hearing on what?

THE CLERK: That case?

THE COURT: No, it's going to be decided on the pleadings.

(Recess at 3:11 p.m., recommencing at 3:17 p.m.)

THE COURT: Yes, counsel.

MR. BERRY: I probably need to approach, Your Honor. Probably need the other side.

THE COURT: All right. Sam, could you -- why don't you come on up while we're waiting.

(Sidebar begins at 3:18 p.m.)

THE COURT: Don't mean to mean rush; I just --

MR. BERRY: Well, look, I totally appreciate how much time you've given us.

THE COURT: Yes.

MR. BERRY: So we, on the issue of the (indiscernible), they're willing to let the case go forward

with the corporate counsel representing -- essentially representing the Defendant with different local counsel.

THE COURT: Sure.

MR. BERRY: What I have to make everybody understand is they won't make a commitment one way or the other about whether they would file a complaint not, you know, against Attorney Donais (indiscernible).

THE COURT: Nothing we can do about that.

MR. BERRY: That's right.

THE COURT: It's beyond our --

MR. TERRELL: Right.

THE COURT: So if I understand correctly, local counsel, you're going to have a local attorney file a request.

MR. DONAIS: I got a call into Dan Kalinski right now to see if he'll take it.

THE COURT: Certainly. And it shouldn't be an issue so we'll get that taken care of. That should be done in the next day or two.

MR. DONAIS: Uh-huh.

THE COURT: The 26th and proposed order along with a memorandum.

MR. TERRELL: Okay.

MR. BERRY: And you'll notify me if you -- by when if you want to respond?

MR. TERRELL: Well, logistics, if I get it from you

# Exhibit 35

STATE OF NEW HAMPSHIRE

HILLSBOROUGH COUNTY SUPERIOR COURT SOUTH

| | | |
|---|---|---|
| NATALIE ANDERSON, | ) | |
| | ) | Superior Court Case No. |
| Plaintiff, | ) | 226-2017-CV-00069 |
| | ) | |
| vs. | ) | Nashua, New Hampshire |
| | ) | April 27, 2017 |
| ADAM ROBITAILLE, et al., | ) | 10:49 p.m. |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ________________________________ | ) | |

PRELIMINARY INJUCTION/PENDING MOTIONS
BEFORE THE HONORABLE CHARLES S. TEMPLE
JUDGE OF THE SUPERIOR COURT

APPEARANCES:

| | |
|---|---|
| Pro Se Plaintiff: | Natalie Anderson<br>Andre Bisasor<br>(Address Unknown) |
| For the Defendants: | Brian Snow, Esq.<br>2 Wellman Avenue, Suite 340<br>Nashua, NH 03064 |
| | Karl M. Terrell, Esq.<br>STOKES WAGNER, ALC<br>One Atlanta Center, Suite 2400<br>1201 W. Peachtree Street, NW<br>Atlanta, GA 30309 |
| Audio Operator: | Electronically Recorded<br>By Teresa R. Neill |
| TRANSCRIPTION COMPANY: | eScribers, LLC<br>7227 N. 16th Street, Suite 207<br>Phoenix, AZ 85020<br>(800) 257-0885<br>www.escribers.net |

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.

UNIDENTIFIED SPEAKER: Your Honor --

MR. BISASOR: Your Honor --

UNIDENTIFIED SPEAKER: -- (indiscernible) --

MR. BISASOR: -- can I just say --

THE COURT: I just want to wait. First of all, what I will do is compare the motion filed in the circuit court very carefully with the motion filed before me, since it's an ethical disqualification concern, I want to be very careful about the circumstances of it. So if Attorney Terrell, who has filed the motion to appear pro hac vice, wants to testify under oath as to the information that was shared or not shared by Attorney Donais or Attorney O'Brien or Attorney Snow, I'll allow him to do that right now and I'll allow you to cross-examine him.

So Attorney Terrell, if you want to come right up here to the stand --

MR. SNOW: Oh, just a correction, Your Honor, I don't believe he has filed a motion pro hac vice yet.

THE COURT: Oh, I thought one had been filed.

MR. SNOW: It was in the district court.

THE COURT: Oh, it was in the district court?

MR. BISASOR: There was one pending here too, Your Honor, that was the whole issue.

MR. SNOW: No, there was one pending here.

UNIDENTIFIED SPEAKER: Yes, there is.

MR. BISASOR: There was a request for the family to be able to waive the fee --

MR. SNOW: Well, that's why it --

MR. BISASOR: -- and to appear here.

MR. SNOW: -- was a request, that wasn't a motion.

MR. BISASOR: Well, a request is a motion, he's asking the Court to grant it, that's being very technical, Your Honor.

MR. SNOW: Could you please raise your right hand and you'd stand?

KARL TERRELL, WITNESS FOR THE DEFENDANTS, SWORN

MR. BISASOR: Hold on a second, I have some question before you start.

THE COURT: I'm going to put him under oath and allow him to testify and allow you to ask him questions.

MR. BISASOR: But before he starts, Your Honor, I just wanted to just respond to two things he just said really quickly, if I may, Your Honor.

First of all, the affidavit that he submitted in the district court was not submitted in this court, so he can't testify to facts about what Craig Donais said in that affidavit, he's testifying, there's no -- he's not here -- Craig Donais is not here, he should've been here so he could be asked questions as well. So that's not appropriate, Your Honor.

In that affidavit, Craig Donais also --

THE COURT: I'm not asking him to testify to the affidavit of Attorney Donais, I'm asking him to testify as to his own direct, personal knowledge, because it's not Mr. Donais who's being asked to be disqualified from this case, it's Attorney Terrell.

MR. BISASOR: Right.

THE COURT: So I'm only interested in his personal knowledge, not Attorney Donais' personal knowledge. I'm interested in the information that was relayed to him, whether it be from Attorney Brown, Attorney Donais. If any information was relayed to him, what was it? But he's not going to testify for Attorney Donais here, I won't --

MR. BISASOR: Well --

THE COURT: -- allow that.

MR. BISASOR: Okay, right, but I was saying, Attorney Snow was doing that from the stand. He was --

THE COURT: Well, if I --

MR. BISASOR: -- testifying as to what was in the affidavit from Craig Donais and trying to introduce as evidence here or for your consideration as inappropriate.

MR. SNOW: He misunderstood what I was saying.

THE COURT: You misunderstood what he said. I think he was talking about what had happened in the district court.

MR. SNOW: Right.

MR. BISASOR: No, no, he said --
THE COURT: He went up and filed --
MR. BISASOR: -- he submitted an affidavit --
THE COURT: -- an administrative --
MR. BISASOR: -- there --
MR. SNOW: In the district --
MR. BISASOR: -- and he will be willing to give it to you as well.
MR. SNOW: Yeah, so I have a copy if the Court wants it now.
THE COURT: He's talking about what happened in the circuit court, he's not -- that would only assist me in terms of what issues and what pieces of affidavits or other documents were in front of Judge Moore.
MR. BISASOR: Okay, great.
THE COURT: He's not offering it here, and all I want Attorney Terrell to do for me, subject to your cross-examination is to give me his knowledge of this representation circumstance.
MR. BISASOR: Would it be appropriate, Your Honor, to have Craig Donais also, because he could contradict what Karl Terrell says, it's just what he shared.
THE COURT: I don't have him here today and the motion was noticed up for today. We're going to handle them, no one's got Attorney Donais here, so I'm going to hear from

Attorney Terrell. Nothing I can do about Attorney Donais at this point. And I'm still, I'm not in any way waiving any arguments on the collateral estoppel issue, but Attorney Terrell's here, so I might as well deal with it from an evidentiary standpoint.

MR. SNOW: That's what I'm saying.

THE COURT: So we'll do that.

MR. SNOW: Might as well.

THE COURT: Okay, Attorney Terrell.

DIRECT EXAMINATION

BY MR. SNOW:

Q Could you please state your name and affiliation for the Court, please?

A My name is Karl Terrell and I was admitted as counsel pro hac vice for the Defendants in this case, over in the Ninth District Court.

Q Okay, and you're an attorney in what state, sir?

A In Georgia.

Q Okay, and you're fully licensed in Georgia?

A Yes.

Q Do you have any disciplinary actions that have caused you to be suspended or have that license revoked at any time?

A No.

Q So you're in good standing?

A Yes.

Q And you made that representation previously to the Ninth Circuit?

A Yes.

Q And the Court approved your pro hac vice motion?

A Yes.

Q Now turning to the events of this particular case, did you have an opportunity to be aware of a 540-A petition that was filed by Natalie Anderson in the district court on January 9th of 2017?

A That is how I was brought into this. My client, the Homewood Suites Hotel or the operating company -- the managing company that operates that hotel, contacted me and informed me of the 540-A action. I've done work for the parent of the management company for -- for many years, and they asked me to represent them in this case. I explained, as they were aware, that we would need to retain local counsel in -- in New Hampshire. My direct contact was Mr. Dave Akridge, who's here in the courtroom. He had an attorney-client relationship in a completely different area with Craig Donais, and so Dave recommended Craig Donais.

Craig Donais, I can't remember if we spoke before he sent me a particular email, but he sent me an email, dated January 11, 2017, which I believe was two days after -- if I recall correctly, two days after the 540-A action was filed in the district court. Somewhere just prior to that, Mr. Donais

realized that the -- that he had spoken with Andre Bisasor and he was related to this case. I'm not trying to testify for Mr. Donais' understanding, but this is how I received it from him.

So right as I was first engaging with Mr. Donais to serve as our local counsel, he advised me -- or maybe Dave advised me before that Craig realized he had had a conversation with someone connected with this case, Andre Bisasor, and so I asked Craig to explain what was the nature of that conversation that you had with Mr. Bisasor, and he sent me an email in which he put it in writing to me.

MR. SNOW: If I may approach, Your Honor?

THE COURT: Yes, you may.

MR. SNOW: Having previously shown this to my brother, may I approach?

BY MR. SNOW:

Q I show you this document and I ask you to identify it.

A That's the email I was describing, yes.

Q And that email was also incorporated in the circuit court objection to a disqualification in Exhibit E, was it not?

A I believe Mr. Donais, in his affidavit, attached and identified this email. In any event, it was made a part of the circuit court filing.

MR. BISASOR: So Your Honor, if I may just point out, as just a point of note, as an objection, I guess, that we're getting into issues about what Donais said, what he wrote, an

email from Donais, and I just want to be careful here, Your Honor, that we -- I don't want the waters to be blurred where I can't cross-examine Craig Donais about the contents of what they're testifying to about what Donais said. It's a very tricky situation, I asked the Defendants to provide Craig Donais here today, they have not.

MR. SNOW: Well, that's --

THE COURT: That is --

MR. SNOW: -- that's not fair, because Craig Donais is out of state, I couldn't get him here if I wanted to, and it was a situation that is manufactured. He didn't ask me to produce Craig Donais, he asked me if he was going to be here, just like he asked if Karl was going to be here and Mr. Akridge too, that's not a demand for their appearance, I have to take issue with that.

THE COURT: I understand that. I'm going to allow the testimony, because I wouldn't be considering anything in these emails in terms of the truth of the matter asserted in terms of what Attorney Donais had to say, but I am considering it in terms of the knowledge that this witness would have had about discussions that were had with you, because that's the issue in this particular case.

BY MR. SNOW:

Q So once you got that email, was there any further discussions you had with Attorney Donais or anyone else about

any conversations involving Mr. Bisasor?

A I think only in passing. Let -- let me set the context. What I understood from Mr. Donais is that he had only had a very brief conversation with Mr. Bisasor, was not representing him, and he -- what he conveyed to me about what he, Craig Donais, knew about the case was simply a summary of what was already a matter of public record in the district court. I mean, and that's what Mr. Donais' email reflects -- states that, "What I know" -- this is Craig's email to me, "What I know is I received a call from Andre", and he put it in quotes, "who wanted to discuss filing a 540-A petition claiming they were being treated differently for food service because they were minorities and were being overcharged for their use of the room." Andre claimed that it was a mixed-use property, in which part was rented and part was under innkeeper.

That's the sum and substance of what Mr. Donais conveyed to me about what he learned from his conversation with Andre Bisasor, which is nothing more than a summary of what was in the complaint filed in the Ninth Circuit District Court. He didn't tell me anything I didn't already know.

He then went on to say in his email, "Given his timeline", and -- and as I recall, he must've contacted Mr. -- spoken with Mr. Donais right before he filed the action in the circuit court, and, as I understand it, Craig doesn't do that kind of work, and also, didn't have the time to devote, because

Mr. Bisasor wanted someone who could take his case immediately and act on it.

So Mr. Donais simply said, "Given his timeline and issues, I was not in a position to assist, and did not engage in any conflict analysis to determine the property, property address or whether there was a conflict. This is the extent of what I know." He certainly conveyed no confidences, Mr. Bisasor -- Anderson to me, he simply said, I had a short conversation with this fellow by the name of Andre, and this is the kind of case that they wanted to talk to me about taking. As I understand it, it was a very short conversation, and that's all Craig conveyed to me, and that was the sum and substance of it.

Q So did you ever speak to -- did Craig ever indicate he ever spoke to Ms. Anderson at all, or conveyed that to you in any fashion or form?

A I don't remember, I just remember he -- he said that he spoke to Andre.

Q All right. Did he have any follow-up conversations with you or did you have any follow-up conversations with Attorney Donais about --

A Well, I -- it was --

Q -- this whole situation?

A The day we were down here in -- I -- I believe it was on January 17th, and the --

Q I think it was the 19th.

A -- in -- was it the 19th -- January 17th, I -- I thought it was the 17th, maybe not, in the district court in front of Judge Moore, and we had a sidebar. Right, I think it might've been here in this courtroom, could it have been this courtroom?

THE COURT: No, it would've been upstairs.

MR. SNOW: No, it was upstairs.

THE WITNESS: Very similar courtroom.

BY MR. SNOW:

Q Yeah.

A And so we had a -- a sidebar with Elliott Berry, the -- who was their lawyer at the time, Mr. Donais and myself, and that's when Elliott Berry brought the issue up about the conflict, and I -- I think we had a -- we talked about the fact that this issue was being raised, and I -- I think per the extent of my conversation with Craig at that point was just to confirm that he didn't convey anything to me beyond what he conveyed in this email, which is really nothing more than a summary of the nature of the claim that Anderson and Bisasor were -- were raising. It was just simply a -- a short description of the lawsuit that, by the time I had this communication with Craig, had already been filed, and so I already knew everything that Craig was telling me that was conveyed to him in a very short short conversation that Craig

said he had.

Q But you said that Bisasor and Anderson's claim, but this is really just Mrs. Anderson's claim, correct?

A Well, she's -- she's the party Plaintiff --

Q She's the Plaintiff.

A -- right.

Q Did you have any further conversations with Craig Donais after that?

A After that? I don't think so.

Q Did you have any conversations with --

A But Craig -- Craig -- Craig removed himself from the case, he just wanted -- he didn't want any part of it, and then he retained you and I don't think I've had any discussion at all with Craig ever since then.

Q You ever have any conversations with me other than what's in the pleadings?

A No.

Q Thanks.

MR. SNOW: Thank you, Your Honor.

THE COURT: Thank you. Mr. Bisasor.

CROSS-EXAMINATION

BY MR. BISASOR:

Q So just to clarify again, how do you know the Defendants?

A The Defendants?

Q Yeah.
A The management company for the Homewood Suite Hotels, I believe is called Nashua Innkeepers, which is a single-purpose entity that manages that hotel for a third-party owner, and the parent of Nashua Innkeepers is Great American Hotels, which has been a client of mine for some 20 years.
Q Okay. So you were contacted by who to deal with this case?
A Dave Akridge.
Q Dave Akridge, and about what --
THE COURT: Please spell his last name, just so I'm clear on it.
THE WITNESS: A-K-R-I-D-G-E.
BY MR. BISASOR:
Q And about what date was that, do you recall?
A It was early January.
Q So the district court filing occurred on January 9th --
A That sounds right.
Q -- and you, I believe, entered motion for pro hac vice, I think around the 11th. The email that you just cited there, I think was on the 10th of January.
A No, the email's dated January 11th.
Q January 11. Okay, so on or about the 11th, you are in communication with Craig. Did he send you that email or you sent it to him?

A He -- he sent it to me.
Q He sent it to you?
A He sent it to me and my -- and my legal assistant.
Q To your legal -- okay.
A I -- I don't even think I'd had a conversation with him at that point.
Q So what I'm trying to establish is, so you were contacted by Dave prior to the filing of the 540-A filing in the district court on January 9th?
A Say that again.
Q Were you contacted by Dave Akridge prior to the filing of the district court 540-A action on January 9th?
A I believe we had some discussion about the dispute with you and Ms. Anderson prior to your filing the 540-A action, but I don't recall now, I'd have to go back and look at my time records when it was, but I'm pretty sure it was in January.
Q Is that the first time --
A Early -- early January.
Q So somewhere after January 1st was the first time that you talked to Dave or Dave talked to you about this case with the Plaintiff and/or myself?
A When you say this case, do you mean the lawsuit you filed?
Q In 540-A in district court, yes. And the issues related to our residency at the hotel.

A To the best of my recollection, it was in early January.

Q Okay. So when you came on the case, did you talk to Craig Donais at that time, prior to the 9th of January, before the filing --

A No.

Q -- of the 540-A?

A No. I didn't talk to Craig until after you filed your action -- your 540-A action, or Ms. Anderson filed it, and I needed a local counsel. The only purpose for my talking to Craig was -- I was directly assisting my clients related to this dispute, they wanted me to come in and make an appearance in the 540-A action you filed in district court, and I said I'd be happy to do it, I need to retain local counsel. And so they suggested Craig Donais. I had no prior relationship with Craig Donais whatsoever.

Q So you were aware that Mr. Akridge -- Dave Akridge had a prior relationship with Mr. Donais?

A On something completely unrelated to his hotel business.

Q Okay. But he had been a long-time attorney for Dave Akridge?

A I don't know the details of that.

Q Do you recall that that was said to Judge Moore, that he had represented --

A Who said that?

Q Craig Donais, that he represented Dave Akridge for over ten --

A Yeah.

Q -- years?

A Yeah, I've -- I've heard him make that representation, I have no reason to doubt it, but I don't know any of the details.

Q Okay. So Mr. Akridge reached out to you to retain you for this case, for the 540-A case --

A Right.

Q -- or for the issues related to the residence, because if he contacted you in early January and the 540-A hadn't been filed until the 9th, then he had been, obviously, working up a legal representation situation for the issues that were unfolding or had been unfolded at the hotel prior to the 540-A?

A You'll have to unpack that question, sir. You put a lot in that question.

Q The representation that you were asked to do wasn't only for the 540-A after January 9th. Is it true that it also had to do with being background legal counsel on the issues related to our residency prior to the filing of 540-A on January 9th?

A Mr. (Indiscernible) -- am I doing the same thing as she did?

THE COURT: No, I don't know what's causing that.

THE WITNESS: Because my foot kicked this wire and that's --

THE COURT: That's probably what it is.

THE WITNESS: Probably a loose connection.

THE MONITOR: Oh, that's probably what it is.

THE WITNESS: It's a loose connection on the wire. Dave Akridge and Great American Hotel company has been a client of mine for years, they periodically call me and ask me for counsel, and there's nothing unusual about that. I'm not going to get into, of course, the substance of my discussions with Mr. Akridge, that's attorney-client privilege protected. So I don't know if that answers your question or not.

BY MR. BISASOR:

Q I think kind of, I mean, I guess it's almost what you're saying is that you were contacted by Mr. Akridge about us and our hotel stay prior to the 549 (sic) filing on January 9th.

A I don't know what you mean by that. He --

Q You testified that you --

A -- contacted -- he contacted me and discussed matters relating to this dispute. I've already testified that I believe it was before you filed your 540-A action --

Q Yeah.

A -- but I -- I -- I don't have a specific, clear

recollection of that. I think he may have discussed it with me, some aspect of what was going on --

Q Um-hum.

A -- but that was just me as an attorney having -- having -- having my client consult with me on things that were going on.

Q Okay. So when you came onto the case, I guess formally to deal with the 540-A filing and you needed local counsel now, how did it -- how was -- what were the circumstances that prompted you to -- did you solicit this email from Donais? Because he wrote it to you saying -- let me see here. It says, "Karl and Felicia, I'm happy to provide local representation to you, support for pro hac vice admission, what I know is that I received a call from Andre who wanted to discuss the filing" --

A Yes.

Q -- "of a 540-A petition, treated differently", yada, yada, yada, you've already read through that.

A Right. Yeah, I think what -- I -- I -- I think what happened is, I don't remember having a conversation with Mr. Donais before this email, but I had had a conversation with Dave -- Dave Akridge, and I think Dave conveyed to me that Craig told him that he had had a conversation with an Andre -- meaning you, and I think, by that point, they had -- not me, put two and two together, and -- and I might've conveyed to Dave -- I might've conveyed to Dave to have Craig tell me what

he learned or what he knew, what that communication was all about, or I may have had a brief conversation with Craig, asking him to tell me.

You know, obviously I wanted to know, because he raised the concern that he had had a conversation with you, and I guess -- I think he raised this through Dave and then Dave to me, and so that obviously raises a flag. He -- he wasn't claiming that he represented you, quite the contrary, he did not represent you, he did not take your case. There was an indication that the conversation between the two of you had been very brief, that it did relate to this dispute, it became your 540-A action, and I wanted to know what he learned from you, I wanted to know what had transpired in their conversation, I wanted to know if there was a problem with having him as local counsel or -- or whether there was no problem. And the end result was this email he sent me, which as I've said before, simply didn't tell me anything I didn't already know and didn't tell me anything that wasn't already at that point a matter of public record.

Q So prior to that email, your testimony is that you think you had a conversation with Craig Donais prior to that email?

A I may have.

Q You may have?

A I may have.

Q And in that conversation, you tried to explore what is it that he knew regarding this conversation with an Andre?

A I just want to know what happened in that conversation, and --

Q Um-hum.

A -- implicit in that request for information is what did you all say, what did the two of you say to each other --

Q Um-hum.

A -- so --

Q How is it that then, if you were needing local counsel, and you suggested that to Dave, how is it that Dave was getting questions from Craig who wasn't on the case and doesn't really represent him on hotel issues?

A And you have to ask that question again.

Q You testified that you were contacted by Dave to take the case.

A Right.

Q In fact, to deal with issues that were brewing -- the dispute that was brewing prior to the filing of --

A That's your --

Q -- the --

A -- characterization, sir. I've already given you my testimony.

Q No, no, no, I'm summarizing, I'm not focusing on that, you've already testified to that, but I'm just trying to lay

the foundation on my question. You've testified that somewhere on or about the beginning of January, you had conversations about a dispute with us and the hotel stay?

A Right.

Q You then testified that somewhere right after the filing of the 540-A on January 9th, you were asked to take this case by Dave Akridge.

A Yes.

Q Okay. You also testified that Mr. Donais doesn't really represent Mr. Akridge on the Homewood Suites Hilton issue. That you were the one that does that.

A I think that's fair --

Q But you also testified --

THE COURT: You're now allowing him to answer.

MR. BISASOR: Oh, I'm sorry.

BY MR. BISASOR:

A I think your characterization was fair.

Q Yeah, yeah, so I'll ask my question, I'm just laying -- I'm getting to my point now, which is, you also testified that Mr. Donais, apparently on his own, raised concern about a potential conflict to Dave -- on his own, without your prompting, Dave mentioned that to you, you were then concerned about a flag, you may have --

A Can I ask you, what was that last --

Q -- you may have a concern about a flag --

A A flag? Oh, yeah --
Q -- to use your term, flag.
A -- yeah, yeah, yeah.
Q And so you may have had a conversation with him prior to this email dated January 11th --
A Yeah, I get it. I don't remember how the connection -- how I became aware that Craig Donais had had a conversation with you, but at some point, I wanted to know what happened, what that was all about, and -- and what I got was this email.
Q Um-hum. Do you -- so when you had that conversation with him, and --
A Which conversation?
Q The one prior to him sending you this email.
A Well, I'd -- I'm not sure that I did. Now I thought I was pretty clear about that.
Q You said you may have.
A I said I may have, so don't ask me when you had that conversation, because I don't specifically recall whether I spoke with Craig before I got this email. I knew about it at the time I got this email, because I think Craig -- I may have had a brief conversation with Craig, I just don't recall. Or I may have only gotten that information through Dave after Dave had spoken with Craig.
Q So the reason why I'm just trying to clarify here is because it says, "Karl and Felicia, I'm happy to provide local

representation."

A Right.

Q And what I know is that I have a call from Andre, he sounds like he's responding to --

A Yes, he is.

Q -- some kind of conversation.

A Yeah.

Q And that conversation sounds --

A He's --

Q -- like it was with you.

THE COURT: He doesn't know.

MR. BISASOR: He doesn't know if it was a --

THE COURT: He may have had a conversation, he doesn't recall the conversation, but he's not denying he had a conversation --

THE WITNESS: Right.

THE COURT: -- he just doesn't have a recollection of the specific conversation with Mr. Donais. It may have come through Mr. Akridge, and then to him, but he's not certain, that's all.

MR. BISASOR: Okay..

THE COURT: Okay, I understand that --

THE WITNESS: Yeah.

THE COURT: -- it's -- he's testified to it on direct --

MR. BISASOR: Okay.

THE COURT: -- and he's testified to it at least a couple times on cross.

MR. BISASOR: I was just trying to see if he could jog his memory, because each time he thinks about it, he seems a little bit more confident that there was a conversation, so I was giving opportunity to jog his memory, if that was what was going to be the case.

All right, I'll move on.

BY MR. BISASOR:

Q So when you spoke to Mr. Donais or you got this email -- sorry, when you got this email and may have had a discussion with him, did what he share with you raise a concern that there could be a conflict, based on what he said to you?

A No, because he didn't -- he did not convey to me any confidences that you had conveyed to him, he had no inside scoop or inside story. What he conveyed to me was that he had a very brief conversation with you in which you tried to engage him as your attorney, and he turned you down. And that was the end of the matter. There was really nothing else for Craig and I to speak about concerning his conversation with you. It was of no value or interest to me, it was just this oddity that you -- the two of you had had a five-minute conversation and you didn't -- he didn't take your case.

Q So in this email, he actually said that I spoke with

him about being treated differently, that we were overcharged, that it was a mixed use property, that part of it was on the innkeeper, and that there was -- we were going to file a 540-A, so those are not just -- that's -- those are going into substance of --

A No, sir, those are just your claims --

Q Um-hum.

A -- those are just your claims, and everything he has that is stated in this email is just a summary of the lawsuit that you filed, your 540-A lawsuit. He was doing nothing more than telling me the nature of your claims, filed in the district court, which I already knew of, because by that point, I had had your 540-A action for about a day or two days. He didn't -- there's nothing confidential or substantive, this is just a description of your lawsuit.

Q Okay.

A It added nothing more.

Q So --

A And it was all he got from you --

Q -- what does --

A -- in his conversation with you.

THE COURT: You need to let him finish.

MR. BISASOR: Sure.

BY MR. BISASOR:

Q So the reason why this is important is because there's

a Robert O'Brien, are you aware of Robert O'Brien's involvement in this?

A I only know about it from having read Craig's affidavit, and -- and I think maybe some of the stuff you filed, and I'm -- and I've seen the statement from Robert O'Brien -- I think that's his name. I don't know who he is, I've never met him, never spoken with him.

Q So when Donais described this to you, he did not indicate that there was a nexus between a conversation with Robert O'Brien and him, and Robert O'Brien and the Plaintiff?

A I think that came out when we were in Judge Moore's courtroom and we had the sidebar.

Q Um-hum.

A I think that's the first time I ever heard anything about Robert O'Brien.

Q Um-hum.

A And I know nothing about that.

Q Do you -- okay, so the -- in Craig Donais' affidavit that he filed --

A The what? I'm sorry.

Q In his affidavit that he filed --

A That Craig Donais filed?

Q Yes.

A Okay.

Q In the district court.

A Yeah.

Q He -- and then even with the motion that was submitted to this court, he attaches an exhibit -- well, sorry, Attorney Snow attaches an exhibit, showing a conversation with Robert O'Brien that lasted, I don't know, whatever it was, and he testified that there was a conversation that took place between him and Robert O'Brien about this case involving the Plaintiff, so when -- if, in fact, that conversation had substance of what was discussed from the Plaintiff and Robert O'Brien that was shared with Donais, could that information have been shared with you indirectly without it being labeled as, I'm sharing with you information from Craig. Could that infection have occurred --

A I don't understand your question, sir.

MR. SNOW: Well, I object, Your Honor. This is asking for speculative comment as to what could've happened or what might've happened.

THE COURT: Right.

MR. SNOW: We're here dealing with facts, what was actually --

MR. BISASOR: All right, let me rephrase --

MR. SNOW: -- transmitted --

MR. BISASOR: -- I'm rephrasing, it's --

THE COURT: Yeah, I would need to --

MR. BISASOR: -- no problem.

THE COURT: -- I think it's already been answered, but I would need to know if he received any information directly from Robert O'Brien based on Robert O'Brien's interview of either you or Ms. Anderson.

MR. BISASOR: Right. Right, so what happened, Your Honor, is that there was a 20-minute conversation that took place between the Plaintiff --

MR. SNOW: Well, there can't be -- you can't testify, sir, that's not fair.

MR. BISASOR: No, I'm addressing the substance -- the foundation --

MR. SNOW: No, you're providing --

MR. BISASOR: You already introduced --

MR. SNOW: -- testimony here.

MR. BISASOR: -- the issue of the affidavit earlier as well, I'm just trying to lay the foundation. There was a 20-minute conversation that took place between Robert O'Brien and the Plaintiff. Robert O'Brien contacted Craig Donais and discussed what was discussed with the Plaintiff in that 20-minute conversation. Craig Donais then sent -- gave him advice about the details, saying it was a good contract case, but he's not (indiscernible) in discrimination and whatnot, and he laid out his opinion on the case, because Robert O'Brien was trying to bring Donais onto the case at that time.

So Craig Donais was in receipt of a ton of

information in that, based on the conversation that the Plaintiff had with Robert O'Brien, and that Robert O'Brien had with Craig Donais. So in the shared -- in the discussions that took place with Mr. Terrell and Donais, whether by email or otherwise, I'm trying to establish that, just because he may not have said this came from Andre, that the infection in the case of getting confidential information that was shared to Donais from Brian through the Plaintiff, right, that's one way in which an infection could've incurred (sic) without him even knowing or realizing it, because if the two attorneys are working the case, what Donais knows in his brain, he can share input into the pleadings or in discussions without labeling as such.

THE COURT: I would only want to know if any of that information was ever shared with Attorney Terrell, that's the question.

MR. BISASOR: Right. So I guess the question is that maybe Donais needs to answer that question, because Terrell probably wouldn't know what was that --

THE COURT: But he's not Attorney Donais, and we're talking about an affidavit, and I just wanted to know what information that Attorney Terrell had --

MR. BISASOR: Um-hum.

THE COURT: -- based on whether it was a conversation you or Ms. Anderson had with Attorney O'Brien, or a

conversation that you had as Andre with Attorney Donais. That's what I need to know.
BY MR. BISASOR:
Q Mr. Donais stated in his affidavit that I accused him of discrimination for not taking his case. Did he ever share that with you?
MR. SNOW: Well --
THE COURT: I'll let him answer the --
MR. SNOW: -- because --
THE COURT: -- question, I -- he can answer the question.
THE WITNESS: I don't remember, I really don't remember that.
BY MR. BISASOR:
Q Why is it that you didn't share the communication about this email, which only surfaced months after the initial sidebar, January 18, before Judge Moore?
A You're talking about this January 11 email?
Q Yes. That --
A We --
Q -- information.
A -- we provided it to the --
Q Hold on, let me --
A -- district court.
Q -- ask my question, let me ask my question. Before

Judge Moore -- when Judge Moore and Elliott Berry, who's the one that started raising these concerns, I'm just piggy-backing off of that. When those concerns were raised and Judge Moore was asking about what was shared, do you recall testifying -- saying as an officer of court, we never shared any information about the case --

A I'm --

Q -- with Donais?

A -- I don't think I would've said, we haven't -- I don't recall precisely what I said, but I said words to the effect consistent with what I'm saying here today. And that is that he and I had had the conversation that's reflected in my -- in this January 11 email from Craig to me. And I didn't -- we didn't have any sharing of information beyond the information that's in this January 11 email.

Q Okay, so I guess what I'm going at is the specific email and the sharing of that information, I don't believe was shared with Judge Moore, and Craig Donais and yourself had said that, as an officer of the court, we do not --

A But the --

Q -- we did not share information and so Judge Moore said unless I have information to the contrary that you did share information, because Judge Moore's clear that Craig was out, because --

A No, no --

Q -- whatever conversation --
A -- you're wrong.
Q -- took place with me --

THE COURT: Now we're just testifying, we're not asking him any questions --

MR. BISASOR: Okay.

THE COURT: -- whatsoever. So I really need you to ask him questions. You testifying is not helpful to me --

MR. BISASOR: Okay.

THE COURT: -- Mr. Bisasor, in terms of judging --

MR. BISASOR: Sure.

THE COURT: -- what level of information he had, so I can determine whether, at any point here --

MR. BISASOR: Yes.

THE COURT: -- he had a conflict of interest that would disqualify him in this case before me.

MR. SNOW: If I may, Your Honor --

MR. BISASOR: What --

THE COURT: Attorney Snow -- let me hear from Attorney Snow.

MR. SNOW: Just real quickly, all that information was embodied in my objection that was raised at the circuit court. It's not a 20-minute conversation they had, it was five minutes, and we have a copy of his phone log, which is Exhibit A. And the conversation --

MR. BISASOR: Objection.

MR. SNOW: -- and there was also Attorney O'Brien's statement that he made as an affidavit, which is Exhibit B, and the seven-minute conversation that Andre had with Attorney Donais is Exhibit C, and then I put in his affidavit as well, and he's arguing, we shouldn't include his affidavit, now he's talking all about it. I mean, he's trying to have it both ways.

MR. BISASOR: Well, all those --

MR. SNOW: It's just not appropriate.

MR. BISASOR: -- exhibits that you just referenced that you filed in this court were all from Donais. Donais is not here, I can't ask him questions about that, so that puts me in a situation where you're introducing evidence as part of your objection, but those things all are coming from Donais.

And number 2, the 20-minute conversation was not about me and Donais. We've already stipulated that was a seven-minute conversation between me and Donais. The 20-minute conversation was between O'Brien and the Plaintiff, that's what I'm saying, so I think you got it confused.

THE COURT: I'm just interested in what this --

MR. BISASOR: Okay.

THE COURT: -- particular witness had in terms of information and whether it was attorney-client privileged information that would rise to the level of him having a

conflict, whether it be at the district court level, or now at this level.

MR. BISASOR: Okay.

BY MR. BISASOR:

Q Did that email that you provided, did you provide that to Judge Moore?

A Yes. It was filed in his court, attached to the objection that Mr. Snow has been talking about.

Q On March 14th?

A I'm -- I don't recall the exact date.

Q Okay. It's testified that it's March 14th, that was after it was denied on the 10th of March. But why didn't you submit -- my question is, why didn't you submit it on January 18th when you guys were contacted by Elliott Berry the day before, raising the concern about the conflict? You guys came to court with other documents showing the call records, showing the letter from Robert O'Brien, and you didn't include the letter that showed that communication in which -- even though you had it in your possession, why didn't you introduce it then?

A Introduce it when, on what day?

Q On January 18th, to Judge Moore at the sidebar when you were discussing the conflict issue?

A Because it had just come up. We were standing right here in front of Judge Moore, Berry, Donais and myself --

Q Um-hum.
A -- and there was no reason for me to present it. I'm -- I stated in my place as an officer of the court to Judge Moore consistent with what I testified here today at greater length, and Judge Moore appeared to accept that, and I -- I forget exactly how he phrased his ruling at that point, but there really was no issue until you filed a formal motion to disqualify --
Q I didn't file that, that was Elliott Berry that did.
A Okay, when Elliott Berry filed it on your behalf, and we responded to it.
Q Well, he raised it as an officer of the court, because he was concerned about the extraordinary set of events that took place.
THE COURT: Again, you're testifying.
THE WITNESS: You're testifying.
MR. BISASOR: Okay.
THE COURT: You just need to --
MR. BISASOR: But --
THE COURT: -- ask a question.
BY MR. BISASOR:
Q So are you aware that Craig Donais was contacted by Elliott Berry on the day before January 18th, on January 17th about the conflict issue?
A Yeah.

Q Are you aware and did you assist with preparing documents, including the phone records from Donais, including a letter from a -- an affidavit from Robert O'Brien, and a phone log from Robert O'Brien, I believe? Did you -- were you aware of that or did you assist in presenting that to Judge Moore on January 18th?

A I had nothing to do with that. That was in Craig's hands. It was Craig's problem, he was dealing with it.

Q It was Craig's problem, he was dealing --

A I mean, it was his issue to handle, and --

Q But you were in possession of this email?

A Yeah, it was in -- it's in my email server. And then Craig was addressing the issue that Elliott had raised, both the day before the hearing and then in front of Judge Moore at the bench. That was Craig's issue, he was handling that, I -- I wasn't -- I had no part in that.

Q When you raised the flag -- concern about Craig in terms of the conversation with me, wouldn't, as in full candor to the tribunal rules, wouldn't that cause you to then present that information so that Judge Moore could review it to determine that communication of what was description of your conversation with him; wouldn't that have been appropriate as an officer of the court in full candor?

A We were fully -- we were fully candid with the court, and -- and when I use the -- when I use the phrase, raised a

flag, I mean something very simple. Any time I'm speaking to another lawyer who I am thinking of bringing in on a case and I find out that he has had a conversation with the opposing party, that's important and I was -- obviously wanted to know what was the extent of that communication. And the answer I got was the answer that's provided in this January 11 email.

At that point, it didn't seem to be an issue, never thought it really was an issue, and then it was raised in the sidebar in front of Judge Moore, and -- and the issue at that point really had to do with Craig's conversation with you, Craig's communications with O'Brien, and I guess O'Brien and -- and the two of you. I was not a part of that, all of that happened away from any involvement I ever had in this matter.

And that was an issue that Craig Donais had to deal with, and it had nothing to do with me.

Q Well, except to the extent that you were co-counsel under local counsel of Craig Donais --

A Right.

Q -- and if he had a conflict issue, then that would implicate you as well. Wouldn't that be your understanding?

A Theoretically, but the facts were that Craig did not know anything, did not convey anything to me of a confidential nature -- or in the nature of confidential information from you. Again, I've said it a dozen times, all Craig conveyed to me were the basic facts of your claim, that and nothing more,

and he told me that he only had a very short conversation with you and that he did not agree to represent you.

Q Well, you can't testify --

A That's his --

Q -- to what Craig --

A -- from where I was sitting, that was the sum total, beginning and end of the matter.

Q I don't think you can testify as to what Craig knew or didn't know.

A I'm not trying --

Q You can only say --

A -- to do that, and I didn't --

Q -- he told you.

A -- do that.

Q That's fine, but what I'm saying is that your -- I guess, the fact that you did not disclose that letter to the judge is concerning, because it didn't allow the judge to have the full information --

THE COURT: That's not a question, you're just --

MR. BISASOR: Okay.

THE COURT: -- lecturing him on --

MR. BISASOR: All right, so --

THE COURT: -- be concerning. I'm at the point where I --

MR. BISASOR: Well, it was presented --

THE COURT: -- think I'm very well educated as to what Attorney Terrell knew and didn't know as he became involved in this case. We're starting to really beat --

MR. BISASOR: Okay.

THE COURT: -- a dead horse here.

MR. BISASOR: That's to --

THE COURT: I have to leave for Concord at 4:15, so I'll --

MR. BISASOR: Just two more question.

THE COURT: -- I'll allow you to ask your two questions.

MR. BISASOR: Okay.

THE COURT: Go right ahead.

BY MR. BISASOR:

Q When you were preparing the pleadings, the motion to dismiss in the district court hearing, I think it was a 60-page document --

A No, but go ahead.

Q -- total amount, it was a very involved document, it was a long pleading with a lot of exhibits. Would you agree it was about 60 pages, I think? Elliott Berry had counted it to be 60 pages. In that pleading, did you work with Attorney Donais in drafting that pleading?

A Not really.

Q Just you alone did it?

A Yeah, Craig -- apart from his conversation with you, Craig really, at that point, wasn't involved in this case. I was communicating and talking directly with Adam and Dave and -- and folks at the hotel and doing my own research and working up the case, and I was working on it at that point, all by myself.

Q So when he signed his name to it and submitted it to the court and his signature is on it, he wasn't really involved it, it was just --

A He read the pleadings, he understood the issues, but he wasn't involved in depth in the drafting of that particular pleading.

Q Okay.

MR. BISASOR: I guess, Your Honor, I'm at a little bit of a standstill, and I'll conclude my questions here. I'm a little bit of a standstill because I can't properly engage the engine of truth here without Craig Donais, because there are statements that he's making that I don't believe to be true, that we have reason to believe Craig Donais, based on his affidavits and other statements he made before Judge Moore, contradicts the testimony presented today. And so without being able to have Donais here, Your Honor, I don't know if there's a way to bring back Donais here on a limited basis on the morning of the 8th, just to conclude this issue for me, 30 minutes. That would really help us, Your Honor, getting to it,

# ATTACHMENT 5

## Motion for Leave to File Surreply to Resp to Obj to MTD Plfs

Filed
File Date: 10/8/2025 9:17 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

# EXHIBITS

## FOR

# PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM

**Filed for Plaintffs**

**Dated: October 6, 2025**

**[PART 2 OF 2][1]**

[1] The Exhibits had to be broken into parts because of file size limitations that prevented the upload of one combined document via the e-filing system.

# EXHIBIT LIST/TABLE OF CONTENTS FOR MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY [PART 2]

1. Exhibit 30 – Excerpt of Transcript of Hearing with Judge Christopher Barry-Smith citing credibility of "Jussie Smollett" analogy supporting harm from alleging racial hoax defamation.
2. Exhibit 31 – Letter from Connecticut Bar Counsel via Connecticut Superior Court Judge Regarding Donais' Misconduct | Excerpt of Finding by Connecticut Judge Regarding Donais' Misconduct.
3. Exhibit 32 – Donais' Withdrawal of Connecticut Law License.
4. Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest.
5. Exhibit 34 – Full Official Transcript of the District Court Hearing with Judge Paul Moore on 1-18-17.
6. Exhibit 35 – Relevant excerpt of transcript of Karl Terrell's Testimony in 4-27-17 in preliminary injunction hearing in superior court.

# Exhibit 30

Volume: I
Pages: 1-24
Exhibits: 0

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX COUNTY SUPERIOR COURT

* * * * * * * * * * * * * * * * *

ANDRE BISSASOR *

v. * Docket No. 2081CV00087

CRAIG DONAIS *

* * * * * * * * * * * * * * * * *

HEARING

BEFORE THE HONORABLE CHRISTOPHER K. BARRY-SMITH

APPEARANCES:

For the Plaintiff:
Pro Se

BY: PRO SE

For the Defendants:
Pro Se

BY: PRO SE

Woburn, Massachusetts
Courtroom via Zoom
November 13, 2020

Sherri L. Breach
Approved Court Transcriber

undermined the case. It undermined the ability to settle the matter with the underlying defendants in that case.

And I should also point out that that case ended up resulting later on, after much back and forth and after much litigation, ended up in a situation where the value of the case was determined to be in the six figures. And I can't go into detail right now about that because it does involve a settlement negotiation situation, which has been stalled and whatnot. But the bottom line is that the case has not been resolved, and the impact and the interference by the defendant in that matter has, you know, interfered with that proceeding, that litigation, and those claims who the defendant represented at one point and then no longer represented them.

And I should be clear that when he no longer represented them, that is when the majority of the wrongful acts or the torts took place.

So the bottom line, Your Honor, is that the -- you know, I want to point out, too, Your Honor, that surrounding the issue of racial -- race-based perjury, which is what I've articulated in the pleadings, Your Honor, it's almost as if he would compare it to the well-known example of the Jussie Smollett false claim of racism and the false attack that occurred in Chicago. That subjected Mr. Smollett to tremendous despise and contempt in the community because

there was the perception of a frivolous false claim of an accusation of racism.

And I use that as an example in my pleadings, Your Honor, that Mr. Donais has falsely accused me of accusing him of racial discrimination in a frivolous manner; that there would be no conceivable way in which my accusation against him that he was racially discriminating against me at the relevant time in question, there would be no way for it to be valid. There would be no way for it to make sense. It suggests that I'm a crazed --

THE COURT: All right. Let me interrupt. Let me interrupt for a second. Let me interrupt because you're getting into the merits now, which I'm not really going to do.

MR. BISSASOR: Oh, I'm sorry.

THE COURT: -- And I just -- I think your example --

MR. BISSASOR: Oh, okay.

THE COURT: -- is a good one about false racism claims being covered widely in a particular city or, state or country that thereby hurts someone's reputation.

One of the questions on my mind here is that we don't seem to be dealing with a broad circulation of allegedly false acts. It's an affidavit in a court proceeding and I don't have any information that it was publicized broadly. So since we're talking about reputation and emotional harm,

# Exhibit 31

Exhibit 3

STATE OF CONNECTICUT
JUDICIAL BRANCH

COURT OPERATIONS DIVISION

**OFFICE OF CHIEF DISCIPLINARY COUNSEL**
Desi Imetovski, *Assistant Chief Disciplinary Counsel*

*100 Washington Street*
*Hartford, Connecticut 06106*
*(860) 706-5055 Fax (860) 706-5063*
*E-mail: Desi.Imetovski@jud.ct.gov*

January 15, 2016

New Hampshire Supreme Court
Attorney Discipline Office
ATTN: Janet DeVito, Esquire
4 Chenelle Drive, Suite 102
Concord, New Hampshire 03301

RE: Referral of Attorney Craig Donais

Dear Attorney DeVito:

As per our conversation in connection with the New Hampshire attorney referenced above, please find a copy of the Memorandum of Decision as well as a transcript of the proceedings dated October 5, 2015 regarding Attorney Craig Donais. These documents are being provided for further investigation by your office of probable attorney misconduct which occurred in Connecticut. Do not hesitate to contact my office with any questions or if additional information is needed.

Thank you in advance for your attention to this matter.

Very truly yours,

Desi Imetovski

Enclosures:/as listed

cc: Hon. Sheila A. Ozalis (without enc.)

**Excerpt from Connecticut Superior Court Judge's ruling**
**(in *Golf Ridge Micro Cap LLC v Aftokinoto Properties Inc.*, Superior Court Judicial District Danbury, December 18, 2015 Memorandum of Decision, Case# DBD-CV-13-6011692S)**

George, advised the court, that shortly before Mr. West's affidavit was filed in this action, he and defendant's New Hampshire counsel, Attorney Craig Donais, had communicated. Attorney George represented that he told Attorney Donais that Mr. West was contemplating filing an affidavit in this action and Attorney Donais had told him "your client will be sorry if he goes to testify today." (10/5/15 Tr. pp. 9-10). Attorney George then represented that Mr. West did supply an affidavit and a few months later Mr. West was sued by the defendant Aftokinito in New Hampshire in August 2015. (10/5/15 Tr. p.10.) Attorney George also advised the court that Attorney Donais had explicitly offered to Mr. West's New Hampshire attorney at the very first hearing in the New Hampshire case in September 2015, that if "Mr. West does not go down to testify in Connecticut, we'll drop the lawsuit in Rockingham County." (10/5/15 Tr p. 11.) Attorney George was deeply concerned by the statements made by New Hampshire counsel.

The court made an inquiry as to whether New Hampshire counsel, Attorney Donais, was sitting in the courtroom observing this proceeding, and defendant's Connecticut counsel, Attorney McCabe, advised the court that he was. This court ordered Attorney Donais up to the front of the courtroom to address the court and swore him in. Attorney Donais was explicitly asked if he told counsel for Mr. West "that if he did not come to testify in this proceeding, you'd drop the lawsuit against him." The following colloquy on the record followed the court's inquiry, which the court finds important to include in this decision:

The Court: "Yes. Did you tell the attorney for Mr. West that if he did not come to testify in this proceeding, the lawsuit in New Hampshire would be dropped against him?

Mr. Donais: We were exploring options, Your Honor, with his counsel in New Hampshire about the case and under New Hampshire rule of evidence 408, it was a settlement discussion with his counsel, Your Honor.

The Court: Well, I'm concerned here about intimidation of witnesses, so my question to you is; did you tell his counsel that if he did not come to this proceeding that you would drop the lawsuit?

Mr Donais: I don't believe we said that specifically, Your Honor.

The Court: What did you say generally, sir?

Mr. Donais: We – We generally said that we really didn't have an interest in pursuing Mr. West, *but if Mr. West was going to make trouble, by being involved in this proceeding, by injecting himself in a way that he did not need to* that we were going to proceed with the case in New Hampshire.

The Court: Okay. And, did you say that if he did not come into this proceeding and testify that you would drop the case?

Mr. Donais: We didn't, specifically, say we were going to drop the case." (Emphasis added. 10/5/15 Tr. pp. 13-14.)

It is clear from Attorney Donais' statements that the lawsuit in New Hampshire was brought in an effort to prevent Mr. West from providing testimony and evidence in this litigation. Attorney Donais' comments that "we really didn't have an interest in pursuing Mr. West" defies logic if defendant Aftokinito's story is to believed that it paid Mr. West $150,400 for ten classic cars that it never received. Attorney Donais' further comment that *"if Mr. West was going to make trouble, by being involved in this proceeding, by injecting himself in a way that he did not need to, then they were going to proceed with the case in New Hampshire*" against him is troubling to this court. (10/5/15 Tr. pp. 13-14.)

On October 5 and 15, 2015, this court held hearings with evidence and testimony from defendant's principal Mr. Condodemetraky, another employee of defendant and Mr. West. Mr. West testified credibly that he never prepared nor signed the Motor Vehicle Purchase Agreements for the sale of the ten classic cars, never received any payment from the defendant for any vehicles, that he had closed down the location of his business in September 2013, and all of the

Case 1:25-cv-00525-SE-AJ Document 17-4 Filed 10/21/25 Page 1 of 5

# Exhibit 32

# Connecticut Law License Retirement of Donais

State of Connecticut
Judicial Branch

Back to Attorney Firm Look-up

Registered Juris Information For: **CRAIG STEPHEN DONAIS**

| | | | |
|---|---|---|---|
| Juris Number: | 414541 | Office Address: | WADLEIGH, STARR & PETERS, PLLC<br>95 MARKET ST<br><br>MANCHESTER, NH 03101<br>(603) 669-4140 |
| Current Status: | Retirement | | |
| Juris Type: | A | | |
| Admission Date: | 11/7/1997 | | |

Court History

| Action | Start Date | Reinstated Date | Action Comments |
|---|---|---|---|
| Retirement | 1/5/2017 | | |

# Exhibit 33

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 06-CV-5189 (JFB) (WDW)

---

MICHAEL FIERRO AND CHRISTINE FIERRO,

Plaintiffs,

VERSUS

THOMAS GALLUCCI AND FLORENCE GALLUCCI,

AND

VILLA POINTE LLC, JAMES NICOTRA AND ANN MARIE NICOTRA

Defendants.

---

MEMORANDUM AND ORDER
December 4, 2007

---

JOSEPH F. BIANCO, District Judge:

Plaintiffs Michael and Christine Fierro brought this action against Thomas and Florence Gallucci, Villa Pointe LLC, and James and Ann Marie Nicotra, claiming that defendants committed fraud by making false and misleading statements to the plaintiffs in order to induce plaintiffs to enter into a contract of sale for their home. Plaintiffs contend that the subsequent demolition of the home and development of the property constitute, among other things, fraud, fraudulent inducement, and breach of contract. Plaintiffs now move to disqualify defendants' counsel – namely, the law firm of Dollinger, Gonski, and Grossman (hereinafter, "the Dollinger Firm" or the "Firm") – because, according to Michael Fierro, he consulted with a member of the Dollinger Firm almost two years prior to bringing this lawsuit about the subject matter of this lawsuit. As set forth below, the motion to disqualify is granted.

## I. BACKGROUND

### A. The Amended Complaint

This case involves the plaintiffs sale of their residence at 327 Lakeview Avenue in Rockville Centre, New York (hereinafter, the "Residence"), to Thomas and Florence Gallucci (hereinafter, the "Gallucci Defendants").

According to the amended complaint, plaintiffs were introduced to the Gallucci Defendants by James and Ann-Marie Nicotra (hereinafter, the "Nicotra Defendants"), who reside immediately adjacent to the Residence. (Amended Compl. ¶ 8.) The amended complaint alleges that the Gallucci Defendants, the Nicotra Defendants, and an LLC created by the Galucci Defendants – namely, Villa Pointe LLC – "were partners in a scheme to con the Plaintiffs into selling the Galucci Defendants their Home, and to then tear it down and develop the property with new homes." (*Id.* ¶ 9.) Specifically, it is alleged that the Gallucci Defendants fraudulently concealed their intention to tear down the home and develop the property. (*Id.* ¶ 11.) Less than one week prior to the consummation of the contract of sale in August 2004, the Gallucci Defendants allegedly informed plaintiffs that they wished to have the right to purchase the home under the contract of sale transferred to the Villa Pointe LLC. (*Id.* ¶ 19.) According to the complaint, prior to the agreement to this assignment of rights to the LLC, plaintiffs asked the Gallucci Defendants whether they intended to tear down the Residence and the Gallucci Defendants denied any current intention to tear down the home. (*Id.* ¶¶ 23-24.) The complaint further alleges that, within one month after the closing on the Residence, the Gallucci Defendants had arranged for the property to be re-zoned for two homes and, shortly thereafter, had the Residence destroyed. (*Id.* ¶¶ 28-29.) Plaintiffs allege that, pursuant to a partnership with the Nicotra Defendants, the Gallucci Defendants (through the Villa Pointe LLC) built two new residences in place of the Residence which sold for approximately $1,300,000 each. (*Id.* ¶¶ 30-31.)

Plaintiffs allege, among other things, that the Gallucci Defendants and Nicotra Defendants made false and misleading statements prior to the signing of the contract of sale in order to fraudulently induce them to enter into the contract of sale for the purchase of the Residence. (*Id.* ¶¶ 35,45.) Plaintiffs contend that "had the [Plaintiffs] known about Defendants' plan to tear down their Home, and had it not been for Defendants' false and misleading statements to Plaintiffs, Plaintiffs would have never sold the Home to Gallucci Defendants, nor would they have agreed to the assignment for the contract of sale to the LLC or the waiver of the rights under the contract of sale." (*Id.* ¶ 32.)

B. Facts Regarding Disqualification Motion

According to plaintiffs, in late November/ early December of 2004, plaintiffs became aware of defendants' intentions and actions to demolish plaintiffs' former residence and develop the property. According to Michael Fierro, he then consulted with Matthew Dollinger, Esq., of the Dollinger Firm on at least two, and possibly three, occasions. (Michael Fierro Affidavit ¶ 3.) Mr. Fierro stated in his affidavit that these conversations related to potential claims pertaining to the subject matter of this action:

> The subject of my conversation with Mr. Dollinger related to potential claims for fraud against the defendants in the above-referenced lawsuit, relating to the sale of our former home. During the conversations, Mr. Dollinger and I discussed the underlying facts of the case, potential claims against the defendants, potential defenses available to the defendants, dollar amounts at risk, and

> relevant case law and other legal theories applicable to the facts in issue.

(*Id.* ¶¶ 4-5.) Mr. Fierro further contends that a fax was sent to him relating to the relevant case law pertaining to plaintiffs' claim. (*Id.* ¶ 6.) Finally, Mr. Fierro states the following: (1) "I have not consented to the Dollinger firm's representation of the defendants in this action" (*Id.* ¶ 7); and (2) "I have not consented to the disclosure of any of the contents of my conversations with any employee of the Dollinger firm nor of any confidential information concerning this case in the Dollinger firm's possession, nor have I waived the attorney-client privilege covering my conversations with the Dollinger firm and its employees" (*Id.* ¶ 8). Plaintiffs decided not to retain Mr. Dollinger and his Firm to represent them in this matter and filed this lawsuit *pro se* on September 25, 2006.

Mr. Dollinger stated in an affirmation to the Court that he has "absolutely no recollection of ever having been contacted by Michael Fierro, or anyone on behalf of the plaintiffs." (Dollinger Affirmation ¶ 5.) Mr. Dollinger further stated that he does "not recall ever speaking with Bernadette Arnold, Esq., who apparently was Mr. Fierro's real-estate attorney in connection with the transaction underlying the plaintiff's lawsuit." (*Id.*) However, at the Court's request, Mr. Dollinger searched the Firm's records to determine whether there is any documentation reflecting contact with Mr. Fierro.[1]

A search of the Firm's records revealed a record of a phone message from Mr. Fierro taken by Mr. Dollinger's Office Administrator on December 10, 2004, which suggests that Mr. Dollinger spoke with Bernadette Arnold on December 9, 2004, and that the Dollinger Firm had sent a fax to Mr. Fierro. (*Id.* ¶ 10; *see also* Attachment to Aug. 14, 2007 Letter to the Court.) A further search of telephone company records by the Firm reflects that two telephone calls were placed from the Firm to plaintiffs' telephone number in Atlanta, Georgia, one lasting 36 seconds, and another lasting ten minutes, twelve seconds. (Dollinger Affirmation ¶ 13.) Based upon these records, Mr. Dollinger concluded the following in his Affirmation: "I assume from these records that I called Michael Fierro and spoke with him for about ten minutes. But again, I have no recollection of ever having spoken to him. I kept no record of any conversation between myself, and Michael Fierro." (*Id.*) Mr. Dollinger emphasized, "I have not worked on, nor have I had any connection with this case except my appearance before Judge Bianco on August 7, 2007 to address the conflict-of-interest issue."

[1] The Court notes that both Mr. Dollinger and the Dollinger Firm have acted in good faith at all times in this litigation in attempting to provide to the Court any information or documentation in their possession that may be relevant to plaintiffs' motion for disqualification. Although Mr. Fierro claims that Mr. Dollinger has unnecessarily disclosed confidential communications to the Court, the Court finds the allegation to be without merit. Instead, Mr. Dollinger has been diligently acting as an officer of the Court in conducting a thorough search of the Firm's records and providing documentation to the Court that, in fact, helps Mr. Fierro's position by corroborating his contact with the Firm, which Mr. Dollinger does not independently recall. Although the phone record provides a very brief summary of the substance of Mr. Fierro's phone message, such disclosure to the Court in connection with the disqualification motion has not in any way prejudiced Mr. Fierro.

(*Id.* ¶ 17.) Instead, his partners, with the assistance of some associates, have performed all the legal work in this matter. (*Id.* ¶ 16.) Finally, Mr. Dollinger stated that the Firm did not make any record indicating either plaintiff as a potential client, did not open up a file as a result of the telephone contact, and never issued a bill in connection with any communications between Mr. Fierro and the Firm. (*Id.* ¶ 18.)

C. Procedural History

Plaintiffs acting *pro se* brought this action by a Summons and Complaint on September 25, 2006. Dollinger, Gonski, & Grossman was retained, through partner Floyd G. Grossman, Esq., to represent the defendants in this action. (Dollinger Affirmation ¶ 14.) On January 31, 2007, plaintiffs filed an amended complaint. On April 17, 2007, defendants moved to dismiss the complaint. In a letter filed July 17, 2007, Mr. Fierro notified the Court that he recently remembered that he had contacted Mr. Dollinger two years prior to bringing this lawsuit about the subject matter of this lawsuit. On September 17, 2007, plaintiffs moved to disqualify defense counsel.

II. DISCUSSION

A. Standard for Disqualification of Counsel

Disqualification is viewed "with disfavor in this circuit," *In re Bohack Corp.*, 607 F.2d 258, 263 (2d Cir. 1979), because it "impinges on parties' rights to employ the attorney of their choice." *U.S. Football League v. Nat'l Football League*, 605 F.Supp. 1448, 1452 (S.D.N.Y. 1985) (citation omitted). In particular, the Second Circuit has noted the "high standard of proof" required for disqualification motions because, among other things, they are "often interposed for tactical reasons, and that even when made in the best of faith, such motions inevitably cause delay." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); *accord Gov't India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

Nevertheless, the disqualification of counsel "is a matter committed to the sound discretion of the district court." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). A federal court's power to disqualify an attorney derives from its "inherent power to 'preserve the integrity of the adversary process,'" *Hempstead Video, Inc. v. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)), and "is only appropriate where allowing the representation to continue would pose a significant risk of trial taint." *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) (internal quotation marks omitted). In exercising this power, courts look for "general guidance" to the American Bar Association ("ABA") and state disciplinary rules, although the Second Circuit has emphasized that "not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc.*, 409 F.3d at 132.[2] However, "any doubt is to be resolved in favor of disqualification."

---

[2] The Court also notes that Civil Rule 1.5(b)(5) of the Local Rules of the U.S. District Courts for the Southern and Eastern Districts of New York binds attorneys appearing before those courts to the New York State Lawyer's Code of Professional Responsibility. Local Civ. R. 1.5(b)(5); *see, e.g., United States v. Hammad*, 846 F.2d 854, 857-58 (2d Cir.1988); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y.1990) ("[I]n this Court federal law incorporates by reference the Code of Professional Responsibility.").

*See Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975); *see also Nichols v. Vill. Voice,* 99 Misc.2d 822, 826, 417 N.Y.S.2d 415 (N.Y. 1979).

B. Grounds for Disqualification

Plaintiffs argue that the Dollinger Firm should be disqualified because, almost two years before bringing this action, plaintiff Michael Fierro had preliminary discussions with the Firm regarding his claims and potential representation in this matter. Specifically, plaintiffs contend that the Firm's continued representation of the defendants would violate New York Code of Professional Responsibility, Disciplinary Rule 4-101(B) and Disciplinary Rule 5-108.

Defendants argue that the motion to disqualify the Dollinger Firm should be denied because of the following: (1) there was never an attorney-client relationship established between the Mr. Dollinger or the Firm and Mr. Fierro; (2) there was no indication that there were any "secrets" or "confidences" discussed during the conversations between Mr. Dollinger and Mr. Fierro; and (3) even if such secrets or confidences were discussed, Mr. Dollinger has no recollection of any such conversations. Thus, defendants contend that there is no conflict of interest in continuing to represent the defendants in this lawsuit.

As set forth below, the Court concludes that plaintiffs have made a sufficient showing to warrant disqualification of the Dollinger Firm. Fierro's statement in his affidavit – that he consulted with Mr. Dollinger in late 2004 regarding the subject matter of this case, including potential claims, potential defenses, and relevant case law – is corroborated by a phone message and phone records maintained by the Firm. Thus, this preliminary discussion regarding the subject matter of this litigation fell within the umbrella of an attorney-client relationship and was privileged. This prior consultation with Mr. Fierro regarding the exact subject matter of this litigation is sufficient to warrant disqualification. Although Mr. Dollinger does not recall any client confidences revealed to him during the conversation, his failure to recall such conversations does not vitiate the otherwise clear basis for disqualification.

a. Code of Professional Responsibility Disciplinary Rules 4-101(B) and 5-108(A)

The two key provisions of the New York Code of Professional Responsibility implicated by this motion are DR 4-101(B) and DR 5-108(A). Disciplinary Rule 4-101(B) provides, in relevant part, that "a lawyer shall not knowingly: (1) Reveal a confidence or secret of a client; [or] (2) Use a confidence or secret of a client to the disadvantage of that client." (McKinney Supp. 1991).

The Disciplinary Rules define a "confidence" as "information protected by the attorney-client privilege under applicable law" and a "secret" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." DR 4-101(A) (McKinney Supp. 1991). Although DR 4-101(A) generally only applies where an attorney-client relationship is present, courts have held that an "analagous fiduciary obligation may be implied in the absence of a attorney-client relationship." *Liu v. Real Estate Inv. Group, Inc.*, 771 F. Supp. 83

(S.D.N.Y. 1991) (internal citations omitted). As the court in *Liu* noted:

> It is clear that where an attorney receives confidential information from a person, who under the circumstances has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidences irrespective of the absence of a formal attorney client relationship.

*Id.* at 86 (quoting *Nichols,* 99 Misc.2d 822, 417 N.Y.S.2d at 418); *see also Rosman v. Shapiro,* 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987); *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.,* 578 F. Supp. 1280, 1283 (D. Conn. 1984).

Disciplinary Rule 5-108 analyzes the duties owed by an attorney to a former client. Specifically, Disciplinary Rule 5-108 provides that "[a] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . .[t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client . . . ." DR 5-108 (McKinney Supp. 1991). Further, an individual lawyer's conflicts are ordinarily imputed to his firm based on the presumption that "associated attorneys share client confidences." *Hempstead Video, Inc.*, 409 F.3d at 133 (internal citations omitted); *see also* 22 N.Y.C.R.R. § 1200.27(b); *Kasis v. Teacher's Ins. and Annuity Ass'n,* 93 N.Y.2d 611, 616, 695 N.Y.S.2d 515, 717 N.E.2d 674 (N.Y.1999) ("[W]here an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are likewise precluded from such representation."). The Second Circuit has held that an attorney may be disqualified under Disciplinary Rule 5-108 if:

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video*, 409 F.3d at 133. As set forth below, under this standard, the Court finds in its discretion that disqualification is warranted because (1) plaintiffs have established that an attorney-client relationship existed as to Mr. Fierro's preliminary discussions, (2) the matters are not just "substantially related" to this litigation, but are indeed identical, and (3) it is likely that confidential and privileged information relevant to this lawsuit was shared with Mr. Dollinger during these conversations.

The first prong of this test requires an attorney-client relationship between the movant and the law firm sought to be disqualified. Although defendants point to the several factors in arguing there was no attorney client relationship – including the fact that the preliminary conversations were brief, the Dollinger Firm never opened a file related to Mr. Fierro, and the Dollinger Firm never charged any legal fees for the initial consultation – none of those factors, individually or collectively, is necessarily

dispositive in analyzing whether there was an attorney-client relationship. *See, e.g., United States v. Devery,* No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship."); *Green v. Montgomery County,* 784 F. Supp. 841, 844 (M.D. Ala. 1992) ("The mere existence of an express contract of employment, or the payment of legal fees, or the length of consultation is not determinative of whether a preliminary consultation has matured into an attorney-client relationship.").

"[C]ourts have not employed a single, well-defined test for determining whether an attorney client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *First Hawaiian Bank v. Russell & Volkening, Inc.,* 861 F. Supp. 233, 238 (S.D.N.Y. 1994); *accord Bennet Silvershein Assocs. v. Furman,* 776 F. Supp. 800, 803 (S.D.N.Y. 1981) (quoting *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.,* 578 F. Supp. at 1283); *Keoseian v. Von Kaulbach,* 707 F. Supp. 150, 152 (S.D.N.Y. 1989) (same). As the Second Circuit has stated, "[t]he key, of course, to whether an attorney/ client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." *United States v. Dennis,* 843 F.2d 652, 657 (2d Cir. 1998).

Further, whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to the attorney client privilege. *See Dennis,* 843 F.2d at 657 ("To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."); *see also Green,* 784 F. Supp. at 845 ("[T]he fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result.") (quotations and citations omitted); *Liu,* 771 F.Supp. at 86 ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."); McCormick on Evidence 6th Ed. § 88 (West Publishing Co., 2006) ( "[C]ommunications in the course of [a] preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted.").

In this instance, it is clear from Mr. Fierro's affidavit – and the corroboration contained in the phone message – that Mr. Fierro engaged Mr. Dollinger in preliminary discussions related to a legal analysis of the potential claims that could be brought in connection with the alleged fraudulent conduct by defendants during the purchase of plaintiff's Residence. Although Mr. Fierro decided not to retain Mr. Dollinger, any communication made during this preliminary consultation is protected by the duty of confidentiality and protected by the attorney-client privilege. Thus, this preliminary conversation is sufficient to establish the existence of an attorney-client relationship, even though the Dollinger Firm was not ultimately retained.

The next prong of the test requires that there be a "substantial relationship" between the issue in the pending case and those in the prior representation. "The substantial relationship test does not depend on the amount of work performed or the duration of the representation, but on the similarity of the issues in the former and current represetantions." *Arifi v. De Transport Du Cocher, Inc.,* 290 F. Supp. 2d 344, 349 (E.D.N.Y. 2003). In this case, the issues are identical. Therefore, the substantial relationship element is met.

The final requirement under the test articulated in *Hempstead Video* is that "the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client." *Hempstead Video*, 409 F.3d at 133. In finding that there was a substantial relationship between Mr. Fierro's preliminary consultation and the current litigation, a rebuttable presumption is created that Mr. Fierro imparted to Mr. Dollinger confidential information relevant to the present litigation. *See Arifi*, 290 F. Supp. 2d at 350. A party moving to disqualify opposing counsel "is not required to prove that [opposing counsel] had access to confidential information while representing the [moving party] but only that he was *likely* to have had such access." *Id.*

As noted *supra*, Mr. Ferro's statement in his affidavit that "confidences" and "secrets" were shared with Mr. Dollinger is corroborated by the Firm's records. Specifically, there are telephone records indicating that there were at least two telephone calls on December 14, 2004 between Mr. Dollinger and Mr. Fierro, one of which lasted over ten minutes. Additionally, a message left with Mr. Dollinger's assistant on that date establishes that Mr. Fierro called Mr. Dollinger, Mr. Dollinger spoke with Ms. Arnold (Mr. Fierro's real estate attorney), that a fax from Mr. Dollinger was transmitted and reviewed by Mr. Fierro, and that Mr. Fierro wanted to proceed with his claim. The message provides sufficent circumstantial evidence to conclude that it is likely that some "confidences" or "secrets" were revealed to Mr. Dollinger in order for him to evaluate the case.

Although Mr. Dollinger states that he has no recollection of any conversation with Mr. Fierro or Ms. Arnold, his failure to recall the conversation does not change the analysis. For example, in *Arifi,* the court held that the former attorney's assertion, that he could not remember any confidential information conveyed to him during the short representation of one of the defendants, did not cure the professional responsibility conflicts which were present. *Arifi,* 290 F. Supp. 2d at 350 ("While there is no reason to doubt Green's claim that he does not remember any confidential information, the Court nevertheless finds that he was likely to have had *access* to such information during the short representation."); *see also Schwed v. Gen. Elec. Co.,* 990 F. Supp. 113, 117 n.2 (N.D.N.Y. 1998) (holding in a case where attorney claimed he did not possess confidential information and did not recall any discussions regarding the case, that the third prong of the Second Circuit test was nevertheless met because there was a likelihood that attorney had access to confidential information.) This Court agress with the analysis in those cases and finds that Mr. Dollinger's lack of recollection does not negate the fact that Mr. Dollinger likely had access to "confidences" or "secrets" during

Mr. Fierro's preliminary discussions and, thus, the third prong has been met.

In sum, the Court finds that all of the requirements of the *Hempstead Video* test have been met and that disqualification is warranted.[3] In reaching this decision, the Court recognizes that the defendants have already moved to dismiss the lawsuit because they argue that it must fail as a matter of law. Defendants argue that the motion to disqualify should be held in abeyance until after the defendants' motion to dismiss is decided.[4] However, the Court believes such an approach under the circumstances presented here is ill-advised. Although that motion to dismiss is fully briefed, the Court is going to hear oral argument on that motion and believes that this disqualification issue should be resolved prior to having oral argument and addressing the motion to dismiss.[5] As the court stated in *Mitchell v. Metropolitan Life Insurance Co., Inc.*,

> Client confidences are not so inert as to limit their usefulness to defined legal disciplines or practice areas. They are fungible, and once disclosed can be applied by an experienced lawyer in ways too numerous to anticipate at this stage of the proceeding. As the Second Circuit observed, "[t]he dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical

---

[3] Plaintiffs further contend that the Firm's representation of defendants in this matter would violate Canon 9 of the Code of Professional Responsibility. Canon 9 of the Code states that "[a] lawyer should avoid even the appearance of professional impropriety." This requirement "reflects the bar's concern that some conduct which is in fact ethical may appear to the layman as unethical and thereby erode public confidence in the judicial system and the legal profession." *Liu*, 771 F. Supp. at 87 (S.D.N.Y. 1991). A motion to disqualify under Canon 9 should only be granted under circumstances in which the facts present a real risk that the trial will be tainted. *See Nyquist*, 590 F.2d at 1246; *accord United States Football League,* 605 F. Supp. at 1452. Although the Court has already concluded that disqualification is warranted under the *Hempstead Video* test, the Court also finds that disqualification is warranted under Canon 9. In the present case, defendants' counsel was consulted by the plaintiffs, but then was retained by the defendants. Such facts raise the specter that this litigation could be tainted. *See Liu,* 771 F. Supp. at 87 ("Although this is not strictly a successive representation problem because R & D simultaneously consulted with plaintiffs and [defendant] simultaneously, the second situation is not implicated here. R & D's initial involvement with parties having adverse postures in this litigation raises significant risks that the trial will be tainted or will appear to be tainted to the laymen."). For the reasons stated above, the risk of the litigation being tainted, or appearing to be tainted, is real.

[4] As a threshold matter, the Court notes that this argument is inconsistent with the position taken by counsel for the defendants at the August 7, 2007 pre-motion conference at which both sides agreed that the Court should decide the disqualification issue before addressing the motion to dismiss. In any event, as set forth *infra*, the Court declines to follow the approach suggested by the defendants

[5] The Court also notes that, even assuming *arguendo* defendants are successful in their motion, the Court would generally provide plaintiffs with an opportunity to replead to attempt to cure any pleading defects, which could then lead to another round of motion practice.

propriety of a lawyer's representation in a given case."

No. 01 CIV. 2112 (WHP), 2002 WL 441194, at *8 (S.D.N.Y. Mar. 21, 2002) (quoting *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973). Given the circumstances, and the fact that Mr. Dollinger's conflict is imputed to the Firm, the Court will not allow the Dollinger Firm to continue the representation even for purposes of a motion to dismiss.

C. Undue Delay

Defendants also contend that plaintiffs' delay in bringing this motion is evidence that they are using disqualification as litigation tactic and, therefore, disqualification should be barred. Defense counsel cites to *Abel v. Morabito,* No. 04 Civ. 7284 (SCR)(MDF), 2005 WL 2452906, at *1 (S.D.N.Y. Oct. 3, 2005) for the proposition that a negative inference should be drawn from delay. In *Abel*, the court had set a discovery schedule five months prior to when the motion for disqualification was filed. *Id.* At the time of the motion for disqualification, various discovery disputes were ruled on and a deposition schedule was about to be set. *Id.* However, the court in *Abel* specifically stated "[d]elay in bringing an application to disqualify counsel, whether tactical or inadvertent, cannot defeat the motion because the basis for disqualification, if it exists, would be a breach of the Code of Professional Responsibility, a matter which implicates the public interest." *Id.* at *1 (internal citations omitted). Thus, undue delay was not a factor in the court's analysis and decision to deny the motion.

In the instant case, the Court does not believe there is any basis to conclude that plaintiffs intentionally delayed bringing this motion. First, the Court has no reason to doubt Mr. Fierro's representation that he did not immediately realize that the Dollinger Firm is the same firm that he had engaged in these preliminary discussions several years ago. Moreover, Mr. Fierro has gained no tactical advantage by not raising this issue as soon as the Dollinger Firm appeared in the action. The case was filed in September 2006, discovery has not begun, and defendants have suffered no material prejudice from any alleged delay. *See, e.g., Talvy v. Am. Red Cross in Greater N.Y.,* 205 A.D.2d 143, 618 N.Y.S.2d 25 (1st Dept. 1994) (disqualification motion made three years had elapsed), *aff'd, 87* N.Y.2d 826, 661 N.E.2d 159, 637 N.Y.S.2d 687; *Potters v. 71st Street Lexington Corp.*, 8 A.D.3d 198, 779 N.Y.S.2d 473 (1st Dept. 2004) (disqualification motion made on eve of trial). Thus, the Court does not conclude there was undue delay or prejudice to the defendants from the timing of the motion. Moreover, although defendents will need to retain new counsel, that counsel will not necessarily need to duplicate the work product of the Dollinger Firm. Specifically, new counsel could adopt the motion papers already filed by the Dollinger Firm or, if necessary, the Court will allow supplemental briefing before oral argument.

III. CONCLUSION

For the foregoing reasons, plaintiffs' motion to disqualify Dollinger, Gonski and Grossman is GRANTED. Defendants will have 30 days to obtain new counsel and have that counsel file a notice of appearance in this action. Following the filing of a notice of appearance, the Court will schedule a telephone conference to discuss how it intends to proceed with respect to the motion to dismiss.

SO ORDERED.

______________________
JOSEPH F. BIANCO
United States District Judge

Dated: December 4, 2007
Central Islip, New York

* * *

The attorneys for plaintiffs pro-se are Michael & Christine Fierro, 5148 Vinings Estates Way, Mableton, GA 30126. The attorneys for defendants are Floyd G. Grossman and Michael J. Spithogiannis of Dollinger, Gonski & Grossman, One Old Country Road, Suite 102, Carle Place, NY 11514.

# Exhibit 34

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - DISTRICT DIVISION - NASHUA

| | | |
|---|---|---|
| NATALIE ANDERSON, Plaintiff, | ) | District Division Case No. 459-2017-LT-00010 |
| vs. | ) | Nashua, New Hampshire |
| ADAM ROBITAILLE, Defendant. | ) | January 18, 2017 1:19 p.m. |

FINAL HEARING
BEFORE THE HONORABLE PAUL MOORE
JUDGE OF THE CIRCUIT COURT - DISTRICT DIVISION

**AMENDED AMENDED**

APPEARANCES:

For the Plaintiff: Elliott Berry, Esq.
NEW HAMPSHIRE LEGAL ASSISTANCE
1850 Elm Street, Suite 7
Manchester, NH 03104

For the Defendant: Craig Donais, Esq.
DONAIS LAW OFFICES, PLLC
444 Willow Street
Manchester, NH 03103

Also Present: Karl Terrell, Esq.

Audio Operator: Electronically Recorded
**Not Monitored**

TRANSCRIPTION COMPANY: AVTranz, an eScribers Company
7227 N. 16th Street, Suite 207
Phoenix, AZ 85020
(800) 257-0885
www.avtranz.com

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.

(Proceedings commence at 1:19 p.m.)

(Indiscernibles due to majority of hearing spent at sidebar and lots of shuffling of papers)

THE CLERK: Natalie Anderson versus Adam Robitaille.

THE COURT: Good morning. I have docket number 2017-LT-10.

MR. TERRELL: Here for Robitaille and Nashua the Homewood Suites. Mr. Berry, is he in the hall?

MR. DONAIS: He's coming in. I just went and grabbed him.

THE COURT: Okay, counsel, if I could have counsel for the record just identify yourself please.

MR. DONAIS: Sure, I'm Craig Donais, Your Honor, here as local counsel for Attorney Terrell who filed a motion that's granted by the Court pro hac vice.

THE COURT: All right. Thank you.

MR. TERRELL: Karl Terrell, admitted pro hac vice, Your Honor.

THE COURT: Thank you, counsel.

MR. BERRY: Elliott Berry, New Hampshire Legal Assistance for the Plaintiff.

THE COURT: Thank you, counsel. Ma'am, you are?

MS. ANDERSON: Natalie Anderson, Plaintiff.

THE COURT: Thank you, ma'am.

MR. BISASOR: Andre Bisasor. I'm --

MR. BERRY: Plaintiff's husband.

THE COURT: Oh, okay, that's fine. Thank you, sir.

MR. ROBITAILLE: Adam Robitaille, Defendant.

THE COURT: Thank you, sir.

MR. AKRIDGE: David Akridge.

THE COURT: Great. Thank you, sir. Okay. Now, I had an opportunity to review the parties' case file and we're here for a final hearing. Now, have the parties had an opportunity to discuss this matter?

MR. TERRELL: We have, Your Honor.

THE COURT: Any movement?

MR. TERRELL: We proposed two forms of settlement but Mr. Berry informed me a few minutes ago that there's no go.

THE COURT: Well, that's fine. I just wanted to know whether or not you've had an opportunity because if you didn't have an opportunity and you needed some time, I'd give you that time today, that's all.

MR. TERRELL: Thanks, Judge.

THE COURT: All right.

MR. BERRY: Your Honor, as a preliminary matter --

THE COURT: Yes.

MR. BERRY: -- if you looked at the file, then you know there was a pleading yesterday, a motion to dismiss on exhibits of over 60 pages dated yesterday which my client got yesterday, which I only got yesterday.

THE COURT: I have that today.

MR. BERRY: And that's one reason we would move that the case be continued at least for a reasonably short time to respond to a pleading like that.

THE COURT: Right.

MR. BERRY: There is a second reason but I would prefer that we at least be able to attest that we'd be able to approach the bench to talk about a more sensitive matter.

THE COURT: Certainly. Why don't you approach, counsel.

(Sidebar begins at 1:22 p.m.)

THE COURT: There are two issues here. Counsel, there are two issues here. The first of which is going to be if you look at the circuit court rules, he had filed -- if you look in that introducing responsive pleadings. Normally, you would do it at least ten days prior.

MR. DONAIS: Didn't even have ten days notice prior to this hearing today.

THE COURT: How many days notice did you get?

MR. DONAIS: The suit I think was the 9th probably.

MR. TERRELL: Tuesday. The 9th, it was filed on the 9th and I think we received it on the 9th.

THE COURT: Okay. The point being is that in a perfect world, you've got -- you would have received notice greater than ten days and given the opportunity to submit it

and at least ten days prior give the other party an opportunity to review and make an informative decision as to how they ought to address that.

Chances are -- this is a 540 so the reason that you received notice so quickly, you know, the 540-A, we're required to schedule these within a set period of time. That's why.

MR. DONAIS: Sure.

THE COURT: So that's a separate issue. We'll deal with your request in a second, counsel.

MR. BERRY: Sure.

THE COURT: Now, I don't think you drafted these initial pleadings.

MR. BERRY: I did not.

THE COURT: In going through the initial pleadings, the majority of what's in here has nothing to do with the 540 or 540-A. It's a contract issue. I mean --

MR. BERRY: No, I get that. And look at the end of the day, it's really about the nature of this facility, right, if it's a more like a tenancy than a guest arrangement, then they have to give and to go through the eviction process. If it's not, they don't.

But what seems like a simple question doesn't have a simple answer. And I know that's why in part Defendants would like to have a big chunk of time to make their case, which they're more than entitled to. But I think we need a little

more time to rebut that.

MR. TERRELL: The issue though is very narrow. It's rather well, do they have the rights of tenancy or are they a hotel guest which we have addressed in our pleading.

THE COURT: Right. And these matters normally, unless you file a specific request for additional time, you're allotted 30 minutes.

MR. TERRELL: Thirty minutes.

THE COURT: Right. And that's both parties.

MR. TERRELL: Uh-huh.

THE COURT: So that's something -- I don't know if it's something I'll be able to do. Now, when I finish our landlord-tenant list today, we're backed up in court and I -- so I'll be setting more probable cause hearings, we can do this afternoon and then I also have a daily supposed to be coming in. The reason I mention that is I don't -- normally I just had landlord-tenant today. We had nothing else coming over. I'd say it's not a big deal, I'll put you on last and I can give you the rest of the afternoon so I can give you an hour, hour and a half. I don't have that today. All right.

So the problem is if you're looking at anything more than 30 minutes, I don't have that time.

MR. TERRELL: How about tomorrow, Your Honor?

THE COURT: You know what the schedule is?

MR. TERRELL: I flew up here from Atlanta. I'm happy

to stay over tomorrow.

THE COURT: Certainly.

MR. TERRELL: Would prefer not to go beyond that if possible.

THE COURT: No, I understand. So counsel, while the clerk's looking at it, so why is this a tenancy matter?

MR. BERRY: Your Honor, first and foremost, but not exclusively, because they have been there for as now almost 14 months. They have a discrete room that looks and feels like an apartment. They made they feel the commitment to be there that long and believe that, you know, there was a reciprocal commitment.

So I think our case law, there's a very important case called Evans versus J Four Realty and Evans clearly recognizes that even within the 540-A -- the 540 exceptions to tenancy which includes hotels, motels, and tourist homes and others for recreational and vacation uses, that even within a facility like that, you can't have a tenancy based on the particular circumstances of that case. So --

THE COURT: Okay. The reason I was asking is I was going through -- granted, we took this granted -- this came in, I haven't had a chance to go through as yet.

MR. TERRELL: I'm not surprised.

MR. DONAIS: I know it's a --

THE COURT: So but going through what was filed

originally, I can see what the tenants are trying to do in the sense that they were utilizing the statute and basically like you said, you know, walks like a duck and quacks like a duck and talks like one, it's a duck. And that's not very eloquent, but --

MR. TERRELL: I've used it myself.

THE COURT: And that's why it's really a tenancy, but I'm not convinced. Now granted, I haven't taken a look at the rest of the paperwork and but when I say that, please don't misunderstand. I'm not predisposed.

MR. BERRY: I understand.

THE COURT: What I'm saying is based upon the pleadings filed. Now, I am assuming that if you filed these pleadings, I wouldn't be having that issue, right, because the promises are what -- you have to see the forest through the trees. There's a ton of issues here that really --

MR. BERRY: And I've made very clear to my client that the other issues will not be dependent on this Court.

THE COURT: Right.

MR. BERRY: I wonder if we could do it this way.

THE COURT: Okay.

MR. BERRY: As you say, normally you get ten days to respond. I don't want to have to make opposing counsel come back here. What if he gave me ten days to just file a response and then you decide it on the pleadings and the memos?

THE COURT: I can certainly do that. There wouldn't be anything in a 20 to 30 minute presentation that's not covered by the pleadings.

MR. BERRY: You know and to the extent they're factual disputes if -- we could certainly do that by affidavit which I imagine you'd be willing to --

MR. TERRELL: I'd like to consult with my local counsel on that suggestion.

THE COURT: Yeah, certainly. Go ahead and take a minute. All right. I'm happy to give you as much time as I can today. My problem being is that if I give you 30 minutes, I still have to review these documents and in fairness to counsel, I'd rather give him time to, you know, to really go through this and --

MR. TERRELL: Is tomorrow a possibility?

THE COURT: Madam Clerk?

THE CLERK: Tomorrow you have a block. And on Friday, it's an administrative day.

THE COURT: Yes.

THE CLERK: We have nothing in the afternoon on Friday.

MR. BERRY: Can I raise just one other issue?

THE COURT: Sure.

MR. BERRY: I mean I don't want to, but I feel like I have to. And I mentioned this to Attorney Donais yesterday.

And I wanted to make clear before I say anything and I'm not making any accusations, but I think what I'm about to tell you and what I can show you raises concern and question. Okay. And that is my client had a conference with a third attorney who and do you mind, I have the email that exchanged a lot. The third attorney called Attorney Donais and obviously discussed the case with him. After which Attorney Donais, all I can tell you right now is that there was a ten-minute, almost 11-minute conversation between Attorney Donais --

MR. DONAIS: Yeah, the --

MR. BERRY: And well, I have a record.

MR. DONAIS: I have mine, too.

MR. BERRY: And so obviously there was a discussion. And I -- again, I really want to be clear. I'm not making any accusation, but I do feel like that ethical responsibilities are such that I do need a chance to look into a little bit more about that issue because obviously there is a potential here and Rule 1.18 of the Code of Professional Ethics is really clear about prospective -- communications between prospective clients and attorneys. And so, you know, basically the duties are pretty similar.

THE COURT: So who had a conversation with --

MR. DONAIS: So here's what happened, Your Honor, is on Thursday, January 5th, at 5:37, Rob O'Brien called me and said hey, I've got a potential client, here's what the issues

are, is it something that you'd be interested in? He didn't tell me who the plaintiff was, didn't tell me who the defendant was, just generically laid out what some of the issues were.

I said I'm not interested. Rob said can I give your name to the other party so that you can explain that to him. I said I'd rather you not since I'm not interested in taking the case. I don't want to take it. I don't have the ability to do it on the timeline. Notwithstanding that, Rob gave contact information. I got a phone call -- I can give you all the records if Your Honor would like. So this is Rob O'Brien's statement of what transpired.

THE COURT: Thank you.

MR. DONAIS: So Rob told me about the case. These come from my phone records and my system, Your Honor. And I redacted out the other entries for the names of -- because they are clients --

THE COURT: Sure.

MR. DONAIS: -- and the whole bit. But there were two records. One was on January 5th.

THE COURT: Yes.

MR. DONAIS: The other was on January 6th. So on the 5th at 6:17 p.m., I had a seven second phone call and that was probably spent navigating the phone tree and it disappeared. There was another phone call on Friday the 6th at 5:16 p.m. for a minute 37. Again, navigating the phone tree. There was a

message.

Got the message, generically about hey, got a landlord-tenant case, can I talk with you about it. And I said sure. This is my call back the following day on Monday, spoke for six minutes 37 seconds to get a sense of what this case was about, Your Honor. Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien and the answer is yes. And I said I already told him I don't want to do it.

So at that point, there was pressure to what can I do with the case. I really don't want to do it. I'm not interested in doing that. I don't have the time to do it. I can't do it on the timeline that you want. May even be a potential conflict. Don't want to take the case. That was the end of the phone call.

THE COURT: See, counsel, here's the issue.

MR. DONAIS: Yeah. Well, and my conversation, Your Honor, wasn't with the plaintiff. It's -- not even a party to this case.

THE COURT: Oh, no, it's -- I understand.

MR. BERRY: If I could --

THE COURT: Just --

MR. BERRY: -- if you don't mind just as long as there's exhibits there to an exhibit showing a ten -- the (indiscernible) showing the next of the (indiscernible) a 10

minute and 40 something second phone call. And here's the emails on the (indiscernible) Friday to my client.

THE COURT: It's ten minutes -- why do I have six minutes here?

MR. BERRY: There --

MR. DONAIS: My system says it was a six minute phone call.

MR. TERRELL: Is it the same phone number? The same 781 number?

THE COURT: 624-7100. You can look at the two and tell me if it's the same number. See the issue is --

MR. DONAIS: 10:43 a.m., Your Honor. That's not how long it was. It was the time.

MR. BERRY: Oh, that could be.

MR. DONAIS: That's the time of the call. Not 11 minutes.

MR. BERRY: My eyesight is shot.

MR. DONAIS: 10:43 a.m.

THE COURT: Oh, it is, yeah.

MR. DONAIS: Which matches with my call.

THE COURT: Right.

MR. DONAIS: Right.

THE COURT: So it was six minutes and 37 seconds.

MR. DONAIS: Yeah.

THE COURT: Okay. But here's the issue. It doesn't

make a difference if you talked to the plaintiffs or not, the petitioners, (indiscernible) is the specific facts of the case, if this other attorney called you and said hey, Craig, I've got a matter involving discrimination, billing fraud and wrongful eviction --

MR. DONAIS: Uh-huh.

THE COURT: -- you know, how are these handled and he said, okay, this is what you have to do.

MR. DONAIS: Uh-huh.

THE COURT: Without getting into any of the facts.

MR. DONAIS: Uh-huh.

THE COURT: You're giving that person a really brief (indiscernible) on how to handle it, that's one issue. If you're sitting there and discussing the facts particular to the case, then that's something else.

MR. DONAIS: And I don't think we did, Your Honor. It was a generic discrimination over charge and I said I don't want to do it, Your Honor.

MR. BERRY: But take a look at the email to my client.

MR. DONAIS: But that's not my email, Your Honor.

THE COURT: Before I do that, let me share something with you, counsel. I spent about ten years on the PCC.

MR. DONAIS: Uh-huh.

THE COURT: The last four I was the vice chair of the

hearing committee.

MR. DONAIS: Uh-huh.

THE COURT: Okay. The reason I mention that is I always feel very uncomfortable when it's a JCC or a PCC complaint because once you (indiscernible) any allegation (indiscernible) you may come across, you may want to address that issue, you know, before the door is open, before the bell is -- the bell is rung.

MR. DONAIS: Uh-huh.

THE COURT: You know what I'm saying?

MR. DONAIS: Yeah.

THE COURT: And because you understand something, I think Attorney Berry is going to afford you every professional courtesy that he can --

MR. DONAIS: Uh-huh.

THE COURT: -- but he answers to his client.

MR. DONAIS: Understood, Your Honor.

THE COURT: All right. Because he has no control over that.

MR. DONAIS: Right.

THE COURT: All right.

MR. BERRY: Right.

MR. DONAIS: When the call came in from my client to do this case, found out who the plaintiff was, I did my conflict check and it was clear so.

THE COURT: Sure. No, I don't think anybody's for a second thinking that you were (indiscernible).

MR. DONAIS: And that's actually not what I said to Rob but that's okay. And I think Rob gave his own statement of what transpired in that conversation.

THE COURT: Not when you're getting statements that are (indiscernible).

MR. DONAIS: Right. I guess, Your Honor, this is kind of a contrived conflict to exclude me when this is my client and has been my client. I've worked with Dave Akridge who is the principal of the defendant for ten years on other matters and the like. So it's easy to call opposing counsel --

MR. BERRY: He can't make it a contrived conflict. In some ways it makes it worse.

THE COURT: Okay. Two things. Before this gets any further. I think the word contrived is inappropriate.

MR. DONAIS: Okay.

THE COURT: Okay. I don't think that -- and I'm not -- and I want to make sure we understand something. I'm trying to help you guys. And I don't want (indiscernible) current situation (indiscernible). That's the last thing (indiscernible).

MR. DONAIS: Sure.

THE COURT: Okay. So we've got three issues. The first of which is we have possibly a conflict issue. Okay.

And that is something that counsel needs to talk to his clients and decide --

MR. DONAIS: Uh-huh.

THE COURT: -- if there are. Because if they don't believe there's a conflict, they can waive it and we can put that issue to bed real quick. Okay, that's the first thing. If they do believe it's a conflict, then you need to have a conversation to decide how you want to handle it. That's issue number one.

The second issue, we have and I agree with counsel, I think it's a very narrow focus as to what is this.

MR. DONAIS: Uh-huh.

THE COURT: Because that's going to make a difference on once the Court determines how they're -- if it's a tenancy and, you know, whether or not their (indiscernible) rules apply as an example. Once the Court decides that and just (indiscernible), I think that's going to drive the bus and I think things may come to a resolution fairly quickly.

And the last thing is (indiscernible) want to sit down and have a conversation with your client, okay, I'm sorry, your co-counsel and decide, you know, how you want to handle it. At the same time, counsel have a conversation with your clients. Take care of the first issue, you know. And whatever happens there, that's just so you know what you're up against.

MR. DONAIS: Uh-huh.

THE COURT: Okay. Because I want you to make an informed decision before you go forward. I don't want you to get caught halfway through this. Okay.

MR. DONAIS: Okay, Your Honor.

MR. TERRELL: Your Honor, may I ask two questions?

THE COURT: Certainly, sir.

MR. TERRELL: As for the hearing option, are we down to not this afternoon, not tomorrow, but is Friday a possibility?

THE COURT: Friday is open. Friday is an admin day.

THE CLERK: Friday is an admin day. We don't have anything scheduled Friday afternoon. You're here all day.

THE COURT: Right.

THE CLERK: It's up to you. Do you want to --

THE COURT: I mean I've got a couple hearings but I can make time for you Friday afternoon if that's what you need. However --

MR. TERRELL: And alternatively that submission on pleadings --

MR. BERRY: Right.

THE COURT: Yes.

MR. TERRELL: -- as Mr. Berry suggested.

MR. BERRY: That's kind of what -- I think the problem is it squeezes me as you probably can guess, my schedule isn't all that flexible. So I'd prefer to do it on

the pleadings, but --

THE COURT: Certainly. Well, have that conversation. Come back and tell me how you want to handle it. If you can't decide between the two of you, that's fine. I'll make the decision. Fair enough?

MR. DONAIS: So I guess, Your Honor, if I'm going to withdraw from this, then what would the implications be for Attorney Terrell's pro hac admission on this case?

MR. TERRELL: I noted that in the pro hac statute that the Court has discretion to allow the pro hac admitted counsel to proceed without local counsel in the courtroom.

THE COURT: I mean and you can also just call any attorney in town. I'm sure there's a number of attorneys that would be happy to step in.

MR. DONAIS: Sure, I can certainly locate someone --

THE COURT: Right.

MR. DONAIS: -- to be able to do this.

THE COURT: Right.

MR. BERRY: Then one other issue --

THE COURT: Yes.

MR. BERRY: -- that in regard to that and again I would certainly give a lot of respect to the affidavit; it's just about the communications about this specific case.

MR. TERRELL: I'm sorry -- I'm sorry. I see your point.

MR. BERRY: (Indiscernible) the communications between the two of you about the case, like you know, so I can at least do some due diligence about whether if there were a conflict, whether it's infected corporate counsel.

THE COURT: Oh, I see.

MR. TERRELL: Well, I can state as an officer of the court --

THE COURT: Yeah.

MR. TERRELL: -- that Mr. Donais did not convey to me anything about the substance of any conversation he had with the plaintiff.

THE COURT: All right. Counsel?

MR. BERRY: I mean I would say I have to consult with my client but I hear that and respect it.

THE COURT: I mean as an officer of the court unless I have any information to the contrary, I would accept that. But again, I want to give Attorney Berry an opportunity to do some due diligence just to make sure. So have that conversation, let me get back to my list and I'll call you back in a few minutes.

MR. BERRY: Thank you very much.

MR. DONAIS: Thanks.

(Sidebar ends at 1:41 p.m.)

(Recess at 1:41 p.m., recommencing at 3:03 p.m.)

THE COURT: All right, counsel, if you would be kind

enough to approach? I didn't want to keep you waiting if you had --

(Sidebar begins at 3:03 p.m.)

MR. TERRELL: Appreciate that. We're inclined from my client's side to proceed on pleadings. Mr. Berry wants to submit something as well. Our concern with doing it that way is it's just going to stretch this out. It's our belief, it's your decision, that they're hotel guests and we want to end that relationship as soon as we can.

But we're prepared to do it on the pleadings. We would request a short timeline for Mr. Berry to submit his --

THE COURT: And the issue is hotel guest v. --

MR. TERRELL: Versus hotel --

MR. BERRY: Tenancy -- tenant.

MR. TERRELL: -- versus tenant. I mean that's the issue.

THE COURT: Okay.

MR. TERRELL: There were some statements in my pleading setting forth the reasons why we want them removed from the hotel.

THE COURT: Certainly.

MR. TERRELL: I'll acknowledge that those issues are not germane to the issue of whether they're a tenant versus a hotel guest.

THE COURT: All right. How much time do you need?

MR. TERRELL: I would like Mr. Berry to submit his by this Friday.

MR. BERRY: I'm sure you would, but I need more time than that.

THE COURT: How much time do you need, sir?

MR. BERRY: I'd like ten days from yesterday which is when I got the pleading.

THE COURT: All right. So let me take a look. And I know that and I'm sensitive to your concerns, too, so don't misunderstand where I'm coming from. Okay. So yesterday was the 17th. Well, whether it's eight or ten days, we're still dealing with -- with my schedule, it's academic whether it's ten days. So I wouldn't be able to get over and deal with it until the weekend anyways. So --

MR. TERRELL: The weekend after the seven --

THE COURT: So it'd be the, you know, without getting into my calendar and everything, whether I gave Attorney Berry ten days or I cut it to seven or eight days, I'm not going to be able to get to it until the 28th, 29th anyways. So I'll take it home that weekend to get to it.

MR. TERRELL: Okay.

THE COURT: Based upon my schedule next week. So what I'll do is the pleadings, what I want to do is the deadline -- I need to have them here at the court no later than, let me see, on the 27th. Counsel?

MR. BERRY: Sure.

THE COURT: All right. That way, by 3 and that way I can take them --

MR. TERRELL: Your Honor, but it's a little more complicated than that. Based on my discussion --

THE COURT: What --

MR. TERRELL: -- we had, if Mr. Berry submits new evidence or new arguments, we would want the right to respond and the right to waive that in order to speed things up. Now, it looks like we might not be reaching a decision until on into February. And I need to discuss with my client whether they want to go that option or whether they want to have the hearing this Friday. That'll only take me a minute to have that discussion.

THE COURT: Okay. I mean what I'd do is obviously Attorney Berry is going to email it to you.

MR. TERRELL: Yeah.

THE COURT: You can email it to him, correct?

MR. BERRY: Oh, yeah. Sure.

THE COURT: Yeah, right. That way you have it when I have it or even beforehand. So if there's an issue, you can notify the Court.

MR. TERRELL: Uh-huh.

THE COURT: And we could deal with that.

MR. TERRELL: And I should be in a position where if

I need to respond, I can do so quickly, hopefully before the weekend. What day of the week is the 27th?

THE COURT: It's a Friday.

MR. TERRELL: Oh, well, maybe not.

MR. BERRY: It would be helpful if you could identify specific information that you're willing to strike because if you're willing to strike it, my client's not going to feel the need to rebut it. So if you have a chance to do that, that would be (indiscernible).

MR. TERRELL: I can -- actually I just represented those -- the representations at the end of our --

THE COURT: Right.

MR. TERRELL: -- pleading that describe the reasons why we want them removed as guests is not germane to the issue of whether they're a tenant or a guest. And you know, I would strike that.

MR. BERRY: Okay.

THE COURT: All right. What I'd like to have both you do though is prior to the 27th is give me proposed orders.

MR. BERRY: Okay.

THE COURT: So what I'm looking for is I know that you're going to be submitting your memorandums. What I want is a, you know, one page whatever it is, one page, two page, no more than two pages.

MR. DONAIS: You can put your signature on it and be

done with it.

THE COURT: I'm not saying I'm going to do that, but what I want you to do is -- I'm a fan of that because it forces the parties to review 60 pages or 40 pages, whatever it's going to be, and give me a succinct this is where I think the Court should go and this is why. And also for appellate purposes, it puts you in a situation where it's very clear for the Supreme Court as to --

MR. BERRY: Did you say you wanted that before --

THE COURT: No, can be --

MR. BERRY: Contemporaneous.

THE COURT: Contemporaneously, right.

MR. TERRELL: Your Honor, could -- I would just request because I think this might make the pleading option sit better with my client if we could move Mr. Berry's deadline to the 25th. You would still be looking at it over the weekend but that would give me a two day window to determine whether I need to do a reply response.

THE COURT: Counsel?

MR. BERRY: What day of the week?

THE COURT: Wednesday.

MR. TERRELL: 25th, which is Wednesday, right.

MR. DONAIS: That's a week from today.

MR. BERRY: We couldn't make it the 26th?

THE COURT: 26th is fine.

MR. TERRELL: By noon?

THE COURT: The 26th is fine. That works for both of you.

MR. BERRY: Okay.

MR. TERRELL: Okay.

THE COURT: So the pleadings and the proposed order, the 26th.

MR. TERRELL: Yeah.

MR. BERRY: Okay.

MR. DONAIS: And I guess with respect to myself, Your Honor, at this point, in terms of this conflict issue, it did not pop up until I guess the pleading that was prepared referenced the individual that called my office. And at this point I guess I'm looking to get out of the case. So I'm looking for an alternate --

THE COURT: Certainly.

MR. DONAIS: -- to serve as the local pro hac counsel and I guess at this point, since that's really not an issue in the case, if the documents we provided up to the bench could be discarded and not part of the file, that'd be great.

THE COURT: Certainly. Why don't I just give them back to you.

MR. DONAIS: Perfect.

MR. BERRY: Yeah, that just -- and let me just -- give me one minute to talk to my clients. Okay. Because the

issue that I realize I haven't resolved with them is possible spillover, right? And I just need to --

MR. DONAIS: And I'll represent --

MR. BERRY: I don't get to make the decision is the point of that.

THE COURT: Right.

MR. BERRY: So I just --

THE COURT: Just so it's clear, I've had representations from --

MR. BERRY: Yeah, I know.

THE COURT: -- both counsel, officers of the court, that there wasn't any in any shape, form or fashion, any discussion relative to the conversation (indiscernible).

MR. DONAIS: I didn't get names, I didn't get properties, anything specific. It was very high level --

THE COURT: So you haven't --

MR. TERRELL: He didn't -- no, he did not, Mr. Donais did not convey to me the substance of any conversation. He conveyed to me that he had spoken with someone and realized I think after the fact that it was Mr. Bisasor but he did not relay to me the substance of what, you know, was said.

THE COURT: Why don't you have that conversation now, counsel. Okay.

MR. BERRY: Okay.

(Sidebar ended at 3:10 p.m.)

THE COURT: Great. All right. While you're having that conversation, I'm going to move on to this matter. So what you can do is -- well actually, Attorney Berry, I'll give you a minute or two before I start. That way we're not interrupting.

MR. BERRY: Okay. And if could approach just for a moment.

THE CLERK: Judge, hearing (indiscernible).

THE COURT: Hearing on what?

THE CLERK: That case?

THE COURT: No, it's going to be decided on the pleadings.

(Recess at 3:11 p.m., recommencing at 3:17 p.m.)

THE COURT: Yes, counsel.

MR. BERRY: I probably need to approach, Your Honor. Probably need the other side.

THE COURT: All right. Sam, could you -- why don't you come on up while we're waiting.

(Sidebar begins at 3:18 p.m.)

THE COURT: Don't mean to mean rush; I just --

MR. BERRY: Well, look, I totally appreciate how much time you've given us.

THE COURT: Yes.

MR. BERRY: So we, on the issue of the (indiscernible), they're willing to let the case go forward

with the corporate counsel representing -- essentially representing the Defendant with different local counsel.

THE COURT: Sure.

MR. BERRY: What I have to make everybody understand is they won't make a commitment one way or the other about whether they would file a complaint not, you know, against Attorney Donais (indiscernible).

THE COURT: Nothing we can do about that.

MR. BERRY: That's right.

THE COURT: It's beyond our --

MR. TERRELL: Right.

THE COURT: So if I understand correctly, local counsel, you're going to have a local attorney file a request.

MR. DONAIS: I got a call into Dan Kalinski right now to see if he'll take it.

THE COURT: Certainly. And it shouldn't be an issue so we'll get that taken care of. That should be done in the next day or two.

MR. DONAIS: Uh-huh.

THE COURT: The 26th and proposed order along with a memorandum.

MR. TERRELL: Okay.

MR. BERRY: And you'll notify me if you -- by when if you want to respond?

MR. TERRELL: Well, logistics, if I get it from you

# Exhibit 35

STATE OF NEW HAMPSHIRE

HILLSBOROUGH COUNTY SUPERIOR COURT SOUTH

| | | |
|---|---|---|
| NATALIE ANDERSON, | ) | |
| | ) | Superior Court Case No. |
| Plaintiff, | ) | 226-2017-CV-00069 |
| | ) | |
| vs. | ) | Nashua, New Hampshire |
| | ) | April 27, 2017 |
| ADAM ROBITAILLE, et al., | ) | 10:49 p.m. |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ______________________________ | ) | |

PRELIMINARY INJUCTION/PENDING MOTIONS
BEFORE THE HONORABLE CHARLES S. TEMPLE
JUDGE OF THE SUPERIOR COURT

APPEARANCES:

| | |
|---|---|
| Pro Se Plaintiff: | Natalie Anderson<br>Andre Bisasor<br>(Address Unknown) |
| For the Defendants: | Brian Snow, Esq.<br>2 Wellman Avenue, Suite 340<br>Nashua, NH 03064 |
| | Karl M. Terrell, Esq.<br>STOKES WAGNER, ALC<br>One Atlanta Center, Suite 2400<br>1201 W. Peachtree Street, NW<br>Atlanta, GA 30309 |
| Audio Operator: | Electronically Recorded<br>By Teresa R. Neill |
| TRANSCRIPTION COMPANY: | eScribers, LLC<br>7227 N. 16th Street, Suite 207<br>Phoenix, AZ 85020<br>(800) 257-0885<br>www.escribers.net |

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.

UNIDENTIFIED SPEAKER: Your Honor --

MR. BISASOR: Your Honor --

UNIDENTIFIED SPEAKER: -- (indiscernible) --

MR. BISASOR: -- can I just say --

THE COURT: I just want to wait. First of all, what I will do is compare the motion filed in the circuit court very carefully with the motion filed before me, since it's an ethical disqualification concern, I want to be very careful about the circumstances of it. So if Attorney Terrell, who has filed the motion to appear pro hac vice, wants to testify under oath as to the information that was shared or not shared by Attorney Donais or Attorney O'Brien or Attorney Snow, I'll allow him to do that right now and I'll allow you to cross-examine him.

So Attorney Terrell, if you want to come right up here to the stand --

MR. SNOW: Oh, just a correction, Your Honor, I don't believe he has filed a motion pro hac vice yet.

THE COURT: Oh, I thought one had been filed.

MR. SNOW: It was in the district court.

THE COURT: Oh, it was in the district court?

MR. BISASOR: There was one pending here too, Your Honor, that was the whole issue.

MR. SNOW: No, there was one pending here.

UNIDENTIFIED SPEAKER: Yes, there is.

MR. BISASOR: There was a request for the family to be able to waive the fee --

MR. SNOW: Well, that's why it --

MR. BISASOR: -- and to appear here.

MR. SNOW: -- was a request, that wasn't a motion.

MR. BISASOR: Well, a request is a motion, he's asking the Court to grant it, that's being very technical, Your Honor.

MR. SNOW: Could you please raise your right hand and you'd stand?

KARL TERRELL, WITNESS FOR THE DEFENDANTS, SWORN

MR. BISASOR: Hold on a second, I have some question before you start.

THE COURT: I'm going to put him under oath and allow him to testify and allow you to ask him questions.

MR. BISASOR: But before he starts, Your Honor, I just wanted to just respond to two things he just said really quickly, if I may, Your Honor.

First of all, the affidavit that he submitted in the district court was not submitted in this court, so he can't testify to facts about what Craig Donais said in that affidavit, he's testifying, there's no -- he's not here -- Craig Donais is not here, he should've been here so he could be asked questions as well. So that's not appropriate, Your Honor.

In that affidavit, Craig Donais also --

THE COURT: I'm not asking him to testify to the affidavit of Attorney Donais, I'm asking him to testify as to his own direct, personal knowledge, because it's not Mr. Donais who's being asked to be disqualified from this case, it's Attorney Terrell.

MR. BISASOR: Right.

THE COURT: So I'm only interested in his personal knowledge, not Attorney Donais' personal knowledge. I'm interested in the information that was relayed to him, whether it be from Attorney Brown, Attorney Donais. If any information was relayed to him, what was it? But he's not going to testify for Attorney Donais here, I won't --

MR. BISASOR: Well --

THE COURT: -- allow that.

MR. BISASOR: Okay, right, but I was saying, Attorney Snow was doing that from the stand. He was --

THE COURT: Well, if I --

MR. BISASOR: -- testifying as to what was in the affidavit from Craig Donais and trying to introduce as evidence here or for your consideration as inappropriate.

MR. SNOW: He misunderstood what I was saying.

THE COURT: You misunderstood what he said. I think he was talking about what had happened in the district court.

MR. SNOW: Right.

MR. BISASOR: No, no, he said --
THE COURT: He went up and filed --
MR. BISASOR: -- he submitted an affidavit --
THE COURT: -- an administrative --
MR. BISASOR: -- there --
MR. SNOW: In the district --
MR. BISASOR: -- and he will be willing to give it to you as well.
MR. SNOW: Yeah, so I have a copy if the Court wants it now.
THE COURT: He's talking about what happened in the circuit court, he's not -- that would only assist me in terms of what issues and what pieces of affidavits or other documents were in front of Judge Moore.
MR. BISASOR: Okay, great.
THE COURT: He's not offering it here, and all I want Attorney Terrell to do for me, subject to your cross-examination is to give me his knowledge of this representation circumstance.
MR. BISASOR: Would it be appropriate, Your Honor, to have Craig Donais also, because he could contradict what Karl Terrell says, it's just what he shared.
THE COURT: I don't have him here today and the motion was noticed up for today. We're going to handle them, no one's got Attorney Donais here, so I'm going to hear from

Attorney Terrell. Nothing I can do about Attorney Donais at this point. And I'm still, I'm not in any way waiving any arguments on the collateral estoppel issue, but Attorney Terrell's here, so I might as well deal with it from an evidentiary standpoint.

MR. SNOW: That's what I'm saying.

THE COURT: So we'll do that.

MR. SNOW: Might as well.

THE COURT: Okay, Attorney Terrell.

DIRECT EXAMINATION

BY MR. SNOW:

Q Could you please state your name and affiliation for the Court, please?

A My name is Karl Terrell and I was admitted as counsel pro hac vice for the Defendants in this case, over in the Ninth District Court.

Q Okay, and you're an attorney in what state, sir?

A In Georgia.

Q Okay, and you're fully licensed in Georgia?

A Yes.

Q Do you have any disciplinary actions that have caused you to be suspended or have that license revoked at any time?

A No.

Q So you're in good standing?

A Yes.

Q And you made that representation previously to the Ninth Circuit?

A Yes.

Q And the Court approved your pro hac vice motion?

A Yes.

Q Now turning to the events of this particular case, did you have an opportunity to be aware of a 540-A petition that was filed by Natalie Anderson in the district court on January 9th of 2017?

A That is how I was brought into this. My client, the Homewood Suites Hotel or the operating company -- the managing company that operates that hotel, contacted me and informed me of the 540-A action. I've done work for the parent of the management company for -- for many years, and they asked me to represent them in this case. I explained, as they were aware, that we would need to retain local counsel in -- in New Hampshire. My direct contact was Mr. Dave Akridge, who's here in the courtroom. He had an attorney-client relationship in a completely different area with Craig Donais, and so Dave recommended Craig Donais.

Craig Donais, I can't remember if we spoke before he sent me a particular email, but he sent me an email, dated January 11, 2017, which I believe was two days after -- if I recall correctly, two days after the 540-A action was filed in the district court. Somewhere just prior to that, Mr. Donais

realized that the -- that he had spoken with Andre Bisasor and he was related to this case. I'm not trying to testify for Mr. Donais' understanding, but this is how I received it from him.

So right as I was first engaging with Mr. Donais to serve as our local counsel, he advised me -- or maybe Dave advised me before that Craig realized he had had a conversation with someone connected with this case, Andre Bisasor, and so I asked Craig to explain what was the nature of that conversation that you had with Mr. Bisasor, and he sent me an email in which he put it in writing to me.

MR. SNOW: If I may approach, Your Honor?

THE COURT: Yes, you may.

MR. SNOW: Having previously shown this to my brother, may I approach?

BY MR. SNOW:

Q I show you this document and I ask you to identify it.

A That's the email I was describing, yes.

Q And that email was also incorporated in the circuit court objection to a disqualification in Exhibit E, was it not?

A I believe Mr. Donais, in his affidavit, attached and identified this email. In any event, it was made a part of the circuit court filing.

MR. BISASOR: So Your Honor, if I may just point out, as just a point of note, as an objection, I guess, that we're getting into issues about what Donais said, what he wrote, an

email from Donais, and I just want to be careful here, Your Honor, that we -- I don't want the waters to be blurred where I can't cross-examine Craig Donais about the contents of what they're testifying to about what Donais said. It's a very tricky situation, I asked the Defendants to provide Craig Donais here today, they have not.

MR. SNOW: Well, that's --

THE COURT: That is --

MR. SNOW: -- that's not fair, because Craig Donais is out of state, I couldn't get him here if I wanted to, and it was a situation that is manufactured. He didn't ask me to produce Craig Donais, he asked me if he was going to be here, just like he asked if Karl was going to be here and Mr. Akridge too, that's not a demand for their appearance, I have to take issue with that.

THE COURT: I understand that. I'm going to allow the testimony, because I wouldn't be considering anything in these emails in terms of the truth of the matter asserted in terms of what Attorney Donais had to say, but I am considering it in terms of the knowledge that this witness would have had about discussions that were had with you, because that's the issue in this particular case.

BY MR. SNOW:

Q So once you got that email, was there any further discussions you had with Attorney Donais or anyone else about

any conversations involving Mr. Bisasor?

A I think only in passing. Let -- let me set the context. What I understood from Mr. Donais is that he had only had a very brief conversation with Mr. Bisasor, was not representing him, and he -- what he conveyed to me about what he, Craig Donais, knew about the case was simply a summary of what was already a matter of public record in the district court. I mean, and that's what Mr. Donais' email reflects -- states that, "What I know" -- this is Craig's email to me, "What I know is I received a call from Andre", and he put it in quotes, "who wanted to discuss filing a 540-A petition claiming they were being treated differently for food service because they were minorities and were being overcharged for their use of the room." Andre claimed that it was a mixed-use property, in which part was rented and part was under innkeeper.

That's the sum and substance of what Mr. Donais conveyed to me about what he learned from his conversation with Andre Bisasor, which is nothing more than a summary of what was in the complaint filed in the Ninth Circuit District Court. He didn't tell me anything I didn't already know.

He then went on to say in his email, "Given his timeline", and -- and as I recall, he must've contacted Mr. -- spoken with Mr. Donais right before he filed the action in the circuit court, and, as I understand it, Craig doesn't do that kind of work, and also, didn't have the time to devote, because

Mr. Bisasor wanted someone who could take his case immediately and act on it.

So Mr. Donais simply said, "Given his timeline and issues, I was not in a position to assist, and did not engage in any conflict analysis to determine the property, property address or whether there was a conflict. This is the extent of what I know." He certainly conveyed no confidences, Mr. Bisasor -- Anderson to me, he simply said, I had a short conversation with this fellow by the name of Andre, and this is the kind of case that they wanted to talk to me about taking. As I understand it, it was a very short conversation, and that's all Craig conveyed to me, and that was the sum and substance of it.

Q So did you ever speak to -- did Craig ever indicate he ever spoke to Ms. Anderson at all, or conveyed that to you in any fashion or form?

A I don't remember, I just remember he -- he said that he spoke to Andre.

Q All right. Did he have any follow-up conversations with you or did you have any follow-up conversations with Attorney Donais about --

A Well, I -- it was --

Q -- this whole situation?

A The day we were down here in -- I -- I believe it was on January 17th, and the --

Q I think it was the 19th.

A -- in -- was it the 19th -- January 17th, I -- I thought it was the 17th, maybe not, in the district court in front of Judge Moore, and we had a sidebar. Right, I think it might've been here in this courtroom, could it have been this courtroom?

THE COURT: No, it would've been upstairs.

MR. SNOW: No, it was upstairs.

THE WITNESS: Very similar courtroom.

BY MR. SNOW:

Q Yeah.

A And so we had a -- a sidebar with Elliott Berry, the -- who was their lawyer at the time, Mr. Donais and myself, and that's when Elliott Berry brought the issue up about the conflict, and I -- I think we had a -- we talked about the fact that this issue was being raised, and I -- I think per the extent of my conversation with Craig at that point was just to confirm that he didn't convey anything to me beyond what he conveyed in this email, which is really nothing more than a summary of the nature of the claim that Anderson and Bisasor were -- were raising. It was just simply a -- a short description of the lawsuit that, by the time I had this communication with Craig, had already been filed, and so I already knew everything that Craig was telling me that was conveyed to him in a very short short conversation that Craig

said he had.

Q But you said that Bisasor and Anderson's claim, but this is really just Mrs. Anderson's claim, correct?

A Well, she's -- she's the party Plaintiff --

Q She's the Plaintiff.

A -- right.

Q Did you have any further conversations with Craig Donais after that?

A After that? I don't think so.

Q Did you have any conversations with --

A But Craig -- Craig -- Craig removed himself from the case, he just wanted -- he didn't want any part of it, and then he retained you and I don't think I've had any discussion at all with Craig ever since then.

Q You ever have any conversations with me other than what's in the pleadings?

A No.

Q Thanks.

MR. SNOW: Thank you, Your Honor.

THE COURT: Thank you. Mr. Bisasor.

CROSS-EXAMINATION

BY MR. BISASOR:

Q So just to clarify again, how do you know the Defendants?

A The Defendants?

Q Yeah.

A The management company for the Homewood Suite Hotels, I believe is called Nashua Innkeepers, which is a single-purpose entity that manages that hotel for a third-party owner, and the parent of Nashua Innkeepers is Great American Hotels, which has been a client of mine for some 20 years.

Q Okay. So you were contacted by who to deal with this case?

A Dave Akridge.

Q Dave Akridge, and about what --

THE COURT: Please spell his last name, just so I'm clear on it.

THE WITNESS: A-K-R-I-D-G-E.

BY MR. BISASOR:

Q And about what date was that, do you recall?

A It was early January.

Q So the district court filing occurred on January 9th --

A That sounds right.

Q -- and you, I believe, entered motion for pro hac vice, I think around the 11th. The email that you just cited there, I think was on the 10th of January.

A No, the email's dated January 11th.

Q January 11. Okay, so on or about the 11th, you are in communication with Craig. Did he send you that email or you sent it to him?

A He -- he sent it to me.
Q He sent it to you?
A He sent it to me and my -- and my legal assistant.
Q To your legal -- okay.
A I -- I don't even think I'd had a conversation with him at that point.
Q So what I'm trying to establish is, so you were contacted by Dave prior to the filing of the 540-A filing in the district court on January 9th?
A Say that again.
Q Were you contacted by Dave Akridge prior to the filing of the district court 540-A action on January 9th?
A I believe we had some discussion about the dispute with you and Ms. Anderson prior to your filing the 540-A action, but I don't recall now, I'd have to go back and look at my time records when it was, but I'm pretty sure it was in January.
Q Is that the first time --
A Early -- early January.
Q So somewhere after January 1st was the first time that you talked to Dave or Dave talked to you about this case with the Plaintiff and/or myself?
A When you say this case, do you mean the lawsuit you filed?
Q In 540-A in district court, yes. And the issues related to our residency at the hotel.

A To the best of my recollection, it was in early January.

Q Okay. So when you came on the case, did you talk to Craig Donais at that time, prior to the 9th of January, before the filing --

A No.

Q -- of the 540-A?

A No. I didn't talk to Craig until after you filed your action -- your 540-A action, or Ms. Anderson filed it, and I needed a local counsel. The only purpose for my talking to Craig was -- I was directly assisting my clients related to this dispute, they wanted me to come in and make an appearance in the 540-A action you filed in district court, and I said I'd be happy to do it, I need to retain local counsel. And so they suggested Craig Donais. I had no prior relationship with Craig Donais whatsoever.

Q So you were aware that Mr. Akridge -- Dave Akridge had a prior relationship with Mr. Donais?

A On something completely unrelated to his hotel business.

Q Okay. But he had been a long-time attorney for Dave Akridge?

A I don't know the details of that.

Q Do you recall that that was said to Judge Moore, that he had represented --

A Who said that?

Q Craig Donais, that he represented Dave Akridge for over ten --

A Yeah.

Q -- years?

A Yeah, I've -- I've heard him make that representation, I have no reason to doubt it, but I don't know any of the details.

Q Okay. So Mr. Akridge reached out to you to retain you for this case, for the 540-A case --

A Right.

Q -- or for the issues related to the residence, because if he contacted you in early January and the 540-A hadn't been filed until the 9th, then he had been, obviously, working up a legal representation situation for the issues that were unfolding or had been unfolded at the hotel prior to the 540-A?

A You'll have to unpack that question, sir. You put a lot in that question.

Q The representation that you were asked to do wasn't only for the 540-A after January 9th. Is it true that it also had to do with being background legal counsel on the issues related to our residency prior to the filing of 540-A on January 9th?

A Mr. (Indiscernible) -- am I doing the same thing as she did?

THE COURT: No, I don't know what's causing that.

THE WITNESS: Because my foot kicked this wire and that's --

THE COURT: That's probably what it is.

THE WITNESS: Probably a loose connection.

THE MONITOR: Oh, that's probably what it is.

THE WITNESS: It's a loose connection on the wire. Dave Akridge and Great American Hotel company has been a client of mine for years, they periodically call me and ask me for counsel, and there's nothing unusual about that. I'm not going to get into, of course, the substance of my discussions with Mr. Akridge, that's attorney-client privilege protected. So I don't know if that answers your question or not.

BY MR. BISASOR:

Q I think kind of, I mean, I guess it's almost what you're saying is that you were contacted by Mr. Akridge about us and our hotel stay prior to the 549 (sic) filing on January 9th.

A I don't know what you mean by that. He --

Q You testified that you --

A -- contacted -- he contacted me and discussed matters relating to this dispute. I've already testified that I believe it was before you filed your 540-A action --

Q Yeah.

A -- but I -- I -- I don't have a specific, clear

recollection of that. I think he may have discussed it with me, some aspect of what was going on --

Q Um-hum.

A -- but that was just me as an attorney having -- having -- having my client consult with me on things that were going on.

Q Okay. So when you came onto the case, I guess formally to deal with the 540-A filing and you needed local counsel now, how did it -- how was -- what were the circumstances that prompted you to -- did you solicit this email from Donais? Because he wrote it to you saying -- let me see here. It says, "Karl and Felicia, I'm happy to provide local representation to you, support for pro hac vice admission, what I know is that I received a call from Andre who wanted to discuss the filing" --

A Yes.

Q -- "of a 540-A petition, treated differently", yada, yada, yada, you've already read through that.

A Right. Yeah, I think what -- I -- I -- I think what happened is, I don't remember having a conversation with Mr. Donais before this email, but I had had a conversation with Dave -- Dave Akridge, and I think Dave conveyed to me that Craig told him that he had had a conversation with an Andre -- meaning you, and I think, by that point, they had -- not me, put two and two together, and -- and I might've conveyed to Dave -- I might've conveyed to Dave to have Craig tell me what

he learned or what he knew, what that communication was all about, or I may have had a brief conversation with Craig, asking him to tell me.

You know, obviously I wanted to know, because he raised the concern that he had had a conversation with you, and I guess -- I think he raised this through Dave and then Dave to me, and so that obviously raises a flag. He -- he wasn't claiming that he represented you, quite the contrary, he did not represent you, he did not take your case. There was an indication that the conversation between the two of you had been very brief, that it did relate to this dispute, it became your 540-A action, and I wanted to know what he learned from you, I wanted to know what had transpired in their conversation, I wanted to know if there was a problem with having him as local counsel or -- or whether there was no problem. And the end result was this email he sent me, which as I've said before, simply didn't tell me anything I didn't already know and didn't tell me anything that wasn't already at that point a matter of public record.

Q So prior to that email, your testimony is that you think you had a conversation with Craig Donais prior to that email?

A I may have.

Q You may have?

A I may have.

Q And in that conversation, you tried to explore what is it that he knew regarding this conversation with an Andre?
A I just want to know what happened in that conversation, and --
Q Um-hum.
A -- implicit in that request for information is what did you all say, what did the two of you say to each other --
Q Um-hum.
A -- so --
Q How is it that then, if you were needing local counsel, and you suggested that to Dave, how is it that Dave was getting questions from Craig who wasn't on the case and doesn't really represent him on hotel issues?
A And you have to ask that question again.
Q You testified that you were contacted by Dave to take the case.
A Right.
Q In fact, to deal with issues that were brewing -- the dispute that was brewing prior to the filing of --
A That's your --
Q -- the --
A -- characterization, sir. I've already given you my testimony.
Q No, no, no, I'm summarizing, I'm not focusing on that, you've already testified to that, but I'm just trying to lay

the foundation on my question. You've testified that somewhere on or about the beginning of January, you had conversations about a dispute with us and the hotel stay?

A Right.

Q You then testified that somewhere right after the filing of the 540-A on January 9th, you were asked to take this case by Dave Akridge.

A Yes.

Q Okay. You also testified that Mr. Donais doesn't really represent Mr. Akridge on the Homewood Suites Hilton issue. That you were the one that does that.

A I think that's fair --

Q But you also testified --

THE COURT: You're now allowing him to answer.

MR. BISASOR: Oh, I'm sorry.

BY MR. BISASOR:

A I think your characterization was fair.

Q Yeah, yeah, so I'll ask my question, I'm just laying -- I'm getting to my point now, which is, you also testified that Mr. Donais, apparently on his own, raised concern about a potential conflict to Dave -- on his own, without your prompting, Dave mentioned that to you, you were then concerned about a flag, you may have --

A Can I ask you, what was that last --

Q -- you may have a concern about a flag --

A A flag? Oh, yeah --
Q -- to use your term, flag.
A -- yeah, yeah, yeah.
Q And so you may have had a conversation with him prior to this email dated January 11th --
A Yeah, I get it. I don't remember how the connection -- how I became aware that Craig Donais had had a conversation with you, but at some point, I wanted to know what happened, what that was all about, and -- and what I got was this email.
Q Um-hum. Do you -- so when you had that conversation with him, and --
A Which conversation?
Q The one prior to him sending you this email.
A Well, I'd -- I'm not sure that I did. Now I thought I was pretty clear about that.
Q You said you may have.
A I said I may have, so don't ask me when you had that conversation, because I don't specifically recall whether I spoke with Craig before I got this email. I knew about it at the time I got this email, because I think Craig -- I may have had a brief conversation with Craig, I just don't recall. Or I may have only gotten that information through Dave after Dave had spoken with Craig.
Q So the reason why I'm just trying to clarify here is because it says, "Karl and Felicia, I'm happy to provide local

representation."

A Right.

Q And what I know is that I have a call from Andre, he sounds like he's responding to --

A Yes, he is.

Q -- some kind of conversation.

A Yeah.

Q And that conversation sounds --

A He's --

Q -- like it was with you.

THE COURT: He doesn't know.

MR. BISASOR: He doesn't know if it was a --

THE COURT: He may have had a conversation, he doesn't recall the conversation, but he's not denying he had a conversation --

THE WITNESS: Right.

THE COURT: -- he just doesn't have a recollection of the specific conversation with Mr. Donais. It may have come through Mr. Akridge, and then to him, but he's not certain, that's all.

MR. BISASOR: Okay..

THE COURT: Okay, I understand that --

THE WITNESS: Yeah.

THE COURT: -- it's -- he's testified to it on direct --

MR. BISASOR: Okay.

THE COURT: -- and he's testified to it at least a couple times on cross.

MR. BISASOR: I was just trying to see if he could jog his memory, because each time he thinks about it, he seems a little bit more confident that there was a conversation, so I was giving opportunity to jog his memory, if that was what was going to be the case.

All right, I'll move on.

BY MR. BISASOR:

Q So when you spoke to Mr. Donais or you got this email -- sorry, when you got this email and may have had a discussion with him, did what he share with you raise a concern that there could be a conflict, based on what he said to you?

A No, because he didn't -- he did not convey to me any confidences that you had conveyed to him, he had no inside scoop or inside story. What he conveyed to me was that he had a very brief conversation with you in which you tried to engage him as your attorney, and he turned you down. And that was the end of the matter. There was really nothing else for Craig and I to speak about concerning his conversation with you. It was of no value or interest to me, it was just this oddity that you -- the two of you had had a five-minute conversation and you didn't -- he didn't take your case.

Q So in this email, he actually said that I spoke with

him about being treated differently, that we were overcharged, that it was a mixed use property, that part of it was on the innkeeper, and that there was -- we were going to file a 540-A, so those are not just -- that's -- those are going into substance of --

A No, sir, those are just your claims --

Q Um-hum.

A -- those are just your claims, and everything he has that is stated in this email is just a summary of the lawsuit that you filed, your 540-A lawsuit. He was doing nothing more than telling me the nature of your claims, filed in the district court, which I already knew of, because by that point, I had had your 540-A action for about a day or two days. He didn't -- there's nothing confidential or substantive, this is just a description of your lawsuit.

Q Okay.

A It added nothing more.

Q So --

A And it was all he got from you --

Q -- what does --

A -- in his conversation with you.

THE COURT: You need to let him finish.

MR. BISASOR: Sure.

BY MR. BISASOR:

Q So the reason why this is important is because there's

a Robert O'Brien, are you aware of Robert O'Brien's involvement in this?

A I only know about it from having read Craig's affidavit, and -- and I think maybe some of the stuff you filed, and I'm -- and I've seen the statement from Robert O'Brien -- I think that's his name. I don't know who he is, I've never met him, never spoken with him.

Q So when Donais described this to you, he did not indicate that there was a nexus between a conversation with Robert O'Brien and him, and Robert O'Brien and the Plaintiff?

A I think that came out when we were in Judge Moore's courtroom and we had the sidebar.

Q Um-hum.

A I think that's the first time I ever heard anything about Robert O'Brien.

Q Um-hum.

A And I know nothing about that.

Q Do you -- okay, so the -- in Craig Donais' affidavit that he filed --

A The what? I'm sorry.

Q In his affidavit that he filed --

A That Craig Donais filed?

Q Yes.

A Okay.

Q In the district court.

A Yeah.

Q He -- and then even with the motion that was submitted to this court, he attaches an exhibit -- well, sorry, Attorney Snow attaches an exhibit, showing a conversation with Robert O'Brien that lasted, I don't know, whatever it was, and he testified that there was a conversation that took place between him and Robert O'Brien about this case involving the Plaintiff, so when -- if, in fact, that conversation had substance of what was discussed from the Plaintiff and Robert O'Brien that was shared with Donais, could that information have been shared with you indirectly without it being labeled as, I'm sharing with you information from Craig. Could that infection have occurred --

A I don't understand your question, sir.

MR. SNOW: Well, I object, Your Honor. This is asking for speculative comment as to what could've happened or what might've happened.

THE COURT: Right.

MR. SNOW: We're here dealing with facts, what was actually --

MR. BISASOR: All right, let me rephrase --

MR. SNOW: -- transmitted --

MR. BISASOR: -- I'm rephrasing, it's --

THE COURT: Yeah, I would need to --

MR. BISASOR: -- no problem.

THE COURT: -- I think it's already been answered, but I would need to know if he received any information directly from Robert O'Brien based on Robert O'Brien's interview of either you or Ms. Anderson.

MR. BISASOR: Right. Right, so what happened, Your Honor, is that there was a 20-minute conversation that took place between the Plaintiff --

MR. SNOW: Well, there can't be -- you can't testify, sir, that's not fair.

MR. BISASOR: No, I'm addressing the substance -- the foundation --

MR. SNOW: No, you're providing --

MR. BISASOR: You already introduced --

MR. SNOW: -- testimony here.

MR. BISASOR: -- the issue of the affidavit earlier as well, I'm just trying to lay the foundation. There was a 20-minute conversation that took place between Robert O'Brien and the Plaintiff. Robert O'Brien contacted Craig Donais and discussed what was discussed with the Plaintiff in that 20-minute conversation. Craig Donais then sent -- gave him advice about the details, saying it was a good contract case, but he's not (indiscernible) in discrimination and whatnot, and he laid out his opinion on the case, because Robert O'Brien was trying to bring Donais onto the case at that time.

So Craig Donais was in receipt of a ton of

information in that, based on the conversation that the Plaintiff had with Robert O'Brien, and that Robert O'Brien had with Craig Donais. So in the shared -- in the discussions that took place with Mr. Terrell and Donais, whether by email or otherwise, I'm trying to establish that, just because he may not have said this came from Andre, that the infection in the case of getting confidential information that was shared to Donais from Brian through the Plaintiff, right, that's one way in which an infection could've incurred (sic) without him even knowing or realizing it, because if the two attorneys are working the case, what Donais knows in his brain, he can share input into the pleadings or in discussions without labeling as such.

THE COURT: I would only want to know if any of that information was ever shared with Attorney Terrell, that's the question.

MR. BISASOR: Right. So I guess the question is that maybe Donais needs to answer that question, because Terrell probably wouldn't know what was that --

THE COURT: But he's not Attorney Donais, and we're talking about an affidavit, and I just wanted to know what information that Attorney Terrell had --

MR. BISASOR: Um-hum.

THE COURT: -- based on whether it was a conversation you or Ms. Anderson had with Attorney O'Brien, or a

conversation that you had as Andre with Attorney Donais. That's what I need to know.

BY MR. BISASOR:

Q Mr. Donais stated in his affidavit that I accused him of discrimination for not taking his case. Did he ever share that with you?

MR. SNOW: Well --

THE COURT: I'll let him answer the --

MR. SNOW: -- because --

THE COURT: -- question, I -- he can answer the question.

THE WITNESS: I don't remember, I really don't remember that.

BY MR. BISASOR:

Q Why is it that you didn't share the communication about this email, which only surfaced months after the initial sidebar, January 18, before Judge Moore?

A You're talking about this January 11 email?

Q Yes. That --

A We --

Q -- information.

A -- we provided it to the --

Q Hold on, let me --

A -- district court.

Q -- ask my question, let me ask my question. Before

Judge Moore -- when Judge Moore and Elliott Berry, who's the one that started raising these concerns, I'm just piggy-backing off of that. When those concerns were raised and Judge Moore was asking about what was shared, do you recall testifying -- saying as an officer of court, we never shared any information about the case --

A I'm --

Q -- with Donais?

A -- I don't think I would've said, we haven't -- I don't recall precisely what I said, but I said words to the effect consistent with what I'm saying here today. And that is that he and I had had the conversation that's reflected in my -- in this January 11 email from Craig to me. And I didn't -- we didn't have any sharing of information beyond the information that's in this January 11 email.

Q Okay, so I guess what I'm going at is the specific email and the sharing of that information, I don't believe was shared with Judge Moore, and Craig Donais and yourself had said that, as an officer of the court, we do not --

A But the --

Q -- we did not share information and so Judge Moore said unless I have information to the contrary that you did share information, because Judge Moore's clear that Craig was out, because --

A No, no --

Q -- whatever conversation --

A -- you're wrong.

Q -- took place with me --

THE COURT: Now we're just testifying, we're not asking him any questions --

MR. BISASOR: Okay.

THE COURT: -- whatsoever. So I really need you to ask him questions. You testifying is not helpful to me --

MR. BISASOR: Okay.

THE COURT: -- Mr. Bisasor, in terms of judging --

MR. BISASOR: Sure.

THE COURT: -- what level of information he had, so I can determine whether, at any point here --

MR. BISASOR: Yes.

THE COURT: -- he had a conflict of interest that would disqualify him in this case before me.

MR. SNOW: If I may, Your Honor --

MR. BISASOR: What --

THE COURT: Attorney Snow -- let me hear from Attorney Snow.

MR. SNOW: Just real quickly, all that information was embodied in my objection that was raised at the circuit court. It's not a 20-minute conversation they had, it was five minutes, and we have a copy of his phone log, which is Exhibit A. And the conversation --

MR. BISASOR: Objection.

MR. SNOW: -- and there was also Attorney O'Brien's statement that he made as an affidavit, which is Exhibit B, and the seven-minute conversation that Andre had with Attorney Donais is Exhibit C, and then I put in his affidavit as well, and he's arguing, we shouldn't include his affidavit, now he's talking all about it. I mean, he's trying to have it both ways.

MR. BISASOR: Well, all those --

MR. SNOW: It's just not appropriate.

MR. BISASOR: -- exhibits that you just referenced that you filed in this court were all from Donais. Donais is not here, I can't ask him questions about that, so that puts me in a situation where you're introducing evidence as part of your objection, but those things all are coming from Donais.

And number 2, the 20-minute conversation was not about me and Donais. We've already stipulated that was a seven-minute conversation between me and Donais. The 20-minute conversation was between O'Brien and the Plaintiff, that's what I'm saying, so I think you got it confused.

THE COURT: I'm just interested in what this --

MR. BISASOR: Okay.

THE COURT: -- particular witness had in terms of information and whether it was attorney-client privileged information that would rise to the level of him having a

conflict, whether it be at the district court level, or now at this level.

MR. BISASOR: Okay.

BY MR. BISASOR:

Q Did that email that you provided, did you provide that to Judge Moore?

A Yes. It was filed in his court, attached to the objection that Mr. Snow has been talking about.

Q On March 14th?

A I'm -- I don't recall the exact date.

Q Okay. It's testified that it's March 14th, that was after it was denied on the 10th of March. But why didn't you submit -- my question is, why didn't you submit it on January 18th when you guys were contacted by Elliott Berry the day before, raising the concern about the conflict? You guys came to court with other documents showing the call records, showing the letter from Robert O'Brien, and you didn't include the letter that showed that communication in which -- even though you had it in your possession, why didn't you introduce it then?

A Introduce it when, on what day?

Q On January 18th, to Judge Moore at the sidebar when you were discussing the conflict issue?

A Because it had just come up. We were standing right here in front of Judge Moore, Berry, Donais and myself --

Q Um-hum.

A -- and there was no reason for me to present it. I'm -- I stated in my place as an officer of the court to Judge Moore consistent with what I testified here today at greater length, and Judge Moore appeared to accept that, and I -- I forget exactly how he phrased his ruling at that point, but there really was no issue until you filed a formal motion to disqualify --

Q I didn't file that, that was Elliott Berry that did.

A Okay, when Elliott Berry filed it on your behalf, and we responded to it.

Q Well, he raised it as an officer of the court, because he was concerned about the extraordinary set of events that took place.

THE COURT: Again, you're testifying.

THE WITNESS: You're testifying.

MR. BISASOR: Okay.

THE COURT: You just need to --

MR. BISASOR: But --

THE COURT: -- ask a question.

BY MR. BISASOR:

Q So are you aware that Craig Donais was contacted by Elliott Berry on the day before January 18th, on January 17th about the conflict issue?

A Yeah.

Q Are you aware and did you assist with preparing documents, including the phone records from Donais, including a letter from a -- an affidavit from Robert O'Brien, and a phone log from Robert O'Brien, I believe? Did you -- were you aware of that or did you assist in presenting that to Judge Moore on January 18th?

A I had nothing to do with that. That was in Craig's hands. It was Craig's problem, he was dealing with it.

Q It was Craig's problem, he was dealing --

A I mean, it was his issue to handle, and --

Q But you were in possession of this email?

A Yeah, it was in -- it's in my email server. And then Craig was addressing the issue that Elliott had raised, both the day before the hearing and then in front of Judge Moore at the bench. That was Craig's issue, he was handling that, I -- I wasn't -- I had no part in that.

Q When you raised the flag -- concern about Craig in terms of the conversation with me, wouldn't, as in full candor to the tribunal rules, wouldn't that cause you to then present that information so that Judge Moore could review it to determine that communication of what was description of your conversation with him; wouldn't that have been appropriate as an officer of the court in full candor?

A We were fully -- we were fully candid with the court, and -- and when I use the -- when I use the phrase, raised a

flag, I mean something very simple. Any time I'm speaking to another lawyer who I am thinking of bringing in on a case and I find out that he has had a conversation with the opposing party, that's important and I was -- obviously wanted to know what was the extent of that communication. And the answer I got was the answer that's provided in this January 11 email.

At that point, it didn't seem to be an issue, never thought it really was an issue, and then it was raised in the sidebar in front of Judge Moore, and -- and the issue at that point really had to do with Craig's conversation with you, Craig's communications with O'Brien, and I guess O'Brien and -- and the two of you. I was not a part of that, all of that happened away from any involvement I ever had in this matter.

And that was an issue that Craig Donais had to deal with, and it had nothing to do with me.

Q Well, except to the extent that you were co-counsel under local counsel of Craig Donais --

A Right.

Q -- and if he had a conflict issue, then that would implicate you as well. Wouldn't that be your understanding?

A Theoretically, but the facts were that Craig did not know anything, did not convey anything to me of a confidential nature -- or in the nature of confidential information from you. Again, I've said it a dozen times, all Craig conveyed to me were the basic facts of your claim, that and nothing more,

and he told me that he only had a very short conversation with you and that he did not agree to represent you.

Q Well, you can't testify --

A That's his --

Q -- to what Craig --

A -- from where I was sitting, that was the sum total, beginning and end of the matter.

Q I don't think you can testify as to what Craig knew or didn't know.

A I'm not trying --

Q You can only say --

A -- to do that, and I didn't --

Q -- he told you.

A -- do that.

Q That's fine, but what I'm saying is that your -- I guess, the fact that you did not disclose that letter to the judge is concerning, because it didn't allow the judge to have the full information --

THE COURT: That's not a question, you're just --

MR. BISASOR: Okay.

THE COURT: -- lecturing him on --

MR. BISASOR: All right, so --

THE COURT: -- be concerning. I'm at the point where I --

MR. BISASOR: Well, it was presented --

THE COURT: -- think I'm very well educated as to what Attorney Terrell knew and didn't know as he became involved in this case. We're starting to really beat --

MR. BISASOR: Okay.

THE COURT: -- a dead horse here.

MR. BISASOR: That's to --

THE COURT: I have to leave for Concord at 4:15, so I'll --

MR. BISASOR: Just two more question.

THE COURT: -- I'll allow you to ask your two questions.

MR. BISASOR: Okay.

THE COURT: Go right ahead.

BY MR. BISASOR:

Q When you were preparing the pleadings, the motion to dismiss in the district court hearing, I think it was a 60-page document --

A No, but go ahead.

Q -- total amount, it was a very involved document, it was a long pleading with a lot of exhibits. Would you agree it was about 60 pages, I think? Elliott Berry had counted it to be 60 pages. In that pleading, did you work with Attorney Donais in drafting that pleading?

A Not really.

Q Just you alone did it?

A Yeah, Craig -- apart from his conversation with you, Craig really, at that point, wasn't involved in this case. I was communicating and talking directly with Adam and Dave and -- and folks at the hotel and doing my own research and working up the case, and I was working on it at that point, all by myself.

Q So when he signed his name to it and submitted it to the court and his signature is on it, he wasn't really involved it, it was just --

A He read the pleadings, he understood the issues, but he wasn't involved in depth in the drafting of that particular pleading.

Q Okay.

MR. BISASOR: I guess, Your Honor, I'm at a little bit of a standstill, and I'll conclude my questions here. I'm a little bit of a standstill because I can't properly engage the engine of truth here without Craig Donais, because there are statements that he's making that I don't believe to be true, that we have reason to believe Craig Donais, based on his affidavits and other statements he made before Judge Moore, contradicts the testimony presented today. And so without being able to have Donais here, Your Honor, I don't know if there's a way to bring back Donais here on a limited basis on the morning of the 8th, just to conclude this issue for me, 30 minutes. That would really help us, Your Honor, getting to it,

# ATTACHMENT 6

## Motion for Ltd Disc to Rebut Def MTD Amended Complaint-Plfs

Filed
File Date: 11/6/2025 10:47 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**NATALIE ANDERSON'S MOTION FOR LEAVE TO FILE SURREPLY**

1. Natalie Anderson submits this motion for leave to file surreply[1] to Donais's reply to objection to motion to dismiss.
2. Donais's perfunctory objection confirms precisely why surreply briefing is necessary and demonstrates the calculated procedural gamesmanship that necessitates judicial intervention.

## I. INTRODUCTION

3. Rule 13A states: "Surreplies may only be filed with permission of the Court." This provides grounds for the filing of a motion for leave to file a surr-reply. This Court thus permits surreplies in accordance with its rules.
4. A sur-reply is necessary in instance to address new items raised in the defendants' reply, and to clarify certain points for the Court's consideration.
5. The Court has allowed surreplies especially when new items or arguments are raised in a reply that were not addressed in the initial filing. This ensures that affected parties have an opportunity to address such new items.
6. Replies are not intended to raise new items. If it does so, the affected party is entitled to surreply. In this instance, the defendant presented new items including new exhibits. In Donais' reply, which totals 61 pages, new exhibits were introduced which presented new information that Plaintiffs did not have an opportunity to address, potentially prejudicing their case. These new issues include: a) introduction of new exhibits not previously in the record; b) new arguments regarding the merits; and c) mischaracterizations of Plaintiffs' objection. These new issues thus go beyond mere elaboration on previously raised ones and constitute new issues that Plaintiffs have not had an opportunity to address. This creates a situation of manifest injustice. Plaintiffs are now faced with a record containing new evidence and arguments to which they have not been allowed to respond.
7. The Court should grant the Motion for Leave to File Surreply based on the fundamental principle that parties should have a fair opportunity to respond to new arguments or evidence presented in a reply brief. This principle is widely recognized in both state and federal courts across the United States.
8. The New Hampshire Supreme Court has recognized the importance of allowing parties to respond to new issues raised in reply briefs. Fundamental fairness dictates that the plaintiff be afforded an opportunity to respond to new

[1] Plaintiff Anderson is only now able to file a motion to sur-reply due to confidential reasons that will be explained separately under seal. It should be noted that Plaintiff Anderson is not aware of any timeline or deadline to file a motion to surreply in the rules. Plaintiff Bisasor submitted a previous motion to surreply but that has not been ruled on. There is no impediment or prohibition for Plaintiff Anderson to file her own separate motion to surreply.

arguments made in a reply brief. See State v. Towle, 162 N.H. 799, 804 (2011). The New Hampshire Supreme Court has also emphasized the importance of preventing manifest injustice in its jurisprudence. See State v. Lavallee, 145 N.H. 424, 428 (2000). This manifest injustice/prejudice to plaintiff, implicated by the above, warrants surreply as denying leave would violate due process under Matthews v. Eldridge, 424 U.S. 319 (1976).

9. Further, in New Hampshire state courts, surreplies have been allowed in various cases when deemed necessary for a full and fair consideration of the issues. See State v. Mottolo 155 N.H. 814, 817 (2007))(the court allowing surreply to address new issues raised in a reply brief).

10. For these and other reasons, the plaintiffs needs to file a sur-reply, without which they may be prejudiced. Plaintiffs are thus entitled to file a sur-reply to the reply filed by the defendant.

11. Similarly, in federal courts, which often provide guidance for state court practice, surreplies are frequently allowed when new arguments or evidence are presented in a reply brief. See Animal Legal Defense Fund v. U.S. Dep't of Agric., 223 F. Supp. 3d 1, 5 (D.D.C. 2016))(holding that a surreply is appropriate when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply).

12. Other courts have recognized the value of surreplies in similar circumstances. See Weems v. Federated Mutual Insurance Co., 220 F. Supp. 2d 979, 983 (N.D. Miss. 2002)(the court allowed a surreply, noting that it "promotes fairness and a full development of the issues").

13. While the Court has broad discretion in managing its cases, this discretion is not unlimited. See State v. Lambert, 147 N.H. 295, 296 (2001))(a trial court's discretion must be exercised in a manner that ensures fairness to all parties).

14. In this case, allowing a surreply would serve the interests of justice by allowing Plaintiffs to respond to new arguments and evidence and to misrepresentations, and ensuring a complete record.

15. The plaintiffs should be allowed a chance to address/rebut the defendant's new exhibits containing the introduction of new documents that was not presented in the initial filing by the defendant. The defendant cannot introduce new matter in a reply and not expect a sur-reply.

16. The plaintiff thus needs an opportunity to address these new item. Defendant also introduced other bad faith, inaccurate, or misleading arguments raised for the first time. For example, defendant asserts the objection to the motion to dismiss "[incorporates] issues raised and resolved in other motions and that it [addressed] many aspects of this proceeding that have no bearing on the validity of the amended complaint". This is a new attack by the

defendant and plaintiff has not had a chance to respond to it. Similarly, the defendant claimed that "the objection fails to recognize the limitations on new causes of action and substantially different evidence established in the order granting leave to amend." This is misleading, untrue and further mischaracterizes, ignores, or sidesteps the plaintiffs' objection, in an obvious attempt to dodge having to address it. This again is a new attack by the defendant and plaintiff has not had a chance to respond to it. A sur-reply is thus needed to show that the defendant has mischaracterized the objection. The plaintiffs did not have an opportunity to respond to these items before. This is fundamentally unfair and it requires a response.

17. Permitting a surreply in this instance ensures that plaintiffs have a fair opportunity to respond to the above prejudicial acts, and would serve the interests of justice, especially given the new items and the misleading and mischaracterizing statements by the defendant.

18. By granting permission to file a surreply, the Court would be acting consistently with its prior practices. This Court has allowed sur-replies in similar circumstances in particular when new issues are raised or when misleading statements are made or when clarification is needed.

19. This motion to file a surreply to the motion to dismiss clearly has merit especially given that Defendant introduced new material in it/attached to it.

## II. SURREPLY IS WARRANTED WHEN NEW EVIDENCE IS INTRODUCED

20. Courts routinely permit surreply briefing when defendants introduce new evidence in reply briefs, i.e., where party has introduced new evidence in its reply brief. It is appropriate to allow the opportunity to reply to that new evidence.

21. Similarly, courts grant surreply where the reply brief made "several misstatements and distortions of the factual record made for the first time" that "essentially amount to the assertion of new facts", recognizing that granting surreply is appropriate when a reply leaves a party "unable to contest matters presented to the court for the first time."

22. Here, Donais's reply introduces exactly this type of new factual material. He acknowledges that his original exhibits were incomplete and unsigned, violating NH Superior Court Rule 7, yet waited until reply to introduce new material and exhibits, and to try to cure the defect of unsigned pleadings. But a reply to an objection to a motion to dismiss cannot be used to cure the defect of a motion to dismiss. The proper course would be to file a corrected or new motion to dismiss with the cured defects. The motion to dismiss is thus defective and remains defective. Yet, this timing creates the precise procedural unfairness that surreply briefing is designed to address.

23. Most significantly, Donais' objection and reply ignore this Court's explicit guidance in its June 5, 2025 Order that "*consideration of materials outside the pleadings is improper on a motion to dismiss.*" Despite this clear directive, Donais repeated the identical procedural violation in his motion to dismiss the amended complaint including many of the very same documents the Court previously found improper, and then he added more extraneous material further in his reply. This willful disregard compounds the procedural violation. When a court provides clear guidance about improper motion practice, repeating those exact violations while introducing additional evidence demonstrates contempt for judicial authority. The fact that Donais now objects to every procedural remedy to address his violation, including leave to surreply, confirms his intent to exploit his creation of these procedural irregularities for tactical advantage.

24. Thus, in Donais submitting defective exhibits (unsigned pleadings), and then waiting for objection before then introducing expanded versions in reply including new exhibits, then objecting to allowing plaintiffs any response, this sequence violates every principle of fair adversarial proceedings and demonstrates why surrepy is necessary to prevent tactical abuse of procedural rules. NH Superior Court Rule 7 provides that unsigned filings may be stricken and proceedings may continue as though the filing had not been made. Donais acknowledged in his pleading that his Exhibit H was unsigned, confirming he was aware this was improper, yet he attached it anyway[2]. He then waited until his reply to include the signed version with additional exhibits. This calculated approach creates exactly the type of procedural trap courts shouldn't permit[3]. The Court should not reward this gamesmanship. When a party deliberately files defective materials, then purportedly "corrects" them in reply and then tacks on additional extraneous materials, while making new arguments on the merits and mischaracterizing pleadings, the proper remedy is to allow surreply to address the corrected and expanded materials, and the new and misleading arguments.

25. Moreover, Donais has systematically objected to plaintiffs' motion for hearing while simultaneously introducing new evidence and arguments in reply that were not presented in his original motion. If the Court resolves this potentially case-ending motion based solely on written submissions, fundamental fairness demands surreply in this instance.

26. Allowing defendants to introduce new evidence in reply while denying plaintiffs opportunity to respond violates fundamental principles of adversarial proceedings.

---

[2] Plaintiffs could not be expected to respond to a defective pleading with unsigned illicit attachments, thus causing prejudice to the plaintiffs with respect to the objection to the motion to dismiss amended complaint.

[3]See NH federal court case that chided defendant for similar conduct with respect to improper use of reply to objection to its motion to dismiss. Collision Communications, Inc. v. Nokia Solutions and Networks OY, No. 20-cv-949-JD, 2021 WL 1165048, at *5 (D.N.H. Mar. 24, 2021)("Nokia, however, failed to raise Rule 9(b) in its motion to dismiss, and instead, improperly, raised it in its reply").

## III. SURREPLY IS WARRANTED DUE TO PROCEDURAL ABUSE

27. Both state and federal courts have recognized that introducing new evidence in reply briefs creates procedural unfairness. Here, Donais engages in exactly this type of tactical abuse. He attached "a complete, executed, as filed copy of Exhibit H as received from the Circuit Court Clerk this day" containing "Exhibits K and L that were not part of the unsigned copy previously submitted." This new evidence introduction in reply, while simultaneously objecting to plaintiffs' ability to respond, violates fundamental fairness principles that require equal opportunity to address evidence presented to the court.

28. The attachment of unsigned pleadings, as evidence, to a motion to dismiss is improper. Yet, Donais did this very thing; he attached unsigned pleadings to his motion to dismiss the amended complaint. He did so intentionally as he acknowledged in his pleading that it was not signed (which confirms that he was aware that it was improper), yet he attached it any way[4].

29. Donais's original motion thus violated NH Superior Court Rule 7, which provides that unsigned filings may be stricken and proceedings may continue as though the filing had not been made. See Rule 7("If a pleading is not signed, or is signed with an intent to defeat this rule, the court may strike the pleading, and the action may proceed as though the pleading had not been filed"). This means that unsigned pleadings generally have no legal effect and cannot be used as evidence in support of or against dispositive motions such as a motion to dismiss[5].

30. In addition, Donais then waited until plaintiff filed an objection, then used his reply to not only attach a signed pleading but this time including in it, additional new exhibits that were not previously included in the attachments[6]. So, he used his reply to the objection to the motion to dismiss, to amend his motion to dismiss. Then he seeks to limit the time or ability of plaintiff to oppose this illicit maneuver. This should not be allowed to stand. Both of the improper filings have caused prejudice to the plaintiffs, especially in light of the fact that NH Superior Court Rule 7 prohibits unsigned filings, and this Court's June 5, 2025 order prohibits consideration of materials outside the pleadings on motions to dismiss. Fundamental due process requires equal opportunity to address evidence presented

[4] This is on top of Donais' violation of the court's 6-5-25 order, as shown elsewhere, that warned against including extraneous material with a motion to dismiss, which as seasoned attorneys, both Donais and Hilliard knew better not to do, in any event, but they did it any way.

[5] Thus, the rules indicate that a party or the court cannot rely on or act upon an unsigned pleading. If an unsigned pleading is presented as evidence in a motion, it may be stricken and treated as not filed. Therefore, unsigned pleadings are not valid evidence and should not be considered by the court in ruling on motions to dismiss or other dispositive motions.

[6] Donais acknowledges his original exhibits were incomplete and unsigned, yet he waited until his reply to address these defects while objecting to plaintiffs' procedural remedies. This sequence demonstrates calculated gamesmanship designed to prevent fair adjudication.

to courts. Donais's conduct violates all three principles, and no circumstances exist where such violations should be permitted to stand without remedy.

31. Simultaneously, Donais introduces new evidence in reply while claiming plaintiffs cannot surreply. This creates the precise type of one-sided proceeding that violates due process.

32. Courts recognize that such systematic suppression of procedural rights warrants intervention. When defendants engage in evasive tactics that prevent fair adjudication, appropriate procedural relief is warranted to ensure adversarial integrity. Here, Donais's pattern of introducing extensive unpermitted materials, while blocking every avenue for response further cements these concerns. Further, the sequence and timing of events reveals Donais's calculated approach. He files a motion containing incomplete exhibits that violate NH Superior Court Rule 7. After plaintiffs object to these procedural defects, he introduces complete versions in reply while objecting to plaintiffs' ability to respond/surreply. This creates exactly the type of procedural trap that courts should not permit.

33. The fundamental issue here transcends this particular motion. If courts permit defendants to introduce extensive materials outside the pleadings for a motion to dismiss, then wait for objections, then introduce expanded versions in their reply, and then object to allowing any response, motion practice becomes a one-sided presentation rather than a fair proceeding, undermining the entire adversarial system. Here, Donais introduces materials that were never admissible because they violate this Court's explicit guidance, then claims no procedural remedy is available.

## IV. DEFENDANT'S REPLY VIOLATES SETTLEMENT TERMS/CONFIDENTIALITY

34. The original defendants settled this case. In order to settle the claims, the plaintiffs required that statements made in the motion to dismiss in Nashua circuit court and in Hillsborough superior court South, must be withdrawn and sealed; otherwise, the plaintiffs would not settle and would instead litigate those statements to show them to be false and defamatory. The 20 defendants agreed to withdraw and seal those statements. Donais was initially part of the settlement agreement but later backed out of the settlement at the last minute just before it was completed/consummated. Donais also used his position as a former attorney for the original defendants to obtain access to the withdrawn/sealed pleadings including the motion to dismiss in Nashua circuit court, and then attached it to the motion to dismiss the amended complaint in this case. He attached an unsigned pleading which he evidently obtained from his prior position, and to which he was privy to as being involved in the internal settlement negotiations of the case, until he departed at the last minute, and to which he knew was being withdrawn and sealed

by the settlement of the parties. Donais has now misused his position to violate the settlement terms and to try to injure the plaintiffs by publicly including stricken, withdraw and sealed pleadings that were governed by confidential settlement agreement. See Exhibits A, B and C in **Exhibit 3** attached.

35. The settlement agreement is under a binding contract for confidentiality and thus plaintiff is not permitted to expose the contract publicly. However, the part of the contract that requires withdrawal and sealing of statements (in the pleading attached by Donais) can be seen as manifested in the two stipulations of settlement filed in this court and signed by the original defendants, which explicitly states that the statements are withdrawn and/or sealed. See Exhibits A, B and C in **Exhibit 3** attached.

36. Moreover, the confidentiality agreement demonstrates why the signed version was likely unavailable initially to Donais, but only the unsigned version. If Donais could not obtain signed documents due to confidentiality restrictions with other defendants, then his introducing them in a reply, further creates unfair advantage.

37. Here, plaintiff needs an opportunity to address these defamatory exhibits which have been placed illicitly in the record of this case. These exhibits are intended to prejudice the court with inflammatory material that are false and disparaging and which the original defendants agreed were unwarranted and should be withdrawn and/or sealed.

## V. THE TIMING AND CONTEXT DEMONSTRATE CALCULATED STRATEGY

38. The procedural sequence reveals Donais's calculated approach to suppress plaintiffs' ability to respond effectively. He files a motion containing defective exhibits that violate court rules. After plaintiffs object to these procedural defects, he introduces complete versions in reply while objecting to every procedural remedy plaintiffs seek. This creates exactly the type of procedural trap that courts should not permit.

39. Surreply should be granted when fundamental fairness requires response opportunities. Here, combination of new evidence introduction with systematic procedural obstruction create textbook allowable circumstances for surreply.

40. Moreover, the timing issue that Donais raised demonstrates his awareness that these materials were available but deliberately withheld. If confidentiality agreements with other defendants prevented disclosure initially, introducing them in reply after those restrictions were resolved creates unfair advantage that surreply is designed to prevent.

41. Donais's reply introduces new evidence while systematically objecting to every procedural remedy, violates this Court's explicit 6-5-25 guidance about materials outside pleadings, and creates fundamental procedural unfairness through coordinated suppression of rights. These exceptional circumstances clearly warrant surreply briefing.

VI. THE CASE-ENDING NATURE OF THE MOTION REQUIRES COMPLETE BRIEFING

42. Donais's motion seeks dismissal with prejudice on multiple claims, which would effectively end substantial portions of this litigation. The stakes involved in this potential case-ending dispositive motion demand complete and fair briefing. The United States Department of Justice recognized this principle in United States v. Defendants, Case No. CV-01-0123 (D. Ariz. 2001), moving for surreply where defendants "raised several issues for the first time" in reply, noting that "the United States seeks a fair opportunity to respond to the new cases cited by Defendants."

43. The case-ending nature becomes particularly important when viewed against Donais's systematic suppression strategy. He objects to plaintiffs' motion for hearing while introducing new evidence in reply. If the Court resolves this dispositive motion without hearing based solely on written submissions, the written record becomes the sole basis for adjudication. Allowing defendants to supplement that record through reply while denying plaintiffs surreply creates fundamental unfairness that becomes insurmountable, especially without hearing to correct the imbalance.

44. Surreply may be necessary to address "misstatements and distortions of the factual record made for the first time" in reply. Donais's reply not only introduces new evidence but does so while claiming plaintiffs cannot respond to it.

VII. DUE PROCESS REQUIRES EQUAL OPPORTUNITY TO ADDRESS EVIDENCE

45. The fundamental due process issue transcends the specific procedural violations. When defendants introduce new evidence in reply while systematically objecting to every procedural remedy, motion practice becomes a one-sided presentation rather than adversarial proceeding. This undermines the entire adversarial system that depends on equal opportunity to address evidence presented to courts.

46. The procedural unfairness becomes particularly acute when viewed against the broader context. Donais presents over 200 pages of exhibits spanning eight years while claiming plaintiffs should respond immediately because they "have seen these before." This position ignores the substantial analytical and organizational work required to respond effectively, particularly for pro se plaintiffs with ADA accommodations who face inherent disadvantages in processing voluminous materials under compressed timelines.

VIII. THE COURT'S 6-5-25 ORDER ESTABLISHES CLEAR LEGAL FRAMEWORK

47. This Court's June 5, 2025 order provides the essential legal framework for understanding why surreply is necessary here. The Court explicitly stated that "consideration of materials outside the pleadings is improper on a motion to dismiss" and noted that plaintiffs were correct about the impropriety of considering extraneous materials. Despite this clear guidance, Donais repeated the identical procedural violation in his motion to dismiss amended complaint.

48. The willful nature of this violation compounds the allowable circumstances for surreply. When a court provides explicit guidance about improper motion practice, repeating those exact violations while introducing additional evidence in reply demonstrates contempt for judicial authority. Donais understood the Court's position but chose to proceed anyway. His reply's introduction of new evidence, which itself is further extraneous, while objecting to procedural remedies confirms his intent to exploit these irregularities for tactical advantage.

## IX. CONCLUSION AND RELIEF REQUESTED

49. The Court should recognize that Donais's pattern of conduct creates precisely the exceptional circumstances that justify surreply briefing. His introduction of new evidence through exhibits, his willful violation of this Court's explicit guidance, his systematic objection to every procedural remedy, and his fundamental denial of due process rights warrant comprehensive response through surreply briefing.

50. The case-ending nature of his motion makes complete briefing particularly critical. Any dismissal would terminate substantial portions of this litigation based on a record that Donais continues to supplement while denying plaintiffs opportunity to respond. This fundamental unfairness becomes insurmountable if the Court resolves these issues without complete briefing or hearing procedures to correct the imbalance.

51. Accordingly, the Court should grant leave to file surreply. Such relief is necessary to ensure fundamental fairness in this potentially case-ending motion and to prevent the type of systematic procedural abuse that Donais's conduct represents. The integrity of motion practice requires that both parties operate under equal procedural rules, and Donais's coordinated violations of those rules cannot be permitted to succeed through suppression of response.

52. Plaintiff incorporates herein, as if fully stated herein, Plaintiff Bisasor's motion to surreply and his reply to Defendant's objection to motion to surreply, attached as **Exhibit 1 and 2**. Plaintiff also incorporates herein, as if fully stated herein, the response pleadings of Plaintiff Bisasor to various objections by Defendant in **Exhibit 4 to 7**, in order to further demonstrate why surreply briefing is proper, and also to preserve against Defendant's attempt to suppress their review by the court. Plaintiff finally incorporates herein, as if fully stated herein, as **Exhibit 8**, the motion for partial summary judgment and attendant memorandum, exhibits and statement of material facts, to further show why Donais' attachment of 200 plus pages of extraneous material triggers legitimate grounds for surreply/rebuttal, and to demonstrate further reasons why the motion to dismiss amended complaint shouldn't be allowed, and to further establish the need for proper briefing in order to get to the truth and for justice to be done.

Respectfully submitted,
/s/Natalie Anderson
Natalie Anderson

Date: November 6, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Natalie Anderson
Natalie Anderson

Case 1:25-cv-00251-SE-AJ Document 178-1 Filed 01/26/26 Page 319 of 575

# <u>Exhibit 1</u>

**ANDRE BISASOR'S REPLY TO DEFENDANT DONAIS'S OBJECTION TO MOTION FOR LEAVE TO FILE SURREPLY**

1. Andre Bisasor submits this reply to defendant Craig Donais's objection to his motion for leave to file surreply to Donais's reply to objection to motion to dismiss. Donais's perfunctory objection confirms precisely why surreply briefing is necessary and demonstrates the calculated procedural gamesmanship that necessitates judicial intervention.

**I. SURREPLY IS WARRANTED WHEN NEW EVIDENCE IS INTRODUCED**

2. Courts routinely permit surreply briefing when defendants introduce new evidence in reply briefs, i.e., where party has introduced new evidence in its reply brief. It is appropriate to allow the opportunity to reply to that new evidence.
3. Similarly, courts grant surreply where the reply brief made "several misstatements and distortions of the factual record made for the first time" that "essentially amount to the assertion of new facts", recognizing that granting surreply is appropriate when a reply leaves a party "unable to contest matters presented to the court for the first time."
4. Here, Donais's reply introduces exactly this type of new factual material. He acknowledges that his original exhibits were incomplete and unsigned, violating NH Superior Court Rule 7, yet waited until reply to introduce new material and exhibits, and to try to cure the defect of unsigned pleadings. But a reply to an objection to a motion to dismiss cannot be used to cure the defect of a motion to dismiss. The proper course would be to file a corrected or new motion to dismiss with the cured defects. The motion to dismiss is thus defective and remains defective. Yet, this timing creates the precise procedural unfairness that surreply briefing is designed to address.

**II. DONAIS'S NON-RESPONSE EXPOSES THE VERY PROBLEM REQUIRING SURREPLY**

5. Donais's objection spans barely over one page and presents only two conclusory assertions without addressing the substantive exceptional circumstances that justify surreply briefing. This evasive approach mirrors exactly the procedural manipulation identified in the motion for leave. Rather than addressing his introduction of new evidence in reply, his systematic violation of this Court's 6-5-25 guidance, or his coordinated suppression of plaintiffs' procedural rights, Donais simply claims that "no further submissions are necessary or appropriate."
6. This non-response is revealing. When a party introduces new exhibits for the first time in reply while systematically objecting to every procedural remedy the opposing party seeks, the failure to defend that conduct demonstrates its indefensibility. Donais cannot explain why he waited until reply to cure the unsigned, incomplete exhibits that violated NH Superior Court Rule 7, nor can he justify his willful disregard of this Court's explicit guidance about materials outside pleadings.

**III. THE PAGE COUNT COMPLAINT REVEALS DONAIS'S HYPOCRISY**

7. Donais's complaint that plaintiffs submitted "eight pages of argument in response to the defendants two page reply" exposes remarkable hypocrisy. This objection comes from the same party who filed a 151-page motion to dismiss attacking plaintiffs' 25-page amended complaint. Moreover, Donais's "two page reply" introduced extensive new evidence through complete exhibits containing "Exhibits K and L that were not part of the unsigned copy previously submitted," comprising over 12 additional pages of materials.

8. The substance of briefing, not mere page count, determines necessity. When a reply introduces new evidence that plaintiffs had no opportunity to address in their original objection, detailed explanation of exceptional circumstances becomes essential. Federal courts also recognize surreply briefing is appropriate when a reply leaves "a party unable to contest matters presented to the court for the first time."

9. Furthermore, Donais's criticism rings hollow when viewed against his own conduct. His reply attached "a complete, executed, as filed copy of Exhibit H as received from the Circuit Court Clerk this day" while simultaneously objecting to plaintiffs' motion for hearing, motion for limited discovery, motion to convert to summary judgment, and motion to strike. This coordinated suppression of procedural rights while introducing new materials creates precisely the exceptional circumstances that justify comprehensive explanation in surreply briefing.

10. Donais's objection that this motion should be denied based on its 8-page length is frivolous and demonstrates a fundamental misstatement of the procedures and rules governing motion practice in New Hampshire Superior Court.

**IV. THERE IS NO RULE THAT LIMITS THE LENGTH OF MOTIONS FOR LEAVE TO FILE SURREPLY**

11. Donais cites no New Hampshire Superior Court rule limiting the page length of motions seeking leave to file a surreply. This is because no such rule exists. The rules impose no restriction on motions for leave to file surreply in NH superior court, recognizing that such threshold motions require some careful explanation to meet legal standards.

**V. THE LAW REQUIRES EXPLANATION WHEN PERMISSION IS NOT AUTOMATICALLY GRANTED**

12. Motions for such leave require proper explanation to meet the standard.

13. Courts grant leave to file surreplies upon a showing of good cause.

14. Donais' position would render movants unable to adequately demonstrate good cause required by law. This would effectively eliminate the moving party's ability or the court's authority to permit surreplies in appropriate cases, contrary to established motion practice principles.

## VI. THE 8-PAGE LENGTH IS NECESSITATED BY DONAIS'S EXTRAORDINARY MISCONDUCT

15. The length of this motion is modest. 8 pages is by no means overlong. Further, it is not a "guise" (as Donais so vexatiously puts it), but it is a direct result of the extraordinary nature of Donais's conduct that necessitates this surreply. As New Hampshire law recognizes, "[f]rivolous litigation is the use of legal processes with apparent disregard for the merit of one's own arguments".

16. The argument and documentation required to establish the extraordinary circumstances created by Donais's conduct cannot be artificially compressed by his arbitrariness, when the court rules impose no such limit.

## VII. DONAIS'S ARGUMENT IS ITSELF FRIVOLOUS

17. Under RSA 507:15, conduct is frivolous when it "clearly appears to the court that the action or any defense is frivolous or intended to harass". Donais's argument lacks any reasonable basis in law and appears designed solely to obstruct legitimate motion practice. New Hampshire courts are empowered to award costs and attorney's fees against parties who engage in frivolous conduct.

18. NH law defines frivolous conduct as that which "lacks any reasonable basis in fact or law". Donais's position would effectively require movants to seek extraordinary relief while being denied the space necessary to demonstrate the required circumstances, a legal impossibility that undermines the very purpose of the motion practice.

19. Plaintiff respectfully requests that this Court reject Donais's frivolous objection regarding page length and grant the motion for leave to file surreply based on the circumstances detailed herein.

## VIII. DONAIS'S OBJECTION PATTERN CONFIRMS THE NEED FOR JUDICIAL INTERVENTION

20. The procedural pattern Donais has established confirms why surreply briefing is necessary. He has systematically objected to plaintiffs' motion to convert to summary judgment, motion for limited discovery, motion to strike extraneous materials, motion for hearing, and now motion for leave to file surreply. This coordinated approach to suppress every procedural avenue for response while introducing extensive materials demonstrates precisely the type of one-sided proceeding that violates fundamental fairness.

## IX. THE ABSENCE OF SUBSTANTIVE RESPONSE CONFIRMS EXCEPTIONAL CIRCUMSTANCES

21. Perhaps most tellingly, Donais's objection contains no citation to any authority governing surreply standards, no analysis of whether exceptional or allowable circumstances exist, and no response to the specific new evidence his reply introduced. This mirrors exactly the evasive pattern identified throughout this litigation: when confronted with legitimate procedural objections, Donais responds with circular conclusions rather than analysis.

22. Surreply may be necessary to address "misstatements and distortions of the factual record made for the first time" in reply. Here, Donais's reply not only introduces new factual evidence but does so while claiming plaintiffs cannot respond to it. His objection's failure to address these substantive concerns confirms he cannot defend this conduct.

## X. PROCEDURAL INTEGRITY REQUIRES SURREPLY TO ADDRESS SYSTEMATIC VIOLATIONS

23. The broader issue here involves the integrity of motion practice itself. If courts permit parties to introduce extensive materials outside pleadings, wait for objections, introduce expanded versions in reply, then object to allowing any response, the adversarial system becomes meaningless. Donais's approach represents exactly this type of systematic manipulation that surreply briefing is designed to prevent.

24. The coordination of his objections reveals the calculated nature of this strategy. Rather than address the procedural defects plaintiffs identified, he seeks to silence response while maintaining overwhelming evidentiary advantage. This creates precisely the type of one-sided proceeding that warrants surreply when parties introduce new evidence "not limited to the evidence already in the record."

25. New evidence introduction, systematic procedural obstruction, willful violation of court orders, and fundamental due process concerns create a compelling case for surreply. Donais's objection addresses none of these substantive concerns, focusing instead on page count while ignoring the underlying fairness issues.

26. Further, the procedures require that a motion to surreply is filed first and then a surreply once the motion is granted. What Donais proposes is that plaintiff must put their entire surreply into the text of the motion to surreply, which is a specious proposition. To the extent that a proposed surreply, as part of an acceptable unwritten custom, can sometimes separately be provided with the motion to surreply (which there is no rule that mandates this), this does not change the fact that the motion itself is not supposed to be the vehicle to file the actual surreply itself. The plaintiff is supposed to seek permission first. In seeking permission, a plaintiff may describe why he needs to surreply. But the surreply itself is supposed to be filed separately from the motion itself. The plaintiff must be able to rely on the rules and procedures of the court and not have them capriciously shifted due to the whim of the defendant's self-serving (often contradictory) purposes.

27. The bottom line is that the plaintiff has not presented his complete surreply in his motion to surreply. Plaintiff needs the opportunity to do so based on the rules of the court and fundamental fairness.

## XI. CONCLUSION AND RELIEF REQUESTED

28. Donais's bare-bones objection confirms every concern raised in the motion for leave to file surreply. His inability to address the substantive exceptional or allowable circumstances, his failure to justify introducing new evidence in reply while objecting to response opportunities, and his systematic suppression of procedural rights demonstrate exactly why surreply briefing is necessary to preserve adversarial integrity.

29. Accordingly, the Court should deny Donais's objection and grant leave to file the proposed surreply.

Respectfully submitted,
/s/andre bisasor
Andre Bisasor

Date: November 6, 2025

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
Andre Bisasor

# Exhibit 2

Filed
File Date: 9/23/2025 12:44 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFF ANDRE BISASOR'S EMERGENCY MOTION FOR LEAVE TO FILE SURREPLY TO DEFENDANT DONAIS'S REPLY TO OBJECTION TO MOTION TO DISMISS**

1. Plaintiff Andre Bisasor ("Bisasor") respectfully move for [emergency] leave to file a surreply to defendant Donais's reply to plaintiffs' objection to his motion to dismiss the amended complaint. Exceptional circumstances mandate this relief because Donais's reply introduces new evidence while simultaneously seeking to silence plaintiffs' response through calculated procedural gamesmanship that violates fundamental fairness principles.

2. NB: Bisasor is quickly filing this motion one day after the filing of Donais' reply. This is because Bisasor does not know the timetable by which the court plans to rule on the pending motions including the motion to dismiss. Therefore, time is of the essence in getting this motion before the court and is the reason why this motion is styled as an emergency. Furthermore, Bisasor is not able to prepare/complete a proposed surreply to attach to this motion, if that is the expectance, as there is literally no adequate time to do so under the circumstances. Bisasor asks the court to allow a reasonable time to file the surreply if this motion is granted.

**I. PREFACE: RESERVATION OF RIGHTS INCLUDING FOR CO-PLAINTIFF**

3. Plaintiff Anderson ("Anderson") is not able to file a motion today. Further, the plaintiffs have not been able to confer due to reasons outlined in the pending sealed ADA motion.

4. Bisasor therefore specifically reserves the right of co-plaintiff Natalie Anderson to file her own separate motion. Anderson has independent standing as a co-plaintiff and possesses separate rights to challenge the defendant's motion to dismiss and reply. Nothing herein should be construed as waiving or limiting Anderson's independent right to file her own pleadings regarding this issue, and she retains full discretion regarding her rights which remain intact. Also, Bisasor files this pleading, protectively, in the abundance of caution. Further, Bisasor filed this in haste.

5. Moreover, Donais used his reply to the objection to the motion to dismiss to complete his motion to dismiss which contained unsigned and missing documents, by attaching purportedly signed documents, along with new exhibits, that were missing from the motion to dismiss. This is totally unfair. Donais wants to get away with all kinds of improper conduct. He wants to use his reply as a vehicle to complete his motion to dismiss. This is simply outrageous.

6. Note: This continuing situation is unsustainable and untenable and highly prejudicial to the plaintiffs. The plaintiffs need to have a hearing/case management conference in order to address these issues, among others. The failure of the court to hold a hearing/case management conference is severely prejudicing the plaintiffs.

## II. GROUNDS FOR SURREPLY

### A. New Evidence Introduced for First Time in Reply

7. Donais's reply introduces material evidence not presented in his original motion by attaching "a complete, executed, as filed copy of Exhibit H as received from the Circuit Court Clerk this day. The executed copy includes Exhibits K and L that were not part of the unsigned copy previously submitted." This constitutes new factual material that plaintiffs had no opportunity to address in their original objection and creates precisely the exceptional circumstances that justify surreply briefing. This admission confirms plaintiffs' argument that his motion relies on improper materials outside the pleadings that violate established procedural requirements. The Court cannot fairly evaluate a motion to dismiss when the movant continues supplementing his evidentiary submissions through reply briefs.

8. Further, this procedural irregularity directly contradicts NH Superior Court Rule 7, which provides that unsigned filings may be stricken and proceedings may continue as though the filing had not been made. Donais further exploits the reply process to introduce new so-called materials or "evidence", while simultaneously arguing that plaintiffs cannot respond. He thus uses the reply as an opportunity to supplement his evidentiary record. This tactical manipulation of procedural rules violates fundamental fairness.

9. The timing of this "evidence" is particularly troubling, further revealing the calculated nature of Donais's approach. Donais acknowledges his original exhibits were incomplete and unsigned, violating NH Superior Court Rule 7 which provides that unsigned filings may be stricken. After filing the motion containing incomplete and unsigned exhibits, he waited for plaintiffs to object, then introduced the missing materials in reply while objecting to plaintiffs' procedural remedies. This sequence demonstrates willful gamesmanship designed to prevent fair adjudication.

### B. Systematic Suppression of Plaintiffs' Defense Rights

10. Donais's reply reveals a coordinated strategy to suppress plaintiffs' ability to mount an effective defense to his dispositive motion and defend against dismissal. He, at the same time, objects to plaintiffs' motion to convert to summary judgment, motion for limited discovery, motion to strike extraneous materials, and motion for hearing. This pattern demonstrates his intent to create an asymmetrical proceeding where he presents extensive materials while blocking/eliminating every procedural avenue for plaintiffs to respond and for fair resolution while maintaining his overwhelming evidentiary advantage.

11. The asymmetry Donais creates violates fundamental due process principles. He presents 151 pages of motion materials attacking a 25-page amended complaint, introduces new evidence in reply, yet objects when plaintiffs seek

appropriate procedural relief to address these irregularities. This approach essentially converts motion practice into a one-sided presentation where defendants present unlimited materials while opponents are silenced.

12. This Court previously ruled on 6-5-25, that "when faced with an excessively burdensome and muddled pleading, the trial court may require the submitting party to file a more orderly and concise pleading," yet Donais filed a 151-page motion with 142 pages of exhibits attacking plaintiffs' 25-page amended complaint. When plaintiffs sought appropriate procedural relief, Donais objects to each remedy while demanding immediate resolution in his favor.

13. Judge Messer's 6-5-25 order recognized this unfairness, noting that "when faced with an excessively burdensome and muddled pleading, the trial court may require the submitting party to file a more orderly and concise pleading." Donais's current motion exceeds even the problems the Court previously identified, yet he demands immediate resolution without allowing procedural corrections.

**C. Direct Violation of Court's Prior Guidance**

14. The 6-5-25 order explicitly stated that consideration of materials outside the pleadings is improper on a motion to dismiss. The Court noted that plaintiffs were correct about the impropriety of considering extraneous materials and that such materials would not be considered. See screenshot of the 6-5-25 order on summary judgment conversion:

> In ruling on the defendant's motion to dismiss, the Court has accepted as true, and relied only upon, the factual allegations as set forth in the Complaint. While the plaintiffs are correct that consideration of, and reliance upon, defendant's evidence submitted in conjunction with their motion to dismiss would not be proper, the Court has not done so. Accordingly, the Court has treated the defendant's motion as it was filed-- as a motion to dismiss. Therefore, there is no basis at this juncture to treat it as a motion for summary judgment. Accordingly, the motion is DENIED.
>
> This is a Service Document For Case: 216-2020-CV-00027
> Hillsborough Superior Court Northern District
> 6/5/2025 4:21 PM
> June 5, 2025
> Honorable Amy B. Messer

15. Despite this clear guidance/directive, Donais repeated the identical procedural violation in his motion to dismiss the amended complaint, including the very same documents the Court previously found improper.

16. Thus, Donais's motion and reply directly violates Judge Messer's explicit June 5, 2025 guidance that consideration of materials outside the pleadings is improper on motions to dismiss. This willful disregard further demonstrates that Donais understood the Court's position but chose to proceed anyway, knowing the Court could convert to summary judgment, allow discovery, or strike his materials. His reply's objection to these procedural remedies while introducing additional evidence compounds the violation, and confirms his intent to exploit procedural irregularities for tactical advantage. This creates the kind of unfair procedural advantage that surreply briefing is designed to address,

17. The Court's order established clear boundaries for motion practice in this case. Donais's deliberate violation of these boundaries while objecting to appropriate remedies creates precisely the type of exceptional circumstances that justify surreply briefing to preserve procedural integrity.

**D. Procedural Asymmetry / Unfair Burden Violates Due Process**

18. Donais's approach creates fundamental procedural unfairness, creating impossible procedural burdens for plaintiffs while claiming procedural advantages for himself. He attaches over 200 pages of exhibits (including attachments in his recent reply) spanning 8 years while plaintiffs have been afforded no adequate time to prepare, organize, or incorporate responsive exhibits. Preparation of exhibits requires substantial time to line up, incorporate, and attach documents with proper headers/numbering. This procedural burden, imposed without adequate extension of time, while Donais claims plaintiffs have seen these before (from 8 years ago), is wholly unfair and draconian.

19. So, in sum, he attaches over 200 pages of exhibits spanning 8 years, then demands immediate response claiming plaintiffs have seen these before from 8 years ago. This position further ignores the substantial work required to, minimally, organize, prepare, and incorporate responsive exhibits with proper headers and numbering, beyond the analytical work involved in reviewing the substance of the exhibits and preparing substantive response to that.

20. For example, Donais now asserts that his motion to dismiss amended complaint had missing several exhibits H, K and L (with multiple pages totaling around/over 12 pages), from a 60-page motion to dismiss in the circuit court, which he now includes for the first time in his reply to the objection to the motion to dismiss. In order for plaintiff to have caught this, he would have had to meticulously compare the original circuit court motion to his exhibit attached to the motion to dismiss amended complaint. This takes an extraordinary amount of time to review, compare and catch issues like this. It is totally unfair to expect plaintiff, who is pro se, and has ADA issues, to accomplish superhuman tasks like this, that no trained lawyer (without ADA issues) would be expected to accomplish. This inclusion of new exhibits in the reply further highlights the complete unfairness and lobsided nature of these proceedings and how things are stacked against the plaintiff but in favor of the defendant.

21. Plaintiffs have been afforded no adequate time extension despite the overwhelming nature of Donais's materials. The Court limited plaintiffs' amended complaint to 25 pages while allowing Donais to present 151 pages in response, creating fundamental unfairness that his reply compounds by introducing additional evidence.

22. Moreover, plaintiffs cannot determine how to respond properly because Donais objects to every procedural remedy while the Court has not yet ruled on whether his extraneous materials will be considered, converted, or stricken. Thus, plaintiffs cannot know whether the Court will strike or consider the extraneous materials, making it impossible to determine how to properly respond and with exactly what attachments. This uncertainty is precisely why rules

exist against including facts and materials outside the complaint, as it unfairly burdens opposing parties and prevents effective response. [Note: The last time around, the court informed the plaintiff that it would not consider the extraneous facts and materials[1], but did so **after** it ruled on the motion to dismiss original complaint, while never allowing the plaintiff to supplement his objection (which would include substantive arguments which were not really included in the initial placeholder objection that focused on procedural issues such as the need to strike the extraneous materials/facts, etc.) which the plaintiffs strenuously requested to do several times but was ignored and eventually denied after the court ruled on the motion to dismiss. This was unfair and highly prejudicial. Moreover, the court never allowed plaintiff adequate time to file reconsideration motion where he could raise substantive arguments. Furthermore, the court should resolve these extraneous issues before ruling on a motion to dismiss.

**E. Unprecedented Procedural Gamesmanship**

23. Donais's approach represents unprecedented manipulation of motion practice rules. He files defective exhibits, waits for objections, introduces expanded versions in reply, then objects to allowing plaintiffs any response. This sequence violates every principle of fair adversarial proceedings and demonstrates why surreply briefing is necessary to prevent tactical abuse of procedural rules. Further, the coordinated nature of his objections reveals the calculated strategy. Rather than address the procedural defects plaintiffs identified, he seeks to silence response while maintaining his overwhelming evidentiary advantage. This involves one-sided presentations that deny fundamental fairness.[2]

**F. Previous Court Allowance of Surreplies**

24. The docket reflects that Judge Messer previously allowed surreply briefing in this case by both parties. Index 52 shows plaintiffs filed a "Motion to File Surreply to Obj. to Mo to Dismiss" in February 2022, and Index 139 shows a "Response Surreply to Response to Obj to Mot Dismiss" was filed. This establishes that the Court recognizes the appropriateness of surreply briefing when circumstances warrant such relief. It certainly is proper in this situation.

**G. Case-Ending Nature of Motion Requires Full Briefing**

25. Donais's motion seeks dismissal with prejudice on multiple claims, effectively ending substantial portions of this litigation. The stakes involved in this potential case-ending dispositive motion demand complete and fair briefing.

[1] Note: Although the court stated this in the summary judgment conversion order, a close review of the 6-5-25 order on the motion to dismiss shows that the court did use/rely on certain information/facts supplied only by the motion to dismiss original complaint, that were not present in the original complaint. This was not fair and the plaintiff is concerned that the court is going to do this again.

[2] Note: Hilliard is a seasoned 74 year old attorney who is well-versed in manipulative tactics. The pro se African American plaintiffs are not match for his unfair tactics. The court should not countenance such tactics and should seek to protect the pro se African American plaintiffs from such unsavory gamesmanship.

Allowing defendants to introduce new evidence in reply while denying plaintiffs the opportunity to respond violates fundamental principles of adversarial proceedings.

**H. Preview of Further Substantive Points/Rebuttals To Be Made in The Surreply**

26. Plaintiff intends to make additional points/rebuttal arguments in the surreply. This includes addressing Donais' arguments, which he raises for the first time in his reply, that "*The "placeholder" objection to the motion to dismiss is 103 pages long, incorporating issues raised and resolved in other motions and addressing many aspects of this proceeding that have no bearing on the validity of the amended complaint. This diffuse and prolix style of pleading imposes undue burdens on the Court and defense counsel, and ought not to be tolerated. More substantively, the objection fails to recognize the limitations on new causes of action and substantially different evidence established in the order granting leave to amend.*" First, there are no other motions that have resolved the issues in the objection and Donais has not cited what he is talking about. This kind of vague insinuations, leaving the plaintiff and the court to figure out/divine what he is referring to, should not be countenanced by the court. Second, the plaintiff has explained the length of the objection to the court, including having inadequate time to edit/proof the objection, and has requested to allow time to file a proper objection but this has not yet been allowed. Moreover, Donais filed a 151 page motion to dismiss so the plaintiff has filed less pages in the objection than Donais. What should not be tolerated is Donais' flagrant defiance/violation of the court's 6-5-25 order that warned against inclusion of extraneous materials in a motion to dismiss. Thus, his claims about "prolix" and "burdensome" pleadings ring hollow when he files 151 pages attacking 25 pages while objecting to every procedural remedy and attempting to characterize plaintiffs' necessary responses as excessive. Third, regarding new claims, it should be noted that the court ruled on plaintiffs' motion to amended complaint, on 6-5-25, stating that it was moot because plaintiff was allowed to amend complaint, in the ruling on motion to dismiss. But yet in the motion to amend complaint, plaintiffs detailed examples of things they intended to include in amended complaint. The court, in its 6-5-25 orders, did not limit those things stated in the motion to amend complaint. If the court intended to do so, it would have so stated it, because otherwise it would leave unfairly plaintiffs in a total state of confusion/ambiguity as to what could be included in the amended complaint, by remaining silent. Plaintiff has further points to make on these things in surreply.

**I. Surreply Is Necessary Especially If There Will Not Be A Hearing On The Motion to Dismiss**

27. The necessity for surreply briefing becomes even more critical if the Court determines not to hold a hearing on the motion to dismiss. Donais has systematically objected to plaintiffs' motion for hearing while simultaneously introducing new evidence and procedural arguments in his reply that were not presented in his original motion. If

the Court resolves this potentially case-ending motion based solely on written submissions, fundamental fairness demands that plaintiffs have the opportunity to respond to all materials and arguments presented.

28. Without a hearing, the Court will have no opportunity to examine witnesses, test the credibility of competing factual assertions, or explore the procedural irregularities that plaintiffs have identified. The written record becomes the sole basis for resolution, making complete briefing essential to fair adjudication. Donais's introduction of new exhibits and procedural arguments in reply while blocking plaintiffs' response creates precisely the type of one-sided record that violates due process when hearings are not conducted.

29. The complexity of the procedural issues presented, including whether materials should be stricken, converted to summary judgment, or subjected to discovery, requires complete briefing for proper resolution without a hearing. Donais's coordinated objections to all procedural remedies demonstrate his intent to force resolution based on incomplete briefing that favors his position. If the Court determines these issues without hearing, plaintiffs must have opportunity to respond to all arguments/evidence presented, including those introduced the first time in reply.

30. Moreover, the case-ending nature of the motion makes complete briefing particularly critical when resolution occurs without hearing. Any dismissal would terminate substantial portions of this litigation based solely on the written record. Allowing defendants to supplement that record through reply while denying plaintiffs responsive opportunity creates fundamental unfairness that becomes insurmountable without hearing procedures to correct the imbalance.

## III. LEGAL STANDARD AND TIMING

31. New Hampshire courts possess inherent authority to permit additional briefing when circumstances warrant such relief. This authority has been exercised in cases like Dover v. Scanlan, where courts permitted surreply briefing to address new arguments raised in reply briefs. This motion is filed promptly after receiving defendant's reply. The surreply will be tailored to address new issues raised in the reply and the systematic suppression of plaintiffs' procedural rights. Permitting surreply serves judicial efficiency by ensuring complete briefing on all relevant issues.

## IV. CONCLUSION

32. Donais's reply confirms that his motion to dismiss violates fundamental procedural requirements through introduction of new evidence, systematic suppression of defense rights, willful disregard of the Court's guidance, and unprecedented procedural gamesmanship. His coordinated objections to every procedural remedy while introducing new materials in reply demonstrates precisely why surreply briefing is necessary to preserve adversarial integrity.

33. Defendant's reply confirms systematic procedural violations plaintiffs identified while introducing additional evidence that compounds these irregularities. His coordinated objections to every procedural remedy plaintiffs seek reveals a calculated strategy to create an unfair advantage in this potential case-ending motion.

34. The Court should recognize that allowing this coordinated suppression of rights would establish dangerous precedent permitting defendants to overwhelm opponents with defective materials while blocking all procedural remedies. Fair adjudication requires that plaintiffs have meaningful opportunity to respond to new evidence and address the systematic procedural violations Donais's reply further reveals.

35. In sum, the exceptional circumstances created by defendant's introduction of new evidence, systematic objection to all procedural remedies, direct violation of the Court's prior guidance, and fundamental procedural unfairness warrant granting leave to file the proposed surreply. A surreply should certainly be allowed on a potential case-ending dispositive motion where the defendant has engaged in coordinated efforts to suppress plaintiffs' defense against dismissal while introducing new materials in reply.

36. WHEREFORE, plaintiff Bisasor respectfully requests that this Court grant leave to file a surreply to ensure fundamental fairness and complete resolution of the procedural and substantive issues presented.

Respectfully submitted,
/s/andre bisasor
Andre Bisasor

Date: September 23, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
Andre Bisasor

# Exhibit 3

Filed
File Date: 10/30/2025 1:51 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

# PLAINTIFF ANDRE BISASOR'S REPLY TO DEFENDANT DONAIS'S OBJECTION TO PLAINTIFF ANDRE BISASOR'S EMERGENCY MOTION TO STRIKE DEFENDANT DONAIS' REPLY TO OBJECTION TO MOTION TO DISMISS AND/OR REPLY ATTACHMENTS

1. Andre Bisasor submits this reply to defendant Craig Donais's objection to his motion to strike Donais's reply to plaintiffs' objection to motion to dismiss and attached materials. Donais's bare-bones objection confirms the very procedural gamesmanship that necessitates striking his reply.

## A. Donais's Evasive Non-Response Demonstrates the Problem

2. Donais's objection spans barely one page and presents zero substantive arguments addressing the specific procedural violations identified in the motion to strike. This non-response is telling. Rather than addressing his introduction of new evidence in his reply, his systematic suppression of plaintiffs' defense rights, or his willful violation of this Court's June 5, 2025 guidance, Donais simply asserts there is "no legitimate basis" to strike his filing. This conclusory statement, devoid of legal analysis, exposes the weakness of his position.

3. The absence of any substantive response to the detailed procedural objections demonstrates that Donais cannot defend his conduct. When a party introduces new evidence for the first time in his reply, claims the opposing party cannot or should not respond, and objects to every procedural remedy the opposing party seeks to address the inclusion of illicit material, the appropriate remedy is striking to preserve adversarial fairness.

## B. Courts Recognize Similar Procedural Abuses Warrant Striking

4. Both state and federal courts have recognized that introducing new evidence in reply briefs creates precisely the type of procedural unfairness that justifies striking. Here, Donais engages in exactly this type of tactical abuse. He attached "a complete, executed, as filed copy of Exhibit H as received from the Circuit Court Clerk this day" containing "Exhibits K and L that were not part of the unsigned copy previously submitted." This new evidence introduction in reply, while simultaneously objecting to plaintiffs' ability to respond, violates fundamental fairness principles that require equal opportunity to address evidence presented to the court.

## C. NH Superior Court Rule 7 Supports Striking Defective Materials

5. The attachment of unsigned pleadings, as evidence, to a motion to dismiss is improper. Yet, Donais did this very thing; he attached unsigned pleadings to his motion to dismiss the amended complaint. He did so intentionally as he

acknowledged in his pleading that it was not signed (which confirms that he was aware that it was improper), yet he attached it any way[1].

6. Donais's original motion thus violated NH Superior Court Rule 7, which provides that unsigned filings may be stricken and proceedings may continue as though the filing had not been made. See Rule 7("If a pleading is not signed, or is signed with an intent to defeat this rule, the court may strike the pleading, and the action may proceed as though the pleading had not been filed"). This means that unsigned pleadings generally have no legal effect and cannot be used as evidence in support of or against dispositive motions such as a motion to dismiss[2].

7. In addition, Donais then waited until plaintiff filed an objection, then used his reply to not only attach a signed pleading but this time including in it, additional new exhibits that were not previously included in the attachments[3]. So, he used his reply to the objection to the motion to dismiss, to amend his motion to dismiss. Then he seeks to limit the time or ability of plaintiff to oppose this illicit maneuver. This should not be allowed to stand. Both of the improper filings should be stricken. Both of the improper filings have caused prejudice to the plaintiffs. These facts directly support striking.

8. Thus, because NH Superior Court Rule 7 prohibits unsigned filings, and this Court's June 5, 2025 order prohibits consideration of materials outside the pleadings on motions to dismiss, then this further together support striking in this instance. Fundamental due process requires equal opportunity to address evidence presented to courts. Donais's conduct violates all three principles, and no circumstances exist where such violations should be permitted to stand.

9. Further, Federal Rule 12(f) provides insight. Under that standard, courts may strike materials that create unfair procedural advantages or prevent proper adversarial testing. Here, Donais's reply does exactly that.

### D. Donais's Strategy Creates Systematic Suppression of Plaintiff's Rights

10. Donais's objection fails to address the coordinated nature of his procedural obstruction. The record demonstrates he has objected to plaintiffs' motion to convert to summary judgment, motion for limited discovery, motion to strike

[1] This is on top of Donais' violation of the court's 6-5-25 order, as shown elsewhere, that warned against including extraneous material with a motion to dismiss, which as seasoned attorneys, both Donais and Hilliard knew better not to do, in any event, but they did it any way.

[2] Thus, the rules indicate that a party or the court cannot rely on or act upon an unsigned pleading. If an unsigned pleading is presented as evidence in a motion, it may be stricken and treated as not filed. Therefore, unsigned pleadings are not valid evidence and should not be considered by the court in ruling on motions to dismiss or other dispositive motions.

[3] Donais acknowledges his original exhibits were incomplete and unsigned, yet he waited until his reply to address these defects while objecting to plaintiffs' procedural remedies. This sequence demonstrates calculated gamesmanship designed to prevent fair adjudication.

extraneous materials, and motion for hearing. Simultaneously, he introduces new evidence in reply while claiming plaintiffs cannot respond. This creates the precise type of one-sided proceeding that violates due process.

11. Courts recognize that such systematic suppression of procedural rights warrants intervention. When defendants engage in evasive tactics that prevent fair adjudication, appropriate procedural relief is warranted to ensure adversarial integrity. Here, Donais's pattern of introducing extensive unpermitted materials, while blocking every avenue for response further cements these concerns.

### E. <u>This Court's June 5, 2025 Order Establishes Clear Boundaries</u>

12. Most significantly, Donais's objection ignores this Court's explicit guidance in its June 5, 2025 order that "consideration of materials outside the pleadings is improper on a motion to dismiss." Despite this clear directive, Donais repeated the identical procedural violation in his motion to dismiss the amended complaint, including some of the very same documents the Court previously found improper, and also more of the same. This willful disregard compounds the procedural violation. Donais has thus violated the court's 6-5-25 order.

13. When a court provides clear guidance about improper motion practice, repeating those exact violations while introducing additional evidence in reply demonstrates contempt for judicial authority. The fact that Donais now objects to every procedural remedy to this violation by him, while claiming no legitimate basis exists to strike his materials, confirms his intent to exploit procedural irregularities for tactical advantage.

### F. <u>The Absence of Substantive Argument Confirms the Need for Relief</u>

14. Most tellingly, Donais's objection contains no citation to any authority, no analysis of the procedural standards governing motions to strike, and no response to the specific violations identified. Instead, he simply claims the motion is "repetitive and frivolous" and requests attorney fees. This response pattern mirrors exactly what plaintiffs identified as systematic suppression: when confronted with legitimate procedural objections, Donais responds with conclusions rather than analysis and seeks to penalize opposition rather than address substantive issues.

### G. <u>Request for Attorney Fees is Improper and Unwarranted</u>

15. The request for attorney fees is particularly inappropriate. Motions to strike serve an important function in preventing procedural abuse. When a party introduces new evidence in reply, violates court orders, and systematically objects to every procedural remedy, the opposing party has every right to seek appropriate relief. Characterizing such relief as frivolous demonstrates exactly the type of procedural bullying that striking is designed to prevent.

16. Further, the NH Supreme Court has emphasized that attorney fee awards require extraordinary circumstances and clear evidence of frivolous conduct lacking any reasonable basis. Plaintiff's motion addresses legitimate procedural concerns arising directly from Donais's decision to introduce extraneous material in/with his motion to dismiss and attendant reply. The motion is grounded in established legal principles, and seeks relief properly within the Court's authority. No basis exists for fee sanctions.

17. The request for an award of fees" lacks any legal or factual foundation. New Hampshire law permits fee awards for frivolous litigation only in limited circumstances. RSA 507:15 authorizes fees where "it clearly appears to the court that the action or any defense is frivolous or intended to harass or intimidate the prevailing party." Similarly, Rule 59 permits fee awards for frivolous or unreasonable motions brought in bad faith. This motion satisfies neither standard.

18. Donais cites no authority suggesting that this motion constitute sanctionable conduct. The objection's fee request appears designed to chill the exercise of legitimate procedural rights rather than to vindicate any genuine grievance. Courts have recognized that "the bar that the moving party must clear to recover an award under is a very high one" and requires showing both that claims were frivolous "and that they were not advanced in good faith; in other words that the party acted with an actual intention to harass or increase the costs of the litigation." The present motion meets none of these criteria.

19. Indeed, if any fee request were appropriate here, it would be against Donais for filing a bare-bones objection that offers no substantive opposition but instead seeks to burden the opposing party with baseless fee threats.

20. Furthermore, it is improper to combine a motion for attorney fees into an objection. See Rule 7(g)("Objections to pending motions and affirmative motions for relief shall not be combined in one filing".). This continual intentional violation of the rules (he has done this in every objection filed recently) supports some kind of sanctions or warning to the defendant, especially when done to be oppressive.

### H. <u>Procedural Fairness Requires Clear Boundaries</u>

21. The fundamental issue here transcends this particular motion. If courts permit defendants to introduce extensive materials outside the pleadings for a motion to dismiss, then wait for objections, then introduce expanded versions in their reply, and then object to allowing any response, motion practice becomes a one-sided presentation rather than a fair proceeding, undermining the entire adversarial system. Here, Donais introduces materials that were never admissible because they violate this Court's explicit guidance, then claims no procedural remedy is available.

## I. The Timing Issue Reveals Calculated Strategy

22. The sequence of events reveals Donais's calculated approach. He files a motion containing incomplete exhibits that violate NH Superior Court Rule 7. After plaintiffs object to these procedural defects, he introduces complete versions in reply while objecting to plaintiffs' ability to respond. This creates exactly the type of procedural trap that courts should not permit.

## J. Violation of Settlement Contract

23. The original defendants settled this case. In order to settle the claims, the plaintiffs required that statements made in the motion to dismiss in Nashua circuit court and in Hillsborough superior court South, must be withdrawn and sealed; otherwise, the plaintiffs would not settle and would instead litigate those statements to show them to be false and defamatory. The 20 defendants agreed to withdraw and seal those statements. Donais was initially part of the settlement agreement but later backed out of the settlement at the last minute just before it was completed/consummated. Donais also used his position as a former attorney for the original defendants to obtain access to the withdrawn/sealed pleadings including the motion to dismiss in Nashua circuit court, and then attached it to the motion to dismiss the amended complaint in this case. He attached an unsigned pleading which he evidently obtained from his prior position, and to which he was privy to as being involved in the internal settlement negotiations of the case, until he departed at the last minute, and to which he knew was being withdrawn and sealed by the settlement of the parties. Donais has now misused his position to violate the settlement terms and to try to injure the plaintiffs by publicly including stricken, withdraw and sealed pleadings that were governed by confidential settlement agreement. See **Exhibits A, B and C.**

24. The settlement agreement is under a binding contract for confidentiality and thus plaintiff is not permitted to expose the contract publicly. However, the part of the contract that requires withdrawal and sealing of statements (in the pleading attached by Donais) can be seen as manifested in the two stipulations of settlement filed in this court and signed by the original defendants, which explicitly states that the statements are withdrawn and/or sealed. See Exhibits A, B and C.

25. Moreover, the confidentiality agreement demonstrates why the signed version was likely unavailable initially to Donais, but only the unsigned version. If Donais could not obtain signed documents due to confidentiality restrictions with other defendants, then his introducing them in a reply, further creates unfair advantage that striking is designed to prevent.

### K. Further Rebuttal to Donais' Objection

26. Donais states that "No legitimate basis exists to strike Donais' properly filed pleading, to which the plaintiffs have already responded with their lengthy motion for leave to surreply."

27. First, there is legitimate basis to strike Donais' reply, which has been outlined above and in the original motion.

    a. Donais violated a court order. This is clear grounds to seek to strike.

    b. Donais also included material outside of the complaint that threatens the fair adjudication of a motion to dismiss, by seeking to introduce material to challenge or establish facts at the motion to dismiss stage, which is not permitted.

    c. Donais also violated rule 7 by including materials that were not signed and thus not proper.

    d. Donais included materials that are the subject of prior striking by another court and that were withdrawn by the parties who drafted the materials, and are the subject of sealing via a confidential settlement agreement[4]. The court should strike for this reason alone.

    e. Not content with the above violations and even after being warned of his continued violations by an initial motion to strike the motion to dismiss amended complaint, Donais doubles down intransigently by further including more extraneous illicit material in his reply to the objection to the motion to dismiss, for the first time (which new material was not present in his motion to dismiss). This is unfair, improper, and prejudicial. It is violative of the rules and of the court's order as well as of the well-established jurisprudence in this jurisdiction. It is thus not properly filed.

28. Second, the motion for leave to surreply is not a response to the objection to the motion to strike. Donais impermissibly seeks to conflate the two.

29. Third, Donais has set up a catch-22 by first filing an illicit pleading, and seeks to attack plaintiff for any attempt to hold him accountable for filing the illicit pleading. If plaintiff moves to strike the illicit pleading because it is illicit and should never have been filed, and then plaintiff subsequently seeks leave to surreply to it to protect himself from the illicit effect of the pleading (not knowing if the court will strike it), Donais then claims that plaintiff has already surreplied via the motion for leave to surreply (which is illogical as a motion for leave is not a surreply) and then

[4] The settlement agreement is under a binding contract for confidentiality and thus plaintiff is not permitted to expose the contract publicly. Plaintiff would have to file the settlement agreement under seal ex parte because Donais is not a party to the final version of the signed settlement agreement with the 20 original defendant. However, the part of the contract that requires withdrawal of statements can be seen as manifested in the two stipulations of settlement filed in this court and signed by the original defendants.

Donais further argues that plaintiff cannot strike it because plaintiff surreplied. These are the features of the unfair procedural traps that he setup that riggs the game in his favor. No matter what, plaintiff is disadvantaged and is setup to lose. If plaintiff tries to address the illicit pleading, plaintiff is setup to lose. By the way the defendant does not address the actual merits of the argument that his pleading is illicit, he just expects to het away with it by brute force). If plaintiff does not address the illicit pleading, then he gets away it and again plaintiff is setup to lose. Defendant has orchestrated situation where the only thing acceptable to him is for plaintiff to say nothing and not oppose his illicit pleadings or unfair actions. And if plaintiff seeks to address it, he requests attorney fees. This is an burdensome, oppressive setup, one which violates the rules of conduct. In seeking attorney fees for everything plaintiff writes, Donais is engaged in frivolous bad faith oppressive bullying conduct.

30. Further, the fact that plaintiff sought leave to surreply while also moving to strike demonstrates that plaintiff is pursuing every available remedy to ensure fair adjudication. Rather than supporting Donais's position, this acknowledgment exposes the problem. If plaintiffs must seek leave to surreply to address new evidence introduced in Donais' reply, this confirms that Donais's reply contains improper material. The appropriate remedy is striking the improper materials, not permitting the procedural gamesmanship to continue.

**L. <u>Frivolousness Allegation Lacks Merit</u>**

31. Donais's characterization of the motion as "repetitive and frivolous" deserves response. The motion addresses specific procedural violations with precise citations to record evidence and applicable authority. When a party introduces new evidence in reply while systematically objecting to every procedural remedy, seeking appropriate relief through motion practice is exactly what the rules contemplate.

32. The allegation of repetitiveness likely refers to the fact that these procedural issues (of including illicit material in a motion to dismiss) have arisen more than once in this litigation. However, this repetition confirms the pattern of procedural abuse rather than undermining the current motion. When a party repeatedly violates procedural requirements despite clear court guidance, continued enforcement through appropriate motions becomes more necessary, not less.

**M. <u>Conclusion and Relief Requested</u>**

33. Donais's bare-bones objection confirms every concern raised in the motion to strike. His inability to address the substantive procedural violations, his failure to cite any supporting authority, and his attempt to characterize

legitimate procedural objections as frivolous demonstrate exactly the type of procedural bullying that striking is designed to prevent.

34. The Court should recognize that Donais's pattern of conduct, introducing extensive materials outside the pleadings, violating explicit court guidance, introducing new evidence in reply, and systematically objecting to every procedural remedy, creates precisely the type of one-sided proceeding that undermines adversarial integrity. His objection's failure to address these substantive concerns while requesting attorney fees for having to respond to legitimate procedural objections confirms the calculated nature of his approach.

35. Accordingly, the Court should deny Donais's objection and grant the motion to strike his reply and attached materials. Such relief is necessary to preserve procedural fairness and prevent the type of systematic abuse that Donais's conduct represents.

36. The Court should also deny his request for attorney fees as inappropriate under these circumstances where legitimate procedural violations warrant judicial intervention. Furthermore, it is improper to combine a motion for attorney fees into an objection. See Rule 7(g)("Objections to pending motions and affirmative motions for relief shall not be combined in one filing".). This continual intentional violation of the rules (he has done this in every objection filed recently) supports some kind of sanctions or warning to the defendant, especially when done to be oppressive.

37. The time has come to establish clear boundaries for motion practice in this case. Permitting Donais's procedural gamesmanship to continue would create dangerous precedent allowing defendants to overwhelm opponents with defective materials while blocking all procedural remedies. Fair adjudication requires that both parties operate under the same procedural rules, and Donais's systematic violations of those rules cannot be permitted to continue.

Respectfully submitted,
/s/andre bisasor
Andre Bisasor

Date: October 30, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
Andre Bisasor

# <u>Exhibit A</u>

Filed
File Date: 4/6/2022 12:45 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE

HILLSBOROUGH NORTH, SS. SUPERIOR COURT

NATALIE ANDERSON )
ANDRE BISASOR )
)
Plaintiffs )
v. ) 226-2020-cv-00027
)
DAVE AKRIDGE; STEPHEN )
ARNOLD; MARIE AUFIERO )
RICHARD AUFIERO; BLACKSTONE )
GROUP, INC.; SERGIO BURGOS )
CINDY DASILVA; CRAIG DONAIS )
JOHN J. FLATLEY; NANETTE )
GONZALEZ; JONATHAN GRAY; )
GREAT AMERICAN HOTEL GROUP; )
HILTON HOTELS WORLDWIDE, INC.)
HOMEWOOD SUITES OF NASHUA; )
JOHN FLATLEY COMPANY; )
SHELAGH MICHAUD; CHRIS )
NASSETTA; ADAM ROBITAILLE; )
BRIAN SNOW; KARL TERRELL; )
KAREN YEAGER )
)
Defendants )

**NOTICE OF SETTLEMENT & FINAL DOCKET MARKINGS**

In the above-captioned action, Defendants Dave Akridge, Stephen Arnold, Marie Aufiero, Richard Aufiero, Blackstone Group, Inc.; Sergio Burgos, Cindy Dasilva, John Flatley; Nanette Gonzalez; Jonathan Gray, Great American Hotel Group, Hilton Hotels Worldwide, Inc., Homewood Suites of Nashua, John Flatley Company, Shelagh Michaud, Chris Nassetta, Adam Robitaille, Brian Snow, Karl Terrell, Karen Yeager

Approved and So Ordered

Amy B. Messer

Honorable Amy B. Messer
April 7, 2022

Clerk's Notice of Decision
Document Sent to Parties
on 04/07/2022

(collectively "Defendants") request that the Court make note of this settlement and mark the docket in this matter as follows:

On terms which will remain confidential, the Parties have now settled this litigation to the mutual satisfaction of the Parties, neither party admitting liability. The Parties hereby acknowledge that the circumstances giving rise to this litigation included misunderstandings and miscommunication. As part of the settlement, the Parties have agreed to withdraw and/or seal certain statements, pleadings and exhibits in this litigation. In accordance with the terms of the settlement, all claims and counterclaims are hereby agreed to be voluntarily dismissed by the Parties. "Judgment for neither party. No further action. No costs or fees."

**PLAINTIFFS**

Dated: March 4, 2022

**ANDRE BISASOR**
119 Drum Hill Rd, #233
Chelmsford, MA 01824
781-492-5675

Dated: March 4, 2022

**NATALIE ANDERSON**
119 Drum Hill Rd, #233
Chelmsford, MA 01824
781-492-5675

**DEFENDANTS**

Dated: March 4__, 2022

Shelagh C.N. Michaud (Bar # 647926)
One Citizens Plaza
Providence, RI 02903-1345
401-454-1133
844-782-4480 fax
smichaud@nixonpeabody.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was or will be served to the parties in this case via the court's electronic filing/service system.

/s/andre bisasor
Andre Bisasor
679 Washington Street, Suite # 8-206
Attleboro, MA 02703
781-492-5675

# Exhibit B

Filed
File Date: 4/6/2022 12:45 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE

HILLSBOROUGH NORTH, SS. SUPERIOR COURT

| | | |
|---|---|---|
| NATALIE ANDERSON<br>ANDRE BISASOR,<br>Plaintiffs<br>v.<br><br>HILTON HOTELS WORLDWIDE, INC.,<br>ET. AL,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 226-2020-cv-00027 |

**STIPULATION OF DEFENDANTS' MARIE & RICHARD AUFIERO**

Now come the defendants Marie and Richard Aufiero in the above-referenced action who, in addition to the joint **notice of settlement and final docket markings** filed by the parties in this case, hereby further stipulate the following:

The written statement by Marie Aufiero made on January 9, 2017, as well as any other written or oral statements made by or on behalf of Marie Aufiero and Richard Aufiero in relation to this matter which are in dispute in this litigation, are hereby withdrawn by Marie Aufiero and Richard Aufiero, as part of the full and final settlement and final disposition of the above-captioned matter. The withdrawal of the above-referenced statements is not an admission of fault or liability for any of the claims and/or counts raised in the Plaintiff's Complaint in the above-referenced action.

Andre Bisasor

**Andre Bisasor aka Andre Bissasor**
679 Washington Street, #8-206
Attleboro, MA 02703
and/or
119 Drum Hill Road, #233
Chelmsford, MA 01824
Tel. (781) 492-5675
Dated: 3-4-22

Natalie Anderson

**Natalie Anderson**
679 Washington Street, #8-206
Attleboro, MA 02703
and/or
119 Drum Hill Road, #233
Chelmsford, MA 01824
Tel. (781) 492-5675
Dated: 3/4/22

*/s/ Meredith J. McGair*

**Counsel for the Defendants,**
**Marie Aufiero and Richard Aufiero**
Meredith J. McGair, B.B.O. #681088
Law Offices of Steven B. Stein
P.O. Box 2903
Hartford, CT 06104-2903
Direct Dial: (617) 772-2807
Facsimile: (888) 275-7090
mmcgair@travelers.com
Dated: 3/31/22

Approved and So Ordered

Amy B. Messer

Honorable Amy B. Messer
April 7, 2022

Clerk's Notice of Decision
Document Sent to Parties
on 04/07/2022

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was or will be served to the parties in this case via the court's electronic filing/service system.

<u>/s/andre bisasor</u>
Andre Bisasor
679 Washington Street, Suite # 8-206
Attleboro, MA 02703
781-492-5675

# Exhibit C

Filed
File Date: 4/6/2022 12:45 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE

HILLSBOROUGH NORTH, ss SUPERIOR COURT DEPARTMENT

NATALIE ANDERSON, ET. AL,
Plaintiffs
v.
HILTON HOTELS WORLDWIDE, INC., ET AL;
Defendants.

CIVIL ACTION NO. 216-2020-CV-00027

**NOTICE AND CLARIFICATION PERTAINING TO TWO NOTICES OF SETTLEMENT/FINAL DOCKET MARKINGS (OR JOINT-STIPULATIONS OF DISMISSAL PURSUANT TO SETTLEMENT) THAT HAVE BEEN COMPLETED AND SIGNED BY ALL NAMED PARTIES (EXCEPT CRAIG DONAIS)**

The plaintiffs hereby report to this court (and provide clarification or explanation) that all the named parties in the above-captioned case (except for Craig Donais) have signed two **notices of settlement and final docket markings (or joint stipulations of dismissal pursuant to settlement**) to now be filed in this court, which contains joint statements by the parties (except for Craig Donais) that they wish to include as part of the final docket markings/entry of dismissal for this case, with respect to these named parties, and which is a specific term/provision called for and directed to be effectuated by the fully executed/signed settlement agreement of the named parties (except Craig Donais).

These two **notices of settlement and final docket markings (or joint stipulation of dismissal pursuant to settlement)** that have been signed are as follows.

1) The first one pertains only to defendants Marie Aufiero and Richard Aufiero who are represented by Attorney Meredith McGair, counsel for Travelers Insurance Company. See **Exhibit 1.**

2) Second one pertains to all named parties in this case (except Craig Donais) including all defendants who relate to the Hilton/Homewood Suites Nashua defendants either as corporate entities, employees or agents, who are represented (or jointly spoken for) by Attorney Shelagh Michaud. See **Exhibit 2**. NB: Attorney Mchaud has indicated that she is signing on behalf of all of the named parties, except Craig Donais. See **Exhibit 3** for a letter from Shelagh Michaud showing communication regarding the settlement documents, including the final docket markings for this case, on behalf of the defendants.

These two **notices of settlement and final docket markings (or joint stipulations of dismissal pursuant to settlement**) will be filed separately and subsequently to this filing.

The plaintiffs ask that the court acknowledge the settlement and enter the appropriate entry/order consistent with the **notices of settlement and final docket markings (or joint stipulations of dismissal pursuant to settlement**) upon filing of the **notices of settlement and final docket markings (or joint stipulations of dismissal pursuant to settlement**).

**Signed under the pains and penalties of perjury**

Respectfully Submitted,
/s/ Andre Bisasor
**ANDRE BISASOR**
679 Washington Street, Suite # 8-206
Attleboro, MA 02703
781-492-5675

Respectfully Submitted,
/s/ Natalie Anderson
**NATALIE ANDERSON**
679 Washington Street, Suite # 8-206
Attleboro, MA 02703
781-492-5675

April 6, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was or will be served to the parties in this case via the court's electronic filing/service system.

/s/andre bisasor
Andre Bisasor
679 Washington Street, Suite # 8-206
Attleboro, MA 02703
781-492-5675

# Exhibit 1

STATE OF NEW HAMPSHIRE

HILLSBOROUGH NORTH, SS. SUPERIOR COURT

| | | |
|---|---|---|
| NATALIE ANDERSON<br>ANDRE BISASOR,<br>Plaintiffs<br>v.<br><br>HILTON HOTELS WORLDWIDE, INC., ET. AL,<br>Defendants | ) | 226-2020-cv-00027 |

**STIPULATION OF DEFENDANTS' MARIE & RICHARD AUFIERO**

Now come the defendants Marie and Richard Aufiero in the above-referenced action who, in addition to the joint **notice of settlement and final docket markings** filed by the parties in this case, hereby further stipulate the following:

The written statement by Marie Aufiero made on January 9, 2017, as well as any other written or oral statements made by or on behalf of Marie Aufiero and Richard Aufiero in relation to this matter which are in dispute in this litigation, are hereby withdrawn by Marie Aufiero and Richard Aufiero, as part of the full and final settlement and final disposition of the above-captioned matter. The withdrawal of the above-referenced statements is not an admission of fault or liability for any of the claims and/or counts raised in the Plaintiff's Complaint in the above-referenced action.

**Andre Bisasor aka Andre Bissasor**
679 Washington Street, #8-206
Attleboro, MA 02703
and/or
119 Drum Hill Road, #233
Chelmsford, MA 01824
Tel. (781) 492-5675
Dated: 3-4-22

**Natalie Anderson**
679 Washington Street, #8-206
Attleboro, MA 02703
and/or
119 Drum Hill Road, #233
Chelmsford, MA 01824
Tel. (781) 492-5675
Dated: 3/4/22

*/s/ Meredith J. McGair*

**Counsel for the Defendants,**
**Marie Aufiero and Richard Aufiero**
Meredith J. McGair, B.B.O. #681088
Law Offices of Steven B. Stein
P.O. Box 2903
Hartford, CT 06104-2903
Direct Dial: (617) 772-2807
Facsimile: (888) 275-7090
mmcgair@travelers.com
Dated: 3/31/22

# <u>Exhibit 2</u>

STATE OF NEW HAMPSHIRE

HILLSBOROUGH NORTH, SS. SUPERIOR COURT

| | | |
|---|---|---|
| NATALIE ANDERSON<br>ANDRE BISASOR<br><br>Plaintiffs<br>v.<br><br>DAVE AKRIDGE; STEPHEN ARNOLD; MARIE AUFIERO RICHARD AUFIERO; BLACKSTONE GROUP, INC.; SERGIO BURGOS CINDY DASILVA; CRAIG DONAIS JOHN J. FLATLEY; NANETTE GONZALEZ; JONATHAN GRAY; GREAT AMERICAN HOTEL GROUP; HILTON HOTELS WORLDWIDE, INC. HOMEWOOD SUITES OF NASHUA; JOHN FLATLEY COMPANY; SHELAGH MICHAUD; CHRIS NASSETTA; ADAM ROBITAILLE; BRIAN SNOW; KARL TERRELL; KAREN YEAGER<br><br>Defendants | ) | 226-2020-cv-00027 |

**NOTICE OF SETTLEMENT & FINAL DOCKET MARKINGS**

In the above-captioned action, Defendants Dave Akridge, Stephen Arnold, Marie Aufiero, Richard Aufiero, Blackstone Group, Inc.; Sergio Burgos, Cindy Dasilva, John Flatley; Nanette Gonzalez; Jonathan Gray, Great American Hotel Group, Hilton Hotels Worldwide, Inc., Homewood Suites of Nashua, John Flatley Company, Shelagh Michaud, Chris Nassetta, Adam Robitaille, Brian Snow, Karl Terrell, Karen Yeager

(collectively "Defendants") request that the Court make note of this settlement and mark the docket in this matter as follows:

On terms which will remain confidential, the Parties have now settled this litigation to the mutual satisfaction of the Parties, neither party admitting liability. The Parties hereby acknowledge that the circumstances giving rise to this litigation included misunderstandings and miscommunication. As part of the settlement, the Parties have agreed to withdraw and/or seal certain statements, pleadings and exhibits in this litigation. In accordance with the terms of the settlement, all claims and counterclaims are hereby agreed to be voluntarily dismissed by the Parties. "Judgment for neither party. No further action. No costs or fees."

**PLAINTIFFS**

Dated: March 4, 2022

**ANDRE BISASOR**
119 Drum Hill Rd, #233
Chelmsford, MA 01824
781-492-5675

Dated: March 4, 2022

**NATALIE ANDERSON**
119 Drum Hill Rd, #233
Chelmsford, MA 01824
781-492-5675

**DEFENDANTS**

Dated: March 4__, 2022

Shelagh C.N. Michaud (Bar # 647926)
One Citizens Plaza
Providence, RI 02903-1345
401-454-1133
844-782-4480 fax
smichaud@nixonpeabody.com

# Exhibit 3

NIXON PEABODY

Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903-1345

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

**Shelagh C.N. Michaud**

T / 401.454.1133
smichaud@nixonpeabody.com

April 1, 2022

*VIA FEDERAL EXPRESS*

Andre Bisasor
Natalie Anderson
679 Washington St., #8-206
Attleboro, MA 02703

**RE: Anderson v. Homewoods, et al. – Requested Copies of Settlement Documents**

Dear Mr. Bisasor and Ms. Anderson:

Per your email request dated 3/29/2022, enclosed please find the following settlement documents in the above-referenced matter:

1. Original signed copies of statements/letter from Homewoods Suites Nashua (copies of these were emailed to you on 3/23/3022 and 3/25/2022 respectively);

2. Copy of fully executed Settlement Agreement (a copy of this was emailed to you on 3/23/2022); and

3. Signature copies of Stipulations of Dismissal and Docket Markings (these were previously emailed to you on 3/23/2022 with valid electronic signatures).

The prior emailed version of these documents were complete and valid and satisfied the Defendants' obligations under the Settlement Agreement. Additionally, these documents are subject to the terms of the Settlement Agreement. Finally, I have otherwise responded to your 3/29/2022 email. Please provide confirmation once the Stipulations of Dismissal and Docket Markings have been filed with the respective Courts.

Sincerely,

Shelagh C.N. Michaud

Encls.

# Exhibit 4

Filed
File Date: 10/30/2025 11:56 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

# PLAINTIFF ANDRE BISASOR'S REPLY TO DEFENDANT'S OBJECTION TO MOTION TO SUBMIT AUDIO EVIDENCE AND FOR IN-CAMERA HEARING

1. Plaintiff Andre Bisasor submits this reply to Donais's objection to the motion to submit audio evidence and for in-camera hearing. Donais's objection fundamentally mischaracterizes the nature of plaintiff's motion and ignores well-established principles governing evidence submission during motion practice.

## I. SUMMARY OF ARGUMENT

2. Donais's objection fundamentally mischaracterizes the motion's purpose while ignoring established principles that permit parties to present contradictory evidence when defendants voluntarily introduce sworn statements into motion practice.

3. This motion requests judicial guidance on submission procedures for impeachment evidence that directly contradicts sworn statements Donais himself chose to attach to his motion to dismiss.

4. When a defendant attaches affidavits containing factual representations to support dismissal, those representations become subject to contradiction and impeachment. Donais attached his 2017 affidavit describing the January 9, 2017 consultation, attached third-party declarations about surrounding events, and relied upon these materials, among other extraneous materials attached, to argue dismissal. Having placed these sworn statements before the Court, Donais cannot now claim immunity from impeachment.

5. The audio evidence serves a singular purpose: to establish that material statements in Donais's 2017 affidavit are demonstrably false. This is quintessential impeachment evidence addressing credibility, not substantive evidence offered to prove claims. The distinction is critical because impeachment evidence is admissible to challenge veracity regardless of whether it would independently establish substantive claims.

6. Moreover, the motion presents a procedural crisis requiring immediate judicial guidance. The Court's e-filing system cannot process audio files. Court clerk Alma explicitly rejected plaintiff's prior attempt to submit materials by hand, stating that once enrolled in e-filing, all submissions must be electronic. This creates an impossible Catch-22 where plaintiff possesses dispositive evidence but cannot present it through any available means. The motion simply requests the Court establish workable submission procedures to resolve this technical barrier.

## II. DONAIS'S OBJECTION MISCHARACTERIZES THE MOTION

7. Donais argues that plaintiff "may not now submit additional 'evidence' in support of their objection" to his motion to dismiss. This argument fails because it misstates or misunderstands the motion's actual purpose and ignores basic procedural principles governing motion practice.

8. The motion does not simply seek to submit "additional evidence"; rather, it requests judicial guidance on procedural mechanisms for submitting impeachment evidence that directly contradicts sworn statements Donais himself attached to his motion to dismiss. When a defendant attaches affidavits/sworn statements to support a motion to dismiss, those materials become fair game for impeachment and contradiction.

9. Federal courts have long recognized that when defendants submit affidavits or declarations with motions to dismiss, opposing parties may present contradictory evidence.

10. Moreover, Donais cannot have it both ways; he cannot attach a 2017 affidavit containing sworn statements about the 1-9-17 consultation, as well as other statements from other third parties, among other things, and then claim those statements are immune from contradiction or impeachment. The audio evidence directly impeaches the veracity of statements Donais chose to put before this Court.

11. Note: In addition to audio evidence, there is also video evidence as well as that Bisasor would like to submit to the court, to impeach defendant (and to further establish plaintiff's claims as true).

12. Further, Donais's argument that the motion is "repetitive and frivolous" lacks merit when viewed against his own conduct. The audio evidence demonstrates a pattern of deception by Donais that extends well beyond the specific statements in his 2017 affidavit. A defendant who has consistently made false statements to courts and third parties is hardly positioned to complain about motions seeking to expose such deception.

## III. THE MOTION IS TIMELY AND PROCEDURALLY PROPER

13. Donais's argument that "the time has long passed for the plaintiffs to plead their case" fundamentally misunderstands both the procedural posture and the motion's limited scope. This motion only seeks judicial guidance on evidence submission procedures where the court's e-filing system creates technical barriers. It requests administrative guidance on evidence submission format when technical limitations prevent use of standard filing procedures.

14. New Hampshire Superior Court Rules expressly contemplate that parties shall furnish documents and papers offered in evidence as the court may require. The motion simply asks the Court to establish procedures for submitting audio evidence that cannot be uploaded through the electronic filing system; a purely administrative matter that falls squarely within the Court's case management authority.

15. Furthermore, the timing objection ignores the reality that the need for these procedures only arose more pressingly after Donais attached his sworn statements to his motion to dismiss. Plaintiff could not have anticipated the need to contradict those specific statements (with audio evidence), until Donais chose to rely upon them as part of his motion practice including in his most recent reply to the objection to the motion to dismiss, where he for the first time attached another but different copy of the Nashua circuit court motion to dismiss with several additional exhibits that were not contained in the prior version submitted by him (and much of which is either stricken by the court, or withdrawn by the original defendants, or subject to sealing via settlement agreement, but yet was illicitly attached nonetheless by Donais).

16. In addition, contrary to Donais' suggestion, the plaintiff still has an opportunity to provide a sur-reply to the defendant's reply to the objection to his motion to dismiss (as there is pending motion to allow surreply to the reply to the objection to the motion to dismiss the amended complaint, which has not been ruled on as yet). Thus, even using defendant's own restrictive self-serving logic, the door has not closed for plaintiff to rebut, contradict, or refute defendant's motion to dismiss and his attendant reply to the plaintiffs' objection.

17. Thus, in sum, the timing objection fails for multiple independent reasons. First, the need for submission procedures only arose after Donais attached his sworn statements to the motion to dismiss filed August 22, 2025. Plaintiff could not have anticipated the specific need to contradict these particular statements at this stage of the case, until Donais chose to rely upon them. The motion responds directly to evidence Donais introduced, making the timing necessarily reactive.

18. Second, Donais himself introduced additional materials in his reply to plaintiff's objection, including a different version of the Nashua Superior Court motion to dismiss containing exhibits not present in the version initially provided. This new evidence, introduced for the first time in reply, triggered additional need for contradictory

materials. Under Donais's own restrictive logic, plaintiff retains the right to file sur-reply addressing these new materials, meaning the procedural window remains open.

19. Third, the case has not progressed beyond preliminary motion to dismiss stage. No scheduling order establishes discovery cutoffs or evidence submission deadlines. No trial date has been set. The case remains in its earliest phases where procedural flexibility should be greatest rather than most restrictive.

20. Fourth, the procedural nature of the motion distinguishes it from substantive attempts to add evidence improperly. The motion addresses a purely ministerial question: what submission protocol should apply when the e-filing system cannot accommodate the evidence format? This administrative matter falls squarely within the Court's case management authority and requires no finding that plaintiff delayed improperly.

## IV. IMPEACHMENT EVIDENCE IS PROPERLY CONSIDERED

21. Donais's objection fails to acknowledge that the audio evidence is impeachment evidence/substantive evidence, being offered/submitted to impeach the statements Donais voluntarily submitted to this Court.

22. Federal and state courts recognize that when defendants attach affidavits or declarations to motions to dismiss, opposing parties may present contradictory evidence without converting the proceeding to summary judgment.

23. The First Circuit has recognized that when defendants submit declarations or affidavits in support of motions to dismiss, courts may consider contradictory evidence. See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). This principle reflects the fundamental unfairness of allowing defendants to introduce sworn statements while preventing plaintiffs from presenting evidence establishing those statements are false. Thus, plaintiff's request for procedures to submit contradictory evidence falls within established precedent.

24. The New Hampshire Supreme Court has emphasized that impeachment evidence serves the distinct purpose of challenging credibility and is admissible for that limited function. In State v. Laurie, 139 N.H. 325 (1995), the Court recognized that impeachment evidence goes directly to witness credibility and must be considered when evaluating reliability, and thus is further admissible for that purpose. Here, the audio evidence directly contradicts material representations Donais made in his 2017 affidavit about the 1-9-17 consultation call and about preceding and subsequent events. Thus, the audio evidence impeaches material representations Donais made under oath about the consultation and surrounding events.

25. Although Laurie was a criminal case, the principle extends beyond criminal proceedings to civil litigation where credibility determinations affect substantive outcomes. When a party places sworn statements before the court, the opposing party must have meaningful opportunity to challenge those statements' veracity through contradictory evidence. Otherwise, motion practice becomes fundamentally unfair, allowing one party to present self-serving factual assertions immune from contradiction.

26. Furthermore, courts possess inherent authority to establish evidence submission procedures that serve justice while protecting legitimate interests. The proposed in-camera review addresses Donais's potential concern about privileged communications by allowing the Court to assess the evidence privately before determining what portions, if any, should be filed publicly or under seal. This balanced approach serves multiple interests: protecting privilege, ensuring evidence reaches the decision-maker, and maintaining orderly procedure.

27. Thus, it is proper for plaintiff to ask the court for this relief. What else should plaintiff do? He cannot submit audio evidence to the court by hand or conventionally (as is barred by court staff). Who else should the plaintiff seek relief from? He cannot ask the court staff. The court is appropriate place to seek this relief by motion.

## V. THE MOTION ADDRESSES LEGITIMATE PROCEDURAL CONCERNS

28. The core issue addressed by plaintiff's motion is procedural: how to submit audio evidence when the court's electronic filing system cannot accommodate such files. This represents a genuine procedural dilemma requiring judicial guidance/instruction, and thus is not frivolous motion practice.

29. New Hampshire courts are required to establish procedures for evidence submission that serve the interests of justice while protecting legitimate confidentiality concerns. Further, the motion's request for in-camera review procedures protects potentially privileged communications while ensuring that relevant impeachment evidence receives proper consideration.

30. The procedural framework requested in the motion serves judicial economy by establishing clear guidelines for handling audio evidence containing privileged material; an issue that will likely recur in future cases as electronic evidence becomes increasingly common. Audio recordings, video evidence, and other non-document materials will arise routinely in modern litigation. Establishing clear submission procedures now prevents repeated motions addressing the same technical barriers and creates precedent for handling similar situations efficiently.

**VI. THE NEED FOR AUDIO EVIDENCE SUBMISSION CREATES PROCEDURAL CRISIS**

31. The pending motion for partial summary judgment on breach of fiduciary duty relies substantially on plaintiffs' refutation of evidence via a 2017 affidavit provided by defendant, which detailed what was said on the 1-9-17 consultation between plaintiff and defendant, as well as concerning surrounding events both before and after.

32. Plaintiffs have refuted the affidavit evidence from Donais, by supplying their own affidavits (under seal), along with other documentary evidence via plaintiffs' motion for partial summary judgment and memorandum/ exhibits. This refutation directly contradicts defendant's characterizations of the content of the consultation.

33. However, rather than relying on the documentary evidence alone and running the risk that the court may reduce this to an issue of dueling affidavits, Bisasor also has audio evidence that he would like to supply to the court that impeaches the defendant and his 2017 affidavit, showing that Donais has lied and continues to lie to the court via the false 2017 affidavit, thereby establishing conclusively that Donais breached fiduciary duty. This evidence provides conclusive impeachment material regarding Donais' 2017 affidavit and third-party affidavits attached to the motion to dismiss. This evidence establishes conclusively the fiduciary relationship Donais seeks to deny through dismissal.

34. Litigation should be a search for the truth. The court had an opportunity to learn the truth definitively from this audio evidence. It is critical that the court allows this audio evidence to be submitted and heard by the court. What will the court do if it learns that Donais and his lawyer Hilliard have conspired to blatantly lie to this court or submitted false evidence (via false affidavit, etc.) to this court, in order to pervert the cause of justice? The court must be interested in this because lawyers cannot so glibly lie to the court and get away with it without consequence. The court cannot allow Donais and Hilliard to "make a fool" out of this court. This definitive evidence must be heard. This definitive evidence will prove to the court that not only have Donais and Hilliard been intentionally lying to the court but also that the entire motion to dismiss has been fraudulently presented with false evidence designed to frustrate and undermine the fair administration of justice.

35. However, there exists an impossible procedural situation where plaintiff possesses dispositive evidence but cannot submit it through any available means. The e-filing system cannot process audio files, and so the audio evidence cannot be submitted through the e-filing system due to technical limitations, creating a procedural dilemma requiring judicial guidance on submission protocols. The Court must clarify how such evidence

should be submitted, whether in person, etc., and whether in-camera review is appropriate given the sensitive nature of the communications.

36. It should be noted that when plaintiff previously attempted to submit physical materials by hand/in-person to the court, by coming to the courthouse, the courthouse clerk staff (Alma) turned plaintiff away, explaining that once signed up for e-filing, the Court does not accept conventional/in-person filings and all materials must be submitted electronically. This created a Catch-22 where plaintiff must file everything electronically but cannot file critical evidence because the electronic system cannot process it. Hence, because the Court has previously rejected in-person filing attempts by plaintiff, and no alternative submission protocol exists, this creates a situation where plaintiff possesses dispositive evidence but cannot present it under current procedural constraints. Interactive judicial guidance/instruction is necessary to establish workable submission procedures that allow this critical evidence to reach the Court. This is also in the interest of justice. [Note: The public is often horrified by nightmare scenarios pertaining to court cases (and especially so in the criminal context involving disadvantaged defendants, in particular minorities), where a truthful party has conclusive evidence that proves their case or their innocence, but cannot present the evidence because of unfair technicalities or barriers that prevent the truth from coming out, or where the truth becomes buried. This is a failure of the legal system wherever and whenever it happens. No innocent person should ever be convicted or serve prison time because the truth was prevented from being presented to the court. The same is true in the civil context, when especially black litigants have truthful meritorious claims of defendant wrongdoing but cannot present conclusive evidence to obtain relief or rectify harm, especially in civil rights cases. This should not be so. Well, here in this instance, in this case, Bisasor avers that he has dispositive evidence to impeach Donais and to establish conclusively that Donais has lied (and to establish the truth of plaintiffs' claims).

37. Further, a case management conference must address this crisis immediately. The audio evidence is central to the breach of fiduciary duty claim and provides impeachment evidence regarding defendant's submissions. Plaintiff cannot be forced to litigate "with both hands tied behind their backs" by being prevented from presenting evidence that establishes liability. The Court has an obligation to establish workable procedures for

submitting evidence in formats the e-filing system cannot accommodate, particularly when such evidence is material to dispositive motions.

38. Moreover, the timing and sequencing of evidentiary submissions requires coordination. If the Court rules on defendant's motion to dismiss, including his one-sided affidavits and other extraneous materials, without first addressing plaintiff's counter-evidence and impeachment materials, plaintiff will be denied the opportunity to present rebuttal evidence. This creates a procedural Catch-22 where plaintiff must simultaneously defend against dismissal arguments while being prevented from introducing the very evidence that conclusively defeats those arguments. The case management conference would thus provide an appropriate forum for establishing orderly procedures that ensure both parties can present relevant evidence under clear, consistent rules.

39. Additionally, plaintiffs may need to file a protective order regarding the audio evidence as it contains privileged communications, but requires clarification on whether such a motion is necessary and what procedures apply. These evidentiary issues require judicial guidance that written motion practice alone cannot resolve or provide.

## VII. THE PROCEDURAL CRISIS REQUIRES IMMEDIATE RESOLUTION

40. The situation plaintiff faces represents a genuine procedural crisis without clear resolution absent judicial guidance. The e-filing system's inability to process audio files creates a technical barrier to evidence submission. Court staff's explicit refusal to accept in-person filing creates an administrative barrier. The combination leaves plaintiff without any available mechanism for submitting material evidence.

41. This is not a situation where plaintiff failed to follow clear procedures or ignored available alternatives. Plaintiff previously attempted to file materials conventionally and was turned away. Plaintiff attempted to use the e-filing system and discovered it cannot accommodate the file format. Having exhausted available options, plaintiff properly seeks judicial guidance establishing workable submission procedures.

42. The Court has authority/responsibility to ensure procedural mechanisms do not prevent parties from presenting material evidence. When technical limitations create barriers to access, courts must establish alternative procedures ensuring substantive rights are not lost to administrative obstacles. This principle applies with particular force when evidence is central to dispositive motions, going directly to material factual disputes.

## VIII. THE EVIDENCE ADDRESSES MATERIAL FACTUAL DISPUTES

43. The audio evidence is not tangential or collateral to the issues before the Court. It directly addresses a key central factual dispute underlying both the motion to dismiss and the motion for partial summary judgment: whether an attorney-client or prospective client relationship existed on January 9, 2017, and whether Donais breached fiduciary duties arising from that relationship.

44. Donais's 2017 affidavit contains specific factual assertions about the 1-9-17 consultation and surrounding events, and the nature of the attorney-client relationship. The audio recording contradicts these assertions demonstrably and definitively. The evidence goes to the heart of defendant's core defense.

45. Moreover, the evidence's strength makes its consideration particularly appropriate. Rather than creating a "swearing match" where the Court must choose between competing affidavits, the audio provides objective documentation that resolves certain disputed issues. Courts should welcome evidence that removes factual disputes from the realm of credibility assessments and places them on firm objective foundations. The truth-seeking function of litigation is best served when courts have access to definitive evidence rather than conflicting sworn statements.

46. Further, the pending motion for partial summary judgment relies substantially on establishing the consultation's existence, content, and resulting fiduciary duties. The audio evidence establishes these facts conclusively, supporting summary judgment in plaintiff's favor. Conversely, if the Court were to grant dismissal while preventing plaintiff from presenting evidence conclusively establishing liability, the resulting injustice would be profound. Plaintiff cannot be forced to litigate "with both hands tied behind their backs" by technical filing barriers that prevent presentation of dispositive evidence.

## IX. THE COURT'S GUIDANCE SERVES JUDICIAL EFFICIENCY

47. Far from being frivolous, plaintiff's motion seeks to establish clear procedures that will facilitate orderly resolution of evidentiary issues while protecting legitimate confidentiality interests. The in-camera review procedure proposed in the motion allows the Court to assess the probative value of the evidence while ensuring that any privileged communications remain protected.

48. The alternative; requiring plaintiff to proceed without clear guidance on evidence submission procedures; would create greater inefficiency and potential confusion. By establishing clear protocols now, the Court can avoid repeated motions and disputes over evidence handling as the case progresses.

## X. FURTHER SPECIFIC REBUTTAL TO DONAIS' OBJECTION

49. Contrary to Donais' assertion that "*Donais has moved to dismiss the amended complaint, and the plaintiffs may not now submit additional "evidence" in support of their objection*", the court has not ruled on the motion to dismiss the amended complaint. The plaintiff still may provide sur-reply to the defendant's reply to the objection to the motion to dismiss. The audio evidence also supports the plaintiff's motion for partial summary judgment. The need to submit evidence arose because the defendant submitted evidence in a motion to dismiss, which is not permitted. Donais submitted evidence but then now wants to block plaintiff's ability to submit impeachment evidence. He evidently wants the game to be rigged in his favor.

50. This evidence proves that there was a fiduciary relationship between plaintiffs and Donais, and that Donais breached fiduciary duty. It would be unjust to deprive the plaintiff of the ability to submit this evidence.

51. Plaintiff could not submit this evidence previously without court instruction. There is no way plaintiff could submit this evidence previously because, as noted before, the court staff turned plaintiff away when attempting to submit filings in person, stating that all submissions must be by electronic filing, with no exceptions.

52. Plaintiff wants to submit this evidence in accordance with the court rules but could not do it as an exhibit to the objection to the motion to dismiss.

53. Further, submitting audio evidence that contains privileged information to the court requires special procedures to protect its confidentiality. In New Hampshire Superior Court, a motion requesting an in camera review of the evidence and seeking an order to seal the record is acceptable. This allows the judge to review the material privately to make determinations regarding privilege and/or admissibility. Also, the evidence is relevant to the motion to dismiss and the judge needs to consider it to make a fair ruling.

54. [Note: This request also includes a request for the judge to review the privileged audio recording in camera (in chambers). The evidence is privileged (i.e., attorney-client, work product, among others, etc.). Disclosure of the information would cause harm that outweighs the public's right to access the court record.].

## XI. THE ALTERNATIVE CREATES FUNDAMENTAL UNFAIRNESS

55. If the Court denies the motion and prevents plaintiff from presenting the audio evidence, the resulting procedural landscape would result in systematic unfairness. Donais will have successfully introduced false sworn statements to support dismissal while preventing plaintiff from presenting evidence establishing those statements are false. This one-sided evidentiary presentation violates basic principles of adversarial litigation and due process. Further, the Court would be forced to evaluate the motion to dismiss based on an incomplete and misleading factual record. Donais's affidavit would stand unchallenged despite objective evidence proving it false. The Court's fact-finding would be compromised by lack of access to material evidence establishing the truth. This outcome serves neither justice nor judicial efficiency.

56. Furthermore, preventing evidence submission based on technical filing barriers rather than substantive evidentiary principles sets dangerous precedent. If courts allow administrative obstacles to prevent presentation of material evidence, parties will be denied meaningful access to justice based on procedural technicalities unrelated to the evidence's relevance or probative value.

## XII. DONAIS REQUEST FOR ATTORNEY FEES IS UNWARRANTED AND FRIVOLOUS

57. Donais's request for attorney fees is particularly inappropriate given that his own conduct necessitated this motion. Had Donais not attached sworn statements containing false representations to his motion to dismiss, there would be no need for procedures to submit contradictory evidence. The motion directly responds to Donais's strategic choices in motion practice, making it the natural and necessary response.

58. The NH Supreme Court has emphasized that attorney fee awards require extraordinary circumstances and clear evidence of frivolous conduct lacking any reasonable basis. Plaintiff's motion addresses legitimate procedural concerns arising directly from Donais's decision to introduce sworn statements that can be contradicted by objective evidence. The motion is grounded in established legal principles, responds to genuine technical barriers, and seeks relief properly within the Court's authority. No basis exists for fee sanctions.

59. Additionally, Donais's pattern of conduct undermines his credibility in characterizing plaintiff's motions. Throughout this litigation, Donais has filed repetitive attacks going back to issues already resolved, has violated court orders by attaching sealed materials, and has repeatedly made factual assertions without supporting

affidavits. His complaint about plaintiff's motion practice lacks the standing that should come from one who engages in exemplary conduct.

## XIII. CONCLUSION

60. Donais's objection ignores the fundamental principle that parties who introduce sworn statements into motion practice cannot insulate those statements from contradiction. The audio evidence directly impeaches material representations Donais voluntarily placed before this Court. Established precedent permits consideration of contradictory evidence during motion practice, particularly when the evidence goes to core factual disputes underlying dispositive motions.

61. The motion seeks reasonable procedural guidance addressing genuine technical limitations in the filing system while protecting legitimate confidentiality interests through in-camera review. This represents responsible case management serving judicial efficiency rather than frivolous motion practice. The timing is proper because the need arose directly from Donais's strategic choice to attach sworn statements to his motion, and plaintiff retains procedural rights to respond to those materials.

62. The Court should welcome rather than reject evidence that definitively resolves factual disputes through objective documentation rather than competing affidavits. Truth-seeking is the fundamental purpose of litigation, and the Court should have access to evidence establishing truth conclusively rather than being forced to choose between self-serving sworn statements.

63. The procedural crisis created by technical filing barriers combined with the evidence's material importance to pending dispositive motions warrants immediate intervention establishing workable submission procedures.

64. Donais's complaint about "repetitive and frivolous" motions would carry more weight if it came from someone who had not consistently made false statements about material facts. A defendant whose pattern of deception necessitates impeachment procedures can hardly complain when such procedures are requested.

65. WHEREFORE, plaintiff respectfully requests that this Court deny defendant's objection and grant the relief requested in the motion to establish procedures for audio evidence submission and in-camera review.

Respectfully submitted,
/s/ Andre Bisasor
ANDRE BISASOR

Date: October 30, 2025

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

# Exhibit 5

Filed
File Date: 11/4/2025 10:58 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFF ANDRE BISASOR'S REPLY TO DEFENDANT DONAIS' OBJECTION TO PLAINTIFF'S MOTION TO CONVERT TO SUMMARY JUDGMENT AND/OR ALLOW DISCOVERY**

1. Plaintiff Andre Bisasor hereby replies to Defendant Craig Donais' objection to Bisasor's motion for limited discovery and/or conversion to summary judgment. Donais' objection spans barely one page and offers zero substantive response to the procedural violations identified in Bisasor's motion. This non-response confirms the very gamesmanship that necessitates the relief sought.

**I. SUMMARY OF GROUNDS FOR DISCOVERY**

2. The discovery necessitated by Donais' introduction of extrinsic materials in his motion to dismiss will likely reveal additional facts supporting amendment of the complaint. Specifically:
3. First, discovery will reveal the full extent of Donais' disclosures of confidential information. Donais' own admissions establish he disclosed information to Akridge, Terrell, his family members, Crime-Line board members, and police. Discovery of communications with these individuals will likely reveal additional unauthorized disclosures and the specific harm caused by each disclosure.
4. Second, discovery will reveal when Donais first fabricated the racism accusation and to whom he disclosed it before filing his March 2017 affidavit. Mark Cornell's Attorney Discipline Office interview notes suggest none of the attorneys interviewed (O'Brien, Terrell, Snow) were told about this alleged accusation, indicating it may have been deceptively fabricated specifically for litigation purposes.
5. Third, discovery will clarify the full scope of information Donais obtained from the O'Brien consultation on behalf of Anderson. O'Brien's 1-51-17 text message to Anderson shows Donais rendered detailed legal opinions about the contract claims, innkeeper rules, and eviction issues. This level of detail requires more information than Donais admits receiving, suggesting the O'Brien consultation was more substantive than Donais' affidavit acknowledges.
6. Fourth, discovery will reveal what information Donais shared with Terrell beyond the January 11, 2017 email. At the April 27, 2017 hearing, Terrell testified inconsistently about what information he received from Donais, alternating between claiming he received information through Akridge versus directly from Donais, and claiming not to recall what was discussed. Discovery of communications between Donais and Terrell will clarify the extent to which Homewood's defense team benefited from confidential information.

7. Fifth, discovery will determine whether Donais performed any actual conflict check before representing Homewood, as he claims in his affidavit, or whether this is another fabrication designed to obscure his knowing violation of Rule 1.18. The chronology of events suggests no legitimate conflict check could have occurred because Donais already knew from his conversations with Akridge that Bisasor was involved in the Homewood case.

8. Sixth, discovery may reveal additional parties who received confidential information from Donais, expanding the scope of the breach of confidentiality claim and potentially adding parties who benefited from the breach.

9. New Hampshire courts favor liberal amendment of pleadings, particularly where discovery reveals additional facts supporting claims. See Petition of Ridgely, 138 N.H. at 244; Beane v. Dana S. Beane & Co., 160 N.H. 708, 715 (2010) (amendments should be allowed unless opposing party would be prejudiced). The facts uncovered through discovery necessitated by Donais' motion to dismiss will provide grounds for more specific allegations regarding the full scope of his fiduciary duty breaches. See Collision Communications, Inc. v. Nokia Corporation, 1:20-cv-00949, (D.N.H.)(2020)( "Here, Collision alleges that agreement was reached based on the parties' communications, which appears to raise a factual issue, a situation that is discussed in the next paragraph in TLT Const. Corp….Because no discovery plan has been entered in this case, however, to the extent Collision's allegations may be wanting, there is no deadline for Collision to move to amend the complaint.").

**II. DONAIS' EVASIVE NON-RESPONSE DEMONSTRATES THE PROBLEM**

10. Donais' objection contains no citation to authority, no analysis of procedural standards, and no response to the specific violations identified. Instead, he simply declares that Bisasor's motion "duplicates" Anderson's motion and requests attorney fees. This conclusory assertion, devoid of legal analysis, exposes the weakness of his position.

11. When a party introduces new evidence in reply briefs while claiming the opposing party cannot respond, objects to every procedural remedy, and then dismisses legitimate objections as "frivolous," the appropriate remedy is precisely what Bisasor seeks. Courts recognize that such systematic suppression of procedural rights warrants intervention. See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1003 (9th Cir. 2018) (recognizing dangers when "defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint" and noting risks of "premature dismissals of plausible claims that may turn out to be valid after discovery").

**III. THIS COURT'S JUNE 5, 2025 ORDER ESTABLISHES CLEAR BOUNDARIES**

12. Most significantly, Donais' objection ignores this Court's explicit guidance in its June 5, 2025 Order that "*consideration of materials outside the pleadings is improper on a motion to dismiss.*" Despite this clear directive, Donais repeated the identical

procedural violation in his motion to dismiss the amended complaint, including many of the very same documents the Court previously found improper. This willful disregard compounds the procedural violation.

13. When a court provides clear guidance about improper motion practice, repeating those exact violations while introducing additional evidence demonstrates contempt for judicial authority. The fact that Donais now objects to every procedural remedy to address his violation, while claiming no legitimate basis exists for the relief sought, confirms his intent to exploit procedural irregularities for tactical advantage.

**IV. DONAIS' MOTION RELIES ON EXTENSIVE MATERIALS OUTSIDE THE PLEADINGS CREATING MULTIPLE AREAS RIPE FOR DISCOVERY**

14. Donais attached 142 pages of exhibits to his 9-page motion to dismiss, including: (1) his own March 13, 2017 affidavit; (2) affidavits from 8 years ago that have never been cross-examined; (3) an unsigned 60-page motion to dismiss from a different case (Exhibit H); (4) unauthenticated emails between third parties; (5) phone records; and (6) cherry-picked pleadings from prior proceedings. Donais then added approximately 60 pages of additional exhibits in his reply to plaintiffs' objection, including previously missing exhibits K and L.

15. These materials introduce disputed facts that directly contradict allegations in the amended complaint. A detailed analysis of specific areas requiring discovery follows.

**A. Discovery Regarding the January 5, 2017 O'Brien-Donais Communication**

16. Factual Dispute Created by Donais: In paragraph 1 of his March 2017 affidavit (Exhibit A to Motion to Dismiss), Donais claims: "*On Thursday, January 5, 2017, I received a cell call after business hours from Attorney Robert O'Brien which lasted approximately five (5) minutes. Attorney O'Brien and I talked about an unrelated matter involving a mutual client, and Attorney O'Brien also mentioned a potential case if I was interested.*"

17. Why Discovery Is Required: This statement creates multiple factual disputes requiring discovery:

a. Contradiction with O'Brien's Own Statements: O'Brien's 1-18-17 affidavit (attached to various defense pleadings) states: "*I reached out to Attorney Donais via email and received an automated reply that he would be unavailable. I called his cellphone and asked if he would be interested in a new matter, using the same words listed above. No names or specific circumstances were discussed with Attorney Donais. He declined my offer to share any other information I had on the matter.*"

b. O'Brien's affidavit makes NO mention of discussing "an unrelated matter involving a mutual client." Discovery is needed to determine: (a) what unrelated matter Donais claims they discussed; (b) who the purported mutual

client was; (c) how much time was spent on this unrelated matter versus Anderson's case; (d) whether O'Brien can corroborate this claim.

c. <u>Contradiction with O'Brien's Text Message to Anderson:</u> O'Brien sent Anderson a text message on January 5, 2017, at 6:15 PM stating: "*I spoke with Attorney Donais. He said you have a great contract case for the overcharges. He said the innkeeper rules would likely apply to your situation. Which allows for 'no cause' evictions. He would not opine on the discrimination claims outside his experience.*"

d. This text message demonstrates that Donais rendered substantive legal opinions on Anderson's case. Discovery is needed to determine: (a) what specific facts O'Brien conveyed to Donais to enable such detailed legal analysis; (b) whether Donais' claim that he "declined to learn more" (paragraph 2 of his affidavit) is truthful given his provision of detailed legal opinions; (c) what notes, if any, Donais made during or after the O'Brien call; (d) whether Donais discussed this matter with anyone else between January 5-9, 2017.

e. <u>Contradiction with Cornell ADO Interview:</u> Mark Cornell of the NH Attorney Discipline Office interviewed O'Brien in August 2020. Cornell reported that O'Brien told him: "*He seems to recall that Mr. Donais did not think the innkeeper/landlord issue was 'cut and dry.*'" This statement proves O'Brien discussed enough case details for Donais to render nuanced legal analysis about the complexity of the innkeeper/landlord distinction.

f. Discovery is needed regarding: (a) Cornell's full interview notes and recordings; (b) whether Donais disclosed to Akridge, Terrell, or others that he had already analyzed the innkeeper/landlord issue before being hired; (c) notes, records or time entries related to Donais and Obrien's legal consultations with Bisasor and Anderson, and time entries for any conflict check Donais claims to have performed.

**<u>B. Discovery Regarding the January 9, 2017 Bisasor-Donais Consultation</u>**

**<u>i. Factual Disputes Created by Donais:</u>**

18. Donais' March 2017 affidavit makes numerous assertions about the January 9, 2017 call that are contradicted by the complaint and other evidence, creating extensive need for discovery.

19. <u>The Voicemail Message Dispute:</u> Donais claims in paragraph 3 of his affidavit: "*On Friday, January 6th, after I had left for the day and after business hours, an office telephone message was received requesting a return call from a Massachusetts phone number requesting assistance on a real estate matter.*"

20. Why Discovery Is Required: Bisasor's voicemail stated: "*Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical.*"

21. Discovery is needed regarding: (a) the actual voicemail recording from Donais' phone system; (b) any transcription or notes Donais made from the voicemail; (c) why Donais falsely claims the voicemail mentioned "real estate matter" when it actually said "tenant legal matter"; (d) whether this false statement was made knowingly.

**ii. The "Bedsore" Fabrication:**

22. Donais claims in paragraph 4 of his affidavit: "*I returned the call and spoke with a person who identified himself as 'Andre', and what sounded like 'Bedsore' as a last name. I had some difficulty clearly understanding the caller and his pronunciation.*"

23. Why Discovery Is Required: Bisasor never stated his last name on the January 9, 2017 call. The phone call was initiated by Donais, who asked "May I speak to Andre?" Bisasor simply responded "This is he." Discovery is needed regarding: (a) any notes or records from Donais showing when and how he learned Bisasor's last name; (b) communications between Donais and Akridge/Terrell prior to January 9, 2017 that may have disclosed Bisasor's full name; (c) why Donais made this specific false statement; (d) whether the "Bedsore" reference was intended to demean or mock Bisasor's name.

24. Critical Contradiction with Berry Call: Elliott Berry's contemporaneous notes from his January 17, 2017 call with Donais state that Donais said "he spoke to some guy" and "he didnt get any specific facts from Andre--that he is not even sure that Mr. Anderson gave him his name." How did Donais go from telling Berry on January 17, 2017 that he wasn't sure he got Bisasor's name, to claiming in his March 13, 2017 affidavit that he heard "Andre Bedsore"? Discovery is needed to explain this evolution of Donais' story.

**iii. Content of the Consultation:**

25. Donais claims in paragraph 8 of his affidavit: "*During the conversation with Andre, I did not provide him with any legal advice nor did I receive or make any private, confidential or privileged communications with Andre.*"

26. Why Discovery Is Required: Phone records establish the call lasted 7 minutes (from 10:43 AM to 10:50 AM on January 9, 2017). The complaint describes substantive legal discussion including: (a) whether a TRO would likely be granted; (b) analysis of contract claims versus innkeeper defenses; (c) discussion of 540-A petition strategy; (d) advice about relevant statutes and likelihood of success, etc.

27. Discovery is needed regarding: (a) whether Donais made any notes during or after the call; (b) whether Donais' claim of no legal advice contradicts his pattern of providing legal opinions (as evidenced by the O'Brien text); (d) why Donais called back if he had no interest in the case.

**iv. The Racism Accusation Fabrication:**

28. Donais claims in paragraph 7 of his affidavit: "*Andre became even more upset that I was declining to represent him such that he intimated I was discriminating against him which I immediately denied since it was not true.*"

29. Why Discovery Is Required: This is perhaps the most serious false statement requiring extensive discovery. Bisasor never mentioned race, racism, or discrimination during the call. Discovery is needed regarding: (a) when Donais first made this accusation (it does not appear in his January 11, 2017 email to Akridge/Terrell); (b) whether Donais told Berry, Akridge, Terrell, or O'Brien about this alleged accusation before filing his March 2017 affidavit; (c) what motivated Donais to fabricate this specific accusation; (d) whether Donais disclosed to anyone that Bisasor never identified himself as Black or a minority during the call.

30. Critical Evidence from Other Sources: Elliott Berry's 1-17-17 notes indicate Donais told Berry that he[Donais] "*questioned whether he[Bisasor] made the call to him [Donais] just to conflict him [Donais] out of the case.*" Here, Donais seeks to allege a damaging insinuation against Bisasor, that Bisasor called Donais to conflict him out of the case. This insinuation is completely different from alleging that Bisasor accused Donais of racism. It is evident that Donais was trying to find ways to discredit Bisasor in the eyes of Berry. But it never occurred to Donais to tell Berry about Bisasor's racism accusation against Donais. Discovery is needed to determine when and why Donais' story changed from insinuating the "conflict out" accusation against Bisasor, to alleging that Bisasor accused Donais of "racism".

31. Mark Cornell's ADO interview notes show that none of the attorneys interviewed (O'Brien, Terrell, Snow) reported being told by Donais that Bisasor accused him of racism. This suggests Donais never mentioned this alleged accusation to anyone until his March 2017 affidavit. Discovery is needed to confirm timelines of this fabrication.

**C. Discovery Regarding Donais' Knowledge of the Parties and Property**

32. Factual Dispute Created by Donais: Donais claims in paragraph 9 of his affidavit: "*Since I did not learn or from either Attorney O'Brien or Andre about the party involved was the Homewood Suites by Hilton, I thereafter agreed to serve as local counsel when I was contacted by Attorney Karl Terrell.*"

33. Why Discovery Is Required: This statement is contradicted by multiple pieces of evidence:

34. January 11, 2017 Email to Akridge: In his email to Akridge and Terrell on January 11, 2017, at 12:34 PM, Donais wrote: "*What I know is that I received a call from 'Andre' who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeepe*r."

35. This email establishes that Donais learned: (a) specific details about discrimination in food services; (b) overcharges for room use; (c) that it was a mixed-use property with rental and innkeeper functions. Donais claims that these details came from the January 9, 2017 call with Bisasor. Yet, the fact about plaintiffs being minorities was not mentioned on the 1-9-17 call with Bisasor.

36. Discovery is needed regarding: (a) how Bisasor described being "*treated differently for food services because they were minorities*" when Bisasor never disclosed his race to Donais; (b) whether this information came from the O'Brien call on January 5, 2017; (c) all communications between Donais and Akridge/Terrell before January 11, 2017; (d) whether Akridge disclosed the property name to Donais before Donais claims he performed a conflict check.

37. Akridge's 5-4-17 Affidavit: Akridge states in paragraph 13: "*During that call, I briefly explained the nature of the case, the fact that it involved the Homewood Suites in Nashua, and the need for local counsel. Donais then let me know that he had received a call from an individual named 'Andre,' who said he was looking for an attorney to represent him in a landlord-tenant matter. The situation, as Donais said he understood it, involved some type of mixed-use property. He said he did not remember the caller identifying this property as the Nashua Homewood Suites. In any event, in piecing this together, we concluded that 'Andre' was quite likely Mr. Bisasor.*"

38. Akridge admits they "pieced together" that Andre was Bisasor. Discovery is needed regarding: (a) what information Akridge provided about the plaintiffs before Donais disclosed the "Andre" call; (b) whether Donais connected "Andre" to the Homewood property based on information from O'Brien.

39. The 540-A Petition Was Public Record: Anderson filed her 540-A petition on 1-9-17 (the same day as the Donais-Bisasor call). This petition identified Homewood Suites as defendant. Discovery is needed regarding: (a) when Donais first saw the 540-A petition, and whether Akridge or Terrell sent Donais a copy before 1-11-17; (b) when Donais made the connection between "Andre" and the Homewood case and that this occurred before Donais agreeing to represent Homewood.

**D. Discovery Regarding Donais' Communications with Akridge and Terrell**

40. Factual Disputes Created by Donais: Donais claims in paragraph 10 of his affidavit: "*When the case was generally explained to me by Attorney Terrell, I then briefly advised Attorney Terrell of the prior limited contact that had taken place involving Andre and sent him an email about it on January 11, 2017. To the best of my knowledge and belief, I did not further discuss the prior telephone conversation with Andre with Attorney Terrell beyond the one email.*"

41. Why Discovery Is Required: This statement raises numerous questions requiring discovery:

42. All Communications Between Donais, Akridge, and Terrell: Discovery is needed of: (a) all phone call logs between Donais and Akridge from January 5-18, 2017; (b) all phone call logs between Donais and Terrell from January 5-18, 2017; (c) all emails beyond the January 11, 2017 email; (d) any text messages or other electronic communications; (e) communications with Terrell's assistant Felicia Brogden.

43. Akridge's 1-11-17 Email: On 1-11-17, Akridge sent an email to Donais stating: "*I laid out the broad issues with Craig to give him some background and he indicated that he may have received a call from Bissasor yesterday. He is did not take his case.*"

44. Discovery is needed regarding: (a) what "broad issues" Akridge laid out; (b) when this conversation occurred; (c) what Donais told Akridge about the Bisasor call before sending his 12:34 PM email.

45. Terrell's Testimony at April 27, 2017 Hearing: At the preliminary injunction hearing in Superior Court, Terrell testified that he received information from Donais through Akridge about the Bisasor consultation. Discovery is needed regarding: (a) what specific information Terrell received; (c) whether Terrell received information beyond what was in the January 11, 2017 email; (d) how this information was used in preparing the 1-17-17 motion to dismiss.

46. The January 17, 2017 Motion to Dismiss: This 60-page motion (filed by both Donais and Terrell) addressed specific issues that Bisasor discussed with Donais on January 9, 2017, including: (a) the mixed-use property argument; (b) innkeeper versus landlord-tenant distinctions; (c) treatment in food services; (d) contract versus tenancy claims.

47. Discovery is needed regarding: (a) who drafted each section of the motion to dismiss in Nashua circuit court and procured the exhibits that were later stricken or withdrawn and now reattached in the motion to dismiss in this court; (b) what role Donais played beyond "reviewing the pleadings before signing them"; (c) whether/why/how the motion incorporated confidential information from the January 5 and January 9, 2017 consultations; (d) how/why the motion to dismiss contained information about issues not disclosed in the 540-A petition.

**E. Discovery Regarding the January 18, 2017 Hearing and Withdrawal**

48. Factual Disputes Created by Donais: Multiple aspects of the January 18, 2017 hearing require discovery:

49. Judge Moore's Findings: The amended complaint alleges that Judge Paul Moore determined Donais had a conflict of interest and needed to withdraw.

50. Donais' Statements at the Hearing: Elliott Berry's notes indicate Donais made several statements to Judge Moore. Discovery is needed regarding: (a) whether Donais admitted discussing case details with Bisasor; (c) whether Donais disclosed the O'Brien consultation at that time; (d) what reasons Donais gave for agreeing to withdraw.

51. Conversations at the Courthouse: The complaint alleges Donais had conversations with Akridge and Terrell at the courthouse on January 18, 2017, advising them of the conflict issues. Discovery is needed regarding: (a) what Donais told Akridge and Terrell; (b) whether Donais disclosed the O'Brien consultation at that time; (c) what information Donais shared about the substance of his consultations with O'Brien and Bisasor.

### F. Discovery Regarding Subsequent Disclosure of Confidential Information

52. Factual Disputes Created by Donais: The amended complaint alleges Donais disclosed confidential information from the consultations to multiple third parties. Discovery is needed regarding:

53. Disclosures to Family Members: Discovery regarding: (a) what Donais told his wife Mary about the case; (b) what Donais told his sons Garrett and Aiden; (c) when these disclosures occurred; (d) whether Donais disclosed details of the January 9, 2017 conversation; (e) whether Donais told family members that Bisasor accused him of racism.

54. Disclosures to Manchester Crime-Line Board: Discovery regarding: (a) emails and communications with Crime-Line board members; (b) what information Donais disclosed about plaintiffs; (c) whether Donais disclosed details of the confidential consultations; (d) when these disclosures occurred; (e) what motivated these disclosures.

55. Disclosures to Police: Discovery regarding: (a) Donais' June 18, 2019 statement to police; (b) what Donais told police about the January 2017 consultations; (c) whether Donais disclosed protected client information; (d) any police reports or recordings of Donais' statements.

56. Public Disclosures: Discovery regarding: (a) Donais' statements made to the Advisory Committee on Rules or to members thereof; (b) what Donais said about plaintiffs in communications to the Advisory Committee; (b) whether those statements referenced the confidential consultations, or were false/defamatory.

## IV. CONVERSION TO SUMMARY JUDGMENT OR LIMITED DISCOVERY IS REQUIRED UNDER ESTABLISHED LAW

### A. New Hampshire Law Mandates Conversion When Matters Outside Pleadings Are Presented

57. The New Hampshire Supreme Court has made clear that factual allegations in briefs or memoranda may not be considered when deciding a motion to dismiss, particularly when the facts contradict those alleged in the complaint.

Energynorth Nat. Gas, Inc. v. Continental Ins. Co., 146 N.H. 156, 163 (2001) (citing Iannelli v. Burger King Corp., 145 N.H. 190, 193 (2000)). Yet Donais seeks to do exactly that.

58. When matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment, and all parties must be given reasonable opportunity to present pertinent material. See White v. Bloom, 621 F.2d 276, 278 (8th Cir. 1980); see also Mass. R. Civ. P. 12(d) (when court considers matters outside pleadings, motion must be converted to summary judgment and parties given opportunity to present material).

59. See Collision Communications, Inc. v. Nokia Corporation, 1:20-cv-00949, (D.N.H.)(2020)("Further, when evidence of the parties' communications is central to the claims and the interpretations of the evidence is disputed, the claims are better addressed in a properly supported motion for summary judgment.").

60. New Hampshire courts further have allowed limited discovery prior to ruling on a motion to dismiss, particularly where the motion raises fact-based defenses that require evidentiary rebuttal. See State v. Laux, 168 N.H. 404, 409 (2015) (discovery may be granted upon showing of particularized need). It should also be noted that, in Collision Communications, Inc. v. Nokia Corporation, 1:20-cv-00949, (D.N.H.)(2020), the court stated (see **<u>Exhibit B</u>**):

> While Nokia may prefer to make its arguments based on its selection of documents and communications while avoiding all discovery from Collision, that procedure would be unfairly prejudicial to Collision. Instead, a decision…should be based on a well-developed and properly presented record.

61. Note also Collision Communications, Inc. v. Nokia Corporation, 1:20-cv-00949, (D.N.H.)(2020)("An exception exists when undisputed evidence, such as a videotape, shows that only one version of the facts is true so that no reasonable jury could believe the contrary story. Karmue, 2020 WL 1290605, at *11.").

**<u>B. Federal Precedent Supports Limited Discovery to Address Factual Assertions in Motion to Dismiss</u>**

62. Federal courts applying analogous rules recognize that when a defendant's motion relies on factual assertions outside the complaint, limited discovery is appropriate to allow plaintiff to oppose the motion. See Doe v. Brown Univ., 943 F.3d 61, 71 (1st Cir. 2019) (Rule 56(d) allows discovery where facts essential to opposition are unavailable); Hannon v. Beard, 645 F.3d 45, 49-50 (1st Cir. 2011) (district court properly allowed discovery before ruling on motion to dismiss where factual issues required development).

63. The First Circuit has recognized that "district courts have discretion to allow discovery" before ruling on dispositive motions "where such discovery might reveal facts that would preclude judgment" for the moving party. Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir. 1992). This principle applies with particular force where, as here, the defendant introduces extensive extrinsic evidence creating factual disputes.

64. See also Collision Communications, Inc. v. Nokia Solutions and Networks OY, No. 20-cv-949-JD, 2021 WL 1165048, at *5 (D.N.H. Mar. 24, 2021)("Having relied on extrinsic materials for at least some of its arguments, Nokia did not follow the constraints of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). It is not the court's duty to work around the situation that Nokia created. Further, given the nature of the claims and Nokia's arguments in defense, the issues are better addressed in the context of a fully developed record".).

65. Similarly, Donais did not follow the constraints of a motion to dismiss under the Rules of Civil Procedure and under the court's 6-5-25 order, and further the court should not be seeking to find a workaround to help facilitate Donais' abuse and violation of the rules and its own orders. Therefore, much like the Collision case, the issues in this case at this stage, and give the nature of defendant's arguments/tactics/maneuvers, are better addressed in the context of a fully developed record.

**C. Ninth Circuit Precedent Recognizes Dangers of Premature Dismissal Based on Extrinsic Evidence**

66. In Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1003 (9th Cir. 2018), the Ninth Circuit addressed the problem of defendants "pil[ing] on numerous documents to their motions to dismiss to undermine the complaint." The court warned against "premature dismissals of plausible claims that may turn out to be valid after discovery." Id. The court emphasized that when "defendants face an alluring temptation" to introduce extensive documentation at the motion to dismiss stage, courts must guard against procedural unfairness. Id.

67. Here, Donais has succumbed to exactly that temptation, attaching 142 pages of exhibits initially, then adding another 60 pages in reply. This pattern creates the precise risk the Khoja court identified: dismissal based on one party's carefully curated presentation of selected documents, without opportunity for the opposing party to test those materials through discovery or present countervailing evidence.

68. Further, in Collision Communications, Inc. v. Nokia Corporation, 1:20-cv-00949, (D.N.H.)(2020), the court made clear that this approach is not permissible (See also **Exhibit A**):

> A motion to dismiss under Rule 12(b)(6) challenges the plausibility of the claims as alleged in the complaint. RiosCampbell v. U.S. Dept. of Commerce, 927 F.3d 21, 24-25 (1st Cir. 2019). For that reason, the court does not consider documents or materials extrinsic to the complaint except in limited circumstances. Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 25 (1st Cir. 2018). When materials extrinsic to the pleadings are submitted in support of a motion to dismiss under Rule 12(b)(6) and are not excluded by the court, the motion must be converted toa motion for summary judgment under Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 12(d). Narrow exceptions to the rule against extrinsic materials exist "for documents the authenticity of which is not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The exceptions are often used in cases involving breach of contract where the plaintiff relies on a contract or agreement as the basis of the claim. Doe v. Harvard Univ., 462 F. Supp. 3d 51, 59 (D. Mass. 2020) (citing cases). "That a complaint mentions a document, or even repeatedly refers to the document, is not enough, however, if that document is not integral to

the claim or explicitly relied upon as a basis for liability." Id. None of the materials submitted by Nokia was filed with the second amended complaint. Nokia asserts that the materials it submitted fall within the exception for documents relied on in the complaint. Collision contends that the materials do not fall within the exception because Nokia uses additional emails and draft agreements to challenge the allegations in the complaint.

## V. SPECIFIC AREAS REQUIRING DISCOVERY BASED ON DONAIS' EXHIBITS

### A. The March 2017 Donais Affidavit Requires Extensive Discovery

69. Donais' March 13, 2017 affidavit makes at least 15 specific factual assertions that contradict the amended complaint and require discovery to test their accuracy:

a. "Unrelated matter involving a mutual client" claim (¶1) - requires discovery of what matter, which client, how much time was spent

b. "Declined to learn more" claim (¶2) - contradicted by legal opinions Donais provided

c. "Real estate matter" voicemail claim (¶3) - contradicted by actual voicemail content

d. "Andre Bedsore" name claim (¶4) - contradicted by fact that no last name was mentioned

e. "Difficulty understanding" claim (¶4) - requires testing through actual recordings

f. One minute into call recognition claim (¶5) - requires discovery of when Donais learned about O'Brien call

g. "Asked if got name from O'Brien" claim (¶6) - contradicted by call description in complaint

h. "No legal advice provided" claim (¶8) - contradicted by call content, O'Brien text & Cornell's interview of Obrien

i. "No confidential information received" claim (¶8) - contradicted by Donais' own January 11 email

j. "Discrimination accusation" claim (¶7) - requires discovery of when this claim first appeared

k. Timing of conflict check claim (¶9) - requires discovery of actual conflict check procedures used by Donais

l. "Did not know party was Homewood" claim (¶9) - requires discovery of when Donais learned this

m. "Only one email to Terrell" claim (¶10) - requires discovery of all communications

n. "Never discussed substance with Terrell" claim (¶14) - contradicted by Terrell testimony

o. "Never communicated with Anderson" claim (¶15) - requires discovery regarding O'Brien communications

70. Each of these assertions creates a factual dispute that cannot be resolved without discovery.

### B. The O'Brien Documents Create Factual Disputes

71. O'Brien's January 18, 2017 letter states: "*No names or specific circumstances were discussed with Attorney Donais. He declined my offer to share any other information I had on the matter.*"

72. This statement directly contradicts: (a) the detailed legal opinions in O'Brien's January 5, 2017 text to Anderson; (b) Cornell's interview notes showing O'Brien told him Donais analyzed the innkeeper/landlord issue; (c) Donais' knowledge of case details he later disclosed to Akridge and Terrell.

73. Discovery is needed to reconcile these contradictions, including: depositions of O'Brien and Donais about their January 5, 2017 conversation; phone records and any recordings; notes or file materials from both attorneys.

### C. The Akridge Affidavit Requires Discovery to Test Credibility

74. Akridge's May 4, 2017 affidavit makes several assertions requiring discovery:

75. Paragraph 13: Akridge claims Donais "did not remember the caller identifying this property as the Nashua Homewood Suites." Discovery is needed to determine: when Akridge told Donais it was Homewood; whether this was before or after Donais agreed to represent them; whether Donais had already connected "Andre" to the Homewood case.

76. Paragraph 14: Akridge claims Donais "told me very little about the substance of what the caller had said to him." This contradicts: Donais' January 11, 2017 email containing substantial detail; the fact that Donais knew enough to render legal opinions to O'Brien; Terrell's testimony about receiving information through Akridge.

77. Paragraph 16: Akridge claims he "specifically recall[s] asking Mr. Donais if he would have a conflict serving as local counsel, given this conversation with 'Andre.' He responded with conviction that he did not." Discovery is needed regarding: what Donais told Akridge about the conflict analysis; whether Donais disclosed the O'Brien consultation; whether Donais disclosed the substance of the Bisasor consultation.

### D. Phone Records Support Need for Discovery

78. The phone records Donais attached show: (a) O'Brien called Donais on January 5, 2017, for 5 minutes; (b) Donais called Bisasor on January 9, 2017, and the call lasted until 10:50 AM (approximately 7 minutes from 10:43 AM).

79. These records establish the duration of the consultations but not their content. Discovery is needed to determine: what was actually discussed during these calls; whether Donais made notes or recordings and whether that contradicts Donais' claims about the limited nature of the consultations.

## VI. DONAIS CANNOT DISPUTE FACTS THROUGH A MOTION TO DISMISS

80. The factual disputes Donais creates include: (1) whether an attorney-client relationship existed; (2) the content and nature of the January 9, 2017 conversation; (3) the content and nature of the January 5, 2017 O'Brien-Donais conversation; (4) the extent of confidential information disclosed; (5) whether any privilege was waived and by whom;

(6) whether a contract existed; (7) whether Donais' conduct was "reprehensible"; (8) when Donais learned the identity of Homewood as the property; (9) what information Donais shared with Akridge, Terrell, and others; (10) whether Bisasor accused Donais of racism.

81. These are precisely the types of genuine issues of material fact that cannot be resolved on a motion to dismiss and require either conversion to summary judgment with attendant procedural protections or limited discovery.

82. In paragraph 10 of his motion, Donais asserts "*there was no contract between the parties in this case, actual or implied*." But the existence of a contract is a factual issue. The defendant cannot dispute facts through a motion to dismiss, but he has done so anyway. Given that he has done so, discovery is appropriate.

83. Similarly, Donais asserts in paragraph 17 that "*Nothing about the defendant's alleged conduct could be characterized as 'reprehensible*.'" Here, he seeks to contradict the amended complaint. This warrants discovery regarding all statements made by Donais, to whom, what exactly he said, how many times, and what was the effect or intended effect. These are factual questions that can only be resolved after discovery.

## VII. ONE-SIDED AFFIDAVITS CANNOT ESTABLISH FACTS WITHOUT CROSS-EXAMINATION

84. By his own admission, Donais attaches affidavits and pleadings from 8 years ago, including his own affidavit and those of his colleagues. But this does not tell the whole story. Each attachment contains numerous evidentiary attachments designed to introduce new facts into this case that are outside the amended complaint and to contradict facts in the amended complaint.

85. These materials include: (1) multiple one-sided affidavits by affiants including those who have never been cross-examined or tested under oath; (2) phone records of other parties not part of the case; (3) multiple unauthenticated emails between third parties that have never been subject to verification; (4) several cherry-picked motions containing factual assertions and arguments designed to attack plaintiffs' credibility; (5) an unsigned 60-page motion that Donais only "corrected" by attaching the signed version in his reply.

86. The strategy here is clear: to use these attachments as a trojan horse to introduce factual disputes to attack the amended complaint while attempting an end-run around the prohibition against doing so. Discovery is more than warranted under these circumstances. Donais needs to be examined under oath via deposition and written discovery regarding all that was said by him to Terrell, Akridge, Terrell's assistant, O'Brien, Berry, and others. Donais cannot

offer tailored limited one-sided affidavits from 8 years ago and expect that to be the end of it in terms of establishing facts and contradicting facts in this lawsuit, with no opportunity to test these affiants and himself under oath.

87. The Court should be skeptical of self-serving declarations made years after the events in question, particularly where: (a) the declarant has a direct financial and professional interest in the outcome; (b) the declarations contradict contemporaneous documents and statements; (c) the declarant's story has evolved/changed over time; (d) the declarations are offered to defeat claims that the declarant has a fiduciary duty to the plaintiffs.

## VIII. DONAIS' APPROACH CREATES FUNDAMENTAL PROCEDURAL UNFAIRNESS

88. Donais attaches over 200 pages of exhibits spanning 8 years, then demands immediate response while claiming plaintiffs have seen these before. This position ignores the substantial work required to organize, prepare, and incorporate responsive exhibits with proper headers and numbering, beyond the analytical work of reviewing substance and preparing substantive response.

89. Moreover, Donais filed defective exhibits (unsigned pleadings in Exhibit H), waited for objections, then introduced expanded versions in reply including new exhibits K and L, then objects to allowing plaintiffs any response. This sequence violates every principle of fair adversarial proceedings and demonstrates why discovery and further briefing is necessary to prevent tactical abuse of procedural rules.

90. NH Superior Court Rule 7 provides that unsigned filings may be stricken and proceedings may continue as though the filing had not been made. Donais acknowledged in his pleading that his Exhibit H was unsigned, confirming he was aware this was improper, yet he attached it anyway[1]. He then waited until his reply to include the signed version with additional exhibits. This calculated approach creates exactly the type of procedural trap courts shouldn't permit[2].

91. The Court should not reward this gamesmanship. When a party deliberately files defective materials, then purportedly "corrects" them only in reply with additional materials, the proper remedy is to allow the opposing party discovery and surreply to address the corrected and expanded materials.

## IX. THE NECESSITY FOR DISCOVERY BECOMES CRITICAL WITHOUT A HEARING

92. Donais has systematically objected to plaintiffs' motion for hearing while simultaneously introducing new evidence and procedural arguments in reply that were not presented in his original motion. If the Court resolves this potentially

---

[1] Plaintiffs could not be expected to respond to a defective pleading with unsigned illicit attachments, thus causing prejudice to the plaintiffs with respect to the objection to the motion to dismiss amended complaint.

[2] See NH federal court case that chided defendant for similar conduct with respect to improper use of reply to objection tp its motion to dismiss. Collision Communications, Inc. v. Nokia Solutions and Networks OY, No. 20-cv-949-JD, 2021 WL 1165048, at *5 (D.N.H. Mar. 24, 2021)("Nokia, however, failed to raise Rule 9(b) in its motion to dismiss, and instead, improperly, raised it in its reply").

case-ending motion based solely on written submissions, fundamental fairness demands either that impermissible material be stricken or that plaintiffs be afforded discovery to test the credibility of competing factual assertions.

93. Allowing defendants to introduce new evidence in reply while denying plaintiffs opportunity to respond violates fundamental principles of adversarial proceedings. Without a hearing and without discovery, the Court will have no opportunity to examine witnesses, test credibility of competing factual assertions, or explore the procedural irregularities identified. The necessity for discovery becomes even more critical under these circumstances.

94. Other courts have recognized this problem. In Bond v. Blum, 317 F.3d 385, 397 (4th Cir. 2003), the Fourth Circuit held that when "the parties present competing versions of the facts," the district court must "accept the plaintiff's version of the facts as true" and may not "weigh the parties' competing evidence." When a defendant introduces extrinsic evidence to contradict the complaint, the proper remedy is conversion to summary judgment or allowance of discovery, not dismissal based on the defendant's preferred version of disputed facts.

## X. GROUNDS FOR AMENDMENT OF THE COMPLAINT ARE CLEAR

95. Discovery will also reveal grounds for further amendment of the complaint. The materials Donais has introduced, combined with discovery, will likely reveal: (1) additional instances of disclosure of confidential information; (2) additional parties who received such disclosures; (3) the full extent of information Donais shared with Akridge, Terrell, and defense team; (4) when Donais first fabricated the racism accusation and to whom he disclosed it; (5) additional evidence of the prospective attorney-client relationship; (6) evidence of Donais' consciousness of guilt through evolving/changing/contradictory stories.

96. Federal courts have recognized that discovery may reveal facts supporting amendment of pleadings. See Foman v. Davis, 371 U.S. 178, 182 (1962) (amendments should be freely given when justice requires); Palmer v. Champion Mortgage, 465 F.3d 24, 30 (1st Cir. 2006) (amendments appropriate where discovery reveals additional facts).

97. New Hampshire courts similarly favor liberal amendment. Petition of Ridgely, 138 N.H. 241, 244 (1994) ("amendments to pleadings are favored in this state and should be allowed freely"); Beane v. Dana S. Beane & Co., 160 N.H. 708, 715 (2010) (court should allow amendment "unless the opposing party would be prejudiced").

98. Discovery here will likely reveal facts supporting additional claims or more specific factual allegations regarding: the full extent of Donais' breach of duties under Rule 1.18; additional parties who received confidential information; the

chronology of Donais' evolving false statements; the specific harm caused by each disclosure; the role of other defense team members in receiving and using confidential information.

99. To the extent Donais may argue that plaintiffs failed to present evidence to support some of their claims, that evidence is appropriate subject for discovery.

**XI. THE REQUEST FOR ATTORNEY FEES IS IMPROPER AND UNWARRANTED**

100. The request for attorney fees is particularly inappropriate. Motions for limited discovery and conversion serve important functions in preventing procedural abuse. When a party introduces new evidence in reply, violates court orders, and systematically objects to every procedural remedy, the opposing party has rights to seek appropriate relief.

101. The New Hampshire Supreme Court has emphasized that attorney fee awards require extraordinary circumstances and clear evidence of frivolous conduct lacking any reasonable basis. Harkeem v. Adams, 117 N.H. 687, 690-91 (1977). Plaintiffs' motion addresses legitimate procedural concerns arising directly from Donais' decision to introduce extraneous material in his motion to dismiss and attendant reply. The motion is grounded in established legal principles and seeks relief properly within the Court's authority.

102. Moreover, it is improper to combine a motion for attorney fees into an objection. See N.H. Super. Ct. R. 7(g) ("Objections to pending motions and affirmative motions for relief shall not be combined in one filing."). This continual violation of the rules supports sanctions or warning to defendant, especially when done to be oppressive.

103. Donais' pattern of requesting attorney fees for any plaintiff filing constitutes abuse of process designed to chill legitimate advocacy, and is particularly problematic when targeting pro se litigants exercising fundamental procedural rights. The Court should reject this pattern of fee requests designed to intimidate plaintiff from exercising their rights.

**XII. THE DUPLICATIVE NATURE CLAIM LACKS MERIT**

104. Donais argues Bisasor's motion duplicates Anderson's motion. This is incorrect. While both plaintiffs seek similar relief, Bisasor filed his motion as a supplement and alternative pleading, explicitly noting in paragraph 1 that it serves "in the alternative" as a supplement to the reply to Anderson's objection. The procedural posture required separate filings, and the motions are not identical in content or argumentation.

105. Further, the fact that both plaintiffs identify the same procedural violations by Donais doesn't make their motions frivolous; it confirms the pattern of procedural abuse. When both plaintiffs independently recognize that Donais violated court orders and procedural rules, this validates rather than undermines the legitimacy of their concerns.

106. The principle that multiple plaintiffs may file separate motions, if they so choose, is well-established in both federal and state jurisprudence. Each plaintiff has the right to make his or her own case. See Thibodeau v. Comcast Corp., 912 A.2d 874, 885 (Pa. Super. Ct. 2006) ("A fundamental principle of justice is everyone should have a day in court."). NH rules of procedure do not prohibit plaintiffs from filing separate motions addressing similar issues.

## XIII. CONCLUSION

107. Donais' bare-bones objection confirms the concerns raised in the motion. His inability to address substantive procedural violations, his failure to cite supporting authority, and his attempt to characterize legitimate procedural objections as frivolous demonstrate exactly the type of procedural bullying the requested relief is designed to prevent.

108. The Court should recognize that Donais' pattern of conduct (introducing extensive materials outside the pleadings, violating explicit court guidance, introducing new evidence in reply, and systematically objecting to every procedural remedy) creates precisely the type of one-sided proceeding that undermines adversarial integrity. His objection's failure to address these substantive concerns while requesting attorney fees for having to respond to legitimate procedural objections confirms the calculated bad faith nature of his approach.

109. The careful analysis above demonstrates that virtually every exhibit Donais attached, and virtually every factual assertion in his March 2017 affidavit, creates factual disputes requiring discovery. The Court cannot properly evaluate a motion to dismiss when the movant has introduced 200+ pages of extrinsic materials creating dozens of factual disputes about matters central to the claims.

110. Accordingly, the Court should grant plaintiff's motion and either: (1) convert Donais' motion to dismiss to one for summary judgment with appropriate notice and opportunity for discovery; or (2) grant limited pre-answer discovery as outlined in plaintiff's motion before ruling on the motion to dismiss. Such relief is necessary to preserve procedural fairness and prevent the type of systematic abuse that Donais' conduct represents. Further, the Court should also deny Donais' request for attorney fees as inappropriate under these circumstances where legitimate procedural violations warrant judicial intervention.

Respectfully submitted,
/s/ Andre Bisasor
Andre Bisasor

Date: November 3, 2025

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Collision Communications, Inc.

v. Civil No. 20-cv-949-JD

Nokia Solutions and Networks OY

O R D E R

Collision Communications, Inc. brings breach of contract and related claims against Nokia Solutions and Networks OY, arising from their failed business relationship. Nokia moves to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6). In support of the motion, Nokia submitted copies of two draft agreements and copies of emails covering the period between June 1 and December 18, 2017. Collision objects to the motion on the grounds that it was improper for Nokia to submit materials extrinsic to the complaint and that the motion fails on the merits.

A motion to dismiss under Rule 12(b)(6) challenges the plausibility of the claims as alleged in the complaint. Rios-Campbell v. U.S. Dept. of Commerce, 927 F.3d 21, 24-25 (1st Cir. 2019). For that reason, the court does not consider documents or materials extrinsic to the complaint except in limited circumstances. Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 25 (1st Cir. 2018). When materials extrinsic to the pleadings are submitted in support of a motion to dismiss under

Rule 12(b)(6) and are not excluded by the court, the motion must be converted toa motion for summary judgment under Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 12(d).

Narrow exceptions to the rule against extrinsic materials exist "for documents the authenticity of which is not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The exceptions are often used in cases involving breach of contract where the plaintiff relies on a contract or agreement as the basis of the claim. Doe v. Harvard Univ., 462 F. Supp. 3d 51, 59 (D. Mass. 2020) (citing cases). "That a complaint mentions a document, or even repeatedly refers to the document, is not enough, however, if that document is not integral to the claim or explicitly relied upon as a basis for liability." Id.

None of the materials submitted by Nokia was filed with the second amended complaint. Nokia asserts that the materials it submitted fall within the exception for documents relied on in the complaint. Collision contends that the materials do not fall within the exception because Nokia uses additional emails and draft agreements to challenge the allegations in the complaint.

While it is true that Collision refers to and quotes from some emails in its complaint, Nokia is not relying exclusively on those parts of the parties' email communications. Instead, Nokia is introducing additional communications from the parties' email chains and two draft agreements in order to challenge Collision's allegations in the complaint. Reliance on these documents is more appropriate in the context of a motion for summary judgment when Collision will have the opportunity to respond with evidence of its own.

## Conclusion

For the foregoing reasons, Nokia's motion to dismiss (document no. 55) is denied without prejudice to filing a properly supported motion for summary judgment.

SO ORDERED

/s/ Joseph A. DiClerico, Jr.
Joseph A. DiClerico, Jr.
United States District Judge

December 23, 2020
cc: Counsel of record.

# Exhibit B

Collision Communications, Inc. v. Nokia Corporation, et al. Doc. 82


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Collision Communications, Inc.

v. Civil No. 20-cv-949-JD
Opinion No. 2021 DNH 057

Nokia Solutions and Networks OY

O R D E R

Collision Communications, Inc. brings claims against Nokia Solutions and Networks OY, arising from the parties' failed business relationship. The court previously denied, without prejudice, Nokia's motion to dismiss because Nokia supported its motion with reference to materials extrinsic to the complaint. The court noted that the issues would be more appropriately addressed through a motion for summary judgment. Nokia has filed a motion for summary judgment but also moves to reconsider the order that denied its motion to dismiss. Collision asks, pursuant to Federal Rule of Civil Procedure 56(d), that consideration of the motion for summary judgment be delayed pending necessary discovery.

I. Motion for Reconsideration

Nokia asks the court to reconsider arguments raised in the motion to dismiss that it contends did not require consideration

Dockets.Justia.com

of documents that are extrinsic to the complaint.[1] In support, Nokia lists eight arguments it made in its motion and/or in its reply that it contends could be decided based only on the allegations in the complaint. Collision objects to the motion.

"A motion to reconsider an interlocutory order of the court, meaning a motion other than one governed by Fed. R. Civ. P. 59 or 60, shall demonstrate that the order was based on a manifest error of fact or law . . . ." LR 7.2(d). Reconsideration will not be granted based on new theories or old arguments that were presented and rejected. D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., 2020 DNH 051, 2020 WL 1517060, at *1 (D.N.H. Mar. 30, 2020). Reconsideration is an extraordinary remedy that is to be used sparingly. Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006).

Nokia argues that Collision agreed in its objection to the motion to dismiss to have the court consider the license and integration agreements and invites the court to review the motion to dismiss to determine whether certain arguments and

[1] One such argument asserted by Nokia is whether a breach of the implied covenant was alleged with sufficient specificity to satisfy Federal Rule of Civil Procedure 9(b). Nokia, however, failed to raise Rule 9(b) in its motion to dismiss, and instead, improperly, raised it in its reply. Further, the argument appears to have little or no merit.

issues might have been resolved without reference to other materials. Nokia agrees for purposes of reconsideration that New Hampshire law, rather than Delaware law, should govern.[2] The court declines to engage in the reconsideration efforts that Nokia proposes.

Having relied on extrinsic materials for at least some of its arguments, Nokia did not follow the constraints of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[3] It is not the court's duty to work around the situation that Nokia created. Further, given the nature of the claims and Nokia's arguments in defense, the issues are better addressed in the context of a fully developed record.

---

[2] In the motion to dismiss, Nokia asserted that Delaware law governed the contract claims, based on provisions in the license and integration agreements and presented its arguments based on Delaware law with footnotes citing New Hampshire law. The question about the governing law is another reason to postpone consideration of a challenge to the claims on the merits when a decision on choice of law may be made.

[3] For example, while Nokia now argues that the court can dismiss the breach of contract claim based only on the allegations in the complaint and the copies of the agreements, Nokia also relied on various emails for purposes of the motion to dismiss. In the motion to dismiss, Nokia represented that a June 1 email could be considered because it was referenced in ¶ 67 of the complaint. See doc. no. 55-1, at *5 n.4. At ¶ 67 of the second amended complaint (doc. no. 54), however, Collision quotes from a June 9 communication. Further, when evidence of the parties' communications is central to the claims and the interpretations of the evidence is disputed, the claims are better addressed in a properly supported motion for summary judgment.

II. Collision's Request under Rule 56(d) for Discovery

As part of its objection to Nokia's motion for summary judgment, Collision invokes the need for discovery under Rule 56(d). Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." In support of a motion under Rule 56(d), a party must file "an authoritative statement that: (i) explains [its] current inability to adduce the facts essential to filing an opposition, (ii) provides a plausible basis for believing that the sought-after facts can be assembled within a reasonable time, and (iii) indicates how those facts would influence the outcome of the pending summary judgment motion." Doe v. Brown Univ., 943 F.3d 61, 71 (1st Cir. 2019).

A. Progress of Case

This case was filed in the District of Massachusetts in November of 2019. Nokia moved to dismiss for lack of personal jurisdiction and for failure to state a claim. In order to cure

the defect in personal jurisdiction, the court transferred the case to this district in September of 2020.

Collision filed a second amended complaint in October, and Nokia moved to dismiss in November. Collision requested that a preliminary pretrial conference be scheduled, which the court denied while the motion to dismiss was pending. On December 23, 2020, the court denied Nokia's motion to dismiss, without prejudice to filing a properly supported motion for summary judgment.

Nokia moved for reconsideration of the order denying the motion to dismiss and moved for summary judgment on the same day. The parties filed a joint motion to extend the briefing deadlines on those motions. The court granted the motion and also directed that no pretrial conference would be scheduled until after resolution of the pending motions. Therefore, there has been no pretrial conference in this case, and no discovery order has issued.

B. Need for Discovery

In support of its request under Rule 56(d), Collision filed the affidavit of its counsel to show why discovery is needed before it can fully respond to the motion for summary judgment. Doc. no. 75. Counsel states in the affidavit that Collision

Case 1:25-cv-02051-SEB-MJD Document 18-3 Filed 10/20/25 Page 6 of 15

sought discovery from Nokia for internal documents pertaining to the parties' dealings with respect to Nokia's efforts to obtain licensed technology from Collision. Nokia refused to provide any discovery pending resolution of its pending motions.

Counsel states that discovery is necessary to obtain internal documents and communications about the parties' dealings in order to show the entire context of those dealings. Counsel also states that Collision needs to depose the individuals from Nokia, particularly its executives, who were involved in Nokia's efforts to obtain licensed technology from Collision. Further, counsel states that Nokia's internal documents and depositions are necessary to determine whether Nokia deliberately delayed finalization of the agreement in writing.

In response, Nokia contends that the discovery Collision seeks is irrelevant to its claims so that no discovery is necessary to respond to the pending motion for summary judgment. Nokia argues that the breach of contract claim depends on whether there is objective evidence that the parties reached an agreement, so that the information Collision hopes to discover about the Nokia officers' intentions and understandings will not

change the outcome.[4] Nokia further argues that the complaint is insufficient to allege the other claims.[5]

Because an evidentiary record generally is necessary for a summary judgment decision, a motion for summary judgment is rarely considered before discovery.[6] Karmue v. Remington, 2020 WL 1290605, at *11 (D.R.I. Mar. 18, 2020) (citing Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 884 (1990) (noting summary judgment appropriate "after adequate time for discovery")). No discovery has been undertaken in this case, and therefore the record has

---

[4] Nokia further argues, based on Massachusetts law rather than New Hampshire law, that contract formation is a legal question not a factual question, citing TLT Const. Corp. v. RI, Inc., 484 F.3d 130, 135 (1st Cir. 2007). The legal question arises only when the formation of the contract is undisputed or is based on writings. Id. Here, Collision alleges that agreement was reached based on the parties' communications, which appears to raise a factual issue, a situation that is discussed in the next paragraph in TLT Const. Corp. Nokia also contends that Collision cannot proceed under a theory of an implied contract because the complaint lacks allegations to support that theory. Because no discovery plan has been entered in this case, however, to the extent Collision's allegations may be wanting, there is no deadline for Collision to move to amend the complaint.

[5] Nokia again raises an issue about whether the claims are alleged with sufficient specificity as required by Federal Rule of Civil Procedure 9(b). The court will not address that issue in this context.

[6] An exception exists when undisputed evidence, such as a videotape, shows that only one version of the facts is true so that no reasonable jury could believe the contrary story. Karmue, 2020 WL 1290605, at *11. That is not the situation presented here.

not been developed for purposes of summary judgment.[7] See In re PHC, Inc. Shareholder Litig., 762 F.3d 138, 144 (1st Cir. 2014) (noting that denial of relief from a pending motion for summary judgment when there has been no opportunity for discovery is likely to be an abuse of discretion). While Nokia may prefer to make its arguments based on its selection of documents and communications while avoiding all discovery from Collision, that procedure would be unfairly prejudicial to Collision.[8] Instead, a decision on a motion for summary judgment should be based on a well-developed and properly presented record.

## Conclusion

For the foregoing reasons, Nokia's motion for reconsideration (document no. 62) is denied.

Nokia's motion for summary judgment (document no. 63) is denied without prejudice to refile that motion or a new motion

---

[7] Importantly, this is not a case where the parties have completed discovery, and yet the nonmoving party asserts a need for additional discovery to oppose summary judgment. See e.g. Booker v. Pfizer, Inc., 847 F.3d 52, 61-62 (1st Cir. 2017); Woods Hole Oceanographic Inst. V. ATS Specialized, Inc., --- F. Supp. 3d ---, 2021 WL 220098, at *3 (D. Mass. Jan. 21 2021).

[8] To that point, Nokia faults Collision for failing to present evidence to support some of its claims. That evidence may be an appropriate subject for discovery.

once discovery is complete or has progressed to the point of providing a sufficiently-developed record to support the motion.

As the pending motions have been resolved, a pretrial conference shall be scheduled.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

March 24, 2021

cc: Counsel of record.

# Exhibit 6

Filed
File Date: 10/17/2025 12:03 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFF ANDRE BISASOR'S REPLY TO DEFENDANT'S OBJECTION TO MOTION FOR CASE MANAGEMENT HEARING**

1. Plaintiff Andre Bisasor submits this reply to defendant's objection to motion for case management hearing.

2. Note: Plaintiff ask that the court reads this reply carefully and really listens to what plaintiff has to say, and apply a pro liberal construction to his words, in light most favorable to him, granting the benefit of the doubt where possible.

## I. INTRODUCTION

3. This reply addresses critical case management issues not fully developed in the original motion but which demonstrate with even greater force why immediate judicial intervention through case management conference is essential. Defendant's assertion that nothing has changed and that a hearing is unnecessary "at this stage" fundamentally mischaracterizes the severity and scope of the systemic problems requiring resolution.

4. This reply further address critical case management issues that defendant's objection ignores entirely. These issues demonstrate why interactive judicial guidance through case management conference is not merely appropriate but essential to fair adjudication of this case.

5. This reply also serves to provide the Court with additional concrete examples and specific instances of case management problems that have intensified since the filing of the original motion. While the motion articulated broad categories of procedural dysfunction, this reply furnishes the detailed factual record demonstrating why these problems cannot be resolved through continued written submissions but require interactive judicial guidance through case management conference. The examples provided herein establish that defendant's characterization of the motion as unnecessary ignores the documented constitutional violations, systemic barriers, and procedural chaos that have prevented meaningful case progression for over four years.

## II. COURT STAFF CONDUCT AND ACCESS TO JUSTICE ISSUES

6. During the course of this litigation, plaintiffs have had to seek clarification/guidance from the clerk/court staff. This is in part due to the fact that the court has not held a case management conference where these issues can be addressed at one place and time before the judge. Instead plaintiffs must rely on communicating with the clerk staff in order to fill the gap. Furthermore, there are issues that often arise related to filings, rejection of filings, clerical errors, technical failures, and other procedural bottlenecks that require that the plaintiffs contact the clerk office/staff including both the e-filing court staff and the courthouse clerk staff.

7. Unfortunately, the interactions between plaintiffs and court staff have created significant barriers to meaningful court access that require immediate judicial attention. Multiple court clerks, including Jane, Nancy, Macie, Karen, and Alma, have demonstrated impatience, refused to answer procedural questions, and terminated telephone communications without resolution. For example, Jane hung up on plaintiff Bisasor during a critical filing deadline inquiry, while Nancy similarly terminated a call regarding plaintiff's attempt to clarify ADA filing procedures and other issues. It should be noted that Nancy[1] explicitly stated that she "does not know anything about the ADA in the court," revealing the profound training deficiencies that have resulted in repeated federal law violations.

8. These incidents are not isolated occurrences but reflect a pattern of treatment that raises serious concerns about equal access to justice. As an African American pro se litigant, plaintiffs deserve the same respect, courtesy, and patience that court staff would extend to a former governor, senator, corporate CEO, or senior partner at a prominent law firm. Procedural fairness requires equal treatment regardless of representation status or racial identity, yet the documented pattern suggests systematic disadvantaging of unrepresented litigants of color. Research demonstrates that implicit bias affects judicial administration, and the documented conduct patterns warrant comprehensive judicial examination. *See* Peter D. Blanck et al., *Discrimination and Bias Reported by Lawyers with Disabilities and Lawyers Who Identify as LGBTQ+*, 38 Touro L. Rev. 961 (2020).

9. Furthermore, e-filing staff have failed to respond to emails, have not returned calls, and have demonstrated similar impatience when plaintiff seeks clarification on filing requirements. This communication breakdown creates impossible situations where plaintiff must file documents without clear guidance, often resulting in rejections that prejudice plaintiff's ability to meet deadlines and present claims effectively.

## III. EX PARTE COMMUNICATIONS AND DEFENDANT'S IMPROPER INFLUENCE

10. Defendant has engaged in a troubling pattern of ex parte communications with court staff in an attempt to prejudice plaintiffs and obtain favorable treatment. The e-filing manager explicitly informed plaintiff that defendant has called repeatedly to complain about plaintiffs and to request adverse action against them, without plaintiff's knowledge or the Court's authorization. This pattern mirrors defendant's conduct documented in other court proceedings where similar complaints about improper communications emerged. It is one thing to contact the court staff about one's own filings or procedural impediments. It is another thing to contact the court staff about other parties.

[1] Nancy evidently is a deputy clerk so this failure and lack of knowledge is even more concerning/troubling.

11. These ex parte attempts to influence court staff violate basic principles of procedural fairness and create an uneven playing field where defendant enjoys behind-the-scenes advocacy while plaintiff must rely solely on proper court filings. The New Hampshire Rules of Professional Conduct prohibit such conduct, and the Court must address this pattern to ensure both parties have equal access to neutral court administration. The case management conference provides the necessary forum for establishing clear boundaries regarding permissible communications and implementing safeguards against future improper contacts.

## IV. CRITICAL ERRORS IN DEADLINE CALCULATIONS

12. Also, court staff (Alma) provided plaintiff with an incorrect deadline calculation for filing the amended complaint, stating the deadline as 8-1-25, when the actual deadline was 8-6-25. This error precisely matched the deliberately incorrect deadline that defendant propounded in an attempt to create prejudice against plaintiff. The coincidence of court staff providing the same erroneous deadline calculation as defendant's strategic misrepresentation raises serious questions about whether defendant's ex parte communications influenced staff conduct to plaintiff's detriment.

13. Such errors are not mere administrative inconveniences but create substantial prejudice by misleading plaintiff about critical filing deadlines. When court staff provide incorrect procedural information, pro se litigants who lack resources or knowledge to verify such information face potential loss of substantive rights through no fault of their own. The case management conference must address procedures for ensuring accurate information provision and establishing accountability when incorrect information or error causes prejudice.

## V. ONGOING CONFIDENTIALITY VIOLATIONS

14. Confidential medical documentation remains publicly available on the court docket despite plaintiffs' repeated written notifications to the Court. Specifically, a medical letter published last year continues to be accessible in violation of ADA confidentiality requirements and federal disability rights law. Additionally, defendant has filed public documents that incorporate sealed court orders, further breaching confidentiality protections mandated by law.

15. These ongoing violations create irreparable harm to plaintiff's privacy rights. The ADA requires strict confidentiality of medical information, and courts have a nondelegable duty to ensure compliance. *See* EEOC v. Prevo's Family Market, Inc., 135 F.3d 1089, 1094 (6th Cir. 1998) (holding employer violated ADA by maintaining insufficiently confidential medical records). The Court's failure to remediate these violations despite written notice creates ongoing harm requiring immediate intervention through case management conference.

## VI. E-FILING SYSTEM DYSFUNCTION AND PREJUDICE

16. The e-filing system/processes operate with systematic deficiencies that disadvantage plaintiffs and prevent effective case prosecution. Filings experience constant delays of two to three days between submission and docketing, creating a temporal gap where plaintiffs have complied with deadlines but the Court remains unaware of the filing. This delay caused specific prejudice when plaintiffs filed a redacted version of a sealed document, but the Court concluded plaintiffs had failed to file the required redacted version because the efiling staff had not yet processed the filing.

17. The e-filing staff have also suddenly changed technical filing requirements, midstream without prior notice, creating moving targets that make compliance impossible. For example, at one point, the e-filing staff suddenly required that sealed documents, and redacted versions of the same and the attendant motion to seal, must all be filed in a single e-filing envelope, rather than separately (as had been previously done/accepted), despite no prior notice of this requirement change. When plaintiff complied with the previous protocol, the e-filing staff rejected the accompanying motion to seal and then simultaneously exposed plaintiff's confidential medical letter to public view under the premise that no motion to seal was filed (which is outrageous), rather than simply reject the confidential medical letter, as well, so as to protect the confidentiality thereof. This procedural trap demonstrates how inconsistent requirements create severe prejudice/violations of plaintiff's rights. This requires case management intervention.

18. Moreover, e-filing staff frequently reject filings without providing any explanation or notation regarding the grounds for rejection. This leaves plaintiff unable to cure deficiencies or understand what correction is required, effectively denying meaningful access to the court/filing system. The Federal Courts of Appeals Manual requires that "the clerk's office should work with pro se filers to resolve technical issues that might result in rejection of filings." Similar standards should apply in state court to ensure equal access.

## VII. THE NEED FOR AUDIO EVIDENCE SUBMISSION CREATES PROCEDURAL CRISIS

19. The pending motion for partial summary judgment on breach of fiduciary duty relies substantially on plaintiffs' refutation of the evidence via a 2017 affidavit provided by the defendant, detailing what was said on a January 9, 2017 consultation between plaintiff and defendant, as well as concerning surrounding events both before and after.

20. Plaintiffs have refuted this affidavit evidence from Donais, by supplying their own affidavits (under seal), along with other documentary evidence via plaintiffs' motion for partial summary judgment and attendant memorandum and exhibits. This refutation directly contradicts defendant's characterizations of the content of the consultation.

21. However, rather than relying on the documentary evidence alone and running the risk that the court may reduce this to an issue of dueling affidavits, Bisasor also has audio evidence that he would like to supply to the court that impeaches the defendant and his 2017 affidavit, showing that Donais has lied and continues to lie to the court via the false 2017 affidavit, thereby establishing conclusively that Donais breached fiduciary duty. This evidence provides conclusive impeachment material regarding Donais' 2017 affidavit and third-party affidavits attached to the motion to dismiss. This evidence establishes conclusively the fiduciary relationship Donais seeks to deny through dismissal.

22. Litigation should be a search for the truth. The court had an opportunity to learn the truth definitively from this audio evidence. It is critical that the court allows this audio evidence to be submitted and heard by the court. What will the court do if it learns that Donais and his lawyer Hilliard have conspired to blatantly lie to this court or submitted false evidence to this court, in order to pervert the cause of justice? The court must be interested in this because lawyers cannot so glibly lie to the court and get away with it without consequence. The court cannot allow Donais and Hilliard to "make a fool" out of this court. This definitive evidence must be heard. This definitive evidence will prove to the court that not only have Donais and Hilliard been intentionally lying to the court but also that the entire motion to dismiss has been fraudulently presented with false evidence designed to frustrate and undermine the fair administration of justice.

23. However, there exists an impossible procedural situation where plaintiff possesses dispositive evidence but cannot submit it through any available means. The e-filing system cannot process audio files, and so the audio evidence cannot be submitted through the e-filing system due to technical limitations, creating a procedural dilemma requiring judicial guidance on submission protocols. The Court must clarify how such evidence should be submitted in person, and whether in-camera review is appropriate given the sensitive nature of the communications.

24. It should be noted that when plaintiff has attempted to submit physical materials by hand/in-person to the court, by coming to the courthouse, the courthouse clerk staff Alma turned plaintiff away, explaining that once signed up for e-filing, the Court does not accept conventional/in-person filings and all materials must be submitted electronically. This creates a Catch-22 where plaintiff must file everything electronically but cannot file critical evidence because the electronic system cannot process it. Hence, because the Court has previously rejected in-person filing attempts, and no alternative submission protocol exists, this creates a situation where plaintiff possesses dispositive evidence but

cannot present it under current procedural constraints. Interactive judicial guidance is necessary to establish workable submission procedures that allow this critical evidence to reach the Court.

25. The case management conference must address this crisis immediately. The audio evidence is central to the breach of fiduciary duty claim and provides impeachment evidence regarding defendant's submissions. Plaintiff cannot be forced to litigate "with both hands tied behind their backs" by being prevented from presenting evidence that establishes liability. The Court has an obligation to establish workable procedures for submitting evidence in formats the e-filing system cannot accommodate, particularly when such evidence is material to dispositive motions.

26. Moreover, the timing and sequencing of evidentiary submissions requires coordination. If the Court rules on defendant's motion to strike without first addressing plaintiff's counter-evidence and impeachment materials, plaintiff is forced to respond to undefined grounds while being denied the opportunity to present rebuttal evidence. This creates a procedural Catch-22 where plaintiff must simultaneously defend against dismissal arguments while being prevented from introducing the very evidence that defeats those arguments. The case management conference provides the appropriate forum for establishing orderly procedures that ensure both parties can present relevant evidence under clear, consistent rules.

27. Additionally, plaintiffs may need to file a protective order regarding the audio evidence as it contains privileged communications, but requires clarification on whether such a motion is necessary and what procedures apply. These evidentiary issues require judicial guidance that written motion practice alone cannot resolve or provide.

## VIII. COUNTER-EVIDENCE AND IMPEACHMENT MATERIAL COORDINATION

28. Defendant attached over 142 pages of exhibits to his motion to dismiss, including his 2017 affidavit and various third-party declarations. Plaintiff must file counter-affidavits and counter-evidence to rebut this material, but the procedural sequence creates fundamental unfairness. If the Court does not first address plaintiff's motion to strike the extraneous materials, plaintiffs face an impossible choice: file an objection addressing only pleading sufficiency while ignoring the extensive evidence defendant improperly introduced, or file counter-evidence and thereby capitulate to defendant's procedural violation.

29. This dilemma demonstrates why case management coordination is essential. The Court cannot reasonably expect plaintiffs to respond to the motion to dismiss without knowing what materials will be considered and what standard will apply. If the motion is converted to summary judgment, plaintiffs need discovery and time to develop counter-

evidence. If the materials are stricken, plaintiff's response focuses exclusively on pleading sufficiency. Attempting to prepare for both possibilities simultaneously within compressed deadlines while pro se, is fundamentally unfair and demonstrates the necessity for case management guidance.

## IX. SETTLED DEFENDANTS AND CASE CAPTION PROBLEMS

30. Twenty of the original twenty-one defendants have settled this case and executed confidential settlement agreements, yet they remain embedded in the e-filing system. This creates ongoing practical problems and confidentiality concerns that require judicial intervention. Every filing must navigate an e-filing system that lists all parties despite their settled status, unnecessarily creating confusion and risk that settled parties may receive service due to error.

31. Moreover, defendant has violated these settlement agreements by attaching materials from other proceedings that were subject to retraction, striking and/or sealing requirements. Specifically, the motion to dismiss filed by Donais and Terrell, in Nashua Circuit Court in 2017, contained material that was stricken in the circuit court in 2017, and was either sealed or had certain materials retracted pursuant to the settlement in 2022. Defendant nevertheless attached these materials to his current motion, including purported witness statements (including unsigned ones) about events that allegedly occurred but that never occurred (which statements are false), and which prejudicial statements were retracted or withdrawn by the settling defendants, and yet defendant continues to rely on them to muddy the record and to potentially inflame/prejudice the Court against plaintiffs.

32. The case management conference must address these settlement agreement violations (which settlement negotiations the defendant was involved in, and privy to, and agreed to, before he dropped out at the last minute) and establish procedures for ensuring defendant complies with or honors settlement privacy or retraction obligations/requirements. Plaintiffs cannot properly defend against these false allegations without violating the settlement terms that require confidentiality regarding stricken materials. This creates another impossible procedural situation requiring judicial resolution through interactive case management.

## X. AMENDMENT OF COMPLAINT COMPLICATIONS

33. Plaintiffs also seek to file a second amended complaint, or a supplemental complaint, to formally add defendant parties, add attendant claims, and clarify existing claims, and also correct scrivener errors in the amended complaint. However, multiple obstacles require case management coordination. The Court's arbitrary 25-page limitation for the amended complaint was overly restrictive and prevented plaintiff from adequately explaining claims against new parties with sufficient factual detail. Furthermore, plaintiff needs clarification on the timeline for amendment and

whether subsequent events occurring after the original complaint was filed is acceptable/allowed to be added. This issue was never resolved or clarified, even though plaintiffs raised them previously in the first motion to amend complaint, which was denied as moot.

34. Defendant also tied up this case for over three years with motions to dismiss on service issues and an appeal to the NH Supreme Court, during which time delay the statute of limitations ran on certain claims. This prevents plaintiff from filing a new complaint now incorporating subsequent events after the original complaint was filed, such as events later in 2020, and in 2021 or 2022, and forces plaintiff to seek amendment of the existing complaint to include these subsequent events, yet the procedural constraints make effective such amendment difficult or out-of-reach.

35. Furthermore, a case management conference will provide the necessary forum for establishing reasonable page limits, clarifying amendment timing, and coordinating amendment with pending dispositive motions.

## XI. PROCEDURAL CLARIFICATION REQUIREMENTS

36. Plaintiffs require comprehensive clarification on numerous procedural matters that arise repeatedly but remain unresolved through written filings. These include guidelines for pleading length, permitted attachments, and what constitutes necessary versus gratuitous supplementation. Defendant has continuously attached materials from other cases and other proceedings, forcing plaintiff to relitigate issues already resolved in other forums. When defendant cherry-picks materials from other cases to present without context, plaintiffs face the burden of explaining the full procedural history to prevent the Court from being misled.

37. Moreover, plaintiffs needs clarification on the Court's timing expectations regarding replies and sur-replies. The Court has previously ruled quickly after objections were filed, not allowing adequate time for replies, motions for leave to file sur-replies, motions for reconsideration, or cross-motions. This creates prejudice particularly for pro se litigants who cannot prepare responsive documents as quickly as represented counsel and need the full procedural opportunities to present their positions effectively.

38. The question of pro se accommodation requires judicial clarification. Will the Court apply liberal construction principles when interpreting plaintiff's filings, or will technical pleading requirements be enforced strictly? When are matters too late to raise or renew? What constitutes repetition versus legitimate renewed motions in changed circumstances? Can plaintiffs file ex parte motions unrelated to sealing, such as emergency extension requests? These

fundamental procedural questions cannot be resolved through continued motion practice but require direct judicial guidance establishing clear expectations.

## XII. INADEQUATE RESPONSE TIME FOR VOLUMINOUS SUBMISSIONS

39. Defendant exploits a significant procedural loophole by attaching hundreds of pages of materials to motions while plaintiffs receive compressed deadlines to respond. The recent motion to dismiss included 151 pages of motion with 142 pages of exhibits, yet plaintiffs initially received only a ten-day response period. While the Court granted an extension to twenty days total, this remains inadequate time for a pro se litigant to research, analyze, and respond to such voluminous submissions while simultaneously managing other pending motions and addressing the procedural complications defendant's violations create.

40. Represented counsel have resources, staff, and experience that enable rapid response to complex filings. Pro se litigants lack these advantages and require additional time to review materials, conduct legal research, draft responses, and ensure accuracy. The case management conference must address this disparity and establish response time guidelines that account for filing volume and pro se status to ensure meaningful opportunity to respond rather than perfunctory compliance with inadequate deadlines.

## XIII. ADA POLICY AND PROCEDURES REQUIRE COMPREHENSIVE RESOLUTION

41. The Court has not established clear ADA policies addressing fundamental questions that recur throughout this litigation. The Court has not established clear criteria for what qualifies for ADA accommodations, what documentation if any is required, how requests should be submitted to protect confidentiality, what timeline applies for rulings, whether denials can be reconsidered, and what appeal procedures exist for improper denials or confidentiality breaches, and whether administrative escalation to the Chief Justice is allowed to be pursued?

42. This lack of clarity creates ongoing violations as court staff make ad hoc decisions without consistent standards or adequate training. The case management conference provides the essential forum for establishing comprehensive ADA policies that comply with federal law while providing workable procedures for future requests.

43. These questions require comprehensive answers that provide a framework for future accommodation requests rather than continued ad hoc determinations.

44. Furthermore, plaintiffs seek clarification on whether the Court will hold an oral hearing to address ADA accommodations and disability needs. Even if not mandatory, can the Court exercise discretion to provide such a hearing given the ongoing issues that keep arising from lack of clarification? The pattern of ADA-related problems

demonstrates that written motion practice alone cannot resolve these systemic compliance issues. Federal disability rights law requires interactive process and meaningful dialogue, which case management conference provides.

45. Furthermore, the question of whether hearing accommodations will be provided requires immediate clarification. If the Court intends never to hold hearings in this case, that decision raises due process concerns particularly where disability accommodations include oral presentation opportunities. Alternatively, if hearings are available only when they would "assist the Court" rather than ensuring parties are heard, that standard conflicts with fundamental due process principles and ADA requirements. These policy questions require judicial clarification that written motion practice cannot provide.

46. Nancy's acknowledgment that she "does not know anything about the ADA in the court" epitomizes the training deficiencies requiring institutional reform. Court staff need comprehensive ADA training addressing confidentiality requirements, accommodation procedures, and federal law compliance obligations. The case management conference allows an opportunity for the Court to address these institutional deficiencies systematically rather than through reactive responses to individual violations, while demonstrating commitment to adhering to ADA requirements.

## XIV. HEARING CRITERIA AND DUE PROCESS CONCERNS

47. Plaintiffs requires clarification on the criteria for obtaining hearings on contested matters. Is it fair for the Court to proceed four years without holding hearings, including through four successive motions to dismiss after the initial hearing in April 2022? Will the Court never hold hearings on dispositive motions? Are hearings granted only when they will assist the Court, or does due process require hearings when parties request them to be heard?

48. These questions take on constitutional dimensions given plaintiff's pro se status and disability. The fundamental due process principle articulated in *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), that "the fundamental requisite of due process of law is the opportunity to be heard," requires more than written submissions when the complexity of issues and the parties' circumstances warrant oral presentation. Massachusetts Superior Court Rule 9A(c) establishes a presumptive right to hearing on motions to dismiss and summary judgment, recognizing that such dispositive matters warrant oral argument. While New Hampshire has not adopted identical rules, the underlying fairness principles apply with equal force.

49. Moreover, as a non-moving party defending against defendant's sixth motion to dismiss, plaintiff's due process interest in being heard is particularly strong. Plaintiffs did not bring these dispositive motions and should not be

forced to defend against them solely through written submissions when oral presentation would enable more effective advocacy. The pattern of denying hearing requests while systematically ruling in defendant's favor on contested issues creates an appearance of bias that undermines confidence in fair adjudication.

**XV. EXTENSION AND CONTINUANCE POLICIES REQUIRE CLARIFICATION**

50. Will the Court allow extensions and continuances in the future? Will such allowances apply equally to both parties, or will defendant continue receiving accommodation while plaintiff faces strict enforcement? What grounds constitute acceptable bases for extensions?

51. The Court needs to establish a standing order on extensions providing clear criteria & ensuring consistent application.

52. Additionally, the timing of rulings on extension requests creates prejudice when the Court does not rule until after the deadline passes. Sometimes court staff do not publish orders on the same day they are issued but delay one or two days. What should plaintiff do in such instances? Will the Court allow at least a short grace period if a requested extension is denied (and/or order is docketed) after the deadline has passed, through no fault of plaintiff?

53. Emergency extension requests require particular attention. Will they be ruled on immediately, or will the Court await objections and replies before deciding? Plaintiffs needs clarity to avoid confusion, anxiety, and stress while ensuring an orderly process rather than arbitrary, haphazard procedures.

54. Also, how will scheduling conflicts and continuances be handled? Defendant previously raised scheduling conflicts and received accommodation; will plaintiffs receive the same consideration?

**XVI. PAGE LIMIT EXCEPTIONS AND ENLARGEMENT STANDARDS**

55. What grounds justify exceeding page limits? Will the Court ever allow such requests? The arbitrary 25-page limitation for the amended complaint proved overly restrictive and impeded plaintiff's ability to add parties and explain attendant claims adequately. When plaintiffs have legitimate need for additional space to present complex claims or respond to voluminous submissions, the Court must have clear standards for evaluating enlargement requests rather than categorical denials that prevent effective advocacy.

**XVII. STRUCTURAL INEQUITIES AND SYSTEMIC BARRIERS**

56. Multiple structural inequities built into the current case posture systematically disadvantage plaintiffs and require judicial intervention to remedy. These include but are not limited to the following:

   a. Plaintiffs cannot be heard in oral hearings despite repeated requests.

   b. Plaintiffs cannot file an amended complaint exceeding 25 pages despite the need to add parties and claims.

c. Plaintiffs could not amend the complaint for over three years to add subsequent events or clarify existing claims while defendant tied up the case with service issues and appeals during which statutes of limitations ran.

d. The Court enforces rigid technical requirements against plaintiffs while applying lax standards to the defendant.

e. Defendant freely files extraneous materials yet plaintiffs are impeded in presenting counter-evidence.

f. Defendant submits his 2017 affidavit as evidence while simultaneously seeking to avoid any discovery regarding that affidavit's content and accuracy.

g. Defendant constantly attacks plaintiff in public filings responding to sealed ADA motions while plaintiff cannot defend publicly because the underlying motions and court orders are sealed.

57. These structural inequities demonstrate systematic disadvantaging that requires comprehensive case management intervention. The cumulative effect of these barriers creates a litigation environment where represented counsel enjoys procedural advantages while pro se litigant faces obstacle after obstacle preventing effective case prosecution.

58. This imbalance violates basic fairness principles requiring judicial correction through case management conference.

## XVIII. DEFENDANT'S RULE VIOLATIONS REQUIRE JUDICIAL ATTENTION

59. Defendant has violated multiple court rules and professional conduct standards without consequence, creating a perception that rules apply only to plaintiffs while defendant enjoys immunity.

60. Specific violations include but are not limited to the following:

a. Defendant files pleadings with the sole intent to embarrass, scandalize, annoy, and burden plaintiffs; asserting facts in pleadings without supporting affidavits; failing to file notice of intent to reply to objections; publicly disclosing sealed court orders; and refusing to provide replies under seal when required.

b. Defendant also files repetitive attacks and engages in gratuitous unnecessary filings including repeatedly going back to plaintiff's requests already ruled on/granted by the Court.

c. Defendant also engages in petty, unbecoming conduct inappropriate for a member of the bar.

d. Defendant lied to the Court about his involvement in settlement negotiations with plaintiffs/Hilton defendants.

e. Defendant amends his objections through reply briefs that effectively seek extensions while simultaneously arguing plaintiffs should not be allowed sur-replies to address these new arguments.

61. The case management conference must address these pattern violations and establish consequences for continued non-compliance. When one party repeatedly violates procedural requirements without sanction while the other party

faces strict enforcement, the appearance of preferential treatment undermines the integrity of the proceedings and creates legitimate concerns about impartial adjudication.

## XIX. DISQUALIFICATION OF OPPOSING COUNSEL

62. Plaintiff intends to file a motion for disqualification of Russell Hilliard as defense counsel because Hilliard is a named defendant in the related case, has been referenced in the amended complaint and will be formally added as a party to this case via second amendment, and is a critical witness regarding events at issue. These conflicts of interest create ethical problems that require resolution before proceeding further. The case management conference provides an appropriate forum for addressing these disqualification issues and establishing procedures for transitioning representation if disqualification is granted. The plaintiffs previously filed a motion to disqualify Hilliard in 2022, but it was denied without prejudice by the court, to re-filing at a later time as necessary. Now is that later time as necessary given the current posture of the case. A case management conference is needed to address this issue including timing.

## XX. BIAS AND APPEARANCE OF BIAS CONCERNS

63. Multiple factors create an appearance of bias that requires judicial attention to restore confidence in fair adjudication including but not limited to the following:

   a. The Court imposes rigid pleading requirements on plaintiffs while overlooking defendant's procedural violations.

   b. The Court enforces strict time requirements against plaintiffs while granting defendant waivers, extensions, etc.

   c. The Court issues one-sided warnings to plaintiffs while remaining silent about defendant's questionable conduct.

   d. The Court is a co-defendant in the related case, creating potential institutional bias concerns.

   e. Disparate treatment compared to other cases suggests overcompensation to avoid appearance of favoritism that ironically creates opposite appearance of bias against plaintiffs.

   f. How will the Court weigh conflicting facts and resolve credibility disputes? Will defendant and his counsel receive the benefit of the doubt based on their standing in the New Hampshire legal community while plaintiff's testimony is subjected to heightened skepticism?

64. Research demonstrates that pro se litigants, particularly litigants of color, face systematic bias in judicial proceedings. *See* Anna E. Carpenter et al., *Studying the "New" Civil Judges*, 2018 Wis. L. Rev. 249, 251 (documenting bias against unrepresented parties). The pattern of decisions in this case raises legitimate questions whether such bias is affecting outcomes. The documented pattern of decisions warrants inquiry into whether implicit bias affects case management and substantive rulings.

65. The case management conference provides an opportunity to address these concerns directly, establish clear procedural expectations that will be applied consistently, and demonstrate commitment to equal justice regardless of representation status or racial identity. Procedural fairness is essential to substantive justice, and the comprehensive problems documented herein demonstrate why case management intervention is not merely appropriate but essential to restoring confidence in fair adjudication.

## XXI. ADDITIONAL MOTIONS REQUIRING COORDINATION

66. Multiple additional motions require filing and coordination with pending matters, further demonstrating the necessity for case management conference. These include:

a. Motion to supplement the objection to the motion to dismiss,

b. Motion for subpoenas to obtain evidence from third parties including Dave Akridge, Karl Terrell, Robert Obrien, the Crimeline Board, and local police,

c. Motion to protect audio evidence,

d. Motion to seal or redact the Nashua circuit court motion to dismiss attachments (which defendant should have done himself) as well as to seal filings by the defendant that contain sealed orders, etc.

e. Motion for evidentiary hearing,

f. Motion to add parties and further amend the complaint,

g. Motion for interlocutory appeal particularly regarding ADA rulings, and

h. [Potential] motion for appointment of counsel (given plaintiff's ADA issues and complexity of the proceedings).

67. These motions represent legitimate procedural needs arising from the complexity of the case and/or defendant's conduct, each of which addresses specific procedural problems that impede effective case prosecution. A case management conference allows for potential elimination of the need to file some of these motions via real-time clarification/input, or otherwise to establish appropriate sequencing and ensure orderly progression rather than continued reactive piecemeal motion practice.

## XXII. DEFENDANT'S OBJECTION IGNORES THE DOCUMENTED PROBLEMS

68. Defendant's cursory objection asserts that "nothing has changed" since prior case management requests and that the motion lacks merit. This characterization ignores the extensive documentation of ongoing harm/violations, systemic barriers, and procedural dysfunction detailed in the motion and further elaborated in this reply. The claim that nothing has changed is demonstrably false given the intensification of ADA violations, the continued ex parte

communications, the procedural crisis regarding audio evidence submission, the settlement agreement violations, and the mounting evidence of systematic disadvantaging of plaintiffs.

69. Defendant's opposition to case management conference reveals a preference for continued procedural chaos that advantages his client, over orderly administration that would ensure equal access/fair procedures. The absence of any substantive engagement with specific problems identified demonstrates that defendant can't refute the necessity for judicial intervention but prefers to continue exploiting systemic advantages the current dysfunction provides.

## XXIII. CONCLUSION

70. The comprehensive nature of the case management issues detailed in this reply, combined with those articulated in the original motion, establishes overwhelming necessity for an urgent case management conference. These are not abstract procedural complaints but concrete, documented problems that prevent meaningful case prosecution and create ongoing harm/violations. Defendant's assertion that a hearing is unnecessary "at this stage" ignores that this case has been pending for almost four years since service of process, has generated hundreds of filings, but yet has not progressed beyond the motion to dismiss stage due to procedural dysfunction this motion seeks to address.

71. The Court cannot resolve these multifaceted, interrelated problems through continued written motion practice alone. Interactive judicial guidance through case management conference is essential to establish clear procedural expectations, address institutional compliance failures, ensure constitutional rights are protected, and create orderly case progression. Procedural fairness is not a luxury or convenience but a fundamental requirement of due process and equal justice. The documented pattern of problems warrants immediate judicial intervention through the case management conference plaintiff requests.

72. The severity and scope of the documented problems require comprehensive judicial intervention that only case management conference can provide. Further delay perpetuates ongoing constitutional violations and systematic procedural unfairness that undermine confidence in the administration of justice.

73. The situation described herein cries out for relief. It would be unmistakably unfair or unjust to ignore the plaintiff's pleas. If the court has really listened to the plaintiff, regardless of how in-artful he may have been as a non-lawyer, it should be evident that a case management hearing is more than needed at this juncture.

**74. WHEREFORE** Plaintiff respectfully requests that this Court:

a. Overrule defendant's objection in its entirety;

b. Grant plaintiff's motion for case management hearing;

c. Schedule said hearing at the earliest possible date;

d. Address all case management issues identified in plaintiff's motion and this reply;

e. Establish clear written procedures addressing ADA compliance, e-filing protocols, audio evidence submission, amendment procedures, hearing and extension criteria, and other procedural matters requiring clarification;

f. Grant such other relief as justice requires under these circumstances.

Respectfully submitted,
/s/ Andre Bisasor
Andre Bisasor

Date: October 14, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that a copy was served via the Court's e-filing system to the Defendant.

/s/ Andre Bisasor
Andre Bisasor

# Exhibit 7

Filed
File Date: 10/30/2025 9:45 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**REPLY TO DEFENDANT CRAIG DONAIS'S OBJECTION TO PLAINTIFF'S RENEWED MOTION TO CONSOLIDATE CASES AND REQUEST FOR HEARING AND STAY**

1. Andre Bisasor respectfully submits this reply to Defendant Craig Donais's objection to the renewed motion to consolidate cases pursuant to Superior Court Rule 12, and in support states as follows:

**A. Introduction**

2. Defendant Donais's objection rests entirely on a misapplication of the standard governing renewed motions. The objection asserts that "nothing material has changed since the initial denials" and therefore this motion should be denied. This argument fundamentally misunderstands both the nature of consolidation motions and the circumstances warranting their renewal. Moreover, the objection's request for attorney fees is wholly unwarranted and lacks any legal or factual basis.

**B. The Changed Circumstances Standard**

3. Donais argues that because this is a "renewed request," it must be denied absent material changes since the initial denial. This position conflates the standard for successive applications before administrative boards with the proper analysis for consolidation motions in civil litigation. The New Hampshire Supreme Court has recognized that in the zoning context, a board having rejected one application need not review subsequent applications absent material changes in circumstances. See Fisher v. Dover, 120 N.H. 187 (1980). However, that doctrine applies to administrative variance applications where a board has rendered a final decision on the merits after a full hearing.

4. The situation here differs fundamentally. Consolidation under Superior Court Rule 12 serves judicial economy and efficiency; it is not a substantive determination of rights but rather a procedural tool for case management. Federal courts applying Federal Rule of Civil Procedure 42(a), which mirrors state consolidation practice, have broad discretion to consolidate cases involving common questions of law or fact to avoid unnecessary cost or delay. Seguro de Servicio de Salud de P.R. v. McAuto Sys. Grp., Inc., 878 F.2d 5, 8 (1st Cir. 1989). Courts weigh the convenience or inconvenience to the parties, the judicial economy, the savings in time, effort or expense and any confusion, delay or prejudice that might result from consolidation.

5. The pendency of multiple dispositive motions in related cases creates precisely the type of circumstance warranting consolidation. When cases involve common parties, common facts, and overlapping legal issues,

consolidation prevents the waste of judicial resources that would result from deciding identical or substantially similar issues multiple times. Consolidation is allowed "by the practice of the court for its convenience, and the saving of time and expense to the parties." See Hall v. Hall, 138 S. Ct. 1118 (2018) (recognizing that consolidation preserves judicial efficiency while maintaining the independent character of consolidated cases).

**C. Material Changes Have Indeed Occurred**

6. Contrary to Donais's assertion, material changes have occurred that warrant renewed consideration of consolidation. The procedural posture of the related cases has evolved significantly since any prior motion. Dispositive motions are now pending that present common questions of law and fact across multiple cases. Deciding these motions separately risks inconsistent rulings on identical issues, wasting judicial resources, and creating confusion for all parties.

7. Furthermore, the Court's inherent authority to manage its docket includes the power to revisit case management decisions when circumstances demonstrate that consolidation would serve judicial economy. A trial court's "power to reconsider its own decisions during the pendency of a case is firmly rooted in the common law." Commonwealth v. Pagan, 73 Mass. App. Ct. 369, 375 (2008) (interpreting similar procedural rules). New Hampshire courts similarly recognize this inherent authority.

8. The progression of litigation naturally creates new circumstances. Discovery developments, the filing of dispositive motions, and the Court's developing understanding of the cases all constitute changes in the litigation landscape. Hence, the mere fact that a consolidation motion was previously filed does not bar renewed consideration when the circumstances demonstrate that consolidation would advance the interests of justice and judicial economy.

**D. Consolidation Serves the Interests of Justice**

9. The fundamental purpose of consolidation is to promote efficiency and avoid duplicative proceedings. Where multiple cases involve common questions of law or fact, consolidation can eliminate redundant proceedings, such as repeated depositions of the same witnesses or duplicative expert analyses, which not only accelerates the timeline toward resolution but also minimizes the financial burden on litigants. Tower Cranes v. Public Serv. of New Hampshire, 702 F. Supp. 371 (D.N.H. 1988).

10. Courts have broad discretion to consolidate cases with common questions of law and fact. United States v. Mottolo, 605 F. Supp. 898, 911 (D.N.H.1985).

11. Donais offers no substantive argument against consolidation on the merits. The objection does not contend that the cases lack common questions of law or fact, that consolidation would cause prejudice, or that separate proceedings would be more efficient. Instead, Donais relies solely on the procedural argument that this is a "renewed request." This formalistic approach ignores the substance of what consolidation would accomplish.

12. The request to stay dispositive motions pending consolidation similarly serves judicial economy. If the Court grants consolidation, separate briefing and argument on identical issues in multiple cases would be wasteful and potentially contradictory. See Fed. R. Civ. P. 42(a)(3) (authorizing courts to "issue any other orders to avoid unnecessary cost or delay"); cf. cases recognizing that staying proceedings pending consolidation decisions promotes efficiency and prevents duplicative work.

**E. The Request for Attorney Fees Is Wholly Unwarranted**

13. Donais's suggestion that the Court should "consider an award of fees" because this motion is allegedly "repetitive and frivolous" lacks any legal or factual foundation. New Hampshire law permits fee awards for frivolous litigation only in limited circumstances. RSA 507:15 authorizes fees where "it clearly appears to the court that the action or any defense is frivolous or intended to harass or intimidate the prevailing party." Similarly, Rule 59 permits fee awards for frivolous or unreasonable motions brought in bad faith.

14. This motion satisfies neither standard. A motion seeking consolidation of related cases involving common questions of law and fact is neither frivolous nor brought in bad faith. Courts regularly entertain consolidation motions, and the decision whether to consolidate lies within the trial court's broad discretion. See Mottolo, 605 F. Supp. at 911. The fact that a party seeks consolidation, even if previously denied, does not render the request frivolous, particularly where circumstances have evolved and the motion serves legitimate purposes of judicial economy.

15. Donais cites no authority suggesting that renewed motions for consolidation constitute sanctionable conduct. The objection's fee request appears designed to chill the exercise of legitimate procedural rights rather than to vindicate any genuine grievance. Courts have recognized that "the bar that the moving party must clear to recover an award under § 6F is a very high one" and requires showing both that claims were frivolous "and

that they were not advanced in good faith; in other words that the party acted with an actual intention to harass or increase the costs of the litigation." The present motion meets none of these criteria.

16. Indeed, if any fee request were appropriate here, it would be against Donais for filing a three-paragraph objection that offers no substantive opposition to consolidation but instead seeks to burden the opposing party with baseless fee threats. However, litigation is better served by focusing on the merits rather than engaging in fee disputes over routine procedural motions.

17. Furthermore, it is improper to combine a motion for attorney fees into an objection. See Rule 7(g)("Objections to pending motions and affirmative motions for relief shall not be combined in one filing".). This continual intentional violation of the rules (he has done this in every objection filed recently) supports some kind of sanctions or warning to the defendant, especially when done to be oppressive.

## F. Conclusion

18. Consolidation of related cases serves fundamental interests in judicial economy, consistency, and fairness. The Court possesses broad discretion to consolidate cases involving common questions of law or fact, and that discretion extends to granting consolidation even where a prior motion was denied if circumstances warrant renewed consideration. The progression of these cases, the pendency of dispositive motions presenting common issues, and the manifest inefficiency of deciding identical questions multiple times all support consolidation.

19. Donais's objection offers no substantive reason why consolidation would be inappropriate, prejudicial, or inefficient. The objection rests entirely on the formalistic argument that this is a "renewed request" and the unfounded suggestion that fee sanctions might be appropriate. Neither argument withstands scrutiny.

20. Accordingly, the Court should deny Donais's objection, grant the motion to consolidate, and stay decision on dispositive motions pending consolidation.

Respectfully submitted,
/s/ Andre Bisasor
Andre Bisasor

Date: October 28, 2025

## CERTIFICATE OF SERVICE

I hereby certify that a copy was served via the Court's e-filing system to the Defendant.

/s/ Andre Bisasor
Andre Bisasor

# <u>Exhibit 8</u>

Filed
File Date: 10/6/2025 8:31 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**[CORRECTED] PLAINTIFFS' [EMERGENCY] MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY**

1. Plaintiffs move for partial summary judgment on the breach of fiduciary count of the amended complaint, seeking judgment as a matter of law that Craig Donais ("Donais") breached his fiduciary duty to plaintiffs arising from the prospective attorney-client relationship established in the direct 1-9-17 consultation (and indirect 1-5-17 consultation).

## I. INTRODUCTION

2. This motion seeks partial summary judgment on a narrow issue: whether Donais breached fiduciary duties owed to plaintiffs as prospective clients by disclosing confidential information from their consultation to unauthorized 3rd parties. Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Undisputed facts establish all elements necessary for claim liability as a matter of law.

## II. STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

3. Below are uncontroverted facts established by Donais own admissions/court records, etc with no genuine issue for trial.

### A. Establishment of Prospective Attorney-Client Relationship

4. On 1-6-17, plaintiff Andre Bisasor left a voicemail for defendant Donais seeking legal representation regarding a landlord-tenant dispute with Homewood Suites. On 1-9-17, Donais returned Bisasor's call and engaged in a 7-minute telephone consultation. Donais admits this consultation occurred and lasted approx. 7 minutes. During this consultation, Bisasor disclosed confidential information about plaintiffs' claims against Homewood Suites, the allegations of disparate treatment, and the urgent legal predicament. This consultation was conducted with mutual understanding that it was for the purpose of evaluating potential legal representation and was subject to attorney-client confidentiality.

### B. Judicial Recognition of Attorney-Client Relationship

5. On 1-18-17, in the Nashua District Court case involving plaintiffs and Homewood Suites, during a hearing, Judge Paul Moore found that an attorney-client relationship [and thus fiduciary duty] existed between Donais and plaintiffs based on the 1-9-17 consultation. As a direct result of this finding, Donais was required to withdraw from representing Homewood Suites due to conflict of interest created by his prior consultation with plaintiffs. That Donais withdrew as a result Judge Moore's finding and guidance in the 1-18-17 hearing, is undisputed. NB: This also included indirect consultation with Plaintiff Natalie Anderson through Attorney Robert Obrien. See attached for further on this point.

### C. Subsequent Breaches of Confidentiality

6. Despite the confidential nature of the 1-9-17 consultation, Donais subsequently disclosed information obtained during that consultation to multiple third parties without plaintiff's consent, including his wife Mary Donais, his sons Garrett and Aiden Donais, members of the Manchester Crime Line Board, and other family members and colleagues.

7. These disclosures occurred well outside of any possible litigation context. The disclosures were made for purposes of harming plaintiff's reputation and protecting Donais's own interests rather than for any legitimate legal purpose.

8. Further, prior to being hired by Homewood Suites, Donais disclosed confidential information from the 1-9-17 call to Homewood Suites' principals and agents. He did so without obtaining consent from the plaintiffs. This is undisputed. Donais was not required to disclose, and should not have disclosed, this information to them as unauthorized third parties. Donais' desire to represent Homewood Suites does not relieve him of his fiduciary duty to the plaintiffs to protect the confidentiality of the 1-9-17 consultation with him. There is no way around this hard cold fact. Donais has admitted to this unauthorized disclosure to them, prior to being hired by them. See also attached memorandum/exhibits.

**D. Fabricated Allegations**

9. Furthermore, in connection with these disclosures, Donais fabricated false allegations that Bisasor had accused him of racial discrimination during the 1-9-17 consultation. These fabricated allegations were designed to portray Bisasor as an unreasonable person, who makes frivolous accusations of racism, on a whim and without any logical reason or evidence, thereby damaging Bisasor's reputation/credibility, but also breaching the fiduciary duty owed to him.

## III. SUMMARY OF ARGUMENT

### A. Fiduciary Relationship Established as Matter of Law

10. Under NH law and NH Rule of Professional Conduct 1.18, prospective clients are entitled to the same confidentiality protections as actual clients. Rule 1.18 explicitly states: "*a person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client*" and that "*a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information*."

11. The 1-91-17 consultation unquestionably created a prospective attorney-client relationship. Bisasor contacted Donais seeking legal advice, Donais engaged in a substantive consultation lasting 7 minutes, and confidential information was disclosed for the purpose of evaluating potential representation. Judge Paul Moore's finding that an attorney-client relationship existed confirms this conclusion as a matter of law. The existence of this fiduciary relationship cannot be disputed by defendant. His own affidavit acknowledges the consultation occurred, and his withdrawal from Homewood representation demonstrates his recognition of the ethical obligations created by that consultation.

### B. Breach of Fiduciary Duty Established Without Dispute

12. The elements of breach of fiduciary duty are: (1) existence of a fiduciary relationship, (2) breach of duty arising from that relationship, (3) causation, and (4) damages. Each element is established without genuine dispute.

13. First, the fiduciary relationship exists as established above. Second, Donais breached this duty by disclosing confidential information to unauthorized third parties for improper purposes. The duty of confidentiality owed to prospective clients is absolute and continues indefinitely. Donais disclosed consultation information to family members and colleagues without any legitimate justification. Third, causation is established by the direct connection between Donais's disclosures and harm to plaintiffs' reputation and case. Donais further used confidential information as the foundation for fabricated allegations designed to damage plaintiffs' credibility. Fourth, damages are established through reputational harm, emotional distress, and other injuries flowing from these breaches. See attached memorandum, affidavits & exhibits.

**C. No Legitimate Defense Exists**

14. NH Prof. Conduct Rule 1.6(b)(3) permits disclosure only "to defend claims regarding [the lawyer's] conduct," but this exception does not authorize wholesale disclosure to unauthorized 3rd parties including to adverse parties in order to be hired by said adverse parties, nor to family members, colleagues, and community organizations for purposes of damaging a former client's reputation. Donais cannot claim any legitimate defense for disclosures to private parties that occurred years after litigation concluded. Moreover, even if Donais were permitted to defend against specific claims in this instance, he cannot fabricate false allegations or disclose confidential information beyond what is necessary for such defense. His conduct far exceeded any legitimate defensive purpose and was designed to inflict harm.

**D. Undisputed Facts Compel Judgment**

15. The critical facts establishing liability are undisputed: the consultation occurred, confidential information was disclosed, Donais subsequently revealed that information to unauthorized 3rd parties, and the disclosures were improperly made. Donais cannot genuinely dispute these facts because they're established by his own admissions, court records, and objective evidence. The only remaining question concerns scope of damages, which is properly reserved for trial or subsequent proceedings. The threshold liability issue should be resolved as a matter of law based on undisputed record.

**IV. CONCLUSION**

16. This motion is accompanied by affidavits in support, a supporting memorandum of law and a record of exhibits, and statement of material facts. The undisputed facts establish defendant's breach of fiduciary duty as a matter of law. Judge Paul Moore's finding of an attorney-client relationship, combined with defendant's own admissions regarding the consultation and subsequent disclosures, eliminate any genuine factual dispute regarding liability. Partial summary judgment will narrow the issues for trial and serve judicial efficiency by resolving this clear-cut claim of misconduct.

17. WHEREFORE, plaintiffs respectfully request that this Court grant partial summary judgment on Count 6 of the amended complaint, finding defendant liable for breach of fiduciary duty as a matter of law. See also the attached.

Respectfully submitted[1],
/s/ Natalie Anderson
NATALIE ANDERSON

/s/ Andre Bisasor
Date: October 6, 2025 ANDRE BISASOR

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

[1] NB: This is submitted as a corrected version of the prior submission of this motion, which is now hereby being submitted by both plaintiffs ( and is also done prior to a response by the defendant). This also is now accompanied by a memorandum of law, affidavits in support and exhibits, which points, facts and arguments are fully incorporated herein as if fully stated herein. As it is a dispositive motion, Plaintiffs request hearing on the motion and also that it is heard/decided at the same time as any other dispositive motion including defendants' motion to dismiss amended complaint.

Filed
File Date: 10/6/2025 8:31 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM**

1. Plaintiffs submit this memorandum for motion for partial summary judgment on the breach of fiduciary duty claim.

2. This partial summary judgment motion addresses breaches of fiduciary duty arising from Craig Donais ("Donais") 1-9-17 consultation with Andre Bisasor ("Bisasor"), and Natalie Anderson's ("Anderson") 1-5-17 consultation with Donais through Robert Obrien, and other undisputed facts that establish a prospective attorney-client relationship, such as Judge Paul Moore's finding of a conflict, requiring Donais's withdrawal from representing Homewood Suites, and breach of confidentiality to unauthorized 3rd parties. The accompanying 3 affidavits and exhibits are fully incorporated herein.

---

## SECTION I: LEGAL STANDARDS

---

### I. SUMMARY JUDGMENT STANDARD

3. Under NH RSA 491:8-a, summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The court views evidence in light most favorable to the non-moving party, but where the material facts are undisputed, legal conclusions flowing from those facts present questions of law appropriate for summary judgment. The NH Supreme Court has held that summary judgment serves the purpose of determining whether genuine factual disputes exist and applying law to undisputed facts.

4. Once the moving party has established the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion.

5. New Hampshire RSA 491:8-a explicitly authorizes partial summary judgment, stating that "A party seeking to recover upon a claim, counterclaim, or crossclaim, or to obtain a declaratory judgment, may, at any time after the defendant has appeared, move for summary judgment in his favor upon all or **any part thereof**." The phrase "any part thereof" establishes clear statutory authority for partial summary judgment on individual claims or issues within a case.

6. The New Hampshire Supreme Court regularly approves partial summary judgment motions when appropriate legal standards are met. In Loeffler v. Bernier, No. 2019-0107 (N.H. 2020), the court affirmed superior court orders "granting partial summary judgment to plaintiff," finding no reversible error in the partial resolution approach, demonstrating standard acceptance of this procedural mechanism for narrowing multi-claim disputes.

7. The NH Supreme Court has thus confirmed that trial courts possess authority under RSA 491:8-a to grant partial summary judgment, indicating partial resolution serves judicial efficiency by determining clear legal issues without

requiring full trials on every aspect of multi-faceted cases. Hence, when undisputed facts establish liability on specific claims, partial summary judgment eliminates unnecessary litigation costs while preserving the remaining disputed issues. This approach particularly benefits certain cases involving clear legal standards applied to uncontested facts.

## II. INTRODUCTION

8. This motion seeks partial summary judgment on the breach of fiduciary duty count that asserts that Donais and his law firm owed a fiduciary duty to Plaintiffs as prospective client, including confidentiality, loyalty, and the obligation to act in good faith, which was breached through multiple egregious acts.

9. As a prospective client, Bisasor shared confidential information with Donais during a 1-9-17 consultation. The facts establish that this was a confidential, substantive discussion about legal issues involving the Hilton Hotels/Homewood Suites defendants. The facts clearly demonstrate that Bisasor reasonably believed he was engaging in a confidential discussion, on behalf of himself and his spouse. Bisasor was thus entitled to confidentiality and loyalty. Donais, knowing this, had a duty to maintain confidentiality and act in Plaintiff's best interests. Instead, Donais breached confidentiality obligations owed to Plaintiff as prospective client by disclosing privileged information to harm Plaintiff's interests. Donais used his position of client trust to maliciously fabricate false allegations, with the intent to defame, intimidate, and retaliate against Plaintiffs. Donais weaponized this confidential discussion and turned it into a defamatory campaign. Donais's conduct violated that trust, breaching his fiduciary obligation. Donais divulged confidential information to third parties, his wife, son, family members and community members, colleagues, and others, without Plaintiff's consent, breaching his fiduciary obligation. These acts constitute a clear breach of fiduciary duty, which under NH law, includes the obligation not to disclose confidential information or use it for personal or third-party advantage. Further, Donais' repeated disclosures of the confidential discussion, especially where he manufactured false statements and disclosed them to 3rd parties, under the pretext that it was disclosed to him in a client call, shows a pattern of breach that is sufficiently egregious to sustain a cause of action. By disclosing privileged information and exploiting it for self-protection, Donais breached that duty, proximately causing reputational and economic loss. Plaintiff's damages include reputational harm, emotional distress, and economic loss, directly caused by the breaches.

## III. LAW REGARDING FIDUCIARY DUTIES TO PROSPECTIVE CLIENTS

### A. NH Rules of Professional Conduct 1:18

10. NH Rule 1.18(a) states: "*a person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client*." Rule 1.18(b) requires that "*a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information except as Rule 1.9 would permit with respect to information of a former client*."

11. Rule 1.18 of the NH Rules of Professional Conduct for Lawyers further states:

> Rule 1.18. Duties to Prospective Client
> (a) A **person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.**
> (b) **Even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information** except as Rule 1.9 would permit with respect to information of a former client.
> (c) **A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received and reviewed information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).**
>
> Ethics Committee Comment:
> 1. The New Hampshire rule expands upon the ABA Model Rule in one area. **The ABA Model Rule 1.18(a) defines a prospective client as one who "consults" with a lawyer about possible representation; the New Hampshire Rule defines prospective client as one who "provides information to a lawyer" about possible representation**. ABA Model Rule 1.18(b) establishes a general rule for protection of information "learned" by a lawyer from a prospective client; the New Hampshire Rule clarifies **the scope of the protection so that it applies to information "received and reviewed" by a lawyer from a prospective client.**
>
> In its version of Rule 1.18, New Hampshire's rule eliminates the terminology of "consultation" and learning and extends **the protections of the rule to persons who, in a good faith search for representation, provide information unilaterally to a lawyer who subsequently receives and reviews the information. This change recognizes that persons frequently initiate contact with an attorney in writing, by e-mail, or in other unilateral forms, and in the process disclose confidential information that warrants protection. This change further recognizes that receipt and review are likely to be more objective standards than learning.**

12. Rule 1.18 is clear that prospective clients are protected by attorney-client privilege and that there is a duty to prospective clients owed by attorneys who consult with them. The NH version of Rule 1.18 is broader than the ABA Model Rule, extending protection to persons who "provide information to a lawyer" rather than limiting it to formal consultations. This expansion recognizes that confidential information warrants protection regardless of the formality of initial contact.

13. Courts have held that fiduciary duties arise when attorneys receive confidential information from prospective clients. The fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result. Thus, fiduciary duty arises when an attorney receives confidential information, even if formal engagement doesn't occur, provided the client reasonably believes the attorney is acting in a professional capacity and the communication is confidential. Such fiduciary duties extend to prospective clients especially where confidential information was shared/relied on in good faith. Hence, under NH law, a prospective attorney-client relationship creates fiduciary obligations of confidentiality, loyalty & good faith.

14. The New Hampshire Rules of Evidence provides the definition of a client:

> A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him. [New Hampshire Rules of Evidence, Rule 502(a)(1).]

15. NH Rules of Evidence, Rule 502(a)(1) establishes that communications from a prospective client are protected by attorney-client privilege, even though the attorney has not yet formalized (or never formalizes) a representative relationship with the individual. One will be deemed a "client" for purposes of applying attorney-client privilege upon consulting a lawyer "with a view to obtaining professional legal services from [a lawyer]." See also McCabe v. Arcidy, 138 N.H. 20, 25, 635 A.2d 446, 449 (1993) ("[A]n attorney-client relationship 'is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.'").

16. New Hampshire has held that an attorney may not disclose the contents or condition of pre-existing documents delivered to the attorney by the client. See Brown v. Payson, 6 N.H. 443, 448, 1833 WL 1321 (1833) ("The situation and contents of a paper, delivered to an attorney for inspection, in the course of employment as attorney, is as much a matter of professional confidence as an oral statement of its contents or condition can be...An attorney is not at liberty to disclose what is communicated confidentially by a client.").

17. New Hampshire generally provides that once the attorney-client privilege attaches to confidential communications, the privilege survives termination of the attorney-client relationship, or the death of the client. See McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) ("communications made during the course of legal representation…are confidential and permanently protected from disclosure."); Stevens v. Thurston, 112 N.H. 118, 289 A.2d 398, 399 (1972) ("the privilege continues after the death of the client"). The perpetual effectiveness of the privilege's protections is recognized by Rule 502(c), which provides the privilege may be claimed on behalf a client, even if that client has passed.

18. "Even after termination of the attorney-client relationship, a lawyer remains bound" to preserve the former client's confidences and secrets. Bays v. Theran, 418 Mass. 685, 691 (1994). "(W]hen an attorney has ceased to represent a client, a conflict of interest may arise in representing a new client because of the attorney's continuing duty to preserve a former client's confidences." Adoption of Erica, 426 Mass. 55, 60 (1997). See also Bartle v. Berry, 80 Mass. App.Ct. 372, 385 (2011) (an attorney's fiduciary duty continues even after termination of the attorney-client relationship).

**B. Definition of Confidential Information**

19. The New Hampshire Rules of Evidence defines a confidential [1]communication as follows:

[1] A "confidence" has also been defined by other courts, as "information protected by attorney-client privilege under applicable law", and a "secret" as "information gained in the professional relationship that the client requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." (McKinney Supp. 1991).

(5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication. [New Hampshire Rule of Evidence, Rule 502(a)(5).]

20. Where legal advice of any kind is sought from a lawyer in his capacity as such, the communications relating to that purpose, made in confidence by the client, are permanently protected from disclosure by the client or by the lawyer unless the protection is waived by the client or his legal representatives. See Riddle Spring Realty Co. v. State, 107 N.H. 271, 220 A.2d 751, 755 (1966) (citing 8 Wigmore, Evidence, §§ 2292, 2327–29 (McNaughton rev. 1961)).

21. The attorney-client privilege is applicable in New Hampshire only when the client has consulted the attorney for the purpose of obtaining legal advice or assistance. State v. Gordon, 141 N.H. 703, 706, 692 A.2d 505, 507 (1997).

22. See also State v. Elwell, 132 N.H. 599, 567 A.2d 1002, 1005 (1989) ("Under the attorney-client privilege, a communications made in confidence in the course of obtaining legal advice from a professional legal advisor are protected from disclosure."). See also Professional Fire Fighters of New Hampshire v. New Hampshire Local Government Center, 163 N.H. 613, 44 A.3d 542, 544 (2012).

23. Thus, for the privilege to apply, the client must intend the communications to be kept confidential at the time the communications were made. New Hampshire courts will determine the intent of the client by examination of the circumstances in which the communications were made. For example, if the communications are made in the presence of a third party, the court will infer that the client did not have the intent of confidentiality. State v. Melvin, 132 N.H. 308, 564 A.2d 458, 459 (1989) ("the presence of an 'extraneous' third party during a privileged conversation operates to destroy the privilege."). This concurs with federal law requiring privilege apply only to communications intended to be confidential when made. McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) ("communications made during the course of legal representation…are confidential and permanently protected from disclosure."); Riddle Spring Realty Co. v. State, 107 N.H. 271, 220 A.2d 751, 755 (1966) ("'[T]he essence of a privileged communication between attorney and client and likewise the basis of its exemption from discovery is its confidentiality.'").

24. New Hampshire also extends the privilege to communications between an attorney and a client, and not to the information that is in those communications. Thus, even though the information may be available from another source, an outside party cannot discover whether or not the same information communicated by the client to an attorney for purposes of seeking legal advice. McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 125 (1979) (The plaintiff could not penetrate the attorney-client privilege to discover whether the defendant made the same statements to his attorney

during the course of legal representation.). New Hampshire also recognizes that attorney-client privilege exists for the benefit of the client. Scott v. Grinnell, 102 N.H. 490, 161 A.2d 179, 183 (1960) ("The privilege is that of the client...").

**C. Formation of Attorney-Client Relationship**

25. Courts have held that an "analagous fiduciary obligation may be implied in the absence of an attorney-client relationship." Liu v. Real Estate Inv. Group, Inc., 771 F. Supp. 83 (S.D.N.Y. 1991). As the court in Liu noted:

> It is clear that where an attorney receives confidential information from a person, who under the circumstances has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidences irrespective of the absence of a formal attorney client relationship.

26. See also United States v. Devery, No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship."). See also Rosman v. Shapiro, 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987).

27. "[C]ourts have not employed a single, well-defined test for determining whether an attorney client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." See First Hawaiian Bank v. Russell Volkening, Inc., 861 F. Supp. 233, 238 (S.D.N.Y. 1994); accord Bennet Silvershein Assocs. v. Furman, 776 F. Supp. 800, 803 (S.D.N.Y. 1981).

28. Further, whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to attorney client privilege. See Dennis, 843 F.2d at 657 ("To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."); see also Green, 784 F. Supp. at 845 ("[T]he fiduciary relationship existing between a lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment did not result."); Liu, 771 F.Supp. at 86 ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."); McCormick on Evidence 6th Ed. § 88 (West Publishing Co., 2006) ("[C]ommunications in the course of [a] preliminary discussion with a view to employing the lawyer are privileged though the employment is, in the upshot, not accepted."). As the Second Circuit has also stated, "[t]he key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." United States v. Dennis, 843 F.2d 652, 657 (2d Cir. 1998).

29. Under Restatement (Third) of the Law Governing Lawyers § 38, just because a prospective client conversation where confidential information was shared, does not result in further engagement, that does not absolve attorneys of fiduciary obligations created by that limited or initial client interaction.

30. Under NH law, breach of fiduciary duty requires (1) the existence of a fiduciary relationship, (2) breach of that duty, (3) causation, and (4) damages. Case law support such breaches are actionable. See Bays v. Theran, 418 Mass. 685 (1990), affirming breach of fiduciary duty can be established via disloyalty, breach of confidentiality, or self-dealing.

---

## SECTION II: ARGUMENT FOR BREACH OF CONFIDENTIALITY OF A PROSPECTIVE CLIENT

---

### I. BREACH OF FIDUCIARY DUTIES TO PLAINTIFFS AS PROSPECTIVE CLIENTS

#### A. Undisputed Establishment of Prospective Client Relationship

31. The 1-9-17 consultation clearly established a prospective attorney-client relationship under any applicable standard. Bisasor contacted Donais seeking legal advice regarding a specific legal matter. Donais engaged in a substantive consultation lasting 7 minutes. Confidential information was disclosed for the specific purpose of evaluating potential representation. An attorney-client relationship existed because Bisasor divulged confidences and secrets to Donais as an attorney and because Bisasor believed that he was approaching Donais as an attorney in a professional capacity with the intent to secure legal advice and did secure legal advice. Bisasor reasonably understood that the call with Donais was confidential. Thus, Bisasor's intent as a prospective client was that of an attorney/client relationship.

32. Further, whether or not employment occurs, preliminary discussions between Donais as an attorney and Bisasor as a prospective client was subject to attorney client privilege. Thus, the fiduciary relationship existing between Bisasor and Donais extended to preliminary consultation with Bisasor as a prospective client with a view to retention of Donais as lawyer, notwithstanding that actual employment did not result. Thus, Donais' duty to preserve confidentiality extended to this preliminary consultation with Bisasor as a prospective client even though actual employment does not result. In this instance, it is clear that Bisasor engaged in preliminary discussions with Donais related to legal analysis of potential claims that could be brought in connection with the landlord-tenant matter involving the Homewood defendants during the tenure of plaintiff's stay. Although there was no further engagement or retainer after that preliminary client conversation, any communication made during this preliminary consultation is protected by the duty of confidentiality and by the attorney-client privilege. Thus, this preliminary conversation is sufficient to establish the existence of an attorney-client relationship, even though Donais was not ultimately retained.

33. Bisasor's statement that he shared confidential information and sought legal advice from Donais is corroborated by telephone records indicating there were at least two telephone calls involved, one on 1-6-17 where Bisasor left a voicemail for Donais, and one on 1-9-17 where Donais called back Bisasor, which lasted 7 minutes. This constitute sufficient circumstantial evidence to show some confidential information was revealed to Donais in order for him to evaluate plaintiffs' case. Yet, the information shared does not have to be some deep dark secret for it to be confidential. Further, the law does not require the information shared to be confidential in the strictest sense of the word. The law simply requires that a person provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter, and he/she is a prospective client. The law simply requires that "even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information." It does not say confidential information. It simply says any information provided t the lawyer with the intent of forming an attorney-client relationship is protected and shall not be revealed. At a minimum, it is undisputed that Bisasor shared information with Donais with the intent of forming an attorney-client relationship and that Donais received and reviewed that information.

34. Thus, Bisasor was a client for purposes of the initial consultation, and at a minimum, was a prospective client, and he became a former client once the engagement went no further after the initial consultation. Rule 1.18 is very clear that prospective clients are protected by attorney-client privilege and that there is a duty to prospective clients owed by attorneys who consult with them. Thus, Donais' relationship with Bisasor, that of attorney/client, was that of a fiduciary. Donais owed an ethical and fiduciary duty to Bisasor. Bisasor placed trust and confidence in Donais. This gave rise to fiduciary duties of the attorney toward Bisasor. Donais owed Bisasor a fiduciary duty to act at all times in good faith and in Bisasor's best interests, and to not expose Bisasor to any unnecessary risk or peril. Donais' fiduciary duty to Bisasor continued after the termination of his attorney/client relationship. The 1-9-17 legal advice consultation with Bisasor triggered a fiduciary relationship with ongoing duties of confidentiality.

35. Most significantly, Judge Moore's finding that an attorney-client relationship existed provides judicial recognition of this relationship. This finding necessitated Donais's withdrawal from representing the adverse party, confirming that the consultation created enforceable ethical/fiduciary obligations.

**B. Establishment of Confidence and Trust**

36. Throughout the 1-9-17 consultation, Donais engaged in conduct that demonstrated his professional expertise and willingness to consider plaintiff's case. Donais received from Bisasor the factual circumstances underlying their legal

claims and engaged in a substantive analysis of their situation. This conduct created a reasonable expectation on the part of plaintiffs that Donais was evaluating their case for potential representation and that the information being shared would be treated with the confidentiality and professional care accorded to attorney-client communications.

37. Under NH law, a fiduciary relationship exists wherever influence has been acquired, and abused or confidence has been reposed and betrayed. During the 1-9-17 consultation, plaintiffs reposed confidence in Donais by sharing sensitive information about their legal predicament, including details about disparate treatment and their vulnerable position facing imminent ejection from their rented unit, among other things. This disclosure of confidential information in the context of seeking professional legal advice created the necessary foundation of trust and confidence that characterizes a fiduciary relationship. The consultation between Donais and Bisasor entailed a substantive exchange of information for the specific purpose of obtaining legal advice/representation. Donais's conduct during this consultation, including his willingness to listen to the details of their case and engage in discussion about the legal issues presented, created reasonable reliance on his professional expertise/judgment. This reliance was furthered by the referral relationship with Attorney O'Brien, who specifically identified Donais as possessing the expertise to handle their type of legal matter.

**C. Acquisition of Influence and Confidential Information**

38. During the 1-9-17 consultation, Donais acquired influence over Anderson and Bisasor's legal situation by positioning himself as a knowledgeable attorney capable of evaluating their claims and providing professional guidance. The very act of consulting with Donais, particularly given the referral context and the urgent timeline of their legal predicament, placed Anderson and Bisasor in a position of dependency on his professional judgment and expertise.

39. Donais acquired material confidential information during this consultation, including specific details about Anderson and Bisasor's allegations of racial discrimination (through Obrien), the nature of their dispute with Homewood Suites, their concerns about improper charges, and their immediate need for legal intervention to prevent unlawful ejection. This information was provided with the reasonable expectation that it would be treated confidentially and used solely for the purpose of evaluating whether Donais would undertake their representation.

40. The confidential nature of this information is demonstrated by its sensitivity and potential harm that could result from disclosure to adverse parties. The information related directly to plaintiffs' legal strategy, their vulnerabilities in the dispute, and their assessment of the strengths/weaknesses of their potential claims. Under NH Rule of Prof. Conduct 1.18, even when no attorney-client relationship ultimately ensues, a lawyer who received and reviewed information from a prospective client owes duties of confidentiality and loyalty that create fiduciary obligations.

41. NB: As stated in the accompanying Affidavits of Andre Bisasor, Bisasor was assured by Donais the conversation would be confidential [NB: The same assurance was made by Obrien to Anderson, which extended also to Donais as Donais was consulted by Obrien as part of the prospective client evaluation process]. Beyond that, even without the averments in the accompanying affidavits, the circumstances demonstrate that Bisasor would have had no reason to believe that his conversation with Donais would not be kept confidential. Bisasor contacted Donais as an attorney seeking legal advice from an attorney, leaving a voicemail that made clear he was seeking legal advice/assistance, and Donais then listened to the voicemail and called Bisasor back to have a conversation with Bisasor about the issues that Bisasor identified on the voicemail. Upon calling Bisasor, Donais asked Bisasor to explain the situation identified on the voicemail. Bisasor then shared information about his legal situation with Donais as an attorney. These facts alone demonstrate that Bisasor would've had some expectation of confidentiality. Why would Bisasor discuss/share his legal situation with Donais, as an attorney, but not expect any confidentiality at all? And why would Donais expect that what Bisasor shared with him as an attorney, in seeking legal advice, wouldn't be protected by confidentiality? So Donais expects that he can solicit prospective clients to contact him and discuss their situations with him, and then he is free to divulge everything they tell him to the public or to others? This wholly is unreasonable/erroneous.

**D. Breach of Fiduciary Duties**

42. Despite having acquired this position of trust and confidential information, Donais breached his fiduciary duties to Anderson and Bisasor in multiple ways. First, within days of their consultation, Donais agreed to represent Homewood Suites, the very party against whom plaintiffs had sought his assistance. This representation created a direct conflict of interest that violated his duty of loyalty to plaintiffs as prospective clients. Second, and more egregiously, prior to being retained by Akridge, Donais disclosed the confidential information obtained during his consultation with Bisasor to representatives of Homewood and their counsel. On 1-11-17, Donais sent an email to Attorney Terrell, counsel for Homewood, detailing the substance of his conversation with Bisasor, including specific information about the claims plaintiffs intended to pursue. This disclosure violated the fundamental duty of confidentiality that Donais owed to plaintiffs as prospective clients. Third, Donais compounded his breach by subsequently providing a false affidavit on 3-16-17, in which he misrepresented the nature and content of his consultation with Bisasor. By providing false information in this affidavit[2], Donais further betrayed the trust plaintiffs placed in him during/via their consultation.

[2] Although the court previously ruled that Donais' March 2017 affidavit cannot be used to recover on defamation claim under NH law, it didn't /doesn't prohibit recovery for a breach of fiduciary claim with respect to breaches of duty done via Donais' March 2017 affidavit.

E. Abuse of Confidence and Betrayal of Trust

43. Donais' conduct represents a clear abuse of the influence he had acquired, and a betrayal of the confidence that had been reposed in him. Rather than declining representation of the adverse party or maintaining the confidentiality of the information he had received, Donais chose to use the confidential information obtained from plaintiffs to benefit their opponents in litigation. This conduct violated the most fundamental principles of the attorney-client relationship and constituted a breach of the fiduciary duties he owed to plaintiffs. The harm caused by Donais' breach was both immediate and substantial. Plaintiffs were deprived of confidentiality protections they reasonably expected when consulting with an attorney, and the confidential information provided was used against them in subsequent litigation. This breach of trust undermined their legal position and caused them to suffer damages as a direct result of Donais' misconduct. Donais used his prospective client conversation with Bisasor, to directly inflict harm by defaming Bisasor and accusing Bisasor of falsely/frivolously accusing Donais of race discrimination because he did not take his case. This false accusation against Bisasor sullied Bisasor, with implication that Bisasor was a frivolous liar who plays the race card without rhyme or reason and is to be discredited as an irrational, angry person who wildly hurls accusations of race discrimination when there is no valid reason to do so. This diminished Bisasor's character and discredits him in the eyes of the public/the community. Notwithstanding the fact plaintiffs do not seek recovery for defamatory statements made in Donais' affidavit, plaintiffs here plead that Donais breached his fiduciary duty therewith, intending to defame Bisasor.

44. If Bisasor had never spoken to Donais on 1-9-17 about a prospective client relationship, Donais could not have had the opportunity to fabricate this lie against Bisasor or to use the consultation as a springboard to launch such lies.

45. Donais used his position as a prospective lawyer to Bisasor as a prospective client as a basis to injure Bisasor by falsely accusing him of falsely accusing Donais of race discrimination in the context of a conversation wherein Bisasor was seeking to legal advice/assistance from Donais, and wherein Bisasor shared with Donais certain confidential information, thus taking Donais into his confidences and placing his trust in Donais. Donais exploited and abused the trust that Bisasor extended to Donais in seeking to have a conversation with him about plaintiffs' case against the Homewood defendants. Donais turned around and used that private privileged conversation as a basis to fabricate lies on Bisasor. This is an utter abuse and travesty that has befallen Bisasor on account of unwittingly and unsuspectingly making the mistake of speaking with a dishonest lawyer like Donais. This is a breach of fiduciary duty. This also goes to the conflict of interest. Donais' conflict of interest further created the fuel by which he found it useful to falsely accuse

Bisasor, in order to harm and damage Bisasor (and his spouse), in the interest of protecting and advancing his own interests and the interests of the opposing party. See accompanying affidavits for further explication of attendant facts.

**F. Clear Breach of Confidential Duties**

46. The breach of fiduciary duty is established through Donais's undisputed disclosures of consultation information to unauthorized 3rd parties. These disclosures also include those made years after the 1-9-17 consultation and were made to family members, colleagues, and community organizations (which were also outside of any judicial context).

47. NH Prof. Conduct Rule 1.6(b)(3) permits attorneys to "reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary to defend the lawyer or the lawyer's employees or associates against a claim or charge of wrongdoing." However, this exception is narrowly construed and does not authorize wholesale disclosure to private parties for purposes of damaging a former client's reputation.

48. Under New Hampshire law, the existence of a fiduciary relationship does not require a formal attorney-client retainer or fee arrangement. Rather, fiduciary duties arise whenever confidence has been reposed and influence has been acquired in the context of a professional consultation. Thus, a fiduciary relationship existed between Donais and plaintiffs based on their consultation and the confidence reposed in him; Donais breached his fiduciary duties by disclosing confidential information to adverse parties and representing those adverse parties; Plaintiffs suffered damages as a result of this breach; and (4) Donais's breach was the proximate cause of their damages. Donais's conduct in engaging in a substantive consultation with plaintiffs, acquiring confidential information, and then using that information to benefit their adversaries constitutes a textbook example of breach of fiduciary duty. Thus, Plaintiffs' assert that a fiduciary relationship existed between the plaintiffs and Donais because Donais had acquired influence with respect to Bisasor which was abused by Donais, and Bisasor reposed confidence in Donais but was betrayed, and because plaintiffs relied on Donais for legal advice for their landlord-tenant matter. Donais later withdrew from representing Homewood, after a judge had determined that Donais had violated ethical duties/breached fiduciary duty. The 1-18-17 court hearing transcript shows that Donais was caught red-handed and that a circuit court judge found that Donais breached fiduciary duty and thus was required to be disqualified/ to withdraw from the case. This by itself is slam-dunk proof that Donais is liable for breach of fiduciary duty, as Donais' own withdrawal serves as his own admission that he was liable for this wrongdoing.

49. It should be noted that it was Donais who called Bisasor on 1-9-17 (in returning Bisasor' call/voicemail from 1-6-17). Donais could have chosen not to call Bisasor back. The fact that Donais initiated the call on 1-9-17 signaled to Bisasor that Donais was interested in pursuing an attorney-client relationship. Bisasor had every right to believe that such a call

could lead to full representation by Donais. The fact that Donais eventually declined to take case is irrelevant to the conflict of interest analysis under Rule 1.18 and to analysis of whether Donais violated his duties under Rule 1.18.

50. It should also be noted that according to Dave Akridge's affidavit, at a time prior to representing Homewood, Donais emphatically 'with conviction" assured Akridge that there is no problem with representing Homewood as the adverse party to plaintiffs, because "he did not take the case" and had "brief conversation" [3]. But Donais knew that the standard under Rule 1.18 is not whether he took the case or had a brief conversation. The standard for Rule 1:18 conflict/disqualification is whether he "received and reviewed" information from someone seeking to form an attorney client relationship. It should be further noted that Donais did not have to take the case to represent the Homewood defendants. Similarly, the Homewood defendants were not obligated to hire Donais. Terrell testified on 4-27-17 that he considered the situation with Donais to be a "flag", but yet still Terrell chose Donais as local counsel and Donais still agreed to be local counsel for Homewood, notwithstanding the conflict/potential conflict and the fact plaintiffs would likely object. See Cardona v. General Motors Corp., 942 F. Supp. 968, 978 (D.N.J. 1996) ("by proceeding in reckless disregard of the…Rules of Professional Conduct," firm must suffer "self-inflicted wound").

51. It is evident that Donais had a strong desire to take the Homewood case as defense counsel, so he breached his duty of confidentiality in so doing. Donais's desire to represent an adverse party, no matter how strong, does not allow him to simply jettison the rules of conduct or his fiduciary obligations. Moreover, according to Terrell, Donais did not disclose[4] to Terrell the conversation Donais had with Robert Obrien about this case. Donais did not do that because evidently, he so wanted to be retained by Homewood Suites as local counsel for the defense. Donais was not concerned about violating the law, the rules of ethics, his fiduciary obligations or the plaintiffs' rights.

52. Donais also admitted that, during the conversation he had with Bisasor on 1-9-17, Donais purportedly[5] told Bisasor that one of the reasons he did not want to take the case was because "there might be a potential conflict". This means that during that conversation Donais realized that there was a conflict, because he knew that Homewood suites of Nashua was part of the dispute and that he had a previous client relationship with Dave Akridge. The only basis for Donais to

[3] See **page 3 and paragraph 16** in **Exhibit 20 - Affidavit of Dave Akridge dated 5-4-17.** See also all other exhibits attached including affidavits.
[4] See **page 228 line 1-25** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**
[5] Yet, Donais didn't tell Bisasor that there might be a potential conflict. But the fact that Donais admits to saying that, shows that Donais knew it at the time (or it at least shows that he was thinking it). Yet, Donais never stated it to Bisasor. If he had stated that, Bisasor would have definitely asked him the basis for the suspected potential conflict.

have known, realized or suspected that there was a conflict, was for Donais to have realized or suspected that Homewood Suites was involved. How else could he have known that there was a conflict or potential conflict?

**G. More on Undisputed Establishment of Breach of Fiduciary Duty By Donais**

53. Donais and Bisasor had a fiduciary relationship. Donais' relationship with Bisasor, that of attorney/client, was and is fiduciary. Donais owed an ethical and fiduciary duty to Bisasor, including to act at all times in good faith and in Bisasor's best interests, and to not expose Bisasor to any unnecessary risk or peril. See Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass.App.Ct. 412, 442 (1980) ("[T]he relationship between attorney and client ... is fiduciary as a matter of law"); Vanacore v. Kennedy, 86 F.Supp.2d 42 (D.Conn. 1998) (the relationship between attorney and client is one of trust and confidence, and gives rise to fiduciary duties of the attorney toward the client).

54. The 1-9-17 communication/consultation with Bisasor triggered a fiduciary relationship with ongoing duties of confidentiality. Donais' fiduciary duty to Bisasor continued after the termination of his attorney/client relationship.

55. As a prospective client, Bisasor shared confidential information with Donais during the 1-19-17 consultation. Bisasor reasonably believed he was engaging in a confidential discussion. Donais received confidential information as an attorney from Bisasor who was seeking legal advice and thus he had a right to believe that Donais, as an attorney, would respect such confidences. Bisasor was thus a prospective client entitled to confidentiality and loyalty. Donais breached confidentiality obligations owed to Bisasor as a prospective client by disclosing privileged information to harm Plaintiff's interests, and further exploiting it for self-protection, which is conduct that violated trust.

56. However, in addition to the breaches in 2017, Donais later on in 2019 and 2020, further disclosed private client information to his wife, son, family members, and friends and to the others including members of the Manchester NH Crime-Line board, etc. These breaches of fiduciary duty, that occurred outside the context of any judicial proceeding, by Donais include disclosure of confidential client conversation information about plaintiffs to: a) Akridge in 2017 prior to being hired by Akridge to represent Homewood; b) his wife in 2017, 2019 & 2020; c) his sons, Garret & Aiden, in 2019 & 2020; d) the Manchester NH Crime-Line board in 2019 & 2020; e) the Manchester NH police in 2019 & 2020.

57. Donais breached his duty by disclosing confidential information, fabricating false allegations, and misusing the relationship to retaliate against plaintiffs, which further goes to the malicious and egregious nature of his conduct.

58. Donais engaged in a pervasive, widespread, systematic and deliberate pattern of abandoning, violating and exploiting his fiduciary obligations to Plaintiffs for his own self-interest, and constituted a willful dereliction of duty designed to exploit Plaintiffs' vulnerability as African-American, and to conceal evidence of Donais' own misconduct. Donais'

concealment of his divulging of plaintiff's confidential client conversation to others, further constitutes a breach of the duty to protect client interests post-termination (In re Jones, NH Sup. Ct., No. 2021-0123, 2021 WL 4472142). Attorneys must prioritize client interests over self-protection. By divulging and exploiting confidential information, Donais engaged in self-dealing barred by Kanamaru, 100 Mass. App. Ct. at 75.

59. Under New Hampshire law, attorneys owe clients and former clients an unwavering duty of confidentiality and transparency, even after termination of a client relationship. Donais' conduct breached this duty at every turn, inflicting severe financial, procedural, and emotional harm. Donais' acts also includes breach of fiduciary duty by divulging information (and fabricated version of it) obtained during a confidential prospective client consultation with the sole purpose of embarrassing, oppressing, scandalizing, defaming and harming the prospective client.

60. It was malicious act and represented an attempt to harm plaintiffs as former prospective clients. Donais' intent was clear: to hurt, damage, harm, oppress, defame, scandalize the plaintiffs. When prospective clients meet with lawyers they are entitled to the same protections and confidentiality as any other client. The public must be assured that lawyers will treat their confidential client consultations including initial meetings as confidential, and that lawyers will not abuse such information because the lawyer ultimately declined representation or because the lawyer joined the legal team of the opposing party. This is forbidden by the rules[6]. So, even if Donais maintains that his allegations of what Bisasor said in the 1-9-17 conversation were true (which it was not), he still breached his duty/obligations to plaintiffs as former clients or former prospective clients. Hence, Donais' breaches are multiple, layered and intertwined with a web of layered misconduct making a very serious combination of violations of ethics that rises to the level of extreme seriousness which is further compounded by further breaches/wrongs that flowed from that to subsequent/continuing events thereafter.

61. Donais breached his fiduciary duty to plaintiffs by breaking his obligation of confidentiality, and acting against plaintiff's interest as a former client and seeking to harm and injure plaintiff's rights. Donais owed a duty to Plaintiffs[7], via the fiduciary relationship that included confidentiality and an obligation to Bisasor to act with the utmost good faith and

[6] Donais' conduct outlined herein, in addition to Rule 1:18, has also violated Rule 8.4 section (a), (b), and (c), in that his false statements reflects adversely on the lawyer's honesty and trustworthiness, and it would also constitute conduct involving dishonesty, fraud, deceit and misrepresentation. Similarly, the fabrication of the race discrimination accusation would further be a violation of Rule 8.4 section (g), in that his false statements were motivated by racial animus and were intended to wrongly embarrass, harass and burden Plaintiff.

[7] Donais owed a duty to plaintiff. There was a fiduciary relationship. Plaintiff was a prospective client. Plaintiff was engaged as a prospective client. Plaintiff was given legal advice. Plaintiff shared confidential information. A prospective attorney client relationship was formed. This is what a judge found (Judge Paul Moore in Nashua district court in NH). This is why Donais withdrew as attorney in that case.

fidelity as a fiduciary agent; to not take advantage of Bisasor and place him at a disadvantage. See Goldman v. Kane, 3 Mass.App.Ct. 336, 341 ( (1975) (attorney must do nothing to take advantage of or disadvantage the client).

62. Donais had a duty of trust and loyalty to Bisasor, to not to betray Bisasor, to not subvert his (Donais) obligation to Bisasor, to not act deceitful. Donais's fiduciary obligation to Bisasor continued after the conclusion of the client conversation between Donais and Bisasor in 2017.

63. In this matter, Donais violated his duty to the plaintiffs in several ways: a) Donais discussed the client conversation with the plaintiffs with several people. These include his wife, Mary Donais, his sons Garrett & Aiden Donais, and the Manchester NH crime-line board, as well as friends and connections, and also the Manchester NH police. These communications with his family, friends, connections, colleagues, violated the rights of the plaintiffs as he had no right to disclose client confidential communications to any of them for any reason; b) Donais also voluntarily engaged in discussion with the Manchester NH police about the confidential 1-9-17 conversation and the 1-5-17 consultation; c) Donais also had a duty to inform plaintiffs, as former clients, that Donais was going to or had discussed such information with others. Instead, Donais actively hid those occurrences from plaintiffs. The act of hiding such from plaintiffs is also a breach of duty to plaintiffs as he is required to seek consent before any such disclosure.

64. As a result of Donais's breaching conduct, plaintiffs sustained injury including lost opportunities, emotional distress, and mental anguish, and the damages sustained were directly, proximately and solely caused by Donais's breach of his duty and his intentional, reckless and negligent acts, which were committed with intent, oppression, fraud and/or neglect, as set forth above, and by doing all of the acts and omissions as herein alleged.

65. NB: It should be noted that Donais did not need to defend himself, for example, with the Manchester crime-line board, his private personal family members, friends and colleagues, etc. The only time and place that the rules contemplate violating confidentiality is in an ADO proceeding against the said attorney or in a proceeding in court where the defendant is called upon to defend himself or herself. None of these things apply here based on the facts that occurred.

66. NB: Based on the above case law, Donais also violated (prospective) attorney-client privilege when he in his March 2017 affidavit stated the false accusation that Bisasor accused him of race discrimination for not taking his case. Even if Donais was telling the truth about that accusation (which he was not), Donais had no need to disclose that (false) statement since it bore no relevance to the motion to disqualify Terrell and since it clearly was an inflammatory and disparaging statement which would only serve to (wrongly) embarrass, annoy or scandalize Bisasor.

## II. RELEVANCE OF FALSE STATEMENTS TO BREACH OF FIDUCIARY DUTY CLAIM

### A. Fundamental Distinction Between Defamation and Fiduciary Duty Claims

67. Although this court determined Donais's March 2017 affidavit had absolute privilege protection from defamation claims under NH law, this ruling didn't preclude recovery for breach of fiduciary duty involving the same false statements.

68. Courts routinely recognize that breach of fiduciary duty claims are "separate and distinct" from other tort claims, including defamation, when premised on conduct involving a culpable state of mind beyond mere negligence. The same principle applies when distinguishing fiduciary duty breaches from defamation claims, as each addresses fundamentally different legal wrongs with distinct elements and protections. The breach of fiduciary duty claim in this case focuses on Donais's abuse of the trust relationship itself and his violation of confidentiality obligations, not merely the publication of false statements to third parties. Fiduciary duty claims arise when an attorney either betrays a confidence or acquires and abuses a position of influence. Donais's fabrication of false statements about confidential consultation content constitutes both a betrayal of confidence and an abuse of his position of influence as a trusted legal advisor.

### B. Absolute Privilege Does Not Extend to Fiduciary Duty Breaches

69. The absolute litigation privilege serves the narrow purpose of promoting candor in judicial proceedings. However, this privilege doesn't immunize claims arising from breaching underlying fiduciary obligations. A fiduciary cannot invoke litigation privilege to escape liability for breaching confidentiality duties owed to former clients. The privilege may protect publication aspects relevant to defamation, but doesn't excuse underlying independent breach of trust violations.

### C. Confidentiality Breach Constitutes Core Fiduciary Violation

70. Under New Hampshire Rule of Professional Conduct 1.18, prospective clients are entitled to the same confidentiality protections as actual clients. Rule 1.18(b) provides that "a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information" except under limited circumstances. Donais's fabrication of false allegations about Bisasor accusing him of racism violates this fundamental obligation. First, Donais revealed confidential information obtained during consultation by creating false statements about its content. Second, he used this information to harm Bisasor by portraying him as someone who makes frivolous racism accusations. Third, he weaponized the confidential relationship to undermine Bisasor's credibility as a discrimination plaintiff. Each of these acts constitutes a separate breach of fiduciary duty independent of any defamation analysis.

### D. Strategic Exploitation of Fiduciary Position

71. The timing & content of Donais's fabricated racism allegation reveal egregious misconduct that transcends ordinary defamation. During the 1-18-17 hearing, when memories were fresh, Donais never mentioned any racism accusation made in the 1-9-17 call. However, months later, in his affidavit, he suddenly "remembered" this inflammatory detail.

This demonstrates deliberate fabrication designed to exploit his position as a former attorney to damage client credibility. Fiduciary duties include obligations of candor & good faith that prohibit using confidential relationships to harm former clients. Donais's conduct represents the antithesis of these obligations; he manufactured lies about confidential communications specifically to undermine vulnerable former prospective clients raising legitimate discrimination claims.

**E. Policy Considerations Support Separate Recovery**

72. Fiduciary duty claims focus on breach of trust rather than publication of statements. Defamation requires publication, falsity, and reputational harm, while fiduciary duty breach requires relationship, breach of duty, causation, and damages. Breach of fiduciary duty claims address exploitation of confidential information obtained through prospective attorney-client relationship, regardless of whether exploitation occurs via privileged or unprivileged statements. Thus, while absolute privilege may shield Donais from defamation liability for false statements in his affidavit, it cannot excuse his fundamental breach of fiduciary duty in fabricating false statements about confidential consultation content and using his position as a trusted legal advisor to harm his former prospective client's credibility and legal standing.

**III. FURTHER CASE LAW SUPORTING FINDING OF BREACH OF DUTY TO PLAINTIFFS**

73. In Fierro v. Galluci (EDNY 2007), the defendants in that case argued that the motion to disqualify should be denied because: (1) there was never an attorney-client relationship established between Dollinger and Fierro; (2) there was no indication there were any "secrets" or "confidences" discussed between Dollinger and Fierro; and (3) even if such secrets or confidences were discussed, Dollinger had no recollection of any such conversations. Thus, the defendants in that case contended there was no conflict of interest in continuing to represent the defendants in that lawsuit. However, that Court concluded that plaintiff made a sufficient showing to warrant disqualification of the Dollinger Firm as follows:

> "Fierro's statement in his affidavit — that he consulted with Mr. Dollinger in late 2004 regarding the subject matter of this case, including potential claims, potential defenses, and relevant case law — is corroborated by a phone message and phone records maintained by the Firm. Thus, this preliminary discussion regarding the subject matter of this litigation fell within the umbrella of an attorney-client relationship and was privileged. This prior consultation with Mr. Fierro regarding the exact subject matter of this litigation is sufficient to warrant disqualification. Although Mr. Dollinger does not recall any client confidences revealed to him during the conversation, his failure to recall such conversations does not vitiate the otherwise clear basis for disqualification."

74. Further, the Fierro court also found disqualification was warranted because (1) plaintiffs established that an attorney-client relationship existed as to Fierro's preliminary discussions, (2) the matters were not just "substantially related" to the litigation, but were identical, and (3) it was likely confidential information was shared with Dollinger during these conversations. Although the defendants point to the several factors in arguing there was no attorney client relationship (including the fact that the preliminary conversations were brief, the Dollinger Firm never opened a file related to Fierro, and the Dollinger Firm never charged any fees for the initial consultation), none of those factors, individually or

collectively, is necessarily dispositive in analyzing whether there was an attorney-client relationship. See United States v. Devery, No. 93 Cr. 273 (LAP), 1995 WL 217529, at *14 (S.D.N.Y. Apr. 12, 1995) ("It is well-established that no formal indicia or technical requirements are required in order to establish an attorney-client relationship.").

75. Furthermore, the Fierro court found that whether or not employment occurs, preliminary discussions between an attorney and a prospective client are subject to the attorney client privilege. Moreover, the Fierro court stated that, in finding that there was a substantial relationship between Fierro's preliminary consultation and the current litigation, a rebuttable presumption is created that Fierro imparted to Dollinger confidential information relevant to the present litigation. See Arifi, 290 F. Supp. 2d at 350. A party moving to disqualify opposing counsel "is not required to prove that [opposing counsel] had access to confidential information while representing the [moving party] but only that he was likely to have had such access." Id. It should further be noted that, in the Fierro case, there were telephone records indicating at least 2 telephone calls on 12-14-04 between Dollinger and Fierro, one of which lasted just about 10 minutes. This, among other things, provided sufficient circumstantial evidence for the Fierro court to conclude it is likely that some "confidences" or "secrets" were revealed to Dollinger in order for him to evaluate the case.

76. Although, in the Fierro case, Dollinger stated he had no recollection of any conversation with Fierro, the Fierro court found his failure to recall the conversation didn't change the analysis. NB: Another court held that a former attorney's assertion that he couldn't remember any confidential information conveyed to him during the short representation of one of the defendants, didn't cure the professional responsibility conflicts which were present. Arifi, 290 F. Supp. 2d at 350 ("While there is no reason to doubt Green's claim that he does not remember any confidential information, the Court nevertheless finds that he was likely to have had access to such information during the short representation."); see also Schwed v. Gen. Elec. Co., 990 F. Supp. 113, 117 n. 2 (N.D.N.Y. 1998) (where attorney claimed he didn't possess confidential information and didn't recall any discussions regarding the case, the third prong of the 2nd Circuit test was still met because there was a likelihood that the attorney had access to confidential information).

77. Similarly, in this case, Terrell testified at a preliminary injunction hearing on 4-27-17 that he didn't recall what he and Donais discussed and that he may have had conversations with Donais (about the Donais-Bisasor conversation), but somehow he doesn't recall whether he had such conversations or if information to came to him (Terrell) from Akridge.

78. Also, the Fierro case is similar to this case, in that defense counsel here claims that there was never an attorney-client relationship established between Donais and Bisasor and that there was no "confidences" shared from Bisasor to

Donais. Although Bisasor vigorously refutes those assertions (which refutations are supported by incontrovertible evidence), the consideration of such refutation by Bisasor is not necessary for the correct legal analysis to be applied. Based on the above case law, in the Fierro case, the correct standard is that, regardless of whether it can be proven that confidences were or were not shared, it is the fact that confidences could have been or were likely to have been shared that establishes the conflict (or the appearance of one). Based on this standard, Donais definitely had a conflict, and he breached fiduciary duty when he shared client information, not only with Akridge, and with Terrell, but also in statements submitted to two NH courts months after he [Donais] was disqualified. Similarly, as it pertains to infection of Terrell, Terrell claims there was never an attorney-client relationship established between Donais and Bisasor; that there was no "confidences" shared between Donais and Terrell; and that even if such confidences were discussed, Terrell does not recall whether any such conversations occurred. Thus, similar to the finding in the Fierro case, Terrell's failure to recall such conversations does not vitiate the otherwise clear basis for establishment of a conflict or appearance of one. See again Fierro v. Gallucci, 2007 U.S. Dist. LEXIS 89296 (E.D.N.Y. Dec. 4, 2007) (disqualification warranted even though lawyer simply could not remember phone calls). Thus, it is clear from the definitions in the Fierro case, that information shared with and later disclosed by Donais (including Bisasor's purported accusation of racism against Donais) would certainly qualify as "confidences" (i.e. "information protected by the attorney-client privilege under applicable law") and as "secrets" (i.e. "other information gained in the professional relationship that the client requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.").

79. These cases from several state and federal courts around the country support the conclusion that there was a conflict of interest that existed with Donais (and also with Terrell), and that Donais violated the confidences/secrets shared by Bisasor when he communicated statements made (or purportedly made) by Bisasor, to Akridge and Terrell prior to being hired, and to other private persons, and also to two NH courts, in order to harm, injure, disparage Bisasor.

80. In In re Sharplin, Jr., 2006 Tex. App. LEXIS 6834 (Tex. App. Aug. 3, 2006), the court was dealing with a lawyer who changed firms, and citing Nat. Med. Enterprises, Inc. v. Godbey, 924 S.W.2d 123 (Tex. 1996), said there was an irrebuttable presumption he shared information from the earlier case with his new partners and disqualified the firm.

81. Similarly, there should be an irrebuttable presumption that Donais shared confidences from Bisasor with Akridge and Terrell either directly, or indirectly through Akridge. This irrebuttable presumption is warranted because invariably in these types of situations, rarely will an attorney fall on his own sword and admit he did wrong or violated the rules.

82. Moreover, the predictable response by lawyers, typically voiced in such situations, in saying "I don't recall" or otherwise outright denials that confidences weren't shared, often makes it difficult to get to the bottom of what was shared. Moreover, it is often difficult for affected parties to prove that secrets were shared because that would involve disclosing those secrets to the court, which presents a catch 22 scenario or a Hobson's choice to require that, in order to vindicate his rights and harm from a conflict, a party must disclose sensitive secrets (protected by attorney-client privilege) to the court, by disclosing to the court such secrets shared with conflicted counsel (which secrets could prejudice the court against the client). This is why the irrebuttable presumption of sharing of confidences is warranted in such situations.

83. Hence, in a situation where lead counsel is in a position to receive client confidences of the aggrieved party, a sharing of confidences should be presumed, even if only by inadvertent disclosure. And the fact that there could have been confidences shared, means that there is at least an appearance of impropriety and of impermissible conflict/breach.

84. This is underscored by the Fierro court's finding that "the dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case." See Fierro, 2007 WL 4287707, at *8 (quoting Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 571 (2d Cir. 1973)). See Best Western Int'l v. CSI Int'l Co., 1995 WL 505565, at *2 (S.D.N.Y. Aug. 25, 1995) (**"misconduct need not be egregious: there need not be intent, bad faith, or actual disclosure of confidential information. Conduct that merely suggests that one side might enjoy the disclosure of confidential information may warrant disqualification.")**.

85. Yet, here, both Donais and Terrell were fully aware of the conflict issue before Donais was hired, and they both made knowing/calculated decisions to accept the risk of conflict in violation of Rule 1.18, as well as knowing/calculated decisions not to inform plaintiffs about it. The law doesn't require plaintiffs to suffer risks that their confidential information could be used against them and the rules do not shield Donais (or Terrell) from their knowing calculated but risky decision to proceed in violation of the rules of conduct (Terrell agreed to settle the case, leaving only Donais).

86. Further, plaintiffs' burden is not to show Donais did in actuality taint or harm the case with confidences he received from them, but instead to show that Donais had a conflict, that he was aware of the conflict, which required him to abstain from taking the Homewood case, whose interests were materially adverse to plaintiffs' legal interests, that Donais' conflict posed a risk of prejudice or taint against plaintiffs and that Donais knew of this risk but proceeded to sign on as defense counsel anyway. See Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981) (test is whether

conflict "poses a significant risk of trial taint," not that the trial would be tainted"). See also Hempstead Video, 409 F.3d 127 at 133 ("One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client."); See also Cheng v. GAF Corp., 631 F.2d 1052 (2d Cir. 1980)(where there is "too high a risk of inadvertent disclosure of confidences," disqualification is appropriate.").

87. The above case law highlights the prospect that Donais (and by extension Terrell/Homewood) benefited from information about an adverse party obtained through preliminary consultation with local counsel, who was subsequently disqualified, and who breached his duty to plaintiffs by representing the adverse party and sharing attorney-client information with them. Donais indisputably received information from plaintiffs, going to the core issues adjudicated in the case. This led to unacceptable appearance of impropriety which cannot be eliminated by Donais saying he received no confidential information (or by the spouting of "I don't recall" retorts by Terrell in the 4-27-17 hearing).

88. The issues implicated by Donais' consultation directly with Bisasor and indirectly via Obrien, are "substantially related" to the issues implicated by Donais' representation in defending against those issues in the Homewood case. See Chinese Automobile Distributors of America LLC v. Bricklin, 2009 WL 47337, at *2 (S.D.N.Y. Jan. 8, 2009). Similarly, the Fierro court also found that "Client confidences are not so inert as to limit their usefulness to defined legal disciplines or practice areas. They are fungible, and once disclosed can be applied by an experienced lawyer in ways too numerous to anticipate[.]" See Fierro, 2007 WL 4287707, at *8. Moreover, the 2nd Circuit has held that "it is unclear to us how disclosures, admittedly inadvertent, can be prevented" where there is a "continuing danger that [the attorney] may unintentionally transmit information he gained through his prior association" with a disqualified counsel. Id. at 1058. Numerous other courts have held similarly. See Crudele v. New York City Police Department, 2001 WL 1033539, at *3-4 (S.D.N.Y. Sept. 7, 2001) (raising concerns about possibility of unintentional breaches of client confidences").

89. Similarly, in preparing his affidavit for use in the district court and superior court in March, April and May 2017, Donais further engaged in consultation with Snow and Terrell about the case and about what was discussed with Bisasor and what Bisasor shared, as well as what Obrien shared. All of this continued consultation and involvement of Donais in the case, even though he had been disqualified, further created a risk of harm to plaintiffs. Donais should have stayed away from the case after being disqualified in January 2017. The purpose of Donais' disqualification was to prevent further communication or tainting of the case from him due to his conflict of interest arising from the communications

he had with plaintiffs. By continuing to be involved/provide input (including his disparaging statements about Bisasor), Donais did an end run around the purpose of Donais' disqualification in the first place. This is a further breach of duty.

90. Donais wants to have it both ways. On the one hand, Donais has asserted, in one place or another, that he did not know that Bisasor's case was the same case as Anderson's case prior to the 1-18-17 hearing in district court (which has been established as not true). Similarly, in other statements, Donais has tried to give the impression that he only learned there was a conflict when Berry contacted him on 1-17-17 by phone and then further shown in the court hearing on 1-18-17. Yet on the other hand, Donais has claimed that, although he shared with Akridge and Terrell (on or before 1-11-17) that he [Donais] had a conversation with Bisasor, still he [Donais] did not share anything much which could have resulted in a taint on the case by infecting co-counsel Terrell. Donais [and by extension Terrell] were thus trying to have their cake and eat it too. Everyone was trying to cover their own rear ends. Terrell claimed raised concerns on this "flag"[8] before he proceeded to hire a potentially conflicted local counsel. The same thing with Akridge i.e. Akridge purportedly asked Donais if there is going to be a problem, but according to Akridge, Donais emphatically 'with conviction" assured Akridge that there is no problem because "he did not take the case" and had "brief conversation"[9]. But Donais knew that the standard under Rule 1.18 is not whether he took the case or had a brief conversation, but whether he "received and reviewed" information from someone seeking to form an attorney-client relationship. The result was serious prejudice to plaintiffs, who shouldn't have been put in the position of having client conversations shared with Donais being shared with Terrell or others, or otherwise, used against them[10] .

---

**SECTION III: CONCLUSION**

---

91. It should be noted that Donais not only disclosed the client conversation with Bisasor to Akridge, Terrell (Homewood) before being hired by them, but then he divulged it publicly in two courts, and then to his family members, non-profit board members and the police, including years later. All of these are separate incidents of breach of fiduciary duty.

92. The undisputed facts establish Donais breached fiduciary duty as a matter of law. No genuine factual disputes exist regarding the consultation and the improper unauthorized disclosures made. Partial summary judgment will serve judicial efficiency by resolving this clear-cut professional misconduct claim, allowing remaining proceedings to focus on damages and other disputed issues. See accompanying affidavits of Bisasor and Anderson and accompanying exhibits.

---

[8] See **page 224** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**

[9] See **page 3 and paragraph 16** in **Exhibit 20 - Affidavit of Dave Akridge dated 5-4-17.** See also all other exhibits attached including affidavits.

[10] See **Exhibit 33 – Case of Fierro v. Gallucci (2007) showing legal standard for conflict of interest**. See also all other exhibits attached.

Respectfully submitted,
/s/ Natalie Anderson
NATALIE ANDERSON

/s/ Andre Bisasor
ANDRE BISASOR

Date: October 6, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY CLAIM**

1. Plaintiffs submit this Statement of Material Facts as to which there is no genuine issue to be tried in support of their Motion for Partial Summary Judgment on the breach of fiduciary duty claim against Craig Donais.

**I. UNDISPUTED MATERIAL FACTS ESTABLISHING FIDUCIARY DUTY BREACH**

**A. Establishment of Prospective Attorney-Client Relationship**

2. On 1-5-17, at approximately 5:16 p.m., Plaintiff Natalie Anderson contacted Attorney Robert O'Brien seeking legal assistance regarding a dispute with Homewood Suites in Nashua, NH. See Anderson Affidavit; Exhibit 6.
3. During their 18-minute consultation, Anderson provided detailed confidential information about plaintiffs' legal situation, including allegations of discriminatory treatment, contract disputes, and urgent need for legal intervention to prevent wrongful ejection. Anderson Affidavit.
4. O'Brien, recognizing the complexity of the legal issues and acknowledging they fell outside his primary practice area, informed Anderson he would consult with Attorney Craig Donais, whom O'Brien specifically identified as possessing greater expertise in landlord-tenant matters. Anderson Affidavit.
5. O'Brien contacted Donais by telephone, conveying the substance of Anderson's legal concerns along with the urgent timeline for action. Anderson Affidavit.
6. Following his consultation with Donais, O'Brien sent Anderson a text message stating that he spoke with Donais, that Donais said plaintiffs "have a great contract case for the overcharges," that "the innkeeper rules would likely apply to your situation" allowing for no cause evictions, and that Donais "would not opine on the discrimination claims outside his experience." Anderson Affidavit; Exhibit 9 [text message from Obrien to Anderson].
7. On 1-6-17, Plaintiff Andre Bisasor left a voicemail for Donais stating: "*Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical*." First Bisasor Affidavit.
8. On 1-9-17, Donais returned Bisasor's call and engaged in a telephone consultation lasting approximately seven minutes. First Bisasor Affidavit; Donais March 2017 Affidavit. During the 1-9-17 consultation, Bisasor disclosed

confidential information about plaintiffs' claims against Homewood, their legal situation, and urgent need for legal representation. First Bisasor Affidavit.

9. Donais asked Bisasor whether he obtained Donais's contact information from O'Brien, and Bisasor confirmed he had. 1-18-17 Court Transcript p. 11-12. During the consultation, Donais realized the conversation with Bisasor related to the same case O'Brien had discussed with him on 1-5-17. See Exhibit 34 - 1-18-17 Court Transcript p. 11-12; Donais March 2017 Affidavit. Bisasor asked Donais whether the consultation was confidential, and Donais confirmed it was protected by attorney-client privilege. First Bisasor Affidavit.

10. Bisasor shared confidential information including: (a) background circumstances of the dispute with Homewood; (b) strategy for filing a 540-A petition before 1-10-17; (c) concerns about potential weaknesses in their case; (d) information from discussions with a Nashua police officer; (e) details about disparate treatment in food service that was never included in any public filing; and (f) other strategic and factual matters. First Bisasor Affidavit.

11. Donais provided legal advice during the consultation, including his opinion that a TRO would likely be granted based on what Bisasor described, and analysis of their contract claims. First Bisasor Affidavit.

12. Donais told Bisasor during the consultation that there "may even be a potential conflict," indicating Donais recognized potential ethical issues. Exhibit 34 - 1-18-17 Court Transcript p. 12.

**B. Judicial Recognition of Attorney-Client Relationship**

13. On 1-18-17, during a hearing in Nashua District Court, Judge Moore found that an attorney-client relationship existed between Donais and plaintiffs based on the consultations. First Bisasor Affidavit; Anderson Affidavit.

14. Judge Moore, who had served on the Professional Conduct Committee for 10 years and as vice chair of the hearing committee for 4 years, told Donais that if he had any discussion with O'Brien or Bisasor about the facts of the case, he would be in conflict. Exhibit 34 - 1-18-17 Court Transcript.

15. As a direct result of Judge Moore's finding, Donais was required to withdraw from representing Homewood Suites due to the conflict of interest created by his consultations with plaintiffs. First Bisasor Affidavit.

**C. Donais' Admissions Establishing Prospective Attorney-Client Relationship**

16. In his March 2017 affidavit, Donais admitted that "Andre provided me some general details about what he described as a landlord tenant dispute involving inflated charges and also a concern about the existence of racial discrimination against him, and a need to immediately file." Donais March 2017 Affidavit.

17. In his email dated 1-11-17, to Dave Akridge and Karl Terrell, Donais admitted: "*What I know is that I received a call from Andre who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper*." Exhibit 19 [1-11-17 Email].

18. At the 1-18-17 hearing, Donais admitted he "spoke in for six minutes 37 seconds to get a sense of what this case was about" and that he "figured out what the case was about." Exhibit 34 - 1-18-17 Court Transcript p. 11-12.

19. Donais admitted he received sufficient information during the consultation to realize it was the same case O'Brien had discussed with him, demonstrating he obtained substantive confidential information. Exhibit 34 - 1-18-17 Court Transcript p. 11-12.

**D. Unauthorized Disclosure To Adverse Parties**

20. On 1-11-17, Akridge contacted Donais seeking his involvement as local counsel for Homewood Suites, the same parties plaintiffs were pursuing claims against. Exhibit 20 - Akridge Affidavit dated 5-4-17.

21. During their 1-11-17 conversation, Donais told Akridge he had received a call from someone named Andre about a landlord-tenant matter involving "some type of mixed-use property." Exhibit 20 - Akridge Affidavit of 5-4-17.

22. Akridge and Donais "concluded that Andre was quite likely Mr. Bisasor" during this conversation. Exhibit 20 - Akridge Affidavit dated 5-4-17. Then Akridge specifically asked Donais whether he would have a conflict serving as local counsel given the conversation with Andre, Donais responded "with conviction that he did not." Exhibit 20 - Akridge Affidavit 5-4-17.

23. On 1-11-17, prior to being retained by Homewood, Donais sent an email to Akridge, Terrell, and Terrell's assistant disclosing confidential information from his consultation with Bisasor, including details about the 540-A petition, claims of disparate treatment in food services, overcharging allegations, and the mixed-use property nature. Exhibit 19 - 1-11-17 Email Chain.

24. The information Donais disclosed about disparate treatment in food services was never included in plaintiffs' 540-A petition, demonstrating it was confidential information obtained only through the privileged consultation. First Bisasor Affidavit.

25. On 1-13-17, Donais filed an appearance on behalf of Homewood defendants and a motion for pro hac vice admission of Terrell. Court Records. Exhibit 21.

26. Donais never sought consent from plaintiffs before disclosing confidential consultation information to adverse parties or before representing those adverse parties. First Bisasor Affidavit.

**E. Continued Breaches of Confidentiality**

27. In March 2017, months after his disqualification, Donais filed an affidavit in two New Hampshire courts containing false statements about the January 9, 2017 consultation, including the fabricated allegation that Bisasor accused him of racial discrimination. Donais March 2017 Affidavit.

28. Bisasor categorically denies making any accusation of racial discrimination against Donais and avers that no words relating to race, racism, or discrimination were spoken during their consultation. First Bisasor Affidavit.

29. During the time period of 2017, 2019, and 2020, Donais disclosed contents of the confidential consultation to multiple unauthorized third parties including: (a) his wife Mary Donais; (b) his sons Garrett and Aiden; (c) members of the Manchester NH Crime-Line board; (d) Manchester NH police; and (e) friends, colleagues, and community members. First Bisasor Affidavit; Anderson Affidavit.

30. On 6-18-19, Donais voluntarily provided detailed information about the confidential consultations to Manchester police, including fabricated statements about plaintiffs' conduct and character. Exhibit 27 - Police Interview Transcript.

31. These disclosures occurred well outside any litigation context and were made for purposes of harming plaintiffs' reputation rather than any legitimate legal purpose. First Bisasor Affidavit.

**F. Knowledge of Conflict and Deliberate Misconduct**

32. Donais knew as early as 1-9-17, that representing Homewood would create a conflict, as evidenced by his admission that he told Bisasor there "may even be a potential conflict." Exhibit 34 - 1-18-17 Transcript p. 12.

33. Despite this knowledge, Donais agreed to represent Homewood on 1-13-17, and fought vigorously to remain on the case even after the conflict was raised by opposing counsel. Exhibit 34 - 1-18-17 Court Transcript; First Bisasor Affidavit.

34. When contacted by Attorney Elliott Berry on 1-17-17, about the conflict, Donais denied any wrongdoing and refused to withdraw voluntarily. First Bisasor Affidavit.

35. At the 1-18-17 hearing, Donais accused Berry of creating a "contrived conflict," which Judge Moore rejected. Exhibit 34 - 1-18-17 Court Transcript.

36. Donais only withdrew after Judge Moore made clear he would formally disqualify him if Donais did not withdraw voluntarily. Exhibit 34 - 1-18-17 Court Transcript; First Bisasor Affidavit.

**G. Indisputable Facts From Donais' Admissions Establishing Breach of Fiduciary Duty**

37. The following facts are established from Donais' own words and admissions:

a. Bisasor had the intent to seek legal advice from an attorney. This is indisputable.

b. Donais called Bisasor with the intention of having a conversation with a prospective client about that prospective client's legal situation and needs. This is indisputable.

c. When Donais called Bisasor, Bisasor then communicated information about his legal situation and needs to Donais, with the intention of securing legal advice and/or legal representation from Donais as an attorney. This is indisputable.

d. [Note: Donais states in his affidavit that Bisasor asked him to take his case but he declined. This establishes the intent of Bisasor, in sharing information with Donais, was to secure legal advice and legal representation from Donais as an attorney on a landlord-tenant matter, in the area of practice of Donais].

38. Under the above facts and circumstances, it is virtually impossible that this information shared with Donais would not be confidential information or not be protected by attorney-client privilege.

39. The above indisputably establishes that a prospective attorney-client relationship was formed, as defined by NH law, and that Donais had fiduciary duty of confidentiality with respect to the plaintiffs and that Donais breached that duty of confidentiality when he divulged information shared with him from Bisasor to the opposing parties, as part of an attempt and desire to secure a position with them to be their local counsel. This represents an intentional egregious breach of fiduciary duty.

**II. FURTHER INDISPUTABLE FACTS FROM ESTABLISHING FIDUCIARY DUTY BREACH**

**A. Overview**

40. On or about 1-6-17, Bisasor left a voicemail message for Donais seeking legal representation regarding their dispute with Homewood.

41. On 1-9-17, Donais returned the call and engaged in a telephone consultation with Bisasor that lasted approximately 7 minutes. During this consultation, Bisasor disclosed confidential information about their claims and legal situation for the purpose of obtaining legal advice and potential representation.

42. Bisasor provided this information in good faith reliance on Donais's professional obligations as an attorney. Bisasor understood this consultation to be confidential and protected by attorney-client privilege.

43. Donais then thereafter went to represent the opposing party and disclosed information about Bisasor's conversation to them prior to representing them.

44. On 1-18-17, in Nashua District Court, Judge Paul Moore ("Judge Moore") found that an attorney-client relationship existed between Donais and Bisasor based on the 1-9-17 consultation and based on Obrien's consultation with Donais on behalf of Anderson on 1-5-17. As a result of this finding, Donais was required to withdraw from representing Homewood due to the conflict of interest.

45. Bisasor and Anderson subsequently learned that Donais subsequently disclosed information from those consultations to more third parties.

**<u>B. Legal Action Initiated By Plaintiffs | Donais Goes To Represented Opposing Side</u>**

46. On 1-9-17, Plaintiffs filed an emergency 540A petition in Nashua District Court. A Temporary Restraining Order (TRO) is granted by the court to halt any threat of a removal action. On 1-10-17, the 540A petition and the TRO is served on general manager Adam Robitaille in the morning.

47. On 1-11-17, after Terrell advises Akridge of the need for local counsel, Akridge contacted Donais seeking his involvement in the case as local counsel and to support the pro hac vice admission of Terrell. During phone call, Akridge explained the Homewood matter involving the plaintiffs. Donais then informed Akridge that he had a conversation with Bisasor about the case the day before. Donais explained to Akridge what was discussed with Bisasor. Akridge asked Donais if this created a conflict and Donais emphatically assured Akridge that it did not. Akridge then informed Terrell of the issue and Terrell instructs Akridge to tell Donais that he needs Donais to describe the substance of the Bisasor conversation to Terrell. Donais then writes an email to Akridge, Terrell, and Terrell's assistant, with a brief description of the 1-9-17 conversation, saying that is all he knows, providing his bar # and ending with "let me know how you want to proceed".

48. Donais' description of the 1-9-17 call contained confidential information shared by Bisasor, the sharing of which constituted unauthorized disclosure of private client information to adverse parties, breaking client confidentiality.

49. Then, further, at some point thereafter, around 2 days later, on or about 1-13-17, Donais (after having consulted with Bisasor on 1-9-17) agrees to be hired and is hired by Akridge to represent the opposing party [Homewood].

50. Donais also failed to inform Bisasor of this nor obtained consent from Bisasor before doing so.

51. Donais' voluntary decision to call back Bisasor in response to his voicemail, represented at the very least an implied agreement by Donais to engage in an attorney-client conversation protected by privilege, and thus Donais should have known that it was protected by privilege.

**C. Donais' Contact With Akridge**

52. After the 1-9-17 call with Bisasor, Donais and Akridge had a phone call on 1-11-17 where the plaintiffs and their case against Homewood was discussed. Donais discussed the information shared with him from Bisasor. Donais shared this information without receiving consent from Bisasor and without informing Bisasor that he was going to share such information with Akridge. This conversation was centered on whether Donais could be hired to represent Akridge/Homewood in the same case that Bisasor discussed with Donais on 1-9-17. Subsequent to this phone call, Donais sent an email on 1-11-17 to Akridge stating:

> "What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper..".

53. Here, Donais admitted that he received specific client consultation information from Bisasor on the 1-9-17 call.

54. On 1-11-17, Akridge calls Terrell and tells him of the discussion he had with Donais about the contact with Bisasor. Donais writes an email to Terrell stating that he had contact with Bisasor and provided a summary of what was discussed with Bisasor. Donais and Terrell had a further conversation by phone about the matter. On 1-13-17, Donais filed an appearance on behalf of the Homewood defendants and filed pro hac vice admission motion for Terrell. On 1-17-17, Donais and Terrell filed a 60-page motion to dismiss in the Nashua District Court. The motion to dismiss included/utilized confidential information that was shared with Donais both directly via call with Bisasor and indirectly via communications with Obrien from Anderson.

**D. Elliot Berry's 1-17-17 Call with Donais**

55. On 1-17-17, renown Attorney Elliott Berry (of the NH Legal Assistance) agreed to formally represent plaintiffs in this case. Plaintiffs advised Berry of the situation with Donais. Berry expressed shock at these events. Berry advised plaintiffs that this was a serious violation of Rule 1.18 of the NH rules of professional conduct.

56. On 1-17-17, Berry called Donais about the conflict of interest and to give him a chance to explain and/or to withdraw from the case because Berry now had a duty to bring the matter to the attention of the court. But Donais told Berry that there was no conflict of interest, and that he did not think he needed to withdraw from the case.

**E. Court Hearing on 1-18-17**

57. On 1-18-17, a court hearing took place in the Nashua district court before Judge Paul Moore. At or near the beginning of the hearing, Berry raised ethical concerns about Donais with the court. A sidebar ensues with counsel for both parties invited to discuss the matter at the bench in front of Judge Moore. Berry explained the ethical concerns to the judge. Donais gave his explanation of the matter citing that he did nothing wrong. Donais fought vigorously to remain on the case, and even accused Berry of creating a contrived conflict. However, Judge Moore told Donais that he had been part of the PCC for the past 10 years and was vice chair of the hearing committee for the past 4 years. Judge Moore told Donais that if he had any discussion with Obrien or Bisasor about the facts of this particular case, he would be in conflict. Judge Moore indicated to Donais that this could become a very serious matter if plaintiffs decide to pursue this as a complaint and that Donais needs to carefully consider what he is going to do because once "the bell is rung", it will be a problem especially if done while the litigation is proceeding. Judge Moore asked Berry if his clients were willing to waive any conflict and that if they were not, then Donais needed to make a decision on withdrawing. If Donais could not decide for himself, then Judge Moore would make the decision for him. Judge Moore clearly was signaling to Donais that it would be much better for him to withdraw on his own without being formally disqualified by the judge. Donais got the message loud and clear. After a short recess, wherein plaintiffs told Berry that they did not waive any conflict, then Donais reluctantly told Judge Moore that he was going to withdraw.

**F. Dave Akridge Affidavit on 5-4-17**

58. Akridge provided a statement on 5-4-17 in an affidavit that shows that, as of 1-11-17, prior to Donais being hired to represent Akridge and Homewood, that Donais and Akridge knew that Bisasor was the plaintiff suing Akridge and Homewood in the district court, i.e. that they concluded that "Andre" was quite likely "Mr. Bisasor" and that Akridge "heard enough to conclude… that the caller he described was likely Mr. Bisasor".

59. The above shows that Donais received legal advice information from Bisasor, that Donais was in contact with Akridge shortly after the consultation call with Bisasor, that before Akridge hired Donais, Donais shared with Akridge information that Bisasor shared with Donais. The above also shows Donais willfully and knowingly persisted in seeking to represent the opposing party when he knew there was a conflict and when his possible new client and their lawyer was specifically concerned that there was a conflict of interest. But Donais persuaded them

that there was nothing to the matter, all the while also hiding that Obrien had spoken to Donais about the same matter and shared more information about the matter, to which Donais even rendered a legal opinion. It is likely that if Akridge and perhaps Terrell had known about the Obrien call, they would not have hired Donais as local counsel. Akridge stated that: *"I specifically recall asking Mr. Donais if he would have a conflict serving as local counsel, given this conversation with "Andre." He responded with conviction that he did not, given the fact that he had turned down the request to take the case, and given also the brief nature of his discussion with the caller."*

**G. Other Statements Made in Donais**

60. Donais admits that he received confidential information from Bisasor. As one example, he admits that he received information regarding the "need to immediately file" which further goes to timing and strategy. Donais also stated that during the call he knew it was the same case that he consulted on with Obrien. Donais disclosed the contents of plaintiffs' client-privileged protected information, as noted above, to Akridge, Terrell, and Terrel's assistant, prior to being hired by them to represent them as parties adverse to plaintiffs. Donais further used/disclosed the contents of plaintiffs' client-privileged protected information, as noted above, to Akridge, Terrell, and Terrell's assistant, after he was hired by them to represent them as parties adverse to plaintiffs. This was a breach of confidentiality.

**H. Additional Subsequent Events**

61. In the time period spanning 2017, 2019, 2020, and after, Donais disclosed the contents of plaintiffs' client-privileged protected information, as noted above, to his family including wife/sons, his friends, members of the Manchester NH crime-line board, and the Manchester NH police, including details of the 1-9-17 conversation with Bisasor and the 1-5-17 conversation with Obrien.

**III. FURTHER INDISPUTABLE FACTS PERTAINING TO BREACH OF FIDUCIARY DUTY ESTABLISHED BY DONAIS' STATEMENTS AND ADMISSIONS**

**A. Donais Has Admitted Facts That Establishes Conflict/Breach Of Fiduciary Duty**

**i. 2017 Affidavit**

62. Donais' affidavit states: "*Andre provided me some general details about what he described as a landlord tenant dispute involving inflated charges and also a concern about the existence of racial discrimination against him, and a need to immediately file*."

63. Rule 1.18 states:

a) A person who provides information to a lawyer regarding the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.
b) Even when no client-lawyer relationship ensues, a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information except as Rule 1.9 would permit with respect to information of a former client.

64. So, according to Rule 1.18, Bisasor was a prospective client. Donais provided information to Bisasor, as a lawyer with the possibility of forming a client-lawyer relationship with Donais.

65. Donais states that Bisasor "***provided some general details about…a landlord-tenant dispute, involving inflated charges",*** along with information about a racial discrimination claim and urgent timing needs, etc. Here, Donais thus admitted to receiving/reviewing information from a prospective client.

66. Therefore, because Bisasor provided information to Donais regarding the possibility of forming a client-lawyer relationship, making Bisasor a prospective client, and because Donais received and reviewed information from Bisasor as a prospective client, Donais was prohibited from representing a client with interests materially adverse to those of Bisasor as a prospective client.

67. Further, Donais knew that the case in which he was contacted about by Dave Akridge on or about 1-9-17, was the same case that Bisasor spoke to him about on 1-9-17.

**ii. 1-18-17 court hearing**

68. In the 1-18-17 court hearing[1], Donais stated:

> "So here's what happened, Your Honor, is on Thursday, January 5th, at 5:37, Rob O'Brien called me and said hey, I've got a potential client, here's what the issues are, is it something that you'd be interested in? He didn't tell me who the plaintiff was, didn't tell me who the defendant was, just generically laid out what some of the issues were. I said I'm not interested. Rob said can I give your name to the other party so that you can explain that to **him**[2]. I said I'd rather you not since I'm not interested in taking the case. I don't want to take it. I don't have the ability to do it on the timeline. Notwithstanding that, Rob gave contact information. I got a phone call -- I can give you all the records if Your Honor would like. So this is Rob O'Brien's statement of what transpired. So Rob told me about the case. These come from my phone records and my system, Your Honor. And I redacted out the other entries for the names of -- because they are clients -- and the whole bit. But there were two records. One was on January 5th. The other was on January 6th. So on the 5th at 6:17 p.m., I had a seven second phone call and that was probably spent navigating the phone tree and it disappeared. There was another phone call on Friday the 6th at 5:16 p.m. for a minute 37. Again, navigating the phone tree. There was a message. Got the message, generically about hey, got a landlord-tenant case, can I talk with you about it. And I said sure. This is my call back the following day on Monday, spoke in for six minutes 37 seconds to get a sense of what this case was about, Your Honor. **Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien** and the answer is yes. And I said I already told him I don't want to do it. So at that point, there was pressure to what can I do with the case. I really don't want to do it. I'm not interested in doing that. I don't have the time to do it. I can't do it on the timeline that you want. **May even be a potential conflict**. Don't want to take the case. That was the end of the phone call."

69. Here, Donais stated that, during the 1-9-17 phone call with Bisasor, Donais figured out that there "**may even be a potential conflict"**. This could only mean that he connected the case to the Homewood suites case. This means that Donais knew that Homewood and Akridge were involved in a case against Bisasor and his spouse. This is proof that Donais knew of the conflict from 1-9-17, by his own admission.

---

[1] See **Exhibit 34 – Transcript of the District Court Hearing on January 18, 2017.**

[2] NB: Mr. Obrien has stated in his 1-18-17 affidavit that the caller was a "**she**", hence a female, meaning me. This was not a "him".

70. Moreover, here Donais also admits that he realized that there was a connection between the conversation Donais had with Obrien on 1-5-17 and the conversation he was having with Bisasor on 1-9-17 i.e. "***Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien and the answer is yes. And I said I already told him I don't want to do it.***"

71. Donais also admitted "*There was another phone call on Friday the 6th at 5:16p.m. for a minute 37. Again, navigating the phone tree.* ***There was a message. Got the message, generically about hey, got a landlord- tenant case, can I talk with you about it. And I said sure. This is my call back the following day on Monday, spoke in for six minutes 37 seconds to get a sense of what this case was about, Your Honor. Once I figured out what the case was about, I said did you get my name and info from Rob O'Brien*** *and the answer is yes.*"

72. Here, Donais states that he received enough information to figure out what the case was about. This establishes that he received confidential information about the legal matter from Bisasor. This also establishes that he received confidential information about the legal matter from Obrien about the same legal matter. It can be inferred from this admission alone that in order to receive enough information to figure out what the case was about, Donais must have received information about the facts of the case, the claims by the plaintiffs, and the alleged wrongdoing by the Homewood defendants. This is even more clear-cut given that Donais states that he figured this all out without having the names of the parties, including without the name of the hotel. Thus, his identification of what the case was about and that it was the same case that Obrien told him about, must have been based on details of the facts and claims of the case, which by definition constitutes confidential information provided via a prospective attorney-client communication. There is no logical way for Donais to avoid the fact that he received confidential information from Bisasor and from Obrien (via Anderson) about the facts and claims of the case, prior to the filing of any lawsuit.

**<u>iii. 1-11-17 Email</u>**

73. On 1-11-17, Donais wrote an email to Dave Akridge, Karl Terrell (out of state counsel advising Akridge), and Felicia Brogden (Terrell's assistant), stating:

> Karl and Felicia: I am happy to provide local representation to support your pro hac vice admission. What I know is that I received a call from "Andre" who wanted to discuss filing a 540-A petition, claiming they were being treated differently for food services because they were minorities, and were being overcharged for their use of the room. Andre claimed that it was a mixed use property, in which part was rented, and part was under innkeeper. Given his timeline and his issues, I was not in a position to assist, and did not engage in any conflict analysis to determine the property, property address, or whether there was a conflict. This is the extent of what I know. I am around and available today

with availability until 2pm today, tied up for about 1 hour, and then spotty after that. Tomorrow is clear from 9-10, and 10:30-1, and 2-4:30. My NH bar # is 12466. Let me know how you wish to proceed. Craig

74. First, Donais here admits that he received information from Bisasor regarding discussing filing a 540A petition, claiming being treated differently for "food services because they were minorities", and were being overcharged for their use of the room, and that it was a "mixed use property", in which part was rented, and part was under innkeeper, and an urgent timeline. Again, this goes to providing confidential information from Bisasor to Donais about the facts of the dispute, and the intent to file a 540A petition (as a legal strategy). Donais further here states he was told about disparate treatment (which was not included in the 540A petition). It should be noted that the motion to dismiss (on page 15 and 16, among others) filed by Donais and Terrell in the Nashua circuit court, fabricated untrue[3] attacks on Bisasor for "misconduct…on numerous occasions during the food service", which was a preemptive attack to undermine any future raising of disparate treatment in the food service, which was a direct function of the information Donais obtained from Bisasor. The motion to dismiss also preemptively raised race issues in order to again neutralize any possible future claim of race discrimination. This is a clear example how Donais' receipt of confidential information from Bisasor and Anderson (via Obrien) compromised the plaintiff's case and disadvantaged them in therein.

75. NB: It should be noted that here Donais stated that this is "all he knows". But yet in his March 2017 affidavit, 3 months later, he then claims to know much more about what was said in the 1-9-17 call way beyond what he said here in this 1-11-17 email. Donais was clearly lying in the email about the extent of what was discussed on the call. The fact that Donais lied about this is undisputed from the record.

76. For instance, in his affidavit, he claims Bisasor accused him of racism for declining the case. Donais also hid the fact that Obrien had contacted him with information from Anderson, that Donais realized it was the same case that Obrien spoke to him about, or that Donais purportedly asked Bisasor if he got the contact info from Obrien. Further, Donais didn't mention that he (purportedly) told Bisasor there may be a potential conflict. This is a lot of information that Donais left out of this email, some of which was later stated in his March 2017 affidavit or in the 1-18-17 hearing.

[3] Note: These untrue attacks were withdrawn by the Homewood case defendants in April 2022, pursuant to a settlement agreement that including nullifying the false defamatory statements made in this motion to dismiss.

77. It should be noted that Donais admits here that Akridge/Homewood had not yet hired him, as he gave his "NH bar number" to them and stated "let me know how you want to proceed" in that first email to them. This demonstrates that he had not been hired as yet because he could not have been hired without providing Akridge and Terrell his bar #. Further, his query about how they wanted to proceed, confirms he hadn't been hired as yet.

78. This directly contradicts his statement in the March 2017 affidavit where he stated:

> "Since I did not learn from either Attorney O'Brien or Andre about the parties involved in Andre's matter, I thereafter agreed to serve as local counsel when I was contacted by Attorney Karl Terrell, representing Homewood Suites, in the case brought by Ms. Natalie Anderson in this 9th Circuit Court-Nashua District Division landlord-tenant case. I had a chance to review Ms. Anderson's pleading, confirmed the identity of the plaintiff (and that Andre was not a plaintiff) and performed a conflict check before undertaking representation.

79. The above statement by Donais is clearly false as he clearly learned that Andre was involved in the Homewood case on 1-11-17, in the first conversation he had with Akridge about the case, prior to undertaking representation of Homewood, before reading any pleadings, before performing any so-called conflict check. This is corroborated by Akridge's affidavit. [NB: This alone should impeach Donais' affidavit as being untruthful. He needs to be put under oath and cross-examined about this.]

80. Further, this email indisputably shows that, on or about 1-11-17, Donais divulged confidential information shared with him from Bisasor on the 1-9-17 prospective client call, to Akridge, Terrell, and Terrell's assistant, prior to being representing Akridge/Homewood, which representation was agreed upon/occurred two days later on 1-13-17 (which is the date of a pro hac vice admission motion, on behalf of Terrell, filed by Donais, in circuit court.)

81. Here, Akridge contacted Donais by phone, on 1-11-17, about possibly representing him and his company as local counsel. Donais told Akridge he spoke to "Andre" about the case on 1-9-17 and figured out that Andre was involved in the case. Donais also told Akridge and Terrell about the facts of what Bisasor told Donais including specific facts, specific potential claims, strategic actions being contemplated, and urgent timing factors. This includes information about disparate treatment claims that was never included in the 540A petition and thus Donais clearly revealed to Akridge and Terrell, information that they did not know about plaintiffs' claims from the 540A petition. This is indisputable. Donais should not have divulged any of this information to unauthorized third parties, much less to the opposing parties in the same dispute.

**iv. Akridge Affidavit**

82. Below is the relevant excerpt of Akridge's affidavit:

On January 10, we received a copy of the legal action the plaintiffs filed in the Circuit Court in Nashua. I asked Mr. Terrell to represent us. On January 11, at 11:29 am, Mr. Terrell sent me an email stating that he would "need to associate local counsel," and provided a copy of the local court rule on the admission of out-of-state counsel. A copy of this email and several subsequent emails, in a single chain dated January 11, is attached. Mr. Terrell and I had discussed, earlier, the likely need to associate local counsel. He concluded his email by stating: "Please ask the lawyer you mentioned if he's willing to provide this service." The lawyer I had in mind was Craig Donais, who I have known for several years. He has provided legal services for me related to the board of a condominium association that I serve on, and he once handled a personal matter for me. Mr. Donais has never been retained to perform work for either Great American Hotel Group or the Homewood Suites by Hilton in Nashua. Shortly after Mr. Terrell's 11:29 am email, I called Mr. Donais. Our discussion was quite short; maybe four or five minutes. This was my first conversation with Donais that had anything to do with the dispute involving Anderson and Bisasor. During that call, I briefly explained the nature of the case, the fact that it involved the Homewood Suites in Nashua, and the need for local counsel. Donais then let me know that he had received a call from an individual named "Andre," who said he was looking for an attorney to represent him in a landlord/tenant matter. The situation, as Donais said he understood it, involved some type of mixed-use property. He said he did not remember the caller identifying this property as the Nashua Homewood Suites. In any event, in piecing this together, we concluded that "Andre" was quite likely Mr. Bisasor.

……

I specifically recall asking Mr. Donais if he would have a conflict serving as local counsel, given this conversation with "Andre." He responded with conviction that he did not, given the fact that he had turned down the request to take the case, and given also the brief nature of his discussion with the caller. Following this call, I sent Mr. Donais an email - at 11:41 am - copying Mr. Terrell and his assistant Felicia Brogden. See the attached email chain. In that email, I offered to "do a phone intro" with Mr. Donais and Mr. Terrell, as the two of them had not yet met or spoken concerning this case (and, to my knowledge, had never met or spoken previously on any other matters). I did not provide Mr. Terrell, in that email, a phone number for Mr. Donais. I stated also to Mr. Terrell, in that email, that Mr. Donais "may have received a call from Bisasor yesterday" (I have since read Mr. Donais' affidavit, in which he states he spoke with Donais on January 9, not January 10, as I apparently thought on Jan 11, when referring to that call as having taken place "yesterday'). I stated further, in this email, that Mr. Donais "did not take his case." I believe I asked Mr. Donais to explain and describe to Mr. Terrell the substance of his conversation with Bisasor.

83. Here, Akridge confirms that Donais learned that Bisasor was involved in the Homewood case on 1-11-17, in the first conversation he had with Akridge about the case, prior to undertaking representation of Homewood, before reading any pleadings, before performing any so-called conflict check. Donais, as of 1-11-17, thus knew that he had received prospective client information on the substance of the Homewood case, from Bisasor on 1-9-17 and from Obrien on 1-5-17. He thus had enough to know there was a conflict, and that to move forward with representing Homewood would constitute a breach of fiduciary duty to the plaintiffs.

**B. Statements & False Statements by Donais in his Affidavit that Support Breach of Fiduciary Duty Claim**

84. Donais made several statements, including false statements in his March 2017 affidavit that establishes the breach of fiduciary duty claim, as follows.

85. In his affidavit, Donais stated that he agreed to serve as local counsel for Homewood because he did know about the parties from Obrien or Bisasor and because he performed a conflict check before undertaking representation and reviewed the pleadings filed in district court, which confirmed that the plaintiff was not Bisasor. But this contradicts his statements made in the 1-11-17 email chain with Donais, Akridge and Terrell, which shows that before Donais undertook representation of Homewood, he had an initial conversation with Akridge who initiated

the contact apparently in the morning of 1-11-17 and who explained the case to Donais, and wherein it shows that Donais immediately recognized that "Andre" was involved in the case. This realization took place before representation was undertaken and it prompted Akridge to inform Terrell of the problem and it further prompted an investigation by Terrell into what exactly was discussed between Donais and Bisasor. Because of the sequence of these facts, it would have been totally unnecessary, unnatural, anachronistic for Donais to then perform a conflict check when he already knew who the plaintiffs were by his own admission, before undertaking representation. Donais' story simply does not make any logical sense and appears to be a rather clumsy attempt to harmonize or massage the facts in order to cover himself. But it cannot be done. The facts are too specific and pronounced to support his tortured story. The facts are not malleable enough to avoid the clear/evident contradictions in his story. The bottom line is that here again it is clear that Donais is not telling the truth. The truth is that he did not need to perform a conflict check because he already knew who the parties were. Plaintiffs have offered evidence that Donais knew who the parties were from 1-5-17 when Obrien contacted him and told him about Homewood. Plaintiffs also offered evidence that Donais knew who the parties were, because he stated/claimed that on the 1-9-17 call with Bisasor, he said that there **may be a potential conflict**. But even if these facts and evidence are not considered for the moment, it is indisputable that Donais knew who the parties at the very least during the purported first contact that Akridge had with Donais wherein Akridge purportedly was first seeking to recruit Donais as local counsel for the case on or about 1-11-17. This is proven by the email record that Donais attached to his motion to dismiss amended complaint filed 8-22-25 in this court.

86. Moreover, Donais' statement that he "***had a chance to review Ms. Anderson's pleading, confirmed the identity of the plaintiff (and that Andre was not a plaintiff)***", simply does not ring true but comes across as a strained attempt to orchestrate the appearance of ignorance and innocence. Moreover, Akridge has stated in his affidavit that when Akridge explained to Donais the broad issues of the case, Donais immediately recognized the facts and the parties (i.e. presumably based on the facts recited to him just a day or two earlier in the call with Bisasor on 1-9-17, as well as on the prior call with Obrien on 1-5-17). Yet if that is true, then how is it that Donais could (on or about 1-11-17) review the entire pleading filed by the plaintiffs in district court on 1-9-17, without making the same realization, since the district court pleadings went into detail about the facts of the case (the

same facts that Akridge must have covered more broadly with Donais on the phone on 1-11-17, assuming that call took place after Donais review of the pleading). This just simply makes no sense. Donais is trying to have it both ways and, in the process, has created an untenable contradiction. Otherwise, there is an irreconcilable contradiction between the affidavit of Donais and the affidavit of Akridge.

87. NB: This is just not believable and this purported paper trail smacks of orchestration and manipulation. Yet, even assuming the benefit of the doubt, it still makes no sense that Donais would later claim in his affidavit that he relied upon a conflict check performed at the same time and in the same call wherein he admitted that he realized who the parties were and that "Andre" was Anderson's husband at that time on 1-11-17. A conflict check was no longer necessary to be performed or otherwise to be relied upon because Donais had perfect knowledge of the parties at that time and because he therefore at that time had knowledge that there was a conflict or at least a potential conflict or the appearance of a conflict. Hence, Donais' story cannot be credited or believed and reflects a further attempt at deflection, obfuscation and subterfuge to mislead this tribunal.

88. It should be noted that the text messages from Obrien were not sent to Bisasor. Obrien sent them to Anderson. Obrien did not have any contact with Bisasor nor did he text Bisasor anything. Any and all contact with Obrien occurred with Anderson. Donais attempts a sleight of hand by trying to insinuate that he understood that the text messages from Obrien were sent from Obrien to Bisasor. But even this fails because Obrien made it clear to Donais that the person he spoke to on 1-5-17 was a female, not a male. This is made clear even in the affidavit that Donais solicited from Obrien on or about 1-17-17 so that Donais could carry it to court on 1-18-17 to show the judge. In that affidavit of Obrien[4], Obrien references the caller as a **"she"** on at least two occasions[5]. Moreover, during the 1-18-17 court hearing, it was clearly stated the conversation with Obrien occurred with Anderson and that the texts were sent to Anderson. Moreover, in the motion to disqualify counsel that was submitted to the district court on 3-6-17 and to the superior court on 3-1-17 by plaintiff, it was abundantly clear that the conversation with Obrien took place with Anderson and that the text messages from Obrien was sent to

[4] See **Exhibit 10 – Affidavit of Robert Obrien dated 1-18-17.**

[5] Donais tries a "sleight of hand" argument to make it look as though no one knew the gender of the person that had called Obrien on 1-5-17. Yet Obrien clearly identifies the person who called him as a "she", which he did twice in his affidavit. This shows the intent to deceive. Donais knew that Obrien had identified the caller as a female, and thus that it could not have been Bisasor who spoke to Obrien. Yet, he put that misleading statement in his filing in order to confuse the court.

Anderson's phone. Yet, with all those facts made clear from multiple sources and in multiple pleadings, Donais still tries, in his 3-13-17 affidavit, to feign ignorance and attempts to reframe the conversation with Obrien as occurring with Bisasor and the texts from Obrien as going to Bisasor. This just shows the lengths to which Donais was and is willing to go to be deceitful and misleading in order to confuse the triers of fact. But there is a purpose to this deceit and obfuscation: he wants to create the impression that Anderson could not be implicated as a prospective client and so if he misdirects the conversation as taking place between Obrien and Bisasor, so that he can try to make or maintain the argument that there was no contact with Anderson whether directly or indirectly and that Anderson can never be considered to have been a prospective client. This is the level of sophistry and subterfuge that Donais is capable of and it is a warning to this tribunal that he is playing a very nuanced and sophisticated game of deceit.

89. Similarly, Donais again tries to engage in "sleight of hand" and misdirection when Donais stated in his affidavit that "***the text message from Attorney Obrien attributed statements to me that I simply did not make. These statements also appear in a paragraph referencing Attorney Diaz, so it is not clear whether the statements were intended to be attributable to Attorney Diaz or to me***.". First it should be noted that Obrien did not speak with "Attorney Diaz" on 1-5-17. Obrien has made clear that Donais was the one who provided the legal opinion on the facts of the case and that was what was presented in the text message from Obrien to Anderson. Second, the reference to "Attorney Diaz" was in reference to the contact information for Attorney Bussiere. Obrien was simply stating that Attorney Diaz (hereafter "Diaz") is another attorney in the law firm of Attorney Emile Bussiere. Then Obrien turned his attention to the conversation he had with Donais and the legal opinion that Donais had about the facts of the case, as was presented to him by Obrien on Anderson's behalf. It should be noted that the statements attributed to Donais could not have been intended to be attributed to Diaz because Diaz does practice discrimination law as noted on his bio[6] from the Bussiere & Bussiere website (in fact Diaz appears to be only attorney in that law firm that has experience in discrimination law). Hence, Diaz's bio does not comport with the statement that "he would not opine on discrimination cases outside his experience".

[6] See **Exhibit 14 – Website Bio Information of Attorney Keith Diaz showing that he practices discrimination law.**

Hence, Donais' clever attempt at misdirection again fails. The text message from Obrien to Anderson stated as follows:

> +16034599965
> Thursday January 5, 2017
>
> "Here is contact info for attorney who handles discrimination cases Bussiere & Bussiere, P.A., please call 603.622.1002 emiljr@bussierelaw.com. Another attorney in that form (firm) is Keith Diaz. I spoke with Attorney Donais. He said you have a great contract case for the overcharges. He said the innkeeper rules would likely apply to your situation. Which allows for "no cause" evictions. He would not opine on the discrimination claims outside his experience." 6.15pm.

90. Further, in his affidavit, Donais states that he did not draft any pleadings nor was he involved in the drafting of any pleadings. This is simply not credible. Both he and Terrell signed and filed a 60-page motion to dismiss on 1-17-17 in the district court. It is not believable that he was not involved in any way with the drafting or editing of that pleading that he signed his name to. Moreover, Donais evidently drafted (at the very least) the filings related to his appearance and he must have been involved in the motion to admit pro hac vice, since outside co-counsel was not yet admitted to the case. Beyond that, he must have been involved in the preparation of the pleadings filed on 3-16-17 in district court which relied heavily upon and utilized his affidavit. It is virtually impossible for those pleadings to be drafted without Donais' involvement (especially given what was written in those pleadings).

91. Donais states further in his affidavit that "***After learning of Attorney Obrien's purported communication with Andre, as well the contents of the text message, and after advising Attorney Terrell of these same facts at the courthouse, it was my decision to file my withdrawal on the case, given the potential appearance of conflict, despite my efforts to avoid any conflict***." But this again is untrue, inaccurate and misleading. First, as stated before, Obrien had no communications with Bisasor. Second, Donais self-purportedly "learned" of the communications between Obrien and Anderson at the very least since the call from Attorney Berry on 1-17-17. He thus had a chance to withdraw at that point but instead he argued with Berry and protested that he did nothing wrong. The reason why Donais had in his possession an affidavit from Obrien dated 1-18-17 was because Donais was advised on 1-17-17 by Berry of the text messages to Anderson from Obrien and thus Donais went to Obrien to solicit an affidavit quickly so that he could carry it to court on 1-18-17. If simply learning of the communications with the plaintiff were sufficient for Donais to withdraw, he would have done so on 1-17-17 upon being apprised of this fact by Berry.

92. NB: But all of this ignores the fact that Donais has also admitted elsewhere that as of 1-9-17, he realized that the communications with Bisasor on the 1-9-17 call and the conversation between Donais and Obrien on 1-5-17 were in fact related, and that as of the 1-9-17 he realized that there may even be a potential conflict. Third, Donais spent significant time arguing to the judge on 1-18-17 why there was no conflict and why he should not be excluded from the case. Donais went as far as to accuse Berry of creating a contrived conflict, for which the judge chided Donais for being inappropriate. Moreover, the judge had to pull rank on Donais in reminding or informing Donais of the fact that the judge had spent about 10 years on the PCC and the vice chair of the hearing committee, signaling that he judge knew exactly how the PCC and the hearing committee would view this situation (i.e. that they would find that there was a conflict). The judge also told Donais that there was a conflict and asked Berry to check with his clients to see if we would waive the conflict. Even then, Donais was still stubbornly trying to convince the judge that he did nothing wrong. The judge finally told Donais that he was trying to help him out by giving him a chance to make the decision on his own, and that otherwise the judge would make the decision for him formally. It was only then that Donais reading the tea leaves that the judge was going to formally remove him from the case due to ethical conflict as an official finding, that Donais "decided" to withdraw "on his own", after talking to his clients. The transcript of the 1-18-17 hearing fully bears this out[7].

93. In taking all of the above together, it is clear that the 3-13-17 affidavit of Donais filed in district court on 3-16-17 (and also used and/or filed in superior court on 4-27-17 and 5-5-17), is full of false, untrue, inaccurate, incredible and misleading statements. Under no conceivable circumstances could Donais' conduct, actions and statements reflected in that affidavit be said to represent the standards of honesty and candor to which the NH rules of ethical and professional conduct hold all lawyers to account. This ultimately supports the point that Donais intentionally breached his fiduciary duty to the plaintiffs.

**C. Statements Made by Donais in the 1-18-17 Court Hearing That Support Breach of Duty Claim**

94. Donais denied giving his legal opinion on the facts of the case as presented to him by Obrien. The judge said to Donais "***You're giving that person a really brief (indiscernible) on how to handle it, that's one issue. If you're sitting there and discussing the facts particular to the case, then that's something else***."

[7] See attached **Exhibit 34 – Transcript of the District Court Hearing on January 18, 2017.**

95. Donais responded to the judge saying "***I don't think we did, Your Honor. It was a generic discrimination over charge and I said I don't want to do it, Your Honor***."

96. Berry then points to the text message from Obrien to Bisasor summarizing the legal opinion that Donais gave regarding the facts of the case.

97. Donais later then states that "***And that's actually not what I said to Rob but that's okay. And I think Rob gave his own statement of what transpired in that conversation***."

98. Donais then accuses Berry of making up a contrived conflict to exclude Donais by saying "***I guess, Your Honor, this is kind of a contrived conflict to exclude me when this is my client and has been my client. I've worked with Dave Akridge who is the principal of the defendant for ten years on other matters and the like. So it's easy to call opposing counsel—***".

99. Berry responds saying that Donais cannot call it a contrived conflict, saying "**MR. BERRY: He can't make it a contrived conflict. In some ways it makes it worse.".** And then the judge steps in and chides Donais for that inappropriate accusation by saying: "**THE COURT: Okay. Two things. Before this gets any further. I think the word contrived is inappropriate**." See Exhibit 34 - page 16 of the 1-18-17 court hearing transcript[8].

100. NB: The fact that Donais snaps at Berry and lashes out accusing him of a contrived conflict shows the unbecoming character of Donais. Similarly, Donais knew there were legitimate concerns about a conflict because he himself stated that he told Bisasor on the 1-9-17 call that there may be one, and both Dave Akridge and Karl Terrell had previously raised concerns about this conflict as of 1-11-17. Thus, it takes a special kind of dishonesty for Mr. Donais to stand there in court and look both Berry and the judge in the eye and accuse Berry of making up a contrived conflict. Moreover, Donais did this knowing that he had an email chain dated 1-11-17 that showed that he and his client and co-counsel were concerned about a conflict and knowing that he was hiding[9] that email chain from the court on 1-18-17. It shows how Donais is capable of exploiting a situation and to try to turn the tables on the other party who is bringing legitimate concerns to the attention of the court or tribunal. This also shows that Donais cannot be trusted to tell the truth or to be forthcoming with the truth.

---

[8] See **Exhibit 34 – Transcript of the District Court Hearing on January 18, 2017.**

[9] See **page 232-240** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court**.

## D. Other False Statements Made by Mr. Donais

101. Donais has stated that the 1-11-17 email from Donais to counsel for Homewood, occurred prior to Donais learning that Bisasor and Anderson were related. Donais has given the indication in his other pleadings in court that he did not know that Bisasor's wife was involved in the case that was discussed with Donais on 1-9-17, until the court hearing on 1-18-17. This is not true. Bisasor explicitly told Donais that the case involved both Bisasor and his wife. So, Donais knew that his wife was part of the case and that it was not Bisasor alone. This is also confirmed by Donais statement (in the 1-18-17 hearing) that, during the 1-9-17 call with Bisasor, he realized the two conversations (i.e. the one with Obrien on 1-5-17 and the one he was having with Bisasor on 1-9-17) were connected and this realization occurred within one minute into the conversation with Bisasor on 1-9-17, showing that Donais knew from early in the conversation there was a conflict. This also confirms that Donais consolidated in his mind the information shared from both conversations, which means there was a substantial amount of information that Donais had about the plaintiff's case as of 1-9-17.

102. Donais has also given contradictory statements, in telling the court on 1-18-17 that he told Bisasor on 1-9-17 that there **may be a potential conflict**. If he did not know or suspect that Homewood was involved in the case, then how could Donais purportedly say to Bisasor, on the 1-9-17 call, that there **may be a potential conflict**. Donais evidently did not represent other principals who owned extended stay hotels in Nashua, NH at the time. The only way for there to be a "potential conflict" is if Donais knew that Homewood Suites of Nashua (managed by his longtime client Akridge) was involved in the dispute with Bisasor and his wife.

103. Anderson explicitly told Obrien that she and her husband, Andre, resided at the Homewood Suites in Nashua NH. It can be inferred that Obrien told this information to Donais when they spoke by phone on 1-5-17. [NB: **It would be important to obtain Donais' phone records and Akridge's phone records to see if Donais had any calls with Akridge just after the 1-5-17 call with Obrien.]**

104. Even assuming arguendo that Obrien did not share this information with Donais on 1-5-17, it is evident that Donais knew that Homewood was involved in the case that Bisasor was speaking to him about on 1-9-17, because Bisasor told Donais that the case involved an extended stay hotel in Nashua NH and that Bisasor wanted to file a 540A petition in the Nashua District Court and had spoken to a Nashua police officer about the case. Donais also knew that Dave Akridge managed the Homewood Suites in Nashua NH. **Again, it would be important to**

**obtain Donais phone records and Akridge phone records to see if Donais had any calls with Akridge just after the 1-9-17 call with Bisasor.**

105. The facts point to knowledge on the part of Donais that Homewood was involved. This can be inferred from his own admissions. There is simply no way to explain away his acknowledgement to the Nashua circuit court that he knew on 1-9-17 that there was a **potential conflict**. Donais needs to be placed under oath and questioned about this matter. Further, in his 2017 affidavit, Donais gives himself credit for recusing himself as soon as he discovered at the 1-18-17 hearing that Homewood was a party. But this is not true or accurate, as he knew that from much earlier. This is undisputed from the record.

106. The conversation that Attorney Berry had with Donais regarding his concerns about the conflict of interest showed that Donais insisted on his intent to stay-on as counsel in advance of the 1-18-17 hearing in the district court. Thus, Donais after being contacted by Berry on 1-17-17 about the conflict of interest and ethical issue and told about the text from Obrien, still doubled down on not coming off the case and went to the court on 1-18-17 with arguments prepared for why he should stay on the case, which were rejected by the Judge.

107. Also, Donais fought to stay on the case while in the 1-18-17 hearing before Judge Moore, until he was forced by Judge Moore to disqualify himself from the case (or otherwise the Judge would do it formally). NB: If there was no conflict of interest or ethical issue whatsoever, then why was he removed/disqualified from the case?

108. Donais simply thought he could take advantage of plaintiffs because they were initially pro se (in filing the 540A petition), and he proceeded with the conflict of interest situation, and was bold enough to think he could get away with it, even after Berry raised concerns about his actions. Donais thus contradicted himself/the facts.

109. It is also noteworthy that Donais states that he performed a conflict check prior to taking on the case as defense counsel for Homewood. But this contradicts his statements made in the 1-11-17 email chain with Donais, Akridge and Terrell, which shows that before Donais undertook representation of Homewood, he had an initial conversation with Akridge (who initiated the contact apparently in the morning of 1-11-17 and who explained the case to Donais), and wherein it shows that Donais immediately recognized that "Andre" was involved in the case. This realization took place before representation of the Homewood defendants was undertaken. Moreover, this

story (about performing a conflict check) simply does not ring true, but comes across as a strained attempt to orchestrate the appearance of ignorance/innocence.

110. Further, in the 1-11-17 email, Donais writes as though he already had a conversation with both Terrell and his assistant, Felicia. The context and syntax suggest a prior conversation i.e. "***Happy to be provide local representation***", "***What I know is…***", etc. Also, Donais then stated that he was around and available to speak further on a few different dates and times. This indicates further discussion took place. NB: Donais stated that, during the 1-9-17 call with Bisasor, he realized the two conversations (i.e. the one with Obrien on 1-5-17 and the one he was having with Bisasor on 1-9-17) were connected and this realization occurred within one minute into the conversation with Bisasor on 1-9-17. How is it then that the conversation continued for another 6 minutes? This shows that Donais intentionally let the conversation continue on, with Bisasor sharing more confidences/information with Donais, when Donais knew from early in the conversation there was a conflict. This also confirms that Donais consolidated in his mind the information shared from both conversations, which means there was a substantial amount of information that Donais now had about plaintiff's case as of 1-9-17.

**E. More Proven False Statements in Donais' Affidavit**

111. First, Donais stated that his call with Obrien was for 5 minutes and that Obrien called him. Yet the phone log of Obrien shows that there was an incoming call to Obrien at 5:35pm. So the phone log provided cannot be evidence of the phone call referenced by Donais in his affidavit[10].

112. On 1-5-17, Donais stated that Obrien told him that the so-called "unknown caller" had a "need to file something on Monday" (presumably Monday 1-9-17). Yet this is contradictory to the actual facts because the departure date was set initially by the Homewood defendants to be on 1-6-17. It was the morning of 1-6-17 that Akridge changed the ejection date to 1-10-17. Therefore, at the time that Anderson spoke with Obrien on 1-5-17, it would have been too late to "file something" on Monday, 1-9-17, given that as far as anyone knew as of 1-5-17, the then departure deadline was 1-6-17 (i.e., Akridge changed the departure deadline to 1-10-17 after a call with Bisasor on 1-6-17). This is another discrepancy with the facts that is created by Donais' affidavit.

[10] See **Exhibit 7 – Phone Log of Robert Obrien Provided by Defendants**.

113. Donais states that he took on the local defense counsel role for Homewood because he did not realize that Anderson was the so-called "unknown caller" vis-à-vis Obrien, or that her husband, Bisasor, was the caller in his 1-9-17 call with Bisasor. But this is belied by the facts as stated before[11].

114. Note: The text on 1-5-17 was from Obrien to Anderson, not to Bisasor, as erroneously stated by Donais.

115. Donais states that he never made certain statements to Obrien. Yet Obrien stated clearly that Donais made these statements. If only Obrien had not sent that text message to Anderson, then they both could just deny everything. Unfortunately, the text message[12] stands as the contemporaneous statements and notes made and sent by Obrien at the time that the statements were made to him by Donais.

116. Based on the above, it is clear that Donais' actions did violate Rule 1.18. His taking the case as Homewood's defense counsel, after the communications he had with Bisasor and Obrien show a willful disregard for Rule 1.18. Similarly, his refusal to withdraw from the case when Akridge pointedly asked him if there was a conflict[13], and when Terrell indicated to him that this was a concerning "flag"[14], shows a willful disregard for rule 1.18. Furthermore, Donais' failure to contact Bisasor to inform him that he would be taking the case as defense counsel is further evidence of a willful disregard for rule 1.18. In addition, Donais refusal to withdraw from the case when Berry contacted him on 1-17-17 about the conflict issue, shows a blatant and stubborn disregard for Rule 1.18. Finally, Donais' attempt to fight with Judge Moore in the 1-18-17 hearing, when the judge was signaling to him that there was in fact a conflict, shows an intransigent disregard for rule 1.18 and Donais only buckled when Judge Moore diplomatically threatened to formally remove him from the case if he did not decide to do so himself. It should be noted that after Donais withdrew from the case in January 2017, he became further involved in the case again at a later point and consulted with the defense lawyers in preparing his affidavit and attendant pleadings filed in two courts for use in April and May 2017. This continued engagement/discussion about the case and discussions with Bisasor and Obrien further resulted in a taint on the case and advantage to the defense.

---

[11] See **page 1 and paragraph 5** in **Affidavit of Craig Donais dated 3-13-17.**
[12] See **Exhibit 9 – Text Message from Robert Obrien to Natalie Anderson on 1-5-17.**
[13] See **page 3 and paragraph 16** in **Exhibit 20 - Affidavit of Dave Akridge dated 5-4-17**.
[14] See **page 221 line 7, page 238 line 17-25 and page 239 line 1-15** in **Exhibit 35 – Relevant excerpt of transcript of Karl Terrell Testimony in 4-27-17 hearing in superior court.**

117. And, further, the fact that Donais used that occasion to fabricate a lie about what Bisasor said in the 1-9-17 prospective client call, in order to attack and disparage Bisasor in Donais' affidavit, violates all bounds of decency and ethics.

## IV. ELEMENTS OF BREACH OF FIDUCIARY DUTY ESTABLISHED

118. Under NH Rule of Professional Conduct 1.18, Bisasor and Anderson were prospective clients entitled to confidentiality protections equivalent to actual clients. NH Rule 1.18(a)(b).

119. Rule 1.18(b) explicitly states that "a lawyer who has received and reviewed information from a prospective client shall not use or reveal that information" except under limited circumstances not applicable here. NH Rule 1.18(b).

120. Donais received and reviewed information from plaintiffs as prospective clients, creating fiduciary obligations of confidentiality and loyalty. First Bisasor Affidavit; Anderson Affidavit.

121. Donais breached these fiduciary duties by: (a) disclosing confidential consultation information to adverse parties; (b) representing adverse parties against plaintiffs' interests; (c) fabricating false statements about consultation content; and (d) continuing to disclose confidential information to unauthorized third parties for years after the consultation. These are undisputed facts above.

122. Plaintiffs suffered damages as a direct result of these breaches, including reputational harm, emotional distress, compromise of their legal position, and other injuries. First Bisasor Affidavit; Anderson Affidavit.

123. Donais's conduct was willful and deliberate, undertaken with full knowledge of his ethical obligations and the harm it would cause plaintiffs. Thes facts are undisputed facts above.

## V. CONCLUSION

124. The foregoing undisputed material facts establish as a matter of law that Donais breached his fiduciary duties to plaintiffs as prospective clients. No genuine factual disputes exist regarding the establishment of the prospective attorney-client relationship, the confidential nature of the consultations, or Donais's subsequent unauthorized disclosures and misuse of confidential information.

Respectfully submitted,
s/ Natalie Anderson
NATALIE ANDERSON

s/ Andre Bisasor
ANDRE BISASOR

Date: October 24, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties and counsel of record via the court's electronic filing system.

s/ Andre Bisasor
ANDRE BISASOR

# ATTACHMENT 7

## Motion to Amend Complaint-Plf

Filed
File Date: 9/26/2025 11:59 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFF ANDRE BISASOR'S MOTION FOR LIMITED DISCOVERY TO REBUT DONAIS' MOTION TO DISMISS AMENDED COMPLAINT**
**AND/OR**
**BISASOR'S MOTION FOR CONVERSION TO SUMMARY JUDGMENT**
**AND/OR [IN THE ALTERNATIVE]**
**BISASOR'S SUPPLEMENT TO BISASOR'S REPLY TO DONAIS' OBJECTION TO MOTION FOR LIMITED DISCOVERY AND BISASOR'S REPLY MOTION TO CONVERT TO SUMMARY JUDGMENT**

1. Plaintiff Andre Bisasor respectfully moves this Court for an Order permitting limited pre-answer discovery to rebut the factual and legal assertions in Defendant Craig Donais' Motion to Dismiss the Amended Complaint, and/or to convert the motion to dismiss amended complaint into one for summary judgment. In the alternative, this filing serves as a supplement to Bisasor's earlier reply[1] to the objection to Anderson's motion to allow discovery and to convert to summary judgement

2. This discovery is necessary to resolve critical factual disputes raised by Donais' defenses (including his 142 pages of attachments to his motion to dismiss and his 60 plus paged of attachments to his reply) evidently designed/intended to influence this court in its decision), which cannot be adjudicated fairly without development of the record.

3. This motion is justified by the need to rebut the factual assertions and defenses raised by Donais.

## I. INTRODUCTION

4. Plaintiffs are only seeking very limited discovery. The court can narrowly tailor discovery to the proper limits.

5. Plaintiffs simply ask for the minimum necessary discovery to defend their case against the defendants' assertion and use of disputed facts outside of the complaint. Plaintiffs are also seeking limited discovery.

6. Discovery is needed to demonstrate the sufficiency of the claims, without which could result in unjust dismissal based on an incomplete record.

## II. LEGAL STANDARD FOR LIMITED DISCOVERY

7. New Hampshire courts have broad discretion to allow discovery prior to ruling on a motion to dismiss, particularly where the motion raises fact-based defenses such as privilege or malice. See State v. Laux, 168 N.H. 404, 409 (2015) (discovery may be granted upon a showing of particularized need); See Krainewood Shores

[1] Technically, the deadline to reply expires today so Bisasor is free to supplement his reply. Anderson is not able to reply on her own for reasons stated confidentially.

Ass'n v. Town of Moultonborough, 174 N.H. 71, 74 (2021) (court must allow plaintiffs to cure defects before dismissal); See also NH Superior Court Rule 35(b)(1) which permits discovery "relevant to the subject matter" of the action, even before an answer is filed.

8. New Hampshire courts allow limited discovery before ruling on a motion to dismiss when:
   a. The motion relies on factual defenses that require evidentiary rebuttal.
   b. The plaintiff shows the discovery is necessary to oppose the motion fairly and is narrowly tailored to the disputed issues.
9. Courts thus have inherent authority to order discovery if the plaintiff shows a "particularized need" to address issues central to the case. State v. Laux, 168 N.H. 404 (2015).
10. Federal courts applying analogous rules have also recognized that when a defendant's motion to dismiss relies on factual assertions outside the complaint, limited discovery is appropriate to allow the plaintiff to oppose the motion. See, e.g., Doe v. Brown Univ., 943 F.3d 61, 71 (1st Cir. 2019) (Rule 56(d) allows discovery where facts essential to opposition are unavailable).
11. While Federal Analog (Rule 56(d)) is directly not binding, NH courts often consider federal principles, and thus here, through this consideration, it is established that courts may defer a motion to dismiss if discovery is needed to test factual assertions.
12. Courts may thus permit discovery before resolving a motion to dismiss if the plaintiff demonstrates a particularized need to address factual issues critical to the motion.

**III. DISPUTED FACTS RAISED BY DONAIS' MOTION TO DISMISS**

13. The factual disputes created include content of the January 9, 2017 conversation, the extent of confidential information disclosed, and the nature of legal advice provided. Donais's unilateral assertion that no confidential communications occurred cannot be accepted at face value without the opportunity to conduct discovery.
14. In paragraph 9 of his motion to dismiss, the defendant asserts that no attorney-client relationship existed and that "it is undisputed that this never existed". But this is in fact disputed. Discovery is needed to establish critical facts regarding the existence of any attorney client relationship.

15. In his motion to dismiss, the defendant further asserts that "any claim related to an expectation of confidentiality does not lie". Such an assertion implies a factual position regarding representations made on the 1-9-17 call, which Bisasor contends includes indication that the conversation would be confidential.

16. Also, the defendant asserts that "the plaintiffs waived any applicable privilege by injecting the issue into the 2017 litigation". This is disputed and it implies factual issues that go to whether any privilege was waived. There are several antecedent facts that also go to establishing how and when "the issue" was inserted or "injected" into the 2017 litigation and who first "injected" it.

17. In paragraph 10 of his motion to dismiss, the defendant asserts "there was no contract between the parties in this case, actual or implied." The existence of a contract, actual or implied, is a factual issue and it is here disputed. The defendant cannot dispute facts through a motion to dismiss but he has done so any way. Given that he has done, discovery is appropriate.

18. It should be noted that the defendant cites in a footnote that "The January 2017 circuit court litigation proceeded in the name of Natalie Anderson only. See Case Summary in 459-2017-LT-00010, attached as Exhibit J at 146." This evidently is intended to support his specious contentions but it is misleading because the February 2017 litigation in superior court proceeded in both of plaintiffs' names.

19. It should be noted further that the defendant inserts another footnote stating that:

> Even if Attorney Terrell [successor counsel] is later admitted to appear in this case pro hac vice, the Court would still deny the plaintiff's motion to disqualify him. Based on the parties' pleadings and the evidence adduced at the hearing on April 27, 2017, Attorney Terrell did not receive any confidential or privileged information from his contact with Attorney Donais. From his testimony, it appears that Attorney Terrell only spoke with Attorney Donais about the factual outlay of the already-filed 540-A petition. That information was part of the public record, and therefore not confidential or privileged.

20. Here the defendant is seeking to introduce facts to contradict the amended complaint. This is not allowed. And since he has done so, the plaintiff is now entitled to seek discovery on the factual issues that he seeks to dispute. The issue of whether "Attorney Terrell only spoke with Attorney Donais about the factual outlay of the already-filed 540-A petition" has not been fully or properly tested as Donais has never been examined under oath and in fact, with respect to the proceeding referenced, Donais evaded a subpoena from a Hillsborough county sheriff by hiding in his office when the sheriff knocked on his office door. Donais needs to be examined under oath via deposition and written discovery regarding all that was said by him to Terrell,

to Akridge, to Terrell's assistant, to Obrien, and to others. Donais cannot offer tailored limited one-sided affidavits from 8 years ago from Akridge, Obrien, and himself, etc., and expect that to be the end of it in terms of establishing facts and contradicting facts in this lawsuit, with no opportunity to test/examine these affiants and himself under oath.

21. Similarly, the defendant asserts that "there were no advantageous relations to be interfered with on the face of the complaint." What face of the complaint? The original complaint? This is an erroneous argument. The defendant still wants to hold plaintiff to the original complaint as a basis for dismissal, of the amended complaint. Yet, in any event, here Donais asserts a factual position and seeks to dispute the facts in the amended complaint. The issue of whether there were any advantageous relations to be interfered with is a matter that needs to be established via discovery. The same thing goes for Donais asserting that there was no contractual relations to interfere with.

22. Further in paragraph 17, the defendant asserts that "Nothing about the defendant's alleged conduct could be characterized as "reprehensible,"". Here he seeks to contradict the amended complaint. This also warrants discovery regarding all of the statements made by Donais, to whom, what exactly did he say, and how many times, and what was the effect or intended effect. These are factual questions that can only be resolved after discovery.

23. By his own admission, in paragraph 8, Donais attaches: "

> The Donais affidavit and the pleadings in the circuit and superior courts relating to disqualification of counsel (Exhibits A-F, at 10). In addition, the original landlord tenant petition filed in the circuit court by plaintiff Anderson on January 9, 2017 (Exhibit G, at 64), the motion to dismiss this petition filed January 17, 2017 by defendant Donais (Exhibit H3, at 72), and the superior court order issued May 5, 2017 (Exhibit I, at 140) are attached to this motion.

24. But this does not tell the whole story. Each of these attachments contain numerous other evidentiary attachments designed to introduce new facts in to this case that are outside of the amended complaint and to contradict facts in the amended complaint. These include multiple one-sided affidavits by affiants that have never been cross-examined/tested under oath, phone records of other parties that are not part of the case, multiple unauthenticated emails between/among other parties that have never been subject to any verification, and several one-sided cherry-picked motions from 8 years ago that contain factual assertions and arguments designed to attack the credibility of the plaintiffs. The strategy here is clear: to use these attachments as a trojan

horse to introduce factual disputes to attack the amended complaint while attempting to do an end-run around the prohibition to not do so. Discovery is more than warranted under these circumstances.

## IV. FURTHER POINTS

25. Moreover, the 6-5-25 order explicitly stated that consideration of materials outside the pleadings is improper on a motion to dismiss. The Court noted that plaintiffs were correct about the impropriety of considering extraneous materials and that such materials would not be considered. See screenshot of the 6-5-25 order on summary judgment conversion:

> In ruling on the defendant's motion to dismiss, the Court has accepted as true, and relied only upon, the factual allegations as set forth in the Complaint. While the plaintiffs are correct that consideration of, and reliance upon, defendant's evidence submitted in conjunction with their motion to dismiss would not be proper, the Court has not done so. Accordingly, the Court has treated the defendant's motion as it was filed-- as a motion to dismiss. Therefore, there is no basis at this juncture to treat it as a motion for summary judgment. Accordingly, the motion is DENIED.
>
> This is a Service Document For Case: 216-2020-CV-00027
> Hillsborough Superior Court Northern District
> 6/5/2025 4:21 PM
> June 5, 2025
> Honorable Amy B. Messer

26. Despite this clear guidance/directive, Donais repeated the identical procedural violation in his motion to dismiss the amended complaint, including the very same documents the Court previously found improper.

27. Thus, Donais's motion and reply directly violates this court's explicit 6-5-25 guidance that consideration of materials outside the pleadings is improper on motions to dismiss. This willful disregard further demonstrates that Donais understood the Court's position but chose to proceed anyway, knowing the Court could convert to summary judgment, **allow discovery**, or strike his materials. His reply's objection to these procedural remedies while introducing additional evidence compounds the violation, and confirms his intent to exploit procedural irregularities for tactical advantage. This creates the kind of unfair procedural advantage that mandates discovery or conversion to summary judgment.

28. Donais's approach creates fundamental procedural unfairness, creating impossible procedural burdens for plaintiffs while claiming procedural advantages for himself. He attaches over 200 pages of exhibits (including attachments in his recent reply) spanning 8 years while plaintiffs have been afforded no adequate time to prepare, organize, or incorporate responsive exhibits. Preparation of exhibits requires substantial time to line up, incorporate, and attach documents with proper headers/numbering. This procedural burden, imposed without adequate extension of time, while Donais claims plaintiffs have seen these before (from 8 years ago), is wholly unfair and draconian. So, in sum, he attaches over 200 pages of exhibits spanning 8 years, then demands immediate response claiming plaintiffs have seen these before from 8 years ago. This position further

ignores the substantial work required to, minimally, organize, prepare, and incorporate responsive exhibits with proper headers and numbering, beyond the analytical work involved in reviewing the substance of the exhibits and preparing substantive response to that.

29. For example, Donais now asserts that his motion to dismiss amended complaint had missing several exhibits H, K and L (with multiple pages totaling around/over 12 pages), from a 60-page motion to dismiss in the circuit court, which he now includes for the first time in his reply to the objection to the motion to dismiss. In order for plaintiff to have caught this, he would have had to meticulously compare the original circuit court motion to his exhibit attached to the motion to dismiss amended complaint. This takes an extraordinary amount of time to review, compare and catch issues like this. It is totally unfair to expect plaintiff, who is pro se, and has ADA issues, to accomplish superhuman tasks like this, that no trained lawyer (without ADA issues) would be expected to accomplish. This inclusion of new exhibits in the reply further highlights the complete unfairness and lobsided nature of these proceedings and how things are stacked against the plaintiff but in favor of the defendant.

30. Plaintiffs have been afforded no adequate time extension despite the overwhelming nature of Donais's materials. The Court limited plaintiffs' amended complaint to 25 pages while allowing Donais to present 151 pages in response, creating fundamental unfairness that his reply compounds by introducing additional evidence. Moreover, plaintiffs cannot determine how to respond properly because Donais objects to every procedural remedy while the Court has not yet ruled on whether his extraneous materials will be considered, converted, or stricken. Thus, plaintiffs cannot know whether the Court will strike or consider the extraneous materials, making it impossible to determine how to properly respond and with exactly what attachments. This uncertainty is precisely why rules exist against including facts and materials outside the complaint, as it unfairly burdens opposing parties and prevents effective response. [Note: The last time around, the court informed the plaintiff that it would not consider the extraneous facts and materials[2], but did so **after** it ruled on the motion to dismiss original complaint, while never allowing the plaintiff to supplement his objection (which would

[2] Note: Although the court stated this in the summary judgment conversion order, a close review of the 6-5-25 order on the motion to dismiss shows that the court did use/rely on certain information/facts supplied only by the motion to dismiss original complaint, that were not present in the original complaint. This was not fair and the plaintiff is concerned that the court is going to do this again.

Case 1:25-cv-00251-SE-AJ Document 114-6 Filed 01/12/26 Page 523 of 595

include substantive arguments which were not really included in the initial placeholder objection that focused on procedural issues such as the need to strike the extraneous materials/facts, etc.) which the plaintiffs strenuously requested to do several times but was ignored and eventually denied after the court ruled on the motion to dismiss. This was unfair and highly prejudicial. Moreover, the court never allowed plaintiff adequate time to file reconsideration motion where he could raise substantive arguments. Furthermore, the court should resolve these extraneous issues before ruling on a motion to dismiss.

31. Donais's approach represents unprecedented manipulation of motion practice rules. He files defective exhibits, waits for objections, introduces expanded versions in reply, then objects to allowing plaintiffs any response. This sequence violates every principle of fair adversarial proceedings and demonstrates why discovery and further briefing is necessary to prevent tactical abuse of procedural rules. Further, this involves one-sided presentations that deny fundamental fairness.[3]

32. Allowing defendants to introduce new evidence in reply while denying plaintiffs the opportunity to respond violates fundamental principles of adversarial proceedings. The necessity for discovery becomes even more critical if the Court determines not to hold a hearing on the motion to dismiss. Donais has systematically objected to plaintiffs' motion for hearing while simultaneously introducing new evidence and procedural arguments in his reply that were not presented in his original motion. If the Court resolves this potentially case-ending motion based solely on written submissions, fundamental fairness demands that impermissible material be stricken from the record so that plaintiffs can truly know what is or remains on the table to be addressed. Without a hearing and without discovery, the Court will have no opportunity to examine witnesses, test the credibility of competing factual assertions, or explore the procedural irregularities that plaintiffs have identified. If the written record becomes the sole basis for resolution, then making record clear/streamlined is essential to fair adjudication. Donais's introduction of new exhibits and procedural arguments in reply creates the type of one-sided record that violates due process, especially when hearings are not conducted.

[3] Note: Hilliard is a seasoned 74 year old attorney who is well-versed in manipulative tactics. The pro se African American plaintiffs are no match for his unfair tactics. The court should not countenance such tactics and should seek to protect plaintiffs from such gamesmanship.

**33.** The complexity of the procedural issues, including whether materials should be stricken, converted to summary judgment, or subjected to discovery, requires proper resolution of the record.

## V. FURTHER ON SCOPE OF REQUESTED DISCOVERY

34. Plaintiffs seek narrowly tailored discovery limited to the following topics, all of which are critical to rebutting Donais's defenses:

### A. Communications Pertaining to the March 2017 Affidavit and Disqualification Motion

35. Donais attached to his motion to dismiss several documents pertaining to his affidavit and his objection to a disqualification motion. Evidently, the purpose of him doing this is to try to establish facts regarding what occurred on the 1-9-17 call, as well as before and after the call. Either way, Donais has made this an issue by attaching these documents and so, if these documents will not be stricken, then discovery is needed as follows:

a. All emails, drafts, and written communications between Craig Donais and Karl Terrell, Brian Snow, Dave Akridge, and any Hilton representatives from January 23, 2017 (Donais's withdrawal as counsel) through May 2017, concerning the preparation, content, and purpose of the March 2017 affidavit, and the motion to disqualify.

b. All communications regarding the decision to include the racism accusation in the affidavit, and whether it was discussed as relevant to the disqualification issue.

c. Any communications, notes, or documents reflecting Donais's knowledge of the truth or falsity of the statements in his affidavit, including prior versions of the affidavit and any discussions with other attorneys about the content of the January 9, 2017 call.

d. Any communications with Attorney Elliott Berry, Attorney Robert O'Brien, or others about the January 9, 2017 call.

e. All communications between Donais and Robert O'Brien regarding the contents of the call.

f. All communications between Donais, Karl Terrell, and Hilton (e.g., emails, drafts of the affidavit).

g. Any evidence that goes to whether Donais knew his assertion of an accusation of racism against him by plaintiff was false (e.g., internal notes, prior inconsistent statements).

### C. Conflict Check and Timeline Evidence

36. All documents reflecting when Donais first communicated with Hilton, Akridge, or their counsel regarding representation in this matter, and when any conflict check was performed.

37. Any documents or communications showing Donais's knowledge of a conflict of interest at the time of the January 9, 2017 call.

38. These conflict check records goes to whether Donais knew of his conflict before advising plaintiff and before representing Hilton.

**D. Other Narrowly Tailored Requests**

39. Documents and testimony directly tied to Donais' defenses including emails/communications (Jan–Mar 2017): Between Donais, Terrell, and Hilton regarding the disqualification motion and affidavit.

40. Drafts of Donais' Affidavit to show when the racism accusation was added and whether it was relevant.

## VI. NO PREJUDICE TO DEFENDANT

41. The discovery is limited to specific, time-bound issues.

42. Donais' own motion relies on factual assertions that require testing.

## VII. NO PRIVILEGE BARS DISCOVERY

**A. Communications with Third Parties**

43. Communications between Donais and third parties (such as Terrell and Snow) after his withdrawal are not privileged unless they meet all requirements and were made for the purpose of legal advice, intended to be confidential; and were between attorney and client only (not just between two lawyers or between a former lawyer and current counsel).

44. The February and March 2017 communications between Craig Donais (after his withdrawal as counsel for Hilton defendants) and Brian Snow, Karl Terrell, and Hilton representatives, including emails and drafts relating to the March 2017 affidavit, are generally subject to discovery in New Hampshire Superior Court unless they are protected by a valid privilege. However, Donais's ability to claim attorney-client privilege or work product protection over those communications is limited and, in this context, inapplicable.

**B. Attorney-Client Privilege After Withdrawal**

45. The privilege only protects communications between an attorney and a client made for the purpose of facilitating legal services. See N.H. R. Evid. 502(b); Hampton Police Assn., Inc. v. Town of Hampton, 162 N.H. 7, 15 (2011). After Donais withdrew as counsel in January 2017, he was no longer acting in a legal capacity for Hilton or its agents. Communications after his withdrawal are not automatically privileged simply because they are with former clients or their new attorneys.

46. If Donais was not acting as Hilton's lawyer in February/March 2017, his communications with Hilton, Terrell, or Snow are not privileged.

47. If Donais was acting as a witness (e.g., preparing an affidavit about a prior event), those communications are not privileged legal advice, but are discoverable as fact witness communications.

## C. Work Product Doctrine

48. The work product doctrine (Superior Court Rule 35b(2)) protects documents prepared by or for a party or its representative in anticipation of litigation. However, this protection is qualified, not absolute. If Donais was not a representative of Hilton at the time, or if the documents were prepared as a witness statement rather than as legal work for a client, the work product privilege does not apply.

49. If Donais was not representing Hilton, but was merely a witness, his communications and drafts are not protected work product. Even if some work product protection applies, it can be overcome if the materials are essential to one' case and cannot be obtained elsewhere.

## VIII. CONVERSION TO SUMMARY JUDGMENT

50. When a defendant introduces matters outside the pleadings in support of a motion to dismiss, the motion must be treated as one for summary judgment. Donais's objection fails to address the central issue: his motion to dismiss relies on extensive extraneous materials that create genuine issues of material fact requiring summary judgment procedures. See also White v. Peabody Construction Co., 386 Mass. 121, 126 (1982) ("a motion to dismiss under rule 12(b)(6) generally may not rely on facts outside the pleadings").

51. This underscores that affidavits cannot be used to establish matters outside the pleadings without procedural safeguards, and that reliance on such affidavits without considering them as part of a summary judgment record is fundamentally procedurally flawed. Further, the use of affidavits outside the pleadings in the context of motions to dismiss violates procedural due process when the opposing party is deprived of the opportunity to respond, challenge, or develop contrary evidence.

52. Further, when material outside the pleadings is presented, the judge may convert the motion to summary judgment, but only after providing notice "to ensure that neither party is taken by surprise by the judge's reliance on material outside the pleadings and thereby deprived of an opportunity to present further material in response."

53. The fundamental purpose of the conversion requirement is to prevent parties from being "deprived of an opportunity to present further material in response" when courts consider materials beyond the pleadings. Here, Defendant submitted extensive affidavits and attachments containing disputed factual assertions that go far beyond the amended complaint.

54. It should be evident that the above grounds for discovery also support conversion to summary judgment and are essentially flipsides of the same coin. Granting conversion to summary judgment would effectively mean discovery should be allowed, and vice versa.

55. Further, the amended complaint alleges that during the January 9, 2017 conversation, Donais provided legal advice, created an attorney-client relationship, and received confidential information from plaintiff's husband regarding their landlord-tenant dispute with Homewood Suites. Donais's affidavit and supporting materials dispute these factual allegations, creating precisely the type of genuine issues of material fact that require summary judgment procedures.

56. The factual disputes include:

   a. Duration and Nature of Communication: The amended complaint alleges a substantive attorney-client consultation, while Donais characterizes it as a brief declination of representation. This fundamental disagreement about what occurred during their conversation cannot be resolved by accepting the plaintiff's allegations as true while simultaneously considering defendant's contradictory evidence.

   b. Scope of Information Disclosed: Plaintiff alleges disclosure of confidential information sufficient to create ethical obligations, while Donais claims no confidential communications occurred. This dispute goes to the heart of multiple claims in the amended complaint.

   c. Formation of Attorney-Client Relationship: The amended complaint alleges facts establishing implied contractual and fiduciary relationships arising from the consultation, which Donais denies. This factual dispute affects multiple counts in the amended complaint.

   d. Subsequent Use of Information: The complaint alleges Donais improperly used information gained during the consultation to advantage his representation of Homewood Suites, while Donais denies having

received any usable information. This dispute bears on claims of breach of fiduciary duty and professional misconduct.

57. Allowing Donais to rely on extensive extraneous materials while denying plaintiff the opportunity for discovery and counter-evidence violates basic due process. Donais's motion essentially asks the court to weigh competing versions of disputed facts without providing plaintiff the procedural protections afforded in summary judgment proceedings.

58. The one-sided nature of Donais's presentation is particularly problematic. His affidavit and supporting materials present only his version of events, while plaintiff has been afforded no opportunity to conduct discovery, depose witnesses, or present countervailing evidence. This procedural asymmetry violates the fundamental principle that factual disputes must be resolved through appropriate procedures with adequate safeguards for all parties.

59. The court should grant plaintiff's motion to convert and provide appropriate notice and opportunity for discovery before ruling on what will then be a motion for summary judgment. This procedural step is essential to ensure fundamental fairness and proper application of the summary judgment standard.

60. By relying on these extraneous materials, Defendant has transformed the motion into one that seeks adjudication on factual disputes that require evaluation under Rule 56 standards. Plaintiff will be prejudiced if these extraneous materials are considered without affording an opportunity for discovery or submission of countervailing evidence.

61. If conversion is denied, it will cause substantial and irreparable prejudice to Plaintiffs. Defendants have introduced numerous disputed factual assertions through their affidavits and attachments.

62. These assertions directly contradict factual allegations in Plaintiff's complaint.

63. By permitting Defendants to rely on these affidavits while denying Plaintiff any opportunity for discovery, the Court has created a fundamentally unfair procedural situation where one party can introduce disputed evidence while the other is prevented from testing or rebutting that evidence.

64. This violates basic due process principles and the adversarial nature of our legal system.

65. As other courts recognized, parties should not be "taken by surprise by the judge's reliance on material outside the pleadings and thereby deprived of an opportunity to present further material in response."

## IX. CONCLUSION

66. Without this discovery, Plaintiffs will be severely prejudiced, as key evidence about Donais's intent, the relevance of his statements, and the factual context of his statements is exclusively in the possession of Donais and his former co-counsel. The defense's motion to dismiss relies on factual assertions that cannot be tested or rebutted without access to these materials.

67. For the foregoing reasons, Plaintiffs respectfully request that the Court grant limited pre-answer discovery on the topics outlined above, including:

    a. All communications between Donais and Hilton/Akridge from December 2016 to January 2017;

    b. Drafts of Donais' affidavit and correspondence with Terrell regarding its contents;

    c. Donais' conflict check records;

    d. Post-affidavit communications where Donais repeated the racism accusation;

    e. All communications and documents related to the factual issues and disputes identified herein.

68. This discovery is narrowly tailored, essential to resolving factual disputes, and consistent with New Hampshire's policy favoring merits-based adjudication.

## V. PRAYER FOR RELIEF

69. WHEREFORE, Plaintiffs respectfully request that the Court:

    a. Grant this motion for limited discovery prior to resolution of Defendant Donais's pre-answer motion to dismiss;

    b. Order Defendant Donais to produce the discovery described above within 30 days; or

    c. Grant such further relief as the Court deems just and proper.

Respectfully submitted,
/s/ Andre Bisasor
ANDRE BISASOR

Date: September 26, 2025

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
ANDRE BISASOR

# ATTACHMENT 8

## Motion to file Surreply - Plt

Filed
File Date: 10/30/2025 9:38 AM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

1. Plaintiff Andre Bisasor respectfully moves this Court for leave to file a Second Amended Complaint. The Court granted leave to amend following its June 5, 2025 dismissal order, and Plaintiff filed a First Amended Complaint on August 1, 2025. Defendant Donais now challenges that First Amended Complaint through a motion to dismiss filed August 22, 2025. Plaintiff seeks leave to file a Second Amended Complaint to address any perceived deficiencies, clarify allegations, and ensure this matter proceeds on its merits rather than on procedural technicalities. Further grounds are as follows.

## I. INTRODUCTION

2. Plaintiffs seek to file a second amended complaint, or a supplemental complaint, to formally add defendant parties, add attendant claims, and clarify existing claims, and also correct scrivener errors in the amended complaint. However, multiple obstacles require case management coordination. The Court's arbitrary 25-page limitation for the amended complaint was overly restrictive and prevented plaintiff from adequately explaining claims against new parties with sufficient factual detail. Furthermore, plaintiff needs clarification on the timeline for events to include amendment and whether subsequent events occurring after the original complaint was filed is acceptable/allowed to be added. This issue was never resolved or clarified, even though plaintiffs raised them previously in the first motion to amend complaint, which was denied as moot[1].
3. Defendant also tied up this case for over three years with motions to dismiss on service issues and an appeal to the NH Supreme Court, during which time delay the statute of limitations ran on certain claims. This prevents plaintiff from filing a new complaint now incorporating subsequent events after the original complaint was filed, such as events later in 2020, and in 2021 or 2022, and forces plaintiff to seek amendment of the existing complaint to include these subsequent events, yet the procedural constraints make effective such amendment difficult or out-of-reach.
4. For example, plaintiffs intend to clarify the breach of fiduciary claim along with the breach of contract and the breach of covenant of good faith and fair dealing. The plaintiffs have now filed a motion for partial summary judgment[2] that includes further careful delineation of facts that would best be included in an amended complaint. Similarly, the

[1] See **Exhibit A** for the previous motion to amend the complaint, which is incorporated herein by reference.
[2] The plaintiffs hereby incorporate by reference the motion for partial summary judgment (including all accompanying pleadings such as the memorandum of law, the exhibits, the sealed affidavits and the statements of undisputed material facts) into this motion as if stated herein.

plaintiffs intend to clarify/amend the race discrimination claim. This includes clarifying the legal theory supporting state law claims as well as including a federal claim under section 1981 for race discrimination (which was referenced in the original complaint). These claims are solid meritorious claims that would benefit from more precise pleading.

5. Similarly, the plaintiffs intend to clarify the defamation claims including claims that pertain to events that occurred in 2017 as well as in 2019, 2020 and thereafter. Plaintiffs would like to make a more definitive statement regarding these claims and to supplement these claims with additional pleading of facts and with further clarification. Plaintiffs are pro se and are not trained lawyers. The plaintiffs need a proper chance to present their claims. It should be clear to the court that there is something valid and legitimate here. The defendant has clearly lied and made false statements. It should be clear that the defendant has committed wrongdoing. But to the extent that pleading technicalities can obscure this fact, then the plaintiffs need an additional chance to amend the complaint.

6. This is especially so now that the defendant has been bent on expanding the four corners of the complaint with his own additional facts beyond the complaint. The plaintiffs need an opportunity to provide proper amended complaint that does not allow for unfair advantage for the defendant by him including facts that the plaintiffs cannot properly respond to in the context of an objection to a motion to dismiss amended complaint. In order to have a fair hearing/proceeding, then a second amended complaint should be allowed to properly establish the facts in a way that does not allow the defendant to gain tactical advantage by including facts not included in the amended complaint. The plaintiffs should be the master of the complaint and the facts at the preliminary motion to dismiss stage. Because the defendant has tried to in effect be the master of the complaint and of the facts, usurping the role of the plaintiffs in establishing the pleading of facts, and because the defendant has sought to confuse the issues and muddy the waters by illicitly pleading facts that are not in the complaint or that seek to dispute the facts of the complaint, then the defendant has opened the door to the absolute need for a second amended complaint.

## II. GROUNDS FOR FURTHER AMENDMENT

7. RSA 514:9 (2007) allows the trial court to permit a substantive amendment to pleadings "in any stage of the proceedings, upon such terms as the court shall deem just and reasonable, when it shall appear to the court that it is necessary for the prevention of injustice...."

8. Therefore, according to this statute, amendment of the complaint in substance should be allowed when it is fair and reasonable to do so, and when it would be unfair to the plaintiffs to not allow amendment. It certainly should be

allowed when the case is in its early stage (pre-answer motion to dismiss stage is still procedurally very early). This finds direct support in New Hampshire case law, court rules, and statutory provisions.

9. Under RSA 514:9, liberal amendment of pleadings is permitted and encouraged by statute. Courts are required to allow substantive amendments when it prevents injustice.

10. This underscores the broader context that reflects a judicial preference for resolving cases on their merits rather than procedural technicalities.

11. Only when "the changes would surprise the opposing party, introduce an entirely new cause of action, or call for substantially different evidence" should a court consider possibly not allowing amendment of substance but still retains discretion to allow amendment even in such circumstances. Dent v. Exeter Hosp., 155 N.H. 787, 796, 931 A.2d 1203 (2007). See Tessier v. Rockefeller, 162 N.H. 324, 340, 33 A.3d 1118 (2011). See also Clinical Lab Prod's Inc. v. Martina, 121 N.H. 989, 991 (1981).

12. Thus, denying leave to amend should be rare unless prejudice or undue delay exists, aligning with the principle that amendments should be liberally and freely allowed when fair and reasonable.

13. In this case, the Court's June 5, 2025 order dismissed Plaintiff's original complaint without prejudice except as to two specific claims; perjury and violations of professional conduct rules. The Court expressly granted leave to amend to correct deficiencies in the remaining claims. Plaintiff exercised that right by filing the First Amended Complaint. However, Defendant's recent motion to dismiss raises arguments suggesting the First Amended Complaint allegedly fails to cure certain deficiencies or introduces claims Defendant characterizes as impermissible. Hence, further amendment is warranted to address these contentions and prevent dismissal on grounds that could be cured through amendment.

14. New Hampshire follows the well-established principle that leave to amend should be freely given when justice so requires. As the New Hampshire Supreme Court recognized in Cole v. Town of Conway, 2023-0648 (N.H. 2024), liberal amendment of pleadings is permitted to ensure cases are decided on their merits. The Court emphasized that "amendment of the complaint should be reviewed under the motion to dismiss standard" and that amendments should be allowed when they can cure deficiencies. Similarly, federal courts applying analogous standards have consistently held that "justice so requires" amendment when it would advance resolution on the merits. See Fed. R. Civ. P. 15(a)(2); Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

15. The present circumstances strongly favor granting leave to amend. This case has been pending since January 2020; and only began effectively in 2022 (because of a hiatus due to the pandemic and due to settlement negotiations that resulted in 20 defendants being settled out of the case in 2022). It has been almost 4 years since the litigation began with the remaining sole defendant (who was to be included in the settlement but backed out at the last minute). During those 4 years, Plaintiffs were prevented from amending the original complaint filed in January 2020 due to Defendant's successive motions to dismiss on service-related grounds and jurisdictional challenges that resulted in appellate delays. The Court only recently provided Plaintiff the first opportunity to amend the complaint after ruling on dismissal motion pertaining to the original complaint. Therefore, denying a second amendment at this early stage would be manifestly unjust, particularly where the proposed amendments would cure any alleged deficiencies and allow the case to proceed to discovery and resolution on the merits.

16. Moreover, the standard for granting leave to amend is particularly liberal where, as here, the plaintiff is pro se. Courts recognize an obligation to make reasonable allowances to protect pro se litigants from inadvertently forfeiting legal rights merely because they lack legal education. Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983). The NH Superior Court has similarly emphasized that cases should be decided on their merits and that procedural rules should be tools promoting justice rather than barriers denying it. American Express Travel v. Moskoff, 148 N.H. 446, 450 (2002).

17. The court has allowed only one opportunity to amend the original complaint. It would be unfair to not allow at least one additional second amended complaint, especially where the plaintiffs were hampered by certain impediments including but not limited to an arbitrary 25-page limit and by certain ADA issues that impacted the ability to complete a proper amended complaint. The issue has further been compounded by the fact that the defendant filed a motion to dismiss the amended complaint totally 151-pages including 142 pages of attachments of extraneous material that go outside of the amended complaint. These circumstances alone support allowance of a second amended complaint.

## III. THE COURT'S RULING ON MOTION TO DISMISS ORIGINAL COMPLAINT SUPPORTS GRANTING A SECOND AMENDMENT

18. The Court's ruling on the motion to dismiss the original complaint supports granting a second amendment of the complaint. Here, the court stated that it would not include material from the defendant's attachments to the motion to dismiss original complaint in its 6-5-25 order, which explicitly stated that consideration of materials outside the pleadings is improper on a motion to dismiss (i.e. the Court noted that plaintiffs were correct about the impropriety

of considering extraneous materials and that such materials would not be considered[3]). See screenshot of the 6-5-25 order on summary judgment conversion:

> In ruling on the defendant's motion to dismiss, the Court has accepted as true, and relied only upon, the factual allegations as set forth in the Complaint. While the plaintiffs are correct that consideration of, and reliance upon, defendant's evidence submitted in conjunction with their motion to dismiss would not be proper, the Court has not done so. Accordingly, the Court has treated the defendant's motion as it was filed-- as a motion to dismiss. Therefore, there is no basis at this juncture to treat it as a motion for summary judgment. Accordingly, the motion is DENIED.
>
> This is a Service Document For Case: 216-2020-CV-00027
> Hillsborough Superior Court Northern District
> 6/5/2025 4:21 PM
>
> June 5, 2025
> Honorable Amy B. Messer

19. Yet, despite this clear statement, the court did rely on and include such material as follows:

> "On March 13, the defendant provided an affidavit on behalf of Homewood and Robitaille for use in the case involving the plaintiffs. (Id.; see Doc. 300, Ex. A.) The affidavit included the following information:…"

20. The court then proceeded to list several references made in the affidavit. This contradicts the statement by the court that "it had not done so", i.e. not used, considered or relied upon evidence submitted in conjunction with the defendant's motion to dismiss.

21. The court also referenced statements made by Elliott Berry about what Donais told him in a phone call on 1-17-17. But the court treats the statements by Donais to Berry as statements that are true for purposes of the complaint and reasserts them in her 6-5-25 order. The plaintiffs have disputed the statements of Donais made to Berry. This had a prejudicial effect on the plaintiffs.

22. The facts above indicate that there is no guarantee that the court will not use or rely upon materials attached to the motion to dismiss the amended complaint. Given the court's ruling on the motion to convert to summary judgment as noted above, the plaintiffs did not anticipate that the defendant would do the same thing again, that is attached to the same extraneous documents, including Exhibits B-F that were attached to the motion to dismiss the original complaint, plus attach several additional documents that were not attached to the motion to dismiss amended complaint but that are even more violative of the principle expressed in the court's 6-5-25 order. Given this penchant of the defendant, the plaintiffs should be allowed a chance to amend the complaint one more time, with full knowledge that the defendant intends to include extraneous material in order to expand the facts and challenge the facts in the amended complaint.

[3] 1Despite this clear guidance/directive, Donais repeated the identical procedural violation in his motion to dismiss the amended complaint, including the very same documents the Court previously found improper.

## IV. NO PREJUDICE TO DEFENDANT

23. Defendant will suffer no prejudice from allowing further amendment. Discovery has not commenced; no scheduling order is in place; no trial date has been set. The case remains at the pleading stage where amendment causes minimal disruption.

24. Moreover, Donais has had notice of the claims to be amended, including additional or subsequent acts and additional parties, since the very beginning of this litigation from the hearing in April 2022 and in other various pleadings including a motion to disqualify counsel. He is also intimately aware of the substantive amendments to be made including additional parties, based on claims that the plaintiffs have alleged against him in other cases such as in Massachusetts and in the current related case that was removed from this court to the NH federal court (which has been sought to be consolidated with this case if it is remanded).

25. Also, the defendant opened the door to the need to amend the complaint again because of his persistence in attaching numerous extraneous materials to his motion to dismiss. The second amended complaint would seek to plead facts from the plaintiffs' prerogative that would protect against the abuse by the defendant, leaving plaintiff not knowing where things stand, if the court will strike the extraneous materials, and whether the plaintiff must now address these [skewed] additional facts and one-sided materials, in an objection pleading.

26. Further, responding to a Second Amended Complaint would involve the same or similar approach the Defendant has already undertaken in challenging the First Amended Complaint.

27. Furthermore, allowing amendment now promotes judicial economy. If the Court were to dismiss the First Amended Complaint with leave to amend, Plaintiff would simply file another amended complaint addressing the same deficiencies that a Second Amended Complaint would cure now. Granting leave at this juncture avoids additional rounds of motion practice and expedites resolution of the actual dispute between the parties.

28. The factors courts typically consider in evaluating motions to amend weigh decidedly in Plaintiff's favor. There has been no undue delay; Plaintiff seeks amendment promptly after Defendant filed his motion to dismiss the First Amended Complaint. There is no bad faith; Plaintiff acts in good faith to ensure his claims are properly pleaded and withstand scrutiny. There is no futility; the proposed amendments address the specific deficiencies Defendant identifies in his motion to dismiss. There is no undue prejudice; as noted, the case remains at an early stage where amendment imposes minimal burden on Defendant.

29. Further, there will be no prejudice to the defendant because he also amended his motion to dismiss several times over the past 3 years and amended it a fifth and sixth time most recently again to include a brand new defense of failure to state a claim and absolute privilege, etc. The defendant was thus allowed by the court to make substantive amendments to his multiple motions to dismiss. For example, the defendant was allowed to revise his first motion to dismiss based on the unsealing of sealed records, which purportedly would provide new information that the defendant did not have because he purported that it had been sealed. This turned out to not be true and there was no new information from the unsealing of sealed records that the defendant did not have before. Yet he was still allowed to revise his 2022 motion to dismiss for insufficient service of process, in 2024, based on the possibility that there could be new information in the unsealed records.

30. It would be unfair to allow the defendants to amend their motions to dismiss in this court but then deny plaintiffs the same opportunity to amend the complaint in this court, at least one more time. This would be an unfair approach.

31. Either way, the plaintiffs should be similarly allowed to amend the complaint in substance based on the new information and new events that occurred after the filing of the original complaint. A second amendment is thus also necessary to add supplemental events since the filing of the original complaint, which was the 25 page limit impeded the plaintiffs from properly pleading in the amended complaint, as the plaintiffs had to address the 15 page ruling on the motion to dismiss and the 52 page motion to dismiss the original complaint, in only 25 pages, while also trying to include additional events that occurred after 2017 that go to supplementing the claims in this case (which was virtually impossible to do properly[4]). For example, in 2019 and 2020, there are events arising from the same claims in 2017 that were repeated, republished and continued defamatory statements about the plaintiffs and that added to and expanded the defamatory statements about the plaintiffs. Thus, there are additional acts by the defendants that have occurred since the filing of the complaint, that plaintiffs need to bring to the attention of the court.

32. Plaintiffs need an opportunity to amend the complaint to include these facts in an amended complaint.

33. Moreover, Donais has had notice of these claims from the very beginning. These claims were also included in the settlement discussions in 2021 that Donais was involved in until January 2022. Because these additional facts occurred after the filing of the original complaint on 1-3-20, these facts were not and could not have been included in the

[4] This is further compounded by the ADA issues that the plaintiff has presented to the court confidentially under seal.

original complaint. The plaintiffs have stated their intent to include these facts and claims in this case from the beginning of the litigation. There is no reason to prevent amendment to include these facts/claims now.

34. The plaintiffs need an opportunity to show the court by way of a second amended complaint that there are facts that the plaintiffs can prove to support their claims. The Second Circuit has opined that the court is obligated to "'make reasonable allowances to protect Pro Se litigants'" from inadvertently forfeiting legal rights merely because they lack a legal education. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006) (quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)). Furthermore, "in civil rights cases where the plaintiff appears pro se, the court must construe the pleading liberally and must afford plaintiff the benefit of any doubt." Karim-Panahi v. L.A. Police Dep't, 839 F.2d 621, 623 (9th Cir.1988). As this is a pro se civil rights case, it is critical that the court allows the plaintiffs every opportunity to show they are entitled to relief including by amending their complaint.

35. Also, here, Plaintiffs' second motion to amend the complaint is timely because the court has not yet entered a scheduling order setting a deadline for filing motions to amend, nor has there been answer filed, nor has there been any discovery, etc. It is still very early, procedurally-speaking in this case.

36. Further, the second amended complaint is necessary to clarify and supplement the claims regarding race discrimination, breach of fiduciary duty, abuse of process, consumer protection violations, and defamation. The plaintiffs one more opportunity to do so properly in order to protect against any technicality that they may have not addressed as they are pro se and not expert pleaders trained in all the technicalities of the law.

37. The bottom line is that the plaintiffs have meritorious claims. This should be evident from the pleadings filed so far, including the amended complaint, the objection to the motion to dismiss and the motion for partial summary judgment. These pleadings may not be drafted with the precision of a trained lawyer, and in fact may be inartfully pleaded in many respects. But it should be evident that there is something there that demonstrates that the plaintiffs have claims that can be proven by the facts, and are entitled to relief. This lawsuit is or should be about justice. If the court steps back and looks at all that has gone on, it should be clear that the plaintiffs deserved a fair chance to be fully and properly heard and to have their full and proper day in court.

## V. DEFENDANT'S ANTICIPATED OBJECTIONS LACK MERIT

38. Defendant's anticipated objections to further amendment lack merit. First, Defendant may argue that Plaintiff already exercised his right to amend once and should not receive another opportunity. This argument fails because New

Hampshire law does not limit parties to a single amendment. To the contrary, courts routinely permit second and even third amendments where justice requires. The question is not how many times a plaintiff has amended but whether the proposed amendment would cure deficiencies, avoid prejudice, and advance resolution on the merits.

39. Second, Defendant may assert that Plaintiff's proposed amendments attempt to resurrect claims dismissed with prejudice. This assertion would be incorrect. The Court dismissed only two claims with prejudice; perjury and violations of professional conduct rules. Plaintiff does not seek to reassert those specific claims. Rather, Plaintiff seeks to properly plead viable causes of action, such as breach of fiduciary duty and defamation, and others, that the Court dismissed without prejudice, and that would benefit from further clarification of the claims.

## VI. LEGAL PRINCIPLES GOVERNING AMENDMENT

40. The legal principles governing amendment are well-established and strongly favor granting Plaintiff's motion. Federal Rule of Civil Procedure 15(a)(2), which New Hampshire courts look to for guidance, provides that courts "should freely give leave when justice so requires." This liberal standard reflects the fundamental principle that cases should be decided on their merits rather than on pleading technicalities. The United States Supreme Court has repeatedly emphasized this principle, holding that the decision to grant or deny leave to amend is committed to the trial court's discretion but that discretion is limited by Rule 15(a)'s liberal policy of permitting amendments. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971).

41. Courts deny leave to amend only when the amendment would be futile, unduly prejudicial to the opposing party, the result of bad faith, or unduly delayed. None of these factors is present here. The proposed amendment is not futile; it addresses the specific deficiencies Defendant identifies in his motion to dismiss. The amendment is not unduly prejudicial; as discussed, the case remains at an early stage. The amendment is not made in bad faith; Plaintiff acts in good faith to cure possible deficiencies, make more definitive statements, clarify claims, and proceed to the merits. The amendment is not unduly delayed; Plaintiff has sought to amend the complaint since 2022 but was not allowed for over 3 years. Then when the defendant filed his motion to dismiss the original complaint (under illicit and dubious circumstances), the plaintiffs filed a motion to amend the complaint. The court denied that motion as moot because of its ruling on the motion to dismiss, but it never in actuality addressed the issues raised in the motion to amend the complaint[5]. Further, after defendant filed his motion to dismiss the complaint, plaintiffs indicated the intent to file a

[5] See again **Exhibit A** for the previous motion to amend the complaint.

second amended complaint in various pleadings including the motion for case management conference, but now in the abundance of caution files a separate standalone motion in order to avoid the charge that plaintiffs did not file a specific motion seeking leave to amend the complaint a second time.

42. Moreover, courts typically afford plaintiffs the opportunity to amend a second time as long as it is still early in the proceedings. Ketterer v. Grayson, Index No. 653510/2021 (N.Y. Sup. Ct. July 25, 2022) (granting leave to file second amended complaint where discovery had not commenced and no prejudice existed). The court in Ketterer emphasized that early in litigation, before substantial discovery has occurred, courts should liberally allow amendment because no prejudice results and the interests of justice favor resolving disputes on their merits rather than on technicalities.

43. Further, courts recognize that pro se litigants require additional consideration when seeking leave to amend. As the 2nd Circuit explained in Traguth v. Zuck, courts have an obligation to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training. Pro se pleadings must be held to less stringent standards than formal pleadings drafted by lawyers, and pro se litigants should be afforded every reasonable opportunity to demonstrate they have a valid claim. Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000).

44. Here, under the above circumstances and additional restrictions/burdens/obstacles the plaintiffs have faced[6], the plaintiffs have not been given a full opportunity to amend the complaint, while on the other hand, the defendant has been given multiple opportunities to file revise and amend his motions to dismiss at least 5 times with the most recent one involving completely new defenses and legal theories never before mentioned for over 3 years (including, failure to state a claim, etc.), and thus representing a substantive amendment to his motion to dismiss defense.

## VII. CASES SHOULD BE DECIDED ON THEIR MERITS AND NOT ON TECHNICALITIES

45. Courts generally disfavor dismissal for technical defects. See Litton Bus. Sys. v. Commissioner of Revenue, 383 Mass. 619, 622 (1981).

46. Defendants' attempt to have the case dismissed based on hyper-technicalities violates the principle that cases ought to be decided on their merits and not on technicalities.

[6] For example, the arbitrary 25-page limitation for the amended complaint proved overly restrictive and impeded plaintiff's ability to add parties and explain attendant claims adequately. It should be noted that the plaintiffs provided an attachment to the amended complaint but the plaintiffs are not confident that it will be treated as part of the amended complaint.

47. In Owens v. Amtrak, No. 94-7444 (Mass. Super. Ct. 1998), the Superior Court explicitly stated that the "spirit of the [procedural] rules favors decisions on the merits, not technicalities, unless the result would be prejudicial to the other party."

48. In JOHN DEWING vs. J.B. DRISCOLL INSURANCE AGENCY, 30 Mass. App. Ct. 467 (1991), the Appeals Court reversed a dismissal for failure to prosecute under Mass.R.Civ.P. 41(b)(2), noting that mere delay without evidence of prejudice or intentional neglect does not justify terminating a case. The court emphasized that dismissals for procedural lapses must be weighed against the policy of resolving disputes on their merits, particularly when there is no showing of harm to the opposing party.

49. In Schiavone v. Fortune, 477 U.S. 21 (1986), the U.S. Supreme Court also highlighted that technicalities should not be rigidly enforced if they undermine the fair adjudication of claims.

50. For New Hampshire cases underscoring this principle, see American Express Travel v. Moskoff, 148 N.H. 446, 450 (2002)("It is important that cases be decided on their merits, that a party have his day in court and that rules of practice and procedure shall be tools in aid of the promotion of justice rather than barriers and traps for its denial." Douglas v. Douglas, 143 N.H. ___, ___, 728 A.2d 215, 219 (1999)". And also see Krainewood Shores Assoc., Inc. v. Town of Moultonborough, 174 N.H. 103, 111 (2021).

51. Thus, Courts should avoid procedural traps (e.g., Owens) and ensure cases are heard on their merits. This includes allowing a second amended complaint in this instance, so that plaintiffs can fully present the merits of their claims.

## VIII. CONCLUSION

52. For the foregoing reasons, Plaintiff respectfully requests that this Court grant leave to file a Second Amended Complaint. Granting leave would advance the interests of justice by allowing this case to proceed on its merits rather than being dismissed on pleading technicalities. No prejudice would result to Defendant because the case remains at an early stage before discovery has commenced. The proposed amendments would cure any deficiencies in the First Amended Complaint and ensure that Plaintiff has a fair opportunity to pursue his claims.

53. This case has been pending for nearly six years, during which time Plaintiff has been prevented from amending due to procedural challenges and appellate delays. Plaintiff has now filed his first amended complaint and seeks leave to file a second to address perceived deficiencies. Denying leave at this juncture would elevate form over substance and deny Plaintiff the opportunity to have his claims adjudicated on their merits. Conversely, granting leave would serve

Case 1:25-cv-00251-SE-AJ Document 178-1 Filed 01/26/26 Page 12 of 65

the fundamental principle that cases should be resolved based on the facts and law applicable to the parties' dispute rather than on procedural technicalities.

54. Accordingly, Plaintiff respectfully requests that the Court grant this motion and allow Plaintiff to file a Second Amended Complaint within a reasonable time after the Court's order granting leave.

Respectfully submitted,
/s/andre bisasor
Andre Bisasor

Date: October 30, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.

/s/ Andre Bisasor
Andre Bisasor

# <u>Exhibit A</u>

STATE OF NEW HAMPSHIRE-HILLSBOROUGH SUPERIOR COURT-NORTHERN DISTRICT
Natalie Anderson, et al. v. Craig Donais | Docket No. 216-2020-CV-00027

**PLAINTIFF'S [EMERGENCY] MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**

1. Pursuant to Rule 12 of the New Hampshire Superior Court Rules of Civil Procedure, Plaintiff Natalie Anderson[1] respectfully moves this Court to grant leave to file the first amended Complaint in this case. The original Complaint was filed on 1-3-20, which is over five years ago.

2. Note: Due to the pending motions for reconsideration of the 4-29-25 order, and motion for interlocutory appeal, this motion is only filed in the chance the court denies those pending motions. If the court grants the pending motions for reconsideration of the 4-29-25 order, and/or motion for interlocutory appeal, then this motion to amend the complaint may become moot to the extent the court, or the NHSC, grants default against the defendant for failure to timely file an answer, or otherwise if the court, or the NHSC, strikes the new motion to dismiss as waived/untimely, and then requires that an answer be filed forthwith.

## I. INTRODUCTION

3. The Plaintiff hereby submits this Motion to Amend Complaint in the above-captioned matter. It is being filed because the Court's 4-29-25 order, allowing the defendant's new fifth pre-answer motion to dismiss with an entirely new defense of failure to state a claim to stand, necessitates its filing.

## II. LEGAL STANDARD

4. An amended complaint is a written revision of an original complaint filed by a plaintiff or petitioner.

5. Plaintiffs may choose to amend a complaint for several reasons, like adding additional claims, correcting errors, adding additional parties, adding requests for relief, or clearing up inadequate claims.

---

[1] It should be noted that in his recent filings, Donais argues that no claims are asserted by Anderson against Donais and that she cannot seek any relief or file motions in this case. This assertion is both factually and legally incorrect, as the complaint and the record demonstrate that Anderson has participated actively in this litigation, has filed numerous motions, and has been the subject of Donais' conduct. Donais never objected to Anderson's claims previously and has thus waived any such argument. To permit Donais to now assert that Anderson has no claims would lead to the absurd result of nullifying years of litigation and filings, including Anderson's many motions and pleadings, and would allow Donais to dictate which plaintiffs may assert which claims, contrary to both the facts and the law. Further, it should be noted that the original complaint begins with: *"COMPLAINT AND DEMAND FOR JURY TRIAL 1. **We the plaintiffs in the above captioned case hereby submit this complaint against the Defendants**…"* It also should be noted that with respect to the section of the complaint that address the claims against Donais, that section begins with: *"IX. CLAIMS AGAINST CRAIG DONAIS. 346. **Plaintiffs hereby reallege and incorporate by reference each of the preceding paragraphs of this as if fully stated herein**."* In both of these instances, the complaint indicates that the claims are being asserted on behalf of both plaintiffs. Thus, Donais should be estopped from this argument because he did not raise for 3 years and he specifically addressed plaintiff Anderson in many of his prior filings. Further, the entire ADO proceedings against Donais, which Donais himself has referenced in support of various arguments and positions taken in this court, was initiated and prosecuted by plaintiff Anderson or under her name. NB: Plaintiff Bisasor will separately file his own motion for permission to amend the complaint.

6. The legal standard for amending a complaint, in NH Superior Court, is outlined as follows.

## A. NH Superior Court Rules of Civil Procedure

7. NH Superior Court Rules of Civil Procedure states the following regarding amendments to a complaint:

> Rule 12. Motions – Specific | (a) Motions to Amend.
> (1) No plaintiff shall have leave to amend a pleading, unless in matters of form, after a default until the defendant has been provided with notice and an opportunity to be heard, to show cause why the amendment should not be allowed.
> (2) Amendments in matters of form will be allowed or ordered, as of course, on motion; but, if the defect or want of form be shown by the adverse party, the order to amend will be made on such terms as justice may require.
> (3) Amendments in matters of substance may be made on such terms as justice may require.
> (4) Amendments may be made to the Complaint or Answer upon the order of the court, at any time and on such terms as may be imposed.

8. This effectively states that amendments in form will be allowed, "as of course", on motion. This indicates that amendments involving form should not be denied. Further, amendments on substance are to be allowed as justice requires. Amendments also may be made at "any time".

9. NH Superior Court Rules of Civil Procedure further states the following about amendments to a complaint:

> Rule 8. Complaint
> (b) An amendment to a pleading relates back to the date of the original pleading when:
> (1) a statute that provides the applicable statute of limitations allows relation back;
> (2) the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out – or attempted to be set out – in the original pleading; or
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 8(b)(2) is satisfied and if, within the period provided for serving the summons and complaint, the party to be brought in by amendment:
> (A) received such notice of the action that it will not be prejudiced in defending on the merits; and
> (B) knew or should have known that the action would have been brought against it, but for a mistake or lack of information concerning the proper party's identity.

10. Here, the rules indicate that amendments arising from the conduct or occurrence in the original pleading should not only be allowed but these will also relate back to the original date of filing.

11. NH Superior Court Rules of Civil Procedure also states the following regarding amendments to a complaint:

> Rule 7. Pleadings, Motions and Objections, General
> (h) The court may in all cases order either party to plead and also to file a statement in sufficient detail to give to the adverse party and to the Court reasonable knowledge of the nature and grounds of the action or defense.

12. Here, the rules indicate or at least suggests that, if there are deficiencies in the complaint, the remedy is not dismissal but an order requiring filing of a statement in sufficient detail. [Note: In Massachusetts, this is referred to as "a more definitive statement". See MRCP Rule 12 (e)("*Motion for more definite statement. If a*

*pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, he may move for a more definite statement before interposing his responsive pleading"*).].

13. So, the rules clearly envision that courts will freely allow plaintiffs to amend their complaint.

## B. Amendments in Form

14. Rule 12(a) distinguishes between amendments that are "matters of form" versus more substantive changes.

15. This distinction is critical because Rule 12(a)(1) of the NH Superior Court states: "No plaintiff shall have leave to amend a pleading, **unless in matters of form**, after a default until the defendant has been provided with notice and an opportunity to be heard, to show cause why the amendment should not be allowed."

16. Therefore, the rules indicate that plaintiffs automatically have leave to amend the complaint in matters of form. This indicates that amendments in matters of form must be allowed. The term "unless in matters of form" indicates the converse is true, that plaintiff have leave to amend in matters of form, as a matter of right. Further, as noted previously, rule 12 also indicates that amendments in form will be allowed, "as of course", on motion. This indicates that amendments involving form should not be denied. The term "as of course" indicates as a matter of right.

17. Thus, the rules do not envision the court preventing a plaintiff from amending the complaint in matters of form. Further, amendments that merely refine procedural aspects—such as correcting party names or updating pleadings to reflect resolved claims—are typically classified as matters of form.

### i. Removing Settled Defendants

18. Similarly, removing defendants whose claims have been resolved through settlement does not introduce new claims but merely reflects the litigation's current status. This aligns with amendments of form, as the remaining defendant's obligations remain unchanged.

19. Thus, removing settled defendants typically has no bearing on the surviving claims or defenses. Also, removing settled defendants does not implicate jurisdiction over the remaining party but instead eliminates extraneous parties, streamlining the case—a procedural adjustment courts routinely permit as a matter of administrative efficiency.

20. In addition, the absolute right to remove or strike out defendants from being named in a case is established by statute as long as it is done before evidence is closed or case submitted. See RSA 514:13 ("In all civil

proceedings, when two or more are joined as plaintiffs or defendants, the writ or other process may be amended before the evidence is closed or the case is submitted, by striking out the name of any plaintiff or of any defendant on paying his costs to that time."). Therefore, plaintiffs have the automatic/absolute right to remove settled defendants from a case before evidence is closed or case submitted (i.e., where evidence is closed or case is submitted after answer/discovery is closed).

**<u>ii. Clarifying Roles of Multiple Plaintiffs</u>**

21. Amendments that merely explicate the relationship between plaintiffs and claims fall within the scope of procedural refinement and thus a matter of form.

22. NH Rev Stat § 514:13 explicitly allows amendments to strike out or clarify the roles of plaintiffs or defendants "before the evidence is closed," provided the amendment does not introduce new claims or defenses. This statute supports the interpretation that clarifying how claims apply to existing plaintiffs is a matter of form, as it involves no substantive alteration to the pleadings.

23. If the amendment explicitly states that both plaintiffs assert the same claims already implied in the original complaint, then the amendment is a matter of form. For example, adding language such as "both plaintiffs jointly allege" to existing counts does not introduce new claims.

24. Further, clarifying claims between plaintiffs—especially where the defendant was already aware or should have been aware of both plaintiffs' involvement—typically does not impair the defense as this clarifies the existing claims without altering its substance and refines the pleading without introducing new claims.

25. Therefore, technical corrections to party roles are amendments in matters of form.

26. Generally, a court should allow amendments to pleadings to correct technical defects but need only allow substantive amendments when necessary to prevent injustice. See Nat'l Marine Underwriters v. McCormack, 138 N.H. 6, 8, 634 A.2d 1008, 1010 (1993).

27. New Hampshire courts distinguish amendments of form from those of substance by assessing whether the change alters the claims (substantively) or merely clarifies, corrects technical defects, or refines procedural aspects (formalities). Thus, amendments to correct "technical defects" in pleadings are permissible as matters of form, while substantive amendments (e.g., adding new claims) require judicial scrutiny.

28. Similarly, federal courts in New Hampshire have allowed plaintiffs to remove settled defendants from complaints as procedural refinements, provided the remaining claims remain unchanged.

29. Under Rule 12(a)(1), post-default amendments are restricted to matters of form unless the defendant receives notice. If the clarification of plaintiffs' roles occurs before default or during early pleading stages, courts are required to permit it as a procedural adjustment.

30. In sum, clarifying how claims apply to both plaintiffs in a multi-plaintiff complaint is generally a matter of form under NH Superior Court Rule 12(a)(1), provided the amendment does not alter the claims, does not prejudice the defendant's ability to respond, and occurs before default or during permissible pleading stages.

31. In Nat'l Marine Underwriters v. McCormack, 138 NH (1993), the court said:

> We allow substitution of an entirely new party as plaintiff, including substitution of a plaintiff with standing for an original plaintiff with no standing, when required to prevent injustice and in the absence of resultant prejudice to the defendant. See Edgewood Civic Club v. Blaisdell, 95 N.H. 244, 247, 61 A.2d 517, 519 (1948); State v. Collins, 68 N.H. 46, 46-47, 36 A. 550, 550-51 (1894); Willoughby v. Holderness, 62 N.H. 661, 662 (1883). We have allowed substitution of a plaintiff for an original plaintiff with no right to recover due to a procedural incapacity. See Coburn v. Dyke, 103 N.H. 159, 160-61, 167 A.2d 223, 224 (1961). Further, we have allowed an insurance company, upon its own motion, to substitute itself for the original plaintiffs, the insureds. See King v. Nedovich, 118 N.H. 161, 161-62, 384 A.2d 134, 135 (1978).
>
> The general rule in this State is to allow liberal amendment of pleadings to cure defects of a technical nature. Tice v. Thomson, 120 N.H. 313, 318, 414 A.2d 1284, 1287 (1980); see RSA 514:8 (1974); SUPER. CT. R. 25. Substantive amendments to pleadings are permitted when they are necessary for the prevention of injustice. Clinical Lab Products, Inc. v. Martina, 121 N.H. 989, 991, 437 A.2d 285, 286 (1981); see RSA 514:9 (1974); SUPER. CT. R. 26. We allow "liberal amendment of pleadings unless the changes surprise the opposite party, introduce an entirely new cause of action, or call for substantially different evidence." Clinical Lab Products, Inc., 121 N.H. at 991, 437 A.2d at 286 (citations omitted); see Gosselin v. Gosselin, 136 N.H. 350, 352, 616 A.2d 1287, 1288 (1992).

32. These references demonstrate that clarifying claims of multiple plaintiffs are of a technical nature and should be liberally allowed.

## C. Amendments in Substance

33. RSA 514:9 (2007) allows the trial court to permit a substantive amendment to pleadings "in any stage of the proceedings, upon such terms as the court shall deem just and reasonable, when it shall appear to the court that it is necessary for the prevention of injustice...."

34. Therefore, according to this statute, amendment of the complaint in substance should be allowed when it is fair and reasonable to do so, and when it would be unfair to the plaintiffs to not allow amendment. It certainly should be allowed when the case is in its early stage (pre-answer motion to dismiss stage is still

procedurally very early) and especially when no amendment has been made to the original complaint, and when no chance or opportunity to amend the complaint has been provided. This finds direct support in New Hampshire case law, court rules, and statutory provisions.

35. Under RSA 514:9, liberal amendment of pleadings is permitted and encouraged by statute. Courts are required to allow substantive amendments when it prevents injustice.

36. Generally, a court should allow amendments to pleadings to correct technical defects but need only allow substantive amendments when necessary to prevent injustice. See Nat'l Marine Underwriters v. McCormack, 138 N.H. 6, 8, 634 A.2d 1008, 1010 (1993).

37. This underscores the broader context that reflects a judicial preference for resolving cases on their merits rather than procedural technicalities.

38. Only when “the changes would surprise the opposing party, introduce an entirely new cause of action, or call for substantially different evidence” should a court consider possibly not allowing amendment of substance but still retains discretion to allow amendment even in such circumstances. Dent v. Exeter Hosp., 155 N.H. 787, 796, 931 A.2d 1203 (2007). See Tessier v. Rockefeller, 162 N.H. 324, 340, 33 A.3d 1118 (2011). See also Clinical Lab Prod’s Inc. v. Martina, 121 N.H. 989, 991 (1981).

39. Thus, denying leave to amend should be rare unless prejudice or undue delay exists, aligning with the principle that amendments should be liberally and freely allowed when fair and reasonable.

40. Rule 12(a)(1) states that amendments in "matters of form" may proceed without judicial intervention after default, but substantive amendments require notice and opportunity to respond. This distinction implies that substantive amendments are permissible if procedural fairness is ensured, particularly in early stages.

41. Although not binding, Federal Rule of Civil Procedure 15(a) strongly influences New Hampshire courts. Rule 15(a) mandates that leave to amend "shall be freely given when justice so requires," prioritizing flexibility to ensure litigants can fully present their claims, and New Hampshire courts frequently adopt this reasoning. Note: Under analogous Fed. R. Civ. P. 15(a)(1), amendment is permitted as of right before responsive pleading. The federal court thus freely allows complaints to be amended at least once in the

federal court. Similarly, in neighboring Massachusetts, amendment is permitted once as a matter of right prior to service of a responsive pleading (i.e., answer) to the complaint. See MRCP Rule 15.

42. A plaintiff must be given leave to amend his complaint to correct perceived deficiencies before a dismissal for failure to state a claim has preclusive effect. See ERG, Inc. v. Barnes, 137 N.H. 186, 189 (1993). In Barnes, the NHSC reiterated the liberal pleading amendment practice in this State. Barnes, 137 N.H. at 189, 624 A.2d at 557. See also Follender v. Scheidegg, 142 N.H. 192, 193 (1997) (denial of motion to amend affirmed only where party was "given ample notice of the deficiency in his pleadings" yet failed to seek amendment until after dismissal).

43. Such a rule is consistent with modern rules of pleading and particularly with NH's liberal doctrine of amendment. See R. Wiebusch, 4 New Hampshire Practice, Civil Practice and Procedure§§ 243-47, at 176-82(1984& Supp.1992-93); Restatement (Second) of Judgments§ 19 comment a at 161-62(1980)(such a result is warranted by ease of amending pleadings).

44. To assure that the opportunity for amendment has practical meaning, however, the plaintiff must be given leave to amend the writ to correct perceived deficiencies before an adverse judgment has preclusive effect.

45. See Branum v. Clark, 927 F.2d 698, 705(2d Cir.1991)(court should not dismiss without granting leave to amend); Isaac v. Schwartz, 706 F.2d 15, 17(1st Cir.1983)(plaintiff given full opportunity to amend complaint). See also Osserman, 369 Mass. at 204, 339 N.E.2d at 195("In each instance the plaintiff has been given two chances to state his case and is not entitled to burden the courts and opposing parties with further attempts.").

46. Here, plaintiffs have been given no opportunity to amend the complaint much less a full opportunity to amend the complaint, while on the other hand, the defendant has been given multiple opportunities to file revise and amend his motions to dismiss at least 5 times with the most recent one involving completely new defenses and legal theories never before mentioned, failure to state a claim/absolute privilege, and thus representing a substantive amendment to his motion to dismiss defense.

47. Therefore, under New Hampshire Superior Court Rules of Civil Procedure, amendments to pleadings should be freely granted when justice so requires. Thus, a party may amend the complaint under New

Hampshire law, that permits liberal amendment of pleadings and that mandates that leave to amend the complaint should be freely given and where amendments to correct technical defects are favored.

## III. GROUNDS FOR AMENDMENT

### A. Plaintiffs Have Had No Opportunity to Amend The Complaint And Thus Justice Requires Allowance of Amendment

48. Plaintiffs have not had any chance or opportunity to amend the complaint after service of process was made on the defendant on 4-14-22.

49. In the Original Complaint (filed in Jan. 2020), Plaintiffs sued 21 defendants, including Donais. The Complaint's length (65 pages, 418 paragraphs) reflects the complexity of claims against multiple corporate and individual defendants.

50. Service deadlines were extended multiple times by Judge David Anderson due to pandemic disruptions and extensive settlement negotiations from early 2020 to early 2022, of which Donais participated in, up until the last minute just before a global settlement with 21 defendants was about to be finalized/consummated, and at which point Donais backed out of the settlement without explanation, in January 2022.

51. There was no opportunity for amendment of the complaint or to seek permission to amend the complaint during the Covid pandemic in 2020/2021, and/or during the settlement negotiations in 2021, all of which suspended litigation in this court including service of process, the deadline for which had been extended by the court through until March/April 2022.

52. The plaintiffs eventually served process on the defendant on 4-14-22 pursuant to court order. The original complaint was served on the defendant at that time.

53. But it should be noted that the defendant prematurely entered appearance in the case in January 2022 in order to prematurely file a motion to dismiss for failure to timely serve the complaint, even though the deadline to serve process had not yet expired. This improper move distorted the case process because it immediately invoked a premature motion to dismiss process while the plaintiffs were still wrapping up the settlement negotiations with the 20 defendants. The defendant took away the plaintiffs autonomy and choice in how to proceed with the case after settling the 20 defendants and after the defendant withdrew from the settlement at the last minute. This was a strategic move by the defendant in order to disrupt and

to "throw a monkey wrench" into the orderly process of this case including the orderly process of serving the defendant and the attendant orderly processes of seeking to the amend the complaint after the 20 defendants were settled.

54. As a reminder, prior to January 2022, the plaintiffs were led to believe that Donais was part of the settlement. Therefore, the plaintiffs had no reason or occasion to think that the case would proceed after settlement was finalized or executed, and thus the plaintiffs had no reason or occasion to think about amending the complaint. As far as the plaintiffs were concerned, the plaintiffs and all defendants had reached a partial settlement agreement in April 2021, where the parties agreed on a specific monetary amount for settlement and with the only thing remaining was the wording and finalization of the settlement contract. The plaintiffs were blindsided by the sudden withdrawal, at the last minute (in early January 2022), from the agreed upon settlement that Donais was included in and had agreed to in April 2021.

55. Once the defendant filed his appearance and first motion to dismiss for failure to timely serve the complaint in January 2022, this led to an intense litigation over the service of process issue. Then the defendant introduced a second motion to dismiss in March 2022 seeking to vacate the summons issued by the clerk office. This further led to more intense litigation. Then, in May 2022, the defendant again filed a third motion to dismiss, this time for insufficient service of process, which re-included the timeliness of service of the complaint and the vacatur of the summons issues combined into one larger threshold issue for whether the court had jurisdiction over the case and triggering the requirements/protections of Rule 9 including the automatic right to interlocutory appeal. All of these challenges were not based on the adequacy of the complaint itself but on technical service arguments that did not address or attack the complaint. Consequently, the plaintiffs were led to believe that the defendant had no challenge to the complaint itself and thus were not given any notice by the defendant of any intent to challenge the adequacy of the complaint for all this time. Therefore, there was no practical need for the plaintiffs to really worry about amending the complaint to address adequacy of the complaint. [Note: This is another reason why it is **prejudicial** to the plaintiffs for the defendant to wait 3 years until 3-14-25 to raise a challenge to the adequacy of the complaint.

It also has given the defendant 3 years to work on challenging the complaint, when they otherwise would have had to come up with such challenges immediately in 2022.]

56. Similarly, if the plaintiffs sought to amend the complaint before serving it, they could be accused of filing a new complaint. Similarly, plaintiffs could not seek to amend the complaint while negotiating and finalizing a settlement. How would the plaintiffs know what to amend if the defendants were settling the case? It was only once the settlement was finalized and executed that the plaintiffs would be in a position to seek permission to amend the complaint because any amendment would have to include removal of the settled defendants and the attendant claims, which removal did not occurred until early April 2022. Even with the appearance of Donais in January 2022 and with his sudden decision to back out of the settlement at that time, him being the only one to do so, the other defendants were not out of the case until the settlement agreement was finalized. So the plaintiffs would have had to wait until the settlement execution to even begin to seek to amend the complaint because the complaint would then have been amended to focus only on the one remaining defendant, Donais, while the other 20 defendants were not fully out of the case as yet though things were on track for completion of the settlement. Plaintiff trusts that this is making sense however in-artful it may be. Hence, the first moment that the plaintiffs could seek to properly amend the complaint was on 4-6-22 when the finalized settlement stipulations of dismissal signed for all 20 defendants were filed officially with the court and those 20 defendants were officially out of the case. Note: It should be noted that 4-6-22 was also the date of the hearing with Judge Messer and during that hearing, the plaintiffs sought to raise the issue of amending the complaint, with the court, but the court, at the behest of the remaining defendant, did not address the issue.[2]

57. Furthermore, the plaintiffs cannot file an amended complaint without permission from the court. The plaintiffs could not simply file an amended complaint on their own.

---

[2] During the 4-6-22 hearing, plaintiffs did raise to the court the issue of the need to amend the complaint but the court ignored the issue at the time and did not address the issue. Thus, Plaintiffs tried to bring this to the attention of the Court but the Court did not see fit to address it at that time. Thus, plaintiffs were unable to amend the complaint prior to this point because the plaintiffs cannot amend the complaint without the permission of the court. By refusing to address the issue, the court effectively withheld its permission to amend the complaint at that time. See relevant excerpt of the transcript of the 4-6-22 hearing, as **<u>Exhibit 1</u>**.

58. The plaintiffs would have had to seek permission to amend the complaint prior to service, while battling the motion to dismiss for failure to serve complaint and the motion to vacate summons, and dealing with a hearing on the motion to dismiss on 4-6-22, while also finalizing and executing the settlement agreement with 20 defendants which was finally executed in early April 2022.

59. Similarly, once the 20 defendants were out of the case, the plaintiffs would have to seek permission to amend the complaint during the same time that the defendant was seeking to dismiss the case for service of process issues and to vacate the summons through two motions to dismiss filed in January 2022 and in March 2022, and appealing the denial of those two motions to the NH Supreme Court (NHSC), and then further pressing for dismissal based on insufficiency of service of process, shortly thereafter, by filing his third motion to dismiss (in May 2022) and then seeking to include that in his appeal to the NH Supreme Court (NHSC) in June 2022. If plaintiffs had sought permission to amend the complaint during those actions by the defendant, it would have been improper firstly because the complaint could not have been amended while the case was being appealed, and secondly because the defendant was seeking to get rid of the case only on the threshold issue of service of process, and it would have been impractical because the procedural posture of the case gave deference to first resolving the jurisdictional challenge regarding service of process. Amending the complaint would not have cured any jurisdictional issue of insufficient service of process. Thus, seeking to amend the complaint back then particularly on substantive issues, ostensibly would have been a waste of time and judicial resources since the case could have been dismissed for insufficient process and an amendment could not stop that, if the court was inclined to do that. Moreover, the complaint could not have been amended while the case was on appeal and/or while this court placed a stay on the case pending appeal. This sufficiently lays out the tight tracing of the timeline showing that the plaintiffs could not have amended the complaint and was given no opportunity to amend the complaint.

60. Plaintiffs cannot reasonably be expected to stand on that original complaint filed 5 years ago with 21 defendants, from before the pandemic began. This would simply not be fair, just or equitable.

61. Moreover, there are additional acts since the filing of the original complaint in January 2020. Plaintiffs need to supplement the complaint with additional events, facts and claims, in addition to clarifying existing

claims. [Note: Some of these additional facts were raised to the Court in the 4-6-22 hearing and in prior pleadings such as the 1-26-22 motion to disqualify counsel and the 2-18-22 reply to the objection to that motion to disqualify counsel.]

62. Therefore, since the original filing of the complaint in this case, there are new acts by Donais that have occurred that are relevant to the matters before this court. Plaintiff could seek to file a new separate lawsuit regarding some of the new acts by Donais, however, for judicial economy reasons, it seems best to bring these expanded facts to the attention of this court, via an amended complaint, given that the same defendant is before this court, for the same or similar claims and/or for claims arising from or related to the same or similar facts, transactions or occurrences. It is simply more efficient to allow incorporation of these new acts into this case via amendment of the complaint rather than forcing the plaintiff to file a separate new lawsuit in this court, which will likely have to be consolidated with this case in any event. Either way, the plaintiffs have a right to pursue claims based on subsequent acts whether in this court or in another court[3].

63. So, in sum, after Donais entered appearance on the case in early January 2022, Donais moved to dismiss the case prior to service of process and tied up the case with technical jurisdictional/sufficiency of process issues for 3 years, with back-to-back procedural motions to dismiss and with an appeal, that triggered multiple stays. Donais employed several dilatory procedural tactics including filing four motions to dismiss (2022–2024) challenging service; pursuing frivolous interlocutory appeal to NHSC, which was declined on 2-27-25, ignoring the 3-31-25 answer deadline, and filing a 5th Motion to Dismiss on 3-14-25.

[3] It should be noted that, while this case was suspended or stayed for 2 years in the NHSC on appeal, the plaintiffs filed a new case in Massachusetts superior court (Bristol County) in 2022, in order to preserve statute of limitations for the subsequent acts of Donais, among other things. The case was served and the defendant removed the case to Massachusetts Federal Court. The defendants then sought to dismiss the case but Judge William Young, after reading the papers and after hearing, decided that he would not dismiss the case but that he would transfer the case to the NH federal court, so as to eliminate any issue of personal jurisdiction (which he did not decide that issue). Judge Young stated that the claims should be heard on the merits and that was why he transferred the case rather than allowing technicalities to get in the way of the merits. The defendant had also requested in the alternative to transfer the case if the court did not dismiss on other grounds. Once transferred to NH federal court, the defendants again moved to dismiss but the federal court did not dismiss the case, and allowed the plaintiff to file an amended complaint. While the amended complaint was being reviewed, the NHSC sent the case back to this court and this case resumed. Because of that, there now would be two cases on similar facts and claims that would be adjudicated in both state court and federal court. Plaintiff filed for voluntarily dismissal on the grounds that this case was further ahead because it had already decided/denied the motion to dismiss and was poised to enter the Answer stage, and thus so that the federal court claims can be consolidated with this prior filed case and so that all the related claims could be heard in one court. (The plaintiff has the right to re-file the case in one year from dismissal, under the NH savings statute, as long as the dismissal was without prejudice and not based on adjudication of the merits). See later section in this filing on the voluntarily dismissed case in NH federal court.

64. The above more than meets the "justice so requires" standard for allowance of amendment of the complaint.

**B. Judicial Economy Requires Allowance of Opportunity to Amend The Complaint**

65. Regarding judicial efficiency, the Court's 4-29-25 order appears to have indicated the preference for judicial efficiency of the proceedings . Removing settled parties and refining claims aligns with this directive. Judicial economy favors amendment by streamlining litigation with a focused complaint that aids resolution of this case, and avoids piecemeal adjudication. Forcing Plaintiffs to defend a 65-page multi-defendant complaint against one remaining defendant wastes resources and is fundamentally unfair.

66. Further, Plaintiffs diligently sought a case management conference in December 2024 including but not limited to addressing amendment. The Court denied scheduling a case management conference, citing the pending appeal by Donais at that time. Post-appeal, amendment is now timely.

**C. Plaintiffs' Previous Diligent Attempts To Seek Amendment**

**i. At the 4-6-22 Hearing**

67. It should also be noted that Plaintiffs previously repeatedly raised the need to amend the Complaint in prior pleadings, including their 1-26-22 motion to disqualify (and 2-18-22 reply for that motion), and at the April 6, 2022 hearing on the first motion to dismiss, and in two subsequent motions for a case management conference in 2024 and this year.

68. With respect to the 4-6-22 hearing, an excerpt from the transcript (page 32) is seen below (See **Exhibit 1**):

> MR. BISSASOR: Yes. The next issue is regarding the service of the actual complaint itself. Because of the 20 defendants are going to be out. I just wanted to bring to the attention of the Court that we intend to amend the complaint. I'm not sure if we should amend it before serving it to pay respect to the fact that the defendants are —— the other 20 defendants are out, or is that something to take up after serving the complaint as is?
>
> THE COURT: So I guess, Attorney Hilliard, if you want to respond to that, you can. If you would prefer not to respond, you don't need to respond.
>
> MR. HILLIARD: I think he's asking the Court for legal advice, Your Honor. I don't think either one of us should respond.
>
> THE COURT: Okay. In case you had a response to him, I was going to let you do it. Okay.
>
> MR. HILLIARD: Thank you.
>
> THE COURT: What? Yeah. There's no response there, Attorney Bissasor (sic), go ahead.
>
> MR. BISSASOR: Yeah. No, I was just going to say that I'm not asking for legal advice. I'm just stating to the Court that there's a need to amend the complaint. So I guess I'm —— procedurally, I was asking whether it's proper to amend the complaint prior to service or amend it —— or take up the issue of amendment after service.
>
> THE COURT: And I ——
>
> MR BISSASOR: Procedurally, what would be most appropriate under these unusual circumstances?

> THE COURT: I appreciate your making the request, Mr. Bissasor, but the Court is not going to answer that question. I'm going to allow –– you need to prosecute your own case. So you've got your reissuance of a summons, and that's –– the Court has no further comment on that. Do you have any other issues you need to raise with the Court today?

69. The transcript excerpt shows that the plaintiffs, through Plaintiff Bisasor, explicitly informed the court of their intent to amend the complaint, including to reflect the fact that 20 defendants would be removed. He sought clarification on whether to amend before or after service, but the court declined to provide any guidance or ruling, instead stating, "the Court is not going to answer that question... you need to prosecute your own case" and moving on without addressing the substance of the request.

70. Further, the record shows that defense counsel sought to characterize the plaintiff's request as seeking legal advice, which the court then adopted as its rationale for refusing to address the issue. This was improper: defense counsel's characterization should not have prevented the court from fulfilling its duty to manage the case and rule on procedural motions including oral ones. The court's role is to ensure fair process for all parties, not to defer to defense counsel's framing of the plaintiff's request.

71. Yet, this was not a request for legal advice, but a legitimate procedural motion for the court to exercise its case management authority. Under pro se liberal construction principles, the court should have treated the plaintiffs' request as a request for permission to amend the complaint, and under its case management authority should have provided some basic information about how the court intended to handle the issue of allowing the plaintiffs to amend the complaint, where without the permission of the court, they could not amend the complaint.

72. Under New Hampshire Superior Court practice, requests to amend a complaint—especially before service or answer—are routine and should be liberally construed in favor of allowing amendment, particularly when it is the plaintiff's first such request. New Hampshire law and practice are clear that amendments to pleadings should be freely permitted, especially in the early stages of litigation and when no prejudice to the opposing party is shown. The federal standard, which New Hampshire courts often follow, is that leave to amend should be "freely given when justice so requires". Further, New Hampshire is a notice-pleading jurisdiction that takes a liberal approach to technical requirements and amendments to pleadings. This policy

is especially strong where, as here, the amendment is sought before an answer or substantive motion has been filed and no prior amendment has been made.

73. The court's refusal to address the plaintiff's request—either to grant, deny, or even clarify the process for amending—constituted an abdication of its case management responsibility. The plaintiff was not seeking legal advice, but rather, as the transcript makes clear, was making a procedural request for permission to amend the complaint in light of changed circumstances. The court should have, at minimum, acknowledged the request and ruled on it, or provided basic procedural direction. Instead, the court's response left the plaintiff without guidance or a ruling on a legitimate procedural issue.

74. Given the above, the plaintiff's request to amend should be granted now for the following reasons:

   a. It was the first request to amend and was made at the earliest possible stage, before service of process.

   b. New Hampshire law and rules require that amendments be freely allowed when justice so requires, especially in early stages and when amendments are made in good faith to reflect changed circumstances.

75. The court's failure to address the original request on 4-6-22 was not right, and should not bar the plaintiff from seeking amendment now. Moreover, the court's refusal to address the plaintiff's request to amend the complaint was contrary to New Hampshire's liberal amendment policy and its own duty to manage procedural matters. The request was not for legal advice but a legitimate procedural request. The court should now grant leave to amend, as it is fair, reasonable, and consistent with both the letter and spirit of New Hampshire law and civil procedure.

**ii. In the 2024 Case Management Conference Motion Pleadings**

76. With respect to the subsequent raising of the issue to amend the complaint, in the case management motions, a relevant excerpt from the 12-9-24 reply to the objection to the 11-22-24 case management motion, is taken from page 13, paragraph 54(g), as follows (See **Exhibit 2**):

> Amendment of Complaint/Addition of Necessary Parties: The need to amend the complaint, including the addition of necessary parties, to ensure comprehensive adjudication of all relevant issues, as well as the timing of when that will be allowed. NB: From the outset, the defendant has been pressing, in this court and on appeal, for early dismissal based on serving process issues, leaving no opportunity to amend the complaint/add necessary parties since service of process on 4-7-22. Plaintiffs would like to flag this issue from now so that it is on the court's radar, and so that it is not said that this issue was never raised (NB: If

recalled correctly, plaintiff believes this item was briefly raised once before, at the 4-6-22 hearing with this court).

77. A further relevant excerpt from the 11-22-24 motion is taken from page 1, paragraph 1(g), as follows (See **Exhibit 3**):

> Amendment/Removal of Settled Defendants: Plaintiffs seek removal of defendants who have settled from the filing system to streamline case management. Assistance is requested for amending complaint names within the e-filing system.

78. Both of these documents clearly raise the issue of amending the complaint, to remove settled parties, to add necessary parties and to clarify or supplement the claims to ensure comprehensive adjudication of all relevant issues.

79. On 1-3-25, the court entered the following order on the Plaintiffs' Motion for a Case Management Conference

> The Court does not find that plaintiffs have set forth a legitimate basis for holding a case management conference at this time. After resolution of the Supreme Court's review of this Court's order on defendant's motion to dismiss, the case will either be resolved or the defendant will be required to file his Answer. The parties would then be required to file a Proposed Case Structuring and ADR Order pursuant to NH Super. Ct. R. 5. Accordingly, the motion for a case management conference is DENIED.

80. Note: The Court's 1-3-25 order failed to address Plaintiffs' entitlement to amend their Complaint under Rule 12 under the circumstances.

81. However, the 1-3-25 order seems to have suggested that the attendant issues of the case management motion, including the amendment of the complaint, will be taken up at the right time, ostensibly after the case comes back from the NHSC. If this is so, then this is evidently the right time to allow the complaint to be amended for the first time in this case.

## iii. Conclusion

82. So, despite the previous requests regarding this issue of amending the complaint, the Court evidently delayed addressing this issue, leaving Plaintiffs without relief regarding the need to amend the Complaint to remove settled defendants, to add parties, and to clarify and supplement claims.

83. Note: The Court's most recent 4-29-25 order also failed to address Plaintiffs' entitlement to amend their Complaint under Rule 12 under these circumstances.

84. Forcing Plaintiffs to litigate a 2020 multi-defendant pleading against one defendant in 2025 violates fundamental fairness. Plaintiffs should be allowed to amend the complaint at least once before ruling on a motion to dismiss for failure to state a claim. Plaintiffs also should be freely allowed to amend the complaint in accordance with Rule 12.

**D. Defendant Will Suffer No Prejudice**

85. Defendant will suffer no prejudice from an amendment because Donais negotiated settlement of this case for 1 year in 2021 and then litigated this case for 3 years from 2022 to the present, and is intimately familiar with the claims.

86. Amending the complaint to remove the other 20 defendants will streamline his defense to focus only claims pertaining to him. Also, amending the complaint to clarify the claims and to provide a more definitive statement will further ensure that the defendant can focus his defense.

87. Donais has had notice of the claims to be amended, including additional or subsequent acts, since the very beginning of this litigation. He is also intimately aware of the substantive amendments based on claims that the plaintiffs have alleged against him in the related NH federal court case, which will be sought to be consolidated into or with this case.

**E. Further on Amendment of Complaint**

88. In this case, the defendant has not filed an answer. He only filed motions to dismiss.

89. Plaintiffs raised the issue of amending the complaint prior to the defendant's filing of a motion to dismiss for failure to state a claim.

90. Plaintiffs also promptly raised the issue of amending the complaint on 4-6-22 during the court hearing. The court did not address this request. There was no undue delay in seeking to amend the complaint.

91. There will be no prejudice to the defendant because he also amended his motion to dismiss several times over the past 3 years and have now amended it again to include a brand new defense of failure to state a claim and absolute privilege. The defendant was thus allowed by the court to make substantive amendments to his multiple motions to dismiss. For example, the defendant was allowed to revise his first motion to dismiss based on the unsealing of sealed records, which purportedly would provide new information that the defendant did not have because he purported that it had been sealed. This turned out to not be true and

there was no new information from the unsealing of sealed records that the defendant did not have before. Yet he was still allowed to revise his 2022 motion to dismiss for insufficient service of process, in 2024, based on the possibility that there could be new information in the unsealed records.

92. Either way, the plaintiffs should be similarly allowed to amend the complaint in substance based on the new information and new events that occurred after the filing of the original complaint.

93. Here, Plaintiffs first motion to amend the complaint is timely because the court has not yet entered a scheduling order setting a deadline for filing motions to amend, nor has there been answer filed, nor has there been any discovery, etc. It is still very early, procedurally-speaking in this case. Further, Plaintiffs acted within a reasonable time after defendant filed his new motion to dismiss for failure to state a complaint on 3-14-25 and after the court issued its 4-29-25 order allowing it to stand. Plaintiffs then promptly raised the issue in the notice of intent filed shortly after the court's 4-29-25 order that allowed the new motion to dismiss to stand based on the court's surprising and unexpected waiver of two bedrock rules regarding waiver and forfeiture of untimely new defenses.

94. Similarly, the court did not grant leave to amend the complaint when Plaintiffs previously raised the issue of amending the complaint, prior to service of process on the defendant. Plaintiffs thus should be allowed the right or the opportunity to amend the complaint, at least once in this court before the filing of a responsive pleading/answer, which has not yet occurred in this court (which is the analogous federal court principle/law, which this court follows the reasoning thereof).

95. Plaintiffs thus intend to amend the complaint. This must be resolved before any motion to dismiss can be resolved.

96. It would be unfair to allow the defendants to amend their motions to dismiss in this court but then deny plaintiffs the same opportunity to amend the complaint in this court. This would be an unfair approach.

97. Note: Plaintiffs predict that the defendant will concoct strained argument to oppose amendment of the complaint which will further reflect a self-serving biased approach that counsel for the Donais has shown a penchant for.

98. NB: This case was filed 5 years ago on 1-3-20. Plaintiffs were blindsided by the new motion to dismiss for failure to state a claim on 3-14-25. Given that the court did not strike the new motion to dismiss, Plaintiffs need an opportunity to amend the complaint at least once. Similarly, there are additional acts by the defendants that have occurred since the filing of the complaint, that Plaintiffs need to bring to the attention of the court. This information was not available prior to filing of complaint.

99. The plaintiffs need an opportunity to show the court by way of an amended complaint that there are facts that the plaintiffs can prove to support their claims. The Second Circuit has opined that the court is obligated to "'make reasonable allowances to protect Pro Se litigants'" from inadvertently forfeiting legal rights merely because they lack a legal education. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006) (quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)). Furthermore, "in civil rights cases where the plaintiff appears pro se, the court must construe the pleading liberally and must afford plaintiff the benefit of any doubt." Karim-Panahi v. L.A. Police Dep't, 839 F.2d 621, 623 (9th Cir.1988). As this is a pro se civil rights case, it is critical that the court allows the plaintiffs every opportunity to show they are entitled to relief including by amending their complaint.

100. In addition, Plaintiffs intend to amend the complaint to include: evidence of false statements and defamation by Donais including but not limited to: audio recording and video recording (that shows/proves that Donais has made false statements about plaintiffs to others including outside of any court proceeding), certified statement by Attorney Elliott Berry to the ADO about Donais and his false statements, certified statement by Attorney Robert Obrien to the ADO, certified statement by Attorney Bussiere about Donais' false statements, court transcripts of hearing in the Nashua circuit court and in the Hillsborough superior court South, in 2017 showing false statements of Donais and proving breach of fiduciary duty and conflict of interest by Donais, all proving Donais is guilty of the wrongdoing alleged by plaintiffs. This includes but is not limited to facts or evidence related to:

a. 1-18-17 District Court hearing transcript and recording.

b. 2020 Interview of Attorney Elliot Berry by the ADO

c. Notes/Email from Attorney Elliot Berry Contemporaneously Written/Documented in 2017 and Later Produced By Elliott Berry to the ADO

d. 2020 Interview of Attorney Karl Terrell by the ADO

e. Statements by colleague and friend Dave Akridge

f. Further on email chains with Donais, Dave Akridge & Attorney Karl Terrell

g. Police Recording of Donais's Statements to The Police

h. Statements by Donais' Personal Friends Who Are Also Police Officers

i. Statements by Donais' To Other Officers At The Manchester NH Police Department

j. Statements by Donais to the members of a non-profit organization that Donais sits on

k. Statements by Donais to the ADO in NH.

l. False Statements by Donais to Donais' wife and to his family members including his eldest adult son Garrett Donais.

m. False Statements by Donais to Donais' friends, colleagues, and associates.

n. Evidence of Donais' breach of fiduciary duty to plaintiffs, or legal malpractice, misrepresentation, fraudulent concealment, including in January 2017 prior to March 2017 as well as thereafter in 2019 and 2020, as well as breach of confidentiality.

o. Evidence of Donais' race discrimination in violation of federal and state laws.

p. NB: All of the claims were referenced in one form or another in the original complaint. However, there are other items that will be presented in the amended complaint.

101. Amendment is also necessary to add supplemental events since the filing of the original complaint. There are additional events that occurred after 2017 that go to supplementing the claims in this case. For example, in 2019 and 2020, there are events arising from the same claims in 2017 that were repeated, republished and continued defamatory statements about the plaintiffs and that added to and expanded the defamatory statements about the plaintiffs. Thus, there are additional acts by the defendants that have occurred since the filing of the complaint, that plaintiffs need to bring to the attention of the court. These include but are not limited to the following:

a. Defendant published the following false and defamatory statements of purported fact concerning plaintiffs as follows:

b. Donais falsely stated that plaintiff falsely and frivolously accused him of racism for declining to represent plaintiffs in a 7 minute prospective attorney-client phone call. Donais spread this false defamatory statement to several people including his family members, friends, colleagues, and to several government officials.

c. Donais falsely stated that plaintiff burglarized and bugged his office phone and office thus committing a felony crime.

d. Donais falsely stated that plaintiff fabricated a recording to put Donais' voice on it to make Donais say things Donais did not say.

e. Donais falsely stated that plaintiff is a criminal offender.

f. Donais falsely stated that plaintiff is mentally crazy/has a mental disease-sickness.

102. These statements were made not in court proceedings and when there was no court proceeding that was ongoing. They are not and cannot be privileged and the plaintiffs intend to show why they cannot be privileged.

103. These statements are related to and flow from the events in 2017 and again in 2019 and 2020.

104. These statements are defamatory. Plaintiff will show evidence of these facts.

105. Plaintiffs need an opportunity to amend the complaint to include these facts in an amended complaint.

106. Donais has had notice of these claims from the very beginning. These claims were also included in the settlement discussions in 2021 that Donais was involved in until January 2022. Because these additional facts occurred after the filing of the original complaint on 1-3-20, these facts were not and could not have been included in the original complaint. The plaintiffs have stated their intent to include these facts and claims in this case from the beginning of the litigation. There is no reason to prevent amendment to include these facts/claims.

107. These statements are lies and defamatory. Any reasonable person would reasonably want to vindicate their right to stop the reputational harm from such false and injurious statements including filing a lawsuit

after all else had failed, including a bar complaint. Plaintiffs also tried to settle with Donais but he strung plaintiffs along thinking that the negotiation was in good faith only to find out at the end that he really did not want to settle.

108. Donais published the false and defamatory statements as alleged above to third parties.

109. To state or imply that someone is or did any of the above is per defamatory. By defaming plaintiffs, Donais sought to publicly humiliate plaintiffs and force plaintiffs to live with a continual question mark over plaintiffs.

110. The original complaint was filed pro se and, as is often the case with pleadings drafted by non-lawyers, the claims were not set out in the formal "count" structure that attorneys typically use. Nonetheless, the complaint does articulate, albeit inartfully, a series of actionable claims against Donais, including defamation, abuse of process, breach of fiduciary duty, interference with contractual relations, breach of confidentiality, and race discrimination. The complaint also sets forth a detailed timeline of events that implicates both plaintiffs, Natalie Anderson and Andre Bisasor, as victims of Donais' conduct. The complaint repeatedly references both plaintiffs as participant and victim in the events. The complaint makes clear that Donais' actions were directed at, and injured, both plaintiffs.

111. The amended complaint is necessary to clarify and supplement the claims regarding discrimination, breach of duty, abuse of process, and defamation. The original complaint did not at every instance clearly distinguish which statements were made in judicial versus non-judicial contexts, nor did it always articulate why certain statements were not privileged or were irrelevant to the proceedings in which they were made. The amended complaint will specifically plead that Donais made defamatory statements to third parties—including but not limited to family members including his spouse and adult children, his friends and colleagues including Nate Linstad, Dave Akridge, and others as well as to other persons such as police officers, and others—outside the context of any judicial proceeding, and that these statements are not protected by absolute privilege. The complaint will further clarify that even those statements made in affidavits to a court, were not relevant or pertinent to the issues before that court, as they did not bear on the disqualification of counsel but were gratuitously and maliciously inserted for the purpose of harming

plaintiffs. There are specific facts that need to be shown to demonstrate this, in order to articulate the full context and thus why it was not pertinent. Under New Hampshire law, privilege does not attach to statements that are palpably irrelevant or made with malice, and the amended complaint will plead specific facts to rebut the assertion of privilege.

112. The amended complaint will also clarify the breach of fiduciary duty and breach of confidentiality claims. Although the timeline section articulates facts that go to establishing breach of fiduciary duty, and there is reference to this claim explicitly, there was no clearly delineated count section that outlines this claim in proper detail. Plaintiffs need a chance to further clarify, outline and plead this claim. Further, the plaintiffs intend to plead in the alternative a legal malpractice claim based on the same facts, which is allowed under NH law. The amendment will further show that Donais acted as a prospective attorney for both plaintiffs, as evidenced by his communications with Plaintiff Bisasor, and by his own admissions and those of Attorney Robert O'Brien and Attorney Elliott Berry. The complaint will incorporate further facts and documentary evidence, including emails and testimony from Elliott Berry, who stated that Donais' conduct constituted a breach of fiduciary duty and a violation of the rules of professional conduct. The complaint will incorporate or attach emails from the ADO regarding Berry's interview, Berry's own written determination that Donais breached his duty, and evidence from the circuit court where Donais withdrew after the judge determined that Donais had violated ethical duties/breach fiduciary duty. The court transcript will show that Donais was effectively caught red-handed and that a circuit court judge effectively found that Donais breached fiduciary duty as thus was required to be disqualified from the case. This by itself is a slam-dunk proof that Donais is liable for this claim of breach of fiduciary duty, and Donais' own withdrawal serves as his own admission that he was guilty/liable for this wrongdoing. The amended complaint will lay this out in no uncertain terms. The complaint will also reference evidence from Robert O'Brien that Donais lied about the nature of his communications with plaintiffs.

113. It should be noted that Donais' motion to dismiss mischaracterizes the complaint as asserting only defamation, perjury, and false affidavit claims, and argues that all are barred by privilege or fail as a matter

of law. This is not correct. The claims asserted are found in paragraphs 401 and 402 of the complaint that states:

> Based on the foregoing, inter alia, Mr. Donais has committed defamation, abuse of process and interference with contractual relations and a breach of fiduciary duty and breach of good faith and fair dealing. Mr. Donais also engaged in a violation of the rules of professional conduct for NH and MA, including those which are actionable under the law such as engaging in misrepresentation, defamation, breach of fiduciary duty, interference with contractual relations and breach of the covenant of good faith and fair dealing as well as the engaging in acts of perjury based on racial animus thereby engaging in discrimination based on race.

114. It should be noted that, contrary to the misinterpretations of Donais, the prior paragraphs that references felony perjury and false affidavit, are not claims or counts but are background or factual descriptions that leads to the claims. However, aside from this confusion by the defendant, the complaint, as clarified and supplemented in an amended complaint, will set forth clear actionable claims and counts for defamation (including statements made outside of privileged contexts and with malice), abuse of process (using legal process for ulterior purposes unrelated to the legitimate ends of litigation), breach of fiduciary duty (arising from the prospective attorney-client relationship), breach of covenant of fair dealing, interference with contractual relations, and race discrimination (by fabricating and weaponizing false allegations of racism), as well as misrepresentation, among other things. The plaintiffs intend to plead in the alternative legal malpractice claim, as well as a breach of contract (implied), breach of confidentiality, and consumer protection violations based on the same or similar facts or fact patterns that establish the breach of fiduciary duty claims. These claims have nothing to do with any kind of privilege so Donais absolute privilege cannot even come to be applied to these claims. The complaint will also clarify that claims are asserted by both Anderson and Bisasor, and that Donais' conduct injured both plaintiffs, including through statements made to the ADO, to police, to family and friends, and to others.

115. Amendment is further necessary to cite events in Massachusetts Superior Court where a Massachusetts Superior Court judge found that false accusations of racism by Donais, if proven, are valid grounds to seek a defamation claim. This directly supports the Plaintiffs' allegations in this court. Thus, this Massachusetts precedent directly validates plaintiffs' defamation claims. Plaintiffs seek to cite these authorities in an amended complaint.

116. Amendment is also necessary to cite events with the New Hampshire Attorney Discipline Office ("ADO") where the ADO opined in an ADO proceeding, in September 2020 that, if Donais did and said the things alleged by plaintiffs (concerning the false accusations of racism) and they are false, it would constitute defamation and should be brought in a lawsuit (as the ADO is not designed to resolve defamation claims that are better suited to be resolved in a court of law).

117. Amendment is also necessary to consolidate claims from a parallel proceeding in NH Federal Court where a related federal case (Bisasor v. Donais (1:23-cv-00374) (D.N.H.)) was voluntarily dismissed by plaintiff Bisasor in order to refile in state court. Thus, this related case that was previously filed in federal court was voluntarily dismissed because this Court resumed proceedings after a 2 year hiatus in the NHSC and plaintiffs sought to have this court resolve all claims, which were first filed in this court in Jan. 2020, which federal court action began after the stay was placed on this case in this court due to Donais' appeal.

118. Thus, the voluntary dismissal in federal court was intended to allow for refiling in this Court (under NH savings statute that allows for refiling of a case not dismissed on the merits or not dismissed with prejudice) and/or for consolidation with the claims in this action. Consolidation is imperative under N.H. Super. Ct. R. 113 to avoid duplicative litigation, address overlapping claims, and streamline discovery.

119. It should be further noted that this is another example of prejudice to the plaintiffs from Donais' multiple successive and now fifth pre-answer motion to dismiss. Plaintiffs relied on Rule 9d's waiver of defenses as grounds to proceed with voluntary dismissal of the federal court action, because the plaintiffs believed that no new pre-answer defenses could be asserted in this case since the deadline had long passed based on the clear mandates of rule 9d. If the plaintiffs knew that this Court would waive Rule 9d in order to give Donais another bite at the motion to dismiss apple, after the NHSC declined Donais' appeal, the plaintiffs would have elected to pursue their federal court action which would have cleared the motion to dismiss stage prior to this court's restart of a new motion to dismiss stage by allowing a fifth motion to dismiss by Donais. This is manifestly unfair and the prejudice is irreparable because the plaintiffs utilized their one option to voluntarily dismiss similar claims in federal court believing that this court would proceed to the Answer stage at this juncture

120. The amended complaint will further remove settled parties and claims, correct the case caption, and focus the claims on Donais. It will provide a more definitive statement, organize the claims into clear counts, and include a damages section. It will also address the privilege issue directly, pleading facts to show why privilege does not bar the claims, and will supplement the complaint with new acts by Donais in 2019 and 2020, which were disclosed to Donais from the outset and in settlement negotiations. Plaintiffs voluntarily dismissed a federal case to consolidate all claims in this forum, and the court previously deferred the issue of amendment. Now, after three years of litigation and multiple motions to dismiss on service of process, plaintiffs should be allowed to amend the complaint at least once, as justice and New Hampshire's liberal amendment policy require.

121. Amendment is necessary to also add necessary parties. For example, the plaintiffs intend to add Donais Law Offices PLLC as a necessary party defendant. Defendant Donais Law Offices PLLC ("Donais Law Offices" or "law office") is a law firm that is owned and managed by Donais. Defendant Donais Law Offices PLLC is the corporate "alter ego" of Craig Donais. Donais is the sole member and manager of this corporate entity as well as the registered agent for this corporate entity. Donais Law Offices is responsible for the conduct of its attorney Craig Donais. Donais operates through and using his law office. The acts perpetrated by Donais occur through the operation of his law office. Donais and his law office are, for all intents and purposes, the same. Donais is employed by his law office (at least at the time of the events in the complaint). Donais Law Offices PLLC is vicariously liable for the acts of Craig Donais under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment. Donais' actions should be imputed to Donais Law Offices because it is merely the alter-ego or instrumentality of Donais.

122. Amendment is thus necessary to cure technical deficiencies in the original complaint. Amendment further addresses Donais' procedural gamesmanship. Defendant's three-year focus on technical defenses (service of process) prevented Plaintiffs from addressing substantive issues including amending the complaint.

123. Plaintiffs could be significantly prejudiced without allowance of an amendment to the complaint.

## IV. SUMMART OF PROPOSED AMENDMENTS

124. This amendment to the Complaint will remove 20 settled defendants and claims, narrowing litigation to focus solely on Donais, clarify factual allegations and legal theories against Donais in response to his latest Motion to Dismiss, address new factual developments since the original 2020 filing, and preserve Plaintiffs' constitutional right to adjudication on the merits after 3 years of procedural delays.

125. Amendment will:

a. Remove or streamline certain factual allegations in order to attempt to cure deficiencies in the complaint or correct mistakes.

b. Clarify certain of the existing claims and facts in the complaint in order to attempt to cure deficiencies in the complaint or correct mistakes.

c. Streamline the complaint to allow more focused litigation and adjudication of the case, and clarify the issues in dispute and streamline the adjudication process.

d. Allow subsequently discovered facts or new information to be presented, that necessitate changes to the original complaint.

126. The proposed amendments will not prejudice the defendant, and justice requires that the Complaint be amended to accurately reflect the facts and issues.

127. Thus, amendment will eliminate redundancy, narrow issues, and address Donais' arguments while causing no prejudice. Granting leave is imperative to prevent manifest injustice and uphold due process.

128. Plaintiffs will be significantly prejudiced without allowance of an amendment to the complaint.

## V. CONCLUSION/RELIEF

129. The plaintiff hereby incorporates by reference the arguments, points and facts from the plaintiffs' related motions, including motion to supplement objection to the new motion to dismiss, motion to stay resolution of the motion to dismiss pending several issues, motion for hearing on the motion to dismiss, renewed motion for case management conference, motion to convert motion to dismiss to summary judgment, etc.

130. The plaintiff in particular hereby requests that the Court stays any resolution of the new motion to dismiss, until this motion to amend the complaint is fully resolved.

131. Plaintiff requests that the Court holds a hearing on this motion.

132. NB: This is styled as an emergency given the uncertainty surrounding the court's timetable for resolving the new motion to dismiss.

133. Plaintiff asks the Court to step back to really hear what plaintiff is saying and grant a pro se liberal construction to this pleading.

134. For the reasons stated above, the Plaintiff respectfully requests that this Court grant the Motion to Amend the Complaint and allow the plaintiffs a reasonable time period from the date of the order to file the first amended complaint.

Respectfully submitted,
/s/Natalie Anderson
May 23, 2025 Plaintiff Natalie Anderson

**CERTIFICATE OF SERVICE**

This filing is served to all parties of record via the e-filing system.

/s/Natalie Anderson
Plaintiff Natalie Anderson

# Exhibit 1

STATE OF NEW HAMPSHIRE

HILLSBOROUGH COUNTY SUPERIOR COURT NORTH

| | |
|---|---|
| NATALIE ANDERSON, ET. AL., | ) Superior Court Case No. |
| | ) 216-2020-CV-00027 |
| Plaintiffs, | ) |
| vs. | ) Manchester, New Hampshire |
| | ) April 6, 2022 |
| HILTON HOTELS ET. AL., | ) 2:58 p.m. |
| | ) |
| Defendants. | ) |
| ______________________________ | ) |

HEARING ON PENDING MOTIONS
BEFORE THE HONORABLE AMY B. MESSER
JUDGE OF THE SUPERIOR COURT
**CORRECTED (Cover)**

APPEARANCES:

| | |
|---|---|
| Pro Se Plaintiffs: | Natalie Anderson |
| Pro Se Plaintiffs: | Andre Bissasor |
| For the Defendant: | Russell F Hilliard, Esq.<br>UPTON & HATFIELD, LLP<br>159 Middle Street<br>1st Floor<br>Portsmouth, NH 03801 |
| Audio Operator: | Electronically Recorded<br>by Joni Bertolami |
| TRANSCRIPTION COMPANY: | eScribers, LLC<br>7227 N. 16th Street, Suite 207<br>Phoenix, AZ 85020<br>(800) 257-0885<br>www.escribers.net |

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.

not I can serve the attorney directly now that he's entered. It's an unusual situation.

And am I really required to have to go to -- we live in Massachusetts -- to go to the sheriff in New Hampshire at this point, to have them serve Donais when they already have the complaint -- that the issues raised --and they entered their appearance. Can we either be allowed to simply send Mr. Hilliard as the attorney entered on the case if the summons and the complaint --

THE COURT: Mr. Bissasor --

MR. BISSASOR: -- (indiscernible).

THE COURT: Mr. Bissasor, I'm just going to require you to effectuate service as is required by the statute. So I'm not giving you any advice about how to do that. But you've had two years to get service done. You've had more extensions than are anywhere near typical. You have a date to do it. You need to complete service as is required, so I'll leave it at that. Your next issue -- do you have another issue?

MR. BISSASOR: Yes. The next issue is regarding the service of the actual complaint itself. Because of the 20 defendants are going to be out. I just wanted to bring to the attention of the Court that we intend to amend the complaint. I'm not sure if we should amend it before serving it to pay respect to the fact that the defendants are -- the other 20

defendants are out, or is that something to take up after serving the complaint as is?

THE COURT: So I guess, Attorney Hilliard, if you want to respond to that, you can. If you would prefer not to respond, you don't need to respond.

MR. HILLIARD: I think he's asking the Court for legal advice, Your Honor. I don't think either one of us should respond.

THE COURT: Okay. In case you had a response to him, I was going to let you do it. Okay.

MR. HILLIARD: Thank you.

THE COURT: What? Yeah.

There's no response there, Attorney Bissasor (sic), go ahead.

MR. BISSASOR: Yeah. No, I was just going to say that I'm not asking for legal advice. I'm just stating to the Court that there's a need to amend the complaint. So I guess I'm -- procedurally, I was asking whether it's proper to amend the complaint prior to service or amend it -- or take up the issue of amendment after service.

THE COURT: And I --

MR BISSASOR: Procedurally, what would be most appropriate under these unusual circumstances?

THE COURT: I appreciate your making the request, Mr. Bissasor, but the Court is not going to answer that

question. I'm going to allow -- you need to prosecute your own case. So you've got your reissuance of a summons, and that's -- the Court has no further comment on that. Do you have any other issues you need to raise with the Court today?

MR. BISSASOR: The only one other thing, Your Honor, that I would like to raise, Your Honor, is I heard your points, and as I said, I appreciate them. I will do my best to comply.

I do want to point out, Your Honor, that we are concerned that because of Mr. Hilliard's status in the legal community, that he will attempt to sort of put us in a negative light or make us seem like we're causing trouble. So for example, he made reference all the pleadings that we did when our pleadings were in response to his actions. And I feel like -- I just want to make sure the level -- the playing field is level, Your Honor.

We're an African American couple. We're not lawyers. We're doing our best to try to vindicate this case which fundamentally flawed about sophisticated --

THE COURT: Mister --

MR. BISSASOR: -- racism of today.

THE COURT: All right.

MR. BISSASOR: We would like to be able to have our day in court. And we just don't want to be prejudiced because Mr. Hilliard is very skilled --

# <u>Exhibit 2</u>

STATE OF NEW HAMPSHIRE – HILLSBOROUGH SUPERIOR COURT NORTH
Case: #216-2020-CV-00027 | Natalie Anderson, et al v Hilton Hotels Worldwide Inc., et. al.

**PLAINTIFF ANDRE BISASOR'S REPLY TO DEFENDANT'S OBJECTION TO MOTION FOR CASE MANAGEMENT HEARING**

1. Plaintiff Andre Bisasor ("Plaintiff") submits this reply to Donais' objection to plaintiffs' motion for case management hearing. Defendant's objection is without merit and should be overruled for the following reasons:

**I. The Purpose of the NH Supreme Court's Remand Has Not Been Fulfilled**

2. Contrary to defendant's assertion, the purpose of the NH Supreme Court (NHSC)'s remand has not been fulfilled. The defendant's claim is based on a misunderstanding of the scope and intent of the remand order. The NHSC's remand was not merely a procedural formality but an opportunity to address substantive issues that have arisen during the course of this litigation and are related to the outstanding matters pending before the court.
3. The defendant's argument relies on the fallacy of hasty generalization, assuming that because some procedural matters have been addressed, the entire purpose of the remand has been achieved. This oversimplification ignores the complexity and the multifaceted nature of the issues at hand.
4. Consider the following syllogism:
   a) Premise 1: A remand's purpose is fulfilled when all issues specified in the remand order are fully addressed.
   b) Premise 2: There are outstanding issues specified in the remand order that have not been fully addressed.
   c) Conclusion: Therefore, the purpose of the remand has not been fulfilled.
5. The plaintiff contends that Premise 2 is true, as evidenced by the numerous unresolved matters outlined in the motion for a case management conference. These issues include, but are not limited to, clarification on procedural guidelines, ADA compliance concerns, and e-filing system limitations, among other things. Each of these points requires careful consideration and resolution before the case can be properly returned to the NHSC.
6. Defendant's assertion that the case is "in order for return to the Supreme Court" is premature and prejudicial to plaintiffs' rights. It is a logical fallacy known as "begging the question" to assume that the case is ready for return without addressing the issues that plaintiffs seek to resolve through a case management conference, as follows.
7. The case is not "in order for return to the Supreme Court" because the 11-15-24 order is not a final order because a) reconsideration/clarification/modification of the court's 11-15-24 order on the motion to dismiss (i.e., motions to modify and clarify the court's 11-15-24 order, filed on 11-25-24) is still underway, b) reconsideration of

plaintiffs' motion to strike the supplement to the motion to dismiss is still underway, and c) there are several related motions still pending including but not limited to those filed and are still pending since 2022 including the **motion for nun pro tunc affirmance of the issuance of the summons** and the **motion to issue findings of fact** pertaining to false statements by the defendant (which obviously are included in the remand).

8. The 11-15-24 order is not final until all reconsideration is fully and finally decided.

9. Furthermore, the remand order explicitly includes resolution of the previously but still pending motions for nunc pro tunc and for findings of fact regarding false statements by the defendant, that were filed in the fall of 2022. The remand order allowed for these pending motions to be included in the remand scope just like how the resolution of the motion to unseal records were included in the remand scope, along with any filing the trial court sees fit to permit as part of the resolution of the pending matters including but not limited to the motion to dismiss. These pending motions are intertwined with the resolution of the motion to dismiss issues.

10. The NHSC remand order gave broad latitude on remand. The NHSC initially gave an order on 9-2-22 stating:

> "The case is partially remanded to the superior court to allow it to rule on the pending motion to dismiss that Craig Donais filed after he was served with process. The clerk of the superior court shall provide this court with a copy of the superior court's order on that motion. This court retains jurisdiction of the appeal, further processing of which is stayed pending receipt of the superior court's order on Craig Donais's motion to dismiss. This order is without prejudice to the parties' positions in the superior court on remand and without prejudice to the parties' positions in this court once the stay is lifted".

11. The plaintiffs also filed a motion for clarification seeking to broaden the remand scope to include several related issues including motions filed by plaintiffs that had not been ruled on as yet (including the motion for nunc pro tunc and motion to issue findings of fact about false statements, and other motions, etc.). Plaintiffs also filed a motion for reconsideration further towards broadening the remand scope to include several related issues.

12. After review, the NHSC granted the broadened scope to include all outstanding motions (including the motion for nunc pro tunc and motion to issue findings of fact about false statements and other motions) and any filing that would assist in resolving the motion to dismiss issues. See the 9-30-22 order which states:

> On September 2, 2022, the court partially remanded this matter to the superior court to allow it to rule on the pending motion to dismiss that Craig Donais filed after he was served with process. Shortly after this court's partial remand order, the parties filed multiple pleadings pertaining to the scope of the remand, which are addressed below. After review, Craig Donais's motion for reconsideration is granted. The scope of the remand is hereby clarified to include full resolution by the superior court of Craig Donais's motion to unseal records…The plaintiffs' emergency motion for clarification is granted to the extent that the court clarifies that, on remand, the superior court may, in its discretion, hold any hearing, rule on any outstanding motion, and permit any filing that would assist it in ruling on Craig Donais's motion to dismiss…

13. The fact that the NHSC allowed this broad remand in light of the plaintiff's motion for clarification, means that the NHSC's intent was to provide broad discretion to the trial court as the trial court saw fit in terms of permitting any filing on remand. The clear intent of the remand order was to afford broad discretion to the trial court to address and dispose of any and all motions and issues before it. That was the intent of the broad wording of the remand. Moreover, because the court's 11-15-24 order on the motion to dismiss is not yet final because the plaintiffs filed timely motions for reconsideration, modification and/or clarification of the 11-15-24 order (including the portion of the order that addressed the pleading instructions and also the portion of the order that did not address the false statements of the defendant), then this means that remand is not yet fulfilled.

14. Moreover, even when a case is on appeal and not on remand, the trial court is not completely divested of jurisdiction. Rautenberg v. Munnis, 107 N.H. 446, 447 (1966)( This Court may still pass "on collateral, subsidiary or independent matters affecting the case. . .". Id. at 448). Pursuant to this residual jurisdiction, trial courts can and do rule on a variety of matters during pendency of appeal. Examples include: issuance of supplemental findings of fact and conclusions of law to be added to the appellate record in lieu of remand, Cornwell v. Cornwell, 116 N.H. 205 (1976); determination of bail terms pending appeal, State v. Gubitosi, 153 N.H. 79 (2005); temporary determinations regarding payment of property taxes during the appeal of a final decree of divorce, In the Matter of Sanborn & Bart, 174 N.H. 343, 350-351 (2021); and, in an interlocutory appeal, continued discovery, Plymouth Vill. Water & Sewer Dist. v. Scott, 217-2019-CV-00650 (N.H. Super. July 2, 2020)(Order, McNamara, J.).

15. NB: The court also has a duty to provide clear judicial guidance on issues of procedural compliance and attorney conduct. This argument is grounded in the fundamental principle that courts have a responsibility not only to decide individual cases but also to provide guidance that promotes the fair and efficient administration of justice. The issues raised in this motion – including the proper application of court rules – are undoubtedly important and warrant clear guidance.

## <u>II. The Plaintiffs' Pleadings Are Neither Baseless Nor Repetitive</u>

16. The defendant's characterization of plaintiffs' pleadings as "a multitude of baseless and repetitive pleadings" is not only inaccurate but also constitutes an ad hominem attack that fails to address the substance of plaintiffs' arguments. This assertion is a clear example of the fallacy of poisoning the well, attempting to discredit the plaintiffs' motions without engaging with their merits.

17. Let us consider another syllogism:

a) Premise 1: Baseless pleadings are those that lack any legal or factual foundation.

b) Premise 2: The plaintiffs' pleadings are grounded in specific legal issues and factual circumstances requiring court attention.

c) Conclusion: Therefore, the plaintiffs' pleadings are not baseless.

18. The motion for a case management conference clearly outlines numerous legitimate concerns that require judicial intervention. These include issues related to procedural clarity, ADA compliance, and the efficient management of the case. Each of these points is rooted in established legal principles and specific circumstances of this case.

19. Moreover, the accusation of repetitiveness fails to acknowledge the evolving nature of complex litigation. As new issues arise and circumstances change, it is not only appropriate but necessary for parties to bring these matters to the court's attention. The defendant's argument here commits the fallacy of false equivalence, equating necessary updates and clarifications with needless repetition. Moreover, the request for a case management conference is separate and different from requesting a hearing on a motion to dismiss. Hence, to the extent the defendant is isolating the word "hearing", as the basis for the repetitive charge in this instance, then the argument is inapposite because a case management hearing is broader, much different and more comprehensive than a narrowly focused motion to dismiss hearing. Given the procedural posture of the case, it is highly proper to request a case management hearing and it is highly appropriate for the court to hold one at this juncture.

**<u>III. There Is a Legitimate Need for a Conference at This Stage of Litigation</u>**

20. The defendant's claim that "there is no legitimate need for a conference at this stage of the litigation" is an erroneous assertion that ignores the complexities and the importance of efficient case management. This argument commits the fallacy of false dichotomy by suggesting that either the case is ready for return to the NHSC or there is no need for further proceedings, without considering the valuable middle ground that a case management conference provides.

21. Consider the following syllogism:

a) Premise 1: A legitimate need for a conference exists when there are unresolved issues that could benefit from judicial guidance and coordination.

b) Premise 2: There are multiple unresolved issues in this case that could benefit from judicial guidance and coordination.

c) Conclusion: Therefore, there is a legitimate need for a conference at this stage of the litigation.

22. The plaintiffs' motion clearly outlines numerous issues that require attention, including but not limited to:

a) Clarification on procedural guidelines governing pleadings

b) Guidance on ADA compliance and accommodations.

c) Resolution of e-filing system limitations.

d) Clarification on the application of Rules 7 and 11.

e) Addressing concerns about judicial conduct and impartiality.

23. Each of these issues impacts the fair & efficient adjudication of the case. Ignoring these matters or deferring them to a later stage could lead to prejudice to the plaintiffs' rights. These issues are ripe to be dealt with at this stage. [NB: If they are not dealt with now, when will they be dealt with? Upon remand back to the NHSC, the appeal will likely take another year or more, or at least several months of the year, to be resolved on appeal, that is if it survives preliminary dismissal. After a year or several months or so, if/when the case comes back to this court, this court will likely forget about these issues and the freshness of these issues will likely be lost, in this court. It is thus most appropriate to address them now, while they are live issues pending and when said issues directly relate to or could impact the immediate rulings the court will need to make on pending issues in the near future.]

24. Furthermore, the defendant's objection fails to consider the well-established principle that case management conferences are an essential tool for promoting judicial economy and ensuring the orderly progression of complex cases. As noted in Rule 16 of the Federal Rules of Civil Procedure, the court may order the attorneys and any unrepresented parties to appear for pretrial conferences for such purposes as expediting disposition of the action, discouraging wasteful pretrial activities, and facilitating settlement.

25. Defendant's objection also overlooks the fact that case management conferences are particularly crucial in cases involving pro se litigants, as they provide opportunity for the court to ensure that all parties understand the proceedings and their obligations. This is consistent with the court's duty to construe pro se pleadings liberally and to ensure access to justice for all litigants, regardless of their legal representation status.

26. NB: According to Rule 16 of the Federal Rules of Civil Procedure, matters that are typically considered in a Rule 16 hearing include: *"At any pretrial conference, the court may consider and take appropriate action on the following matters: (A) formulating and simplifying the issues; (B) amending the pleadings if necessary or desirable;…(D) avoiding unnecessary proof and cumulative evidence…(F) controlling and scheduling discovery…(K) disposing of pending motions; (L) adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems;…and (P) facilitating in other ways the just, speedy, and inexpensive disposition of the action."*

27. These are just some of the benefits of a case management hearing. In any event, it simply will not hurt for the court to conduct an initial case management hearing, in order to get some basic things in order from now, so that all parties can be on the same page and so that any confusion/lack of clarity regarding how to proceed, can be addressed. For example, the court's requirements for future pleadings has to be addressed now. Also, the plaintiffs' ADA requests and attendant compliance issues must be addressed now. These cannot be put off to a later time. And issuing more rulings from the bench without a hearing could result in continued lack of clarity, especially for the pro se plaintiffs.

## IV. The Defendant's Objection Mischaracterizes the Plaintiffs' Intentions

28. The defendant's suggestion that the plaintiffs are seeking to "avoid and delay the Supreme Court's review" is a mischaracterization that commits the fallacy of appeal to motive. This argument attempts to discredit the plaintiffs' motion by attributing improper motives without addressing the substance of their requests.

29. Let us consider another syllogism:

   a) Premise 1: Parties seeking to avoid and delay court review do not actively pursue case management and resolution of procedural issues.

   b) Premise 2: The plaintiffs are actively pursuing case management and resolution of procedural issues.

   c) Conclusion: Therefore, the plaintiffs are not seeking to avoid and delay court review.

30. The Plaintiffs' motion demonstrates a commitment to advancing the case efficiently and resolving outstanding issues. Far from seeking delay, plaintiffs are proactively addressing matters that, if left unresolved, could lead to significant delays/complications at later stages of the proceedings.

31. It should be noted that once Donais' appeal is resumed at the NHSC, the process will slow down, where transcripts must be ordered, preliminary procedural issues will be addressed and eventually a briefing order will

be issued. This will take place over several months. Then actual briefing, opposing briefing and reply briefing will take place over several more months. Then thereafter the case will be set for oral argument, some several months later. Then, once the case is submitted after oral argument, then the NHSC will likely take another several months to a year to issue its rulings. The whole process may take a year and a half, or almost two years, depending on the caseload at the NHSC. This is the long drawn-out detour of a process that the defendant wants to subject this case to, rather than abandon the appeal and proceed on the merits in this court at this juncture (i.e., preferring anything to avoid the merits and resolution of the claims in this case), which is particularly suspect especially after the 11-15-24 order's complete debunking and refutation of the defendant's arguments that attacked the clerk's authority to issue summons.

32. NB: The defendant's reference to the plaintiffs' past extensions for service of the complaint is irrelevant to the current motion and constitutes the fallacy of red herring. The issue at hand is not the history of extensions in the case but the present need for judicial guidance on specific, clearly articulated matters.

**<u>V. The Case Management Conference Is Essential for Ensuring Due Process and Equal Access to Justice</u>**

33. The defendant's objection fails to consider the fundamental principles of due process and equal access to justice that underpin the plaintiffs' motion for a case management conference. These principles are particularly relevant given the plaintiffs' pro se status and the complexities of the case.

34. Consider the following syllogism:

   a) Premise 1: Due process and equal access to justice require that all parties have a clear understanding of court procedures and their rights within the legal process.

   b) Premise 2: A case management conference provides an opportunity for the court to ensure all parties have a clear understanding of procedures and rights.

   c) Conclusion: Therefore, a case management conference is essential for ensuring due process and equal access to justice in this case.

35. The U.S. Supreme Court has long recognized that "the fundamental requisite of due process of law is the opportunity to be heard" (Grannis v. Ordean, 234 U.S. 385, 394 (1914)). A case management conference provides precisely this opportunity, allowing the plaintiffs to address their concerns directly with the court and ensuring that their voice is heard in shaping the course of the litigation and in the resolution of outstanding matters.

36. Further, defendant's objection fails to acknowledge the court's responsibility to "construe pro se complaints liberally and to apply a more flexible standard in determining the sufficiency of a pro se complaint than they would in reviewing a pleading submitted by counsel" (Platsky v. C.I.A., 953 F.2d 26, 28 (2d Cir. 1991)) ("Pro se plaintiffs are often unfamiliar with the formalities of pleading requirements. Recognizing this, the Supreme Court has instructed the district courts to construe pro se complaints liberally and to apply a more flexible standard in determining the sufficiency of a pro se complaint than they would in reviewing a pleading submitted by counsel…In order to justify the dismissal of a pro se complaint, it must be "`beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'").

37. A case management conference is an ideal setting for the court to fulfill this responsibility, providing guidance and clarification to pro se litigants in a manner that promotes fairness and efficiency in the proceedings, especially as it relates to pleading requirements and to ADA compliance processes among other things. In particular, the pending ADA request in instance especially requires an iterative/interactive process and a hearing is best suited to facilitate that at this juncture.

## VI. The Defendant's Objection Ignores the Potential Benefits of Early Case Management

38. Defendant's opposition to a case management conference overlooks the well-documented benefits of early and active case management in complex litigation. Numerous studies and judicial opinions have recognized that proactive case management can lead to more efficient resolution of cases, reduced costs, and increased satisfaction among litigants.

39. Consider this syllogism:

a) Premise 1: Early case management leads to more efficient and cost-effective resolution of complex cases.

b) Premise 2: This case is complex and would benefit from efficient and cost-effective resolution.

c) Conclusion: Therefore, this case would benefit from early case management.

40. The Manual for Complex Litigation, Fourth Edition, published by the Federal Judicial Center, emphasizes the importance of early case management, stating that fair and efficient resolution of complex litigation requires at least that the judge and counsel collaborate to develop and implement a comprehensive plan for the conduct of pretrial and trial proceedings. (§ 10.1).

41. By opposing the case management conference, the defendant is effectively arguing against a practice that has been widely recognized as beneficial to all parties and the court system as a whole. This position is not only short-sighted but potentially detrimental to the efficient resolution of the case.

**VII. The Defendant's Objection Fails to Address the Specific Issues Raised in the Plaintiffs' Motion**

42. A critical flaw in the defendant's objection is its failure to substantively address any of the specific issues raised in the plaintiffs' motion for a case management conference. This omission constitutes the fallacy of ignoratio elenchi, or irrelevant conclusion, as defendant's arguments do not actually engage with the substance of plaintiffs' requests.

43. Let us consider another syllogism:

a) Premise 1: A valid objection to a motion must address the specific issues raised in that motion.

b) Premise 2: The defendant's objection does not address the specific issues raised in the plaintiffs' motion.

c) Conclusion: Therefore, the defendant's objection is not a valid objection to the plaintiffs' motion.

44. The plaintiffs' motion clearly outlined several key areas requiring court guidance, including:

a) Clarification on procedural guidelines for pleadings.

b) Guidance on ADA compliance and accommodations.

c) Resolution of e-filing system limitations.

d) Clarification on the application of Rules 7 and 11.

e) Addressing concerns about judicial conduct and impartiality.

45. The defendant's objection does not engage with any of these points, instead relying on broad generalizations about the state of the case and unsupported assertions about the plaintiffs' motives. This failure to address the specific issues at hand undermines the credibility and relevance of the defendant's objection.

**VIII. The Defendant's Objection Misinterprets the Purpose and Scope of Case Management Conferences**

46. The defendant's objection demonstrates a fundamental misunderstanding of the purpose and scope of case management conferences in modern litigation. This misinterpretation leads to faulty conclusions about the necessity and appropriateness of such a conference in this case.

47. Consider the following syllogism:

a) Premise 1: Case management conferences are designed to address a wide range of procedural and substantive issues to promote efficient case resolution.

b) Premise 2: This case involves multiple procedural and substantive issues that require resolution for efficient case progression.

c) Conclusion: Therefore, a case management conference is appropriate and necessary for this case.

48. By way of analogy to federal court practice, it should be noted that the Federal Rules of Civil Procedure, specifically Rule 16, provide broad authority for courts to hold pretrial conferences. The plaintiffs' motion for a case management conference aligns perfectly with these objectives. By seeking clarification on procedural issues, addressing potential barriers to access (such as ADA compliance concerns), and proactively identifying areas of potential conflict, the plaintiffs are demonstrating a commitment to efficient and effective case management.

49. The defendant's narrow interpretation of when a case management conference is appropriate fails to recognize the evolving nature of civil litigation and the increasing emphasis on active case management by judges.

**<u>IX. The Defendant's Objection Fails to Consider the Unique Circumstances of This Case</u>**

50. The defendant's blanket objection to a case management conference fails to account for the unique circumstances of this case, including its complexity, the pro se status of the plaintiffs, and the specific issues that have arisen during the course of the litigation and the nature of the matters pending before the court. This failure to consider this context constitutes the fallacy of hasty generalization, applying a one-size-fits-all approach to case management that is inappropriate and potentially prejudicial.

51. Let us consider another syllogism:

a) Premise 1: Cases with unique circumstances require tailored case management approaches.

b) Premise 2: This case has unique circumstances, including complex issues and pro se litigants.

c) Conclusion: Therefore, this case requires a tailored case management approach, which a case management conference can provide.

52. The plaintiffs' motion for a case management conference is not a routine or frivolous request, but a carefully considered response to the specific challenges presented by this case and the current procedural posture. These challenges include:

a) The complexity of the legal issues involved.

b) The need for clarity on procedural matters, particularly given the plaintiffs' pro se status.

c) Concerns about ADA compliance and accessibility.

d) Technical issues related to e-filing and document management.

e) Questions about the application of specific court rules.

53. Each of these factors contributes to the unique nature of this case and underscores the need for active judicial management. The defendant's objection, in its failure to acknowledge these specific circumstances, demonstrates a lack of engagement with the realities of the case and the legitimate needs of the parties.

**X. Additional Issues to be Addressed in the Case Management Conference**

54. In addition to the matters previously outlined, the plaintiff respectfully request that the following issues be addressed during the case management conference:

a) Procedural Clarity: Further clarification on procedural matters, including:

i. Guidance on permissible filings.

ii. Content requirements for replies and surreplies; and when surreplies will be allowed.

iii. Circumstances necessitating affidavits of facts to support pleadings.

iv. The court's approach to resolving disputed facts at this stage of the proceedings. i.e.. such as how will the court know who is telling the truth. Will the plaintiffs automatically be at a disadvantage as African-American pro se plaintiffs? What safeguards will be in place to protect against unconscious or implicit bias and to ensure a fair or even playing field?

v. Are renewed motions allowed even if they cover ground previously covered in an original motion? If so, when and how? Or are renewed motions prohibited because they ostensibly will likely be somewhat repetitive?

b) Findings of Fact: Addressing how the court will approach findings of fact in this case at this stage, including the standard of review for such findings and their potential impact on future proceedings; when can findings of fact and/or rulings of law be requested after a court order and what will be the court's approach to such requests? Will the court properly oblige such requests?

c) Limited Discovery: Exploration of possibility of implementing limited/simplified discovery at this stage including limited document requests. When will it be acceptable to seek to issue limited subpoenas or request limited evidentiary hearings at this preliminary stage, in order to address factual disputes? Will the court ever address any false or misleading statements in the future? And if so, when, or how will that be determined?

d) Clerk's Office Information/Limited Discovery: Obtaining/clarifying information or limited discovery from the Clerk's office regarding: i) Instructions given to plaintiffs about the procedure for serving process; ii) The necessity of obtaining a reissued summons before effectuating service; iii) Any other relevant communications that may have affected the plaintiffs' actions in pursuing this case. NB: This may include the need to file additional motions such as: **Motion for Limited Discovery** (requesting specific information from the clerk's office related to plaintiffs' interactions with the clerk's office and the reissuance of summons); or **Motion to Compel Clerk's Testimony** (asking the court to order the clerk to testify about plaintiff's interactions and the instructions provided); or **Motion for Judicial Notice** (requesting that the court take judicial notice of the clerk's authority under Rule 1-6 of the NH Superior Court Administrative Rules). These may be needed because the plaintiffs relied on the clerk's official representation of their authority, and may need to assert this as a defense to the defendant's bad faith specious arguments that he evidently intends to press on appeal. However, plaintiffs are not certain how to go about requesting this information, including whether by affidavit or testimony from the clerk's office, and thus the plaintiffs need the court's guidance, including as to whether there are other ways to obtain this information, etc., for the record. Defendant evidently intends to argue to the NHSC that the plaintiffs should have ignored the clerk's office and thus should have served process on him, long before the actual deadline ordered by the clerk's office. But the defendant ignores the fact that the plaintiff cannot serve process without a reissued summons from the clerk in NH, as all summonses from the court automatically expire after a certain date. It is not like in other states, like Massachusetts, where the summons form is left blank to be filled out by plaintiffs. In NH, only the clerk can fill out the summons, and every summons is issued as an order from the court with a deadline for service. Thus, the plaintiffs had to rely on the clerk to reissue the summons, to replace the expired summons that had long expired in 2020 pursuant to the granting of extensions by Judge Anderson in 2020 and 2021. Consequently, when, in early 2022, plaintiffs contacted the clerk's office about service of process and the expired summons, the clerk's office gave instructions to the plaintiffs regarding filing a request for reissued summons (and not to file a motion to the judge). To be sure, the plaintiffs went as far as to insist on speaking not only to the head of the e-filing department of the NH superior court, but also to the deputy clerk of the NH Superior Court Hillsborough

North, Nancy McGuire, who assured plaintiff that he simply needed to follow the instructions of the clerk's office and not to worry about anything else because the clerk's office will follow through with the representations made to the plaintiffs. Some of these representation were captured when plaintiff sent a basic follow-up email to the head of the e-filing department at that time (see email referenced in motion for default/sanctions, or other filings by plaintiffs, etc.). But the plaintiff is now seeking to obtain further information, confirming all of the assurances and representations made to the plaintiff by the clerk's office, upon which the plaintiff detrimentally relied. The plaintiff needs to get this into the record from now and to fully establish the record on this issue, in order to do everything possible to defend/protect against the sneaky bad faith meretricious arguments that the defendant intends to press on appeal.].

e) Nunc Pro Tunc Issue: Addressing the need and proprietary for nunc pro tunc orders in this case, particularly regarding any potential retroactive corrections or modifications to previous rulings or filings, as outlined in the motion for nunc pro tunc that has been pending since 2022.

f) COVID-19 Impact: Addressing the impact of the COVID-19 pandemic on the case in 2020, including the reasons why Judge Anderson granted extensions during this period, as part of the findings of fact by the court; as well as establishing that the plaintiffs' motions to extend time to serve process (filed in 2020), citing Covid-19's impact on the plaintiffs, including medical impact, was in fact a de facto ADA request (or the equivalent), seeking reasonable accommodations due to medical disability related to Covid-19.

g) Amendment of Complaint/Addition of Necessary Parties: The need to amend the complaint, including the addition of necessary parties, to ensure comprehensive adjudication of all relevant issues, as well as the timing of when that will be allowed. NB: From the outset, the defendant has been pressing, in this court and on appeal, for early dismissal based on serving process issues, leaving no opportunity to amend the complaint/add necessary parties since service of process on 4-7-22. Plaintiffs would like to flag this issue from now so that it is on the court's radar, and so that it is not said that this issue was never raised (NB: If recalled correctly, plaintiff believes this item was briefly raised once before, at the 4-6-22 hearing with this court).

h) Stay of Proceedings: Consideration of a stay of proceedings due to a pending motion for preliminary injunction against the New Hampshire Superior Court and New Hampshire Judicial Branch, which is currently pending in federal court.

55. These additional points further underscore the necessity and value of holding a case management conference. They highlight the complex and evolving nature of this case, as well as the need for clear judicial guidance on both substantive and procedural matters. The inclusion of these items demonstrates the plaintiffs' commitment to addressing all relevant issues comprehensively and efficiently. It also reinforces the argument that a case management conference is not only appropriate but essential for the fair and effective progression of this case.

56. By addressing these additional matters, along with those previously mentioned, the case management conference will serve as a crucial tool for streamlining the litigation process, clarifying expectations for all parties, and ensuring that the case proceeds in a manner that serves the interests of justice.

## XI. Further Rebuttal

57. In his objection, the defendant states: "*The plaintiffs have filed a multitude of baseless and repetitive pleadings to avoid and delay the Supreme Court's review of the issues they created by extending service of the complaint for more than two years, and then failing to serve within the deadline established by their eleventh and last motion to extend the time to do so*." Here, the defendant falsely asserts that plaintiffs extended the time to serve the complaint by more than 2 years, when it was the court that did that. The plaintiffs have no power to extend deadlines including the time to serve the complaint. But more curiously, the defendant reasserted the very argument that the court shot down in its 11-15-24 order, in which the court stated that the plaintiffs timely served the complaint and complied with all court orders for service of the complaint. This again reflects the stubborn, contumacious, defiant attitude of the defendant towards the court's 11-15-24 order, where the defendant has here indicated that he still intends to press on appeal, which has been debunked by the court's 11-15-24 order. Thus, it is ironic that he attacks the plaintiffs with the charge of "baseless"[1], when his entire continued effort to seek dismissal is based on debunked/meritless theories that are frivolous/spurious.

[1] NB: It is further ironic that the defendant attacks further with charges of being "repetitive", when he in fact has filed numerous repetitive pleadings in this case including literally copy and paste several filings with the exact same wording for several motions, etc. For example, repetitive filings by Donais that are exact duplicates can be found at Index #89, 90, 91, and Index# 103, 104, 105. These also include 3 motion to dismiss with repetitive supplement, 3 motions for reconsiderations, 3 replies, and 3 objections to plaintiffs' ADA requests, etc.

## XII. Conclusion and Request for Relief

58. The plaintiffs maintain that a case management conference is not only appropriate but necessary at this stage of the litigation. It will serve to clarify important procedural and substantive issues, ensure equal access to justice for all parties, and promote the efficient and fair resolution of this case. The defendant's objection, rooted in misunderstandings of case management principles and logical fallacies, should not stand in the way of this important step in the litigation process.

59. For the reasons stated above, the defendant's objection to plaintiffs' motion for a case management conference is without merit and should be overruled. The plaintiffs respectfully request that this Court:

a) Overrule the defendant's objection in its entirety;
b) Grant the plaintiffs' motion for a case management conference;
c) Schedule said conference at the earliest convenient date; and
d) Provide such other relief as the Court deems just and proper.

Respectfully submitted,
/s/ Andre Bisasor
Date: December 9, 2024 ANDRE BISASOR

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all parties/counsel of record via the court's electronic filing system.
/s/ Andre Bisasor
ANDRE BISASOR

# <u>Exhibit 3</u>

Filed
File Date: 11/22/2024 11:59 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE-HILLSBOROUGH SUPERIOR COURT-NORTHERN DISTRICT
Natalie Anderson, et al. v. Craig Donais | Docket No. 216-2020-CV-00027

**PLAINTIFFS' MOTION FOR A CASE MANAGEMENT CONFERENCE**

1. The Plaintiffs respectfully move this Honorable Court to schedule a Case Management Conference to address various procedural and administrative matters critical to the fair and efficient adjudication of this case. In support thereof, Plaintiffs state as follows:

   a. Procedural and Administrative Issues: Plaintiffs seek clarification on the procedural guidelines governing the length and format of pleadings, including concerns about repetition, footnote spacing, font sizes, and the number of exhibits allowed. Plaintiffs further request guidance on whether separate pleadings by each plaintiff are permissible without being deemed repetitive or overly lengthy.

   b. Content Management Concerns: Clarification is sought on whether pleadings may be filed not only to assist the court in ruling on motions but also to preserve rights, ensure a fair record, and counteract any obstruction to justice by the defendant.

   c. Clarification of Rules 7 and 11: Plaintiffs request clarification on when affidavits are required under these rules and how the court intends to assess credibility without them. Guidance is needed on handling false statements by the defendant within pleadings.

   d. ADA Compliance/Issues: Plaintiffs require detailed information on the process for requesting accommodations under the Americans with Disabilities Act (ADA), including how such requests will be treated and attendant confidentiality concerns.

   e. Pro Se Liberal Construction: Plaintiffs seek clarity on the court's approach to handling pro se pleadings in terms of whether they will be liberally construed in accordance with legal standards.

   f. E-Filing System Issues: Plaintiffs have encountered bottlenecks and file size limitations within the e-filing system that impede efficient case management.

   g. Amendment/Removal of Settled Defendants: Plaintiffs seek removal of defendants who have settled from the filing system to streamline case management. Assistance is requested for amending complaint names within the e-filing system.

h. Judicial Conduct and Tone: Plaintiffs express concerns over perceived judicial attitudes towards them and seek assurance of impartial treatment.

i. Sanctions and Misconduct: Plaintiffs request clarification on how issues related to sanctions and misconduct will be addressed by the court to ensure fairness and justice.

j. Inclusion of Unrelated Cases: Regulation is sought regarding defendant's references to unrelated cases.

k. Sealing and Unsealing of Records: Clarification is needed on the protocol for sealing or unsealing medical records and other confidential information including but not limited settlement documents, going forward.

l. Information from Clerk's Office for Appeal: Plaintiffs need guidance on obtaining necessary information from the Clerk's office to facilitate information needed for appeal.

m. Interlocutory Appeals Process: Plaintiffs seek to address guidelines on the need to obtain permission for pursuing interlocutory appeals.

2. WHEREFORE, Plaintiffs respectfully request that this Honorable Court:
   a. Schedule a Case Management Conference at the earliest convenience;
   b. Provide clarification and guidance on the issues outlined above; and
   c. Grant such other relief as may be just and proper.

Respectfully submitted,
/s/Natalie Anderson
Plaintiff Natalie Anderson

/s/Andre Bisasor
Plaintiff Andre Bisasor

November 22, 2024

**CERTIFICATE OF SERVICE**

This filing is served to all parties of record via the e-filing system.

/s/Natalie Anderson
Plaintiff Natalie Anderson

/s/Andre Bisasor
Andre Bisasor

**The Court does not find that plaintiffs have set forth a legitimate basis for holding a case management conference at this time. After resolution of the Supreme Court's review of this Court's order on defendant's motion to dismiss, the case will either be resolved or the defendant will be required to file his Answer. The parties would then be required to file a Proposed Case Structuring and ADR Order pursuant to NH Super. Ct. R. 5. Accordingly, the motion for a case management conference is DENIED.**

Amy B. Messer
Honorable Amy B. Messer
January 3, 2025

Clerk's Notice of Decision
Document Sent to Parties
on 01/07/2025