UNITED STATES DISTRICT COURT-DISTRICT OF NEW HAMPSHIRE
CIVIL ACTION NO: 1:25-cv-00251 |BISASOR v. DONAIS, et. al.

# PLAINTIFF ANDRE BISASOR'S RULE 59E MOTION CONCERNING RECUSAL

1. Plaintiff Andre Bisasor respectfully moves this Court, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend the Judgment entered on September 14, 2026 (Doc. No. 109), and the accompanying Order denying the motion for recusal.

## I. INTRODUCTION

2. The Order denies recusal by treating three distinct grounds as if they were a single tactical maneuver. Separating them restores the analysis that Section 455(a) requires and demonstrates that each ground, standing on its own, warrants recusal, and that in combination they compel it.

### A. The NHLA Tenure Is Historical Fact, Not Tactics

3. The first ground rests on the Court's own institutional history. At the time of the events that produced this litigation, the presiding judge served as president and co-chair of New Hampshire Legal Assistance, the organization whose attorney, Elliott Berry, is a witness and whose contemporaneous observations and communications are central to the defamation and breach-of-fiduciary-duty allegations against Craig Donais. That is a historical fact about the judge's own past. It exists whether the plaintiffs said anything about it or not. It cannot be characterized as tactical because the plaintiffs did not create it and cannot make it go away by pleading choices.

4. The Order responds to that historical fact by observing that the judge no longer serves on the NHLA board, that Attorney Berry no longer works at NHLA, and that no one at NHLA discussed the plaintiffs with her while she served. Each of those statements is irrelevant to Section 455(a). The statute asks whether a reasonable, well-informed observer, knowing the facts, would question impartiality. That observer applies the test to the historical alignment between the judge and the organization whose lawyer will testify about the very conduct at issue. The observer does not ask whether the board seat has since been vacated. Appearance created by institutional overlap with the underlying facts is not cured by later resignation. Further, its only recently relative to the facts in complaint that Attorney Berry no longer works there. Moreover, how would Judge Elliott know for certain whether Attorney Berry works still there or whether or when he stopped working there, unless she was still connected to the situation somehow. This raises

more questions than it answers. Similarly, whether anyone discussed the plaintiffs with her directly is not relevant. Her position, as the head of the organization representing the plaintiffs in the same or similar underlying case where the nucleus facts are derived from, establishes an irreparable conflict or at least the appearance thereof. Further, the names of the plaintiffs themselves doesn't have to reach her for the case in general or the issues to have been presented to her as the head of the organization. Monthly or quarterly reports of cases handled by the organization are routinely provided to the head of legal organizations. It is not believable that Judge Elliott received no such reports of what was going on in her organization that she was the head of. Moreover, its not only the names of the plaintiffs but the names of the defendants and their attorneys in the underlying case that are connected and relevant.

5. Furthermore, the First Circuit's Boston's Children First formulation of Section 455(a) does not require a showing of actual bias, actual knowledge, or ongoing office. If it did, every former board member of every organization would be immune from every appearance challenge involving that organization's work, and Section 455(a) would collapse into Section 455(b)(4) and (b)(5). It does not. The temporal frame for the appearance inquiry is the events at issue in the litigation, not the date the recusal motion is decided. Under that correct frame, the judge's past NHLA presidency creates an appearance concern that the Order's present-tense analysis never engages.

6. The Court's brief footnote treatment of the additional NHLA-adjacent connections identified in the recusal affidavit compounds the problem. The affidavit describes Attorney Hilliard's role as chair of the New Hampshire Bar Foundation, which channeled IOLTA funds to NHLA; it describes Attorney Messer's prior association with the Disability Rights Center of New Hampshire and that organization's collaborative work with NHLA (which led to Attorney Berry being placed on Judge Messer's recusal list in NH superior court); and it describes the Berry connection to the underlying facts. The Order acknowledges those materials in a footnote and states that it has considered them individually and cumulatively, but the body of the opinion does not analyze them. The reasonable observer, given those overlapping institutional threads, has more than enough to question impartiality. Silence in the analysis is not analysis.

**B. The Gorham Amendment Reflects Ordinary Sequence of Federal Pleading, Not Judge Shopping**

7. The second ground concerns the addition of Chief Deputy Clerk Karen Gorham as a proposed defendant. The Order presents this as a manipulative attempt to trigger recusal, relying on a truncated version of the timing. The accurate sequence refutes that characterization.

    a. The underlying dispute began in state court, where the initial action was filed. New Hampshire's Superior Court is a limited forum for federal ADA and civil-rights claims against state judicial officers and court staff, and the plaintiffs made the ordinary pleading choice to bring the state-law claims in state court and to reserve the federal claims for the federal forum. That is not tactics. It is the standard division of labor between state and federal courts recognized by parallel-proceeding doctrine.

    b. The action was then removed by the defendants to this Court. Removal changed the forum but did not change the fact that the federal claims against Gorham had not yet ripened as pleadings in this action, because a related federal case in this District already carried the plaintiffs' federal claims involving Gorham. That parallel federal action was still pending when the First Amended Complaint was filed here, and adding Gorham to this case at that time would have created duplicative or first-to-file problems that federal courts routinely disfavor.

    c. In September 2025, after filing of First Amended Complaint, plaintiffs first learned from a communication by Superior Court court administrator, Macy Sherry, that a blocking arrangement affecting plaintiffs' access to state court remained in effect after Gorham's departure from that role. That disclosure identified Gorham specifically and revealed a factual predicate for claims against her that plaintiffs didn't previously know about. Section 455(a) recognizes that recusal grounds may crystallize as new facts emerge; new information about a court employee's specific role in a challenged practice is exactly the kind of post-filing development that a reasonable litigant would act on.

    d. In October 2025, the parallel action with plaintiffs' Gorham-related federal claims was voluntarily dismissed. Only at that point could Gorham be added in this action without duplicative-litigation. Plaintiffs then moved to amend. That sequence is not judge-shopping; it's the ordinary chronology of pleadings catching up with newly disclosed facts and with resolution of parallel proceedings.

8. The Order compresses those four items into a single sentence about tactics. It does not engage the September 2025 disclosure, does not acknowledge the parallel federal proceeding that was live during the earlier amendment window, and does not explain why the plaintiffs' step-by-step pleading choices should be treated as manipulation rather than as prudent litigation practice. Once the sequence is laid out with dates, the tactical characterization has nothing to rest on. Further, Bisasor told Judge Elliott in his notice of intent to file pleadings that he planned to file a motion regarding the parallel proceedings. Bisasor would likely have resolved the Gorham issue for amendment in that hearing prior to filing the motion to amend the complaint. But Judge Elliott closed her ears to the pleas of the plaintiff and blocked him from addressing any of those issues in writing with a case management order that curtailed his ability to file until after the motion to dismiss was ruled on. Bisasor also asked for a case management hearing where he could explain these issues, but Judge Elliott blocked him from speaking to explain in a hearing. She blocked him from speaking in a hearing on the motions to dismiss and the motions to amend, and even his request for hearing under the ADA to explain why a hearing on these other motions was required due to his ADA issues. Judge Elliott blocked them all. Then she turns around and insinuates bad faith without allowing Bisasor any chance to explain or to address any concerns of the court. But having a hearing that would discuss Gorham would perhaps appear unseemly and only reinforce the appearance problem, which adds to the inference on why Judge Elliott did not want to hold any hearing at all, whatsoever on anything, ostensibly perhaps because in any of it, Gorham could be raised and Judge Elliott perhaps wanted to maintain her ability to protect her employee from suit? The fact this is even on the table satisfies at least the appearance problem. A judge who is conflicted regarding her employee would act in a way that is similar to how Judge Elliott has here acted. There would be no way to distinguish between a judge who is conflicted and one who has not, based on the very same actions/approach undertaken by Judge Elliott. A non-conflicted judge would at least have held a hearing somewhere in there. Judge Elliott was ostensibly incentivized to not hold any hearing even where it made no logical or reasonable sense to deny a hearing requested on multiple issues on multiple valid grounds. Whether she acted on that incentive is a matter for debate, but what is not debatable is that the incentive existed and this serves as grounds for recusal.

9. The Order also mischaracterizes why Gorham was not named earlier. The plaintiffs did not withhold Gorham to preserve a recusal argument for later; they could not have brought the federal claims against her in state court, and they could not properly have added her to this case while the parallel federal action was pending (which was only dismissed in October 2025, after the first amended complaint had long been filed in the summer of 2025 which primarily was more focused on addressing removal under Royal Cannin in order to obtain remand). Those are structural constraints of federal practice, not litigation strategy.

**C. The Judge's Ruling On Her Own Subordinate Is Itself The Appearance Problem**

10. The third ground is the one the Order does not confront at all. The proposed defendant is the Chief Deputy Clerk of the very court over which the judge presides. When a judge is asked to decide whether the appearance test is satisfied with respect to naming her own subordinate court employee as a defendant, the very act of adjudicating that question is what the reasonable observer scrutinizes. A protective ruling deepens the appearance problem; an exposing ruling raises its own concerns. Section 455(a) does not permit the judge to resolve that dilemma by attacking the plaintiff's motives.

11. This is why the presiding judge previously recused in a materially similar case in which Gorham was named among the defendants. That earlier recusal is inconsistent with the ruling here, and the Order's attempt to distinguish it is circular: it uses the merits ruling on the amendment, that adding Gorham is manipulative, to justify the recusal ruling, that appearance is not implicated. That reverses the proper order. Recusal should be decided first, on the record as a whole and with attention to appearance; the amendment ruling should then follows in front of whichever judge presides. The Court's sequencing collapses the two inquiries in the direction that favors continued jurisdiction.

12. The Order's characterization of Gorham as a peripheral figure added for tactical purposes further understates the record. The allegations against Gorham arise from her role as Chief Deputy Clerk in the access practices that produced Count 31 and the Case Management Order restrictions that plaintiffs have challenged throughout this litigation. She is not a bit player who could be omitted without loss to the pleading; she is a named actor in the very court-administration practices at issue.

**D. Referral of Reconsideration To Another Judge in Sister District**

13. Because the same objection that requires recusal on the merits also disables the presiding judge from ruling

on the reconsideration of her own recusal, the plaintiffs respectfully request that this motion, insofar as it addresses recusal, be referred to another judge in another sister District for decision (such as Massachusetts or Maine). That is the ordinary practice under In re Cargill and its progeny where the appearance concern goes to the recusal decision itself. Referral avoids compounding the appearance problem and preserves the integrity of the reconsideration ruling for appellate review. Judge Elliott as chief justice of the NH Federal court cannot refer this to a judge below her at the same court. Moreover, the same grounds for recusal would apply to every judge in this court, as was confirmed by the full slate of recusals in the prior case involving Gorham.

**E. Standard of Review and Cumulative Effect**

14. Section 455(a) rulings are reviewed for abuse of discretion, but the legal standard governing the appearance inquiry is reviewed de novo. The Order's substitution of a present-tense inquiry for the historical-facts inquiry, its collapse of three distinct grounds into a single tactical narrative, and its silence on the subordinate-protection dimension are legal errors that survive the deferential portion of that standard. Even if any one of the three grounds standing alone might not compel recusal, the correct cumulative analysis under Boston's Children First requires the Court to ask whether a reasonable observer, knowing all of the facts together, would question impartiality. The Order performs neither the individual nor the cumulative analysis in the body of the opinion. On reconsideration, the proper course is to withdraw the recusal denial or, at minimum, to refer the recusal question to another judge for the analysis Section 455(a) requires.

**F. Further Recusal Blind-Spots**

15. The recusal analysis of the Order is replete with facially serious blind-spots because it disposes of a Section 455(a) motion by talking past the strongest factual predicate rather than confronting it.

16. The Court frames the motion as resting on three grounds: her prior board membership at NHLA, the presence of Gorham in the proposed second amended complaint, and the plaintiffs' complaints about the Case Management Order. That framing itself omits key allegations from the recusal motion and its 191-paragraph affidavit, including the alleged connection between the judge and defendant Berry, the Hilliard-NHLA Bar Foundation IOLTA funding link, and the pattern of adverse rulings against ADA-related requests, among other things. Footnote 9 says the Court has considered these bases individually and

cumulatively, but the body of the opinion does not analyze them; the affidavit is treated as background rather than as evidence.

17. On the NHLA ground, the Court applies the correct Section 455(a) reasonable-observer standard from In re United States and Snyder but performs the analysis at a level of generality that would immunize almost any past board service. She writes that she did not perform work on behalf of NHLA clients, did not monitor the attorney relationship, was never told about the plaintiffs by anyone at NHLA, and that NHLA and its attorney no longer have any stake. Whether any or all of those points are true is not established. How would Judge Elliott know if NHLA has any stake or consider itself to have any stake? If the case proceeds, and witnesses were called, both NHLA and Attorney Berry would be called in the case. This by itself is a stake and one that continues. Further, in reviewing the case, including the complaint, Judge Elliott has to judge whether the NHLA's statements about Craig Donais provide grounds for the claims to be plausible. This means Judge Elliott must pass upon or evaluate statements her own organization made at the time she was the head of the organization. This cannot be done impartially.

18. Yet Section 455(a) does not require actual bias or actual knowledge; it asks how the objective, well-informed observer would view the appearance. The Order does not discuss whether that observer, knowing that the same NHLA lawyer represented the plaintiff in a matter that will now be litigated in front of a former NHLA president and co-chair as a foreseeable witness, would question impartiality. That is the classic Boston's Children First inquiry, which the Court cites but does not apply. This is a strong appellate issue because Section 455(a) rulings are reviewed for abuse of discretion but with a de novo overlay on the legal standard, and the failure to analyze appearance rather than actual bias is a legal error.

19. On the Gorham ground, the Order treats the request to add Gorham as a manufactured hook for recusal rather than examining what the underlying allegations against Gorham would look like to a reasonable observer. The Court's own recitation acknowledges that she recused from a prior case naming Gorham with 13 other defendants. The order does not explain why a recusal she found necessary in one case involving Gorham can be avoided in another case that seeks to add Gorham on materially similar allegations. The Court's answer is that the plaintiffs are trying to judge shop by adding Gorham now, but

that answer is circular because it assumes the merits of the amendment ruling that has not yet been made when the recusal is decided. The proper sequence under In re Cargill and Rodriguez-Hernandez is to decide recusal on the record as a whole, including proposed amendments, and to consider whether that record raises objectively reasonable doubts. Any appeal on this ground would be strong because the Court's reasoning is legally inconsistent with its own prior recusal in the parallel case.

20. The Order treats the Case Management Order and adverse rulings under Liteky as no more than dissatisfaction with judicial rulings. That is a serious blind-spot because the plaintiffs' recusal papers alleged more than rulings; they alleged extrajudicial connections through NHLA, IOLTA, Berry, and Messer's prior employment at the Disability Rights Center of New Hampshire. The Order collapses the extrajudicial-source doctrine into the ruling-dissatisfaction cliché without adjudicating whether the network of institutional ties, aggregated, would move a reasonable observer.

21. Further, Order's use of the plaintiffs' prior recusal motions in other cases as evidence of judge-shopping is analytically weak. Section 455(a) does not permit a court to draw inferences of bad faith from a litigant's motion history in unrelated cases without a specific showing that the current motion is objectively baseless. Citing Bisasor I, Bisasor II, and the Middlesex Superior Court motion as a pattern effectively punishes protected advocacy without engaging the merits of the current motion. The In re Kansas Public Employees Retirement System quotation about tactical motives assumes what it needs to prove. Furthermore, the Court ignores the fact that more than one justice in the New Hampshire Supreme Court did in fact grant self-recusal in light of recusal motions brought by the plaintiff including Justice Anna Hanz Marconi and Justice Gordon MacDonald[1]. Judge Kissinger in Merrimack Superior Court, who denied recusal, was later discovered to be close friends with Craig Donais and/or Craig Donais' wife, with out of court communications occurring especially during holidays. This was discovered later by plaintiff, through a right

[1] Note: Both Justice Marconi and Justice MacDonald have been found to have committed serious misconduct resulting in either criminal charges or JCC finding of misconduct requiring resignation. It should also be noted that both justices gave into the temptation to cover and protect a subordinate, in the case of Justice MacDonald, or a loved one, in the case of Justice Marconi. Justice MacDonald's recent example of violating the ethical code because of an attempt to protect an employee of the court shows that even a Chief Justice of the highest court in NH is not immune to such issues. This is the same kind of issue that Judge Elliott summarily dismisses as not rising to the level of an appearance if not actual bias problem in this case as she must have natural incentive and desire to protect her "right-hand" man employee.

to know request answered by the Department of Justice, thus revealing that both Judge Kissinger and Craig Donais hid these connections from the plaintiff at the time the case was going on and when the recusal motion was filed and denied. Note: This is something that is ripe for review by the JCC for accountability purposes.

22. These examples that Judge Elliott references are thus examples that show that the recusal motions were valid and in good faith. But Judge Elliott undertook no such diligent analysis of underlying facts to ensure that her references weren't superficial or meretricious.

23. Note: The problem of judicial accountability and ethics has been notable problem in New Hampshire. From Superior Court Judges, Judge Patricia Coffey to Judge Paul Moore to Judge Julie Introcaso, and Supreme Court Justices, Judge Anna Hanz Marconi and Judge Gordon MacDonald[2], the frequent incidents of serious judicial misconduct in New Hampshire have been breathtaking. This leads to the inference that there's something systemic about the recurring judicial ethics problems in New Hampshire. Arguably, the climate for judicial accountability appears to be simply too lax, where too often judges in New Hampshire do not take bias, conflict and ethics issues seriously. Some seem quick to brush off or dismiss real ethics or appearance concerns and they then later run into serious problems because of this.

24. The NH Federal Court, which draws from the same pool of lawyers and jurists in New Hampshire that get appointed to state courts, appears to have a similar climate of laxity when it comes to taking these issues seriously. There are, however, some notable counter examples in New Hampshire such as Judge Andrew Schulman, who recused himself from the same case in Merrimack Superior Court (which Judge John Kissinger took over for) citing his past association with Craig Donais. Although he felt he could rule fairly in the case, he stated the appearance of conflict issue was enough to warrant recusal and gave the parties a chance to waive it, which they did not. This is the standard that judges should follow in New Hampshire. Judge John Kissinger had a similar conflict with Craig Donais but did not recuse. The plaintiff cannot be

[2] Note: Justice MacDonald recused himself because he was the head of the organization that reviewed the underlying case when he was the Attorney General of the state of New Hampshire. Justice MacDonald did not argue that he did know the plaintiffs or that he did not personally review their case or that he no longer worked there, etc., all of which Judge Elliott has effectively argued in her denial of recusal. Arguably, if Justice MacDonald is disqualifiable, then so is Justice Elliott.

faulted for raising recusal concerns for a judge who later was discovered had past and current associations with Craig Donais and his wife.

25. It should be noted here that this case and related cases in New Hampshire all relate to or surround Craig Donais and Russell Hilliard who are highly connected figures in the legal and political world of New Hampshire. Most of the conflicts stem from the involvement of these well-connected individuals in these cases. For example, Judge Patrick Donovan of the New Hampshire Supreme Court had a similar association with Craig Donais but did not recuse from the underlying case. Judge David Anderson of the Hillsborough Superior Court, another counter-example, had a conflict with Russell Hilliard and he recused from the underlying case; while Judge Amy Messer had a conflict with Russell Hilliard but not only did she not disclose it but she did not recuse, on top of the fact that Elliott Berry was on her recusal list but she did not recuse when Elliott Berry's statements became central to the evaluation of the claims in the case, which at point she claimed that Berry posed no conflict because her conflict arose from a while ago (if that is so, then why was he put on her current recusal list?

26. This shows the arbitrariness of how recusal standard is applied by different judges dependent only on whether they had enough incentive to stay on the case and to control its outcome, which in Messer's case her husband Jack Ruderman had an attorney-client relationship with Russell Hilliard for decades where they both are key influencers of the local Rotary Club of Hopkinton and where Ruderman control key positions on the Hopkinton town government and where Hilliard is counsel for Hopkinton and Ruderman for a small tight-knit affluent town of about 4000 people in which both Messer and Ruderman reside together, own property together, hobnob with influential figures like Hilliard, and host political parties at their home, and benefit from Town's resources and benefits). Messer hid all of these associations and even after they were discovered and brought to her attention she refused to even rule on these damaging recusal concerns, which by itself indicated a guilty conscience. Under any normal circumstances, this would result in recusal. But not so in New Hampshire, or at least with these judges in question. Judge Messer is able to sit with a straight face and refuse recusal without batting eye. This is an outrageous example of bias, conflict and appearance if not actual partiality and conflict, and it undermines confidence in the judiciary. Justice Marconi

similarly sought to deny that anything was wrong in her using her judicial position to protect her husband from an investigation, but also sought to hide it. It resulted in criminal charges and abuse of office charges, resulting in her stepping down from her seat, and just recently the JCC announced judicial misconduct charges that further threaten to disbar her from the practice of law. Why did Justice Marconi think it was acceptable to do this kind of thing? Whatever the reason, it appears Judge Messer thinks it acceptable to hide her husband's conflict with Russell Hilliard. Further, why did Justice MacDonald think it was acceptable to cover for or protect his employee in an unethical way? Whatever the reason, it appears Judge Elliott also thinks it acceptable to protect her key employee in a way that is blatant and thinks no one will care or notice? What is it about the way judges in New Hampshire think, or socialized, or trained, or mentored, that results in these recurring judgment errors, blind-spots or outright ethical missteps? Whatever it is, the citizens of New Hampshire are tired and frustrated by these outrageous developments/trends and are desiring a new day and culture of accountability for judges, as reported by various newspapers in New Hampshire. See news articles attached.

27. The recusal standards in New Hampshire thus appear to be malleable and/or not consistently applied. A plaintiff such as Bisasor cannot be expected to perfectly know how to apply the recusal standards in New Hampshire when the judges themselves apply it arbitrarily and capriciously regarding the same two sources of extra-judicial conflict, namely Craig Donais, Russell Hilliard or involvement in the underlying case or with key witnesses or attorneys thereof. Bisasor has raised recusal concerns in good faith, and he has been vindicated in some of these instances, as noted above.

28. Here, Bisasor has valid extra-judicial grounds for raising recusal concerns. This cannot be held to be in bad faith in any way. The references to some of the clearly draconian rulings only serve to support the main inference of conflict or bias from the extrajudicial sources of conflict. If a judge is conflicted, we would logically expect for the bias to show up or creep-in somewhere or at some point. The rulings (especially on basic procedural issues that don't deal with the merits but which determines beforehand what is allowed in or to be discussed for the review of the merits, or who is allowed to speak or be heard, or whether the parties are treated even-handedly or with preferential treatment) are where they can creep-in, and the

relevant case law, including from the US Supreme Court, allow problematic unfair or biased rulings, or a pattern thereof, to serve as further evidence of pervasive bias for purposes of disqualification. Judge Elliott has mischaracterized the purpose of Bisasor's references to her unfair biased rulings.

29. Further, seeking to add Gorham cannot serve as bad faith because adding Gorham makes logical sense from a judicial economy standpoint, in terms of bringing all related defendants in one case in one forum, especially after the related case against Gorham was voluntarily dismissed in Maine, along with all other defendants in that case, in order to correct a pleading deficiency that the Maine court identified and instructed plaintiff to fix in order to proceed and with a hard deadline to do so in that court. The voluntary dismissal was done in October 2025 in response to the Maine court-ordered deadline to amend the complaint to fix the defect or otherwise suffer dismissal. Plaintiff needed more time to fix the defect in terms of meeting the pleading standards. Only after that case was voluntarily dismissed in October 2025 could plaintiff seek to add Gorham to this case, which was sought in March 2026. However, plaintiff raised the Gorham conflict in administrative complaint writings to Judge Elliott before that, to which Judge Elliott did not respond (but to which she was required to respond as Chief Justice of the NH Federal Court).

## II. RECUSAL ON THE CORRECTED FACTUAL RECORD

### A. The Statutory Question and Order's Actual Reasoning

30. Section 455(a) requires disqualification where a judge's impartiality might reasonably be questioned. Section 455(b) separately identifies specified circumstances, including personal bias or personal knowledge of disputed evidentiary facts. The Order expressly states the objective standard and concludes that a fully informed reasonable observer would not question impartiality. It also states that the asserted grounds were considered individually and cumulatively. Order at 9 n.9, 10, 14.

31. The reconsideration issue is whether the stated evaluation adequately distinguishes past institutional associations from a current court-employee relationship and whether the finding of strategic manufacture rests on a complete factual premise. Bisasor requests correction of a manifest factual or legal error. Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925 (1st Cir. 2014).

32. Bisasor seeks reconsideration of the recusal ruling because its account of the chronology omits information already presented before judgment. The September 2025 communication supplies one explanation the

Order found missing. Page 12 states that, without discovery, it was difficult to imagine what facts Bisasor could have learned about Gorham during the related litigation, and that Bisasor had not attempted to explain the point. The record contains a concrete explanation. Document 108, paragraphs 177–179, at pages 54–55, identifies a September 12, 2025 email exchange with Maicie L. Cherry, the Superior Court E-Filing Assistant Manager. Document 104-1, paragraphs 1059–1061, at pages 236–237, describes the same exchange.

33. Bisasor's affidavit quotes Cherry as stating: "As the past Superior Court Administrator, Karen Gorham told you, we would not be taking your calls." Doc. 108, ¶ 177. The proposed complaint describes that communication as confirmation that Gorham's earlier direction was still being invoked after her departure from state-court employment. The significance is that an identified communication outside formal discovery supplied information about the continued operation of the challenged practice.

34. That communication postdates both the June 3, 2025 commencement of this action and the July 29, 2025 first amended complaint. It was nevertheless identified in the proposed pleading and recusal affidavit before the September 14, 2026 judgment. Bisasor relies on the Court's failure to account for that existing submission. The distinction is material. Bisasor already knew of Gorham and had asserted claims against her in another action. The September email therefore does not establish that Bisasor first learned of every alleged act in 2025. It identifies later information about the continued use of an earlier directive. Whether that information ultimately proves unlawful conduct is a separate question from whether Bisasor explained any source of additional information at all.

35. The Order could find that this later information was insufficient to justify amendment or that the timing remained inadequately explained. But those would be different findings from saying that Bisasor had not attempted to identify information learned without discovery. The categorical statement should be corrected before it supports the conclusion that the amendment and recusal request were a contrived effort to avoid an impending decision.

36. The separate action also belongs in that chronology. The public docket for Bisasor v. New Hampshire Judicial Branch, No. 1:24-cv-00360, reflects that the action remained pending when this case began and

when Document 13 was filed; the notice of voluntary dismissal and closing order are dated October 2, 2025. Although judges from Maine were assigned after the New Hampshire judges recused, the case retained its New Hampshire docket and filing arrangements. The pending case was not a circumstance created after the present dismissal motions became ready for decision.

37. Bisasor's explanation is that Bisasor sought to avoid duplicating claims already pending in that action. This is a litigation-management reason for not placing the same proposed defendant in two actions at once. The Court should not make an inference that the omission had no possible legitimate explanation. Bisasor requests consideration of the actual sequence, including later information and the previously pending case.

## B. The Appearance Question Is Distinct From Proof of Personal Hostility

38. Section 455(a) asks whether impartiality might reasonably be questioned. The First Circuit's informed-observer test requires consideration of the relevant facts, not proof of the judge's subjective state of mind. In Re United States, 441 F.3d 44 (1st Cir. 2006). The issue here is whether the appearance analysis rests on a materially incomplete account of those facts.

39. Bisasor's institutional concern is that Gorham serves as Chief Deputy Clerk in this district while Bisasor seeks consideration of claims concerning her alleged conduct in her earlier state-court position. Those are distinct roles. The concern is the relationship between the present court administration and the person whose proposed liability the Court is being asked to evaluate.

40. The Order answers in part that it is deciding amendment, not the merits of an admitted claim against Gorham. But the amendment decision expressly evaluates the proposed claims' legal viability and my purpose in presenting them. That does mean that the appearance inquiry cannot be answered solely by saying that Gorham has not yet become a party. Bisasor asks the Court to evaluate the actual function it performed and the institutional relationship involved.

41. The corrected September chronology bears directly on that evaluation. If the claim was rejected as a tactical maneuver because the record supposedly disclosed no additional information, the omission affects both the bad-faith finding and the explanation for deciding the Gorham-related issues without reassignment. The same unsupported factual premise should not reinforce itself across the amendment and recusal rulings.

42. The NHLA issue is separate and predates the effort to add Gorham. Document 108, paragraphs 2–4, describes NHLA's representation of us and Judge Elliott's governance role during the relevant period. Berry's involvement is concrete: he is identified in Document 104-1, paragraph 55, and his account of the Donais consultation appears in Document 104-3, Exhibit 24, at PDF page 71. Bisasor's request concerns the relationship of that institution and material witness to this dispute.

43. The Order states that she did not handle client matters or receive information about plaintiffs. That is not the same question as whether all the verified circumstances, considered together, create a reasonable appearance concern. Bisasor requests that distinct assessment.

44. The prior recusal also should receive its proper significance. The Bisasor II docket records Judge Elliott's recusal on November 20, 2024, followed by referral after all district judges recused. The reasons were not disclosed. Bisasor asks whether any material circumstances from that prior relationship persist here.

45. The discussion of Bisasor's other recusal requests at page 13 likewise should distinguish the fact of a request from a finding that the request was abusive. Repeated requests do not establish that each lacked a factual basis, particularly when the asserted relationships involve recurring participants in related litigation. Bisasor requests an assessment of the specific ground, supporting record, and disposition of any prior request used to establish tactical use in this case. Consider it from Bisasor's standpoint. He enters into the world of New Hampshire's small close-knit almost incestuous legal community, he sees all these hidden relationships becoming exposed after the fact, he sees some judges recusing because of the defendants and attorneys in the case, he sees several judges being exposed for hidden bias and misconduct including criminal charges and resignations from the highest court. As a black man in New Hampshire, already 95% white, he sees the impact of race on a number of issues including in the justice system that's been reported in local newspapers and as a leader in the Manchester NAACP. Should he simply see benign impact when a Chief Justice of a federal court recused from one case but refuse to recuse from another with the same sources of disqualification, when she "goes to bat" for or protect her employee from being added to a lawsuit? And makes several harsh unfair rulings only against plaintiffs but never against the defendants or their attorneys? When he sees her constantly chiding and finding fault with every little thing the pro se African American

plaintiffs do. Is he supposed to just chalk it all up to an unfortunate but misleading coincidence? Put yourself in his shoes. What would you think if the shoes were on the other foot? What if this was just after post-Nazi Germany and a Jewish plaintiff experienced the same exact situation with German judges in a small German town? What would that Jew think? Would you say that the Jewish plaintiff was overthinking it? And how would a reasonable objective observer be expected to see it?

**C. Requested Remedy is Specific**

46. Bisasor asks the Court to decide the corrected recusal issue before resolving the contested substance of the remaining post-judgment requests. That is a request about the proper decision-maker. Bisasor further requests non-deliberative facts materially bearing on Gorham's participation in administering this case.

47. Moreover, although ordinary adverse rulings remain subject to the limits explained in Liteky v. United States, 510 U.S. 540 (1994), the question is whether the documented circumstances here satisfy § 455 on their own. Alternatively, Bisasor requests an express ruling on the September communication, the significance of the previously pending action, and the distinct institutional relationships discussed here. Those rulings would identify what remains disputed and permit review of the actual reasons for the decision.

**D. Recusal Must Rest On Accurate Objective Record**

48. Bisasor also seeks alteration of the recusal disposition incorporated into Document 109. Section 455(a) asks whether impartiality might reasonably be questioned. The error Bisasor raises here includes the treatment of the record supporting their application.

49. The NHLA issue concerns the judge's governance role during the organization's representation of us and Berry's role in the underlying events. Doc. 108, ¶¶ 2–4. The Order states that the judge did not work on clients' matters, monitor client relationships, or receive information about plaintiffs. Order at 10.

50. The appearance question is whether the documented institutional relationship, Berry's identified involvement, and the other circumstances reasonably affect the appearance of impartiality. Berry's contemporaneous notes, Doc. 104-3 at 71, explain why he is a material source of information. Bisasor requests assessment of that actual role.

51. The chronology also requires precision. Document 108, paragraphs 9–11 and its attached November 6, 2025 letter, show that Bisasor raised the NHLA/Berry concern before the January 30 notice of intended

motions and the April recusal motion. An administrative letter is not necessarily a properly filed recusal motion. It nevertheless contradicts an inference that this particular concern was first devised when dismissal became imminent.

52. As to Gorham, the concern is adjudication of a request to sue the district's current Chief Deputy Clerk for alleged conduct in her former state-court role. An accusation of tactical joinder does not, without considering the underlying relationship and claim, answer whether the decisionmaker's impartiality reasonably appears in question.

53. The Court relied on the absence of discovery to discount the possibility that Bisasor learned more about Gorham's involvement. Order at 12. Formal discovery is not the only possible source of information; public records and events in litigation may supply it. Bisasor requests reconsideration of the inference drawn from the absence of discovery.

54. The Order also inferred a lack of motivation to pursue Messer from nonservice. Document 29 reflects that Bisasor sought clarification concerning service and summons procedure. The point is that a documented effort to obtain procedural direction bears on the inference of deliberate inaction. That effort should be weighed before nonservice becomes evidence that the related proposed claim was merely tactical.

55. The prior district-wide recusals in Bisasor II occurred for undisclosed reasons. Bisasor requests application of the present record to the objective standard, including the distinction between merely deciding joinder and making adverse findings about the motives for seeking to sue a senior court employee. Administrative efficiency cannot substitute for the statutory inquiry.

## III. CONCLUSION

56. In sum, the question is whether this particular evaluation of Judge Elliott, in this particular institutional setting, requires a different judge under the objective statutory standard. Bisasor thus challenges the underlying rulings on their own merits and the institutional circumstances under § 455(a).

Respectfully submitted,
/s/ Andre Bisasor
Andre Bisasor

October 13, 2026

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served to the defendants in this case.

/s/ Andre Bisasor
Andre Bisasor

New Hampshire Bulletin

THE BULLETIN BOARD

# MacDonald resigns from NH Supreme Court amid judicial misconduct allegations

BY **WILLIAM SKIPWORTH** - SEPTEMBER 15, 2026 1:41 PM




Supreme Court Chief Justice Gordon MacDonald (left) presents to Executive Councilors Joseph Kenney and John Stephen on July 24, 2025. (Photo by Ethan DeWitt/New Hampshire Bulletin)

Chief Justice Gordon MacDonald resigned from his position on the New Hampshire Supreme Court Tuesday, the governor's office announced, amid allegations of judicial misconduct and an unexplained medical leave.

In October, New Hampshire Public Radio reported that Dianne Martin, a MacDonald ally, had received nearly $50,000 by completing an unusual personnel maneuver. Martin had been MacDonald's chief of staff in his previous role as New Hampshire's attorney general. As Supreme Court chief justice a few years later, MacDonald and his colleagues recruited Martin to lead the court's administrative office. Before she accepted the role, however, Martin was laid off from state government for about 48 hours before being immediately rehired into her new role. The highly unusual move, which was orchestrated by MacDonald, according to NHPR's reporting, allowed her to collect almost $50,000 for unused vacation, sick time, and other benefits. State policy typically prohibits employees from receiving any accrued benefits when transitioning between roles.

Also on Tuesday, the New Hampshire State Judicial Conduct Committee, which had been investigating the issue since November, reported that MacDonald admitted to violating three provisions of the Judicial Code of Conduct. According to the Judicial Conduct Committee, MacDonald "failed to avoid favoritism with respect to the removal of Dianne Martin," "failed to act in a manner that promotes public confidence in the impartiality of the judiciary," and "failed to avoid the appearance of impropriety." The committee ruled that formal disciplinary measures were appropriate but because MacDonald resigned, "no additional disciplinary action is available."

In his resignation letter, MacDonald wrote: "I believe this is in the best interests of the New Hampshire Judicial Branch. I accept responsibility and accountability for my conduct." He wrote in a separate statement that he takes "full responsibility for my shortcomings," and that "to maintain the integrity of the judicial branch and to avoid the protracted and disruptive spectacle a public hearing would cause to the judicial branch and its dedicated employees, I have agreed to resign my position."

Meanwhile, MacDonald has been on medical leave since July. Neither MacDonald nor the judicial branch provided an explanation for the leave.

MacDonald, 64, was appointed to the court by former Gov. Chris Sununu in 2021. He was also the state attorney general from 2017 to 2021. He's a Dartmouth College and Cornell University alum.

His resignation opens a seat on the bench for Ayotte to nominate his successor. Unless she loses November's general election before she can announce and have her nominee confirmed, this will be her third pick for the Supreme Court. In March, Ayotte appointed Daniel Will to the court and in 2025, she appointed Bryan Gould.

# Judicial misconduct charges filed against former N.H. Supreme Court justice criminally convicted over chat with governor

Former judge Anna Barbara Hantz Marconi called the charges "unnecessary." "I acknowledged that violation in person and in writing," she said in a statement.

**By** Steven Porter Globe Staff, Updated August 6, 2026, 1:09 p.m.



New Hampshire Supreme Court Associate Justice Anna Barbara Hantz Marconi sits with her lawyers at a plea and sentencing hearing at Merrimack County Superior Court on Oct. 12, 2025. She pleaded no contest to a single misdemeanor. DAVID LANE/UNION LEADER POOL PHO/DAVID LANE/UNION LEADER

Anna Barbara "Bobbie" Hantz Marconi, the former New Hampshire Supreme Court justice who was convicted last year of a low-level misdemeanor for having an improper conversation with the governor in 2024 about a pending criminal investigation into her husband, is now facing formal charges of professional misconduct.

New Hampshire's Judicial Conduct Committee announced this week that a three-day hearing will be held in December to assess whether Hantz Marconi's actions violated the Code of Judicial Conduct. The committee has brought two formal charges alleging misconduct based on the judge having broken the law and failed to avoid the appearance of impropriety.

Hantz Marconi, who briefly returned to the bench after her criminal conviction last fall before taking another leave of absence, resigned in February, on her 70th birthday, the

state's mandatory judicial retirement age.

In a statement released by her attorneys, Hantz Marconi said Thursday the newly filed charges are superfluous, since she already acknowledged she violated the rules by failing to recognize how her meeting with then-Governor Chris Sununu might be interpreted.

"I acknowledged that violation in person and in writing. I also said that I would accept a sanction for that violation," she said, expressing dissatisfaction that the committee appears to prefer moving forward with "a trial" anyway. "I am disappointed that I am being subjected to this unnecessary process."

Hantz Marconi said she didn't attempt to influence the attorney general's investigation into her husband, Geno J. Marconi, who ultimately struck a misdemeanor plea deal to resolve allegations related to his former role as New Hampshire Port Authority director.

Her statement also noted some comments Sununu had made to investigators, including the governor's assessment that there wasn't "anything illegal" about their meeting in his office.

Witness interview transcripts that the attorney general's office previously released to The Boston Globe in response to a public records request show that Sununu said he found the meeting with Hantz Marconi to be "awkward" and "a little bit inappropriate."

"I didn't think there was anything illegal about it, but I'm, I'm not a lawyer," he said.

Attorney General John M. Formella, whose team oversaw Hantz Marconi's prosecution, issued a statement last fall recounting how she had sought special treatment.

"That conduct was unlawful and unethical, and it undermines confidence in our criminal justice system," Formella said at the time, describing the situation as "a sad and unfortunate case that reflects a serious breach of the public trust."

The list of witnesses who might have been called to testify, if Hantz Marconi's criminal case had gone to trial, featured big names in state government, including Sununu and Supreme Court Chief Justice Gordon J. MacDonald, who had served as attorney general during Sununu's first several years in office.

In October 2024, shortly after she was indicted, Hantz Marconi said she had consulted MacDonald before meeting with Sununu, and he had signaled the meeting seemed appropriate.

The witness interview transcripts indicate MacDonald told investigators in August 2024 that no one informed him in advance that Hantz Marconi would be meeting with Sununu.

In 2025, MacDonald came under scrutiny over a separate matter involving a senior staffer's nearly $50,000 payout. Amid the heightened attention, the Supreme Court used a no-bid contracting process to hire a prominent GOP political operative to handle strategic communications and information-sharing with the public, New Hampshire Public Radio reported.

Last week, the New Hampshire Supreme Court announced MacDonald would immediately take a medical leave of absence, without disclosing additional details.

It's not immediately clear what disciplinary actions the Judicial Conduct Committee might take against Hantz Marconi beyond a reprimand, since she is no longer eligible to serve as a New Hampshire judge, on account of her age. The committee operates separately from the state's attorney discipline system.

---

Steven Porter can be reached at steven.porter@globe.com. Follow him @reporterporter.

OWN A BUSINESS? EXPAND YOUR REACH AND GROW YOUR BUSINESS BY BECOMING AN UNDERWRITER ON NHPR.

# A former N.H. judge pleads guilty to tampering with case files; given a suspended sentence

nhpr News from New Hampshire and npr

Support



Todd Bookman / NHPR

Julie Introcaso (R) speaks with her attorney Michael Delaney (L), a former state attorney general, during her sentencing.

A former circuit court judge will avoid serving a jail sentence after pleading guilty to

NHPR
The World

*Get NHPR's reporting about politics, the pandemic, and other top stories in your inbox — sign up for our newsletter today.*

Julie Introcaso, 57, pleaded guilty on Monday to two counts of tampering with public records, as well as a charge of submitting false statements. She was accused by prosecutors of using Wite-Out correction tape to alter a previously signed court document in a family court matter in which she was friends with an assigned guardian ad litem.

Inside the same Nashua courthouse where Introcaso previously sat on the bench, Judge Charles Temple said Introcaso's actions had "eviscerated trust" people hold in the legal system. Under the terms of her plea agreement, Introcaso was given a 12-month jail sentence, with all of that time suspended with good behavior, as well as 100 hours of community service.

Introcaso was allowed to use an Alford plea, a legal procedure in which she did not admit to the facts of the case, but acknowledged that prosecutors had enough evidence to achieve a guilty verdict.

State prosecutors said Introcaso, who was appointed to the bench in 2012, oversaw a child custody case despite having a friendship with a lawyer who was serving as a guardian ad litem in the matter. During that case, Introcaso signed off on rulings related to the guardian ad litem's fees and method of payment.

Introcaso eventually recused herself from the case, but the Judicial Conduct Committee then opened an investigation into the matter after receiving a complaint from Robin Partello, one of the parties.

During the committee's ongoing investigation, Introcaso is alleged to have taken the court file from the custody case into her private chambers, where she altered the court orders with Wite-Out.

Introcaso initially denied the claims when they were brought forward by the Judicial Conduct Committee, but later agreed to resign. Under the terms of her resignation, Introcaso was billed nearly $75,000 for the cost of the investigation.

In court Monday, Judge Temple permitted Partello, who was involved in the underlying

NHPR
The World

"My confidence in the judiciary is pretty low at this point," Partello told the court. "And I have a hard time trusting any court official, at this moment, and that's unfortunate. But that's the work of Julie Introcaso."

Partello asked the judge to impose a jail sentence on Introcaso, which he declined to do, noting that she had already lost her income, retirement plan, career and reputation.

Tags NH News Nashua



## Todd Bookman

As a general assignment reporter, I pursue breaking news as well as investigative pieces across a range of topics. I'm drawn to stories that are big and timely, as well as those that may appear small but tell us something larger about the state we live in. I also love a good tip, a good character, or a story that involves a boat ride.

See stories by Todd Bookman

## Latest Stories



Politics

WATCH: 2nd Congressional District candidate forum with Goodlander and Williams



NH News

Audit finds staffing struggles, ICE detainees, stretching Berlin prison

NHPR
**The World**

The Telegraph

# Former Nashua judge disbarred

By Damien Fisher - Staff Writer | Jul 7, 2018

CONCORD – Paul S. Moore, the former Nashua District Court judge convicted of fraud earlier this year, has been formally disbarred by the New Hampshire Supreme Court.

"In light of the seriousness of the misconduct, the court concluded that (Moore) should be disbarred," the Friday court ruling states.

Moore, 59, of Bedford, who was himself angling for a position on the state Supreme Court before he got caught manipulating the judicial job performance review system in an effort to advance his career, will no longer be able to practice law in New Hampshire in any way.

Moore pleaded guilty in May to one count of felony fraud after he was caught lying on his disability retirement application, which he submitted after he was removed from the bench in the wake of the job performance review investigation.

Moore had been gaming his performance reviews as far back as 2008 in order to advance his career, Assistant Attorney General Jane Young said during the plea hearing, held in the Merrimack County Superior Court in Concord. When he was caught in July 2017 forging positive job performance surveys, Young said, Moore was then trying to bolster his application to serve on the New Hampshire Supreme Court.

Moore was sentenced to 12 months in jail, suspended for two years. He is also required to pay $7,000 in restitution.

The fraud charge stems from Moore's attempt in January to retire from his job by claiming a mental disability. Moore is a U.S. Army veteran who suffered an injury in the 1990s from a parachuting accident. Moore's retirement application states that his mental and physical health began to deteriorate rapidly beginning 15

months prior, or in late 2016. However, in March 2017, Moore submitted an application to serve on the New Hampshire Supreme Court. That application stated that while he dealt with physical issues, he was not impaired from being able to perform his job, according to court records.

If Moore had been able to retire at 59 with a disability retirement, Young estimated he would have taken more than $1 million from New Hampshire taxpayers in pay and benefits.

While serving as a per diem judge in 2008, Moore allegedly forged reviews of his performance, including a review that stated he should be on the high court. After the overwhelmingly positive 2008 reviews, Moore received a full-time position on the bench.

Judges are reviewed in New Hampshire every three years through an anonymous survey system. People who have had business before a judge under review are invited to take an online survey to evaluate the judge.

Moore was removed from the bench in October and escorted out of the Nashua courthouse after an investigation into his 2017 job performance reviews. During the investigation by the New Hampshire Judicial Conduct Committee, Moore admitted to forging positive performance evaluations, and to trying to manipulate the system in other ways. He blamed these actions on his physical and mental deterioration.

"I fostered personal and professional fears that my growing physical and mental symptoms would be detected by others through possible negative judicial evaluations of me," Moore wrote in a letter responding to questions from the committee investigative team.

Moore was notified on July 10, 2017 that he would be given a performance review, and by the morning of July 11, 16 evaluations had been sent into the committee via the online survey program. These reviews contained perfect scores for Moore in every category, according to the statement of charges.

These evaluations were coming in, even though the public notice inviting reviews of Moore had yet to be made public. By July 12, after an e-bulletin went out from the New Hampshire Bar Association News, Moore had dozens of reviews, 80 percent of which were positive.

The unusually high volume, and the disproportionate number of perfect scores, raised suspicions. A September confidential memo to the then Supreme Court Chief Justice Linda Dalianis states that the committee decided to check internet protocol, or IP, addresses to determine the origin of the reviews.

One IP address was responsible for 12 perfect scores, all coming in during times Moore was not serving in court. The IP address was traced to Newport, near where Moore has a vacation home, according to the memo. The memo also alleges Moore was trying to "stuff the ballot" by getting police and probation officers, and landlords who had business in his court to give him favorable reviews.

Moore is still due to appear at a JCC hearing later this month to face charges related to the job performance review forgeries.

The New Hampshire Judicial Performance Evaluation Advisory Committee announced it will work with researchers at the University of New Hampshire to create a more secure system for the surveys to keep them from being gamed in a similar fashion going forward.

Damien Fisher can be reached at 594-1245 or dfisher@nashuatelegraph.com or @Telegraph_DF.

Seacoastonline

PORTSMOUTH HERALD

# Judge Coffey resigns

**Norma Love**

April 21, 2008 | Updated Feb. 8, 2011, 12:36 p.m. ET

CONCORD — Embattled Judge Patricia Coffey resigned Monday after the New Hampshire Supreme Court had suspended her for three years, concluding she was complicit in a fraudulent property transfer and evasive and misleading to investigators.

The 54-year-old Coffey, a Superior Court judge in Rockingham County, has admitted helping shield her lawyer-husband's assets as he was being disbarred three years ago. She said she realized then the state probably would demand that he pay thousands of dollars to cover the cost of investigating him.

A disciplinary committee recommended the court suspend her for three months, without pay, but the high court said that was not enough.

In her letter, Coffey said she was disappointed by the court's decision last week because it emphasized some evidence while ignoring other evidence.

"I have taken responsibility for what I did and I did try to deal honorably and in a forthright manner with counsel for the Professional Conduct Committee and the Judicial Conduct Committee," she wrote. "My regret is that my actions, when I was under extreme emotional duress, may have reflected poorly on the judicial system as a whole and on those people who strive daily to make that system work, and to them, I apologize."

Contacted by phone, Coffey declined to comment further.

Gov. John Lynch had said if Coffey didn't resign, the Legislature should remove her. A bill was filed to do that.

"To ensure the continued faith of the people in our judicial system, its judges must meet the highest standards of ethics and integrity, and follow the law at all times," Lynch said Monday after announcing her departure.

Chief Justice John Broderick, who did not participate in the court's decision to suspend Coffey, said "given recent events, I think she has made the correct decision to step down."

Coffey's husband, John Coffey, was disbarred in 2005 for exploiting an elderly client with dementia. Property he owned with his wife was transferred into a family trust four days before he was notified he had been found guilty of misconduct and would face discipline.

The justices found that Judge Coffey participated in a fraud by transferring the property, disregarded an explicit court order to repay the costs of her husband's disbarment investigation, and was evasive and misleading about her actions.

The court's Judicial Conduct Committee investigates misconduct by judges and recommends punishment. The committee's recommendation for censure and a three-month suspension for Coffey was based, in part, on its conclusion that she had cooperated with the investigation. But the high court said the record showed she was "not completely forthright."

Judge Coffey, a judge since 1991, had told the panel she kept her distance from her husband's professional problems at the time so they wouldn't affect her work as a judge. She said she spoke to him about it only twice, and he seemed "cautiously optimistic" about the outcome. Around that time, she said she had been dealing with stressful family issues and wasn't thinking like a lawyer or judge but like a wife and concerned mother.

In its order disbarring John Coffey, the high court ordered him to pay for the investigation. He replied that he had no job and no property _ it already had been transferred to the trust _ and couldn't pay.

Judge Coffey also said later that the couple had no money to pay. However, the court wrote that the couple did not inform the conduct committee at the time that property had been transferred and that they had received $10,000 from a stock sale.

Seven weeks later, the couple made $176,000 by selling an office condo. She said later that proceeds were spent on living expenses and improvements to their home. Again, the court said, the conduct committee, which was waiting for payment, was not informed.

The court said the Coffeys spent at least $110,000 on improvements after it ordered them to repay the conduct committee.

This was not the first time that she was investigated. In 2006, a special panel investigated a complaint that Coffey dozed off repeatedly during court proceedings.

The panel concluded that she did not actually sleep on the bench, but briefly nodded off. That didn't affect the outcome of any trials or infringe anyone's rights, the committee found. However, as a result, Judge Coffey agreed to seek diagnosis and treatment of any medical condition she might have and to have her courtroom randomly monitored.

letter of resignation

State Rep. Laura Pantelakos said she was relieved to learn of the resignation because it means she and other legislators will not hold hearings Friday that could have led to Coffey's forcible removal from the bench.

"Thank goodness we don't have to go through that," Pantelakos said.

Rockingham County Attorney Jim Reams called "the whole affair very sad for the New Hampshire Judiciary and the state."

"Thankfully, it is over and the state can move on," Reams said. "It is my hope that Gov. Lynch will fill the position quickly, but it is more important to select a qualified individual."

Coffey's husband, John Coffey, was disbarred in 2005 for exploiting an elderly client with dementia. Property John Coffey owned with his wife was transferred into a family trust four days before he was notified he had been found guilty of misconduct and would face discipline.

The justices found that Judge Coffey participated in a fraud by transferring the property, disregarded an explicit court order to repay the costs of her husband's disbarrment investigation, and was evasive and misleading about her actions.

The court's Judicial Conduct Committee investigates misconduct by judges and recommends punishment. The committee's recommendation for censure and a three-month suspension for Coffey was based, in part, on its conclusion that she had cooperated with the investigation. But the high court said the record showed she was "not completely forthright."

Judge Coffey, a judge since 1991, had told the panel she kept her distance from her husband's professional problems at the time so they wouldn't affect her work as a judge. She said she spoke to him about it only twice, and he seemed "cautiously optimistic" about the outcome. Around that time, she said she had been dealing with stressful family issues.

"When I participated in creating the trust, I was not thinking like a lawyer, and certainly not as a judge, but rather I acted as a distraught wife and a concerned mother," she said.

In its order disbarring John Coffey, the high court ordered him to pay for the investigation. He replied that he had no job and no property — it already had been

transferred to the trust — and couldn't pay.

Judge Coffey also said later that the couple had no money to pay. However, the court wrote that the couple did not inform the conduct committee at the time that property had been transferred and that they had received $10,000 from a stock sale.

Seven weeks later, the couple made $176,000 by selling an office condo. She said later that proceeds were spent on living expenses and improvements to their home. Again, the court said, the conduct committee, which was waiting for payment, was not informed.

The court said the Coffeys spent at least $110,000 on improvements after it ordered them to repay the conduct committee.

This was not the first time that she was investigated. In 2006, a special panel investigated a complaint that Coffey dozed off repeatedly during court proceedings.

The panel concluded that she did not actually sleep on the bench, but briefly nodded off. That didn't affect the outcome of any trials or infringe anyone's rights, the committee found. However, as a result, Judge Coffey agreed to see diagnosis and treatment of any medical condition she might have and to have her courtroom randomly monitored.